# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

DENKA PERFORMANCE
ELASTOMER LLC,

          Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY and
MICHAEL REGAN, Administrator,
United States Environmental Protection
Agency,

          Respondents.
_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. _____

U.S. COURT OF APPEALS
RECEIVED
July 10, 2024
FIFTH CIRCUIT

## PETITION FOR REVIEW AND COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

James C. Percy
JONES WALKER LLP
445 N. Boulevard, Suite 800
Baton Rouge, LA 70802
Telephone: (225) 248-2130
jpercy@joneswalker.com

Robert E. Holden
Brett S. Venn
JONES WALKER LLP
201 St. Charles Ave
New Orleans, LA 70170
Telephone: (504) 582-8000
bholden@joneswalker.com
bvenn@joneswalker.com

David A. Super
Jason B. Hutt
Jeffrey R. Holmstead
Britt Cass Steckman
Kevin M. Voelkel
BRACEWELL LLP
2001 M Street NW, Ste. 900
Washington, DC 20036
Telephone: (202) 828-5800
david.super@bracewell.com
jason.hutt@bracewell.com
jeff.holmstead@bracewell.com
britt.steckman@bracewell.com
kevin.voelkel@bracewell.com

*(counsel cont'd)*

Jeffrey L. Oldham
BRACEWELL LLP
711 Louisiana Street, Suite 2300
Houston, TX 77002
Telephone: (713) 223-2300
jeffrey.oldham@bracewell.com

*Counsel for Petitioner Denka Performance Elastomer LLC*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

- Denka Performance Elastomer LLC ("DPE") (Petitioner). DPE is a privately owned limited liability company formed under the laws of the State of Delaware, headquartered in LaPlace, Louisiana, and authorized to do business in the State of Louisiana. DPE owns and operates a manufacturing facility in LaPlace, Louisiana that produces Neoprene by utilizing chloroprene, a chemical regulated under a Clean Air Act rule promulgated by EPA that is relevant to this action. DPE's membership interests are held by Denka USA LLC (whose ultimate parent is Denka Company Limited) and Diana Elastomers, Inc. (whose ultimate parent is Mitsui & Co., Ltd). Denka Company Limited and Mitsui & Co. Ltd. are each Japanese companies listed on the Tokyo Stock Exchange.

- BRACEWELL LLP (Counsel for Petitioner)

- David A. Super (Counsel for Petitioner)

- Jason B. Hutt (Counsel for Petitioner)

- Jeffrey R. Holmstead (Counsel for Petitioner)

- Britt Cass Steckman (Counsel for Petitioner)

- Kevin M. Voelkel (Counsel for Petitioner)

- Jeffrey L. Oldham (Counsel for Petitioner)

- JONES WALKER LLP (Counsel for Petitioner)

- James C. Percy (Counsel for Petitioner)

- Robert E. Holden (Counsel for Petitioner)

- Brett S. Venn (Counsel for Petitioner)

- United States Environmental Protection Agency (Respondent)

- Michael S. Regan, Administrator, United States Environmental Protection Agency (Respondent)

- United States Department of Justice, Environment and Natural Resources Division, Environmental Enforcement Section (Counsel for Respondents)

- Steven D. Shermer (Counsel for Respondents)

- Davis H. Forsythe (Counsel for Respondents)

- Daniel S. Smith (Counsel for Respondents)

- Hannah L. Frazier (Counsel for Respondents)

- Scott Cernich (Counsel for Respondents)

- Heather Gange (Counsel for Respondents)

- Brandon N. Adkins (Counsel for Respondents)

Date: July 10, 2024

*/s/ David A. Super*
David A. Super

***Counsel for Petitioner***
***Denka Performance Elastomer LLC***

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

TABLE OF AUTHORITIES ............................................................................... iv

TABLE OF EXHIBITS ..................................................................................... vii

NATURE OF THE ACTION ............................................................................... 1

PARTIES ............................................................................................................. 6

JURISDICTION AND VENUE ........................................................................... 7

BACKGROUND ................................................................................................. 7

    I.      The Final Rule. ................................................................................. 7

    II.     Regulatory Framework For Approving Extensions. ......................... 10

    III.    LDEQ Authority To Grant Extensions. ............................................ 12

         A.     Expressly delegated authority pursuant to Part 63, Subpart E. .................................................................................. 12

         B.     Automatic authority pursuant to approved permitting program. ..................................................................................... 13

    IV.    DPE's Extension Request And LDEQ's Approval. ........................... 15

    V.     EPA's Amendment Of Section 63.507 And Rejection Of LDEQ Extension. ....................................................................................... 16

    VI.    EPA's Confirmation Of Its Final Position. ....................................... 17

LEGAL PRINCIPLES ...................................................................................... 18

CLAIM ONE, REQUEST FOR DECLARATORY RELIEF ................................ 25

CLAIM TWO, REQUEST FOR INJUNCTIVE RELIEF ..................................... 27

PRAYER FOR RELIEF .................................................................................... 27

CERTIFICATE OF COMPLIANCE .................................................................. 29

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Abbott Laboratories v. Gardner*,
  387 U.S. 136 (1967)..................................................................................19

*Denka Performance Elastomer, LLC - Request For Extension of*
  *Compliance Periods Set Forth In Final Rule In*
  *EPA Docket EPA-HQ-OAR-2022-0730* (April 19, 2024) ......................11, 15, 25

*Denka Performance Elastomer, LLC vs. EPA*, No. 24-1135
  (D.C. Cir. filed June 11, 2024) (Doc. #2059123)...........................3, 16

*MedImmune, Inc. v. Genentech, Inc.*,
  549 U.S. 118 (2007)..................................................................................19

*Sackett v. EPA*,
  566 U.S. 120 (2012)..................................................................................17

*U.S. v. DPE, et al.*,
  Doc. No. 2:23-cv-00735 (E.D. La. filed Feb. 28, 2023)
  ("Section 303 Litigation") ......................................................................9

**Statutes**

5 U.S.C. § 702 ........................................................................................7

28 U.S.C. § 2201 ........................................................................5, 19, 25, 26

28 U.S.C. § 2201(a) ..................................................................................7

28 U.S.C. § 2202 ......................................................................................26

42 U.S.C. Chapter 85 ..............................................................................7

42 U.S.C. § 7412................................................. 3, 6, 8, 10, 12, 13, 14, 20, 22, 23

42 U.S.C. §7412(f)....................................................................................10, 25

42 U.S.C. §7412(f)(4)(B)..........................................................................10, 11

42 U.S.C. §7412(l) ..................................................................................12

42 U.S.C. § 7603 ......................................................................................9

42 U.S.C. § 7603 ....................................................................................18

42 U.S.C. § 7607(b)(1) ..........................................................................5, 7

42 U.S.C. § 7607(d)(9)(A) .......................................................................27

**Rules**

Fifth Circuit Rule 28.2.1 .............................................................................i

**Regulations**

40 C.F.R. § 63.6(i) .................................................................11, 13, 22, 24

40 C.F.R. § 63.6(i)(1) ..............................................................................13

40 C.F.R. § 63.6(i)(3) .........................................................................11, 24

40 C.F.R. § 63.6(i)(4)(ii) ................................. 10, 11, 12, 13, 16, 19, 23, 24, 25, 26

40 C.F.R. §§ 63.6(i)(4) through (i)(7) .................................................11, 24

40 C.F.R. § 63.6(i)(8) .........................................................................11, 25

40 C.F.R. § 63.6.(i)(9) ................................. 11, 12, 13, 14, 24, 25

40 C.F.R. §§ 63.6(i)(9) through (i)(14) ...............................................11, 25

40 C.F.R. § 63.6(i)(14) .......................................................................12, 21

40 C.F.R. § 63.99 ............................................................................3, 12, 24

40 C.F.R. § 63.99(a)(19)(i) .................................................................13, 22

40 C.F.R. § 63.481(o) ....................................................................8, 15, 16, 26

40 C.F.R. § 63.481(p)(2) ...........................................................................8

40 C.F.R. § 63.507 ......................................................9, 16, 20, 21, 23, 25

40 C.F.R. § 63.507(c) ...................................................................16, 19, 21

40 C.F.R. § 63.507(c)(6) ....................................................................4, 10, 22, 24, 25

60 Fed. Reg. 47,296 (Sept. 12, 1995) ...............................................................14, 21

67 Fed. Reg. 16,582 (Apr. 5, 2002) ........................................................................13

68 Fed. Reg. 37,334 (June 23, 2003) ......................................................................22

69 Fed. Reg. 15,687 (Mar. 26, 2004).......................................................................12

80 Fed. Reg. 9,613 (Feb. 24, 2015) ........................................................................22

88 Fed. Reg. 25,080 (April 25, 2023) .......................................................................8

| | |
|---|---|
| Exhibit A | Relevant portions of EPA, *New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emissions Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry*, 89 Fed. Reg. 42,932 (May 16, 2024) |
| Exhibit B | Declaration of Christopher Meyers in Support of Petitioner's Emergency Motion for Stay Pending Review (July 10, 2024) |
| Exhibit C | Declaration of Michelle Helfrich in Support of Petitioner's Emergency Motion for Stay Pending Review (July 8, 2024) |
| Exhibit D | Relevant portions of EPA, *New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emissions Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry*, 88 Fed. Reg. 25,080 (Apr. 25, 2023) |
| Exhibit E | EPA, *New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants; Delegation of Authority to Louisiana*, 69 Fed. Reg. 15,687 (Mar. 26, 2004) |
| Exhibit F | EPA, *National Emission Standards for Hazardous Air Pollutants for Source Categories: General Provisions; and Requirements for Control Technology Determinations for Major Sources in Accordance with Clean Air Act Sections, Sections 112(g) and 112(j)*, 67 Fed. Reg. 16,582 (Apr. 5, 2002) |
| Exhibit G | Letter from John S. Seitz re *Delegation of 40 CFR Part 63 General Provisions Authorities to State and Local Air Pollution Control Agencies* (July 10, 1998) ("Seitz Memorandum") |
| Exhibit H | EPA, *Clean Air Act Final Full Approval of Operating Permits Program; Louisiana Department of Environmental Quality*, 60 Fed. Reg. 47,296 (Sept. 12, 1995) |
| Exhibit I | Letter from Mr. Jeffrey R. Holmstead to Secretary Aurelia S. Giacometto and Mr. Bryan Johnston, *Denka Performance Elastomer, LLC – Request For Extension of Compliance Periods Set Forth In Final Rule In EPA Docket EPA-HQ-OAR-2022-0730* (April 19, 2024) |

| Exhibit J | *Respondents' Opposition to Motion to Stay Final Rule* at 7-8 n.2, *DPE v. EPA*, No. 24-1135 (D.C. Cir. filed June 11, 2024) (Doc. #2059123) |
| Exhibit K | Letter from Aamanda Vincent, LDEQ, to Jeffrey R. Holmstead, DPE, re *Extension of Compliance* (June 27, 2024) |
| Exhibit L | Letter from Mr. Jeffrey R. Holmstead to Administrator Michael S. Regan (June 28, 2024) |
| Exhibit M | EPA, *New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants; Delegation of Authority to Louisiana*, 80 Fed. Reg. 9,613 (Feb. 24, 2015) |
| Exhibit N | EPA, *Clarifications to Existing National Emissions Standards for Hazardous Air Pollutants Delegations Provisions*, 68 Fed. Reg. 37,334 (June 23, 2003) |

# NATURE OF THE ACTION

1.      The Environmental Protection Agency ("EPA") and its Administrator have embarked on a politically motivated, unscientific crusade to shut down Petitioner Denka Performance Elastomer LLC's ("DPE") Neoprene manufacturing facility in LaPlace, Louisiana (the "Facility").  After thwarted attempts to stretch its enforcement and emergency powers to achieve such aims, EPA contrived an unprecedented approach to rulemaking to, yet again, single out and threaten the continued existence of DPE's Facility.

2.      On June 27, 2024, Louisiana's Department of Environmental Quality ("LDEQ") extended a lifeline to DPE—a two-year extension of time to comply with EPA's new rule, described below—but EPA has determined that the State's action is "ineffectual" so that EPA may hold its enforcement hammer over DPE and force the DPE Facility out of existence.  EPA's determination that the LDEQ extension is "ineffectual" ignores fundamental principles of cooperative federalism, particularly Louisiana's delegated, lawful, and long-held authority to govern air emissions and public health in the State.

3.      On May 16, 2024, EPA promulgated a final rule under the Clean Air Act ("CAA") ("Final Rule") that requires the DPE Facility to design, purchase, and install equipment and implement a series of stringent emission control requirements in mere months—by October 15, 2024—which EPA readily acknowledges is an

impossible task. EPA, *New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emissions Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry*, 89 Fed. Reg. 42,932, 43,236-37 (May 16, 2024) (attached hereto as Exhibit A) (63.481(o)-(p)); *id.* at 42,955.

4. Without any judicial relief, it is undisputed that DPE would be forced to shut down the Facility by October 15, likely permanently, thereby destroying DPE's business, jeopardizing the livelihoods of the Facility's roughly 250 employees and their families, disrupting the State and local economy, and cutting off any source of revenue that would be necessary to achieve compliance with the new requirements. DPE is challenging the Final Rule in a pending action in the D.C. Circuit. On June 26, 2024, the D.C. Circuit denied an emergency motion to stay the compliance deadline set forth in the Final Rule—October 15, 2024. On July 5, 2024, DPE filed a petition for rehearing and rehearing en banc of the D.C. Circuit's order denying the stay, which is pending.

5. Meanwhile, the day after the D.C. Circuit's decision, LDEQ exercised its lawful authority to grant DPE a reasonable extension of time, until July 15, 2026, to attempt to comply with the requirements of the Final Rule ("LDEQ Extension").

6. DPE had applied to LDEQ for the extension on April 19, 2024. In its motion seeking a stay from the D.C. Circuit, DPE expressly referred to the fact that it was seeking the LDEQ Extension. In response to DPE's stay motion, EPA definitively stated its position that the LDEQ Extension is "ineffectual." *Respondents' Opposition to Motion to Stay Final Rule* at 7-8 n.2, *DPE v. EPA*, No. 24-1135 (D.C. Cir. filed June 11, 2024) (Doc. #2059123) (Exhibit J). That statement of EPA's final position was signed by the Department of Justice and the EPA Office of General Counsel on behalf of EPA and the Administrator. *Id.* After the LDEQ Extension was issued, EPA further cemented its position by failing to respond to DPE's formal request seeking to confirm the validity of the LDEQ Extension.

7. Given EPA's multi-year objective to shut down the DPE Facility, EPA's position that the LDEQ Extension is not valid, coupled with the Agency's expansive civil and criminal enforcement powers, means that DPE will be forced to shut down the Facility, likely permanently, on or before October 15, 2024 (a process that must begin in mid-August), unless DPE obtains certainty regarding the validity of the LDEQ Extension.

8. EPA's position on the validity of the LDEQ Extension is wrong, for multiple reasons. LDEQ has authority to grant extensions via two sources of authority: (i) an express delegation of authority pursuant to Subpart E in the Section 112 regulations, 40 C.F.R. Part 63, Subpart E, *and* (ii) an automatic

delegation of authority pursuant to an approved CAA permit program. Both of those sources of authority were operative on June 27, 2024, when LDEQ granted the LDEQ Extension, and remain operative today. In the Final Rule, EPA amended a provision—Section 63.507(c)(6)—to state that the authority to implement a specific extension approval provision cannot be expressly delegated to states. However, EPA failed to take any of the necessary actions to *actually withdraw* LDEQ's express or automatic authority to issue extensions. As a matter of common sense, EPA would not have even attempted to revoke authority that LDEQ did not already possess. Nonetheless, EPA's amendment failed to achieve EPA's objective of negating LDEQ's authority to grant the LDEQ Extension to DPE.

9. Even assuming the Final Rule's validity (an issue before the D.C. Circuit and not challenged in this action), EPA's amendment does not constrain LDEQ's authority to grant extensions for multiple reasons. First, Louisiana maintains its automatic permitting authority. Second, LDEQ issued the LDEQ Extension *before* EPA's amendment is even effective. Third, EPA failed to amend the operative regulations governing express delegations of authority. And fourth, EPA failed to address other applicable extension approval provisions that have been expressly delegated to LDEQ. In sum, EPA's amendment simply does not legally foreclose LDEQ from issuing extensions.

10.     In this action, DPE seeks a declaratory judgment to confirm the validity of the LDEQ Extension so as to resolve the massive uncertainty clouding the continuing existence of the DPE Facility.  This Court has exclusive jurisdiction under the CAA, 42 U.S.C. § 7607(b)(1) (restricting jurisdiction to review final EPA actions which are "locally or regionally applicable" to the United States Court of Appeals for the appropriate circuit), and authority to issue such a judgment based on the Declaratory Judgment Act.  *See* 28 U.S.C. § 2201 ("In a case of actual controversy within its jurisdiction, . . . any court of the United States. . . may declare the rights and other legal relations of any interested party seeking such declaration. . . .").  Concurrently with this Petition, DPE seeks an emergency stay to preserve the status quo, meaning EPA would be precluded from taking action in contravention of the validity of the LDEQ Extension pending resolution of this Petition.

11.     From DPE's perspective, the stakes here could not be higher.  The harm to the DPE Facility is existential:  The Final Rule requires DPE to meet a comprehensive slate of capital-intensive emission control requirements by October 15, 2024—which EPA acknowledges is impossible.  DPE faces mounting uncertainty, including statutory and contractual obligations, leading up to October 15, 2024.  DPE is entitled to know, as soon as possible, whether continued operation of the Facility beyond October 15, 2024, will constitute compliance with the Final Rule as a result of the LDEQ Extension, or whether such operations would

trigger action by EPA to impose its civil and criminal enforcement powers. EPA has unabashedly sought to force a shutdown of the DPE Facility and made clear that it intends to use all tools available to achieve that outcome. But it is equally clear that LDEQ has exercised its lawful authority to grant DPE an extension of time to comply with the Rule. DPE is entitled to know whether it can rely upon the LDEQ Extension.

## PARTIES

12.     The DPE Facility produces Neoprene, which requires the use of an intermediate product, chloroprene. Neoprene is a popular synthetic rubber that is used in a wide array of products, including cars, adhesives, medical devices, wetsuits, and other applications. The Facility, the only Neoprene manufacturing facility in the United States, employs roughly 250 employees and roughly 75-100 resident contractors. The Facility's workforce is a highly specialized one with unique experience and training, particularly with regard to controlling the polymerization reaction to address risks to safety.

13.     Respondent EPA is the federal agency charged with promulgating National Emission Standards for Hazardous Air Pollutants ("NESHAPs") under the CAA, codified as 42 U.S.C. § 7412.

14.     Respondent Michael Regan is the Administrator of EPA. Administrator Regan is responsible for supervising the activities of EPA, including

the actions at issue in this action. He is being sued in this action in his official capacity.

## JURISDICTION AND VENUE

15. This Court has original jurisdiction over this action pursuant to Section 307(b)(1) of the CAA, 42 U.S.C. § 7607(b)(1), because this action challenges a final action of the Administrator under Chapter 85 of the CAA, 42 U.S.C. Chapter 85.

16. This Court also has authority under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), and Section 702 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, to decide this action and award relief because the action presents an actual case or controversy within the Court's original jurisdiction.

17. Because the effect of EPA's action is a locally or regionally applicable action, solely impacting the DPE Facility in Louisiana, this Court is the appropriate venue pursuant to 42 U.S.C. § 7607(b)(1).

18. This action is timely, as it was filed within sixty days of the Administrator's action. *See* 42 U.S.C. § 7607(b)(1).

## BACKGROUND

### I.     The Final Rule.

19. On May 16, 2024, EPA published the Final Rule. Exhibit A. The Final Rule becomes effective 60 days after publication, which is July 15, 2024.

20.    Pursuant to Section 112 of the CAA, the Final Rule promulgates amendments to the NESHAP that apply to hundreds of chemical facilities, including DPE.

21.    The Final Rule requires DPE to comply with certain capital- and time-intensive requirements within 90 days after the effective date of the Final Rule, which is October 15, 2024.  *See* 40 C.F.R. § 63.481(o) and 63.481(p)(2) (the "90-Day Requirements").   The 90-Day Requirements are all targeted at reducing chloroprene emissions from the Facility.  It is undisputed that the 90-day deadline is impossible for DPE to meet and will require the Facility to shut down, likely permanently.  Declaration of Christopher Meyers, P.E. ¶¶ 4-44 (attached hereto as Exhibit B); Declaration of Michelle Helfrich ¶ 2 (attached hereto as Exhibit C).  EPA has never disputed these critical facts.

22.    In the April 2023 proposed rule preceding the Final Rule ("Proposed Rule"), EPA had proposed that the DPE Facility (along with 200 other facilities subject to the rule) have at least a two-year deadline by which to complete the applicable requirements.  In so doing, EPA expressly recognized in the Proposed Rule that the DPE Facility "will require additional time to plan, purchase, and install equipment for . . . chloroprene control."  88 Fed. Reg. 25,080, 25,178 (April 25, 2023) (attached hereto as Exhibit D).  However, in the Final Rule, solely for the DPE Facility, EPA switched the two-year compliance period to only 90 days, which

would force the DPE Facility to comply with the Final Rule's requirements—or else shut down—by October 15, 2024, instead of being allowed two years to comply. Exhibit A at 43,236-37 (63.481(o)-(p)); *id.* at 42,955.

23.    In the Final Rule, EPA provided no explanation for the switch from two years to 90 days, other than to cite the existence of litigation that EPA filed against DPE in February 2023.  EPA filed that unprecedented litigation in the U.S. District Court for the Eastern District of Louisiana pursuant to EPA's emergency authority under Section 303 of the CAA.  *U.S. v. DPE, et al.*, Doc. No. 2:23-cv-00735 (E.D. La. filed Feb. 28, 2023) ("Section 303 Litigation").  In the Section 303 Litigation, EPA *alleges* that the DPE Facility is causing an "imminent and substantial endangerment" because its emissions result in off-site, ambient air concentrations of chloroprene greater than 0.2 $\mu g/m^3$—a level EPA *alleges* is needed to ensure that the lifetime cancer risk for a person located continuously at the Facility's fenceline *all day, every day for 70 years* is no higher than 1-in-10,000.  DPE vigorously opposes EPA's unproven allegations and the Section 303 Litigation remains unadjudicated.[1]

24.    In the Final Rule, buried in a footnote, EPA also describes an amendment to Section 63.507 to state that "[a]pproval of an extension request under

---

[1] In February 2024, after having demanded expedited litigation on the alleged "emergency" for nearly a year, EPA moved for an indefinite continuance of the March 2024 trial date in the Section 303 Litigation, which the district court subsequently granted.  To justify the continuance, EPA pointed to the then-expected issuance of the Final Rule by March 29, 2024.

§ 63.6(i)(4)(ii)" *cannot* be delegated, despite more than 20 years of precedent to the contrary. Final Rule at 43,261 (Exhibit A) (40 C.F.R. § 63.507(c)(6)). Section 63.6(i)(4)(ii) is one of multiple provisions in EPA's regulations that provides the authority to grant extensions or "waivers" pursuant to Section 112(f) of the CAA.

25. EPA's amendment purports to revoke an express delegation of authority to LDEQ in one set of regulatory provisions by now stating in an entirely *different* set of regulatory provisions that no such delegation may be made. Yet EPA took no action to actually withdraw LDEQ's expressly delegated authority. EPA's single amendment in the Final Rule—even assuming that the Final Rule is valid (an issue before the D.C. Circuit)—simply does not foreclose LDEQ from granting extensions, as a matter of law.[2]

## II. Regulatory Framework For Approving Extensions.

26. Section 112(f)(4)(B) of the CAA provides that the Administrator of the EPA may grant an extension (or "waiver") permitting sources up to two years to comply with a standard if the Administrator finds (1) "that such period is necessary

---

[2] While the issue is not before this Court, in the Proposed Rule, EPA did not mention, let alone meaningfully discuss, any intent to revoke LDEQ's delegation of authority for approvals of requests under 40 C.F.R. § 63.6(i)(4)(ii). Nor is there any such explanation in the Final Rule for EPA's cursory statement purporting to revoke LDEQ's delegated authority. There is also no precedent for EPA's selective attempt to revoke Louisiana's authority. In fact, in the roughly 34 years since the 1990 CAA Amendments, EPA has never imposed a 90-day deadline under Section 112 rule for similar requirements, let alone done so without providing notice that it would attempt to revoke a state's authority to grant extensions of such a deadline.

for the installation of controls" and (2) "that steps will be taken during the period of the waiver to assure that the health of persons will be protected from imminent endangerment." 42 U.S.C. § 7412(f)(4)(B). 40 C.F.R. § 63.6(i)(4)(ii) then provides:

> The owner or operator of an existing source . . . may request that [EPA] grant an extension allowing the source up to 2 years after the standard's effective date to comply with the standard. The Administrator may grant such an extension if he/she finds that such additional period is necessary for the installation of controls and that steps will be taken during the period of the extension to assure that the health of persons will be protected from imminent endangerment. . . .

40 C.F.R. § 63.6(i)(4)(ii).

27.    Section 63.6(i) sets forth clear and distinct authorities for *requesting* and *approving* compliance extensions. Sections 63.6(i)(4) through (i)(7) "concern *requests for an extension* of compliance with a relevant standard under this part. . . ." 40 C.F.R. § 63.6(i)(3) (emphasis added). These *request* provisions include 40 C.F.R. § 63.6(i)(4)(ii), the authority that EPA purported to revoke in the Final Rule. However, separately, Sections 63.6(i)(9) through (i)(14) "concern *approval of an extension* of compliance requested under paragraphs (i)(4) through (i)(6) of this section. . . ." 40 C.F.R. § 63.6(i)(8) (emphasis added). These *approval* provisions include Section 63.6(i)(9), which states:

> Based on the information provided in any request made under paragraphs (i)(4) through (i)(6) of this section, or other information, the Administrator (or *the State with an approved permit program) may grant an extension of compliance with an emission standard*, as specified in paragraphs (i)(4) and (i)(5) of this section.

40 C.F.R. § 63.6.(i)(9) (emphasis added).

28.     The "[EPA] Administrator (or the State with an approved permit program) may terminate an extension of compliance [early] if any specification [in the extension request] is not met." 40 C.F.R. § 63.6(i)(14). There are no other grounds for terminating a compliance extension.

**III.     LDEQ Authority To Grant Extensions.**

29.     LDEQ maintains authority to grant extensions via *two sources of authority:* (i) its express delegation of certain provisions pursuant to Part 63, Subpart E *and* (ii) its automatic authority pursuant to its approved CAA permit program.

**A.     Expressly delegated authority pursuant to Part 63, Subpart E.**

30.     Section 112(l) of the CAA allows EPA to expressly delegate the implementation of Section 112 standards to the states. 42 U.S.C. § 7412(l). 40 C.F.R. Part 63, Subpart E contains the regulatory framework for such express delegations. *See* 40 C.F.R. Part 63, Subpart E. On March 26, 2004, EPA expressly delegated to Louisiana the authority to implement Section 112 standards, including the authority to grant compliance extensions via 40 C.F.R. § 63.6(i)(9) and 40 C.F.R. § 63.6(i)(4)(ii). 69 Fed. Reg. 15,687 (Mar. 26, 2004) (attached hereto as Exhibit E). Thus, for more than 20 years, Louisiana has governed the State's air emissions pursuant to this expressly delegated authority.

31.     Subpart E includes a table listing the specific Section 112 standards that have been delegated to Louisiana.  40 C.F.R. § 63.99(a)(19)(i).  This table confirms that the extension approval provisions—40 C.F.R. § 63.6(i)(9) and 40 C.F.R. § 63.6(i)(4)(ii)—have been delegated to LDEQ.  The table also identifies provisions that *cannot* be delegated to LDEQ.  Pertinent here, the authorities to approve of extensions under Section 63.6(i) are *not* listed as authorities that cannot be delegated.

32.     Subpart E specifies that provisions amended after July 1, 2013, are not delegated to Louisiana.  40 C.F.R. § 63.99(a)(19)(i).  The extension approval provisions in 40 C.F.R. § 63.6(i) have not been amended since April 5, 2002.  67 Fed. Reg. 16,582, 16,599 (attached hereto as Exhibit F).  Accordingly, the provisions in 40 C.F.R. § 63.6(i) are and remain delegated to Louisiana.

**B.     Automatic authority pursuant to approved permitting program.**

33.     Separate from the express delegation via Subpart E discussed above, state agencies also have automatic authority to grant Section 112 compliance extensions if they have an approved permitting program.  40 C.F.R. § 63.6(i)(1) ("Until an extension of compliance has been granted by the Administrator *(or a State with an approved permit program)* under this paragraph, the owner or operator of an affected source subject to the requirements of this section shall comply with all applicable requirements of this part.") (emphasis added); 40 C.F.R. § 63.6(i)(9) ("the

Administrator (*or the State with an approved permit program*) may grant an extension of compliance. 40 C.F.R. § 63.6(i)(9)") (emphasis added)).

34.     EPA has confirmed in formal guidance that state agencies have this "automatic" extension approval authority based on an approved permitting program and do not require a separate express delegation from EPA. Specifically, on July 10, 1998, EPA's Director of the Office of Air Quality and Standards published a memorandum confirming that the authority to grant compliance extensions "does not require delegation through subpart E and, instead, is automatically granted to States as part of their part 70 operating permits program approval." EPA, Memorandum from John S. Seitz re *Delegation of 40 CFR Part 63 General Provisions Authorities to State and Local Air Pollution Control Agencies* at 1 (July 10, 1998) ("Seitz Memorandum") (attached hereto as Exhibit G).

35.     The Seitz Memorandum further confirms EPA's "interpretation that the State would not need to have been delegated a particular source category or have issued a part 70 operating permit for a particular source to grant that source a compliance extension." *Id.* at 1.

36.     Pertinent here, EPA approved the Louisiana Operating Permits program on September 12, 1995. 60 Fed. Reg. 47,296 (Sept. 12, 1995) (attached hereto as Exhibit H). Thus, as confirmed by EPA in the Seitz Memorandum, Louisiana has held and continues to hold automatic authority to issue Section 112

compliance extensions based on Louisiana's approved permitting authority. EPA itself has made clear that Louisiana does not require further delegated authority from EPA in order to grant a compliance extension.

## IV. DPE's Extension Request And LDEQ's Approval.

37. On April 19, 2024, faced with the Final Rule's impossible-to-meet 90-day implementation period, DPE submitted to LDEQ an extension request for the DPE Facility, seeking an extension of the 90-Day Requirements to at least two years ("Extension Request"). *See* Letter from Mr. Jeffrey R. Holmstead to Secretary Aurelia S. Giacometto and Mr. Bryan Johnston, *Denka Performance Elastomer, LLC – Request For Extension of Compliance Periods Set Forth In Final Rule In EPA Docket EPA-HQ-OAR-2022-0730* (April 19, 2024) (attached hereto as Exhibit I). DPE sought an extension based on LDEQ's authority both under LDEQ's air permitting authority and its delegated authority under 40 C.F.R. Part 63. In the Extension Request, DPE explained that good cause exists for the extension because a period of at least two years is necessary for DPE to comply with the 90-Day Requirements and the Facility does not present an "imminent endangerment." DPE's Extension Request was well known to EPA, given that it was published by LDEQ on the State's public database and DPE expressly referred to the pending Extension Request in its stay motion filed with the D.C. Circuit, which prompted EPA to take the position that such an extension would be "ineffectual."

*Respondents' Opposition to Motion to Stay Final Rule* at 7-8 n.2, *DPE v. EPA*, No. 24-1135 (D.C. Cir. filed June 11, 2024) (Doc. #2059123) (attached hereto as Exhibit J).

38.     On June 27, 2024, LDEQ granted DPE's Extension Request, finding, in part:  "LDEQ finds that additional time is needed for Denka to install controls . . . . LDEQ also finds that steps will be taken during the period of the extension to assure that the health of persons will be protected from imminent endangerment." Letter from Aamanda Vincent, LDEQ, to Jeffrey R. Holmstead, DPE, re *Extension of Compliance* (June 27, 2024) at 2 (attached hereto as Exhibit K).  The LDEQ Extension provides DPE until July 15, 2026, to comply with the 90-Day Requirements, subject to DPE satisfying specified conditions regarding additional emissions controls, monitoring of ambient air, and periodic reporting to LDEQ.  *Id.*

**V.     EPA's Amendment Of Section 63.507 And Rejection Of LDEQ Extension.**

39.     In the Final Rule published on May 16, 2024, EPA included an amendment of 40 C.F.R. § 63.507(c) to provide that the "[a]pproval of an extension request under § 63.6(i)(4)(ii)" cannot be delegated to state agencies.  Final Rule at 43,261 (Exhibit A).  Subsequently, on June 11, 2024, in a pleading filed in the D.C. Circuit and signed by the Department of Justice and EPA's Office of General Counsel on behalf of EPA and its Administrator, EPA declared that any extension

granted by LDEQ to DPE would be "ineffectual." Exhibit J at 7-8, n.2. Specifically,

EPA stated:

> Denka states that it has requested a compliance extension from a Louisiana state agency. . . . Any purported compliance extension granted by a state to Denka would be ineffectual.

*Id.* In taking that final position, EPA provided no explanation as to why any such

state-issued extension would be "ineffectual."

## VI. EPA's Confirmation Of Its Final Position.

40. On June 28, 2024, DPE submitted a request to EPA seeking

confirmation of EPA's position on the alleged non-validity of the LDEQ Extension

and a statement of the legal basis for EPA's position. *See* Letter from Mr. Jeffrey

R. Holmstead to Administrator Michael S. Regan (June 28, 2024) (attached hereto

as Exhibit L). DPE specifically explained that "DPE will be subjected to substantial

and mounting legal uncertainty on October 15, 2024, the compliance deadline in

place before the LDEQ Extension was granted." *Id.* at 2. The letter also expressly

stated that "[i]f EPA intends to treat the LDEQ Extension as 'ineffectual,' and

enforce the October 15, 2024, compliance deadline, then DPE intends to avail itself

of legal recourse to resolve the consequent uncertainty before allowing 'the Agency

to drop the hammer' and impose virtually unlimited legal liability on DPE." *Id.*

(citing *Sackett v. EPA*, 566 U.S. 120, 127 (2012)). Given that the DPE Facility's

future hangs in the balance and the clock is ticking, DPE's letter also expressly

informed EPA that DPE would treat EPA's failure to respond by July 8, 2024 as a confirmation that EPA would continue to treat the LDEQ Extension is "ineffectual."

41.     On July 8, 2024, litigation counsel for EPA informed DPE by email that a timely response to DPE's June 28 letter was not possible.  Thus, despite DPE's urgent invitation to EPA to modify its final position, EPA has taken no action to dissuade DPE from believing that the Agency's enforcement sword is poised to strike a death blow to the company.

## LEGAL PRINCIPLES

42.     DPE properly brings this declaratory-judgment action to resolve a real, concrete, and substantial dispute between the parties that threatens the existence of the DPE Facility and strongly implicates federal-state relations under the CAA. Each of the following points is true: LDEQ has formally and lawfully issued the LDEQ Extension, DPE undisputedly will have to shut down its Facility (likely permanently) if the LDEQ Extension is not valid, and EPA has definitively stated its position that the LDEQ Extension is "ineffectual."  EPA's manifest goal to shut down the DPE Facility is crystal clear from EPA's unprecedented Section 303 Litigation, EPA's "surprise switcheroo" of compliance deadline in the Final Rule, EPA's contrived and unsuccessful attempt to revoke LDEQ's extension authority, and, most recently, EPA's determination as to the non-validity of the LDEQ Extension.  DPE is now faced with the "Hobson's choice" of shutting down the

Facility by October 15, 2024, or, in reliance on the LDEQ Extension, continuing to operate but with the fear of civil and criminal enforcement action by EPA.

