**ORAL ARGUMENT NOT YET SCHEDULED**

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

| | | |
|---|---|---|
| **DENKA PERFORMANCE ELASTOMER LLC,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 24-60351** |
| | ) | |
| **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL REGAN, Administrator, United States Environmental Protection Agency,** | ) | |
| | ) | |
| **Respondents.** | ) | |

**PETITIONER'S EMERGENCY MOTION FOR STAY PENDING REVIEW**
**(Ruling Requested By August 12, 2024)**

James C. Percy
JONES WALKER LLP
445 N. Boulevard, Suite 800
Baton Rouge, LA 70802
Telephone: (225) 248-2130
jpercy@joneswalker.com

Robert E. Holden
Brett S. Venn
JONES WALKER LLP
201 St. Charles Ave
New Orleans, LA 70170
Telephone: (504) 582-8000
bholden@joneswalker.com
bvenn@joneswalker.com

David A. Super
Jason B. Hutt
Jeffrey R. Holmstead
Britt Cass Steckman
Kevin M. Voelkel
BRACEWELL LLP
2001 M Street NW, Ste. 900
Washington, DC 20036
Telephone: (202) 828-5800
david.super@bracewell.com
jason.hutt@bracewell.com
jeff.holmstead@bracewell.com
britt.steckman@bracewell.com
kevin.voelkel@bracewell.com

*(counsel cont'd)*

Jeffrey L. Oldham
BRACEWELL LLP
711 Louisiana Street, Suite 2300
Houston, TX 77002
Telephone: (713) 223-2300
jeffrey.oldham@bracewell.com

*Counsel for Petitioner Denka Performance Elastomer LLC*

<u>**CERTIFICATE OF INTERESTED PERSONS**</u>

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

- Denka Performance Elastomer LLC ("DPE") (Petitioner). DPE is a privately owned limited liability company formed under the laws of the State of Delaware, headquartered in LaPlace, Louisiana, and authorized to do business in the State of Louisiana. DPE owns and operates a manufacturing facility in LaPlace, Louisiana that produces Neoprene by utilizing chloroprene, a chemical regulated under a Clean Air Act rule promulgated by EPA that is relevant to this action. DPE's membership interests are held by Denka USA LLC (whose ultimate parent is Denka Company Limited) and Diana Elastomers, Inc. (whose ultimate parent is Mitsui & Co., Ltd). Denka Company Limited and Mitsui & Co. Ltd. are each Japanese companies listed on the Tokyo Stock Exchange.

- BRACEWELL LLP (Counsel for Petitioner)

- David A. Super (Counsel for Petitioner)

- Jason B. Hutt (Counsel for Petitioner)

- Jeffrey R. Holmstead (Counsel for Petitioner)

- Britt Cass Steckman (Counsel for Petitioner)

- Kevin M. Voelkel (Counsel for Petitioner)

- Jeffrey L. Oldham (Counsel for Petitioner)

- JONES WALKER LLP (Counsel for Petitioner)

- James C. Percy (Counsel for Petitioner)

- Robert E. Holden (Counsel for Petitioner)

- Brett S. Venn (Counsel for Petitioner)

- United States Environmental Protection Agency (Respondent)

- Michael S. Regan, Administrator, United States Environmental Protection Agency (Respondent)

- United States Department of Justice, Environment and Natural Resources Division, Environmental Enforcement Section (Counsel for Respondents)

- Steven D. Shermer (Counsel for Respondents)

- Davis H. Forsythe (Counsel for Respondents)

- Daniel S. Smith (Counsel for Respondents)

- Hannah L. Frazier (Counsel for Respondents)

- Scott Cernich (Counsel for Respondents)

- Heather Gange (Counsel for Respondents)

- Brandon N. Adkins (Counsel for Respondents)

Date: July 11, 2024                    */s/ David A. Super*
                                       David A. Super

                                       **Counsel for Petitioner**
                                       **Denka Performance Elastomer LLC**

## CERTIFICATE OF COMPLIANCE WITH RULE 18(A)

The undersigned counsel for Denka Performance Elastomers LLC ("DPE") certifies that this motion for stay complies with Federal Rule of Appellate Procedure 18(a) on the ground that moving for a stay first before the Environmental Protection Agency ("EPA") would be entirely impracticable and futile. *See* Fed. R. App. Proc. 18(a)(2)(A)(i). This case seeks a declaration and an emergency stay concerning the validity of an extension of time issued by Louisiana's Department of Environmental Quality ("LDEQ") applicable to DPE's Neoprene manufacturing facility in LaPlace, Louisiana (the "Facility") on June 27, 2024 ("the LDEQ Extension"). The LDEQ Extension provides DPE with a two-year extension of time to comply with a final rule issued by EPA under the Clean Air Act. EPA's rule requires the DPE Facility to design, purchase, and install equipment and implement a series of stringent emission control requirements by October 15, 2024—a task EPA acknowledges is impossible. *See* Exhibit A at 42,954 (justifying two-year compliance period for requirements virtually identical to DPE's requirements because they "will require additional time to plan, purchase, and install emission control equipment").

On June 11, 2024, in a filing in the D.C. Circuit, EPA stated its position that any extension issued to DPE by a state agency would be "ineffectual." On June 28, 2024, after the LDEQ Extension was issued, DPE sought to confirm EPA's position

on the validity of the LDEQ Extension and the legal basis for that position.  *See* Exhibit J ("If EPA intends to treat the LDEQ Extension as 'ineffectual,' and enforce the October 15, 2024, compliance deadline, then DPE intends to avail itself of legal recourse to resolve the consequence uncertainty before allowing 'the Agency to drop the hammer' and impose virtually unlimited legal liability on DPE.").  DPE's June 28 letter also informed EPA that, due to the exigencies of this matter, DPE would treat EPA's failure to respond by July 8, 2024, as a confirmation that EPA would continue to treat the LDEQ Extension is "ineffectual."  By email dated July 8, 2024, litigation counsel for EPA informed DPE that a timely response to DPE's June 28 letter was not possible.

If DPE cannot rely on the LDEQ Extension, it will have to shutdown the Facility, likely permanently, a process that must begin no later than mid-August 2024.  Exhibit N ¶¶ 4-44; Exhibit O ¶ 8.  In light of EPA's finding that the LDEQ Extension is "ineffectual," if DPE attempted to continue operations past October 15, 2024, DPE faces the threat of EPA seeking to impose civil and criminal penalties under the CAA.[1]  This harm is irreparable.  *See, e.g.*, *Wages and White Lion Investments v. U.S. Food and Drug Admin.*, 16 F.4th 1130, 1142 (5th Cir. 2021) ("Substantial financial injury may be sufficient to show irreparable injury,"

---

[1] *See generally* 42 U.S.C. § 7413 ("administrative penalties," civil judicial enforcement, and criminal penalties); 42 U.S.C. § 7420 ("noncompliance penalties").

particularly where a movant's "alleged financial injury threatens the very existence of its business.").

