# **<u>EXHIBIT A</u>**

# ENVIRONMENTAL PROTECTION AGENCY

## 40 CFR Parts 60 and 63

[EPA–HQ–OAR–2022–0730; FRL–9327–02–OAR]

RIN 2060–AV71

## New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** This action finalizes amendments to the New Source Performance Standards (NSPS) that apply to the Synthetic Organic Chemical Manufacturing Industry (SOCMI) and amendments to the National Emission Standards for Hazardous Air Pollutants (NESHAP) that apply to the SOCMI (more commonly referred to as the Hazardous Organic NESHAP or HON) and Group I and II Polymers and Resins (P&R I and P&R II, respectively) Industries. The EPA is finalizing decisions resulting from the Agency's technology review of the HON and the P&R I and P&R II NESHAP, and its review of the NSPS that apply to the SOCMI. The EPA is also finalizing amendments to the NSPS for equipment leaks of volatile organic compounds (VOC) in SOCMI based on its reconsideration of certain issues raised in an administrative petition for reconsideration. Furthermore, the EPA is finalizing emission standards for ethylene oxide (EtO) emissions and chloroprene emissions after considering the results of a risk assessment for the HON and for Neoprene Production processes subject to the P&R I NESHAP, and is finalizing a fenceline monitoring work practice standard for certain hazardous air pollutants (HAP). Lastly, the EPA is finalizing the removal of exemptions from standards for periods of startup, shutdown, and malfunction (SSM), adding work practice standards for such periods where appropriate, finalizing standards for previously unregulated HAP, and adding provisions for electronic reporting of performance test reports and periodic reports.

**DATES:** This final rule is effective on July 15, 2024. The incorporation by reference (IBR) of certain publications listed in the rule is approved by the Director of the Federal Register as of July 15, 2024. The incorporation by reference of certain other material listed in the rule was approved by the Director of the Federal Register as of October 17, 2000 and November 16, 2007.

**ADDRESSES:** The U.S. Environmental Protection Agency (EPA) has established a docket for this action under Docket ID No. EPA–HQ–OAR–2022–0730. All documents in the docket are listed on the *https://www.regulations.gov/* website. Although listed, some information is not publicly available, *e.g.,* Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available either electronically through *https://www.regulations.gov/*, or in hard copy at the EPA Docket Center, WJC West Building, Room Number 3334, 1301 Constitution Ave. NW, Washington, DC. The Public Reading Room hours of operation are 8:30 a.m. to 4:30 p.m. Eastern Standard Time, Monday through Friday. The telephone number for the Public Reading Room is (202) 566–1744, and the telephone number for the EPA Docket Center is (202) 566–1742.

**FOR FURTHER INFORMATION CONTACT:** For questions about the HON and SOCMI NSPS, contact U.S. EPA, Attn: Mr. Andrew Bouchard, Mail Drop: Sector Policies and Programs Division (E143–01), 109 T.W. Alexander Drive, P.O. Box 12055, RTP, North Carolina 27711; telephone number: (919) 541–4036; and email address: *bouchard.andrew@epa.gov*. For questions about the P&R I and P&R II NESHAP, contact U.S. EPA, Attn: Ms. Njeri Moeller, Mail Drop: Sector Policies and Programs Division (E143–01), 109 T.W. Alexander Drive, P.O. Box 12055, RTP, North Carolina 27711; telephone number: (919) 541–1380; and email address: *moeller.njeri@epa.gov*. For specific information regarding the risk modeling methodology, contact U.S. EPA, Attn: Mr. Matthew Woody, Mail Drop: Health and Environmental Impacts Division (C539–02), 109 T.W. Alexander Drive, P.O. Box 12055, RTP, North Carolina 27711; telephone number: (919) 541–1535; and email address: *woody.matthew@epa.gov*.

**SUPPLEMENTARY INFORMATION:**

*Preamble acronyms and abbreviations.* We use multiple acronyms and terms in this preamble. While this list may not be exhaustive, to ease the reading of this preamble and for reference purposes, the EPA defines the following terms and acronyms here:

ACS  American Community Survey
AERMOD  American Meteorological Society/EPA Regulatory Model dispersion modeling system
ANSI  American National Standards Institute
APCD  air pollution control device
API  American Petroleum Institute
ASME  American Society of Mechanical Engineers
BACT  best available control technology
BLR  basic liquid epoxy resins
BPT  benefit per-ton
BSER  best system of emissions reduction
BTEX  benzene, toluene, ethylbenzene, and xylenes
CAA  Clean Air Act
CBI  confidential business information
CDX  Central Data Exchange
CEDRI  Compliance and Emissions Data Reporting Interface
CFR  Code of Federal Regulations
CMPU  chemical manufacturing process unit
CO  carbon monoxide
$CO_2$  carbon dioxide
CPI  consumer price index
CRA  Congressional Review Act
EAV  equivalent annual value
ECHO  Enforcement and Compliance History Online
EFR  external floating roof
EIS  Emission Information System
EPA  Environmental Protection Agency
EPPU  elastomer product process unit
ERT  Electronic Reporting Tool
EtO  ethylene oxide
FTIR  fourier transform infrared
HAP  hazardous air pollutant(s)
HON  Hazardous Organic NESHAP
HQ  hazard quotient
$HQ_{REL}$  hazard quotient reference exposure level
IBR  incorporation by reference
ICR  information collection request
IFR  internal floating roof
IRIS  Integrated Risk Information System
ISA  Integrated Science Assessment
km  kilometer
LAER  lowest achievable emissions rate
lb/hr  pound per hour
lb/yr  pound per year
LDAR  leak detection and repair
LDEQ  Louisiana Department of Environmental Quality
LEL  lower explosive limit
MACT  maximum achievable control technology
MDL  method detection limit
MERP  monomer emission reduction project
MIR  maximum individual lifetime [cancer] risk
MON  Miscellaneous Organic Chemical Manufacturing NESHAP
MTVP  maximum true vapor pressure
NAICS  North American Industry Classification System
NAAQS  National Ambient Air Quality Standards
NATTS  National Air Toxic Trends Station
NEI  National Emissions Inventory
NESHAP  national emission standards for hazardous air pollutants
$NO_X$  nitrogen oxides
$N_2O$  nitrous oxide

63.139(d)(5) (for HON), and 40 CFR 63.484(t), 40 CFR 63.485(x), and 40 CFR 63.489(b)(10) (for the P&R I NESHAP) for owners or operators using adsorbers that cannot be regenerated and regenerative adsorbers that are regenerated offsite to use dual (two or more) adsorbent beds in series and conduct monitoring of HAP or TOC on the outlet of the first adsorber bed in series using a sample port and a portable analyzer or chromatographic analysis. However, we have clarified in the proposed rule text in this final action that the monitoring plan provisions in 40 CFR 63.120(d)(2) and (3) do not apply to HON sources subject to the monitoring provisions in 40 CFR 63.120(d)(1)(iii); and the monitoring plan provisions in 40 CFR 63.120(d)(2) and (3) do not apply to P&R I sources subject to the monitoring provisions in 40 CFR 63.120(d)(1)(iii) (via 40 CFR 63.484(t) and 40 CFR 63.485(x)). The comments and our specific responses to these items can be found in the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking.

We are also finalizing, as proposed, several corrections to the calibration drift assessment requirements in NSPS subpart VVa at 40 CFR 60.485a(b)(2). These amendments include: (1) Correcting a regulatory citation to read "§ 60.486a(e)(8)" instead of "§ 60.486a(e)(7)"; (2) removing the extraneous sentence "Calculate the average algebraic difference between the three meter readings and the most recent readings and the most recent calibration value."; (3) providing clarity in the mathematical step of the assessment by replacing the sentence "Divide this algebraic difference by the initial calibration value and multiply by 100 to express the calibration drift as a percentage." with "Divide the arithmetic difference of the initial and post-test calibration response by the corresponding calibration gas value for each scale and multiply by 100 to express the calibration drift as a percentage."; and (4) providing clarity by making other minor textual changes to the provisions related to the procedures for when a calibration drift assessment shows negative or positive drift of more than 10 percent. We did not receive any comments in opposition of these amendments.

In addition, we are finalizing, as proposed, the requirement in the HON and the P&R I and P&R II NESHAP, and NSPS subparts IIIa, NNNa, and RRRa to conduct subsequent performance testing on non-flare control devices no later than 60 calendar months after the previous performance test. The comments and our specific response to this item can be found in the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking.

