# **EXHIBIT E**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | CIVIL ACTION NO. 2:23-cv-735 |
| ) | |
| v. ) | SECTION J(5) |
| ) | |
| DENKA PERFORMANCE ELASTOMER ) | JUDGE BARBIER |
| LLC and DUPONT SPECIALTY ) | |
| PRODUCTS USA, LLC, ) | MAGISTRATE JUDGE NORTH |
| ) | |
| Defendants. ) | |

**MEMORANDUM IN SUPPORT OF DENKA PERFORMANCE ELASTOMER LLC'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

JONES WALKER LLP

James C. Percy (La. Bar No. 10413)
445 N. Boulevard, Suite 800
Baton Rouge, LA 70802
Telephone: (225) 248-2130
Favsimile: (225) 248-3130
jpercy@joneswalker.com

Robert E. Holden (La. Bar No. 06935)
Brett S. Venn (La. Bar No. 32954)
201 St. Charles Ave., Suite 5100
New Orleans, LA 70170
Telephone: (504) 582-8000
Facsimile: (504) 582-8583
bholden@joneswalker.com
bvenn@joneswalker.com

BRACEWELL LLP

David A. Super (*pro hac vice*)
Jason B. Hutt (*pro hac vice*)
Jeffery R. Holmstead (*pro hac vice*)
Kevin D. Collins (*pro hac vice*)
Britt Cass Steckman (*pro hac vice*)
Kevin M. Voelkel (*pro hac vice*)
2001 M Street NW, Ste. 900
Washington, DC 20006
Telephone: (202) 828-5800
david.super@bracewell.com
jason.hutt@bracewell.com
jeff.holmstead@bracewell.com
kevin.collins@bracewell.com
britt.steckman@bracewell.com
kevin.voelkel@bracewell.com

***Counsel for Denka Performance Elastomer LLC***

### III. ARGUMENT

**A. In Issuing The Proposed Rule, EPA Conceded That The Facility's Emissions Are Not Causing An "Imminent Endangerment."**

EPA's claim that the Facility's chloroprene emissions are causing an imminent and substantial endangerment is directly refuted by the Proposed Rule that EPA published *after* it initiated this litigation. 88 Fed. Reg. 25,080 (Ex. 1). As discussed below, in issuing the Proposed Rule, EPA was *required* by statute to assess whether the Facility's current chloroprene emissions constitute an "imminent endangerment," 42 U.S.C. § 7412(f)(4), and EPA necessarily determined they do not. Having already determined that the Facility's chloroprene emissions are not causing an "imminent endangerment," EPA cannot legitimately assert that those *same emissions* constitute an even more dire "imminent *and substantial* endangerment" under Section 303.[3]

Under Section 112(f) of the CAA, when EPA issues new pollution control requirements to address unacceptable cancer risks, there is a statutory presumption that a source must comply with those requirements within 90 days. 42 U.S.C. § 7412(f)(4). However, this default 90-day period may be extended up to two years if EPA grants a compliance "waiver." *Id.* A waiver of the 90-day compliance deadline may be extended only if EPA "finds that [additional time] is necessary for the installation of controls and that *steps will be taken during the period of the waiver to assure that the health of persons will be protected from **imminent endangerment***." *Id.* (emphasis added).

---

[3] EPA's concession that there is no imminent endangerment is an evidentiary admission. *See In re McLain*, 516 F.3d 301, 309 (5th Cir. 2008) (evidentiary admissions include a "concession made for some independent purpose" and "[s]uch admissions 'are received as substantive evidence of the facts admitted'") (quoting *Martinez v. Bally's Louisiana, Inc.*, 244 F.3d 474, 476–77 (5th Cir. 2001)); 2 McCormick On Evid. § 254 (8th ed.) (recognizing "admissions by conduct"). EPA's admission requires dismissal of this action because proving an imminent endangerment is a core element of EPA's case.

-5-

In the Proposed Rule, EPA gave DPE the full 2-year period to comply with the Section 112(f) requirements. 88 Fed. Reg. at 25,178 (Ex. 1). EPA said the 2-year period is appropriate because the "proposed provisions will require additional time to plan, purchase, and install equipment for … chloroprene control." *Id.* Section 112(f)(4) precludes EPA from granting the 2-year waiver unless it finds that (i) there is no "imminent endangerment" or (ii) steps will be taken to protect against such an endangerment. Thus, under the statute's plain language, EPA could *not have granted the waiver* in the Proposed Rule *unless it found there is no imminent endangerment*, because EPA did not include any steps to protect against any purported imminent endangerment.[4]

Indeed, EPA's grant of the 2-year waiver in the Proposed Rule is consistent with EPA's long-standing view that lifetime cancer risks above 1-in-10,000 do not constitute "imminent endangerment" and the fact that, for 30 years, EPA has routinely granted Section 112(f) compliance waivers even when cancer risks are well above this level. In fact, EPA has admitted that it has *never* found a pre-compliance risk level in a rulemaking to be an "imminent endangerment," including rulemakings where the pre-compliance risk level was greater than 1-in-10,000. *See* EPA's Response to Interrogatory No. 17 at 17 (Ex. 4). For example, in the proposed rule for Sterilization Facilities, EPA proposed an 18-month waiver where the maximum risk was *60-in-10,000* and 18,000 people faced higher than the 1-in-10,000 risk level. *See* 88 Fed. Reg. 22,790, 22,794 (4/13/23) (risk estimates) (Ex. 5); *id.* at 22,852-53 (waiver). In addition, EPA's

