# **EXHIBIT G**

# BRACEWELL

April 19, 2024

**BY E-MAIL AND FEDEX**

Secretary Aurelia S. Giacometto
Louisiana Department of Environmental Quality
Galvez Building, 602 North Fifth Street
Baton Rouge, LA 70802
Officesec@la.gov

Mr. Bryan Johnston
Louisiana Department of Environmental Quality
Galvez Building, 602 North Fifth Street
Baton Rouge, LA  70802
Bryan.Johnston@la.gov

Re:    **Denka Performance Elastomer, LLC – Request For Extension of Compliance Periods Set Forth In Final Rule In EPA Docket EPA-HQ-OAR-2022-0730**

**Agency Interest No. 199310**

Dear Secretary Giacometto and Mr. Johnston:

I write on behalf of Denka Performance Elastomer, LLC ("DPE") to request a facility-specific extension of compliance periods prescribed in the final rule in docket EPA-HQ-OAR-2022-0730 ("Final Rule").[1] Specifically, DPE requests that the compliance periods of 90 days after the effective date, including those set forth in amended 40 C.F.R. 63.481(o)[2] and 63.481(p)(2) applicable to DPE's facility in LaPlace, Louisiana be extended to two years after the Final Rule's effective date pursuant to 42 U.S.C. 7412(f)(4)(B) and 40 C.F.R. 63.6(i)(4)(ii).  The Louisiana Department of Environmental Quality ("LDEQ") is authorized to grant this request pursuant to its Part 70 operating permits program and its delegated authority under 40 C.F.R. Part 63.[3]

The enclosed document provides the basis for granting DPE's request and satisfies the criteria set forth in 40 C.F.R. Part 63, Subpart A. As the enclosure describes in detail, good cause exists for LDEQ to grant DPE's request because a period of at least two years is necessary for DPE to comply with the applicable requirements and DPE's facility does not present an imminent endangerment.

---

[1] *See* EPA, *New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry* (signed Mar. 28, 2024) (pre-publication version).
[2] This includes chloroprene requirements in amended §63.484(u), §§63.485(y) and (z), §63.487(j), §63.494(a)(7), §63.501(a)(10)(iv), §63.502(a)(3) and (a)(7), §63.509, and §63.510.  40 C.F.R. 63.481(o).
[3] 60 Fed. Reg. 47296 (Sept. 12, 1995) (EPA approval of the Louisiana Operating Permits program); 80 Fed. Reg. 9613 (Feb. 24, 2015) (EPA approval of updated NESHAP delegation).

**Jeffrey R. Holmstead**
Partner

T:+1.202.828.5852        F: +1.800.404.3970
2001 M Street NW, Suite 900, Washington,DC 20036-3310
jeff.holmstead@bracewell.com        bracewell.com

AUSTIN   CONNECTICUT   DALLAS   DUBAI   HOUSTON   LONDON   NEW YORK   SAN ANTONIO   SEATTLE   WASHINGTON, DC

# BRACEWELL

Secretary Aurelia S. Giacometto
Mr. Bryan Johnston
April 19, 2024
Page 2


Due to their volume, the exhibits cited in the enclosure are being provided on a flash drive accompanying the overnight delivery of this letter. In addition, exhibits referenced in the enclosure are being made available via a file sharing website at the following URL:[4]

https://bracewell.sharefile.com/d-s5980150835e645b9805b968e1dd0158e

Please do not hesitate to contact me with any questions.


Sincerely,

Jeffrey R. Holmstead
*Counsel to Denka Performance Elastomer, LLC*


Enclosure:
        Enclosure in Support of Extension Request

---

[4] Exhibit 26 contains information that is proprietary and confidential to DPE and exempt from public disclosure. Due to the sensitive nature of the information, Exhibit 26 is being provided only via flash drive.

# <u>Enclosure in Support of Extension Request</u>

## *Denka Performance Elastomer, LLC*

**Extension Request**
*Denka Performance Elastomer, LLC*

Denka Performance Elastomer, LLC ("DPE") submits this facility-specific request for an extension of compliance periods prescribed in the final rule in docket EPA-HQ-OAR-2022-0730 ("Final Rule").[1] Specifically, DPE requests that the compliance period for the requirements with a 90-day compliance deadline including those set forth in amended 40 C.F.R. 63.481(o)[2] and 63.481(p)(2) applicable to DPE's facility in LaPlace, Louisiana (the "Facility") be extended to two years after the Final Rule's effective date pursuant to 42 U.S.C. 7412(f)(4)(B) and 40 C.F.R. 63.6(i)(4)(ii) ("Extension Request").[3]

The Final Rule requires a suite of new emission controls that would be necessary for compliance ("Section 112(f) Control Projects"). The Louisiana Department of Environmental Quality ("LDEQ") is authorized to grant this request pursuant to its Part 70 operating permits program and its delegated authority under 40 C.F.R. Part 63.[4] Good cause exists for LDEQ to grant this Extension Request because a period of at least two years is necessary for DPE to comply with the Section 112(f) Control Projects and the Facility does not present an imminent endangerment.

As EPA has historically and repeatedly recognized in rulemakings, including in the proposed rule in the above-referenced docket ("Proposed Rule")[5] as well as the Final Rule, emission reduction projects like the Section 112(f) Control Projects will take significant time to plan, purchase, and install. Emission controls such as a thermal oxidizer and steam stripper are simply not equipment that can be safely installed in 90 days. Without additional time for implementation, a compliance period shorter than two years would jeopardize the continuing viability of the Facility and the jobs and livelihood of hundreds of employees and contractors who work there.

During the requested two-year implementation period, DPE would continue to comply with the existing Part 63 requirements at the Facility and continue to implement the significant emission reduction measures it has put in place there. These steps are sufficient to ensure that individuals near the Facility will be protected from any potential "imminent endangerment." While EPA has limited express guidance on what constitutes an "imminent endangerment" for purposes of setting NESHAP compliance periods, EPA's actions in prior Section 112 rulemakings make clear that emissions from the Facility do not

---

[1] *See* EPA, *New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry* (signed Mar. 28, 2024) (pre-publication version) (Ex. 1). Due to their volume, the exhibits cited herein have been provided on a ShareFile (via cover email) and a flash drive (via overnight delivery). Certain exhibits contain only the relevant portions of the cited material and have been highlighted for convenience.

[2] This includes chloroprene requirements in amended § 63.484(u), §§63.485(y) and (z), §63.487(j), §63.494(a)(7), §63.501(a)(10)(iv), §63.502(a)(3) and (a)(7), §63.509, and §63.510. 40 C.F.R. 63.481(o).

[3] For ease of reference, this request will refer to the compliance period from the Final Rule's effective date, i.e., 90 days. *See* Final Rule at 1131-32 (amended 40 C.F.R. 481(o) (not yet effective)) (Ex. 1)

[4] 60 Fed. Reg. 47296 (Sept. 12, 1995) (EPA approval of the Louisiana Operating Permits program) (Exhibit 2); 80 Fed. Reg. 9613 (Feb. 24, 2015) (EPA approval of updated NESHAP delegation) (Exhibit 3).

[5] Denka Performance Elastomer LLC Comments re: EPA's New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry, 88 Fed. Reg. 25080 (April 25, 2023) (Docket No. EPA-HQ-OAR-2022-0730; FRL-9327-01-OAR) (Ex. 4), Comment ID No. EPA-HQ-OAR-2022-0730-0176 (July 7, 2023) ("DPE Comment"), available at https://www.regulations.gov/comment/EPA-HQ-OAR-2022-0730-0176 (Ex. 5).

constitute an "imminent endangerment."  There have been no credible allegations of endangerment related to acute, short-term, or subchronic exposures from the Facility.  In the pending litigation against DPE under Section 303 of the Clean Air Act ("Section 303 Litigation"),[6] EPA has alleged that chronic exposures from the Facility's chloroprene emissions are causing an "imminent and substantial endangerment" due to the maximum plausible risk of cancer over a lifetime.  EPA's allegations of "imminent endangerment" are contradicted by decades of EPA actions under Section 112, and predicated on flawed conclusions that fail to consider and incorporate the best available science.  Importantly, EPA's allegations in the Section 303 litigation are just allegations and do not constitute a  judicial *finding*, nor does EPA offer any support in the Final Rule for the presence of an "imminent endangerment" associated with the current, historically low level of chloroprene emissions at the DPE Facility.

In recent Section 112 rulemakings, EPA has consistently provided compliance deadlines of at least two years for facilities with estimated maximum individual risks ("MIRs") equal to and in many cases greater than the DPE Facility, for facilities with higher estimated cancer incidences, and for facilities for which a greater number of people were exposed to an estimated risk above 1-in-10,000.   As demonstrated in the chart below, there are 20 facilities that EPA has estimated have a higher risk than the DPE Facility, yet EPA has determined that no "imminent endangerment" exists at any of these 20 facilities by providing them unqualified compliance extensions. There is no basis to find that an imminent endangerment exists near DPE's Facility given that EPA has consistently allowed such facilities at least two years to come into compliance.



---

[6] *U.S. v. Denka Performance Elastomer LLC et al.*, No. 2:23-cv-00735 (E.D. La. Feb. 28, 2023).

Using the "maximum plausible" estimate of risk, the Final Rule estimates that, without the further emissions controls contemplated by the Final Rule, there will be 0.06 cancer incidences per year due to emissions from the Facility, which equates to approximately one cancer case every 17 years.[7] By EPA's estimate in the Final Rule—an estimate DPE disputes—providing the Facility a two-year compliance period would equate to less than 1/8th of a single cancer over the next 70 years. In contrast, the 90-day compliance requirement will virtually ensure the shutdown of the Facility, jeopardize the jobs of hundreds of employees and contractors, and significantly impact the local and state economies.[8]

I.      **Good cause exists to grant an extension of the compliance period based on the time necessary to install the Section 112(f) Emission Control Projects and the lack of an imminent endangerment at or near the Facility.**

Section 112(f)(4)(a) provides that standards promulgated pursuant to Section 112(f)(2) shall not apply until 90 days after the effective date.[9] However, Section 112(f)(4)(B) provides that a waiver permitting sources up to two years to comply with a standard may be granted if (1) "such period is necessary for the installation of controls" and (2) "steps will be taken during the period of the waiver to assure that the health of persons will be protected from imminent endangerment."[10]

The procedures for obtaining a Section 112(f)(4)(B) compliance extension are set forth in 40 C.F.R. 63.6(i)(4)(ii), which provides as follows:

> The owner or operator of an existing source unable to comply with a relevant standard established under this part pursuant to section 112(f) of the Act may request that the Administrator grant an extension allowing the source up to 2 years after the standard's effective date to comply with the standard. The Administrator may grant such an extension if he/she finds that such additional period is necessary for the installation of controls and that steps will be taken during the period of the extension to assure that the health of persons will be protected from imminent endangerment. Any request for an extension of compliance with a relevant standard under this paragraph must be submitted in writing to the Administrator not later than 90 calendar days after the effective date of the relevant standard.[11]

Additionally, the applicable regulations require a compliance extension request to include: (1) a "description of the controls to be installed to comply with the standard" and (2) a "compliance schedule, including the date by which each step toward compliance will be reached."[12]

As discussed herein, good cause exists to grant this Extension Request. However, this Extension Request does not constitute a waiver of DPE's rights to challenge the Final Rule, the compliance periods set therein, or the applicability of Section 112(f)(4).

---

[7] Final Rule at 109 (Table 5) (Ex. 1). EPA admits that the value on which the risk estimate is based is a "plausible upper limit to the true value of a quantity" and, in some circumstances, the "the true risk could be as low as zero. . . ." Proposed Rule at 25103 (Ex. 4).

[8] *See* Remedy Declaration of Dr. Loren C. Scott ("Scott Remedy Decl.") (Ex. 6).

[9] 42 U.S.C. § 7412(f)(4)(A).

[10] 42 U.S.C. § 7412(f)(4)(B); Final Rule at 86 ("such sources [producing neoprene] may seek the EPA's approval of a waiver from the 90-day compliance deadline and obtain a compliance date…") (Ex. 1).

[11] 40 C.F.R. § 63.6(I)(4)(ii).

[12] 40 C.F.R. § 63.6(i)(6).

II.     **A Compliance Period Of At Least Two Years Is Necessary For The Facility To Have Any Realistic Chance Of Completing The Section 112(f) Control Projects.**

    A.     **Safely Completing The Section 112(f) Control Projects, Including Planning, Approval, Construction, Installation, And Testing, Will Require Substantially More Than 90 Days at the Facility.**

The Facility will require at least a two-year compliance period to comply with regulatory requirements in the Final Rule.  The Final Rule imposes stringent new regulatory requirements for chloroprene emissions based on a discretionary Section 112(f) residual risk review.[13]  Specifically, the Final Rule "require[s] control of chloroprene for: (1) Process vents, (2) storage vessels, (3) wastewater 'in chloroprene service'" and "finaliz[es] requirements to reduce chloroprene emissions from maintenance vents" to reduce risk to what EPA believes is an acceptable level and provides an ample margin of safety to protect public health.[14]  The Final Rule also requires fenceline monitoring provisions that include an unreasonable threshold for taking corrective action.[15]

The Section 112(f) Control Projects each require at least two years to safely design, install, construct, and test.[16]  Additionally, the Final Rule includes standards for pressure relief devices, control equipment bypasses, flares, and dioxins and furans emissions that must be accounted for in the planning of the Section 112(f) Control Projects.

DPE personnel and consultants have dedicated significant time and resources to evaluating many potential emission reduction projects at the Facility, including the types of projects necessary to meet the Final Rule requirements. For example, Montrose Environmental Group, Inc. ("Montrose"), a global environmental services provider specializing in emission control planning, measurement, and analysis, has worked closely with DPE over the past two years on nearly all aspects of potential options for chloroprene control at the Facility.  Montrose developed several memoranda and Excel calculation workbooks in support of the Proposed Rule evaluating the feasibility of the Section 112(f) Control Projects. Specifically, Montrose analyzed: the overall cost-benefits of the Proposed Rule; the proposed wastewater requirements; and the proposed dioxins and furans requirements.  DPE also worked with ECT2, a consulting group with significant wastewater expertise, to evaluate the feasibility and alternatives to control projects related to wastewater.  Norton Engineering Consultants, Inc. ("Norton Engineering"), a consulting group with specialized expertise in thermal oxidizers, also assisted DPE after the Proposed Rule was released in evaluating potential thermal oxidizer configurations.  Norton Engineering provided an analysis memorandum covering thermal oxidizer options and costs, as well as an analysis of the PRD and flare requirements proposed by EPA in the Proposed Rule.  On July 7, 2023, DPE submitted comments to the Proposed Rule, which incorporated the robust technical work of these outside consultants, including

---

[13] Final Rule at 34 ("In order to ensure our standards provide an ample margin of safety to protect public health following the new IRIS inhalation UREs for EtO and chloroprene, we are exercising our *discretion* and conducting risk assessments in this action for HON sources and for affected sources producing neoprene subject to the P&R I NESHAP.") (emphasis added) (Ex. 1).

[14] Final Rule at 59-60 (Ex. 1).

[15] Final Rule at 1209-1210 (amended 40 C.F.R. 63.502(a)(7)) (Ex. 1).

[16] EPA submitted several analysis memorandums in support of the Proposed Rule that describe such projects that were developed by their contractor, ERG.  *See* ERG, *Analysis of Control Options for Wastewater Streams to Reduce Residual Risk of Chloroprene From Neoprene Production Processes Subject to P&R I* (July 6, 2023) ("ERG Wastewater Memo") (Ex. 7); ERG, *Analysis of Control Options for Process Vents and Storage Vessels to Reduce Residual Risk of Chloroprene Emissions at P&R I Affected Sources Producing Neoprene* (Mar. 2023) ("ERG Control Options for Process Vents and Storage Vessels Memo") (Ex. 8).

analysis memoranda and Excel workbooks.[17]  DPE also continued its evaluation work after submitting its Proposed Rule comments, including continued evaluation of Wash Belt emission capture projects and other projects.

The extensive analyses performed by DPE and these outside consultants are based on reviews of the Proposed Rule and associated technical documents, Facility site visits, third-party vendor quotes for emission control equipment, and extensive emissions control experience.  The Final Rule requires virtually the same control projects as the Proposed Rule.[18]  Therefore, the work performed to analyze the Proposed Rule remains a reasonable basis to estimate timing and cost. These analyses show that each of the Section 112(f) Control Projects will require significantly more time than a 90-day compliance period at the Facility. Each project involves site- and equipment-specific considerations at the Facility before completing the design, approval, construction, installation, and testing phases.

In addition, DPE has substantial concerns regarding the numerous complex process changes that will be required at the Facility for the installation of the Section 112(f) Control Projects.  Chloroprene is a highly volatile, flammable, and highly reactive (polymeric) chemical.  Any changes to the production process at the Facility will require properly trained and knowledgeable employees and contractors with process safety experience.[19]  Failure to follow process safety procedures can result in disastrous consequences such as fires, explosions, and fatalities, as well as unintended environmental releases. These incidents commonly stem from stressors resulting in significant human error and omissions which are more likely to happen if new complex safety processes are implemented.  Avoiding the chloroprene-related consequences associated with process safety failures will demand careful planning and sufficient time to safely develop, assess, and implement procedures required for the Section 112(f) Control Projects.

Further, complicated emissions reduction projects inherently change the day-to-day operations at the Facility.  Such changes significantly increase the risk of human error by encouraging personnel to rush multiple process and procedural changes.  A 90-day compliance period would unsafely ignore the potential for human error that can arise in (1) designing processes; (2) engineering projects; (2) specifying process components; (4) predicting safeguards necessary to control risk to an acceptable level and sustain the required safeguards for the life of the process; (5) managing process changes; (6) startup testing; and (7) trouble-shooting (shakedown) physical process changes.  The shortened compliance period in the Final Rule fails to adequately account for process safety actions and does not detail designs necessary for DPE to initiate immediate implementation or consider sound change-management principles. Demanding compliance on an unreasonable schedule would pose a serious risk to DPE, its employees, and the surrounding community.

The following discussion in sections i. through v. identifies each Section 112(f) Control Project described in the Final Rule and describes why compliance within 90 days would be infeasible.  In accordance with 40 C.F.R. 63.6(i)(6), Table 1 below provides estimated dates for each project by which on-site construction, installation of emission control equipment, or a process change could be initiated and completed, and the estimated date by which final compliance could be achieved.  These preliminary estimates are based on DPE's current knowledge of Facility operations and past experience implementing emission control

---

[17] The memoranda covered: thermal oxidizer; wastewater; PRDs; flares; dioxins and furans; and cost-benefits review.

[18] One control project that is no longer needed is a replacement for DPE's existing thermal oxidizer. Under the Proposed Rule, DPE would have been required to operate a thermal oxidizer with a destruction efficiency of 99.9%, an efficiency beyond the capabilities of its current equipment. Nevertheless, the thermal oxidizer analysis performed by DPE and its contractors remains applicable to investigating, designing, constructing, and testing the new thermal oxidizer that is required to meet the Final Rule requirements.

[19] Remedy Declaration of Paul S. Casarez ("Casarez Remedy Decl."), ¶¶ 24, 30, Case No. 2:23-cv-00735 (Ex. 9).

projects; they are subject to change. Although the estimates contained herein are good faith approximations of the time necessary, these projects could take significantly longer to implement. DPE makes no commitment to meet these preliminary minimum estimates.

