# EXHIBIT N

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

| | |
|---|---|
| **DENKA PERFORMANCE ELASTOMER LLC,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **v.** ) | No. _____ |
| ) | |
| **UNITED STATES ENVIRONMENTAL** ) | |
| **PROTECTION AGENCY and** ) | |
| **MICHAEL REGAN, Administrator,** ) | |
| **United States Environmental Protection** ) | |
| **Agency,** ) | |
| ) | |
| **Respondents.** ) | |

## <u>DECLARATION OF CHRISTOPHER MEYERS, P.E.</u>

Pursuant to 28 U.S.C § 1746, I, Chris Meyers, declare as follows:

1.     I am currently employed as the Environmental Affairs Manager for Denka Performance Elastomer, LLC ("DPE").  I have held this position at the Neoprene plant in LaPlace, Louisiana (the "Facility"), since June 3, 2022.  I previously held the position of Environmental Permitting Specialist at DPE from June 28, 2016, to June 2, 2022.  Prior to that, I held the position of Senior Consultant at Trinity Consultants where I was periodically engaged by DPE to advise on air permitting matters.

2.      On May 16, 2024, EPA published its final rule in docket EPA-HQ-OAR-2022-0730 ("Final Rule").[1]  The Final Rule requires DPE to implement new emission controls at the Facility to comply with requirements issued under Section 112(f) ("Section 112(f) Control Projects") and provides only 90 days after the effective date for implementation.[2]  The 90-day compliance period for Section 112(f) Control Projects is eight times shorter than the compliance period contained in EPA's proposed rule ("Proposed Rule").[3]  On June 27, 2024, the Louisiana Department of Environmental Quality ("LDEQ") issued an Extension of Compliance to DPE that would permit DPE two years to comply with the Final Rule ("LDEQ Extension").

**<u>Summary of Opinions</u>**

3.      Based on several years of intensive investigation by DPE assessing the prospect of reducing the emissions of chloroprene from DPE's Facility and my

---

[1] New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry, 89 Fed. Reg. 42,932 (May 16, 2024).

[2] After accounting for weekends and federal holidays, compliance with the Section 112(f) Control Projects is required by October 15, 2024.

[3] *New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry*, 88 Fed. Reg. 25,080 (Apr. 25, 2023), available at https://www.govinfo.gov/content/pkg/FR-2023-04-25/pdf/2023-07188.pdf.

extensive experience safely planning and implementing emissions reduction projects at the Facility, I am certain that (i) the Section 112(f) Control Projects cannot be implemented within a 90-day compliance period and (ii) DPE is already incurring significant and escalating harm as a result. I offer the following specific opinions on this point:

- **Opinion 1**: Safely completing the Section 112(f) Control Projects at the Facility, including design and planning of the required modifications, capital approval, procurement and fabrication, installation, and testing of equipment, cannot be done in 90 days and will require at least two years.

- **Opinion 2**: A compliance period of 90 days will require the Facility to shut down by October 2024. A compliance period of less than two years would likely require a shutdown of the Facility and increase the complexity and dangers of implementing the requirements.

- **Opinion 3**: DPE has continued to reduce emissions through practicable, safe, and effective emissions reduction strategies since May 2022.

**Discussion**

4.    **Opinion 1: Safely completing the Section 112(f) Control Projects at the Facility, including design and planning of the required modifications,**

**capital approval, procurement and fabrication, installation, and testing, cannot be done in 90 days and will require at least two years.**

5.     I have led a significant effort, with the assistance of qualified, outside consultants, to evaluate many potential emission control projects at the Facility, including several of those necessary to comply with the Final Rule.  On June 7, 2023, DPE submitted comments ("DPE Comments") to EPA's Proposed Rule that incorporated the technical work of these outside consultants, including analysis memoranda and Excel workbooks.[4]  Based on my review of the Final Rule, there are no major changes to the scope of the Section 112(f) Control Projects from the Proposed Rule.   Accordingly, the technical analyses submitted with the DPE Comments are applicable for evaluating the Final Rule requirements.[5]  Following the submittal of the DPE Comments, DPE has continued to evaluate other emission reduction projects including emission capture and control for the wash belts in the "Finishing Area," batch reactor vessels ("Poly Kettles") and stripper strainers,

---

[4] The memoranda covered: thermal oxidizer; wastewater; pressure relief devices; flares; dioxins and furans; and cost-benefits review.

