# EXHIBIT O

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

| | |
|---|---|
| **DENKA PERFORMANCE ELASTOMER LLC,**<br><br>Petitioner,<br><br>v.<br><br>**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL REGAN, Administrator, United States Environmental Protection Agency,**<br><br>Respondents. | No. _____ |

## DECLARATION OF MICHELLE HELFRICH

Pursuant to 28 U.S.C § 1746, I, Michelle Helfrich, declare as follows:

1. My name is Michelle Helfrich. I am an Executive Officer and the Plant Manager at Denka Performance Elastomer, LLC's ("DPE") Neoprene manufacturing facility in LaPlace, Louisiana (the "Facility"). The Facility is the only Neoprene manufacturing facility in the United States.

2. The major industrial users of Neoprene are the automotive, construction, adhesives, and medical industries. Neoprene is used in end products such as rubber belts, gaskets, boots, rubber bridge bearing pads, rubber joint sealants for airports, rubber gloves, medical bandages, anesthesia bags, roofing adhesives, and DIY adhesives. Users of DPE's Neoprene include manufacturers who are the

largest producers of these products in North America. Further, Neoprene is used to manufacture critical products required by the U.S. Department of Defense. I attach a letter from U.S. Congressman Jack Bergman, a member of the House of Representatives Armed Services Committee, to U.S. Secretary of Defense Lloyd J. Austin III requesting information regarding the impact of EPA's Final Rule for chloroprene on critical Neoprene products and raising potential national security concerns.

3. I have held the Plant Manager position since January 3, 2024. Prior to this position, I worked as Plant Operations Manager at the Facility, beginning January 30, 2023. As the Plant Operations Manager, I reported directly to the then-Plant Manager, Jorge Lavastida, who served in that role since November 1, 2015. Mr. Lavastida has over 34 years of experience in the chemical industry, over 17 years in site senior leadership positions, and over 10 years of experience in the Neoprene business. After completing a process for knowledge transfer with me, Mr. Lavastida retired on January 2, 2024. I have over 30 years of experience in the chemical industry where I have managed cross-functional teams, implemented process improvements, and ensured adherence to company standards at chemical companies including BASF Corporation, Shell Chemical Company, and The Dow Chemical Company, among others. I have over 22 years in leadership positions with increasing responsibility.

4. My current job responsibilities include overseeing the safe operation, maintenance, and development of the Facility. I manage the work of senior managers who are responsible for process safety, personnel safety and health, environmental affairs, production, supply chain, quality, and maintenance management of the Facility, and the technical improvements needed to support our operations.

5. The Facility utilizes multiple hazardous chemicals in its operations. As Plant Manager, my most important guiding principle and highest priority is ensuring that the Facility operates in a manner that protects the safety of its personnel and the community.

6. My current job responsibilities include overseeing DPE's planning efforts with respect to EPA's Final Rule for chloroprene. I am also part of the leadership team responsible for overseeing DPE's response to EPA's emergency lawsuit filed against DPE under Section 303 of the Clean Air Act ("Section 303 Litigation").

7. In both the Section 303 Litigation and the Final Rule, among other agency actions, EPA has demanded that DPE substantially reduce its chloroprene emissions. The Final Rule requires DPE to install complex and capital-intensive emission control equipment that needs to be reviewed, designed, approved, installed, and tested before the equipment can be placed into service. While the Proposed Rule

would have allowed DPE two years to take these steps and DPE commenced its planning process accordingly, the Final Rule requires DPE to implement these steps by October 15, 2024. In a separate declaration, my colleague and direct report, DPE Environmental Affairs Manager Chris Meyers, discusses the significant feasibility and safety concerns associated with placing the required emission reduction projects into service within the much shorter, 90-day compliance period imposed by the Final Rule.

8. For the reasons explained in Mr. Meyers' declaration, DPE will not be able to safely implement the changes required by the Final Rule within anywhere near the 90-day period imposed by the Rule. DPE has received an Extension of Compliance from the Louisiana Department of Environmental Quality that allows DPE two years to implement the required changes ("LDEQ Extension"). DPE will not be able to continue its Neoprene operations at the Facility unless it can rely in good faith on the LDEQ Extension, without fear of EPA enforcing the Final Rule after the 90-day period. As discussed further herein, DPE otherwise must take steps beginning in August 2024 to orchestrate a safe, and likely permanent, shutdown of operations.

