# **<u>EXHIBIT Q</u>**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | **CIVIL ACTION NO. 2:23-cv-735** |
| ) | |
| **v.** ) | **SECTION J(5)** |
| ) | |
| **DENKA PERFORMANCE ELASTOMER** ) | **JUDGE BARBIER** |
| **LLC and DUPONT SPECIALTY** ) | |
| **PRODUCTS USA, LLC,** ) | **MAGISTRATE JUDGE NORTH** |
| ) | |
| **Defendants.** ) | |
| ) | |

**DECLARATION OF DR. KENNETH A. MUNDT, PhD, FACE**

Pursuant to 28 U.S.C § 1746, I, Kenneth A. Mundt, declare as follows:

<u>**Introduction**</u>

1.      I have been retained by counsel for Denka Performance Elastomers ("DPE") to provide expert epidemiological opinions regarding exposure to chloroprene and possible subsequent risk of respiratory system cancers (RSC) and liver cancers (LC) in connection with emissions from DPE's Neoprene manufacturing facility in LaPlace, Louisiana (the "Facility"). Additionally, I have been asked to evaluate the epidemiological basis for the opinions expressed by Dr. Helen Suh and as set forth in the initial Declaration and Rebuttal Declaration of Dr. Helen Suh in Support of the United States' Motion for Preliminary Injunction.

2.      It is my understanding that I was retained by counsel for DPE upon Dr. Gary Marsh's untimely passing. In addition to my independent review of the epidemiological evidence relevant to the alleged associations between chloroprene exposure and risk of RSC and LC, I also have carefully reviewed Dr. Gary Marsh's Declaration and deposition testimony. Nevertheless,

1

the Opinions I formulated, and state below are based on my independent evaluation of all relevant materials and solely represent my independent professional views and opinions.

## Qualifications

3.      I hold a PhD in Epidemiology from the Department of Epidemiology, School of Public Health, University of North Carolina; a Master of Science (MS) in Epidemiology from the Department of Biostatistics and Epidemiology, School of Public Health, University of Massachusetts; a Master of Arts (MA) from the Department of English, University of Virginia; and a Bachelor of Arts (AB) from Dartmouth College.

4.      I have worked full-time as an epidemiologist for 35 years, first as a university professor and subsequently as a consultant. From September 1989 through June 1999, I served on the Graduate Faculty of the Department of Biostatistics and Epidemiology of the School of Public Health and Health Sciences (SPHHS), University of Massachusetts. In 1999 I joined Applied Epidemiology, Inc. (AEI) - an independent consulting company I founded in 1991 – and in November 2003, AEI merged with ENVIRON International Corporation (ENVIRON). In 2015, ENVIRON merged with Ramboll, where I served as Health Sciences Global Practice Network Leader until July 2018. I joined Cardno ChemRisk in September 2018 as a Senior Principal Health Scientist, and Stantec acquired Cardno ChemRisk in December 2021. I separated from Stantec ChemRisk in June 2023 and continue to provide independent epidemiological consulting services to Stantec ChemRisk and other clients.

5.      I am a Fellow in the American College of Epidemiology (FACE). In July 2016, I was appointed Secretary General of MEDICHEM, the international scientific association for occupational and environmental medicine and health in the production and use of chemicals. I

currently serve on the Advisory Board of the International Archives of Occupational and Environmental Health; the Advisory Editorial Board of the Archives of Industrial Hygiene and Toxicology; and Review Editor for the Editorial Board of Frontiers in Environmental Health. I regularly author and peer-review scientific papers submitted to these and numerous other medical and health professional journals.

6.     In 2023, I was nominated and selected to serve on the Board of Directors of the Society to Improve Diagnosis in Medicine (SIDM) and am a member of SIDM's Governance and Development Committees.

7.     My scientific research and professional evaluations focus on identifying and quantifying human health risks related to occupational, environmental and consumer product exposures, typically leading to publication in peer-reviewed health and medical journals. I have provided epidemiological and human health risk evaluations and advice to governmental entities (including the US DoD, US EPA, US NIOSH and the Dutch Public Health Authority), institutions for statutory accident insurance and prevention (e.g., German Berufsgenoβenschaften), inter-governmental organizations (e.g., the World Bank, International Social Security Association) and multiple companies, trade associations and law firms. I have testified before legislative and regulatory bodies (including US OSHA, US EPA and US Congress) on human health risk matters.

8.     A true and correct copy of my *Curriculum Vitae* is attached as Appendix I and provides a more detailed summary of my professional activities, as well as a list of my publications.

**Publications In the Last Ten Years**

9.      In the last ten years, findings from my professional research and scholarship have been communicated in 39 peer-reviewed scientific articles published in a variety of professional health and medical journals. The publications represent critical reviews and syntheses of the literature on various human health topics, major epidemiological research studies, commentaries on methodological and regulatory matters, etc. These and other scientific articles I have published are identified in my *Curriculum Vitae*, attached as Appendix I.

**Prior Testimony**

10.      A full list of deposition and trial testimony that I have provided in the last four years is attached as Appendix II.

**Compensation**

11.      I am being compensated for the professional services provided in this litigation. For research, declaration and trial preparation I invoice $450 per hour and for deposition and trial testimony I invoice $550 per hour. As of the date of execution of this Declaration, I have spent approximately 100 hours on this matter.

**Data Considered**

12.      In formulating my opinions in this matter, I reviewed (a) case materials including various filings, motion, expert declarations, exhibits and deposition transcripts; (b) government and other agency reports and documents including the EPA Integrated Risk Information System (IRIS) 2010 Toxicological Review of Chloroprene released on September 30, 2010 (EPA, 2010b) and the Final Reviewer Comments for the External Peer Review Meeting on the Toxicological Review of Chloroprene (EPA, 2010a); and (c) published scientific studies

including the relevant primary studies addressing the purported relationship between chloroprene exposure and cancer risk as well as my scientific publication on chloroprene and cancer (Sax et al., 2020). Lists of these items are provided in Appendix III.

