IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

DENKA PERFORMANCE ELASTOMER LLC,

*Petitioner,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondent.*

ON PETITION FOR REVIEW OF AGENCY ACTION OF THE UNITED
STATES ENVIRONMENTAL PROTECTION AGENCY

**RESPONDENTS' OPPOSITION TO PETITIONER'S EMERGENCY
MOTION FOR STAY PENDING REVIEW
AND
OPPOSED COUNTERMOTION TO DISMISS**

TODD KIM
*Assistant Attorney General*

*Of Counsel:*
MICHAEL THRIFT
HALI KERR
  Office of the General Counsel
  U.S. Environmental Protection
  Agency
  Washington, DC

ALEXANDER M. PURPURO
BRANDON N. ADKINS
  *Attorneys, Environmental Defense
  Section*
  Environment and Natural Resources
  Division
  U.S. Department of Justice
  P.O. Box 7611
  Washington, D.C.  20044
  (202) 514-9771
  Brandon.Adkins@usdoj.gov
  Alexander.Purpuro@usdoj.gov

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

DENKA PERFORMANCE
ELASTOMER LLC,

     Petitioner,

       v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, et al.,

     Respondents.

No. 24-60351

## CERTIFICATE OF INTERESTED PERSONS

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Respondents, as

governmental parties, need not furnish a certificate of interested persons.


Date: July 22, 2024

                         */s/ Alexander M. Purpuro*
                         Alexander M. Purpuro
                         U.S. Department of Justice
                         Environment & Natural Resources
                         Division
                         Environmental Defense Section
                         P.O. Box 7611
                         Washington, D.C. 20044
                         (202) 514-9771
                         Alexander.purpuro@usdoj.gov

                         *Counsel for Respondents*

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .......................................................i

TABLE OF CONTENTS............................................................................... ii

TABLE OF AUTHORITIES ..........................................................................iv

INTRODUCTION ..........................................................................................1

BACKGROUND .............................................................................................1

    A.    Statutory and Regulatory Background ...................................1

    B.    The 2024 Rule ..........................................................................4

    C.    CAA Endangerment Action .....................................................5

    D.    Denka's Immediate Response to the Rule ..............................6

    E.    Denka's Pivot to This Court ....................................................8

STANDARD OF REVIEW .............................................................................8

ARGUMENT ..................................................................................................9

I.    Denka's Failure to Identify a Final Agency Action Subject to Review in this Court Requires Dismissal .........................................9

II.    Denka's Motion to Stay Should be Denied.....................................15

    A.    Denka is Not Likely to Succeed on the Merits ...................16

    B.    Denka Has Not Established Irreparable Harm ...................20

    C.    The Public Interest Weights Against a Stay........................21

CONCLUSION .............................................................................................23

CERTIFICATES OF COMPLIANCE.................................................................A1

CERTIFICATE OF SERVICE ................................................................................A2

# TABLE OF AUTHORITIES

**CASES**

*Bennett v. Spear*,
  520 U.S. 154 (1997) ...........................................................10

*Braidwood Mgmt., Inc. v. EEOC*,
  70 F.4th 914 (5th Cir. 2023) ........................................ 14, 15

*Cuomo v. U.S. Nuclear Regul. Comm'n*,
  772 F.2d 972 (D.C. Cir. 1985).........................................8

*Elldaki v. Garland*,
  64 F.4th 666 (5th Cir. 2023) ........................................ 14, 15

*Kokkonen v. Guardian Life Ins. Co.*,
  511 U.S. 375 (1994) .........................................................8

*Luminant Generation Co., v. EPA*,
  757 F.3d 439 (5th Cir. 2014) ...........................................12

*Nat'l Ass'n of Home Builders v. Norton*,
  415 F.3d 8 (D.C. Cir. 2005)..............................................12

*Nken v. Holder*,
  556 U.S. 418 (2009) ...................................................... 9, 21

*NRDC v. EPA*,
  529 F.3d 1077 (D.C. Cir. 2008)................................. 3, 21, 22

*NRDC v. EPA*,
  643 F.3d 311 (D.C. Cir. 2011)...........................................9

*Ohio v. EPA*,
  144 S. Ct. 2040 (2024) .....................................................9

*Texas v. Becerra*,
  89 F.4th 529 (5th Cir. 2024) ........................................ 10, 12

*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016) ................................................................10

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    578 U.S. 590 (2016) ...................................................................... 11, 13

*United States v. Oakland Cannabis Buyers' Coop.*,
    532 U.S. 483 (2001) ................................................................22

*Valero Energy Corp. v. EPA*,
    927 F.3d 532 (D.C. Cir. 2019) ...........................................................10

*Walmart Inc. v. U.S. Dep't of Just.*,
    21 F.4th 300 (5th Cir. 2021) ..................................................... 13, 14, 15

*Watts v. SEC*,
    482 F.3d 501 (D.C. Cir. 2007) ...................................................... 12, 13

**STATUTES**

5 U.S.C. § 702 ............................................................................13

5 U.S.C. § 704 ............................................................................13

5 U.S.C. § 705 ............................................................................13

42 U.S.C. § 7411 ..........................................................................1

42 U.S.C. § 7412 ..........................................................................1

42 U.S.C. § 7412(b)(1)....................................................................2

42 U.S.C. § 7412(c) ......................................................................2

42 U.S.C. § 7412(d) ......................................................................2

42 U.S.C. § 7412(d)(6)....................................................................2

42 U.S.C. § 7412(f) ................................................................2, 3

42 U.S.C. § 7412(f)(2) ...........................................................2, 3

42 U.S.C. § 7412(f)(2)(A) ..........................................................22

42 U.S.C. § 7412(f)(2)(B) ....................................................... 3, 21

42 U.S.C. § 7412(f)(4)(A) ............................................................3

42 U.S.C. § 7412(f)(4)(B) ..................................................... 3, 16

42 U.S.C. § 7602(a) .....................................................................3

42 U.S.C. § 7605(a) ...................................................................11

42 U.S.C. § 7607(b)(1)........................................... 1, 8, 10, 14

42 U.S.C. § 7607(e) ............................................................ 1, 14

## CODE OF FEDERAL REGULATIONS

40 C.F.R. Part 63, Subpart U, Table 1 (2021) ............................ 4, 11, 19

40 C.F.R. § 63.481(o) ................................................................4

40 C.F.R. § 63.481(p)(2).............................................................4

40 C.F.R. § 63.6(*i*)(1)..............................................................19

40 C.F.R. § 63.6(*i*)(9).............................................................20

40 C.F.R. § 63.6(*i*)(4)(ii)........................................... 3, 5, 16, 17

40 C.F.R. § 63.6(*i*)(6)(i) ...........................................................3

40 C.F.R. § 63.99(a)(19)(i) ............................................... 17, 19

40 C.F.R. § 63.507(c)(6) ..................................................... 5, 18

**FEDERAL REGISTERS**

54 Fed. Reg. 38044 (Sept. 14, 1989) ................................................................. 2, 21

65 Fed. Reg. 38003 (June 19, 2000) ............................................................................17

80 Fed. Reg. 9613 (Feb. 24, 2015) ..............................................................................17

89 Fed. Reg. 42932 (May 16, 2024) ............................. 2, 4, 5, 11, 12, 18, 21, 22, 23

**INTRODUCTION**

Denka Performance Elastomer, LLC ("Denka"), is challenging the rule at issue in the D.C. Circuit, which just denied Denka's motion to stay its compliance obligations. Seeking a second bite at the apple, Denka asks this Circuit to grant what its sister circuit denied. Its collateral attack depends on the untenable notion that this Court can review—as supposed a "final action" of the Environmental Protection Agency ("EPA"), 42 U.S.C. § 7607(b)(1)—not the rule itself, which Denka disclaims challenging here, but a single, footnoted sentence from a brief that the Department of Justice filed on EPA's behalf in the D.C. Circuit in opposition to Denka's stay motion there. Not only should this Court deny emergency relief that the D.C. Circuit refused to grant, it should promptly dismiss this petition for lack of jurisdiction.

**BACKGROUND**

**A.      Statutory and Regulatory Background**

The Clean Air Act ("CAA") establishes a comprehensive program for controlling and improving the Nation's air quality. Relevant here, EPA promulgated emission standards under 42 U.S.C. §§ 7411 and 7412 entitled, "New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers

1

and Resins Industry." 89 Fed. Reg. 42932 (May 16, 2024) ("the 2024 Rule"). A brief explanation of the standards is helpful to understand Denka's collateral attack here.

Section 7412 establishes a process for regulating emissions of hazardous air pollutants from stationary sources, including the carcinogen chloroprene. 42 U.S.C. § 7412(b)(1). EPA must identify the types of facilities (called source categories) that emit hazardous air pollutants like chloroprene, and then establish emission standards for each category. *See id.* § 7412(c).

Section 7412 uses a two-stage process. First, for each category of regulated sources, EPA sets technology-based emission standards. *Id.* § 7412(d). Later, EPA reviews the standards to determine (1) whether to update them given developments practices, processes, and control technologies (this is known as the technology review), *id.* § 7412(d)(6); and (2) whether more measures are needed to address any remaining health risks or adverse environmental effects (this is known as the residual-risk review), *id.* § 7412(f)(2).

The section 7412(f) residual-risk review considers, among other things, the maximum lifetime individual cancer risk from exposure to the source category's emissions. That risk is generally presumed to be acceptable if it is no higher than 1 in 10,000 (or 100 in 1 million). *See* 54 Fed. Reg. 38044, 38044-45 (Sept. 14,

1989) (setting forth EPA's approach to risk); 42 U.S.C. § 7412(f)(2)(B); *Nat. Res. Def. Council v. EPA*, 529 F.3d 1077, 1080 (D.C. Cir. 2008).

Existing sources generally must comply with section 7412(f) residual-risk standards within ninety days after their effective date. 42 U.S.C. § 7412(f)(4)(A). Congress authorized EPA to grant an extension of the compliance deadline to up to two years after the effective date of section 7412(f) standards. *Id.* § 7412(f)(4)(B). EPA may grant such an extension upon finding that (1) it is necessary for the installation of controls *and* (2) steps will be taken during the extension period to ensure that people's health will be protected from imminent endangerment. 42 U.S.C. § 7412(f)(4)(B). Section 7412(f) provides that "the Administrator may grant a waiver." *Id.* But that means "the Administrator of the Environmental Protection Agency," *id.* § 7602(a), and the CAA does not discuss anyone else's authority to extend such compliance deadline.

EPA has long-standing regulations for compliance-extension requests of section 7412(f) deadlines. *See* 40 C.F.R. § 63.6(*i*)(4)(ii). Requests must be submitted within 90 days after the effective date of the standard and describe the controls that will be installed and when installation will be completed. *Id.* § 63.6(*i*)(4)(ii). Prior to the 2024 Rule's effective date, however, the regulatory provision authorizing such requests did not apply to neoprene producers, the

source category covering Denka, which previously were not regulated under section 7412(f).  *See* 40 C.F.R. Part 63, Subpart U, Table 1 (2021).[1]

## B.    The 2024 Rule

The 2024 Rule was published in the Federal Register on May 16, 2024, and took effect on July 15, 2024.  89 Fed. Reg. at 42932.  It amended emissions standards that apply to several source categories under sections 7411 and 7412.  Relevant here, the 2024 Rule finalized section 7412(f) standards for chloroprene emissions from neoprene producers in the Group I Polymers and Resins category, codified at 40 C.F.R. Part 63, Subpart U (hereinafter, "Subpart U").  Denka makes and uses chloroprene to produce neoprene, an oil-resistant substitute for natural rubber.  *See* Pet. & Compl. ¶ 12.  Denka is the only affected neoprene producer currently operating in the United States.  89 Fed. Reg. at 42955.  Its production facility is adjacent to Fifth Ward Elementary School in St. John the Baptist Parish.  *See id.* at 42964-65.  Children are especially susceptible to chloroprene's harmful effects because it can damage DNA.  *Id.* at 43058.

For existing sources producing neoprene, EPA finalized the ninety-day statutory default period for compliance with the section 7412(f) chloroprene standards, ending on October 15, 2024.  40 C.F.R. § 63.481(o), (p)(2).  EPA also

---

[1] This version is included as Exhibit A, hereinafter "Subpart U, Table 1 (2021)."

explained that a source may request an extension pursuant to EPA's regulations if it demonstrates the statutory and regulatory prerequisites. 89 Fed. Reg. at 42955.

To provide a regulatory mechanism for sources to request this extension, EPA amended its regulations addressing neoprene producers in two relevant ways. First, the 2024 Rule newly provides a regulatory mechanism for EPA to receive and grant extensions for section 7412(f) standards that apply to neoprene producers pursuant to 40 C.F.R. § 63.6(i)(4)(ii). *See* 89 Fed. Reg. at 43264. Second, the 2024 Rule specified that, in making these revisions, EPA was "retaining authority to grant or deny requests for extensions of the compliance date under 40 C.F.R. § 63.6(i)(4)(ii) at 40 C.F.R. § 63.507(c)(6), and is not delegating that authority to states." *Id.* at 42955 n.33. The amendments to the regulatory text governing compliance extensions appear in the Federal Register notice for the 2024 Rule, alongside the regulatory text prescribing the substantive standards. *Id.* at 43067-296.

## C.    CAA Endangerment Action

In February 2023, the United States, at EPA's request, had filed a complaint alleging that carcinogenic chloroprene emissions from Denka's neoprene manufacturing operations in Louisiana present an imminent and substantial endangerment to public health and welfare. Exh. B ¶ 1. The United States seeks injunctive relief that would require Denka to immediately reduce its chloroprene

emissions to levels that no longer cause or contribute to unacceptably high cancer risks within neighboring communities, including at the adjacent elementary school. *Id.* The enforcement action predates, and does not allege violations of the rule.

### D.    Denka's Immediate Response to the Rule

On the 2024 Rule's publication date, Denka petitioned the D.C. Circuit "to review the final rule" and attached to its petition the entire rule, including the regulatory text governing compliance extensions.[2] *Denka Performance Elastomer LLC v. EPA*, No. 24-1135, ECF No. 2054934 (D.C. Cir. May 16, 2024). Denka then filed an emergency motion in the D.C. Circuit to stay the 2024 Rule's ninety-day compliance deadline for the section 7412(f) chloroprene emission standards. Exh. C at 24. Therein, Denka stated that on April 19, 2024 (after the Final Rule's text was publicly released but before its publication in the Federal Register), Denka had requested an extension of the compliance deadline from the Louisiana Department of Environmental Quality ("LDEQ"). *Id.* at 8. Denka also asserted that "the Rule purports to revoke LDEQ's long-standing authority to extend compliance dates for rules such as this one." *Id.*

On June 11, 2024, in the opposition to the stay motion, the Department of Justice, on EPA's behalf, observed in a footnote that the 2024 Rule "was not

---

[2] Certain relevant filings in that matter are attached as exhibits for convenience.

delegating authority to states to grant or deny extension requests under 40 C.F.R. § 63.6(*i*)(4)(ii)" and that, pursuant to the express text of the final rule, an attempt by LDEQ to grant such an extension would be "ineffectual."  Exh. D at 7-8 n.2.

On June 26, 2024, a D.C. Circuit motions panel—consisting of Judges Katsas, Rao, and Childs—denied Denka's request for a stay.  Exh. E.  The next day, LDEQ purported to grant Denka's extension request.  Mot. Exh. H.  The State of Louisiana then petitioned for review of the full 2024 Rule, including the compliance-extension provisions, in the D.C. Circuit.  *Louisiana v. EPA*, D.C. Cir. No. 24-1228, ECF No. 2062495 (July 1, 2024).

Denka subsequently sought panel and en banc rehearing of the D.C. Circuit's stay denial, citing the June 11th briefing footnote and stating that "while [Denka] disputes EPA's position on the validity of the LDEQ extension request, that extension has no bearing on the need for a stay from [the D.C. Circuit]."  Exh. F at 3 n.2.  The motions panel denied rehearing, reasoning that "[i]n neither the motion for a stay nor the petition for reconsideration has petitioner established that it will be irreparably harmed absent a stay given that it could but has not requested from [EPA] an extension of the deadline to comply with the rule under review."  Exh. G.

To date, Denka has not submitted a request that EPA extend its compliance deadline.

### E.    Denka's Pivot to This Court

Having failed to obtain relief from the D.C. Circuit, and possibly lacking

confidence in LDEQ's purported grant of a compliance extension, Denka filed a

"Petition for Review and Complaint for Declaratory and Injunctive Relief" against

EPA that invokes this Court's original jurisdiction under the provision of the CAA

that allows for review of "final action of the Administrator," 42 U.S.C. §

7607(b)(1). *See* Pet. & Compl. ¶ 15.  Denka's motion indicates that EPA's

supposed "final action" is the agency's "position" as stated in a footnote in the

brief filed by the Department of Justice in the D.C. Circuit, that LDEQ's waiver is

ineffectual.  Mot. 12-13.  Claiming it now has "no adequate remedy at law," Pet. &

Compl. ¶ 60, Denka's pleading seeks from this Court both "a declaratory judgment

that the LDEQ Extension is valid and enforceable," *id.* ¶ 56, and "injunctive relief

preventing EPA from denying the validity of the LDEQ Extension," *id.* ¶ 63.

### STANDARD OF REVIEW

Denka bears the burden of demonstrating jurisdiction, *see Kokkonen v.*

*Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994), and the burden to justify

a stay. *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 978 (D.C. Cir.

1985).  The Court considers whether (1) Denka made a strong showing that it is

likely to succeed on the merits; (2) Denka will suffer irreparable harm absent a

stay; (3) a stay will substantially injure other interested parties; and (4) a stay

would serve the public interest.  *See Ohio v. EPA*, 144 S. Ct. 2040, 2052-53

(2024).  The third and fourth requirements merge here.  *Nken v. Holder*, 556 U.S.

418, 435 (2009).

## ARGUMENT

Denka asks this Court to decide whether LDEQ can extend Denka's ninety-

day compliance deadline under the 2024 Rule.  Denka's challenge is an obvious

attempt to circumvent the CAA's judicial-review provisions, as well as the D.C.

Circuit's orders denying Denka's previous stay request.  This collateral attack on

the 2024 Rule improperly duplicates the D.C. Circuit litigation and risks

inconsistent rulings.  The Court should dismiss this action for lack of jurisdiction.

Regardless, Denka's motion should be denied because it is unlikely to succeed on

the merits of Denka's challenge and otherwise has not shown entitlement to

extraordinary relief.

## I.     Denka's Failure to Identify a Final Action Subject to Review in this Court Requires Dismissal.

The Court lacks jurisdiction over Denka's Petition and Complaint because

Denka failed to identify a final action underlying this dispute that is separate from

the 2024 Rule now under review by the D.C. Circuit.

Denka contends that this Court has jurisdiction pursuant to 42 U.S.C. §

7607(b)(1), the exclusive avenue for challenging CAA final actions.  *See NRDC v.

EPA*, 643 F.3d 311, 317 (D.C. Cir. 2011).  The CAA only authorizes judicial

review of a "final action" taken by EPA, a term which is synonymous with "final agency action" under the Administrative Procedure Act ("APA"). *See Valero Energy Corp. v. EPA*, 927 F.3d 532, 536 (D.C. Cir. 2019). This "finality" requirement is jurisdictional. *Id.*; *see also Texas v. EPA*, 829 F.3d 405, 418 (5th Cir. 2016). Thus, to invoke this Court's jurisdiction, Denka must challenge a "final action" by EPA within the meaning of section 7607(b)(1).

To be "final," an action must (1) "mark the 'consummation' of the agency's decisionmaking process,"; and (2) "must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Texas v. Becerra*, 89 F.4th 529, 538 (5th Cir. 2024) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). There is indeed a final action by EPA establishing that LDEQ is not authorized to extend Denka's ninety-day compliance deadline—the 2024 Rule that Denka challenged in the D.C. Circuit. Denka's problem is that it cannot identify a final action separate and apart from the 2024 Rule.

Denka expressly and appropriately disclaims that it is challenging any aspect of the 2024 Rule in this Court. Mot. 3. Any such challenge would be improper because Denka already has a pending challenge to the 2024 Rule in the D.C. Circuit, and because section 7607(b)(1) requires that *any* challenge to the 2024 Rule (which is "nationally applicable") must be brought in the D.C. Circuit. 42 U.S.C. § 7607(b)(1).

Denka advances the novel theory that a footnote in a brief filed in opposition to a motion, in one court, is itself a final action that can be separately challenged in a petition for review in a different court. Mot. 8-9, 13. Denka's theory is meritless.

The government's opposition brief was not an action (final or otherwise) of "the Administrator" of EPA, per 42 U.S.C. § 7607(b)(1). Although it was filed on EPA's behalf, it was nonetheless filed pursuant to the authority of the Attorney General, not the Administrator. *See* 42 U.S.C. § 7605(a).

Regardless, a statement in response to Denka's D.C. Circuit stay motion is not an "action . . . by which rights or obligations have been determined, or from which legal consequences will flow." *See U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016). The only "action" fitting that definition here is EPA's 2024 Rule. That final rule plainly marks the consummation of EPA's decisionmaking process. And the 2024 Rule sets forth the "rights or obligations" from which any "legal consequences" may flow. That Rule establishes Denka's ninety-day compliance deadline; to obtain an extension, Denka must seek one from EPA. 89 Fed. Reg. at 42955. To provide a regulatory mechanism for this, EPA amended the regulations codified at Subpart U to allow parties to seek extensions of section 7412(f) compliance deadlines. *Compare* Subpart U, Table 1 (2021), *with* 89 Fed. Reg. at 43264. EPA specified that, in allowing for such extensions in

Subpart U for the first time, the agency was not delegating extension-granting authority to the states.  *See* 89 Fed. Reg. at 42955 n.33.

A brief restatement of the plain import of the 2024 Rule in a footnote in the government's response to Denka's D.C. Circuit stay motion is not a *new* "final action" that Denka may challenge under 42 U.S.C. § 7607(b)(1).  *See Becerra*, 89 F.4th at 540 ("[A]gency action is not final if it merely restates a statutory requirement or merely reiterates what has already been established.") (cleaned up). The briefing footnote does not *newly* determine Denka's or Louisiana's "rights or obligations," and the restatement therein of amendments in the 2024 Rule has no legal consequence.  The regulatory text that withholds authority from states would have force even without the footnote.  *See Luminant Generation Co. v. EPA*, 757 F.3d 439, 441-42 (5th Cir. 2014); *see also Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 15 (D.C. Cir. 2005) ("[I]f the practical effect of the agency action is not a certain change in the legal obligations of a party, the action is non-final for purposes of judicial review.").  Therefore, the Court lacks jurisdiction over Denka's petition for review.

Additionally, "an ordinary litigation decision" cannot constitute a final action subject to judicial review.  *See Watts v. SEC*, 482 F.3d 501, 506-08 (D.C. Cir. 2007).  To hold otherwise would lead to absurd situations, such as this, where a party challenges an agency action in one court and then files subsequent litigation

in another court challenging positions in the filings that an agency made to defend itself in litigation. *See id.* at 506 (expressing concern that "agency amicus briefs, privilege assertions, letters about scheduling issues, and the like—would be orders separately reviewable in the court of appeals under a direct-review provision, while the litigation itself chugged along in the district court"); *cf. Walmart Inc. v. U.S. Dep't of Just.*, 21 F.4th 300, 307-11 (5th Cir. 2021).

Denka also suggests that EPA's position on the question was "further cemented" by the agency's "fail[ure] to respond to [Denka's] formal request seeking to confirm the validity of the LDEQ Extension." Pet. & Compl. ¶ 6. But Denka cannot conjure a final action through its own demand letter to EPA. The 2024 Rule speaks for itself and EPA's non-response so far to Denka's letter does not determine rights or obligations, nor does it carry legal consequences. *See Hawkes*, 578 U.S. at 598. The 2024 Rule is the only relevant action that does.

Denka further incorrectly cites APA sections 702, 704, and 705 as providing an avenue for relief. Mot. 9. Section 702 states that "[n]othing herein . . . confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. Section 704 only provides for review of a "final agency action for which there is no other adequate remedy in a court." *Id.* § 704. And section 705 merely outlines types of relief that may be granted, it does not provide for jurisdiction. *Id.* § 705. As discussed,

section 7607(b)(1) provides the exclusive avenue for challenging final actions under the CAA and forbids challenges to non-final actions, such as Denka's. *See* 42 U.S.C. § 7607(b)(1), (e). Thus, the APA does not provide for jurisdiction in this Court.[3]

Nor can Denka rely for jurisdiction on the Declaratory Judgment Act, which "is not an independent basis for subject matter jurisdiction." *Elldakli v. Garland*, 64 F.4th 666, 670 (5th Cir. 2023). Where the CAA precludes this Court's review, Denka cannot circumvent the Act's requirements by alternatively asserting a Declaratory Judgment Act claim. *See id.* (holding that the Declaratory Judgment Act did not confer jurisdiction where the APA and the Immigration and Nationality Act barred review of the plaintiffs' claims); *see also Walmart*, 21 F.4th at 307-311. Because Denka identifies no final action over which this Court has jurisdiction pursuant to section 7607(b)(1), Denka may not seek a declaratory judgment from this Court.

