## ORAL ARGUMENT NOT YET SCHEDULED

## UNITED STATES COURT OF APPEALS
### FOR THE FIFTH CIRCUIT

| | | |
|---|---|---|
| **DENKA PERFORMANCE ELASTOMER LLC,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| v. | ) | **No. 24-60351** |
| | ) | |
| **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL REGAN, Administrator, United States Environmental Protection Agency,** | ) ) ) ) ) | |
| | ) | |
| **Respondents.** | ) | |

## PETITIONER'S OPPOSITION TO RESPONDENTS' MOTION TO DISMISS

James C. Percy
JONES WALKER LLP
445 N. Boulevard, Suite 800
Baton Rouge, LA 70802
Telephone: (225) 248-2130
jpercy@joneswalker.com

Robert E. Holden
Brett S. Venn
JONES WALKER LLP
201 St. Charles Ave
New Orleans, LA 70170
Telephone: (504) 582-8000
bholden@joneswalker.com
bvenn@joneswalker.com

David A. Super
Jason B. Hutt
Jeffrey R. Holmstead
Britt Cass Steckman
Kevin M. Voelkel
BRACEWELL LLP
2001 M Street NW, Ste. 900
Washington, DC 20036
Telephone: (202) 828-5800
david.super@bracewell.com
jason.hutt@bracewell.com
jeff.holmstead@bracewell.com
britt.steckman@bracewell.com
kevin.voelkel@bracewell.com

*(counsel cont'd)*

Jeffrey L. Oldham
BRACEWELL LLP
711 Louisiana Street, Suite 2300
Houston, TX 77002
Telephone:  (713) 223-2300
jeffrey.oldham@bracewell.com

*Counsel for Petitioner Denka Performance Elastomer LLC*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

- Denka Performance Elastomer LLC ("DPE") (Petitioner). DPE is a privately owned limited liability company formed under the laws of the State of Delaware, headquartered in LaPlace, Louisiana, and authorized to do business in the State of Louisiana. DPE owns and operates a manufacturing facility in LaPlace, Louisiana that produces Neoprene by utilizing chloroprene, a chemical regulated under a Clean Air Act rule promulgated by EPA that is relevant to this action. DPE's membership interests are held by Denka USA LLC (whose ultimate parent is Denka Company Limited) and Diana Elastomers, Inc. (whose ultimate parent is Mitsui & Co., Ltd). Denka Company Limited and Mitsui & Co. Ltd. are each Japanese companies listed on the Tokyo Stock Exchange.

- BRACEWELL LLP (Counsel for Petitioner)

- David A. Super (Counsel for Petitioner)

- Jason B. Hutt (Counsel for Petitioner)

- Jeffrey R. Holmstead (Counsel for Petitioner)

- Britt Cass Steckman (Counsel for Petitioner)

- Kevin M. Voelkel (Counsel for Petitioner)

- Jeffrey L. Oldham (Counsel for Petitioner)

- JONES WALKER LLP (Counsel for Petitioner)

- James C. Percy (Counsel for Petitioner)

- Robert E. Holden (Counsel for Petitioner)

- Brett S. Venn (Counsel for Petitioner)

- United States Environmental Protection Agency (Respondent)

- Michael S. Regan, Administrator, United States Environmental Protection Agency (Respondent)

- United States Department of Justice, Environment and Natural Resources Division, Environmental Enforcement Section (Counsel for Respondents)

- Todd Kim (Assistant Attorney General)

- Alexander M. Purpuro (Counsel for Respondents)

- Brandon N. Adkins (Counsel for Respondents)

- Michael Thrift (Office of the General Counsel, EPA)

- Hali Kerr (Office of the General Counsel, EPA)

- Steven D. Shermer (Counsel for Respondents)

- Davis H. Forsythe (Counsel for Respondents)

- Daniel S. Smith (Counsel for Respondents)

- Hannah L. Frazier (Counsel for Respondents)

- Scott Cernich (Counsel for Respondents)

- Heather Gange (Counsel for Respondents)


Date: July 29, 2024                    */s/ David A. Super*
                                       David A. Super

                                       **Counsel for Petitioner**
                                       **Denka Performance Elastomer LLC**

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................i

TABLE OF AUTHORITIES .....................................................................................iv

TABLE OF EXHIBITS ............................................................................................vi

I.    INTRODUCTION.................................................................................1

II.    ARGUMENT ........................................................................................5

    A.    Only This Court Can Hear DPE's Petition. ...................................5

    B.    DPE Seeks Review Of EPA's Final Determination That
        The LDEQ Extension Is Invalid. ..................................................10

        1.    EPA's decisionmaking process is final and DPE need
            not wait for EPA to "drop the hammer" with an
            enforcement action. ............................................................10

        2.    EPA's invalidation of the LDEQ Extension
            determines DPE's rights and obligations. ..........................12

    C.    EPA's Arguments About The Form Of Its Invalidity
        Determination Ignore The Impact Of EPA's Action....................13

        1.    EPA's focus on the form of announcing its action is
            misguided...........................................................................13

        2.    EPA's determination of the LDEQ Extension's non-
            validity is not a mere litigation position. ...........................15

        3.    The statements of non-validity at issue were made by
            EPA....................................................................................16

        4.    The context of EPA's pronouncements is critical..............17

III.    CONCLUSION ...................................................................................18

CERTIFICATE OF COMPLIANCE.......................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbott Laboratories v. Gardner*,
  387 U.S. 136 (1967)............................................................................................15

*Barrick Goldstrike Mines Inc. v. Browner*,
  215 F.3d 45 (D.C. Cir. 2000)....................................................................13, 14, 17

*Ciba-Geigy Corp. v. EPA*,
  801 F.2d 430 (D.C. Cir. 1986).......................................................................15, 18

*Clarke v. CFTC*,
  74 F.4th 627 (5th Cir. 2023) ................................................................6, 11, 12, 14

*Coughlin v. Capitol Cement Co.*,
  571 F.2d 290 (5th Cir. 1978) .............................................................................17

*Data Mktg. P'ship v. Dep't of Labor*,
  45 F.4th 846 (5th Cir. 2022) ........................................................................12, 15

*Elldakli v. Garland*,
  64 F.4th 666 (5th Cir. 2023) ...............................................................................7

*Friedman v. Federal Aviation Administration*,
  841 F.3d 537 (D.C. Cir. 2016)......................................................................12, 15

*Her Majesty the Queen in Right of Ontario v. EPA*,
  912 F.2d 1525 (D.C. Cir. 1990)....................................................................14, 15

*Luminant Generation Co. v. EPA*,
  757 F.3d 439 (5th Cir. 2014) ............................................................................8, 9

*Mexichem Specialty Resins, Inc. v. EPA*,
  787 F.3d 544 (D.C. Cir. 2015) (Kavanaugh, J., dissenting in part) .....................7

*Monsanto v. EPA*,
  19 F.3d 1201 (7th Cir. 1994) ...............................................................................6

*Nat'l Ass'n of Home Builders v. Norton*,
  415 F.3d 8 (D.C. Cir. 2005)..................................................................................9

*Sackett v. EPA*,
  566 U.S. 120 (2012)...........................................................................10, 11, 12, 16

*Texas v. Becerra*,
  89 F.4th 529 (5th Cir. 2024) ................................................................7, 8, 10, 18

*Texas v. EPA*,
  829 F.3d 405 (5th Cir. 2016) ...........................................................................5, 7

*Texas v. United States*,
  40 F.4th 205 (5th Cir. 2022) ...............................................................................17

*United States v. Yildiz*,
  355 F.3d 80 (2d Cir. 2004) ..................................................................................12

*Walmart v. Department of Justice*,
  21 F.4th 300 (5th Cir. 2021) ...............................................................................16

*Watts v. SEC*,
  482 F.3d 501 (D.C. Cir. 2007)......................................................................15, 16

**Statutes**

5 U.S.C. § 705...........................................................................................................7

28 U.S.C. § 2201(a) ..................................................................................................7

42 U.S.C. Chapter 85 ............................................................................................2, 8

42 U.S.C. § 7605(a) ................................................................................................17

42 U.S.C. § 7607(b) ......................................................................................3, 5, 6, 7

42 U.S.C. § 7607(b)(1)..........................................................................................2, 7

**Rules**

Federal Rule of Appellate Procedure 27(a)(3)...........................................................1

Federal Rule of Evidence 801(d)(2)(C)..................................................................17

# TABLE OF EXHIBITS

| Exhibit 1 | Transcript of Status Conference, *United States v. Denka Performance Elastomer, LLC*, No. 2:23-cv-00735 (E.D.La. July 17, 2024) |
| --- | --- |

## I.    INTRODUCTION

Pursuant to Rule 27(a)(3) of the Federal Rules of Appellate Procedure, Denka Performance Elastomer LLC ("DPE") files this opposition to the Environmental Protection Agency's ("EPA") Motion to Dismiss ("Motion") DPE's Petition for Review and Complaint for Declaratory and Injunctive Relief ("Petition").[1]

For over two years, EPA has been laser-focused on a politically motivated, unscientific crusade to shut down Denka's Neoprene facility in LaPlace, Louisiana (the "Facility"). When EPA's February 2023 "emergency" lawsuit against DPE in Louisiana district court faced dismissal in February 2024, EPA shifted to rulemaking tactics to, again, single out DPE and put the Facility out of business. Through its final rule released in March 2024 and published on May 16, 2024 ("Rule") (*see* Petition Exhibit A), EPA (with no prior notice) demands that DPE implement comprehensive emission control requirements by October 15, 2024, an undisputedly impossible task. The 200-plus other facilities subject to the Rule, including facilities that EPA itself estimates pose higher estimated risk levels than the Facility, have two years to comply. Thus far, EPA has "gotten away" with its conduct in unlawfully singling out DPE through the Rule.

---

[1] For additional context relevant to this dispute, DPE respectfully refers the Court to the "Background" section of its Petition at pages 7-18.

On June 27, 2024, Louisiana's Department of Environmental Quality ("LDEQ") extended a lifeline to DPE—a two-year extension of time to comply with the Rule—based on LDEQ's decades-old authority to issue such extensions as a State with an approved permitting program under the Clean Air Act ("CAA"). Undeterred, EPA has determined that the LDEQ Extension is invalid, thereby threatening DPE with substantial criminal and civil penalties for each day it operates past October 15. Unless this Court determines the validity of the LDEQ Extension, DPE's Facility will be forced to shutdown by October 15, for fear of EPA "dropping the hammer" through crippling civil and criminal enforcement proceedings.

This Court has original jurisdiction over this action pursuant to Section 307(b)(1) of the CAA, 42 U.S.C. § 7607(b)(1), because this action challenges a final action of the EPA Administrator under Chapter 85 of the CAA, 42 U.S.C. Chapter 85. Section 307(b)(1) of the CAA requires that this type of petition—challenging a regionally applicable EPA action—*must* be brought in this Court and nowhere else.

EPA claims this is merely a "second bite at the apple" and "collateral attack" that belongs in the D.C. Circuit action, but that fundamentally misunderstands the issue here and the rule challenge before the D.C. Circuit. The question here is the validity of the LDEQ Extension even assuming the Rule is valid, and that question was not and could not be presented to the D.C. Circuit.

It is EPA's determination that the LDEQ Extension is invalid that has changed the date by which DPE must comply with the Rule, and that determination clearly impacts DPE's legal rights and obligations. Prior to EPA's action, DPE's obligation, per the LDEQ Extension, was to comply with the Rule by July 15, 2026. But as a direct result of EPA's action, DPE's obligation is now to comply by this coming October—again, an impossibility, and so the de facto legal obligation is for DPE to shut down the Facility. Section 307(b) vests exclusive jurisdiction in this Court to adjudicate petitions for review of such agency actions that impact a party's legal rights and obligations solely inside this Court's geographic coverage.

While EPA denies that there has been final agency action, in its Motion, EPA openly argues that the LDEQ Extension is invalid and does not even remotely suggest that its determination is subject to further deliberation. *See* Motion at 17-20. Instead, EPA aims to obfuscate and distract. For example, EPA argues that its determination about the LDEQ Extension is the same agency action as the Rule (*id.* at 20), despite that EPA's determination here (i) relates to the separate action of the State with delegated regulatory and permitting authority, (ii) imposes a legal impact *solely* on DPE's Facility, and (iii) was issued *after* the Rule was published.

EPA suggests that its determination that the LDEQ Extension is invalid is immune from judicial review simply because of the manner in which EPA communicated its determination. Motion at 11. But EPA's action has been

eminently clear. EPA expressly represented to the D.C. Circuit that "[a]ny purported compliance extension granted by a state agency to *Denka* would be ineffectual." Petition Exhibit J at 7-8 n.2 (emphasis added). At the time of EPA's "ineffectual" statement to the D.C. Circuit in late-June, an extension from LDEQ for the DPE Facility was hardly hypothetical. DPE had submitted the extension request to LDEQ on April 19, 2024 (*see* Petition Exhibit I), and LDEQ had publicly posted the request on its official records website.

If that was not already clear enough, on July 17, 2024, counsel for EPA represented to the U.S. District Court for the Eastern District of Louisiana in EPA's 303 Litigation against DPE that the LDEQ Extension is invalid. *See* Transcript of July 17, 2024, Status Conference at 17, 19 ("EPA does not believe that [the LDEQ Extension] is valid," and "it is [EPA's] belief that on October 15 that emissions standard … will become effective.") (attached hereto as Exhibit 1).

But while those statements are perfectly clear, it makes no difference *how* EPA communicates its determination that DPE cannot rely on the LDEQ Extension to operate after October 15, 2024. The legal impact of EPA's determination is unmistakable. EPA wields the hammer of the government and the threat of substantial criminal and civil penalties. From DPE's perspective, ignoring a clear and definitive direction from its federal regulator would be just as reckless whether such a statement was communicated in a letter, memorandum, order, phone call,

court filing, or statement in open court. EPA's theory of the case would incentivize federal agencies to hide their compliance determinations behind informal communications. Courts have soundly rejected such transparent attempts to evade judicial review. EPA's Motion to Dismiss should be denied.

## II.    ARGUMENT

EPA's primary jurisdictional argument is that the only final agency action here is the Rule, which is subject to review in the D.C. Circuit, and that DPE's Petition is therefore a collateral attack on a rulemaking challenge already before the D.C. Circuit. That argument should be rejected because it ignores the text of the CAA, the facts, and binding case law defining "final agency action."