43.     The law is settled that, "where threatened action by *government* is concerned, [courts] do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007).  "The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction." *Id.* at 129 (citations omitted).  In these circumstances, a plaintiff's decision to abstain from an action to eliminate liability for an allegedly unlawful activity does not "preclude subject-matter jurisdiction because the threat-eliminating behavior was effectively coerced." *Id.*  "The dilemma posed by that coercion—putting the challenger to the choice between abandoning his rights or risking prosecution—is 'a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate.'" *Id.* (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 152 (1967)).  A declaratory-judgment action is recognized as proper, as an alternative to taking the arguably unlawful action, given a "genuine threat of enforcement." *Id.*

44.     In the Final Rule, EPA amended Section 63.507(c) to state that the "[a]pproval of an extension request under § 63.6(i)(4)(ii)" cannot be delegated to state agencies.  Final Rule at 43,261 (Exhibit A).  EPA apparently believes this

amendment "retain[s] authority to grant or deny request for extensions" and does not delegate such authority to LDEQ. *Id.* at 42,955, n.33. Presumably on that basis, EPA has definitively taken the position that the LDEQ Extension is "ineffectual." However, EPA has not revoked the express delegation or automatic authority that LDEQ has maintained for decades. EPA's amendment does not divest LDEQ of its authority to grant extensions.

45.     Even assuming the validity of EPA's Final Rule (which DPE does not challenge here), EPA's position that the LDEQ Extension is invalid is incorrect for multiple reasons.

46.     First, LDEQ had automatic authority to grant DPE the LDEQ Extension based on LDEQ's approved permit program and EPA has not even attempted to modify such automatic authority through its amendment to Section 63.507. Section 63.507 *only* concerns express delegations pursuant to Subpart E, which is an entirely *separate* source of extension approval authority from the authority derived from a state's approved permit program. Thus, EPA's amendment—even if otherwise applicable or effective—does not prevent LDEQ from granting extensions based on its approved permit program. EPA's own guidance confirms that granting a Section 112 compliance extension "does *not require delegation through Subpart E and, instead, is automatically granted to the States as part of their part 70 operating permits program approval. . . .*" Seitz Memorandum at 1 (Exhibit G) (emphasis

added).  EPA approved the Louisiana Operating Permits program on September 12, 1995.  60 Fed. Reg. 47,296 (Exhibit H).  As such, EPA's amendment to Section 63.507 is irrelevant to whether LDEQ can issue an extension pursuant to the automatic authority derived from its approved permit program.  Section 63.507 does not address such authority and, accordingly, does not impact the validity of the LDEQ Extension.

47.  Second, on its face, the Final Rule does not become effective until *July 15*, 2024.  Thus, it has no impact on the LDEQ Extension that was granted on *June 27*, 2024.  Even assuming that the Final Rule's amendment to 40 C.F.R. § 63.507(c) otherwise applied to LDEQ's authority to grant extensions—and, as explained herein, it plainly does not—the amended Section 63.507(c) is not effective until July 15, 2024, and therefore does not legally foreclose any actions before that date.  EPA's attempt to revoke Louisiana's authority to grant extensions *after the effective date* unequivocally recognizes that Louisiana *does* have such expressly delegated authority *before the effective date*, including on June 27, 2024, when the LDEQ Extension was granted.  Further, even assuming the Final Rule's amendment otherwise applied to the LDEQ's authority to grant extensions, the LDEQ Extension would not terminate on or after July 15, 2024, unless DPE fails to meet a condition of the extension *and* LDEQ elects to terminate the extension.  *See* 40 C.F.R. § 63.6(i)(14) (the "Administrator (or the State with an approved permit program)

may terminate an extension of compliance at an earlier date than specified if any specification [in the extension request] is not met.").

48.     Third, EPA's amendment to Section 63.507(c)(6) is ineffective because it also does not actually revoke LDEQ's expressly delegated authority pursuant to Subpart E.   LDEQ continues to have authority pursuant to Subpart E to grant extensions.  40 C.F.R. § 63.99(a)(19)(i) (table showing Subpart A has been delegated to Louisiana).  Subpart E authority is modified by amending Subpart E, which EPA last did on February 24, 2015.  80 Fed. Reg. 9,613 (attached hereto as Exhibit M).  In that notice, EPA identified several authorities which are not delegated to LDEQ, none of which include the extension provisions in Section 63.6(i).  *Id.* at 9,615.  Likewise, the table in Subpart E that governs the provisions delegated to Louisiana confirms that the extension provisions under Section 63.6(i) are *not* carved out from Louisiana's delegation.

49.     It is astonishing that EPA attempts to revoke the express delegation of LDEQ's extension authority without amending a single provision in Subpart E—*the subpart governing that delegation of authority*.  Instead, in a completely different set of regulations, the Final Rule amends Section 63.507(c)(6)—a provision intended only to cross-reference Subpart E and clarify what authorities pursuant to Subpart E can and cannot be delegated *as a matter of law* for any subpart.  68 Fed. Reg. 37,334 ("there are separate parts of each section 112 requirement that we cannot delegate to

you.") (attached hereto as Exhibit N). However, given that there has been no amendment to Subpart E, Louisiana's expressly delegated extension authority remains intact. Such authority was plainly sufficient to issue the LDEQ Extension. The notion that LDEQ's extension authority "cannot" be delegated is contradicted by the fact that EPA *has* delegated such authority to LDEQ *for decades* and *continues to delegate* such authority for every other set of Section 112 standards in the country.

50. Like Section 63.507, there are dozens of provisions in EPA's regulations that identify what standards and authorities "cannot" be delegated to states. EPA has not taken the position that extension approval authority *cannot* be delegated in *any other* such provision. Indeed, in every other set of Section 112 standards, such authority *can* be delegated, including for other standards amended in the Final Rule. *See, e.g.,* Final Rule at 43,212 (Exhibit A) (amending Section 63.153 without including language in 63.507(c)(6)); *id.* at 43,228 (amending Section 63.183 without including language in 63.507(c)(6)); *id.* at 43,274 (amending 63.529 without including language in 63.507(c)(6)). If approval authority for requests under Section 63.6(i)(4)(ii) cannot be delegated to state agencies, then how did EPA allow such authority to continue to be delegated in other standards at the *very same time* and in the *very same rule*? Likewise, such authority *has* been expressly delegated to LDEQ as a matter of law and implemented for more than

20 years.  There can be no serious contention that the extension provisions in Section 63.6(i) *cannot* be delegated to LDEQ as a matter of law.

51.     EPA simply cannot revoke the authorities delegated to LDEQ without amending the "Delegated Federal Authorities" set forth in Subpart E, 40 C.F.R. § 63.99.  Such an amendment would have proved problematic for EPA because the Proposed Rule did not propose to amend Subpart E.  Instead of having a separate rulemaking subject to notice-and-comment, EPA amended a provision that—while not included in the Proposed Rule—at least was located in a subpart covered by the Proposed Rule.  If DPE is able to continue to exist long enough to have its day in court, DPE intends to challenge EPA's amendment to Section 63.507(c)(6) to prevent the amendment from being promulgated as part of its challenge to the Final Rule.  But, for purposes of this action, even assuming the amendment is valid, it has utterly no bearing on LDEQ's delegated authority in Subpart E, which still stands and is what authorizes LDEQ to grant extensions pursuant to Section 63.6(i).

52.     Finally, any contention that the "[a]pproval of an extension request under § 63.6(i)(4)(ii)" cannot be delegated to state agencies fails to grapple with another approval authority in Section 63.6(i)(9).  Final Rule at 43,261 (Exhibit A). Section 63.6(i) sets forth clear and distinct authorities for *requesting* and *approving* compliance extensions.   40 C.F.R. § 63.6(i).  Sections 63.6(i)(4) through (i)(7) "concern *requests for an extension* of compliance. . . ."  40 C.F.R. § 63.6(i)(3)

(emphasis added). Included in these *request* provisions is Section 63.6(i)(4)(ii), which addresses compliance extensions under Section 112(f) of the CAA. Separately, Sections 63.6(i)(9) through (i)(14) "concern *approval of an extension* of compliance requested under paragraphs (i)(4) through (i)(6) of this section. . . ." 40 C.F.R. § 63.6(i)(8) (emphasis added). Included in these *approval* provisions is Section 63.6(i)(9), which states:

> Based on the information provided in any request made under paragraphs (i)(4) through (i)(6) of this section, or other information, the Administrator (or *the State with an approved permit program) may grant an extension of compliance with an emission standard*, as specified in paragraphs (i)(4) and (i)(5) of this section.

40 C.F.R. § 63.6.(i)(9) (emphasis added). Accordingly, EPA's amendment to Section 63.507 does not reference 40 C.F.R. § 63.6.(i)(9), which is one legal basis authorizing LDEQ to grant extension requests. Nor does the plain language of 40 C.F.R. § 63.507(c)(6) purport to prohibit DPE from submitting an extension request to LDEQ. Thus, even if EPA's revocation of authority were otherwise proper, it simply does not impact LDEQ's authority under Section 63.6(i)(9).

## CLAIM ONE
## REQUEST FOR DECLARATORY RELIEF

53.     DPE incorporates by reference all preceding allegations above as if set forth herein.

54.     The Declaratory Judgment Act provides that in a case of actual controversy within its jurisdiction, any court of the United States may declare the

rights and other legal relations of any interested party seeking such declaration. 28 U.S.C. § 2201.

55. The Declaratory Judgment Act also provides that "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." 28 U.S.C. § 2202.

56. In light of EPA's conclusion that the LDEQ Extension is ineffectual, DPE seeks a declaratory judgment that the LDEQ Extension is valid and enforceable.

57. There is an actual and justiciable controversy between DPE and EPA regarding the validity of the LDEQ Extension and EPA's purported revocation of LDEQ's authority to grant compliance extensions under 40 C.F.R. § 63.6(i)(4)(ii).

58. This actual and justiciable controversy will continue because DPE cannot comply with the 90-Day Requirements by October 15, 2024, the compliance deadline that was in place before the LDEQ Extension was granted and that would continue unless the LDEQ Extension is confirmed as valid.

59. A judicial declaration of the parties' respective rights and obligations with respect to the validity of the LDEQ Extension is necessary and appropriate because of the ongoing nature of DPE's obligations with the Final Rule.

60.     DPE has no adequate remedy at law to address the allegations set forth herein.

### CLAIM TWO
### REQUEST FOR INJUNCTIVE RELIEF

61.     DPE incorporates by reference all preceding allegations above as if set forth herein.

62.     EPA's conclusion that the LDEQ Extension is ineffectual is arbitrary and capricious and otherwise not in accordance with law in violation of 42 U.S.C. § 7607(d)(9)(A).

63.     DPE seeks injunctive relief preventing EPA from denying the validity of the LDEQ Extension.

### PRAYER FOR RELIEF

WHEREFORE, DPE respectfully prays for judgment:

a.    Granting this Petition for Review and Complaint for Declaratory and Injunctive Relief;

b.    Declaring that the LDEQ Extension is valid and enforceable;

c.    Enjoining EPA from denying the validity of the LDEQ Extension and taking action in contravention of the validity of the LDEQ Extension;

d.    Awarding attorneys' fees and the costs of this litigation; and

e.    Awarding DPE all other relief as the Court deems just and proper.

Date: July 10, 2022

Respectfully submitted,

James C. Percy
JONES WALKER LLP
445 N. Boulevard, Suite 800
Baton Rouge, LA 70802
Telephone: (225) 248-2130
jpercy@joneswalker.com

Robert E. Holden
Brett S. Venn
JONES WALKER LLP
201 St. Charles Ave
New Orleans, LA 70170
Telephone: (504) 582-8000
bholden@joneswalker.com
bvenn@joneswalker.com

*/s/ David A. Super*
David A. Super
Jason B. Hutt
Jeffrey R. Holmstead
Britt Cass Steckman
Kevin M. Voelkel
BRACEWELL LLP
2001 M Street NW, Ste. 900
Washington, DC 20036
Telephone: (202) 828-5800
david.super@bracewell.com
jason.hutt@bracewell.com
jeff.holmstead@bracewell.com
britt.steckman@bracewell.com
kevin.voelkel@bracewell.com

Jeffrey L. Oldham
BRACEWELL LLP
711 Louisiana Street, Suite 2300
Houston, TX 77002
Telephone: (713) 223-2300
jeffrey.oldham@bracewell.com

***Counsel for Petitioner Denka Performance Elastomer LLC***

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Fed. R. App. P. 27(d)(1)(E), that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in Times New Roman 14-point font using Microsoft Word 2013.

Date: July 10, 2024         */s/ David A. Super*
David A. Super

**Counsel for Petitioner**
**Denka Performance Elastomer LLC**

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this 10th day of July 2024, pursuant to Federal Rules of Appellate Procedure 15(c) and 25(d), and 40 C.F.R. § 23.12(a), I electronically filed the foregoing *Petition for Review and Complaint for Declaratory and Injunctive Relief* with the Clerk of the Court for the U.S. Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system, with copies of the foregoing served on the following recipients.

<u>**By Hand Delivery**</u>:

Correspondence Control Unit
Office of General Counsel (2311)
U.S. ENVIRONMENTAL PROTECTION AGENCY
1200 Pennsylvania Avenue, NW
Washington, DC 20460

Date: July 10, 2024

*/s/ David A. Super*
David A. Super

***Counsel for Petitioner***
***Denka Performance Elastomer LLC***

# **EXHIBIT A**



# ENVIRONMENTAL PROTECTION AGENCY

## 40 CFR Parts 60 and 63

[EPA–HQ–OAR–2022–0730; FRL–9327–02–OAR]

RIN 2060–AV71

**New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** This action finalizes amendments to the New Source Performance Standards (NSPS) that apply to the Synthetic Organic Chemical Manufacturing Industry (SOCMI) and amendments to the National Emission Standards for Hazardous Air Pollutants (NESHAP) that apply to the SOCMI (more commonly referred to as the Hazardous Organic NESHAP or HON) and Group I and II Polymers and Resins (P&R I and P&R II, respectively) Industries. The EPA is finalizing decisions resulting from the Agency's technology review of the HON and the P&R I and P&R II NESHAP, and its review of the NSPS that apply to the SOCMI. The EPA is also finalizing amendments to the NSPS for equipment leaks of volatile organic compounds (VOC) in SOCMI based on its reconsideration of certain issues raised in an administrative petition for reconsideration. Furthermore, the EPA is finalizing emission standards for ethylene oxide (EtO) emissions and chloroprene emissions after considering the results of a risk assessment for the HON and for Neoprene Production processes subject to the P&R I NESHAP, and is finalizing a fenceline monitoring work practice standard for certain hazardous air pollutants (HAP). Lastly, the EPA is finalizing the removal of exemptions from standards for periods of startup, shutdown, and malfunction (SSM), adding work practice standards for such periods where appropriate, finalizing standards for previously unregulated HAP, and adding provisions for electronic reporting of performance test reports and periodic reports.

**DATES:** This final rule is effective on July 15, 2024. The incorporation by reference (IBR) of certain publications listed in the rule is approved by the Director of

the Federal Register as of July 15, 2024. The incorporation by reference of certain other material listed in the rule was approved by the Director of the Federal Register as of October 17, 2000 and November 16, 2007.

**ADDRESSES:** The U.S. Environmental Protection Agency (EPA) has established a docket for this action under Docket ID No. EPA–HQ–OAR–2022–0730. All documents in the docket are listed on the *https://www.regulations.gov/* website. Although listed, some information is not publicly available, *e.g.*, Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available either electronically through *https://www.regulations.gov/*, or in hard copy at the EPA Docket Center, WJC West Building, Room Number 3334, 1301 Constitution Ave. NW, Washington, DC. The Public Reading Room hours of operation are 8:30 a.m. to 4:30 p.m. Eastern Standard Time, Monday through Friday. The telephone number for the Public Reading Room is (202) 566–1744, and the telephone number for the EPA Docket Center is (202) 566–1742.

**FOR FURTHER INFORMATION CONTACT:** For questions about the HON and SOCMI NSPS, contact U.S. EPA, Attn: Mr. Andrew Bouchard, Mail Drop: Sector Policies and Programs Division (E143–01), 109 T.W. Alexander Drive, P.O. Box 12055, RTP, North Carolina 27711; telephone number: (919) 541–4036; and email address: *bouchard.andrew@epa.gov.* For questions about the P&R I and P&R II NESHAP, contact U.S. EPA, Attn: Ms. Njeri Moeller, Mail Drop: Sector Policies and Programs Division (E143–01), 109 T.W. Alexander Drive, P.O. Box 12055, RTP, North Carolina 27711; telephone number: (919) 541–1380; and email address: *moeller.njeri@epa.gov.* For specific information regarding the risk modeling methodology, contact U.S. EPA, Attn: Mr. Matthew Woody, Mail Drop: Health and Environmental Impacts Division (C539–02), 109 T.W. Alexander Drive, P.O. Box 12055, RTP, North Carolina 27711; telephone number: (919) 541–1535; and email address: *woody.matthew@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

*Preamble acronyms and abbreviations.* We use multiple acronyms and terms in this preamble. While this list may not be exhaustive, to ease the reading of this preamble and for

reference purposes, the EPA defines the following terms and acronyms here:

ACS American Community Survey
AERMOD American Meteorological Society/EPA Regulatory Model dispersion modeling system
ANSI American National Standards Institute
APCD air pollution control device
API American Petroleum Institute
ASME American Society of Mechanical Engineers
BACT best available control technology
BLR basic liquid epoxy resins
BPT benefit per-ton
BSER best system of emissions reduction
BTEX benzene, toluene, ethylbenzene, and xylenes
CAA Clean Air Act
CBI confidential business information
CDX Central Data Exchange
CEDRI Compliance and Emissions Data Reporting Interface
CFR Code of Federal Regulations
CMPU chemical manufacturing process unit
CO carbon monoxide
$CO_2$ carbon dioxide
CPI consumer price index
CRA Congressional Review Act
EAV equivalent annual value
ECHO Enforcement and Compliance History Online
EFR external floating roof
EIS Emission Information System
EPA Environmental Protection Agency
EPPU elastomer product process unit
ERT Electronic Reporting Tool
EtO ethylene oxide
FTIR fourier transform infrared
HAP hazardous air pollutant(s)
HON Hazardous Organic NESHAP
HQ hazard quotient
$HQ_{REL}$ hazard quotient reference exposure level
IBR incorporation by reference
ICR information collection request
IFR internal floating roof
IRIS Integrated Risk Information System
ISA Integrated Science Assessment
km kilometer
LAER lowest achievable emissions rate
lb/hr pound per hour
lb/yr pound per year
LDAR leak detection and repair
LDEQ Louisiana Department of Environmental Quality
LEL lower explosive limit
MACT maximum achievable control technology
MDL method detection limit
MERP monomer emission reduction project
MIR maximum individual lifetime [cancer] risk
MON Miscellaneous Organic Chemical Manufacturing NESHAP
MTVP maximum true vapor pressure
NAICS North American Industry Classification System
NAAQS National Ambient Air Quality Standards
NATTS National Air Toxic Trends Station
NEI National Emissions Inventory
NESHAP national emission standards for hazardous air pollutants
$NO_X$ nitrogen oxides
$N_2O$ nitrous oxide

63.139(d)(5) (for HON), and 40 CFR 63.484(t), 40 CFR 63.485(x), and 40 CFR 63.489(b)(10) (for the P&R I NESHAP) for owners or operators using adsorbers that cannot be regenerated and regenerative adsorbers that are regenerated offsite to use dual (two or more) adsorbent beds in series and conduct monitoring of HAP or TOC on the outlet of the first adsorber bed in series using a sample port and a portable analyzer or chromatographic analysis. However, we have clarified in the proposed rule text in this final action that the monitoring plan provisions in 40 CFR 63.120(d)(2) and (3) do not apply to HON sources subject to the monitoring provisions in 40 CFR 63.120(d)(1)(iii); and the monitoring plan provisions in 40 CFR 63.120(d)(2) and (3) do not apply to P&R I sources subject to the monitoring provisions in 40 CFR 63.120(d)(1)(iii) (via 40 CFR 63.484(t) and 40 CFR 63.485(x)). The comments and our specific responses to these items can be found in the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking.

We are also finalizing, as proposed, several corrections to the calibration drift assessment requirements in NSPS subpart VVa at 40 CFR 60.485a(b)(2). These amendments include: (1) Correcting a regulatory citation to read "§ 60.486a(e)(8)" instead of "§ 60.486a(e)(7)"; (2) removing the extraneous sentence "Calculate the average algebraic difference between the three meter readings and the most recent readings and the most recent calibration value."; (3) providing clarity in the mathematical step of the assessment by replacing the sentence "Divide this algebraic difference by the initial calibration value and multiply by 100 to express the calibration drift as a percentage." with "Divide the arithmetic difference of the initial and post-test calibration response by the corresponding calibration gas value for each scale and multiply by 100 to express the calibration drift as a percentage."; and (4) providing clarity by making other minor textural changes to the provisions related to the procedures for when a calibration drift assessment shows negative or positive drift of more than 10 percent. We did

not receive any comments in opposition of these amendments.

In addition, we are finalizing, as proposed, the requirement in the HON and the P&R I and P&R II NESHAP, and NSPS subparts IIIa, NNNa, and RRRa to conduct subsequent performance testing on non-flare control devices no later than 60 calendar months after the previous performance test. The comments and our specific response to this item can be found in the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking.

Also, we are finalizing, as proposed to: (1) Remove the provisions that allow compliance with certain portions of 40 CFR part 264, subpart AA or CC in lieu of portions of NESHAP subpart G (see 40 CFR 63.110(h)); and (2) remove the provisions that allow compliance with certain portions of 40 CFR part 65 in lieu of portions of NESHAP subparts G and H (see 40 CFR 63.110(i) and 40 CFR 60.160(g)). In addition, based on comments received on the proposed rulemaking, we are: (1) Revising 40 CFR 63.160(b)(1) and (c)(1) in the final rule such that compliance with HON subpart H constitutes compliance with NSPS subpart VVa provided the owner or operator continues to comply with 40 CFR 60.480a(e)(2)(i); and (2) revising 40 CFR 63.160(b)(1) and (c)(1) in the final rule such that compliance with HON subpart H constitutes compliance with NSPS subpart VVb provided the owner or operator continues to comply with 40 CFR 60.480b(e)(2)(i). We have also revised 40 CFR 60.480b(e)(2)(i) in the final rule to require compliance with 40 CFR 60.482–7b (*i.e.,* the standards for gas and light liquid valves in NSPS subpart VVb) in addition to the requirements of 40 CFR 60.485b(d), (e), and (f), and 40 CFR 60.486b(i) and (j). The comments and our specific responses to these items can be found in the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking.

Finally, we are finalizing all of the revisions that we proposed for clarifying text or correcting typographical errors, grammatical errors, and cross-reference errors. These editorial corrections and clarifications are discussed in section III.E.5.f of the proposal preamble (see 88 FR 25080, April 25, 2023). We are also including several additional minor clarifying edits in the final rule based on comments received during the public comment period. The comments and our specific responses to these items can be found in the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking.

*G. What are the effective and compliance dates of the standards?*

1. HON and the P&R I and P&R II NESHAP

For all of the requirements we are finalizing under CAA sections 112(d)(2), (3), and (6), and 112(h) (except for the removal of affirmative defense provisions in the P&R I NESHAP and fenceline monitoring requirements in HON and the P&R I NESHAP), all existing affected sources and all affected sources that were new sources under the previous HON and P&R I NESHAP (*i.e.,* sources that commenced construction or reconstruction after December 31, 1992 (for HON) or after June 12, 1995 (for the P&R I NESHAP), and on or before April 25, 2023), must comply with all of the amendments no later than July 15, 2027, or upon startup, whichever is later. For existing sources, CAA section 112(i) provides that the compliance date for standards promulgated under section 112(d) shall be as expeditious as practicable, but no later than 3 years after the effective date of the standard. *Association of Battery Recyclers* v. *EPA,* 716 F.3d 667, 672 (D.C. Cir. 2013) ("Section 112(i)(3)'s three-year maximum compliance period applies generally to any emission standard . . . promulgated under [section 112]."). We agree with the commenters (see section 11.1 of the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and*

*Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking) that 3 years is needed for owners and operators to implement the requirements we are finalizing under CAA sections 112(d)(2), (3), and (6). For example, for process vents, if an affected source has uncontrolled process vents that emit greater than or equal to 1.0 lb/hr of total organic HAP, then a new control system, such as a thermal oxidizer with piping, ductwork, etc., may need to be installed (due to the removal of the TRE concept in its entirety in the final rule). Also, additional permits (*e.g.,* New Source Review and/or a Title V permit modifications) may be required for new emission control equipment. Moreover, 3 years is needed to understand the final rule changes; revise site guidance and compliance programs; ensure operations can meet the standards during startup and shutdown; update operation, maintenance, and monitoring plans; upgrade emission capture and control systems; install new flare monitoring equipment; and install new process control systems. As provided in CAA section 112(i) and 5 U.S.C. 801(3), all new affected sources that commenced construction or reconstruction after April 25, 2023, are required to comply with all requirements under CAA sections 112(d)(2), (3), (6), and 112(h) (including fenceline monitoring) by July 15, 2024 or upon startup, whichever is later. We are also finalizing, as proposed, that owners or operators of P&R I affected sources must comply with the removal of the affirmative defense provisions 60 days after the publication date of the final rule (or upon startup, whichever is later). We provided additional rationale for these compliance dates in the preamble to the proposed rule (88 FR 25080, April 25, 2023).

In a change from the proposed rule, we have extended the compliance date for fenceline monitoring (with the exception of fenceline monitoring of chloroprene at P&R I affected sources producing neoprene, which is discussed later in this section) from 1 to 2 years. Owners and operators of all existing sources, and all affected sources that were new under the current rules—*i.e.,* sources that commenced construction or reconstruction after December 31, 1992 (for HON) or after June 12, 1995 (for the P&R I NESHAP), and on or before April 25, 2023—must begin fenceline monitoring 2 years after the effective date of the final rule and, starting 3 years after the effective date of the final rule, must perform root cause analysis and apply corrective action

requirements upon exceedance of an annual average concentration action level. We extended the timeline for fenceline monitoring from 1 to 2 years based on comments received, which indicated that EPA Method 327 will require laboratories to increase their capacity to meet the requirements for fenceline monitoring. We consider this expanded timeline to be necessary to allow commercial labs to conduct the needed method development, expand capacity, and develop the logistics needed to meet the requirements in the final rule. We also agree with commenters' other assertions that more time is needed to read and assess the new fenceline monitoring requirements; prepare sampling and analysis plans; develop and submit site-specific monitoring plans; identify representative, accessible, and secure monitoring locations for offsite monitors and obtain permission from the property owner to both place and routinely access the monitors; make any necessary physical improvements to fencelines to be able to site monitors, including construction of access roads, physical fencing, and potential drainage improvements; and obtain approval of any necessary capital expenditures. We consider 2 years to be necessary to allow for all of these things. For additional details, see section 11.1 of the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking.

For all of the requirements we are finalizing under CAA sections 112(f) for the HON, we are finalizing as proposed, except we are clarifying that the compliance dates we proposed are from the effective date of the rule rather than the publication date of the proposal. In other words, all existing affected sources and all affected sources that were new sources under the previous HON (*i.e.,* sources that commenced construction or reconstruction after December 31, 1992, and on or before April 25, 2023) must comply with the EtO requirements no later than July 15, 2026, or upon startup, whichever is later. As explained in the April 25, 2023, proposed rule (88 FR 25080, 25176), CAA section 112(f)(4) prescribes the compliance date for emission standards issued under CAA section 112(f). *Ass'n of Battery Recyclers* v.

*EPA, 716 F.3d 667, 672 (D.C. Cir. 2013)* ("[S]ection 112(f)(4)'s two-year maximum applies more specifically to standards 'under this subsection,' *i.e.,* section 112(f)."). For existing sources, the earliest compliance date for CAA section 112(f) standards is 90 days. However, the compliance period can be extended up to 2 years if the EPA finds that more time is needed for the installation of controls. 42 U.S.C. 7412(f)(4)(B). The EPA finds that the new EtO provisions under CAA section 112(f) will require additional time to plan, purchase, and install emission control equipment. For example, for process vents, if an affected source cannot demonstrate 99.9-percent control of EtO emissions, or reduce EtO emissions to less than 1 ppmv (from each process vent) or 5 pounds per year (for all combined process vents), then a new control system, such as a scrubber with piping, ductwork, feed tanks, etc., may need to be installed. Similarly, this same scenario (*i.e.,* installation of a new control system, such as a scrubber with piping, ductwork, feed tanks, etc) may be necessary for storage vessels in order to reduce EtO emissions by greater than or equal to 99.9 percent by weight or to a concentration less than 1 ppmv. Likewise, a new steam stripper may be needed control wastewater with a total annual average concentration of EtO greater than or equal to 1 ppmw. Additionally, we agree with commenters (see section 11.1 of the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking) that additional permits may be required for these new emission control equipment (*e.g.,* New Source Review and/or a Title V permit modifications). In other words, sufficient time is needed to properly engineer the project, obtain capital authorization and funding, procure the equipment, obtain permits, and construct and start-up the equipment. Therefore, we are finalizing a compliance date of 2 years after the effective date of the final rule for all existing affected sources to meet the EtO requirements. All new affected sources that commence construction or reconstruction after April 25, 2023, are required to comply with the EtO requirements for the HON by July 15, 2024 or upon startup, whichever is later.

This compliance schedule is consistent with the compliance deadlines outlined in the CAA under section 112(f)(4) and the CRA. We provided additional rationale for these compliance dates in the preamble to the proposed rule (88 FR 25080, April 25, 2023).

In a change from the proposed rule, the EPA is shortening the compliance deadline for affected sources producing neoprene, due to the EPA's finding that chloroprene emissions from the only such source pose an imminent and substantial endangerment under CAA section 303, 42 U.S.C. 7603. *United States* v. *Denka Performance Elastomer, LLC, et al.,* No. 2:23–cv–00735 (E.D. La. filed Feb. 28, 2023). All existing affected sources producing neoprene and all affected sources producing neoprene that were new sources under the previous P&R I NESHAP (*i.e.,* sources that commenced construction or reconstruction after June 12, 1995, and on or before April 25, 2023) must comply with the chloroprene requirements we are finalizing under CAA section 112(f) for the P&R I NESHAP (see sections III.B.1 and IV.A.3.e of this preamble for a details about these chloroprene requirements) no later than October 15, 2024,[32] or upon startup, whichever is later. However, such sources may seek the EPA's approval of a waiver from the 90-day compliance deadline and obtain a compliance date of up to July 15, 2026 if they demonstrate to the Administrator's satisfaction that "such period is necessary for the installation of controls" and that steps will be taken during the waiver period to assure that the public health of persons will be protected from any imminent endangerment. See 42 U.S.C. 112(f)(4)(B); 40 CFR 63.6(i)(4)(ii).[33]

[32] The compliance date is 90 days after the effective date of this final action due to the Congressional Review Act.

[33] We are revising the General Provisions table to the P&R II NESHAP entry for 40 CFR 63.6(e)(1)(i) by changing the "No" to "Yes" for affected sources producing neoprene. EPA is also retaining authority to grant or deny requests for extensions of the compliance date under 40 CFR 63.6(i)(4)(ii) at 40 CFR 63.507(c)(6), and is not delegating that authority to states.

All new affected sources that commence construction or reconstruction after April 25, 2023, are required to comply with the chloroprene requirements for P&R I affected sources producing neoprene no later than by July 15, 2024 or upon startup, whichever is later. This compliance schedule is consistent with the compliance deadlines outlined in the CAA under section 112(f)(4) and the CRA, 5 U.S.C. 801.

2. NSPS Subparts VV, VVa, VVb, III, IIIa, NNN, NNNa, RRR, RRRa

All sources of equipment leaks in the SOCMI (regulated under NSPS subpart VVb) and all SOCMI air oxidation unit processes, distillation operations, and reactor processes (regulated under NSPS subparts IIIa, NNNa, and RRRa, respectively), that commenced construction, reconstruction, or modification on or after April 25, 2023, must meet the requirements of the new NSPS upon startup of the new, reconstructed or modified facility or by July 15, 2024, whichever is later. This compliance schedule is consistent with the requirements in section 111 of the CAA and the CRA.

Also, for NSPS subparts VV, VVa, III, NNN, and RRR, we are finalizing, as proposed, the change in format of the reporting requirements to require electronic reporting (*i.e.,* we are not finalizing any new data elements); and owners and operators must begin submitting performance test reports electronically beginning on July 15, 2024 and semiannual reports on and after July 15, 2025 or once the report template for the subpart has been available on the CEDRI website (*https://www.epa.gov/electronic-reporting-air-emissions/cedri*) for 1 year, whichever date is later. For NSPS subparts IIIa, NNNa, and RRRa, we are finalizing, as proposed, that owners and operators must submit performance test reports electronically within 60 days after the date of completing each performance test, and for NSPS subparts VVb, IIIa, NNNa, and RRRa, semiannual reports on and after July 15, 2024 or once the report template for the subpart has been available on the CEDRI website (*https://www.epa.gov/electronic-reporting-air-emissions/cedri*) for 1 year, whichever date is later.

IV. What is the rationale for our final decisions and amendments for the SOCMI, P&R I, and P&R II source categories?

For each issue, this section provides a description of what we proposed and what we are finalizing for the issue, the EPA's rationale for the final decisions and amendments, and a summary of key comments and responses. For all comments not discussed in this preamble, comment summaries and the EPA's responses can be found in the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking.

A. Residual Risk Review for the SOCMI and Neoprene Production Source Categories NESHAP

1. What did we propose pursuant to CAA section 112(f) for the SOCMI and Neoprene Production source categories?

a. SOCMI Source Category

Pursuant to CAA section 112(f), the EPA conducted a residual risk review and presented the results of this review, along with our proposed decisions regarding risk acceptability and ample margin of safety, in the April 25, 2023, proposed rule for the SOCMI source category subject to HON (88 FR 25080). The results of the risk assessment for the proposal are presented briefly in Table 1 of this preamble. More detail is in the residual risk technical support document, *Residual Risk Assessment for the SOCMI Source Category in Support of the 2023 Risk and Technology Review Proposed Rule* (see Docket Item No. EPA–HQ–OAR–2022–0730–0085).

**Table 4. SOCMI Source Category and Facility-wide Inhalation Risk Assessment Results Based on Baseline (Pre-Control) Emissions and Post-Control Emissions**

| Risk Assessment | Maximum Individual Cancer Risk (-in-1 million)[1] | Estimated Population at Increased Risk of Cancer | | Estimated Annual Cancer Incidence (cases per year) | Maximum Chronic Noncancer TOSHI | Refined Maximum Screening Acute Noncancer HQ |
|---|---|---|---|---|---|---|
| | | > 100-in-1 million | ≥ 1-in-1 million | | | |
| *SOCMI Source Category* | | | | | | |
| Pre-Control Baseline | 2,000 | 83,000 (50 km) | 7.17 million (50 km) | 2 | 2 (maleic anhydride)  2 (chlorine) | HQ$_{REL}$ = 3 (chlorine)  HQ$_{REL}$ = 3 (acrolein) |
| Post-Control | 100 | 0 | 6.27 million (50km) | 0.4 | 2 (maleic anhydride)  2 (chlorine) | HQ$_{REL}$ = 3 (chlorine)  HQ$_{REL}$ = 3 (acrolein) |
| *Facility-wide* | | | | | | |
| Pre-Control Baseline | 2,000 | 90,000 (50 km) | 8.92 million (50 km) | 2 | 4 (chlorine, acrylic acid, and acrylonitrile) | -- |
| Post-Control | 2,000 | 2,900 (50 km) | 8.49 million (50 km) | 2 | 4 (chlorine, acrylic acid, and acrylonitrile) | -- |

[1] Maximum individual excess lifetime cancer risk due to HAP emissions.

b. Neoprene Source Category

In response to a comment in section IV.A.3.e.i of this preamble, we revised the performance standard for process vents and storage vessels in chloroprene service for the Neoprene Production source category. This revision did not change the baseline source category or facility-wide risk assessments for the Neoprene Production source category from proposal (see section IV.A.1.b of this preamble and Table 5 of this preamble). The revised assessment indicated that, after implementation of the controls, the MIR for the Neoprene Production source category is 100-in-1 million (down from 500-in-1 million in the pre-control baseline) with no individuals exposed to risk levels greater than 100-in-1 million from HAP

emissions from the Neoprene Production source category. This result is the same as in the proposal. The total population exposed to risk levels from the Neoprene Production source category greater than or equal to 1-in-1 million would be reduced from 690,000 people to 58,000 people. The total estimated cancer incidence of 0.05 drops to 0.01 excess cancer cases per year. For the risk results estimated after implementation of controls, the two changes from proposal are the number of people exposed to risk levels greater than or equal to 1-in-1 million (58,000 here compared to 48,000 at proposal) and the cancer incidence (0.01 here compared to 0.008 at proposal) from HAP emissions from the Neoprene Production source category. All other

results remained the same. Table 5 of this preamble summarizes the reduction in cancer risks due to emissions from the Neoprene Production source category based on the controls in this action. For further details on the revised risk assessment for the Neoprene Production source category, see the document titled *Residual Risk Assessment for the Polymers & Resins I Neoprene Production Source Category in Support of the 2024 Risk and Technology Review Final Rule,* which is available in the docket for this rulemaking.