In light of the extremely tight timeline by which DPE must request this Court to act—a timeline not of DPE's making—and the virtually certain irreparable harm that will befall DPE absent timely judicial relief, it is impracticable for DPE to make an initial request for a stay to EPA beyond the June 28 letter already sent. *See* Fed. R. App. Proc. 18(a)(2)(A)(i); *Wages and White Lion*, 16 F.4th at 1135 n.1 (excusing petitioner facing irreparable harm from moving first before the agency for a stay where "it would have been 'impracticable' … to do so"). Nor is there any meaningful possibility that EPA would grant such a stay, given that the Agency just one month ago took the position that the compliance extension on which DPE relies is "ineffectual." Requiring DPE to go back to EPA yet again is the very definition of futility.

Date: July 11, 2024

/s/ David A. Super
David A. Super

**Counsel for Petitioner**
**Denka Performance Elastomer LLC**

# CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 27.3

The undersigned counsel for Denka Performance Elastomers LLC ("DPE") certifies that this motion for stay complies with Circuit Rule 27.3, and specifically certifies that:

- Counsel for DPE contacted the clerk's office and opposing counsel to inform them of the intent to file this emergency motion.  Counsel for DPE stated its request for relief by August 12, 2024, and stated its belief that it would be reasonable for the standard briefing schedule under Federal Rule of Appellate Procedure 37(a)(3) & (4) to apply.

- During multiple video conferences, counsel for DPE discussed with counsel for EPA the relief addressed in DPE's letter of June 28, 2024 (Exhibit J), and counsel for EPA did not consent to that relief.  By email dated July 10, 2024, counsel for DPE expressly requested EPA's consent to the relief requested in this Motion and stated that DPE would continue to assume EPA opposed the Motion if EPA failed to respond.  Counsel for EPA did not respond as of the filing of this Motion.

- The facts supporting emergency consideration of this Motion, which are set forth herein, are true and complete.  As set forth in the Motion, if DPE is not able to obtain relief from this Court by mid-August 2024, it will have to begin the

process of shutting down, likely permanently, its Neoprene manufacturing facility

in Louisiana by October 15, 2024.


Date: July 11, 2024                    /s/ David A. Super
                                       David A. Super

                                       **Counsel for Petitioner**
                                       **Denka Performance Elastomer LLC**

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..........................................i

CERTIFICATE OF COMPLIANCE WITH RULE 18(a) ..................... iii

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 27.3.......................vi

TABLE OF AUTHORITIES ...................................................x

TABLE OF EXHIBITS .................................................... xiii

I.    INTRODUCTION...............................................1

II.   BACKGROUND.................................................4

    A.   The Clean Air Act: Cooperative Federalism. ..................4

    B.   EPA's Rule And Litigation Against DPE......................5

    C.   LDEQ's Extension of Compliance And EPA's Final Action Declaring It "Ineffectual." ...............................6

III.  JURISDICTION AND VENUE ...............................9

IV.  STANDARD OF REVIEW ...................................10

V.   ARGUMENT ......................................................11

    A.   DPE Is Likely To Succeed On The Merits. .................11

        1.   This case is appropriate for a declaratory judgment. .........11

            a.   There is a justiciable dispute as to EPA's finding that the LDEQ Extension is "ineffectual."...........................................12

            b.   This Court has authority to issue a declaration regarding EPA's final agency action. ......................12

        2.   EPA's action treating the LDEQ Extension as "ineffectual" is arbitrary, capricious, and contrary to law. ..................................................14

        a.     LDEQ has automatic delegation authority via its EPA-approved permit program. ...........................14

        b.     LDEQ's expressly delegated authority cannot be modified by an amendment that is not yet effective. ...................................................................16

        c.     LDEQ continues to have expressly delegated authority because EPA has not amended such authority. ...............................................................16

        d.     LDEQ continues to have expressly delegated authority because EPA has not revoked authority in Section 63.6(i)(9)..................................19

    B.     DPE Will Suffer Irreparable Harm Absent A Stay.......................20

    C.     A Stay Will Not Injure Other Parties And Is Supported By The Public Interest. ........................................................20

  VI.     REQUEST FOR RELIEF ....................................................23

CERTIFICATE OF COMPLIANCE....................................................25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Elec. Power Co. v. Conn.*,
   564 U.S. 410 (2011)..............................................................................4

*Bennett v. Spear*,
   520 U.S. 154 (1997)............................................................................12

*BST Holdings v. OSHA*,
   17 F.4th 604 (5th Cir. 2021) ....................................................9, 10, 20

*Clarke v. CFTC*,
   74 F.4th 627 (5th Cir. 2023) .............................................................13

*Her Majesty the Queen in Right of Ontario v. EPA*,
   912 F.2d 1525 (D.C. Cir. 1990)........................................................12

*Nat'l Automatic Laundry & Cleaning Council v. Shultz*,
   443 F.2d 689 (D.C. Cir. 1971)....................................................12, 13

*Nken* v. *Holder*,
   556 U.S. 418 (2009)..........................................................................10

*Ohio v. EPA*,
   603 U.S. ----, ---- S.Ct. ----, 2024 WL 3187768
   (June 27, 2024)..............................................................................4, 10

*Sackett v. EPA*,
   566 U.S. 120 (2012).................................................................9, 12, 14

*Scripps-Howard Radio v. FCC*,
   316 U.S. 4 (1941)..............................................................................10

*Sherwin-Williams Co. v. Holmes County*,
   343 F.3d 383 (5th Cir. 2003) .......................................................11, 12

*Superior Trucking Co. v. U.S.*,
   614 F.2d 481 (5th Cir. 1980) ............................................................10

*Tex. Employers' Ins. Assn. v. Jackson*,
  862 F.2d 491 (5th Cir. 1988) ...............................................................11

*Texas v. Becerra*,
  89 F.4th 529 (5th Cir. 2024) ..............................................................13

*W. Illinois Home Health Care, Inc. v. Herman*,
  150 F.3d 659 (7th Cir. 1998) .............................................................13

*Wages and White Lion Investments v. FDA*,
  16 F.4th 1130 (5th Cir. 2021) .............................................11, 20, 23