Also, we are finalizing, as proposed to: (1) Remove the provisions that allow compliance with certain portions of 40 CFR part 264, subpart AA or CC in lieu of portions of NESHAP subpart G (see 40 CFR 63.110(h)); and (2) remove the provisions that allow compliance with certain portions of 40 CFR part 65 in lieu of portions of NESHAP subparts G and H (see 40 CFR 63.110(i) and 40 CFR 60.160(g)). In addition, based on comments received on the proposed rulemaking, we are: (1) Revising 40 CFR 63.160(b)(1) and (c)(1) in the final rule such that compliance with HON subpart H constitutes compliance with NSPS subpart VVa provided the owner or operator continues to comply with 40 CFR 60.480a(e)(2)(i); and (2) revising 40 CFR 63.160(b)(1) and (c)(1) in the final rule such that compliance with HON subpart H constitutes compliance with NSPS subpart VVb provided the owner or operator continues to comply with 40 CFR 60.480b(e)(2)(i). We have also revised 40 CFR 60.480b(e)(2)(i) in the final rule to require compliance with 40 CFR 60.482–7b (*i.e.,* the standards for gas and light liquid valves in NSPS subpart VVb) in addition to the requirements of 40 CFR 60.485b(d), (e), and (f), and 40 CFR 60.486b(i) and (j). The comments and our specific responses to these items can be found in the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking.

Finally, we are finalizing all of the revisions that we proposed for clarifying text or correcting typographical errors, grammatical errors, and cross-reference errors. These editorial corrections and clarifications are discussed in section III.E.5.f of the proposal preamble (see 88 FR 25080, April 25, 2023). We are also including several additional minor clarifying edits in the final rule based on comments received during the public comment period. The comments and our specific responses to these items can be found in the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking.

*G. What are the effective and compliance dates of the standards?*

1. HON and the P&R I and P&R II NESHAP

For all of the requirements we are finalizing under CAA sections 112(d)(2), (3), and (6), and 112(h) (except for the removal of affirmative defense provisions in the P&R I NESHAP and fenceline monitoring requirements in HON and the P&R I NESHAP), all existing affected sources and all affected sources that were new sources under the previous HON and P&R I NESHAP (*i.e.,* sources that commenced construction or reconstruction after December 31, 1992 (for HON) or after June 12, 1995 (for the P&R I NESHAP), and on or before April 25, 2023), must comply with all of the amendments no later than July 15, 2027, or upon startup, whichever is later. For existing sources, CAA section 112(i) provides that the compliance date for standards promulgated under section 112(d) shall be as expeditious as practicable, but no later than 3 years after the effective date of the standard. *Association of Battery Recyclers* v. *EPA,* 716 F.3d 667, 672 (D.C. Cir. 2013) ("Section 112(i)(3)'s three-year maximum compliance period applies generally to any emission standard . . . promulgated under [section 112]."). We agree with the commenters (see section 11.1 of the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and

*Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking) that 3 years is needed for owners and operators to implement the requirements we are finalizing under CAA sections 112(d)(2), (3), and (6). For example, for process vents, if an affected source has uncontrolled process vents that emit greater than or equal to 1.0 lb/hr of total organic HAP, then a new control system, such as a thermal oxidizer with piping, ductwork, etc., may need to be installed (due to the removal of the TRE concept in its entirety in the final rule). Also, additional permits (*e.g.,* New Source Review and/or a Title V permit modifications) may be required for new emission control equipment. Moreover, 3 years is needed to understand the final rule changes; revise site guidance and compliance programs; ensure operations can meet the standards during startup and shutdown; update operation, maintenance, and monitoring plans; upgrade emission capture and control systems; install new flare monitoring equipment; and install new process control systems. As provided in CAA section 112(i) and 5 U.S.C. 801(3), all new affected sources that commenced construction or reconstruction after April 25, 2023, are required to comply with all requirements under CAA sections 112(d)(2), (3), (6), and 112(h) (including fenceline monitoring) by July 15, 2024 or upon startup, whichever is later. We are also finalizing, as proposed, that owners or operators of P&R I affected sources must comply with the removal of the affirmative defense provisions 60 days after the publication date of the final rule (or upon startup, whichever is later). We provided additional rationale for these compliance dates in the preamble to the proposed rule (88 FR 25080, April 25, 2023).

In a change from the proposed rule, we have extended the compliance date for fenceline monitoring (with the exception of fenceline monitoring of chloroprene at P&R I affected sources producing neoprene, which is discussed later in this section) from 1 to 2 years. Owners and operators of all existing sources, and all affected sources that were new under the current rules—*i.e.,* sources that commenced construction or reconstruction after December 31, 1992 (for HON) or after June 12, 1995 (for the P&R I NESHAP), and on or before April 25, 2023—must begin fenceline monitoring 2 years after the effective date of the final rule and, starting 3 years after the effective date of the final rule, must perform root cause analysis and apply corrective action requirements upon exceedance of an annual average concentration action level. We extended the timeline for fenceline monitoring from 1 to 2 years based on comments received, which indicated that EPA Method 327 will require laboratories to increase their capacity to meet the requirements for fenceline monitoring. We consider this expanded timeline to be necessary to allow commercial labs to conduct the needed method development, expand capacity, and develop the logistics needed to meet the requirements in the final rule. We also agree with commenters' other assertions that more time is needed to read and assess the new fenceline monitoring requirements; prepare sampling and analysis plans; develop and submit site-specific monitoring plans; identify representative, accessible, and secure monitoring locations for offsite monitors and obtain permission from the property owner to both place and routinely access the monitors; make any necessary physical improvements to fencelines to be able to site monitors, including construction of access roads, physical fencing, and potential drainage improvements; and obtain approval of any necessary capital expenditures. We consider 2 years to be necessary to allow for all of these things. For additional details, see section 11.1 of the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking.

For all of the requirements we are finalizing under CAA sections 112(f) for the HON, we are finalizing as proposed, except we are clarifying that the compliance dates we proposed are from the effective date of the rule rather than the publication date of the proposal. In other words, all existing affected sources and all affected sources that were new sources under the previous HON (*i.e.,* sources that commenced construction or reconstruction after December 31, 1992, and on or before April 25, 2023) must comply with the EtO requirements no later than July 15, 2026, or upon startup, whichever is later. As explained in the April 25, 2023, proposed rule (88 FR 25080, 25176), CAA section 112(f)(4) prescribes the compliance date for emission standards issued under CAA section 112(f). *Ass'n of Battery Recyclers* v. *EPA,* 716 F.3d 667, 672 (D.C. Cir 2013) (''[S]ection 112(f)(4)'s two-year maximum applies more specifically to standards 'under this subsection,' *i.e.,* section 112(f)."). For existing sources, the earliest compliance date for CAA section 112(f) standards is 90 days. However, the compliance period can be extended up to 2 years if the EPA finds that more time is needed for the installation of controls. 42 U.S.C. 7412(f)(4)(B). The EPA finds that the new EtO provisions under CAA section 112(f) will require additional time to plan, purchase, and install emission control equipment. For example, for process vents, if an affected source cannot demonstrate 99.9-percent control of EtO emissions, or reduce EtO emissions to less than 1 ppmv (from each process vent) or 5 pounds per year (for all combined process vents), then a new control system, such as a scrubber with piping, ductwork, feed tanks, etc., may need to be installed. Similarly, this same scenario (*i.e.,* installation of a new control system, such as a scrubber with piping, ductwork, feed tanks, etc) may be necessary for storage vessels in order to reduce EtO emissions by greater than or equal to 99.9 percent by weight or to a concentration less than 1 ppmv. Likewise, a new steam stripper may be needed control wastewater with a total annual average concentration of EtO greater than or equal to 1 ppmw. Additionally, we agree with commenters (see section 11.1 of the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking) that additional permits may be required for these new emission control equipment (*e.g.,* New Source Review and/or a Title V permit modifications). In other words, sufficient time is needed to properly engineer the project, obtain capital authorization and funding, procure the equipment, obtain permits, and construct and start-up the equipment. Therefore, we are finalizing a compliance date of 2 years after the effective date of the final rule for all existing affected sources to meet the EtO requirements. All new affected sources that commence construction or reconstruction after April 25, 2023, are required to comply with the EtO requirements for the HON by July 15, 2024 or upon startup, whichever is later.

This compliance schedule is consistent with the compliance deadlines outlined in the CAA under section 112(f)(4) and the CRA. We provided additional rationale for these compliance dates in the preamble to the proposed rule (88 FR 25080, April 25, 2023).