---

[4] EPA has tried to avoid this critical concession in the Proposed Rule by arguing that the preamble to the Proposed Rule is silent on whether there is no "imminent endangerment." R. Doc. 94 at 11. But that argument ignores the statutory language, which mandates that the 2-year waiver (which EPA granted) *cannot be granted* unless there is no imminent endangerment or EPA identifies steps to avoid such endangerment. Thus, the waiver could not have been granted *unless EPA found no imminent endangerment*. Under the statute's plain language, EPA cannot avoid the implications of its granting the 2-year waiver by relying on the absence of "magic words" in the preamble.

-6-

Proposed Rule proposes the same 2-year waiver for ethylene oxide sources despite those sources having risk estimates *higher* than chloroprene. *See* 88 Fed. Reg. at 25,116 (15-in-10,000 risk estimate solely for ethylene oxide pressure relief devices) (Ex. 1); *id.* at 25,178 (waiver).

Before publication, the Office of Management and Budget ("OMB") reviewed the Proposed Rule and questioned if the Facility's emissions would constitute an "imminent endangerment." OMB Review at 347 (Ex. 6). OMB asked that EPA address "what steps will be taken during the proposed 2-year period to assure that the health of people exposed to [chloroprene] emissions (including children) will receive protection from imminent endangerment[.]" *Id.* EPA declined to change the 2-year waiver and made no changes to describe steps to protect from "imminent endangerment." Instead, EPA responded that "[s]ignificant capital will need to be invested in controls here to further reduce emissions [of ethylene oxide] and chloroprene. . . . This takes significant time [to] engineer, install, and update operating procedures and staff." *Id.* Under the plain language of Section 112(f), by declining to impose any protective steps during the compliance period, EPA conceded there is no imminent endangerment.

EPA's grant of a waiver in the Proposed Rule confirms that a 1-in-10,000 risk estimate was never designed as a measure of whether emissions cause an "imminent endangerment." That is why EPA routinely—indeed, *always* (*see* EPA's Response to Interrogatory No. 17 at 17 (Ex. 4))—grants waivers under Section 112(f), like it has done here, because it recognizes that upper-bound lifetime cancer risks are not proof of "imminent endangerment." Indeed, EPA made this point emphatically in 2011 in response to a public comment arguing that a 2-year waiver violated Section 112(f)(4) because an "unacceptable" risk would persist during the compliance period:

> The commenter has not indicated any specific concern which presents an "imminent endangerment" that will occur during the two-year compliance period, merely making general allegations about the risks which formed the basis of the EPA's decision to promulgate regulations. Since Congress recognized that a 2-year

-7-

compliance period may be granted despite EPA's determining to promulgate regulations to address risk, it is clear that Congress did not contemplate that any risk addressed by rules under 112(f)(2) created an imminent and substantial endangerment that would preclude a 2-year compliance date.[5]

That exact analysis applies here. But EPA is contorting itself—*in this case, and this case only*—to argue that the same "general allegations" of risks covered by Section 112(f) constitute an imminent and substantial endangerment. If the Facility's emissions do not present an "imminent endangerment," as EPA conceded in the Proposed Rule, then there is plainly no "imminent *and substantial* endangerment" for purposes of this Section 303 action.

**B.     The Risk Levels Alleged By EPA In This Lawsuit Do Not Constitute An Imminent And Substantial Endangerment As A Matter Of Law.**

EPA's fundamental allegation in this action is that chloroprene emissions from the Facility are causing a lifetime cancer risk of greater than 1-in-10,000, which constitutes an imminent and substantial endangerment. *See, e.g.*, Compl. ¶ 58 (R. Doc. 1). While EPA's threshold for imminent and substantial endangerment is 1-in-10,000, the highest level of risk alleged by EPA equates to a 14-in-10,000 risk, based on concentrations measured at one monitoring location over a 45-month period before EPA filed the Complaint. *Id.* ¶ 48. As of December 8, 2023, however, the highest alleged concentration measured over the prior 12-months had decreased, equating to a 5.4-in-10,000 risk level as determined by EPA's expert. *See* 12/8/23 Vandenberg Decl. ¶ 10 (Ex. 7).

DPE strongly disputes EPA's claims about the cancer risk of chloroprene, but for purposes of this Motion, the Court can assume the above alleged risk levels are accurate and still grant summary judgment. The reason: The lifetime risk level alleged by EPA here—be it 1-in-10,000 or the outdated 14-in-10,000—does not constitute an imminent and substantial endangerment as a

---

[5] EPA, *Nat'l Emission Stands. for Haz. Air Pollutants: Primary Lead Smelting, Sum. of Pub. Comment and Response* at 21, Docket No. EPA-HQ-OAR-2004-0305 (Nov. 4, 2011) (Ex. 38).