**Table 1**

| Project | Description of Controls 40 CFR 63.6(i)(6)(i)(A) | The date by which on-site construction, installation of emission control equipment, or a process change is planned to be initiated 40 CFR 63.6(i)(6)(i)(B)(1) | The date by which on-site construction, installation of emission control equipment, or a process change is planned to be completed 40 CFR 63.6(i)(6)(i)(B)(3) | The date by which final compliance is to be achieved. 40 CFR 63.6(i)(6)(i)(B)(4) |
|---|---|---|---|---|
| **Thermal Oxidizer** | *See Section II(A)(i)* | [18-24] months from publication | [30-36] months from publication | [30-36] months from publication |
| **Wastewater Steam Stripper** | *See Section II(A)(ii)* | [18-24] months from publication | [30-36] months from publication | [30-36] months from publication |
| **Equipment to Limit Maintenance Emissions < 1 tpy** | *See Section II(A)(iii)* | [18-24] months from publication | [30-36] months from publication | [30-36] months from publication |

DPE recognizes that some of the preliminary estimates provided in Table 1 extend beyond two years after the effective date, which is the maximum compliance period permitted in 40 CFR 63.6(i)(4)(ii). DPE will endeavor to reduce the implementation period, but Table 1 reflects DPE's best estimates at this time. Given that DPE's preliminary estimates for all three projects will require more than two years to complete, DPE is requesting that LDEQ grant DPE the maximum extension of two years from the effective date.

i.    **Thermal Oxidizer.**

Thermal oxidizers ("TOs") are combustion devices used to control volatile organic compounds ("VOCs") and other HAP emissions by combusting them to carbon dioxide ("$CO_2$") and water. To do so, a TO's combustion chamber is designed to reach temperatures high enough to remove VOCs from an incoming gas stream by initiating reactions required for oxidation of VOCs.[20] The high temperature within the TO must be maintained for sufficient time to ensure that oxidization destroys the VOCs and the gas stream should be thoroughly mixed inside the combustion chamber to ensure the VOC is uniformly burned out.[21] DPE's Facility currently has a regenerative thermal oxidizer ("RTO").[22] Following startup and shakedown,

---

[20] Norton Engineering Consultants Inc., *Thermal Oxidizer Technology Review* (June 30, 2023) ("Norton Thermal Oxidizer Memo") at 1 (Ex. 12); Presentation to EPA (Oct. 18, 2023) ("DPE Presentation") at Slide 8 (Ex. 10); Extension Request Declaration of Chris Meyers ("Meyers Extension Request Decl."), ¶ 9-10 (Exhibit 11); DPE Comment at 78 (Ex. 5).

[21] Norton Thermal Oxidizer Memo at 1 (Ex. 12).

[22] Regenerative thermal oxidizers are characterized by their regenerative heat recovery capability which allows them to improve overall thermal efficiency.

stack testing of the existing RTO indicated a destruction removal efficiency ("DRE") above 98% and a flow capacity of 58,500 scfm.[23]

The Final Rule requires emissions from process vents and storage vessels in chloroprene service[24] to be routed to a closed vent system to a non-flare control device that reduces chloroprene by greater or equal to 98% DRE.[25] EPA concluded in the Proposed Rule "that the only viable way to meet [the] proposed standards is to enclose all of the polymer batch reactors, emulsion storage vessels, strainers, and wash belt dryers and route the vapors to a thermal oxidizer."[26] In the Final Rule, EPA has reiterated that it "continue[s] to stand by [their] analysis" and finalized control requirements for those same sources.[27] However, these sources have air flows that are more than 4.3 times higher than the Facility's existing RTO. The existing RTO is limited to a flow capacity of 58,500 scfm, but the sources identified by EPA would add 210,558 scfm of flow (resulting in a new total flow of 252,869 scfm).[28] Therefore, a new TO must be installed at the Facility to control the excess flow from process vents and storage vessels in chloroprene service as required by the Final Rule. EPA acknowledges that it "anticipate[s] that the facility will still need to install an additional thermal oxidizer in order to comply with the final performance standard for process vents and storage vessels in chloroprene service."[29]

1. **At least two years is needed to design, obtain approval for, construct, and test a new TO at the Facility.**

As part of its feasibility evaluation following the Proposed Rule, DPE and its outside experts investigated various TO configurations.[30] Based on prior experience with thermal oxidizer installation at the Facility and evaluation work already completed by DPE in relation to an additional TO, DPE expects the design, approvals, construction, installation, and testing of a TO would take at least two years.[31] This timeframe does not account for testing to determine the applicability of the dioxins and furans standard that must be understood before finalizing the planning of the TO. However, as described in the following section, if the dioxins and furans standard is determined to be applicable, additional time will be needed at the Facility to account for such standards in the design and construction of a TO.

---

[23] Norton Thermal Oxidizer Memo at 5-6 (Ex. 12); *see also* Meyers Extension Request Decl., ¶ 10 (Ex. 11).

[24] "In chloroprene service" is defined in the Final Rule at §63.482. For process vents, "in chloroprene service" means each continuous front-end process vent, each batch front-end process vent, and each back-end process vent in a process at affected sources producing neoprene that, when uncontrolled, contains a concentration of greater than or equal to 1 ppmv undiluted chloroprene, and when combined, the sum of all these process vents within the process would emit uncontrolled, chloroprene emissions greater than or equal to 5 lb/yr (2.27 kg/yr). For storage vessels, "in chloroprene service" means storage vessels of any capacity and vapor pressure in a process at affected sources producing neoprene storing a liquid that is at least 0.1 percent by weight of chloroprene. Final Rule at 1145-46 (Ex. 1).

[25] Final Rule at 19-20 (Ex. 1).

[26] 88 Fed. Reg. at 25117 (Ex. 4); *see* ERG Control Options for Process Vents and Storage Vessels Memo at 7 (Ex. 8).

[27] Final Rule at 196-97 (Ex. 1).

[28] Meyers Extension Request Decl., ¶ 10 (Ex. 11); *see also* Norton Thermal Oxidizer Memo at 5-6 (Ex. 12).

[29] Final Rule at 198 (Ex. 1).

[30] Meyers Extension Request Decl., ¶ 10-11 (Ex. 11).

[31] *Id.* ¶ 9-26.

> **2.    Complying with the Final Rule will require significant time to design, obtain approval for, construct, and test new permanent total enclosures at the Facility.**

DPE must be able to capture chloroprene emissions in order to route them to a TO.  EPA concludes that "the only viable way to meet these proposed standards is to enclose all of the polymer batch reactors, emulsion storage vessels, strainers, and wash belt dryers" to capture and route the emissions to the TO.[32] In support of the Proposed Rule, EPA determined that three (3) Permanent Total Enclosures ("PTEs") around each of the emissions sources would be necessary to capture and route chloroprene emissions to a TO:[33]

- One PTE for all five polymerization batch reactors;
- One PTE for the two wash belt dryers; and
- One PTE for the three emulsion storage tanks.

In the Final Rule, EPA indicated that there is no explicit requirement to install permanent total enclosures,[34] but provides no alternative compliance option and DPE is aware of no alternative option that achieves the Final Rule requirements.  The Final Rule does not alter EPA's analysis regarding PTEs and fails to account for the technical and process safety challenges of enclosing the wash belts and equipment in the poly building at the Facility.  DPE is faced with the technical, process, and safety challenges of enclosing several different and dispersed sections of the Facility, and routing captured emissions to a TO. EPA recently recognized that achieving compliance with PTE requirements based on EPA Method 204 will take well over a year:

> Most commercial sterilization facilities were not initially designed to be compliant with the PTE requirements of EPA Method 204.  We have learned from the comments received that for these facilities, the capture requirements associated with the emission reduction standards for Group 1 and Group 2 room air emissions in the final rule will likely require a redesign of a portion if not all of the facility.  Many facilities will also need to purchase additional equipment (e.g., fans, transformers, variable frequency drives, etc.) to meet the capture requirements.  Moreover, compliance with the final emission standards will likely require the installation of additional control devices.  We have reviewed the time that it has taken for previous projects of this nature to be completed, from submission of the initial state or local permit application to installation of the continuous compliance mechanisms.  Based on this analysis, we find that the process of bringing a facility into compliance with the PTE requirements of EPA Method 204, as well as installing and verifying additional emission controls, can take approximately a year from permit submission to project completion.  However, this estimate does not account for the time needed to design and plan before the initial permit application is submitted, nor for the time needed to avoid impacts on medical device supply chains, to procure control devices

---

[32] As stated in the Proposed Rule, 88 Fed. Reg. at 25117 (Ex. 4), and affirmed in the Final Rule. *See* Final Rule at 196-97 ("we continue to stand by our analysis").

[33] ERG Control Options for Process Vents and Storage Vessels Memo at 7 (Ex. 8).

[34] Final Rule at 198-199 ("with regard to a commenter's specific objections to installing a permanent total enclosure…even though we costed out permanent total enclosures for these emission sources in our proposal, there is no explicit requirement in the proposed rule, or final rule, to install permanent total enclosures around these emission sources.") (Ex. 1).

from a limited number of vendors, and to account for the other complexities identified below.[35]

The Final Rule does not require DPE to comply with EPA Method 204, but the time-consuming considerations identified by EPA will also need to be evaluated by DPE.

Capturing emissions from the wash belts at the Facility also poses a serious concern regarding occupational exposure, human health and safety, process maintenance and product quality associated. DPE's wash belt blower motors are equipped with variable frequency drives, which allow a reduction of the total flow rate through the vents. DPE will need an industrial hygienist to evaluate any changes to the airflow through the vent hoods themselves or in other areas of the finishing building to ensure compliance with personnel exposure requirements, or to make recommendations for additional protective equipment.[36] Changes in airflow resulting from enclosing the wash belts can also have a negative impact on product quality and will need to be evaluated before the enclosures are put into permanent use.

Additionally, the wash belts require frequent, manual intervention from area personnel to ensure stable operation. Physical access is required to perform maintenance and repairs. This means that any enclosures will likely need to be transparent and capable of easily and frequently being dissembled and reassembled.[37] In any event, the change in routine maintenance and repairs on the wash belts once enclosed needs to be evaluated to ensure these activities can be carried out safely.

Taken together, enclosing certain equipment like the wash belts will take significant time due to process safety and product quality concerns and contribute to a compliance period of at least two years before the TO can commence operation and control emissions from the enclosures at the Facility.

> **3.      Alternative to safety bypass lines must be considered in Thermal Oxidizer design.**

The Final Rule prohibits the use of bypass lines in closed systems to allow a flow to avoid air pollution control devices at any time.[38] The Final Rule also requires monitoring systems for flow on bypass lines to detect whether vent stream flow is present every 15 minutes and to estimate and report any releases.[39] These requirements must be considered when planning, designing, and installing a TO at the Facility, and contribute to the complexities of implementing required control equipment within 90 days. Although the Final Rule provides DPE three years to comply with this requirement, it must be accounted for in DPE's planning of a TO.

The Facility has four closed vent systems to route process emissions from the Neoprene process area to the RTO: (1) a nitrogen-rich header for streams with high chloroprene concentrations; (2) an air rich header for streams with lower chloroprene concentrations; (3) the East Hot Dryer Vent; and (4) the West Hot Dryer Vent. The Facility's Monomer Emissions Reduction Project (MERP)[40] is also a closed vent system which routes emissions from the monomer process area to the halogen acid production furnace. In total,

---

[35] EPA, *National Emission Standards for Hazardous Air Pollutants: Ethylene Oxide Emissions Standards for Sterilization Facilities Residual Risk and Technology Review*, 89 Fed. Reg. 24090, 24102 (Apr. 5, 2024) (Ex. 14).

[36] Meyers Extension Request Decl., ¶ 14 (Ex. 11); DPE Comment at 91 (Ex. 5).

[37] DPE Comment at 92 (Ex. 5); Meyers Extension Request Decl., ¶ 15 (Ex. 11).

[38] Final Rule at 68, 336 (Ex. 1).

[39] Final Rule at 68, 336, 690 (Ex. 1).

[40] The MERP controls emissions from the monomer and HCl unit from the following sources: chloroprene synthesis; waste organics tank; HCl feed tanks; aqueous wase system; isomerization and DCM refining vents.

there are 19 bypass lines associated with the RTO and 8 bypass lines associated with the MERP that are required for safety reasons. These bypass lines are rarely used—and only for emergencies[41] (emissions from bypass lines made up less than 1% of Facility emissions in 2022).[42]

EPA's requirement is problematic because bypass lines are used to safeguard against high incoming concentrations of chloroprene into the RTO unit to avoid catastrophic failure. Without bypass lines, there is nowhere else for these dangerous streams to go.[43] DPE needs an ample amount of time to safely design, plan, and implement new configurations to handle these flows. This may require the installation of a new control device or require immense reworking of piping and ducting to safely connect these flows to the Facility's RTO or new TO.[44] Accordingly, the design of the new TO must consider the potential connection of these bypass lines.

> **4.     Equipment to analyze exhaust and monitor releases to atmosphere on 300 pressure relief devices ("PRDs") which must be routed to control device.**

The Final Rule prohibits "any release event" from a pressure relief device ("PRD") in chloroprene service.[45] PRDs are safety equipment that remain closed during normal operation but activate and release in response to an overpressure in the system. Overpressure can occur for a variety of reasons including malfunctions due to power failure or equipment failure, or other unexpected causes that result in immediate venting of gas from process equipment to avoid safety hazards or equipment damage.[46]

The Final Rule requires work practice standards for PRD releases that require facilities to "monitor these PRDs using a system that is capable of identifying and recording the time and duration of each pressure release and of notifying operators that a pressure release has occurred."[47] The Final Rule expects that operators will install electronic devices or monitors on PRDs[48] to achieve these work practice standards. DPE estimates that there are 300 PRDs at the Facility that would be affected by these requirements.[49] DPE does not currently have a complete system in place, or the necessary PRD equipment installed, to be in compliance with the requirements.[50]

---

[41] Meyers Extension Request Decl., ¶ 24 (Ex. 11).

[42] DPE Comment at 98 (Ex. 5); Meyers Extension Request Decl., ¶ 24 (Ex. 11).

[43] Rebuttal Declaration of Junius "J.R." Roussell ("Roussell Rebuttal Decl."), ¶¶ 9-10, Case No. 2:23-cv-00735 (Ex. 15).

[44] DPE Comment at 98 (Ex. 5); Meyers Extension Request Decl., ¶¶ 23, 25 (Ex. 11).

[45] Final Rule at 1210-1211 (amended 40 C.F.R. 63.502(a)(6)) (modifying amended 63.165(e)(3)(v)(D)).

[46] 88 Fed. Reg. at 25155 (Ex. 4).

[47] *Id.* at 25158. As explained in the Final Rule, EPA proposed "that any release event from a PRD in chloroprene service is a violation of the standard…" Final Rule at 100 (Ex. 1).

[48] Final Rule at 1069 (Ex. 1). "For purposes of estimating the costs of this requirement, [EPA] assumed that operators would install electronic monitors on PRDs that vent to atmosphere to identify and record the time and duration of each pressure release." 88 Fed. Reg. at 25158.

[49] Meyers Extension Request Decl., ¶ 18 (Ex. 11); Norton Engineering Consultants, Inc., *Summary of the Ruling Applied to Pressure Relief Devices* (June 30, 2023) ("Norton PRD Memo") at 1 (Ex. 16).

[50] Meyers Extension Request Decl., ¶ 18 (Ex. 11).

The Final Rule also requires the installation of a ppm level analyzer instrument with calibration features and diagnostic feedback at the exhaust of each PRD that is capable of verifying that any discharge is less than 500 ppm.[51] Monitoring equipment associated with the process and piping must also be installed on all 300 PRDs with the capability of indicating when a release to the atmosphere is occurring.[52] This requires installation of a magnetic sensor or motion detector connected to PRD stem travel (or an equivalent indicator of PRD movement).[53] This technological approach has not been implemented in the industry today and is a significant deviation from commercially available PRDs. In turn, DPE will likely not be able to retrofit this equipment onto the 300 PRDs already installed at the Facility, which will further complicate installations. Additionally, it will take longer to plan and test such monitoring systems given the significant risk in terms of reliability due to the lack of reference installations within the industry.[54]

PRDs also play a critical role in protecting employee and community safety.[55] DPE must carefully design an installation plan that continues to protect employee and community safety while navigating the Process Safety Management regulations promulgated by the Occupational Safety and Health Administration (OSHA). In turn, modifications of the PRD systems will require a comprehensive process hazard review.[56]

Based on these realities, DPE expects that the PRD requirements will take significant time to plan. Because PRDs are prohibited from releasing into the atmosphere, DPE will need to consider routing PRDs to the new TO. As a result, although the Final Rule provides DPE three years to comply with the PRD requirements, they must be accounted for in DPE's planning of a TO.

### 5. Dioxins and furans emissions limit further complicates planning and implementation of TO at the Facility.

The dioxins and furans limit of the Final Rule further complicates the designing, planning, and implementation of the TO as additional condenser equipment or other control devices must be evaluated concurrently with chloroprene ERPs.[57] Although the Final Rule provides DPE three years to comply with this requirement, it must be accounted for in DPE's planning of a TO. The Final Rule provides that neoprene production facilities can use, produce, or emit chlorinated chemicals and therefore has imposed dioxins and furans MACT standards under CAA section 112(d)(2) and (3) for P&R I.[58] In doing so, EPA adds an emission standard of 0.054 nanograms per DSCM at 3% $O_2$ for dioxins and furans from chlorinated process vents (including continuous front-end process vents).[59]

The Final Rule further explains that dioxins and furans can be formed when chlorinated compounds are present and combusted in a thermal oxidizer.[60] In turn, the Final Rule assumes that affected facilities would install a condenser prior to the existing control device that, in the case of DPE, is a thermal oxidizer. The condenser is designed to remove chlorinated compounds from the stream and prevent the formation

---

[51] Final Rule at 1067 (Ex. 1).

[52] Final Rule at 342-43 (Ex. 1).

[53] Norton PRD Memo at 1 (Ex. 16).

[54] *Id.*

[55] Meyers Extension Request Decl., ¶ 20 (Ex. 11).

[56] Norton PRD Memo at 2 (Ex. 16); Meyers Extension Request Decl., ¶ 20 (Ex. 11).

[57] Meyers Extension Request Decl., ¶ 26 (Ex. 11).

[58] Final Rule at 20-21; 152 (Ex. 1).

[59] Final Rule at 20-21(Ex. 1).

[60] *Id.* at 97.

of dioxins and furans within the thermal oxidizer.[61] In support of the Proposed Rule, EPA assumed that a refrigeration method will be implemented to recover or condense chloroprene out of the vapor streams.[62] Based on the analysis by DPE consultants, DPE will need to identify and evaluate commercially available refrigeration systems that can achieve the temperatures required to recover or condense chloroprene out of the vapor streams. This will take time considering that DPE's consultants are not aware of a commercially available refrigeration system that can achieve the temperatures required to condense chloroprene out of the vapor streams.[63] Therefore, to implement the requirements of the Final Rule at the Facility, the Facility would likely need to install cryogenic technology to achieve the required temperatures, which will pose additional technical, cost, and operational challenges.[64] However, for DPE's Facility, cryogenic technology may not be a feasible option and therefore, installation and/or routing to a control device may be required.[65] How DPE determines to address dioxins and furans may affect how flow streams are routed to the TO. This may impact flow capacities and pose serious process safety considerations. Ultimately, ensuring compliance with these dioxins and furans standards must be accounted for in the design of a TO.

### ii. Wastewater Steam Stripper.

The Final Rule requires owners and operators to manage any existing wastewater streams that are in chloroprene service.[66] This provision requires installation of a steam stripper to achieve 99% reduction[67] of chloroprene emissions from wastewater in chloroprene service.[68] Steam stripping is a method of removing VOCs from a wastewater stream where pressure and temperature is used to separate or strip the contaminants from the water.

Currently, DPE already employs an air stripping system—a process that occurs in the air sparging tank and which routes to the onsite RTO.[69] However, as discussed above, the Facility's RTO does not have the capacity to take on additional waste streams, including chloroprene-containing air from a new steam stripper. Therefore, a new control device will need to be installed in addition to the new steam stripper to properly control the additional steam stripper wastewater streams.[70] As stated above, based on prior

---

[61] As explained in the Proposed Rule. 88 Fed. Reg. at 25162 (Ex. 4). The same dioxins and furans requirements were finalized in the Final Rule.

[62] ERG, *Dioxins and Furans MACT Floor in the SOCMI Source Category for Processes Subject to HON and Processes Subject to Group I and Group II Polymers and Resins NESHAPs* (Mar. 2023) ("ERG Dioxins and Furans Memo"), Table 11 (costs based on refrigeration condenser technology that has been applied in the PVC industry) (Ex. 17).