[5] One control project that is no longer needed is a replacement for DPE's existing thermal oxidizer. Under the Proposed Rule, DPE would have been required to operate a thermal oxidizer with a destruction efficiency of 99.9%, an efficiency beyond the capabilities of its current equipment.  Nevertheless, I believe that the thermal oxidizer analysis performed by DPE personnel and its contractors remains applicable to investigating, designing, constructing, and testing the new thermal oxidizer which will still be required to meet the Final Rule requirements.

wastewater streams in the Polymer Area, and certain site maintenance activities; as well as modifications/improvements to the leak detection and repair program and the existing regenerative thermal oxidizer to further reduce emissions.  The extensive analyses performed by DPE and outside consultants are based on reviews of the Proposed Rule and associated technical documents, third-party vendor quotes for emission control equipment, extensive emissions control experience, and Facility site visits, many of which I personally led.  In addition, DPE established a task force in July 2022 to evaluate emission reduction projects made up of more than 20 engineers, managers, and process experts from all across the plant ("Emission Reduction Project Task Force" or "Task Force').  The Task Force meets at least once per week to discuss status and schedule updates, planning, and assignment of specific tasks.

6.     As the Environmental Affairs Manager of a complex chemical manufacturing facility, after reviewing the extensive analyses by DPE personnel and outside consultants, I have serious concerns regarding the numerous complex process changes that will be required at the Facility for the installation of the Section 112(f) Control Projects.  Chloroprene is a highly volatile, flammable, and highly reactive (polymeric) chemical.  In turn, any changes to the production process at the Facility will require properly trained and knowledgeable employees and contractors with process safety experience.   Failure to follow process safety

procedures can result in disastrous consequences such as fires, explosions, and fatalities, as well as unintended environmental releases.  Probability of incidents such as these is increased by stressors such as human error and omissions which are more likely to happen if new complex safety processes are implemented on an accelerated timeline, as is required in the Final Rule.  Avoiding the consequences associated with potential chloroprene-related process safety failures will demand careful planning and sufficient time to develop, assess, and implement the appropriate procedures required to safely operate the Section 112(f) Control Projects.

7.     As the Environmental Affairs Manager, I have substantial concerns that the design, installation, and testing of the major projects required to comply with the Final Rule, combined with the requirement to complete these projects in a 90-day or even a two-year window, will encourage personnel to rush standard industry processes and practices, and increase the probability of human error.  Circumvention of these standard processes and practices can easily result in a violation of the Occupational Safety and Health Administration's ("OSHA") Process Safety Management requirements, serious injury or death to employees, and increased risk of community exposure due to an environmental release incident.  As explained in the DPE Comments, an insufficient compliance period unsafely ignores the potential for human error that can arise in (1) designing processes; (2) engineering projects;

(3) specifying process components; (4) predicting safeguards necessary to control risk to an acceptable level and sustain the required safeguards for the life of the process; (5) managing process changes; (6) startup testing; and (7) trouble-shooting (shakedown) physical process changes.[6]  In its Final Rule, EPA has still not addressed process safety actions or demonstrated that sound change-management principles were used in developing the required Section 112(f) Control Projects. EPA's demand for compliance on such an unreasonable schedule poses serious risks to DPE, its employees, and the surrounding community.

8.     I have reviewed the requirements of the Final Rule in relation to the Section 112(f) Control Projects.  As detailed further below, and as LDEQ recognized in the LDEQ Extension issued to DPE, none of these projects can be feasibly or safely implemented in only 90 days, let alone all of them simultaneously.

9.     **<u>Thermal Oxidizer</u>**.  The Final Rule requires emissions from process vents and storage vessels in chloroprene service to be routed to a closed vent system to a non-flare control device that reduces chloroprene by greater or equal to 98% Destruction Removal Efficiency.[7]  As EPA concluded, this requires routing of all

---

[6] DPE Comment at 108.
[7] 89 Fed. Reg. at 42,937, 43,243-44.

chloroprene emissions from the polymer batch reactors, emulsion storage vessels, strainers, and wash belt dryers to a thermal oxidizer.[8]