9. Ceasing or indefinitely suspending chloroprene and Neoprene production at the Facility would be catastrophic to DPE's operations, financial position, and ability to continue as a viable business.

10. <u>Revenue loss</u>. DPE's revenue is derived entirely from the sale of various types of Neoprene. Requiring the Facility to shut down indefinitely would deprive DPE of its only source of revenue. Based on my knowledge of the Facility's budget and production plan, I estimate that each day the Facility is shut down would cost DPE hundreds of thousands of dollars in lost revenue.

11. <u>Workforce loss</u>. With no revenue and no Neoprene production, DPE would be forced to lay off a significant portion of its workforce. DPE currently employs approximately 250 employees plus another 75-100 resident contractors. DPE has obligations under the federal WARN Act to provide employees with 60 days' notice ahead of any mass layoff or plant closure. The vast majority of DPE's employees and contractors are skilled workers with unique experience and process knowledge to operate the Facility that they gained on the job working at the nation's only Neoprene facility. If DPE shuts down operation of the Facility, I fully expect these workers would seek new employment immediately, rather than wait to see if the Facility might eventually resume operations at some unknown date in the future, while earning no salary. In addition, important institutional knowledge of the Facility's operations resides with many longtime employees who are at or near retirement age. Without an operating Facility, the typical process for managing worker transitions due to retirement or otherwise (e.g., succession planning, part-time employment and/or temporary employment) and the process for knowledge

transfer among workers would be infeasible. Even if DPE were eventually able to restart operations, we would need to recruit and replace nearly the entire workforce and ensure each specialized unit, in addition to support groups within the Facility was appropriately staffed in order to safely operate. I strongly believe that we would not be able to re-hire our current skilled workforce. If the Facility were able to restart, operations could not safely resume without re-hiring knowledgeable staff, hiring new employees, and providing significant training within each specialized unit of the Facility. Inability to rely on our experienced, skilled workforce in the future is a substantial reason that it would be extremely difficult to re-open the Facility once it is shut down.

12. <u>Shut Down Preparations Must Begin Months In Advance</u>. Preparations for an indefinite shut down must begin well ahead of the actual shut down date. As noted above, DPE must provide employees with 60 days' notice ahead of any mass layoff. Further, shutting down the Facility is a complex, multi-stage operation that would be further complicated if the Facility were being shut down for an indefinite time period. DPE is staffed to run an operating chemical plant. DPE's available resources must be redeployed immediately to plan the shutdown process, as well as the engagement of legal and technical experts familiar with the complexities of an indefinite shut down period. While planning documents have been developed by DPE for short, known duration shutdowns such as turnarounds and weather events

(e.g., hurricanes), DPE does not have plans or staffing in place to orchestrate an indefinite shut down. DPE must address its permitting requirements, its contractual obligations to suppliers and customers, and its workforce. Likewise, DPE must address its potential inability to provide services to the co-located chemical facility owned and operated by DuPont. Loss of these services could be detrimental to the safety and operating ability of DuPont's plant.

13. Chloroprene production cannot cease immediately but will require a planned and orderly process to systematically terminate activities for each of the three operating units of the Facility. I have substantial concerns about whether DPE's employees would remain employed at DPE long enough to safely shut down the Facility on Day 90, as I would expect employees to seek more stable employment. The shutdown process is likely to take several weeks, if not months, and will require multiple steps that must be coordinated across the Facility's three operating units, including safely storing or removing the volatile chemicals utilized at the Facility. I expect contractors would need to be hired and trained to complete the shutdown process, which certainly begins on Day 1 and may not be feasible in the 90-day period permitted by the Final Rule. Further, the Facility would still require a sufficient number of employees capable of training and overseeing the new contractors. With no revenue and no operations, DPE has limited tools to retain these critical employees.