13.     I applied standard and widely accepted methods for critically reviewing and synthesizing the scientific literature, and formulated my independent scientific opinions and conclusions based on this assessment. In addition to the relevant peer-reviewed, published epidemiological literature, I draw upon my education, training and professional experience to formulate my professional opinions and conclusions, which I hold to a reasonable degree of scientific and epidemiological certainty. Furthermore, as I have been called on to substitute for Dr. Marsh, I reviewed his Declaration and have no dispute with his opinions. My professional opinions are set forth in the following section.

## OPINIONS

14.     **OPINION 1: Epidemiological concepts and methods have been developed and refined over several decades, leading to standardized and generally accepted methodologies.**

15.     Epidemiology is the basic science of public health practice. Epidemiology uses measures such as the incidence, prevalence and distribution of diseases in populations, and compares these across otherwise comparable groups with different exposure and risk factor profiles to identify and evaluate factors that may be related to disease risk. Methods are employed to identify and interpret statistical correlations or "associations" between various exposures or other risk factors for disease and disease occurrence or "risk" in humans.

16.     While animal experiments and disease mechanistic studies provide invaluable information regarding plausible health hazards, epidemiology provides a "reality check" regarding hypothesized hazards and presumed risks.

17.     The classification of substances as hazards (i.e., capable of causing or contributing to disease) based on laboratory animal experiments and/or laboratory studies of cultured cells cannot necessarily demonstrate that these possible hazards increase the risk of disease in humans (different species) at human-relevant exposures (experimental conditions generally expose animals at extremely high doses). For example, "Due to differences in pharmacokinetics, mice appear to be uniquely responsive to chloroprene exposure compared to other animals, including humans, which is consistent with the lack of evidence of carcinogenicity in robust occupational epidemiological studies" (Sax et al. 2020).

18.     Establishing causation generally requires the systematic critical review and synthesis of the epidemiological, toxicological and disease mechanistic evidence, combined with a quality-based, weight-of-evidence integration across these lines of inquiry. The International Agency for Research on Cancer (IARC) uses this approach for classifying carcinogens (IARC 2006) as do US government agencies such as the Office of Health Assessment and Translation (OHAT) – part of the National Toxicology Program of the National Institute for Environmental Health Sciences – and the Integrated Risk Information System (IRIS) of the US Environmental Protection Agency (NTP 2019; EPA 2018). A quality-based weight-of-evidence approach assigns greater weight to high-quality studies than to weaker or clearly biased studies, which may be given much less weight or excluded. Key to the synthesis of epidemiological evidence is consideration of the strength and consistency of epidemiological evidence across high-quality studies performed using different methods and diverse populations. Results from any single

observational study, no matter how compelling, are insufficient to demonstrate a causal association.

19.     **OPINION 2: High-quality epidemiological studies provide the most direct and relevant evidence regarding human health risks and serve as a primary basis for evaluating potential causal relationships.**

20.     Epidemiological concepts and standard methods have been established for decades. Their proper use provides invaluable scientific analyses and perspectives in the process of evaluating and integrating evidence for purposes of determining preventable causes of human disease and prioritizing public health interventions. Causal relationships identified from weight-of-evidence evaluations of the body of published epidemiological literature may be quantified in terms of exposure-disease relationships, i.e., risk assessment.

21.     However, not all epidemiologists have been comparably trained, and some may be influenced by common practice (whether correct or not), consensus (the opposite of science, which challenges status quo and conventional thinking), belief (scientific folklore), etc. Variation can arise/persist in the understanding of concepts, the application of epidemiological methods, and the interpretation of evidence. For example, many epidemiologists erroneously believe that any single 95% confidence interval ("CI") has a 95% probability of containing the "true" measure of association (also expressed as "95% confidence"). A CI technically is a numerical indicator of the random "margin of error" as seen in the reporting of a statistical estimate, e.g., political polling results or disease rate estimates, with narrow CIs indicating higher precision and wide CIs indicating lower precision. Any CI is highly specific to the study sample on which it is based. Where repeated sampling and analyses are performed, each sample drawn from a population will generate different estimates and CIs. With additional sampling and with

7

relatively large sample sizes, however, the distribution of estimates and CIs approach the "true" value, and by definition, 95% of these CIs will contain the "true" value (and 5% of the time the "true" value will fall outside of the CI). Given an adequately large number of replications, the CIs on average will capture the "true" value of the estimate, but it still is not possible to know where within the CI the "true" value actually falls. Therefore, epidemiological interpretations that treat a single estimate and CI as if they were the "true" value of both almost certainly are inaccurate and even may be misleading, especially if that single estimate were among the 5% (i.e., 1 out of every 20 CIs) that misses the "true" value entirely.

22.    Investigator and evaluator bias unwittingly can influence how scientists view the same body of scientific evidence differently. Therefore, current standards for reviewing epidemiological evidence favor procedural transparency (to allow replication); comprehensive consideration of relevant studies (to reduce selective or preferential inclusion of studies); critical assessment of study quality (to reduce risk of bias from selecting and relying on poor-quality studies); and proper synthesis of evidence, placing greater weight on the strongest studies and the least (if any) on weak or poorly conducted studies.

23.    See Appendix IV for a focused overview of epidemiological principles, perspectives and methods, and especially Appendix IV sections E through I for more detailed descriptions of various types of bias commonly affecting epidemiological studies.