This Court's decision in *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914 (5th Cir. 2023), is inapposite, as it did not involve a statutory scheme setting forth the particular bounds of judicial review, such as the CAA or the APA. This case is

---

[3] Even if the APA cause of action were available here, Denka has failed to identify a final action. Further, there is no route to APA review in a suit filed originally in this Court.

just like the scenarios analyzed by the Court in *Walmart* and *Elldakli*, where the Court held that the Declaratory Judgment Act could not confer jurisdiction where the APA precluded review. *See Elldakli*, 64 F.4th at 670; *Walmart*, 21 F.4th at 310-311. Allowing review here would circumvent Congress's specific limits on judicial review of EPA action under the CAA. Denka is not "otherwise without a satisfactory remedy," *Braidwood*, 70 F.4th at 933 (quotation omitted); it is challenging the 2024 Rule, which includes the compliance-extension provisions. That the D.C. Circuit has denied Denka emergency relief does not give it license to sue in another forum under the Declaratory Judgment Act or otherwise.

Accordingly, for the reasons stated, the Court should dismiss this action.

## II. Denka's Motion to Stay Should be Denied

Even if the Court had jurisdiction, Denka's motion to stay fails because Denka is not likely to succeed on the merits of its claim. First, Denka cites no authority for the extraordinary and unprecedented relief it seeks, which is not a stay but a pre-emptive, mandatory injunction against EPA's use of enforcement authority. Moreover, even if the relief it sought could be construed as a stay of some agency action, Denka fails to meet its heavy burden for such relief. Further, a panel of the D.C. Circuit denied Denka's request for a stay of its compliance deadline as well as its request for rehearing because Denka failed to demonstrate irreparable harm absent a stay. Exh. G. This Court should do the same.

**A.  Denka is Not Likely to Succeed on the Merits**

Denka is unlikely to succeed on the merits not only because this Court lacks jurisdiction, but also because LDEQ has never had authority to grant Denka's extension request.  Prior to the 2024 Rule, the extension-waiver authority at issue expressly did not apply to the emission standards governing neoprene producers, including Denka.  And after, EPA expressly precluded delegation of that authority to State agencies, including LDEQ.  Denka's assertions to the contrary are based on a fundamental misunderstanding of the CAA, and EPA's previous and amended regulations, and must be rejected.

The CAA does not itself directly authorize any state to grant an extension request of section 7412(f) standards.  42 U.S.C. § 7412(f)(4)(B) ("the Administrator may grant a waiver").  Thus, any authority LDEQ has to grant Denka's extension request must be delegated by EPA.

EPA, however, has not delegated to Louisiana the ability to grant extensions of compliance deadlines for section 7412(f) standards for neoprene production facilities.  When EPA promulgates or revises a standard addressing a specific source category, EPA often coincidingly establishes, or revises through regulation, the list of "General Provisions" under Subpart A that apply to that particular standard.  One such "General Provision," relevant here, is section 63.6(*i*)(4)(ii),

which provides that the Administrator may grant compliance extensions for section 7412(f) standards under certain circumstances.  40 C.F.R. § 63.6(*i*)(4)(ii).

EPA has long specified that section 63.6(*i*)(4)(ii) does not apply to emissions standards governing neoprene production sources like Denka.  Those standards are contained in 40 C.F.R. Part 63, Subpart U.  Subpart U includes a table identifying which provisions under Subpart A apply to the Subpart U standards, and which do not.  Since 2000, EPA has expressly stated that 40 C.F.R. § 63.6(*i*)(4)(ii)—the provision authorizing section 7412(f) compliance extensions—does *not* apply to Subpart U, the neoprene production source standards.  *See* 65 Fed. Reg. 38030, 38084-87 (June 19, 2000).  This was the case in 2015 when EPA last delegated authority to LDEQ.  80 Fed. Reg. 9613 (Feb. 24, 2015).  Thus, when Louisiana purportedly acted on Denka's extension request, no regulatory provision allowed for state extensions of the compliance deadlines for section 7412(f) standards with respect to Denka.[4]  Therefore, LDEQ had no authority to entertain such an extension under its delegated authority.  *See* 40 C.F.R. § 63.99(a)(19)(i).  That was the state of play before the 2024 Rule took effect on July 15, 2024.

Nor does LDEQ have authority to entertain Denka's compliance extension now that the 2024 Rule has taken effect.  In establishing section 7412(f) standards

---

[4] Indeed, prior to the 2024 Rule, no section 7412(f) standards applying to Denka existed in Subpart U.

under Subpart U, EPA also amended Subpart U, Table 1 to provide that section 63.6(*i*)(4)(ii) applies to compliance deadlines for neoprene production sources subject to the newly adopted section 7412(f) standards.  89 Fed. Reg. at 43264.  In amending Table 1, EPA stated that it was "retaining authority to grant or deny requests for extensions of the compliance date under 40 C.F.R. 63.6(*i*)(4)(ii) at 40 C.F.R. 63.507(c)(6), and is not delegating that authority to states."  *Id.* at 42955 n.33.  To underscore this point, EPA also amended its regulations to clarify that an "[a]pproval of an extension request under § 63.6(*i*)(4)(ii)" cannot be delegated to states.  *See* 40 C.F.R. § 63.507(c)(6).  Therefore, LDEQ had no authority before the 2024 Rule took effect to entertain or grant Denka a compliance deadline extension for the chloroprene standards, and it continues to lack such authority now that the Rule is effective.

Denka's argument that LDEQ has "automatic authority to grant Denka's request by virtue of a 1995 delegation" fails.  Mot. 15.  No section 7412(f) standards applying to Subpart U sources, like Denka's facility, existed at the time of that 1995 delegation.  And the 2015 delegation of authority with respect to Subpart U is subject to the express limitations under Table 1, which stated that the

compliance-extension regulations for section 7412(f) did not apply.[5]  Subpart U,

Table 1 (2021).

Denka's argument that EPA has not amended a table listing Louisiana's

delegated authorities under 40 C.F.R. Part 63, Subpart E, Mot. 16-19, fails on

similar grounds.  While Subpart E, section 63.99(a)(19) does generally delegate

Subpart U implementation authority to Louisiana, it also states that "[t]he

delegations are subject to all of the conditions and limitations set forth in Federal

law, regulations, policy, guidance, and determinations."  40 C.F.R.

§ 63.99(a)(19)(i).  LDEQ's authority is subject to the "conditions and limitations"

under EPA's regulations, including those set forth in Subpart U, Table 1.

Therefore, Louisiana does not have the authority to grant requests for compliance-

extensions to Subpart U's new section 7412(f) standards.

Finally, 40 C.F.R. § 63.6(*i*)(1) and (9) do not include some independent

delegation of authority to approve section 7412(f) compliance extensions.  Mot.

14-16, 19-20.  Paragraph (*i*)(1) simply states that a source remains subject to a

standard during the pendency of a request for an extension; it does not indicate

when or how sources can seek extensions.  40 C.F.R. § 63.6(*i*)(1).  And paragraph

(*i*)(9) does not authorize extensions of section 7412(f) standards.  Rather,

---

[5] The 26-year-old memorandum Denka cites cannot overcome this express
exclusion in EPA's regulations.  *See* Mot. 15.

paragraph (*i*)(9) outlines the basis by which EPA, or a state where appropriate, can approve a request for an extension that is otherwise properly made under paragraphs (*i*)(4) and (*i*)(5). *Id.* § 63.6(*i*)(9). Both these provisions' threshold applicability depends upon the source's ability to request an extension to a particular standard's compliance deadline in the first instance. As discussed, Subpart U did not provide an avenue to request an extension for section 7412(f) standards prior to the 2024 Rule. And after the 2024 Rule became effective, only EPA could grant such an extension.

Thus, for the reasons stated, Denka is unlikely to succeed on the merits, and its request for a stay can be denied on that basis as well.

## B. Denka Has Not Established Irreparable Harm

Denka cannot establish irreparable harm deriving from EPA's D.C. Circuit response brief or EPA's lack of response to Denka's letter. Denka does not challenge the section 7412(f) standards in EPA's 2024 Rule in this Court. The Court must therefore assume that Denka must comply with those standards or seek an extension from EPA as provided by the 2024 Rule. As the D.C. Circuit has found regarding the *same* alleged harms, Denka's failure to seek such an extension "from [EPA]" precludes a finding of irreparable harm. *See* Exh. G.

Moreover, the only irreparable injury that Denka can claim here must derive from the compliance deadline being October 2024 rather than July 2026. The

Court should therefore deduct any injuries Denka is expected to suffer even *with* a stay of the ninety-day compliance deadline. *See Nken*, 556 U.S. at 434. Denka fails to establish such injury. Denka does not articulate that each alleged injury will be redressed by a July 2026 compliance deadline. While Denka submits the Christopher Meyers declaration in support of its Motion, that declaration fails to specify which injuries will be redressed by a stay, and instead suggests that Denka *will not* be able to comply with the standards within even a two-year time frame. *See* Mot. Exh. N ¶¶ 7, 11, 16, 22, 25, 26, 31, 35. Accordingly, Denka fails to establish an irreparable injury that specifically derives from the "action" it challenges here.

### C. The Public Interest Weights Against a Stay

EPA determined in the 2024 Rule that the cancer risk for thousands of people exposed to chloroprene emissions at levels emitted by Denka's facility is not acceptable. Under EPA precedents, blessed by Congress, cancer risk from hazardous air pollutants like chloroprene is "presumptively acceptable" where excess lifetime cancer risks are below 100-in-1 million. *NRDC*, 529 F.3d. at 1080-83; 54 Fed. Reg. at 38044-45; *See* 42 U.S.C. § 7412(f)(2)(B). In the 2024 Rule's computation, cancer risk from Denka's chloroprene emissions just from producing neoprene is five times higher—500-in-1 million. 89 Fed. Reg. at 42963 (Table 5). The Rule's standards will reduce that risk to an acceptable level that provides an

ample margin of safety to protect public health. Staying Denka's compliance deadline would delay those reductions and prolong unacceptable risks to the public.

Denka wrongly asserts that "a stay... will pose virtually no risk to the public." Mot. 20. In enacting section 7412, Congress recognized the serious threats to human health posed by toxic air pollutants. *See United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001) ("Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a statute."). And section 7412(f) in particular focuses on the *risk* of harm, not merely specific incidences of harm. *See* 89 Fed. Reg. at 42958 (neoprene production risk assessment results); 42 U.S.C. § 7412(f)(2)(A) (discussing "lifetime excess cancer risks"). *Contra* Mot. 20-23.

The standards are thus consistent with the statute. Section 7412(f)(2) requires EPA to assess the residual risk to public health. If the standards for a source category do not provide "an ample margin of safety to protect public health," EPA must promulgate health-based standards for that source category to reduce risk further from hazardous air pollutant emissions and set appropriate deadlines. 42 U.S.C. § 7412(f)(2)(A). The standards are called "risk-based" or "health-based" because they are based on a scientific assessment of a given pollutant's health *risks*. *NRDC*, 529 F.3d at 1080.

In sum, the public is harmed by the increased risk of cancer from excess chloroprene emissions from Denka's facility and will continue to be harmed until Denka's facility complies with the Rule. By postponing reductions of this harmful pollution, Denka's requested stay would adversely affect the public interest and the health of people who live, work, and attend school near the facility. And because chloroprene can damage DNA, children are more susceptible to its harmful effects. 89 Fed. Reg. at 43058. It is hard to imagine that parents of children living and attending school in the shadow of Denka's facility would characterize their EPA-determined cancer risk as "miniscule." Mot. 21.

## CONCLUSION

The Court should dismiss the Petition and Complaint[6] and deny Denka's Motion for Stay pending review.

Respectfully submitted,

TODD KIM
*Assistant Attorney General*

*Of Counsel:*                                s/ Alexander M. Purpuro
MICHAEL THRIFT                   ALEXANDER M. PURPURO
HALI KERR                                BRANDON N. ADKINS
   Office of the General Counsel        *Attorney, Environmental Defense*
   U.S. Environmental Protection        *Section*
   Agency                                            Environment and Natural Resources
   Washington, DC                              Division

---

[6] Petitioners' counsel advised that they oppose Respondents' Motion. Intervenors' Counsel did not respond to Respondents' Counsel's email inquiry.

U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044
(202) 514-9771
*Alexander.Purpuro@usdoj.gov*
*Brandon.Adkins@usdoj.gov*

JULY 22, 2024

# CERTIFICATES OF COMPLIANCE

I hereby certify that this motion complies with the requirements of Fed. R. App. P. 27(d)(2)(A) because it contains 5,192 words according to the count of Microsoft Word, excluding the parts of the motion exempted by Fed. R. App. P. 32(f), and therefore is within the word limit of 5,200 words.

I further certify that this motion complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally-spaced font, and is double-spaced, except for headings and footnotes.


Dated: July 22, 2024
                                  */s/ Alexander M. Purpuro*
                                  ALEXANDER M. PURPURO

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing Respondents' Opposition to Petitioners' Emergency Motion for Stay Pending Review and Opposed Countermotion to Dismiss on all registered counsel through the Court's electronic filing system (CM/ECF).


Dated: July 22, 2024

/s/ Alexander M. Purpuro
ALEXANDER M. PURPURO

# EXHIBIT A

## Subpart U—National Emission Standards for Hazardous Air Pollutant Emissions: Group I Polymers and Resins

SOURCE: 62 FR 46925, Sept. 5, 1996, unless otherwise noted.

### § 63.480 Applicability and designation of affected sources.

(a) *Definition of affected source.* The provisions of this subpart apply to each affected source. Affected sources are described in paragraphs (a)(1) through (a)(4) of this section.

(1) An affected source is either an existing affected source or a new affected source. Existing affected source is defined in paragraph (a)(2) of this section, and new affected source is defined in paragraph (a)(3) of this section.

(2) An existing affected source is defined as each group of one or more elastomer product process units (EPPU) and associated equipment, as listed in paragraph (a)(4) of this section, that is not part of a new affected source, as defined in paragraph (a)(3) of this section, that is manufacturing the same primary product and that is located at a plant site that is a major source.

(3) A new affected source is defined by the criteria in paragraph (a)(3)(i), (a)(3)(ii), or (a)(3)(iii) of this section. The situation described in paragraph (a)(3)(i) of this section is distinct from those situations described in paragraphs (a)(3)(ii) and (a)(3)(iii) of this section and from any situation described in paragraph (i) of this section.

(i) At a site without HAP emission points before June 12, 1995 (i.e., a "greenfield" site), each group of one or more EPPU and associated equipment, as listed in paragraph (a)(4) of this section, that is manufacturing the same primary product and that is part of a major source on which construction commenced after June 12, 1995;

(ii) A group of one or more EPPU meeting the criteria in paragraph (i)(1)(i) of this section; or

(iii) A reconstructed affected source meeting the criteria in paragraph (i)(2)(i) of this section.

(4) *Emission points and equipment.* The affected source also includes the emission points and equipment specified in paragraphs (a)(4)(i) through (a)(4)(iv) of

this section that are associated with each applicable group of one or more EPPU constituting an affected source.

(i) Each waste management unit.

(ii) Maintenance wastewater.

(iii) Each heat exchange system.

(iv) Equipment required by, or utilized as a method of compliance with, this subpart which may include control devices and recovery devices.

(5) EPPUs and associated equipment, as listed in paragraph (a)(4) of this section, that are located at plant sites that are not major sources are neither affected sources nor part of an affected source.

(b) *EPPUs without organic HAP.* The owner or operator of an EPPU that is part of an affected source, as defined in paragraph (a) of this section, but that does not use or manufacture any organic HAP shall comply with the requirements of either paragraph (b)(1) or (b)(2) of this section. Such an EPPU is not subject to any other provision of this subpart and is not required to comply with the provisions of subpart A of this part.

(1) Retain information, data, and analyses used to document the basis for the determination that the EPPU does not use or manufacture any organic HAP. Types of information that could document this determination include, but are not limited to, records of chemicals purchased for the process, analyses of process stream composition, engineering calculations, or process knowledge.

(2) When requested by the Administrator, demonstrate that the EPPU does not use or manufacture any organic HAP.

(c) *Emission points not subject to the provisions of this subpart.* The affected source includes the emission points listed in paragraphs (c)(1) through (c)(9) of this section, but these emission points are not subject to the requirements of this subpart or to the provisions of subpart A of this part.

(1) Equipment that does not contain organic HAP and is located at an EPPU that is part of an affected source;

(2) Stormwater from segregated sewers;

(3) Water from fire-fighting and deluge systems in segregated sewers;

(4) Spills;

610

TABLE 1 TO SUBPART U OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART U AFFECTED SOURCES

| Reference | Applies to subpart U | Explanation |
|---|---|---|
| §63.1(a)(1) | Yes | §63.482 specifies definitions in addition to or that supersede definitions in §63.2. |
| §63.1(a)(2) | Yes | |
| §63.1(a)(3) | Yes | §63.481(f) through (k) and §63.160(b) identify those standards which may apply in addition to the requirements of subparts U and H of this part, and specify how compliance shall be achieved. |
| §63.1(a)(4) | Yes | Subpart U (this table) specifies the applicability of each paragraph in subpart A to subpart U. |
| §63.1(a)(5) | No | [Reserved] |
| §63.1(a)(6)–(8) | Yes | |
| §63.1(a)(9) | No | [Reserved]. |
| §63.1(a)(10) | Yes | |
| §63.1(a)(11) | Yes | |
| §63.1(a)(12)–(14) | Yes | |
| §63.1(b)(1) | No | §63.480(a) contains specific applicability criteria. |
| §63.1(b)(2) | Yes | |
| §63.1(b)(3) | No | §63.480(b) provides documentation requirements for EPPUs not considered affected sources. |
| §63.1(c)(1) | Yes | Subpart U (this table) specifies the applicability of each paragraph in subpart A to subpart U. |
| §63.1(c)(2) | No | Area sources are not subject to subpart U. |
| §63.1(c)(3) | Yes | |
| §63.1(c)(4) | No | [Reserved]. |
| §63.1(c)(5) | Yes | Except that affected sources are not required to submit notifications that are not required by subpart U. |
| §63.1(c)(6) | Yes | |
| §63.1(d) | No | [Reserved]. |
| §63.1(e) | Yes | |
| §63.2 | Yes | §63.482 specifies those subpart A definitions that apply to subpart U. |
| §63.3 | Yes | |
| §63.4(a)(1)–(3) | Yes | |
| §63.4(a)(4) | No | [Reserved]. |
| §63.4(a)(5) | Yes | |
| §63.4(b) | Yes | |
| §63.4(c) | Yes | |
| §63.5(a)(1) | Yes | Except the terms "source" and "stationary source" should be interpreted as having the same meaning as "affected source". |
| §63.5(a)(2) | Yes | |
| §63.5(b)(1) | Yes | Except §63.480(i) defines when construction or reconstruction is subject to new source standards. |
| §63.5(b)(2) | No | [Reserved]. |
| §63.5(b)(3) | Yes | |
| §63.5(b)(4) | Yes | Except that the Initial Notification and §63.9(b) requirements do not apply. |
| §63.5(b)(5) | Yes | |
| §63.5(b)(6) | Yes | Except that §63.480(i) defines when construction or reconstruction is subject to the new source standards. |
| §63.5(c) | No | [Reserved]. |
| §63.5(d)(1)(i) | Yes | Except that the references to the Initial Notification and §63.9(b)(5) do not apply. |
| §63.5(d)(1)(ii) | Yes | Except that §63.5(d)(1)(ii)(H) does not apply. |
| §63.5(d)(1)(iii) | No | §63.506(e)(5) and §63.502(f) specify Notification of Compliance Status requirements. |
| §63.5(d)(2) | No | |
| §63.5(d)(3) | Yes | Except §63.5(d)(3)(ii) does not apply, and equipment leaks subject to §63.502 are exempt. |
| §63.5(d)(4) | Yes | |
| §63.5(e) | Yes | |
| §63.5(f)(1) | Yes | |
| §63.5(f)(2) | Yes | Except that where §63.9(b)(2) is referred to, the owner or operator need not comply. |
| §63.6(a) | Yes | |
| §63.6(b)(1) | No | The dates specified in §63.481(b) apply, instead. |
| §63.6(b)(2) | No | |
| §63.6(b)(3) | No | |
| §63.6(b)(4) | No | |
| §63.6(b)(5) | No | |
| §63.6(b)(6) | No | [Reserved]. |
| §63.6(b)(7) | No | |

724

| Reference | Applies to subpart U | Explanation |
|---|---|---|
| § 63.6(c)(1) | Yes | § 63.481 specifies the compliance date. |
| § 63.6(c)(2) | No. | |
| § 63.6(c)(3) | No | [Reserved]. |
| § 63.6(c)(4) | No | [Reserved]. |
| § 63.6(c)(5) | Yes. | |
| § 63.6(d) | No | [Reserved]. |
| § 63.6(e)(1)(i) | No | See § 63.483(a)(1) for general duty requirement. Any cross-reference to § 63.6(e)(1)(i) in any other general provision incorporated by reference shall be treated as a cross reference to § 63.483(a)(1). |
| § 63.6(e)(1)(ii) | No. | |
| § 63.6(e)(1)(iii) | Yes. | |
| § 63.6(e)(2) | No | [Reserved] |
| § 63.6(e)(3) | No. | |
| § 63.6(f)(1) | No. | |
| § 63.6(f)(2) | Yes | Except 63.7(c), as referred to in § 63.6(f)(2)(iii)(D) does not apply, and except that § 63.6(f)(2)(ii) does not apply to equipment leaks subject to § 63.502. |
| § 63.6(f)(3) | Yes. | |
| § 63.6(g) | Yes. | |
| § 63.6(h) | No | Subpart U does not require opacity and visible emission standards. |
| § 63.6(i)(1) | Yes. | |
| § 63.6(i)(2) | Yes. | |
| § 63.6(i)(3) | Yes. | |
| § 63.6(i)(4)(i)(A) | Yes. | |
| § 63.6(i)(4)(i)(B) | No | Dates are specified in § 63.481(e) and § 63.506(e)(3)(i). |
| § 63.6(i)(4)(ii) | No. | |
| § 63.6(i)(5)–(14) | Yes. | |
| § 63.6(i)(15) | No | [Reserved]. |
| § 63.6(i)(16) | Yes. | |
| § 63.6(j) | Yes. | |
| § 63.7(a)(1) | Yes. | |
| § 63.7(a)(2) | No. | § 63.506(e)(5) specifies the submittal dates of performance test results for all emission points except equipment leaks; for equipment leaks, compliance demonstration results are reported in the Periodic Reports. |
| § 63.7(a)(3) | Yes. | |
| § 63.7(b) | No | § 63.504(a)(4) specifies notification requirements. |
| § 63.7(c) | No | Except if the owner or operator chooses to submit an alternative nonopacity emission standard for approval under § 63.6(g). |
| § 63.7(d) | Yes. | |
| § 63.7(e)(1) | No | See § 63.504(a)(1). Any cross-reference to § 63.7(e)(1) in any other general provision incorporated by reference shall be treated as a cross-reference to § 63.504(a)(1). |
| § 63.7(e)(2) | Yes. | |
| § 63.7(e)(3) | No | Subpart U specifies requirements. |
| § 63.7(e)(4) | Yes. | |
| § 63.7(f) | Yes | Except that § 63.144(b)(5)(iii)(A) & (B) shall apply for process wastewater. Also, since a site specific test plan is not required, the notification deadline in § 63.7(f)(2)(i) shall be 60 days prior to the performance test, and in § 63.7(f)(3) approval or disapproval of the alternative test method shall not be tied to the site specific test plan. |
| § 63.7(g) | Yes | Except that the requirements in § 63.506(e)(5) shall apply instead of references to the Notification of Compliance Status report in 63.9(h). In addition, equipment leaks subject to § 63.502 are not required to conduct performance tests. |
| § 63.7(h) | Yes | Except § 63.7(h)(4)(ii) is not applicable, since the site-specific test plans in § 63.7(c)(2) are not required. |
| § 63.8(a)(1) | Yes. | |
| § 63.8(a)(2) | No. | |
| § 63.8(a)(3) | No | [Reserved]. |
| § 63.8(a)(4) | Yes. | |
| § 63.8(b)(1) | Yes. | |
| § 63.8(b)(2) | No | Subpart U specifies locations to conduct monitoring. |
| § 63.8(b)(3) | Yes. | |
| § 63.8(c)(1) | Yes. | |
| § 63.8(c)(1)(i) | Yes. | |
| § 63.8(c)(1)(ii) | No | For all emission points except equipment leaks, comply with § 63.506(b)(1)(i)(B); for equipment leaks, comply with § 63.181(g)(2)(iii). |
| § 63.8(c)(1)(iii) | Yes. | |
| § 63.8(c)(2) | Yes. | |

725

| Reference | Applies to subpart U | Explanation |
|---|---|---|
| §63.8(c)(3) | Yes. | |
| §63.8(c)(4) | No | §63.505 specifies monitoring frequency; not applicable to equipment leaks, because §63.502 does not require continuous monitoring systems. |
| §63.8(c)(5)–(8) | No. | |
| §63.8(d) | No. | |
| §63.8(e) | No. | |
| §63.8(f)(1)–(3) | Yes. | |
| §63.8(f)(4)(i) | No | Timeframe for submitting request is specified in §63.506(f) or (g); not applicable to equipment leaks, because §63.502 (through reference to subpart H) specifies acceptable alternative methods. |
| §63.8(f)(4)(ii) | No | Contents of request are specified in §63.506(f) or (g). |
| §63.8(f)(4)(iii) | No. | |
| §63.8(f)(5)(i) | Yes. | |
| §63.8(f)(5)(ii) | No. | |
| §63.8(f)(5)(iii) | Yes. | |
| §63.8(f)(6) | No | Subpart U does not require CEM's. |
| §63.8(g) | No | Data reduction procedures specified in §63.506(d) and (h); not applicable to equipment leaks. |
| §63.9(a) | Yes. | |
| §63.9(b) | No | Subpart U does not require an initial notification. |
| §63.9(c) | Yes. | |
| §63.9(d) | Yes. | |
| §63.9(e) | No | §63.504(a)(4) specifies notification deadline. |
| §63.9(f) | No | Subpart U does not require opacity and visible emission standards. |
| §63.9(g) | No. | |
| §63.9(h) | No | §63.506(e)(5) specifies Notification of Compliance Status requirements. |
| §63.9(i) | Yes. | |
| §63.9(j) | Yes | For change in major source status only. |
| §63.9(k) | Yes | Only as specified in §63.9(j). |
| §63.10(a) | Yes. | |
| §63.10(b)(1) | No | §63.506(a) specifies record retention requirements. |
| §63.10(b)(2) | No | Subpart U specifies recordkeeping requirements. |
| §63.10(b)(3) | No | §63.480(b) requires documentation of sources that are not affected sources. |
| §63.10(c) | No | §63.506 specifies recordkeeping requirements. |
| §63.10(d)(1) | Yes. | |
| §63.10(d)(2) | No | §63.506(e)(5) specifies performance test reporting requirements; not applicable to equipment leaks. |
| §63.10(d)(3) | No | Subpart U does not require opacity and visible emission standards. |
| §63.10(d)(4) | Yes. | |
| 63.10(d)(5)(i) | No. | |
| §63.10(d)(5)(ii) | No. | |
| §63.10(e) | No | §63.506 specifies reporting requirements. |
| §63.10(f) | Yes. | |
| §63.11 | Yes | §63.11(b) specifies requirements for flares used to comply with provisions of this subpart. §63.504(c) contains the requirements to conduct compliance demonstrations for flares subject to this subpart. §63.11(c), (d), and (e) specifies requirements for an alternative work practice for equipment leaks. |
| §63.12 | Yes | Except that the authority of §63.503(i) and the authority of §63.177 (for equipment leaks) will not be delegated to States. |
| §§63.13–63.15 | Yes. | |

ª The plan and any records or reports of start-up, shutdown, and malfunction do not apply to Group 2 emission points unless they are included in an emissions average.