## A.    Only This Court Can Hear DPE's Petition.

The judicial review provision under the CAA, Section 307, vests appellate courts with jurisdiction over challenges to final agency actions pursuant to the CAA and delineates the appropriate venue according to the nature of the action that the petition challenges. *See* 42 U.S.C. § 7607(b). As this Court has explained: "The statute separates petitions for review of nationally applicable actions from petitions for review of locally or regionally applicable actions. The question of applicability turns on the legal impact of the action as a whole." *Texas v. EPA*, 829 F.3d 405, 419 (5th Cir. 2016) (citations omitted). EPA's determination that the LDEQ Extension is invalid has a "legal impact" solely on DPE and solely on the DPE Facility located

in Louisiana. EPA was crystal clear: its determination applied to extensions "granted by a state agency to *Denka*." Petition Exhibit J at 7-8, n.2 (emphasis added).

EPA seeks to avoid this Court's jurisdiction by mischaracterizing this action as a challenge to the Rule. Motion at 1. But this lawsuit assumes the Rule's validity and challenges another specific and narrow agency action under the CAA—i.e., EPA's separate determination, made after the Rule was issued, that the LDEQ Extension is invalid. The Rule itself obviously does not address the question of the validity of the LDEQ Extension post-Rule. The Rule applies to more than 200 facilities, and it was released before the LDEQ Extension. Conversely, EPA's determination at issue here addresses *solely* the LDEQ Extension, imposes a legal impact *solely* on DPE's Facility, and was issued *after* the Rule was published. The Rule was an action by EPA. The LDEQ Extension was a separate action by LDEQ. *See Monsanto v. EPA*, 19 F.3d 1201, 1204 (7th Cir. 1994) (finding Seventh Circuit had jurisdiction to review the denial of a request for a compliance date extension for an EPA CAA rule).[2] EPA's invalidation of the LDEQ Extension is yet another separate, reviewable agency action. *See Clarke v. CFTC*, 74 F.4th 627, 637 (5th Cir.

---

[2] In *Monsanto*, as here, the underlying CAA rule could only be challenged in the D.C. Circuit, but litigation relating to the compliance date extension was appropriately heard in the local Court of Appeals (the Seventh Circuit) pursuant to 42 U.S.C. § 7607(b).

2023) (recognizing that a CFTC no-action letter is a "license" under the APA and that withdrawal of that letter is a separate, reviewable agency action).

Unlike the Rule, which has nation-wide applicability, EPA's determination that the LDEQ Extension is invalid applies only to DPE's Facility in Louisiana. EPA's determination of invalidity is a "locally or regionally applicable" action that "may be filed only in the United States Court of Appeals for the appropriate circuit" —this Court. 42 U.S.C. § 7607(b).[3]  In the D.C. Circuit action, DPE is appropriately challenging the compliance deadline set by EPA in the Rule.  However, a review of EPA's distinct determination that the LDEQ Extension is invalid can *only* be heard in this Court. 42 U.S.C. § 7607(b)(1); *Texas v. EPA*, 829 F.3d at 419.  It is hard to imagine an EPA action—targeting a single operator by name—that is more clearly regionally applicable.

EPA relies on *Texas v. Becerra*, 89 F.4th 529 (5th Cir. 2024), to argue that its invalidation of the LDEQ Extension is not agency action separate from the Rule.

---

[3] As EPA appears to acknowledge, Motion at 9, 14, DPE does not rely on the Declaratory Judgment Act as a basis for jurisdiction.  Therefore, *Elldakli v. Garland*, 64 F.4th 666, 670 (5th Cir. 2023), is inapposite.  Motion at 14.  The Declaratory Judgment Act gives this Court the authority to issue declarations in cases like this one where it has jurisdiction based on some other statutory provision. 28 U.S.C. § 2201(a).  Further, this Court may rely on its APA authority to supplement its CAA authority, including to issue stays as necessary to maintain the status quo pending judicial review. *See Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 562 n.1 (D.C. Cir. 2015) (Kavanaugh, J., dissenting in part) ("The Clean Air Act does not displace Section 705, the general APA provision governing stays pending judicial review.").

Motion at 12.  But *Becerra* supports *DPE's* position.  In *Becerra*, this Court found that a guidance document promulgated by the Department of Health & Human Services following a U.S. Supreme Court decision that "caused a sea change in the law" was new agency action, because the guidance created "new policy" and "legal consequences" in response to the "new ingredient" injected by the change in law. 89 F.4th at 541.  EPA cannot legitimately argue that its position on the LDEQ Extension's validity was not "new" final action.  Motion at 12.  EPA had never before determined that an extension from LDEQ to DPE was invalid.  The LDEQ Extension *was* the "new ingredient" to which EPA responded by determining its invalidity, and the "new policy" and "legal consequences" created by EPA's determination are therefore what is challenged here.

EPA's reliance on *Luminant Generation Co. v. EPA*, 757 F.3d 439, 441-42 (5th Cir. 2014), is equally misplaced.  Motion at 12.  In *Luminant*, this Court determined that EPA's issuance of a notice of violation under Section 313 of the CAA was not final agency action.  But the Court relied on specific language in Section 313, not applicable here, to conclude that the notice did not commit EPA to any particular course of action.  *Id.* at 442-43.  In contrast, EPA here has expressly informed DPE that the LDEQ Extension is invalid, effectively forcing DPE to either shutdown the Facility by October 15, 2024, or, in reliance on the LDEQ Extension, continue to operate the Facility after October 15 and risk civil and criminal

enforcement action by EPA. Given that EPA has been laser-focused on shutting down the Facility for over a year in the Section 303 Litigation in Louisiana district court, there is no need to speculate as to whether EPA will pursue aggressive enforcement action if DPE continues to operate after October 15. These circumstances were not present in *Luminant*.[4]

In addition, EPA's assertion that the "regulatory text that withholds authority from states would have force even without the footnote" (Motion at 12) has no bearing on whether this Court has *jurisdiction* to adjudicate this case. Disputes with EPA commonly arise when operators allege that EPA has misapplied law to facts. If EPA's theory were accepted, it is hard to imagine this Court having jurisdiction over *any* case involving an agency enforcement action because there is always an underlying source of law being applied. The *jurisdictional* question at issue in EPA's Motion is not whether EPA's application of law is valid, but whether that application is *reviewable* by this Court.

---

[4] *National Association of Home Builders v. Norton*, 415 F.3d 8 (D.C. Cir. 2005), is similarly inapposite. Motion at 12. There, the D.C. Circuit determined that the Department of Interior's actions were not final agency action because they did not determine legal obligations where the agency's directives were "voluntary" and were "consistently referred to in agency documents as 'recommended,' rather than mandatory." 415 F.3d at 14 (citations omitted). Here, EPA's determination that the LDEQ Extension is invalid is expressed in unequivocal terms. Particularly in light of EPA's ongoing campaign against DPE, EPA left no doubt that DPE cannot rely on the LDEQ Extension to operate after October 15 without the protections requested from this Court.

**B.    DPE Seeks Review Of EPA's Final Determination That The LDEQ Extension Is Invalid.**

EPA has made a final determination that the LDEQ Extension is invalid.  EPA has declared multiple times and in multiple venues that the LDEQ Extension is "ineffectual" and "invalid."    Therefore, absent relief from this Court, EPA's determination of invalidity will prevent DPE from relying on the LDEQ Extension to operate after October 15.  EPA acknowledges, but does not meaningfully address, the two-part test for whether agency action is "final" and thus subject to judicial review: the action must (1) "'mark the 'consummation' of the agency's decisionmaking process,' and (2) 'must be one by which rights or obligations have been determined, or from which legal consequences will flow.'"    Motion at 10 (quoting *Becerra*, 89 F.4th at 538).  This case easily satisfies the test for final agency action.

> **1.    EPA's decisionmaking process is final and DPE need not wait for EPA to "drop the hammer" with an enforcement action.**

EPA does not dispute that its decisionmaking process is complete and that it does not intend to engage in further review of the validity of the LDEQ Extension. EPA also fails to address *Sackett v. EPA*, 566 U.S. 120 (2012), the primary authority on which DPE's final agency action argument rests.  *See* Motion for Stay at 9, 12, 14 (citing *Sackett*).  In *Sackett*, the Supreme Court recognized that a party faced with potential enforcement action need not wait for "the Agency to drop the hammer,"

but could obtain immediate judicial review once the agency's position is final. 566 U.S. at 127. Here, like *Sackett*, "EPA's 'deliberation' over whether" DPE will be in violation of the CAA on October 15 "is at an end; the Agency may still have to deliberate over whether it is confident enough about this conclusion to initiate litigation, but that is a separate subject." *Id.* at 129.

EPA's position appears to be that DPE cannot obtain judicial review until EPA issues some more official statement at a time of its choosing. *See, e.g.*, Motion at 13 (asserting that EPA's failure to respond to DPE's June 28 letter "*so far* … does not determine rights or obligations, nor does it carry legal consequences") (emphasis added). But there is no mechanism for such a statement other than an enforcement action. *See Sackett*, 566 U.S. at 127 (agency decisionmaking process has consummated where agency's conclusions are "not subject to further Agency review"). The perverse result of EPA's logic is that an agency can loudly and unambiguously change the legal rights of a regulated party but evade judicial review simply by the form of or label it attaches to its pronouncement. This flies in the face of *Sackett* and the decisions of this Circuit applying it. *See, e.g.*, *Clarke*, 74 F.4th at 638 ("As to the 'consummation' prong, the key question is whether withdrawal of the no-action letter is subject to further agency review.") (cleaned up).

**2. EPA's invalidation of the LDEQ Extension determines DPE's rights and obligations.**

Since the LDEQ Extension was issued, EPA's "unwavering position," *Friedman v. Federal Aviation Administration*, 841 F.3d 537, 539 (D.C. Cir. 2016), has been that the LDEQ Extension is invalid and that DPE will be in violation of the Rule if it continues operating after October 15, 2024, without having complied with the Rule's impossible-to-meet requirements. As in *Sackett*, EPA has "determine[d]" DPE's "rights" and "obligations." 566 U.S. at 126. The Rule set DPE's compliance period at 90 days after the effective date. The LDEQ Extension extended the compliance period to two years (until July 15, 2026). EPA's invalidation of the LDEQ Extension has the effect of undoing the license granted by LDEQ. "Courts have previously found that … grants of permission to avoid compliance with administrative requirements constitute agency action," and that "withdrawal" of such grants "constitute[] agency action." *Clarke*, 74 F.4th at 637. Like the withdrawal of the CFTC no-action letter in *Clarke*, which found that the prior no-action letter was "void," EPA's action here unquestionably results in legal consequences to DPE. *Id.* at 638-39.[5]

---

[5] Further, EPA does not deny that it is bound by its multiple statements in Court that the LDEQ Extension is invalid. *Id.* at 638 (citing *Data Mktg. P'ship v. Dep't of Labor*, 45 F.4th 846, 854 (5th Cir. 2022)); *see United States v. Yildiz*, 355 F.3d 80, 82 (2d Cir. 2004) ("[T]he government's attorneys can bind the government with their in-court statements … and filings.").

**C.   EPA's Arguments About The Form Of Its Invalidity Determination Ignore The Impact Of EPA's Action.**

   **1.   EPA's focus on the form of announcing its action is misguided.**

EPA attempts to downplay the import of its action by characterizing it, dismissively, as "a footnote in a brief," and a "litigation decision." Motion at 11, 12. But "[f]inal agency action may result from a series of agency pronouncements rather than a single edict." *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48-49 (D.C. Cir. 2000). Here, EPA has been clear that it views the LDEQ Extension as invalid. While DPE's extension request was pending with LDEQ since April 19, 2024, EPA's footnote in its D.C. Circuit brief was the first public expression of the agency's position that has further crystallized as this fast-moving case has progressed. By letter dated June 28, 2024, DPE, facing potential civil and criminal liability under the CAA if it continues to operate past October 15 in reliance on an invalid extension of compliance, requested that EPA provide a written response to clarify whether DPE should consider itself bound by EPA's position that the LDEQ Extension was "ineffectual." EPA refused to respond. Subsequently, on July 17, counsel for EPA represented to the U.S. District Court for the Eastern District of Louisiana that "EPA does not believe that [the LDEQ Extension] is valid," and that "it is [EPA's] belief that on October 15 that emissions standard … will become effective" as to DPE. July 17, 2024 Transcript at 17, 19 (Exhibit 1). Rather than explain its position in response to DPE's June 28 letter, EPA filed its Motion (and

opposition to DPE's Stay Motion) in this Court that, for the first time, laid out *why* EPA believes that the LDEQ Extension is invalid.

EPA is overly focused on the *form* of the agency action at issue and the fact that its invalidation of the LDEQ Extension was first promulgated via a statement in an appellate brief. Motion at 12. As an initial matter, in considering finality, courts may consider statements by agency counsel made in the course of litigation. *See Barrick Goldstrike Mines*, 215 F.3d at 48 ("Counsel for EPA admitted at oral argument that EPA's position on the application of the de minimis exception to waste rock is final.").

But more fundamentally, the *form* of EPA's statement does not dictate whether the Agency's action is final and reviewable. *See Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1531 (D.C. Cir. 1990) ("[T]he absence of a formal statement of the agency's position … is not dispositive[.]"). Here, the form of EPA's pronouncement that DPE will be violating the law as of October 15 makes no difference to DPE. DPE's legal obligations as a result of that communication are the same. Stay Motion at 13 (explaining that EPA action creates new "obligations" and "legal consequences" for DPE because it prevents DPE from relying on the LDEQ Extension). For that reason, whether a particular action is "final agency action" under the APA and CAA "is a pragmatic inquiry colored by the APA's embodiment of the 'basic presumption of judicial review.'" *Clarke*, 74 F.4th at 637-

-14-

38 (quoting *Abbot Lab'ys*, 387 U.S. at 140)); *accord Her Majesty the Queen*, 912 F.2d at 1531 (noting the "flexible and pragmatic way in which we apply the finality requirement"). Thus, courts find final agency action in such diverse forms as letters from agency officials (*Her Majesty the Queen*, 912 F.2d at 1528-29); advisory opinions (*Data Mktg. P'ship v. Dep't of Labor*, 45 F.4th 846, 852 (5th Cir. 2022)); and even failure to act at all (*Friedman*, 841 F.3d at 542).