Table 5 of this preamble also provides the facility-wide risks for the facility in the Neoprene Production source category, which are of increased importance due to the secondary

fenceline action level for chloroprene, before (pre-control baseline) and after controls (post-control) of neoprene production emission sources in this action. The post-control facility-wide MIR is 200-in-1 million, driven by chloroprene emissions from SOCMI and

neoprene production emission sources. The secondary fenceline action level of 0.3 µg/m³ for chloroprene will further reduce chloroprene emissions and therefore risks below these levels, with the MIR expected to be 100-in-1 million or lower, with no individuals exposed

to lifetime cancer risk levels greater than 100-in-1 million, and the number of people exposed to cancer risk levels greater than or equal to 1-in-1 million expected to be lower than those in Table 5 of this preamble.

## Table 5. Neoprene Production Source Category and Facility-wide Inhalation Risk Assessment Results Based on Baseline (Pre-Control) Emissions and Post-Control Emissions

| Risk Assessment | Maximum Individual Cancer Risk (-in-1 million)[1] | Estimated Population at Increased Risk of Cancer | | Estimated Annual Cancer Incidence (cases per year) | Maximum Chronic Noncancer TOSHI | Maximum Screening Acute Noncancer HQ |
|---|---|---|---|---|---|---|
| | | > 100-in-1 million | ≥ 1-in-1 million | | | |
| Neoprene Production Source Category | | | | | | |
| Pre-Control Baseline | 500 | 2,100 (50 km) | 690,000 (50 km) | 0.05 | 0.05 (chloroprene) | $HQ_{REL}$ = 0.3 (chloroform) |
| Post-Control | 100 | 0 | 58,000 (50 km) | 0.01 | 0.01 (chloroprene) | $HQ_{REL}$ = 0.3 (chloroform) |
| Facility-wide | | | | | | |
| Pre-Control Baseline | 600 | 2,300 (50 km) | 890,000 (50 km) | 0.06 | 0.3 (chlorine) | -- |
| Post-Control | 200 | 326 (50 km) | 87,000 (50 km) | 0.02 | 0.3 (chlorine) | --- |

[1] Maximum individual excess lifetime cancer risk due to HAP emissions.

3. What key comments did we receive on the risk review, and what are our responses?

This section provides summaries of and responses to the key comments received regarding our risk assessment for the SOCMI source category, our risk assessment for the Neoprene Production source category, the proposed requirements to reduce EtO emissions from the SOCMI source category, and the proposed requirements to reduce chloroprene emissions from the Neoprene Production source category. We received comments in support of and against the proposed residual risk review, the IRIS URE used in the review, and our determination that additional controls were warranted under CAA section 112(f)(2) for the SOCMI and Neoprene Production source categories. Other comments on these issues, as well as the EtO IRIS URE, chloroprene IRIS URE, and on additional issues regarding the residual risk review and the EPA's proposed changes based on the residual risk

review, can be found in the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking.

a. EtO IRIS URE

We received numerous comments in support of, and in opposition to, the EPA's use of the EtO IRIS value in assessing cancer risk for a source category under CAA section 112(f)(2) for EtO. After careful review of the comments, the Agency has determined that commenters did not identify new scientific information that would alter aspects of the EPA IRIS assessments or call into question the scientific judgments reflected in those assessments. The EPA continues to

affirm its determination that the IRIS assessments are scientifically sound and robust and represent the best available inhalation cancer risk values for EtO.[34] These comments are not summarized in this preamble. Instead, all of these comments (related to the EPA's use of the EtO IRIS value for CAA section 112(f)(2) risk assessment) and the EPA's responses are in the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking.

[34] 87 FR 77985 (Dec. 21, 2022), *Reconsideration of the 2020 National Emission Standards for Hazardous Air Pollutants: Miscellaneous Organic Chemical Manufacturing Residual Risk and Technology Review, Final action;* reconsideration of the final rule.

storage; log entries) for each required record. If the description changes, the owner or operator shall retain both the current and the most recent superseded description. The description, and the most recent superseded description, shall be retained as provided in § 63.103(c) of subpart F of this part, except as provided in paragraph (g)(1)(vi)(D) of this section.

(C) A description, and the date, of any change to the monitoring system that would reasonably be expected to affect its ability to comply with the requirements of paragraph (g)(1) of this section.

(D) Owners and operators subject to paragraph (g)(1)(vi)(B) of this section shall retain the current description of the monitoring system as long as the description is current, but not less than 5 years from the date of its creation. The current description shall, at all times, be retained on-site or be accessible from a central location by computer or other means that provides access within 2 hours after a request. The owner or operator shall retain the most recent superseded description at least until 5 years from the date of its creation. The superseded description shall be retained on-site (or accessible from a central location by computer that provides access within 2 hours after a request) at least 6 months after its creation. Thereafter, the superseded description may be stored off-site.

(2) If an owner or operator has elected to implement the requirements of paragraph (g)(1) of this section, and a period of 6 consecutive months has passed without an excursion as defined in paragraph (g)(2)(iv) of this section, the owner or operator is no longer required to record the daily average value for that parameter for that unit of equipment, for any operating day when the daily average value is less than the maximum, or greater than the minimum established limit. With approval by the Administrator, monitoring data generated prior to the compliance date of this subpart shall be credited toward the period of 6 consecutive months, if

the parameter limit and the monitoring was required and/or approved by the Administrator.

(i) If the owner or operator elects not to retain the daily average values, the owner or operator shall notify the Administrator in the next periodic report. The notification shall identify the parameter and unit of equipment.

(ii) If, on any operating day after the owner or operator has ceased recording daily averages as provided in paragraph (g)(2) of this section, there is an excursion as defined in paragraph (g)(2)(iv) of this section, the owner or operator shall immediately resume retaining the daily average value for each day, and shall notify the Administrator in the next periodic report. The owner or operator shall continue to retain each daily average value until another period of 6 consecutive months has passed without an excursion as defined in paragraph (g)(2)(iv) of this section.

(iii) The owner or operator shall retain the records specified in paragraphs (g)(1) (i), (ii), (iii), (iv), (v), and (vi) of this section. For any calendar week, if compliance with paragraphs (g)(1) (i), (ii), (iii), and (iv) of this section does not result in retention of a record of at least one occurrence or measured parameter value, the owner or operator shall record and retain at least one parameter value during a period of operation other than a startup, shutdown, or malfunction. For each source as defined in § 63.101, on and after July 15, 2027, the phrase "other than a startup, shutdown, or malfunction" in this paragraph no longer applies.

(iv) For purposes of paragraph (g) of this section, an excursion means that the daily average value of monitoring data for a parameter is greater than the maximum, or less than the minimum established value, except as provided in paragraphs (g)(2)(iv)(A) and (B) of this section.

(A) The daily average value during any startup, shutdown, or malfunction shall not be considered an excursion for purposes of this paragraph (g)(2), if the owner or operator operates the source

during such periods in accordance with § 63.102(a)(4). For each source as defined in § 63.101, on and after July 15, 2027, this paragraph no longer applies.

(B) An excused excursion, as described in § 63.152(c)(2)(ii)(B) and (C), shall not be considered an excursion for purposes of this paragraph (g)(2).

(h) Beginning no later than July 15, 2024, owners and operators must submit performance test reports in accordance with this paragraph. Unless otherwise specified in this subpart, within 60 days after the date of completing each performance test required by this subpart, owners and operators must submit the results of the performance test following the procedures specified in § 63.9(k). Data collected using test methods supported by the EPA's Electronic Reporting Tool (ERT) as listed on the EPA's ERT website (*https://www.epa.gov/electronic-reporting-air-emissions/electronic-reporting-tool-ert*) at the time of the test must be submitted in a file format generated through the use of the EPA's ERT. Alternatively, owners and operators may submit an electronic file consistent with the extensible markup language (XML) schema listed on the EPA's ERT website. Data collected using test methods that are not supported by the EPA's ERT as listed on the EPA's ERT website at the time of the test must be included as an attachment in the ERT or alternate electronic file.

■ 90. Amend § 63.153 by revising paragraph (c) introductory text and adding paragraph (c)(5) as follows:

### § 63.153 Implementation and enforcement.

\* \* \* \* \*

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (5) of this section.

\* \* \* \* \*

(5) Approval of an alternative to any electronic reporting to the EPA required by this subpart.

■ 91. Revise table 3 to subpart G to read as follows:

TABLE 3 TO SUBPART G OF PART 63—PROCESS VENTS—MONITORING, RECORDKEEPING, AND REPORTING REQUIREMENTS FOR CONTROL DEVICES AND RECAPTURE DEVICES

| Control or recapture device | Parameters to be monitored [a] | Recordkeeping and reporting requirements for monitored parameters |
|---|---|---|
| Thermal incinerator, other than a thermal oxidizer used to comply with § 63.124. | Firebox temperature [b] [63.114(a)(1)(i)] ........... | 1. Continuous records.[c]<br>2. Record and report the firebox temperature averaged over the full period of the performance test—NCS.[d]<br>3. Record the daily average firebox temperature for each operating day.[e]<br>4. Report all daily average temperatures that are outside the range established in the NCS or operating permit and all operating days when insufficient monitoring data are collected [f]—PR.[g] |
| Thermal oxidizer used to comply with § 63.124. | Combustion chamber temperature [63.124(b)(5)(i)]. | 1. Continuous records.[c]<br>2. Record and report the combustion chamber temperature averaged over the full period of the performance test—NCS.[d] |

contamination by the sample handler. High sample results attributed to unknown causes are not outliers if there is no evidence of sample contamination and the sample does not meet the requirements in Section 9.2 of Method 325A of appendix A of this part.

(7) The concentration difference (Δc) for each monitored compound for each sampling period and the annual average Δc for each monitored compound for each sampling period.

(8) Indication of whether the owner or operator was required to develop a corrective action plan under § 63.184(f).

(9) Data flags for each monitor for each analyte that was skipped for the sampling period, if the owner or operator uses an alternative sampling frequency under § 63.184(a)(3)(iii) or § 63.184(b)(2)(iii).

■ 115. Amend § 63.183 by revising paragraph (c) introductory text and adding paragraph (c)(5) to read as follows:

### § 63.183 Implementation and enforcement.

\* \* \* \* \*

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (5) of this section.

\* \* \* \* \*

(5) Approval of an alternative to any electronic reporting to the EPA required by this subpart.

■ 116. Add § 63.184 to read as follows:

### § 63.184 Fenceline monitoring provisions.

For each source as defined in § 63.101, and for each source as defined in § 63.191, beginning no later than the compliance dates specified in § 63.100(k)(12), the owner or operator must conduct sampling along the facility property boundary and analyze the samples in accordance with paragraphs (a) through (i) of this section. Sampling of benzene, 1,3-butadiene, chloroprene, and ethylene dichloride must be conducted in accordance with paragraph (a) of this section. Sampling of ethylene oxide and vinyl chloride must be conducted in accordance with paragraph (b) of this section. Paragraphs (c) through (i) of this section apply for any compound required to be sampled.

(a) The owner or operator must conduct sampling along the facility property boundary and analyze the samples in accordance with Methods 325A and 325B of appendix A to this part and paragraphs (a)(1) through (3) of this section. The monitoring perimeter may be located inside the facility, away from the facility property boundary. However, the monitoring perimeter must encompass all potential sources of

the target analyte(s) specified in paragraph (a)(1) of this section that are located within the facility's property boundary.

(1) The owner or operator must monitor the target analyte(s), as specified in paragraphs (a)(1)(i) through (iv) of this section. The owner or operator must follow the procedure in Section 9.6 of Method 325B of appendix A to this part to determine the detection limit of benzene, 1,3-butadiene, chloroprene, and ethylene dichloride for each sampler used to collect samples and blanks.

(i) If an affected source uses, produces, stores, or emits benzene, the owner or operator must include benzene as a target analyte.

(ii) If an affected source uses, produces, stores, or emits 1,3-butadiene, the owner or operator must include 1,3-butadiene as a target analyte.

(iii) If an affected source uses, produces, stores, or emits chloroprene, the owner or operator must include chloroprene as a target analyte.

(iv) If an affected source uses, produces, stores, or emits ethylene dichloride, the owner or operator must include ethylene dichloride as a target analyte.

(2) The owner or operator must determine passive monitor locations in accordance with Section 8.2 of Method 325A of appendix A to this part.

(i) As it pertains to this subpart, known sources of VOCs, as used in Section 8.2.1.3 in Method 325A of appendix A to this part for siting passive monitors, means a wastewater treatment unit, process unit, or any emission source requiring control according to the requirements of this subpart, including marine vessel loading operations. For marine vessel loading operations, one passive monitor should be sited on the shoreline adjacent to the dock. For this subpart, an additional monitor is not required if the only emission sources within 50 meters of the monitoring boundary are equipment leak sources satisfying all of the conditions in paragraphs (a)(2)(i)(A) through (C) of this section. If a leak is found, it must be repaired no later than 15 calendar days after it is detected with no provisions for delay of repair. If a repair is not completed within 15 calendar days, the additional passive monitor specified in Section 8.2.1.3 in Method 325A of appendix A to this part must be used.

(A) The equipment leak sources in organic HAP service within 50 meters of the monitoring boundary are limited to valves, pumps, connectors, sampling connections, and open-ended lines. If compressors, pressure relief devices, or

agitators in organic HAP service are present within 50 meters of the monitoring boundary, the additional passive monitoring location specified in Section 8.2.1.3 in Method 325A of appendix A to this part must be used.

(B) All equipment leak sources in gas or light liquid service (and in organic HAP service), including valves, pumps, connectors, sampling connections and open-ended lines, must be monitored using Method 21 of appendix A–7 to 40 CFR part 60 no less frequently than quarterly with no provisions for skip period monitoring, or according to the provisions of § 63.11(c) Alternative Work practice for monitoring equipment for leaks. For the purpose of this provision, a leak is detected if the instrument reading equals or exceeds the applicable limits in paragraphs (a)(2)(i)(B)(*1*) through (*5*) of this section:

(*1*) For valves, pumps or connectors at an existing source, an instrument reading of 10,000 ppmv.

(*2*) For valves or connectors at a new source, an instrument reading of 500 ppmv.

(*3*) For pumps at a new source, an instrument reading of 2,000 ppmv.

(*4*) For sampling connections or open-ended lines, an instrument reading of 500 ppmv above background.

(*5*) For equipment monitored according to the Alternative Work practice for monitoring equipment for leaks, the leak definitions contained in § 63.11(c)(6)(i) through (iii).

(C) All equipment leak sources in organic HAP service, including sources in gas, light liquid and heavy liquid service, must be inspected using visual, audible, olfactory, or any other detection method at least monthly. A leak is detected if the inspection identifies a potential leak to the atmosphere or if there are indications of liquids dripping.

(ii) If there are 19 or fewer monitoring locations, the owner or operator must collect at least one co-located duplicate sample per sampling period and at least one field blank per sampling period. If there are 20 or more monitoring locations, the owner or operator must collect at least two co-located duplicate samples per sampling period and at least one field blank per sampling period. The co-located duplicates may be collected at any of the perimeter sampling.

(iii) Samplers are not required to be placed along internal roads, waterways, or other right of ways that may bisect the facility. If a facility is bounded by a waterway on one or more sides, the shoreline is considered the facility property boundary.

**§ 63.480 Applicability and designation of affected sources.**

\* \* \* \* \*

(j) *Applicability of this subpart.* Paragraphs (j)(1) through (3) of this section must be followed during periods of non-operation of the affected source or any part thereof.

\* \* \* \* \*

(4) Beginning on July 15, 2024, this paragraph (j)(4) no longer applies. In response to an action to enforce the standards set forth in this subpart, an owner or operator may assert an affirmative defense to a claim for civil penalties for exceedances of such standards that are caused by a malfunction, as defined in § 63.2. Appropriate penalties may be assessed, however, if the owner or operator fails to meet the burden of proving all the requirements in the affirmative defense. The affirmative defense shall not be available for claims for injunctive relief.

\* \* \* \* \*

■ 121. Amend § 63.481 by revising paragraph (a), (b), (c) introductory text, (d) introductory text, (k), and adding paragraphs (k)(2) and (n) through (p) as follows:

**§ 63.481 Compliance dates and relationship of this subpart to existing applicable rules.**

(a) Affected sources are required to achieve compliance on or before the dates specified in paragraphs (b) through (d) of this section and paragraphs (n) and (o) of this section. Paragraph (e) of this section provides information on requesting compliance extensions. Paragraphs (f) through (l) of this section discuss the relationship of this subpart to subpart A and to other applicable rules. Where an override of another authority of the Act is indicated in this subpart, only compliance with the provisions of this subpart is required. Paragraph (m) of this section specifies the meaning of time periods.

(b) Except as specified in paragraphs (n) and (o) of this section, new affected sources that commence construction or reconstruction after June 12, 1995 shall be in compliance with this subpart upon initial start-up or by June 19, 2000, whichever is later.

(c) With the exceptions provided in paragraphs (c)(1) through (3) of this section and paragraphs (n) and (o) of this section, existing affected sources shall be in compliance with this subpart no later than June 19, 2001, as provided in § 63.6(c), unless an extension has been granted as specified in paragraph (e) of this section.

\* \* \* \* \*

(d) Except as provided for in paragraphs (d)(1) through (d)(6) of this section, and paragraphs (n) and (o) of this section, existing affected sources shall be in compliance with § 63.502 no later than July 31, 1997, unless an extension has been granted pursuant to paragraph (e) of this section.

\* \* \* \* \*

(k) *Applicability of other regulations for monitoring, recordkeeping or reporting with respect to combustion devices, recovery devices, or recapture devices.* (1) After the compliance dates specified in this subpart, if any combustion device, recovery device or recapture device subject to this subpart is also subject to monitoring, recordkeeping, and reporting requirements in 40 CFR part 264 subpart AA or CC, or is subject to monitoring and recordkeeping requirements in 40 CFR part 265 subpart AA or CC and the owner or operator complies with the periodic reporting requirements under 40 CFR part 264 subpart AA or CC that would apply to the device if the facility had final-permitted status, the owner or operator may elect to comply either with the monitoring, recordkeeping and reporting requirements of this subpart, or with the monitoring, recordkeeping and reporting requirements in 40 CFR parts 264 and/or 265, as described in this paragraph, which shall constitute compliance with the monitoring, recordkeeping and reporting requirements of this subpart. The owner or operator shall identify which option has been selected in the Notification of Compliance Status required by § 63.506(e)(5).

(2) Owners and operators of flares that are subject to the flare related requirements of this subpart and are also subject to flare related requirements of any other regulation in this part or 40 CFR part 61 or 63, may elect to comply with the requirements in § 63.508 in lieu of all flare related requirements in any other regulation in this part or 40 CFR part 61 or 63.

\* \* \* \* \*

(n) All affected sources that commenced construction or reconstruction on or before April 25, 2023, must be in compliance with the requirements listed in paragraphs (n)(1) through (9) of this section upon initial startup or on July 15, 2027, whichever is later. All affected sources that commenced construction or reconstruction after April 25, 2023, must be in compliance with the requirements listed in paragraphs (n)(1) through (9) of this section upon initial startup, or on July 15, 2024, whichever is later.

(1) The general requirements specified in § 63.483(e), § 63.504(a),
§ 63.504(a)(1)(iii), and
§ 63.506(e)(6)(iii)(C).

(2) For flares, the requirements specified in § 63.508.

(3) For storage vessels, the requirements specified in § 63.484(t) and § 63.506(e)(4)(ii)(F)(6).

(4) For continuous front-end process vents, the requirements specified in §§ 63.485(l)(6), (o)(6), (p)(5), (q)(1)(vii), (x), § 63.503(g)(2)(iii)(B)(4), and § 63.506(e)(4)(ii)(F)(6).

(5) For batch front-end process vents, the requirements specified in §§ 63.487(a)(3), (b)(3), and (e)(1)(iv) and (i), §§ 63.488(d)(2), (e)(4), (f)(2), and (g)(3), §§ 63.489(b)(10) and (d)(3), §§ 63.491(d)(1)(iii), (e)(6), and (h), § 63.492(g), and Table 6 to this subpart, item 3 in column 3 for diversion to the atmosphere and monthly inspections of sealed valves for all control devices.

(6) For back-end processes, the requirements specified in §§ 63.497(a)(8) and (d)(3), and § 63.498(d)(5)(v).

(7) For wastewater, the requirements specified in §§ 63.501(d), (e), and (f).

(8) For equipment leaks, the requirements specified in §§ 63.502(a)(2) and (k)(2).

(9) For heat exchange systems, the requirements specified in §§ 63.502(n)(7) and (n)(8).

(o) All affected sources that commenced construction or reconstruction on or before April 25, 2023, must be in compliance with the chloroprene requirements in §§ 63.484(u), 63.485(y) and (z), 63.487(j), 63.494(a)(7), 63.501(a)(10)(iv), 63.502(a)(3) and (a)(7), 63.509, and 63.510 upon initial startup or on October 15, 2024, whichever is later. All affected sources that commenced construction or reconstruction after April 25, 2023, must be in compliance with the chloroprene requirements in §§ 63.484(u), 63.485(x) and (z), 63.487(j), 63.494(a)(7), § 63.501(a)(10)(iv), 63.502(q), 63.502(a)(3) and (a)(7), 63.509, and 63.510 upon initial startup, or on July 15, 2024, whichever is later.

(p) The compliance schedule for fenceline monitoring is specified in paragraphs (p)(1) and (2) of this section.

(1) Except as specified in paragraph (p)(2) of this section, all affected sources that commenced construction or reconstruction on or before April 25, 2023, must commence fenceline monitoring according to the requirements in § 63.502(a)(4) by no later than July 15, 2026, however requirements for corrective actions are not required until on or after July 15, 2027. All affected sources that commenced construction or

reconstruction after April 25, 2023, must be in compliance with the fenceline monitoring requirements listed in § 63.502(a)(4) upon initial startup, or on July 15, 2024, whichever is later.

(2) For affected sources producing neoprene, the compliance schedule specified in paragraph (p)(1) of this section does not apply for chloroprene. Instead, all affected sources producing neoprene that commenced construction or reconstruction on or before April 25, 2023, must be in compliance with the fenceline monitoring requirements for chloroprene listed in § 63.502(a)(4) and (a)(7) upon initial startup or on October 15, 2024, whichever is later. All affected sources producing neoprene that commenced construction or reconstruction after April 25, 2023, must be in compliance with the fenceline monitoring requirements for chloroprene listed in § 63.502(a)(4) and (a)(7) upon initial startup, or on July 15, 2024, whichever is later.

■ 122. Revise and republish § 63.482 to read as follows:

§ 63.482  Definitions.

(a) The following terms used in this subpart shall have the meaning given them in § 63.2, § 63.101, or the Act, as specified after each term:

Act (§ 63.2)
Administrator (§ 63.2)
Automated monitoring and recording system (§ 63.101)
Boiler (§ 63.101)
Bottoms receiver (§ 63.101)
Breakthrough (§ 63.101)
By compound (§ 63.101)
By-product (§ 63.101)
Car-seal (§ 63.101)
Closed-vent system (§ 63.101)
Combustion device (§ 63.101)
Commenced (§ 63.2)
Compliance date (§ 63.2)
Connector (§ 63.101)
Continuous monitoring system (§ 63.2)
Distillation unit (§ 63.101)
Duct work (§ 63.101)
Emission limitation (Section 302(k) of the Act)
Emission standard (§ 63.2)
Emissions averaging (§ 63.2)
EPA (§ 63.2)
Equipment leak (§ 63.101)
External floating roof (§ 63.101)
Fill or filling (§ 63.101)
Fixed capital cost (§ 63.2)
Flame zone (§ 63.101)
Floating roof (§ 63.101)
Flow indicator (§ 63.101)
Fuel gas system (§ 63.101)
Halogens and hydrogen halides (§ 63.101)
Hard-piping (§ 63.101)

Hazardous air pollutant (§ 63.2)
Heat exchange system (§ 63.101)
Impurity (§ 63.101)
Incinerator (§ 63.101)
In organic hazardous air pollutant service or in organic HAP service (§ 63.101)
Instrumentation system (§ 63.101)
Internal floating roof (§ 63.101)
Lesser quantity (§ 63.2)
Major source (§ 63.2)
Malfunction (§ 63.2)
Oil-water separator or organic-water separator (§ 63.101)
Open-ended valve or line (§ 63.101)
Operating permit (§ 63.101)
Organic monitoring device (§ 63.101)
Owner or operator (§ 63.2)
Performance evaluation (§ 63.2)
Performance test (§ 63.2)
Permitting authority (§ 63.2)
Plant site (§ 63.101)
Potential to emit (§ 63.2)
Pressure release (§ 63.101)
Primary fuel (§ 63.101)
Pressure release (§ 63.101)
Pressure relief device (§ 63.101)
Pressure vessel (§ 63.101)
Process heater (§ 63.101)
Process unit shutdown (§ 63.101)
Process wastewater (§ 63.101)
Process wastewater stream (§ 63.101)
Reactor (§ 63.101)
Recapture device (§ 63.101)
Relief valve (§ 63.101)
Repaired (§ 63.101)
Research and development facility (§ 63.101)
Routed to a process or route to a process (§ 63.101)
Run (§ 63.2)
Secondary fuel (§ 63.101)
Sensor (§ 63.101)
Specific gravity monitoring device (§ 63.101)
Start-up, shutdown, and malfunction plan (§ 63.101) On and after July 15, 2027, this definition no longer applies.
State (§ 63.2)
Stationary Source (§ 63.2)
Surge control vessel (§ 63.101)
Temperature monitoring device (§ 63.101)
Test method (§ 63.2)
Treatment process (§ 63.101)
Unit operation (§ 63.101)
Visible emission (§ 63.2)
Secondary fuel (§ 63.101)
Sensor (§ 63.101)
Specific gravity monitoring device (§ 63.101)
Start-up, shutdown, and malfunction plan (§ 63.101) On and after July 15, 2027, this definition no longer applies.
State (§ 63.2)
Stationary Source (§ 63.2)
Surge control vessel (§ 63.101)

Temperature monitoring device (§ 63.101)
Test method (§ 63.2)
Treatment process (§ 63.101)
Unit operation (§ 63.101)
Visible emission (§ 63.2)

(b) All other terms used in this subpart shall have the meaning given them in this section. If a term is defined in a subpart referenced in this section, it shall have the meaning given in this section for purposes of this subpart.

*Affected source* is defined in § 63.480(a).

*Affirmative defense* means, in the context of an enforcement proceeding, a response or a defense put forward by a defendant, regarding which the defendant has the burden of proof, and the merits of which are independently and objectively evaluated in a judicial or administrative proceeding. Beginning on July 15, 2024, this definition of *affirmative defense* no longer applies.

*Aggregate batch vent stream* means a gaseous emission stream containing only the exhausts from two or more batch front-end process vents that are ducted, hard-piped, or otherwise connected together for a continuous flow.

*Annual average batch vent concentration* is determined using Equation 17, as described in § 63.488(h)(2) for halogenated compounds.

*Annual average batch vent flow rate* is determined by the procedures in § 63.488(e)(3).

*Annual average concentration,* as used in the wastewater provisions, means the flow-weighted annual average concentration, as determined according to the procedures specified in § 63.144(b), with the exceptions noted in § 63.501, for the purposes of this subpart.

*Annual average flow rate,* as used in the wastewater provisions, means the annual average flow rate, as determined according to the procedures specified in § 63.144(c), with the exceptions noted in § 63.501, for the purposes of this subpart.

*Average batch vent concentration* is determined by the procedures in § 63.488(b)(5)(iii) for HAP concentrations and is determined by the procedures in § 63.488(h)(1)(iii) for organic compounds containing halogens and hydrogen halides.

*Average batch vent flow rate* is determined by the procedures in § 63.488(e)(1) and (2).

*Back-end* refers to the unit operations in an EPPU following the stripping operations. Back-end process operations include, but are not limited to, filtering,

subpart, owners and operators must submit the results of the performance test following the procedures specified in § 63.9(k). Data collected using test methods supported by the EPA's Electronic Reporting Tool (ERT) as listed on the EPA's ERT website (*https://www.epa.gov/electronic-reporting-air-emissions/electronic-reporting-tool-ert*) at the time of the test must be submitted in a file format generated through the use of the EPA's ERT. Alternatively, owners and operators may submit an electronic file consistent with the extensible markup language (XML) schema listed on the EPA's ERT website. Data collected using test methods that are not supported by the EPA's ERT as listed on the EPA's ERT website at the time of the test must be included as an attachment in the ERT or alternate electronic file.

■ 144. Amend § 63.507 by revising paragraph (c) introductory text and adding paragraphs (c)(5) and (6) to read as follows:

**§ 63.507  Implementation and enforcement.**

\* \* \* \* \*

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (6) of this section.

\* \* \* \* \*

(5) Approval of an alternative to any electronic reporting to the EPA required by this subpart.

(6) Approval of an extension request under § 63.6(i)(4)(ii).

■ 145. Add § 63.508 to read as follows:

**§ 63.508  Flare requirements.**

(a) For any flare that is used to reduce organic HAP emissions from an EPPU, the owner or operator may elect to comply with the requirements in this section in lieu of the requirements of § 63.11(b) and the requirements referenced therein. The owner or operator may also elect to comply with the requirements in this section pursuant to the overlap provisions provided in § 63.481(k)(2). However, beginning no later than the compliance dates specified in § 63.481(n), the provisions specified in paragraphs (a)(1) through (32) of this section no longer apply. Instead, if an owner or operator reduces organic HAP emissions from an EPPU by venting emissions through a closed-vent system to a steam-assisted, air-assisted, or non-assisted flare, then the owner or operator must meet the applicable requirements for flares as specified in §§ 63.670 and 63.671, including the provisions in tables 12 and 13 to subpart CC of this part, except as specified in paragraph (b) of this

section. This requirement also applies to any flare using fuel gas from a fuel gas system, of which 50 percent or more of the fuel gas is derived from a EPPU, as determined on an annual average basis. For purposes of compliance with this paragraph, the following terms are defined in § 63.641 of subpart CC of this part: Assist air, assist steam, center steam, combustion zone, combustion zone gas, flare, flare purge gas, flare supplemental gas, flare sweep gas, flare vent gas, lower steam, net heating value, perimeter assist air, pilot gas, premix assist air, total steam, and upper steam.

(1) §§ 63.487(a)(1)(i) and (b)(1)(i);
(2) § 63.489(b)(2);
(3) § 63.490(a)(1);
(4) §§ 63.491(b)(3)(i) through (b)(3)(iii);
(5) § 63.494(d);
(6) § 63.496(b)(7)(i)(A);
(7) § 63.497(a)(2);
(8) § 63.498(d)(5)(ii)(E);
(9) § 63.502(k)(1);
(10) §§ 63.504(c)(1) through (c)(3);
(11) § 63.107(h)(9)(i) related to criteria in § 63.11(b);
(12) § 63.113(a)(1);
(13) § 63.114(a)(2);
(14) §§ 63.116(a)(1) through (a)(3);
(15) §§ 63.117(a)(5)(i) through (a)(5)(iii);
(16) § 63.118(f)(5);
(17) The last sentence in § 63.119(e)(1);
(18) §§ 63.120(e)(1) through (e)(6);
(19) §§ 63.122(c)(2) and (g)(3);
(20) § 63.126(b)(2)(i);
(21) § 63.127(a)(2);
(22) §§ 63.128(b)(1) through (b)(3);
(23) §§ 63.129(a)(5)(i) through (a)(5)(iii);
(24) §§ 63.130(a)(2)(i), (c), and (d)(5);
(25) §§ 63.139(c)(3) and (d)(3);
(26) §§ 63.145(j)(1) through (j)(3);
(27) §§ 63.146(b)(7)(i)(A) through (b)(7)(i)(C);
(28) § 63.147(d)(1);
(29) §§ 63.172(d);
(30) §§ 63.180(e)(1) through (e)(3);
(31) § 63.181(g)(1)(iii); and
(32) The phrase "including periods when a flare pilot light system does not have a flame" in § 63.181(g)(2)(i).

(b) The exceptions specified in paragraphs (b) through (o) of § 63.108 apply, except as specified in paragraphs (b)(1) through (5) of this section.

(1) Where the term "chemical manufacturing process unit" is used, the term "EPPU" applies instead for the purposes of this subpart.

(2) Where the reference "§ 63.100(k)(10)" is used, the reference § 63.481(n) applies instead for the purposes of this subpart.

(3) Where the phrase "Hazardous Organic Chemical Manufacturing" is

used, the phrase "Polymers and Resins" applies instead for the purposes of this subpart.

(4) Where the reference "§ 63.152(b)(7) of subpart G of this part" is used, the reference "§ 63.506(e)(5)(xiii)" applies instead for the purposes of this subpart.

(5) Section 63.108(i) does not apply.

■ 146. Add § 63.509 to read as follows:

**§ 63.509  Procedures for determining whether process vents, storage vessels, or wastewater are in chloroprene service.**

This section applies beginning no later than the compliance dates specified in § 63.481(o). To determine if process vents, storage vessels, or wastewater in a process at affected sources producing neoprene are in chloroprene service, as defined in § 63.482, owners and operators must comply with the requirements in paragraphs (a) through (c) of this section, as applicable.

(a) For each continuous front-end process vent, each batch front-end process vent, and each back-end process vent in a process at affected sources producing neoprene, owners and operators must measure the flow rate and concentration of chloroprene of each process vent as specified in paragraphs (a)(1) through (5) of this section.

(1) Measurements must be made prior to any dilution of the vent streams.

(2) Measurements may be made on the combined vent streams at an elastomer product process unit or for each separate vent stream.

(3) The sampling site shall be after the last recovery device (if any recovery devices are present) but prior to the inlet of any control device that is present and prior to release to the atmosphere. Method 1 or 1A of appendix A–1 to 40 CFR part 60, as appropriate, must be used for the selection of the sampling sites. For vents smaller than 0.10 meter in diameter, sample at one point at the center of the duct.

(4) The gas volumetric flow rate must be determined using Method 2, 2A, 2C, 2D, 2F, or 2G of appendices A–1 and A–2 to 40 CFR part 60, as appropriate.

(5) Except as specified in paragraph (a)(6) of this section, the concentration of chloroprene must be determined using Method 18 of appendix A–6 to 40 CFR part 60 or Method 320 of appendix A to this part.

(6) You may elect to use ASTM D6348–12 (Reapproved 2020) (incorporated by reference, see § 63.14) in lieu of Method 320 of appendix A to this part as specified in paragraph (a)(5) of this section. To comply with this

*www.epa.gov/electronic-reporting-air-emissions/cedri*) for this subpart. The date report templates become available will be listed on the CEDRI website. Unless the Administrator or delegated state agency or other authority has approved a different schedule for submission of reports under § 63.9(i) and § 63.10(a), the report must be submitted by the deadline specified in this subpart, regardless of the method in which the report is submitted. If a report is submitted via CEDRI, the certifier's electronic signature during the submission process replaces the requirements in § 63.10(e)(3)(v), § 63.10(e)(3)(vi)(L), and § 63.10(e)(3)(vi)(M) to submit the date of the report and the name, title, and signature of the responsible official who is certifying the accuracy of the report.