**Statutes**

5 U.S.C. § 702 ..........................................................................................9

5 U.S.C. § 704 ..........................................................................................9

5 U.S.C. § 705 .....................................................................................9, 10

5 U.S.C. § 706(2) ...................................................................................11

28 U.S.C. § 1331 .....................................................................................9

28 U.S.C. § 1651 ...................................................................................10

42 U.S.C. § 112(f)(2) ..............................................................................4

42 U.S.C. § 112(f)(4) ..............................................................................6

42 U.S.C. § 112(f)(4)(B) .........................................................................6

42 U.S.C. § 112(l) .................................................................................17

42 U.S.C. § 7401(a)(3) ............................................................................4

42 U.S.C. § 7412 ............................................... 2, 4, 9, 14, 15, 17, 18

42 U.S.C. § 7412(f) ...........................................................................4, 19

42 U.S.C. § 7412(f)(2)(A) .......................................................................4

42 U.S.C. § 7412(f)(4)(B) ..............................................................4, 5, 6

42 U.S.C. § 7412(l) ...............................................................................17

42 U.S.C. § 7603 .................................................................................5, 6

42 U.S.C. § 7607(b) ...........................................................................9, 10

42 U.S.C. § 7607(d)(9).............................................................................11

**Regulations**

40 C.F.R. § 63.6(i) .......................................................................7, 17, 19

40 C.F.R. § 63.6(i)(1)..............................................................................14

40 C.F.R. §§ 63.6(i)(3)..........................................................................6, 19

40 C.F.R. § 63.6(i)(4)(ii)...............................................4, 6, 8, 17, 18, 19

40 C.F.R. §§ 63.6(i)(4) through (i)(7)......................................................19

40 C.F.R. § 63.6(i)(8)...........................................................................7, 19

40 C.F.R. § 63.6(i)(9)............................................. 4, 7, 8, 15, 17, 19, 20

40 C.F.R. §§ 63.6(i)(9) through (i)(14)....................................................19

40 C.F.R. § 63.99 ................................................. 2, 4, 7, 15, 16, 17, 18

40 C.F.R. § 63.99(a)(19) ..........................................................................7

40 C.F.R. § 63.99(a)(19)(i) .....................................................................17

40 C.F.R. § 63.507 ....................................................14, 15, 18, 19, 20

40 C.F.R. § 63.507(c)..........................................................................8, 16

40 C.F.R. § 63.507(c)(6).................................................................2, 16, 17

89 Fed. Reg. 42,932 ...................................................................................1

**Other Authorities**

https://www.cancer.gov/about-
    cancer/understanding/statistics#:~:text=Approximately%2040.5%2
    5%20of%20men%20and,on%202017%E2%80%932019%20data ...................21

**TABLE OF EXHIBITS**

| Exhibit A | Relevant portions of EPA, *New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emissions Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry*, 89 Fed. Reg. 42,932 (May 16, 2024) |
|---|---|
| Exhibit B | EPA, *New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants; Delegation of Authority to Louisiana*, 69 Fed. Reg. 15,687 (Mar. 26, 2004) |
| Exhibit C | EPA, *Clean Air Act Final Full Approval of Operating Permits Program; Louisiana Department of Environmental Quality*, 60 Fed. Reg. 47,296 (Sept. 12, 1995) |
| Exhibit D | Relevant portions of EPA, *New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emissions Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry*, 88 Fed. Reg. 25,080 (Apr. 25, 2023) |
| Exhibit E | Relevant portions of DPE Memorandum in Support of Motion for Summary Judgment, *United States v. Denka Performance Elastomer LLC, et al.*, No. 2:23-cv-00735 (E.D. La.), R. Doc. 131-2 |
| Exhibit F | Relevant portions of United States' Memorandum in Opposition of Motion for Summary Judgment, *United States v. Denka Performance Elastomer LLC, et al.*, No. 2:23-cv-00735 (E.D. La.), R. Doc. 150 |
| Exhibit G | Letter from Jeffrey R. Holmstead, DPE, to Aurelia S. Giacometto and Bryan Johnston, LDEQ, re *Request for Extension of Compliance Period Set Forth in Final Rule in EPA Docket EPA-HQ-OAR-2022-0730* (Apr. 19, 2024) |
| Exhibit H | Letter from Amanda Vincent, LDEQ, to Jeffrey R. Holmstead, DPE, re *Extension of Compliance* (June 27, 2024) |

| | |
|---|---|
| Exhibit I | Relevant portions of United States' Opposition to Motion to Stay, *Denka Performance Elastomer LLC v. Environmental Protection Agency*, No. 24-1135 (D.C. Cir.), Doc. # 2059123 |
| Exhibit J | Letter from Jeffrey R. Holmstead, DPE, to Michael S. Regan, EPA, re *Expedited Request for Final Action Addressing Validity of Extension of Time Granted in June 27, 2024 Letter from Louisiana Department of Environmental Quality; Contingent Application for Extension of Time* (July 28, 2024) |
| Exhibit K | Letter from John S. Seitz re *Delegation of 40 CFR Part 63 General Provisions Authorities to State and Local Air Pollution Control Agencies* (July 10, 1998) ("Seitz Memorandum") |
| Exhibit L | EPA, *New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants; Delegation of Authority to Louisiana*, 80 Fed. Reg. 9,613 (Feb. 24, 2015) |
| Exhibit M | EPA, *Clarifications to Existing National Emissions Standards for Hazardous Air Pollutants Delegations' Provisions*, 68 Fed. Reg. 37,334 (June 23, 2003) |
| Exhibit N | Declaration of Christopher Meyers in Support of Petitioner's Emergency Motion for Stay Pending Review (July 10, 2024) |
| Exhibit O | Declaration of Michelle Helfrich in Support of Petitioner's Emergency Motion for Stay Pending Review (July 8, 2024) |
| Exhibit P | Relevant portions of United States' Response to DPE First Set of Interrogatories, *United States v. Denka Performance Elastomer, LLC, et al.*, No. 2:23-cv-00735 (E.D. La.) |
| Exhibit Q | Declaration of Dr. Kenneth A. Mundt, PhD, FACE, *United States v. Denka Performance Elastomer, LLC, et al.*, No. 2:23-cv-00735 (E.D. La.) |

# I. INTRODUCTION

Denka Performance Elastomer LLC ("DPE") seeks emergency relief from this Court to prevent the closure of its Neoprene manufacturing facility in Louisiana (the "Facility"), the only such facility in the Nation. On May 16, 2024, the Environmental Protection Agency ("EPA") promulgated a rule under the Clean Air Act ("CAA") ("Rule"), 89 Fed. Reg. 42,932 (Exhibit A), requiring DPE to implement stringent emission control requirements by October 15, 2024, which is 90 days after the Rule's effective date (the "90-Day Requirements"). It is undisputed that this deadline is impossible to meet and will require the Facility to shutdown, thereby destroying DPE's business and jeopardizing the livelihoods of DPE's roughly 250 employees and their families. DPE has challenged the Rule in the D.C. Circuit; that action remains pending.