In a change from the proposed rule, the EPA is shortening the compliance deadline for affected sources producing neoprene, due to the EPA's finding that chloroprene emissions from the only such source pose an imminent and substantial endangerment under CAA section 303, 42 U.S.C. 7603. *United States* v. *Denka Performance Elastomer, LLC, et al.,* No. 2:23–cv–00735 (E.D. La. filed Feb. 28, 2023). All existing affected sources producing neoprene and all affected sources producing neoprene that were new sources under the previous P&R I NESHAP (*i.e.,* sources that commenced construction or reconstruction after June 12, 1995, and on or before April 25, 2023) must comply with the chloroprene requirements we are finalizing under CAA section 112(f) for the P&R I NESHAP (see sections III.B.1 and IV.A.3.e of this preamble for a details about these chloroprene requirements) no later than October 15, 2024,[32] or upon startup, whichever is later. However, such sources may seek the EPA's approval of a waiver from the 90-day compliance deadline and obtain a compliance date of up to July 15, 2026 if they demonstrate to the Administrator's satisfaction that "such period is necessary for the installation of controls" and that steps will be taken during the waiver period to assure that the public health of persons will be protected from any imminent endangerment. See 42 U.S.C. 112(f)(4)(B); 40 CFR 63.6(i)(4)(ii).[33]

---

[32] The compliance date is 90 days after the effective date of this final action due to the Congressional Review Act.

[33] We are revising the General Provisions table to the P&R II NESHAP entry for 40 CFR 63.6(e)(1)(i) by changing the "No" to "Yes" for affected sources producing neoprene. EPA is also retaining authority to grant or deny requests for extensions of the compliance date under 40 CFR 63.6(i)(4)(ii) at 40 CFR 63.507(c)(6), and is not delegating that authority to states.

All new affected sources that commence construction or reconstruction after April 25, 2023, are required to comply with the chloroprene requirements for P&R I affected sources producing neoprene no later than by July 15, 2024 or upon startup, whichever is later. This compliance schedule is consistent with the compliance deadlines outlined in the CAA under section 112(f)(4) and the CRA, 5 U.S.C. 801.

2. NSPS Subparts VV, VVa, VVb, III, IIIa, NNN, NNNa, RRR, RRRa

All sources of equipment leaks in the SOCMI (regulated under NSPS subpart VVb) and all SOCMI air oxidation unit processes, distillation operations, and reactor processes (regulated under NSPS subparts IIIa, NNNa, and RRRa, respectively), that commenced construction, reconstruction, or modification on or after April 25, 2023, must meet the requirements of the new NSPS upon startup of the new, reconstructed or modified facility or by July 15, 2024, whichever is later. This compliance schedule is consistent with the requirements in section 111 of the CAA and the CRA.

Also, for NSPS subparts VV, VVa, III, NNN, and RRR, we are finalizing, as proposed, the change in format of the reporting requirements to require electronic reporting (*i.e.,* we are not finalizing any new data elements); and owners and operators must begin submitting performance test reports electronically beginning on July 15, 2024 and semiannual reports on and after July 15, 2025 or once the report template for the subpart has been available on the CEDRI website (*https://www.epa.gov/electronic-reporting-air-emissions/cedri*) for 1 year, whichever date is later. For NSPS subparts IIIa, NNNa, and RRRa, we are finalizing, as proposed, that owners and operators must submit performance test reports electronically within 60 days after the date of completing each performance test, and for NSPS subparts VVb, IIIa, NNNa, and RRRa, semiannual reports on and after July 15, 2024 or once the report template for the subpart has been available on the CEDRI website (*https://www.epa.gov/electronic-reporting-air-emissions/cedri*) for 1 year, whichever date is later.

IV. What is the rationale for our final decisions and amendments for the SOCMI, P&R I, and P&R II source categories?

For each issue, this section provides a description of what we proposed and what we are finalizing for the issue, the EPA's rationale for the final decisions and amendments, and a summary of key comments and responses. For all comments not discussed in this preamble, comment summaries and the EPA's responses can be found in the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking.

*A. Residual Risk Review for the SOCMI and Neoprene Production Source Categories NESHAP*

1. What did we propose pursuant to CAA section 112(f) for the SOCMI and Neoprene Production source categories?

a. SOCMI Source Category

Pursuant to CAA section 112(f), the EPA conducted a residual risk review and presented the results of this review, along with our proposed decisions regarding risk acceptability and ample margin of safety, in the April 25, 2023, proposed rule for the SOCMI source category subject to HON (88 FR 25080). The results of the risk assessment for the proposal are presented briefly in Table 1 of this preamble. More detail is in the residual risk technical support document, *Residual Risk Assessment for the SOCMI Source Category in Support of the 2023 Risk and Technology Review Proposed Rule* (see Docket Item No. EPA–HQ–OAR–2022–0730–0085).

**Table 4. SOCMI Source Category and Facility-wide Inhalation Risk Assessment Results Based on Baseline (Pre-Control) Emissions and Post-Control Emissions**

| Risk Assessment | Maximum Individual Cancer Risk (-in-1 million)[1] | Estimated Population at Increased Risk of Cancer | | Estimated Annual Cancer Incidence (cases per year) | Maximum Chronic Noncancer TOSHI | Refined Maximum Screening Acute Noncancer HQ |
| --- | --- | --- | --- | --- | --- | --- |
| | | > 100-in-1 million | ≥ 1-in-1 million | | | |
| SOCMI Source Category | | | | | | |
| Pre-Control Baseline | 2,000 | 83,000 (50 km) | 7.17 million (50 km) | 2 | 2 (maleic anhydride) 2 (chlorine) | $HQ_{REL}$ = 3 (chlorine) $HQ_{REL}$ = 3 (acrolein) |
| Post-Control | 100 | 0 | 6.27 million (50km) | 0.4 | 2 (maleic anhydride) 2 (chlorine) | $HQ_{REL}$ = 3 (chlorine) $HQ_{REL}$ = 3 (acrolein) |
| Facility-wide | | | | | | |
| Pre-Control Baseline | 2,000 | 90,000 (50 km) | 8.92 million (50 km) | 2 | 4 (chlorine, acrylic acid, and acrylonitrile) | -- |
| Post-Control | 2,000 | 2,900 (50 km) | 8.49 million (50 km) | 2 | 4 (chlorine, acrylic acid, and acrylonitrile) | -- |

[1] Maximum individual excess lifetime cancer risk due to HAP emissions.

b. Neoprene Source Category

In response to a comment in section IV.A.3.e.i of this preamble, we revised the performance standard for process vents and storage vessels in chloroprene service for the Neoprene Production source category. This revision did not change the baseline source category or facility-wide risk assessments for the Neoprene Production source category from proposal (see section IV.A.1.b of this preamble and Table 5 of this preamble). The revised assessment indicated that, after implementation of the controls, the MIR for the Neoprene Production source category is 100-in-1 million (down from 500-in-1 million in the pre-control baseline) with no individuals exposed to risk levels greater than 100-in-1 million from HAP emissions from the Neoprene Production source category. This result is the same as in the proposal. The total population exposed to risk levels from the Neoprene Production source category greater than or equal to 1-in-1 million would be reduced from 690,000 people to 58,000 people. The total estimated cancer incidence of 0.05 drops to 0.01 excess cancer cases per year. For the risk results estimated after implementation of controls, the two changes from proposal are the number of people exposed to risk levels greater than or equal to 1-in-1 million (58,000 here compared to 48,000 at proposal) and the cancer incidence (0.01 here compared to 0.008 at proposal) from HAP emissions from the Neoprene Production source category. All other results remained the same. Table 5 of this preamble summarizes the reduction in cancer risks due to emissions from the Neoprene Production source category based on the controls in this action. For further details on the revised risk assessment for the Neoprene Production source category, see the document titled *Residual Risk Assessment for the Polymers & Resins I Neoprene Production Source Category in Support of the 2024 Risk and Technology Review Final Rule,* which is available in the docket for this rulemaking.

Table 5 of this preamble also provides the facility-wide risks for the facility in the Neoprene Production source category, which are of increased importance due to the secondary

fenceline action level for chloroprene, before (pre-control baseline) and after controls (post-control) of neoprene production emission sources in this action. The post-control facility-wide MIR is 200-in-1 million, driven by chloroprene emissions from SOCMI and neoprene production emission sources. The secondary fenceline action level of 0.3 µg/m³ for chloroprene will further reduce chloroprene emissions and therefore risks below these levels, with the MIR expected to be 100-in-1 million or lower, with no individuals exposed to lifetime cancer risk levels greater than 100-in-1 million, and the number of people exposed to cancer risk levels greater than or equal to 1-in-1 million expected to be lower than those in Table 5 of this preamble.