[63] Montrose, *Dioxins and Furans Proposed Rules* (July 6, 2023) ("Montrose Dioxins and Furans Memo") at 2 (Ex. 18).

[64] Montrose Dioxins and Furans Memo at 2 (Ex. 18).

[65] Meyers Extension Request Decl., ¶ 26 (Ex. 11).

[66] For wastewater, "in chloroprene service" is proposed to mean a wastewater stream containing total annual average concentration of chloroprene greater than or equal to 10 ppmw at any flow rate. Final Rule at 22, 99 (Ex. 1).

[67] EPA "believe[s] the use of 99 percent removal of chloroprene from steam stripping is appropriate…" Final Rule at 202 (Ex. 1). DPE, however, remains concerned with the lack of evidence provided that steam stripper efficiency can achieve 99% removal. *See* ECT2 and Montrose, *ERG Chloroprene Reduction Memo Analysis* (July 6, 2023) ("ECT2 and Montrose Wastewater Memo") at 2-3 (Ex. 19).

[68] *Id.* at 8; *see also* Final Rule at 202 (Ex. 1) (EPA "maintain[s] it was appropriate to assume no controls during [their] initial analysis such that a steam stripper would be placed before the air sparging tank.").

[69] *Id.* at 2. Also note that the Facility uses an outdoor brine pit to control steam stripper rundown steams which are then routed to the WWTP and subject to biological control that achieves 80% reduction.

[70] *Id.* at 3.

experience with the design and installation of wastewater control equipment at the Facility and evaluation work already completed, DPE expects that the design, approvals, construction, installation, and testing of a TO would take at least two years.[71]

### iii.    Equipment to limit maintenance emissions to 1 tpy.

The Final Rule imposes a 1 tpy cap on maintenance vent emission releases.[72] DPE has made a significant effort to identify and evaluate various options to achieve this requirement, but the complexities of the Facility's processes have hindered the company's evaluation to date.[73] DPE understands that the largest single source of emissions from maintenance activities are from annual steaming of the Facility's 2mmlb Tank (approximately 660 lbs of emissions associated with each annual steam event).

DPE considered the use of a portable condenser and catch tank that would allow vapors from tank steaming maintenance to be routed to an RTO for control but determined that the time requirements render this option infeasible.[74]

DPE also has requested proposals for the use of portable TOs in the maintenance steaming process from several vendors.[75] The proposals, however, failed to consider that scrubbing equipment to remove HCl or heat exchange equipment to combat elevated temperatures, would be required for safe steaming operations and use of the portable TO.[76] DPE cannot limit maintenance vent emissions to 1 tpy without sufficient time to evaluate whether the Facility can develop safe processes. DPE expects evaluation, acquiring of equipment, testing, approvals, and implementation of new maintenance activity processes will take two years or more.

### iv.    Section 112(d) requirements will increase the complexities and planning time needed to implement the Section 112(f) Control Projects.

In addition to the Section 112(f) Control Projects, DPE must also plan for the implementation of 112(d) requirements. DPE's engineers will need to consider the potential impact of the 112(d) projects when planning, designing, and implementing the Section 112(f) Control Projects.[77] For example, the Final Rule requires that flares used in the production of polymers and resins meet the flare requirements in the Refinery Sector Rule ("RSR") (40 CFR 63.670 and 63.671).[78] The need to account for this and other 112(d) requirements further underscores the need for at least 2 years for safe implementation.

### v.    The fenceline monitoring requirements should conform to the revised compliance dates.

The Final Rule sets forth a prescriptive set of fenceline monitoring requirements addressing monitoring, root cause analysis, and corrective actions.[79] For every operator except DPE, these requirements provide two years for operators to comply with the monitoring requirements, and three years to comply with the

---

[71] Meyers Extension Request Decl., ¶ 30 (Ex. 11).

[72] Final Rule at 20-21, 1168-69, 1175-76 (Ex. 1).

[73] Meyers Extension Request Decl., ¶ 31-32 (Ex. 11); DPE Comment at 88-90, Section XV (Ex. 5).

[74] DPE Comment at 88-89 (Ex. 5); Meyers Extension Request Decl., ¶ 33 (Ex. 11).

[75] *Id*; Meyers Extension Request Decl., ¶ 32 (Ex. 11).

[76] *Id.* at 89.

[77] Meyers Extension Request Decl., ¶ 36-37 (Ex. 11).

[78] Final Rule at 868 (Ex. 1).

[79] Final Rule at 1209-1210 (amended 40 C.F.R. 63.502(a)(4), (a)(7))) (modifying amended 63.184) (Ex. 1).

corrective action requirements.[80] However, for DPE, the Final Rule provides only 90 days for compliance with both the monitoring *and* the corrective action requirements.[81] This Extension Request seeks to extend all 90-day compliance periods in the Final Rule to two years from the effective date. It would be premature for DPE to perform root cause analyses and corrective actions before DPE has installed the control equipment required by the Final Rule. Moreover, the trigger for corrective action is based on the annual average "Δc" (the difference between the highest and lowest concentration for each sampling period), which necessarily reflects data from the past 51 weeks. Unless DPE is provided a three-year compliance period to comply with the corrective action requirements, DPE will be evaluating unrepresentative data that do not reflect post-control conditions and are not useful for meaningfully identifying post-control sources of fugitive emissions. Accordingly, a compliance period of 2-3 years is needed for the fenceline monitoring requirements.

   **B.     EPA's Own Timing Estimates Demonstrate That A 90-Day Compliance Period Would Be Infeasible at the Facility.**

The Final Rule contains two-year compliance deadlines for similar emission controls for affected EtO sources, as well as EPA's rationale for those deadlines. These two-year deadlines starkly demonstrate that the Final Rule's 90-day compliance deadline for chloroprene is fundamentally infeasible. As EPA explains in the Final Rule as to affected EtO sources, "sufficient time is needed to properly engineer the [emissions reduction] project, obtain capital authorization and funding, procure the equipment, obtain permits, and construct and start-up the equipment."[82] Therefore, EPA determined to "finaliz[e] a compliance date of 2 years after the effective date of the final rule for all existing affected sources to meet the EtO requirements," which are substantially similar, and in many cases identical, to those promulgated for chloroprene.[83]

Further, in the Proposed Rule, EPA deemed it appropriate to provide DPE with an unqualified extension to two full years for compliance.[84] Before the Proposed Rule was published, the Office of Management and Budget ("OMB") reviewed the Proposed Rule and questioned if the Facility's emissions would constitute an "imminent endangerment."[85] OMB specifically asked that EPA address "what steps will be taken during the proposed 2-year period to assure that the health of people exposed to [chloroprene] emissions (including children) will receive protection from imminent endangerment[.]" *Id.* In response to OMB, and notwithstanding that EPA had already commenced its Section 303 litigation, EPA declined to change the 2-year waiver and made no changes to describe steps to protect from "imminent endangerment." Instead, EPA responded with the same rationale it uses in the Final Rule to justify a two-year implementation for EtO facilities:

> Significant capital will need to be invested in controls here to further reduce emissions [for] EtO and chloroprene. We are talking about requiring installation of large thermal oxidizers, steam-strippers, etc. at all of the facilities emitting these HAP. This takes significant time [to] engineer, install, and update operating procedures and staff. . . .[86]

---

[80] Final Rule at 1132 (amended 40 C.F.R. 63.481(p)(1)) (Ex. 1).

[81] Final Rule at 1132-33 (amended 40 C.F.R. 63.481(p)(2)) (Ex. 1).

[82] Final Rule at 85 (Ex. 1).

[83] *Id.*

[84] 88 Fed. Reg. at 25178 (Ex. 4).

[85] EPA Passback 1 at 347 (Ex. 20).

[86] *Id.*

EPA's response to OMB simply confirms the reality that the emission reduction projects contemplated by the Final Rule requires at least two years at DPE's Facility.

EPA's position taken in the Section 303 Litigation—and presented to the Court—further confirms EPA's express acknowledgment that a 90-day compliance period for the Final Rule is simply infeasible. In March 2023, EPA filed a motion for preliminary injunction demanding that DPE comply with a series of prescriptive emission controls similar to some of the controls set forth in the Final Rule. To be clear, EPA's estimates dramatically underestimate feasible timelines for its requested relief, most glaringly by ignoring fundamental safety requirements that would endanger personnel and the community.[87] EPA based its timetables on the opinions of an expert who ultimately conceded that he did not account for several critical safety requirements.[88] Even with those inherent flaws and incomplete analyses, however, EPA's estimates in the Section 303 Litigation of the timing needed for emission controls demonstrate the infeasibility of a 90-day compliance period.

For example, in support of EPA's request for injunctive relief in the Section 303 Litigation, EPA's expert estimated that it would take DPE 90 days just to *prepare a plan* to "evaluate and control" chloroprene emissions in the polymer building.[89] For the reasons described above, the complexities involved with controlling emissions from the polymer building will require more than 90 days to plan. But the point is, even by EPA's woefully insufficient 90-day estimate for *just planning*, it is patently obvious that the time needed to *also* approve, construct, install, and test a strategy to capture and control such emissions will take far longer than 90 days, by EPA's expert's own analysis. Similarly, EPA's expert in the Section 303 Litigation fails to account for the complexities needed to plan, construct, and install permanent total enclosures for the Facility's "Poly Kettles,"[90] but still estimates installation would require 150 days.[91] There is simply no basis to square these positions on timing—which EPA represented to the Court as accurate—with the Final Rule's demand that the Facility comply with a 90-day implementation period.

### C. A Compliance Period Of 90 Days Would Likely Require A Shutdown Of The Facility And Increase The Complexity And Dangers Of Implementing The Requirements.

The Section 112(f) Control Projects cannot be technically or safely designed, approved, constructed, and tested at the Facility in 90 days. The extensive analyses performed by DPE and its outside experts demonstrate that a timeframe of 90 days is infeasible and potentially unsafe.

As discussed above, based upon prior efforts to implement similar ERPs and DPE's substantial efforts to anticipate and prepare for implementation of the Final Rule requirements, DPE expects that at least two years is required, and possibly longer given the complexities of conducting several ERPs concurrently. A compliance period of 90 days will require a shutdown of the Facility thereby increasing the complexity of completing the requirements of the Final Rule.

Without an extension of the compliance period, DPE will need to immediately shift its attention, time, and resources toward completing a safe and effective shutdown of the Facility for an indefinite period of time.

---

[87] Deposition Transcript of Jeffrey R. Harrington (July 28, 2023) ("Harrington Dep. Tr.") 90:8-10; 91:16-18; 106:8-17, Case No. 2:23-cv-00735 (Ex. 21).

[88] *Id.*

[89] Declaration of Jeffrey R. Harrington In Support of Motion for Preliminary Injunction filed in Case No. 2:23-cv-00735 (E.D. La.) ("Harrington PI Declaration"), ¶ 77, Case No. 2:23-cv-00735 (Ex. 22).

[90] The Facility's large poly kettles are batch process units and are critical to the manufacture of all types of Neoprene.

[91] Harrington PI Decl., ¶ 51 (estimating PTE installation can occur within 120 days after plan approval) (Ex. 22).

Shutdowns and restarts are dangerous[92] and will only complicate the feasibility of implementing the Final Rule.  Safety risks increase as personnel are more likely to have to make a "confined space entry" during shutdowns; presence of toxic materials in equipment increases; and the number of maintenance workers (often temporary contractors less familiar with the plant) increases.[93]

The estimated time required to just shutdown the Facility for an extended outage is between 90-150 days, meaning that, unless an extension is granted, DPE personnel need to begin planning and implementing an indefinite shutdown.[94] The effort, time, and diversion of resources required to safely shutdown a plant will negate DPE's ability to even begin to efficiently or effectively implement the ERPs required by the Final Rule. Additionally, DPE will be unable to field test the effectiveness of ERPs in a functional, operational setting if the Facility is shutdown.[95] This would prevent DPE from evaluating effective methods to address potential process safety hazards.  Simply put, DPE requires the Facility to be operational to test large-scale ERPs like thermal oxidizers.[96] Even during normal operations, DPE faces process hazard challenges when evaluating ERPs on accelerated timelines—a shutdown would only complicate this further and exacerbate the Facility's shortage in process safety personnel.[97]

Further, significant process safety steps will need to precede any restart of the Facility after a prolonged shutdown.  Process safety regulations require a pre-startup safety review before a restart.  Because DPE has never idled the Facility for an indefinite period, personnel would need to draft, review, and finalize safety procedures for any restart that followed a prolonged period of non-use.[98] Installing the Section 112(f) Control Projects from an idled state will impact the amount of time necessary to comply with the Final Rule.

> **D.     A multi-year or permanent shutdown of the Facility would result in significant negative impacts to both the Parish and State economies and lower tax revenue.**

DPE is a significant economic force in Louisiana and St. John the Baptist Parish. Based on robust modeling performed by an expert economist, Dr. Loren Scott, the total positive economic impacts on the Louisiana economy for the next 10 years directly related to Facility's operations are: $5.086 billion in sales, $1.719 billion in household earnings, and the creation of an annual average of 2,318 jobs.[99]  In addition, Tax revenue for the next 10 years are estimated to total $149.3 million.[100]  These positive economic impacts will be eliminated if the Facility is forced to permanently shutdown.  Indeed, a permanent shutdown may be likely if the Facility is forced to shutdown until the Section 112(f) Control Projects are implemented.   A nearly two-year shutdown would eliminate DPE's only source of revenue, drive employees to secure permanent positions elsewhere, drive suppliers to alternative consumers, and drive customers to substitute products.  Likewise, the inter-dependence and shared services between DPE's

---

[92] Remedy Declaration of Jim Moore, P.E. ("Moore Remedy Decl."), ¶¶ 27-30 (noting that 50% of work-related accidents in manufacturing plants occur during plant maintenance shutdowns), Case No. 2:23-cv-00735 (Ex. 23).

[93] *Id.* ¶ 31.

[94] *Id.* ¶ 39.

[95] Casarez Remedy Decl., ¶ 9 (Ex. 9).

[96] Remedy Declaration of Jorge Lavastida ("Lavastida Remedy Decl."), ¶ 28, Case No. 2:23-cv-00735 (Ex. 24); Remedy Declaration of Michelle Helfrich ("Helfrich Remedy Decl."), ¶¶ 36-37, Case No. 2:23-cv-00735 (Ex. 25).

[97] Casarez Remedy Decl., ¶ 22 (Ex.9).

[98] Casarez Remedy Decl., ¶ 32 (Ex. 9); Lavastida Remedy Decl., ¶ 25 (Ex. 24).

[99] Loren C. Scott & Associates, Inc., The Economic Impact of Denka Elastic Polymers on St. John the Baptist Parish & the State of Louisiana (Dec. 2023) ("Scott Report") at 9 (Ex. 26).

[100] *Id.*

Facility and DuPont's co-located diamines plant could threaten the continuing viability of DuPont's operations and its associated workforce.

### Impacts of Denka Plant Operational Spending on the Louisiana Economy: 2023-2032

| Year | Sales* | Earnings* | Jobs | Taxes* |
|------|--------|-----------|------|--------|
| 2023 | $443.7 | $150.0 | 2,147 | $13.4 |
| 2024 | $457.0 | $154.5 | 2,184 | $13.7 |
| 2025 | $470.7 | $159.1 | 2,221 | $14.0 |
| 2026 | $484.9 | $163.9 | 2,259 | $14.4 |
| 2027 | $499.4 | $168.8 | 2,297 | $14.7 |
| 2028 | $514.4 | $173.8 | 2,335 | $15.1 |
| 2029 | $529.8 | $179.1 | 2,374 | $15.4 |
| 2030 | $545.7 | $184.4 | 2,414 | $15.8 |
| 2031 | $562.1 | $190.0 | 2,454 | $16.2 |
| 2032 | $579.0 | $195.7 | 2,494 | $16.6 |
| **Total** | **$5,086.8** | **$1,719.2** | **2,318**** | **$149.3** |

*Values in millions of dollars. **Jobs total represents an average over the 10-year period.

Source: Scott Report at 9.

Even if the Facility is able to avoid a permanent shutdown, a temporary shutdown would come at enormous cost. Absent an extension of the 90-day compliance period, a shutdown of at least two years is a near certainty. Dr. Scott's modeling also analyzed the economic impact of a two-year shutdown based on modeling of calendar years 2024 and 2025.[101] The results show that the State would lose $927.8 million in business sales, $313.6 million in household earnings, 2,203 jobs, and 13.8 million in state tax revenues.[102] These forecasted economic losses are significant and strongly favor granting a two-year extension of the compliance period.

### III.    DPE Has Reduced Emissions Since May 2022 Through Practicable and Effective Emission Reduction Strategies And Will Continue to Implement Such Strategies During the Compliance Period.

DPE has spent considerable time and resources evaluating emission reduction opportunities at the Facility and continues to do so. Between 2016 and 2018, DPE reduced the Facility's emissions by 85%, in large part due to the installation of the Facility's RTO.[103] DPE continued its emission reduction efforts and has implemented a series of additional reduction strategies since May 2022—many of which are voluntary and bolster DPE's compliance with existing requirements to assure that the health of personnel and the community will be protected.

### A.    Implemented Emission Reduction Strategies Since May 2022.

In July 2022, DPE established a formal chloroprene emission reduction task force ("ERP Task Force") made up of more than 20 engineers, managers, and process experts from all across the Facility. The ERP Task

---

[101] *Id.* at 16.

[102] *Id.*

[103] Meyers Extension Request Decl., ¶ 44 (Ex. 11).

Force met multiple times a week and dedicated well over 5,000 man-hours through July 2023, to ongoing efforts to reduce emissions.[104] These efforts include the following:

- DPE has implemented a process to reduce emissions associated with waste from the Facility's poly kettle production units consistent with the requirements of the consent agreement in EPA Docket No. RCRA-06-2023-0906, as well as applying a similar process to waste coagulant generated from the stripper strainers.[105] DPE now steams the coagulant and routes emissions to the RTO. DPE has also improved its washing and nitrogen purging processes to further reduce emissions associated with the poly kettle production units.

- DPE has implemented a voluntary process to reduce the number of concurrently operating unstripped emulsion storage tanks and to strip chloroprene from in-tank coagulant during maintenance of the unstripped emulsion storage tanks.[106] Now only two tanks are used at a time to reduce coagulate formation.  The tanks containing coagulate are filled with water and are circulated to strip the remaining chloroprene and route emissions to the RTO.[107]

- The Facility has also employed a voluntary process to strip chloroprene from in-tank coagulant during maintenance of the five poly kettles (emission source 1700-13A).

- DPE has voluntarily decreased the site-wide leak detection and repair threshold from the regulatory standard of 500 ppm organic vapor concentration to 250 ppm.[108] In conjunction with this new 250 ppm threshold hold, an additional voluntary process to screen certain components in the polymerization building located at the Facility and the 1236 waste organics storage tank area multiple times each week and to schedule repairs if leaking components are identified has been rolled out.[109] DPE hired an LDAR technician with over 20 years of experience to lead these voluntary efforts which has included increased weekly screenings, new immediate repair procedures, and the purchase of state-of-the-art detection equipment.[110]

- Further, DPE has supplied operators in the polymers area with photoionization detectors (PIDs) to perform LDAR screenings on any component at any time to detect leaks.  Accordingly, prompt repairs are made when leaks are detected.[111]

- DPE voluntarily implemented a process requiring transfers of chloroprene-containing wastes from the chloroprene heels tank to the waste organics tanks in the HCl recovery unit process area be performed only when the 1236 tank system is connected to the MERP control system or other form of emissions control.[112]

---

[104] DPE Comment at 75 (Ex. 5).

[105] DPE Responses to US First Set of Interrogatories, at 12-13 (Response to Interrogatory No. 4), Case No. 2:23-cv-00735 (Ex. 26); Meyers Extension Request Decl., ¶ 45 (Ex. 11).

[106] *Id.*; Meyers Extension Request Decl., ¶ 45 (Ex. 11).

[107] DPE Presentation at Slide 6 (Ex. 10).

[108] DPE Responses to US First Set of Interrogatories, at 12-13 (Response to Interrogatory No. 4) (Ex. 26); Meyers Extension Request Decl., ¶ 45 (Ex. 11).