10.    The Facility currently has a regenerative thermal oxidizer with a Destruction Removal Efficiency of approximately 98% and a flow capacity of 58,500 standard cubic feet per minute (scfm).[9]  However, the sources identified by EPA that would need to be routed to a thermal oxidizer would add 210,558 scfm of flow, resulting in a new total flow of 252,869 scfm.[10]  The additional flows are more than 4.3 times higher than the Facility's existing regenerative thermal oxidizer flow capacity.  In other words, the Final Rule requires the installation of a new, much larger thermal oxidizer at the Facility to control the excess flow from process vents and storage vessels in chloroprene service.  EPA has acknowledged that the Facility will need to install an additional thermal oxidizer to comply with the Final Rule.[11]

---

[8] 88 Fed. Reg. at 25,117; *see* ERG Control Options for Process Vents and Storage Vessels Memo at 7.  *See also* 89 Fed. Reg. at 42,986-87 (EPA has reiterated in the Final Rule that it "continue[s] to stand by [their] analysis" and finalized control requirements for those same sources.).

[9] Presentation to EPA (Oct. 18, 2023) ("DPE Presentation") at Slide 8; Norton Thermal Oxidizer Memo at 5-6; *see also* Declaration of Chrisopher Meyers submitted in *United States v. Denka Performance Elastomer, LLC*, Case No. 2:23-cv-00735 ("Section 303 Litigation"), regarding the remedy demanded by EPA ("Meyers Remedy Decl."), ¶¶ 27, 29.

[10] Meyers Remedy Decl., ¶ 30 and Exhibit A; *see also* Norton Thermal Oxidizer Memo at 5-6.

[11] 89 Fed. Reg at 42,986 (EPA "anticipate[s] that the facility will still need to install an additional thermal oxidizer in order to comply with the final performance standard for process vents and storage vessels in chloroprene service.").

11.    Based on my prior experience with the installation of emission controls, including the first regenerative thermal oxidizer installation at the Facility, and evaluation work already completed by DPE in relation to an additional thermal oxidizer, I would expect that DPE will need *at least* two years to safely design, obtain approvals for, complete construction, install, and test a new thermal oxidizer with a much larger flow capacity.  My estimated timeframe does not account for testing to determine the applicability of the dioxins and furans standard[12] that must be understood before finalizing the planning of the thermal oxidizer.  If the dioxins and furans standard is also determined to be applicable, additional time will be needed at the Facility to account for such standards in the design and construction of a thermal oxidizer.

12.    EPA's Final Rule instructs that the only viable way to capture chloroprene emissions from the identified sources and route them to a thermal oxidizer is to install three permanent total enclosures:[13]

- One permanent total enclosure for all five polymerization batch reactors;

- One permanent total enclosure for the two wash belt dryers; and

- One permanent total enclosure for the three emulsion storage tanks.

---

[12] 89 Fed. Reg. at 42,937, 43,244-45.

[13] *See* 89 Fed. Reg. at 42,986 ("we continue to stand by our analysis"); *see also* ERG Control Options for Process Vents and Storage Vessels Memo at 7.

13.    Although EPA indicated that there is no explicit requirement to install permanent total enclosure,[14] I am not aware of an alternative option that can achieve the Final Rule requirements.  As the Environmental Affairs Manager for the Facility, I am extremely concerned that the Final Rule fails to account for the technical and process safety challenges of enclosing the wash belts and equipment in the poly building required to meet the new standards.  Capturing chloroprene from these areas is complex and will take time to plan and safely implement, especially considering capturing emissions from these areas involves sources that are not closely clustered at the Facility.  For example, the wash belts are located in the finishing building, which is separate from the poly building.  However, EPA had claimed they were in the same building in the Proposed Rule.  Although EPA purports to acknowledge this burden in the Final Rule,[15] it does not appear to me that EPA has given any meaningful, let alone adequate, consideration of the physical layout or technical limitations of the Facility's equipment when requiring that emissions be captured.

14.    The enclosures that will likely be necessary to comply with the Final Rule pose serious concerns regarding occupational exposure, human health and

---

[14] 89 Fed. Reg. at 42,987.

[15] *See* 89 Fed. Reg. at 42,986 (acknowledging that the wash belts are located in the finishing building rather than polymer building but reiterating that they still must be controlled under the Final Rule and that an additional thermal oxidizer is likely required).

safety, process maintenance, and product quality associated with enclosing the wash belts at the Facility. I am especially concerned with how an enclosure may impact safe ventilation in the finishing building. DPE's wash belt blower motors are equipped with variable frequency drives that allow a reduction of the total flow rate through the vents. An industrial hygienist is needed to evaluate any changes to the airflow through the vent hoods themselves or in other areas of the finishing building to ensure compliance with personnel exposure requirements, or to make recommendations for additional protective equipment. I also note that changes in airflow from enclosing the wash belts can negatively impact product quality, which also needs to be evaluated before enclosures are permanently installed.