14. Further, in the event that DPE does make the substantial capital investments required to achieve compliance with the Final Rule and restart operations at some date in the future, during the shutdown period, DPE will need to retain a limited number of personnel to support functions like process safety, safety and health, engineering, IT, procurement, human resources, maintenance, emergency response, and project planning. DPE will also likely need to add new personnel with new skill sets to address the new challenges associated with shutting down and maintaining an idled facility. Even leaving aside the very real question of how to pay those employees with no revenue coming in, I expect it to be very difficult to retain these employees during this period of uncertainty, as these skilled workers are likely to pursue career opportunities at other chemical plants or other businesses with a more positive outlook and job stability and longevity.

15. <u>Need For Capital Investment</u>. The emission control projects described in the Final Rule would require significant capital investment. Mr. Meyers discusses the scale of the project costs in his declaration. Again, DPE would need to secure and deploy the necessary capital during a period with no revenue coming in which could lead to higher financing costs or other unfavorable terms, if financing is even available. Further, the cost of the emission control measures would be on top of the tremendous costs DPE has already incurred, and continues to incur, in connection with EPA's prior demands to reduce the Facility's chloroprene emissions, including

DPE's investment of more than $35 million in a Regenerative Thermal Oxidizer in 2017, which contributed to an 85% reduction in the Facility's emissions. Under the Final Rule, DPE would have to install an *additional* thermal oxidizer, which will require additional investment, in addition to other new emission reductions projects.

16. <u>Challenges Associated With Implementing New Controls During Shutdown</u>. In my experience, new projects and processes like the emission reduction projects and associated processes required by the Final Rule are tested in an operational facility, not a non-operating plant like the Facility will be after the 90-day period has run out. In order to prove the effectiveness of any newly installed equipment, the Facility must be operational to test the efficacy of design criteria. This allows for testing of the new equipment under actual operating conditions to allow for adjustments and fine tuning of its operation. It also provides the opportunity for workers to be trained on how to operate the newly installed equipment.

17. <u>Supply Chain Disruptions and Contractual Impacts</u>. In addition, ceasing DPE's production would cause significant supply chain disruptions, affecting both upstream suppliers and downstream customers and end-users of Neoprene, and preventing DPE from meeting its contractual obligations. For example, DPE has entered contracts with key suppliers that have termination provisions that DPE would likely have difficulty complying with if DPE must shut

down production at the Facility by the 90-day deadline, which we expect would result in contractual penalties and damage DPE's relationship with these suppliers.

18. In the event of a shutdown, suppliers providing raw materials for DPE's operations will seek to find new buyers to consume their products, meaning that if DPE were able to resume operations at some point in the future, there is serious concern that the raw materials required by DPE would not be available in the necessary quantity or schedule. In the case of some of the raw materials, DPE only has one qualified supplier. Although the raw material could possibly be obtained through another specific supplier, DPE has not qualified that supplier for use at the Facility. I expect this process would require DPE to conduct testing as well as notification to customers who would then be expected to require test material be made with the new raw material before agreeing to accept our product. It would be difficult, if not impossible, for DPE to re-establish its supply chain in the future if it were to restart operations after an indefinite prolonged shutdown.

19. Similarly, there is a substantial risk that DPE's customers would seek another polychloroprene supplier or a substitute product to replace Neoprene and enter into replacement contracts, assuming they are able to find a replacement product at all. I expect that not all of DPE's customers would return to purchasing Neoprene in the long-term, and certainly not in the short-term while existing contracts with other suppliers remain effective.

20. <u>Challenges Associated With Storage and Disposal of Hazardous Materials</u>. DPE uses feedstocks of hazardous materials to manufacture chloroprene. Storage and disposal of these materials is governed by the Resource Conservation and Recovery Act (RCRA). Pursuant to RCRA, DPE cannot store certain materials at the Facility for a period of longer than 90 days. In the absence of active operations at the Facility, to comply with RCRA, DPE will be required to investigate, test, and implement alternative waste handling procedures for hazardous materials contained in any idled process unit for more than 90 days. DPE has already confronted challenges associated with finding facilities to accept its hazardous waste in light of EPA's allegations in the Section 303 Action and I would expect similar challenges to complicate compliance with the RCRA storage requirements.