24.    **OPINION 3: The most recent published state-of-the science, quality-based systematic review of the totality of the disease mechanistic, animal toxicological and epidemiological evidence on the human carcinogenicity of chloroprene (on which I served as the senior author), concluded that "the epidemiological evidence on chloroprene and cancer is insufficient to conclude that chloroprene causes cancer in humans, and the**

**strongest studies demonstrate no increased risk of liver or lung cancers (or any other cancer) from occupational exposure to chloroprene" (Sax et al. 2020).**

25.     The "strongest studies" noted in the quote above consist of the 2007 Marsh et al. study published in two parts (Marsh et al. 2007a and Marsh et al. 2007b, collectively "the 2007 Marsh Study"), "the only [study] of adequate quality to validly address epidemiologically the cancer risks associated with human exposure to chloroprene" (Sax et al. 2020).

26.     Table IX from Sax et al. 2020 (replicated below and based on Bukowski 2009) presents a peer-reviewed application of US EPA's systematic review quality assessment principles to each of the published studies—including the 2007 Marsh Study and studies pre-dating the 2007 Marsh Study—based on cohorts of chloroprene-exposed workers, by location. While the geographically defined investigations included in the 2007 Marsh Study predominately scored "H" (high-quality) or "H-M" (high to medium quality) in all quality review domains, all "Other Studies" predominately received medium or lower quality ratings in most of the quality review domains. In fact, only two cohorts received (one each) "H" or high-quality ratings, and for both it was for the "Clear objectives" domain. Note that stating objectives clearly does not assure that such were met, possibly explaining why most studies outside of the 2007 Marsh Study were rated high-quality for this but not for any other of the US EPA criteria.

**Table IX.** Quality Rankings for Cohort Studies of Cancer Risks from Occupational Chloroprene Exposure

| US EPA Criteria | Marsh et al.'s Study | | | | Other Studies | | | |
|---|---|---|---|---|---|---|---|---|
| | Kentucky[a] | North Ireland[a] | Louisiana[a] | France-Mort[*,a] | Armenia[b] | France-Incid[**,c] | Russia[d] | China[e] |
| Clear objectives | H[‡] | H | H | H | H | H-M | H | M |
| Comparison groups | H | H-M | H-M | M | M | M | M-L | L |
| Exposure | H | H | H | H | M | M | L | L |
| Follow-up | H | H-M | H | H-M | M-L | M-L | M-L | M-L |
| Case ascertainment | H | H-M | H-M | H-M | M | M | M | H-M |
| Control of bias | H-M | H-M | H-M | M | M-L | M | M | M-L |
| Sample size | H | H | M | L | M-L | L | H-M | M-L |
| Data collection and evaluation | H | H | H | H | M | M | M-L | M-L |
| Adequate response | H | H | H | H | M | M | M | H-M |
| Documentation of results | H | H | H | H | M-L | M | M | L |
| **Overall rank (1 = best)** | **1** | **2** | **3** | **4** | **5** | **5** | **5** | **6** |

Source: Bukowski (2009).
[*]Mort = Mortality.
[**]Incid = Incidence.
[‡]Subjective estimate of study quality for each specific criterion H = high, M = medium, L = low.
[a]Marsh et al. (2007a, 2007b).
[b]Bulbulyan et al. (1999).
[c]Colonna and Laydevant (2001).
[d]Bulbulyan et al. (1998).
[e]Li et al. (1989).

27.     Furthermore, the 2007 Marsh Study (all sites) represented 74% of the total person-years studied across all studies, as well as 88% of all lung cancer deaths and 49% of all liver cancer deaths. While the ratio of respiratory cancer deaths to liver cancer deaths was about 18:1 in the 2007 Marsh Study, the same ratio was 2.25:1 for all the other studies combined, indicating a much higher rate (about 7.6 times higher) of liver cancers in the other studies (possibly due to extreme alcohol consumption leading to high rates of alcoholic cirrhosis as well as hepatitis B virus, aflatoxin B1, or possibly combinations of these). Both the Russian study (Bulbulyan et al. 1998) and the Armenian study Bulbulyan et al. 1999) reported more than threefold excesses of liver cancers, in contrast with the 2007 Marsh Study that reported no excess liver cancer deaths in the Louisville plant workers and too few to calculate any stable measures of risk or association in the Pontchartrain Facility (Marsh et al. 2007a). Conversely, the 2007 Marsh Study had a much higher rate (about 5.7 times higher) of respiratory cancers than the other studies (likely due to higher historical smoking prevalence in the studied regions, i.e., the

US, Northern Ireland, and France). These observations suggest that the poorer studies, in addition to having small numbers of observed respiratory and liver cancer deaths, possibly represented study groups and settings with underlying risk profiles that were very different from those in the 2007 Marsh Study. This also highlights that study results often are highly location-specific, and the underlying characteristics of the study and the comparison groups likely contribute substantially to the variability in the observed results, apart from effects (if any) from the exposures being studied.

28.     **OPINION 4: The 2007 Marsh Study clearly demonstrates no excess occurrence of either respiratory system cancers (RSC) or liver cancer (LC), and some results indicate a statistically significant deficit of deaths due to these cancers (i.e., an apparent "protective effect").**

29.     Excess occurrence of deaths due to respiratory system cancers (RSC), liver cancer (LC) – or any other cancer or cause of death – is determined by comparing the cancer mortality rates for these cancers among the occupational cohorts (i.e., groups of workers) with the cancer mortality rates for these cancers among the general, non-exposed population. This is achieved by calculating standardized mortality ratios, or SMRs. SMRs compare the number of "observed" health outcome (e.g., deaths from bladder cancer) in a defined study group (e.g., firefighters in a large city) with the "expected" number of bladder cancers, i.e., the number that would have been observed if the rates in the general population (e.g., the same city) were applied to the firefighters. Reference groups that are not part of the study cohort or study group often are called "external" referents. The SMR simply is the ratio of the "observed" to the "expected" number of bladder cancers. Where there is no difference in the disease rates or risk between the groups being compared, the SMR will be close to 1.0. If the rate of bladder cancers among the study

group is higher, the SMR will be greater than 1.0 and if the exposed group has lower rates than the unexposed referent, the SMR will be less than 1.0.