[66 FR 36928, July 16, 2001, as amended at 71 FR 20457, Apr. 20, 2006; 73 FR 78213, Dec. 22, 2008; 85 FR 73891, Nov. 19, 2020]

TABLE 2 TO SUBPART U OF PART 63—APPLICABILITY OF SUBPARTS F, G, & H OF THIS PART TO SUBPART U AFFECTED SOURCES

| Reference | Applies to Subpart U | Comment | Applicable section of Subpart U |
|---|---|---|---|
| Subpart F: | | | |
| §63.100 | No. | | |
| §63.101 | Yes | Several definitions from §63.101 are referenced in §63.482. | §63.482. |

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

_____

UNITED STATES OF AMERICA,　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　Plaintiff,　　　　　)　　　Civil Action No.  2:23-cv-735
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　v.　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
DENKA PERFORMANCE ELASTOMER, )
LLC and DUPONT SPECIALTY　　　　　)
PRODUCTS USA, LLC,　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　Defendants.　　　　)
_____)

**COMPLAINT**

Plaintiff, the United States of America ("United States"), by authority of the Attorney

General of the United States and through the undersigned attorneys, acting at the request of the

Administrator of the United States Environmental Protection Agency ("EPA"), files this

Complaint and alleges:

**NATURE OF ACTION**

1.　　　This is a civil action alleging that carcinogenic chloroprene emissions from

Defendant Denka Performance Elastomer, LLC's ("Denka's") neoprene manufacturing

operations at the Pontchartrain Works Site in St. John the Baptist Parish, Louisiana (the

"Facility") present an imminent and substantial endangerment to public health and welfare.  The

Facility's address is in LaPlace, Louisiana, but its chloroprene emissions also travel into other

nearby communities in the Parish, such as Reserve and Edgard, Louisiana.  People living in these

communities are being exposed to an unacceptably high risk of developing certain cancers

because of Denka's chloroprene emissions.  The United States seeks injunctive relief under

Clean Air Act Section 303, 42 U.S.C. § 7603, requiring that Denka immediately reduce its chloroprene emissions to levels that no longer cause or contribute to unacceptably high cancer risks within the communities surrounding the Facility.

2.     This civil action also seeks relief from DuPont Specialty Products USA, LLC ("DuPont Specialty Products") based on Fed. R. Civ. P. 19(a) and the All Writs Act, 28 U.S.C. § 1651.  DuPont Specialty Products owns the land at the Pontchartrain Works Site on which Denka's neoprene manufacturing operations are located.  DuPont Specialty Products is Denka's landlord and leases that land on which the neoprene manufacturing operations are located to Denka pursuant to a "Ground Lease."  Accordingly, Denka may need DuPont Specialty Products' permission or cooperation to comply with the Court's orders in this matter.  The Ground Lease requires Denka to obtain DuPont Specialty Products' consent before undertaking certain construction activities or equipment modifications involving the neoprene manufacturing operations.

3.     Chloroprene is a liquid raw material that is used to produce neoprene.  It is colorless, flammable, and readily evaporates at room temperature.  Chloroprene is produced using toxic substances, including 1,3-butadiene and chlorine.  And it is, itself, defined by the Clean Air Act as a hazardous air pollutant.  *See* 42 U.S.C. § 7412(b)(1).

4.     Chloroprene is hazardous, in part, because it is a likely human carcinogen. Breathing chloroprene increases the risk of developing cancers, such as lung and liver cancer, over the course of a lifetime.  Chloroprene acts via a mutagenic "mode of action," meaning that when a person breathes chloroprene, it causes mutations in the body's cells.  These mutations increase the likelihood that a person who breathes chloroprene will develop certain cancers over the course of their lifetime.

5.      Infants and children younger than 16 are likely to be especially susceptible to chloroprene's cancer-causing effects.  Chloroprene exposure during a person's early years is therefore particularly significant to their lifetime risk of developing cancer.

6.      The concentrations of airborne chloroprene in the communities surrounding the Facility are exposing thousands of people living there, including children younger than 16, to lifetime cancer risks that are multiples higher than what is typically considered acceptable by several United States regulatory agencies charged with protecting human health.  And the only source of chloroprene emissions in St. John the Baptist Parish is Denka's neoprene manufacturing operations at the Facility.

7.      A 1-in-10,000 cancer risk is a generally accepted threshold for demarcating the ceiling for acceptable excess cancer risk, and it is a benchmark for the level of cancer risk that is considered important to address in most instances by regulatory agencies.  For example, the EPA's policy for setting national emission standards for hazardous air pollutants, like chloroprene, that are emitted by industrial source categories uses a presumptive 1-in-10,000 upper threshold for acceptable excess lifetime cancer risk.  *See* 54 Fed. Reg. 38,044, 38,045 (Sept. 14, 1989) (the EPA's "1989 Residual Risk Policy").  Congress subsequently endorsed this policy in amendments to the Clean Air Act.  *See* 42 U.S.C. § 7412(f)(2)(B).  Other EPA non-air programs also rely on a 1-in-10,000 excess cancer risk as a presumptive risk management standard.  *See* 40 C.F.R. § 300.430(e)(2)(i)(A)(2) (explaining Superfund remedial action cleanup goals).  And other federal agencies, like the National Institute for Occupational Safety and Health ("NIOSH"), also use a 1-in-10,000 excess cancer risk as a threshold for taking action to address cancer risk.  *See* Current Intelligence Bulletin 68 - NIOSH Chemical Carcinogen Policy (July 2017).

8.      The EPA estimates that breathing chloroprene at concentrations averaging 0.2 micrograms of chloroprene per cubic meter (0.2 $\mu g/m^3$) over a 70-year lifetime increases a person's risk of developing cancer by 1-in-10,000.  And the greater the average chloroprene concentration that a person is exposed to, the faster their chloroprene related cancer risk accumulates.  As people breathe chloroprene at long-term average concentrations greater than 0.2 $\mu g/m^3$, their risk of developing cancer as a result of that exposure will reach and exceed 1-in-10,000 sooner than 70 years.

9.      Average concentrations of airborne chloroprene near the Facility have been consistently greater than 0.2 $\mu g/m^3$ since at least 2016, and likely for years before then.  Two sets of air monitoring stations were installed in 2016 at several locations near the Facility – one set was installed by the EPA, the other by Denka.  Each set of air monitors measured chloroprene concentrations in the ambient air.  Air monitors were installed in residential neighborhoods near the Facility and near schools close to the Facility, including the Fifth Ward Elementary School and East St. John High School.

10.     Both sets of air monitors detected chloroprene at average concentrations that were consistently much greater than 0.2 $\mu g/m^3$.  The air monitors located in the residential neighborhoods just west of the Facility detected some of the highest chloroprene levels.

11.     At the average chloroprene concentrations currently being detected, people are being exposed to risks of developing chloroprene-related cancers that are as much as an order of magnitude greater than multiple federal agencies' presumptive benchmark for acceptable excess lifetime cancer risk.  At the average chloroprene concentrations currently being detected, people exposed to these concentrations will reach unacceptably high cancer risks much sooner than over a 70-year lifetime.  For example, infants born today in the communities surrounding the Facility

4

who are exposed to the highest measured levels of chloroprene from Denka's neoprene manufacturing operations will exceed an estimated *lifetime* of acceptable excess cancer risk within approximately their first two years of life.

12.     Many people living near Denka's neoprene manufacturing operations already have been exposed to unacceptably high excess cancer risks.  The neoprene manufacturing operations at the Pontchartrain Works Site have existed for decades, and people have lived there just as long.  Those people have been breathing the air there for decades, and the Facility historically emitted even higher levels of chloroprene than it does today.  Those individuals' cancer risk increases every day they continue to breathe Denka's chloroprene emissions.

13.     The increased cancer risk that the communities near the Facility are currently being exposed to because of Denka's chloroprene emissions presents an imminent and substantial endangerment to public health and welfare.  The endangerment is imminent because Denka emits chloroprene at levels that are producing unacceptably high risks of cancer to the people, including children, that are regularly exposed to the Facility's emissions.  Hundreds of children attend school near the Facility and currently breathe the air there.  Many of them likely also live in the neighborhoods surrounding the Facility.

14.     The endangerment is substantial because Denka's emissions of chloroprene cause ambient levels of chloroprene in nearby communities to be many times greater than the generally accepted threshold for demarcating unacceptably high cancer risks, and because children living in these communities and attending the schools close to the Facility are likely to be especially susceptible to the cancer risks posed by chloroprene.  Denka's chloroprene emissions are the cause of this endangerment.

15.     The United States seeks injunctive relief, pursuant to 42 U.S.C. § 7603, to stop Denka from emitting chloroprene at levels that present an imminent and substantial endangerment to public health and welfare in the communities surrounding the Facility.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action pursuant to 42 U.S.C. § 7603, and 28 U.S.C. §§ 1331 and 1345.

17.     This Court has personal jurisdiction over Denka.  Denka is incorporated in the State of Louisiana and does business here, including via its neoprene manufacturing operations at the Facility, which is located in St. John the Baptist Parish at 586 Highway 44, LaPlace, Louisiana, 70068.

18.     This Court has personal jurisdiction over DuPont Specialty Products.  DuPont Specialty Products conducts business in LaPlace, Louisiana at the Facility.

19.     Venue is proper in this District pursuant to 42 U.S.C. § 7603, and 28 U.S.C. § 1391(b) and (c).  Denka does business in this District and the chloroprene emissions from its neoprene manufacturing operations are occurring in this District.

## NOTICE

20.     Pursuant to 42 U.S.C. § 7603, the United States has provided notice of the commencement of this action to, and has consulted with representatives of, the Louisiana Department of Environmental Quality ("Louisiana DEQ") to attempt to confirm the accuracy of the information upon which the United States is basing this action.  The United States has provided notice of the commencement of this civil action to the Louisiana DEQ.

**PARTIES**

21.     Plaintiff, the United States of America, is acting by authority of the Attorney

General of the United States and through the undersigned attorneys, on behalf of the

Administrator of the EPA.  Authority to bring this action is vested in the Attorney General of the

United States by 42 U.S.C. § 7605, and pursuant to 28 U.S.C. §§ 516 and 519.

22.     Denka is a privately owned limited liability company formed under the laws of

the State of Delaware, headquartered in LaPlace, Louisiana, and authorized to do business in the

State of Louisiana.  Denka is a joint venture between majority owner Denka Company Limited

and minority owner Mitsui & Co. Ltd., both of which are Japanese companies.  Denka is the

current owner and operator, as defined by 42 U.S.C. § 7412(a)(9), of the neoprene manufacturing

operations at the Facility.  At all times relevant to the Complaint, Denka has been a corporate

entity and therefore a "person" within the meaning of 42 U.S.C. §§ 7602(e) and 7603.

23.     Formed in 2018, DuPont Specialty Products is a privately owned limited liability

company that is headquartered in Delaware and maintains its principal place of business in

Delaware.  At all times relevant to the Complaint, DuPont Specialty Products has been a

corporate entity and therefore a "person" within the meaning of 42 U.S.C. §§ 7602(e) and 7603.

24.     Subject to a reasonable opportunity for investigation and discovery, DuPont

Specialty Products owns the land upon which the Facility is located.  Subject to a reasonable

opportunity for investigation and discovery, DuPont Specialty Products leases to Denka the land

upon which the neoprene manufacturing operations are located.  The Ground Lease documents

this lessor/lessee relationship.  The Ground Lease has an effective date of approximately October

30, 2015 and lasts for a 99-year term.

25.     The Ground Lease retains certain rights for DuPont Specialty Products (either directly or as an assignee) that can affect Denka's neoprene manufacturing operations.  Under the Ground Lease, DuPont Specialty Products (either directly or as an assignee) retains rights over certain assets at the Facility.  These assets include fixtures, improvements, and easements, such as: certain of the well injection pumps, carbon beds, wastewater sampling equipment, tanks, process and service lines, sewer lines, electrical equipment, and rights-of-way on certain roadways.  The Ground Lease also requires Denka to obtain DuPont Specialty Products' consent before undertaking certain construction activities or equipment modifications involving the neoprene manufacturing operations.

26.     In order for complete relief to be afforded in this matter, the Court may need to involve DuPont Specialty Products.  DuPont Specialty Products maintains rights or interests under the Ground Lease and as the owner of the land upon which Denka's neoprene manufacturing operations are located.  These rights and interests may be impacted in this matter because the relief that the United States seeks from Denka may, for example, require onsite construction or other work that requires DuPont Specialty Products' consent under the Ground Lease.  DuPont Specialty Products is therefore a required party pursuant to Fed. R. Civ. P. 19(a) and the All Writs Act, 28 U.S.C. § 1651.

## GENERAL ALLEGATIONS

### Denka's Neoprene Manufacturing Operations

27.     Neoprene (*a.k.a.* "chloroprene rubber" or "polychloroprene") is a flexible, synthetic rubber used to produce common goods like wetsuits, beverage cozies, orthopedic braces, and automotive belts and hoses.  Denka began manufacturing neoprene at the Facility on approximately November 1, 2015.  Denka purchased the neoprene manufacturing operations at

the Facility in 2014 from E.I. DuPont de Nemours and Company.  E.I. DuPont de Nemours and

Company (or a predecessor-in-interest) owned and operated the original neoprene manufacturing

operations at the Facility from about 1968 until the sale to Denka.

28.     Since about 2008, neoprene has been manufactured at only one place in the

United States: the Facility.  According to the EPA's Toxic Release Inventory database, Denka's

manufacturing operations at the Facility are the sole source of chloroprene emissions in St. John

the Baptist Parish, Louisiana.

29.     Denka's neoprene manufacturing operations consist primarily of three chemical

manufacturing process units: the Chloroprene Unit, the Neoprene Unit, and the HCl Recovery

Unit.  Each of these three units emits chloroprene as well as other hazardous air pollutants.

30.     At all times relevant to the Complaint, chloroprene has been an "air pollutant"

within the meaning of 42 U.S.C. § 7602(g).  At all times relevant to the Complaint, chloroprene

has also been defined as a "hazardous air pollutant" by 42 U.S.C. § 7412(b)(1).  The Clean Air

Act classifies hazardous air pollutants as substances that, through inhalation or other exposure

pathways, present or may present a threat of adverse effects to human health or the environment.

*See* 42 U.S.C. § 7412(b)(2).

31.     Chloroprene is routinely emitted into the air at various stages of Denka's

neoprene manufacturing operations.  Chloroprene is emitted through vents from the

manufacturing operations that discharge directly to the atmosphere.  Chloroprene is emitted

when tanks and other process vessels are opened, during both normal operations and

maintenance work.  Chloroprene is also emitted through more diffuse ("fugitive") sources, like

equipment leaks and evaporative emissions from wastewater generated during neoprene

manufacturing.

32.     For example, Denka uses a series of three open-to-the-air, brick-lined pits (collectively called the "Outside Brine Pit") to treat reactive chloroprene-containing sludge, wastewater, and solid waste material generated by the neoprene manufacturing process.  These wastes, which are chemically reactive and volatilize high levels of chloroprene into the air, are skimmed from strainers at the polymerization kettles and poured into open, wheeled bins several times per day.  Liquid wastewater is hosed into open grated trenches that eventually empty into the Outside Brine Pit.  The wastes are wheeled in the open bins to the Outside Brine Pit.  There, employees dump the wastes into the Outside Brine Pit where they are left to finish their chemical reactions.  By design, these wastes volatilize chloroprene to the open air before they are collected for off-site disposal.

33.     Denka's chloroprene emissions drift beyond the Facility's property line and into the ambient air of the surrounding communities in LaPlace, Reserve, and Edgard, Louisiana.  Thousands of people, including children, who live, work, and go to school in these communities breathe that air.

34.     Pursuant to a January 6, 2017 Administrative Order on Consent issued by the Louisiana DEQ, Denka agreed to reduce chloroprene emissions from its neoprene manufacturing operations.  Denka upgraded equipment and installed emission control devices, including a Regenerative Thermal Oxidizer which became fully operational in March of 2018.  These actions reduced the Facility's chloroprene emissions.

35.     Despite these emission reductions, Denka continues to emit approximately 18 tons of chloroprene each year.  And despite Denka's emission reductions, chloroprene concentrations in the communities surrounding the Facility have averaged between approximately 0.4 and 2.9 µg/m³ since April 2018, depending on the monitoring location – all

10

significantly exceeding 0.2 μg/m$^3$.  Without further emission reductions, Denka's chloroprene

emissions will continue to cause average chloroprene levels to exceed 0.2 μg/m$^3$ in the

communities surrounding the Facility.

**The Communities Living Near the Facility**

36.     According to United States census data, between approximately 15,000 to 17,000

people live within two-and-a-half miles of Denka's Facility.  Over 20% of that population

(roughly 3,000-4,000) is under the age of 18.  Of those 3,000-4,000 young people, approximately

800-1,000 are young children under the age of 5.

37.     The Fifth Ward Elementary School, which is attended by more than 300 children,

is located about half-a-mile from the center of Denka's Facility.  Approximately 1,200 students

are enrolled at East St. John High School, which is roughly a mile-and-a-half north of Denka's

neoprene manufacturing operations.

**Chloroprene's Carcinogenic Effects**

38.     Chloroprene is a likely human carcinogen that acts via a mutagenic mode of

action.

39.     Infants and children are more susceptible than adults to the cancer risks posed by

mutagens like chloroprene.  This is because more rapid cell division during early life results in

less time for the body to repair DNA mutations before the damaged cells replicate.  The more

rapid replication of mutated cells increases the risk of developing cancer.  Infants and children

are also more susceptible to chloroprene's cancer-causing risks because, for physiological

reasons, they will likely have higher and more persistent blood concentrations of chloroprene or

its metabolites than adults exposed to the same air concentrations of chloroprene.

11

40.     The EPA's Integrated Risk Information System ("IRIS") program identifies and characterizes the health hazards of chemicals found in the environment.  The EPA develops IRIS assessments to characterize the risks to human health posed by specific environmental hazards. IRIS assessments are conducted by experts in various scientific disciplines such as toxicology, epidemiology, and pharmacokinetics.  Developing an IRIS assessment for a particular chemical involves identifying health hazards associated with human exposure to that chemical, then quantifying the relationship between exposure to the chemical and the related health hazards to arrive at an estimate of cancer potency.

41.     In 2010, the EPA IRIS program published its peer-reviewed assessment of chloroprene (the "2010 IRIS Assessment").  In the 2010 IRIS Assessment, the EPA concluded that chloroprene is "likely to be carcinogenic to humans" and determined that it acts through a mutagenic mode of action.  The 2010 IRIS Assessment also provided a quantitative estimate of carcinogenic risk from breathing (*a.k.a.* "inhalation exposure") chloroprene.  The 2010 IRIS Assessment was based on a comprehensive review of the available evidence on chloroprene toxicity, including animal toxicology data, evidence of chloroprene's mutagenic properties, and human epidemiological data.  The 2010 IRIS Assessment was subject to a rigorous review process within the EPA, by other federal agencies and White House offices, and the public.  The conclusions of the 2010 IRIS Assessment were subsequently confirmed by an independent external peer review panel.

42.     In the 2010 IRIS Assessment, the EPA also quantified the cancer risks associated with long-term chronic inhalation exposure to chloroprene.  Breathing is the primary pathway by which people living near the Facility are exposed to chloroprene.  The EPA's 2010 IRIS Assessment establishes 0.2 $\mu g/m^3$ as the average concentration of chloroprene that a person may

breathe over a 70-year lifetime without being expected to exceed a 1-in-10,000 risk of contracting chloroprene-linked cancers.  1.2 $\mu g/m^3$ is the average chloroprene concentration a child may regularly breathe from birth to their second birthday without being expected to exceed a 1-in-10,000 lifetime risk of contracting chloroprene related cancers.

## Denka Consistently Emits Chloroprene at Levels That Cause Unacceptably High Cancer Risk in the Surrounding Communities

43.     The EPA has determined that Denka's chloroprene emissions are presenting an imminent and substantial endangerment because the average chloroprene concentrations in the ambient air near the Facility from the period of April 2018 through January 2023 at Denka's monitoring stations are 2.89, 2.21, 1.26, 1.06 and 0.89 $\mu g/m^3$ for the five closest monitors to the Facility, and 0.41 $\mu g/m^3$ for the monitor located approximately two-and-a-half miles away in Edgard, Louisiana.  Even the lowest measured average value for the five closest monitors is more than four times greater than 0.2 $\mu g/m^3$, and the highest average is more than 14 times higher.  In the aggregate, the thousands of people breathing this air are incurring a significantly higher cancer risk than would be typically allowed, and they are being exposed to a much greater cancer risk from Denka's air pollution than the majority of United States residents face.

44.     In 2016, the EPA and Denka both began monitoring chloroprene concentrations in the air around the Facility.  This air monitoring was intended to better understand the amount of chloroprene that people living near the Facility were exposed to and to better characterize the associated health risks.

45.     The air monitoring data from both monitoring systems consistently show average airborne chloroprene concentrations in the communities surrounding Denka's neoprene manufacturing operations that are multiples greater than 0.2 $\mu g/m^3$.  People living in the

residential area closest to the Facility are currently exposed to average levels of chloroprene that are more than 14 times greater than 0.2 µg/m$^3$.

***Denka's Air Monitoring Shows Chloroprene Levels that Indicate Excessive Cancer Risk***

46.     Beginning in August 2016, Denka commenced regular air sampling at several locations near the Facility.  Samples are taken roughly once every three to six days, and measure average chloroprene concentrations over a 24-hour period.  Denka's monitors are identified as:

        a.  The "Entergy" monitor, located at or near the Entergy Substation,

        b.  The "Railroad" monitor, located at or near the intersection of Highway 44 and the Illinois Central Railroad tracks,

        c.  The "Western" monitor, located at or near the Western Edge of the Facility,

        d.  The "Levee" monitor, located at or near the Mississippi River Levee on the south side of the Facility,

        e.  The "Ochsner Hospital" monitor located at or near the Ochsner Hospital, and

        f.  The "Edgard" monitor, located at or near the St. John the Baptist Parish Courthouse in Edgard.