If EPA sent DPE a letter with the same language and arguments that it made to the D.C. Circuit, the Eastern District of Louisiana, and this Court, there would be no question that such a letter constituted a reviewable, final agency action. *See Her Majesty the Queen*, 912 F.2d at 1528-29; *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 435 & n.7, 436 (D.C. Cir. 1986) (agency letter threatening enforcement action constituted final agency action). EPA cannot shield its positions from judicial review by using court briefs to promulgate them. Notably, EPA does not dispute the position set forth in the court briefs, nor does EPA suggest that its position remains under consideration.

### 2. EPA's determination of the LDEQ Extension's non-validity is not a mere litigation position.

EPA relies on *Watts v. SEC*, 482 F.3d 501 (D.C. Cir. 2007), for the proposition that a "litigation decision" is not a reviewable final agency action. Motion at 12-13. But *Watts* is entirely inapposite. There, the D.C. Circuit denied a motion to compel third-party testimony of SEC employees in a civil dispute between two private

parties, reasoning that "an agency's determination not to comply with a third-party subpoena in an ongoing civil suit is simply an agency's ordinary litigation decision, not an 'order' that a court of appeals has separate jurisdiction to directly review." 482 F.3d at 503. Unlike in this case, there was no allegation that the agency's response to the subpoena somehow determined the party's rights or obligations or exposed the party to enforcement action. This case is far more like *Sackett*, where the Court expressly relied on "the Government's current litigating position" in deciding the agency action at issue was final. 566 U.S. at 126.

EPA also gives a "cf." citation to *Walmart v. Department of Justice*, 21 F.4th 300, 309 (5th Cir. 2021), where this Court held that the Department of Justice's negotiating position during settlement talks, made "behind closed doors," was not final agency action. Motion at 13. EPA does not explain why *Walmart* is relevant here, where EPA's pronouncements of invalidity were made in publicly filed briefs and in open court, thus "announc[ing] agency views to the public," and clearly intended to be "binding" on DPE. *Walmart*, 21 F.4th at 308, 309.

### 3. The statements of non-validity at issue were made by EPA.

EPA half-heartedly suggests that its statement in its D.C. Circuit brief should not be attributed to EPA because the brief was "filed pursuant to the authority of the Attorney General, not the Administrator" of EPA. Motion at 11. That is nonsensical. First, EPA's D.C. Circuit brief was signed both by the Department of

Justice and the EPA Office of General Counsel on behalf of EPA and the EPA Administrator. Second, the statutory provision that EPA cites, 42 U.S.C. § 7605(a), merely provides that the EPA Administrator "shall request the Attorney General to appear and represent him in any civil action instituted under this chapter to which the Administrator is a party." EPA's argument appears to be essentially that a lawyer does not speak for his or her client—an argument that courts have rejected. *See, e.g.*, *Coughlin v. Capitol Cement Co.*, 571 F.2d 290, 306 (5th Cir. 1978) (statements of an attorney may be admissions against his or her client under Federal Rule of Evidence 801(d)(2)(C)); *see also, e.g.*, *Barrick Goldstrike Mines*, 215 F.3d at 47 (relying on and attributing to EPA statements made by Department of Justice attorney on behalf of EPA during oral argument). EPA cites no authority for this novel proposition.

### 4. The context of EPA's pronouncements is critical.

In assessing the finality of agency action, the Court must consider the context of the agency pronouncement (or failure to respond). *See Texas v. United States*, 40 F.4th 205, 220-21 (5th Cir. 2022) (examining contemporaneous agency conduct beyond the face of the agency-issued document in question and concluding that Department of Homeland Security memorandum "alters the legal regime" and "binds" the agency). Here, the context of EPA's pronouncements is critical. EPA has devoted over two years and significant resources to shutting down the Facility

-17-

unless DPE implements tens of millions of dollars' worth of emissions reduction measures. This has included, among other things, filing an unprecedented enforcement action using EPA's imminent and substantial endangerment authority and imposing via the Rule (without notice and comment) a 90-day compliance period for emissions controls that EPA knows would take at least two years to implement. Stay Motion at 5-6. Recognizing the validity of the LDEQ Extension would be incompatible with EPA's political crusade to shut down the Facility, there can be no reasonable question that EPA made its determination and pronouncements intending to coerce DPE into abandoning its reliance on the LDEQ Extension under the threat of severe criminal and civil penalties. *See Becerra*, 89 F.4th at 538 ("[A]n action is final once the agency makes clear that it 'expects regulated entities to alter their primary conduct to conform to the agency's position[.]'") (quoting *Ciba-Geigy*, 801 F.2d at 436).

### III.    CONCLUSION

For the foregoing reasons, DPE respectfully requests that the Court deny EPA's Motion to Dismiss.

Date:  July 29, 2024

James C. Percy
JONES WALKER LLP
445 N. Boulevard, Suite 800
Baton Rouge, LA 70802
Telephone: (225) 248-2130
jpercy@joneswalker.com

Robert E. Holden
Brett S. Venn
JONES WALKER LLP
201 St. Charles Ave
New Orleans, LA 70170
Telephone: (504) 582-8000
bholden@joneswalker.com
bvenn@joneswalker.com

Respectfully submitted,

*/s/ David A. Super*

David A. Super
Jason B. Hutt
Jeffrey R. Holmstead
Britt Cass Steckman
Kevin M. Voelkel
BRACEWELL LLP
2001 M Street NW, Ste. 900
Washington, DC 20036
Telephone: (202) 828-5800
david.super@bracewell.com
jason.hutt@bracewell.com
jeff.holmstead@bracewell.com
britt.steckman@bracewell.com
kevin.voelkel@bracewell.com

Jeffrey L. Oldham
BRACEWELL LLP
711 Louisiana Street, Suite 2300
Houston, TX 77002
Telephone:  (713) 223-2300
jeffrey.oldham@bracewell.com

***Counsel for Petitioner Denka Performance Elastomer LLC***

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify that this motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because this motion contains 4,504 words.

I further certify, pursuant to Fed. R. App. P. 27(d)(1)(E), that this motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this motion has been prepared in Times New Roman 14-point font using Microsoft Word 2013.

Date: July 29, 2024

*/s/ David A. Super*

David A. Super

*Counsel for Petitioner*
*Denka Performance Elastomer LLC*

-20-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 29th day of July 2024, pursuant to Federal Rules of Appellate Procedure 15(c) and 25(d), and 40 C.F.R. § 23.12(a), I electronically filed the foregoing *Petitioner's Opposition to Respondents' Motion to Dismiss* with the Clerk of the Court for the U.S. Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system, with copies of the foregoing served on all registered counsel through the Court's electronic filing system (CM/ECF).


Date:  July 29, 2024                    */s/ David A. Super*
                                        David A. Super

                                        **Counsel for Petitioner**
                                        **Denka Performance Elastomer LLC**

# EXHIBIT 1

```
                   UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF LOUISIANA

   ***********************************************************
   UNITED STATES OF AMERICA,

                  Plaintiff,

                          Civil Action No. 23-735
   VS.                    Section "J"(3)
                          New Orleans, Louisiana
                          July 18, 2024

   DENKA PERFORMANCE ELASTOMER, LLC
   AND DUPONT SPECIALTY PRODUCTS USA, LLC,

                  Defendants.
   ***********************************************************

               TRANSCRIPT OF STATUS CONFERENCE
         HEARD BEFORE THE HONORABLE CARL J. BARBIER
               UNITED STATES DISTRICT JUDGE


   APPEARANCES:

   FOR THE GOVERNMENT:        Steven David Shermer
                              U.S. Department of Justice
                              Environmental
                              601 D Street NW
                              Washington, DC 20004

                              Heather E. Gange
                              U.S. Department of Justice
                              P.O. Box 23926
                              Washington, DC 20026

                              Davis Hoskins Forsythe
                              DOJ-Enrd
                              150 M Street NE
                              Room 2.1130
                              Washington, DC 20002

                              Hannah Lee Frazier
                              DOJ-Enrd
                              Enrd-Ees
                              150 M Street NE
                              Washington, DC 20002
```

APPEARANCES CONTINUED

FOR THE GOVERNMENT:            Daniel Stephen Smith
                              DOJ-Enrd
                              Environmental Enforcement
                              Section
                              P.O. Box 7611
                              Ben Frankling Station
                              Washington, DC 20044

                              Jonah M Seligman
                              DOJ-Enrd
                              Environment and Natural
                              Resources Division
                              150 M St. NE
                              Rm 5.130
                              Washington, DC 20002

FOR DENKA PERFORMANCE ELASTOMER, LLC:

                              David A. Super
                              Jason B. Hutt
                              Jeffrey Holmstead
                              Kevin Voelkel
                              Bracewell LLP
                              2001 M Street, NW
                              Suite 900
                              Washington D.C., DC 20036

                              Robert E. Holden
                              Jones Walker
                              Place St. Charles
                              201 St. Charles Avenue
                              Suite 5100
                              New Orleans, LA 70170

FOR DUPONT SPECIALTY PRODUCTS USA, LLC:

                         Eric Earl Jarrell
                         King & Jurgens, LLC
                         201 St. Charles Avenue
                         Suite 4500
                         New Orleans, LA 70170

                         Marie Olga Luis
                         King & Jurgens, LLC
                         201 St. Charles Ave
                         45th Floor
                         New Orleans, LA 70170

Official Court Reporter:   Nichelle N. Wheeler, RMR, CRR
                           500 Poydras Street, B-275
                           New Orleans, Louisiana 70130
                           (504) 589-7775

    Proceedings recorded by mechanical stenography,
transcript produced via computer.

1                    P R O C E E D I N G S

2                 (Call to order of the court.)

3          THE DEPUTY CLERK:  The Court calls Civil Action

4    23-735, *United States of America v. Denka Performance*

5    *Elastomer, LLC, et al.*

6          THE COURT:  All right.  The Court has this -- we

7    have this as -- scheduled as a status conference to see

8    where we are in this whole litigation.  I've got to say

9    this has all been somewhat confusing.  There's so much

10   going on and I'm not sure exactly where we are or where

11   we're headed with all of this.  So that's what I hope to

12   talk about this morning.

13         Who plans to speak here today, first of all, I

14   guess on behalf of the United States?

15         MR. SHERMER:  Good morning, Your Honor, I'm Steve

16   Shermer.  I'm lead counsel for the United States.  I plan

17   to speak, as well as Heather Gange, who is counsel for

18   the United States in its capacity as a counterclaim

19   defendant.

20         THE COURT:  Okay.  Very well.  Thank you.

21         And on behalf of DPE, who plans to speak?

22         MR. SUPER:  Good morning, Your Honor, Dan Super.

23   It's nice to meet you in person.  I'll be speaking on

24   behalf of Denka Performance Elastomer.

25         THE COURT:  Okay.  Is there someone here from

1  DuPont?

2       MR. JARRELL:  Eric Jarrell, Your Honor, for DuPont

3  Specialty Products USA, LLC.

4       THE COURT:  Okay.  Other than the persons who just

5  identified themselves, I have a list of everyone who is

6  here, but does anyone plan to need to speak here this

7  morning?

8       Okay.  All right.  I don't know who wants to

9  start.

10      The suit that we have here in this court, of

11  course, was brought by the EPA, by the United States, as

12  an enforcement action against Denka under Section 303 of

13  the Clean Air Act, arguing that Denka's emissions are

14  imminent, constituting imminent and substantial

15  endangerment to the surrounding community, and as I

16  understand, they argued that any emissions above that 0.2

17  microgram level was unsafe and presents an unacceptable

18  high risk of cancer for individuals living near Denka.

19      Denka is located in St. John Parish?

20      MR. SHERMER:  Yes.

21      THE COURT:  So this is in LaPlace, right?

22      MR. SUPER:  LaPlace.

23      THE COURT:  Is that where you're located?

24      Okay.  In the meantime, the EPA has promulgated

25  the so-called final rule, and initially, as I recall, the

1 | proposed rule would impose that same standard, 0.2, but

2 | with a two-year window to apply -- to comply, right?  The

3 | proposed rule?

4 | MR. SUPER:  That's not -- may I approach the

5 | podium?

6 | THE COURT:  Sure.  Go ahead.

7 | MR. SUPER:  That's not correct, Your Honor, and

8 | that's actually a fundamental point.

9 | The proposed rule and now the final rule actually,

10 | if all of the control requirements were implemented under

11 | the final rule, EPA has said that the concentration that

12 | would result is 0.8 micrograms per cubic meter.  And in

13 | the rule, the United States says that that would be

14 | protective of human health.  So in our view, the rule

15 | with a 0.8 result is fundamentally inconsistent with the

16 | Section 303 action where they're saying that a level of

17 | 0.2 constitutes an imminent and substantial endangerment.

18 | THE COURT:  Well, you just managed to confuse me

19 | even further, Mr. Super.

20 | MR. SUPER:  It's confusing.  I'm sorry.

21 | THE COURT:  Wait.  You can sit down, ma'am.

22 | Wait.  No, stay where you are.  Stay where you

23 | are.  I got a couple questions for you.

24 | MR. SUPER:  Sure.

25 | THE COURT:  So this is the first time I've heard

1   the 0.8.  I thought we were talking about 0.2 that was in

2   the proposed rule, but it provided for a proposed

3   two-year window to comply, but when the final rule came

4   out, they said, no, it's 90 days to comply.

5          MR. SUPER:  That is one of the --

6          THE COURT:  As I understand, the 90 days, I don't

7   want to call it the standard or the statutory

8   requirement, right, the 90 days -- the two-year would be

9   an extension, correct?

10         MR. SUPER:  That is correct.

11         THE COURT:  And that's what was originally

12  proposed.  Now it is 90 days.  So I didn't know there was

13  some argument about 0.2 versus 0.8.  Tell me about that.

14         MR. SUPER:  Yes.

15         THE COURT:  It's the first I heard about that.

16         MR. SUPER:  No, it's a really important point for

17  our motion for summary judgment, but, again -- because,

18  again, the risk assessment in the final rule points out,

19  the estimate is that once all the control requirements

20  are in place, the concentrations then would apply.  The

21  maximum average annual concentration would be 0.8.  And,

22  again, that is four times higher than the level that

23  we're --

24         THE COURT:  Meaning --

25         MR. SUPER:  -- trying to meet --

1          THE COURT:  -- meaning all the controls that Denka

2     would be required to implement.