(1) Reports of monitoring data, including 15-minute monitoring values as well as daily average values or per-unit operation average values, as applicable, of monitored parameters for all operating days or unit operations when the average values were outside the ranges established in the Notification of Compliance Status or operating permit, including reports specified in paragraph (a)(4) of this section.

(2) Reports of the duration of periods when monitoring data is not collected for each excursion caused by insufficient monitoring data, including reports specified in paragraph (a)(4) of this section. An excursion means any of the three cases listed in paragraph (a)(2)(i) or (a)(2)(ii) of this section. For a control device where multiple parameters are monitored, if one or more of the parameters meets the excursion criteria in paragraph (a)(2)(i) or (a)(2)(ii) of this section, this is considered a single excursion for the control device. In the report, include the identification of the source, start date, start time, duration in hours, and monitored parameter(s) meeting the excursion criteria.

(i) When the period of control device operation is 4 hours or greater in an operating day and monitoring data are insufficient to constitute a valid hour of data, as defined in paragraph (a)(2)(iii) of this section, for at least 75 percent of the operating hours.

(ii) When the period of control device operation is less than 4 hours in an operating day and more than one of the hours during the period of operation does not constitute a valid hour of data due to insufficient monitoring data.

(iii) Monitoring data are insufficient to constitute a valid hour of data, as

used in paragraphs (a)(2)(i) and (ii) of this section, if measured values are unavailable for any of the 15-minute periods within the hour.

(3) Whenever a process change, as defined in § 63.115(e), is made that causes the emission rate from a de minimis emission point to become a process vent with an emission rate of one pound per year or greater, the owner or operator shall submit a report within 180 calendar days after the process change. The report may be submitted as part of the next summary report required under § 63.10(e)(3). The report shall include:

(i) A description of the process change; and

(ii) The results of the recalculation of the emission rate.

(4) For each existing, new, or reconstructed affected BLR and WSR source, beginning no later than the compliance dates specified in § 63.521(c), for each excursion that is not an excused excursion, the report must include a list of the affected sources or equipment, the monitored parameter, an estimate of the quantity in pounds of each regulated pollutant emitted over any emission limit, a description of the method used to estimate the emissions, the cause of the excursion (including unknown cause, if applicable), as applicable, and the corrective action taken. Include the start date, start time, and duration in hours of each excursion.

(5) For pressure relief device subject to § 63.527(f), report each pressure release to the atmosphere, including pressure relief device identification name or number, the start date, start time, and duration (in minutes) of the pressure release; and an estimate of the mass quantity in pounds of each organic HAP released.

(6) For heat exchangers subject to § 63.104 of subpart F of this part, the information specified in § 63.104(f)(2) of subpart F of this part.

(b) The owner or operator of any affected BLR source, as well as the owner or operator of any affected WSR source who is subject to the leak detection and repair program specified in subpart H of this part, shall implement the reporting requirements outlined therein. Copies of all reports shall be retained as records for a period of 5 years, in accordance with the requirements of 40 CFR 63.10(b)(1).

(c) The owner or operator of any affected BLR source, as well as the owner or operator of any affected WSR source that is subject to the emission

limit for process vents, storage tanks, and wastewater systems shall include records of all monitoring parameters in the Notification of Compliance Status and summary reports required by subpart A of this part.

(d) Beginning no later than July 15, 2024, owners and operators must submit performance test reports in accordance with this paragraph. Unless otherwise specified in this subpart, within 60 days after the date of completing each performance test required by this subpart, owners and operators must submit the results of the performance test following the procedures specified in § 63.9(k). Data collected using test methods supported by the EPA's Electronic Reporting Tool (ERT) as listed on the EPA's ERT website (*https://www.epa.gov/electronic-reporting-air-emissions/electronic-reporting-tool-ert*) at the time of the test must be submitted in a file format generated using the EPA's ERT. Alternatively, owners and operators may submit an electronic file consistent with the extensible markup language (XML) schema listed on the EPA's ERT website. Data collected using test methods that are not supported by the EPA's ERT as listed on the EPA's ERT website at the time of the test must be included as an attachment in the ERT or alternate electronic file.

■ 161. Amend § 63.529 by revising paragraph (c) introductory text, and adding paragraph (c)(5) as follows:

## § 63.529 Implementation and enforcement.

\* \* \* \* \*

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (5) of this section.

\* \* \* \* \*

(5) Approval of an alternative to any electronic reporting required by this subpart.

■ 162. Amend table 1 to subpart W by:
■ a. Revising the header row;
■ b. Revising entry "§ 63.6(e)(1)(i)";
■ c. Adding entries "§ 63.6(e)(1)(ii)", "§ 63.6(e)(1)(iii)", "63.6(e)(2)", and "63.6(e)(3)';
■ d. Revising entry "§ 63.6(g)";
■ e. Adding entry "§ 63.7(a)(4)"; and
■ f. Revising entries "§ 63.7(e)(1)", "§ 63.7(g)(1)", "§ 63.8(c)(1)(i)", "§ 63.8(c)(1)(iii)", "§ 63.9(k)", "§ 63.10(d)(2)", "§ 63.10(d)(5)" and "§ 63.10(e)(3)".

The revisions and additions read as follows:

TABLE 1 TO SUBPART W OF PART 63—GENERAL PROVISIONS APPLICABILITY TO SUBPART W

| Reference | Applies to subpart W | | | Comment |
|---|---|---|---|---|
| | BLR | WSR | WSR equipment leak standard, and BLR equipment leak standard (40 CFR part 63, subpart H) | |
| * | * | * | * | * |
| §63.6(e)(1)(i) ............... | | See Comment | | Yes, before July 15, 2027. No, beginning on and after July 15, 2027. See §63.525(k) for general duty requirement. |
| §63.6(e)(1)(ii) ............... | | See Comment | | Yes, before July 15, 2027. No, beginning on and after July 15, 2027. |
| §63.6(e)(1)(iii) ............... | Yes ............... | Yes ............... | Yes. | |
| 63.6(e)(2) ..................... | N/A ............... | N/A ............... | N/A ............................. | Reserved. |
| 63.6(e)(3) ..................... | | See Comment | | Yes, before July 15, 2027. No, beginning on and after July 15, 2027. |
| * | * | * | * | * |
| §63.6(g) ........................ | Yes ............... | Yes ............... | Yes | Affected sources have the opportunity to demonstrate other alternatives to the Administrator. |
| * | * | * | * | * |
| §63.7(a)(4) ................... | Yes ............... | Yes ............... | Yes. | |
| * | * | * | * | * |
| §63.7(e)(1) ................... | Yes, before July 15, 2027. No, beginning on and after July 15, 2027. | | | See §63.525(l). Subpart W also contains test methods specific to BLR and WSR sources. |
| * | * | * | * | * |
| §63.7(g)(1) ................... | Yes ............... | Yes ............... | No ................................. | Subpart H specifies performance test reporting. Additionally, this subpart specifies how and when the performance test results are reported for BLR and WSR. |
| §63.8(b)(3) ................... | Yes ............... | Yes ............... | Yes. | |
| §63.8(c)(1)(i) ............... | Yes, before July 15, 2027. No, beginning on and after July 15, 2027. | | | |
| * | * | * | * | * |
| §63.8(c)(1)(iii) ............... | Yes, before July 15, 2027. No, beginning on and after July 15, 2027. | | | |
| * | * | * | * | * |
| §63.9(k) ........................ | Yes ............... | Yes ............... | Yes. | |
| * | * | * | * | * |
| §63.10(d)(2) ................... | No ............... | No ............... | No ................................. | This subpart and Subpart H specify performance test reporting requirements. |
| * | * | * | * | * |
| §63.10(d)(5) ................... | Yes, before July 15, 2027. No, beginning on and after July 15, 2027. | | | |
| * | * | * | * | * |
| §63.10(e)(3) ................... | Yes ............... | Yes ............... | No ................................. | Except that on and after July 15, 2027, the reports shall be submitted according to and in the format required by §63.528(a). |
| * | * | * | * | * |

■ 163. Add table 2 to subpart W to read as follows:

TABLE 2 TO SUBPART W OF PART 63—TOXIC EQUIVALENCY FACTORS

| Dioxin and Furan Congener | Toxic equivalency factor |
|---|---|
| 1,2,3,7,8-pentachlorodibenzo-p-dioxin ........................................................................................................... | 1 |
| 1,2,3,4,7,8-hexachlorodibenzo-p-dioxin ........................................................................................................... | 0.1 |
| 1,2,3,7,8,9-hexachlorodibenzo-p-dioxin ........................................................................................................... | 0.1 |
| 1,2,3,6,7,8-hexachlorodibenzo-p-dioxin ........................................................................................................... | 0.1 |

# **EXHIBIT B**

**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

| | |
|---|---|
| **DENKA PERFORMANCE** ) | |
| **ELASTOMER LLC,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **v.** ) | **No. _____** |
| ) | |
| **UNITED STATES ENVIRONMENTAL** ) | |
| **PROTECTION AGENCY and** ) | |
| **MICHAEL REGAN, Administrator,** ) | |
| **United States Environmental Protection** ) | |
| **Agency,** ) | |
| ) | |
| **Respondents.** ) | |

## <u>DECLARATION OF CHRISTOPHER MEYERS, P.E.</u>

Pursuant to 28 U.S.C § 1746, I, Chris Meyers, declare as follows:

1.     I am currently employed as the Environmental Affairs Manager for Denka Performance Elastomer, LLC ("DPE").  I have held this position at the Neoprene plant in LaPlace, Louisiana (the "Facility"), since June 3, 2022.  I previously held the position of Environmental Permitting Specialist at DPE from June 28, 2016, to June 2, 2022.  Prior to that, I held the position of Senior Consultant at Trinity Consultants where I was periodically engaged by DPE to advise on air permitting matters.

2. On May 16, 2024, EPA published its final rule in docket EPA-HQ-OAR-2022-0730 ("Final Rule").[1] The Final Rule requires DPE to implement new emission controls at the Facility to comply with requirements issued under Section 112(f) ("Section 112(f) Control Projects") and provides only 90 days after the effective date for implementation.[2] The 90-day compliance period for Section 112(f) Control Projects is eight times shorter than the compliance period contained in EPA's proposed rule ("Proposed Rule").[3] On June 27, 2024, the Louisiana Department of Environmental Quality ("LDEQ") issued an Extension of Compliance to DPE that would permit DPE two years to comply with the Final Rule ("LDEQ Extension").

**<u>Summary of Opinions</u>**

3. Based on several years of intensive investigation by DPE assessing the prospect of reducing the emissions of chloroprene from DPE's Facility and my

---

[1] New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry, 89 Fed. Reg. 42,932 (May 16, 2024).

[2] After accounting for weekends and federal holidays, compliance with the Section 112(f) Control Projects is required by October 15, 2024.

[3] *New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry*, 88 Fed. Reg. 25,080 (Apr. 25, 2023), available at https://www.govinfo.gov/content/pkg/FR-2023-04-25/pdf/2023-07188.pdf.

extensive experience safely planning and implementing emissions reduction projects at the Facility, I am certain that (i) the Section 112(f) Control Projects cannot be implemented within a 90-day compliance period and (ii) DPE is already incurring significant and escalating harm as a result. I offer the following specific opinions on this point:

- **Opinion 1**: Safely completing the Section 112(f) Control Projects at the Facility, including design and planning of the required modifications, capital approval, procurement and fabrication, installation, and testing of equipment, cannot be done in 90 days and will require at least two years.

- **Opinion 2**: A compliance period of 90 days will require the Facility to shut down by October 2024. A compliance period of less than two years would likely require a shutdown of the Facility and increase the complexity and dangers of implementing the requirements.

- **Opinion 3**: DPE has continued to reduce emissions through practicable, safe, and effective emissions reduction strategies since May 2022.

## Discussion

4. **Opinion 1: Safely completing the Section 112(f) Control Projects at the Facility, including design and planning of the required modifications,**

**capital approval, procurement and fabrication, installation, and testing, cannot be done in 90 days and will require at least two years.**

5.      I have led a significant effort, with the assistance of qualified, outside consultants, to evaluate many potential emission control projects at the Facility, including several of those necessary to comply with the Final Rule.  On June 7, 2023, DPE submitted comments ("DPE Comments") to EPA's Proposed Rule that incorporated the technical work of these outside consultants, including analysis memoranda and Excel workbooks.[4]  Based on my review of the Final Rule, there are no major changes to the scope of the Section 112(f) Control Projects from the Proposed Rule.   Accordingly, the technical analyses submitted with the DPE Comments are applicable for evaluating the Final Rule requirements.[5]  Following the submittal of the DPE Comments, DPE has continued to evaluate other emission reduction projects including emission capture and control for the wash belts in the "Finishing Area," batch reactor vessels ("Poly Kettles") and stripper strainers,

---

[4] The memoranda covered: thermal oxidizer; wastewater; pressure relief devices; flares; dioxins and furans; and cost-benefits review.

[5] One control project that is no longer needed is a replacement for DPE's existing thermal oxidizer. Under the Proposed Rule, DPE would have been required to operate a thermal oxidizer with a destruction efficiency of 99.9%, an efficiency beyond the capabilities of its current equipment.  Nevertheless, I believe that the thermal oxidizer analysis performed by DPE personnel and its contractors remains applicable to investigating, designing, constructing, and testing the new thermal oxidizer which will still be required to meet the Final Rule requirements.

wastewater streams in the Polymer Area, and certain site maintenance activities; as well as modifications/improvements to the leak detection and repair program and the existing regenerative thermal oxidizer to further reduce emissions. The extensive analyses performed by DPE and outside consultants are based on reviews of the Proposed Rule and associated technical documents, third-party vendor quotes for emission control equipment, extensive emissions control experience, and Facility site visits, many of which I personally led. In addition, DPE established a task force in July 2022 to evaluate emission reduction projects made up of more than 20 engineers, managers, and process experts from all across the plant ("Emission Reduction Project Task Force" or "Task Force'). The Task Force meets at least once per week to discuss status and schedule updates, planning, and assignment of specific tasks.

6. As the Environmental Affairs Manager of a complex chemical manufacturing facility, after reviewing the extensive analyses by DPE personnel and outside consultants, I have serious concerns regarding the numerous complex process changes that will be required at the Facility for the installation of the Section 112(f) Control Projects. Chloroprene is a highly volatile, flammable, and highly reactive (polymeric) chemical. In turn, any changes to the production process at the Facility will require properly trained and knowledgeable employees and contractors with process safety experience. Failure to follow process safety

procedures can result in disastrous consequences such as fires, explosions, and fatalities, as well as unintended environmental releases. Probability of incidents such as these is increased by stressors such as human error and omissions which are more likely to happen if new complex safety processes are implemented on an accelerated timeline, as is required in the Final Rule. Avoiding the consequences associated with potential chloroprene-related process safety failures will demand careful planning and sufficient time to develop, assess, and implement the appropriate procedures required to safely operate the Section 112(f) Control Projects.

7. As the Environmental Affairs Manager, I have substantial concerns that the design, installation, and testing of the major projects required to comply with the Final Rule, combined with the requirement to complete these projects in a 90-day or even a two-year window, will encourage personnel to rush standard industry processes and practices, and increase the probability of human error. Circumvention of these standard processes and practices can easily result in a violation of the Occupational Safety and Health Administration's ("OSHA") Process Safety Management requirements, serious injury or death to employees, and increased risk of community exposure due to an environmental release incident. As explained in the DPE Comments, an insufficient compliance period unsafely ignores the potential for human error that can arise in (1) designing processes; (2) engineering projects;

(3) specifying process components; (4) predicting safeguards necessary to control risk to an acceptable level and sustain the required safeguards for the life of the process; (5) managing process changes; (6) startup testing; and (7) trouble-shooting (shakedown) physical process changes.[6]  In its Final Rule, EPA has still not addressed process safety actions or demonstrated that sound change-management principles were used in developing the required Section 112(f) Control Projects. EPA's demand for compliance on such an unreasonable schedule poses serious risks to DPE, its employees, and the surrounding community.

8.      I have reviewed the requirements of the Final Rule in relation to the Section 112(f) Control Projects.  As detailed further below, and as LDEQ recognized in the LDEQ Extension issued to DPE, none of these projects can be feasibly or safely implemented in only 90 days, let alone all of them simultaneously.

9.      **Thermal Oxidizer**.  The Final Rule requires emissions from process vents and storage vessels in chloroprene service to be routed to a closed vent system to a non-flare control device that reduces chloroprene by greater or equal to 98% Destruction Removal Efficiency.[7]  As EPA concluded, this requires routing of all

---

[6] DPE Comment at 108.
[7] 89 Fed. Reg. at 42,937, 43,243-44.

-7-

chloroprene emissions from the polymer batch reactors, emulsion storage vessels, strainers, and wash belt dryers to a thermal oxidizer.[8]

10. The Facility currently has a regenerative thermal oxidizer with a Destruction Removal Efficiency of approximately 98% and a flow capacity of 58,500 standard cubic feet per minute (scfm).[9] However, the sources identified by EPA that would need to be routed to a thermal oxidizer would add 210,558 scfm of flow, resulting in a new total flow of 252,869 scfm.[10] The additional flows are more than 4.3 times higher than the Facility's existing regenerative thermal oxidizer flow capacity. In other words, the Final Rule requires the installation of a new, much larger thermal oxidizer at the Facility to control the excess flow from process vents and storage vessels in chloroprene service. EPA has acknowledged that the Facility will need to install an additional thermal oxidizer to comply with the Final Rule.[11]

---

[8] 88 Fed. Reg. at 25,117; *see* ERG Control Options for Process Vents and Storage Vessels Memo at 7. *See also* 89 Fed. Reg. at 42,986-87 (EPA has reiterated in the Final Rule that it "continue[s] to stand by [their] analysis" and finalized control requirements for those same sources.).

[9] Presentation to EPA (Oct. 18, 2023) ("DPE Presentation") at Slide 8; Norton Thermal Oxidizer Memo at 5-6; *see also* Declaration of Chrisopher Meyers submitted in *United States v. Denka Performance Elastomer, LLC*, Case No. 2:23-cv-00735 ("Section 303 Litigation"), regarding the remedy demanded by EPA ("Meyers Remedy Decl."), ¶¶ 27, 29.

[10] Meyers Remedy Decl., ¶ 30 and Exhibit A; *see also* Norton Thermal Oxidizer Memo at 5-6.

[11] 89 Fed. Reg at 42,986 (EPA "anticipate[s] that the facility will still need to install an additional thermal oxidizer in order to comply with the final performance standard for process vents and storage vessels in chloroprene service.").

11.     Based on my prior experience with the installation of emission controls, including the first regenerative thermal oxidizer installation at the Facility, and evaluation work already completed by DPE in relation to an additional thermal oxidizer, I would expect that DPE will need *at least* two years to safely design, obtain approvals for, complete construction, install, and test a new thermal oxidizer with a much larger flow capacity. My estimated timeframe does not account for testing to determine the applicability of the dioxins and furans standard[12] that must be understood before finalizing the planning of the thermal oxidizer. If the dioxins and furans standard is also determined to be applicable, additional time will be needed at the Facility to account for such standards in the design and construction of a thermal oxidizer.

12.     EPA's Final Rule instructs that the only viable way to capture chloroprene emissions from the identified sources and route them to a thermal oxidizer is to install three permanent total enclosures:[13]

- One permanent total enclosure for all five polymerization batch reactors;

- One permanent total enclosure for the two wash belt dryers; and

- One permanent total enclosure for the three emulsion storage tanks.

---

[12] 89 Fed. Reg. at 42,937, 43,244-45.

[13] *See* 89 Fed. Reg. at 42,986 ("we continue to stand by our analysis"); *see also* ERG Control Options for Process Vents and Storage Vessels Memo at 7.

13.    Although EPA indicated that there is no explicit requirement to install permanent total enclosure,[14] I am not aware of an alternative option that can achieve the Final Rule requirements.  As the Environmental Affairs Manager for the Facility, I am extremely concerned that the Final Rule fails to account for the technical and process safety challenges of enclosing the wash belts and equipment in the poly building required to meet the new standards.  Capturing chloroprene from these areas is complex and will take time to plan and safely implement, especially considering capturing emissions from these areas involves sources that are not closely clustered at the Facility.  For example, the wash belts are located in the finishing building, which is separate from the poly building.  However, EPA had claimed they were in the same building in the Proposed Rule.  Although EPA purports to acknowledge this burden in the Final Rule,[15] it does not appear to me that EPA has given any meaningful, let alone adequate, consideration of the physical layout or technical limitations of the Facility's equipment when requiring that emissions be captured.

14.    The enclosures that will likely be necessary to comply with the Final Rule pose serious concerns regarding occupational exposure, human health and

---

[14] 89 Fed. Reg. at 42,987.

[15] *See* 89 Fed. Reg. at 42,986 (acknowledging that the wash belts are located in the finishing building rather than polymer building but reiterating that they still must be controlled under the Final Rule and that an additional thermal oxidizer is likely required).

safety, process maintenance, and product quality associated with enclosing the wash belts at the Facility. I am especially concerned with how an enclosure may impact safe ventilation in the finishing building. DPE's wash belt blower motors are equipped with variable frequency drives that allow a reduction of the total flow rate through the vents. An industrial hygienist is needed to evaluate any changes to the airflow through the vent hoods themselves or in other areas of the finishing building to ensure compliance with personnel exposure requirements, or to make recommendations for additional protective equipment. I also note that changes in airflow from enclosing the wash belts can negatively impact product quality, which also needs to be evaluated before enclosures are permanently installed.

15.    Enclosing the wash belts also poses maintenance and repair considerations that concern me as an Environmental Affairs Manager. The wash belts require frequent manual intervention from DPE personnel to ensure stable operation. This requires physical access to the equipment to complete maintenance and repairs. As a result, I believe it is likely that any enclosures will need to be transparent and capable of easily and frequently being dissembled and reassembled.

16.    Based on my prior experience installing existing enclosures at the Facility, the process safety concerns, and the necessary design, review, and approval process, I estimate a period of at least two years – and more likely 30-36 months – would be required before the new, much larger thermal oxidizer could commence

operation and safely control emissions from the enclosures at the Facility. DPE's existing regenerative thermal oxidizer and Monomer Emissions Reduction Project control systems took nearly two years to design, approve, install, test, and place into service. The existing regenerative thermal oxidizer controls the higher concentration flows at the Facility – meaning that the Facility will face more challenges associated with capturing the more diffused sources and routing them to the new thermal oxidizer. Also, nearly two years of work was done by DPE on an accelerated schedule to meet the requirements of the January 2017 Administrative Order on Consent. Based on that experience and the dangerous risks that were revealed during the accelerated nearly two-year process, I would not authorize a similar accelerated implementation schedule for a new, much larger and more complicated thermal oxidizer. I believe the risk inherent in attempting to complete such a task in only 90 days is unthinkable. Additionally, after DPE completed work on the existing regenerative thermal oxidizer and Monomer Emissions Reduction Project control systems, the new systems did not function effectively upon startup and required several months of shakedown and then over a year of process optimization before they were considered fully successful. Based on this prior experience alone, I estimate that the Facility would require at least 30-36 months to complete another thermal oxidizer.

17.   **<u>Pressure Relief Devices</u>**.   The Final Rule imposes a new set of work practice standards for pressure relief device releases that prohibits such devices releasing into the atmosphere and requires DPE to utilize monitoring and notification systems capable of identifying and recording the time and duration of each pressure release.[16]   EPA has assumed that operators would install electronic monitors on PRDs to achieve such work practice standards.[17]

18.   The Facility has approximately 300 pressure relief devices that could be affected by these new standards.   These pressure relief devices will either need to be routed to a control device and/or enhanced monitoring systems will need to be installed.   Therefore, these requirements must be considered as DPE works to design and install a thermal oxidizer to meet the Final Rule requirements.   The Facility does not currently have a complete system in place, or the necessary equipment installed to be in compliance with the new pressure relief device work practice standards at this time.

---

[16] 88 Fed. Reg. at 25,158.  As explained in the Final Rule, EPA proposed "that any release event from a PRD in chloroprene service is a violation of the standard…" 89 Fed. Reg. at 42,959.

[17] 89 Fed. Reg. at 43,222. "For purposes of estimating the costs of this requirement, [EPA] assumed that operators would install electronic monitors on PRDs that vent to atmosphere to identify and record the time and duration of each pressure."  88 Fed. Reg. at 25,158.

19.    The new requirements call for DPE to install ppm ("parts per million") level analyzers with calibration features and diagnostic feedback at the exhaust of each pressure relief device that can emit to the atmosphere.  These analyzers must be capable of verifying that any discharge is less than 500 ppm.  Monitoring equipment associated with the process and piping capable of indicating when a release to the atmosphere is occurring may potentially be required on all 300 pressure relief devices.  This involves installation of a magnetic sensor or motion detector connected to pressure relief device stem travel (or an equivalent indicator of pressure relief device movement).  As explained by DPE's outside consultants, this technological approach has not been implemented in the industry today and is a significant deviation from commercially available pressure relief devices.  As the Environmental Affairs Manager, it is my opinion that this will only further complicate procurement and installation of pressure relief device equipment required by the Final Rule.  Additionally, I believe that it will take longer to plan and test the required monitoring equipment to ensure reliability because there are not reference installations within the industry.

20.    As the Facility's Environmental Affairs Manager, I cannot stress enough how critical pressure relief devices are to the safety of the Facility, the workers, and the community.  Pressure relief devices are first and foremost *safety equipment* that remain closed during normal operation but activate and release in

response to an overpressure in the system.  Overpressure can occur for a variety of reasons including malfunctions due to power failure or equipment failure, or other unexpected causes that result in immediate venting of gasses from process equipment to avoid safety hazards or equipment damage.[18]  Pressure relief device releases can be violent events.  In turn, DPE must carefully design a pressure relief device system that continues to protect employee and community safety while navigating the Process Safety Management Regulations promulgated by the OSHA.  DPE will be required to conduct an appropriate process hazards review surrounding any changes made to each and every one of the Facility's pressure relief device systems.

21.    The Facility does not currently have the engineering resources to adequately evaluate what modifications are necessary for each of the approximately 300 pressure relief devices to comply with the Final Rule requirements.  DPE will need to carefully evaluate each pressure relief device individually and ensure that none of the safety devices are inadvertently disabled as the Facility works towards compliance with the pressure relief device work practice standards.  To accomplish this, DPE will need to hire additional internal engineering resources or outside contractors that have the expertise required to complete this complicated work.  Any new personnel will need to be trained and learn the Facility's process and safety

---

[18] 88 Fed. Reg. at 25,155.

procedures. Securing the appropriate personnel and evaluating the potential modifications for the pressure relief device requirements will contribute to the time required to plan and implement a thermal oxidizer.

22. Additionally, I am concerned that the new pressure relief device requirements will lead to more non-serious trips of the instruments. This may force unintended shutdowns, subsequent restarts, and excess violation of emission standards. Further analysis will be needed prior to rolling out a modified 300-pressure relief device program, which will require additional time to address. The possibility of routing pressure relief devices to a control device must be considered in designing the new thermal oxidizer. In my opinion, the pressure relief device requirements will contribute to the Facility's need for 30-36 months to achieve implementation of the thermal oxidizer.

23. **Safety Bypass Lines**. I am also very concerned with EPA's prohibition of the use of bypass lines that would prevent the Facility from bypassing control devices without incurring a potentially enforceable permit violation. The Final Rule will require monitoring systems for flow on bypass lines to detect whether vent stream flow is present every 15 minutes and to estimate and report any releases.[19] A unqualified prohibition is alarming because bypass lines are critical process safety devices used to prevent an explosive mixture of gases from accumulating within the

---

[19] 89 Fed. Reg. at 42,950, 43,023, 43,102.

header systems connected to the regenerative thermal oxidizer and avoid catastrophic failure. These bypass lines cannot be fully eliminated—without these bypass lines there is nowhere else for these dangerous vapor streams to go. I am concerned that use of the bypass lines for their intended process safety purpose will result in excess violations of appliable emission standards. Accordingly, the design of the new thermal oxidizer must consider the possibility of routing certain bypass lines to the thermal oxidizer.

24.    The Facility has four closed vent systems to route process emissions from the Neoprene process area to the regenerative thermal oxidizer: (1) a nitrogen-rich header for streams with high chloroprene concentrations; (2) an air rich header for streams with lower chloroprene concentrations; (3) the East Hot Dryer Vent; and (4) the West Hot Dryer Vent. The Facility's Monomer Emissions Reduction Project is also a closed vent system which routes emissions from the monomer process area to the Halogen Acid Production Furnace. In total, there are 19 bypass lines associated with the regenerative thermal oxidizer and 8 bypass lines associated with the Monomer Emissions Reduction Project control systems that are required for safety reasons. As the Facility's Environmental Affairs Manager, I can attest that these bypass lines are rarely used—and only for emergencies (emissions from bypass lines made up less than 1% of the Facility's total emissions in 2022). These

bypass lines are critical safety equipment for the Facility with low emissions consequences.

25.     DPE will need time to safely design, plan, and implement new configurations to handle these potentially catastrophic flows.  This may require designing the new thermal oxidizer to accept these vent streams, regardless of how infrequently they occur, or require substantial reworking of piping and ducting to accommodate the instrumentation required to meet the new monitoring standards. In my opinion, addressing the unqualified prohibition on bypasses will contribute to the Facility's need for 30-36 months to achieve implementation of the thermal oxidizer.

26.     **Dioxins and Furans Emission Limit**.  DPE needs additional time to complete testing for the presence of dioxins and furans.  Additionally, the dioxins and furans limit further complicates the designing, planning, and implementation of an additional thermal oxidizer because additional condenser equipment or other control devices must be evaluated concurrently with the chloroprene Section 112(f) Control Projects.  EPA's dioxins and furans technical support document assumed that a condenser would be installed prior to the existing control device, which in DPE's case is a thermal oxidizer.[20]  Based on the analysis performed by DPE's

---

[20]  ERG, *Dioxins and Furans MACT Floor in the SOCMI Source Category for Processes Subject to HON and Processes Subject to Group I and Group II Polymers and Resins NESHAPs* (Mar. 2023) ("ERG Dioxins and Furans Memo"), Table 11

consultants,[21] DPE would have to evaluate commercially available refrigeration systems that can achieve the temperatures required to recover or condense chloroprene out of the vapor streams. This evaluation would only be the first step towards compliance and there is no guarantee that it would provide a feasible option that meets the requirements of the Final Rule. If a feasible option is identified, it will take months to design, approve, install, and test such an option. If a feasible option is not identified, then the Facility will likely need to install and/or route the emissions to a new control device. Either option will significantly add to the time and complexity needed to implement the Section 112(f) Control Projects.

27. **Wastewater Steam Stripper**. The Final Rule requires wastewater streams that are in chloroprene service to comply with the requirements for Group 1 wastewater streams. This will likely necessitate the installation of a steam stripper

---

(costs based on refrigeration condenser technology that has been applied in the PVC industry).

[21] *See* Montrose, *Dioxins and Furans Proposed Rules* (July 6, 2023). Montrose Environmental Group, Inc. ("Montrose") is a global environmental services provider specializing in emission control planning, measurement, and analysis, has worked closely with DPE over the past two years on nearly all aspects of potential options for chloroprene control at the Facility. Norton Engineering Consultants, Inc. ("Norton Engineering") is a consultant group with specialized expertise in thermal oxidizers has also assisted DPE in evaluating potential thermal oxidizer configurations and assisted Montrose in evaluating the dioxins and furans requirements proposed by EPA.

to achieve reduction of chloroprene emissions from wastewater in chloroprene service.[22]

28.     DPE currently utilizes an air stripping system.  This process occurs in the air sparging tank and routes to the onsite regenerative thermal oxidizer.[23] However, as I previously discussed, the existing regenerative thermal oxidizer does not have air flow capacity to take on additional waste streams, including chloroprene-containing air from a new steam stripper.  Therefore, a new control device would need to be installed in addition to the new stream stripper to properly control the additional steam stripper wastewater streams at the Facility.

29.     The Facility's current air stripping equipment and sparging tanks took more than 6 months to plan and implement, more than twice the 90 days EPA has given DPE to implement a new steam stripper system.  And because steam stripping equipment is more complicated than air stripping equipment, it would take longer to safely plan, approve, install, test, and place steam stripping equipment into operation.

30.     Based on my prior experience with the design and installation of wastewater control equipment at the Facility and evaluation work already completed

---

[22] 89 Fed. Reg. at 42,938, 42,959, 42,987-88.

[23] Also note that the Facility uses an outdoor brine pit to control steam stripper rundown streams which are then routed to the Wastewater Treatment Plant and subject to biological control that achieves 80% reduction.

by DPE personnel and outside consultants, I expect that the design, approvals, construction, installation, and testing of a new steam stripper together with a thermal oxidizer would take at least two years.

31.     **Equipment to Limit Maintenance Emissions to 1 tpy**.  The Final Rule imposes a 1 ton per year (tpy) cap on maintenance vent emission releases.[24] Despite significant efforts, DPE has not yet identified feasible options for achieving this requirement.

32.     The largest single source of emissions from maintenance activities is from annual steaming of the Facility's 2 million pound tank (approximately 660 lbs of emission associated with each annual steam event).  DPE has considered various options, but none of them have been viable.[25]   First, based on discussions with EPA enforcement officials, DPE requested proposals from third-party vendors for the use of a portable thermal oxidizer for use during steam cleanings of the 2 million pound tank.  However, two of the EPA-recommended vendors declined to submit proposals due to technical challenges and/or lack of available engineering resources.  One vendor did submit a proposal but failed to properly evaluate safety considerations such as the use of the thermal oxidizer with HCl scrubbing equipment and required heat exchanger equipment that would be necessary due to elevated temperatures

---

[24] 89 Fed. Reg. at 42,937, 43,245, 43,246.

[25] *See, e.g.,* DPE Comments at 88-89.

from the steaming process.  Attempting to apply this proposed method on other tanks would pose similar issues.[26]

33.     The Facility also considered using a new portable condenser and catch tank that would route steam vapors to a regenerative thermal oxidizer for control. Unfortunately, this method would likely extend the length of plant turnaround times by unknown amounts of time with enormous costs.[27]

34.     DPE also considered nitrogen purging of the 2 million pound tank in which vapors would be routed to a regenerative thermal oxidizer for control. However, this purging process would take multiple days longer than the current steaming process posing immense cost-per-day consequences.[28]  At this time, I am still not certain how many days it would take to use this option each cleaning.

35.     DPE requires substantially more time to adequately assess solutions to this new maintenance emissions cap.  Based on the substantial analysis and investigation already committed to this requirement, I estimate that DPE would need two years or more to evaluate, acquire equipment, test, obtain approval, and implement any new maintenance activity processes to comply with the new standard.

---

[26] *Id.*

[27] *Id.*

[28] *Id.*

36.    **Other Section 112(d) requirements will increase the time needed to
implement the Section 112(f) Control Projects**.  The Section 112(f) Control
Projects are not the only projects that I, or the Facility, must evaluate and implement
within timeframes prescribed in the Final Rule.  In addition to the Section 112(f)
Control projects, DPE will be required to plan for the implementation of the Final
Rule's requirements under Section 112(d) of the Clean Air Act, which must be
implemented within three years of the effective date.  As a result, the engineer
members of DPE's Emission Reduction Projects Task Force must also consider any
potential impacts of the Section 112(d) projects when planning, designing, and
implementing the Section 112(f) Control Projects.

37.    DPE personnel will need to account for the Section 112(d) requirements
in planning the Section 112(f) Control Projects which further contributes to the need
for at least two years for safe implementation of the Section 112(f) Control Projects.

38.    **Opinion 2: A compliance period of 90 days will require the Facility
to shut down by October 2024.  A compliance period of less than two years
would likely require a shutdown of the Facility and increase the complexity and
dangers of implementing the requirements.**

39.    As discussed above, the Section 112(f) Control Projects cannot be
technically or safely designed, approved, constructed, and tested at the Facility in

less than two years.  The extensive analysis performed by DPE and its outside experts demonstrates that anything less than two years is infeasible and unsafe.