The instant action seeks a declaration from this Court as to the validity of an entirely separate, but critical, action taken by the State of Louisiana. On June 27, 2024, the Louisiana Department of Environmental Quality ("LDEQ") exercised its lawful authority to grant DPE an extension, until July 15, 2026, to comply with the Rule ("LDEQ Extension"). However, EPA has unequivocally declared that the LDEQ Extension is "ineffectual." Thus, DPE is now faced with the "Hobson's choice" of shutting down the Facility by October 15, 2024 (a process that must begin in mid-August) or, in reliance on the LDEQ Extension, continuing to operate the

Facility after October 15 and risk civil and criminal enforcement by EPA. The threat of enforcement is real. Every action taken by EPA since May 2022 has been contrived to force a shutdown of the Facility. Under these dire circumstances, DPE must obtain certainty that the LDEQ Extension is valid, and quickly.

Accordingly, DPE requests that the Court grant a stay to preserve the status quo, meaning that EPA would be precluded from taking action in contravention of the validity of the LDEQ Extension pending resolution of this Petition.

DPE has a strong likelihood of success on its position that the LDEQ Extension is valid. LDEQ has authority to grant extensions via two sources of authority: (i) an express delegation of authority pursuant to Subpart E in the Section 112 regulations, 40 C.F.R. Part 63, Subpart E, *and* (ii) an automatic delegation of authority pursuant to an approved CAA permit program. Both of those sources of authority were operative on June 27, 2024, when LDEQ granted the LDEQ Extension, and remain operative today.

In the Rule, EPA amended a regulatory provision—Section 63.507(c)(6)—to state that the authority to implement a specific extension approval provision cannot be expressly delegated to states. However, EPA failed to take any of the necessary actions to *actually withdraw* LDEQ's express or automatic authority to issue extensions. As a matter of common sense, EPA would not have even attempted to revoke authority that LDEQ did not already possess. Nonetheless, EPA's

amendment failed to achieve EPA's objective of negating LDEQ's authority to grant the LDEQ Extension.

Even assuming the Rule's validity (an issue before the D.C. Circuit and not challenged here), EPA's amendment does not constrain LDEQ's authority to grant extensions for multiple reasons. First, Louisiana maintains its automatic permitting authority. Second, LDEQ issued the LDEQ Extension *before* EPA's amendment is even effective. Third, EPA failed to amend the operative regulations governing express delegations of authority. And fourth, EPA failed to address other applicable extension approval provisions that have been expressly delegated to LDEQ. In sum, EPA's amendment simply does not legally foreclose LDEQ from issuing extensions.

Irreparable harm is also clear, given the existential threat to the DPE Facility and the jobs of DPE's roughly 250 employees, the disruption to the State and local economies, and the elimination of the Nation's only domestic source of Neoprene. In contrast, a stay will not harm other parties and is in the public interest.

Given that the clock is ticking, DPE respectfully requests a ruling on this Motion by August 12, 2024, the latest DPE must know whether it needs to begin the extensive process of preparing the Facility and its employees for a permanent shutdown by October 15.

## II. BACKGROUND

**A. The Clean Air Act: Cooperative Federalism.**

"The Clean Air Act regulates air quality through a federal-state collaboration." *Ohio v. EPA*, 603 U.S. ----, ---- S.Ct. ----, 2024 WL 3187768, at *3 (June 27, 2024) (quotation omitted). The CAA assigns States the primary role in air pollution prevention and control as to existing sources. *Am. Elec. Power Co. v. Conn.*, 564 U.S. 410, 424-28 (2011); 42 U.S.C. § 7401(a)(3).

Section 112(f) of the CAA requires EPA to prescribe emission standards if EPA determines that existing standards do not provide an "ample margin of safety to protect public health." 42 U.S.C. § 7412(f)(2)(A). Standards promulgated pursuant to Section 112(f)(2) cannot apply until 90 days after the effective date, 42 U.S.C. § 7412(f)(2)(A), and the EPA Administrator may grant an extension (or "waiver") permitting sources up to two years to comply. 42 U.S.C. § 7412(f)(4)(B).

On March 26, 2004, pursuant to 40 C.F.R. Part 63, Subpart E, EPA Region 6 expressly delegated to Louisiana the authority to implement and enforce Section 112 standards, including the authority to grant compliance extensions via 40 C.F.R. § 63.6(i)(9) and 40 C.F.R. § 63.6(i)(4)(ii). *See* Exhibit B. EPA approved the Louisiana Operating Permits program on September 12, 1995. *See* Exhibit C. The approval of LDEQ's permit program also authorizes LDEQ to issue extensions. *See infra* at 14-16. For more than 20 years, Louisiana has governed the State's air

emissions pursuant to this delegated authority. The Rule is the first time that EPA has purported to revoke any part of that authority.

## B.    EPA's Rule And Litigation Against DPE.

In April 2023, EPA published the proposal for the Rule ("Proposed Rule"), which gave all sources, including DPE, the maximum two years to comply, because, in EPA's words, the "proposed [emission control requirements] will require additional time to plan, purchase, and install equipment for … chloroprene control." Exhibit D at 25,178. A two-year compliance deadline is available only if EPA finds that steps will be taken to protect people from "imminent endangerment." 42 U.S.C. § 7412(f)(4)(B).

Yet two months earlier, on February 28, 2023, pursuant to Section 303 of the CAA, EPA filed an unprecedented action against DPE in the U.S. District Court for the Eastern District of Louisiana ("Section 303 Litigation"). EPA alleged there that the Facility is causing an "imminent and substantial endangerment" because its emissions—which did not violate any air standard or permit—result in off-site, ambient air concentrations of chloroprene greater than the level EPA alleges is needed to ensure that the lifetime cancer risk for a person located continuously at the Facility's fenceline *all day, every day for 70 years* is no higher than 1-in-10,000.

In December 2023, DPE moved for summary judgment in the Section 303 Litigation, arguing that, because the Facility's emissions do not present an

"imminent endangerment," as EPA conceded in the Proposed Rule by providing the two-year compliance period, then there was no "imminent *and substantial* endangerment." Exhibit E at 5-8. EPA's only response was that the Proposed Rule was not final. Exhibit F at 5-6 & n.6.