**Table 5. Neoprene Production Source Category and Facility-wide Inhalation Risk Assessment Results Based on Baseline (Pre-Control) Emissions and Post-Control Emissions**

| Risk Assessment | Maximum Individual Cancer Risk (-in-1 million)[1] | Estimated Population at Increased Risk of Cancer | | Estimated Annual Cancer Incidence (cases per year) | Maximum Chronic Noncancer TOSHI | Maximum Screening Acute Noncancer HQ |
|---|---|---|---|---|---|---|
| | | > 100-in-1 million | ≥ 1-in-1 million | | | |
| Neoprene Production Source Category | | | | | | |
| Pre-Control Baseline | 500 | 2,100 (50 km) | 690,000 (50 km) | 0.05 | 0.05 (chloroprene) | $HQ_{REL}$ = 0.3 (chloroform) |
| Post-Control | 100 | 0 | 58,000 (50 km) | 0.01 | 0.01 (chloroprene) | $HQ_{REL}$ = 0.3 (chloroform) |
| Facility-wide | | | | | | |
| Pre-Control Baseline | 600 | 2,300 (50 km) | 890,000 (50 km) | 0.06 | 0.3 (chlorine) | -- |
| Post-Control | 200 | 326 (50 km) | 87,000 (50 km) | 0.02 | 0.3 (chlorine) | --- |

[1] Maximum individual excess lifetime cancer risk due to HAP emissions.

3. What key comments did we receive on the risk review, and what are our responses?

This section provides summaries of and responses to the key comments received regarding our risk assessment for the SOCMI source category, our risk assessment for the Neoprene Production source category, the proposed requirements to reduce EtO emissions from the SOCMI source category, and the proposed requirements to reduce chloroprene emissions from the Neoprene Production source category. We received comments in support of and against the proposed residual risk review, the IRIS URE used in the review, and our determination that additional controls were warranted under CAA section 112(f)(2) for the SOCMI and Neoprene Production source categories. Other comments on these issues, as well as the EtO IRIS URE, chloroprene IRIS URE, and on additional issues regarding the residual risk review and the EPA's proposed changes based on the residual risk review, can be found in the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking.

a. EtO IRIS URE

We received numerous comments in support of, and in opposition to, the EPA's use of the EtO IRIS value in assessing cancer risk for a source category under CAA section 112(f)(2) for EtO. After careful review of the comments, the Agency has determined that commenters did not identify new scientific information that would alter aspects of the EPA IRIS assessments or call into question the scientific judgments reflected in those assessments. The EPA continues to affirm its determination that the IRIS assessments are scientifically sound and robust and represent the best available inhalation cancer risk values for EtO.[34] These comments are not summarized in this preamble. Instead, all of these comments (related to the EPA's use of the EtO IRIS value for CAA section 112(f)(2) risk assessment) and the EPA's responses are in the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking.

---

[34] 87 FR 77985 (Dec. 21, 2022), *Reconsideration of the 2020 National Emission Standards for Hazardous Air Pollutants: Miscellaneous Organic Chemical Manufacturing Residual Risk and Technology Review, Final action;* reconsideration of the final rule.

storage; log entries) for each required record. If the description changes, the owner or operator shall retain both the current and the most recent superseded description. The description, and the most recent superseded description, shall be retained as provided in § 63.103(c) of subpart F of this part, except as provided in paragraph (g)(1)(vi)(D) of this section.

(C) A description, and the date, of any change to the monitoring system that would reasonably be expected to affect its ability to comply with the requirements of paragraph (g)(1) of this section.

(D) Owners and operators subject to paragraph (g)(1)(vi)(B) of this section shall retain the current description of the monitoring system as long as the description is current, but not less than 5 years from the date of its creation. The current description shall, at all times, be retained on-site or be accessible from a central location by computer or other means that provides access within 2 hours after a request. The owner or operator shall retain the most recent superseded description at least until 5 years from the date of its creation. The superseded description shall be retained on-site (or accessible from a central location by computer that provides access within 2 hours after a request) at least 6 months after its creation. Thereafter, the superseded description may be stored off-site.

(2) If an owner or operator has elected to implement the requirements of paragraph (g)(1) of this section, and a period of 6 consecutive months has passed without an excursion as defined in paragraph (g)(2)(iv) of this section, the owner or operator is no longer required to record the daily average value for that parameter for that unit of equipment, for any operating day when the daily average value is less than the maximum, or greater than the minimum established limit. With approval by the Administrator, monitoring data generated prior to the compliance date of this subpart shall be credited toward the period of 6 consecutive months, if the parameter limit and the monitoring was required and/or approved by the Administrator.

(i) If the owner or operator elects not to retain the daily average values, the owner or operator shall notify the Administrator in the next periodic report. The notification shall identify the parameter and unit of equipment.

(ii) If, on any operating day after the owner or operator has ceased recording daily averages as provided in paragraph (g)(2) of this section, there is an excursion as defined in paragraph (g)(2)(iv) of this section, the owner or operator shall immediately resume retaining the daily average value for each day, and shall notify the Administrator in the next periodic report. The owner or operator shall continue to retain each daily average value until another period of 6 consecutive months has passed without an excursion as defined in paragraph (g)(2)(iv) of this section.

(iii) The owner or operator shall retain the records specified in paragraphs (g)(1) (i), (ii), (iii), (iv), (v), and (vi) of this section. For any calendar week, if compliance with paragraphs (g)(1) (i), (ii), (iii), and (iv) of this section does not result in retention of a record of at least one occurrence or measured parameter value, the owner or operator shall record and retain at least one parameter value during a period of operation other than a startup, shutdown, or malfunction. For each source as defined in § 63.101, on and after July 15, 2027, the phrase "other than a startup, shutdown, or malfunction" in this paragraph no longer applies.

(iv) For purposes of paragraph (g) of this section, an excursion means that the daily average value of monitoring data for a parameter is greater than the maximum, or less than the minimum established value, except as provided in paragraphs (g)(2)(iv)(A) and (B) of this section.

(A) The daily average value during any startup, shutdown, or malfunction shall not be considered an excursion for purposes of this paragraph (g)(2), if the owner or operator operates the source during such periods in accordance with § 63.102(a)(4). For each source as defined in § 63.101, on and after July 15, 2027, this paragraph no longer applies.

(B) An excused excursion, as described in § 63.152(c)(2)(ii)(B) and (C), shall not be considered an excursion for purposes of this paragraph (g)(2).

(h) Beginning no later than July 15, 2024, owners and operators must submit performance test reports in accordance with this paragraph. Unless otherwise specified in this subpart, within 60 days after the date of completing each performance test required by this subpart, owners and operators must submit the results of the performance test following the procedures specified in § 63.9(k). Data collected using test methods supported by the EPA's Electronic Reporting Tool (ERT) as listed on the EPA's ERT website (h*ttps://www.epa.gov/electronic-reporting-air-emissions/electronic-reporting-tool-ert*) at the time of the test must be submitted in a file format generated through the use of the EPA's ERT. Alternatively, owners and operators may submit an electronic file consistent with the extensible markup language (XML) schema listed on the EPA's ERT website. Data collected using test methods that are not supported by the EPA's ERT as listed on the EPA's ERT website at the time of the test must be included as an attachment in the ERT or alternate electronic file.

■ 90. Amend § 63.153 by revising paragraph (c) introductory text and adding paragraph (c)(5) as follows:

### § 63.153   Implementation and enforcement.

\* \* \* \* \*

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (5) of this section.

\* \* \* \* \*

(5) Approval of an alternative to any electronic reporting to the EPA required by this subpart.

■ 91. Revise table 3 to subpart G to read as follows:

TABLE 3 TO SUBPART G OF PART 63—PROCESS VENTS—MONITORING, RECORDKEEPING, AND REPORTING REQUIREMENTS FOR CONTROL DEVICES AND RECAPTURE DEVICES

| Control or recapture device | Parameters to be monitored [a] | Recordkeeping and reporting requirements for monitored parameters |
|---|---|---|
| Thermal incinerator, other than a thermal oxidizer used to comply with § 63.124. | Firebox temperature [b] [63.114(a)(1)(i)] | 1. Continuous records.[c]<br>2. Record and report the firebox temperature averaged over the full period of the performance test—NCS.[d]<br>3. Record the daily average firebox temperature for each operating day.[e]<br>4. Report all daily average temperatures that are outside the range established in the NCS or operating permit and all operating days when insufficient monitoring data are collected [f]—PR.[g] |
| Thermal oxidizer used to comply with § 63.124. | Combustion chamber temperature [63.124(b)(5)(i)]. | 1. Continuous records.[c]<br>2. Record and report the combustion chamber temperature averaged over the full period of the performance test—NCS.[d] |

contamination by the sample handler. High sample results attributed to unknown causes are not outliers if there is no evidence of sample contamination and the sample does not meet the requirements in Section 9.2 of Method 325A of appendix A of this part.