[109] *Id.*; Meyers Extension Request Decl., ¶ 45 (Ex. 11).

[110] DPE Comment at 76 (Ex. 5).

[111] *Id.*; Meyers Extension Request Decl., ¶ 45 (Ex. 11).

[112] DPE Responses to US First Set of Interrogatories, at 12-13 (Response to Interrogatory No. 4) (Ex. 27); Meyers Extension Request Decl., ¶ 45 (Ex. 11).

- DPE instituted new outdoor brine pit (OBP) management measures which require coagulant from the unstripped emulsion storage tanks and large poly kettles to be placed directly into plastic drums to be sent off-site for incineration. This new process change ensures that solid material is no longer placed in the OBP.[113]

In addition, DPE continues to evaluate additional, voluntary emission reduction projects, such as (i) a potential project to remove chloroprene from the poly kettle strainer waste by circulating water through the strainer and sparging the water and (ii) the potential use of Forward Looking Infrared, or FLIR, cameras to improve leak detection activities.

      B.      **DPE's Emission Reduction Strategies Have Resulted in Significant, Quantified Reductions of Chloroprene Concentrations Near the Facility.**

DPE's significant efforts to implement these voluntary emission reduction strategies have resulted in quantified reductions of chloroprene concentrations near the Facility. Analysis of Method 325B and Method TO-15 monitoring data demonstrate that, following these voluntary changes, the Facility has achieved the lowest average chloroprene concentrations to date.[114] The fenceline monitoring results below illustrate the effectiveness of DPE's voluntary emissions reductions:



---

[113] DPE Presentation at Slide 6 (Ex. 10).

[114] Declaration of Mr. David R. Blye ("Blye PI Decl."), ¶ 33, Case No. 2:23-cv-00735 (Ex. 28); *see also* Meyers Extension Request Decl., ¶ 47 (Ex. 11).

**C.      DPE Plans To Continue To Implement Emission Reduction Projects During The Compliance Period.**

Because these voluntary measures help to reduce chloroprene emissions, DPE plans to continue utilizing these voluntary reduction strategies throughout the compliance period.  These steps, in conjunction with a compliance timeline of at least two years, will better support DPE's overall efforts to safely design, install, and implement the control equipment and processes necessary under the Final Rule and ensure that emissions from the Facility will not pose a potential imminent endangerment.

**IV.      A Two-Year Compliance Period Will Not Result in "Imminent Endangerment" Near the Facility.**

In addition to finding that additional time is necessary for compliance, to grant an extension, there must be a finding that "steps will be taken during the period of the waiver to assure that the health of persons will be protected from imminent endangerment."[115] Because no imminent endangerment exists near the Facility, no additional steps need to be taken during the waiver period.

EPA's inclusion of a two-year compliance period in the Proposed Rule appropriately recognized the lack of an imminent endangerment due to the only facility in the source category.  DPE is aware of no allegations of acute endangerment from the Facility's chloroprene emissions and EPA has admitted it is not aware of <u>any</u> incidents of cancer due to the Facility's emissions.[116]

EPA has alleged in the Section 303 Litigation that an "imminent and substantial endangerment" exists, but this allegation is based on a conservative and deeply flawed theoretical risk of cancer.  Specifically, EPA alleges that the 1-in-10,000 risk level associated with the inhalation unit risk ("IUR") derived in the 2010 *Toxicological Review of Chloroprene* ("2010 IUR") — which translates to a chloroprene concentration of 0.2 $\mu g/m^3$ — constitutes an imminent and substantial endangerment.  With no explanation or analysis whatsoever, the Final Rule points to EPA's allegations in the Section 303 Litigation as the sole basis for imposing a 90-day compliance period on DPE for the Section 112(f) Control Projects:

> In a change from the proposed rule, the EPA is shortening the compliance deadline for affected sources producing neoprene, due to the EPA's finding that chloroprene emissions from the only such source pose an imminent and substantial endangerment under CAA section 303, 42 U.S.C. § 7603. *United States v. Denka Performance Elastomer, LLC, et al.*, No. 2:23-cv-00735 (E.D. La. filed Feb. 28, 2023).[117]

Even if EPA's view of the applicable science underlying the 2010 IUR were accepted as true (a point DPE strenuously disputes), the risk levels near the Facility fall far short of an "imminent endangerment" for purposes of Section 112(f)(4)(B).  The entire statutory framework of Section 112 refutes any notion that risks above a 1-in-10,000 threshold constitute an "imminent endangerment." If they did, Congress would not have given EPA 18 years to complete residual risk reviews, which specifically use the 1-in-10,000 threshold as a presumptive benchmark for acceptability.  Interpreting risks above a 1-in-10,000 threshold to compel a 90-day compliance period is simply incompatible with Congress's decision to tolerate such risks for 18 years.

---

[115] 42 U.S.C. § 7412(f)(4)(B).

[116] EPA Responses to DPE First Set of Interrogatories, at 27-28 (Response to Interrogatory No. 12), Case No. 2:23-cv-00735 (Ex. 29).

[117] Final Rule at 85 (Ex. 1).

EPA has *always* recognized that theoretical, pre-compliance risks described in residual risk reviews do not constitute an "imminent endangerment" that prevents EPA from granting extensions.[118] In fact, EPA has consistently issued final rules that expressly allow for a post-compliance risk level greater than 1-in-10,000.  In the very first residual risk review imposing requirements under Section 112(f), EPA provided facilities a two-year compliance period despite finding pre-control MIRs as high as 4-in-10,000.[119] Likewise, recent Section 112 rulemakings propose to provide compliance extensions to facilities with MIRs equal to or greater than DPE, including to *twelve facilities* in EPA's April 2024 rule for Sterilization Facilities.[120]

Moreover, the lack of an endangerment becomes even more evident after accounting for data as to real-world risk and the severe distortions of risk inherent in the 2010 IUR.  The available epidemiological evidence, which examines health outcomes of workers exposed to chloroprene emissions at dramatically higher rates than the Facility emits today, shows that the Facility's chloroprene emissions have not and do not pose an increased risk of respiratory or liver cancer (the types of cancer that, according to EPA, are most associated with exposure to chloroprene).  In addition, data from the Louisiana Tumor Registry ("LTR") consistently show no increase in cancer incidence rates in the community surrounding the Facility.

Instead, EPA's risk estimates for the Facility are based entirely on the 2010 IUR for chloroprene.  The 2010 IUR is a flawed risk estimate that adopts a series of patently unrealistic and unsubstantiated assumptions that overstate the actual risk of chloroprene exposure to humans.  Most notably, the 2010 IUR relies on cancer incidence data from female B6C3F1 mice and fails to make scientifically-supported adjustments to account for the dramatic differences between humans and female B6C3F1 mice.  Despite the availability of a sophisticated, peer-review physiologically-based pharmacokinetic ("PBPK") computer model capable of accounting for these important inter-species differences, EPA continues to rely on an outdated and distorted risk estimate.

Neither the underlying science nor EPA's deeply flawed 2010 IUR supports a finding of "imminent endangerment" within the meaning of Section 112(f)(4)(B).  Accordingly, no additional steps need to be taken by DPE during the compliance period beyond the emission control strategies already being implemented by DPE at the Facility.

> **A.    Even if the Flawed IUR Is Accepted, Chloroprene Concentration Levels Near the Facility Do Not Constitute an Imminent Endangerment.**

In the Final Rule, based entirely on a bare citation to the existence of the Section 303 Litigation, EPA takes the position that an "imminent endangerment" exists near the Facility because chloroprene emissions are allegedly causing a lifetime cancer risk of greater than 1-in-10,000.[121]  While EPA has alleged risk levels as high as 14-in-10,000 in the Section 303 Litigation, those allegations are based on outdated monitoring

---

[118] EPA Responses to DPE Second Set of Interrogatories, at 17 (Response to Interrogatory No. 17), Case No. 2:23-cv-00735 (Ex. 30).

[119] EPA, *National Perchloroethylene Air Emission Standards for Dry Cleaning Facilities*, 71 Fed. Reg. 42724, 42731 (July 27, 2006) (estimating baseline MIRs between 50- and 400-in-1-million) (Ex. 31); *id.* at 42729-30 (providing 2-year compliance period).

[120] 89 Fed. Reg. 24090 (Apr. 5, 2024) (Ex. 14); EPA, *Residual Risk Assessment for the Commercial Sterilization Facilities Source Category in Support of the 2024 Risk and Technology Review Final Rule* (Jan. 2024) (Table 2a-1) (Ex. 32).

[121] Final Rule at 85 (Ex. 1); *see also* Compl., ¶ 60-66, *U.S. v. Denka Performance Elastomer LLC et al.*, No. 2:23-cv-00735, ECF No. 1 (E.D. La. Feb. 28, 2023) (Ex. 33).

data.[122]   As of January 15, 2024, the highest alleged concentration measured over the prior 12-months equated to a 6.85-in-10,000 risk level, as determined by EPA's expert in the Section 303 Litigation.[123]

The lifetime risk level associated with chloroprene emissions from the Facility does not constitute an imminent endangerment, including under Section 112(f)(4)(B).

> **i.    In Section 112 of the CAA, Congress made clear that the risk levels above 1-in-10,000 do not constitute an imminent endangerment by mandating that such risks be addressed through an *18-year* regulatory process.**

In Section 112 of the CAA, Congress created a comprehensive program to address cancer risks due to emissions of hazardous air pollutants ("HAPs") from industrial facilities.  In Section 112, Congress imposed deadlines by which EPA was required to take several steps.

- Within one year after the statute was signed into law in 1990, EPA was to identify "source categories"—different types of industrial facilities—that included "major sources" of such pollutants.[124]

- Within ten years (by 2000), EPA was to conduct rulemakings to set technology-based standards to reduce HAP emissions from each source category.[125]

- Within eight years of setting those standards, EPA was to conduct another rulemaking to complete a "residual risk review"—*i.e.*, to evaluate the "risk to public health remaining" after the implementation of the technology-based standards.  As part of this rulemaking, EPA was *for the first time* required to consider whether more stringent standards were needed to address lifetime cancer risks higher than 1-in-10,000.[126]

This means that Congress knew that people were then exposed to lifetime cancer risks higher than 1-in-10,000 due to HAPs, yet Congress determined that it was acceptable to allow such exposure *for up to 18 years*.  Indeed, as shown in the following table, Congress was specifically briefed prior to passing the 1990 CAA amendments on sources with MIRs higher than 10-in-10,000 ($1 \times 10^{-3}$), including some sources with MIRs as high as 100-in-10,000 ($1 \times 10^{-2}$), or more than *16 times higher* than the alleged MIR associated with the entire Facility in the Final Rule.[127]

---

[122] *Id.* ¶ 48.

[123] *See* Supplement to September 6, 2023 Rebuttal Declaration and December 8, 2023 Declaration of Dr. John J. Vandenberg in Support of United States' Statement of Final Relief ("Vandenberg Supp. Decl."), Updated Table 1, Case No. 2:23-cv-00735 (Ex. 34).

[124] 42 U.S.C. § 7412(c)(1).

[125] *Id.* § 7412(d)(2).

[126] *Id.* § 7412(f)(2).

[127] Report on the Committee on Environment and Public Works United States Senate Report Accompanying S. 1894, at 9907 (S. Rept. 100-231) (Nov. 20, 1987) (Ex. 35).

**Denka Performance Elastomer, LLC**

Enclosure in Support of Extension Request
April 19, 2024



| ESTIMATED CANCER RISKS REMAINING UNDER EPA § 112 STANDARDS | | |
|---|---|---|
| POLLUTANT | ANNUAL CANCER INCIDENCE FROM BOTH REGULATED AND UNREGULATED SOURCES | SOURCES POSING MIRs OF $10^{-3}$ OR HIGHER |
| Inorganic Arsenic | 1.7 | Uncontrolled Primary Copper Smelters ($1\times10^{-3}$) |
| | | Primary Lead Smelters ($2\times10^{-3}$) |
| | | Zinc Oxide Plants ($1\times10^{-3}$) |
| Asbestos | 0.7-1.2 | None |
| Benzene | 2.8 | Benzene Handling ($1\times10^{-3}$) |
| Coke Oven Emissions | 4.0 | Wet-Coal Charged By-Product Coke Oven Batteries ($1\times10^{-2}$) |
| Radionuclides | 2.0-2.8 | Underground Uranium Mines ($>1\times10^{-3}$) |
| | | Open-Pit Uranium Mines ($1\times10^{-3}$) |
| | | Elemental Phosphorous Plants ($1\times10^{-3}$) |
| Vinyl Chloride | 0.8 | No estimate |
| TOTALS | 12-13 | 8 sources $\geq 10^{-3}$ |

Notably, EPA attributed to each of the source categories an annual cancer incidence at least 10-times higher than the pre-compliance cancer incidence estimated for DPE's Facility in the Final Rule. Despite these much higher risk estimates, Congress provided *years* to address these risks. Thus, the allegation that emissions from DPE's Facility now pose an "imminent endangerment" directly contradicts Congress' mandate under Section 112 that higher risks be addressed over many years.

> ii.    **The Benzene Rule addressed risk levels up to 10-times higher than the risk level EPA alleges in the Final Rule, yet EPA did not allege the facilities responsible for such risks were causing an imminent endangerment.**

It is inappropriate to use the 1-in-10,000 risk level as the threshold for an "imminent endangerment" because it flatly contradicts the purpose of the 1-in-10,000 risk benchmark in Section 112. Section 112(f)(2)(B) expressly endorsed EPA's use of the 1-in-10,000 risk level in 1989 rulemaking—known as the "Benzene Rule"—to guide what constitutes an "acceptable risk" under Section 112.[128] In doing so, "Congress rejected the Senate version of the bill—which mandated a bright line standard for

---

[128] *Compare* DPE Statement of Material Facts in Support of Motion for Summary Judgment ("DPE MSJ SOF"), *U.S. v. Denka Performance Elastomer LLC*, No. 2:23-cv-00735 (E.D. La. Dec. 29, 2023) ECF No. 131-3, ¶ 9 (Ex. 36) *with* US Statement of Material Facts in Opposition of Motion for Summary Judgment ("US Contested SOF"), *U.S. v. Denka Performance Elastomer LLC*, No. 2:23-cv-00735 (E.D. La. Jan. 26, 2024) ECF No. 150-1, ¶ 9 (Ex. 37); EPA, *National Emission Standards for Hazardous Air Pollutants; Stationary Combustion Turbines Residual Risk and Technology Review*, 54 Fed. Reg. 38044, 38045 (Sept. 14, 1989) (Ex. 38).

carcinogens—in favor of the House version, which gave the Secretary more discretion under the 'ample margin of safety' standard."[129]

EPA admitted in the Section 303 Litigation that the Benzene Rule is "the primary model for establishing emission standards" under Section 112 and that "[t]he approach developed in [the Benzene] rule was endorsed by Congress in the CAA's 1990 Amendments."[130]  The Benzene Rule, which is the Congressionally endorsed "primary model for establishing emission standards," demonstrates that the risk levels attributed to the Facility in the Final Rule, which are dwarfed by the risk levels addressed in the Benzene Rule, do not constitute an imminent endangerment.

In the Benzene Rule, EPA stated that it would "generally presume that if the risk to [the maximum exposed] individual is no higher than approximately 1 in 10 thousand, that risk level is considered acceptable."[131]  As made clear in the Benzene Rule, this "presumptive" risk level of 1-in-10,000 is the *beginning* of EPA's framework for rulemaking, which includes significant safeguards to prevent reflexive reliance on a bare number.  EPA set out a flexible process, requiring consideration of a range of factors, including scientific uncertainties and weight of evidence.[132]  EPA explained that the 1-in-10,000 risk level "does not necessarily reflect the true risk, but displays a conservative risk level which is an upper-bound that is unlikely to be exceeded."[133]

The proposed Benzene Rule was published in July 1988 to establish emission standards for five categories of facilities, known as "source categories."[134]  Of those five source categories, EPA determined that the "coke by-product recovery plant" category posed the highest risk, estimating a risk level of 60-in-10,000 (or $6 \times 10^{-3}$), or 60 times higher than 1-in-10,000 risk level.[135]  That risk level is also 10 times higher than the risk EPA attributes to the Facility in the Final Rule (6-in-10,000)[136]; more than 8 times higher than the highest risk level EPA attributes to the Facility in the most recent 12-month analyzed in the Section 303 Litigation (6.85-in-10,000)[137]; and more than four times higher even than the highest risk level EPA attributed to the Facility in the Section 303 Litigation based on outdated data (14-in-10,000).[138]

Despite being far higher than any risk level alleged for the DPE Facility, EPA did not assert that coke by-product recovery plants were causing an imminent endangerment in the Benzene Rule, nor did EPA declare such plants were causing an "imminent and substantial endangerment" under Section 303 prior to implementation of the final rule.  In the Final Benzene Rule, EPA again did not make an "imminent

[129] *NRDC, et al., v. EPA*, 529 F.3d 1077, 1081 n.4 (D.C. Cir. 2008).

[130] *Compare* DPE MSJ SOF, ¶ 9 (Ex. 36), *with* US Contested SOF, ¶ 9 (Ex. 37); EPA Response to DPE Interrogatory No. 6 (Ex. 39).

[131] 54 Fed. Reg. at 38045 (Ex. 38).

[132] *Id.*

[133] *Id.*

[134] *See* EPA, *National Emission Standards for Hazardous Air Pollutants; Benzene Emissions from Maleic Anhydride Plants, Ethylbenzene/Styrene Plants, Benzene Storage Vessels, Benzene Equipment Leaks, and Coke By-Product Recovery Plants*, 53 Fed. Reg. 28496 (July 28, 1988) (Ex. 40).

[135] *Id.* at 28498.

[136] Final Rule at 109 (Ex. 1) (Table 5 shows a Facility-wide "maximum individual cancer risk" of 600-in-1 million, or 6-in-10,000 for the Neoprene Source Category).

[137] Vandenberg Supp. Decl., Updated Table 1 (Ex. 34).

[138] Declaration of Dr. John J. Vandenberg in Support of Motion for Preliminary Injunction ("Vandenberg PI Decl."), ¶ 60 ("The estimated lifetime cancer risks from chloroprene concentrations detected in the air at the Active monitoring sites range from 2 to 14 per 10,000 people. . . ."), Case No. 2:23-cv-00735 (Ex. 41).

endangerment" finding even though EPA *increased* the risk estimate for coke by-product recovery plants to 70-in-10,000.[139]

In addition to addressing substantially higher risk levels than EPA alleges for the DPE Facility, in the Benzene Rule, EPA also estimated that far more people were exposed to pre-compliance risks greater than 1-in-10,000. In the Final Rule for chloroprene, EPA estimates that 2,300 individuals near DPE's Facility could be exposed to greater than a 1-in-10,000 risk from chloroprene based on the *maximum* individual risk estimate.[140] In the Benzene Rule proposal, EPA estimated that 100,000 people were exposed to risks greater than 1-in-10,000 from coke by-product recovery plants.[141] If a 1-in-10,000 risk level constitutes an imminent endangerment, then surely EPA would have made such a finding when such risk levels existed for 100,000 people in the rule that serves as EPA's "primary model" for regulation of HAPs like chloroprene.

> iii. **Congress expressly deferred any abatement of risk from coke oven facilities for years despite estimating maximum risk levels more than 56-times higher than the risk EPA estimates for the Facility and 340-times higher than the 1-in-10,000 risk level.**

In September 1984, EPA listed coke oven emissions as a HAP under Section 112(b)(1)(A) of the CAA.[142] The EPA Carcinogen Assessment Group established that the unit risk estimate for coke oven emissions was $6.2 \times 10^{-4}$ per µg/m³ for 70-years of continuous exposure ("coke oven IUR").[143] Based on the entire set of health studies, the Administrator concluded that coke oven emissions presented a significant risk of cancer to the public.[144] In 1987, EPA proposed standards for coke ovens pursuant to Section 112 of the CAA Amendments of 1970.[145] In that rulemaking, EPA determined that "[f]or 38 of the 43 plants, the [maximum lifetime risk] is more than 1 chance in 1,000 ($1 \times 10^{-3}$), while the highest [maximum lifetime risk] is 3.4 chances in 100 or *340-in-10,000* ($3.4 \times 10^{-2}$)."[146] This estimate is 56-times higher than the estimated MIR for DPE's Facility (including risk from non-chloroprene sources) in the Final Rule, which is 6-in-10,000.