15.    Enclosing the wash belts also poses maintenance and repair considerations that concern me as an Environmental Affairs Manager. The wash belts require frequent manual intervention from DPE personnel to ensure stable operation. This requires physical access to the equipment to complete maintenance and repairs. As a result, I believe it is likely that any enclosures will need to be transparent and capable of easily and frequently being dissembled and reassembled.

16.    Based on my prior experience installing existing enclosures at the Facility, the process safety concerns, and the necessary design, review, and approval process, I estimate a period of at least two years – and more likely 30-36 months – would be required before the new, much larger thermal oxidizer could commence

operation and safely control emissions from the enclosures at the Facility. DPE's existing regenerative thermal oxidizer and Monomer Emissions Reduction Project control systems took nearly two years to design, approve, install, test, and place into service. The existing regenerative thermal oxidizer controls the higher concentration flows at the Facility – meaning that the Facility will face more challenges associated with capturing the more diffused sources and routing them to the new thermal oxidizer. Also, nearly two years of work was done by DPE on an accelerated schedule to meet the requirements of the January 2017 Administrative Order on Consent. Based on that experience and the dangerous risks that were revealed during the accelerated nearly two-year process, I would not authorize a similar accelerated implementation schedule for a new, much larger and more complicated thermal oxidizer. I believe the risk inherent in attempting to complete such a task in only 90 days is unthinkable. Additionally, after DPE completed work on the existing regenerative thermal oxidizer and Monomer Emissions Reduction Project control systems, the new systems did not function effectively upon startup and required several months of shakedown and then over a year of process optimization before they were considered fully successful. Based on this prior experience alone, I estimate that the Facility would require at least 30-36 months to complete another thermal oxidizer.

17.    **<u>Pressure Relief Devices</u>**.  The Final Rule imposes a new set of work practice standards for pressure relief device releases that prohibits such devices releasing into the atmosphere and requires DPE to utilize monitoring and notification systems capable of identifying and recording the time and duration of each pressure release.[16]  EPA has assumed that operators would install electronic monitors on PRDs to achieve such work practice standards.[17]

18.    The Facility has approximately 300 pressure relief devices that could be affected by these new standards.  These pressure relief devices will either need to be routed to a control device and/or enhanced monitoring systems will need to be installed.  Therefore, these requirements must be considered as DPE works to design and install a thermal oxidizer to meet the Final Rule requirements.  The Facility does not currently have a complete system in place, or the necessary equipment installed to be in compliance with the new pressure relief device work practice standards at this time.

---

[16] 88 Fed. Reg. at 25,158.  As explained in the Final Rule, EPA proposed "that any release event from a PRD in chloroprene service is a violation of the standard…" 89 Fed. Reg. at 42,959.

[17] 89 Fed. Reg. at 43,222. "For purposes of estimating the costs of this requirement, [EPA] assumed that operators would install electronic monitors on PRDs that vent to atmosphere to identify and record the time and duration of each pressure."  88 Fed. Reg. at 25,158.

19.    The new requirements call for DPE to install ppm ("parts per million")
level analyzers with calibration features and diagnostic feedback at the exhaust of
each pressure relief device that can emit to the atmosphere.  These analyzers must
be capable of verifying that any discharge is less than 500 ppm.  Monitoring
equipment associated with the process and piping capable of indicating when a
release to the atmosphere is occurring may potentially be required on all 300 pressure
relief devices.  This involves installation of a magnetic sensor or motion detector
connected to pressure relief device stem travel (or an equivalent indicator of pressure
relief device movement).  As explained by DPE's outside consultants, this
technological approach has not been implemented in the industry today and is a
significant deviation from commercially available pressure relief devices.  As the
Environmental Affairs Manager, it is my opinion that this will only further
complicate procurement and installation of pressure relief device equipment
required by the Final Rule.  Additionally, I believe that it will take longer to plan
and test the required monitoring equipment to ensure reliability because there are
not reference installations within the industry.