21. <u>Reputational consequences, loss of goodwill, and impact on social license to operate</u>. Shutting down the Facility would also result in negative reputational harms as DPE would be considered a "polluter" in the community, with resulting harms to its commercial reputation and its reputation as an employer. It would also negatively impact DPE's social license to operate. This is the ongoing acceptance of a company's business practices and operating procedures by the general public, stakeholders, and employees. It is not a legal permit, but it is an essential intangible asset of the company to hold community approval and trust. For these reasons, DPE (like other chemical plants where I have worked and held

leadership responsibilities) expends significant resources communicating with the community about its operations, providing financial support to the community, and interacting with the community's leadership to hear and address concerns. A major driver for DPE's investment of $35 million in emission reduction projects was related to DPE's social license to operate. Eroding DPE's social license to operate results in actual economic harm to DPE.

22. This will further impede DPE's ability to hire qualified employees and negotiate favorable contracts with suppliers and customers.

23. In short, due to the enormous revenue losses that would be associated with a shutdown, the large capital investments that must be made before production could restart, the loss of key personnel, difficulty obtaining key supplies, loss of customers, and the damage to DPE's reputation and social license to operate, I do not expect that the Facility would ever restart operations, once it is shut down.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _July 8_, 2024.

_____
Michelle Helfrich

JACK BERGMAN
1ST DISTRICT, MICHIGAN

COMMITTEE ON ARMED SERVICES
COMMITTEE ON VETERANS' AFFAIRS
COMMITTEE ON THE BUDGET

# Congress of the United States
## House of Representatives
### Washington, DC 20515-2201

May 14, 2024

The Honorable Lloyd J. Austin III
Secretary of Defense
1000 Defense Pentagon
Washington, D.C. 20301-1000

Dear Secretary Austin:

I write to request information regarding the U.S. Environmental Protection Agency's (EPA) activities relating to the regulation of chloroprene. I am concerned that EPA's April 2024 final rule titled "New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry"[1] will result in bans or unachievable standards related to critical products required by the Department of Defense (DOD). Due to EPA's final rule, DOD will likely be forced to rely on neoprene products produced in the People's Republic of China (PRC) – threating U.S. national security by limiting the domestic availability of products necessary for U.S. warfighters.

Unfortunately, EPA pushed forward with this overreaching regulation without properly consulting with the defense agencies on the availability of domestically produced resources. EPA's regulation directly impacts chloroprene, an emission produced during the production of neoprene, a critical synthetic rubber used in a number of military applications including wetsuits, military boots, and car parts. Limiting access to domestically produced neoprene will hinder access to the availability of these products for use in our national defense.

Further, this regulation directly benefits the PRC and its chemical industry. For example, Denka Performance Elastomer (DPE) is the only domestic producer of the synthetic rubber neoprene. EPA's misguided promulgation of a regulation not based on sound science will force DPE to cease production of neoprene, in turn, making the U.S. reliant on the PRC to source its neoprene for military applications. I urge that DOD consult with EPA on this final rule and reconsider the necessity of domestically sourced neoprene.

Given the concerns about EPA's regulatory actions on chloroprene and their national security impacts, I respectfully request the following information.

1. All communications between or among DOD and EPA referring or relating to chloroprene, neoprene, or the final rule "New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air

---

[1] https://www.epa.gov/system/files/documents/2024-04/san9327_hon_pr-i-and-ii_socmi-nsps_final_preamble.prepublication.pdf

-2-

<ol start="1">
<li>Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry."</li>
</ol>

<ol start="2">
<li>A briefing by relevant DOD officials regarding the national security consequences and security implications of EPA activities regarding chloroprene no later than June 1, 2024.</li>
</ol>

Thank you for your attention to this important matter. Please do not hesitate to contact my office with any questions.

Sincerely,

Jack Bergman
Member of Congress

Cc:
Honorable Michael S. Regan, Administrator, U.S. Environmental Protection Agency