30.     Even when an SMR is statistically significantly greater than 1.0, it is not appropriate to attribute the excess risk to any particular exposure or risk factor. Tests for statistical significance indicate whether an observed measure (such as excess risk of cancer in a study group) might reflect random error or "chance" or whether the measure was sufficiently stable, or precise such that chance reasonably can be ruled out. CIs often are used as tests for statistical significance: when the CI excludes the null value, i.e., the value reflecting no difference or no effect, e.g., a standardized mortality ratio ("SMR") or relative risk ("RR") equal to 1.0 (RR is calculated by dividing the rate of disease or death in the exposed group(s) by the rate of an unexposed group generally from the same study population). For example, in the hypothetical above, the bladder cancer SMR might be 1.22 (95% CI 1.04–1.43) indicating that firefighters have an estimated 22% higher (and statistically significant, as the CI excludes 1.0) rate of bladder cancer than expected based on the city rates. However, if firefighters historically smoked cigarettes more than comparable people in the city, the increased risk might reflect the difference in smoking exposure and not occupational exposures. This indicates that the possible association between firefighting exposures and risk of bladder cancer is confounded by cigarette smoking (See Appendix IV, section E. "Alternative explanations for observed associations (or failure to observe associations): Chance, Bias and Confounding)." Briefly, confounding is a bias arising from failing to identify and account for causal or strong risk factors that also are correlated with the exposure of interest. Furthermore, if we look at subgroups of firefighters based on their firefighting exposures and find that for all subgroups – low, medium and high – the SMR remains around 1.2, we would conclude that the observed excess is not associated with

exposure level, adding weight to the interpretation that the observed association arose due to differences between the firefighters other than their workplace exposures (most likely differences in smoking prevalence between firefighters and other residents of the city). Though exposures associated with firefighting might increase the risk of bladder cancer, it is impossible to validly attribute the association between firefighting and bladder cancer to the firefighting exposures if in fact firefighters smoked more than the people in the comparison group but that this was never measured. Because smoking is a strong causal factor in bladder cancer risk, the firefighters will have an increased risk of bladder cancer, but because smoking has not been considered and controlled in the statistical analysis, some or all of the apparent excess bladder cancer risk erroneously will be attributed to firefighting exposures. By measuring and taking into account or "controlling" for confounders such as cigarette smoking in the analysis, the risks associated with each of separate factors contributing to the observed excess risk often can be disentangled.

31.     SMR analyses reported in the 2007 Marsh Study were performed using various "external" reference groups including general population rates at the national, state, and local level, as well as rates derived from a corporate mortality registry (see Leonard et al. 2007). Depending on the reference group applied, the SMR estimates varied to some degree, which is expected, as some reference groups may be very different from the occupational cohort with respect to several socio-economic and lifestyle factors. Importantly, the degree to which the referent population differs from the occupational cohort with respect to known causes of the diseases (or causes of death) of interest, i.e., confounders or confounding factors, can greatly influence SMR results. For example, if the corporate mortality registry covers a range of diverse regions and socioeconomic groups, including differences in lifetime smoking and alcohol consumption (and other behavioral factors) compared with those of the occupational cohort,

confounding will be introduced. Smoking is a cause of many cancers, including respiratory and liver cancers, and therefore is an important confounder that must be measured and controlled in statistical analysis to reduce or eliminate the confounding bias. Note that sporadic SMRs, even if statistically significantly less than the null value (1.0) should not be interpreted as reflecting "protective" effects of the exposure, just as sporadic positive associations that are statistically significant should not be interpreted as reflecting "causal" relationships. Such sporadic findings most often arise due to random error or chance (especially if based on small sample sizes), but also can reflect other biases, or a combination of these. Generally, positive (or negative) results will be seen more consistently and robustly across exposed study groups when they reflect true underlying associations.

      32.    Geographically, more local reference groups generally are preferred for such comparisons in occupational epidemiological studies because they often better reflect the rates of the non-exposed portion of the same population from which the workers derive, as well as other causal factors such as the prevalence of smoking and alcohol consumption (causes of RSCs and LCs), exposure to cancer-causing pathogens (e.g., hepatitis, a cause of LCs), etc. Disease and mortality rates represent one of the most basic indicators of the health and disease of defined groups or populations and are readily compared over time to detect disease trends or with other comparable groups to identify groups that experience more (or less) disease than others. Rates of rare diseases such as specific cancers generally are expressed in terms of the number of newly diagnosed cases (or deaths) occurring per unit of time (most commonly per year) per 10,000 or 100,000 people. For example, bladder cancer rates in the US are about 16/100,000 per year among men and about 4/100,000 among women (based on these rates, the RR for being a "man" is about 4.0, derived by dividing the rate for men by the rate for women). Disease rates also vary

14

considerably by region and over time, especially for diseases whose rates are strongly influenced by the underlying prevalence of behavioral risk factors that also vary by location and over time, e.g., tobacco smoking for lung cancers, and hepatitis, alcohol consumption and cigarette smoking for liver cancers. Given the very large regional variability in the prevalence of these causal factors and resulting population rates for some cancers, SMRs based on geographically diverse reference populations (e.g., national, or national corporate mortality registry) are expected to be different, challenging to interpret and may spuriously suggest either statistically significantly increased (i.e., > 1.0) or decreased (i.e., < 1.0) cancer-specific SMRs even if there is no true underlying causal relationship.