47.     The Western monitor is located near a residential neighborhood that begins only about 50 feet from the Facility's western property line.  The Fifth Ward Elementary School is approximately 1,000 feet from the Western monitor.  The Railroad monitor is located near a residential area and the closest home sits approximately 500 feet from the monitor.  The Levee monitor is located about 2,000 feet from the nearest home.  The Edgard monitor is located approximately two-and-a-half miles southwest of the Facility, across the Mississippi River.  The Entergy, Ochsner Hospital, and Railroad monitors are respectively located approximately one mile north, northeast, and east of the Facility.

48.     Air monitoring data collected at each of Denka's monitoring sites since April 2018 – reflecting air quality after the Regenerative Thermal Oxidizer commenced stable operations – shows that the average chloroprene concentration across all six Denka sampling sites from April 2018 through January 2023 was approximately 1.46 $\mu g/m^3$— more than 7 times higher than 0.2 $\mu g/m^3$.  The worst of Denka's sampling locations (the Western monitor, which is closest to the residential neighborhood west of the Facility) showed average concentrations of 2.89 $\mu g/m^3$, more than 14 times higher than 0.2 $\mu g/m^3$.  *See* Table 1 below:

| Table 1: Denka Air Monitoring Results, April 2018 – January 2023 | |
|---|---|
| **Denka Monitoring Site** | **Average Monitored Chloroprene Concentration from April 2018 – January 2023** |
| Western | 2.89 $\mu g/m^3$ |
| Levee | 2.21 $\mu g/m^3$ |
| Railroad | 1.26 $\mu g/m^3$ |
| Ochsner Hospital | 1.06 $\mu g/m^3$ |
| Entergy | 0.89 $\mu g/m^3$ |
| Edgard | 0.41 $\mu g/m^3$ |
| **Average Monitored Chloroprene Concentration Across All Denka Monitoring Sites from April 2018 – January 2023** | **1.46 $\mu g/m^3$** |

49.     In January 2022, Denka deployed 18 diffusion tube air monitors – a different type of monitor than the six 24-hour canisters – around the Facility's fenceline.  Three additional diffusion tube monitors were installed later that year (for a total of 21 diffusion tube monitors).  These new monitors measure the ambient air concentration of chloroprene over a two-week sampling period.  Consistent with the results of the EPA's and Denka's 24-hour air sampling, through late December 2022, 19 of 21 diffusion tube sampling locations are measuring average chloroprene concentrations greater than 0.2 $\mu g/m^3$.  And two-week average concentrations of chloroprene significantly greater than 0.2 $\mu g/m^3$ continue to occur near residential areas.

***EPA's Air Monitoring Showed Chloroprene Levels that Indicate Excessive Cancer Risk***

50.    From May 2016 through September 2020, the EPA also regularly collected 24-hour air samples from six locations near the Facility.  The EPA's monitoring sites, which were near, but not exactly where Denka's monitors are located, were identified as:

   a.  The "Acorn and Highway 44" monitor, located at or near the intersection of Acorn Street and Highway 44,

   b.  The "Levee" monitor, located at or near the Mississippi River Levee on the south side of the Facility,

   c.  The "Fifth Ward Elementary School" monitor, located at or near the Fifth Ward Elementary School,

   d.  The "Ochsner Hospital" monitor located at or near Ochsner Hospital,

   e.  The "Chad Baker" monitor, located at or near a residence on Chad Baker Street, and

   f.  The "East St. John High School" monitor located at or near East St. John High School.

51.    Air monitoring data collected at each of the EPA's monitoring sites, starting in April 2018, show that the average chloroprene concentration across all the EPA's sampling sites from April 2018 through September 2020 was 1.43 $\mu g/m^3$—7 times higher than 0.2 $\mu g/m^3$.  The worst of EPA's sampling locations (the Chad Baker site, in the residential neighborhood west of the Facility) showed average concentrations of 2.22 $\mu g/m^3$, more than 11 times higher than 0.2 $\mu g/m^3$.  *See* Table 2 below:

| Table 2: EPA Air Monitoring Results, April 2018 – September 2020 | |
| --- | --- |
| **EPA Monitoring Site** | **Average Monitored Chloroprene Concentration from April 2018 – September 2020** |
| Chad Baker | 2.22 $\mu g/m^3$ |
| Levee | 1.90 $\mu g/m^3$ |
| Fifth Ward Elementary School | 1.73 $\mu g/m^3$ |
| Acorn and Hwy 44 | 1.17 $\mu g/m^3$ |
| Ochsner Hospital | 1.15 $\mu g/m^3$ |
| East St. John High School | 0.44 $\mu g/m^3$ |
| **Average Monitored Chloroprene Concentration Across All EPA Monitoring Sites from April 2018 – September 2020** | **1.43 $\mu g/m^3$** |

***Infants and Young Children Will Exceed Unacceptable Lifetime Cancer Risk Levels Much More Quickly Than Adults***

52.     Current chloroprene concentrations near the Facility present a risk that is especially grave for infants and children under the age of 16.  For example, infants and children who begin consistently breathing chloroprene starting in infancy at the average concentrations measured near the Western and Chad Baker air monitors (listed in Tables 1 and 2) will surpass their lifetime 1-in-10,000 excess cancer risk within approximately two years after their exposure begins (68 years sooner than the 70-year period over which lifetime excess cancer risks are determined).  Adolescents and adults who consistently breathe Denka's current chloroprene emissions will similarly surpass a 1-in-10,000 excess cancer risk in far less time than the 70-year timeframe that the EPA uses to identify "lifetime" cancer risks.

***The Cancer Risks from the Facility's Chloroprene Emissions are Cumulative***

53.     Chloroprene has been released into the environment for decades as a result of neoprene manufacturing operations at the Pontchartrain Works Site.  Historical sampling,

17

emission data, and air modeling show that, before April 2018 and during the decades when the

Facility was owned and operated by E.I. DuPont de Nemours and Company (and its predecessors

in interest), people living near the Facility were exposed to chloroprene at average concentrations

multiples higher than current levels.  Until recently, the neoprene manufacturing operations often

emitted more than one hundred tons of chloroprene each year.

54.     Residents in communities surrounding the Facility have been and continue to be

chronically exposed to unacceptably high levels of chloroprene and the consequent cancer risk.

**Clean Air Act Section 303**

55.     Congress enacted the Clean Air Act "to protect and enhance the quality of the

Nation's air resources so as to promote the public health and welfare and the productive capacity

of its population." 42 U.S.C. § 7401(b)(1).

56.     Section 303 of the Clean Air Act, 42 U.S.C. § 7603, provides:

Notwithstanding any other provision of this chapter, the Administrator, upon
receipt of evidence that a pollution source or combination of sources (including
moving sources) is presenting an imminent and substantial endangerment to
public health or welfare, or the environment, may bring suit on behalf of the
United States in the appropriate United States district court to immediately
restrain any person causing or contributing to the alleged pollution to stop the
emission of air pollutants causing or contributing to such pollution or to take such
other action as may be necessary.

57.     The increased cancer risks to people living near Denka's neoprene manufacturing

operations that are being caused by long-term exposure to Denka's chloroprene emissions

represent an "endangerment to public health [and] welfare" within the meaning of 42 U.S.C.

§ 7603.  The Clean Air Act explains that effects on welfare include, but are not limited to, harm

to "personal comfort and well-being, whether caused by transformation, conversion, or

combination with other air pollutants." 42 U.S.C. § 7602(h).

18

58.     The endangerment posed by Denka's chloroprene emissions is "imminent" in that the conditions giving rise to it – the currently measured average concentrations of airborne chloroprene – are present now.  The endangerment is also "substantial" given the proximity of the surrounding communities to Denka's chloroprene emissions, the number and age distribution of the exposed population, the magnitude of Denka's current chloroprene emissions and the communities' ongoing exposure to them, and the consequent greater than 1-in-10,000 lifetime excess cancer risk.  Based on these circumstances, Denka's current chloroprene emissions represent a serious threat of harm to public health and welfare.

59.     The serious threats to public health and welfare caused by Denka's chloroprene emissions will continue until Denka significantly reduces its emissions.  Even after Denka's more recent efforts to reduce its chloroprene emissions, chloroprene concentrations in the ambient air around the Facility still average well above 0.2 µg/m$^3$.  If Denka continues to emit chloroprene at its current levels, chloroprene concentrations in the communities surrounding the Facility will continue to present an imminent and substantial endangerment.

**CLAIM FOR RELIEF**
**(Injunctive Relief under 42 U.S.C. § 7603)**

60.     Paragraphs 1 through 59 are re-alleged and incorporated herein by reference.

61.     At all times relevant to the Complaint, Denka's neoprene manufacturing operations at the Pontchartrain Works Site have been a "pollution source" within the meaning of 42 U.S.C. § 7603.  The Chloroprene Unit, Neoprene Unit, and HCl Recovery Unit constitute a "combination of sources" within the meaning of 42 U.S.C. § 7603.

62.     Emissions of chloroprene from Denka's neoprene manufacturing operations are "pollution" within the meaning of 42 U.S.C. § 7603.

19

63.     At all times relevant to this Complaint, Denka has caused and continues to cause the observed concentrations of chloroprene in the air in, around, and outside of the Facility's property line at the air monitoring locations listed in Tables 1 and 2.

64.     Based on the information described in Paragraphs 3 - 54, the EPA has received evidence that the current concentrations of chloroprene in the air in and around the Facility present an imminent and substantial endangerment to public health or welfare, including but not limited to unacceptably high lifetime excess cancer risks to residents of LaPlace and Reserve, Louisiana.

65.     Based on the terms of the Ground Lease, Denka may need permission or cooperation from DuPont Specialty Products in order to take the necessary actions to abate the imminent and substantial endangerment posed by its current chloroprene emissions.

66.     Any delay or refusal by DuPont Specialty Products to authorize Denka under the Ground Lease to comply with the requirements of any order of this Court will contribute to the emission of air pollutants within the meaning of 42 U.S.C. §§ 7602(g) and 7603.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff the United States of America respectfully requests that the Court provide the following relief:

1.     Order Denka to immediately take all necessary measures to eliminate the imminent and substantial endangerment posed by chloroprene emissions from the Facility;

2.     Order Denka to take all other actions as may be necessary to address and mitigate the harm to public health and welfare that Denka's chloroprene emissions have caused;

3.    Order DuPont Specialty Products to authorize and not impede, under the terms of the Ground Lease, all construction and other necessary measures for Denka to comply with any order issued by the Court in this matter; and

4.    Award Plaintiff such other and further relief as the Court deems just and proper.

Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA**

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

Trial Attorney:          STEVEN D. SHERMER
Senior Attorney
District of Columbia Bar No. 486394
DAVIS H. FORSYTHE
Senior Counsel
HANNAH L. FRAZIER
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, DC  20044-7611
(202) 514-1134
Steven.Shermer@usdoj.gov

OF COUNSEL:

ROBERT PARRISH
Attorney-Advisor
U.S. Environmental Protection Agency
Office of Civil Enforcement, Air Enforcement Division
1200 Pennsylvania Avenue, NW (2242A)
Washington, D.C. 20460

21

JUSTIN LANNEN
Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 6
1201 Elm Street, Suite 500 (ORCEA)
Dallas, TX 75270

# EXHIBIT C

ORAL ARGUMENT NOT YET SCHEDULED

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| **DENKA PERFORMANCE ELASTOMER LLC,** )<br><br>)<br>**Petitioner,** )<br>)<br>**v.** )<br>)<br>**UNITED STATES ENVIRONMENTAL** )<br>**PROTECTION AGENCY and** )<br>**MICHAEL REGAN, Administrator,** )<br>**United States Environmental Protection** )<br>**Agency,** )<br>)<br>**Respondents.** ) | **No. 24-1135** |

**PETITIONER'S EMERGENCY MOTION FOR STAY PENDING REVIEW**
**(Ruling Requested By June 28, 2024)**

James C. Percy
JONES WALKER LLP
445 N. Boulevard, Suite 800
Baton Rouge, LA 70802
Telephone: (225) 248-2130
jpercy@joneswalker.com

Robert E. Holden
Brett S. Venn
JONES WALKER LLP
201 St. Charles Ave
New Orleans, LA 70170
Telephone: (504) 582-8000
bholden@joneswalker.com
bvenn@joneswalker.com

David A. Super
Jason B. Hutt
Jeffrey R. Holmstead
Britt Cass Steckman
Kevin M. Voelkel
BRACEWELL LLP
2001 M Street NW, Ste. 900
Washington, DC 20036
Telephone: (202) 828-5800
david.super@bracewell.com
jason.hutt@bracewell.com
jeff.holmstead@bracewell.com
britt.steckman@bracewell.com
kevin.voelkel@bracewell.com

*Counsel for Petitioner Denka Performance Elastomer LLC*

## RULE 28 CERTIFICATE OF PARTIES AND RELATED CASES

Pursuant to D.C. Circuit Rule 28, Petitioner Denka Performance Elastomer LLC ("DPE") certifies as follows:

**A.      Parties and Amici**

Petitioner:  Denka Performance Elastomer LLC.

Respondents:   United States Environmental Protection Agency and Michael S. Regan, as Administrator for the United States Environmental Protection Agency.

Amici:  None as of the time of filing of this motion.

**B.      Rule Under Review**

DPE has petitioned the Court to review EPA's final rule entitled "*New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry*," published in the Federal Register at 89 Fed. Reg. 42,932 on May 16, 2024.

**C.      Related Cases**

There are no related cases pending in this Court.  However, there is a related case pending in the United States District Court for the Eastern District of Louisiana captioned *EPA v. Denka Performance Elastomer LLC*, No. 2:23-cv-00735 (E.D. La.) ("Section 303 Litigation").  In the Section 303 Litigation, filed on February 28, 2023, under EPA's emergency authority Section 303 of the Clean Air Act, EPA alleges

-i-

that the Facility's chloroprene emissions are causing an "imminent and substantial endangerment," and EPA seeks an injunction requiring DPE to shut down the Facility immediately and not resume production until DPE can demonstrate its ability to maintain chloroprene concentrations below 0.2 $\mu g/m^3$ or 0.3 $\mu g/m^3$ depending on the monitoring method.  In the Section 303 Litigation, the district court has indicated its intent to assess the validity of the scientific evidence underlying EPA's claims at trial.  *United States v. DPE*, No. 2:23-cv-00735 (E.D. La.), R. Doc. 90 at 18 ("Although the Court has dismissed Denka's claims under the APA, Denka may still challenge the science behind the United States' Section 303 action.").

On February 12, 2024, after having demanded expedited litigation on the alleged "emergency" for nearly a year, EPA moved for an indefinite continuance of the March 2024 trial date in the Section 303 Litigation.  To justify the continuance, EPA pointed to the expected issuance of the Rule by March 29, 2024.  On February 16, 2024, the district court granted EPA's unopposed continuance in the Section 303 Litigation, directing the parties to advise the court when the Final Rule is published after which the Court would set a status conference to discuss a new trial date.  *United States v. DPE*, No. 2:23-cv-00735 (E.D. La.), R. Doc. 169.

On May 28, 2024, the parties filed with the district court a joint notice of publication of the Final Rule.

Date:  May 28, 2024                    Respectfully submitted,

                                        */s/ David A. Super*
                                       David A. Super

                                       **Counsel for Petitioner**
                                       **Denka Performance Elastomer LLC**

-iii-

## <u>RULE 26.1 DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 26.1 and D.C. Circuit Rule 26.1, Petitioner Denka Performance Elastomer LLC ("DPE") files the following statement:

DPE is a privately owned limited liability company formed under the laws of the State of Delaware, headquartered in LaPlace, Louisiana, and authorized to do business in the State of Louisiana.  DPE owns and operates a manufacturing facility in LaPlace, Louisiana that produces Neoprene by utilizing chloroprene, a chemical regulated under the EPA final rule at issue in this appeal.  DPE's membership interests are held by Denka USA LLC (whose ultimate parent is Denka Company Limited) and Diana Elastomers, Inc. (whose ultimate parent is Mitsui & Co., Ltd).  Denka Company Limited and Mitsui & Co. Ltd. are each Japanese companies listed on the Tokyo Stock Exchange.

Date:  May 28, 2024                          Respectfully submitted,

                                    */s/ David A. Super*
                                    David A. Super

                                    ***Counsel for Petitioner***
                                    ***Denka Performance Elastomer LLC***

-iv-

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 18(A)

The undersigned counsel for Denka Performance Elastomers LLC ("DPE") certifies that this motion for stay complies with Circuit Rule 18(a)(1). On April 17, 2024, DPE sought an administrative stay from EPA. *See* Exhibit V ("Because the Final Rule allows only 90 days from the effective date to implement the Rule's requirements, and time is of the essence, DPE requests that EPA respond to this stay request immediately."). By letter dated April 30, 2024, EPA denied DPE's stay request without prejudice. *See* Exhibit W ("April 30 Denial"). In the April 30 Denial, EPA took the position that DPE may seek EPA's approval of an extension of the 90-day compliance period pursuant to EPA regulation by explaining "the specific measures [DPE] intends to pursue to reduce emissions" from the DPE Facility to justify the extension. *Id.* at 2. EPA further asserted that it would "consider at that time any renewed request by [DPE] for an administrative stay of the Final Rule." *Id.*

As discussed further herein, there is no lawful basis for EPA's disparate treatment of the DPE Facility, requiring DPE to propose and engage in "specific measures" to further "reduce emissions" in order to alleviate the irreparable burdens caused by EPA's 90-day implementation requirement, when all other facilities subject to the Rule, including multiple facilities with higher estimated risk than the DPE Facility, are not subject to any such requirements yet still received at least a

two-year implementation period.   Nor does Fed. R. App. P. 18(a) require DPE, in light of EPA's April 30 Denial, to submit a second request for an administrative stay. DPE "move[d] first before the agency" for a stay of its final agency action pending judicial review.  Fed. R. App. P. 18(a)(1).  EPA then "denied the motion."  *See* Fed. R. App. P. 18(a)(2)(A)(ii).  This satisfies the Rule 18(a) requirements at issue.

Following the April 30 Denial, DPE engaged in several meetings with EPA (through counsel) regarding the prospect of an extension of the 90-day implementation period.  Consistent with the April 30 Denial, EPA continued to demand that DPE must commit to substantial additional actions—not required of any other facilities subject to the Rule—to obtain relief from the 90-day implementation period.  On May 24, 2024, DPE responded to EPA's April 30 Denial and disputed EPA's position.  *See* Exhibit X.

The undersigned further certifies under Circuit Rule 18(a)(2) that, on May 24, 2024, counsel for DPE notified counsel for EPA by videoconference that DPE would be filing this motion for stay and counsel for EPA stated that EPA opposes the motion.

Date:  May 28, 2024                              Respectfully submitted,

                                                             */s/ David A. Super*
                                                             David A. Super

                                                             ***Counsel for Petitioner***
                                                             ***Denka Performance Elastomer LLC***

# <u>TABLE OF CONTENTS</u>

RULE 28 CERTIFICATE OF PARTIES AND RELATED CASES.........................i

RULE 26.1 DISCLOSURE STATEMENT.................................................iv

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 18(a) ......................v

TABLE OF AUTHORITIES .........................................................ix

TABLE OF EXHIBITS .............................................................. xii

I.     INTRODUCTION...............................................................1

II.    BACKGROUND................................................................3

    A.    EPA's Lawsuit Under Section 303 Of The CAA. ......................3

    B.    EPA's Rule Regulating Chloroprene And EtO. ......................4

III.   JURISDICTION AND VENUE............................................8

IV.   STANDARD OF REVIEW ...................................................9

V.    ARGUMENT ....................................................................9

    A.    DPE Is Likely To Succeed On The Merits. ............................9

        1.    DPE cannot possibly comply with the Rule in 90 days. ...............................................................9

        2.    EPA's imposition of a 90-day compliance period is arbitrary and capricious. ...................................11

            a.    EPA's purported "finding" of an imminent endangerment has no support in the administrative record...........................11

            b.    EPA's "singling out" the Facility for disparate treatment is arbitrary and capricious..............................................14

-vii-

3.      EPA's imposition of a 90-day compliance period is a classic "surprise switcheroo" in violation of the APA. ...............................................................................18

B.      DPE Suffers Escalating And Irreparable Harm Absent A Prompt Stay. ...............................................................................19

C.      A Stay Will Not Injure Other Parties And Is Supported By The Public Interest. ...........................................................22

VI.      REQUEST FOR RELIEF...................................................................24

CERTIFICATE OF COMPLIANCE.......................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*BellSouth Telecomms., Inc. v. MCI-Metro Access Transmission Servs., LLC,*
425 F.3d 964 (11th Cir. 2005) .......................................................................21

*Burlington Northern & Santa Fe Ry. Co. v. Surface Transp. Bd.,*
403 F.3d 771 (D.C. Cir. 2005)........................................................................17

*Env't Integrity Project v. EPA,*
425 F.3d 992 (D.C. Cir. 2005)..........................................................2, 9, 18, 19

*Greyscale Invs., LLC v. SEC,*
82 F.4th 1239 (D.C. Cir. 2023)................................................................18, 22

*Kreis v. Sec'y of the Air Force,*
406 F.3d 684 (D.C. Cir. 2005)..................................................................18, 22

*League of Women Voters of U.S. v. Newby,*
838 F.3d 1 (D.C. Cir. 2016)...........................................................................23

*Lilliputian Sys. Inc. v. PHMSA,*
741 F.3d 1309 (D.C. Cir. 2014)................................................................18, 22

*Monsanto Co. v. EPA,*
19 F.3d 1201 (7th Cir. 1994) ...........................................................................5

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983)..........................................................................................11

*N. Mariana Islands v. United States,*
686 F. Supp. 2d 7 (D.D.C. 2009).....................................................................24

*Nken v. Holder,*
556 U.S. 418 (2009)..........................................................................................9

*North Carolina v. EPA,*
531 F.3d 896 (D.C. Cir. 2008)........................................................................14

-ix-

*In re NTE Conn., LLC,*
   26 F.4th 980 (D.C. Cir. 2022)........................................................21

*Odebrecht Constr., Inc. v. Fla. Dep't of Transp.,*
   715 F.3d 1268 (11th Cir. 2013) ....................................................21

*Southwest Airlines v. FERC,*
   926 F.3d 851 (D.C. Cir. 2019).......................................................17

*Steger v. Def. Investigative Serv. Dep't of Def.,*
   717 F.2d 1402 (D.C. Cir. 1983)........................................................9

*United States v. Denka Performance Elastomer, LLC, et al.,*
   No. 2:23-cv-00735 (E.D. La. filed Feb. 28, 2023) ..........................7

*Wages & White Lion Investments, L.L.C. v. FDA,*
   16 F.4th 1130 (5th Cir. 2021) ..................................................21, 22

*Window Covering Mfrs. Ass'n v. CPSC,*
   82 F.4th 1273 (D.C. Cir. 2023).......................................................11

*Wis. Gas Co. v. FERC,*
   758 F.2d 669 (D.C. Cir. 1985).......................................................21

**Statutes**

5 U.S.C. § 705 ..............................................................................24

5 U.S.C. § 706(2)(A).......................................................................9

28 U.S.C. § 1331 .............................................................................8

42 U.S.C. § 7412 .......................................................................8, 14

42 U.S.C. § 7412(f)(2)(A)...............................................................4

42 U.S.C. § 7412(f)(4)(A)..............................................4, 5, 14, 15

42 U.S.C. § 7412(f)(4)(B)............................................................5, 6

42 U.S.C. § 7603 .........................3, 4, 5, 7, 8, 10, 11, 12, 13, 14, 18, 23

42 U.S.C. § 7607(b) .........................................................................8

-x-

42 U.S.C. § 7607(d)(4)(B)(i) ...................................................................12

42 U.S.C. § 7607(d)(7) .............................................................................12

42 U.S.C. § 7607(d)(9) ...............................................................................9

**Rules**

Fed. R. App. P. 18 .......................................................................................1

Fed. R. App. P. 27(a)(3) .............................................................................3