3          MR. SUPER:  Under the rule.  That's exactly --

4     it's a post -- a post-control concentration of 0.8, that

5     under the statute as a matter of law, the agency in

6     promulgating this rule has said that is protective of

7     human health.

8          THE COURT:  What's the current emission from there

9     now?

10          MR. SUPER:  They've gone down considerably over

11     the past several years including during the pendency of

12     this lawsuit.  I can't tell you exactly what they are at

13     the moment, but 0.8 is within the realm of possibility as

14     we've consistently represented to the Court.  0.2 is not.

15     That would require a shutdown.  It's impossible to meet.

16          So, again, the rule, the final rule, will have in

17     our view an enormous impact on this case and it will be

18     part of the summary -- the supplemental summary judgment

19     briefing that --

20          THE COURT:  But --

21          MR. SUPER:  -- both sides proposed.

22          THE COURT:  -- but -- okay.

23          Let me hear from the government --

24          MR. SUPER:  Sure.

25          THE COURT:  -- on their point.  Okay?

1    MR. SHERMER:  Good morning --

2    THE COURT:  Good morning.

3    MR. SHERMER:  -- Your Honor, Steve Shermer for the

4  United States.

5    Your Honor, the reason you're hearing about this

6  0.8 concentration for the first time is because Mr. Super

7  is incorrect.  That is not the end-all be-all of this

8  final rule.  The final rule in addition to the technology

9  requirements, emission standards that it also requires,

10  it also requires a 0.3 concentration that Denka would

11  have to meet after installing all of its control

12  technologies as a backstop.  That is the end goal of the

13  rule.  So that's why you're not -- you haven't

14  heard about 0.3 --

15    THE COURT:  So now we're talking about 0.8, 0.3

16  and 0.2.

17    MR. SHERMER:  Correct.

18    THE COURT:  So what --

19    MR. SHERMER:  I can try and square that a bit for

20  you.

21    THE COURT:  Yeah, please.

22    MR. SHERMER:  So that 0.3 standard is measured at

23  the fence line, the perimeter of the facility.  The EPA

24  has modeled that that -- achieving that concentration

25  will result in acceptable below or at 0.2 levels in the

1  community, outside the perimeter.  So that's how you

2  reconcile the different numbers that you're hearing.  0.8

3  is a technology based standard, 0.3 is an air

4  concentration based standard at the perimeter of the

5  fence line, and 0.2 is the ultimate end goal in the

6  community amongst the people who are being exposed to

7  Denka's emissions.

8          THE COURT:  So what is the goal -- what is the

9  EPA -- what is your final goal here in terms of -- other

10 than shutting down the plant?  What is your goal here in

11 terms of emissions?

12         MR. SHERMER:  So our goal is not to shut down the

13 plant, Your Honor.  Our goal is to have Denka meet -- the

14 relief that we've asked for in this case is that Denka

15 achieve a 0.3 concentration at the perimeter at its fence

16 line using one type of monitoring system, and at the same

17 time, achieve a 0.2 microgram per cubic meter

18 concentration outside the fence line using a different

19 type of monitoring system, hand-in-hand monitoring

20 systems to give --

21         THE COURT:  So you're saying it would be 0.3 at

22 the fence line, so the farther away you got, the

23 concentration would logically be lower, right?

24         MR. SHERMER:  That's correct, in the affected

25 communities who have been exposed --

1          THE COURT:  So from your perspective, what's the

2   significance of the 0.8 that Mr. Super was talking about?

3          MR. SHERMER:  It's part of the rule, Your Honor.

4   It's EPA's calculation of how far they project Denka will

5   be able to get implementing all of the sort of known

6   control technologies that the rule talks about.  0.3 is

7   another target that EPA doesn't dictate how Denka needs

8   to get there, but it needs to get there.

9          THE COURT:  That doesn't make a lot of sense to

10  me, I got to tell you.

11          So you're saying if they install every bit of

12  technology that's available now they would only get to

13  0.8?

14          MR. SHERMER:  Of the categories of emissions.

15          THE COURT:  But they need to get to 0.3, but you

16  don't care how they get there.  Is that what you just

17  said?

18          MR. SHERMER:  The last part is correct, Your

19  Honor.  They have the flexibility to meet that 0.3

20  requirement.

21          THE COURT:  How would they get there if there's no

22  technology other than shutting down?  I'm not -- I'm just

23  having trouble understanding your argument here.

24          MR. SHERMER:  So the 0.8 number is based on a

25  fixed set of different emission sources.  It doesn't

1 | represent the whole universe of sources of chloroprene
2 | emissions at the facility.

3 | So, for example, the rule talks about how to
4 | control tanks, how to control different, essentially,
5 | smokestacks, process fence (phonetic), how to control
6 | emissions from wastewater.  The rule talks about a set of
7 | different emission sources that the EPA -- the rule
8 | dictates the control requirements for those different
9 | sources.  But beyond that, there are other sources of
10 | chloroprene emissions that Denka can control.

11 | It can control those same sources like tanks below
12 | the standards to achieve a 0.3 standard, but the point --
13 | the 0.8 standard is based on a fixed set of different
14 | manufacturing equipment that the EPA focused on.

15 | THE COURT:  Okay.  So tell me -- and I'll let Mr.
16 | Super respond, but tell me where things stand
17 | procedurally in all of this litigation.  Because you have
18 | this case here where you want -- your goal here is to --
19 | your goal here would be to shut them down, right, at
20 | least temporarily?

21 | MR. SHERMER:  The goal would be for them -- would
22 | be for them to achieve those two concentrations --

23 | THE COURT:  Well, is it even feasible for them to
24 | do this -- like, if you say this is an immediate danger,
25 | it needs to be shut down or they need to reduce it to

1   that level, it doesn't sound like that's even feasible,

2   would it be?

3           MR. SHERMER:  Within the time that's left between

4   now and October 15th, I don't know.  We don't know if it

5   is feasible.  Denka has had years of time to plan for

6   this, to understand the government's objectives in this

7   case, and with the time that it's been aware of what the

8   government has asked for, it certainly could have

9   achieved those numbers without the need for a shutdown.

10          THE COURT:  And you have the rule up -- the rule

11  in DC.  What's the status of that?

12          MR. SHERMER:  So Ms. Gange's section of the

13  Justice Department is handling that litigation.  If I

14  may, Your Honor, she might be best suited to speak to

15  that.

16          THE COURT:  Okay.  Sure.

17          MS. GANGE:  Good morning, Your Honor.

18          THE COURT:  Hi.

19          MS. GANGE:  The litigation in the DC Circuit of

20  the window for additional petitioners challenging that

21  rule just closed this Monday.  EPA recently designated

22  the administrative record, and so that litigation is in

23  its early stages.  We're estimating that that may take up

24  to a year, give or take a few months, possibly more to

25  resolve and have a decision issued from the DC Circuit,

 1  but in the meantime, because Denka's request for a stay

 2  of that rule pending review is denied, the rule is valid,

 3  and on October 15th will become effective.  And so that

 4  will from that date forward be effective and potentially

 5  enforceable.

 6          All of it is provisions.  There are many, many

 7  categories of sources; many, many pollutants regulated by

 8  that rule.  So that is very --

 9          THE COURT:  This is much -- this is much broader

10  than just the Denka Plant in LaPlace.

11          MS. GANGE:  Much; much, much broader; many more

12  pollutants, many more categories of potential sources all

13  across the country.

14          THE COURT:  But Denka is the only place where

15  chloroprene is manufactured, correct, only place in the

16  United States?

17          MS. GANGE:  I might need to stand corrected, but I

18  believe that there is one other source of chloroprene in

19  this country or one other facility that uses it and

20  therefore might be regulated.  But Denka -- I mean,

21  Denka's focus is chloroprene because that is so central

22  to their manufacturing, but the rule is so much more

23  broader.  There are many more petitioners.  And so

24  Denka's brief may be very focused, but the other issues

25  raised by other petitioners all will be litigated

1  simultaneously in the DC Circuit.

2       THE COURT:  But all the other petitioners -- their

3  argument, one of their arguments for the stay, as I

4  appreciate it, has been that, for whatever reason, the

5  EPA decided to -- in the rule to give every other

6  facility two years to comply as opposed to 90 days for

7  Denka.  Is that -- is that accurate?

8       MS. GANGE:  That is an issue that the DC Circuit

9  will need to grapple with, yes.

10      With respect to -- because that is an issue in the

11 final rule that jurisdiction to entertain that lies

12 exclusively in the DC Circuit.

13      I think Your Honor was accurate earlier today

14 though when you pointed out that under the statute it

15 requires a 90-day compliance with an emissions standard

16 issued under Section 112 unless the EPA grants an

17 extension, and the EPA determined not to do that due to

18 the imminent and substantial endangerment presented by

19 chloroprene.

20      THE COURT:  So in the EPA's view, chloroprene is

21 more imminently dangerous than any of these other

22 chemicals anywhere?

23      MS. GANGE:  My understanding -- and I apologize.

24 I might, again, need to stand corrected, but my

25 understanding of the chemicals regulated in the rule,

1    chloroprene happens to be the only one for which an

2    actual determination of an imminent and substantial

3    endangerment has been made.  For the other chemicals that

4    are regulated, there has not been a formal EPA

5    determination that there is an imminent and substantial

6    endangerment presented.

7            THE COURT:  How was -- who determined that?  How

8    is that determined by the EPA, the imminent danger part

9    of it?

10           MS. GANGE:  Imminent and substantial endangerment?

11           THE COURT:  Yes.

12           MS. GANGE:  In the preparation for this lawsuit

13   and in this lawsuit, there have been positions and

14   statements made.  There is no formal rulemaking, per se,

15   that there is -- there's no document I can point you to

16   from the EPA that has, say, been published in the Federal

17   Register making that determination, but the gravamen of

18   this lawsuit is that EPA scientists in the agency have

19   analyzed the data and information available and

20   determined that there is, in fact, an imminent and

21   substantial endangerment presented that -- that that

22   actually is the issue before Your Honor in this case.

23           THE COURT:  Right.  I understand that, but I was

24   trying to figure out how is that determined.  Do you

25   know?

1          As I recall -- as I recall, there was some --
2   Denka has filed a request for reconsideration or
3   rehearing or something up in the DC Circuit on their
4   request for a stay?
5          MS. GANGE:  They did.  That was recently filed.
6   That has not yet been decided.
7          THE COURT:  Okay.  Now, has -- I know the State of
8   Louisiana, the Attorney General and so forth, have filed
9   something in the Fifth Circuit.  Has Louisiana or anyone
10  filed something intervening or somehow in the DC Circuit,
11  too?
12         MS. GANGE:  I am not aware of whether or not
13  Louisiana has intervened in the DC Circuit.  I know that
14  Denka did file a request with the Fifth Circuit for a
15  finding that an extension, a two-year extension that
16  Louisiana tried to grant them, is valid.  They're asking
17  for declaratory judgment that that two-year extension is
18  valid.
19         EPA does not believe that that is valid.  By
20  Friday, I believe an intervention motion from Louisiana
21  will have to be responded to.  Louisiana has tried to
22  intervene in that Fifth Circuit action, and by Monday,
23  the EPA is required to file a response on the merits --
24         THE COURT:  So are you --
25         MS. GANGE:  -- to the request.

1           THE COURT:  -- are you involved in that?  Who is
2    involved in that?  Same lawyers who are here in this
3    courtroom this morning?
4           MS. GANGE:  No, Your Honor.  My section of DOJ --
5    I'm in the environmental defense section, and so we are
6    handling the DC Circuit and the Fifth Circuit litigation.
7    I am not personally writing the briefs, but members of my
8    section are and I work with them --
9           THE COURT:  In the Fifth Circuit, too?
10          MS. GANGE:  That's correct.
11          THE COURT:  Okay.  And I'll, of course, ask the
12   other side, but I'm trying to understand the procedural
13   avenue by which Denka and/or Louisiana went from -- went
14   directly to the Fifth Circuit.  Or is that an issue?
15          MS. GANGE:  That is an issue.  It is a bit of a
16   puzzlement.
17          THE COURT:  Yeah.
18          MS. GANGE:  So I -- at this point, the
19   government's position hasn't been articulated formally in
20   a brief and I'm not allowed to present issues until I
21   know that they've been approved by officials at an
22   appropriate level to make them.
23          But I can say and it has been said in other
24   filings that the government does not believe that the
25   two-year extension that was granted by the State of

1   Louisiana is --

2        THE COURT:  Well, I know -- I know that.  I

3   understand the government's position on that.  But I was

4   just thinking about the procedural machinations, if I

5   want to call it, in this whole case that is going on.

6        MS. GANGE:  Whether or not all proceedings should

7   go in the DC Circuit or not, that's certainly a question

8   and an issue that is being grappled with.  But in the

9   meantime, for this case, there is no inconsistency

10  between the endangerment that's being litigated here in

11  the 0.2 figure and the figures in the final rule.

12       I think the way perhaps to drop to the bottom line

13  might be that it is our belief that on October 15th that

14  emissions standard or all of these figures you have been

15  hearing about will become effective.  But if --

16       THE COURT:  And what's the -- if that occurs,

17  what's the practical effect or implication?  Does that

18  shut down the plant?  Because they say they can't comply,

19  it's impossible.

20       MS. GANGE:  And I think we -- I would have to

21  reiterate what Mr. Shermer said earlier, which is Denka

22  has been aware of this for years.

23       THE COURT:  Well, that's fine.  But we are where

24  we are now.  We're not -- we're not two years in the

25  past.

1          So if that happens, do you envision that Denka

2    would be shut down if they can't get a stay from either

3    the Fifth Circuit or the DC Circuit?

4          MS. GANGE:  Whether Denka is shut down or not in

5    light of that emissions standard, I'm afraid that's

6    something only Denka could answer.  I think in the

7    meantime our concern is Denka has been trying every --

8    trying to follow every possible pathway to try to ensure

9    that the standards in the final rule would not become

10   effective against them and our concern is that in the

11   meantime the public is being endangered by these

12   emissions.  And so we would like for this case to go

13   forward so that the public can be protected while these

14   other machinations are playing out.

15         THE COURT:  All right.  Thank you.

16         Mr. Super, you want to --

17         MR. SUPER:  Yes.  Thank you, Your Honor.

18         THE COURT:  Why don't you start by telling me, are

19   you involved in the Fifth Circuit --

20         MR. SUPER:  I'm involved in all of them, Your

21   Honor.

22         THE COURT:  I figured you were.

23         MR. SUPER:  Yeah.  Okay.

24         THE COURT:  So tell me, how is it that you go

25   directly to the circuit on that issue.