40.    In the Section 303 Litigation filed against DPE, EPA effectively admitted that the Section 112(f) Control Projects cannot be done in 90 days.  In the Section 303 Litigation, EPA sought preliminary injunctive relief in the form of emission control projects that are substantially similar to requirements of the Final Rule.  But even though EPA's proposed timelines for those projects in the Section 303 Litigation were woefully inadequate, EPA nonetheless conceded that such projects could not be completed in 90 days.  For example, EPA's expert opined that it would take 90 days or more *just to prepare a plan* to evaluate and control chloroprene emissions in the Facility's polymer building.  Even setting aside the validity of this disputed estimate, it demonstrates that substantially more than 90 days will be needed to approve, construct, install, and test the ultimate control project.   It is unreasonable for EPA to now demand compliance timeframes that are shorter than what EPA already represented to the district court were necessary in the Section 303 Litigation.

41.    If DPE is not provided at least two years to complete the Section 112(f) Control Projects, in my opinion, the Final Rule will require the Facility to shutdown thereby increasing the complexity and dangers of complying with the requirements of the Final Rule.

42.     The Facility has already shifted its attention, time, and resources toward completing a safe and effective shutdown of the Facility for an indefinite period of time.  This comes at the cost of planning successful implementation of EPA's Final Rule requirements.  Absent immediate action that provides DPE with additional time for compliance, DPE will be forced to commit an even larger share of its attention, time, and resources toward shutdown.

43.     Once the shutdown occurs, DPE will be unable to field test the effectiveness of any emission reduction projects in a functional, operational setting. This prevents me or other DPE personnel from evaluating effective methods to address potential process safety hazards.  In order to evaluate the effectiveness and safety of both large- and small-scale emission reduction projects, DPE requires an operational facility.  DPE already faces process hazard challenges during normal operations when evaluating emission reduction projects on accelerated timelines and a shutdown would just pose further challenges.  Also, I am concerned about an indefinite shutdown's impact on the allocation of process safety resources and personnel.  Additionally, I have serious concerns about the ability of DPE to maintain its personnel if DPE were forced to meet an unreasonable and infeasible compliance deadline of 90 days.

44.     Lastly, as Environmental Affairs Manager, I am not aware of a single time in the Facility's history where DPE was required to restart operations after a

prolonged shutdown of 3-6 months or longer. A shutdown here would last significantly longer due to the time needed to safely develop and implement the Section 112(f) Control Projects. Therefore, significant process safety steps will need to be developed before a restart. This includes drafting, reviewing, and finalizing safety procedures for any restart that follows a prolonged period of non-use. Obviously, installing the Section 112(f) Control Projects from an idled state will impact the amount of time necessary to comply with the Final Rule and I fully expect that it would take at least two years to shut down the Facility, install such projects, and restart operations.

45. **Opinion 3: DPE has continued to reduce emissions through practicable and effective emission reduction strategies since May 2022.**

46. DPE has and continues to evaluate emission reduction opportunities at the Facility. Between 2016 and 2018, DPE reduced the Facility's emissions by 85%. This was in large part due to the installation of the Facility's current regenerative thermal oxidizer. Since May 2022, I have continued to lead efforts to reduce emissions and the Facility has implemented a series of additional reduction strategies.

47. As Environmental Affairs Manager, I have overseen a number of these reduction efforts, which are discussed below:

- DPE has implemented a process to reduce emissions associated with waste from the Facility's poly kettle production units consistent with the requirements of the consent agreement in EPA Docket No. RCRA-06-2023-0906, as well as applying a similar process to waste coagulant generated from the stripper strainers. DPE now steams the coagulant and routes emissions to the regenerative thermal oxidizer. DPE has also improved its washing and nitrogen purging processes to further reduce emissions associated with the poly kettle production units.

- DPE has implemented a voluntary process to reduce the number of concurrently operating unstripped emulsion storage tanks and to strip chloroprene from in-tank coagulant during maintenance of the unstripped emulsion storage tanks. Now only two tanks are used at a time to reduce coagulate formation. The tanks containing coagulate are filled with water and are circulated to strip the remaining chloroprene and route emissions to the regenerative thermal oxidizer.

- The Facility has also employed a voluntary process to strip chloroprene from in-tank coagulant during maintenance of the five poly kettles.

- DPE has voluntarily decreased the site-wide leak detection and repair threshold from the regulatory standard of 500 ppm organic vapor concentration to 250 ppm. In conjunction with this new 250 ppm threshold, an additional voluntary process to screen certain components in the polymerization building located at the Facility and the 1236 waste organics storage tank area multiple times each week and to schedule repairs if leaking components are identified has been rolled out. DPE hired a Leak Detection and Repair technician with over 20 years of experience to lead these voluntary efforts which has included increased weekly screenings, new immediate repair procedures, and the purchase of state-of-the-art detection equipment.

- Furthermore, DPE has supplied operators in the polymers area with photoionization detectors to perform Leak Detection and Repair screenings on any component at any time to detect leaks. Accordingly, prompt repairs are made when leaks are detected.

- DPE voluntarily implemented a process requiring transfers of chloroprene-containing wastes from the chloroprene heels tank to the waste organics tanks in the HCl recovery unit process area be performed only when the 1236 tank system is connected to the Monomer Emissions Reduction Project control system or other form of emissions control.

- DPE instituted new outdoor brine pit management measures which require coagulant from the unstripped emulsion storage tanks and large poly kettles to be placed directly into plastic drums to be sent off-site for incineration. This new process change ensures that solid material is no longer placed in the outdoor brine pit.

48. In addition, DPE is currently evaluating additional emission reduction projects such as (i) a potential project to remove chloroprene from the poly kettle strainer waste by circulating water through the strainer and sparging the water in a closed vessel connected to the existing regenerative thermal oxidizer, and (ii) the potential use of Forward Looking Infrared, or FLIR, cameras to improve leak detection activities.

49. I have been involved in reviewing the Facility's EPA Method 325B and EPA Method TO-15 air monitoring data which demonstrates that the voluntary emission reduction projects discussed above have resulted in quantified reductions of chloroprene concentrations near the Facility. Moreover, the Facility has achieved the lowest average chloroprene concentrations during my tenure following these voluntary changes.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on July 10 , 2024


CHRIS MEYERS, P.E.

# <u>EXHIBIT C</u>

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

| | |
|---|---|
| **DENKA PERFORMANCE ELASTOMER LLC,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **v.** ) | **No. _____** |
| ) | |
| **UNITED STATES ENVIRONMENTAL** ) | |
| **PROTECTION AGENCY and** ) | |
| **MICHAEL REGAN, Administrator,** ) | |
| **United States Environmental Protection** ) | |
| **Agency,** ) | |
| ) | |
| **Respondents.** ) | |

## <u>DECLARATION OF MICHELLE HELFRICH</u>

Pursuant to 28 U.S.C § 1746, I, Michelle Helfrich, declare as follows:

1.      My name is Michelle Helfrich.  I am an Executive Officer and the Plant Manager at Denka Performance Elastomer, LLC's ("DPE") Neoprene manufacturing facility in LaPlace, Louisiana (the "Facility").  The Facility is the only Neoprene manufacturing facility in the United States.

2.      The major industrial users of Neoprene are the automotive, construction, adhesives, and medical industries.  Neoprene is used in end products such as rubber belts, gaskets, boots, rubber bridge bearing pads, rubber joint sealants for airports, rubber gloves, medical bandages, anesthesia bags, roofing adhesives, and DIY adhesives.  Users of DPE's Neoprene include manufacturers who are the

largest producers of these products in North America. Further, Neoprene is used to manufacture critical products required by the U.S. Department of Defense. I attach a letter from U.S. Congressman Jack Bergman, a member of the House of Representatives Armed Services Committee, to U.S. Secretary of Defense Lloyd J. Austin III requesting information regarding the impact of EPA's Final Rule for chloroprene on critical Neoprene products and raising potential national security concerns.

3.      I have held the Plant Manager position since January 3, 2024. Prior to this position, I worked as Plant Operations Manager at the Facility, beginning January 30, 2023. As the Plant Operations Manager, I reported directly to the then-Plant Manager, Jorge Lavastida, who served in that role since November 1, 2015. Mr. Lavastida has over 34 years of experience in the chemical industry, over 17 years in site senior leadership positions, and over 10 years of experience in the Neoprene business. After completing a process for knowledge transfer with me, Mr. Lavastida retired on January 2, 2024. I have over 30 years of experience in the chemical industry where I have managed cross-functional teams, implemented process improvements, and ensured adherence to company standards at chemical companies including BASF Corporation, Shell Chemical Company, and The Dow Chemical Company, among others. I have over 22 years in leadership positions with increasing responsibility.

4.     My current job responsibilities include overseeing the safe operation, maintenance, and development of the Facility.  I manage the work of senior managers who are responsible for process safety, personnel safety and health, environmental affairs, production, supply chain, quality, and maintenance management of the Facility, and the technical improvements needed to support our operations.

5.     The Facility utilizes multiple hazardous chemicals in its operations.  As Plant Manager, my most important guiding principle and highest priority is ensuring that the Facility operates in a manner that protects the safety of its personnel and the community.

6.     My current job responsibilities include overseeing DPE's planning efforts with respect to EPA's Final Rule for chloroprene.  I am also part of the leadership team responsible for overseeing DPE's response to EPA's emergency lawsuit filed against DPE under Section 303 of the Clean Air Act ("Section 303 Litigation").

7.     In both the Section 303 Litigation and the Final Rule, among other agency actions, EPA has demanded that DPE substantially reduce its chloroprene emissions.  The Final Rule requires DPE to install complex and capital-intensive emission control equipment that needs to be reviewed, designed, approved, installed, and tested before the equipment can be placed into service.  While the Proposed Rule

would have allowed DPE two years to take these steps and DPE commenced its planning process accordingly, the Final Rule requires DPE to implement these steps by October 15, 2024. In a separate declaration, my colleague and direct report, DPE Environmental Affairs Manager Chris Meyers, discusses the significant feasibility and safety concerns associated with placing the required emission reduction projects into service within the much shorter, 90-day compliance period imposed by the Final Rule.

8.     For the reasons explained in Mr. Meyers' declaration, DPE will not be able to safely implement the changes required by the Final Rule within anywhere near the 90-day period imposed by the Rule. DPE has received an Extension of Compliance from the Louisiana Department of Environmental Quality that allows DPE two years to implement the required changes ("LDEQ Extension"). DPE will not be able to continue its Neoprene operations at the Facility unless it can rely in good faith on the LDEQ Extension, without fear of EPA enforcing the Final Rule after the 90-day period. As discussed further herein, DPE otherwise must take steps beginning in August 2024 to orchestrate a safe, and likely permanent, shutdown of operations.

9.     Ceasing or indefinitely suspending chloroprene and Neoprene production at the Facility would be catastrophic to DPE's operations, financial position, and ability to continue as a viable business.

10. <u>Revenue loss</u>. DPE's revenue is derived entirely from the sale of various types of Neoprene. Requiring the Facility to shut down indefinitely would deprive DPE of its only source of revenue. Based on my knowledge of the Facility's budget and production plan, I estimate that each day the Facility is shut down would cost DPE hundreds of thousands of dollars in lost revenue.

11. <u>Workforce loss</u>. With no revenue and no Neoprene production, DPE would be forced to lay off a significant portion of its workforce. DPE currently employs approximately 250 employees plus another 75-100 resident contractors. DPE has obligations under the federal WARN Act to provide employees with 60 days' notice ahead of any mass layoff or plant closure. The vast majority of DPE's employees and contractors are skilled workers with unique experience and process knowledge to operate the Facility that they gained on the job working at the nation's only Neoprene facility. If DPE shuts down operation of the Facility, I fully expect these workers would seek new employment immediately, rather than wait to see if the Facility might eventually resume operations at some unknown date in the future, while earning no salary. In addition, important institutional knowledge of the Facility's operations resides with many longtime employees who are at or near retirement age. Without an operating Facility, the typical process for managing worker transitions due to retirement or otherwise (e.g., succession planning, part-time employment and/or temporary employment) and the process for knowledge

transfer among workers would be infeasible.  Even if DPE were eventually able to restart operations, we would need to recruit and replace nearly the entire workforce and ensure each specialized unit, in addition to support groups within the Facility was appropriately staffed in order to safely operate.  I strongly believe that we would not be able to re-hire our current skilled workforce.  If the Facility were able to restart, operations could not safely resume without re-hiring knowledgeable staff, hiring new employees, and providing significant training within each specialized unit of the Facility.  Inability to rely on our experienced, skilled workforce in the future is a substantial reason that it would be extremely difficult to re-open the Facility once it is shut down.

12.  <u>Shut Down Preparations Must Begin Months In Advance</u>.  Preparations for an indefinite shut down must begin well ahead of the actual shut down date.  As noted above, DPE must provide employees with 60 days' notice ahead of any mass layoff.  Further, shutting down the Facility is a complex, multi-stage operation that would be further complicated if the Facility were being shut down for an indefinite time period.  DPE is staffed to run an operating chemical plant.  DPE's available resources must be redeployed immediately to plan the shutdown process, as well as the engagement of legal and technical experts familiar with the complexities of an indefinite shut down period.  While planning documents have been developed by DPE for short, known duration shutdowns such as turnarounds and weather events

(e.g., hurricanes), DPE does not have plans or staffing in place to orchestrate an indefinite shut down. DPE must address its permitting requirements, its contractual obligations to suppliers and customers, and its workforce. Likewise, DPE must address its potential inability to provide services to the co-located chemical facility owned and operated by DuPont. Loss of these services could be detrimental to the safety and operating ability of DuPont's plant.

13. Chloroprene production cannot cease immediately but will require a planned and orderly process to systematically terminate activities for each of the three operating units of the Facility. I have substantial concerns about whether DPE's employees would remain employed at DPE long enough to safely shut down the Facility on Day 90, as I would expect employees to seek more stable employment. The shutdown process is likely to take several weeks, if not months, and will require multiple steps that must be coordinated across the Facility's three operating units, including safely storing or removing the volatile chemicals utilized at the Facility. I expect contractors would need to be hired and trained to complete the shutdown process, which certainly begins on Day 1 and may not be feasible in the 90-day period permitted by the Final Rule. Further, the Facility would still require a sufficient number of employees capable of training and overseeing the new contractors. With no revenue and no operations, DPE has limited tools to retain these critical employees.

14. Further, in the event that DPE does make the substantial capital investments required to achieve compliance with the Final Rule and restart operations at some date in the future, during the shutdown period, DPE will need to retain a limited number of personnel to support functions like process safety, safety and health, engineering, IT, procurement, human resources, maintenance, emergency response, and project planning. DPE will also likely need to add new personnel with new skill sets to address the new challenges associated with shutting down and maintaining an idled facility. Even leaving aside the very real question of how to pay those employees with no revenue coming in, I expect it to be very difficult to retain these employees during this period of uncertainty, as these skilled workers are likely to pursue career opportunities at other chemical plants or other businesses with a more positive outlook and job stability and longevity.

15. Need For Capital Investment. The emission control projects described in the Final Rule would require significant capital investment. Mr. Meyers discusses the scale of the project costs in his declaration. Again, DPE would need to secure and deploy the necessary capital during a period with no revenue coming in which could lead to higher financing costs or other unfavorable terms, if financing is even available. Further, the cost of the emission control measures would be on top of the tremendous costs DPE has already incurred, and continues to incur, in connection with EPA's prior demands to reduce the Facility's chloroprene emissions, including

DPE's investment of more than $35 million in a Regenerative Thermal Oxidizer in 2017, which contributed to an 85% reduction in the Facility's emissions. Under the Final Rule, DPE would have to install an *additional* thermal oxidizer, which will require additional investment, in addition to other new emission reductions projects.

16. <u>Challenges Associated With Implementing New Controls During Shutdown</u>. In my experience, new projects and processes like the emission reduction projects and associated processes required by the Final Rule are tested in an operational facility, not a non-operating plant like the Facility will be after the 90-day period has run out. In order to prove the effectiveness of any newly installed equipment, the Facility must be operational to test the efficacy of design criteria. This allows for testing of the new equipment under actual operating conditions to allow for adjustments and fine tuning of its operation. It also provides the opportunity for workers to be trained on how to operate the newly installed equipment.

17. <u>Supply Chain Disruptions and Contractual Impacts</u>. In addition, ceasing DPE's production would cause significant supply chain disruptions, affecting both upstream suppliers and downstream customers and end-users of Neoprene, and preventing DPE from meeting its contractual obligations. For example, DPE has entered contracts with key suppliers that have termination provisions that DPE would likely have difficulty complying with if DPE must shut

down production at the Facility by the 90-day deadline, which we expect would result in contractual penalties and damage DPE's relationship with these suppliers.

18.    In the event of a shutdown, suppliers providing raw materials for DPE's operations will seek to find new buyers to consume their products, meaning that if DPE were able to resume operations at some point in the future, there is serious concern that the raw materials required by DPE would not be available in the necessary quantity or schedule.  In the case of some of the raw materials, DPE only has one qualified supplier.  Although the raw material could possibly be obtained through another specific supplier, DPE has not qualified that supplier for use at the Facility.  I expect this process would require DPE to conduct testing as well as notification to customers who would then be expected to require test material be made with the new raw material before agreeing to accept our product.  It would be difficult, if not impossible, for DPE to re-establish its supply chain in the future if it were to restart operations after an indefinite prolonged shutdown.

19.    Similarly, there is a substantial risk that DPE's customers would seek another polychloroprene supplier or a substitute product to replace Neoprene and enter into replacement contracts, assuming they are able to find a replacement product at all.  I expect that not all of DPE's customers would return to purchasing Neoprene in the long-term, and certainly not in the short-term while existing contracts with other suppliers remain effective.

20. <u>Challenges Associated With Storage and Disposal of Hazardous Materials</u>. DPE uses feedstocks of hazardous materials to manufacture chloroprene. Storage and disposal of these materials is governed by the Resource Conservation and Recovery Act (RCRA). Pursuant to RCRA, DPE cannot store certain materials at the Facility for a period of longer than 90 days. In the absence of active operations at the Facility, to comply with RCRA, DPE will be required to investigate, test, and implement alternative waste handling procedures for hazardous materials contained in any idled process unit for more than 90 days. DPE has already confronted challenges associated with finding facilities to accept its hazardous waste in light of EPA's allegations in the Section 303 Action and I would expect similar challenges to complicate compliance with the RCRA storage requirements.

21. <u>Reputational consequences, loss of goodwill, and impact on social license to operate</u>. Shutting down the Facility would also result in negative reputational harms as DPE would be considered a "polluter" in the community, with resulting harms to its commercial reputation and its reputation as an employer. It would also negatively impact DPE's social license to operate. This is the ongoing acceptance of a company's business practices and operating procedures by the general public, stakeholders, and employees. It is not a legal permit, but it is an essential intangible asset of the company to hold community approval and trust. For these reasons, DPE (like other chemical plants where I have worked and held

leadership responsibilities) expends significant resources communicating with the community about its operations, providing financial support to the community, and interacting with the community's leadership to hear and address concerns. A major driver for DPE's investment of $35 million in emission reduction projects was related to DPE's social license to operate. Eroding DPE's social license to operate results in actual economic harm to DPE.

22.     This will further impede DPE's ability to hire qualified employees and negotiate favorable contracts with suppliers and customers.

23.     In short, due to the enormous revenue losses that would be associated with a shutdown, the large capital investments that must be made before production could restart, the loss of key personnel, difficulty obtaining key supplies, loss of customers, and the damage to DPE's reputation and social license to operate, I do not expect that the Facility would ever restart operations, once it is shut down.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on ___July 8___, 2024.

_Michelle Helfrich_
Michelle Helfrich

# Congress of the United States

## House of Representatives

### Washington, DC 20515-2201

May 14, 2024

The Honorable Lloyd J. Austin III
Secretary of Defense
1000 Defense Pentagon
Washington, D.C. 20301-1000

Dear Secretary Austin:

I write to request information regarding the U.S. Environmental Protection Agency's (EPA) activities relating to the regulation of chloroprene. I am concerned that EPA's April 2024 final rule titled "New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry"[1] will result in bans or unachievable standards related to critical products required by the Department of Defense (DOD). Due to EPA's final rule, DOD will likely be forced to rely on neoprene products produced in the People's Republic of China (PRC) – threating U.S. national security by limiting the domestic availability of products necessary for U.S. warfighters.

Unfortunately, EPA pushed forward with this overreaching regulation without properly consulting with the defense agencies on the availability of domestically produced resources. EPA's regulation directly impacts chloroprene, an emission produced during the production of neoprene, a critical synthetic rubber used in a number of military applications including wetsuits, military boots, and car parts. Limiting access to domestically produced neoprene will hinder access to the availability of these products for use in our national defense.

Further, this regulation directly benefits the PRC and its chemical industry. For example, Denka Performance Elastomer (DPE) is the only domestic producer of the synthetic rubber neoprene. EPA's misguided promulgation of a regulation not based on sound science will force DPE to cease production of neoprene, in turn, making the U.S. reliant on the PRC to source its neoprene for military applications. I urge that DOD consult with EPA on this final rule and reconsider the necessity of domestically sourced neoprene.

Given the concerns about EPA's regulatory actions on chloroprene and their national security impacts, I respectfully request the following information.

1. All communications between or among DOD and EPA referring or relating to chloroprene, neoprene, or the final rule "New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air

---

[1] https://www.epa.gov/system/files/documents/2024-04/san9327_hon_pr-i-and-ii_socmi-nsps_final_preamble.prepublication.pdf

Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry."

2. A briefing by relevant DOD officials regarding the national security consequences and security implications of EPA activities regarding chloroprene no later than June 1, 2024.

Thank you for your attention to this important matter. Please do not hesitate to contact my office with any questions.

Sincerely,

Jack Bergman
Member of Congress

Cc:
Honorable Michael S. Regan, Administrator, U.S. Environmental Protection Agency

# <u>EXHIBIT D</u>



## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Parts 60 and 63

**[EPA–HQ–OAR–2022–0730; FRL–9327–01–OAR]**

**RIN 2060–AV71**

### New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** The U.S. Environmental Protection Agency (EPA) is proposing amendments to the New Source Performance Standards (NSPS) that apply to the Synthetic Organic Chemical Manufacturing Industry (SOCMI) and to the National Emission Standards for Hazardous Air Pollutants (NESHAP) that apply to the SOCMI (more commonly referred to as the Hazardous Organic NESHAP or HON) and Group I and II Polymers and Resins Industries (P&R I and P&R II). The EPA is proposing decisions resulting from the Agency's technology review of the HON, P&R I, and P&R II, and its eight-year review of the NSPS that apply to the SOCMI. The EPA is also proposing amendments to the NSPS for equipment leaks of volatile organic compounds (VOC) in SOCMI based on its reconsideration of certain issues raised in an administrative petition for reconsideration. Furthermore, the EPA is proposing to strengthen the emission standards for ethylene oxide (EtO) emissions and chloroprene emissions after considering the results of a risk assessment for the HON and Neoprene Production processes subject to P&R I. Lastly, the EPA is proposing to remove exemptions from standards for periods of startup, shutdown, and malfunction (SSM), to add work practice standards for such periods where appropriate, and to add provisions for electronic reporting. We estimate that the proposed amendments to the NESHAP would reduce hazardous air pollutants (HAP) emissions (excluding EtO and chloroprene) from the SOCMI, P&R I, and P&R II sources by approximately 1,123 tons per year (tpy), reduce EtO emissions from HON processes by approximately 58 tpy, and reduce chloroprene emissions from Neoprene Production processes in P&R I by

approximately 14 tpy. We also estimate that these proposed amendments to the NESHAP will reduce excess emissions of HAP from flares in the SOCMI and P&R I source categories by an additional 4,858 tpy. Lastly, we estimate that the proposed amendments to the NSPS would reduce VOC emissions from the SOCMI source category by approximately 1,609 tpy.

**DATES:**

*Comments.* Comments must be received on or before June 26, 2023. Under the Paperwork Reduction Act (PRA), comments on the information collection provisions are best assured of consideration if the Office of Management and Budget (OMB) receives a copy of your comments on or before May 25, 2023.

*Public hearing:* The EPA will hold a virtual public hearing on May 16, 2023. See **SUPPLEMENTARY INFORMATION** for information on the public hearing.

**ADDRESSES:** You may send comments, identified by Docket ID No. EPA–HQ–OAR–2022–0730, by any of the following methods:

• *Federal eRulemaking Portal: https://www.regulations.gov/* (our preferred method). Follow the online instructions for submitting comments.

• *Email:* a-and-r-docket@epa.gov. Include Docket ID No. EPA–HQ–OAR–2022–0730 in the subject line of the message.

• *Fax:* (202) 566–9744. Attention Docket ID No. EPA–HQ–OAR–2022–0730.

• *Mail:* U.S. Environmental Protection Agency, EPA Docket Center, Docket ID No. EPA–HQ–OAR–2022–0730, Mail Code 28221T, 1200 Pennsylvania Avenue NW, Washington, DC 20460.

• *Hand/Courier Delivery:* EPA Docket Center, WJC West Building, Room 3334, 1301 Constitution Avenue NW, Washington, DC 20004. The Docket Center's hours of operation are 8:30 a.m.–4:30 p.m., Monday–Friday (except Federal Holidays).

*Instructions:* All submissions received must include the Docket ID No. for this rulemaking. Comments received may be posted without change to *https://www.regulations.gov/,* including any personal information provided. For detailed instructions on sending comments and additional information on the rulemaking process, see the **SUPPLEMENTARY INFORMATION** section of this document.

**FOR FURTHER INFORMATION CONTACT:** Mr. Andrew Bouchard, Sector Policies and Programs Division (E143–01), Office of Air Quality Planning and Standards, U.S. Environmental Protection Agency,

Research Triangle Park, North Carolina 27711; telephone number: (919) 541–4036; and email address: *bouchard.andrew@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

*Participation in virtual public hearing.* The public hearing will be held via virtual platform on May 16, 2023. The hearing will convene at 11:00 a.m. Eastern Time (ET) and will conclude at 7:00 p.m. ET. The EPA may close a session 15 minutes after the last pre-registered speaker has testified if there are not additional speakers. The EPA will announce further details on the virtual public hearing website at *https://www.epa.gov/stationary-sources-air-pollution/synthetic-organic-chemical-manufacturing-industry-organic-national, https://www.epa.gov/stationary-sources-air-pollution/group-i-polymers-and-resins-national-emission-standards-hazardous,* and *https://www.epa.gov/stationary-sources-air-pollution/epoxy-resins-production-and-non-nylon-polyamides-national-emission.* If the EPA receives a high volume of registrations for the public hearing, we may continue the public hearing on May 17, 2023.

The EPA will begin pre-registering speakers for the hearing no later than 1 business day following the publication of this document in the **Federal Register.** The EPA will accept registrations on an individual basis. To register to speak at the virtual hearing, please use the online registration form available at any of the following websites: *https://www.epa.gov/stationary-sources-air-pollution/synthetic-organic-chemical-manufacturing-industry-organic-national, https://www.epa.gov/stationary-sources-air-pollution/group-i-polymers-and-resins-national-emission-standards-hazardous,* or *https://www.epa.gov/stationary-sources-air-pollution/epoxy-resins-production-and-non-nylon-polyamides-national-emission;* or contact the public hearing team at (888) 372–8699 or by email at *SPPDpublichearing@epa.gov.* The last day to pre-register to speak at the hearing will be May 10, 2023. Prior to the hearing, the EPA will post a general agenda that will list pre-registered speakers in approximate order at: *https://www.epa.gov/stationary-sources-air-pollution/synthetic-organic-chemical-manufacturing-industry-organic-national, https://www.epa.gov/stationary-sources-air-pollution/group-i-polymers-and-resins-national-emission-standards-hazardous,* and *https://www.epa.gov/stationary-sources-air-pollution/epoxy-resins-production-and-*

operator training. Therefore, we are proposing that all existing affected sources, and all new affected sources under the current rules that commenced construction or reconstruction after December 31, 1992 (for HON) or after June 12, 1995 (for P&R I), and on or before April 25, 2023, must comply with the new process vent requirements no later than 3 years from the publication date of the final rule (or upon startup, whichever is later). For all new affected sources that commence construction or reconstruction after April 25, 2023, we are proposing owners or operators comply with the new process vent requirements within 60 days after the publication date of the final rule (or upon startup, whichever is later).

Compliance dates for the fenceline monitoring provisions proposed under CAA section 112 (d)(6) consider the amount of time that it will take owners and operators to develop their siting plans and secure the capabilities to conduct the monitoring and analyze the results. For fenceline monitoring, the compliance timeline also must consider the timeline for controls to be installed and operational before root cause analysis and application of corrective measures can take place. However, the actual monitoring can and must begin at least a year before to develop the annual average concentration baseline. Therefore, we are proposing that owners and operators of all existing sources and all new affected sources under the current rules that commenced construction or reconstruction after December 31, 1992 (for HON) or after June 12, 1995 (for P&R I), and on or before April 25, 2023 must begin fenceline monitoring one year after the publication date of the final rule and must perform root cause analysis and apply corrective action requirements upon exceedance of an annual average concentration action level starting 3 years after the publication date of the final rule (*i.e.,* such that by after two years after the publication date of this rule, facilities will have installed controls to reduce EtO and chloroprene (as discussed in section III.F.1.c of this preamble) and be able to compare 1 year of data to the annual average concentration action level by year 3). For all new affected sources that commence construction or reconstruction after April 25, 2023, we are proposing owners or operators begin fenceline monitoring within 60 days after the publication date of the final rule (or upon startup, whichever is later). We are also proposing to require quarterly reporting of fenceline results

beginning 1 year after monitoring begins.

c. Rationale for Proposed Compliance Dates of Proposed CAA Section 112(f) Amendments

As previously mentioned in this preamble, we are proposing under CAA section 112(f), new provisions considering results of the risk assessments to address emissions of EtO from equipment leaks, flares, heat exchange systems, maintenance vents, process vents, storage vessels, and wastewater at HON processes; and emissions of chloroprene from continuous front-end process vents, batch front-end process vents, maintenance vents, storage vessels, and wastewater associated with neoprene production processes subject to P&R I. The proposed provisions will require additional time to plan, purchase, and install equipment for EtO or chloroprene control. For example, for HON process vents in EtO service, if the affected source cannot demonstrate 99.9 percent control of EtO emissions, or reduce EtO emissions to less than 1 ppmv (from each process vent) or 5 pounds per year (for all combined process vents), then a new control system will need to be installed. Therefore, we are proposing a compliance date of 2 years after the publication date of the final rule, or upon startup, whichever is later for all existing affected sources, and all new affected sources that commenced construction or reconstruction after December 31, 1992 (for HON) or after June 12, 1995 (for P&R I), and on or before April 25, 2023 to comply with the proposed EtO and chloroprene requirements. For all new affected sources that commence construction or reconstruction after April 25, 2023, we are proposing owners or operators comply with the EtO and chloroprene requirements within 60 days after the publication date of the final rule (or upon startup, whichever is later).

d. Rationale for Proposed Compliance Dates of Other Proposed Amendments

We are proposing to change the HON, P&R I, and P&R II requirements for SSM by removing the exemption from the requirements to meet the standard during SSM periods, proposing alternative standards where needed, and by removing the requirement to develop and implement an SSM plan. In addition, we are proposing to remove all of the regulatory affirmative defense provisions from P&R I. We are also proposing electronic reporting requirements for the HON, P&R I, and

P&R II. For details on these proposed amendments, see section III.E of this preamble. Except for the removal of the affirmative defense provisions in P&R I, we are positing that facilities would need some time to successfully accomplish these revisions, including time to read and understand the amended rule requirements, to evaluate their operations to ensure that they can meet the standards during periods of startup and shutdown, as defined in the rule, and make any necessary adjustments, including making adjustments to standard operating procedures, and to convert reporting mechanisms to install necessary hardware and software. As previously mentioned, the EPA recognizes the confusion that multiple different compliance dates for individual requirements would create and the additional burden such an assortment of dates would impose. From our assessment of the timeframe needed for compliance with the entirety of the proposed revisions to SSM requirements as well as the new proposed electronic reporting requirements for flare management plans, compliance reports, and performance evaluation reports, the EPA considers a period of 3 years after the publication date of the final rule to be the most expeditious compliance period practicable and, thus, is proposing that all affected sources be in compliance with these revised requirements upon initial startup or within 3 years of the publication date of the final rule, whichever is later. However, we are proposing to provide 60 days after the publication date of the final rule (or upon startup, whichever is later) for owners or operators of all affected sources to comply with the requirement to report electronically. We are also proposing to provide 60 days after the publication date of the final rule (or upon startup, whichever is later) for owners or operators of P&R I affected sources to comply with the removal of the affirmative defense provisions.

2. NSPS Subparts VVb, IIIa, NNNa, RRRa

We are proposing that all sources of equipment leaks in the SOCMI (regulated under 40 CFR part 60, subpart VVb) and all SOCMI air oxidation unit processes, distillation operations, and reactor processes (regulated under 40 CFR part 60, subparts IIIa, NNNa, and RRRa, respectively), that commenced construction, reconstruction, or modification on or after April 25, 2023, would need to meet the requirements of the new NSPS upon startup of the new, reconstructed or modified facility or 60

# **EXHIBIT E**

[FR Doc. 04–6309 Filed 3–25–04; 8:45 am]

BILLING CODE 6560–50–P

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Parts 60, 61, and 63

[LA–69–2–7617a; FRL–7638–7]

### New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants; Delegation of Authority to Louisiana

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Direct final rule; delegation of authority.

**SUMMARY:** The Louisiana Department of Environmental Quality (LDEQ) has submitted updated regulations for receiving delegation of EPA authority for implementation and enforcement of New Source Performance Standards (NSPS) and National Emission Standards for Hazardous Air Pollutants (NESHAPs) for all sources (both part 70 and non-part 70 sources). These regulations apply to certain NSPS promulgated by EPA at 40 CFR part 60, as amended through July 1, 2002; and certain NESHAPs promulgated by EPA, as amended through July 1, 2002, for both 40 CFR part 61 and 63 standards. The delegation of authority under this notice does not apply to sources located in Indian Country. EPA is providing notice that it has approved delegation of certain NSPS to LDEQ, and taking direct final action to approve the delegation of certain NESHAPs to LDEQ.

**DATES:** This rule is effective on May 25, 2004, without further notice, unless EPA receives adverse comment by April 26, 2004. If EPA receives such comment, EPA will publish a timely withdrawal in the **Federal Register** informing the public that this rule will not take effect.

**ADDRESSES:** Comments may be submitted electronically, by mail, or through hand delivery/courier. Follow the detailed instructions as provided in the **SUPPLEMENTARY INFORMATION** section below.

**FOR FURTHER INFORMATION CONTACT:** Mr. Jeffery Robinson, U.S. EPA, Region 6, Multimedia Planning and Permitting Division (6PD), 1445 Ross Avenue, Dallas, TX 75202–2733, (214) 665–6435; or electronic mail at *robinson.jeffrey@epa.gov*.

**SUPPLEMENTARY INFORMATION:**

Table of Contents

I. General Information
II. What Does This Action Do?
III. What Is The Authority For Delegation?
IV. What Criteria Must Louisiana's Program Meet To Be Approved?
V. How Did LDEQ Meet The Subpart E Approval Criteria?
VI. What Is Being Delegated?
VII. What Is Not Being Delegated?
VIII. How Will Applicability Determinations Under Section 112 Be Made?
IX. What Authority Does EPA Have?
X. What Information Must LDEQ Provide To EPA?
XI. What Is EPA's Oversight Of This Delegation To LDEQ?
XII. Should Sources Submit Notices To EPA Or LDEQ?
XIII. How Will Unchanged Authorities Be Delegated To LDEQ In The Future?
XIV. What Is The Relationship Between RCRA And The Hazardous Waste Combustor MACT?
XV. Final Action
XVI. Statutory and Executive Order Reviews

## I. General Information

### A. What Is the Public Rulemaking File?

EPA is committed to ensuring public access to the information that is used to inform the public of the Agency's decisions regarding the environment and human health and to ensuring that the public has an opportunity to participate in the Agency's decision process. The official public rulemaking file consists of the documents specifically referenced in this action, any public comments received, and other information related to this action. The public rulemaking file does not include Confidential Business Information (CBI) or other information for which disclosure is restricted by statute, although such information is a part of the administrative record for this action. The public rulemaking file is the collection of materials that is available for public viewing at the Regional Office. The administrative record is the collection of material used to inform the public of the Agency's decision on this rulemaking action.