On March 28, 2024, the EPA Administrator signed the Rule, allowing DPE only 90 days to comply, but retaining the Proposed Rule's two-year compliance period for every other source, including those with higher estimated risks. Exhibit A at 43,236-37 (63.481(o)-(p)); *id.* at 42,955. The Rule provided no explanation for cutting DPE's compliance period from two years to 90 days, other than to cite the Section 303 Litigation against DPE. *Id.*

## C.    LDEQ's Extension of Compliance And EPA's Final Action Declaring It "Ineffectual."

Section 112(f)(4)(B) of the CAA provides that the Administrator of the EPA may grant an extension (or "waiver") permitting sources up to two years to comply with a standard if the Administrator finds (1) "that such period is necessary for the installation of controls" and (2) "that steps will be taken during the period of the waiver to assure that the health of persons will be protected from imminent endangerment." 42 U.S.C. § 7412(f)(4)(B). EPA's regulations implementing Section 112(f)(4) are set forth in 40 C.F.R. 63.6(i). Section 63.6(i)(4)(ii) governs the procedures for requesting compliance extensions. *See* 40 C.F.R. §§ 63.6(i)(3);

63.6(i)(4)(ii). Section 63.6(i)(9) governs the approvals of compliance extensions. *See* 40 C.F.R. §§ 63.6(i)(8), 63.6(i)(9).

As noted above, LDEQ has authority to grant extensions under Section 63.6(i) via *two sources of authority:* (i) its express delegation of certain provisions pursuant to Part 63, Subpart E, *see* 40 C.F.R. § 63.99(a)(19), *and* (ii) its automatic authority pursuant to its approved CAA permit program. 40 C.F.R. § 63.6(i)(9) (authorizing EPA "or the State with an approved permit program" to grant extension).

On April 19, 2024, faced with the Rule's impossible-to-meet 90-day implementation period, DPE submitted to LDEQ an extension request for the DPE Facility, seeking a two-year extension of the implementation period ("Extension Request"). *See* Exhibit G. DPE sought an extension pursuant to both LDEQ's automatic authority based on its EPA-approved air permit program and LDEQ's express delegated authority under Subpart E. In the Extension Request, DPE explained that good cause exists for the extension because a period of at least two years is necessary for DPE to comply with the 90-Day Requirements and the Facility does not present an "imminent endangerment."

On June 27, 2024, LDEQ granted DPE's Extension Request, finding, in part: "LDEQ finds that additional time is needed for Denka to install controls . . . . LDEQ also finds that steps will be taken during the period of the extension to assure that the health of persons will be protected from imminent endangerment." Exhibit H at

2. The LDEQ Extension provides DPE until July 15, 2026, to comply with the 90-Day Requirements, subject to DPE satisfying specified conditions regarding additional emissions controls, monitoring of ambient air, and periodic reporting to LDEQ. *Id.*

In the Rule, EPA included an amendment of 40 C.F.R. § 63.507(c) to provide that the "[a]pproval of an extension request under § 63.6(i)(4)(ii)" cannot be delegated to state agencies. Exhibit A at 43,261.

Subsequently, on June 11, 2024, in a pleading filed in the D.C. Circuit and signed by the Department of Justice and EPA's Office of General Counsel on behalf of EPA and its Administrator, EPA declared that any extension granted by LDEQ to DPE "would be ineffectual." *See* Exhibit I at 7-8 n.2. In taking that final position, EPA provided no explanation as to why any such state-issued extension "would be ineffectual."

On June 28, 2024, DPE submitted a request to EPA seeking confirmation of EPA's position on the alleged non-validity of the LDEQ Extension and the legal basis for EPA's position. *See* Exhibit J. DPE specifically explained that "DPE will be subjected to substantial and mounting legal uncertainty on October 15, 2024, the compliance deadline in place before the LDEQ Extension was granted." *Id.* at 2. The letter also expressly stated that "[i]f EPA intends to treat the LDEQ Extension as 'ineffectual,' and enforce the October 15, 2024, compliance deadline, then DPE

intends to avail itself of legal recourse to resolve the consequent uncertainty before allowing 'the Agency to drop the hammer' and impose virtually unlimited legal liability on DPE." *Id.* (citing *Sackett v. EPA*, 566 U.S. 120, 127 (2012)).  Given that the DPE Facility's future hangs in the balance and the clock is ticking, DPE's letter also expressly informed EPA that DPE would treat EPA's failure to respond by July 8, 2024, as a confirmation that EPA would continue to treat the LDEQ Extension as "ineffectual." *Id.*

On July 8, 2024, litigation counsel for EPA informed DPE by email that a timely response to DPE's June 28 letter was not possible.  Thus, despite DPE's urgent invitation, EPA has solidified its final position.

## III.   JURISDICTION AND VENUE

The Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 7607(b) because this case challenges a final action under the CAA, 42 U.S.C. § 7412, and seeks relief under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 704, 705.  Venue is appropriate in this Court pursuant to 42 U.S.C. § 7607(b).

The Court can grant DPE's requested relief through either a stay or preliminary injunction.  "The unusual procedural posture of this case makes for an unusual process." *BST Holdings v. OSHA*, 17 F.4th 604, 610 n.7 (5th Cir. 2021).  Although "[o]rdinarily, a federal plaintiff aggrieved by an adversary's threatened course of action must go to a district court to seek injunctive relief at the outset," *id.*,

this Court may grant a stay or injunction pending review here because the CAA provides for judicial review of EPA's action in this Court. 42 U.S.C. § 7607(b). The Court applies "the traditional factors for a stay pending judicial review and draw[s] factual support from the attachments to the pleadings, uncontested facts, and judicial notice." *BST Holdings*, 17 F.4th at 610 n.7. Alternatively, DPE's requested relief can be granted as a preliminary injunction. "[T]he power of the courts of appeals to enter . . . an injunction might emanate from any of several sources. . . . Authority can be found in (1) the All Writs Statute, 28 U.S.C. § 1651; (2) the APA, 5 U.S.C. § 705; and (3) the inherent power of the courts of appeals to maintain the status quo pending review." *Superior Trucking Co. v. U.S.*, 614 F.2d 481, 483-84 (5th Cir. 1980) (citing *Scripps-Howard Radio v. FCC*, 316 U.S. 4, 9-10 (1941); other citations omitted).