(7) The concentration difference (Δc) for each monitored compound for each sampling period and the annual average Δc for each monitored compound for each sampling period.

(8) Indication of whether the owner or operator was required to develop a corrective action plan under § 63.184(f).

(9) Data flags for each monitor for each analyte that was skipped for the sampling period, if the owner or operator uses an alternative sampling frequency under § 63.184(a)(3)(iii) or § 63.184(b)(2)(iii).

■ 115. Amend § 63.183 by revising paragraph (c) introductory text and adding paragraph (c)(5) to read as follows:

### § 63.183  Implementation and enforcement.

\* \* \* \* \*

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (5) of this section.

\* \* \* \* \*

(5) Approval of an alternative to any electronic reporting to the EPA required by this subpart.

■ 116. Add § 63.184 to read as follows:

### § 63.184  Fenceline monitoring provisions.

For each source as defined in § 63.101, and for each source as defined in § 63.191, beginning no later than the compliance dates specified in § 63.100(k)(12), the owner or operator must conduct sampling along the facility property boundary and analyze the samples in accordance with paragraphs (a) through (i) of this section. Sampling of benzene, 1,3-butadiene, chloroprene, and ethylene dichloride must be conducted in accordance with paragraph (a) of this section. Sampling of ethylene oxide and vinyl chloride must be conducted in accordance with paragraph (b) of this section. Paragraphs (c) through (i) of this section apply for any compound required to be sampled.

(a) The owner or operator must conduct sampling along the facility property boundary and analyze the samples in accordance with Methods 325A and 325B of appendix A to this part and paragraphs (a)(1) through (3) of this section. The monitoring perimeter may be located inside the facility, away from the facility property boundary. However, the monitoring perimeter must encompass all potential sources of the target analyte(s) specified in paragraph (a)(1) of this section that are located within the facility's property boundary.

(1) The owner or operator must monitor the target analyte(s), as specified in paragraphs (a)(1)(i) through (iv) of this section. The owner or operator must follow the procedure in Section 9.6 of Method 325B of appendix A to this part to determine the detection limit of benzene, 1,3-butadiene, chloroprene, and ethylene dichloride for each sampler used to collect samples and blanks.

(i) If an affected source uses, produces, stores, or emits benzene, the owner or operator must include benzene as a target analyte.

(ii) If an affected source uses, produces, stores, or emits 1,3-butadiene, the owner or operator must include 1,3-butadiene as a target analyte.

(iii) If an affected source uses, produces, stores, or emits chloroprene, the owner or operator must include chloroprene as a target analyte.

(iv) If an affected source uses, produces, stores, or emits ethylene dichloride, the owner or operator must include ethylene dichloride as a target analyte.

(2) The owner or operator must determine passive monitor locations in accordance with Section 8.2 of Method 325A of appendix A to this part.

(i) As it pertains to this subpart, known sources of VOCs, as used in Section 8.2.1.3 in Method 325A of appendix A to this part for siting passive monitors, means a wastewater treatment unit, process unit, or any emission source requiring control according to the requirements of this subpart, including marine vessel loading operations. For marine vessel loading operations, one passive monitor should be sited on the shoreline adjacent to the dock. For this subpart, an additional monitor is not required if the only emission sources within 50 meters of the monitoring boundary are equipment leak sources satisfying all of the conditions in paragraphs (a)(2)(i)(A) through (C) of this section. If a leak is found, it must be repaired no later than 15 calendar days after it is detected with no provisions for delay of repair. If a repair is not completed within 15 calendar days, the additional passive monitor specified in Section 8.2.1.3 in Method 325A of appendix A to this part must be used.

(A) The equipment leak sources in organic HAP service within 50 meters of the monitoring boundary are limited to valves, pumps, connectors, sampling connections, and open-ended lines. If compressors, pressure relief devices, or agitators in organic HAP service are present within 50 meters of the monitoring boundary, the additional passive monitoring location specified in Section 8.2.1.3 in Method 325A of appendix A to this part must be used.

(B) All equipment leak sources in gas or light liquid service (and in organic HAP service), including valves, pumps, connectors, sampling connections and open-ended lines, must be monitored using Method 21 of appendix A–7 to 40 CFR part 60 no less frequently than quarterly with no provisions for skip period monitoring, or according to the provisions of § 63.11(c) Alternative Work practice for monitoring equipment for leaks. For the purpose of this provision, a leak is detected if the instrument reading equals or exceeds the applicable limits in paragraphs (a)(2)(i)(B)(*1*) through (*5*) of this section:

(*1*) For valves, pumps or connectors at an existing source, an instrument reading of 10,000 ppmv.

(*2*) For valves or connectors at a new source, an instrument reading of 500 ppmv.

(*3*) For pumps at a new source, an instrument reading of 2,000 ppmv.

(*4*) For sampling connections or open-ended lines, an instrument reading of 500 ppmv above background.

(*5*) For equipment monitored according to the Alternative Work practice for monitoring equipment for leaks, the leak definitions contained in § 63.11(c)(6)(i) through (iii).

(C) All equipment leak sources in organic HAP service, including sources in gas, light liquid and heavy liquid service, must be inspected using visual, audible, olfactory, or any other detection method at least monthly. A leak is detected if the inspection identifies a potential leak to the atmosphere or if there are indications of liquids dripping.

(ii) If there are 19 or fewer monitoring locations, the owner or operator must collect at least one co-located duplicate sample per sampling period and at least one field blank per sampling period. If there are 20 or more monitoring locations, the owner or operator must collect at least two co-located duplicate samples per sampling period and at least one field blank per sampling period. The co-located duplicates may be collected at any of the perimeter sampling.

(iii) Samplers are not required to be placed along internal roads, waterways, or other right of ways that may bisect the facility. If a facility is bounded by a waterway on one or more sides, the shoreline is considered the facility property boundary.

§ 63.480  Applicability and designation of affected sources.

* * * * *

(j) *Applicability of this subpart.* Paragraphs (j)(1) through (3) of this section must be followed during periods of non-operation of the affected source or any part thereof.

* * * * *

(4) Beginning on July 15, 2024, this paragraph (j)(4) no longer applies. In response to an action to enforce the standards set forth in this subpart, an owner or operator may assert an affirmative defense to a claim for civil penalties for exceedances of such standards that are caused by a malfunction, as defined in § 63.2. Appropriate penalties may be assessed, however, if the owner or operator fails to meet the burden of proving all the requirements in the affirmative defense. The affirmative defense shall not be available for claims for injunctive relief.

* * * * *

■ 121. Amend § 63.481 by revising paragraph (a), (b), (c) introductory text, (d) introductory text, (k), and adding paragraphs (k)(2) and (n) through (p) as follows:

§ 63.481  Compliance dates and relationship of this subpart to existing applicable rules.

(a) Affected sources are required to achieve compliance on or before the dates specified in paragraphs (b) through (d) of this section and paragraphs (n) and (o) of this section. Paragraph (e) of this section provides information on requesting compliance extensions. Paragraphs (f) through (l) of this section discuss the relationship of this subpart to subpart A and to other applicable rules. Where an override of another authority of the Act is indicated in this subpart, only compliance with the provisions of this subpart is required. Paragraph (m) of this section specifies the meaning of time periods.

(b) Except as specified in paragraphs (n) and (o) of this section, new affected sources that commence construction or reconstruction after June 12, 1995 shall be in compliance with this subpart upon initial start-up or by June 19, 2000, whichever is later.

(c) With the exceptions provided in paragraphs (c)(1) through (3) of this section and paragraphs (n) and (o) of this section, existing affected sources shall be in compliance with this subpart no later than June 19, 2001, as provided in § 63.6(c), unless an extension has been granted as specified in paragraph (e) of this section.

* * * * *

(d) Except as provided for in paragraphs (d)(1) through (d)(6) of this section, and paragraphs (n) and (o) of this section, existing affected sources shall be in compliance with § 63.502 no later than July 31, 1997, unless an extension has been granted pursuant to paragraph (e) of this section.

* * * * *

(k) *Applicability of other regulations for monitoring, recordkeeping or reporting with respect to combustion devices, recovery devices, or recapture devices.* (1) After the compliance dates specified in this subpart, if any combustion device, recovery device or recapture device subject to this subpart is also subject to monitoring, recordkeeping, and reporting requirements in 40 CFR part 264 subpart AA or CC, or is subject to monitoring and recordkeeping requirements in 40 CFR part 265 subpart AA or CC and the owner or operator complies with the periodic reporting requirements under 40 CFR part 264 subpart AA or CC that would apply to the device if the facility had final-permitted status, the owner or operator may elect to comply either with the monitoring, recordkeeping and reporting requirements of this subpart, or with the monitoring, recordkeeping and reporting requirements in 40 CFR parts 264 and/or 265, as described in this paragraph, which shall constitute compliance with the monitoring, recordkeeping and reporting requirements of this subpart. The owner or operator shall identify which option has been selected in the Notification of Compliance Status required by § 63.506(e)(5).