Despite EPA's estimate that the levels of coke oven emissions in 1987 caused an average of 6.9 deaths from respiratory cancer per year[147] and that the highest risk to the most exposed individual was 340-in-10,000, EPA permitted the facilities to continue operation. Further, EPA chose not to propose controls that "could potentially shut down much of the domestic coke-making capacity."[148] Instead, EPA proposed controls that would only reduce the maximum lifetime risk from 340-in-10,000 to 120-in-10,000, a number

---

[139] *See* 54 Fed. Reg. at 38051 ("There are now 36 coke by-product recovery plants . . . . The revised baseline estimates of health risk indicate an MIR of $7 \times 10^{-3}$ and an annual cancer incidence of 1 case every 6 months (2 cases/year).") (Ex. 38).

[140] Final Rule at 109 (Ex. 1) (Table 5 showing the estimated population at increased risk of cancer greater than 1-in-10,000 to be 2,300).

[141] 53 Fed. Reg. at 28498 (Table I-1 listing estimated population subject to "baseline" risk of $1 \times 10^{-4}$ before compliance with rule) (Ex. 40).

[142] *See* 49 Fed. Reg. 36560 (Sept. 19, 1984) (Ex. 42).

[143] EPA, *Carcinogen Assessment of Coke Oven Emissions* at 5 (Feb. 1984) (Ex. 43).

[144] 52 Fed. Reg. 13586, 13587 (Apr. 23, 1987) (Ex. 44).

[145] *Id.*

[146] 52 Fed. Reg. at 13589 (Ex. 44).

[147] This figure does not include any carcinogenic effects of occupational exposures.

[148] 52 Fed. Reg. at 13594 (Ex. 44).

that is still 20-times higher than EPA's MIR for DPE's Facility.[149] EPA never finalized its regulation of coke oven emissions due to the decision in *NRDC v. EPA*, 824 F.2d 1146 (D.C. Cir. 1987) ("*Vinyl Chloride* case"), which ruled that EPA was improperly applying the "ample margin of safety" language in Section 112 at the time.[150]

In the 1990 CAA Amendments, which remain effective today, Congress expressly provided *additional* time for coke ovens to comply with Section 112 requirements despite EPA having previously estimated that coke ovens pose a 340-in-10,000 risk level.  A House of Representatives debate on the 1990 Amendments provided the following explanation for a compliance extension:

> Due to the enormous capital investment that will be required over the next decade of the American steel industry in order to clean it up and make it more efficient, the conferees felt it appropriate to extend the deadline for compliance with the residual risk standard for those coke ovens that would comply with a more stringent regulatory regimen in the earlier years.[151]

The result of the 1990 CAA Amendments was that the timetables for compliance with regulations for coke ovens are far longer than those for other industrial sectors.  For example, under the normal Section 112 deadlines, the compliance date to comply with MACT standards would have been January 1, 1996, but coke oven facilities were given two additional years (until January 1, 1998) to comply with the MACT standards. In the MACT rule, EPA specifically noted that numerous commenters cited cancer risk estimates ranging from 1-in-55 to 1-in-300 over 70 years, meaning that risks had actually *increased* for some facilities since Congress passed the 1990 Amendments.  In response, EPA stated:

> The proposed emission limits were developed under the 1990 Amendments to the Act and are based on available emission control technology and the performance levels that are achievable by the technology. The Act specifically defers immediate implementation of residual risk standards. Estimates of risk to the surrounding community simply do not play a role in the development of MACT standards. (See sections 112(d)(8) (a) and (c).) However, the EPA is required under the Act to develop residual risk standards within the next 8 years. Provisions within the Act will allow certain batteries to defer meeting this risk standard until the year 2020. To defer the risk standard, these batteries must meet the more stringent LAER emission limits.[152]

The importance of this history here could not be clearer: chloroprene emissions from DPE's Facility cannot be causing an imminent endangerment if both Congress and EPA expressly allowed for coke oven facilities to continue operating for years with much higher risk estimates.

---

[149] *Id.*

[150] In the *Vinyl Chloride* case, the U.S. Court of Appeals for the D.C. Circuit ruled en banc that this means that EPA must: (a) determine a safe emissions level, and (b) promulgate an emissions standard at a level which protects the public health with an ample margin of safety—*i.e.*, the promulgated standard may not be less stringent than the safe emissions level determined in (a). Cost and feasibility issues may be considered with regard to the latter, but not the former step.  The first NESHAP to be promulgated under the *Vinyl Chloride* ruling would be that for benzene; next was coke oven emissions.

[151] H. Res. 535 (Oct. 26, 1990) (Ex. 45).

[152] 58 Fed. Reg. 57898, 57907 (Oct. 27, 1993) (Ex. 46).

    **iv.**    **EPA's long-standing, as well as recent, acceptance of risk levels greater than 1-in-10,000 and 6-in-10,000 shows that such levels of risk are not permissible thresholds for alleging an imminent endangerment.**

Finding that the Facility's emissions constitute an imminent endangerment would be unprecedented and contradict more than 30 years of EPA's treatment of risk under Section 112.  When EPA has identified a risk level greater than 1-in-10,000 in past rulemakings, EPA has *never* found an imminent endangerment or otherwise limited emissions from the regulated facilities while the rule is being implemented.  In fact, EPA has issued final rules that expressly allow for lifetime cancer risks *greater* than 1-in-10,000.[153]  For example, in the final rule implementing the Section 112(f) residual risk review for coke ovens, EPA accepted a post-control MIR of 2.7-in-10,000 and a post-control cancer incidence of 0.06.[154] A 0.06 annual cancer incidence is the same incidence that EPA estimates for DPE's Facility in the Final Rule *prior to controls being installed*.[155]  In other words, a 90-day compliance period means that EPA believes a 0.06 cancer incidence rate results in an "imminent endangerment" for DPE's Facility during a 21-month period, but is perfectly acceptable for coke oven facilities *indefinitely*.[156]

Likewise, in recent rulemakings, EPA has consistently extended compliance periods for facilities with estimated MIRs equal to or far greater than DPE's Facility, for facilities with higher estimated cancer incidences, and for facilities for which a greater number of people were exposed to an estimated risk above 1-in-10,000. In the Section 112 rulemaking for commercial sterilization facilities, EPA provides unqualified compliance periods of 2-years to all facilities, including 12 facilities with MIRs equal to or greater than DPE.[157] EPA has not released the final risk assessment in support of the Final Rule, but the Final Rule provides unqualified compliance period of 2-years to all facilities other than DPE, including four facilities for which EPA estimated MIRs that were equal to or greater than DPE at the time of the Proposed Rule.[158] Similarly, EPA provided unqualified extensions for numerous facilities in the Miscellaneous Organic Chemical Manufacturing source category with MIRs equal to or greater than the MIR attributed to DPE in the Final Rule.[159]  In total, EPA has provided unqualified extensions to 20 facilities with MIRs higher than DPE in the past four years.

---

[153] *See* EPA, *National Emission Standards for Coke Oven Batteries*, 70 Fed. Reg. 19992, 19994 (Apr. 15, 2005) (NESHAP for Coke Oven Batteries setting lifetime cancer risk from exposure to coke oven emissions at 2.7-in-10,000) (Ex. 47); 72 Fed. Reg. 25138, 25143 (May 3, 2007) (NESHAP for Halogenated Solvent Cleaning settings risk level of 2-in-10,000) (Ex. 48).

[154] 70 Fed. Reg. at 19993-94 (Ex. 47).

[155] Final Rule at 109 (Table 5) (Ex. 1).

[156] As for chloroprene, EPA determined that children are more sensitive than adults to the carcinogenic effects of coke oven emissions.

[157] 89 Fed. Reg. 24090 (Apr. 5, 2024) (Ex. 14); EPA, *Residual Risk Assessment for the Commercial Sterilization Facilities Source Category in Support of the 2024 Risk and Technology Review Final Rule* (Jan. 2024) (Table 2a-1) (Ex. 32).

[158] EPA, *Residual Risk Assessment for the SOCMI Source Category in Support of the 2023 Risk and Technology Review Proposed Rule* (Table 2) (Ex. 49).

[159] 85 Fed. Reg. 49084 (Aug. 12, 2020) (Ex. 50); EPA, *Residual Risk Assessment for the Miscellaneous Organic Chemical Manufacturing Source Category in Support of the 2020 Risk and Technology Review Final Rule* (Table 21) (Ex. 51).

Enclosure in Support of Extension Request
April 19, 2024



EPA also estimates that there are 15 U.S. census tracts where EtO poses a higher cancer risk than chloroprene poses.[160] The Final Rule imposes additional emission controls on EtO facilities, but such facilities will operate for at least 24 months at existing emission levels. As with chloroprene, EPA has also concluded that EtO operates through a "mutagenic mode of action," meaning that the alleged risks to children are higher in those 15 tracts than in the tract in which the Facility is located. In four of those tracts the risk is more than twice as high as that attributed to the Facility.[161] Thus, any potential impacts to children would arise even faster in census tracts in which these EtO facilities are located. Yet EPA has not imposed a 90-day compliance deadline on EtO facilities in any of the 15 tracts, nor has EPA taken any action under Section 303 to allege an imminent and substantial endangerment in these tracts.[162] This dramatic inconsistency underscores the fundamental flaws in EPA's position on chloroprene.

---

[160] *See* EPA, *2019 AirToxScreen: Assessment Results* (last updated Dec. 27, 2023) (providing access to pollutant-specific data in spreadsheet entitled 2019 AirToxScreen National Cancer Risk by Pollutant) (identifying fifteen U.S. census tracts where ethylene oxide poses a higher cancer risk than chloroprene poses at the Facility) (Ex. 52).

[161] *Id.* (identifying Tracts 72123953100, 13217100300, 48141010337, and 48141010338 as having risk from ethylene oxide emissions more than twice the chloroprene risk in the Facility's tract).

[162] 89 Fed. Reg. 24090 (Apr. 5, 2024) (Ex. 14).

**B.     EPA's Allegation Of Imminent Endangerment Is Refuted By The Available Real-World Data Showing No Cancer Risk Of Chloroprene To Humans Near the Facility.**

The available real-world evidence shows that chloroprene emissions from the Facility have not and do not pose an increased risk of respiratory or liver cancer (the cancers that, according to EPA, are associated with exposure to chloroprene).  The rulemaking record contains no evidence of a single case of cancer attributable to chloroprene emissions from the Facility, let alone any evidence that cancer rates in the vicinity of the Facility have actually increased due to the Facility's chloroprene emissions.  Likewise, EPA admitted in the Section 303 Litigation that it has no such evidence.[163]  Further, the lack of an association between chloroprene and cancer is corroborated by tumor incidence data collected by the Louisiana Tumor Registry.  This complete lack of evidence is meaningful given the decades of operation of the Facility, under prior ownership, when chloroprene emissions were orders of magnitude higher than they are today.[164]  If chloroprene posed the risk of respiratory and liver cancer alleged by EPA, then one would expect some signal of such cancers in the neighboring community after many decades of substantially higher chloroprene emission levels.[165]  There is no such signal.  This is consistent with the strongest epidemiological study of workers historically exposed to substantially greater levels of chloroprene, which found no linkage between chloroprene and lung and liver cancer.

**i.     The epidemiological evidence supports the conclusion that chloroprene exposure at human-relevant levels does not cause respiratory or liver cancers, and thus poses no risk in the vicinity of the Facility.**

The "strongest studies" on the human carcinogenicity of chloroprene is the 2007 Marsh *et al.* study published in two parts (Marsh *et al.* 2007a and Marsh *et al.* 2007b, collectively "the 2007 Marsh Study"), which is "the only [study] of adequate quality to validly address epidemiologically the cancer risks associated with human exposure to chloroprene."[166]  Dr. Helen Suh, EPA's epidemiology expert in the Section 303 Litigation, testified that the epidemiological study conducted by Dr. Gary Marsh of chloroprene workers "was the most comprehensive study," was "head and shoulders above" the other chloroprene studies, and "had the most detailed and precise measure of chloroprene exposures."[167]  The 2007 Marsh Study, which represented 74% of the total person-years studied across all studies, as well as 88% of all lung cancer deaths and 49% of all liver cancer deaths, received scores of "H" (high-quality) or "H-M" (high to medium quality) in all quality review categories.[168]

Marsh *et al.* (2007) studied the impacts of chloroprene on a large cohort of U.S. and European chloroprene workers—individuals who for multiple decades were subjected to chloroprene concentrations estimated

---

[163] *See* EPA Responses to DPE First Set of Interrogatories, at 28 (Response to Interrogatory No. 12) (EPA "not currently aware of specific incidents of cancer that have been attributed by a medical professional or individual with other relevant scientific expertise to exposure to Denka's chloroprene emissions.") (Ex. 29); *see also* Deposition Transcript of Dr. Helen Suh ("Suh Dep. Tr.") 230:7-18 (EPA epidemiology expert not aware of any cancer incidence specifically attributable to chloroprene due to Facility emissions), Case No. 2:23-cv-00735 (Ex. 53).

[164] Declaration of Kenneth A. Mundt, PhD, FACE ("Mundt Decl."), ¶¶ 47-49 (including graph from 10/12/2022 Letter from EPA to LDEQ at 28 showing 500 tons of chloroprene emissions in 1985), Case No. 2:23-cv-00735 (Ex. 54); Meyers Extension Request Decl., ¶ 44 (Ex. 11).

[165] Mundt Decl., ¶¶ 44-45, 47-49 (Ex. 54).

[166] *Id.* ¶ 25 (quoting Sax, Sonja N. *et al.*, "Extended Analysis and Evidence Integration of Chloroprene as a Human Carcinogen," *Risk Analysis* 40(2): 294-318 (2020) ("Sax *et al.* (2020)") (Ex. 55)).

[167] Suh Dep. Tr. 87:12-15, 83:3-13, 84:15-18 (Ex. 53).

[168] Mundt Decl., ¶ 26 (Ex. 54).

to be hundreds of times higher than those of residents living in the vicinity of the Facility today.[169]  Overall, the 2007 Marsh Study did not provide evidence of elevated respiratory or liver cancer mortality risks among the cohort of chloroprene-exposed workers.[170]  For the chloroprene worker subcohorts defined by the specific plants in the 2007 Marsh Study, all of the standardized mortality rates ("SMRs", the ratio of the number of observed deaths to the number of expected deaths) based on local reference rates were below 1.0, providing no indication of any excess occurrence of cancers among the chloroprene-exposed workers compared with local background rates.[171]  In sum, the chloroprene-exposed workers in the 2007 Marsh Study had only about 90% of the expected all-cause mortality rate, relative to the background rates in the local (or state or national) population.  This evidence, and especially the results specific to respiratory and liver cancers demonstrating no excesses occurrence of these cancers, does not demonstrate—or even suggest—an association between occupational chloroprene exposure and increased risk of human respiratory or liver cancers.[172]

The Louisville plant chloroprene workers included in the 2007 Marsh Study represent the largest single-site ever studied epidemiologically for chloroprene exposure and had the largest number of reported respiratory cancer deaths—more than all other epidemiological chloroprene studies combined, regardless of study quality.[173]  This group also was among the most highly exposed to chloroprene.[174]  Nevertheless, no clear evidence of excess occurrence of these cancers or any relationship with exposure category is seen.  Regardless of the referent group or exposure metric used, the 2007 Marsh Study of the Louisville workers most highly exposed to chloroprene demonstrated no clear or consistent exposure-response relationship between estimated i) duration of exposure, ii) exposure intensity, and iii) cumulative exposure to chloroprene, and increased risk of respiratory or liver cancers.[175]  The lack of exposure-response (*i.e.*, increasing risks with increasing exposures) is real-world evidence that refutes EPA's allegation that chloroprene causes these cancers, as demonstrating increasing risk with increasing exposure is a central tenet in assessing causality.[176]

The chart below[177] plots the relative risk estimates and their 95% confidence intervals (indicated by vertical lines) based on (i) regional referent rates (shown in orange); (ii) an internal referent group (shown in blue); and (iii) on analyses using mortality rates from a corporate mortality registry (shown in green):

---

[169] *Id.* ¶¶ 39, 42-43.

[170] *Id.* ¶ 28.

[171] *Id.* ¶¶ 28, 36, 41; Sax *et al.* (2020).

[172] *Id.* ¶¶ 28, 36, 41; Sax *et al.* (2020).

[173] *Id.* ¶ 36.

[174] *Id.*

[175] *Id.* ¶ 35.

[176] *Id*.

[177] *Id.* ¶ 36.



While there are small differences based on the referent rates used, all the results lie close to the null value of 1.0 (*i.e.*, the horizontal line) representing "no association"—meaning there is a clear lack of any exposure-response relationship.[178]  Eleven out of twelve estimates indicate no statistically significant increase in the relative risk estimate.[179]

In general, where exposure increases the risk of a specific cancer, SMRs and RRs tend to increase with increasing exposure and an exposure-response will be seen.[180]  In contrast, the above chart shows that the subset of workers with the very highest cumulative exposures—shown on the far right of the chart— all fall *below* the null value of 1.0 representing *no association* between chloroprene exposure and cancer.[181]  The chart above illustrates what one typically observes where the exposure (especially when ranging over three orders of magnitude) fails to move the risk needle.[182]

---

[178] *Id.* ¶ 37.

[179] *Id.*

[180] *Id.*

[181] *Id.*

[182] *Id.*; *see also* Mundt, K.A. *et al.*, "Quantitative estimated exposure to vinyl chloride and risk of angiosarcoma of the liver and hepatocellular cancer in the US industry-wide vinyl chloride cohort: mortality update through 2013," *Occupational and Environmental Medicine*, 74(10): 709-16 (2017) ("Mundt *et al.* (2017)") (study of the North American Vinyl Chloride Workers presents clear demonstration of both excess liver cancer among workers and strong exposure-response relationships) (Ex. 56).

In 2021, Dr. Marsh updated the 2007 study, examining 17 additional years of data (through 2017) on the same cohort of U.S. chloroprene workers as well from the 2007 study.[183]  Again, Dr. Marsh found no increase in cancer mortalities among U.S. chloroprene workers, a population exposed to far higher concentrations of chloroprene than the communities surrounding the Facility today.[184]  As depicted in the table below, the updated study of chloroprene workers continued to demonstrate no excess occurrence of either respiratory or liver cancers at the Louisville Plant—the largest plant with the highest chloroprene exposures.[185]  The table shows that most SMRs are lower than 1.0 and that, for the two that are greater than 1.0, the lower bound of the 95% confidence interval ("CI") never exceeds 1.0, indicating that, there are no statistically significant excess risks seen.[186] Findings that are not statistically significant, including all reported in the table below, are interpreted as being no different from 1.0, the value representing no association, and therefore providing no scientific support for the hypothesis that chloroprene causes these cancers.[187]

|  | Cumulative exposure | Observed deaths | SMR | 95% CI |
|---|---|---|---|---|
| RSC | < 4.747 | 95 | 0.66 | 0.53-0.80 |
|  | 4.747-55.918 | 97 | 0.71 | 0.57-0.86 |
|  | 55.919-164.052 | 96 | 0.94 | 0.76-1.15 |
|  | 164.053+ | 70 | 0.65 | 0.51-0.82 |
| LC | < 4.747 | 9 | 0.76 | 0.35-1.45 |
|  | 4.747-55.918 | 8 | 1.34 | 0.58-2.63 |
|  | 55.919-164.052 | 5 | 1.09 | 0.35-2.55 |
|  | 164.053+ | 9 | 0.90 | 0.41-1.71 |

Dr. Marsh's epidemiological studies strongly support the conclusion that chloroprene does not pose a meaningful risk of respiratory or liver cancer to humans, particularly given the orders of magnitude higher chloroprene exposures experienced by the chloroprene workers compared to the chloroprene concentrations existing near the Facility today.[188]

---

[183] Mundt Decl., ¶¶ 50-51 (Ex. 54); Marsh, G. M., Kruchten, A., & Buchanich, J. M., "Mortality Patterns Among Industrial Workers Exposed to Chloroprene and Other Substances: Extended Follow-Up," *J. Occup. Environ. Med.*: 63(2), 126-138 (2021) ("Marsh *et al.* (2021)" (Ex. 57)).