20.    As the Facility's Environmental Affairs Manager, I cannot stress
enough how critical pressure relief devices are to the safety of the Facility, the
workers, and the community.  Pressure relief devices are first and foremost *safety
equipment* that remain closed during normal operation but activate and release in

response to an overpressure in the system. Overpressure can occur for a variety of reasons including malfunctions due to power failure or equipment failure, or other unexpected causes that result in immediate venting of gasses from process equipment to avoid safety hazards or equipment damage.[18] Pressure relief device releases can be violent events. In turn, DPE must carefully design a pressure relief device system that continues to protect employee and community safety while navigating the Process Safety Management Regulations promulgated by the OSHA. DPE will be required to conduct an appropriate process hazards review surrounding any changes made to each and every one of the Facility's pressure relief device systems.

21.     The Facility does not currently have the engineering resources to adequately evaluate what modifications are necessary for each of the approximately 300 pressure relief devices to comply with the Final Rule requirements. DPE will need to carefully evaluate each pressure relief device individually and ensure that none of the safety devices are inadvertently disabled as the Facility works towards compliance with the pressure relief device work practice standards. To accomplish this, DPE will need to hire additional internal engineering resources or outside contractors that have the expertise required to complete this complicated work. Any new personnel will need to be trained and learn the Facility's process and safety

---

[18] 88 Fed. Reg. at 25,155.

procedures.    Securing  the  appropriate  personnel  and  evaluating  the  potential

modifications for the pressure relief device requirements will contribute to the time

required to plan and implement a thermal oxidizer.

22.    Additionally,  I  am  concerned  that  the  new  pressure  relief  device

requirements will lead to more non-serious trips of the instruments.  This may force

unintended  shutdowns,  subsequent  restarts,  and  excess  violation  of  emission

standards.    Further  analysis  will  be  needed  prior  to  rolling  out  a  modified  300-

pressure relief device program, which will require additional time to address.  The

possibility of routing pressure relief devices to a control device must be considered

in designing the new thermal oxidizer.  In my opinion, the pressure relief device

requirements will contribute to the Facility's need for 30-36 months to achieve

implementation of the thermal oxidizer.

23.    **Safety Bypass Lines**.  I am also very concerned with EPA's prohibition

of the use of bypass lines that would prevent the Facility from bypassing control

devices without incurring a potentially enforceable permit violation.  The Final Rule

will  require  monitoring  systems  for  flow  on  bypass  lines  to  detect  whether  vent

stream flow is present every 15 minutes and to estimate and report any releases.[19]  A

unqualified prohibition is alarming because bypass lines are critical process safety

devices used to prevent an explosive mixture of gases from accumulating within the

---

[19] 89 Fed. Reg. at 42,950, 43,023, 43,102.

header systems connected to the regenerative thermal oxidizer and avoid catastrophic failure. These bypass lines cannot be fully eliminated—without these bypass lines there is nowhere else for these dangerous vapor streams to go. I am concerned that use of the bypass lines for their intended process safety purpose will result in excess violations of appliable emission standards. Accordingly, the design of the new thermal oxidizer must consider the possibility of routing certain bypass lines to the thermal oxidizer.

24.    The Facility has four closed vent systems to route process emissions from the Neoprene process area to the regenerative thermal oxidizer: (1) a nitrogen-rich header for streams with high chloroprene concentrations; (2) an air rich header for streams with lower chloroprene concentrations; (3) the East Hot Dryer Vent; and (4) the West Hot Dryer Vent. The Facility's Monomer Emissions Reduction Project is also a closed vent system which routes emissions from the monomer process area to the Halogen Acid Production Furnace. In total, there are 19 bypass lines associated with the regenerative thermal oxidizer and 8 bypass lines associated with the Monomer Emissions Reduction Project control systems that are required for safety reasons. As the Facility's Environmental Affairs Manager, I can attest that these bypass lines are rarely used—and only for emergencies (emissions from bypass lines made up less than 1% of the Facility's total emissions in 2022). These

bypass lines are critical safety equipment for the Facility with low emissions consequences.

25.   DPE will need time to safely design, plan, and implement new configurations to handle these potentially catastrophic flows. This may require designing the new thermal oxidizer to accept these vent streams, regardless of how infrequently they occur, or require substantial reworking of piping and ducting to accommodate the instrumentation required to meet the new monitoring standards. In my opinion, addressing the unqualified prohibition on bypasses will contribute to the Facility's need for 30-36 months to achieve implementation of the thermal oxidizer.