33.     An important methodological advantage of SMR analysis is that it is more tolerant of smaller observed numbers of events (in this case, respiratory and liver cancers) than alternative statistical approaches. This is due to the use of the general population as the referent, which usually consists of much larger groups than some subset of an occupational study cohort and thereby improves the stability (i.e., by reducing random error) of the SMR. This clearly can be seen in comparing the width of the 95% confidence intervals (95% CI) for the SMRs based on "external" referent groups and the relative risk (RR) estimates using an "internal" referent as reported in Marsh et al. 2007b for respiratory cancers (RSC) by cumulative chloroprene exposure category in the Pontchartrain cohort. "Internal" referents typically are part of the study group or cohort and defined as the least-exposed members. The RR generally is derived by dividing the disease or mortality rate among exposed group by the disease or mortality rate among the referent or unexposed group and interpreted the same as the SMR (see above). The instability of the RR results for RSC is directly reflected and clearly can be seen in the extremely wide CIs for each exposure-category-specific RR and in contrast to the relatively narrow CIs generated for the

SMRs for the same exposure categories as illustrated in the graphical presentation below (data

from Marsh 2007b also tabulated below):



| Cumulative Exposure (ppm-years) | Observed deaths | Marsh et al. 2007 (RR) | | | Marsh et al. 2007 (SMR) | | |
|---|---|---|---|---|---|---|---|
| | | RR | LCL | UCL | SMR | LCL | UCL |
| < 0.0193 | 3 | 1 | na | na | 0.40 | 0.08 | 1.18 |
| 0.0193-1.8944 | 3 | 1.60 | 0.20 | 12.77 | 0.52 | 0.11 | 1.53 |
| 1.8945-16.1918 | 2 | 2.90 | 0.20 | 34.11 | 0.96 | 0.12 | 3.48 |
| 16.1919-110.9 | 4 | 2.32 | 0.30 | 21.83 | 0.85 | 0.23 | 2.18 |

From both the graph and the data table it can be seen that the upper end of the 95% CIs for each

of the higher exposure categories is about 10 times larger (i.e., less stable) than the CIs for the

corresponding SMRs. Note that by definition, the RR for the reference group is 1.0, as the risk in

that group (no matter how unstable) is divided by itself, and any quantity divided by itself equals

1.0. The instability resulting from having only three observed lung cancer deaths in the referent

group further is underscored by imagining what effect observing only one more or one less RSC

death would have had on the estimated RRs (i.e., decrease by 25% or increase by 50%,

respectively). Overall, the observed numbers of RSCs appear to be grossly inadequate to support valid RR analyses.

34.    While there may be no "perfect" reference group for a given occupational cohort and for a given study hypothesis, epidemiologists generally consider the underlying reasons for results that appear to be different, especially in light of important confounding factors that cannot be identified or directly controlled. Triangulating the results from different analytical approaches represents the "art" of epidemiology, as there is no method or formula that can replace critical thinking and evaluation. Nevertheless, even if patterns vary by referent group used, the more important factor is whether the SMR or RR clearly increases across groups with increasingly higher estimated exposures and demonstrating an exposure-response relationship.

35.    **OPINION 5: Regardless of the referent group used, the published 2007 Marsh Study of the Louisville workers highly exposed to chloroprene demonstrated no clear or consistent exposure-response relationship between estimated i) duration of exposure, ii) exposure intensity and iii) cumulative exposure to chloroprene and increased risk of respiratory or liver cancers. The lack of exposure-response (i.e., increasing risks with increasing exposures) is real-world evidence that strongly counters the unsubstantiated claim that chloroprene causes these cancers.**

36.    The Louisville plant chloroprene workers included in the 2007 Marsh Study represented the largest single site ever studied epidemiologically for chloroprene exposure, and also had the largest number of reported respiratory cancer deaths – in fact, more than all other epidemiological chloroprene studies combined, regardless of study quality. This group also was among the most highly exposed to chloroprene. Therefore, it is informative to examine and compare the results of the analyses based on the Louisville cohort but using different reference

groups. The chart below plots the relative risk estimates (SMR or RR as points or dots on the chart) and their 95% confidence intervals (95% CIs indicated by vertical lines) by cumulative exposure group (plotted at midpoint of exposure range). The results plotted in orange are based on regional referent rates (Marsh et al. 2007a). The results plotted in blue are based on an RR analysis using an "internal" referent group (Marsh et al. 2007b). The results plotted in green are based on analyses using mortality rates from a corporate mortality registry (Leonard et al. 2007).



37.     While small differences are noted based on the referent rates used, the most striking feature gleaned from this visualization of the data is that all the results lie close to the null value of 1.0 (represented by the horizontal line) representing "no association," i.e., there is a clear lack of any exposure-response relationship. In general, where exposure increases the risk of – or cause – a specific cancer, SMRs and RRs tend to increase with increasing exposure and an

exposure-response will be seen. In contrast, the above chart shows that the subset of workers with the very highest cumulative exposures—shown here on the far right of the chart—all fall below the null value of 1.0 representing no association. Also, apart from one apparently anomalous statistically significant result reported by Leonard et al. 2007 for the third-highest cumulative exposure group, 11 out of 12 estimates indicate no statistically significant increase in the relative risk estimate, regardless of whether RRs or SMRs are presented. The single statistically significant association seen appears inconsistent with the body of evidence, and likely is anomalous (and possibly due to chance, the specific characteristics of the comparison group, or some combination). This presentation illustrates what one typically observes where the exposure (especially when ranging over three orders of magnitude) fails to move the risk needle. The difference between the sets of results based on using different referents can be viewed as a matter of "calibration" where the same underlying relationship across exposure groups (in this case no clear trend with higher levels of chloroprene exposure) is raised or lowered slightly depending on the referent group.