**Regulations**

20 C.F.R. § 639.2 .....................................................................................20

40 C.F.R. § 63.6(i)(6)(ii) ...........................................................................22

40 C.F.R. § 63.100(k)(11)-(12) .............................................................7, 16

40 C.F.R. § 63.481(o) .............................................................................7, 24

40 C.F.R. § 63.481(p)(2) ........................................................................7, 24

40 C.F.R. § 63.507(c)(6) .............................................................................8

88 Fed. Reg. 25080 (April 25, 2023) .......................................................5, 6

## TABLE OF EXHIBITS

| Exhibit A | 89 Fed. Reg. 42,932 (May 16, 2024) ("Rule") |
|-----------|---------------------------------------------|
| Exhibit B | 88 Fed. Reg. 25,080 (April 25, 2023) ("Proposed Rule") |
| Exhibit C | Letter from Steven D. Shermer, Department of Justice, to David Super, Bracewell LLP (October 20, 2023) |
| Exhibit D | DPE's Memorandum in Support of Motion for Summary Judgment, *United States v. Denka Performance Elastomer, LLC, et al.*, No. 2:23-cv-00735 (E.D. La.), R. Doc. 131-2 |
| Exhibit E | U.S. Memorandum in Opposition of Motion for Summary Judgment, *United States v. Denka Performance Elastomer, LLC, et al.*, No. 2:23-cv-00735 (E.D. La.), R. Doc. 150 |
| Exhibit F | Declaration of Christopher Meyers, P.E. in Support of Petitioner's Emergency Motion for Stay Pending Review (May 24, 2024) |
| Exhibit G | Residual Risk Assessment for the Synthetic Organic Chemical Manufacturing Industry (SOCMI) Source Category in Support of the 2024 Risk and Technology Review Final Rule (March 2024), EPA Docket No. EPA-HQ-OAR-2022-0730-2807 |
| Exhibit H | Declaration of Jeffery Harrington in Support of Preliminary Injunction, *United States v. Denka Performance Elastomer, LLC, et al.*, No. 2:23-cv-00735 (E.D. La.), R. Doc. 9-9 |
| Exhibit I | March 26, 2024 Email and attachments from Njeri Moeller, USEPA/OAQPS to Sofie E. Miller, EOP/OMB, regarding Passback Response #2 of Rule |
| Exhibit J | Denka Performance Elastomer LLC Comments re: *EPA's New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry*, 88 Fed. Reg. 25080 (April 25, 2023) (Docket No. EPA-HQ-OAR-2022-0730; FRL-9327-01-OAR) (July 7, 2023) |
| Exhibit K | National Emission Standards for Coke Oven Batteries, 70 Fed. Reg. 19,992 (April 15, 2005) |

| Exhibit L | National Emission Standards for Halogenated Solvent Cleaning, 72 Fed. Reg. 25,138 (May 3, 2007) |
|---|---|
| Exhibit M | National Emission Standards for Sterilization Facilities, 89 Fed. Reg. 24,090 (April 5, 2024) |
| Exhibit N | Residual Risk Assessment for the Commercial Sterilization Facilities Source Category in Support of the 2024 Risk and Technology Review Final Rule (January 2024), EPA Docket No. EPA-HQ-OAR-2019-0178-1576 |
| Exhibit O | National Emission Standards for Hazardous Air Pollutants: Miscellaneous Organic Chemical Manufacturing Residual Risk and Technology Review, 85 Fed. Reg. 49084 (August 12, 2020) |
| Exhibit P | Residual Risk Assessment for the Miscellaneous Organic Chemical Manufacturing Source Category in Support of the 2020 Risk and Technology Review Final Rule (April 2020), EPA Docket No. EPA-HQ-OAR-2018-0746-0189 |
| Exhibit Q | 2019 AirToxScreen: Assessment Results (2019 AirToxScreen National Cancer Risk by Pollutant) |
| Exhibit R | OMB Review of Proposed Rule (March 2023) |
| Exhibit S | Declaration of Michelle Helfrich in Support of Petititioner's Emergency Motion for Stay Pending Review (May 24, 2024) |
| Exhibit T | U.S. Response to DPE First Set of Interrogatories, *United States v. Denka Performance Elastomer, LLC, et al.*, No. 2:23-cv-00735 (E.D. La.) |
| Exhibit U | Declaration of Dr. Kenneth A. Mundt, PhD, FACE, *United States v. Denka Performance Elastomer, LLC, et al.*, No. 2:23-cv-00735 (E.D. La.) |
| Exhibit V | Letter from David Super, Bracewell LLP, to Michael S. Regan, Administrator, EPA (April 17, 2024) |
| Exhibit W | Letter from Joseph Goffman, Assistant Administrator, EPA, to David Super, Bracewell LLP (April 30, 2024) |
| Exhibit X | Letter from David Super, Bracewell LLP, to Joseph Goffman, EPA (May 24, 2024) |

# I.     INTRODUCTION

Pursuant to Federal Rule of Appellate Procedure 18, Denka Performance Elastomer LLC ("DPE") seeks a stay pending review of the 90-day compliance deadline set forth in a rule ("Rule") (Exhibit A) promulgated by the Environmental Protection Agency ("EPA") under the Clean Air Act ("CAA").  EPA's 90-day compliance deadline applies only to chloroprene emissions from a single facility, DPE's Neoprene manufacturing facility in Louisiana (the "Facility"), the Nation's only such facility.[1]  The Rule requires DPE to meet a comprehensive slate of capital-intensive emission control requirements *in only 90 days*—which EPA acknowledges is impossible—or shut down until it does.  The very same Rule gives all other regulated sources at least two years to come into compliance, despite expressly finding that some pose *greater* risk than the single Neoprene source.  The impossible-to-meet 90-day period is unnecessary to protect the public from harm, as EPA recognized when it proposed to provide Neoprene sources with a two-year compliance period in the proposed rule issued in April 2023 ("Proposed Rule") (Exhibit B).  The Proposed Rule provided no inkling that EPA would cut the implementation period from two years to 90 days, and the Rule fails to articulate any

---

[1] Neoprene is a synthetic rubber used in many applications, from military and medical devices to consumer products.

substantive basis for doing so.  It was a quintessential "surprise switcheroo."  *Env't Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005).

The switch was orchestrated solely to respond to DPE's dispositive legal argument made in a pending lawsuit that EPA brought against DPE two months *before* EPA issued the Proposed Rule.  In sum, the Rule is arbitrary and capricious because it is impossible to meet, is unsupported by the administrative record, and provides no explanation for its disparate treatment of DPE or the 180-degree change in agency policy.  The Rule is also capricious because EPA's switcheroo was plainly implemented to support its unadjudicated enforcement case.  For all these reasons, DPE has a strong likelihood of success on the merits.

Further, DPE is currently suffering irreparable harm due to EPA's finding that the Facility is causing imminent endangerment and—given the absurdly short implementation period—the need to immediately react to the Rule's requirements.  Absent relief from the 90-day implementation period, DPE will have no ability to comply with the Rule and will be forced to shut down the Facility, likely permanently.  In contrast, a stay pending appeal will not harm other parties and is in the public interest.

Finally, because the clock is now ticking and DPE is suffering escalating irreparable harm, DPE respectfully requests a ruling on this stay motion by June 28,

-2-

2024.[2]  If a stay is granted, DPE is prepared to engage in expedited briefing on its challenge to the Rule if the Court deems it appropriate.

## II.    BACKGROUND

### A.    EPA's Lawsuit Under Section 303 Of The CAA.

On February 28, 2023, seeking to use its emergency powers in Section 303 of the CAA, EPA filed an unprecedented action in the U.S. District Court for the Eastern District of Louisiana against DPE ("Section 303 Litigation") alleging that the Facility is causing an "imminent and substantial endangerment" because its emissions result in off-site, ambient air concentrations of chloroprene greater than $0.2 \, \mu g/m^3$—a level EPA alleges is needed to ensure that the lifetime cancer risk for a person located continuously at the Facility's fenceline *all day, every day for 70 years* is no higher than 1-in-10,000.

When EPA filed the Section 303 Litigation, EPA knew it would shortly be issuing the Proposed Rule to address the exact same alleged risk from the Facility's chloroprene emissions, and it did so two months later.  EPA also knew that it was required to issue the final rule by March 29, 2024.  Nonetheless, in the Section 303 Litigation, EPA sought relief demanding that DPE shutdown the Facility immediately and not resume production until it could demonstrate its ability to

---

[2]  DPE believes it is reasonable to provide EPA with the standard ten days to respond to this Motion, followed by DPE's reply.  Fed. R. App. P. 27(a)(3).

maintain chloroprene concentrations below 0.2 μg/m³ or 0.3 μg/m³ depending on the monitoring method.  *See* Exhibit C at 2 (EPA's "Statement of Final Relief").

In December 2023, DPE moved for summary judgment in the Section 303 Litigation, arguing that, because the Facility's emissions do not present an "imminent endangerment," as EPA conceded in the Proposed Rule by providing the two-year compliance period, then there was no "imminent *and substantial* endangerment" as a matter of law.  Exhibit D at 5-8.  EPA had no meaningful response to that argument, except to say that the Proposed Rule was not final. Exhibit E at 5-6 & n.6.

On February 12, 2024, after having demanded expedited litigation on the alleged "emergency" for nearly a year, EPA abruptly moved for an indefinite continuance of the March 2024 trial date.  As its sole justification for the continuance, EPA pointed to the expected issuance of the Rule by March 29, 2024. On February 16, 2024, the district court granted EPA's continuance.

## B.     EPA's Rule Regulating Chloroprene And EtO.

Section 112(f) of the CAA requires EPA to assess health risks of industrial emissions and prescribe emission control standards if EPA determines that existing standards do not provide an "ample margin of safety to protect public health." 42 U.S.C. § 7412(f)(2)(A).  Section 112 requires EPA to give sources at least 90 days to come into compliance and provides that EPA may permit a source up to

two years to comply (referred to as a "waiver") if "the Administrator finds that such period is necessary for the installation of controls and that steps will be taken during the period of the waiver to assure that the health of persons will be protected from imminent endangerment."  42 U.S.C. § 7412(f)(4)(A) & (B); *see Monsanto Co. v. EPA*, 19 F.3d 1201, 1203 (7th Cir. 1994) (reversing EPA's denial of §112(f) waiver request where source "clearly needed additional time to install appropriate controls").  EPA routinely grants such compliance waivers, typically as part of a rule.  In fact, DPE is unaware of any such rule in which regulated entities were not given enough time to install the required emission controls.

The Proposed Rule, which was filed two months *after* EPA filed the Section 303 Litigation alleging an "imminent and substantial endangerment," proposed to give DPE the full two years to comply, explaining that this was appropriate because the "proposed [emission control requirements] will require additional time to plan, purchase, and install equipment for … chloroprene control."  Exhibit B at 25,178.  The Proposed Rule estimated that the Facility's emissions created a risk of 0.06 incidences of cancer per year, and that 2,300 individuals near the Facility could be exposed to greater than a 1-in-10,000 risk based on the *maximum* individual risk estimate.  *Id.* at 25,107 (Table 2).

Given the inclusion of the two-year compliance period in the Proposed Rule, EPA necessarily concluded that the Facility's estimated risk level did not constitute

-5-

an "imminent endangerment." *See* 42 U.S.C. § 7412(f)(4)(B). Notably, the Proposed Rule included the same two-year compliance period for sources of ethylene oxide ("EtO"), several of which, according to EPA's risk calculations, posed a higher risk than the Facility. Exhibit B at 25,106 (estimating risk level 3.3 times higher than Facility); *id.* at 25,178 (proposing waivers for Facility and EtO facilities). DPE submitted comments to the Proposed Rule explaining that DPE needed *more than* two years to comply.

Since the Proposed Rule was issued, data from DPE's continuous fenceline monitoring system show that the Facility's emissions are lower than ever. Exhibit F ¶¶ 45-49 (Declaration of DPE's Environmental Manager). Air monitoring data are depicted in the chart below and show significant decreases in chloroprene concentrations near the Facility between 2022 (red bars) and 2023 (purple bars):



Nonetheless, on March 28, 2024, the EPA Administrator signed the Rule giving DPE only 90 days to comply, although the risk estimates applicable to the DPE Facility in the Rule remain unchanged.  Exhibit A at 43,236-37 (40 C.F.R. § 63.481(o) & (p)(2) (setting 90-day compliance period)); *compare* Exhibit B at 25,107 (6-in-10,000 risk level for DPE in Proposed Rule), *with* Exhibit A at 42,958 (6-in-10,000 risk level for DPE in Rule).[3]  Despite higher risk estimates for EtO sources, the Rule provides those sources with the same two-year compliance period contained in the Proposed Rule.  *Id.* at 43,154 (40 C.F.R. § 63.100(k)(11)-(12)); *id.* at 42,962 (20-in-10,000 facility-wide maximum individual risk for facilities in SOCMI Source Category).  The Rule offers no explanation for EPA's disparate treatment of the Facility as compared to the EtO sources.

The Rule contains only a one-sentence explanation for cutting DPE's compliance period from two years to 90 days:

> In a change from the proposed rule, the EPA is shortening the compliance deadline for affected sources producing neoprene, due to the EPA's finding that chloroprene emissions from the only such source pose an imminent and substantial endangerment under CAA section 303, 42 U.S.C. § 7603. *United States v. Denka Performance Elastomer, LLC, et al.*, No. 2:23-cv-00735 (E.D. La. filed Feb. 28, 2023).

---

[3] EPA sometimes refers to these risks as 600-in-1,000,000, which is the same as 6-in-10,000.  For consistency, this Motion refers to risks calculated by EPA as *x*-in-10,000.

-7-

Exhibit A at 42,955.  There is, however, no such "finding" in the Section 303 Litigation, merely an EPA *allegation* that has not been adjudicated, despite the fact that EPA filed the Section 303 Litigation 15 months ago (and three months ago requested that the trial be postponed indefinitely).  The *rulemaking* record contains no analysis or evidence supporting EPA's purported "finding" of "imminent and substantial endangerment."

On April 19, 2024, DPE submitted to the Louisiana Department of Environmental Quality ("LDEQ") a request to extend the compliance period to two years.  LDEQ has not yet acted on DPE's request.  To thwart such efforts (and further illustrate the litigation-driven, capricious actions of EPA's rulemaking), the Rule purports to revoke LDEQ's long-standing authority to extend compliance dates for rules such as this one, *but only with respect to DPE*.  Exhibit A at 43,261 (40 C.F.R. § 63.507(c)(6)).  The Proposed Rule did not contain a single word about possibly revoking LDEQ's authority.

On May 16, 2024, EPA published the Rule in the Federal Register. On May 16, 2024, DPE filed a Petition for Review of the Rule

### III.    JURISDICTION AND VENUE

The Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this case challenges a rulemaking under the CAA, 42 U.S.C. § 7412.  Venue is appropriate in this Court pursuant to 42 U.S.C. § 7607(b).

-8-

## IV.    STANDARD OF REVIEW

When deciding whether to stay an agency action, courts consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009).

The Court will reverse EPA's actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Env't Integrity Project*, 425 F.3d at 995 (citing 5 U.S.C. § 706(2)(A)) (other citations omitted); *see also* 42 U.S.C. § 7607(d)(9).

## V.    ARGUMENT

### A.    DPE Is Likely To Succeed On The Merits.

#### 1.    DPE cannot possibly comply with the Rule in 90 days.

EPA's 90-day compliance deadline for DPE, and DPE alone, is arbitrary and capricious. An agency "cannot, despite its considerable discretion, treat similar situations dissimilarly, and, indeed, can be said to be at its most arbitrary when it does so." *Steger v. Def. Investigative Serv. Dep't of Def.*, 717 F.2d 1402, 1406 (D.C. Cir. 1983).

There is no dispute that DPE requires far more than 90 days to install the emission controls necessary to comply with the Rule. In the Proposed Rule, which

-9-

contained substantially similar requirements as the Rule, EPA acknowledged that "[t]he proposed provisions will require additional time to plan, purchase, and install equipment for … chloroprene control" and therefore "propos[ed] a compliance date of 2 years after the publication date of the final rule." Exhibit B at 25,178. The Rule says nothing to the contrary.

As DPE explained in its comments on the Proposed Rule, DPE will need *at least* two years to plan, develop, test, and install the controls required by the Rule. Exhibit F ¶¶ 4-37 (describing comments). Inexplicably, the Rule retains a two-year compliance period for the substantially similar, and in many cases identical, emission controls for EtO sources, and reasserts EPA's rationale for those deadlines, despite some EtO sources having higher estimated risks than the Facility. *See* Exhibit G at 42,956 (Table 1) (20-in-10,000 risk level for SOCMI Source Category); *id.* at 42,958 (Table 2) (6-in-10,000 risk level for Neoprene Production Source Category). These two-year EtO deadlines starkly demonstrate the impossibility of the 90-day compliance period for DPE. Similarly, in the Section 303 Litigation, EPA, through its expert, expressly represented to the district court that it would take DPE 90 days *just to plan one* of the control projects required by the Rule. Exhibit H ¶ 77 (EPA expert's declaration); Exhibit F ¶ 40. Here, it was plainly arbitrary and capricious for EPA to impose an absurdly short (and impossible-to-meet)

-10-

compliance deadline on DPE, when the same Rule gives all other facilities (including several that pose a higher risk) at least two years to come into compliance.

**2.    EPA's imposition of a 90-day compliance period is arbitrary and capricious.**

**a.    EPA's purported "finding" of an imminent endangerment has no support in the administrative record.**

EPA's sole justification for cutting the two-year compliance period to 90 days is EPA's *allegation* of an "imminent and substantial endangerment" in the Section 303 Litigation. Exhibit A at 42,955. That single sentence in the Rule is decidedly not reasoned decisionmaking. *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) ("[T]he agency must explain the evidence which is available, and must offer a rational connection between the facts found and the choice made.") (cleaned up). EPA must explain its reasons for imposing that impossible-to-meet compliance period, particularly given EPA's first-time, selective departure from the compliance periods contained in the Proposed Rule for just one of more than 200 regulated sources. *See Window Covering Mfrs. Ass'n v. CPSC*, 82 F.4th 1273, 1291 (D.C. Cir. 2023) (vacating CPSC rule selecting default one-year compliance period where "the Commission's stated reasons for declining to find 'good cause' to extend the [default] compliance deadline were flawed").

Moreover, EPA's claim of an "imminent and substantial endangerment" in the Section 303 Litigation is merely an unproven *allegation*, not an agency "finding"

-11-

as the Rule declares, and plainly not reasoned decisionmaking.  42 U.S.C. §§ 7607(d)(4)(B)(i) & (d)(7).  Indeed, in March 2024, during interagency review of the Rule, the Office of Management and Budget ("OMB") expressly recommended that EPA "add[] or cite[] factual support" in the Rule for its "finding" that the Facility was causing an "imminent and substantial endangerment."  Exhibit I at 394.  EPA rejected OMB's recommendation, stating that the Section 303 Litigation "contains all the necessary factual information."  *Id.*  Thus, through a single sentence, EPA purports to incorporate into the administrative record the entire record of the Section 303 Litigation *after* the close of the notice-and-comment period.  Exhibit A at 42,955.  Other than that single sentence, however, the administrative record contains nothing to support EPA's "finding."  In contrast, in its comments to the Proposed Rule, DPE submitted a vast amount of "factual information" to show that the Facility's emissions do not pose even an appreciable cancer risk and refuting EPA's assertion of an "imminent and substantial endangerment."  *See* Exhibit J (DPE July 2024 Comments to Proposed Rule (voluminous exhibits omitted)).  Even if it were appropriate for EPA to bootstrap the entire district court record into the administrative rulemaking record after the close of the notice-and-comment period, that district court record contains substantial evidence refuting EPA's purported "finding."  In short, whether the Facility poses an "imminent and substantial

-12-

endangerment"—an issue aggressively litigated for over a year—remains hotly disputed and has not been adjudicated by the district court.

Indeed, it is DPE's position that the Facility poses no "imminent and substantial endangerment" as a matter of law. Exhibit D at 5-8. EPA included the two-year compliance period in the Proposed Rule—thereby conceding the lack of an "imminent endangerment"—*two months after* EPA initiated the Section 303 Litigation alleging an "imminent and substantial endangerment." *Id.* If EPA believed that the mere existence of the Section 303 Litigation demonstrated the existence of an "imminent endangerment," then surely EPA would have said so in the Proposed Rule issued two months *after* EPA commenced the litigation. Instead, when DPE sought summary judgment based on the Proposed Rule's concession of the lack of imminent endangerment, EPA's only response was that the Proposed Rule was "not final." Exhibit E at 5-6 & n.6. EPA's tactical decision to keep DPE and the rest of the rulemaking participants in the dark about a critical change until the last possible moment is antithetical to the notice-and-comment regime at the heart of APA rulemaking. Critically, EPA's risk estimate for the Facility has not changed since the Proposed Rule. *See* Exhibit B at 25,107 (6-in-10,000 risk level); Exhibit A at 42,958 (6-in-10,000 risk level). In fact, the only meaningful change is that chloroprene emissions from DPE's Facility have gone *down* (as continuously

-13-

reported to EPA) and are at an all-time low.  Exhibit F ¶¶ 45-49; *see also supra* at 6 (discussing emissions chart).

But now, to avoid summary judgment, EPA has simply orchestrated—via a single sentence in the Rule—its litigation position in the Section 303 Litigation as a purported administrative "finding."  Rulemaking driven solely by litigation position is not reasoned decisionmaking and is plainly arbitrary and capricious.  *See North Carolina v. EPA*, 531 F.3d 896, 930 (D.C. Cir. 2008) (It is "entirely arbitrary" to base regulatory standard "on irrelevant factors.").

> **b.    EPA's "singling out" the Facility for disparate treatment is arbitrary and capricious.**

EPA's purported "finding" that the Facility's emissions constitute an "imminent endangerment" is unprecedented and contradicts more than 30 years of EPA rulemaking under Section 112.  Although EPA has often found lifetime cancer risks greater than 1-in-10,000 in past rulemakings, EPA has *never* before claimed that such a risk posed an "imminent endangerment" or refused to give regulated parties sufficient time to install pollution controls.  In fact, EPA has issued final rules that expressly allow for lifetime cancer risks *greater* than 1-in-10,000 even *after* emission control requirements are met.  For example, in the Section 112(f) rule for coke ovens, EPA accepted a *post-control* cancer risk of 2.7-in-10,000 and a post-

-14-

control cancer incidence of 0.06 per year. Exhibit K at 19,993-94.[4] A 0.06 annual cancer incidence is the same incidence that EPA estimates for DPE's Facility in the Rule *before the new controls are installed*. Exhibit A at 42,963 (Table 5). By imposing a 90-day compliance deadline here, EPA claims that a 0.06 annual cancer incidence rate results in an "imminent endangerment" from DPE's Facility during a two-year implementation period but was perfectly acceptable for coke oven facilities *indefinitely*.

In recent Section 112 rulemakings, EPA has consistently extended compliance periods for facilities with estimated maximum individual risks ("MIRs") equal to or far greater than DPE's Facility, for facilities with higher estimated cancer incidences and for which a greater number of people were exposed to an estimated risk above 1-in-10,000. In this year's rulemaking for commercial sterilization facilities, EPA gave all facilities two-year compliance periods, including twelve facilities with MIRs equal to or greater than DPE's Facility. Exhibit M at 24,102 (setting two-year compliance period); Exhibit N at Table 2a-1 (identifying 12 facilities with risk levels greater than 6-in-10,000).

Likewise, the Rule inexplicably provides a compliance period of at least two years to *all facilities other than DPE*, including two facilities for which EPA

---

[4] *See also* Exhibit L at 25143 (setting risk level for halogenated solvent cleaning at 2-in-10,000).

estimates MIRs that are more than three times greater than EPA's estimate for DPE's Facility. Exhibit A at 43,154 (40 C.F.R. § 63.100(k)(11)-(12)); Exhibit F (Table 2). Similarly, EPA provided extensions for numerous facilities in the Miscellaneous Organic Chemical Manufacturing source category with MIRs equal to or greater than DPE's Facility. Exhibit O at 49,093 (two-year compliance period); Exhibit P at Table 2a (identifying facilities with risk levels equal to or greater than 6-in-10,000). As shown in the following chart, in the past four years, EPA has provided two-year compliance periods to at least *sixteen* facilities with MIRs higher than DPE's Facility:



-16-

EPA also estimates that there are fifteen U.S. census tracts where EtO poses a higher cancer risk than chloroprene poses. *See* Exhibit Q. Yet EPA has not imposed a 90-day compliance deadline on the EtO facilities in any of those fifteen tracts.

It was arbitrary and capricious for EPA to apply a new policy that an estimated risk of 1-in-10,000 constitutes an "imminent endangerment" without even mentioning, let alone explaining, the basis for the fundamental change. *Southwest Airlines v. FERC*, 926 F.3d 851, 856 (D.C. Cir. 2019) ("A full and rational explanation becomes especially important when, as here, an agency elects to shift [its] policy or depart[] from its typical manner of administering a program.") (quotation omitted).

The fact that EPA's reversal in policy applies *solely* to DPE's Facility, despite many other facilities causing greater risk, makes the complete absence of any explanation all the more arbitrary and capricious. "Where an agency applies different standards to similarly situated entities and fails to support this disparate treatment with *a reasoned explanation and substantial evidence* in the record, its action is arbitrary and capricious and cannot be upheld." *Burlington Northern & Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 777 (D.C. Cir. 2005) (citation omitted) (emphasis added).

-17-

Indeed, EPA expressly admitted in the Section 303 Litigation that DPE has been "singled out." Exhibit E at 7-8. Whether an agency may use its enforcement discretion to treat like cases differently may be debatable, but this sort of disparate treatment of similarly situated parties in a rulemaking is a hallmark of arbitrary and capricious agency action. *Greyscale Invs., LLC v. SEC*, 82 F.4th 1239, 1242 (D.C. Cir. 2023) ("It is a fundamental principle of administrative law that agencies must treat like cases alike."); *Kreis v. Sec'y of the Air Force*, 406 F.3d 684, 687 (D.C. Cir. 2005). Failure to provide the "*how*" and "*why*" necessary to justify disparate treatment is arbitrary and capricious. *Lilliputian Sys. Inc. v. PHMSA*, 741 F.3d 1309, 1313-14 (D.C. Cir. 2014). Here, EPA offers no substantive explanation for EPA's disparate treatment of DPE.