1           MR. SUPER:  Certainly.

2           THE COURT:  Okay.

3           MR. SUPER:  If I might --

4           THE COURT:  Procedurally.  I'm just trying to

5    understand --

6           MR. SUPER:  Can I just spend a few minutes just

7    telling you what's going on in the DC Circuit and the

8    Fifth Circuit?

9           THE COURT:  Sure.  Yeah.  I'd love --

10          MR. SUPER:  That may help.

11          THE COURT:  -- for you to do that.

12          MR. SUPER:  But the one thing I really do need to

13   just say immediately is, the notion that we're doing

14   everything we can to nullify this unlawful rule is

15   exactly right, because we're trying to protect a plant

16   that they're ordering to be closed.  We're trying to

17   protect the jobs of 250 employees and their families.  So

18   it does matter a lot to us.

19          And so in the DC Circuit, we are challenging the

20   rule in its entirety, but we filed an emergency stay just

21   to stop the 90-day implementation period.  And there

22   really can be no mistake in this court that that

23   implementation period is impossible to comply with.

24          And I'm not sure what Mr. Shermer was referring

25   to, but, I mean, their own experts in this litigation in

1 | front of you opined that it would take 90 days just to
2 | plan one of the control projects, just one, and now we
3 | would have to plan and implement all of the projects in a
4 | 90-day period and no one believes that's possible,
5 | including the EPA.

6 | Now -- so we filed a motion for stay of the rule
7 | in the DC Circuit and we got sort of the standard
8 | one-sentence denial from the court that we had met the
9 | stringent standards for a stay.  The next day, the
10 | Supreme Court issued the *Ohio v. EPA* case which pretty
11 | fundamentally changes how our court should look at
12 | granting a stay of an agency rule.  That's why we filed
13 | our petition for review just last -- on July 5th actually
14 | and we're very hopeful that that may gain some traction
15 | with the court.

16 | But just to tell you quickly what that argument
17 | was, when EPA issued the proposed rule, that was two
18 | months after this case had been filed.  And in that
19 | proposed result, as Your Honor knows, they had proposed a
20 | two-year limitation period for Denka and all the other
21 | 200 facilities that are impacted by the rule.  And by
22 | definition, as a matter of law, to give us that two-year
23 | period, they had to have found that there was no imminent
24 | endangerment.  Otherwise, they couldn't give it.
25 | Now, we argued in summary judgment before this

1  Court that that means they've admitted there is no
2  imminent and substantial endangerment because they were
3  giving us a two-year compliance period.  And we frankly
4  think that the jig was up on summary judgment.  The EPA
5  realized that and so they went and they changed the rule.
6  They changed it to a 90-day implementation period.  And
7  the key thing is, they gave no notice of that in the
8  proposed rule.  In fact, during the rulemaking process,
9  they gave a full-throated defense of the two-year period
10  when the Office of Management and Budget asked about
11  that.  So the EPA was all in favor of the two-year period
12  until they changed it.

13         And, you know, in the words of the DC Circuit and
14  the Fifth Circuit and other cases, that's a classic
15  surprise switcheroo.  We think that makes the rule
16  invalid.

17         But worse, in the rule, EPA failed to explain why
18  Denka was being singled out and only given a 90-day
19  period.  Because, Your Honor, there are -- there are two
20  facilities out of the 200 that the EPA estimates that has
21  far higher risk levels than Denka and yet those
22  facilities got the two -- the full two-year period.  Does
23  that mean they're not posing an imminent endangerment?
24  We don't know.

25         I mean, the EPA has not explained how it can

1  single out Denka and say that it's causing an

2  endangerment, when these other facilities are not, who

3  admittedly pose a higher level of risk.

4          And I've got to address this finding they're

5  talking about.  The only, the only explanation they gave

6  in a 140-page preamble for why Denka was being singled

7  out was because of a so-called finding that Denka is

8  posing an imminent and substantial --

9          THE COURT:  You're talking about what they filed

10  in this court?

11          MR. SUPER:  Well, actually --

12          THE COURT:  Is that -- is that what you're talking

13  --

14          MR. SUPER:  It's even more slippery than that,

15  Your Honor.  They cited this case, but they didn't cite

16  anything in this case.

17          THE COURT:  No.  But you said 140 pages.  Where

18  are you talking about?  In the Circuit, in the DC --

19          MR. SUPER:  That's in the preamble to the rule.

20          THE COURT:  Oh, in the preamble to the rule.

21  Okay.

22          MR. SUPER:  So there's one sentence in the entire

23  preamble to the rule --

24          THE COURT:  Okay.

25          MR. SUPER:  -- purporting to explain why we're

1  only given 90 days --

2         THE COURT:  Okay.

3         MR. SUPER:  -- and the sentence says there's a

4  finding of an imminent and substantial endangerment

5  related to Denka and they cite to this case.

6         When we argued, okay, fine, there has been no

7  finding in this case, yet clearly we haven't had a trial

8  yet, but tell us what evidence you're pointing to, they

9  said no.  They're not pointing to the evidence in this

10 case.  They're just pointing to the existence of the

11 case.

12        We have no idea who made that finding and, again,

13 it's important to point out allegedly the finding was

14 made two months before they issued the proposed rule

15 giving us the two-year period, which is fundamentally

16 inconsistent with saying there is no imminent

17 endangerment.

18        So we know nothing about this finding.  The EPA

19 has explained nothing about it and we think it's critical

20 because if there is a finding that Denka is causing an

21 imminent endangerment and yet there is at least two

22 facilities under the rule who admittedly pose a higher

23 risk, where's the finding about whether they're causing

24 an imminent endangerment or not?  Apparently, the EPA

25 found that they're not because the EPA gave them the

1   two-year period.  And, again, they cannot do that as a

2   matter of law unless they found no imminent endangerment.

3          So we do think that when we spell all of this out

4   to the DC Circuit, as we did in our petition for review,

5   we're very hopeful the Circuit will take another look at

6   this case and enter the stay.

7          We have clear eyes about this though.  It's very

8   difficult to obtain a reversal of a denial of a stay by

9   the DC Circuit.  The DC Circuit has stayed one EPA rule

10  since 2011.  So it's a daunting -- it's a daunting task.

11  So that's where we are in the DC Circuit.

12         Fifth Circuit, on June 27th, the Louisiana

13  Department of Environmental Quality issued an extension

14  to Denka of the 90-day compliance period out to July 15,

15  2026.  Now, it's our position that the LDEQ had full

16  authority to do that for multiple reasons on the merits.

17  I mean, probably the simplest is, in the rule itself, the

18  EPA amended a provision purporting to remove LDEQ's

19  ability to grant extensions.  Well, that rule doesn't

20  come into effect -- it wasn't in effect at the time that

21  LDEQ granted the extension.  So that's one reason.

22         Another is LDEQ has separate authority to issue

23  extensions just because of the fact that it's the

24  permitting authority under the Clean Air Act and there

25  are other reasons as well, but that's for the Fifth

1   Circuit to decide. EPA has taken the position that the

2   extension issued by LDEQ is invalid. And so Denka cannot

3   rely upon that extension come October 15, and beyond --

4   without knowing -- without having some certainty that it

5   is valid. Otherwise, the EPA is going to bring its full

6   civil and criminal enforcement liability to bear against

7   Denka after October 15th.

8          So what we've done is, we've gone to the Fifth

9   Circuit. We filed a petition for review that asks for a

10  declaratory judgment that the LDEQ extension is valid --

11          THE COURT: But why does that go directly to a

12  circuit?

13          MR. SUPER: Because it's --

14          THE COURT: That's what I'm trying to -- that's

15  what I'm trying to understand.

16          MR. SUPER: Under Section 307(b) of the Clear Air

17  Act, it covers final EPA actions of a local or regional

18  nature. And so EPA, taking a final position that the

19  LDEQ extension is invalid, is a local matter that goes to

20  the local circuit. And that's why it's in the Fifth

21  Circuit instead of the DC Circuit.

22          Now, we've also asked the DC Circuit to issue an

23  emergency stay precluding EPA from taking any action in

24  contravention of what we view as a -- as a valid

25  extension granted by the LDEQ. And mind you --

1        THE COURT:  So you raise the Louisiana LDEQ

2   extension.  If someone is valid -- if -- I mean,

3   obviously, you think it is valid, they think it's not,

4   but you've raised that in the DC Circuit also?

5        MR. SUPER:  We have not.  In the DC Circuit, we're

6   challenging other aspects of the rule.

7        THE COURT:  Okay.

8        MR. SUPER:  This really -- this really isn't the

9   rule.  This is seeking to get a declaration of the

10  validity of all the other reasons why LDEQ has authority

11  to issue this extension.

12       THE COURT:  I know.  But it creates -- it creates

13  quite an interesting procedural --

14       MR. SUPER:  It does, Your Honor.

15       THE COURT:  -- where you have a DC Circuit -- you

16  have this proceeding in the DC Circuit where the EPA

17  wants to enforce their rule, which is with the 90 days.

18  You've asked to stay that --

19       MR. SUPER:  Right.

20       THE COURT:  The Circuit at this point has denied

21  your request for a stay.  You've applied for a rehearing

22  I guess *en banc*.

23       MR. SUPER:  That's right, rehearing by the panel

24  and rehearing *en banc*.

25       THE COURT:  Okay.  And while all that's pending,

1   you now go to the Circuit, the Fifth Circuit --

2        MR. SUPER:  Right.

3        THE COURT:  -- ask them to give you the two-year

4   extension that the DC Circuit may or may not -- what if

5   the DC Circuit says, no, you can't get a stay -- you have

6   to comply with this rule and the Fifth Circuit says you

7   have a two-year extension.  We have one circuit against

8   another circuit.  Meanwhile, I'm sitting down here

9   between both of them.

10       MR. SUPER:  I'm going to get to your position on

11  this --

12       THE COURT:  Okay.

13       MR. SUPER:  -- in a moment --

14       THE COURT:  Okay.

15       MR. SUPER:  -- if you don't mind.

16       What I would say to you there, Your Honor -- this

17  was on page 1 of our motion for stay in the Fifth

18  Circuit.  The arguments we are making to the Fifth

19  Circuit can assume that the rule is valid because, again,

20  we're saying that LDEQ acted under other authority.  It

21  doesn't matter that that rule is out there, that LDEQ had

22  separate and independent and lawful authority to issue

23  this extension.  So that's what we've got before the

24  Fifth Circuit right now.

25       Now, what we've asked the Court to do --

1            THE COURT:  Could you have -- could you have gone

2    to the DC Circuit with the argument about the extension

3    granted by the LDEQ?

4            MR. SUPER:  I believe we -- I believe we could.

5    My colleagues may correct me on this, but I think when

6    you're talking about a final agency action of local or

7    regional application, you can either go to the local

8    circuit or you can go to the DC Circuit.  We elected to

9    go to the Fifth Circuit.

10           And, again, in our view and we spelled this out to

11   the Fifth Circuit, there was no overlap between the two

12   cases, because in the DC Circuit, we're talking about a

13   rule; in the Fifth Circuit, we're talking about other

14   authority that the State maintains to issue extensions.

15           THE COURT:  Well, I see a lot of potential overlap

16   from where I sit here, but anyway.  Go ahead.

17           MR. SUPER:  We will undoubtedly be faced with

18   those arguments and we'll wade through them, but to kind

19   of -- just one other point about the Fifth Circuit.

20           We've asked for the Court to rule on our stay

21   motion by the 12th of August.  Very significant date.

22           October 14th, again, that is when the 90-day

23   implementation period kicks it.  Denka cannot comply with

24   it.  It's gonna have to shut down.  But it can't shut

25   down on October 14th.  It has to start that process

1   earlier and many of the things that need to be done will

2   be starting in mid-August and that is why we need --

3        THE COURT:  Give me an example of why -- why it

4   takes two months to shut down a plant.

5        MR. SUPER:  Yeah.  One major one is there's

6   the W-A-R-N, the WARN Act, obligations with respect to

7   employees.  We have to tell them --

8        THE COURT:  I'm very familiar with that.

9        MR. SUPER:  -- we have to tell them well in

10  advance.  But it's not an -- it's not an easy task to

11  shut down a facility, particularly if it's shut down

12  potentially permanently.  There's just a lot of

13  engineering steps that go into it to ensure safety, to

14  ensure the removal of all of the ingredients that go into

15  the products.  So it's something that does need to start

16  in August, again, which is why we with some temerity

17  asked the Fifth Circuit to rule pretty quickly.

18        THE COURT:  Well, what would be -- what would be

19  the practical consequences if nothing changes, the 90-day

20  requirement stays in effect and Denka chooses not to shut

21  down or says we can't shut down by that time?  Are they

22  continuing to challenge on the merits, but they're not --

23        MR. SUPER:  Denka, Your Honor, is not -- is

24  sensibly not willing to operate beyond October 15th

25  without an assurance that it has a valid extension

1   permitting it to do so due to the substantial criminal

2   and civil liabilities that could be brought to merit --

3       THE COURT:  So you can ensure the Court there's no

4   question, no doubt that if Denka does not get a stay from

5   either the DC Circuit or the Fifth Circuit, it's going to

6   shut down by October 15th.

7       MR. SUPER:  Yes, Your Honor.  Yes, Your Honor.

8   There's no other -- there's no other options.

9       And that kind of leads to where I believe the

10  matter sits before this Court, and as you saw in our

11  portion of the status report, we were suggesting that the

12  case should be held in abeyance to find out what's going

13  to happen in the Fifth Circuit and the DC Circuit, which

14  would certainly happen before October 14th and may happen

15  much sooner in the next, I don't know, six to

16  eight weeks.  But if we don't obtain relief from the

17  90-day implementation period, just as I said, the plant

18  will shut down and the litigation alleging an imminent

19  and substantial endangerment will render moot.