### B. How Can I Get Copies of This Document and Other Related Information?

1. *An official public rulemaking file is available for inspection at the Regional Office.* The Regional Office has established an official public rulemaking file for this action under LA–69–2–7617a. The public rulemaking file is available for viewing at the Air Permits Section, U.S. Environmental Protection Agency, 1445 Ross Avenue, Suite 700, Dallas, Texas 75202–2733. EPA requests that, if at all possible, you contact the person listed in the **FOR FURTHER INFORMATION CONTACT** section two working days in advance to schedule your inspection. The Regional Office's official hours of business are Monday through Friday, 8:30 a.m. to 4 p.m. excluding Federal holidays.

2. *Copies of the State submittal.* Copies of the State submittal are also available for public inspection during official business hours, by appointment at the Louisiana Department of Environmental Quality, 602 N. Fifth Street, Baton Rouge, LA 70802.

3. *Electronic Access.* You may access this **Federal Register** document electronically through the Regulation.gov Web site located at *http://www.regulations.gov* where you can find, review, and submit comments on federal rules that are open for comment and have been published in the **Federal Register**.

The E Government Act of 2002 states that to "to the extent practicable" agencies shall accept electronic comments and establish electronic dockets. Also, President Bush's management plan for government includes a government-wide electronic rulemaking system. The first phase of the e-Rulemaking initiative was the development of a Federal portal that displays all **Federal Register** notices and proposed rules open for comment. The URL for this site is *http://www.regulations.gov*. The site also provides the public with the ability to submit electronic comments that can then be transferred to the Agency responsible for the rule.

EPA's policy is to make all comments it receives, whether submitted electronically or on paper, available for public viewing at the Regional Office as EPA receives them and without change. However, those portions of a comment that contain properly identified and claimed CBI or other information for which disclosure is restricted by statute will be excluded from the public rulemaking file. The entire comment, including publicly restricted information, will be included in the administrative record for this action.

### C. How and To Whom Do I Submit Comments?

You may submit comments electronically, by mail, or through hand delivery/courier. To ensure proper receipt by EPA, identify the appropriate docket identification number in the subject line on the first page of your comment. Please ensure that your comments are submitted within the specified comment period. Comments received after the close of the comment period will be marked "late." EPA is not required to consider these late comments. If you wish to submit CBI or information that is otherwise protected by statute, please follow the instructions in Section I.D, below. Do not use e-mail

to submit CBI or information protected by statute.

1. *Electronically.* If you submit an electronic comment as prescribed below, EPA recommends that you include your name, mailing address, and an e-mail address or other contact information in the body of your comment. Also include this contact information on the outside of any disk or CD ROM you submit, and in any cover letter accompanying the disk or CD ROM. This ensures that you can be identified as the submitter of the comment, and allows EPA to contact you in case EPA cannot read your comment due to technical difficulties or needs further information on the substance of your comment. EPA's policy is that EPA will not edit your comment, and any identifying or contact information provided in the body of a comment will be included as part of the comment that is placed in the public rulemaking file, and may be made available in EPA's electronic public docket. If EPA cannot read your comment due to technical difficulties and cannot contact you for clarification, EPA may not be able to consider your comment.

i. *E-mail.* Comments may be sent by electronic mail (e-mail) to *robinson.jeffrey@epa.gov,* Attention "Public comment on proposed rulemaking LA–69–2–7617a." In contrast to EPA's electronic public docket, EPA's e-mail system is not an "anonymous access" system. If you send an e-mail comment directly to the Docket without going through EPA's electronic public docket, EPA's e-mail system automatically captures your e-mail address. E-mail addresses that are automatically captured by EPA's e-mail system are included as part of the comment that is placed in the official public docket, and made available in EPA's electronic public docket.

ii. *Regulations.gov.* As an alternative to e-mail, you may submit comments electronically to EPA by using the Federal web-based portal that displays all **Federal Register** notices and proposed rules open for comment. To use this method, access the Regulations.gov Web site at *http:// www.regulations.gov,* then select "Environmental Protection Agency" at the top of the page and click on the "Go" button. The list of current EPA actions available for comment will be displayed. Select the appropriate action and please follow the online instructions for submitting comments. Unlike EPA's e-mail system, the Regulations.gov Web site is an "anonymous" system, which means EPA will not know your identity, e-mail

address, or other contact information, unless you provide it in the text of your comments.

iii. *Disk or CD ROM.* You may submit comments on a disk or CD ROM that you mail to the mailing address identified in Section I.C.2, directly below. These electronic submissions will be accepted in WordPerfect, Word, or ASCII file format. You should avoid the use of special characters and any form of encryption.

2. *By Mail.* Send your comments to: Jeff Robinson, Air Permits Section (6PD–R), Multimedia Planning and Permitting Division, U.S. Environmental Protection Agency, 1445 Ross Avenue, Suite 700, Dallas, Texas 75202–2733. Please include the text "Public comment on proposed rulemaking LA– 69–2–7617a" in the subject line of the first page of your comments.

3. *By Hand Delivery or Courier.* Deliver your written comments or comments on a disk or CD ROM to: Jeff Robinson, Air Permits Section (6PD–R), Multimedia Planning and Permitting Division, U.S. Environmental Protection Agency, 1445 Ross Avenue, Suite 700, Dallas, Texas 75202–2733, Attention "Public comment on proposed rulemaking LA–69–2–7617a." Such deliveries are only accepted during official hours of business, which are Monday through Friday, 8:30 a.m. to 4:00 p.m., excluding Federal holidays.

*D. How Should I Submit CBI to the Agency?*

For comments submitted to the Agency by mail or hand delivery, in either paper or electronic format, you may assert a business confidentiality claim covering confidential business information (CBI) included in your comment by clearly marking any part or all of the information as CBI at the time the comment is submitted to EPA. CBI should be submitted separately, if possible, to facilitate handling by EPA. Submit one complete version of the comment that includes the properly labeled CBI for EPA's official docket and one copy that does not contain the CBI to be included in the public docket. If you submit CBI on a disk or CD ROM, mark on the outside of the disk or the CD ROM that it contains CBI and then identify the CBI within the disk or CD ROM. Also submit a non-CBI version if possible. Information which is properly labeled as CBI and submitted by mail or hand delivery will be disclosed only in accordance with procedures set forth in 40 CFR part 2. For comments submitted by EPA's e-mail system or through Regulations.gov, no CBI claim may be asserted. Do not submit CBI to Regulations.gov or via EPA's e-mail

system. Any claim of CBI will be waived for comments received through Regulations.gov or EPA's e-mail system. For further advice on submitting CBI to the Agency, contact the person listed in the **FOR FURTHER INFORMATION CONTACT** section of this notice.

*E. Privacy Notice*

It is important to note that the comments you provide to EPA will be publicly disclosed in a rulemaking docket or on the Internet. The comments are made available for public viewing as EPA receives them and without change. Any personal information you choose to include in your comment will be included in the docket. However, EPA will exclude from the public docket any information labeled confidential business information (CBI), copyrighted material or other information restricted from disclosure by statute.

Comments submitted via Regulations.gov will not collect any personal information, e-mail addresses, or contact information unless they are included in the body of the comment. Comments submitted via Regulations.gov will be submitted anonymously unless you include personal information in the body of the comment. Please be advised that EPA cannot contact you for any necessary clarification if technical difficulties arise unless your contact information is included in the body of comments submitted through Regulations.gov. However, EPA's e-mail system is not an anonymous system. E-mail addresses are automatically captured by EPA's e-mail system and included as part of your comment that is placed in the public rulemaking docket.

*F. What Should I Consider as I Prepare My Comments for EPA?*

You may find the following suggestions helpful for preparing your comments:

1. Explain your views as clearly as possible.
2. Describe any assumptions that you used.
3. Provide any technical information and/or data you used that support your views.
4. If you estimate potential burden or costs, explain how you arrived at your estimate.
5. Provide specific examples to illustrate your concerns.
6. Offer alternatives.
7. Make sure to submit your comments by the comment period deadline identified.
8. To ensure proper receipt by EPA, identify the appropriate docket identification number in the subject line

on the first page of your response. It would also be helpful if you provided the name, date, and **Federal Register** citation related to your comments.

## II. What Does This Action Do?

EPA is providing notice that it is delegating authority for implementation and enforcement of certain NSPS to LDEQ. EPA is also taking direct final action to approve the delegation of certain NESHAPs to LDEQ. With this delegation, LDEQ has the primary responsibility to implement and enforce the delegated standards.

## III. What Is the Authority for Delegation?

Section 111(c)(1) of the Clean Air Act (CAA) authorizes EPA to delegate authority to any state agency which submits adequate regulatory procedures for implementation and enforcement of the NSPS program. The NSPS standards are codified at 40 CFR part 60.

Section 112(l) of the CAA and 40 CFR part 63, subpart E, authorizes EPA to delegate authority to any state or local agency which submits adequate regulatory procedures for implementation and enforcement of emission standards for hazardous air pollutants. The hazardous air pollutant standards are codified at 40 CFR parts 61 and 63, respectively.

## IV. What Criteria Must Louisiana's Program Meet To Be Approved?

EPA previously approved LDEQ's program for the delegation of NSPS. 47 FR 07665 (February 22, 1982). This action notifies the public that EPA is updating LDEQ's delegation to implement and enforce certain NSPS. As to the NESHAP standards in 40 CFR parts 61 and 63, section 112(l) of the CAA enables EPA to approve State air toxics programs or rules to operate in place of the Federal air toxics program or rules. 40 CFR part 63, subpart E (subpart E) governs EPA's approval of State rules or programs under section 112(l).

EPA will approve an air toxics program if we find that:

(1) the State program is "no less stringent" than the corresponding Federal program or rule;

(2) the State has adequate authority and resources to implement the program;

(3) the schedule for implementation and compliance is sufficiently expeditious; and

(4) the program otherwise complies with Federal guidance.

In order to obtain approval of its program to implement and enforce Federal section 112 rules as

promulgated without changes (straight delegation), only the criteria of 40 CFR 63.91(d) must be met. 40 CFR 63.91(d)(3) provides that interim or final Title V program approval will satisfy the criteria of 40 CFR 63.91(d) for part 70 sources.

## V. How Did LDEQ Meet the Subpart E Approval Criteria?

As part of its Title V submission, LDEQ stated that it intended to use the mechanism of incorporation by reference to adopt unchanged Federal section 112 into its regulations. This applied to both existing and future standards as they applied to part 70 sources. 59 FR 43797 (August 25, 1994) and 60 FR 17750 (April 7, 1995). On September 12, 1995, EPA promulgated final full approval of the State's operating permits program effective October 12, 1995. 60 FR 42296. Under 40 CFR 63.91(d)(2), once a state has satisfied up-front approval criteria, it needs only to reference the previous demonstration and reaffirm that it still meets the criteria for any subsequent submittals. LDEQ has affirmed that it still meets the criteria for the up-front approval criteria.

In addition, Louisiana has requested delegation of a State requirement to adjust a section 112 rule. The approval of this adjustment is regulated at 40 CFR 63.92. The LDEQ has adopted an earlier compliance date and is more stringent than the Federal requirement at 40 CFR 63.440(d)(1). The LDEQ has met the criteria of 40 CFR 63.91, and the State compliance date adjustment is not ambiguous with respect to stringency of applicability, level of control, compliance and enforcement measures, or the compliance date of any affected source or emission point, and satisfies the requirements at 40 CFR 63.92(b).

## VI. What Is Being Delegated?

EPA received requests to update the NSPS and NESHAP delegations on November 21, 1997, and June 17, 2003. LDEQ requested the EPA to update the delegation of authority for the following:

A. NSPS (40 CFR part 60 standards) through July 1, 2002;

B. NESHAPs (40 CFR part 61 standards) through July 1, 2002; and

C. NESHAPs (40 CFR part 63 standards) through July 1, 2002.

LDEQ's request was for delegation of certain NSPS and NESHAP for all sources (both part 70 and non-part 70 sources). The request includes revisions of the NESHAP standards adopted unchanged into Louisiana Administrative Code (LAC) Title 33:III, Chapter 30, Subchapter A, section 3003—Incorporation by Reference 40 CFR part 60; Chapter 51, Subchapter B,

section 5116—Incorporation by Reference of 40 CFR part 61; Chapter 51, Subchapter C, section 5122—Incorporation by Reference of 40 CFR part 63 as it Applies to Major Sources, except for the compliance date established in Subpart S—Pulp and Paper Industry at 40 CFR 63.440(d)(1); and Chapter 53, Subchapter B, section 5311—Incorporation by Reference of 40 CFR part 63 as it Applies to Area Sources. For NSPS, this revision incorporated all NSPS promulgated by EPA (except Subpart AAA—Standards of Performance for New Residential Wood Heaters) as amended in the **Federal Register** through July 1, 2002. For the part 61 NESHAPs, this revision included all NESHAPs promulgated by EPA as amended in the **Federal Register** through July 1, 2002, excluding subparts B, H, I, K, Q, R, T, and W. For the part 63 NESHAPs, this includes the NESHAPs set forth in Table 1 below. The effective date of the Federal delegation for parts 61 and 63 standards is the effective date of this rule.

TABLE 1
40 CFR Part 63 NESHAP for Source Categories

| Subpart | Emission standard |
|---------|-------------------|
| A | General Provisions |
| D | Early Reductions |
| F | Hazardous Organic NESHAP (HON)—Synthetic Organic Chemical Manufacturing Industry (SOCMI) |
| G | HON—SOCMI Process Vents, Storage Vessels, Transfer Operations and Wastewater |
| H | HON—Equipment Leaks |
| I | HON—Certain Processes Negotiated Equipment Leak Regulation |
| J | Polyvinyl Chloride and Co-polymers Production |
| L | Coke Oven Batteries |
| M | Perchloroethylene Dry Cleaning |
| N | Chromium Electroplating |
| O | Ethylene Oxide Sterilizers |
| Q | Industrial Process Cooling Towers |
| R | Gasoline Distribution |
| S | Pulp and Paper Industry |
| T | Halogenated Solvent Cleaning |
| U | Polymers and Resins I |
| W | Polymers and Resins II—Epoxy Resins and Non-Nylon Polyamides |
| X | Secondary Lead Smelting |
| Y | Marine Tank Vessel Loading |
| AA | Phosphoric Acid |
| BB | Phosphate Fertilizers |
| CC | Petroleum Refineries |
| DD | Off-Site Waste and Recovery |
| EE | Magnetic Tape Manufacturing |

TABLE 1—Continued

40 CFR Part 63 NESHAP for Source Categories

| Subpart | Emission standard |
|---------|-------------------|
| GG | Aerospace Manufacturing and Rework |
| HH | Oil and Natural Gas Production |
| II | Shipbuilding and Ship Repair |
| JJ | Wood Furniture Manufacturing |
| KK | Printing and Publishing Industry |
| LL | Primary Aluminum Reduction Plants |
| OO | Tanks—Level 1 |
| PP | Containers |
| QQ | Surface Impoundments |
| RR | Individual Drain Systems |
| SS | Closed Vent Systems, Control Devices, Recovery Devices and Routing to a Fuel Gas System or a Process |
| TT | Equipment Leaks—Level 1 |
| UU | Equipment Leaks—Level 2 Standards |
| VV | Oil-Water Separators and Organic-Water Separators |
| WW | Storage Vessels (Tanks)—Control Level 2 |
| YY | Generic Maximum Achievable Control Technology Standards |
| CCC | Steel Pickling—HCl Process Facilities and Hydrochloric Acid Regeneration |
| DDD | Mineral Wool Production |
| EEE | Hazardous Waste Combustors |
| GGG | Pharmaceuticals Production |
| HHH | Natural Gas Transmission and Storage |
| III | Flexible Polyurethane Foam Production |
| JJJ | Polymers and Resins, Group IV |
| LLL | Portland Cement Manufacturing |
| MMM | Pesticide Active Ingredient Production |
| NNN | Wool Fiberglass Manufacturing |
| OOO | Polymer and Resins III—Amino Resins and Phenolic Resins |
| PPP | Polyether Polyols Production |
| QQQ | Primary Copper Smelting |
| RRR | Secondary Aluminum |
| TTT | Primary Lead Smelting |
| UUU | Petroleum Refineries—Catalytic Reforming and Sulfer Plants |
| VVV | Publicly Owned Treatment Works (POTW) |
| XXX | Ferroalloys Production |
| CCCC | Nutritional Yeast Mfg. |
| GGGG | Vegetable Oil Production—Solvent Extraction |
| HHHH | Wet Formed Fiberglass Mat Production |
| SSSS | Surface Coating for Metal Coil |

TABLE 1—Continued

40 CFR Part 63 NESHAP for Source Categories

| Subpart | Emission standard |
|---------|-------------------|
| TTTT | Leather Finishing Operations |
| UUUU | Cellulose Production Manufacture |
| VVVV | Boat Manufacturing |
| CCCCC | Coke Ovens: Pushing, Quenching and Battery Stacks |

## VII. What Is Not Being Delegated?

As mentioned above, LDEQ has not been delegated the authority for the following standards:

40 CFR Part 60, Subpart AAA (Standards of Performance for New Residential Wood Heaters);

40 CFR Part 61, Subpart B (National Emission Standards for Radon Emissions from Underground Uranium Mines);

40 CFR Part 61, Subpart H (National Emission Standards for Emissions of Radionuclides Other Than Radon From Department of Energy Facilities);

40 CFR Part 61, Subpart I (National Emission Standards for Radionuclide Emissions from Federal Facilities Other Than Nuclear Regulatory Commission Licensees and Not Covered by Subpart H);

40 CFR Part 61, Subpart K—(National Emission Standards for Radionuclide Emissions from Elemental Phosphorus Plants);

40 CFR Part 61, Subpart Q (National Emission Standards for Radon Emissions from Department of Energy facilities);

40 CFR Part 61, Subpart R (National Emission Standards for Radon Emissions from Phosphogypsum Stacks);

40 CFR Part 61, Subpart T (National Emission Standards for Radon Emissions from the Disposal of Uranium Mill Tailings); and

40 CFR Part 61, Subpart W (National Emission Standards for Radon Emissions from Operating Mill Tailings).

In addition, EPA cannot delegate to a State any of the Category II Subpart A authorities set forth in 40 CFR 63.91(g)(2). These include the following provisions: § 63.6(g), Approval of Alternative Non-Opacity Standards; § 63.6(h)(9), Approval of Alternative Opacity Standards; § 63.7(e)(2)(ii) and (f), Approval of Major Alternatives to Test Methods; § 63.8(f), Approval of Major Alternatives to Monitoring; and § 63.10(f), Approval of Major Alternatives to Recordkeeping and Reporting. In addition, some MACT

standards have certain provisions that cannot be delegated to the States [e.g. 40 CFR 63.106(b)].[1] Therefore, any MACT standard that EPA is delegating to LDEQ that provides that certain authorities cannot be delegated are retained by EPA and not delegated. Furthermore, no authorities are delegated that require rulemaking in the **Federal Register** to implement, or where Federal overview is the only way to ensure national consistency in the application of the standards or requirements of CAA section 112. Finally, section 112(r), the accidental release program authority, is not being delegated by this approval.

All of the inquiries and requests concerning implementation and enforcement of the excluded standards in the State of Louisiana should be directed to the EPA Region 6 Office.

In addition, this delegation to LDEQ to implement and enforce certain NSPS and NESHAPs does not extend to sources or activities located in Indian country, as defined in 18 U.S.C. 1151. Under this definition, EPA treats as reservations, trust lands validly set aside for the use of a Tribe even if the trust lands have not been formally designated as a reservation. Consistent with previous federal program approvals or delegations, EPA will continue to implement the NSPS and NESHAPs in Indian country because LDEQ has not adequately demonstrated its authority over sources and activities located within the exterior boundaries of Indian reservations and other areas in Indian country.

## VIII. How Will Applicability Determinations Under Section 112 Be Made?

In approving this delegation, LDEQ will obtain concurrence from EPA on any matter involving the interpretation of section 112 of the CAA or 40 CFR part 63 to the extent that implementation, administration, or enforcement of these sections have not been covered by EPA determinations or guidance.

## IX. What Authority Does EPA Have?

We retain the right, as provided by CAA section 112(l)(7), to enforce any applicable emission standard or requirement under section 112. EPA also has the authority to make certain decisions under the General Provisions

---

[1] On June 23, 2003, EPA modified certain NESHAPs to clarify which authorities can be delegated to State, local, and tribal agencies. 68 FR 37334. However, this delegation is not directly affected by these changes, since LDEQ is receiving delegation of the part 63 standards that were promulgated by EPA, as amended thorugh July 1, 2002.

(subpart A) of part 63. We are granting LDEQ some of these authorities, and retaining others, as explained in sections VI and VII above. In addition, EPA may review and disapprove of State determinations and subsequently require corrections. (*See* 40 CFR 63.91(g) and 65 FR 55810, 55823, September 14, 2000.)

Furthermore, we retain any authority in an individual emission standard that may not be delegated according to provisions of the standard.[2] Also, listed in the footnotes of the part 63 delegation table at the end of this rule are the authorities that cannot be delegated to any State or local agency which we therefore retain.

## X. What Information Must LDEQ Provide to EPA?

In delegating the authority to implement and enforce these rules and in granting a waiver of EPA notification requirements, we require LDEQ to input all source information into the Aerometric Information Retrieval System (AIRS) for both point and area sources. LDEQ must enter this information into the AIRS system and update the information by September 30 of every year. LDEQ must provide any additional compliance related information to EPA, Region 6, Office of Enforcement and Compliance Assurance within 45 days of a request under 40 CFR 63.96(a).

In receiving delegation for specific General Provisions authorities, LDEQ must submit to EPA Region 6 on a semi-annual basis, copies of determinations issued under these authorities. For part 63 standards, these determinations include: Applicability determinations (§ 63.1); approval/disapprovals of construction and reconstruction (§ 63.5(e) and (f)); notifications regarding the use of a continuous opacity monitoring system (§ 63.6(h)(7)(ii)); finding of compliance (§ 63.6(h)(8)); approval/disapprovals of compliance extensions (§ 63.6(i)); approvals/disapprovals of minor (§ 63.7(e)(2)(i)) or intermediate (§ 63.7(e)(2)(ii) and (f)) alternative test methods; approval of shorter sampling times and volumes (§ 63.7(e)(2)(iii));

waiver of performance testing (§ 63.7(e)(2)(iv) and (h)(2), (3)); approvals/disapprovals of minor or intermediate alternative monitoring methods (§ 63.8(f)); approval of adjustments to time periods for submitting reports (§ 63.9 and 63.10); and approvals/disapprovals of minor alternatives to recordkeeping and reporting (§ 63.10(f)).

Additionally, EPA's Emission Measurement Center of the Emissions Monitoring and Analysis Division must receive copies of any approved intermediate changes to test methods or monitoring. (Please note that intermediate changes to test methods must be demonstrated as equivalent through the procedures set out in EPA method 301.) This information on approved intermediate changes to test methods and monitoring will be used to compile a database of decisions that will be accessible to State and local agencies and EPA Regions for reference in making future decisions. (For definitions of *major, intermediate* and *minor* alternative test methods or monitoring methods, *see* 40 CFR 63.90). The LDEQ should forward these intermediate test methods or monitoring changes via mail or facsimile to: Chief, Source Categorization Group A, EPA (MD–19), Research Triangle Park, NC 27711, Facsimile telephone number: (919) 541–1039.

## XI. What Is EPA's Oversight of This Delegation to LDEQ?

EPA must oversee LDEQ's decisions to ensure the delegated authorities are being adequately implemented and enforced. We will integrate oversight of the delegated authorities into the existing mechanisms and resources for oversight currently in place. If, during oversight, we determine that LDEQ made decisions that decreased the stringency of the delegated standards, then LDEQ shall be required to take corrective actions and the source(s) affected by the decisions will be notified, as required by 40 CFR 63.91(g)(1)(ii). We will initiate withdrawal of the program or rule if the corrective actions taken are insufficient.

## XII. Should Sources Submit Notices to EPA or LDEQ?

All of the information required pursuant to the Federal NSPS and NESHAP (40 CFR parts 60, 61, and 63) should be submitted by sources located outside of Indian country, directly to the LDEQ at the following address: Office of Environmental Services, P. O. Box 4313, Baton Rouge, LA 70821–4313. The LDEQ is the primary point of contact with respect to delegated NSPS and

NESHAPs. Sources do not need to send a copy to EPA. EPA Region 6 waives the requirement that notifications and reports for delegated standards be submitted to EPA in addition to LDEQ in accordance with 40 CFR 63.9(a)(4)(ii) and 63.10(a)(4)(ii).

## XIII. How Will Unchanged Authorities Be Delegated to LDEQ in the Future?

In the future, LDEQ will only need to send a letter of request to EPA, Region 6, for those NSPS and NESHAP regulations that LDEQ has adopted by reference. The letter must reference the previous up-front approval demonstration and reaffirm that it still meets the up-front approval criteria. We will respond in writing to the request stating that the request for delegation is either granted or denied. If a request is approved, the effective date of the delegation will be the date of our response letter. A **Federal Register** will be published to inform the public and affected sources of the delegation, indicate where source notifications and reports should be sent, and to amend the relevant portions of the Code of Federal Regulations showing which NSPS and NESHAP standards have been delegated to LDEQ.

## XIV. What Is the Relationship Between RCRA and the Hazardous Waste Combustor MACT?

As part of today's rule, we are delegating, under the CAA, implementation and enforcement authority for the Hazardous Waste Combustor (HWC) MACT (subpart EEE) to LDEQ. Many of the sources subject to the HWC MACT are also subject to the RCRA permitting requirements. We expect air emissions and related operating requirements found in the HWC MACT will be included in part 70 permits issued by LDEQ. However, RCRA permits will still be required for all other aspects of the combustion unit and the facility that are governed by RCRA (*e.g.*, corrective action, general facility standards, other combustor-specific concerns such as materials handling, risk-based emissions limits and operating requirements, as appropriate and other hazardous waste management units).[3] See the HWC

---

[2] EPA amended several NESHPs to clarify the implementation and enforcement authorities within the standards that we may delegate to each State, local or tribal agency such as LDEQ. 68 FR 37334 (June 23, 2003). A complete list of the standards is contained in a copy of the proposal available for review at the Dallas Regional Office. An electronic copy of the proposal may be obtained from EPA's Internet site, *http://www.epa.gov/ttn/oarpg/t3pfpr.html*. EPA believes the changes make all of the standards consistent in defining what may not be delegated in actions such as the one we are taking today.

[3] EPA promulgated the HWC MACT (40 CFR part 63, subpart EEE) under the joint authority of the CAA and RCRA. Before this rule went into effect, the air emissions from these sources were primarily regulated under the authority of RCRA. *See* 40 CFR parts 264, 265, 266, and 270. With the release of HWC MACT, the air emissions are now regulated under both CAA and RCRA. Even though both statutes give EPA the authority to regulate air emissions, we determined that having the emissions standards and permitting requirements in both sets
Continued

MACT rule preamble discussion (64 FR 52828, 52839–52843 (September 30, 1999)), and the RCRA Site-Specific Risk Assessment Policy for HWC Facilities dated June 2000 for more information on the interrelationship of the MACT rule with the RCRA Omnibus provision and site specific risk assessments.

## XV. Final Action

The public was provided the opportunity to comment on the proposed approval of the program and mechanism for delegation of section 112 standards, as they apply to part 70 sources, on August 24, 1994, for the proposed interim approval of LDEQ's Title V operating permits program; and on April 7, 1995, for the proposed final approval of LDEQ's Title V operating permits program. In EPA's final full approval of Louisiana's Operating Permits Program (60 FR 47296), the EPA discussed the public comments on the proposed delegation of the Title V operating permits program. In this action, the public is given the opportunity to comment on the approval of LDEQ request for delegation of authority to implement and enforce certain section 112 standards for all sources (both part 70 and non-part 70 sources) which have been adopted by reference into Louisiana's state regulations. However, the Agency views the approval of these requests as a noncontroversial action and anticipates no adverse comments. Therefore, EPA is publishing this rule without prior proposal. However, in the "Proposed Rules" section of today's **Federal Register** publication, EPA is publishing a separate document that will serve as the proposal to approve the program and delegation of authority described in this action if adverse comments are received. This action will be effective May 25, 2004, without further notice unless the Agency receives relevant adverse comments by April 26, 2004.

If EPA receives adverse comments, we will publish a timely withdrawal in the **Federal Register** informing the public

of implementing regulations would be duplicative. For this reason, using the authority provided by section 1006(b) of RCRA, EPA deferred the RCRA requirements for the HWC emission controls to the CAA requirements of 40 CFR part 63, subpart EEE. After a facility has demonstrated compliance with the HWC MACT, the RCRA standards for air emissions from these units will no longer apply, with the exception of section 3005(c)(3) of RCRA, which requires that each RCRA permit contain the terms and conditions necessary to protect human health and the environment. Under this provision of RCRA, if a regulatory authority determines that more stringent conditions that the HWC MACT are necessary to protect human health and the environment for a particular facility, then that regulatory authority may impose those conditions in the facility's RCRA permit.

the rule will not take effect. We will address all public comments in a subsequent final rule based on the proposed rule. The EPA will not institute a second comment period on this action. Any parties interested in commenting must do so at this time. Please note that if we receive adverse comment on an amendment, paragraph, or section of this rule and if that provision may be severed from the remainder of the rule, we may adopt as final those provisions of the rule that are not the subject of an adverse comment.

## XVI. Statutory and Executive Order Reviews

Under Executive Order 12866 (58 FR 51735, October 4, 1993), this action is not a "significant regulatory action" and therefore is not subject to review by the Office of Management and Budget. For this reason, this action is also not subject to Executive Order 13211, "Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use" (66 FR 28355, May 22, 2001). This action merely approves state law as meeting Federal requirements and imposes no additional requirements beyond those imposed by state law. Accordingly, the Administrator certifies that this rule will not have a significant economic impact on a substantial number of small entities under the Regulatory Flexibility Act (5 U.S.C. 601 et seq.). Because this rule approves pre-existing requirements under state law and does not impose any additional enforceable duty beyond that required by state law, it does not contain any unfunded mandate or significantly or uniquely affect small governments, as described in the Unfunded Mandates Reform Act of 1995 (Public Law 104–4).

This rule also does not have tribal implications because it will not have a substantial direct effect on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes, as specified by Executive Order 13175 (65 FR 67249, November 9, 2000). This action also does not have Federalism implications because it does not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government, as specified in Executive Order 13132 (64 FR 43255, August 10, 1999). This action merely approves a state request to receive delegation of certain Federal standards, and does not alter the relationship or

the distribution of power and responsibilities established in the Clean Air Act. This rule also is not subject to Executive Order 13045 "Protection of Children from Environmental Health Risks and Safety Risks" (62 FR 19885, April 23, 1997), because it is not economically significant.

In reviewing delegation submissions, EPA's role is to approve submissions provided that they meet the criteria of the Clean Air Act. In this context, in the absence of a prior existing requirement for the State to use voluntary consensus standards (VCS), EPA has no authority to disapprove a delegation submission for failure to use VCS. It would thus be inconsistent with applicable law for EPA to use VCS in place of a delegation submission that otherwise satisfies the provisions of the Clean Air Act. Thus, the requirements of section 12(d) of the National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) do not apply. This rule does not impose an information collection burden under the provisions of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 et seq.).

The Congressional Review Act, 5 U.S.C. 801 et seq., as added by the Small Business Regulatory Enforcement Fairness Act of 1996, generally provides that before a rule may take effect, the agency promulgating the rule must submit a rule report, which includes a copy of the rule, to each House of the Congress and to the Comptroller General of the United States. EPA will submit a report containing this rule and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States prior to publication of the rule in the **Federal Register**. A major rule cannot take effect until 60 days after it is published in the **Federal Register**. This action is not a "major rule" as defined by 5 U.S.C. 804(2).

Under section 307(b)(1) of the Clean Air Act, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by May 25, 2004. Filing a petition for reconsideration by the Administrator of this final rule does not affect the finality of this rule for the purposes of judicial review nor does it extend the time within which a petition for judicial review may be filed, and shall not postpone the effectiveness of such rule or action. This action may not be challenged later in proceedings to enforce its requirements. (See section 307(b)(2).)

## List of Subjects

### 40 CFR Part 60

Environmental protection, Administrative practice and procedure, Air pollution control, Hazardous substances, Intergovernmental relations, Reporting and recordkeeping requirements.

### 40 CFR Part 61

Environmental protection, Air pollution control, Arsenic, Benzene, Beryllium, Hazardous substances, Mercury, Radon, Reporting, and recordkeeping requirements, Uranium, Vinyl chloride.

### 40 CFR Part 63

Environmental protection, Air pollution control, Hazardous substances, Intergovernmental relations, Reporting and recordkeeping requirements.

**Authority:** This action is issued under the authority of sections 111 and 112 of the Clean Air Act, as amended, 42 U.S.C. 7411 and 7412.

Dated: March 9, 2004.

**Richard E. Greene,**

*Regional Administrator, Region 6.*

40 CFR parts 60, 61, and 63 are amended as follows:

## PART 60—[AMENDED]

■ 1. The authority citation for part 60 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

■ 2. Section 60.4 is amended by revising paragraph (b)(T), and adding paragraph (e)(2) to read as follows:

### § 60.4  Address.

\*    \*    \*    \*    \*

(b) \* \* \*

(T) State of Louisiana: Louisiana Department of Environmental Quality, Office of Environmental Assessment, P.O. Box 4314, Baton Rouge, LA 70821–4314. For a list of delegated standards for Louisiana (excluding Indian country), see paragraph (e)(1) of this section.

\*    \*    \*    \*    \*

(e) \* \* \*

(2) Louisiana. The Louisiana Department of Environmental Quality has been delegated all part 60 standards promulgated by EPA, except subpart AAA—Standards of Performance for New Residential Wood Heaters, as amended in the **Federal Register** through July 1, 2002.

## PART 61—[AMENDED]

■ 1. The authority citation for part 61 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

■ 2. Section 61.04 is amended by revising paragraph (b)(T), and adding paragraph (c)(6)(ii) to read as follows:

### § 61.04  Addresses.

\*    \*    \*    \*    \*

(b) \* \* \*

(T) State of Louisiana: Louisiana Department of Environmental Quality, Office of Environmental Assessment, P.O. Box 4314, Baton Rouge, LA 70821–4314.

\*    \*    \*    \*    \*

(c) \* \* \*

(6) \* \* \*

(ii) Louisiana. The Louisiana Department of Environmental Quality (LDEQ) has been delegated the following part 61 standards promulgated by EPA, as amended in the **Federal Register** through July 1, 2002. The (X) symbol is used to indicate each subpart that has been delegated.

DELEGATION STATUS FOR PART 61 STANDARDS—STATE OF LOUISIANA[1]

| Subpart | | LDEQ[2,3] |
|---|---|---|
| A | General Provisions | X |
| C | Beryllium | X |
| D | Beryllium Rocket Motor Firing | X |
| E | Mercury | X |
| F | Vinyl Chloride | X |
| J | Equipment Leaks of Benzene | X |
| L | Benzene Emissions from Coke By-Product Recovery Plants | X |
| N | Inorganic Arsenic Emissions from Glass Manufacturing Plants | X |
| O | Inorganic Arsenic Emissions from Primary Copper Smelters | X |
| P | Inorganic Arsenic Emissions from Arsenic Trioxide and Metallic Arsenic Production Facilities | X |
| V | Equipment Leaks | X |
| Y | Benzene Emissions from Benzene Storage Vessels | X |
| BB | Benzene Emissions from Benzene Transfer Operations | X |
| FF | Benzene Emissions from Benzene Waste Operations | X |

[1] Program delegated to Louisiana Department of Environmental Quality (LDEQ).