## IV.   STANDARD OF REVIEW

When deciding whether to stay or enjoin an agency action, courts consider four factors:

> (1) whether the applicant is likely to succeed on the merits, (2) whether it will suffer irreparable injury without a stay, (3) whether the stay will substantially injure the other parties interested in the proceedings, and (4) where the public interest lies.

*Ohio*, 2024 WL 3187768, at *6 (citing *Nken* v. *Holder*, 556 U.S. 418, 434 (2009)). Where both sides have "strong arguments about the harms they face and equities involved, our resolution of these stay requests ultimately turns on the merits and the question who is likely to prevail at the end of this litigation." *Id.* (citations omitted).

The Court will reverse EPA's actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Wages and White Lion Investments v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021) (citing 5 U.S.C. § 706(2)) (other citations omitted); *see also* 42 U.S.C. § 7607(d)(9).

## V.    ARGUMENT

**A.    DPE Is Likely To Succeed On The Merits.**

**1.    This case is appropriate for a declaratory judgment.**

It is undisputed that DPE cannot comply with the Rule by October 15. Absent relief from this Court, DPE will be faced with a Hobson's choice of either shutting down the Facility by October 15 (a process that must begin in mid-August) or continuing to operate in reliance on the LDEQ Extension but risk civil and criminal liability imposed by EPA under the CAA. *See Tex. Employers' Ins. Assn. v. Jackson*, 862 F.2d 491, 505 (5th Cir. 1988) (through action under Declaratory Judgment Act, "[l]itigants would no longer be put to the Hobson's choice of foregoing their rights or acting at their peril").

To obtain a declaratory judgment, DPE must show that: (1) "the declaratory action is justiciable;" (2) "the court has the authority to grant declaratory relief;" and (3) the Court should "exercise its discretion to decide or dismiss the action." *Sherwin-Williams Co. v. Holmes County*, 343 F.3d 383, 397 (5th Cir. 2003). Each element is met here.

### a. There is a justiciable dispute as to EPA's finding that the LDEQ Extension is "ineffectual."

An action is justiciable if there is "an actual controversy among the parties." *Id.* at 387. Here, without the LDEQ Extension, DPE will be forced to shut down the Facility. EPA has taken the position that the extension is "ineffectual" and made clear it will continue to seek the Facility's closure. Thus, there is a justiciable dispute as to the LDEQ Extension's validity.

### b. This Court has authority to issue a declaration regarding EPA's final agency action.

This Court has authority to issue the requested declaration. Both the CAA and APA permit this Court to enter orders concerning final agency action. EPA's position that the LDEQ Extension is "ineffectual" is (i) an unequivocal statement that "determines" DPE's "rights or obligations" and (ii) "marks the consummation of [EPA's] decisionmaking process." *Sackett*, 566 U.S. at 126-27 (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)). The D.C. Circuit brief in which EPA stated its position was signed by the Department of Justice and the EPA Office of General Counsel on behalf of EPA and the Administrator; there is "no reason to question [their] authority to speak for the EPA." *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1532 (D.C. Cir. 1990) (letter from EPA Assistant Administrator constituted final agency action); *Nat'l Automatic Laundry & Cleaning Council v. Shultz*, 443 F.2d 689, 696 (D.C. Cir. 1971) (finding final agency action

where petitioner's interpretation of regulation "has been considered and rejected by the government officials who have primary responsibility for the application and implementation of the statute"). EPA's operative language is "a simple, declarative sentence" that expresses "the agency's enforcement position." *W. Illinois Home Health Care, Inc. v. Herman*, 150 F.3d 659, 663 (7th Cir. 1998). There is "nothing hypothetical or tentative" about it. *Id.*

EPA's action plainly creates new "obligations" or "legal consequences" because it prevents DPE from relying on the LDEQ Extension and requires DPE to comply with certain emissions standards by October 15, 2024, instead of July 15, 2026. *See Texas v. Becerra*, 89 F.4th 529, 540 (5th Cir. 2024) ("To constitute a final agency action, rights, obligations, or legal consequences created by a challenged action must be new.") (cleaned up). In light of EPA's crusade to shut down the DPE Facility, EPA's "ineffectual" statement is an enforcement threat aimed directly at DPE. *See Nat'l Automatic Laundry*, 443 F.2d at 696; *W. Illinois*, 150 F.3d at 663.

Moreover, EPA's action is final. EPA's determination "does not say [EPA] is merely *considering*" treating the LDEQ as ineffectual. *Clarke v. CFTC*, 74 F.4th 627, 639 (5th Cir. 2023). It declares that *any* extension granted to DPE "*would* be ineffectual." The "possibility that [EPA] may reconsider is irrelevant to [the Court's] inquiry." *Id.* "The mere fact that the agency could. . . reverse course in the future does not change an action's finality." *Id.* (cleaned up). Further, DPE is not

entitled to any hearing or other process. *See Sackett*, 566 U.S. at 127 (finding agency action final where it is "not subject to further Agency review"). DPE need not wait until EPA "drop[s] the hammer" with an enforcement action prior to DPE obtaining judicial review. *Sackett*, 566 U.S. at 127.[2]

### 2. EPA's action treating the LDEQ Extension as "ineffectual" is arbitrary, capricious, and contrary to law.

EPA's determination that the LDEQ Extension is "ineffectual" is arbitrary, capricious, and contrary to law. EPA cannot disregard a legally issued extension by a state agency. EPA's amendment of Section 63.507 via the Final Rule did not divest LDEQ of authority to grant the LDEQ Extension.

### a. LDEQ has automatic delegation authority via its EPA-approved permit program.

LDEQ has automatic authority to grant the LDEQ Extension based on LDEQ's approved permit program and EPA has not even attempted to modify such automatic authority through its amendment to Section 63.507.

State agencies have automatic authority to grant Section 112 compliance extensions if they have an approved permitting program. 40 C.F.R. § 63.6(i)(1) ("Until an extension of compliance has been granted by the Administrator *(or a State with an approved permit program)* under this paragraph, the owner or operator of an

---

[2] Regarding the third element for declaratory relief, the Court should exercise its discretion so that DPE will know whether it may rely on the LDEQ Extension or must shutdown the Facility by October 15.

affected source subject to the requirements of this section shall comply with all applicable requirements of this part.") (emphasis added); 40 C.F.R. § 63.6(i)(9) ("the Administrator (*or the State with an approved permit program*) may grant an extension of compliance. 40 C.F.R. § 63.6(i)(9)") (emphasis added)).