(2) Owners and operators of flares that are subject to the flare related requirements of this subpart and are also subject to flare related requirements of any other regulation in this part or 40 CFR part 61 or 63, may elect to comply with the requirements in § 63.508 in lieu of all flare related requirements in any other regulation in this part or 40 CFR part 61 or 63.

* * * * *

(n) All affected sources that commenced construction or reconstruction on or before April 25, 2023, must be in compliance with the requirements listed in paragraphs (n)(1) through (9) of this section upon initial startup or on July 15, 2027, whichever is later. All affected sources that commenced construction or reconstruction after April 25, 2023, must be in compliance with the requirements listed in paragraphs (n)(1) through (9) of this section upon initial startup, or on July 15, 2024, whichever is later.

(1) The general requirements specified in § 63.483(e), § 63.504(a), § 63.504(a)(1)(iii), and § 63.506(e)(6)(iii)(C).

(2) For flares, the requirements specified in § 63.508.

(3) For storage vessels, the requirements specified in § 63.484(t) and § 63.506(e)(4)(ii)(F)(*6*).

(4) For continuous front-end process vents, the requirements specified in §§ 63.485(l)(6), (o)(6), (p)(5), (q)(1)(vii), (x), § 63.503(g)(2)(iii)(B)(*4*), and § 63.506(e)(4)(ii)(F)(*6*).

(5) For batch front-end process vents, the requirements specified in §§ 63.487(a)(3), (b)(3), and (e)(1)(iv) and (i), §§ 63.488(d)(2), (e)(4), (f)(2), and (g)(3), §§ 63.489(b)(10) and (d)(3), §§ 63.491(d)(1)(iii), (e)(6), and (h), § 63.492(g), and Table 6 to this subpart, item 3 in column 3 for diversion to the atmosphere and monthly inspections of sealed valves for all control devices.

(6) For back-end processes, the requirements specified in §§ 63.497(a)(8) and (d)(3), and § 63.498(d)(5)(v).

(7) For wastewater, the requirements specified in §§ 63.501(d), (e), and (f).

(8) For equipment leaks, the requirements specified in §§ 63.502(a)(2) and (k)(2).

(9) For heat exchange systems, the requirements specified in §§ 63.502(n)(7) and (n)(8).

(o) All affected sources that commenced construction or reconstruction on or before April 25, 2023, must be in compliance with the chloroprene requirements in §§ 63.484(u), 63.485(y) and (z), 63.487(j), 63.494(a)(7), 63.501(a)(10)(iv), 63.502(a)(3) and (a)(7), 63.509, and 63.510 upon initial startup or on October 15, 2024, whichever is later. All affected sources that commenced construction or reconstruction after April 25, 2023, must be in compliance with the chloroprene requirements in §§ 63.484(u), 63.485(x) and (z), 63.487(j), 63.494(a)(7), § 63.501(a)(10)(iv), 63.502(q), 63.502(a)(3) and (a)(7), 63.509, and 63.510 upon initial startup, or on July 15, 2024, whichever is later.

(p) The compliance schedule for fenceline monitoring is specified in paragraphs (p)(1) and (2) of this section.

(1) Except as specified in paragraph (p)(2) of this section, all affected sources that commenced construction or reconstruction on or before April 25, 2023, must commence fenceline monitoring according to the requirements in § 63.502(a)(4) by no later than July 15, 2026, however requirements for corrective actions are not required until on or after July 15, 2027. All affected sources that commenced construction or

reconstruction after April 25, 2023, must be in compliance with the fenceline monitoring requirements listed in § 63.502(a)(4) upon initial startup, or on July 15, 2024, whichever is later.

(2) For affected sources producing neoprene, the compliance schedule specified in paragraph (p)(1) of this section does not apply for chloroprene. Instead, all affected sources producing neoprene that commenced construction or reconstruction on or before April 25, 2023, must be in compliance with the fenceline monitoring requirements for chloroprene listed in § 63.502(a)(4) and (a)(7) upon initial startup or on October 15, 2024, whichever is later. All affected sources producing neoprene that commenced construction or reconstruction after April 25, 2023, must be in compliance with the fenceline monitoring requirements for chloroprene listed in § 63.502(a)(4) and (a)(7) upon initial startup, or on July 15, 2024, whichever is later.

■ 122. Revise and republish § 63.482 to read as follows:

§ 63.482  Definitions.

(a) The following terms used in this subpart shall have the meaning given them in § 63.2, § 63.101, or the Act, as specified after each term:

Act (§ 63.2)
Administrator (§ 63.2)
Automated monitoring and recording system (§ 63.101)
Boiler (§ 63.101)
Bottoms receiver (§ 63.101)
Breakthrough (§ 63.101)
By compound (§ 63.101)
By-product (§ 63.101)
Car-seal (§ 63.101)
Closed-vent system (§ 63.101)
Combustion device (§ 63.101)
Commenced (§ 63.2)
Compliance date (§ 63.2)
Connector (§ 63.101)
Continuous monitoring system (§ 63.2)
Distillation unit (§ 63.101)
Duct work (§ 63.101)
Emission limitation (Section 302(k) of the Act)
Emission standard (§ 63.2)
Emissions averaging (§ 63.2)
EPA (§ 63.2)
Equipment leak (§ 63.101)
External floating roof (§ 63.101)
Fill or filling (§ 63.101)
Fixed capital cost (§ 63.2)
Flame zone (§ 63.101)
Floating roof (§ 63.101)
Flow indicator (§ 63.101)
Fuel gas system (§ 63.101)
Halogens and hydrogen halides (§ 63.101)
Hard-piping (§ 63.101)
Hazardous air pollutant (§ 63.2)
Heat exchange system (§ 63.101)
Impurity (§ 63.101)
Incinerator (§ 63.101)
In organic hazardous air pollutant service or in organic HAP service (§ 63.101)
Instrumentation system (§ 63.101)
Internal floating roof (§ 63.101)
Lesser quantity (§ 63.2)
Major source (§ 63.2)
Malfunction (§ 63.2)
Oil-water separator or organic-water separator (§ 63.101)
Open-ended valve or line (§ 63.101)
Operating permit (§ 63.101)
Organic monitoring device (§ 63.101)
Owner or operator (§ 63.2)
Performance evaluation (§ 63.2)
Performance test (§ 63.2)
Permitting authority (§ 63.2)
Plant site (§ 63.101)
Potential to emit (§ 63.2)
Pressure release (§ 63.101)
Primary fuel (§ 63.101)
Pressure release (§ 63.101)
Pressure relief device (§ 63.101)
Pressure vessel (§ 63.101)
Process heater (§ 63.101)
Process unit shutdown (§ 63.101)
Process wastewater (§ 63.101)
Process wastewater stream (§ 63.101)
Reactor (§ 63.101)
Recapture device (§ 63.101)
Relief valve (§ 63.101)
Repaired (§ 63.101)
Research and development facility (§ 63.101)
Routed to a process or route to a process (§ 63.101)
Run (§ 63.2)
Secondary fuel (§ 63.101)
Sensor (§ 63.101)
Specific gravity monitoring device (§ 63.101)
Start-up, shutdown, and malfunction plan (§ 63.101) On and after July 15, 2027, this definition no longer applies.
State (§ 63.2)
Stationary Source (§ 63.2)
Surge control vessel (§ 63.101)
Temperature monitoring device (§ 63.101)
Test method (§ 63.2)
Treatment process (§ 63.101)
Unit operation (§ 63.101)
Visible emission (§ 63.2)
Secondary fuel (§ 63.101)
Sensor (§ 63.101)
Specific gravity monitoring device (§ 63.101)
Start-up, shutdown, and malfunction plan (§ 63.101) On and after July 15, 2027, this definition no longer applies.
State (§ 63.2)
Stationary Source (§ 63.2)
Surge control vessel (§ 63.101)
Temperature monitoring device (§ 63.101)
Test method (§ 63.2)
Treatment process (§ 63.101)
Unit operation (§ 63.101)
Visible emission (§ 63.2)

(b) All other terms used in this subpart shall have the meaning given them in this section. If a term is defined in a subpart referenced in this section, it shall have the meaning given in this section for purposes of this subpart.

*Affected source* is defined in § 63.480(a).