[184] Mundt Decl., ¶¶ 50-51 (Ex. 54); Marsh *et al.* (2021) (Ex. 57).

[185] Mundt Decl., ¶ 50 (Ex. 54).

[186] *Id.*

[187] *Id.*

[188] *Id.* ¶¶ 51-52.

>    ii.    **The lack of association between chloroprene and cancer in the vicinity of the Facility is corroborated by data from the Louisiana Tumor Registry.**

For decades, in conjunction with the National Cancer Institute, Louisiana has had a robust program to track cancer cases throughout the state. The data from the Louisiana Tumor Registry ("LTR") consistently show no increase in cancer incidence rates in the community surrounding the Facility.[189] The LTR, maintained by the Louisiana State University School of Public Health, has a mission "[t]o collect and report complete, high-quality, and timely population-based cancer data in Louisiana to support cancer research, control, and prevention."[190] In 2020-2021, Louisiana State University conducted a study confirming that the LTR had not omitted any relevant cancer cases in the 2009-2018 timeframe.[191] Dr. Helen Suh, EPA's epidemiology expert in the Section 303 Litigation, confirmed that the LTR data "seems like it's high-quality,"[192] and she had no questions about the completeness and quality of the LTR data.[193]

Community disease surveillance studies, including those based on the LTR data, can provide a sense of, or clues as to, whether there might be excess occurrences of disease that an agent (like chloroprene) has been postulated to cause.[194] A lack of increased risk of respiratory and liver cancers from chloroprene exposure in the communities surrounding the Facility—where chloroprene exposure likely is orders of magnitude lower than that of the workers studied in the 2007 Marsh Study—would be expected, given the lack of any excess of these cancers in the highly exposed workers in both the Pontchartrain and Louisville plants studied in the 2007 Marsh Study.[195] Analyses using LTR data and comparing cancer rates across Louisiana parishes demonstrate that the overall cancer rate for St. John the Baptist Parish falls into the lowest 25% of cancer rates by parish across the entire state.[196]

Historical emissions from the Facility were orders of magnitude higher during the late 1960s through the mid-1980s than in recent years.[197] In an October 12, 2022 "letter of concern," issued under the authority of Title VI of the Civil Rights Act of 1964, sent by EPA to the Louisiana Department of Environmental Quality ("LDEQ") and the Louisiana Department of Health ("LDH"), EPA included a figure showing the significant emission reductions at the Facility since 1987, particularly the substantial reductions achieved by DPE since commencing operations at the Facility in 2015.[198] This figure not only illustrates the dramatic reduction in chloroprene emissions since 1987, but it also demonstrates the additional, significant chloroprene emission reductions achieved by DPE after DPE's acquisition of the Facility in 2015.

---

[189] *Id.* ¶¶ 52-53.

[190] LSU Health, *About the Registry*, available at https://sph.lsuhsc.edu/louisiana-tumor-registry/about-the-registry/.

[191] LDH Cancer Surveillance Study in St. John Parish (CRISP) Report (Jan. 2022) (Ex. 58).

[192] Suh Dep. Tr. 99:21-100:12 (Ex. 53).

[193] *Id.* at 113:6-12; 151:1-9.

[194] Mundt Decl., ¶ 44 (Ex. 54).

[195] *Id.*

[196] *Id.* ¶ 45; LSU Health, *Louisiana Cancer Data Visualization*, available at https://sph.lsuhsc.edu/louisiana-tumor-registry/data-usestatistics/louisiana-data-interactive-statistics/louisiana-cancer-data-visualization/ (LTR update for 2015-2019 period showing St. John the Baptist Parish within bottom 25% of cancer incidence rates state-wide).

[197] Mundt Decl., ¶ 47 (including graph from 10/12/2022 Letter from EPA to LDEQ at 28) (Ex. 54).

[198] *See* 10/12/2022 Letter from EPA to LDEQ at 28 (Ex. 59).



Chloroprene emissions from the Facility dropped precipitously between 1987 and 1993, and declined continuously and roughly monotonically until 2017, whereupon the emissions again rapidly declined.[199] The typical latency periods for respiratory and liver cancers are 20 or more years and can range well above 30 years.[200]  Therefore, the exposure time period most likely to give rise to excess cancers (if any) today or in recent years would be those that occurred at least 20 years ago.[201]  Thus, if chloroprene emissions from the Facility had increased the risks of respiratory and liver cancers in the community surrounding the Facility from around 2015 to 2020, the most relevant time window for those exposures would have occurred from at least 20 to 40 or more years ago, *i.e.,* conservatively, between 1975 and 2000.[202]  The LTR data show no signal of excess occurrence of respiratory or liver cancers, notwithstanding the orders of magnitude higher levels of chloroprene during the period of time most likely to give rise to excess cancers in recent years.[203]

EPA itself relied upon LTR data to assess the health risks due to chloroprene exposure in the communities surrounding the Facility.  In 2020, EPA granted roughly $300,000 to the LDEQ and the LDH "to assess the health risks associated with Chloroprene exposure in St. John the Baptist Parish near the Denka Plant." The two stated objectives of the funded research were to determine "if there are higher instances of cancer in the community due to" the Facility's emissions, and "if there has been under-reporting of these

---

[199] Mundt Decl., ¶ 47 (Ex. 54).

[200] *Id.* ¶ 48.

[201] *Id.*

[202] *Id.* ¶ 49.

[203] *Id.* ¶ 50.

cases in the [LTR]."[204]   The LDH Report resulting from the EPA grant was issued in 2021 and found that "no reportable cancers were identified that were not already contained in the LTR data."[205]  The Report further found that census tracts in the vicinity of the Facility "have statistically significantly lower overall cancer incidence rates ... compared to Louisiana overall cancer incidence rate."[206]  An LDH official also reported to EPA based on the LTR analysis that "the only elevated rates we found were in census tract 702 for prostate and NHL, which have not been found to be related to chloroprene."[207]

As no excess occurrence of respiratory or liver cancers has been reported in any area or community surrounding the Facility, the LTR cancer surveillance exercises fail to support any claim that chloroprene emissions at historically very high levels had any measurable impact on rates of these cancers among residents in areas surrounding the Facility in any recent years.[208] Given the dramatically lower exposure levels today, it is inconceivable that future rates would be any different due to environmental exposure to chloroprene.[209]

> C.   **To the Extent EPA's Imminent Endangerment Assessment Is Based on EPA's 2010 Inhalation Unit Risk, the IUR Fails To Provide The Best Estimate Of Human Risk From Chloroprene.**

EPA's MIR and risk assessment is based on the IUR developed in EPA's Toxicology Review of Chloroprene ("2010 Review").[210] EPA calculated the IUR for human exposure to chloroprene to be $5 \times 10^{-4}$ per $\mu g/m^3$ for 70-years of continuous exposure ("chloroprene IUR").  In the Section 303 Litigation, EPA calculated cancer risks to humans in relation to a threshold of 0.2 $\mu g/m^3$.[211]  The 0.2 $\mu g/m^3$ value represents EPA's estimate of a chloroprene concentration that, if inhaled continuously for 70 years, corresponds to a 1-in-10,000 excess chance of cancer.  EPA's Integrated Risk Information System ("IRIS") program develops toxicology reviews to characterize the risks to human health posed by specific environmental hazards.

The IRIS Program follows a risk assessment approach based on the four-step process described by the National Research Council.[212]   IRIS assessments "serve as starting materials for the overall risk characterization process that completes the risk assessment."[213]  The EPA's Guidelines for Carcinogen Risk Assessment state that risk characterization "is an appraisal of the science that informs the risk manager in public health decisions, as do other decision-making analyses of economic, social, or technology

---

[204] EPA Cooperative Agreement 01F70601 to LDEQ (Sept. 19, 2020) (Ex. 60); EPA Responses to DPE Second Set of Interrogatories, at 14-15 (Response to Interrogatory No. 16) (Ex. 30); EPA_1932780 at EPA_1932855 (Ex. 61) ("There are two tasks that are to be accomplished: a study to ensure that the types and numbers of cancers in the Louisiana Tumor Registry database are complete for the area to serve as a baseline, and an evaluation and analysis of that database specific to the 1.5-km radius and 2.5-km radius around Denka to determine if there are higher instances of cancer in the community and if the observed cancers are attributable to Denka.").

[205] Cancer Reporting in St. John Parish, Cancer Surveillance Project, EPA_2235649 at EPA_2235661 (Ex. 62).

[206] *Id.* at Appendix F ("Cancer Incidence Rates in St. John the Baptist Parish") at EPA_2235686.

[207] EPA_2548391 (email correspondence) (Ex. 63).

[208] Mundt Decl., ¶ 50 (Ex. 54).

[209] *Id.* ¶¶ 50, 52.

[210] EPA, *Toxicological Review of Chloroprene: In Support of Summary Information on the Integrated Risk Information System (IRIS)* (Sept. 2010) ("2010 Review") (Ex. 64).

[211] *Id.* at 138.

[212] *See* EPA, *Basic Information about the Integrated Risk Information System* (last updated Nov. 9, 2023), available at https://www.epa.gov/iris/basic-information-about-integrated-risk-information-system.

[213] EPA, *Guidelines for Carcinogen Risk Assessment* 1-21 (Mar. 2005), EPA/630/P-03/001B (Ex. 65).

issues."[214]  The risk assessment does not generate independently actionable information, but must be incorporated into EPA's risk management paradigm.[215]  Following the completion of a risk assessment, EPA implements "risk management" processes, which include EPA's rulemaking activities.[216]

Simply put, EPA has failed in its obligation to apply risk management principles in assessing the risk of the DPE Facility.  Risk management involves developing, analyzing, and comparing options related to potential regulatory control in light of legal, political, social, economic, and technical considerations.[217]  The chloroprene IUR does not reflect any of these essential considerations.  Therefore, it is incumbent upon risk managers to consider the uncertainties and weaknesses of the chloroprene IUR.  EPA has provided no evidence that it has considered new risk estimates or qualitative information that accompanied and informed the chloroprene IUR.  Instead, EPA applied the chloroprene IUR without adjustment and has opted out of the risk management obligations that it is required to perform.

When new risk estimates and qualitative information are considered, it is clear that the chloroprene IUR fails to provide the most probative estimate of human risk from exposure to chloroprene and should not be used to assess "imminent endangerment."  First, the physiologically-based pharmacokinetic ("PBPK") computer model developed by scientists at Ramboll US Corporation ("Ramboll"), which can be used to aid in the calculation of an IUR that accounts for species-specific parameters (the "Ramboll PBPK Model"),[218] provides the best method to provide a reasonable scientific estimate of chloroprene's cancer potency in humans and provides a better estimate of risk than the chloroprene IUR.[219]  Second, even if the Ramboll PBPK Model were not utilized to calculate the chloroprene IUR, applying real-world adjustments to EPA's chloroprene IUR results in a less uncertain and distorted risk estimate.

> i.     **The Ramboll PBPK Model provides the best estimate of human risk from chloroprene.**

A PBPK model is a mathematical computer model that simulates the uptake, distribution, metabolism, and elimination of a chemical in a human or animal body using equations that are consistent with the biological structure of the organism being simulated.[220]  PBPK models simulate chemical exposures and predict internal doses of the chemical or one or more of its metabolites that appear in specific organ systems of the body.[221]  These type of models use well-established, known values for modeling physiological parameters such as heart rate, breathing rate, blood flow rate, body weight, size of organs, and others in the mathematical equations to accurately represent the physiology of a laboratory animal or a human.[222]  They also incorporate measured rates of metabolism in the various organs and elimination from the body (such as exhalation or clearance in the urine).[223]  Importantly, PBPK models are capable of extrapolating from animal exposures or doses to human exposure, while accounting for physiological and

---

[214] *Id.* at 5-1 to 5-2.

[215] *Id.*

[216] *Id.*

[217] *Id.*

[218] Declaration of Dr. Robinan Gentry in Support of Opposition to Motion for Preliminary Injunction ("Gentry Decl."), ¶¶ 14-15, Case No. 2:23-cv-00735 (Ex. 66).

[219] Declaration of Dr. Michael Lumpkin in Support of Opposition to Motion for Preliminary Injunction ("Lumpkin Decl."), ¶ 120, Case No. 2:23-cv-00735 (Ex. 67).

[220] Gentry Decl., ¶ 14 (Ex. 66).

[221] Lumpkin Decl., ¶ 42 (Ex. 67).

[222] *Id.* ¶ 43.

[223] *Id.*

toxicokinetic differences between the species.[224]  EPA considers PBPK models to be the optimal approach for extrapolation of chemical dose across species.[225]   When preparing IRIS toxicological reviews, EPA considers whether an adequate PBPK model is available for use.[226]

Using the Ramboll PBPK Model and EPA software to calculate an IUR results in the best estimate of chloroprene's cancer potency in humans because it accounts for the significant toxicokinetic differences between humans and female B6C3F1 mice.  By failing to calculate its risk estimate for chloroprene using the Ramboll PBPK Model, EPA has failed to offer a risk estimate that is appropriate for assessing whether there is an imminent endangerment to *humans*.

The Ramboll PBPK Model was not available when EPA published the 2010 Review.[227] However, the 2010 Review stated, "[i]deally, a PBPK model for the internal dose(s) of the reactive metabolite(s) would decrease some of the quantitative uncertainty in interspecies extrapolation; however, current PBPK models are inadequate for this purpose." [228]  EPA guidance supports the use of PBPK modeling when available, stating that, "[t]oxicokinetic modeling is the preferred approach for estimating dose metrics from exposure."[229] EPA recognizes that "[t]he primary advantage gained by using PBPK models in risk assessment is their ability to relate toxicity responses in a test species to humans and outcomes observed in smaller populations to likely outcomes in the general population."[230]

In April 2018, DPE and Ramboll submitted a work plan to EPA for the development of a PBPK model for chloroprene that would satisfy EPA requirements.[231] From 2018 through 2020, EPA and Ramboll engaged in sustained dialogue to improve the PBPK model, including two separate rounds of quality review by EPA.[232]  In response to EPA's review, Ramboll made revisions to the model, developed supporting documentation, and provided EPA with the model's computer code and validation data.[233] At EPA's request, Ramboll also agreed to conduct an additional experiment in support of a specific model parameter.[234]

Based on EPA's feedback, the Ramboll PBPK Model was published in a peer-reviewed article in *Frontiers in Pharmacology* in 2023.[235]  Prior to the Ramboll PBPK Model being published in 2023, DPE in 2021

---

[224] EPA, *Approaches for the Application of Physiologically Based Pharmacokinetic Models and Supporting Data in Risk Assessment* at 4-11 – 4-12 (Aug. 2006) ("EPA PBPK Guidance") (Ex. 68).

[225] EPA, *Methods for Derivation of Inhalation Reference Concentrations and Application of Inhalation Dosimetry* at 1-12 (Oct. 1994) (Ex. 69).

[226] *See e.g.,* EPA, *Toxicological Review of Dichloromethane (Methylene Chloride)* at 226 (Nov. 2011) (using "the best available" PBPK models to derive IUR) (Ex. 70); EPA, *Toxicological Review of Vinyl Chloride* at 44-53 (May 2000) (using Clewell *et al.* PBPK model to derive IUR) (Ex. 71).

[227] Gentry Decl., ¶ 15 (Ex. 66).

[228] 2010 Review at 141 (Ex. 64).

[229] EPA, *Guidelines for Carcinogen Risk Assessment* (Mar. 2005), EPA/630/P-03/001B (Ex. 65).

[230]  EPA PBPK Guidance at 2-9 (2006) (Ex. 68).

[231] EPA, *Background Description for Chloroprene PBPK Modeling* at 4 (July 2020) (Ex. 72).

[232] *Id.*; Gentry Decl., ¶¶ 20-28 (Ex. 66).

[233] Gentry Decl., ¶ 23 (Ex. 66).

[234] *Id.*

[235] Lumpkin Decl., ¶ 70 (Ex. 67); Campbell, J.L. et al., "Using available in vitro metabolite identification and time course kinetics for β-chloroprene and its metabolite, (1-chloroethenyl) oxirane, to include reactive oxidative metabolites and glutathione depletion in a PBPK model for β-chloroprene," *Frontiers in Pharmacology* 14:1223808 (2023) ("Campbell et al. (2023)") (Ex. 73).

submitted the model (including detailed documentation and the underlying computer code) to EPA as part of DPE's administrative challenge to the chloroprene IUR based on the 2010 Review.[236]  EPA did not undertake a technical analysis to evaluate the IUR estimated by the Ramboll PBPK Model.  EPA stated: "Ramboll's analyses assert that the risk of human lung cancer is minimal compared to mice, making the current IRIS IUR an overestimate of risk.  EPA has not undertaken the technical analysis to reach a conclusion on concurrence with this assertion."[237]  EPA subsequently denied DPE's administrative appeal of EPA's decision not to revisit the chloroprene IUR based on the Ramboll PBPK Model, citing resource limitations and a lack of an appropriate procedural mechanism.[238] Specifically, EPA stated that "the [IRIS administrative appeal] process is not a mechanism to commit EPA to undertake scientific updates of its risk assessment products, such as IRIS Toxicological Reviews."[239] EPA has not evaluated the Ramboll PBPK Model outside of the IRIS program either.

> 1.      **The Ramboll PBPK Model uses the appropriate dose metric to estimate
>         risk.**

PBPK models are designed to estimate an internal "dose metric," which is the amount of a chemical that most closely relates to an adverse (*e.g.,* toxic) response.[240]  Internal dose metrics provide a better understanding of the potential for toxicity than an "external" dose (*e.g.,* the amount of chloroprene inhaled), thus reducing uncertainty.[241]  This is because internal dose metrics can account for the most biologically relevant form of the chemical, its level, duration of internal exposure, intensity, and the appropriate tissues.[242]  The major advantage of using an internal dose metric is that it can provide a stronger biological basis for comparing the effects of a chemical across species (*i.e.,* mice to human) and dose levels (*e.g.,* high levels of chloroprene to low levels of chloroprene).[243]

Because the dose metric is the form of chemical most closely associated with toxicity, a PBPK model is needed to estimate the relevant dose metric across varying exposure scenarios.[244] The appropriate dose metric for a given chemical varies depending on the "mode of action," *i.e.,* the sequence of events and processes resulting in toxicity and tumor formation.[245] Chloroprene's toxicity is thought to result from the formation of "reactive epoxides," compounds that are produced during the metabolism of chloroprene.[246]

The Ramboll PBPK Model estimates the internal dose metric amount of chloroprene metabolized per gram of tissue ("Total Metabolism") for the liver and lung.[247]  Using Total Metabolism as the dose metric is appropriate because chloroprene's toxicity is thought to result from the formation of "reactive epoxides," compounds that are produced during the metabolism of chloroprene.[248]  There is substantial evidence supporting the use of Total Metabolism as a dose metric.  The 2010 Review describes a PBPK model from

---

[236] DPE, Request for Correction #21005 (July 15, 2021) (Ex. 74).

[237] 3/14/2022 Letter from M. Gwinn to P. Walsh at 6 (Ex. 75).

[238] 10/19/2022 Letter from Mr. Vaughn Noga to Mr. Robert Holden, *et al.* at 1-2 (Ex. 76).

[239] *Id.*

[240] EPA PBPK Guidance at 2-3 (Ex. 68).

[241] *Id.* at 2-3.

[242] *Id.* at 2-3 – 2-4.

[243] *Id.* at 2-3.

[244] *Id.* at 4-3.

[245] *Id.*

[246] Lumpkin Decl., ¶ 37 (Ex. 67).

[247] Gentry Decl., ¶ 69 (Ex. 66).

[248] Lumpkin Decl., ¶ 37 (Ex. 67).