26.   **Dioxins and Furans Emission Limit**. DPE needs additional time to complete testing for the presence of dioxins and furans. Additionally, the dioxins and furans limit further complicates the designing, planning, and implementation of an additional thermal oxidizer because additional condenser equipment or other control devices must be evaluated concurrently with the chloroprene Section 112(f) Control Projects. EPA's dioxins and furans technical support document assumed that a condenser would be installed prior to the existing control device, which in DPE's case is a thermal oxidizer.[20]   Based on the analysis performed by DPE's

---

[20]   ERG, *Dioxins and Furans MACT Floor in the SOCMI Source Category for Processes Subject to HON and Processes Subject to Group I and Group II Polymers and Resins NESHAPs* (Mar. 2023) ("ERG Dioxins and Furans Memo"), Table 11

consultants,[21] DPE would have to evaluate commercially available refrigeration systems that can achieve the temperatures required to recover or condense chloroprene out of the vapor streams. This evaluation would only be the first step towards compliance and there is no guarantee that it would provide a feasible option that meets the requirements of the Final Rule. If a feasible option is identified, it will take months to design, approve, install, and test such an option. If a feasible option is not identified, then the Facility will likely need to install and/or route the emissions to a new control device. Either option will significantly add to the time and complexity needed to implement the Section 112(f) Control Projects.

27.    **Wastewater Steam Stripper**. The Final Rule requires wastewater streams that are in chloroprene service to comply with the requirements for Group 1 wastewater streams. This will likely necessitate the installation of a steam stripper

---

(costs based on refrigeration condenser technology that has been applied in the PVC industry).

[21] *See* Montrose, *Dioxins and Furans Proposed Rules* (July 6, 2023). Montrose Environmental Group, Inc. ("Montrose") is a global environmental services provider specializing in emission control planning, measurement, and analysis, has worked closely with DPE over the past two years on nearly all aspects of potential options for chloroprene control at the Facility. Norton Engineering Consultants, Inc. ("Norton Engineering") is a consultant group with specialized expertise in thermal oxidizers has also assisted DPE in evaluating potential thermal oxidizer configurations and assisted Montrose in evaluating the dioxins and furans requirements proposed by EPA.

to achieve reduction of chloroprene emissions from wastewater in chloroprene service.[22]

28.     DPE currently utilizes an air stripping system. This process occurs in the air sparging tank and routes to the onsite regenerative thermal oxidizer.[23] However, as I previously discussed, the existing regenerative thermal oxidizer does not have air flow capacity to take on additional waste streams, including chloroprene-containing air from a new steam stripper. Therefore, a new control device would need to be installed in addition to the new stream stripper to properly control the additional steam stripper wastewater streams at the Facility.

29.     The Facility's current air stripping equipment and sparging tanks took more than 6 months to plan and implement, more than twice the 90 days EPA has given DPE to implement a new steam stripper system. And because steam stripping equipment is more complicated than air stripping equipment, it would take longer to safely plan, approve, install, test, and place steam stripping equipment into operation.

30.     Based on my prior experience with the design and installation of wastewater control equipment at the Facility and evaluation work already completed

---

[22] 89 Fed. Reg. at 42,938, 42,959, 42,987-88.

[23] Also note that the Facility uses an outdoor brine pit to control steam stripper rundown streams which are then routed to the Wastewater Treatment Plant and subject to biological control that achieves 80% reduction.

by DPE personnel and outside consultants, I expect that the design, approvals, construction, installation, and testing of a new steam stripper together with a thermal oxidizer would take at least two years.

31.    **Equipment to Limit Maintenance Emissions to 1 tpy**.  The Final Rule imposes a 1 ton per year (tpy) cap on maintenance vent emission releases.[24] Despite significant efforts, DPE has not yet identified feasible options for achieving this requirement.

32.    The largest single source of emissions from maintenance activities is from annual steaming of the Facility's 2 million pound tank (approximately 660 lbs of emission associated with each annual steam event).  DPE has considered various options, but none of them have been viable.[25]   First, based on discussions with EPA enforcement officials, DPE requested proposals from third-party vendors for the use of a portable thermal oxidizer for use during steam cleanings of the 2 million pound tank.  However, two of the EPA-recommended vendors declined to submit proposals due to technical challenges and/or lack of available engineering resources.  One vendor did submit a proposal but failed to properly evaluate safety considerations such as the use of the thermal oxidizer with HCl scrubbing equipment and required heat exchanger equipment that would be necessary due to elevated temperatures

---

[24] 89 Fed. Reg. at 42,937, 43,245, 43,246.