38.     In contrast, where a causal exposure is present and a statistically significant excess of deaths due to some (e.g., chemical) cause is established (which is not the case with the chloroprene evidence), further analyses using an internal referent group often can increase our confidence that the observed excess likely is related to the chemical exposure. To illustrate this, a study that I published on very high occupational vinyl chloride exposure and risk of various cancers and other causes of death revealed a robust and statistically significant excess of liver cancers (SMR=3.68, 95% CI, 3.04-4.41) based on local state-based referent rates for each plant in the study (Mundt et al. 2017). The figure below – comparable to that above (but based only on one set of referent rates) is from that publication. It shows a striking increase in risk with

increasing cumulative exposure, i.e., a clear exposure-response relationship. In fact, when cumulative exposure exceeds a threshold of about 1,300 ppm-years, the risk of hepatocellular carcinoma (the most common type of liver cancer) rises sharply, and four out of six exposure-category-specific hazard ratios (a form of relative risk) at or above this exposure level are highly statistically significant, and even the two that are not statistically significant are still consistent with the general impression of a probably causal relationship.



39.    There are additional considerations in statistically analyzing epidemiological study data once an excess occurrence of a health outcome, e.g., some cancer, is demonstrated, typically as indicated by a statistically significantly elevated SMR. As noted above, to further analyze the data to elucidate possible exposure-response relationships including identification of possible exposure thresholds for risk, analyses often follow where the non- or least-exposed

subset of workers serve as the "internal" referent group. The two main additional considerations include:

(1) whether there are adequate numbers of observed cancers overall to provide sufficient numbers in each exposure subgroup (including the proposed referent group) such that statistically stable (or reliable) results are reasonably expected; and

(2) whether the least exposed group is both representative of the more highly exposed groups except for exposure AND whether this proposed reference group truly represents the "background" level of the cancer of interest.

40.     Regarding the first question, one can examine the numbers of deaths reported in Table 4 of Marsh et al. 2007b for each cumulative chloroprene exposure category for Louisville plant employees. For RSC, the numbers of observed deaths ranged from 60 to 77 across exposure categories. These numbers of observed deaths are adequate (the rule of thumb for such analysis is a minimum of about 10 deaths for each variable in the model), as it appears that cumulative exposure, worker pay type and sex were included in the model (for which a minimum of 30 observed deaths would be recommended). However, the observed numbers of LC deaths ranged only from 2 to 7 across exposure categories, and the referent category only had two cases, which additionally contributed to the highly unstable and unreliable RR estimates. It is easy to imagine that that entire set of RR results would be dramatically different from those reported and from each other if there had been only one more (the reference rate would increase 50%) or one less (the reference rate would be cut in half) observed death in the referent category, as all other estimated rates are compared to the referent. Accordingly, the RRs for all other exposure

categories would be reduced by 50% (but slightly more stable) or doubled (with even greater volatility).

41.     To address the first half of the second question, various characteristics of the workers in the proposed reference group can be compared with those of the more highly exposed groups. Where clear differences are noted (e.g., a large majority of the least exposed workers are women, or younger, or only employed for short periods), using such a group might be ill-advised. I was unable to locate any such presentation in the published papers on the 2007 Marsh Study or in the Marsh et al. 2021 update. To address the next half of the second question, one can examine the SMR associated with the proposed reference group to verify that they do not have either an anomalously high or low risk that is not representative of "background" risk, i.e., disease rates comparable to those of the general unexposed population (Savitz and Wellenius 2016). As can be seen in the graph presented in paragraph 36 above, three of the four exposure categories produced SMRs below 1.0 (the fourth was closer, but still below 1.0) – all of which were statistically significantly below 1.0, including the lowest exposure group used in Marsh et al. 2007b as the referent for the RR analyses. This provides a strong indication that this group is not an appropriate choice of referent for the RR analyses (if even necessary). The analysis in Marsh et al. 2007b appears to have been performed without fully satisfying these questions. However, it is very clear from the published paper that the investigators indeed recognized that the selected reference group likely was not representative of background cancer rates. Marsh et al. 2007b (and Dr. Marsh's Declarations and testimony in this matter) repeatedly noted that using the lowest exposure group(s) from these cohorts as the "internal" referent probably was inappropriate, specifically because these workers exhibited anomalously low (and statistically significantly lower than local population) rates of both respiratory and liver cancers. When the

22

referent represents an anomalously reduced risk, all other exposure groups – even if they exhibit background or small deficit risks – will appear to have elevated risks, a concept Dr. Marsh referred to as the "comparison of two deficits" problem. Marsh et al. 2007b summarized their efforts to elucidate reasons for the least exposed members of the cohort having anomalously low cancer risks as follows: "Without further formal investigation of this phenomenon in the CD [chloroprene] cohort, the reason(s) for the marked deficits in cancer in unexposed workers will remain unknown" (page 314). The spuriously inflated and highly unstable RR estimates that result from the RR analyses are therefore invalid and should not selectively be relied upon over the more reliable (i.e., stable) SMR results.

42.    Despite the Marsh et al. 2007 research team's detailed explanation of the inappropriateness of the least exposed group as the referent, EPA (and Dr. Suh) erroneously selected the reported results of these analyses to bolster conceptions – probably based on animal experiments using mice (the most sensitive species) – that chloroprene also is carcinogenic at human-relevant levels including at exceedingly low community level exposures (the implications of this are clearly reflected in EPA's erroneous IUR – see Sax et al. 2020).

43.    The "art" of epidemiology, as noted above, often requires that the epidemiologist stand back from the canvas and appreciate the overall impression that the evidence presents. All too often, mechanical interpretations prevail that favor hypotheses that have not or cannot be tested in epidemiological studies of humans exposed at human-relevant levels. Where epidemiological studies of good quality are available, their findings should serve as a "reality check" for conclusions that otherwise are based on experiments using highly sensitive species (e.g., B6C3F1 mice bred to be genetically and phenotypically uniform and highly sensitive to various stimuli, and as used in the NTP study) or on proposed disease mechanisms. In this

instance, the hypothesis that chloroprene causes human cancers largely was based on mouse experiments (and not experiments in other species, which demonstrated no clear effects) and grossly extrapolated as directly relevant to humans, whereas the workers in the Louisville facility were genetically and phenotypically diverse humans exposed to chloroprene at levels that were orders of magnitude higher than seen today in the community surrounding the Facility. That no clear relationship was observed among the exposed humans places the mouse experimental evidence (and negative rat experimental results) into context, i.e., it is of little value in predicting risks among humans exposed at even high historical occupational levels (Sax et al. 2020). Similarly, epidemiologists should resist seeking and highlighting select (often sporadic and possibly spurious) epidemiological study findings and rather consider the landscape presented by the body of evidence from the strongest studies.