### 3. EPA's imposition of a 90-day compliance period is a classic "surprise switcheroo" in violation of the APA.

"Given the strictures of notice-and-comment rulemaking, an agency's proposed rule and its final rule may differ only insofar as the latter is a 'logical outgrowth' of the former … Thus, we have refused to allow agencies to use the rulemaking process to pull a surprise switcheroo on regulated entities." *Env't Integrity Project*, 425 F.3d at 996. Here, the Proposed Rule gave no indication whatsoever that EPA would cut the compliance period from two years to 90 days. Indeed, because EPA has *never* failed to provide a waiver to comply with similar requirements, DPE had no reason to anticipate EPA would do so here for the first

-18-

time—until February 2024, when EPA abruptly sought to postpone indefinitely the Section 303 Litigation. *Id.* at 997 (an EPA "flip-flop" between proposed and final rule must be "preceded by adequate notice and opportunity for public comment" on changed position).

During the interagency review process, EPA explicitly acknowledged that DPE would need at least two years to come into compliance with the Rule. When OMB was reviewing the Proposed Rule, it questioned whether the proposed two-year compliance period was appropriate and whether steps would be needed to protect from "imminent endangerment." Exhibit R at 347. EPA brushed off concerns about any purported imminent endangerment and responded with the same rationale it used in the Rule to justify a two-year compliance period for EtO facilities: "Significant capital will need to be invested in controls here to further reduce emissions [of EtO] and chloroprene. . . . This takes significant time [to] engineer, install, and update operating procedures and staff." *Id.* These comments, which DPE reviewed when it prepared comments on the Proposed Rule, underscore that EPA's "surprise switcheroo" in the Rule is arbitrary and capricious. *Env't Integrity Project*, 425 F.3d at 996.

**B.    DPE Suffers Escalating And Irreparable Harm Absent A Prompt Stay.**

EPA's imminent endangerment "finding" and the 90-day compliance period impose continuing, escalating, and irreparable harms on DPE. As explained in the

-19-

Declaration of DPE's Plant Manager, DPE's irreparable harm includes workforce instability, a triggering of DPE's WARN Act obligations,[5] impacts on DPE's social license to operate and goodwill as well as its commercial relationships with suppliers and customers, unrecoverable loss of revenue associated with indefinite shutdown preparations, and the accelerated expenditure of resources and funds to comply with the Rule's requirements, which DPE must begin incurring immediately and would have no means of recovering if DPE's judicial challenge to the Rule is successful. Exhibit S ¶¶ 10-27.  Unless DPE can obtain relief from the 90-day compliance deadline, the Facility will have to shut down *and likely never restart*.  Exhibit F ¶¶ 4-44; Exhibit S ¶ 22.

DPE's harms also include significant costs—which can never be recovered—associated with analyzing the feasibility, cost, and timing of complying with the Rule on an incredibly expedited basis; indeed, the 90-day compliance period is only 12.5 percent of a two-year period granted to every other facility covered by the Rule and only 8.2 percent of the time period that DPE explained was necessary in its comments to the Rule.   Exhibit F ¶¶ 50-54.  Even a two-year compliance period hardly provides sufficient time for DPE to integrate analyses and planning activities for major compliance projects into its day-to-day operations, and the 90-day

---

[5] 20 C.F.R. § 639.2 (employers with 100 or more employees must provide at least 60 calendar days' advance written notice of a plant closing and/or mass layoff).

compliance period will force DPE to divert resources away from other Facility priorities and engage teams of outside specialists that would otherwise not be needed. *Id.* Given the unique aspects of DPE's operations as the only Neoprene manufacturer in the country, outside consulting teams unfamiliar with DPE's operations are far less efficient than existing personnel with knowledge of the processes. *Id.*

These harms are irreparable. *See, e.g.*, *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (recognizing that threats to "the very existence of the movant's business" may constitute irreparable harm); *In re NTE Conn., LLC*, 26 F.4th 980, 990-91 (D.C. Cir. 2022) ("[F]inancial injury can be irreparable where no adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation.") (cleaned up); *Wages & White Lion Investments, L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021) ("[C]omplying with [an agency order] later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs."); *Odebrecht Constr., Inc. v. Fla. Dep't of Transp.*, 715 F.3d 1268, 1288 (11th Cir. 2013) (Interference with a business's "ability to . . . retain employees" is irreparable.); *BellSouth Telecomms., Inc. v. MCI-Metro Access Transmission Servs., LLC*, 425 F.3d 964, 970 (11th Cir. 2005) ("[T]he loss of customers and goodwill is an irreparable injury.") (cleaned up).

-21-

In denying DPE's request for an administrative stay, EPA suggested that DPE is not suffering irreparable harm because DPE can request an extension of the 90-day period under EPA regulations by committing to implement specific emission reduction projects. *See* Exhibit W. But there is no lawful basis for EPA's disparate treatment of the DPE Facility, requiring DPE to implement "specific measures" to "reduce emissions" (40 C.F.R. § 63.6(i)(6)(ii)) to obtain a reasonable implementation period, when all other facilities subject to the Rule, including multiple facilities with higher estimated risk than the DPE Facility, are not subject to any such requirements yet still received a two-year implementation period. EPA should not be permitted to use its unlawful imposition of a 90-day compliance period as leverage to extract concessions from DPE, the cost of which could never be recovered, *Wages & White Lion*, 16 F.4th at 1142, and that do not apply to any other similarly situated entity. Such disparate treatment is plainly arbitrary and capricious. *Greyscale*, 82 F.4th at 1242; *Lilliputian*, 741 F.3d at 1313-14; *Kreis*, 406 F.3d at 687.

## C.    A Stay Will Not Injure Other Parties And Is Supported By The Public Interest.

In contrast to the irreparable harms to DPE, a stay pending review will pose virtually no risk to the public. The Facility's current chloroprene emissions are at an all-time low. *See supra* at 6 (discussing emissions chart). Moreover, according to EPA's "maximum plausible" estimate of risk, without the Rule, there will be 0.06

-22-

cancer incidences per year due to the DPE Facility's emissions, which equates to roughly one cancer case every 17 years. Exhibit A at 42,963 (Table 5). EPA admits that the value on which the risk estimate is based is a "plausible upper limit to the true value" and, in some circumstances, "the true risk could be as low as zero." Exhibit B at 25,103. Yet, even taking the Rule's risk estimate as true—which DPE disputes—extending the compliance period from 90 days to two years would equate to less than *1/8th of a cancer case over the next 70 years*. Thus, there is a vanishingly small risk of incremental harm to the community if the Rule is stayed until DPE's appeal is heard.

Further, the rulemaking record contains no real-world evidence of a single incidence of cancer attributable to the DPE Facility's chloroprene emissions, let alone any evidence that cancer rates in the vicinity of the Facility have actually increased. EPA admitted in the Section 303 Litigation that it has no such evidence. Exhibit T at 28. The lack of an association between chloroprene and cancer is corroborated by tumor incidence data collected by the Louisiana Tumor Registry, Exhibit U ¶¶ 44-50, and a robust epidemiological study of workers historically exposed to substantially greater levels of chloroprene, which found no linkage between chloroprene and the types of cancer that EPA attributes to it. *Id.* ¶¶ 28-43.

Finally, there is no public interest in EPA's indefensible 90-day compliance period. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)

-23-

("There is generally no public interest in the perpetuation of unlawful agency action"); *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) ("The public interest is served when administrative agencies comply with their obligations under the APA.").

## VI.    REQUEST FOR RELIEF

DPE requests that the Court grant a stay pending review of the 90-day compliance deadline (40 C.F.R. § 63.481(o) & (p)(2)) in the Rule that applies to chloroprene emissions from the Facility.  5 U.S.C. § 705.

Date:  May 28, 2024

Respectfully submitted,

*/s/ David A. Super*

James C. Percy
JONES WALKER LLP
445 N. Boulevard, Suite 800
Baton Rouge, LA 70802
Telephone: (225) 248-2130
jpercy@joneswalker.com

Robert E. Holden
Brett S. Venn
JONES WALKER LLP
201 St. Charles Ave
New Orleans, LA 70170
Telephone: (504) 582-8000
bholden@joneswalker.com
bvenn@joneswalker.com

David A. Super
Jason B. Hutt
Jeffrey R. Holmstead
Britt Cass Steckman
Kevin M. Voelkel
BRACEWELL LLP
2001 M Street NW, Ste. 900
Washington, DC 20036
Telephone: (202) 828-5800
david.super@bracewell.com
jason.hutt@bracewell.com
jeff.holmstead@bracewell.com
britt.steckman@bracewell.com
kevin.voelkel@bracewell.com

*Counsel for Petitioner*
*Denka Performance Elastomer LLC*

-24-

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(g), I certify that this motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because this motion contains 5,198 words.

I further certify, pursuant to Fed. R. App. P. 27(d)(1)(E), that this motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this motion has been prepared in Times New Roman 14-point font using Microsoft Word 2013.

Date:  May 28, 2024                                    */s/ David A. Super*
                                                       David A. Super

                                                       **Counsel for Petitioner**
                                                       **Denka Performance Elastomer LLC**

-25-

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this date, I have caused a true and correct copy of the foregoing *Petitioner's Emergency Motion for Stay Pending Review* to be electronically filed with the Clerk of the Court using the CM/ECF System, which will send a notice of filing to all registered users.


Date:  May 28, 2024                    */s/ David A. Super*
                                        David A. Super

                                        ***Counsel for Petitioner***
                                        ***Denka Performance Elastomer LLC***

# EXHIBIT D

**NOT YET SCHEDULED FOR ORAL ARGUMENT**

No. 24-1135

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————

DENKA PERFORMANCE ELASTOMER LLC,

*Petitioner*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, ET AL.,

*Respondents.*

———————

ON PETITION FOR REVIEW OF FINAL AGENCY ACTION OF THE
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

———————

**RESPONDENTS' OPPOSITION TO MOTION TO STAY FINAL RULE**

———————

|  | TODD KIM |
|---|---|
|  | *Assistant Attorney General* |
| *Of Counsel:* |  |
| MICHAEL THRIFT | BRANDON N. ADKINS |
| HALI KERR | *Attorney, Environmental Defense Section* |
|   Office of General Counsel | Environment and Natural Resources Division |
|   U.S. Environmental Protection Agency | U.S. Department of Justice |
|   Washington, D.C. | P.O. Box 7611 |
|  | Washington, D.C.  20044 |
|  | (202) 616-9174 |
|  | Brandon.Adkins@usdoj.gov |

# TABLE OF CONTENTS

Table of Contents ................................................................................ ii

Table of Authorities ........................................................................... iii

Introduction ........................................................................................1

Background .........................................................................................3

    A.    Statutory Background ................................................3

    B.    The Rule .....................................................................4

    C.    Clean Air Act Endangerment Action .........................6

    D.    Denka's Response to the Rule .....................................7

Standard of Review .............................................................................8

Argument .............................................................................................9

    I.    Denka is Unlikely to Succeed on the Merits. .......................10

        A.    EPA Reasonably Required Denka to Submit an Extension Request. ....................................................10

        B.    Denka's Procedural Challenge Fails. .........................15

    II.    Denka Will Not Suffer Certain and Great Irreparable Injury. ...........16

    III.    The Balance of Harms and Public Interest Favor Denying a Stay. ...................................................................18

    IV.    Remedy .................................................................................20

Conclusion .........................................................................................22

# TABLE OF AUTHORITIES

## Cases

*Allied Loc. & Reg'l Mfrs. Caucus v. EPA*,
    215 F.3d 61 (D.C. Cir. 2000) ...................................................................8

*Ass'n of Battery Recyclers, Inc. v. EPA*,
    716 F.3d 667 (D.C. Cir. 2013) .............................................. 4, 12, 20

*Cal. Cmtys. Against Toxics v. EPA*,
    928 F.3d 1041 (D.C. Cir. 2019) ............................................ 9, 10

*Cuomo v. U.S. Nuclear Regul. Comm'n*,
    772 F.2d 972 (D.C. Cir. 1985) ...................................................................8

*Dickson v. Sec'y of Def.*,
    *Def.*, 68 F.3d 1396 (D.C. Cir. 1995) ....................................................12

*EME Homer City Generation, L.P. v. EPA*,
    795 F.3d 118 (D.C. Cir. 2015) ...............................................................16

*Env't Integrity Project v. EPA*,
    425 F.3d 992 (D.C. Cir. 2005) ...............................................................15

*Hilton v. Braunskill*,
    481 U.S. 770 (1987) ...................................................................................8

*Monsanto Co. v. EPA*,
    19 F.3d 1201 (7th Cir. 1994) ................................................... 12, 13

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29 (1983) .................................................................................11

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................ 8, 16, 17

*NRDC v. EPA*,
  529 F.3d 1077 (D.C. Cir. 2008) ............................................................ 4, 18, 20

*United States v. Oakland Cannabis Buyers' Coop.*,
  532 U.S. 483 (2001) ........................................................................................19

*Winter v. NRDC*,
  555 U.S. 7 (2008) .............................................................................................8

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ............................................................ 16, 17, 18

**Federal Statutes**

5 U.S.C. § 705 ...................................................................................................7

5 U.S.C. § 706 ...................................................................................................8

42 U.S.C. § 7412 ................................... 3, 4, 5, 7, 11, 12, 13, 18, 19, 20, 21

42 U.S.C. § 7603 ...............................................................................................1

42 U.S.C. §7607 ................................................................................ 8, 15, 16

**Federal Regulations**

40 C.F.R. § 63.6 ............................................................... 5, 7, 11, 12, 13

40 C.F.R. § 63.481 ....................................................................... 5, 21

**Federal Register Publications**

54 Fed. Reg. 38,044 (Sept. 14, 1989) ...................................................... 4, 18

89 Fed. Reg. 42,932 (May 16, 2024) .................................... 3, 4, 8, 11, 19, 20

## INTRODUCTION

The stay motion filed by petitioner Denka Performance Elastomer, LLC, is unusual in that it does not endeavor to show a likelihood of success in invalidating the challenged rule of the Environmental Protection Agency ("EPA"). The motion contends only that EPA erred in applying the Clean Air Act's default compliance deadline of ninety days (that is, for purposes of this rule, October 15, 2024) rather than "up to" two years (as far out as but no farther than July 15, 2026) to chloroprene emissions from Denka's neoprene-manufacturing facility in St. John the Baptist Parish, Louisiana. Because the motion does not argue Denka is likely to succeed on the merits of any attacks it may mount on the underlying rule, the Court must assume for purposes of resolving this motion that those attacks lack merit, such that EPA's rule will be upheld and Denka will have to comply with it.

That assumption has three important implications for the Court's disposition of this motion. First, it limits the likelihood-of-success inquiry to the issue whether EPA acted arbitrarily or capriciously in requiring Denka to achieve the chloroprene standards by the Act's default compliance deadline, while allowing the company to request a later deadline based on a site-specific showing. EPA explained that it had commenced a lawsuit against Denka in federal district court, claiming that the facility's emissions "present[] an imminent and substantial endangerment to public health or welfare, or the environment." 42 U.S.C. § 7603. That is a non-arbitrary

reason for requiring Denka, unlike polluters subject to different emissions standards covering different source categories imposed by the same rule, to affirmatively demonstrate to EPA why circumstances at Denka's facility necessitate a compliance deadline later than the statutory default.

Second, the assumption that the rule is valid colors the Court's consideration of the non-merits stay factors. A cognizable irreparable harm to Denka could only stem from, at most, some difference between the cost of complying with EPA's standards by October 2024 and the cost of complying by July 2026. Denka has not established that the cost differential is both certain and great, as would be required to support a stay. And regardless, any cost increase would be outweighed by the strong public interest, including the significant health benefits, in applying the compliance date Congress chose as the default.

Third, because the rule is presumed valid and Denka must comply with it even if the Court grants this motion, Denka would be entitled at most to an interim order that shifts, but does not lift, Denka's compliance deadline pending judicial review. Even that relief should be denied, though, because Denka has not met its burden on any of the stay factors.

## BACKGROUND

### A.    Statutory Background

The Clean Air Act establishes a comprehensive program for controlling and improving the Nation's air quality. At dispute are emission standards that EPA promulgated under 42 U.S.C. § 7412. 89 Fed. Reg. 42,932 (May 16, 2024) ("the Rule").

Section 7412 establishes a process for regulating emissions of hazardous air pollutants from stationary sources. Among the hazardous air pollutants that Congress identified for regulation is the carcinogen chloroprene. 42 U.S.C. § 7412(b)(1). EPA must identify the types of facilities (called source categories) that emit hazardous air pollutants like chloroprene and establish emissions standards for each category. *See id.* § 7412(c).

Section 7412's regulatory framework uses a two-stage process. First, for each category of regulated sources, EPA sets technology-based emission standards. *Id.* § 7412(d). Later, EPA must review the standards to see (1) whether to update them given technological developments (this is known as the technology review), *id.* § 7412(d)(6), and (2) whether more measures are needed to address any remaining health risks or adverse environmental effects (this is known as the residual-risk review), *id.* § 7412(f)(2).

3

The residual-risk review considers, among other things, the maximum lifetime individual cancer risk from exposure to the source category's emissions. That risk is generally presumed to be acceptable if it is no higher than 1 in 10,000 (or 100 in 1 million). *See* 54 Fed. Reg. 38,044, 38,044–45 (Sept. 14, 1989) (setting forth EPA's approach to risk); 42 U.S.C. § 7412(f)(2)(B); *NRDC v. EPA*, 529 F.3d 1077, 1080 (D.C. Cir. 2008).

The compliance deadline for section 7412(f) chloroprene standards applicable to Denka is relevant to the motion. Existing sources generally must comply with section 7412(f) residual risk standards within ninety days after their effective date. 42 U.S.C. § 7412(f)(4)(A). Congress authorized EPA to grant a longer compliance period of up to two years after the effective date of section 7412(f) standards. *Id.* § 7412(f)(4)(B); *Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 672 (D.C. Cir. 2013). EPA may grant such an extension upon finding that (1) it is necessary for the installation of controls and (2) steps will be taken during the extension period to ensure that the health of persons will be protected from imminent endangerment. 42 U.S.C. § 7412(f)(4)(B).

## B.    The Rule

In the Rule, EPA amended emissions standards that apply to several source categories under section 7412, among other regulations. Relevant here, the Rule imposes section 7412(f) standards for ethylene oxide and chloroprene emissions.

4

Denka makes chloroprene and uses the chloroprene to produce neoprene, an oil-resistant substitute for natural rubber. *See* Mot. 1 & n.1. Denka is the only affected neoprene producer currently operating in the United States. 89 Fed. Reg. at 42,955. Its lone production facility is adjacent to Fifth Ward Elementary School in St. John the Baptist Parish. *See id.* at 42,964. Children are especially susceptible to chloroprene's harmful effects because it can damage DNA. *Id.* at 43,058.

EPA initially proposed to extend the deadline for existing sources to comply with the ethylene oxide and chloroprene standards to up to two years after the effective date. *See id.* at 42,954. EPA finalized the two-year extension for the ethylene oxide standards. *See id.* For existing sources producing neoprene (that is, Denka's facility in Louisiana), EPA finalized the ninety-day statutory default period for the chloroprene standards, which ends on October 15, 2024. 40 C.F.R. § 63.481(o), (p)(2). EPA provided that an existing source producing neoprene may request an extension under section 7412(f)(4)(B) if it demonstrates the statutory and regulatory prerequisites. 89 Fed. Reg. at 42,955 (citing 42 U.S.C. § 7412(f)(4)(B); 40 C.F.R. § 63.6(*i*)(4)(ii)). EPA acknowledged this "change from the proposed rule" and justified it "due to the EPA's finding that chloroprene emissions from the only [existing neoprene] source pose an imminent and substantial endangerment under [42 U.S.C. § 7603]." *Id.*

5

### C.     Clean Air Act Endangerment Action

In February 2023, the United States, acting at EPA's request, had filed a complaint alleging that carcinogenic chloroprene emissions from Denka's neoprene manufacturing operations in Louisiana present an imminent and substantial endangerment to public health and welfare. Compl. ¶ 1, Opp'n Ex. A.[1] The United States alleges that thousands of infants, young children, and adults living in nearby communities are being exposed to an unacceptably high risk of developing certain cancers because of Denka's chloroprene emissions. *E.g.*, *id.* ¶¶ 6, 11.

The United States seeks injunctive relief that would require Denka immediately to reduce its chloroprene emissions to levels that no longer cause or contribute to unacceptably high cancer risks within neighboring communities, including at the adjacent elementary school. *Id.*

In February 2024, the district court granted the United States' motion to reset the March 2024 trial date considering the forthcoming Rule and continued the trial. Mot. to Continue Trial 1, Opp'n Ex. B; Minute Entry of Feb. 16, 2024, at 1–

---

[1]     All citations in this subsection are to documents filed in *United States v. Denka Performance Elastomer, LLC*, E.D. La. Case No. 2:23-cv-00735, and, for convenience, are exhibits to this Opposition.

2, Opp'n Ex. C. The court set a status conference for July 17 to discuss the effect of the Rule on the endangerment action. Order 1, Opp'n Ex. D.

### D.    Denka's Response to the Rule

Before filing the Petition, Denka asked EPA to stay the Rule's chloroprene standard for neoprene producers under the Administrative Procedure Act, 5 U.S.C. § 705. Mot. Ex. V. EPA denied Denka's request without prejudice because Denka had not followed through in requesting an extension of the compliance deadline under the regulations implementing section 7412(f)(4). Mot. Ex. W. In its response, EPA explained that under its regulations, such a request must focus narrowly on the specific measures the applicant intends to pursue to reduce emissions from a specific source. *Id.*

Denka petitioned for review of the Rule without submitting a compliance-extension request to EPA under section 7412(f). Denka and EPA had informal discussions regarding a potential compliance-extension request, in which EPA "made clear . . . that [Denka] must commit to substantial additional actions to obtain relief from the 90-day implementation period." Mot. Ex. X, at 2. Denka did not submit a compliance-extension request before filing this motion, or since.[2]

---

[2]    Denka states that it has requested a compliance extension from a Louisiana state agency and suggests it lacked notice that EPA was not delegating authority to states to grant or deny extension requests under 40 C.F.R. § 63.6(*i*)(4)(ii). Mot. 8;

*Cont.*

7

## STANDARD OF REVIEW

Like a preliminary injunction, a stay of a rule is an "extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008). Denka shoulders the burden to justify a stay. *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985). The Court considers (1) whether Denka made a strong showing that it is likely to succeed on the merits; (2) whether Denka will suffer irreparable harm absent a stay; (3) whether a stay will substantially injure other interested parties; and (4) whether a stay would serve the public interest. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). The third and fourth requirements merge here. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

On the merits, the Court must uphold the compliance deadline in the Rule unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 7607(d)(9)(A); *id.* § 7607(d)(1)(C) (noting that subsection (d) applies to "any standard under section 7412(f)"). In this analysis, the Court applies the same standard of review as under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). *See Allied Loc. & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 68 (D.C. Cir. 2000). Relevant here, Denka shoulders the burden to show EPA

---

*see* 89 Fed. Reg. at 42,955 n.33. Denka offers no argument why EPA's delegation decision is unlawful. Any purported compliance extension granted by a state agency to Denka would be ineffectual.

"offered insufficient reasons for treating similar situations differently." *Cal. Cmtys. Against Toxics v. EPA*, 928 F.3d 1041, 1057 (D.C. Cir. 2019).

## ARGUMENT

The motion should be denied because it does not establish that any criterion for a stay is met.

Denka has not shown a likelihood of success on the merits. EPA did not act arbitrarily or capriciously in requiring Denka to request an extension of the default compliance deadline before deciding whether to grant the extension. Denka is the only neoprene producer affected by the Rule. EPA had alleged in a separate (and still pending) district court action that Denka's chloroprene emissions imminently and substantially endanger public health and welfare. Whether Denka will take steps during an extension period to protect people from imminent endangerment is a relevant consideration under the statutory provision that authorizes extensions.

Denka has not shown it will suffer certain and great irreparable injury from a shorter compliance period, and it fails entirely to argue that it is likely to succeed on a challenge to the substance of the rule. Nor does the balance of equities or the public interest support a stay. EPA found that cancer risk from some of Denka's chloroprene emissions is five times the presumptively acceptable rate, under the Rule's computation. A stay would suspend the critical public health protections the Rule provides for communities who must regularly breathe Denka's chloroprene

9

emissions, including the children who attend Fifth Ward Elementary School adjacent to the company's facility.

## I.     Denka is Unlikely to Succeed on the Merits.

Denka's motion presents a narrow challenge only to the compliance period for the chloroprene emission standards in the Rule. Denka does not challenge the standards in its motion. The only question here is whether it was reasonable for EPA to impose the default ninety-day compliance period and require Denka, but not other sources, to request an extension. The answer is yes: EPA required Denka to make the request because EPA had investigated and alleged that Denka's chloroprene emissions present an imminent and substantial endangerment to the public. By contrast, no other source covered by the Rule faced a similar endangerment action. Requiring that Denka make an extension request is also consistent with the statute and implementing regulations. Because EPA acted reasonably, the Court should deny the motion.