20      And so in our view, it doesn't make much sense and

21  it's not very prudent for the parties to be preparing for

22  a trial, I think -- actually I know that the United

23  States proposed the second half of October, that the

24  parties should be preparing for a trial that could be

25  rendered moot, like days before the trial begins, nor

1  frankly should the Court be wrestling with fairly complex

2  motion for judgment, a motion to dismiss, DuPont's motion

3  for judgment on the pleadings, I think there's a couple

4  of motions in limine out there, I think there are a lot

5  of party and judicial resources that would be wasted

6  unless -- and believe you me, I'm very hopeful that we

7  get relief from the DC Circuit or the Fifth Circuit.  But

8  we recognize that we have some daunting challenges in

9  front of us before those courts.

10      If we don't get that relief, again, it doesn't

11  make much sense to have been preparing for a trial that

12  has been rendered moot and that was the basis for our

13  abeyance suggestion.

14      THE COURT:  In light of -- in light of speaking of

15  the pending motions, there's a pending motion for --

16  there's still a renewed, I guess, motion on the -- on the

17  your counterclaims, right?

18      MR. SUPER:  That is correct.

19      THE COURT:  And then your motion for summary

20  judgment, of course.

21      MR. SUPER:  And our motion for summary judgment.

22  As I alluded to before, we think that motion has -- the

23  strength of that motion has doubled since the rule came

24  out.

25      THE COURT:  So here's my question and does it --

1   do you envision that it would -- the court should or

2   would be -- would be asked to file additional -- allow

3   additional briefing on those motions?

4        MR. SUPER:  I do --

5        THE COURT:  In light of everything that's going on

6   that we've talked about and the couple of recent U.S.

7   Supreme Court cases.

8        MR. SUPER:  No, I do, Your Honor, and I apologize

9   for sort of the separate status reports, but this was one

10  point that we sort of agreed on, that the United States,

11  for example, in the motion for summary judgment, would

12  file a sur-reply updating the court on the issues and we

13  would file an opposition.  I think where we disagreed is

14  we felt like we needed about 15 pages to make all of

15  these points clear and I think they had mentioned eight,

16  but, you know, going forward with the summary judgment

17  actually makes a lot of sense because we think that can

18  make this case go away.

19        By the same token, we would be -- we would be

20  happy to submit a supplemental brief relating to the

21  motion to dismiss our counterclaim as well because there

22  have been some developments there that --

23        THE COURT:  Would it be cleaner to allow or to

24  start anew with the briefing?  In other words, instead of

25  filing a supplemental brief for each side, just dismiss

1    the -- let's just file a renewed brief --

2          MR. SUPER:  I will say an emphatic yes.  We were

3    thinking this might be easier for the Court, but if the

4    Court would rather have an omnibus motion for summary

5    judgment with all the points, we're happy to do that.

6          THE COURT:  I mean, that's kind of what I have

7    been thinking, but I'll let the other side respond, too.

8          Okay.  All right.  Let me hear from the government

9    again, please.

10          Thank you.

11          Who wants to speak?

12          Mr. Shermer?

13          MS. GANGE:  Your Honor, I apologize for the

14    shuffle.  Just one quick point.

15          Is Your Honor more concerned at this point about

16    hearing about the schedule and potentially renewed

17    briefing for summary judgment?

18          THE COURT:  Well, that and whether we should hold

19    things in abeyance until at least October 15th to see

20    where we are, because I'm really concerned about spending

21    not only my time, but time of the parties and counsel on

22    something that could become essentially moot.

23          If -- if Denka loses on their request for stays in

24    either the circuit -- either circuit, they've represented

25    to the Court that there's no question that they will have

1   to shut down.  So that would seem to me moot the

2   immediate endangerment issue in this court, right?

3          MS. GANGE:  If I could have --

4          THE COURT:  If they're not operating, they can't

5   have a -- that's what you're effectively asking me to do

6   anyway.

7          Mr. Shermer.

8          MR. SHERMER:  So, Your Honor, if, in fact, Denka

9   permanently shuts down, then, yes, this case is moot, but

10  Denka --

11         THE COURT:  Well, even if they temporarily shut

12  down, it's moot.  The immediacy of this whole case is

13  not -- not present it seems to me.

14         MR. SHERMER:  Until they restart, which --

15         THE COURT:  Well, yeah.  But, I mean, there would

16  be no -- I wouldn't see any need to go forward on an

17  injunction hearing as opposed to a trial on the merits if

18  that's necessary at some point down the line.

19         MR. SHERMER:  So, Your Honor, we do think it makes

20  sense to restart the litigation schedule.  Denka's

21  arguments about not wanting to spend time and resources

22  on this litigation seem to fall away pretty quickly when

23  it comes to submitting additional briefing, which they

24  seem more than willing to do.  They obviously have filed

25  multiple pieces of other litigation.  So they have the

1   resources and the determination to file litigation when

2   they want to --

3        THE COURT:  Well, how about if we just held

4   everything in abeyance until October 15th and then we

5   hold another status conference around that time and see

6   where we are?

7        MR. SHERMER:  So, Your Honor, the -- until that

8   time, Denka has made it clear that they will continue to

9   emit their chloroprene emissions at their current levels,

10  and if they get their extension from the Fifth Circuit or

11  they get their extension from the DC Circuit, they will

12  continue to emit for as long as whatever relief they get

13  in either of those circuits.  During that time, their

14  emissions are causing cancer risks to the people --

15       THE COURT:  We're not going to be able to hold

16  this trial and have that decided earlier than that

17  anyway, right?

18       MR. SHERMER:  So, Your Honor, we can provide the

19  Court with status updates, the status of the circuit

20  court litigation, which is on fast-track to keep you

21  apprised of the decisions in that case or how that may or

22  may not affect the schedule, but the harm associated with

23  Denka's emissions will continue until they're ordered to

24  stop and reduce them.

25       THE COURT:  Well, if -- but if they get stays from

1   one or both of those circuits, I don't know how -- I

2   don't know how that does not impact our schedule here,

3   our litigation here.

4        MR. SHERMER:  If they get a stay, Your Honor, then

5   it's all the more reason for this case to continue.  This

6   case is based on a separate statute under the Clean Air

7   Act, Section 303, which makes -- the text makes clear

8   that authority stands and gives this Court authority to

9   order relief to abate endangerments to public health,

10  notwithstanding any other provision of the Clean Air Act,

11  notwithstanding Section 112 rulemaking like is going on

12  in DC Circuit.  This action stands alone based on

13  independent legal authority, which is a lot of what our

14  summary judgment briefing is about.

15       Denka disagrees with that position.  We think

16  that's contrary to the text of the statute, but if they

17  get a stay for a year, eighteen months, two years from

18  either one of these courts, then they will continue their

19  current level of emissions, which depending on the

20  monitor we're looking at, it can be as much as seven

21  times in the past year, that 0.2 number.

22       So seven times the --

23       THE COURT:  How long --

24       MR. SHERMER:  -- acceptable --

25       THE COURT:  -- has the Denka Plant been in

1 | operation?  Do you know?

2 |     MR. SHERMER:  Roughly 1968, but DuPont's counsel
3 | might know that better.

4 |     THE COURT:  So has the emissions since 1968 been
5 | more or less the same?  Has it increased?  Has it gone
6 | down?  What's the general sense of that?

7 |     MR. SHERMER:  Since Denka has bought the plant, it
8 | is undeniable that they have reduced their emissions
9 | substantially, Your Honor, in no small part due to the
10 | government's efforts to do that.

11 |     In 2017 they talk about this.  They entered into
12 | an agreement with the State that required them to take on
13 | multiple projects to install air pollution control
14 | equipment that reduced their emissions by about
15 | 85 percent from when they bought the plant from DuPont.
16 | So the emissions are dramatically lower, but they are
17 | still too high and Denka has explained that it will not
18 | reduce them further without being ordered to do so.  It's
19 | filed litigation, multiple pieces of litigation in the
20 | circuit courts of appeal so that it can avoid ever having
21 | to comply with the final rule, because that's its end
22 | game, is to invalidate the final rule, in which case,
23 | this case is abundantly necessary.  It will be the last
24 | legal action that's available to address the public
25 | health endangerment caused by Denka's chloroprene

1  emissions.

2         THE COURT:  Okay.  Thank you.

3         I got a couple more questions for Mr. Super,

4  please.

5         Maybe you can answer.  Do you know -- is Denka the

6  only plant in the entire United States that produces

7  chloroprene?

8         MR. SUPER:  Yes.

9         THE COURT:  Okay.  I understand there was a plant

10  in Kentucky that was shut down.

11         MR. SUPER:  Yes.  And that actually sort of

12  relates to the merits of this action because there was a

13  study conducted at that plant of chloroprene workers by

14  Dr. Gary Marsh back in 20 -- 2007 and then updated in

15  2021 and those workers inhaled orders of magnitude higher

16  levels of chloroprene than anyone in connection with the

17  vicinity of the Denka facility.  And Dr. --

18         THE COURT:  And why was that?

19         MR. SUPER:  They worked there.  And so just by

20  working in a chloroprene plant, they were exposed to much

21  higher levels.

22         And Dr. Marsh's study found there was no linkage

23  between the types of cancers that the EPA attributes to

24  chloroprene and these massive exposures of chloroprene.

25  But we think that's pretty --

1          THE COURT:  So why was that plant shut down in
2    Kentucky?
3          MR. SUPER:  That I don't know.
4          THE COURT:  Who shut it down?
5          MR. SUPER:  I don't know the answer to that.
6          THE COURT:  You don't know -- you don't know if
7    the EPA or the State of Kentucky shut it down?
8          MR. SUPER:  I don't know.  Maybe one of my
9    colleagues --
10          MR. JARRELL:  If Your Honor is really interested
11    --
12          THE COURT:  Give us your name, please.
13          MR. JARRELL:  Eric Jarrell, Your Honor, for DuPont
14    --
15          THE COURT:  Oh, yeah, DuPont.  Why don't you come
16    up?
17          MR. JARRELL:  That facility, Your Honor, was shut
18    down for marketing reasons.  It wasn't -- it wasn't
19    environmental health and safety reasons.
20          THE COURT:  Marketing reasons.
21          That was a DuPont plant also?
22          MR. JARRELL:  Right.  It was -- it produced a
23    product that wasn't needed in the place it wasn't needed
24    and so that's why it was shut down.  No one --
25          THE COURT:  It wasn't --

1           MR. JARRELL:  -- shut it down.

2           THE COURT:  Didn't it produce the same product as

3    Denka?

4           MR. JARRELL:  It did.

5           THE COURT:  So why is Denka's product needed, but

6    not that plant?

7           MR. JARRELL:  Oh, it's just the -- as I appreciate

8    it -- now I'm going off of memory here.  But as I

9    appreciate it, it was simply because of what was needed

10   in the market worldwide and whether multiple facilities

11   were needed for that, but the remaining operations in

12   LaPlace were needed and continued.  That facility has

13   been operating since the early 1960s.  I have been

14   representing it since the early 1980s and going out there

15   regularly.  It's a relatively modest facility, but serves

16   a very important purpose.

17          THE COURT:  So since Denka took it over -- I read

18   something on Denka's website.  I know this is not

19   evidence, but I assume this is accurate information.

20          Denka took -- bought it from DuPont November 1,

21   2015, correct?

22          MR. JARRELL:  Correct, Your Honor.

23          THE COURT:  And then it says that Denka -- Denka

24   Company, Limited -- whose polychloroprene business is

25   based in Japan, has long business experience with this

1    product.

2          So Denka had been in a business -- Denka had been

3    in a business of manufacturing chloroprene long before it

4    bought the Denka Plant?  I mean, the LaPlace plant,

5    right?

6          MR. JARRELL:  Correct, Your Honor.  They were a

7    market competitor.

8          THE COURT:  Of DuPont?

9          MR. JARRELL:  Of DuPont.

10         THE COURT:  Okay.

11         MR. JARRELL:  And that was the only facility that

12   E.I. du Pont de Nemours and Company had at the time doing

13   that.  Denka had other facilities.

14         THE COURT:  So if you can't compete, buy out your

15   competition, huh?

16         MR. JARRELL:  That's certainly one thing that

17   someone can argue.

18         THE COURT:  You don't have to answer that.

19         MR. JARRELL:  I think we were just happy someone

20   was willing to buy it for a price we were willing to

21   accept.  That's how the world works, right?

22         THE COURT:  Okay.  I have another question for Mr.

23   Super.  It looks like he wants to say something anyway.

24         MR. SUPER:  My colleague --

25         THE COURT:  Come up, Mr. Super --

OFFICIAL TRANSCRIPT
Page 43

1          MR. SUPER:  -- may have historical knowledge --

2          THE COURT:  Wait.

3          MR. SUPER:  -- of Denka.

4          THE COURT:  Well, here's my question and I don't

5    know which one of you wants to answer this.  But Denka,

6    based on the statement that they have a long business

7    experience with this product that they manufactured in

8    Japan?

9          MR. SUPER:  I'm going to let my colleague, Jason

10   Hutt, address these points.

11         THE COURT:  Okay.

12         MR. HUTT:  Good morning, Your Honor, Jason Hutt,

13   for Denka Performance Elastomer.

14         THE COURT:  Okay.

15         MR. HUTT:  So Denka, one of the joint venture

16   partners of DPE, the Defendant in this case, owns a

17   neoprene manufacturing facility in Japan, but the way in

18   which they make neoprene is not the same as the way

19   neoprene is made here in LaPlace, Louisiana, or in the

20   way in which it was made at the Kentucky facility by the

21   prior owner and operator of DuPont.

22         The Kentucky facility and the LaPlace plant make

23   the neoprene in the same way in that chloroprene is one

24   of the key ingredients that is used to make the neoprene.

25   The neoprene that is made in Japan is not made with

1  chloroprene as the input ingredient.  They use a settling

2  process, so it's a different process, has a different

3  emission profile, different public health considerations

4  associated with that.

5          THE COURT:  So in Japan, Denka is not emitting

6  chloroprene.  Is that what you're saying?

7          MR. HUTT:  Not in the same way that this -- this

8  facility uses two fundamental ingredients -- butadiene,

9  1,3-butadiene and chloroprene -- that they combine to

10  make neoprene at the plant.

11          THE COURT:  So apparently -- are you a chemist,

12  too?

13          MR. HUTT:  No, sir.  An aspiring chemist.

14          THE COURT:  Okay.  So it seems like based on what

15  you said you can make neoprene without using chloroprene.

16          MR. HUTT:  That's correct.  If your plant is

17  configured in that fashion.