[2] Authorities which may not be delegated include: § 61.04(b), Addresses of State and Local Implementing Agencies; § 61.12(d)(1), Compliance with Standards and Maintenance Requirements, Alternate Means of Emission Limitation; § 61.13(h), Major Change to an Emissions Test; § 61.14(g), Major Modifications to Monitoring Requirements; § 61.16, Availability of Information Procedures; § 61.53(c)(4), List of Approved Design, Maintenance, and Housekeeping Practices for Mercury Chlor-Alkali Plants; and all authorities identified within specific subparts (*e.g.*, under "Delegation of Authority") that cannot be delegated.

[3] Federal rules adopted unchanged as of July 1, 2002.

\*    \*    \*    \*    \*

## PART 63—[AMENDED]

■ 1. The authority citation for part 63 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

■ 2. Section 63.99 is amended by adding paragraph (a)(18) to read as follows:

### § 63.99  Delegated Federal authorities.

(a) \* \* \*

(18) Louisiana.

(i) The following table lists the specific part 63 standards that have been delegated unchanged to the Louisiana Department of Environmental Quality for all sources. The "X" symbol is used to indicate each subpart that has been delegated. The delegations are

subject to all of the conditions and limitations set forth in Federal law, regulations, policy, guidance, and determinations. Some authorities cannot be delegated and are retained by EPA. These include certain General Provisions authorities and specific parts of some standards. Any amendments made to these rules after this effective date are not delegated.

DELEGATION STATUS FOR PART 63 STANDARDS—STATE OF LOUISIANA [1]

| Subpart | Source category | LDEQ [2,3] |
|---------|-----------------|------------|
| A .................... | General Provisions [2] | X |
| D .................... | Early Reductions | X |
| F .................... | Hazardous Organic NESHAP (HON)—Synthetic Organic Chemical Manufacturing Industry (SOCMI) | X |
| G .................... | HON—SOCMI Process Vents, Storage Vessels, Transfer Operations and Wastewater | X |
| H .................... | HON—Equipment Leaks | X |
| I .................... | HON—Certain Processes Negotiated Equipment Leak Regulation | X |
| J .................... | Polyvinyl Chloride and Copolymers Production | X |
| K .................... | (Reserved). | |
| L .................... | Coke Oven Batteries | X |
| M .................... | Perchloroethylene Dry Cleaning | X |
| N .................... | Chromium Electroplating and Chromium Anodizing Tanks | X |
| O .................... | Ethylene Oxide Sterilizers | X |
| P .................... | (Reserved). | |
| Q .................... | Industrial Process Cooling Towers | X |
| R .................... | Gasoline Distribution | X |
| T .................... | Halogenated Solvent Cleaning | X |
| U .................... | Group I Polymers and Resins | X |
| V .................... | (Reserved). | |
| W .................... | Epoxy Resins Production and Non-Nylon Polyamides Production | X |
| X .................... | Secondary Lead Smelting | X |
| Y .................... | Marine Tank Vessel Loading | X |
| Z .................... | (Reserved). | |
| AA .................... | Phosphoric Acid Manufacturing Plants | X |
| BB .................... | Phosphate Fertilizers Production Plants | X |
| CC .................... | Petroleum Refineries | X |
| DD .................... | Off-Site Waste and Recovery Operations | X |
| EE .................... | Magnetic Tape Manufacturing | X |
| FF .................... | (Reserved). | |
| GG .................... | Aerospace Manufacturing and Rework Facilities | X |
| HH .................... | Oil and Natural Gas Production Facilities | X |
| II .................... | Shipbuilding and Ship Repair Facilities | X |
| JJ .................... | Wood Furniture Manufacturing Operations | X |
| KK .................... | Printing and Publishing Industry | X |
| LL .................... | Primary Aluminum Reduction Plants | X |
| MM .................... | Chemical Recovery Combustion Sources at Kraft, Soda, Sulfide, and Stand-Alone Semichemical Pulp Mills | X |
| NN .................... | (Reserved). | |
| OO .................... | Tanks—Level 1 | X |
| PP .................... | Containers | X |
| QQ .................... | Surface Impoundments | X |
| RR .................... | Individual Drain Systems | X |
| SS .................... | Closed Vent Systems, Control Devices, Recovery Devices and Routing to a Fuel Gas System or a Process | X |
| TT .................... | Equipment Leaks—Control Level 1 | X |
| UU .................... | Equipment Leaks—Control Level 2 Standards | X |
| VV .................... | Oil-Water Separators and Organic-Water Separators | X |
| WW .................... | Storage Vessels (Tanks)—Control Level 2 | X |
| XX .................... | (Reserved). | |
| YY .................... | Generic Maximum Achievable Control Technology Standards | X |
| ZZ–BBB .................... | (Reserved). | |
| CCC .................... | Steel Pickling—HCl Process Facilities and Hydrochloric Acid Regeneration | X |
| DDD .................... | Mineral Wool Production | X |
| EEE .................... | Hazardous Waste Combustors | X |
| FFF .................... | (Reserved). | |
| GGG .................... | Pharmaceuticals Production | X |
| HHH .................... | Natural Gas Transmission and Storage Facilities | X |
| III .................... | Flexible Polyurethane Foam Production | X |
| JJJ .................... | Group IV Polymers and Resins | X |
| KKK .................... | (Reserved). | |
| LLL .................... | Portland Cement Manufacturing | X |
| MMM .................... | Pesticide Active Ingredient Production | X |
| NNN .................... | Wool Fiberglass Manufacturing | X |
| OOO .................... | Amino/Phenolic Resins | X |
| PPP .................... | Polyether Polyols Production | X |
| QQQ .................... | Primary Copper Smelting | X |
| RRR .................... | Secondary Aluminum Production | X |
| SSS .................... | (Reserved). | |
| TTT .................... | Primary Lead Smelting | X |
| UUU .................... | Petroleum Refineries—Catalytic Cracking Units, Catalytic Reforming Units and Sulfur Recovery Plants | X |
| VVV .................... | Publicly Owned Treatment Works (POTW) | X |
| WWW .................... | (Reserved). | |
| XXX .................... | Ferroalloys Production: Ferromanganese and Silicomanganese | X |
| AAAA .................... | Municipal Solid Waste Landfills. | |
| CCCC .................... | Nutritional Yeast Manufacturing | X |

DELEGATION STATUS FOR PART 63 STANDARDS—STATE OF LOUISIANA [1]—Continued

| Subpart | Source category | LDEQ [2,3] |
|---|---|---|
| GGGG .......... | Solvent Extraction for Vegetable Oil Production ........................................................................................................ | X |
| HHHH .......... | Wet Formed Fiberglass Mat Production ..................................................................................................................... | X |
| JJJJ .............. | Paper and other Web (Surface Coating). | |
| NNNN .......... | Surface Coating of Large Appliances. | |
| OOOO .......... | Fabric Printing Coating and Dyeing. | |
| QQQQ .......... | Surface Coating of Wood Building Products. | |
| RRRR .......... | Surface Coating of Metal Furniture. | |
| SSSS ........... | Surface Coating for Metal Coil ................................................................................................................................. | X |
| TTTT ............ | Leather Finishing Operations .................................................................................................................................. | X |
| UUUU .......... | Cellulose Production Manufacture ........................................................................................................................... | X |
| VVVV ........... | Boat Manufacturing .................................................................................................................................................. | X |
| WWWW ....... | Reinforced Plastic Composites Production. | |
| XXXX ........... | Tire Manufacturing. | |
| BBBBB ......... | Semiconductor Manufacturing. | |
| CCCCC ........ | Coke Ovens: Pushing, Quenching and Battery Stacks ............................................................................................ | X |
| FFFFF .......... | Integrated Iron and Steel. | |
| JJJJJ ............ | Brick and Structural Clay Products Manufacturing. | |
| KKKKK ......... | Clay Ceramics Manufacturing. | |
| LLLLL ........... | Asphalt Roofing and Processing. | |
| MMMMM ...... | Flexible Polyurethane Foam Fabrication Operation. | |
| NNNNN ........ | Hydrochloric Acid Production, Fumed Silica Production. | |
| PPPPP ......... | Engine Test Facilities. | |
| QQQQQ ....... | Friction Products Manufacturing. | |
| SSSSS ......... | Refractory Products Manufacture. | |

[1] Program delegated to Louisiana Department of Environmental Quality (LDEQ).
[2] Authorities which may not be delegated include: § 63.6(g), Approval of Alternative Non-Opacity Emission Standards; § 63.6(h)(9), Approval of Alternative Opacity Standards; § 63.7(e)(2)(ii) and (f), Approval of Major Alternatives to Test Methods; § 63.8(f), Approval of Major Alternatives to Monitoring; § 63.10(f), Approval of Major Alternatives to Recordkeeping and Reporting; and all authorities identified in the subparts (*e.g.*, under "Delegation of Authority") that cannot be delegated.
[3] Federal rules adopted unchanged as of July 1, 2002.

(ii) Affected sources within Louisiana shall comply with the Federal requirements of 40 CFR part 63—subpart S—Pulp and Paper Industry, adopted by reference by the Louisiana Department of Environmental Quality's (LDEQ), with the exception of the compliance date listed in § 63.440(d)(1). The LDEQ has adopted an earlier compliance date than the Federal requirement. The earlier compliance date is approved by EPA pursuant to § 63.92. Affected sources in Louisiana that are subject to the requirements of Subpart S shall meet the compliance date established at Louisiana Administrative Code, Title 33, part III, chapter 51, subchapter C., section 5122, C.2.

*  *  *  *  *

[FR Doc. 04–6299 Filed 3–25–04; 8:45 am]

**BILLING CODE 6560–50–P**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

**Office of the Secretary**

**45 CFR Part 148**

**[CMS–2179–F]**

**RIN 0938–AM42**

## Grants to States for Operation of Qualified High Risk Pools

**AGENCY:** Office of the Secretary, HHS.

**ACTION:** Final rule.

**SUMMARY:** This final rule implements a provision of the Trade Adjustment Assistance Reform Act of 2002 by providing $40 million in Federal fiscal year 2003 and $40 million in Federal fiscal year 2004 to States that have incurred losses in connection with the operation of qualified high risk pools that meet certain criteria. This final rule also addresses comments received in response to the interim final rule that was published on May 2, 2003. This grant program implements section 2745 of the Public Health Service Act, as added by the Trade Adjustment Assistance Reform Act of 2002.

**DATES:** Effective date. These regulations are effective on April 26, 2004

*Deadline for States to submit an application for losses incurred in their fiscal year 2002:* States had to submit an application to us by no later than September 30, 2003. *Deadline for States to submit an application for losses incurred in their fiscal year 2003:* States must submit an application to us by no later than June 30, 2004. *Deadline for States to submit an application for losses incurred in their fiscal year 2004:* States must submit an application to us by no later than June 30, 2005.

**ADDRESSES:** *Where To Submit an Application.* All initial applications and supplemental applications must be submitted to: Centers for Medicare & Medicaid Services, Acquisition and Grants Group, Mail Stop C2–21–15, 7500 Security Boulevard, Baltimore, MD 21244–1850, Attn: Nicole Nicholson.

**FOR FURTHER INFORMATION CONTACT:** James Mayhew, (410) 786–9244.

**SUPPLEMENTARY INFORMATION:**

## I. Background

### A. General

Section 2745(b) of the Public Health Service Act (PHS Act), as added by section 201(b) of the Trade Adjustment Assistance Reform Act of 2002, authorizes the Secretary to make grants to States for up to 50 percent of the losses they incur in the operation of qualified high risk pools, and appropriates the necessary funds. In order to qualify for a grant, a State's risk

# EXHIBIT F

## ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Part 63**

[FRL–7155–8]

RIN 2060–AF31

**National Emission Standards for Hazardous Air Pollutants for Source Categories: General Provisions; and Requirements for Control Technology Determinations for Major Sources in Accordance with Clean Air Act Sections, Sections 112(g) and 112(j)**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule; amendments.

**SUMMARY:** On March 16, 1994, the EPA promulgated General Provisions for national emission standards for hazardous air pollutants (NESHAP) and other regulatory requirements that are established under section 112 of the Clean Air Act (CAA). In today's action, we are promulgating amendments to the General Provisions that revise and clarify several of the current provisions.

We are promulgating these amendments, in part, as a result of decisions reached in settlement negotiations conducted between petitioners who filed for review of the General Provisions and the EPA, as well as internal EPA discussions on issues regarding implementation of the General Provisions. The promulgated amendments also reflect our response to public comments.

In a separate action in today's **Federal Register**, we are also amending regulations on National Emission Standards for Hazardous Air Pollutants: Solvent Extraction for Vegetable Oil Production, in a direct final rule in order to resolve inconsistencies between that rule and these amendments to the General Provisions.

In addition, in today's action, we are promulgating amendments to the rule that establishes equivalent emission limitations by permit under section 112(j) of the CAA. The "section 112(j)" rule establishes requirements and procedures for owners or operators of major sources of hazardous air pollutants (HAP) and permitting authorities to comply with section 112(j). The section 112(j) rule was promulgated on May 20, 1994.

These amendments have been developed in response to settlement negotiations conducted between petitioners who filed for review of the section 112(j) rule and the EPA, as well as internal EPA discussions regarding implementation of the section 112(j)

rule. The promulgated amendments to the section 112(j) rule also reflect our response to public comments.

**EFFECTIVE DATE:** April 5, 2002.

**ADDRESSES:** Docket No. A–2001–02, Part 63 General Provisions (Subpart A) and Section 112(j) Regulations (Subpart B) Litigation Settlement Amendments, contains supporting information used in developing these amendments. This docket is located at the U.S. EPA, 401 M Street, SW, Washington, DC 20460 in room M–1500, Waterside Mall (ground floor), and is available for public inspection and copying from 8:30 a.m. through 5:30 p.m., Monday through Friday, excluding legal holidays. A reasonable fee may be charged for copying.

**FOR FURTHER INFORMATION CONTACT:** For information concerning applicability and rule determinations, contact your State or local permitting agency representative or the appropriate EPA Regional Office representative. For further information concerning the development of these rule amendments, contact Mr. Rick Colyer, U.S. EPA, Office of Air Quality Planning and Standards, Minerals and Inorganic Chemicals Group, C504–05, Research Triangle Park, North Carolina, 27711, telephone (919) 541–5262, *e-mail colyer.rick@epa.gov.*

**SUPPLEMENTARY INFORMATION:** *Docket.* The docket is an organized and complete file of the record compiled by EPA in the development of this rulemaking. The docket is a dynamic file because material is added throughout the rulemaking process. The docketing system is intended to allow members of the public and industries involved to readily identify and locate documents so that they can effectively participate in the rulemaking process. Along with the background information document and the proposal and promulgation preamble and standards for this rulemaking, the contents of the docket will serve as the record in the case of judicial review. (See section 307(d)(7)(A) of the CAA.) All these materials are available for review in the docket or copies may be mailed on request from the Air Docket by calling (202) 260–7548. A reasonable fee may be charged for copying docket materials.

*Worldwide Web (WWW).* In addition to being available in the docket, an electronic copy of today's promulgated rule amendments will also be available on the WWW through the Technology Transfer Network (TTN). Following the Administrator's signature, a copy of the rule will be posted on the TTN's policy and guidance page for newly proposed

or promulgated rules: *http://www.epa.gov/ttn/oarpg.* The TTN provides information and technology exchange in various areas of air pollution control. If more information regarding the TTN is needed, call the TTN HELP line at (919) 541–5384.

*Regulated Entities.* Categories and entities potentially regulated by this action include all section 112 source categories listed under section 112(c) of the CAA.

**Industry Group: Source Category**

*Fuel Combustion*

Combustion Turbines
Engine Test Facilities
Industrial Boilers
Institutional/Commercial Boilers
Process Heaters
Reciprocating Internal Combustion Engines
Rocket Testing Facilities

*Non-Ferrous Metals Processing*

Primary Aluminum Production
Primary Copper Smelting
Primary Lead Smelting
Primary Magnesium Refining
Secondary Aluminum Production
Secondary Lead Smelting

*Ferrous Metals Processing*

Coke By-Product Plants
Coke Ovens: Charging, Top Side, and Door Leaks
Coke Ovens: Pushing, Quenching, Battery Stacks
Ferroalloys Production: Silicomanganese and Ferromanganese
Integrated Iron and Steel Manufacturing
Iron Foundries Electric Arc Furnace (EAF) Operation
Steel Foundries
Steel Pickling—HCl Process Facilities and Hydrochloric Acid Regeneration

*Mineral Products Processing*

Alumina Processing
Asphalt Concrete Manufacturing
Asphalt Processing
Asphalt Roofing Manufacturing
Asphalt/Coal Tar Application—Metal Pipes
Clay Products Manufacturing
Lime Manufacturing
Mineral Wool Production
Portland Cement Manufacturing
Refractories Manufacturing
Taconite Iron Ore Processing
Wool Fiberglass Manufacturing

*Petroleum and Natural Gas Production and Refining*

Oil and Natural Gas Production
Natural Gas Transmission and Storage
Petroleum Refineries—Catalytic Cracking (Fluid and other) Units, Catalytic Reforming Units, and Sulfur Plant Units
Petroleum Refineries—Other Sources Not Distinctly Listed

*Liquids Distribution*

Gasoline Distribution (Stage 1)
Marine Vessel Loading Operations
Organic Liquids Distribution (Non-Gasoline)

in paragraph (d)(1)(ii) of this section, technical information describing the proposed nature, size, design, operating design capacity, and method of operation of the source, including an identification of each type of emission point for each type of hazardous air pollutant that is emitted (or could reasonably be anticipated to be emitted) and a description of the planned air pollution control system (equipment or method) for each emission point. The description of the equipment to be used for the control of emissions must include each control device for each hazardous air pollutant, and the estimated control efficiency (percent) for each control device. The description of the method to be used for the control of emissions must include an estimated control efficiency (percent) for that method. Such technical information must include calculations of emission estimates in sufficient detail to permit assessment of the validity of the calculations.

(3) * * *

(vi) If in the application for approval of reconstruction the owner or operator designates the affected source as a reconstructed source and declares that there are no economic or technical limitations to prevent the source from complying with all relevant standards or other requirements, the owner or operator need not submit the information required in paragraphs (d)(3)(iii) through (d)(3)(v) of this section.

* * * * *

(f) * * *

(1) Preconstruction review procedures that a State utilizes for other purposes may also be utilized for purposes of this section if the procedures are substantially equivalent to those specified in this section. The Administrator will approve an application for construction or reconstruction specified in paragraphs (b)(3) and (d) of this section if the owner or operator of a new affected source or reconstructed affected source, who is subject to such requirement meets the following conditions:

(i) The owner or operator of the new affected source or reconstructed affected source has undergone a preconstruction review and approval process in the State in which the source is (or would be) located and has received a federally enforceable construction permit that contains a finding that the source will meet the relevant promulgated emission standard, if the source is properly built and operated.

(ii) Provide a statement from the State or other evidence (such as State

regulations) that it considered the factors specified in paragraph (e)(1) of this section.

(2) The owner or operator must submit to the Administrator the request for approval of construction or reconstruction under this paragraph (f)(2) no later than the application deadline specified in paragraph (d)(1) of this section (see also § 63.9(b)(2)). The owner or operator must include in the request information sufficient for the Administrator's determination. The Administrator will evaluate the owner or operator's request in accordance with the procedures specified in paragraph (e) of this section. The Administrator may request additional relevant information after the submittal of a request for approval of construction or reconstruction under this paragraph (f)(2).

7. Section 63.6 is amended by:
a. Revising paragraph (a)(1) introductory text;
b. Revising paragraphs (b)(1), (b)(2), (b)(3)(i), (b)(4), (b)(5), and (b)(7);
c. Revising paragraphs (c)(2) and (c)(5);
d. Revising paragraphs (e)(1)(i) and (ii);
e. Removing and reserving paragraph (e)(2);
f. Revising paragraphs (e)(3)(i) introductory text, (e)(3)(i)(A), (e)(3)(ii), the first three sentences of (e)(3)(iii) and (e)(3)(v), revising paragraphs (e)(3)(iv), (e)(3)(vii)(B), (e)(3)(vii)(C), adding paragraph (e)(3)(vii)(D), revising paragraph (e)(3)(viii) and adding paragraph (e)(3)(ix);
g. Revising paragraphs (f)(1), (f)(2)(iii)(D), and (f)(3);
h. Revising paragraph (h)(1);
i. Revising paragraph (h)(2)(iii)(C);
j. Revising paragraph (i)(4)(i)(B);
k. Revising the last sentence of paragraph (i)(4)(ii);
l. Revising paragraphs (i)(6)(i)(B)(*1*) and (*2*) and removing and reserving paragraphs (i)(6)(i)(C) & (D);
m. Revising paragraph (i)(12)(i);
n. Revising paragraph (i)(14); and
o. Adding paragraph (i)(4)(i)(C).
The revisions and additions read as follows:

**§ 63.6  Compliance with standards and maintenance requirements.**

(a) * * *

(1) The requirements in this section apply to the owner or operator of affected sources for which any relevant standard has been established pursuant to section 112 of the Act and the applicability of such requirements is set out in accordance with § 63.1(a)(4) unless—

* * * * *

(b) *Compliance dates for new and reconstructed affected sources.* (1) Except as specified in paragraphs (b)(3) and (4) of this section, the owner or operator of a new or reconstructed affected source for which construction or reconstruction commences after proposal of a relevant standard that has an initial startup before the effective date of a relevant standard established under this part pursuant to section 112(d), (f), or (h) of the Act must comply with such standard not later than the standard's effective date.

(2) Except as specified in paragraphs (b)(3) and (4) of this section, the owner or operator of a new or reconstructed affected source that has an initial startup after the effective date of a relevant standard established under this part pursuant to section 112(d), (f), or (h) of the Act must comply with such standard upon startup of the source.

(3) * * *

(i) The promulgated standard (that is, the relevant standard) is more stringent than the proposed standard; for purposes of this paragraph, a finding that controls or compliance methods are "more stringent" must include control technologies or performance criteria and compliance or compliance assurance methods that are different but are substantially equivalent to those required by the promulgated rule, as determined by the Administrator (or his or her authorized representative); and

* * * * *

(4) The owner or operator of an affected source for which construction or reconstruction is commenced after the proposal date of a relevant standard established pursuant to section 112(d) of the Act but before the proposal date of a relevant standard established pursuant to section 112(f) shall not be required to comply with the section 112(f) emission standard until the date 10 years after the date construction or reconstruction is commenced, except that, if the section 112(f) standard is promulgated more than 10 years after construction or reconstruction is commenced, the owner or operator must comply with the standard as provided in paragraphs (b)(1) and (2) of this section.

(5) The owner or operator of a new source that is subject to the compliance requirements of paragraph (b)(3) or (4) of this section must notify the Administrator in accordance with § 63.9(d).

* * * * *

(7) When an area source becomes a major source by the addition of equipment or operations that meet the definition of new affected source in the relevant standard, the portion of the

existing facility that is a new affected source must comply with all requirements of that standard applicable to new sources. The source owner or operator must comply with the relevant standard upon startup.

(c) * * *

(2) If an existing source is subject to a standard established under this part pursuant to section 112(f) of the Act, the owner or operator must comply with the standard by the date 90 days after the standard's effective date, or by the date specified in an extension granted to the source by the Administrator under paragraph (i)(4)(ii) of this section, whichever is later.

* * * * *

(5) Except as provided in paragraph (b)(7) of this section, the owner or operator of an area source that increases its emissions of (or its potential to emit) hazardous air pollutants such that the source becomes a major source shall be subject to relevant standards for existing sources. Such sources must comply by the date specified in the standards for existing area sources that become major sources. If no such compliance date is specified in the standards, the source shall have a period of time to comply with the relevant emission standard that is equivalent to the compliance period specified in the relevant standard for existing sources in existence at the time the standard becomes effective.

* * * * *

(e) * * *

(1)(i) At all times, including periods of startup, shutdown, and malfunction, the owner or operator must operate and maintain any affected source, including associated air pollution control equipment and monitoring equipment, in a manner consistent with safety and good air pollution control practices for minimizing emissions to the levels required by the relevant standards, i.e., meet the emission standard or comply with the startup, shutdown, and malfunction plan. Determination of whether such operation and maintenance procedures are being used will be based on information available to the Administrator which may include, but is not limited to, monitoring results, review of operation and maintenance procedures (including the startup, shutdown, and malfunction plan required in paragraph (e)(3) of this section), review of operation and maintenance records, and inspection of the source.

(ii) Malfunctions must be corrected as soon as practicable after their occurrence in accordance with the startup, shutdown, and malfunction plan required in paragraph (e)(3) of this section. To the extent that an unexpected event arises during a startup, shutdown, or malfunction, an owner or operator must comply by minimizing emissions during such a startup, shutdown, and malfunction event consistent with safety and good air pollution control practices.

* * * * *

(2) [Reserved]

(3) * * *

(i) The owner or operator of an affected source must develop and implement a written startup, shutdown, and malfunction plan that describes, in detail, procedures for operating and maintaining the source during periods of startup, shutdown, and malfunction; a program of corrective action for malfunctioning process; and air pollution control and monitoring equipment used to comply with the relevant standard. This plan must be developed by the owner or operator by the source's compliance date for that relevant standard. The purpose of the startup, shutdown, and malfunction plan is to—

(A) Ensure that, at all times, the owner or operator operate and maintain affected sources, including associated air pollution control and monitoring equipment, in a manner consistent with safety and good air pollution control practices for minimizing emissions to the levels required by the relevant standards;

* * * * *

(ii) During periods of startup, shutdown, and malfunction, the owner or operator of an affected source must operate and maintain such source (including associated air pollution control and monitoring equipment) in accordance with the procedures specified in the startup, shutdown, and malfunction plan developed under paragraph (e)(3)(i) of this section.

(iii) When actions taken by the owner or operator during a startup, shutdown, or malfunction (including actions taken to correct a malfunction) are consistent with the procedures specified in the affected source's startup, shutdown, and malfunction plan, the owner or operator must keep records for that event which demonstrate that the procedures specified in the plan were followed. These records may take the form of a ''checklist,'' or other effective form of recordkeeping that confirms conformance with the startup, shutdown, and malfunction plan for that event. In addition, the owner or operator must keep records of these events as specified in § 63.10(b), including records of the occurrence and duration of each startup, shutdown, or malfunction of operation and each malfunction of the air pollution control and monitoring equipment. * * *

(iv) If an action taken by the owner or operator during a startup, shutdown, or malfunction (including an action taken to correct a malfunction) is not consistent with the procedures specified in the affected source's startup, shutdown, and malfunction plan, and the source exceeds the relevant emission standard, then the owner or operator must record the actions taken for that event and must report such actions within 2 working days after commencing actions inconsistent with the plan, followed by a letter within 7 working days after the end of the event, in accordance with § 63.10(d)(5) (unless the owner or operator makes alternative reporting arrangements, in advance, with the Administrator).

(v) The owner or operator must maintain at the affected source a current startup, shutdown, and malfunction plan and must make the plan available upon request for inspection and copying by the Administrator. In addition, if the startup, shutdown, and malfunction plan is subsequently revised as provided in paragraph (e)(3)(viii) of this section, the owner or operator must maintain at the affected source each previous (i.e., superseded) version of the startup, shutdown, and malfunction plan, and must make each such previous version available for inspection and copying by the Administrator for a period of 5 years after revision of the plan. If at any time after adoption of a startup, shutdown, and malfunction plan the affected source ceases operation or is otherwise no longer subject to the provisions of this part, the owner or operator must retain a copy of the most recent plan for 5 years from the date the source ceases operation or is no longer subject to this part and must make the plan available upon request for inspection and copying by the Administrator. * * *

* * * * *

(vii) * * *

(B) Fails to provide for the operation of the source (including associated air pollution control and monitoring equipment) during a startup, shutdown, or malfunction event in a manner consistent with safety and good air pollution control practices for minimizing emissions to the levels required by the relevant standards;

(C) Does not provide adequate procedures for correcting malfunctioning process and/or air pollution control and monitoring equipment as quickly as practicable; or

(D) Includes an event that does not meet the definition of startup,

shutdown, or malfunction listed in § 63.2.

(viii) The owner or operator may periodically revise the startup, shutdown, and malfunction plan for the affected source as necessary to satisfy the requirements of this part or to reflect changes in equipment or procedures at the affected source. Unless the permitting authority provides otherwise, the owner or operator may make such revisions to the startup, shutdown, and malfunction plan without prior approval by the Administrator or the permitting authority. However, each such revision to a startup, shutdown, and malfunction plan must be reported in the semiannual report required by § 63.10(d)(5). If the startup, shutdown, and malfunction plan fails to address or inadequately addresses an event that meets the characteristics of a malfunction but was not included in the startup, shutdown, and malfunction plan at the time the owner or operator developed the plan, the owner or operator must revise the startup, shutdown, and malfunction plan within 45 days after the event to include detailed procedures for operating and maintaining the source during similar malfunction events and a program of corrective action for similar malfunctions of process or air pollution control and monitoring equipment. In the event that the owner or operator makes any revision to the startup, shutdown, and malfunction plan which alters the scope of the activities at the source which are deemed to be a startup, shutdown, malfunction, or otherwise modifies the applicability of any emission limit, work practice requirement, or other requirement in a standard established under this part, the revised plan shall not take effect until after the owner or operator has provided a written notice describing the revision to the permitting authority.

(ix) The title V permit for an affected source must require that the owner or operator adopt a startup, shutdown, and malfunction plan which conforms to the provisions of this part, and that the owner or operator operate and maintain the source in accordance with the procedures specified in the current startup, shutdown, and malfunction plan. However, any revisions made to the startup, shutdown, and malfunction plan in accordance with the procedures established by this part shall not be deemed to constitute permit revisions under part 70 or part 71 of this chapter. Moreover, none of the procedures specified by the startup, shutdown, and malfunction plan for an affected source shall be deemed to fall within the

permit shield provision in section 504(f) of the Act.

(f) * * *

(1) *Applicability.* The non-opacity emission standards set forth in this part shall apply at all times except during periods of startup, shutdown, and malfunction, and as otherwise specified in an applicable subpart. If a startup, shutdown, or malfunction of one portion of an affected source does not affect the ability of particular emission points within other portions of the affected source to comply with the non-opacity emission standards set forth in this part, then that emission point must still be required to comply with the non-opacity emission standards and other applicable requirements.

(2) * * *

(iii) * * *

(D) The performance test was appropriately quality-assured, as specified in § 63.7(c).

*      *      *      *      *

(3) *Finding of compliance.* The Administrator will make a finding concerning an affected source's compliance with a non-opacity emission standard, as specified in paragraphs (f)(1) and (2) of this section, upon obtaining all the compliance information required by the relevant standard (including the written reports of performance test results, monitoring results, and other information, if applicable), and information available to the Administrator pursuant to paragraph (e)(1)(i) of this section.

*      *      *      *      *

(h) * * *

(1) *Applicability.* The opacity and visible emission standards set forth in this part must apply at all times except during periods of startup, shutdown, and malfunction, and as otherwise specified in an applicable subpart. If a startup, shutdown, or malfunction of one portion of an affected source does not affect the ability of particular emission points within other portions of the affected source to comply with the opacity and visible emission standards set forth in this part, then that emission point shall still be required to comply with the opacity and visible emission standards and other applicable requirements.

(2) * * *

(iii) * * *

(C) The opacity or visible emission test was conducted and the resulting data were reduced using EPA-approved test methods and procedures, as specified in § 63.7(e); and

*      *      *      *      *

(i) * * *

(4)(i) * * *

(B) Any request under this paragraph for an extension of compliance with a relevant standard must be submitted in writing to the appropriate authority no later than 120 days prior to the affected source's compliance date (as specified in paragraphs (b) and (c) of this section), except as provided for in paragraph (i)(4)(i)(C) of this section. Nonfrivolous requests submitted under this paragraph will stay the applicability of the rule as to the emission points in question until such time as the request is granted or denied. A denial will be effective as of the date of denial. Emission standards established under this part may specify alternative dates for the submittal of requests for an extension of compliance if alternatives are appropriate for the source categories affected by those standards.

(C) An owner or operator may submit a compliance extension request after the date specified in paragraph (i)(4)(i)(B) of this section provided the need for the compliance extension arose after that date, and before the otherwise applicable compliance date and the need arose due to circumstances beyond reasonable control of the owner or operator. This request must include, in addition to the information required in paragraph (i)(6)(i) of this section, a statement of the reasons additional time is needed and the date when the owner or operator first learned of the problems. Nonfrivolous requests submitted under this paragraph will stay the applicability of the rule as to the emission points in question until such time as the request is granted or denied. A denial will be effective as of the original compliance date.

(ii) * * * Any request for an extension of compliance with a relevant standard under this paragraph must be submitted in writing to the Administrator not later than 90 calendar days after the effective date of the relevant standard.

*      *      *      *      *

(6)(i) * * *

(B) * * *

(*1*) The date by which on-site construction, installation of emission control equipment, or a process change is planned to be initiated; and

(*2*) The date by which final compliance is to be achieved.

(C) [Reserved]

(D) [Reserved]

*      *      *      *      *

(12)(i) The Administrator (or the State with an approved permit program) will notify the owner or operator in writing of approval or intention to deny approval of a request for an extension of compliance within 30 calendar days

after receipt of sufficient information to evaluate a request submitted under paragraph (i)(4)(i) or (i)(5) of this section. The Administrator (or the State) will notify the owner or operator in writing of the status of his/her application, that is, whether the application contains sufficient information to make a determination, within 30 calendar days after receipt of the original application and within 30 calendar days after receipt of any supplementary information that is submitted. The 30-day approval or denial period will begin after the owner or operator has been notified in writing that his/her application is complete.

*     *     *     *     *

(14) The Administrator (or the State with an approved permit program) may terminate an extension of compliance at an earlier date than specified if any specification under paragraph (i)(10)(iii) or (iv) of this section is not met. Upon a determination to terminate, the Administrator will notify, in writing, the owner or operator of the Administrator's determination to terminate, together with:

(i) Notice of the reason for termination; and

(ii) Notice of opportunity for the owner or operator to present in writing, within 15 calendar days after he/she is notified of the determination to terminate, additional information or arguments to the Administrator before further action on the termination.

(iii) A final determination to terminate an extension of compliance will be in writing and will set forth the specific grounds on which the termination is based. The final determination will be made within 30 calendar days after presentation of additional information or arguments, or within 30 calendar days after the final date specified for the presentation if no presentation is made.

*     *     *     *     *

8. Section 63.7 is amended by:

a. Revising paragraphs (a)(1) and (a)(2) introductory text;

b. Removing and reserving paragraphs (a)(2)(i) through (viii);

c. Revising paragraph (b)(1);

d. Revising the first sentence of paragraph (b)(2);

e. Revising paragraphs (c)(3)(ii)(A) through (B);

f. Revising paragraph (c)(4)(i);

g. Revising paragraphs (e)(2)(i) through (iii);

h. Revising paragraph (f)(1);

i. Revising paragraphs (f)(2)(i) through (ii); and

j. Revising paragraph (f)(3).

The revisions read as follows:

**§ 63.7  Performance testing requirements.**

(a) * * *

(1) The applicability of this section is set out in § 63.1(a)(4).

(2) If required to do performance testing by a relevant standard, and unless a waiver of performance testing is obtained under this section or the conditions of paragraph (c)(3)(ii)(B) of this section apply, the owner or operator of the affected source must perform such tests within 180 days of the compliance date for such source.

(i)—(viii) [Reserved]

*     *     *     *     *

(b) * * *

(1) The owner or operator of an affected source must notify the Administrator in writing of his or her intention to conduct a performance test at least 60 calendar days before the performance test is initially scheduled to begin to allow the Administrator, upon request, to review an approve the site-specific test plan required under paragraph (c) of this section and to have an observer present during the test.