EPA has confirmed in formal guidance that state agencies have this "automatic" extension approval authority based on an approved permitting program and do not require a separate express delegation from EPA. Specifically, on July 10, 1998, EPA published a memorandum confirming that the authority to grant compliance extensions "does not require delegation through subpart E and, instead, is automatically granted to States as part of their part 70 operating permits program approval." Exhibit K ("Seitz Memorandum").

EPA approved the Louisiana Operating Permits program on September 12, 1995. Exhibit C. Thus, as confirmed by the regulatory text and by EPA in the Seitz Memorandum, Louisiana has held and continues to hold automatic authority to issue Section 112 compliance extensions.

Section 63.507, the provision that EPA amended, *does not concern* automatic authority pursuant a state's approved permit program. Section 63.507 only concerns *express* delegations of authority pursuant to Part 63, Subpart E. Thus, EPA's amendment—even if otherwise applicable or effective—does not prevent LDEQ from granting extensions based on its approved permit program. Section 63.507

does not even purport to address such authority, and thus, has no bearing on the validity of the LDEQ Extension.

**b.    LDEQ's expressly delegated authority cannot be modified by an amendment that is not yet effective.**

On its face, the Rule does not become effective until *July 15*, 2024.  Thus, it has no impact on the LDEQ Extension that was granted on *June 27*, 2024.  Even assuming that the Rule's amendment to 40 C.F.R. § 63.507(c) otherwise impacted LDEQ's authority to grant extensions—and, as explained herein, it plainly does not—the amended Section 63.507(c) is not effective until July 15, 2024, and therefore does not legally foreclose any actions before that date.  EPA's attempt to revoke Louisiana's authority to grant extensions *after the effective date* unequivocally recognizes that Louisiana *does* have such expressly delegated authority *before the effective date*, including on June 27, 2024, when the LDEQ Extension was granted.

**c.    LDEQ continues to have expressly delegated authority because EPA has not amended such authority.**

LDEQ has expressly delegated authority to grant extensions pursuant to Part 63, Subpart E and EPA has not amended such authority.  EPA's amendment to Section 63.507(c)(6) does not amend Subpart E and, consequently, does not preclude LDEQ from issuing extensions.

Section 112(l) of the CAA allows EPA to expressly delegate the implementation of Section 112 standards to the states. 42 U.S.C. § 7412(l). 40 C.F.R. Part 63, Subpart E contains the regulatory framework for such express delegations. *See* 40 C.F.R. Part 63, Subpart E. On September 11, 1985, EPA first expressly delegated to Louisiana the authority to implement Section 112 standards pursuant to Subpart E.

Subpart E includes a table listing the specific Section 112 standards that have been delegated to Louisiana. 40 C.F.R. § 63.99(a)(19)(i). This table confirms that the extension approval provisions—Sections 63.6(i)(9) and 63.6(i)(4)(ii)—have been delegated to LDEQ. The table also identifies provisions that *cannot* be delegated to LDEQ. The extension-approval provisions in Section 63.6(i) are *not* listed in the table, confirming that such provisions can be—and are—delegated to LDEQ. A state's Subpart E authority is modified by amending Subpart E, which EPA last did on February 24, 2015. Exhibit L.

It is astonishing that EPA attempts to revoke the express delegation of LDEQ's extension authority without amending a single provision in Subpart E—*the subpart governing that delegation of authority*. Instead, in a completely different set of regulations, the Rule amends Section 63.507(c)(6)—a provision intended only to clarify what authorities pursuant to Subpart E can and cannot be delegated *as a*

*matter of law* for any subpart. Exhibit M at 37,334 ("[T]here are separate parts of each section 112 requirement that we cannot delegate to you.").

The notion that LDEQ's extension authority "cannot" be delegated is contradicted by the fact that EPA *has* delegated such authority to LDEQ *for decades* and *continues to delegate* such authority for every other set of Section 112 standards in the country. Like Section 63.507, there are dozens of provisions in EPA's regulations that identify what standards and authorities "cannot" be delegated to states. Yet, in no other provision does EPA take the position that extension approval authority *cannot* be delegated. Indeed, in every other set of Section 112 standards, such authority *can* be delegated, including for other standards amended in the Rule. *See, e.g.,* Exhibit A at 43,212 (addressing provision parallel to § 63.507, but not addressing extensions); *id.* at 43,228 (same); *id.* at 43,274 (same). If authority to approve requests under Section 63.6(i)(4)(ii) cannot be delegated to state agencies, then how did EPA allow such authority to continue to be delegated in other standards at the *very same time* and in the *very same rule*? Likewise, LDEQ has exercised such authority for more than 20 years without EPA ever claiming such authority could not be delegated.

EPA simply cannot revoke the authorities delegated to LDEQ without amending the "Delegated Federal Authorities" set forth in Subpart E, 40 C.F.R. § 63.99. Such an amendment would have proved problematic for EPA because the

Proposed Rule did not propose to amend Subpart E. Instead of having a separate rulemaking subject to notice-and-comment, EPA amended a provision that—while not included in the Proposed Rule—at least was located in a subpart covered by the Proposed Rule. Even assuming the amendment is valid, the amendment to Section 63.507 has utterly no bearing on LDEQ's delegated authority in Subpart E, which still stands and authorizes LDEQ to grant extensions pursuant to Section 63.6(i).

### d. LDEQ continues to have expressly delegated authority because EPA has not revoked authority in Section 63.6(i)(9).

Finally, any contention that the "[a]pproval of an extension request under § 63.6(i)(4)(ii)" cannot be delegated to state agencies fails to grapple with another approval authority in Section 63.6(i)(9). Exhibit A at 43,261. Section 63.6(i) sets forth clear and distinct authorities for *requesting* and *approving* compliance extensions. 40 C.F.R. § 63.6(i).

Sections 63.6(i)(4) through (i)(7) "concern *requests for an extension* of compliance. . . ." 40 C.F.R. § 63.6(i)(3) (emphasis added). Included in these *request* provisions is Section 63.6(i)(4)(ii), which addresses compliance extensions under Section 112(f) of the CAA.

Separately, Sections 63.6(i)(9) through (i)(14) "concern *approval of an extension* of compliance requested under paragraphs (i)(4) through (i)(6) of this section. . . ." 40 C.F.R. § 63.6(i)(8) (emphasis added). Included in these *approval* provisions is Section 63.6(i)(9), which states:

Based on the information provided in any request made under paragraphs (i)(4) through (i)(6) of this section, or other information, the Administrator (or *the State with an approved permit program) may grant an extension of compliance with an emission standard*, as specified in paragraphs (i)(4) and (i)(5) of this section.