*Affirmative defense* means, in the context of an enforcement proceeding, a response or a defense put forward by a defendant, regarding which the defendant has the burden of proof, and the merits of which are independently and objectively evaluated in a judicial or administrative proceeding. Beginning on July 15, 2024, this definition of *affirmative defense* no longer applies.

*Aggregate batch vent stream* means a gaseous emission stream containing only the exhausts from two or more batch front-end process vents that are ducted, hard-piped, or otherwise connected together for a continuous flow.

*Annual average batch vent concentration* is determined using Equation 17, as described in § 63.488(h)(2) for halogenated compounds.

*Annual average batch vent flow rate* is determined by the procedures in § 63.488(e)(3).

*Annual average concentration,* as used in the wastewater provisions, means the flow-weighted annual average concentration, as determined according to the procedures specified in § 63.144(b), with the exceptions noted in § 63.501, for the purposes of this subpart.

*Annual average flow rate,* as used in the wastewater provisions, means the annual average flow rate, as determined according to the procedures specified in § 63.144(c), with the exceptions noted in § 63.501, for the purposes of this subpart.

*Average batch vent concentration* is determined by the procedures in § 63.488(b)(5)(iii) for HAP concentrations and is determined by the procedures in § 63.488(h)(1)(iii) for organic compounds containing halogens and hydrogen halides.

*Average batch vent flow rate* is determined by the procedures in § 63.488(e)(1) and (2).

*Back-end* refers to the unit operations in an EPPU following the stripping operations. Back-end process operations include, but are not limited to, filtering,

subpart, owners and operators must submit the results of the performance test following the procedures specified in § 63.9(k). Data collected using test methods supported by the EPA's Electronic Reporting Tool (ERT) as listed on the EPA's ERT website (*https://www.epa.gov/electronic-reporting-air-emissions/electronic-reporting-tool-ert*) at the time of the test must be submitted in a file format generated through the use of the EPA's ERT. Alternatively, owners and operators may submit an electronic file consistent with the extensible markup language (XML) schema listed on the EPA's ERT website. Data collected using test methods that are not supported by the EPA's ERT as listed on the EPA's ERT website at the time of the test must be included as an attachment in the ERT or alternate electronic file.

■ 144. Amend § 63.507 by revising paragraph (c) introductory text and adding paragraphs (c)(5) and (6) to read as follows:

### § 63.507  Implementation and enforcement.

\* \* \* \* \*

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (6) of this section.

\* \* \* \* \*

(5) Approval of an alternative to any electronic reporting to the EPA required by this subpart.

(6) Approval of an extension request under § 63.6(i)(4)(ii).

■ 145. Add § 63.508 to read as follows:

### § 63.508  Flare requirements.

(a) For any flare that is used to reduce organic HAP emissions from an EPPU, the owner or operator may elect to comply with the requirements in this section in lieu of the requirements of § 63.11(b) and the requirements referenced therein. The owner or operator may also elect to comply with the requirements in this section pursuant to the overlap provisions provided in § 63.481(k)(2). However, beginning no later than the compliance dates specified in § 63.481(n), the provisions specified in paragraphs (a)(1) through (32) of this section no longer apply. Instead, if an owner or operator reduces organic HAP emissions from an EPPU by venting emissions through a closed-vent system to a steam-assisted, air-assisted, or non-assisted flare, then the owner or operator must meet the applicable requirements for flares as specified in §§ 63.670 and 63.671, including the provisions in tables 12 and 13 to subpart CC of this part, except as specified in paragraph (b) of this section. This requirement also applies to any flare using fuel gas from a fuel gas system, of which 50 percent or more of the fuel gas is derived from a EPPU, as determined on an annual average basis. For purposes of compliance with this paragraph, the following terms are defined in § 63.641 of subpart CC of this part: Assist air, assist steam, center steam, combustion zone, combustion zone gas, flare, flare purge gas, flare supplemental gas, flare sweep gas, flare vent gas, lower steam, net heating value, perimeter assist air, pilot gas, premix assist air, total steam, and upper steam.

(1) §§ 63.487(a)(1)(i) and (b)(1)(i);
(2) § 63.489(b)(2);
(3) § 63.490(a)(1);
(4) §§ 63.491(b)(3)(i) through (b)(3)(iii);
(5) § 63.494(d);
(6) § 63.496(b)(7)(i)(A);
(7) § 63.497(a)(2);
(8) § 63.498(d)(5)(ii)(E);
(9) § 63.502(k)(1);
(10) §§ 63.504(c)(1) through (c)(3);
(11) § 63.107(h)(9)(i) related to criteria in § 63.11(b);
(12) § 63.113(a)(1);
(13) § 63.114(a)(2);
(14) §§ 63.116(a)(1) through (a)(3);
(15) §§ 63.117(a)(5)(i) through (a)(5)(iii);
(16) § 63.118(f)(5);
(17) The last sentence in § 63.119(e)(1);
(18) §§ 63.120(e)(1) through (e)(6);
(19) §§ 63.122(c)(2) and (g)(3);
(20) § 63.126(b)(2)(i);
(21) § 63.127(a)(2);
(22) §§ 63.128(b)(1) through (b)(3);
(23) §§ 63.129(a)(5)(i) through (a)(5)(iii);
(24) §§ 63.130(a)(2)(i), (c), and (d)(5);
(25) §§ 63.139(c)(3) and (d)(3);
(26) §§ 63.145(j)(1) through (j)(3);
(27) §§ 63.146(b)(7)(i)(A) through (b)(7)(i)(C);
(28) § 63.147(d)(1);
(29) §§ 63.172(d);
(30) §§ 63.180(e)(1) through (e)(3);
(31) § 63.181(g)(1)(iii); and
(32) The phrase ''including periods when a flare pilot light system does not have a flame'' in § 63.181(g)(2)(i).

(b) The exceptions specified in paragraphs (b) through (o) of § 63.108 apply, except as specified in paragraphs (b)(1) through (5) of this section.

(1) Where the term ''chemical manufacturing process unit'' is used, the term ''EPPU'' applies instead for the purposes of this subpart.

(2) Where the reference ''§ 63.100(k)(10)'' is used, the reference § 63.481(n) applies instead for the purposes of this subpart.

(3) Where the phrase ''Hazardous Organic Chemical Manufacturing'' is used, the phrase ''Polymers and Resins'' applies instead for the purposes of this subpart.

(4) Where the reference ''§ 63.152(b)(7) of subpart G of this part'' is used, the reference ''§ 63.506(e)(5)(xiii)'' applies instead for the purposes of this subpart.

(5) Section 63.108(i) does not apply.

■ 146. Add § 63.509 to read as follows:

### § 63.509  Procedures for determining whether process vents, storage vessels, or wastewater are in chloroprene service.

This section applies beginning no later than the compliance dates specified in § 63.481(o). To determine if process vents, storage vessels, or wastewater in a process at affected sources producing neoprene are in chloroprene service, as defined in § 63.482, owners and operators must comply with the requirements in paragraphs (a) through (c) of this section, as applicable.

(a) For each continuous front-end process vent, each batch front-end process vent, and each back-end process vent in a process at affected sources producing neoprene, owners and operators must measure the flow rate and concentration of chloroprene of each process vent as specified in paragraphs (a)(1) through (5) of this section.

(1) Measurements must be made prior to any dilution of the vent streams.

(2) Measurements may be made on the combined vent streams at an elastomer product process unit or for each separate vent stream.

(3) The sampling site shall be after the last recovery device (if any recovery devices are present) but prior to the inlet of any control device that is present and prior to release to the atmosphere. Method 1 or 1A of appendix A–1 to 40 CFR part 60, as appropriate, must be used for the selection of the sampling sites. For vents smaller than 0.10 meter in diameter, sample at one point at the center of the duct.

(4) The gas volumetric flow rate must be determined using Method 2, 2A, 2C, 2D, 2F, or 2G of appendices A–1 and A–2 to 40 CFR part 60, as appropriate.

(5) Except as specified in paragraph (a)(6) of this section, the concentration of chloroprene must be determined using Method 18 of appendix A–6 to 40 CFR part 60 or Method 320 of appendix A to this part.

(6) You may elect to use ASTM D6348–12 (Reapproved 2020) (incorporated by reference, § 63.14) in lieu of Method 320 of appendix A to this part as specified in paragraph (a)(5) of this section. To comply with this

*www.epa.gov/electronic-reporting-air-emissions/cedri*) for this subpart. The date report templates become available will be listed on the CEDRI website. Unless the Administrator or delegated state agency or other authority has approved a different schedule for submission of reports under § 63.9(i) and § 63.10(a), the report must be submitted by the deadline specified in this subpart, regardless of the method in which the report is submitted. If a report is submitted via CEDRI, the certifier's electronic signature during the submission process replaces the requirements in § 63.10(e)(3)(v), § 63.10(e)(3)(vi)(L), and § 63.10(e)(3)(vi)(M) to submit the date of the report and the name, title, and signature of the responsible official who is certifying the accuracy of the report.