2004 (the "Himmelstein PBPK Model") that was a precursor to the models prepared by Ramboll and notes that the Total Metabolism dose metric "fit the [tumor] incidence data much better than the external dose metric."[249]  The 2010 Review also explains that many of the available studies investigating the mode of action for chloroprene have focused on identifying reactive metabolites.[250]  An expanded version of the Himmelstein PBPK Model was published in 2012 (the "Yang PBPK Model") that incorporated additional measurements of metabolism and further refined parameter values for chloroprene metabolism.[251]  In 2019, Ramboll again expanded the model (the "Clewell PBPK Model") to describe metabolism of a specific reactive metabolite and to confirm the Total Metabolism dose metric.[252]  The Clewell PBPK Model was published in a peer-reviewed article in *Inhalation Toxicology* in 2019 (Clewell, 2019).[253]  The article explains:

> The dose metric calculated with the PBPK model in this analysis is micromoles of chloroprene metabolized in the lung per gram lung per day (Himmelstein, Carpenter, Evans, *et al.* 2004; Yang *et al.* 2012).  This dose metric was chosen because (1) the lung is the tissue with the highest tumor incidence in the chloroprene inhalation bioassays (NTP 1998) and (2) the carcinogenicity of chloroprene in rodents is believed to result from its metabolism to reactive epoxides in the target tissue (Himmelstein, Carpenter, and Hinderliter 2004; Himmelstein, Carpenter, Evans, *et al.* 2004). The dose metric selected for chloroprene is consistent with the dose metrics used in previous PBPK-based risk assessments for both vinyl chloride (USEPA 2000; Clewell *et al.* 2001) and methylene chloride (Andersen *et al.* 1987; USEPA 2011), which were also based on the rate of production of reactive metabolites.[254]

As an outgrowth of Ramboll's dialogue with EPA, Ramboll again extended the PBPK model in 2021 to include more detail on the production of reactive metabolites and a detoxification process involving the compound glutathione.[255]  The 2021 extension was subsequently published in a peer-reviewed article in *Frontiers in Pharmacology* in August 2023 and constitutes the Ramboll PBPK Model in this case.[256]  The article describing the Ramboll PBPK Model again confirmed that Total Metabolism was the appropriate dose metric.[257]

> **2.     The Ramboll PBPK Model has been validated using robust and established methods.**

Model "validation" is the process of substantiating that a model, within its domain of applicability, behaves with satisfactory accuracy.[258]  To adequately validate a PBPK model, the model should be compared against data that are informative of parameters that influence model predictions (*i.e.*, if metabolism is the most significant influence on model predictions, the validation data should provide

---

[249] 2010 Review at 20 (Ex. 64).

[250] *Id.* at 82.

[251] *Id.* at 66.

[252] Clewell, H.J. *et al.*, "Incorporation of in vitro metabolism data and physiologically based pharmacokinetic modeling in a risk assessment for chloroprene," *Inhalation Toxicology* 31(13-14): 468-483 (2019) ("Clewell *et al.* (2019)") (Ex. 77).

[253] *Id.*

[254] *Id.* at 478.

[255] Lumpkin Decl., ¶ 70 (Ex. 67).

[256] Campbell *et al.* (2023) (Ex. 73).

[257] *Id.* at 7-11.

[258] EPA PBPK Guidance at 3-18 (Ex. 68).

informative data for metabolism parameters).[259]  Toxicokinetic tests of cells and tissues removed from the intact body are called *in vitro* tests, while tests conducted on intact animals or humans are called *in vivo* tests.[260]

The Ramboll PBPK Model was validated against *in vivo* data from a 2009 study of female B6C3F1 mice (the same species/gender used by EPA to calculate the chloroprene IUR in the 2010 Review) in which the mice were exposed chloroprene via nose-only inhalation.[261]  The Ramboll PBPK Model was able to accurately predict the data collected in the 2009 study, showing predictions generally within roughly a factor of two, which is consistent with guidance of the World Health Organization and the International Programme on Chemical Safety ("WHO/IPCS").[262]

Ramboll used an approach known as "quantitative *in vitro* to *in vivo* extrapolation" ("IVIE") in developing the Ramboll PBPK Model, which allows modelers to translate *in vitro* test results to *in vivo* outcomes for use in chemical-specific PBPK models.[263]  Obtaining *in vivo* data of *humans* requires conducting controlled exposures of human subjects to chemicals.[264]  Obtaining *in vivo* data of *animals* requires conducting controlled exposures of animals in a laboratory study.[265]

The notion of requiring human, and even animal, *in vivo* studies is increasingly scrutinized due to ethical concerns.[266]  In 2021, EPA led the development of a document on behalf of the Organisation for Economic Co-operation and Development that provides guidance on the use of PBPK models for regulatory purposes ("OECD Guidance").[267]  The OECD Guidance explains that there is a trend to reduce animal testing in chemical assessments and that PBPK models have become an important tool because of their ability to leverage *in vitro* to *in vivo* extrapolation.[268]

No human *in vivo* validation data is available for chloroprene, and it is effectively impossible to obtain such data, given the obvious inability to conduct an experiment exposing humans to a chemical that EPA has classified as a likely carcinogenic.[269]  In the Section 303 Litigation, EPA has insisted upon the use of *in vivo* validation data, but that argument is an obvious pretext for arbitrarily disregarding the Ramboll PBPK Model.  The fact is, until EPA elected to exploit the absence of human *in vivo* data for litigation purposes, EPA spent roughly four years examining the Ramboll PBPK Model (or a predecessor iteration of the model) and never once indicated that the model would be unsuitable for use in the risk assessment due to a lack of *in vivo* human data.

---

[259] EPA PBPK Guidance at 3-21 (Ex. 68).

[260] Lumpkin Decl., ¶ 33 (Ex. 67).

[261] Gentry Decl., ¶ 51 (describing International Institute of Synthetic Rubber Producers, *Chloroprene: blood concentration toxicokinetics in female mice by single and repeated inhalation exposure,* IISRP-12828-1388 (2009) (Ex. 66); Clewell *et al.* (2019), at 477-81 (describing same) (Ex. 77).

[262] Gentry Decl., ¶ 51 (Ex. 66); Clewell *et al.* (2019) at 477-81 (World Health Organization/International Programme on Chemical Safety, Characterization and application of physiologically based pharmacokinetic models in risk assessment (2010)) (Ex. 77).

[263] Gentry Decl., ¶ 51 (Ex. 66); Clewell *et al.* (2019) at 471 (Exhibit 77).

[264] Clewell *et al.* (2019) at 481 (Ex. 77).

[265] Lumpkin Decl., ¶ 33 (Ex. 67).

[266] Clewell *et al.* (2019) at 481 (Ex. 77).

[267] OECD, *Guidance document on the characterization, validation and reporting of Physiologically Based Kinetic (PBK) models for regulatory purposes* 5 (2021) (Ex. 78).

[268] *Id.* at 17.

[269] Clewell *et al.* (2019) at 481 (Ex. 77).

Moreover, even if human *in vivo* data for chloroprene were available, such data would not materially impact the evaluation of the Ramboll PBPK Model.[270] This is because the key parameters for estimating the relevant dose metric of chloroprene for use in risk assessment are the parameters for lung metabolism and human *in vivo* data would not meaningfully inform those parameters.[271] As such, even if there were a hypothetical set of human *in vivo* data available to DPE, those data would not provide meaningful information to inform or validate the metabolic parameters used in the Ramboll PBPK Model. Indeed, EPA has accepted a PBPK model in prior toxicological reviews under the IRIS program despite the fact that, like the Ramboll PBPK Model, human *in vivo* data could not be used to validate or inform the key parameter of those models.

Unlike EPA's chloroprene IUR based on the 2010 Review, the Ramboll PBPK Model accounts for the substantial toxicokinetic differences between female B6C3F1 mice and humans and results in a substantial reduction in uncertainty of extrapolating cancer potency between these two dramatically different species.[272] The Ramboll PBPK Model reflects multiple years of review, dialogue, and revision between EPA and Ramboll scientists. By declining to use the Ramboll PBPK Model to calculate an IUR for chloroprene, EPA has failed to offer a risk value that best estimates human risk.

> ### 3.  Estimating risk in the lung and liver appropriately accounts for tumors observed in female B6C3F1 mice in the NTP Study.

In IRIS toxicological reviews, EPA must determine whether to calculate an IUR based on the total number of *tumors* in animal studies or the total number of *tumor-bearing animals*.[273] The key determinant in this decision is whether the tumors observed in a study occurred in a statistically independent manner (*e.g.,* the occurrence of a tumor in the liver was *not* influenced by the occurrence of a tumor in the lung).[274] In the 2010 Review, EPA did not determine whether tumor types associated with chloroprene exposure were statistically independent.[275] In the absence of such a determination, EPA simply *assumed* that the tumor types were statistically independent.[276] At the same time, however, EPA conceded that its assumption "could not be verified and if not correct could lead to an overestimate of risk from summing across tumor sites."[277]

In February 2020, an article published in the peer-reviewed journal *Risk Analysis* demonstrated that EPA's independence assumption was incorrect by reporting the results of a correlation analysis.[278] These results demonstrated that tumor incidences in the female B6C3F1 mice in the NTP Toxicology and Carcinogenesis Studies of Chloroprene ("NTP Study") were not statistically independent of lung and liver tumors.[279] The results also showed that EPA's approach of treating tumors as independent was inappropriately overestimating total tumor potency. Indeed, in some cases, EPA ended up counting more tumors than there were animals in a given test group.[280]

---

[270] Clewell *et al.* (2019) at 481 (Ex. 77).

[271] *Id.*

[272] Lumpkin Decl., ¶ 73 (Ex. 67).

[273] 2010 Review at 133 (Ex. 64).

[274] *Id.*

[275] *Id.* at 136.

[276] *Id.*

[277] *Id.*

[278] Sax *et al.* (2020) (Ex. 55).

[279] *Id.*

[280] *Id.*

Although tumors in B6C3F1 female mice were observed in tissues other than the lung and liver in the NTP Study, at least 85% of all tumors were observed in animals with tumors in the lung or liver.[281]  Because the tumors are statistically dependent, calculating an IUR based on multiple tumors in the same animals inappropriately double count tumors and overestimates risk.[282]  Unlike the chloroprene IUR derived in the 2010 Review, the IUR derived from the Ramboll PBPK Model considers each animal with tumor(s) only once, properly reflecting the tumors' statistical dependence.

Any assessment of "imminent endangerment" should be based on an IUR derived from the Ramboll PBPK Model.  The Ramboll PBPK Model provides the best estimate of chloroprene's cancer potency in humans because it accounts for toxicokinetic differences between humans and female B6C3F1 mice.

### ii.        Applying corrective adjustments to EPA's chloroprene IUR results in risk estimates that are more representative of actual risk.

Even if the Ramboll PBPK Model is not used to calculate an IUR for chloroprene, applying corrective adjustments to EPA's chloroprene IUR would better estimate actual *human* risk.  By failing to make these adjustments, EPA has failed to offer a risk estimate that is appropriate to assess imminent endangerment to humans.

### 1.        Selecting animal tumor incidence data that is more representative of human risk.

Even if the Ramboll PBPK Model were not used to calculate an IUR for chloroprene, using tumor incidence data from F344 rats would better estimate human risk than using data from female B6C3F1 mice.  The material toxicokinetic differences between humans and female B6C3F1 mice demonstrate that the F344 rat is the "animal model that is most relevant to humans" and a better surrogate for human risk.[283]  Because EPA's chloroprene UR fails to calculate a risk estimate based on available animal data that is more representative of human risk, EPA's IUR is not appropriate to assess whether an "imminent endangerment" exists for *humans*.

The first step in developing an IUR is to select the data from which the value will be based.  In some cases, the data will be a human epidemiological study, if an epidemiological study is deemed suitable for use.[284]  In other cases, the data utilized will be from an inhalation study using laboratory animals, if an epidemiological study is not deemed suitable for use.[285]

In the 2010 Review, EPA discussed the available toxicokinetic data for chloroprene in humans and animals.[286]  A chemical's toxicokinetics are its behavior in how it is absorbed from the environment into the body's tissues (absorption), how it is distributed around various tissues of the body (distribution), how the body makes physical changes to the chemical (metabolism), and how the body removes the chemical from the body (elimination).[287]  Toxicokinetic tests of cells, cell components, and tissues removed from the intact body are called *in vitro* tests, while tests conducted on intact and living animals or humans are

---

[281] Gentry Decl., ¶¶ 66-70 (Ex. 66).

[282] *Id.*

[283] Lumpkin Decl., ¶ 38 (Ex. 67); 2010 Review at 13-14 (Ex. 64).

[284] 2010 Review at 128 (Ex. 64).

[285] *Id.*

[286] Lumpkin Decl., ¶ 32 (Ex. 67).

[287] *Id.*

called *in vivo* tests.[288] A third, and more recent, kind of toxicokinetic test examines toxicokinetic behaviors through computer simulation of a chemical in cells, tissues, and organ systems of the body, commonly called *in silico* tests (because the data are generated in the silicon chip space of a computer).[289]

EPA concluded that the existing epidemiological studies of chloroprene's potential impacts on humans contained limitations that "precluded developing quantitative risk estimates" from that human epidemiological data.   Instead, EPA considered two animal studies for use in calculating the 2010 IUR: (1) the Trochimowicz *et al.* (1998) study, which reported tumor incidences in two types of hamsters following chloroprene inhalation exposures; and (2) a 1998 study by the National Toxicology Program ("NTP"), which reported tumor incidences in groups of male and female F344 rats and male and female B6C3F1 mice ("NTP Study") following chloroprene inhalation exposures.[290]  The study involving hamsters found no dose-related increases in cancer development in the animals, Trochimowicz *et al.* (1998), but the NTP Study observed dose-related increases in cancer development in mice, and, to a lesser extent, in rats.[291]  In the 2010 Review, EPA estimated the chloroprene IUR based solely on a 1998 NTP Study of female B6C3F1 mice.[292]

Specifically, the 2010 Review recites the conclusion of the NTP Study that there was evidence of carcinogenicity in F344/N rats and B6C3F1 mice due to lifetime inhalation exposure to chloroprene.[293]  Purely as a matter of policy, EPA estimates *human* IURs based on the IUR for the most sensitive *animal* sex and species if (i) EPA does not identify a "clearly most relevant species" and (ii) no adequate human data are available.[294]  EPA's guidance document states:

> Although it is preferable to use human studies as the basis for the dose-response derivation, adequate human data are not always available, often forcing reliance on laboratory animal data.  Presented with data from several animal studies, *the risk assessor first seeks to identify the animal model that is most relevant to humans*, based on comparability of biological effects using the most defensible biological rationale; for instance, by using comparative metabolic, pharmacokinetic, and pharmacodynamic data. *In the absence of a clearly most relevant species, however, the most sensitive species is used as a matter of science policy at the EPA*.[295]

As the 2010 Review acknowledges, the chloroprene IUR derived from female B6C3F1 mice studies was *not* based on data that allows for any adjustments to reflect the substantial differences in risks applicable to female B6C3F1 mice versus humans:

> The calculated composite unit risk is based on the most sensitive endpoint (risk of any tumor type) in the most sensitive species and sex (female mouse).  *There is no information*

---

[288] *Id*.

[289] *Id*.

[290] 2010 Review at 128 (Ex. 64).

[291] Lumpkin Decl., ¶ 27 (Ex. 67).

[292] *Compare* DPE MSJ SOF, ¶ 46 (Ex. 36), *with* US Contested SOF, ¶ 46 (Ex. 37); US Responses to DPE First Set of RFAs, at 18 (Response to RFA No. 17), Case No. 2:23-cv-00735 (Ex. 79).

[293] 2010 Review at 102 (Ex. 64).

[294] *Compare* DPE MSJ SOF, ¶ 50 (Ex. 36), *with* US Contested SOF, ¶ 50 (Ex. 37).

[295] EPA, *Methods for Derivation of Inhalation Reference Concentrations and Application of Inhalation Dosimetry* at 1-5 (Oct. 1994) (emphases added) (Ex. 69).  EPA's expert, Dr. Ila Cote, confirmed that, "in the absence of data to the contrary, the agency will use the most sensitive end point, which generally means the most sensitive [sex and] species."  Deposition Transcript of Dr. Ila L. Cote ("Cote Dep. Tr.") 20:1-6 (Ex. 80).

*on chloroprene to indicate that the observed rodent tumors are not relevant to humans.
Further, no data exist to guide quantitative adjustment for differences in sensitivity among
rodents and humans.*[296]

In the 2010 Review, EPA did not identify animal data that was most relevant to human response to
chloroprene.[297]   In the absence of such a determination, EPA used data from the most sensitive sex and
species in the NTP Study to calculate the IUR for chloroprene, relying entirely on tumor incidence data for
female B6C3F1 mice.[298]

In relying on tumor incidence data for the female B6C3F1 mice, EPA made the conservative assumption
that humans are equally susceptible to cancer from inhaled chloroprene as female B6C3F1 mice, the most
sensitive sex and species in the animal studies that EPA considered.[299]   Thus, as an extension of that
conservative assumption, the EPA's chloroprene IUR assumes that humans are *more sensitive* to
chloroprene-induced cancer than male B6C3F1 mice, male and female rats, and male and female
hamsters—*i.e.*, the other sexes and species considered by EPA in the chloroprene animal studies, which
were all less susceptible to chloroprene-induced cancer than female B6C3F1 mice, the sex and species of
animal that EPA chose to exclusively rely upon.[300]

Any "imminent endangerment" finding would need to assess whether there is an imminent
endangerment *to humans*.  Dr. Kristina Thayer, who leads the IRIS program, testified in the Section 303
Litigation that "EPA has . . . no idea of the true correspondence of the [B6C3F1] mouse to human
response."[301]   Further, EPA admits that, since the 2010 Review, it has performed no *new* analysis to
determine that the 2010 IUR provides a risk estimate representative of human risk.[302]   Instead, EPA has
rested on its unsupported "default" assumption that bases the chloroprene IUR on the highest possible
risk level, stating that EPA's "analysis relating to its use of the B6C3F1 mouse data in calculating the IUR
in the 2010 IRIS Assessment, and the analysis EPA performed to determine that the B6C3F1 mouse data
was the most representative information available to understand potential human responses to
chloroprene *is contained in the 2010 IRIS Assessment*...."[303]

Toxicokinetic data related to chloroprene exposure in humans and animals demonstrates that humans
and female B6C3F1 mice are not equally susceptible to chloroprene, as EPA assumed.[304]   In the 2010

---

[296] 2010 Review at 141 (Ex. 64) (emphases added).

[297] *Id.* at 139 ("It was assumed that humans are as sensitive as the most sensitive rodent sex/species tested; true
correspondence is unknown."); Deposition Transcript of Kris Thayer, Ph.D. ("Thayer Dep. Tr.") 63:5-21; 154:11-14
(Ex. 81).

[298] Lumpkin Decl., ¶ 28 (Ex. 67); 2010 Review at 147-48 (Ex. 64).  "The chloroprene IUR is based on the assumption
that humans are as sensitive to chloroprene exposure as the female B6C3F1 mouse." *Compare* DPE MSJ SOF, ¶ 47
(Ex. 36), *with* US Contested SOF, ¶ 47 (Ex. 37).

[299] US Responses to DPE First Set of RFAs, at 18 (Response to DPE's RFA No. 17) ("The United States further admits
that the inhalation unit risk for chloroprene determined in the 2010 IRIS assessment is based on the assumption that
humans are as sensitive to chloroprene exposure as the female B6C3F1 mouse.") (Ex. 79); Lumpkin Decl., ¶ 31 (Ex.
67).

[300] Lumpkin Decl., ¶ 31 (Ex. 67).

[301] Thayer Dep. Tr. 63:5-21; 154:11-14, Case No. 2:23-cv-00735 (Ex. 81); *see also* 2010 Review at 139 (true
correspondence of B6C3F1 mouse to human is "unknown") (Ex. 64).

[302] EPA Responses to DPE Second Set of Interrogatories, at 20 (Response to Interrogatory No. 18) (Ex. 30).

[303] *Id.*

[304] Lumpkin Decl., ¶ 38 (Ex. 67).