[25] *See, e.g.,* DPE Comments at 88-89.

from the steaming process.  Attempting to apply this proposed method on other tanks would pose similar issues.[26]

33.    The Facility also considered using a new portable condenser and catch tank that would route steam vapors to a regenerative thermal oxidizer for control. Unfortunately, this method would likely extend the length of plant turnaround times by unknown amounts of time with enormous costs.[27]

34.    DPE also considered nitrogen purging of the 2 million pound tank in which vapors would be routed to a regenerative thermal oxidizer for control. However, this purging process would take multiple days longer than the current steaming process posing immense cost-per-day consequences.[28]  At this time, I am still not certain how many days it would take to use this option each cleaning.

35.    DPE requires substantially more time to adequately assess solutions to this new maintenance emissions cap.   Based on the substantial analysis and investigation already committed to this requirement, I estimate that DPE would need two years or more to evaluate, acquire equipment, test, obtain approval, and implement any new maintenance activity processes to comply with the new standard.

---

[26] *Id.*

[27] *Id.*

[28] *Id.*

36.    **Other Section 112(d) requirements will increase the time needed to implement the Section 112(f) Control Projects**.    The Section 112(f) Control Projects are not the only projects that I, or the Facility, must evaluate and implement within timeframes prescribed in the Final Rule.    In addition to the Section 112(f) Control projects, DPE will be required to plan for the implementation of the Final Rule's requirements under Section 112(d) of the Clean Air Act, which must be implemented within three years of the effective date.    As a result, the engineer members of DPE's Emission Reduction Projects Task Force must also consider any potential impacts of the Section 112(d) projects when planning, designing, and implementing the Section 112(f) Control Projects.

37.    DPE personnel will need to account for the Section 112(d) requirements in planning the Section 112(f) Control Projects which further contributes to the need for at least two years for safe implementation of the Section 112(f) Control Projects.

38.    **Opinion 2: A compliance period of 90 days will require the Facility to shut down by October 2024.    A compliance period of less than two years would likely require a shutdown of the Facility and increase the complexity and dangers of implementing the requirements.**

39.    As discussed above, the Section 112(f) Control Projects cannot be technically or safely designed, approved, constructed, and tested at the Facility in

less than two years.  The extensive analysis performed by DPE and its outside experts demonstrates that anything less than two years is infeasible and unsafe.

40.     In the Section 303 Litigation filed against DPE, EPA effectively admitted that the Section 112(f) Control Projects cannot be done in 90 days.  In the Section 303 Litigation, EPA sought preliminary injunctive relief in the form of emission control projects that are substantially similar to requirements of the Final Rule.  But even though EPA's proposed timelines for those projects in the Section 303 Litigation were woefully inadequate, EPA nonetheless conceded that such projects could not be completed in 90 days.  For example, EPA's expert opined that it would take 90 days or more *just to prepare a plan* to evaluate and control chloroprene emissions in the Facility's polymer building.  Even setting aside the validity of this disputed estimate, it demonstrates that substantially more than 90 days will be needed to approve, construct, install, and test the ultimate control project.   It is unreasonable for EPA to now demand compliance timeframes that are shorter than what EPA already represented to the district court were necessary in the Section 303 Litigation.

41.     If DPE is not provided at least two years to complete the Section 112(f) Control Projects, in my opinion, the Final Rule will require the Facility to shutdown thereby increasing the complexity and dangers of complying with the requirements of the Final Rule.

42.     The Facility has already shifted its attention, time, and resources toward completing a safe and effective shutdown of the Facility for an indefinite period of time.  This comes at the cost of planning successful implementation of EPA's Final Rule requirements.  Absent immediate action that provides DPE with additional time for compliance, DPE will be forced to commit an even larger share of its attention, time, and resources toward shutdown.

43.     Once the shutdown occurs, DPE will be unable to field test the effectiveness of any emission reduction projects in a functional, operational setting.  This prevents me or other DPE personnel from evaluating effective methods to address potential process safety hazards.  In order to evaluate the effectiveness and safety of both large- and small-scale emission reduction projects, DPE requires an operational facility.  DPE already faces process hazard challenges during normal operations when evaluating emission reduction projects on accelerated timelines and a shutdown would just pose further challenges.  Also, I am concerned about an indefinite shutdown's impact on the allocation of process safety resources and personnel.  Additionally, I have serious concerns about the ability of DPE to maintain its personnel if DPE were forced to meet an unreasonable and infeasible compliance deadline of 90 days.