44.     **OPINION 6: Community disease surveillance studies, including those based on the Louisiana Tumor Registry ("LTR"), cannot inform causality. However, where known causes of disease may be present (e.g., communities surrounding the nuclear plant meltdown in Fukushima, Japan in March 2011 and exposed to increased ionizing radiation levels), epidemiological surveillance can provide a sense of or clues as to whether there also might be excess occurrences of diseases that agent likely causes. A lack of increased risks of respiratory and liver cancers from chloroprene exposure in the communities surrounding the Facility (where chloroprene exposure likely is orders of magnitude lower than that of the workers studied in the 2007 Marsh Study) is expected, given the lack of any excess of these cancers in the highly exposed workers (this applies to both the Pontchartrain and Louisville plants).**

45.    According to the Louisiana Tumor Registry website:

The Louisiana Tumor Registry (LTR) collects information from the entire state

on the incidence of cancer. This information includes the types of cancer

(morphology, grade, and behavior), anatomic location, extent of cancer at the

time of diagnosis (stage), treatment, and outcomes (survival and mortality). . .

In addition, LTR data have been used for assessing the magnitude of the cancer

burden in Louisiana, identifying areas and populations at high risk, helping set

priorities for allocating health resources, monitoring trends in cancer incidence

over time, projecting future needs of healthcare facilities, advancing clinical,

epidemiologic and health services research, and assessing the quality and

effectiveness of care in terms of patient-reported quality of life indicators

(https://sph.lsuhsc.edu/louisiana-tumor-registry/data-usestatistics/).

Analyses using LTR data and comparing cancer rates across parishes demonstrate that the

overall cancer rate (for all cancers combined) for St. John the Baptist Parish falls into the lowest

25% of the entire state of Louisiana, and several adjacent parishes also have overall cancer rates

below the state average. More detailed analyses for RSCs and LCs, and others based on smaller

geographic units, i.e., census tracts, also failed to demonstrate increased risks of these cancers in

St. John the Baptist Parish, although most census tracts throughout the state have too small

populations to provide stable estimates and results were not reported (Maniscalco L. et al. 2023).

Even where epidemiological surveillance identifies increased rates of some cancer, the reasons

may not be easy to determine, as many such statistical excursions arise due to other phenomena

unrelated to any environmental exposure (including random variability, but also shifts in the prevalence of lifestyle risk factors over time, or even increased access to medical surveillance programs). For example, introducing a new breast cancer screening clinic predictably will identify previously unrecognized cases, and the incidence rate in that community accordingly will increase. In this context, searching for potential chemical exposures decades earlier would be a wild goose chase and produce no useful explanation for the "increased risk" of breast cancer observed. Generally, community surveillance is viewed as an early warning system that can generate hypotheses that can be tested using more rigorous epidemiological research methods. Clearly, based on LTR data for St. John the Baptist Parish, such a scenario has not arisen in the communities and parishes surrounding the Facility, and no further study or intervention would be warranted. These surveillance efforts, though not definitive, nevertheless provide no indication that the Facility's emissions historically have increased the cancer rates in surrounding communities.

46.    Interestingly, the poorly informed conclusion of EPA and Dr. Suh that local reference rates represent an inappropriate if not invalid choice (e.g., as one of the referent populations used in the 2007 Marsh Study and Marsh et al. 2021) appears to be challenged by the LTR surveillance data. If the local referent population is as "unhealthy" as is implied by the so-called "healthy worker effect (HWE)," then why do we not see any sign of elevated rates of respiratory or liver cancers in this general population? The HWE is a concept built on the expectation that groups of employed individuals exclude less healthy individuals who remain in the general population and contribute to higher rates in the community versus the occupational group. The concept originally arose out of observations that workers in many jobs requiring physical strength were selected from the general population because of their physical fitness

26

subsequently exhibited lower rates of cardiovascular disease. However, this phenomenon does not apply to most cancers, because most cancers are diagnosed at older including post-retirement ages and have no bearing on hiring practices, and more plainly, future cancer risks generally cannot be known at the time of hire (See Appendix IV section J, "The critical role of the referent group(s) in the statistical analysis of epidemiological studies" for an in-depth discussion of the HWE). To the contrary, what can be seen in the LTR data is that St. John the Baptist and other adjacent Parishes tend to have lower rates of RSCs and LCs than in the rest of the state, which hardly supports claims that the Facility is causing increased cancer rates in the community.

47.    Hypothetically, even if actual human health risks had been (or could be) ascribed to the Facility's historical chloroprene emissions, one must understand how such emissions (and presumed community exposure) changed over time and consider during what subsequent timeframe any increased cancer rates might be anticipated, given general knowledge of cancer latency periods. From EPA's graphical representations of DPE's chloroprene emissions, it is clear that historical emissions from the Facility were orders of magnitude higher during the late 1960s through the mid-1980s than in recent years, and that the trends indicate continued reduction.[1]

---

[1] https://www.epa.gov/system/files/documents/2022-10/2022%2010%2012%20Final%20Letter%20LDEQ%20LDH%2001R-22-R6%2C%2002R-22-R6%2C%2004R-22-R6.pdf



The above graph demonstrates that chloroprene emissions from the Facility dropped precipitously between 1987 and 1993, and declined continuously and roughly monotonically until 2017, whereupon the emissions again rapidly declined.