### A.     EPA Reasonably Required Denka to Submit an Extension Request.

EPA required only Denka to submit an extension request, because only Denka is a defendant in a suit brought by EPA alleging imminent and substantial endangerment to public health from the emissions that are the subject of the Rule. In other words, Denka is not similarly situated to the other sources. *See Cal. Cmtys. Against Toxics*, 928 F.3d at 1057. When EPA finalized the ninety-day

compliance deadline for existing neoprene producers, it provided that those sources may request a two-year extension under the statute and implementing regulations. 89 Fed. Reg. at 42,955. EPA thus outlined precisely what the applicant needs to show—that the extension is "necessary for the installation of controls" and steps will be taken to protect the public from imminent endangerment—to get the extension. *Id.* (citing 42 U.S.C. § 7412(f)(4)(B); 40 C.F.R. § 63.6(*i*)(4)(ii)).

EPA did not act arbitrarily or capriciously. EPA required this procedural step of Denka because of EPA's "finding that chloroprene emissions from the only such source"—meaning Denka—"pose an imminent and substantial endangerment under CAA section 303, 42 U.S.C. 7603." 89 Fed. Reg. at 42,955 (citing *United States v. Denka Performance Elastomer, LLC*, No. 23-cv-00735 (E.D. La. filed Feb. 28, 2023)). In other words, EPA investigated, and, on the Agency's behalf, the United States commenced a civil action alleging that Denka's chloroprene emissions present an imminent and substantial endangerment to the public.

To be sure, EPA's allegations have not yet been proven at trial. *See* Mot. 11. But the endangerment proceeding—concerning the *same* facility and emissions of the *same* hazardous air pollutant—gave EPA a reasonable basis to interpose the procedural step that Denka request a compliance extension. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 52 (1983) (agency decision

11

must be upheld where agency offers a "rational connection" between the facts and decision).

Requiring Denka to request an extension is also consistent with the statute and the regulations. Congress set a default period of ninety days for existing sources to comply with section 7412(f) standards and authorized EPA to grant extensions for up to two years. 42 U.S.C. § 7412(f)(4)(A)–(B); 40 C.F.R. § 63.6(*i*)(4)(ii); *Ass'n of Battery Recyclers*, 716 F.3d at 672. EPA promulgated regulations for compliance-extension requests. *See* 40 C.F.R. § 63.6(*i*)(4)(ii). A request must be submitted within ninety days after the effective date of the standard and describe the controls that will be installed and when installation will be completed. *Id.* § 63.6(*i*)(4)(ii), (6)(i). The regulations also set forth EPA's duties after receiving the request. *Id.* § 63.6(*i*)(13)(i), (iv). If EPA denies a request, it must give the grounds for doing so in writing, *id.* § 63.6(*i*)(13)(iv), and its denial is a final action subject to judicial review, *see, e.g.*, *Monsanto Co. v. EPA*, 19 F.3d 1201 (7th Cir. 1994).

Neither the statute nor the regulations entitle any person to an extension, especially absent a request. Whether to grant extensions is discretionary. After all, under the statute, EPA "may"—not must—grant an extension even when certain conditions are met. 42 U.S.C. § 7412(f)(4)(B); *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1401 (D.C. Cir. 1995) ("When a statute uses a permissive term such as

12

'may' rather than a mandatory term such as 'shall,' this choice of language suggests that Congress intends to confer some discretion on the agency, and that courts should accordingly show *deference* to the agency's determination.").

Whatever discretion the Agency has, no court has held that a source is entitled to an extension without making a request. In fact, the only decision about extensions of the compliance deadline of which undersigned counsel is aware is *Monsanto Co. v. EPA*, 19 F.3d 1201 (7th Cir. 1994). But that case does not help Denka, because the regulated source there affirmatively requested an extension— twice. 19 F.3d at 1203.[3] That court held that EPA's denial of the second request was arbitrary and capricious because of specific issues concerning the need to install controls in that case. *Id.* at 1207. *Monsanto* does not, as Denka contends, detract from the reasonableness of requiring Denka to submit a request here. Mot. 5.

However much Denka believes it qualifies for a compliance extension and contests the allegations in the endangerment action, *id.* at 9–10, 13–14, it must submit a compliance-extension request to EPA, which EPA would consider and decide (within thirty days of any additional presentation or argument) whether to grant or deny. 40 C.F.R. § 63.6(*i*)(13)(iv). But today, there is no such agency

---

[3]    The Seventh Circuit applied identical language in section 7412(f)(4)(B)'s predecessor. *See* 42 U.S.C. § 7412(c)(1)(B)(ii) (1988).

decision for the Court to review, and thus no administrative record on which this Court presently can decide whether EPA would likely be arbitrary and capricious if it denied a compliance-extension request.

Denka's contention that EPA must "explain its reasons" for imposing what Denka characterizes as an "impossible-to-meet compliance period" would flip the statute on its head. Mot. 11. The ninety-day compliance period is a default that Congress imposed, and Congress granted EPA discretion in determining whether to grant an extension of that deadline. Because Denka has not submitted an extension request to EPA, EPA understandably has not yet made any "finding" whether to grant or deny Denka an extension. *Id.* at 11–13.[4]

Finally, Denka's assertion that EPA "claims" a certain cancer incidence rate results in "imminent endangerment," and is reversing "policy" on that issue by finalizing the ninety-day compliance period, is wrong. *Id.* at 15–17. EPA made no such claim or reversal. And nowhere in the Rule did EPA equate "imminent endangerment" under section 7412(f)(4)(B) with any specific cancer risk rate.

---

[4] EPA explained its compliance-deadline decision by reference to the United States' endangerment suit against Denka, but EPA did not thereby "incorporate into the administrative record the entire record" of that litigation. Mot. 12. The Agency referred to the litigation to explain why it was reverting to the ninety-day statutory default in the final rule compared to the proposal—that is, the existence of an endangerment action to abate a public health endangerment caused by the only facility producing neoprene.

14

Rather, EPA withheld judgment whether to grant Denka a compliance extension because only Denka is subject to an endangerment action resulting from its emissions of chloroprene. The only differential treatment Denka received in the Rule is that it must submit a request for an extension. EPA was justified in requiring this procedural step of Denka.

### B.    Denka's Procedural Challenge Fails.

Denka incorrectly asserts that it lacked fair notice that EPA would reduce Denka's compliance time from the proposed to final versions. Mot. 18–19.[5] Denka relies on correspondence during the Office of Management and Budget review process to demonstrate a likelihood of success on this point. *Id.* at 19 (citing Exhibit R). That correspondence is outside the administrative record and thus cannot be considered in the Court's merits review. *See* 42 U.S.C. § 7607(d)(7)(A). But Denka's discussion of the document belies its claim of surprise at the final compliance period. Denka admits it "reviewed" the Office of Management and Budget's comments questioning the appropriateness of the proposed two-year compliance period "when [Denka] prepared comments on the Proposed Rule." *Id.* at 19. Denka cannot now claim to have lacked reasonable notice that EPA might

---

[5]    Denka refers to the "APA" in its subheading and cites *Environmental Integrity Project v. EPA*, 425 F.3d 992 (D.C. Cir. 2005), which dealt with the notice-and-comment requirements of the APA. In fact, the notice-and-comment requirements in section 7607(d) apply here.

finalize a different compliance period. Moreover, Denka even commented on the compliance period by advocating that EPA adopt the section 7412(f) standards under a different subsection and set a longer compliance window. Mot. Ex. J, at 107–09.[6]

## II.    Denka Will Not Suffer Certain and Great Irreparable Injury.

Denka fails to demonstrate irreparable harm of "such imminence that there is a clear and present need for equitable relief." *Wis. Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C. Cir. 1985) (cleaned up). Harm must be "both certain and great" and "actual and not theoretical" to justify the extraordinary relief of a stay pending review. *Id.* Consideration of harm is "critical," and "simply showing some possibility of irreparable injury" is insufficient. *Nken*, 556 U.S. at 434–35 (cleaned up).

That Denka does not challenge in its motion the substance of the chloroprene standards narrows the universe of irreparable injury that could entitle

---

[6]    To the extent Denka did *not* comment on the compliance-date issue, its challenge would not be before this Court. Judicial review of the Rule is limited to objections raised with reasonable specificity during the public-comment period, and if it was impracticable to raise an objection during that period or the grounds to object arose afterwards, Denka would have to petition for administrative reconsideration before raising the issue on judicial review. 42 U.S.C. § 7607(d)(7)(B); *see EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 137 (D.C. Cir. 2015) (holding that 42 U.S.C. § 7607(d)(7)(B) requires petitioner first to seek reconsideration on issue that EPA violated notice-and-comment requirements by significantly changing final rule from proposal).

it to a stay. Again, Denka argues only that it will succeed on a challenge to the compliance deadline. The only irreparable injury that the Court can consider, then, is that stemming from the compliance date being October 2024 rather than July 2026. True, this Court can be expected to dispose of the petition before July 2026. And if the chloroprene standards are vacated at that time (which they should not be), Denka would not have to comply with them prospectively. But because Denka does not even try to show that vacatur of the standards is the likely outcome, the Court must assume for purposes of this motion that the standards will be upheld. Put another way, when evaluating whether Denka "will be irreparably injured *absent* a stay," *Nken*, 556 U.S. at 434 (emphasis added), the Court must deduct any injuries Denka is expected to suffer even *with* a stay of the ninety-day compliance deadline that is the sole target of its motion.

Denka fails to demonstrate irreparable injury from the earlier compliance deadline. Denka relies on two declarations submitted with its motion. *See* Meyers Decl. ¶¶ 4–44, 50–54 (Mot. Ex. F); Helfrich Decl. ¶¶ 10–27 (Mot. Ex. S). Virtually all the claimed injuries stem from Denka having to comply with the chloroprene standards—irrespective of when. *E.g.*, Meyers Decl. ¶¶ 7, 41; Helfrich Decl. ¶ 8. The uncertain *additional* harm from a shorter compliance deadline is not the kind of certain and great harm required for the Court to issue a stay—as to only the ninety-day compliance deadline. *See Wis. Gas Co.,* 758 F.2d at 674.

17

The only extra cost Denka specifies that it is incurring from a ninety-day, as opposed to a longer, compliance period is the cost of hiring outside consultants. Meyers Decl. ¶ 52. But such costs do not constitute irreparable injury. Economic injury is generally not sufficient, except where the injury "threatens the very existence of the movant's business." *Wis. Gas Co.*, 758 F.2d at 674. Denka does not argue that hiring consultants will threaten its existence. Indeed, Denka's comments to the proposed rule reveal it has already hired many consultants for the installation and operation of many of the same controls the Rule requires. *See, e.g.*, Mot. Ex. J, at 77 ("Since the Proposed Rule was released, [Denka] has consulted with several engineering firms . . . ."); *id.* at 88–90 (discussing proposals Envent Corporation provided to Denka); *id.* at 97, 104 (discussing Montrose Environmental Solutions' advice to Denka). Denka has not established irreparable harm that would warrant a stay.

## III.    The Balance of Harms and Public Interest Favor Denying a Stay.

EPA determined in the Rule that the cancer risk for thousands of people exposed to chloroprene emissions at levels emitted by Denka's facility is not acceptable. Under EPA precedents, cancer risk from hazardous air pollutants like chloroprene is "presumptively acceptable" where excess lifetime cancer risks are below 100-in-1 million. *NRDC*, 529 F.3d at 1080–83; 54 Fed. Reg. at 38,044–45. Congress blessed EPA's approach. 42 U.S.C. § 7412(f)(2)(B). In the Rule's

18

computation, cancer risk from Denka's chloroprene emissions just from producing neoprene is five times higher—500-in-1 million. 89 Fed. Reg. at 42,963 (Table 5). The Rule's standards will reduce that risk to an acceptable level that provides an ample margin of safety to protect public health. Staying Denka's compliance deadline would delay those reductions and prolong unacceptable risks to the public.

Denka wrongly asserts that "a stay pending review will pose virtually no risk to the public." Mot. 22. But when Congress enacted section 7412, it recognized the serious threats to human health posed by toxic air pollutants. *See United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001) ("Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a statute."). And section 7412(f) in particular focuses on the *risk* of harm, not merely specific incidences of harm. *See* 89 Fed. Reg. at 42,958 (neoprene production risk assessment results); 42 U.S.C. § 7412(f)(2)(A) (discussing "lifetime excess cancer risks"). *Contra* Mot. 22–23.

The standards are thus consistent with the statute. Section 7412(f)(2) requires EPA to assess the residual risk to public health. If the standards for a source category do not provide "an ample margin of safety to protect public health," EPA must promulgate health-based standards for that source category to reduce risk further from hazardous air pollutant emissions and set appropriate

deadlines considering the circumstances of the regulated facilities. 42 U.S.C.
§ 7412(f)(2)(A). The standards are called "risk-based" or "health-based" because
they are based on a medical assessment of a given pollutant's health *risks*. *NRDC*,
529 F.3d at 1080.

In sum, the public is harmed by the increased risk of cancer from excess
chloroprene emissions from Denka's facility and will continue to be harmed until
Denka's facility complies with the Rule. By postponing reductions of this harmful
pollution, Denka's requested stay of the ninety-day deadline would adversely
affect the public interest and the health of people who live and work near the
facility. And because chloroprene can damage DNA, children are more susceptible
to its harmful effects. 89 Fed. Reg. at 43,058. It is hard to imagine that parents of
children living and attending school in the shadow of Denka's facility would
characterize their EPA-determined cancer risk as "vanishingly small." Mot. 23.

## IV.   Remedy

The Court should deny Denka's motion.

If the Court were inclined to grant the motion, however, the Court should
limit its stay order to be consistent with the two-year maximum extension that
Congress authorized in the statute. *See Ass'n of Battery Recyclers*, 716 F.3d at 672
("Because Congress clearly intended to grant existing sources no more than two

years to comply with standards promulgated under section [7412(f)], that is the end of the matter.").

If this Court were to grant Denka interim relief, any such order should reflect that Denka challenges only that it received the default ninety-day compliance deadline, not the chloroprene standards themselves. Denka cannot take a stay of the compliance deadline by this Court as license to freeze its compliance efforts during judicial review.

Thus, EPA respectfully proposes that if any interim relief is to be awarded to Denka, it be limited as follows: During judicial review of the Rule, the compliance date in 40 C.F.R. § 63.481(o) and (p)(2) for the section 7412(f) chloroprene standards that apply to Denka is treated as July 16, 2026. Then, if both the chloroprene standards and the October 15, 2024, compliance date are upheld on the merits, Denka would have to comply with the Rule immediately. If the chloroprene standards are upheld on the merits but the October 15, 2024, compliance date is vacated, Denka would have to comply with the Rule as of July 16, 2026.

21

# CONCLUSION

The Court should deny the motion to stay.

Respectfully submitted,

TODD KIM
*Assistant Attorney General*

*Of Counsel:*                                    *s/ Brandon N. Adkins*
MICHAEL THRIFT                          BRANDON N. ADKINS
HALI KERR                                        *Attorney, Environmental Defense*
  Office of the General Counsel          *Section*
  U.S. Environmental Protection       Environment and Natural Resources
  Agency                                            Division
  Washington, D.C.                            U.S. Department of Justice
                                                          P.O. Box 7611
                                                          Washington, D.C.  20044
                                                          (202) 616-9174
                                                          *Brandon.Adkins@usdoj.gov*

JUNE 11, 2024
90-5-2-3-22694

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Opposition complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font.

I further certify that this Opposition complies with the length limit of Fed. R. App. P. 27(d)(2)(A) because it contains 4,817 words, excluding exempted portions, according to the count of Microsoft Word.

*s/ Brandon N. Adkins*
BRANDON N. ADKINS

## CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2024, I electronically filed Respondent's Opposition to Motion to Stay Final Rule with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

*s/ Brandon N. Adkins*
BRANDON N. ADKINS

# EXHIBIT E

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 24-1135**                                    **September Term, 2023**

**EPA-89FR42932**

**Filed On:** June 26, 2024

Denka Performance Elastomer LLC,

       Petitioner

     v.

Environmental Protection Agency and
Michael Regan, Administrator, United States
Environmental Protection Agency,

       Respondents

------------------------------

Air Alliance Houston, et al.,
       Intervenors

    **BEFORE:**   Katsas, Rao, and Childs, Circuit Judges

## O R D E R

Upon consideration of the motion for a stay pending review, the oppositions thereto, and the reply, it is

**ORDERED** that the motion for a stay be denied.  Petitioner has not satisfied the stringent requirements for a stay pending court review.  See Nken v. Holder, 556 U.S. 418, 434 (2009); D.C. Circuit Handbook of Practice and Internal Procedures 32–33 (2020).

The Clerk is directed to enter a briefing schedule.

## Per Curiam

                    **FOR THE COURT:**
                    Mark J. Langer, Clerk

          BY:    /s/
                   Selena R. Gancasz
                   Deputy Clerk

# EXHIBIT F

ORAL ARGUMENT NOT YET SCHEDULED

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| **DENKA PERFORMANCE ELASTOMER LLC,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 24-1135** |
| | ) | |
| **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL REGAN, Administrator, United States Environmental Protection Agency,** | ) | |
| | ) | |
| **Respondents.** | ) | |

**PETITION FOR PANEL REHEARING AND REHEARING EN BANC ON ORDER DENYING EMERGENCY MOTION FOR STAY PENDING REVIEW**

James C. Percy
JONES WALKER LLP
445 N. Boulevard, Suite 800
Baton Rouge, LA 70802
Telephone: (225) 248-2130
jpercy@joneswalker.com

Robert E. Holden
Brett S. Venn
JONES WALKER LLP
201 St. Charles Ave
New Orleans, LA 70170
Telephone: (504) 582-8000
bholden@joneswalker.com
bvenn@joneswalker.com

David A. Super
Jason B. Hutt
Jeffrey R. Holmstead
Britt Cass Steckman
Kevin M. Voelkel
BRACEWELL LLP
2001 M Street NW, Ste. 900
Washington, DC 20036
Telephone: (202) 828-5800
david.super@bracewell.com
jason.hutt@bracewell.com
jeff.holmstead@bracewell.com
britt.steckman@bracewell.com
kevin.voelkel@bracewell.com

*Counsel for Petitioner Denka Performance Elastomer LLC*

## **RULE 28 CERTIFICATE OF PARTIES AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28, Petitioner Denka Performance Elastomer LLC ("DPE") certifies as follows:

**A.     Parties and Amici**

Petitioner:  Denka Performance Elastomer LLC.

Respondents:  United States Environmental Protection Agency and Michael S. Regan, as Administrator for the United States Environmental Protection Agency.

Respondent-Intervenors:  Concerned Citizens of St. John, Rise St. James Louisiana, Louisiana Environmental Action Network, Texas Environmental Justice Advocacy Services, Air Alliance Houston, California Communities Against Toxics, Environmental Defense Fund, Environmental Integrity Project, and Sierra Club.

Amici:  None as of the time of filing of this Petition.

**B.     Rule Under Review**

DPE has petitioned the Court to review EPA's final rule entitled "New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry," published in the Federal Register at 89 Fed. Reg. 42,932 on May 16, 2024.

**C.      Related Cases**

There are no related cases pending in this Court.  However, there is a related case pending in the United States District Court for the Eastern District of Louisiana captioned *United States v. Denka Performance Elastomer LLC*, No. 2:23-cv-00735 (E.D. La.) ("Section 303 Litigation").   In the Section 303 Litigation, filed on February 28, 2023, under EPA's emergency authority under Section 303 of the Clean Air Act, EPA alleges that the Facility's chloroprene emissions are causing an "imminent and substantial endangerment," and EPA seeks an injunction requiring DPE to shut down the Facility immediately and not resume production until DPE can demonstrate its ability to maintain chloroprene concentrations below 0.2 $\mu g/m^3$ or 0.3 $\mu g/m^3$ depending on the monitoring method.  In the Section 303 Litigation, the district court has indicated its intent to assess the validity of the scientific evidence underlying EPA's claims at trial.  *United States v. Denka Performance Elastomer LLC*, No. 2:23-cv-00735 (E.D. La.), R. Doc. 90 at 18 ("Although the Court has dismissed Denka's claims under the APA, Denka may still challenge the science behind the United States' Section 303 action.").

On February 12, 2024, after having demanded expedited litigation on the alleged "emergency" for nearly a year, EPA moved for an indefinite continuance of the March 2024 trial date in the Section 303 Litigation.  To justify the continuance, EPA pointed to the then-expected issuance of the Rule by March 29, 2024.  On

February 16, 2024, the district court granted EPA's unopposed continuance in the Section 303 Litigation, directing the parties to advise the court when the Final Rule is published after which the Court would set a status conference to discuss a new trial date. *United States v. Denka Performance Elastomer LLC*, No. 2:23-cv-00735 (E.D. La.), R. Doc. 169.

On May 28, 2024, the parties filed with the district court a joint notice of publication of the Final Rule. The district court has set a status conference for July 17, 2024.

Date: July 5, 2024                         */s/ David A. Super*
                                           David A. Super

                                           **Counsel for Petitioner**
                                           **Denka Performance Elastomer LLC**

## <u>RULE 26.1 DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 26.1 and D.C. Circuit Rule 26.1, Petitioner Denka Performance Elastomer LLC ("DPE") files the following statement:

DPE is a privately owned limited liability company formed under the laws of the State of Delaware, headquartered in LaPlace, Louisiana, and authorized to do business in the State of Louisiana.  DPE owns and operates a manufacturing facility in LaPlace, Louisiana that produces Neoprene by utilizing chloroprene, a chemical regulated under the EPA final rule at issue in this appeal.  DPE's membership interests are held by Denka USA LLC (whose ultimate parent is Denka Company Limited) and Diana Elastomers, Inc. (whose ultimate parent is Mitsui & Co., Ltd). Denka Company Limited and Mitsui & Co. Ltd. are each Japanese companies listed on the Tokyo Stock Exchange.

Date:  July 5, 2024                      */s/ David A. Super*
                                          David A. Super

                                          **Counsel for Petitioner**
                                          **Denka Performance Elastomer LLC**

# **TABLE OF CONTENTS**

RULE 28 CERTIFICATE OF PARTIES AND RELATED CASES.........................i

RULE 26.1 DISCLOSURE STATEMENT...............................................iv

TABLE OF AUTHORITIES .........................................................vi

    I.       INTRODUCTION AND RULE 35(b) STATEMENT ...........................1

    II.      ARGUMENT .........................................................4

           A.    In *Ohio,* The Supreme Court Held That, In A Case Such As This One, The Determination Of Whether To Grant A Stay "turns on the merits and the question who is likely to prevail at the end of this litigation."...............................4

           B.    Based On The Same Administrative Law Principles At Issue In This Case, The Supreme Court Found That The *Ohio* Petitioners Are Likely To Prevail On The Argument That EPA's Good Neighbor Rule Is Arbitrary And Capricious. ......................................................5

           C.    For The Same Reason Petitioners In *Ohio* Are Likely To Prevail On The Merits, It Is Highly Likely That DPE Will Prevail On The Argument That The 90-Day Deadline For DPE Is Arbitrary And Capricious..................................6

           D.    DPE Has "Strong Arguments" On Irreparable Harm: It Is Undisputed That, Without A Stay, DPE Will Be Forced To Shut Down In October 2024........................................12

    III.     REQUEST FOR RELIEF .....................................................16

CERTIFICATE OF COMPLIANCE.......................................................17

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Burlington Northern & Santa Fe Ry. Co. v. Surface Transp. Bd.*,
    403 F.3d 771 (D.C. Cir. 2005)................................................................7

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021).....................................................................5, 6

*Labrador v. Poe*,
    ---- U.S. ----, 144 S.Ct. 921 (2024)..............................................5

*Loper Bright Enterprises v. Raimondo*,
    603 U.S. ----, ---- S.Ct. ----, 2024 WL 3208360 (June 28, 2024).........................9

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut.
Automobile Ins. Co.*,
    463 U.S. 29 (1983)..........................................................3, 5, 6, 7, 10

*Nken* v. *Holder*,
    556 U.S. 418 (2009)....................................................................4, 5

*Ohio v. Environmental Protection Agency*,
    603 U.S. ----, ---- S.Ct. ----, 2024 WL 3187768 (June 27, 2024)
    ........................................................ 1, 2, 3, 4, 5, 6, 7, 10, 12, 13, 15

*Small Refiner Lead Phase-Down Task Force v. EPA*,
    705 F.2d 506 (D.C. Cir. 1983)............................................................10

*Steger v. Def. Investigative Serv. Dep't of Def.*,
    717 F.2d 1402 (D.C. Cir. 1983)...........................................................6

*Utah v. Environmental Protection Agency*,
    No. 23-1157 (D.C. Cir.), Doc. #2021268 ...........................................4

*West Virginia v. EPA*,
    No. 15A773 (Feb. 9, 2016) (Order)....................................................2

*Wis. Gas. Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985)...........................................................13

**Statutes**

42 U.S.C. § 7607(d)(6)(C) ....................................................................11

42 U.S.C. § 7607(d)(7)(A) ....................................................................11

**Other Authorities**

https://www.cancer.gov/about-
    cancer/understanding/statistics#:~:text=Approximately%2040.5%2
    5%20of%20men%20and,on%202017%E2%80%932019%20data ...................14

## I.    INTRODUCTION AND RULE 35(b) STATEMENT

In light of the United States Supreme Court's June 27 decision to grant a stay pending review in *Ohio v. EPA*, 603 U.S. ----, ---- S.Ct. ----, 2024 WL 3187768 (June 27, 2024), Denka Performance Elastomer LLC ("DPE") respectfully seeks Panel rehearing and rehearing en banc of this Court's Order of June 26 denying DPE's Emergency Motion for Stay Pending Review ("Stay Motion") (Doc. #2061788) in this action.