18          No?

19          MR. HOLDEN:  Can I weigh in?

20          MR. HUTT:  Yeah.  Sure.

21          MR. HOLDEN:  Your Honor, this is Bob Holden with

22  Jones Walker on behalf of Denka Performance Elastomer and

23  I have had the privilege of representing DPE since 2016.

24          Neoprene is polychloroprene.  It is a polymerized

25  version of chloroprene.  So in Japan and the United

1   States, you have to use chloroprene in order to make

2   neoprene.  How you make the chloroprene is the difference

3   between the Japanese plant and the United States plant.

4         And in the United States at the LaPlace plant,

5   butadiene is the raw material along with chlorine that's

6   purchased separately in order to make the chloroprene,

7   and from the chloroprene, you go through a polymerized

8   process, but it is correct that DPE is the only

9   significant emitter of chloroprene in the United States.

10  So everything else that my colleagues have said is

11  correct, but I don't think we were really prepared to get

12  into an elaborate discussion of the chemical processes

13  that make the chloroprene.

14        THE COURT:  Well, I'm only -- I'm trying to

15  understand downstream, so to speak, downstream from this

16  litigation what the practical consequences of any of this

17  would be, if -- I know neoprene, you know -- yeah,

18  neoprene is apparently an important product that's

19  produced in the country for -- that can make everything

20  from gloves to diving suits and so forth, right?

21        MR. HOLDEN:  That is correct, Your Honor.

22        THE COURT:  And a lot of other things I'm sure.

23        MR. HOLDEN:  Used in all sort of industrial,

24  automotive --

25        THE COURT:  But I guess what I'm -- I'm just

1  wondering out loud here, if this same product can be

2  produced in a different way, perhaps a safer way in

3  Japan, why can't that be done in the United States?

4        MR. HOLDEN:  There are also chloroprene emissions

5  in Japan, but Japan is not subject to the same sorts of

6  EPA risk analyses that resulted in ultimately the 0.2,

7  0.3, 0.8 types of argument and analyses.

8        THE COURT:  And do you know -- does someone know

9  what the emission levels are in Japan from that plant?

10       MR. HOLDEN:  We would have to take that under

11  advisement and respond to Your Honor separately.  I don't

12  think we're prepared to address that.

13       THE COURT:  Okay.  All right.  Thank you.

14       You want to say something?

15       MR. SUPER:  May I just address one point that Mr.

16  Shermer made about the alleged harms that might accrue

17  during an abeyance period?

18       I think it's important to keep in mind that

19  they're the ones who asked the Court to cancel the March

20  trial and that led to -- if they get a trial in October,

21  which they want, that would have led to a seven-month

22  delay.  So the harm during that seven-month delay would

23  be longer or more than any potential harm during a

24  four-month abeyance period.

25       So I think it's -- you know, pointing out there

1  will be substantial harms during this abeyance period

2  isn't really accurate. I mean, they assess their whole

3  risk profile based on a 70-year lifetime, so a four-month

4  abeyance period is something like 0.005 percent of that

5  70-year lifetime. So it's an infinitesimal increase in

6  risk if the Court were to grant an abeyance. And, again,

7  it's less than the delay that was caused by the United

8  States canceling the trial last March.

9      THE COURT: While you're up, tell me about this:

10  One of the issues that was raised in the status report to

11  the court, it says that Denka suggests or argues that it

12  would like to conduct additional discovery.

13      I'm not clear on what additional -- assuming if or

14  when this litigation goes forward, what would be the need

15  for that and the scope of that discovery?

16      MR. SUPER: I'm glad you asked that because it is

17  very targeted and limited discovery that goes directly to

18  the rule and it relates to issues we've already discussed

19  today, you know. One is, again, the fact that once all

20  of the projects that are required by the rule are

21  implemented, the EPA admits that you're left with a 0.8

22  micrograms per cubic meter concentration which is

23  entirely consistent with the emergency they're alleging

24  in this case, that 0.2.

25      And there are -- there's modeling. It's called

1  Human Exposure Modeling or HEMs that EPA performed in
2  connection with the rule that would lay all of that --
3  lay all of that out and we really need that modeling.
4  Interestingly enough, they actually made it available
5  with respect to the proposed rule, but they have not made
6  it available with respect to the final rule. And that is
7  something that they should be able to produce to us and
8  we should be able to receive.

9          But it doesn't end there because, you know, as
10  we've talked earlier today, this notion that Denka was
11  singled out and given the 90-day period when other
12  facilities with higher risk profiles were given two
13  years, we think we're entitled to know why, what analysis
14  was done by the EPA to say -- as they had to as a matter
15  of law, to say this facility that has a four times higher
16  risk profile than Denka gets two years, thus no imminent
17  endangerment, but Denka doesn't. Why? How? Who made
18  that decision? What is it based on?

19          We have nothing on that other than one sentence in
20  the 140-page preamble, which is this finding associated
21  with this case. And I know Your Honor has made no
22  findings in this case. We have no idea what they're
23  talking about with respect to these findings. So we
24  think we should be able to get some basic simple
25  discovery on who made the finding, where does it exist,

1  is it on a piece of paper, what is it supported by,

2  because they can't stand up here and tell you that it has

3  anything to do with what's happened in this case because

4  we made that point.

5      We said, all right, if you're making a finding

6  based on the case before Judge Barbier, then let's put

7  that whole district court record into the administrative

8  record as support for the finding.  They said no.  It's

9  not that.  It's something else.  It's this mysterious

10  finding that someone made sometime presumably in February

11  of 2023 and we need to know what that finding is all

12  about.  And it's critical because if the finding was made

13  by the EPA that Denka is causing an imminent

14  endangerment, then who made the finding that these higher

15  profile facilities are not causing an imminent

16  endangerment and why?  What's the difference?

17      That is a fundamental point of administrative law.

18  If you're going to single out a party and then treat it

19  in a disparate fashion, you've got to explain why and we

20  see no explanation why other than this one sentence

21  referring to the case before you where there have been no

22  findings.  So that in a nutshell is the discovery.

23      What I would propose is that we write it up in a

24  very short motion, explain to you exactly what we want

25  and why we want it and why it's important both as to the

1  summary judgment and to the trial and we can get that

2  prepared pretty quickly or after the abeyance period if

3  the Court thinks that's appropriate.

4        THE COURT: So we talked about what happened --

5  what the effect would be if Denka does not get its relief

6  in either circuit. You represent to the Court it would

7  require a shutdown.

8        What if you do get the relief from either circuit?

9  Where does that leave this case in your view?

10        MR. SUPER: I think if we do get the relief, that

11  means we are alive until July 15, 2026, to try to comply

12  with the rule. Under those circumstances, if the United

13  States thinks it's important to renew this imminent and

14  substantial litigation, then they can take that position

15  and maybe we'll try to find a trial date.

16        What I will say though is, if we do get relief,

17  that means one of the circuit courts has basically

18  undercut this notion that Denka is causing an imminent

19  endangerment because that would be the basis upon which

20  we receive the extension. If, you know, that happens, we

21  think in addition to the various points about the rules

22  that I've been talking about, our summary judgment motion

23  would be very strong at that point.

24        So if the United States wants to bring the case

25  back, that's the first thing we want to do, is make sure

1   we get the summary judgment motion in front of you.

2          THE COURT:  And just to be clear, finally, Denka

3   really doesn't want to ever comply with this rule, right?

4          MR. SUPER:  Denka cannot comply with the rule.

5          THE COURT:  So it's not just a matter of 90 days

6   or two years.

7          MR. SUPER:  I know -- I can represent to the Court

8   that 90 days is impossible.  It's not going to work.  I

9   can't really say that with respect to July 2026.  It

10  gives the company hope that it can continue.  I'm not

11  sure how that will play out.

12         THE COURT:  And why couldn't it comply in two

13  years?

14         MR. SUPER:  Why couldn't it comply --

15         THE COURT:  Why could it not comply if given the

16  two years?

17         MR. SUPER:  Well, I think that's an analysis

18  that's beyond my ability to discuss at this point.  It

19  involves a lot of engineering issues.  But I think it's

20  on the table.

21         I'm not standing here saying to you the plant

22  would shut down after two years.  I just don't know the

23  ends and outs of how the rule would be complied with.

24  What I do know right now is they cannot possibly do it by

25  October 15th.

1           THE COURT:  Okay.  Thank you, Mr. Super.

2           Anybody want to respond briefly before we

3   conclude?

4           MS. GANGE:  I would like to make a couple of quick

5   points about the discovery --

6           THE COURT:  Okay.  Sure.

7           MS. GANGE:  -- that we had spoken about earlier.

8           With respect to information and data and analyses

9   that were used to develop the terms of the final rule,

10  that all is available to Denka today.

11          The United States --

12          THE COURT:  When you say it's available, you mean

13  it has been provided or it's publicly available or what?

14          MS. GANGE:  It is publicly available.

15          Under Section 42, U.S. Code, Section 7607(d), the

16  statute specifies that the EPA is required to put all of

17  the information that it based its final rules on into the

18  administrative record and all of those materials have to

19  be posted to that record by the time the rule is

20  finalized and that is available online at

21  regulations.gov.  And every rule in the Federal Register

22  Notice it specifies the internet address and the rule

23  number that you simply type in to access all of that

24  information.

25          So Denka's counsel -- everyone can Google today,

1  right -- they should -- they should be able to download

2  that.  If they have electronic issues, we're happy to

3  talk to the EPA about it.

4        THE COURT:  Well, if they -- if they for some

5  reason need information that is not available as you

6  just -- as easily as you just said, you have no problem

7  -- the EPA would have no problem providing that, correct?

8        MS. GANGE:  All they need to do is contact us and

9  ask for it and we'll either point to the regulations.gov

10  page or discuss whether it's legitimate.

11        THE COURT:  Okay.

12        MS. GANGE:  With respect to a finding, I just

13  wanted to clarify, when people talk about an agency

14  finding, let's say of an imminent and substantial

15  endangerment, most people are thinking of some final and

16  reviewable agency action.  There is not a final and

17  reviewable agency action as that's codified under the

18  Clean Air Act.  There is no magic document that was, say,

19  published in the Federal Register.

20        But this lawsuit is an imminent and substantial

21  endangerment lawsuit.  The claim that the EPA brought has

22  to by definition and by statute be based on a scientific

23  conclusion that an imminent and substantial endangerment

24  is being created and that had to be substantiated in the

25  EPA.  The EPA had to refer the case to DOJ and DOJ had to

1    make its determinations about filing and all of the

2    information about that and how it was determined and

3    calculated, all the information supporting it, is the

4    evidence in this case.

5           THE COURT:  What's the -- what's the case law

6    under Section 303?  That's what this case is based on,

7    right?

8           MS. GANGE:  Yes, it is, Your Honor.

9           THE COURT:  Is there any case law supporting using

10   that section in the way the EPA seeks to use it in this

11   case?

12          MS. GANGE:  I'm sorry, Your Honor.  I don't quite

13   understand.

14          THE COURT:  Well, I mean, I can envision things

15   happening, you know, something blows up and creates an

16   immediate endangerment to the surrounding community,

17   whatever, but the -- I believe the other side suggests

18   that this is an unprecedented use of Section 303 in the

19   context of this kind of case is -- what's your response

20   to that?

21          And I know we're not arguing a motion for summary

22   judgment right now, but I believe I've stated that

23   correctly.

24          MS. GANGE:  Could I hand this to Mr. Shermer?

25          THE COURT:  Okay.  Sure.  Sure.

1          MS. GANGE:  Thank you.

2          THE COURT:  Okay.

3          MR. SHERMER:  Thank you, Your Honor.

4          So, Your Honor, in our preliminary injunction

5   briefing, we discussed the state of the law under

6   Section 303 and how those elements have been interpreted

7   by different courts and the statute provides very broad

8   authority for the court to stop an endangerment to public

9   health and welfare caused by air pollution.  There is

10  really no limit in terms of what basis the EPA can use,

11  what evidence it can rely upon, to bring this type of

12  claim.

13         Here, a while ago, Your Honor, you asked how is

14  this endangerment determined.  And the EPA determined

15  that based on a very site specific investigation using

16  air monitoring data, multiple sets of air monitors,

17  that have been collecting data for years --

18         THE COURT:  I guess what I'm -- that's the issue

19  here, because you've got a plant that's been in existence

20  since 1968 --

21         MR. SHERMER:  I believe so.

22         THE COURT:  -- with emitting certain chemicals, a

23  certain chemical that I don't think there's any question

24  that can cause, you know, a danger to people over a

25  period of time, but it's been emitting this for decades

 1 | and you even admitted that they've made substantial
 2 | progress in reducing those emissions since Denka bought
 3 | the plant in 2015.  So I'm trying to -- I'm just trying
 4 | to envision how this fits into the idea of an immediate
 5 | endangerment, where this has been going on for so long.
 6 | What's the immediacy of it?
 7 |         MR. SHERMER:  So cases that we -- I can point you
 8 | to --
 9 |         THE COURT:  Again, this is not like something
10 | explodes and causes catastrophe in an immediate area or
11 | whatever.
12 |         MR. SHERMER:  So the legislative history in a
13 | companion statute, the Safe Drinking Water Act, talks
14 | about the long-term cancer risks as being an example of
15 | an endangerment that these types of environmental
16 | endangerment statutes are supposed to cover.  It cites --
17 | and it is sort of particularly for the reasons that we've
18 | been talking about, that cancer -- you don't step on
19 | something and get cancer.  It takes years, if not
20 | decades, to develop.
21 |         THE COURT:  Right.
22 |         MR. SHERMER:  And so because of that very
23 | secretive, very slow moving harm, it's important to still
24 | make progress, even if emission levels have gone down.
25 |         The cases have cited that legislative history as

1  acknowledging that is an actionable type of endangerment

2  under similar environmental endangerment statutes.  I

3  mean, it's probably a poor analogy, but, Your Honor, if

4  you're driving your car at 150 miles an hour and you drop

5  it down to 100, you're still speeding and you're still

6  being --

7          THE COURT:  Yeah --

8          MR. SHERMER:  -- dangerous.

9          THE COURT:  -- but that's a little different than

10  this.  But okay.

11          I guess when we get around to maybe the motion for

12  summary judgment -- I'm just trying to -- I'm inclined to

13  just grant the suggestion of -- agree with the suggestion

14  that we should hold this in abeyance until October 15th

15  and then hold a status conference at that time.

16          I mean, the only other thing we could do is have

17  the parties file additional or new briefing in the

18  interim.  Perhaps that makes sense.  I don't know.