(2) In the event the owner or operator is unable to conduct the performance test on the date specified in the notification requirement specified in paragraph (b)(1) of this section due to unforeseeable circumstances beyond his or her control, the owner or operator must notify the Administrator as soon as practicable and without delay prior to the scheduled performance test date and specify the date when the performance test is rescheduled. * * *

(c) * * *

(3) * * *

(ii) * * *

(A) If the owner or operator intends to demonstrate compliance using the test method(s) specified in the relevant standard or with only minor changes to those tests methods (see paragraph (e)(2)(i) of this section), the owner or operator must conduct the performance test within the time specified in this section using the specified method(s);

(B) If the owner or operator intends to demonstrate compliance by using an alternative to any test method specified in the relevant standard, the owner or operator is authorized to conduct the performance test using an alternative test method after the Administrator approves the use of the alternative method when the Administrator approves the site-specific test plan (if review of the site-specific test plan is requested) or after the alternative method is approved (see paragraph (f) of this section). However, the owner or operator is authorized to conduct the performance test using an alternative method in the absence of notification of

approval 45 days after submission of the site-specific test plan or request to use an alternative method. The owner or operator is authorized to conduct the performance test within 60 calendar days after he/she is authorized to demonstrate compliance using an alternative test method. Notwithstanding the requirements in the preceding three sentences, the owner or operator may proceed to conduct the performance test as required in this section (without the Administrator's prior approval of the site-specific test plan) if he/she subsequently chooses to use the specified testing and monitoring methods instead of an alternative.

*     *     *     *     *

(4)(i) *Performance test method audit program.* The owner or operator must analyze performance audit (PA) samples during each performance test. The owner or operator must request performance audit materials 30 days prior to the test date. Audit materials including cylinder audit gases may be obtained by contacting the appropriate EPA Regional Office or the responsible enforcement authority.

*     *     *     *     *

(e) * * *

(2) * * *

(i) Specifies or approves, in specific cases, the use of a test method with minor changes in methodology (see definition in § 63.90(a)). Such changes may be approved in conjunction with approval of the site-specific test plan (see paragraph (c) of this section); or

(ii) Approves the use of an intermediate or major change or alternative to a test method (see definitions in § 63.90(a)), the results of which the Administrator has determined to be adequate for indicating whether a specific affected source is in compliance; or

(iii) Approves shorter sampling times or smaller sample volumes when necessitated by process variables or other factors; or

*     *     *     *     *

(f) * * *

(1) *General.* Until authorized to use an intermediate or major change or alternative to a test method, the owner or operator of an affected source remains subject to the requirements of this section and the relevant standard.

(2) * * *

(i) Notifies the Administrator of his or her intention to use an alternative test method at least 60 days before the performance test is scheduled to begin;

(ii) Uses Method 301 in appendix A of this part to validate the alternative test method. This may include the use

# **EXHIBIT G**

July 10, 1998


MEMORANDUM

SUBJECT:  Delegation of 40 CFR Part 63 General Provisions Authorities to State and Local
          Air Pollution Control Agencies

FROM:     John S. Seitz, Director /s/ John Seitz
          Office of Air Quality Planning and Standards (MD-10)

TO:       See Addressees


     This memorandum is to provide guidance to the EPA Regional Offices on delegation of
discretionary authorities relating to air toxics in 40 CFR part 63, subpart A (the General
Provisions) to State and Local Air Pollution Control (S/L) agencies through 40 CFR part 63,
subpart E (Approval of State Programs).  Under the General Provisions, the EPA Administrator
has the authority to approve certain changes to, or make decisions under, specific General
Provisions requirements.  Questions have been raised by the Regions about whether S/L agencies
may make the same discretionary decisions when they are delegated the General Provisions.

     In explaining the straight delegation process for delegating air toxics provisions to S/L
agencies under 40 CFR part 63, subpart E, we did not clarify what discretionary authorities are
delegated to S/L agencies when they seek straight delegation of the General Provisions.  Although
this is briefly discussed in the proposed General Provisions' preamble (Federal Register, August
11, 1993, page 42775-42777), the forthcoming proposed subpart E revisions will fill that gap by
clarifying which discretionary authorities may be delegated to S/L agencies through straight
delegation of the General Provisions.  At your discretion, the Regional Offices must then specify
in delegation agreements or documents which of the subpart A authorities are being delegated to
each State.  We recommend that you begin implementing these changes as soon as possible.
Therefore, this memorandum is intended to explain the changes and provide guidance for you to
begin implementing the changes now.  Neither this memorandum nor the subpart E rulemaking
changes any source-specific decisions that have already been made under the General Provisions,
but the guidance in this memorandum should be used as guidance for all future decisions
regarding the General Provisions' authorities.

     To implement these changes, you will need to clarify with your S/L agencies which
General Provisions' authorities have and have not been delegated.  In cases where you may have
delegated authorities in the past that should no longer be delegated,  you will need to inform your
S/L agencies that delegation of these authorities will be revoked.

     At this time, we are also providing clarification of section 63.6(i)(1), "Extension of
Compliance with Emission Standards," General Provisions authority.  This section states "(u)ntil
an extension of compliance has been granted by the Administrator (or a State with an approved
permit program) under this paragraph, the owner or operator of an affected source subject to the
requirements of this section shall comply with all applicable requirements of this part."  It is our
interpretation that this authority does not require delegation through subpart E and, instead, is
automatically granted to States as part of their part 70 operating permits program approval
regardless of whether the operating permits program approval is interim or final.  Additionally, it
is our interpretation that the State would not need to have been delegated a particular source
category or have issued a part 70 operating permit for a particular source to grant that source a
compliance extension.

     We are also providing clarification of section 63.5(e) and (f), "Approval and Disapproval
of Construction and Reconstruction," General Provisions authority.  The Clean Air Act as

amended (1990 Amendments), sections 112(i)(1) and (3) state that the "Administrator (or a State with a permit program approved under title V)" can determine whether a source will comply with the standard if constructed properly.  It is our interpretation that this authority does not require
delegation through subpart E and, instead, is automatically granted to States as part of their part 70 operating permits program approval.

Link to section 112(l):  This guidance only addresses the case where the General Provisions are delegated to an S/L agency through straight delegation under section 112(l) provisions which were promulgated in 40 CFR part 63, subpart E.  Therefore, the guidance addresses S/L agencies' authority to make source-specific decisions only, not source-category wide decisions.  Any S/L agency wishing to make discretionary decisions on a source-category wide basis under the General Provisions or any other part 63 requirement would need to use the section 112(l) delegation process under 40 CFR part 63, subsections 63.92, 63.93, or 63.94 to substitute its own rule or program.  When subpart E revisions are promulgated, section 63.97 will be added to the above list as a delegation option.

Consistency with Previous Policies:  This guidance is intended to be consistent with previous policies developed for new source performance standards (NSPS) under 40 CFR part 60, national emission standards for hazardous air pollutants (NESHAP) under 40 CFR part 61, and for changes to State implementation plans (SIP's).  Past guidance issued for NSPS changes has permitted delegation to S/L agencies of all the Administrator's authorities except those that require Federal rulemaking, or those for which Federal oversight is critical to ensuring
national consistency in the application of standards.  Additionally, such delegations were not intended to give S/L agencies the authority to issue interpretations of Federal law that are subsequently binding on the Federal Government.  Current SIP policy, as reflected in White Paper Number 2 for Improved Implementation of the Part 70 Operating Permits Program, permits S/L agencies to alter SIP requirements so long as the alternative requirements are shown to be equally
stringent and are within a pre-approved protocol (and so long as public review is provided and EPA approval is obtained).  The S/L agencies can show equivalent stringency by providing substantive criteria in SIPs governing the implementation of alternative requirements.

We recognize that Regions have the prerogative to approve delegation of specific authorities to some S/L agencies and not to others.  Therefore, we encourage Regions to provide as clearly as possible an explanation of the criteria they have used to approve or disapprove delegation of a specific authority, and to apply those criteria consistently across their S/L agencies.  Such criteria could include a determination of whether the S/L agency has sufficient expertise to make such decisions, or a determination that the working relationship between the Region and the S/L agencies is such that individual decisions could or could not be determined through consultation on an "as needed" basis.  For example, you may want to work more closely with your S/L agencies on their first decision-making for some authorities, thus gaining assurance
that the S/L agencies can and will make appropriate decisions.  We also recommend that Regions obtain copies of all S/L agencies' alternative determinations for their records; especially where new issues are addressed.

Delegation of Specific Authorities

The part 63 General Provisions lists 15 specific types of authorities for which the Administrator may make discretionary decisions on a source-specific basis.  When the General Provisions are delegated to an S/L agency, such discretion may be appropriately delegated, provided the stringency of the underlying standard would not be compromised.

We recognize that, in order for Regional Offices to have the authority to delegate some of the authorities outlined in this memorandum (such as intermediate changes to test methods), delegation 7-121 must first be revised to delegate these authorities to the Regions.  We intend to
make this revision, i.e., to delegation 7-121, as soon as possible.  Additionally, the Emission Measurement Center of the Emissions Monitoring and Analysis Division must receive copies o
any approved intermediate changes to test methods or monitoring.  Please note that intermediate

changes to test methods must be demonstrated as equivalent through the procedures set out in EPA method 301 (see Attachment 1). This information will be used to compile a database of decisions that will be accessible to the S/L agencies and Regions for reference in making future decisions. Regions are asked to ensure that initial intermediate changes to testing and monitoring
made in each Region are evaluated. All intermediate test changes and State-issued intermediate changes to monitoring should be provided via mail or facsimile to:

Chief, Source Characterization Group A
U.S. EPA (MD-19)
Research Triangle Park, NC 27711
Facsimile Telephone Number: (919) 541-1039

Changes in monitoring issued by Regional Offices should continue to be posted on the Applicability Determination Index (ADI). For electronic file transfer procedures for ADI updates,
please contact Belinda Breidenbach in the Office of Compliance at 202-564-7022.

We have divided the General Provisions discretionary authorities into two categories, based upon the relative significance of each discretionary type of decision: they are those authorities which can be delegated and those authorities which cannot be delegated. These categories are delineated below:

Category I. General Provisions That May Be Delegated

In general, we believe that, where possible, authority to make decisions which are not likely to be nationally significant or to alter the stringency of the underlying standard should be
delegated to S/L agencies. While we understand the need for Federal oversight of S/L agency decision-making which will ensure that the delegated authorities are being adequately implemented and enforced, we do not want to impede S/L agencies in running the part 70 operating permit and Federal air toxics programs with oversight that is cumbersome. We recommend that Regions rely on their existing mechanisms and resources for oversight. During oversight, if the Region determines that the S/L agency had made decisions that decreased the stringency of the standard, then corrective actions should be taken and the source(s) should be notified. Withdrawal of the program should be initiated if the corrective actions taken are insufficient.

The authorities listed in Table 1 may be delegated to S/L agencies, so long as the S/L agencies have the capability to carry out the Administrator's responsibilities and any decisions made do not decrease the stringency of the standards. Since you are ultimately responsible for all General Provisions authorities' decision-making made in your Region, I am comfortable with trusting your judgement about which of the Administrator's discretionary authorities listed here should be delegated to the S/L agencies in your Region. When the Region delegates any category I authority to the S/L agency, it could be accomplished either when the General Provisions are delegated or at the time that each relevant maximum achievable control technology (MACT) standard is delegated, with the exception of approval of construction and reconstruction (40 CFR part 63, section 63.5), which should be delegated when the General Provisions are delegated.

There are some category I authorities, such as approval of intermediate alternatives to test methods, for which you should be notified when decisions are made by your S/L agencies. Also, you may want to monitor the progress of S/L agencies' decision-making, in addition to updating your files for compliance and enforcement matters. We have indicated these authorities in Table 1 with an asterisk. We encourage you to document, in delegation agreements or delegation rulemaking, the request for notification when decisions are made regarding the indicated category I authorities.

Category II. General Provisions That May Not Be Delegated

Authorities listed in this section are those decisions which could result in a change to the stringency of the underlying standard, which are likely to be nationally significant, or which may

require a rulemaking and subsequent Federal Register notice.  Therefore, these authorities must be retained by the EPA Regional Office or EPA Headquarters.  As a result, the following authorities in Table 2 may not be delegated to S/L agencies (all references are to sections of 40 CFR part 63, subpart A):

     If you have any questions, or would like to discuss this matter further, please contact me at (919) 541-5608, or Tom Driscoll of my staff at (919) 541-5135.

 Table 1.  General Provisions' Authorities that may be Delegate


Section
Authorities


Section 63.1
Applicability Determinations


Section 63.6(e)
Operation and Maintenance Requirements -
Responsibility for Determining Compliance


Section 63.6(f)
Compliance with Non-Opacity Standards -
Responsibility for Determining Compliance


Section 63.6(h)
Compliance with Opacity and Visible
Emissions Standards - Responsibility for
Determining Compliance


Sections 63.7(c)(2)(i) and (d)
Approval of Site-Specific Test Plans


Section 63.7(e)(2)(i)*
Approval of Minor Alternatives to Test
Methods (see Attachment 1)


Sections 63.7(e)(2)(ii) and (f)*
Approval of Intermediate Alternatives to Test
Methods (see Attachment 1)


Section 63.7(e)(2)(iii)
Approval of Shorter Sampling Times and
Volumes When Necessitated by Process
Variables or Other Factors


Sections 63.7(e)(2)(iv) and (h)(2), (3)
 Waiver of Performance Testing


Sections 63.8(c)(1) and (e)(1)
Approval of Site-Specific Performance
Evaluation (monitoring) Test Plans

Section 63.8(f)*
Approval of Minor Alternatives to Monitoring
(see Attachment 1)


Section 63.8(f)*
Approval of Intermediate Alternatives to
Monitoring (see Attachment 1)


Sections 63.9 and 63.10
Approval of Adjustments to Time Periods for
Submitting Reports

                    Table 2.  Authorities That May Not Be Delegated


Section
Authority


Section 63.6(g)
Approval of Alternative Non-Opacity
Emission Standards


Section 63.6(h)(9)
Approval of Alternative Opacity Standard


Sections 63.7(e)(2)(ii) and (f)
Approval of Major Alternatives to Test
Methods (see Attachment 1)


Section 63.8(f)
Approval of Major Alternatives to Monitoring
(see Attachment 1)


Section 63.10(f)
Waiver of Recordkeeping -- all

  Addressees
Director, Office of Ecosystem Protection, Region I
Director, Division of Environmental Planning and Protection, Region II
Director, Air Protection Division, Region III
Director, Air, Pesticides and Toxics Management Division, Region IV
Director, Air and Radiation Division, Region V
Director, Multimedia Planning and Permitting Division, Region VI
Director, Air, RCRA and Toxics Division, Region VII
Assistant Regional Administrator, Office of Pollution Prevention,
     State and Tribal Programs, Region VIII
Director, Air and Toxics Division, Region IX
Director, Office of Air Quality, Region X

Attachments

cc:  B.  Buckheit, 2242A
     C.  Garlow, 2111A
     B.  Hunt, MD-14B

    B.  Jordan, MD-13
    S.  Mitoff, 2223A
    J.  Seitz, MD-10
    L.  Wegman, MD-10

bcc:    K.  Blanchard, MD-12
    F.  Dimmick, MD-12
    K.  Kaufman, MD-12
    J.  Szykman, MD-13
    Regional Air Toxics Coordinators

This letter has been concurred with William Lamason, SCGA, Emission Measurement Center,
Charles Garlow, OECA, and verbally from Patrick Chang, OGC.

OAQPS:ITPID:IIG:TDriscoll:cjbaines:x1-5319:MD-12:June 17, 1998:
File: Driscoll/delauth9.mem

ATTACHMENT

Intermediate change to monitoring is a modification to federally required monitoring
involving "proven technology" (generally accepted by the scientific community as equivalent or
better) that is applied on a site-specific basis and that may have the potential to decrease the
stringency of the compliance and enforcement measures for the relevant standard.  Though site-
specific, an intermediate decrease may set a national precedent for a source category and may
ultimately result in a revision to the federally required monitoring.  Examples of intermediate
changes to monitoring include, but are not limited to: (1) use of a continuous emission
monitoring
system (CEMS) in lieu of a parameter monitoring approach;  (2) changes to quality control
requirements for parameter monitoring; and (3) use of an electronic data reduction system in lieu
of manual data reduction.

Intermediate change to a test method is a within-method modification to a federally
enforceable test method involving "proven technology" (generally accepted by the scientific
community as equivalent or better) that is applied on a site-specific basis and that may have the
potential to decrease the stringency of the associated emission limitation or standard.
Intermediate changes are not approvable if they decrease the stringency of the standard.  Though
site-specific, an intermediate change may set a national precedent for a source category and may
ultimately result in a revision to the federally enforceable test method.  In order to be
approved,
an intermediate change must be validated according to EPA method 301 (part 63, appendix A) to
demonstrate that it provides equal or improved accuracy and precision.  Examples of intermediate
changes to a test method include, but are not limited to:  (1) modifications to a test method's
sampling procedure including substitution of sampling equipment that has been demonstrated for
a particular sample matrix and the use of a different impinger absorbing solution; (2) changes in
sample recovery procedures and analytical techniques, such as changes to sample holding times
and use of a different analytical finish with proven capability for the analyte of interest; and
(3)
"combining" a federally-required method with another proven method for application to processes
emitting multiple pollutants.  As an example, Region IX and the CARB have developed a testing
protocol to determine whether California chromium electroplaters needed to "retest" for the
Chromium Electroplating NESHAP.  This testing protocol has been attached (Attachment 2) for
your information should you choose to use it.  Again, these examples should only be approved if
they do not decrease the stringency of the monitoring requirement.

Major change to monitoring is a modification to federally required monitoring that uses
unproven technology or procedures or is an entirely new method (sometimes necessary when the
required monitoring is unsuitable).  A major change to a test method may be site-specific or may
apply to one or more source categories and will usually set a national precedent.  Examples of
major changes to a test method include, but are not limited to:  (1) use of a new monitoring
approach developed to apply to a control technology not contemplated in the applicable
regulation; (2) use of a predictive emission monitoring system (PEMS) in place of a required
 continuous emission monitoring system (CEMS); (3) use of alternative calibration procedures tha

do not involve calibration gases or test cells; (4) use of an analytical technology that differs from
that specified by a performance specification; and (5) use of alternative averaging times for reporting purposes.

Major change to a test method is a modification to a federally enforceable test method that uses unproven technology or procedures or is an entirely new method (sometimes necessary when the required test method is unsuitable). A major change to a test method may be site-specific or may apply to one or more source categories and will usually set a national precedent.

In order to be approved, a major change must be validated according to EPA method 301 (part 63, appendix A). Examples of major changes to a test method include, but are not limited to: (1) use of an unproven analytical finish; (2) use of a method developed to fill a test method gap; (3) use of a new test method developed to apply to a control technology not contemplated in the applicable regulation; and (4) "combining" two or more sampling/analytical methods (at least one unproven) into one for application to processes

Minor change to monitoring is a modification to federally required monitoring that (a) does not decrease the stringency of the compliance and enforcement measures for the relevant standard; (b) has no national significance (e.g., does not affect implementation of the applicable regulation for other affected sources, does not set a national precedent, and individually does not result in a revision to the monitoring requirements); and (c) is site-specific, made to reflect or accommodate the operational characteristics, physical constraints, or safety concerns of an affected source. Examples of minor changes to monitoring include, but are not limited to: (1) modifications to a sampling procedure, such as use of an improved sample conditioning system to reduce maintenance requirements; (2) increased monitoring frequency; and (3) modification of the environmental shelter to moderate temperature fluctuation and thus protect the analytical instrumentation.

Minor change to a test method is a modification to a federally enforceable test method that (a) does not decrease the stringency of the emission limitation or standard; (b) has no national significance (e.g., does not affect implementation of the applicable regulation for other affected sources, does not set a national precedent, and individually does not result in a revision to the test method); and (c) is site-specific, made to reflect or accommodate the operational characteristics, physical constraints, or safety concerns of an affected source. Examples of minor changes to a test procedure, such as a modified sampling traverse or location to avoid interference from an obstruction in the stack, increasing the sampling time or volume, use of additional impingers for a high moisture situation, accepting particulate emission results for a test run that was conducted with a lower than specified temperature, substitution of a material in the sampling train that has been demonstrated to be more inert for the sample matrix, and changes in recovery and analytical techniques such as a change in quality control/quality assurance requirements needed to adjust for analysis of a certain sample matrix. NOTE: The authority to approve decreases in sampling times and volumes when necessitated by process variables has typically been delegated in conjunction with the minor changes to test methods, but these types of changes are not included within the scope of minor changes.

ATTACHMENT

DESCRIPTION OF THE TECHNICAL REVIEW
PROTOCOL FOR PERFORMANCE TESTS OF

CALIFORNIA CHROME PLATING SOURCES

Introduction

In 1988, the CARB adopted a statewide airborne toxics control measure (ATCM) for the control of hexavalent chrome emissions from chrome platers (both decorative and hard) and chromic acid anodizers.  In general, the California ATCM required facilities to install equipment or modify their operation to minimize emissions of hexavalent chrome.  In addition to installing equipment and making the necessary process changes, hard chrome platers were required to demonstrate compliance by performing a District -approved source test.

Since the State ATCM was adopted, the majority of hard chrome platers in California have complied with the requirements by installing and source testing their control equipment to demonstrate compliance with the California standards.

On January 25, 1995, the EPA promulgated a national regulation to control emissions of chromium from chrome platers and anodizers.  This regulation is known as the NESHAP for hard and decorative chromium electroplating and chromium anodizing tanks.  This regulation also requires facilities to demonstrate compliance by performing an approved emission source test.

Further, on January 30, 1997, the EPA promulgated certain revisions to the chrome NESHAP dealing with the monitoring, recordkeeping and reporting (MRR) requirements for hard chromium electroplaters and chromic acid anodizers in California.  Specifically, EPA extended the MRR compliance deadline from January 25, 1997 to July 24, 1997.  This action was taken to allow time for CARB to establish and get approved MRR requirements for these sources that would be at least as stringent as the Federal NESHAP requirements; however, that work remains unfinished.  The Federal NESHAP requires these sources to monitor applicable parameters on and after the date on which the initial performance test is required to be completed, which is July 24,
1997.  It is consistent with the revised NESHAP MRR requirements that all California source tests of hard chrome platers and chromic acid anodizers conducted prior to July 24, 1997 be reviewed according to the performance test review criteria contained herein to determine compliance with the applicable NESHAP emission standard.  This recommendation is made notwithstanding the restrictions identified in 40 CFR 63 section 63.344(b)(2).

This criteria was developed by a team of chrome plating/regulatory professionals representing EPA, CARB, Bay Area Air Quality Management District, South Coast Air Quality Management District (SCAQMD), and Pacific Environmental Services (industry).  The criteria are necessary in reviewing the existing chrome plating emissions source tests in California.  It is
estimated that in California there are approximately 100 hard chrome platers, 150 decorative chrome platers and 50 chromic acid anodizers, over half of which have performed source tests (where applicable).  Many of these source tests have sufficient information and quality control to
demonstrate compliance with the Federal NESHAP for chrome plating and anodizing.  This document is to present and discuss the criteria developed for this purpose.

NESHAP Source Testing for Compliance

The NESHAP standard for chrome plating and anodizing indicates that source testing to demonstrate compliance with the standard is required unless the facility is a decorative chrome plater or chromic acid anodizer choosing the alternate emission limitation of 45 dyne/cm bath surface tension.  In accordance with this, 40 CFR part 63 specifies acceptable source test procedures, methods, materials, etc.  Although the requirements outlined in the NESHAP are specific, there are allowances for the "owner or operator of an affected source conduct[ing] performance testing at startup to obtain an operating permit in the State in which the affected source is located, the results of such testing may be used to demonstrate compliance with this subpart . . . " (40 CFR 63.344).  The following discussion presents a step-by-step approach for determining whether an existing source test in California can be used to demonstrate compliance with the chrome plating and anodizing NESHAP.

Determining if Existing Source Tests Can Be Used to Demonstrate Compliance

The Chrome Plating Source Test Review Criteria Section (see below) provides a step-by-step process for the review of existing source tests in light of the NESHAP standards. The following is a discussion of each of the criteria steps from the Chrome Plating Source Test Review Criteria Section with an explanation of the rationale for the chosen process.

Criteria Step 1. Compliance with the NESHAP Standards Demonstrated? The NESHAP standards are in terms of milligram of total chrome per dry standard cubic meter (mg/dscm) of ventilation gas flow. The NESHAP standards are listed in 40 CFR part 63, section 63.342. Emission standards vary depending on whether the facility performs hard chrome plating, decorative chrome plating, chromic acid anodizing, or whether the facility is new or existing, and
how large the facility is (how much chrome plating is performed on an annual basis).

Most of the existing chrome emission source test reports provide a variety of information including test date and time, plating bath rectifier amp-hours, sample volume, ventilation gas velocity, sample flowrate percent isokinetic, duct temperature, flowrate, ventilation gas water content, total and hexavalent chrome catch, as well as chrome emissions on a process rate (amp-hrs) and concentration basis.

   - If the resulting average source test emission value is less than or equal to th applicable
NESHAP standard, the source test acceptability determination can continue.

   - If the existing source test does not demonstrate compliance with the NESHAP, then the facility operator must decide what course of action to take for a remediation. For example, the facility operator may need to make some operational or design changes to lower the emission rate to achieve compliance with the NESHAP standards. A retest will be required. All future source tests should be conducted according to the requirements and specifications of 40 CFR part 63.344 Performance test requirements and test methods.

Criteria Step 2. Was the Source Test Conducted Under Close Approximation of Normal Operating Conditions? Normal operating conditions are defined as normal bath temperatures (+ 10 deg F), normal bath composition range (within 5 percent), normal rectifier amperage range, normal agitation rates, and normal voltage loadings. For the purpose of demonstrating compliance, normal operating conditions can also include conditions needed to meet specific source test requirements such as the use of dummy parts to be plated.

   Although there can be a significant variation in the operating conditions from one plating shop to another, most chrome platers are well aware of their individual normal operating conditions and operate on a consistent basis with these constraints. Significant variation from the
normal operating mode is undesirable for quality assurance and controllability purposes.

   Facilities may have increased the source test sampling period in order to capture the requisite sample mass for analytical detection. Extending the source test period may require the use of dummy parts rather than the real parts that would normally be plated. An example of this is a Bay Area plater which plates automobile body part dies. Plating such a part for a longer than
normal period would result in a plated part with tolerances outside of specification limits. To avoid ruining an expensive automobile die, a dummy part (a large sheet of steel, sized similar to the die) is plated for the time period required to meet capture requirements.

   - If the source test was conducted under close approximation of normal operating conditions, then the evaluator can proceed to the next step in the evaluation process, step 3.

   - If the source test was conducted under conditions deemed abnormal, the facility must conduct a new source test. All retests should be conducted according to the requirements and specifications of 40 CFR part 63.344 Performance test requirements and test methods.

Criteria Step 3. Correct Use of Approved Test Method? Source tests to demonstrate compliance with the requirements of the NESHAP must use the EPA approved source test

method.  According to 40 CFR part 63.344 the following source test methods have been deemed acceptable to demonstrate compliance with the NESHAP standards:  EPA method 306 or 306A (conducted after December 1991) and CARB method 425.  The EPA has granted a verbal approval for the use of the SCAQMD method 205.1 for total chrome analysis only and will issue an official letter soon.

Any use of an approved source test method must be done in strict accordance with the requirements and specifications of the method itself and performance testing requirements of section 63.344 of the NESHAP.  Such requirements include sample point locations, use of EPA method 5 source test train, impinger solution compositions, isokinetic ratios, sample handling, sampling times, sample volume, catch mass requirements, etc.  Implicit in the use of an approved source test method is the correct use of the method itself.  Any variation in the source test procedure will trigger a retest unless the change has been approved beforehand by the EPA and the local permitting authority.

Criteria Step 4.  Number of Runs:  Paragraph 63.7(e)(3) of the part 63 General Provisions specifies at least three sampling runs to make up one source test.  If three sampling runs were performed, the reviewer is directed to proceed on to review criteria step 5 (catch mass requirement).

<3 sampling runs:  Previous source tests attempted to meet the requirement for at least three sampling runs.  For some previous California source tests, the expected ultra-low concentrations of chrome in the exhaust required the use of longer than normal source test runs (normal sampling run length is 120 minutes and normal sampling volume is 1.7 dscm).

Some operators chose (with local agency approval) to perform longer sample runs to capture enough sample to produce a chrome emission number and to reduce the potential for error with minimal chrome capture.  In California the longer times ranged from 3 to 8 hours per sampling run.  Due to the added expense, potential problems of multiple long sampling runs, and the potential operational conflicts due to reduced production from multiple sampling runs, these facilities proposed performing one or two long duration source tests instead of three or more shorter runs.

For tests where less than three sampling runs were conducted, the reviewer is directed to go to criteria step 6 to determine if the source testing results are far enough below the NESHAP emission limit to warrant acceptance.

Regarding future source testing/Retesting:  Unless prior approval is obtained from EP and the local air quality agency, future source tests will require at least three sampling runs to be acceptable.

Criteria Step 5.  Catch Mass Requirements:  Consistent with the discussion in section 2.2.2 of method 306 in 40 CFR part 63, appendix A, it is recommended that the catch mass requirement be at least five times the limit of detection for the analytical method chosen.  Such catch mass requirements produce analytical results well within the range of confidence.  If the catch mass requirements are not met, the reviewer is directed to criteria step 6.

Criteria Step 6.  Source Test Emission Results Compared With NESHAP Limit:  If the catch mass requirement is not met, the reviewer evaluates the resulting emission rate according to criteria step 6.  Criteria step 6 requires that the source test results be ó1/5 of the respective NESHAP standard; if this specification is met, then the existing source test can be accepted for demonstrating compliance with the NESHAP.  A factor of one fifth (20 percent) is consistent with the catch mass requirements.

Criteria step 6 directs that if the source test results were greater than 1/5 of the NESHAP standard, the facility must retest.  All retests should be conducted according to the requirements and specifications of 40 CFR part 63.344 Performance test requirements and test methods.

Regarding future source testing/Retesting:  Unless prior approval is given from EPA and

the local air quality agency, all future source tests will require at least three sampling runs to be
acceptable.  The catch mass requirements identified in 40 CFR part 63, section 63.344 also must
be met unless the source test emission result is <1/5 of the respective NESHAP emission limit or
is below detection levels.

Other Issues:  Establishing Monitoring Parameter Ranges to Ensure Ongoing Compliance

     Continued compliance with the chrome plating and anodizing NESHAP is assured by
monitoring of specific operating parameters associated with the control equipment.  Normally
operating parameter values or ranges are established in conducting the performance test.  Since
many California source tests were performed before the final adoption and understanding of the
NESHAP monitoring requirements, some alternate procedures may be necessary to establish
appropriate ranges/values for the monitoring parameters.

     The Establishing Monitoring Pararmeters to Ensure Ongoing Compliance Section (see
below) provides an approach to establishing the monitoring parameter compliance ranges after the
performance test is completed.  Where applicable, the basic requirements include the following:

  (1)  Source test conducted during normal operating conditions.

  (2)  Flowrate was monitored/recorded at outlet of emission control device.

     Control Device Pressure Drop and Velocity Pressure:  Assuming the above criteria items
(1) and (2) were met and that the current ventilation gas flowrate is within 10 percent of the
flowrate determined during the source test, the current control device pressure drop and/or
velocity pressure can be used to establish the appropriate ranges/value for the monitoring
parameters.  Guidance for the development of the operating parameter range is found in
40 CFR 63 section 63.344.

     Surface Tension Parameter Development:  If the surface tension was monitored during the
performance test, the facility operator should use the higher of either (1) the surface tension
parameter measured during the source test; or (2) 45 dyne/cm as specified in the NESHAP.  If the
surface tension was not monitored during the source test, the facility should use 45 dyne/cm as
the maximum allowable surface tension parameter for monitoring ongoing compliance.

     Foam Thickness Parameter Development:  If the foam additive thickness was monitored
during the performance test, the facility operator should use the lessor of either (1) the foam
thickness parameter measured during the source test; or (2) the 1 inch foam thickness as specified
in the NESHAP.  If the foam thickness was not monitored during the source test, then the facility
should use 1 inch foam thickness as the minimum allowable thickness parameter for monitoring
ongoing compliance.
               Chrome Plating Source Test Review Criteria

     The following criteria are to be used for those chrome plater and anodizer performance tests
conducted in the State of California prior to July 24, 1997.  If the source test cannot be evaluated
using these criteria, then the facility owner/operator should contact Kingsley Adeduro, EPA
Region IX at (415) 744-1177 for guidance.

(1)  Compliance with the NESHAP Standards Demonstrated?
  Y:  Go to (2)
  N:  Evaluate operation/make necessary changes then perform retest according to
40 CFR 63.344.

(2)  Was source test conducted under close approximation of normal operating
     conditions?
  Y:  Go to (3)

N:  Retest according to 40 CFR part 63.344.

(3)      Correct Use of Approved Test Method [CARB 425, EPA 306, EPA 306A (conducted
    after 12/91), SCAQMD 205.1 ( total chrome only)]
    Y:  Go to (4)
    N:  Retest according to 40 CFR part 63.344.

(4)     Number of Sampling Runs
    (a)  3 or more runs:  Go to (5)
    (b)  1 or 2 runs:  Go to (6)

    (5)     Catch Mass Requirements (at least 5 times the limit of detection for the analytical
method)
    Hex Chrome Analysis Methods      Diphenylcarbazide Colorimetric Test
                          Ion Chromatography with Post-Column Reactor (ICPCR)
    Total Chrome Analysis Methods:  Atomic Absorption Graphite Furnace (AAGF)
                          Inductively Coupled Argon Plasmography (ICAP)

    Y:  S/T is acceptable
    N:  Go to (6)

(6)         Source Test Emission Results <20 prcent (1/5) of the NESHAP Emission Limit?
    Y:  S/T is acceptable
        N:  Retest according to 40 CFR part 63.344. Establishing Monitoring Parameters to Ensure
Ongoing Compliance

(A)  Were normal operating conditions employed during source test performance?
    Y:  Go to (B)
    N:  Retest according to source testing and operating parameter development guidelines of
            40 CFR part 63.344.

(B)     Were appropriate operating parameters monitored/recorded during the source test?
    Y:  Use measured parameter values to establish ranges for ongoing compliance
        monitoring.
    N:  (a)  If bath emissions controlled by bath controls (surfactant additive or  foam) only
                go to (E).
        (b)  If bath emissions controlled by bath controls and downstream control device go
                to (C) and (E).
        (c)  If bath emission controlled by downstream control device(s) go to (C).

(C)  Was control device outlet flow rate recorded during the source test?
    Y:  Go to (D).
    N:  Retest according to source testing and operating parameter range development
        guidelines of 40 CFR part 63.344.

(D)  Determine inlet velocity pressure compliant range as follows:  (for PBS only)

    Collect concurrent data on facility's inlet velocity pressure, and scrubber outlet flow rate.
        If the current scrubber outlet flow rate is within 10 percent of the outlet flow rate
        measured during the source testing, then the current inlet velocity pressure value can be
        used to establish the compliant range for continuous monitoring.

    Determine control device pressure drop complaint range as follows:  (for CMP, FB Mist
        Eliminator, PBS, HEPA Filter)
            Collect concurrent data on pressure drop across the control device, and outlet flow
rate.
        If the outlet flow rate is within 10 percent of the outlet flow rate recorded during the
        source testing, then the current pressure drop value can be used to establish the compliant
        range for continuous monitoring if the controls are visually inspected and the work
        practice standards are conducted immediately prior to collecting current pressure drop
        data.

(E)     Surfactant Additive Surface Tension:  If surface tension was monitored during the source test, use the higher of either (1) the surface tension developed during the source test or (2) 45 dyne/cm surface tension for demonstration of ongoing compliance.  If no surface tension monitoring during source test, use 45 dyne/cm as surface tension parameter for demonstration of ongoing compliance.

Foam Thickness:  If foam thickness was monitored during the source test, use the minimum thickness parameter for demonstration of ongoing compliance.  If no foam thickness monitoring during source test, use 1 inch foam blanket as parameter for demonstration of ongoing compliance.