40 C.F.R. § 63.6.(i)(9) (emphasis added).  EPA's amendment to Section 63.507 does not reference 40 C.F.R. § 63.6.(i)(9), which is one legal basis authorizing LDEQ to grant extension requests.  Thus, even if EPA's revocation of authority were otherwise proper, it does not impact LDEQ's authority under Section 63.6(i)(9).

**B.    DPE Will Suffer Irreparable Harm Absent A Stay.**

The irreparable harm facing the DPE Facility and its roughly 250 employees is certain and undisputed.  Unless DPE can obtain timely relief from this Court, and be able to rely on the LDEQ Extension, the Facility will have to shut down by October 15, 2024, and likely never restart.  *See* Exhibit N ¶¶ 4-44; Exhibit O ¶ 8.  That harm is irreparable.  *See, e.g.*, *Wages & White Lion*, 16 F.4th at 1142 ("Substantial financial injury may be sufficient to show irreparable injury," particularly where a movant's "alleged financial injury threatens the very existence of its business."); *BST Holdings*, 17 F.4th at 618.

**C.    A Stay Will Not Injure Other Parties And Is Supported By The Public Interest.**

A stay to maintain the status quo while this Court considers DPE's petition will pose virtually no risk to the public.  *Wages & White Lion*, 16 F.4th at 1143 ("The

maintenance of the status quo is an important consideration in granting a stay.")

(quotation omitted).

The harm that EPA attributes to chloroprene emissions from DPE's Facility is miniscule even if one assumes EPA's allegations of risk are correct (which DPE disputes). EPA estimates that, for a hypothetical (but completely implausible) person who remains continuously just outside the Facility's fenceline all day, every day for 70 years breathing the Facility's chloroprene emissions, that person's lifetime risk of cancer would be increased by 6-in-10,000 or 0.06 percent due to exposure to chloroprene. Exhibit A at 42,963 (Table 5). To put that risk in perspective, according to the U.S. Center for Disease Control, an average American has a 40.5 percent chance of getting cancer in his or her lifetime.[3] Assuming that EPA's claims about chloroprene's risk are true, this means that the above-described hypothetical person who remains planted outside the Facility's fenceline and breathes chloroprene emissions *continuously every day for 70 years* would have an increase in lifetime cancer risk from 40.5 percent to 40.56 percent.

Under the LDEQ Extension, DPE's compliance period is extended by less than two years—or less than 1/35th of a 70-year period. Confirming the validity of the LDEQ Extension and allowing DPE a compliance period until July 2026 would,

---

[3]*See* https://www.cancer.gov/about-cancer/understanding/statistics#:~:text=Approximately%2040.5%25%20of%20men%20and,on%202017%E2%80%932019%20data.

at most, increase that hypothetical person's alleged risk by less than 1/35th of this amount, or 0.0017 percent. Thus, EPA's own risk calculus invites the Court to weigh the slightest of increased risk to a counterfactual population that remains planted outside the Facility's fenceline and breathes chloroprene emissions continuously every day for 70 years against the *certainty* of shutting down the Nation's only Neoprene plant by October 2024.

Since the Proposed Rule was issued, data show that the Facility's emissions are lower than ever. Exhibit N ¶¶ 45-49. Air monitoring data depicted in the chart below show significant decreases in chloroprene concentrations near the Facility between 2022 (red bars) and 2023 (purple bars):



Moreover, EPA admits that there is no real-world evidence of a single incidence of cancer attributable to the DPE Facility, let alone any evidence that cancer rates in the vicinity of the Facility have actually increased. Exhibit P at 28. The lack of an association between chloroprene and cancer is corroborated by tumor incidence data collected by the Louisiana Tumor Registry, Exhibit Q ¶¶ 44-50, and a robust epidemiological study of workers historically exposed to substantially greater levels of chloroprene, which found no linkage between chloroprene and the types of cancer that EPA attributes to it. *Id.* ¶¶ 28-43.

Finally, there is no public interest in EPA's indefensible position that the LDEQ Extension is "ineffectual." *Wages & White Lion*, 16 F.4th at 1143.

## VI.   REQUEST FOR RELIEF

DPE requests that the Court grant a stay to preserve the status quo, meaning EPA would be precluded from taking action in contravention of the validity of the LDEQ Extension pending resolution of this Petition.

Date: July 11, 2024

Respectfully submitted,

James C. Percy
JONES WALKER LLP
445 N. Boulevard, Suite 800
Baton Rouge, LA 70802
Telephone: (225) 248-2130
jpercy@joneswalker.com

Robert E. Holden
Brett S. Venn
JONES WALKER LLP
201 St. Charles Ave
New Orleans, LA 70170
Telephone: (504) 582-8000
bholden@joneswalker.com
bvenn@joneswalker.com

*/s/ David A. Super*
David A. Super
Jason B. Hutt
Jeffrey R. Holmstead
Britt Cass Steckman
Kevin M. Voelkel
BRACEWELL LLP
2001 M Street NW, Ste. 900
Washington, DC 20036
Telephone: (202) 828-5800
david.super@bracewell.com
jason.hutt@bracewell.com
jeff.holmstead@bracewell.com
britt.steckman@bracewell.com
kevin.voelkel@bracewell.com

Jeffrey L. Oldham
BRACEWELL LLP
711 Louisiana Street, Suite 2300
Houston, TX 77002
Telephone: (713) 223-2300
jeffrey.oldham@bracewell.com

**Counsel for Petitioner Denka Performance Elastomer LLC**

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify that this motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because this motion contains 5,195 words.

I further certify, pursuant to Fed. R. App. P. 27(d)(1)(E), that this motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this motion has been prepared in Times New Roman 14-point font using Microsoft Word 2013.


Date:  July 11, 2024                            */s/ David A. Super*
                                                David A. Super

                                                **Counsel for Petitioner**
                                                **Denka Performance Elastomer LLC**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 10th day of July 2024, pursuant to Federal Rules of Appellate Procedure 15(c) and 25(d), and 40 C.F.R. § 23.12(a), I electronically filed the foregoing *Petitioner's Emergency Motion for Stay Pending Review* with the Clerk of the Court for the U.S. Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system, with copies of the foregoing served on the following recipients.

<u>**By Hand Delivery**</u>:

Correspondence Control Unit
Office of General Counsel (2311)
U.S. ENVIRONMENTAL PROTECTION AGENCY
1200 Pennsylvania Avenue, NW
Washington, DC 20460

Date: July 11, 2024

*/s/ David A. Super*
David A. Super

***Counsel for Petitioner***
***Denka Performance Elastomer LLC***