(1) Reports of monitoring data, including 15-minute monitoring values as well as daily average values or per-unit operation average values, as applicable, of monitored parameters for all operating days or unit operations when the average values were outside the ranges established in the Notification of Compliance Status or operating permit, including reports specified in paragraph (a)(4) of this section.

(2) Reports of the duration of periods when monitoring data is not collected for each excursion caused by insufficient monitoring data, including reports specified in paragraph (a)(4) of this section. An excursion means any of the three cases listed in paragraph (a)(2)(i) or (a)(2)(ii) of this section. For a control device where multiple parameters are monitored, if one or more of the parameters meets the excursion criteria in paragraph (a)(2)(i) or (a)(2)(ii) of this section, this is considered a single excursion for the control device. In the report, include the identification of the source, start date, start time, duration in hours, and monitored parameter(s) meeting the excursion criteria.

(i) When the period of control device operation is 4 hours or greater in an operating day and monitoring data are insufficient to constitute a valid hour of data, as defined in paragraph (a)(2)(iii) of this section, for at least 75 percent of the operating hours.

(ii) When the period of control device operation is less than 4 hours in an operating day and more than one of the hours during the period of operation does not constitute a valid hour of data due to insufficient monitoring data.

(iii) Monitoring data are insufficient to constitute a valid hour of data, as used in paragraphs (a)(2)(i) and (ii) of this section, if measured values are unavailable for any of the 15-minute periods within the hour.

(3) Whenever a process change, as defined in § 63.115(e), is made that causes the emission rate from a de minimis emission point to become a process vent with an emission rate of one pound per year or greater, the owner or operator shall submit a report within 180 calendar days after the process change. The report may be submitted as part of the next summary report required under § 63.10(e)(3). The report shall include:

(i) A description of the process change; and

(ii) The results of the recalculation of the emission rate.

(4) For each existing, new, or reconstructed affected BLR and WSR source, beginning no later than the compliance dates specified in § 63.521(c), for each excursion that is not an excused excursion, the report must include a list of the affected sources or equipment, the monitored parameter, an estimate of the quantity in pounds of each regulated pollutant emitted over any emission limit, a description of the method used to estimate the emissions, the cause of the excursion (including unknown cause, if applicable), as applicable, and the corrective action taken. Include the start date, start time, and duration in hours of each excursion.

(5) For pressure relief device subject to § 63.527(f), report each pressure release to the atmosphere, including pressure relief device identification name or number, the start date, start time, and duration (in minutes) of the pressure release; and an estimate of the mass quantity in pounds of each organic HAP released.

(6) For heat exchangers subject to § 63.104 of subpart F of this part, the information specified in § 63.104(f)(2) of subpart F of this part.

(b) The owner or operator of any affected BLR source, as well as the owner or operator of any affected WSR source who is subject to the leak detection and repair program specified in subpart H of this part, shall implement the reporting requirements outlined therein. Copies of all reports shall be retained as records for a period of 5 years, in accordance with the requirements of 40 CFR 63.10(b)(1).

(c) The owner or operator of any affected BLR source, as well as the owner or operator of any affected WSR source that is subject to the emission limit for process vents, storage tanks, and wastewater systems shall include records of all monitoring parameters in the Notification of Compliance Status and summary reports required by subpart A of this part.

(d) Beginning no later than July 15, 2024, owners and operators must submit performance test reports in accordance with this paragraph. Unless otherwise specified in this subpart, within 60 days after the date of completing each performance test required by this subpart, owners and operators must submit the results of the performance test following the procedures specified in § 63.9(k). Data collected using test methods supported by the EPA's Electronic Reporting Tool (ERT) as listed on the EPA's ERT website (*https://www.epa.gov/electronic-reporting-air-emissions/electronic-reporting-tool-ert*) at the time of the test must be submitted in a file format generated using the EPA's ERT. Alternatively, owners and operators may submit an electronic file consistent with the extensible markup language (XML) schema listed on the EPA's ERT website. Data collected using test methods that are not supported by the EPA's ERT as listed on the EPA's ERT website at the time of the test must be included as an attachment in the ERT or alternate electronic file.

■ 161. Amend § 63.529 by revising paragraph (c) introductory text, and adding paragraph (c)(5) as follows:

**§ 63.529  Implementation and enforcement.**

\* \* \* \* \*

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (5) of this section.

\* \* \* \* \*

(5) Approval of an alternative to any electronic reporting to the EPA required by this subpart.

■ 162. Amend table 1 to subpart W by:
■ a. Revising the header row;
■ b. Revising entry "§ 63.6(e)(1)(i)";
■ c. Adding entries "§ 63.6(e)(1)(ii)", "§ 63.6(e)(1)(iii)", "63.6(e)(2)", and "63.6(e)(3)";
■ d. Revising entry "§ 63.6(g)";
■ e. Adding entry "§ 63.7(a)(4)"; and
■ f. Revising entries "§ 63.7(e)(1)", "§ 63.7(g)(1)", "§ 63.8(c)(1)(i)", "§ 63.8(c)(1)(iii)", "§ 63.9(k)", "§ 63.10(d)(2)", "§ 63.10(d)(5)" and "§ 63.10(e)(3)".

The revisions and additions read as follows:

TABLE 1 TO SUBPART W OF PART 63—GENERAL PROVISIONS APPLICABILITY TO SUBPART W

| Reference | Applies to subpart W | | | Comment |
|---|---|---|---|---|
| | BLR | WSR | WSR equipment leak standard, and BLR equipment leak standard (40 CFR part 63, subpart H) | |
| * | * | * | * | * * * |
| § 63.6(e)(1)(i) | | See Comment | | Yes, before July 15, 2027. No, beginning on and after July 15, 2027. See § 63.525(k) for general duty requirement. |
| § 63.6(e)(1)(ii) | | See Comment | | Yes, before July 15, 2027. No, beginning on and after July 15, 2027. |
| § 63.6(e)(1)(iii) | Yes | Yes | Yes. | |
| 63.6(e)(2) | N/A | N/A | N/A | Reserved. |
| 63.6(e)(3) | | See Comment | | Yes, before July 15, 2027. No, beginning on and after July 15, 2027. |
| * | * | * | * | * * * |
| § 63.6(g) | Yes | Yes | Yes | Affected sources have the opportunity to demonstrate other alternatives to the Administrator. |
| * | * | * | * | * * * |
| § 63.7(a)(4) | Yes | Yes | Yes. | |
| * | * | * | * | * * * |
| § 63.7(e)(1) | | Yes, before July 15, 2027. No, beginning on and after July 15, 2027. | | See § 63.525(l). Subpart W also contains test methods specific to BLR and WSR sources. |
| * | * | * | * | * * * |
| § 63.7(g)(1) | Yes | Yes | No | Subpart H specifies performance test reporting. Additionally, this subpart specifies how and when the performance test results are reported for BLR and WSR. |
| § 63.8(b)(3) | Yes | Yes | Yes. | |
| § 63.8(c)(1)(i) | | Yes, before July 15, 2027. No, beginning on and after July 15, 2027. | | |
| * | * | * | * | * * * |
| § 63.8(c)(1)(iii) | | Yes, before July 15, 2027. No, beginning on and after July 15, 2027. | | |
| * | * | * | * | * * * |
| § 63.9(k) | Yes | Yes | Yes. | |
| * | * | * | * | * * * |
| § 63.10(d)(2) | No | No | No | This subpart and Subpart H specify performance test reporting requirements. |
| * | * | * | * | * * * |
| § 63.10(d)(5) | | Yes, before July 15, 2027. No, beginning on and after July 15, 2027. | | |
| * | * | * | * | * * * |
| § 63.10(e)(3) | Yes | Yes | No | Except that on and after July 15, 2027, the reports shall be submitted according to and in the format required by § 63.528(a). |
| * | * | * | * | * * * |

■ 163. Add table 2 to subpart W to read as follows:

TABLE 2 TO SUBPART W OF PART 63—TOXIC EQUIVALENCY FACTORS

| Dioxin and Furan Congener | Toxic equivalency factor |
|---|---|
| 1,2,3,7,8-pentachlorodibenzo-p-dioxin | 1 |
| 1,2,3,4,7,8-hexachlorodibenzo-p-dioxin | 0.1 |
| 1,2,3,7,8,9-hexachlorodibenzo-p-dioxin | 0.1 |
| 1,2,3,6,7,8-hexachlorodibenzo-p-dioxin | 0.1 |