Review, EPA discussed the available toxicokinetic data for chloroprene in humans and animals.[305] However, EPA makes no reference to this critical information in support of its decision to assess chloroprene risk based on female B6C3F1 mouse data. Instead, EPA blindly relies on the analysis performed in the 2010 Review, ignoring the crucial fact that the 2010 Review failed to determine which set of animal data best reflected human risk.[306]

In Chapter 3 of the 2010 Review (entitled "Toxicokinetics"), EPA summarizes the then-available *in vitro* and *in vivo* studies that informed the toxicokinetic behaviors of chloroprene in animals and humans.[307] Section 3.3 of the 2010 Review discusses the then-available metabolism data for chloroprene based on laboratory rodents and humans, including data on the rate at which chloroprene is metabolized *in vitro* by specific liver and lung cellular components (called microsomes) to a class of one or more compounds called "reactive epoxides."[308] These "reactive epoxides" are believed to react with the cellular structures in the tissues in which they are produced (*e.g.*, the lung or liver), resulting in the loss of proper function and, ultimately, leading to formation and growth of tumors (*i.e.*, the source of toxicity).[309]

The toxicokinetic data presented in the 2010 Review demonstrates significant metabolic differences between female B6C3F1 mice and humans. For example, the data demonstrate that humans and female B6C3F1 mice do *not* metabolize chloroprene the same.[310] Table 3-4 of the 2010 Review, and EPA's accompanying discussion, summarizes the differences between female B6C3F1 mice and humans in metabolizing chloroprene into reactive epoxides, showing, based on *in vitro* studies, that the rate of this metabolism in a female B6C3F1 mouse's liver is more than twice that of human liver microsomes and about 50-times higher in lung microsomes.[311] Because a mouse's metabolic rate of chloroprene is much higher than a human's, a mouse is capable of producing significantly higher amounts of "reactive epoxides," the compounds understood to be responsible for chloroprene's toxicity. The 2010 Review also states that higher metabolism of chloroprene to reactive epoxides was observed in female B6C3F1 mice compared to other tested laboratory rats and hamsters, providing the most likely explanation of the higher tumor incidence reported in B6C3F1 mice relative to the other tested rodents.[312]

In Table 3-5 of the 2010 Review and the accompanying discussion, EPA summarizes study data indicating that enzyme systems that metabolize, and potentially detoxify, one of the key reactive epoxides are much more active in human microsomes than in female B6C3F1 mice.[313] Because a mouse's metabolic rate for the pathway that metabolizes the key reactive epoxide is lower than in a human's, a human is capable of detoxifying (*i.e.*, clearing) higher amounts of this key reactive epoxide from the body.[314]

EPA's risk assessment accepts, at face value, the chloroprene IUR's use of female B6C3F1 mice to estimate risk, despite ample toxicokinetic data that data from female B6C3F1 mice is not the most representative of human risk. The Final Rule provides no evidence that EPA has considered this data, instead capriciously rejecting DPE's scientific position because EPA determined that DPE failed to provide "new scientific

---

[305] *Id.* ¶ 32.
[306] EPA Responses to DPE Second Set of Interrogatories, at 20 (Response to Interrogatory No. 18) (Ex. 30).
[307] Lumpkin Decl., ¶ 113 (Ex. 67).
[308] 2010 Review at 7-19 (Ex. 64); Lumpkin Decl., ¶ 37 (Ex. 67).
[309] Lumpkin Decl., ¶ 38 (Ex. 67).
[310] *Id.*
[311] 2010 Review at 13-44 (Ex. 64); Lumpkin Decl., ¶ 38 (Ex. 67).
[312] 2010 Review at 13-14 (Ex. 64).
[313] *Id.*
[314] Lumpkin Decl., ¶ 116 (Ex. 67).

information that would alter aspects of the EPA IRIS assessment or call into question the scientific judgments reflected in those assessment."[315]

Likewise, EPA's expert in the Section 303 Litigation, Dr. Ila Cote, testified that she did not consider the pharmacokinetic data in Tables 3-4 and 3-5 of the 2010 Review in formulating her opinions, explaining she was not familiar with those critical data.[316]

In the 2010 Review, EPA's use of the female B6C3F1 mouse to calculate the chloroprene IUR was based on the NTP Study. But the same NTP Study that included data for female B6C3F1 mice *also included* tumor incidence data for the F344 female rat (the more sensitive sex of F344 rat), which would have resulted in an IUR of 6.9 x 10$^{-5}$, after adjusting for age-dependent adjustment factors ("ADAFs").[317] Indeed, the F344 rat has a rate of metabolism for chloroprene, and metabolic rate for the pathway that metabolizes the key reactive epoxide, that is more similar to humans than the female BC3F1 mouse.[318] EPA's use of female B6C3F1 mice data, despite the availability of animal data more representative of humans, is inappropriate for use in assessing whether an "imminent endangerment" exists for *humans*.

## 2.    Adjusting for continuous exposure.

EPA's chloroprene IUR and corresponding 0.2 μg/m$^3$ concentration level assumes that individuals are continuously exposed to chloroprene 24 hours per day, every day, for 70 years.[319] In the Final Rule, EPA provides no suggestion that an assumption of continuous exposure is plausible. Likewise, in the Section 303 Litigation, EPA's expert offered no evidence that the assumption of continuous exposure is plausible, and he failed to follow EPA's applicable guidance. EPA typically relies on an assumption of continuous exposure when considering a maximum plausible risk and implementing the Benzene Rule framework. However, an "imminent endangerment" finding is based on actual risk and requires EPA to substantiate such that an assumption is plausible.[320]

In the residual risk review for coke ovens, EPA explained that the MIR must be "tempered" by the implausible considerations, such as the assumption of continuous exposure for 70 years for every individual near the Facility:

> For the source category associated with the 1993 national emission standards, the revised MIR estimate is 300 in a million. . . . Although we are adjusting risk estimates upward to reflect the new supplemental guidance, these estimated risk increases must also be tempered by consideration of other factors that were discussed at proposal and in the risk assessment document, and the further protective assumption added to the risk assessment that all individuals are born in the assessed area. . . . Our 70-year exposure assumption includes exposures from birth to 70 years. If exposures were from 3 years to 73 years, the adjustment factor would be less than 1.6. If exposures were from 16 years to 86 years, no adjustment would be necessary. In addition, we used a health-protective assumption of a 70-year exposure duration in our risk estimates; however, using the

---

[315] Final Rule at 110 (Ex. 1).

[316] Cote Dep. Tr. 186:2-186:18 (Ex. 80).

[317] Gentry Decl., ¶ 46 (Ex. 66).

[318] 2010 Review at 13-14 (Ex. 64).

[319] 2010 Review at 138 (Ex. 64); Lumpkin Decl., ¶ 90 (Ex. 67).

[320] Lumpkin Decl., ¶ 61 (Ex. 67).

national average residency time of 12 years would reduce the estimate of risk by a factor of six (69 FR 48347).[321]

Notably, EPA failed to include any similar discussion in the Final Rule, despite adopting the same assumption. By failing to account for the implausibility of the 70-year assumption, the Final Rule suggests that an MIR is an appropriate proxy for actual risk. It is not. Without accounting for the 70-year assumption through the use of an exposure assessment, a MIR is rendered useless for assessing "imminent endangerment."

EPA's *Guidelines for Human Exposure Assessment* provide guidance on how exposure assessments should be performed and how the risk assessor can better understand the characteristics of a population and its behaviors.[322] The EPA guidance explains that exposure estimates for an individual or population can be developed "[b]y combining information and data describing exposure scenarios, concentrations, activity patterns and other exposure factors."[323] The guidelines also emphasize the importance of data, noting that "[t]he drivers for human activities are complex and, unlike [chemicals], cannot be predicted using first-principle models based on physical/chemical properties. Instead, human activities are treated as stochastic properties (random variables) described by population distributions based on available (*e.g.,* observational or modeled) data."[324]

The preliminary assumption in risk assessment that a person is constantly exposed for a lifetime is a hypothetical construct and only useful for an initial screening-level risk assessment.[325] Moving beyond a mere screening-level risk assessment, however, adjustments for reasonably plausible mobility and residential occupancy durations are needed to sufficiently assess exposure and associated risks on which to justify regulatory action like declaring an imminent and substantial endangerment.[326] While it is true that IURs in the IRIS Program are not developed to account for residential mobility and occupancy (IRIS IURs are chemical-specific, but facility-neutral and, accordingly, assume 70-year continuous exposure), EPA guidance is clear that exposure assessments *do* account for residential mobility and occupancy.[327]

EPA has not performed any such exposure analysis in the Final Rule. Likewise, in the Section 303 Litigation, EPA failed to make any such adjustments for residential mobility and occupancy duration.[328] For example, EPA has developed an *Exposure Factors Handbook*.[329] This guidance document is specifically designed to reduce uncertainties in estimates of exposure duration and frequency to environmental chemicals.[330] For example, EPA's *Exposure Factors Handbook* provides residential occupancy data, *i.e.,* the "time (years) between a person moving into a residence and the time the person moves out or dies."[331] The *Exposure Factors Handbook* states that the average (mean) residential occupancy period is 12 years and the 95th

[321] 70 Fed. Reg. at 19994 (Ex. 47).

[322] EPA, *Guidelines for Human Exposure Assessment* xiv (Oct. 2019) (Ex. 82).

[323] *Id.* at 17.

[324] *Id.* at 6-7.

[325] *Id.*

[326] *Id.*

[327] *Id.*

[328] Rebuttal Declaration of Dr. John J. Vandenberg in Support of United States' Reply to its Motion for Preliminary Injunction ("Vandenberg Rebuttal PI Decl."), ¶ 70, Attachment 11A ("Updated graph of estimated excess lifetime cancer risk associated with *continuous chloroprene exposure* at Denka TO-15 monitoring locations" (emphasis added)), Case No. 2:23-cv-00735 (Ex. 83).

[329] Lumpkin Decl., ¶ 92 (Ex. 67); EPA, *Exposure Factors Handbook: 2011 Edition* at 6-1 (2011) (Ex. 84).

[330] EPA, *Exposure Factors Handbook: 2011 Edition* at 6-1 (2011) (Ex. 84).

[331] *Id.* at Table ES-1; Lumpkin Decl., ¶ 96 (Ex. 67).

percentile is 33 years, meaning that, across a population, the true residential occupancy period is expected to be less than 33 years 95% of the time.[332]  Notably, the average residential occupancy period of 12 years is the same period of time referenced by EPA in the residual risk review for coke ovens.

For example, in the Section 303 Litigation, DPE's expert, Dr. Lumpkin, prepared such estimates based on plausible residential duration and occupancy (without making other appropriate adjustments described above).  Dr. Lumpkin's estimates resulted in an IUR of 2.4 ×10$^{-4}$ per μg/m$^3$, or twice the IUR developed by EPA in the 2010 Review.  Dr. Lumpkin's exposure-adjusted IUR, or any similar adjustments to the IUR, would provide a more representative estimate of actual risk.

Values from EPA's *Exposure Factors Handbook* demonstrate that assuming a person is born near the Facility and remains constantly immobile there for 70 years is not plausible.[333]  Even less plausible is the notion that *every* person living near the Facility would remain at a single location for 70 continuous years.  Failing to adjust the default 70-year exposure assumption to account for reasonably plausible mobility and residential occupancy durations renders an exposure assessment preliminary, incomplete, and inappropriate for use to assess whether an imminent and substantial endangerment exists.[334]

### 3.        Adjusting for upper-bound estimate.

In the 2010 Review, EPA used the "upper bound" risk value when estimating the chloroprene IUR based exclusively on tumor incidence data from female B6C3F1 mice.[335]  The "upper bound" value, or the "upper confidence limit," is a value expected to contain the true value 95% of the time over many different samples.[336]  In *estimating* risk in Section 112 rulemakings, EPA often uses an upper bound estimate.  However, in assessing whether an *imminent endangerment* exists, it is inappropriate to use a value that, by definition, does *not* reflect the most probable risk estimate.[337]  An "upper bound" value of the IUR—which results in a concentration of 0.2 μg/m$^3$ associated with a 1-in-10,000 excess risk—is just as likely as the "lower bound" value, which results in a concentration of 0.4 μg/m$^3$ associated with a 1-in-10,000 excess risk, and is less likely than every value in between.[338]  In addition, when the IUR contains other flawed data (*i.e.*, the use of female B6C3F1 mice data), using the upper bound value amplifies the risk distortions caused by those data.

When EPA uses an "upper bound" estimate for IURs, it means EPA has confidence that the excess cancer risk will not be *greater* than that estimate.[339]  However, the true excess cancer risk is statistically likely to be below that estimate and could be as low as zero.[340]  In the Section 303 Litigation, EPA incorrectly alleges that "a person may breathe no more than an average chloroprene concentration of 0.2 μg/m$^3$ over 70 years in order to remain below a 1-in-10,000 lifetime excess cancer risk."[341]  Even if every other aspect of

---

[332] EPA, *Exposure Factors Handbook: 2011 Edition* at Table 16-4 (2011) (Ex. 84).

[333] Lumpkin Decl., ¶ 119 (Ex. 67).

[334] *Id.* ¶¶ 90-102.

[335] *Id.* ¶ 60; 2010 Review at 136 (Ex. 64).

[336] 2010 Review at 136 (stating that the 95% upper confidence limit was calculated assuming a normal distribution and using the formula 95% UCL = MLE + 1.645 × SD) (Ex. 64).

[337] Lumpkin Decl., ¶ 59 (Ex. 67).

[338] *Id.* ¶¶ 30, 60-62.

[339] *See* EPA, *Air Toxics Risk Assessment Ref. Library, Vol. 2* at 32-33 (Apr. 2004) (Ex. 85).

[340] EPA, *Guidelines for Carcinogen Risk Assessment* at 13 (Sept. 1986) (approach used in developing IUR "does not necessarily give a realistic prediction of the risk.  The *true value of the risk* is *unknown*, and may be as low as zero.") (emphasis added) (Ex. 86); *see also* Cote Dep. Tr. 31:8-10 ("The true value for human risk [of chloroprene] is really not known.  So this is an estimate based on rodent data. . . .") (Ex. 80).

[341] EPA Memorandum in Support of Motion for Preliminary Injunction, *U.S. v. Denka Performance Elastomer LLC et al.*, Case No. 2:23-cv-00735, ECF No. 9-2, at 2 (E.D. La. Mar. 20, 2023) (Ex. 87).

EPA's risk allegations were assumed to be correct, which is a false assumption, only a fractional subset of people would face a 1-in-10,000 excess risk of cancer at 0.2 µg/m$^3$, and it is more probable that *no* people would face such risk.  Accordingly, EPA's use of the upper bound IUR does not provide a meaningful estimate of excess cancer risk actually posed by chloroprene.  Nor does EPA (i) define what characteristics people within the upper bound exhibit or (ii) identify a single person who exhibits such characteristics.  Even if using an upper bound value is appropriate within the framework of the Benzene Rule, it is inappropriate when assessing actual risk such as in an "imminent endangerment" finding.  Adjusting the IUR to reflect the central tendency (2.2 x 10$^{-4}$) would provide a more representative estimate of actual risk.

### 4.    Adjusting for arbitrary rounding.

In the 2010 Review, EPA calculated an IUR of 5 x 10$^{-4}$ (the equivalent of 0.20 µg/m$^3$), in part, by rounding the composite IUR (the risk for all tumor types) for female B6C3F1 mice upwards, from 2.7 x 10$^{-4}$ (the equivalent of 0.37 µg/m$^3$) to 3 x 10$^{-4}$ (the equivalent of 0.33 µg/m$^3$).[342]  EPA then applied the ADAFs to the rounded value to calculate a final IUR of 5 x 10$^{-4}$ corresponding to 0.20 µg/m$^3$.[343]  If EPA had not rounded the composite risk value before applying the ADAFs, the final IUR would be 4.47 x 10$^{-4}$ (the equivalent of 0.22 µg/m$^3$), a decrease in the risk estimate of ten percent.

EPA had no biological-based or risk-based reason for rounding the composite risk value from 2.7 x 10$^{-4}$ to 3 x 10$^{-4}$.[344]  Nor has EPA even attempted to offer such a reason, instead admitting that the IUR was rounded as purely a matter of "convention in mathematics."[345]  Critically, however, this "convention," by itself, translates into a 10 percent decrease the chloroprene IUR, which is substantial.  Likewise, rounding can distort the MIR values assigned to a facility, particularly given that the MIRs themselves are rounded.  EPA's decision to round the values in the chloroprene IUR overstates the risk of cancer actually posed by chloroprene and it is inappropriate to adopt this arbitrary (and deliberate) error in assessing imminent endangerment.   Simply by calculating the IUR without rounding, the 2010 IUR would be more representative of actual risk.

### 5.    Adjusting for unsupported mutagenic mode of action classification.

EPA incorrectly determined that the weight of evidence supported classifying chloroprene as acting via a "mutagenetic mode of action."[346]  Based on this classification, EPA applied age-dependent adjustment factors ("ADAFs") to the IUR, increasing the IUR by 66 percent from 3 x 10$^{-4}$ (the equivalent of 0.33 µg/m$^3$) to 5 x 10$^{-4}$ (the equivalent of 0.20 µg/m$^3$).

Contrary to EPA's determination, the scientific evidence demonstrates that a mutagenic mode of action for chloroprene is unlikely.[347]  The question of whether chloroprene is a mutagen has been evaluated in *in vitro* mammalian cell studies, *in vitro* bacteria studies, and *in vivo* studies, and the overall evidence

---

[342] 2010 Review at 137 (Ex. 64); Lumpkin Decl., ¶ 30 (Ex. 67).

[343] 2010 Review at 137-38 (Ex. 64).

[344] Cote Dep. Tr. 93-94 (explaining that rounding the composite risk value is "simply a convention in mathematics") (Ex. 80).

[345] *Id.*

[346] 2010 Review at 106-11 (Ex. 64).  EPA defines the carcinogenic "mode of action" of a chemical as "a sequence of key events and processes, starting with interaction of an agency with a cell, proceeding through operational and anatomical changes, and resulting in cancer formation."  Lumpkin Decl., ¶ 53 (citing EPA, *Guidelines for Cancer Risk Assessment* (Mar. 2005) at 1-10, n.2 (Ex. 65)) (Ex. 67).  Although multiple modes of action have been identified for chemical carcinogens, per EPA guidelines, the distinction between a mutagenic or non-mutagenic mode of action has significant implications for deriving an IUR.  Lumpkin Decl., ¶ 53 (Ex. 67).

[347] Lumpkin Decl., ¶ 30 (Opinion 3) (Ex. 67).

indicates that chloroprene does not have a mutagenic mode of action.[348] Most significantly, *in vivo* studies of mice did not report changes in mutations that would support a mutagenic mode of action.[349]

Critically, considering the evidence on whether chloroprene acts via a mutagenic mode of action, the NTP Study (the same study EPA relies on for the data on female B6C3F1 mice) concluded that "[c]hloroprene showed *no evidence of mutagenicity* in tests performed in vitro or in vivo."[350]

The Ramboll PBPK Model simulation of the NTP rodent dose-response data indicates that the carcinogenic mode of action may likely be due to cytotoxicity (frank cell damage) rather than direct mutagenicity, and that the prevalence of reactive metabolites is likely to occur only after glutathione (a molecule that can attach to and neutralize the reactivity of chloroprene's reactive metabolites) is depleted at chloroprene exposure levels used in the NTP (1998) studies, but far higher than levels measured in the environment.[351] By accounting for chloroprene's cytotoxic mode of action, and calculating the IUR without applying the ADAFs, the chloroprene IUR would be more representative of actual risk.

## V.     Conclusion

As set forth herein, a two-year compliance period is "necessary for the installation of controls" and the steps that DPE has already taken to reduce emissions will ensure that emissions from the Facility will not cause an "imminent endangerment" during the extension period.

---

[348] Lumpkin Decl., ¶ 78-86 (Ex. 67); Sax *et al.* (2020), at 300-303 (Ex. 55).

[349] Lumpkin Decl., ¶ 83 (Ex. 67).

[350] *Id.* (citing 1998 NTP Study at 276) (emphasis added).

[351] *Id.* ¶ 71.