44.     Lastly, as Environmental Affairs Manager, I am not aware of a single time in the Facility's history where DPE was required to restart operations after a

prolonged shutdown of 3-6 months or longer. A shutdown here would last significantly longer due to the time needed to safely develop and implement the Section 112(f) Control Projects. Therefore, significant process safety steps will need to be developed before a restart. This includes drafting, reviewing, and finalizing safety procedures for any restart that follows a prolonged period of non-use. Obviously, installing the Section 112(f) Control Projects from an idled state will impact the amount of time necessary to comply with the Final Rule and I fully expect that it would take at least two years to shut down the Facility, install such projects, and restart operations.

45. **Opinion 3: DPE has continued to reduce emissions through practicable and effective emission reduction strategies since May 2022.**

46. DPE has and continues to evaluate emission reduction opportunities at the Facility. Between 2016 and 2018, DPE reduced the Facility's emissions by 85%. This was in large part due to the installation of the Facility's current regenerative thermal oxidizer. Since May 2022, I have continued to lead efforts to reduce emissions and the Facility has implemented a series of additional reduction strategies.

47. As Environmental Affairs Manager, I have overseen a number of these reduction efforts, which are discussed below:

- DPE has implemented a process to reduce emissions associated with waste from the Facility's poly kettle production units consistent with the requirements of the consent agreement in EPA Docket No. RCRA-06-2023-0906, as well as applying a similar process to waste coagulant generated from the stripper strainers. DPE now steams the coagulant and routes emissions to the regenerative thermal oxidizer. DPE has also improved its washing and nitrogen purging processes to further reduce emissions associated with the poly kettle production units.

- DPE has implemented a voluntary process to reduce the number of concurrently operating unstripped emulsion storage tanks and to strip chloroprene from in-tank coagulant during maintenance of the unstripped emulsion storage tanks. Now only two tanks are used at a time to reduce coagulate formation. The tanks containing coagulate are filled with water and are circulated to strip the remaining chloroprene and route emissions to the regenerative thermal oxidizer.

- The Facility has also employed a voluntary process to strip chloroprene from in-tank coagulant during maintenance of the five poly kettles.

- DPE has voluntarily decreased the site-wide leak detection and repair threshold from the regulatory standard of 500 ppm organic vapor concentration to 250 ppm. In conjunction with this new 250 ppm threshold, an additional voluntary process to screen certain components in the polymerization building located at the Facility and the 1236 waste organics storage tank area multiple times each week and to schedule repairs if leaking components are identified has been rolled out. DPE hired a Leak Detection and Repair technician with over 20 years of experience to lead these voluntary efforts which has included increased weekly screenings, new immediate repair procedures, and the purchase of state-of-the-art detection equipment.

- Furthermore, DPE has supplied operators in the polymers area with photoionization detectors to perform Leak Detection and Repair screenings on any component at any time to detect leaks. Accordingly, prompt repairs are made when leaks are detected.

- DPE voluntarily implemented a process requiring transfers of chloroprene-containing wastes from the chloroprene heels tank to the waste organics tanks in the HCl recovery unit process area be performed only when the 1236 tank system is connected to the Monomer Emissions Reduction Project control system or other form of emissions control.

- DPE instituted new outdoor brine pit management measures which require coagulant from the unstripped emulsion storage tanks and large poly kettles to be placed directly into plastic drums to be sent off-site for incineration. This new process change ensures that solid material is no longer placed in the outdoor brine pit.

48.    In addition, DPE is currently evaluating additional emission reduction projects such as (i) a potential project to remove chloroprene from the poly kettle strainer waste by circulating water through the strainer and sparging the water in a closed vessel connected to the existing regenerative thermal oxidizer, and (ii) the potential use of Forward Looking Infrared, or FLIR, cameras to improve leak detection activities.

49.    I have been involved in reviewing the Facility's EPA Method 325B and EPA Method TO-15 air monitoring data which demonstrates that the voluntary emission reduction projects discussed above have resulted in quantified reductions of chloroprene concentrations near the Facility.  Moreover, the Facility has achieved the lowest average chloroprene concentrations during my tenure following these voluntary changes.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 10, 2024

_____

CHRIS MEYERS, P.E.

Case: 24-60351    Document: 6-15    Page: 30    Date Filed: 07/11/2024