48.     Due to their specific developmental characteristics (e.g., as the induction period, promotion, and progression to a clinically detectable state – collectively called "latency") cancers that are caused by specific carcinogens (e.g., committed cigarette smoking and lung cancer; exposure to substantial quantities of asbestos and mesothelioma risk, etc.) tend to occur at different periods (called latency periods) following sufficient exposures to induce irreversible carcinogenic changes. For cancers characterized by solid tumors (vs. blood malignancies) such as respiratory system cancers and liver cancers, typical latency periods are 20 or more years, and closer to 30 for adenocarcinomas of the lung, but there is a broad distribution around these estimates (Kenfield et al. 2008). Liver cancers arising from hepatitis-C damage have been

estimated to have a latency period of 20-30 years.[2] For angiosarcoma of the liver (highly specifically caused by occupational exposure the industrial chemical vinyl chloride) the median latency was 36 years (range: 13.5–55.9 years) (Mundt et al., 2017).

49.    Thus, if chloroprene emissions from the Facility had increased the risks of respiratory and liver cancers in the community surrounding the Facility from around 2015 to 2020, the relevant time window for those exposures would have occurred from at least 20 to 40 or more years ago, i.e., and conservatively, between 1975 and 2000. Dr. Marsh graphically depicted this very point (see yellow-shaded region) in the graph reproduced below (p. 25, DPE Opposition to Motion for PI).



*Chloroprene emissions (Source: TRI) shown with cancer rate years and relevant exposure years highlighted in green and yellow, respectively.*

---

[2] For example, see https://emedicine.medscape.com/article/197319-overview, accessed 12/18/2023.

50.     As no excess occurrence of the cancers of concern have been reported – and despite focused attempts by various entities to do so[3] – the (expected) negative findings of these epidemiological surveillance exercises plainly fail to support the EPA's unsubstantiated claims that chloroprene emissions at historically very high (and currently dramatically lower) levels had any measurable impact on human cancer occurrence today or in any recent years. Furthermore, the updated study of chloroprene workers (Marsh et al. 2021) continued to demonstrate no excess risk of either RSC or LC at the Louisville Plant – the largest plant with the highest chloroprene exposures:

|  | Cumulative exposure | Observed deaths | SMR | 95% CI |
|---|---|---|---|---|
| **RSC** | < 4.747 | 95 | 0.66 | 0.53-0.80 |
|  | 4.747-55.918 | 97 | 0.71 | 0.57-0.86 |
|  | 55.919-164.052 | 96 | 0.94 | 0.76-1.15 |
|  | 164.053+ | 70 | 0.65 | 0.51-0.82 |
| **LC** | < 4.747 | 9 | 0.76 | 0.35-1.45 |
|  | 4.747-55.918 | 8 | 1.34 | 0.58-2.63 |
|  | 55.919-164.052 | 5 | 1.09 | 0.35-2.55 |
|  | 164.053+ | 9 | 0.90 | 0.41-1.71 |

---

[3] Based on documents I reviewed, it appears that one such attempt was funded by EPA in 2020. Specifically, EPA granted roughly $300,000 to the Louisiana Department of Environmental Quality ("LDEQ") and the Louisiana Department of Health ("LDH") "to assess the health risks associated with Chloroprene exposure in St. John the Baptist Parish near the Denka Plant." The two stated objectives of the funded research were to determine "if there are higher instances of cancer in the community due to" the Facility's emissions, and "if there has been under-reporting of these cases in the [LTR]." See, e.g., EPA Cooperative Agreement 01F70601 to LDEQ, dated September 19, 2020; United States' Response to DPE Interrogatory No. 16; EPA_1932780 ("There are two tasks that are to be accomplished: a study to ensure that the types and numbers of cancers in the Louisiana Tumor Registry database are complete for the area to serve as a baseline, and an evaluation and analysis of that database specific to the 1.5-km radius and 2.5-km radius around Denka to determine if there are higher instances of cancer in the community and if the observed cancers are attributable to Denka."). An LDH official subsequently reported to EPA that "the only elevated rates we found were in census tract 702 for prostate and NHL, which have not been found to be related to chloroprene." EPA_2548391 (email correspondence).

Note that most SMRs are <1.0 and that the lower bound of the 95% CI never exceeds 1.0 indicating that there are no statistically significant excess risks seen. Even if historically high chloroprene emissions could be linked with increased cancer risks in Louisville or St. John the Baptist Parish today – or in recent years – epidemiologically, such risks would be expected to begin to decline roughly 20 years after any substantial reduction of exposure. As no relationship whatsoever can be established between DPE's historically high chloroprene emissions and community cancer rates, this notion remains theoretical. Any claim that the drastically reduced chloroprene emissions and fence-line measurements recorded in the most recent years poses any future cancer risks to the community (and where none has been demonstrated historically, even among highly exposed workers) cannot scientifically be substantiated and remains scientifically speculative.

51.     **OPINION 7: Based on my critical review and synthesis of the body of epidemiological evidence as reflected in Sax et al. (2020) and summarized above – and in consideration of the Marsh et al. (2021) publication, an expanded and updated version of the 2007 Marsh Study – I conclude to a reasonable degree of epidemiological certainty that chloroprene exposure at human-relevant levels does not cause respiratory or liver cancers.**

52.     **OPINION 8: Further, my independent evaluation of the relevant epidemiological literature on chloroprene exposure and risk of respiratory and liver (and any other) cancer logically leads to the conclusion that the risks of these cancers are not increased among those historically occupationally exposed to relatively high levels of chloroprene; therefore, it is improbable that community exposure to chloroprene at low to**

**negligible levels somehow confers increased risk (much less "imminent and substantial endangerment") today.**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 22, 2023

Kenneth A. Mundt, Ph.D, F.A.C.E.