Panel rehearing and an en banc determination are warranted because the Panel's order denying the stay motion conflicts with the Supreme Court's analysis in *Ohio*, and reconsideration by the Panel or consideration by the full Court is therefore necessary to secure and maintain uniformity of the Court's decisions. In addition, this Petition raises a question of exceptional importance regarding the proper standard for deciding a stay pending review of an agency rule.

DPE's Stay Motion sought a stay of the 90-day compliance deadline set forth in a rule ("Rule") (Stay Motion Ex. A) promulgated by the Environmental Protection Agency ("EPA") under the Clean Air Act ("CAA"). In *Ohio*, the Supreme Court granted a stay pending review of another CAA rule issued by EPA, after this Court had denied a motion for a stay pending review of the same rule in that case.

In *Ohio*, by granting a stay motion that this Court had previously denied, the Supreme Court made it clear that this Court had not properly applied the factors that

are relevant for determining whether a stay pending review is justified.[1]  In granting the stay in *Ohio*, the Supreme Court issued a written opinion to explain the proper application of the stay factors, which is the first time the Supreme Court has issued an opinion to explain its reasoning for issuing a stay pending review of an agency rule.  In *Ohio*, the Court made it clear that, in a case where there are strong arguments about the harms and equities on both sides, the determination of whether to grant a stay pending review "turns on the merits and the question who is likely to prevail at the end of this litigation."  2024 WL 3187768, at *7.  The Supreme Court also emphasized that, in determining whether a petitioner is likely to prevail on the merits, a court must focus on whether an agency has provided a "satisfactory explanation" for its action that is "reasonable and reasonably explained" and shown that there is a "rational connection between the facts found and the choice made.'"  *Id.* at *7-8 (quoting cases).  These principles are highly relevant to DPE's Stay Motion and, DPE submits, warrant rehearing of the Court's denial of that Motion.

From DPE's perspective, the stakes here could not be higher:  The Rule requires DPE to shut down in 90 days if it cannot make major capital investments to

---

[1] As far as DPE has been able to determine, this Court has not granted a stay pending review of any EPA rule since 2011.  *See* Order No. 11-1302 (D.C. Circuit, Dec. 30, 2011).  Since 2016, however, the Supreme Court has granted motions for stays pending review of two EPA rules under the CAA after this Court had denied them. In addition to the Supreme Court's decision in *Ohio*, the Court also granted a stay pending review of EPA's "Clean Power Plan" on February 9, 2016.  *See West Virginia v. EPA*, No. 15A773 (Feb. 9, 2016) (Order).

install new emission control equipment by then—which EPA acknowledges is impossible.  Thus, without relief from the 90-day deadline, the DPE Facility will be shut down, likely permanently, costing the livelihoods of roughly 250 employees and their families.   Moreover, EPA has seen fit to direct these catastrophic consequences solely upon DPE, despite expressly finding that other facilities subject to the Rule—*which all have two years to comply with virtually identical requirements*—pose *greater* risk than the DPE's Facility.  In so doing, EPA has violated the same principles of administrative law that the Supreme Court emphasized in *Ohio*, because it utterly failed to provide even a plausible explanation for treating DPE differently than many other similarly situated parties, much less "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made."  *Id.*, at *7 (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co*., 463 U.S. 29, 43 (1983)).  Thus, in light of *Ohio*, DPE respectfully requests that the Panel reconsider its denial of DPE's Stay Motion and prevent EPA from closing down DPE's Facility before DPE can get its day in court.[2]

---

[2]  On April 19, 2024, DPE submitted to the Louisiana Department of Environmental Quality ("LDEQ") a request to extend the compliance period to two years.  On June 27, 2024, LDEQ granted DPE's Extension Request.  However, EPA has taken the position that "[a]ny purported compliance extension granted by a state to Denka would be ineffectual."  EPA Opp. (Doc. #2059123) at 7-8, n.2.  Thus, while DPE disputes EPA's position on the validity of the LDEQ extension request, that extension has no bearing on the need for a stay from this Court.

## II.     ARGUMENT

**A.     In *Ohio,* The Supreme Court Held That, In A Case Such As This One, The Determination Of Whether To Grant A Stay "turns on the merits and the question who is likely to prevail at the end of this litigation."**

In *Ohio*, several states and industry groups are challenging EPA's "Good Neighbor Rule," which requires power plants and other industrial sources in 23 states to reduce their emissions to ensure that they do not cause air quality problems in other "downwind states."  *Ohio*, 2024 WL 3187768, at *4-5.  After submitting their petitions for review, the petitioners in *Ohio* moved for a stay pending review from this Court, but the Court denied the stay, issuing the standard one-sentence explanation (as it did in the instant case) that the petitioners have "not satisfied the stringent requirements for a stay pending court review."  *See, e.g.*, *Utah v. EPA*, No. 23-1157 (D.C. Cir.), Doc. #2021268.  The petitioners in *Ohio* then sought a stay from the Supreme Court, which granted the stay and explained its reasoning for doing so.

The Supreme Court confirmed that, in deciding whether to issue a stay, it applies the same "sound principles" as other federal courts:

> (1) whether the applicant is likely to succeed on the merits, (2) whether it will suffer irreparable injury without a stay, (3) whether the stay will substantially injure the other parties interested in the proceedings, and (4) where the public interest lies.

*Ohio*, 2024 WL 3187768, at *6 (citing *Nken* v. *Holder*, 556 U.S. 418, 434 (2009)).

After summarizing the parties' arguments about the harms and equities, the Court

concluded that "both sides have strong arguments with respect to the latter three *Nken* factors." *Id.* at *7. It went on to say that "[b]ecause each side has strong arguments about the harms they face and equities involved, our resolution of these stay requests ultimately turns on the merits and the question who is likely to prevail at the end of this litigation. *Id.* (citing *Nken*, 556 U.S. at 434; *Labrador v. Poe*, ---- U.S. ----, 144 S.Ct. 921, 930-31 (2024)).

**B.    Based On The Same Administrative Law Principles At Issue In This Case, The Supreme Court Found That The *Ohio* Petitioners Are Likely To Prevail On The Argument That EPA's Good Neighbor Rule Is Arbitrary And Capricious.**

Turning to the likelihood of success analysis, the Court considered the same fundamental administrative law principles and cases that DPE discussed in its Stay Motion and concluded the *Ohio* petitioners are likely to prevail on the argument that the Good Neighbor Rule is arbitrary and capricious. *Id.* at *7-8. The Supreme Court started its analysis by emphasizing that "[a]n agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Id.* at *7 (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). The Court then confirmed that, to justify a rule, an agency must provide in the administrative record "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Id.* (quoting *Motor Vehicle Mfrs. Assn.,* 463 U.S. at 43). The Court further observed that "an agency cannot simply ignore 'an important aspect of the problem.'" *Id.*

-5-

After pointing out EPA's failure to explain a key provision in the Good Neighbor Rule, the Supreme Court found that the petitioners "are likely to prevail on their argument that EPA's final rule was not 'reasonably explained,'" *id.* at *8 (quoting *Prometheus Radio Project*, 592 U.S. at 423), that "the agency failed to supply 'a satisfactory explanation for its action[,]'" *id.* (quoting *Motor Vehicle Mfrs. Assn.*, 463 U.S. at 43), and that EPA "instead ignored 'an important aspect of the problem' before it." *Id.* Each of those conclusions applies with equal or greater force here.

## C.     For The Same Reason Petitioners In *Ohio* Are Likely To Prevail On The Merits, It Is Highly Likely That DPE Will Prevail On The Argument That The 90-Day Deadline For DPE Is Arbitrary And Capricious.

It is hard to imagine a regulatory requirement that is more arbitrary and capricious than the 90-day deadline that DPE asks this Court to stay. EPA has given DPE only 90 days to come into compliance when it has given all other similarly situated facilities two years to do the same. The Court has repeatedly said that agencies must treat like cases alike unless they provide a reasoned explanation based on substantial evidence in the record to justify the disparate treatment. *See* Stay Motion at 9-10, 17-18 (citing multiple cases, including *Steger v. Def. Investigative Serv. Dep't of Def.*, 717 F.2d 1402, 1406 (D.C. Cir. 1983) (An agency "cannot, despite its considerable discretion, treat similar situations dissimilarly, and, indeed, can be said to be at its most arbitrary when it does so.")).

EPA does not dispute that it has treated DPE differently from all other similarly situated parties.  Thus, the question before this Court is precisely the same as the question in *Ohio*—whether EPA has provided a "satisfactory explanation" for its action that is "reasonable and reasonably explained" and shown that there is a "rational connection between the facts found and the choice made.'"  *Ohio*, 2024 WL 3187768, at \*7 (quoting *Motor Vehicle Mfrs. Assn.*, 463 U.S. at 43).

In *Ohio*, the decision turned on whether EPA had provided such an explanation for a "severability provision" that it had included in the rule at issue. Here, this Court's decision turns on whether EPA has provided such an explanation for its disparate treatment of DPE.  As this Court has explained, "[w]here an agency applies different standards to similarly situated entities and fails to support this disparate treatment with *a reasoned explanation and substantial evidence in the record*, its action is arbitrary and capricious and cannot be upheld."  *Burlington Northern & Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 777 (D.C. Cir. 2005) (citation omitted) (emphasis added).

EPA has admitted that it has "singled out" DPE to require it to meet the undisputedly impossible task of complying with the Rule's requirements in only 90 days, when every other facility subject to the Rule, including those posing greater risks, have been given two years.  *See* Stay Motion at 14-18.  EPA has never done this in the nearly 35-year history of the current version of Section 112.  *Id.*; Reply at

4-5, 8-10.  Indeed, in just the past four years, in rules issued under the same statutory authority, EPA has provided two-year compliance deadlines in rulemaking to at least sixteen facilities (including several covered by this Rule) with risk levels higher (and in many cases substantially higher) than EPA alleges for DPE's Facility.  *See* Stay Motion at 15-18.



Here, EPA's only purported "explanation" for the disparate treatment of DPE is one sentence in the 136-page Preamble to the Rule referring to a purported "finding" of "imminent and substantial endangerment" that EPA made in an enforcement action (the still-pending "Section 303 Litigation" discussed above as a

related case) against DPE.[3]    EPA inexplicably claims to have made this

undocumented "finding" two months *before* it issued the Proposed Rule, in which

EPA proposed to give DPE (like every other facility) two years to implement the

Rule's requirements, completely undermining any notion of an alleged "imminent

endangerment."  Stay Motion at 5, 15-16.  As discussed in the Stay Motion—and

left completely unrebutted in EPA's Opposition—the record suggests that EPA's

only reason for cutting the compliance period from two years to 90 days was to

address an argument that DPE made, after the Proposed Rule was issued, in

summary judgment briefing.  *See* Stay Motion at 3-4.

    The administrative record contains no documentation of—let alone analysis

or evidence supporting—EPA's purported "finding" of "imminent and substantial

---

[3] Under the CAA, EPA can impose a 90-day deadline for facilities causing an "imminent endangerment," but EPA has never before alleged (let alone found) that a miniscule increase in lifetime cancer risk is an "imminent endangerment," and here does so only for DPE, not for other facilities undisputedly posing a higher cancer risk.  After the Supreme Court's recent decision in *Loper Bright*, the question of whether emissions from DPE's Facility constitute an "imminent endangerment" is a question that requires the Court to exercise its independent judgment to answer. *Loper Bright Enterprises v. Raimondo*, 603 U.S. ----, ---- S.Ct. ----, 2024 WL 3208360 (June 28, 2024) ("[C]ourts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous.").  DPE is confident that, under the CAA, a 0.0017 percent increase in lifetime cancer risk does not present an "imminent endangerment."  Because emissions from DPE's Facility, like emissions from the other sixteen facilities with higher estimated risk levels, do not constitute an "imminent endangerment," setting different compliance deadlines without reasoned explanation is a fundamentally arbitrary and capricious action.

-9-

endangerment."  Stay Motion at 7-8, 11-14; Reply at 10-12.  There is no factual *evidence* whatsoever in the administrative record to support EPA's disparate treatment of DPE.  *Id.*; EPA Opp. at 14, n.4 (EPA asserting "the *existence* of [the] endangerment action" is enough) (emphasis added).

In the Opposition brief, EPA's litigation counsel tried to expand on EPA's single sentence from the Rule by asserting that "EPA investigated, and, on the Agency's behalf, the United States commenced a civil action alleging that Denka's chloroprene emissions present an imminent and substantial endangerment."  EPA Opp. at 11.  But even litigation counsel failed to point to a single document substantiating EPA's purported "finding" or "investigation" *anywhere*, let alone in the administrative rulemaking record.  EPA's failure to point to *anything* in the administrative record to support its purported "finding" leaves DPE and this Court with no ability to confirm its existence, let alone scrutinize it.  EPA's failure of explanation violates the fundamental requirements of *Ohio* and this Court's precedent.  *Ohio*, 2024 WL 3187768, at *7 (the administrative record must contain "'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'") (quoting *Motor Vehicles Mfrs. Assn.*, 463 U.S. at 52); *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 519 (D.C. Cir. 1983) ("The final rule must be based entirely on material that has 'been placed in the docket as of the date of . . .  promulgation,' and the material in

the docket is the exclusive record for judicial review.") (citing 42 U.S.C. § 7607(d)(6)(C), (7)(A)).  At the very least, EPA was required to explain *somewhere* in the administrative record what facts and circumstances make the DPE Facility somehow different from the sixteen facilities posing higher risks that still received two-year compliance deadlines.  Stay Motion at 15-16 (discussing chart).

In its Opposition, EPA argued that it "reasonably required [DPE] to submit an extension request" to be sure that DPE would take additional steps to "protect the public from imminent endangerment" during the two-year compliance period.  EPA Opp. at 10-14.  But in every rulemaking like this one, EPA has provided compliance periods longer than 90 days (typically two years) without requiring any facility to take additional steps during the compliance period to protect the public from imminent endangerment, even in rules where the regulated facilities posed cancer risks much higher than those allegedly posed by DPE's Facility—and just as "imminent."

Here, EPA's disparate treatment of DPE is obvious: In a 136-page preamble, the Rule offers not a single word to explain *why DPE's facility poses an imminent endangerment* while facilities posing up to ten-times higher (and equally non-imminent) risk than the DPE Facility do not.  The absence of reasoned explanation for that disparate treatment renders the 90-day deadline arbitrary and capricious.

-11-

**D.**   **DPE Has "Strong Arguments" On Irreparable Harm: It Is Undisputed That, Without A Stay, DPE Will Be Forced To Shut Down In October 2024.**

As noted above, the Supreme Court explained in *Ohio* that, when "each side has strong arguments about the harms they face and equities involved, our resolution of these stay requests ultimately turns on the merits question who is likely to prevail at the end of this litigation."  *Ohio*, 2024 WL 3187768, at *7.  Certainly, the same must be true when the party seeking a stay faces irreparable harm that is much greater than the harm claimed by the other side.

Here, the impending irreparable harm facing the DPE Facility and its roughly 250 employees is certain and undisputed.  EPA does not dispute that it is impossible for DPE to comply with the 90-day compliance deadline without shutting down.  *See* Stay Motion Ex. F ¶¶ 4-37 (*unrebutted* testimony that Rule's requirements cannot be implemented in 90 days and will require at least two years); Stay Motion Ex. S ¶ 8 (same); Stay Motion at 9-11.   In the Proposed Rule, which contained substantially similar requirements as the Rule, EPA explicitly acknowledged that "[t]he proposed provisions will require additional time to plan, purchase, and install equipment for … chloroprene control" and therefore "propos[ed] a compliance date of 2 years after the publication date of the final rule."  Stay Motion Ex. B at 25,178. The Rule says nothing to the contrary.

-12-

If DPE's Facility is forced to shut down in 90 days, it will likely never reopen because it will have no revenue to fund pollution controls or operations on which they can be tested; and it will lose customers, suppliers, and workers with the necessary skills and experience to operate the Facility. Stay Motion Ex. F ¶¶ 4-44 (unrebutted declaration); Stay Motion Ex. S ¶ 22 (unrebutted declaration). These facts are undisputed.

In *Ohio*, the Court pointed to unrecoverable compliance costs as supporting the petitioners' "strong arguments" on irreparable harm. *Ohio*, 2024 WL 3187768, at 11. Here, the harm is far worse than in *Ohio* because it is existential. Without relief from the 90-day deadline, DPE will be forced to shut down the Facility in October and likely never reopen, threatening "the very existence of [the DPE Facility's] business." *Wis. Gas. Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). That is plainly irreparable harm.

In contrast to DPE's irreparable harm, the harm that EPA attributes to chloroprene emissions from DPE's Facility is relatively small. EPA estimates that, for a hypothetical person who remains continuously just outside the Facility's fenceline all day, every day for 70 years breathing the Facility's chloroprene emissions, that person's lifetime risk of cancer would be increased by 6-in-10,000 or 0.06 percent due to exposure to chloroprene. *See* Stay Motion Ex. A at 42,956-58 (Table 2). To put that risk in perspective, according to the U.S. Center for Disease

-13-

Control, an average American has a 40.5 percent chance of getting cancer in his or her lifetime.[4]  Assuming that EPA's claims about chloroprene's risk are true, this means that, for the above-described (and totally implausible) hypothetical person who remains planted outside the Facility's fenceline and breathes chloroprene emissions *continuously every day for 70 years*, that person's lifetime risk of cancer would be increased from 40.5 percent to 40.56 percent.[5]

If this Court were to grant a stay and DPE were to prevail on the merits of its claim against the 90-day deadline, DPE's compliance period would be extended by less than two years—or less than 1/35th of a 70-year period.  Granting the stay requested by DPE would, at most, increase that hypothetical person's alleged risk by less than 1/35th of this amount, or 0.0017 percent.  Thus, EPA's own risk calculus invites the Court to weigh the slightest of increased risk to a counterfactual population that remains planted outside the Facility's fenceline and breathes

---

[4] *See* https://www.cancer.gov/about-cancer/understanding/statistics#:~:text=Approximately%2040.5%25%20of%20men%20and,on%202017%E2%80%932019%20data.

[5] EPA claims that children are especially susceptible to this type of cancer risk, but this is already accounted for in EPA's risk estimates.  Stay Motion Ex. A at 43,058-59.  Thus, EPA estimates that an infant continuously exposed to emissions from the Facility, including chloroprene emissions, during the first two years of life—and for the next 68 years—would face an increase of 0.06 percent in his or her risk of getting cancer in their lifetime.  Notably, EPA's claim that children are more susceptible to chloroprene is the same for certain chemicals from other facilities regulated by the Rule, including those with higher estimated risk levels, yet EPA has given those facilities a two-year compliance period.  Reply at 22.

chloroprene emissions continuously every day for 70 years against the certainty of shutting down the Nation's only Neoprene plant by October 2024.

Except for allegations that EPA now makes against DPE, EPA has never claimed, in any rule or enforcement action, that such a risk must be abated immediately.  Until now, despite the fact that EPA often deals with such cancer risks in many of its regulatory programs, it has never claimed that such a risk represents an imminent endangerment, much less an "imminent and substantial endangerment." Stay Motion at 14-18.  Indeed, based on EPA's estimates of cancer risk, there are many people living around other industrial facilities that face a higher risk (and in some cases, a much higher risk) of cancer than anyone living near DPE's Facility. Stay Motion Ex. B at 25,106.  And this does not include cancer risk from "mobile sources" (cars, trucks, buses) or other non-industrial sources or other environmental factors.  In sum, there is no evidence of any harm that might be caused by a stay that would justify the *certainty* of shutting down the Facility and jeopardizing the livelihoods of more than 250 employees and their families.

But even assuming, for the sake of argument, that EPA did present "strong arguments" on potential harm caused by the Facility during a stay that might be as great as the irreparable harm to DPE in the absence of a stay, *Ohio* now requires that the analysis of whether to grant the stay should shift to the likelihood of success prong.  *Ohio*, 2024 WL 3187768, at *7.  As discussed above and set forth fully in

-15-

the Stay Motion and Reply, DPE has shown a strong likelihood of success on the merits.  In fact, it is hard to imagine a more clear-cut case of arbitrary and capricious agency action.

## III.    REQUEST FOR RELIEF

DPE respectfully requests that the Panel, or the Court en banc, rehear the denial of the Stay Motion and grant DPE a stay pending review of the 90-day compliance deadline.


Date:  July 5, 2024

Respectfully submitted,

*/s/ David A. Super*

| | |
|---|---|
| James C. Percy | David A. Super |
| JONES WALKER LLP | Jason B. Hutt |
| 445 N. Boulevard, Suite 800 | Jeffrey R. Holmstead |
| Baton Rouge, LA 70802 | Britt Cass Steckman |
| Telephone: (225) 248-2130 | Kevin M. Voelkel |
| jpercy@joneswalker.com | BRACEWELL LLP |
| | 2001 M Street NW, Ste. 900 |
| Robert E. Holden | Washington, DC 20036 |
| Brett S. Venn | Telephone: (202) 828-5800 |
| JONES WALKER LLP | david.super@bracewell.com |
| 201 St. Charles Ave | jason.hutt@bracewell.com |
| New Orleans, LA 70170 | jeff.holmstead@bracewell.com |
| Telephone: (504) 582-8000 | britt.steckman@bracewell.com |
| bholden@joneswalker.com | kevin.voelkel@bracewell.com |
| bvenn@joneswalker.com | |

***Counsel for Petitioner***
***Denka Performance Elastomer LLC***

-16-

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(g), I certify that this motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because this motion contains 3,900 words.

I further certify, pursuant to Fed. R. App. P. 27(d)(1)(E), that this motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this motion has been prepared in Times New Roman 14-point font using Microsoft Word 2013.

Date:  July 5, 2024                         _/s/ David A. Super_____
                                            David A. Super

                                            **_Counsel for Petitioner_**
                                            **_Denka Performance Elastomer LLC_**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this date, I have caused a true and correct copy of the foregoing *Petition for Panel Rehearing and Rehearing En Banc on Order Denying Emergency Motion for Stay Pending Review* to be electronically filed with the Clerk of the Court using the CM/ECF System, which will send a notice of filing to all registered users.


Date:  July 5, 2024                              /s/ David A. Super

                                                 David A. Super

                                                 **Counsel for Petitioner**
                                                 **Denka Performance Elastomer LLC**

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 24-1135**                                    **September Term, 2023**

**EPA-89FR42932**

**Filed On:** June 26, 2024

Denka Performance Elastomer LLC,

       Petitioner

    v.

Environmental Protection Agency and
Michael Regan, Administrator, United States
Environmental Protection Agency,

       Respondents

------------------------------

Air Alliance Houston, et al.,
       Intervenors


**BEFORE:**    Katsas, Rao, and Childs, Circuit Judges

## O R D E R

Upon consideration of the motion for a stay pending review, the oppositions thereto, and the reply, it is

**ORDERED** that the motion for a stay be denied.  Petitioner has not satisfied the stringent requirements for a stay pending court review.  See Nken v. Holder, 556 U.S. 418, 434 (2009); D.C. Circuit Handbook of Practice and Internal Procedures 32–33 (2020).

The Clerk is directed to enter a briefing schedule.

### Per Curiam

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:   /s/
      Selena R. Gancasz
      Deputy Clerk

# EXHIBIT G

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 24-1135**　　　　　　　　　　　　　　　　**September Term, 2023**

**EPA-89FR42932**

**Filed On:** July 17, 2024

Denka Performance Elastomer LLC,

　　　　　Petitioner

　　v.

Environmental Protection Agency and
Michael Regan, Administrator, United States
Environmental Protection Agency,

　　　　　Respondents

------------------------------

Air Alliance Houston, et al.,
　　　　　　　　Intervenors
------------------------------

Consolidated with 24-1228, 24-1246,
24-1249, 24-1250, 24-1251, 24-1252

**BEFORE:**　　Katsas, Rao, and Childs, Circuit Judges

## O R D E R

　　　　Upon consideration of the petition for reconsideration of the court's June 26, 2024 order denying petitioner's motion for a stay, it is

　　　　**ORDERED** that the petition for reconsideration be denied.  In neither the motion for a stay nor the petition for reconsideration has petitioner established that it will be irreparably harmed absent a stay given that it could but has not requested from respondents an extension of the deadline to comply with the rule under review.  See Nken v. Holder, 556 U.S. 418, 434 (2009).

### Per Curiam

　　　　　　　　　　　　　　　**FOR THE COURT:**
　　　　　　　　　　　　　　　Mark J. Langer, Clerk

　　　　　　　　　　　BY:　　/s/
　　　　　　　　　　　　　　　Selena R. Gancasz
　　　　　　　　　　　　　　　Deputy Clerk