19          What are your thoughts on that?

20          MR. SHERMER:  Your Honor, we would be amenable to

21  filing additional briefing in the interim.

22          MS. GANGE:  I think Your Honor would respect -- I

23  think with respect to the amended counterclaim, the

24  fundamental issue hasn't changed and that's that this

25  court does not have subject matter jurisdiction for legal

1 | reasons. It's not a factual or fact based issue --

2 | THE COURT: So you think there's no need for

3 | additional briefing on that issue?

4 | MS. GANGE: That is correct, Your Honor. And the

5 | United States would be more than happy to provide

6 | argument or stand on its briefs.

7 | THE COURT: What about the DuPont issue? Because

8 | we haven't talked about that very much.

9 | MR. SHERMER: Your Honor, I don't think we need

10 | additional briefing on that as well. It's ready to be

11 | decided. I think you observed back in February that

12 | DuPont's motion didn't raise any new issues from the

13 | motion to dismiss that it filed in the middle of last

14 | year and that you denied. It's re-casted as a motion for

15 | judgment on the pleadings, but it really doesn't change

16 | much and I think you recognized that. So we

17 | don't believe there would be additional briefing

18 | necessary --

19 | THE COURT: Let me ask Mr. Jarrell to respond to

20 | that, if he would like.

21 | MR. JARRELL: Your Honor --

22 | THE COURT: What's changed from when I denied your

23 | motion to -- originally, it was a -- it's a motion to

24 | dismiss. Is that what it is? Okay.

25 | MR. JARRELL: What's changed -- and it's

1   everything that matters, Your Honor.  While we didn't

2   necessarily completely agree with what was in the Court's

3   ruling --

4        THE COURT:  Well, I suspected that.

5        MR. JARRELL:  But having said that, it doesn't

6   matter because the Court's ruling then perfectly fits

7   what happens when they change the relief they were

8   requesting.  They got out from under the 12(b)(6) by

9   convincing the Court that they were going to be coming in

10  here and directing that Denka would make specific changes

11  at the facility and they were going to have to do this to

12  this air emission point and they were going to have to

13  change this facility this way.  They had specific

14  projects that they said they were going to have the Court

15  force Denka to do.  And so, therefore, they had to

16  involve us because we could stand in the way of the

17  specific relief that the Court was going to grant.  And

18  that's how they tried to hook into the All Writs Act.

19        THE COURT:  Well, are they still going to try to

20  require that?

21        MR. JARRELL:  Absolutely not, Your Honor.

22        When Your Honor required that they give a

23  statement of final relief requested, they shifted from

24  saying they were going to require Denka to do specific

25  projects, possibly because Denka was saying those

1    projects won't work and so they were going to have a big

2    fight about that. And so they shifted to not that Denka

3    would do specific projects, but that they would shut down

4    unless and until they could meet certain standards, and

5    how they got there, if they ever got there, was up to

6    Denka --

7         THE COURT: Well, I mean, obviously, to get to

8    this much lower standard that the EPA is requesting or

9    requiring, would a necessity require Denka to do some

10   substantial changes at that plant? Would it not? I

11   mean, it just strikes me as common sense.

12        MR. JARRELL: Well, there's two aspects to that.

13   First, Your Honor, that assumes they would ever do the

14   projects, because you've heard folks come up here and

15   tell you already today they can't get there. The

16   standard that the government is asking them to meet,

17   there is no way to get there.

18        THE COURT: But I asked Mr. Super and he said they

19   are not prepared to say absolutely that they can't

20   eventually lower their emissions.

21        MR. JARRELL: I don't wish to speak for them, but

22   it was always my understanding the point, too, is just an

23   absolutely no-go.

24        But aside from that, the truth of the matter is,

25   there's a massive distinction between an order that this

1   Court would issue that says you have to stop operating

2   unless and until you can do these things and an order

3   that this Court was going to issue, which what they --

4   what they said they were going to have the Court do

5   before, to get out from under our 12(b)(6), was the Court

6   was going to order specific changes at the facility.  So

7   the actual order from this Court would direct specific

8   projects to be done and that's how they tried to hook

9   into the All Writs Act to say that if we stood in the way

10  of the specific project that was ordered, then we could

11  potentially interfere with the jurisdiction of the court

12  because we could get in the way of that specific project.

13  The notion that some project might be done on down the

14  road at some point in some way is completely different.

15      The All Writs Act requires that you present an

16  extraordinary circumstance of undermining the court's

17  jurisdiction.  We're just not there now.  There's no way

18  to get there.  What we're at right now is very simply

19  they're requesting an order that says you shut down until

20  you can meet this, you figure out how to do it.  All

21  Writs Act doesn't come into play.

22          THE COURT:  All right.

23          MR. JARRELL:  We got no involvement with that

24  order.

25          THE COURT:  Okay.  I'll look at that again, but

1    I'm kind of -- I think I'm at the same view that I was

2    the last time when we argued your motion, you know.

3            Thank you.  Thank you, Mr. Jarrell.

4            MR. JARRELL:  If Your Honor would like, I am happy

5    to provide additional briefing.

6            THE COURT:  No, no, no, I don't need any

7    additional briefing on this.

8            Okay.  Thank you.

9            Okay.  So anybody need to say anything else?

10           MR. SUPER:  Your Honor, I just wanted to address

11   the notion of a briefing on the summary judgment.

12           THE COURT:  Okay.  Okay.

13           MR. SUPER:  I agree with Mr. Shermer that we

14   should go ahead and do that and I think Your Honor

15   preferred the full brief --

16           THE COURT:  Yeah --

17           MR. SUPER:  -- instead of just a --

18           THE COURT:  -- it would be cleaner, I think, to do

19   it that way.

20           MR. SUPER:  We'll do that.

21           And with the Court's indulgence, we would like to

22   submit --

23           THE COURT:  So we're talking about your motion for

24   summary judgment?

25           MR. SUPER:  That's correct.

1           THE COURT:  So how much time would you need to do
2     that?

3           MR. SUPER:  Three weeks.

4           THE COURT:  Okay.  I'll tell you what, I'll give
5     you 30 days.  How about that?  30 days.

6           MR. SUPER:  30 days.

7           THE COURT:  And how much time will the government
8     need to file an opposition after that?

9           MR. SHERMER:  Your Honor, that's tough to say
10    since we don't know how that summary judgment motion
11    would change, but we would ask for a similar amount of
12    time to respond.

13          THE COURT:  I'm sorry.  What?

14          MR. SHERMER:  We would ask for -- it's tough for
15    us to budget for a response if we don't know how the
16    arguments are going to change, but we would ask for a
17    similar amount of time --

18          THE COURT:  Okay.  So what we'll do -- here's what
19    we'll do.  I'm going to order the parties to file, I
20    guess, their new briefs in support of your motion for
21    summary judgment and new brief and opposition by the
22    government, 30 days for Denka, 30 days for the
23    government, 10 days after that for any reply by Denka.
24    Okay?

25          MR. SUPER:  That's good.

1      THE COURT:  At which time I'll look at it and

2  decide where we are in terms of whether I schedule oral

3  argument on that or we may be -- otherwise, I'm not --

4  I'm holding everything else in abeyance in this case

5  until at least October 15th.  Okay?

6      MR. SUPER:  And, Your Honor, with your indulgence,

7  we would like to submit a very short motion to compel,

8  the rule-related discovery that I had mentioned.  We can

9  get that in almost immediately.  Some of it is relevant

10  to the summary judgment and we think it supports the

11  summary judgment, particularly that Human Exposure

12  Modeling information I was talking about.

13      And, of course, we will meet and confer with the

14  government before we submit that.  And if there is

15  something that we're just not looking at the right spot

16  on the website to find it, then, of course, we won't

17  include that in the motion.  But I can promise you, Your

18  Honor, that it will be a short motion, very targeted,

19  explaining exactly what we need and when we would like to

20  get it.  So we can submit that within a week.

21      THE COURT:  All right.  Submit that in a week and

22  we'll see what the response is.  But hopefully you-all

23  can work that out.  Okay?

24      MR. SUPER:  And I have one last point --

25      THE COURT:  Okay.

1          MR. SUPER:  -- because it relates to the amended

2     counterclaim.

3          I agree with Ms. Gange that the -- otherwise the

4     amended counterclaim and the motion to dismiss are ripe,

5     but there is one issue that's arisen based on a recent

6     Supreme Court ruling.

7          Your Honor, in the August 30th ruling dismissing

8     five of the counterclaims, dismissed counterclaim number

9     one and counterclaim number one, was a challenge to the

10    2010 toxicological review which ended up in the 0.2

11    concentration that we've been fighting about.  And Your

12    Honor dismissed that claim based on a Fifth Circuit case

13    called *Dunn-McCampbell Royalty Interest v. National Park*

14    *Service* from 1997 on the grounds that the claim was in

15    violation of the six-year statute of limitations.

16         Well, last month, in the *Corner Post* case, the

17    Supreme Court expressly overruled *Dunn-McCampbell* and how

18    that six-year statue of limitations --

19         THE COURT:  When it starts to run.

20         MR. SUPER:  Yeah.  It doesn't start -- it's once

21    -- it's once the agency action is being applied to a

22    plaintiff.  That's when the statute of limitations

23    starts.  So we think we've got a very strong argument

24    that the results of the 2010 toxicological review, the

25    0.2 level, were not applied to us until many years later,

1  so the statute of limitations wouldn't be a problem.

2       The Court, I believe, is free to reconsider its

3  decision based on intervening Supreme Court authority and

4  we would propose submitting a very short motion to

5  reconsider just that aspect of the August 30th order

6  because it does impact the amended counterclaim in a

7  pretty important way.

8       THE COURT:  What's the goal of your amended

9  counterclaim?  Because I said when I denied your motion

10  that you can raise the same -- attack the standard

11  regardless as a defense to this case, right?

12       MR. SUPER:  Yeah.  That is --

13       THE COURT:  So I've always had a hard time

14  understanding the purpose of your counterclaim.

15       MR. SUPER:  If I -- the way to address that, I

16  think, is -- if they decided to dismiss the imminent and

17  substantial endangerment claim for whatever reason, they

18  still have -- we describe it as an *ultra vires* standard

19  of 0.2 that they're trying to get Denka to comply with

20  and it's completely separate from the rule.  This is a

21  standard they've tried to impose upon us in this case,

22  through rigger enforcement actions, through pressuring

23  LDEQ to impact our permits.

24       THE COURT:  Wasn't that issue -- was it raised,

25  litigated, somehow in 2010?  Wasn't Denka involved in

1    that?

2          MR. SUPER:  I'm not sure what you're referring to,

3    Your Honor.

4          THE COURT:  I thought there was some -- what

5    happened in 2010 when that -- what you're talking about

6    occurred?

7          MR. SUPER:  Well, when the toxicological review of

8    chloroprene came out and established the inhalation unit

9    risk that led to the 0.2 concentration, Denka did

10   ultimately file administrative challenges before the

11   agency.  But those were denied by the agency.

12         THE COURT:  So how does -- I'm trying to

13   understand how this *Corner Post* case would make a

14   difference.

15         MR. SUPER:  Well, the *Corner Post* case --

16         THE COURT:  I know what the *Corner Post* case says

17   --

18         MR. SUPER:  Yeah.

19         THE COURT:  -- but it seems that to me that Denka

20   was aware in 2010 that there were -- that the EPA was

21   going to enforce the 0.2 standard, right?

22         MR. SUPER:  No, because Denka didn't enter the

23   picture until 2015.  So that may have been DuPont, but it

24   wasn't Denka.

25         So Denka -- our argument would be that when the

                      OFFICIAL TRANSCRIPT
                          Page 68

1   EPA tries to start enforcing this 0.2 standard against

2   us, it was in May of 2022, when they -- when one of the

3   EPA officials said we're going to bring all the tools the

4   agency can bring to bear to make sure that you get down

5   to 0.2.  That was applying what we describe as an *ultra*

6   *vires* ambient air standard against Denka and that was

7   what was applied to us and a six-year statute of

8   limitations wouldn't apply to preclude that action

9   because we didn't learn about it until 2022.  So that's

10  why we think that --

11         THE COURT:  Well, I don't -- I can't believe you

12  didn't know about it.  Denka buys this plant in 2015.

13  They have no clue that this is hanging out there, that

14  the EPA -- I mean, I'm assuming these are smart people

15  that bought Denka and they would know what they're buying

16  here, right?

17         MR. SUPER:  We do have an argument that Denka --

18  that the 0.2 level was brought to bear against Denka

19  within the six-year statute of limitations.

20         THE COURT:  All right.  Well, I'm not

21  reconsidering that right now and I'm going to -- the more

22  we talk, the more I might say don't do anything until

23  October 15th.  I'll tell you, you-all keep adding stuff

24  here.

25         MR. SHERMER:  Can I say one thing to that point,

1   Your Honor?

2          THE COURT:  Yeah.

3          MR. SHERMER:  I think I would agree with you, Your

4   Honor.  We object to --

5          THE COURT:  You know, we talked about briefing.

6   Then we talked about now more discovery before the

7   briefing.  And now we're talking about the counterclaim

8   and all of that.

9          MR. SHERMER:  Your Honor, the United States

10  certainly objects to the discovery and we would ask

11  for --

12         THE COURT:  Well, I'll tell you what I'm going to

13  do.  I'm going to hold everything in abeyance.  We're not

14  going to have anymore briefing or anything until at least

15  October 15th.  You-all have managed to change my mind

16  here.  And so we will hold everything in abeyance.  By

17  October 15th, I think, you -- the parties shall file

18  another status report, tell me where things stand, we'll

19  set a status conference and we'll go from there.  Okay?

20         All right.  Everyone have a good day.

21         THE DEPUTY CLERK:  All rise.

22                         * * * *

23         (WHEREUPON, the proceedings were adjourned.)

24                         * * * *

25

OFFICIAL TRANSCRIPT
Page 70

1                    REPORTER'S CERTIFICATE

2            I, Nichelle N. Wheeler, RMR, CRR, Official
     Court Reporter, United States District Court, Eastern
3    District of Louisiana, do hereby certify that the
     foregoing is a true and correct transcript, to the best
4    of my ability and understanding, from the record of the
     proceedings in the above-entitled and numbered matter.

5

6                          ___/s/ Nichelle N. Wheeler___
                              Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                         OFFICIAL TRANSCRIPT
                              Page 71