**ORAL ARGUMENT NOT YET SCHEDULED**

**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

| | | |
|---|---|---|
| **DENKA PERFORMANCE ELASTOMER LLC,**<br><br>**Petitioner,**<br><br>**v.**<br><br>**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL REGAN, Administrator, United States Environmental Protection Agency,**<br><br>**Respondents.** | ) | **No. 24-60351** |

# PETITIONER'S REPLY IN SUPPORT OF EMERGENCY MOTION FOR STAY PENDING REVIEW
**(Ruling Requested By August 12, 2024)**


James C. Percy
JONES WALKER LLP
445 N. Boulevard, Suite 800
Baton Rouge, LA 70802
Telephone: (225) 248-2130
jpercy@joneswalker.com

Robert E. Holden
Brett S. Venn
JONES WALKER LLP
201 St. Charles Ave
New Orleans, LA 70170
Telephone: (504) 582-8000
bholden@joneswalker.com
bvenn@joneswalker.com

David A. Super
Jason B. Hutt
Jeffrey R. Holmstead
Britt Cass Steckman
Kevin M. Voelkel
BRACEWELL LLP
2001 M Street NW, Ste. 900
Washington, DC 20036
Telephone: (202) 828-5800
david.super@bracewell.com
jason.hutt@bracewell.com
jeff.holmstead@bracewell.com
britt.steckman@bracewell.com
kevin.voelkel@bracewell.com


***(counsel cont'd)***

Jeffrey L. Oldham
BRACEWELL LLP
711 Louisiana Street, Suite 2300
Houston, TX 77002
Telephone: (713) 223-2300
jeffrey.oldham@bracewell.com

***Counsel for Petitioner Denka Performance Elastomer LLC***

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... ii

TABLE OF EXHIBITS ..... iv

I. INTRODUCTION ..... 1

II. ARGUMENT ..... 3

A. DPE Is Likely To Succeed On The Merits. ..... 3

1. EPA delegated LDEQ authority to grant extensions in 2004 and has not withdrawn such delegation. ..... 3

2. LDEQ has permitting-based extension authority independent from its delegated authority. ..... 5

3. "Table 1" in Subpart U does not impact either source of LDEQ's extension authority. ..... 8

B. DPE Will Suffer Irreparable Harm Absent A Stay ..... 10

C. The Balance Of Harms Favors A Stay. ..... 12

CERTIFICATE OF COMPLIANCE ..... 14

# TABLE OF AUTHORITIES

**Page(s)**

**Statutes**

42 U.S.C. § 7412 .......... 3, 5

42 U.S.C. § 7412(d) .......... 6, 7

42 U.S.C. § 7412(f) .......... 6, 7

42 U.S.C. § 7412(f)(4) .......... 9

42 U.S.C. § 7412(f)(4)(B) .......... 5

42 U.S.C. § 7412(l) .......... 9

42 U.S.C. §§ 7412(l)(1)-(5) .......... 3

42 U.S.C. § 7412(l)(6) .......... 3, 4

**Regulations**

40 C.F.R. § 63.4(a)(1) .......... 5

40 C.F.R. § 63.6 .......... 3, 6, 8

40 C.F.R. § 63.6(i) .......... 3, 6

40 C.F.R. § 63.6(i)(1) .......... 5, 6

40 C.F.R. § 63.6(i)(4)(ii) .......... 8, 9, 10

40 C.F.R. § 63.6(i)(9) .......... 5, 10

40 C.F.R. § 63.6(a)(1)-(1)(i) .......... 5

40 C.F.R. § 63.96(b) .......... 4

40 C.F.R. § 63.99 .......... 4

40 C.F.R. § 63.99(a)(19)(i) .......... 3

40 C.F.R. § 63.481(f) .......... 8, 9

40 C.F.R. § 63.507(c) .......... 3, 4, 5, 7

76 Fed. Reg. 22,566 (Apr. 21, 2011) .......... 9

**TABLE OF EXHIBITS**


| | |
|---|---|
| Exhibit R | Declaration of Jason B. Hutt (July 29, 2024) |
| Exhibit S | EPA, *Compliance Extensions Summary* (July 30, 2002) |
| Exhibit T | EPA, *National Emission Standards for Hazardous Air Pollutants for Source Categories; General Provisions*, 59 Fed. Reg. 12,408 (Mar. 16, 1994) |
| Exhibit U | Excerpt from EPA, *New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry* (May 16, 2024) ("Final Rule") |
| Exhibit V | Letter from Jeffrey Holmstead (DPE counsel) to Cheryl T. Seager (EPA) re *Denka Performance Elastomer, LLC–Notice of Intent to Submit Extension Request* (Mar. 15, 2024) |
| Exhibit W | Letter from Joseph Goffman (EPA) to David Super (DPE counsel) (Apr. 30, 2024) |
| Exhibit X | Letter from Jeffrey Holmstead (DPE counsel) to *Cheryl Seager* (EPA) re *Denka Performance Elastomer, LLC–Request for Extension* (July 26, 2024) |

# I. INTRODUCTION

On June 27, Louisiana's Department of Environmental Quality ("LDEQ") extended DPE a lifeline—a two-year extension of time to comply with EPA's Rule. For decades, under the cooperative federalism model, LDEQ has held authority to issue extensions as a State with delegated authority and an approved permitting program under the Clean Air Act ("CAA"). And for decades, thousands of emission sources in Louisiana have relied upon LDEQ to implement CAA authority, including regular issuance of extensions.

EPA's unprecedented invalidation of the LDEQ Extension is but another step in EPA's well-chronicled crusade to shut down Denka's Facility. When EPA's "emergency" lawsuit against DPE in Louisiana district court faced dismissal in February 2024, EPA shifted to rulemaking tactics to, again, single out DPE and put the Facility out of business. The Rule demands that DPE implement comprehensive emission control requirements by October 15, 2024, an undisputedly impossible task, while the 200-plus other facilities subject to the Rule, including facilities posing higher estimated risk levels, have two years to comply. Until receiving the lifeline of the LDEQ Extension, EPA had "gotten away" with singling out DPE.

Undeterred, EPA's determination as to the validity of the LDEQ Extension threatens DPE with "dropping the hammer" through crippling civil and criminal enforcement proceedings for each day the Facility operates past October 15. While

this Court decides that critical issue, DPE requests that EPA be stayed from acting in contravention of the validity of the LDEQ Extension.

DPE is entitled to a stay and nothing in EPA's opposition ("Opposition") shows otherwise. On the merits, LDEQ has two independent sources of authority: expressly delegated authority and automatic permitting-based authority. Despite EPA's Eleventh-hour attempts and post-hoc justifications, EPA has not withdrawn either.

Further, it is undisputed that, without a stay, the Facility will be forced to shut-down by October 15 and DPE's 250-plus employees will lose their livelihoods. That *certain-to-occur* harm vastly outweighs the purely hypothetical 0.0017% increase in cancer risk if DPE receives a two-year compliance period. The LDEQ Extension reaches this same conclusion. Moreover, EPA's contention that DPE has not previously sought an extension from EPA contradicts the facts, as demonstrated by the attached declaration. *See* Exhibit R. Nonetheless, DPE has now formally submitted such an extension request to prevent EPA from continuing to perpetuate the counter-factual narrative that DPE never sought one previously and that EPA ever had any intention of granting an extension absent absurd and draconian terms.

The remainder of the Opposition simply aims to distract. Most notably, this case is not a collateral attack on the Rule being litigated in the D.C. Circuit. Completely aside from the Rule's content, which DPE does not challenge here,

LDEQ *has* granted DPE an extension and EPA *has* acted to declare that extension invalid. As addressed in DPE's accompanying Opposition to EPA's Motion to Dismiss, only this Court, not the D.C. Circuit, has jurisdiction to decide whether EPA's action to invalidate the LDEQ Extension is proper.

## II. ARGUMENT

### A. DPE Is Likely To Succeed On The Merits.

DPE is likely to succeed on the merits because LDEQ properly granted the Extension under two separate sources of authority and no EPA action, including EPA's amendment to Section 63.507(c), has withdrawn either authority.

#### 1. EPA delegated LDEQ authority to grant extensions in 2004 and has not withdrawn such delegation.

Section 112(l)(1)-(5) of the CAA authorizes EPA to delegate authorities under Section 112 to states. 42 U.S.C. §§ 7412(l)(1)-(5). Section 112(l)(6) mandates how such authorities are withdrawn. On March 26, 2004, EPA first delegated LDEQ the authority to implement Part 63, Subpart A, including extension approvals. Motion at 4-5. EPA clearly intended to delegate extension authority. Motion Exhibit B at 15,691 ("In receiving delegation . . . LDEQ must submit approval/disapprovals of compliance extensions (§63.6(i))…."). Critically, as of June 27, 2024, when LDEQ issued the LDEQ Extension, EPA did not withdraw such delegation. *See* Section 63.99(a)(19)(i) (table providing that Subpart A remains delegated to Louisiana,

subject to exceptions in footnote 1 that do *not* carve out extension provisions). This Court can reject EPA's position based on this point alone.

To withdraw a state's delegation, Section 112(l)(6) requires that EPA (i) hold a public hearing; (ii) determine that a State is not appropriately administering a CAA program; and (iii) notify the State of EPA's intention to withdraw the delegation. 42 U.S.C. § 7412(l)(6).[1] EPA took none of these statutorily-required steps.

EPA argues that "Table 1" in Subpart U and EPA's amendment to Section 63.507(c) effectively withdraw delegation of LDEQ's extension authority. Opposition at 16. EPA is wrong. As explained in Part A.3 below, LDEQ's authority is unaffected by Table 1.

EPA mischaracterizes the legal effect of Section 63.507(c). Even if a not-yet-effective regulation could somehow impose legal obligations, EPA's amendment fails to comply with Section 112(l)(6) and does not amend Part 63, Subpart E—the operative delegation regulations. Motion at 16-19. EPA may have *wanted* to withdraw LDEQ's delegated authority, but failed to do so. *Id.* Presumably, EPA recognized the required statutory steps would have stretched well beyond the window for LDEQ to grant an extension. Motion at 18-19. Moreover, the purported

[1] EPA's implementing regulations, 40 C.F.R. § 63.96(b) appropriately mirror the statutory predicates, including if EPA seeks to withdraw "part of a [delegated] program."

legal effect of Section 63.507(c) is flatly contradicted by the regulatory history of Subpart U and every other subpart in Section 112. *Id.*

### 2. LDEQ has permitting-based extension authority independent from its delegated authority.

EPA's regulations also specifically provide the states with direct extension authority if they have an "approved permit program." Motion at 14-16. Multiple provisions in Part 63 confirm this:

- "An extension . . . can be granted by the Administrator under this part; by *a State with an approved permit program*; or by the President. . . . " 40 C.F.R. § 63.4(a)(1).
- "The requirements in this section apply to the owner or operator of affected sources . . . unless. . . (i) The Administrator (*or a State with an approved permit program*) has granted an extension . . . ." 40 C.F.R. § 63.6(a)(1)-(1)(i).
- "Until an extension . . . has been granted by the Administrator (*or a State with an approved permit program*) . . . the owner or operator . . . shall comply with all applicable requirements. . . . " 40 C.F.R. § 63.6(i)(1).
- "[T]he Administrator (*or the State with an approved permit program*) may grant an extension . . . with an emission standard . . . ." 40 C.F.R. § 63.6(i)(9) (emphases added).

EPA asserts that 42 U.S.C. § 7412(f)(4)(B) does not "directly authorize" states to grant extensions. Opposition at 16. But EPA promulgated the above regulations to authorize states to grant extensions based on permitting authority and repeatedly issued guidance to confirm such authority.

Following promulgation of Part 63, Subpart A, EPA issued guidance addressing *all* compliance extensions under Section 63.6(i), meaning both Section 112(d) *and* Section 112(f) standards. *See* Motion Exhibit K at 1 ("we are also providing clarification of section 63.6(i)(1)"); *see also* 40 C.F.R. § 63.6(i)(1) (addressing extensions under all of paragraph 63.6(i)). EPA expressly confirmed states' permitting-based authority:

> It is [EPA's] interpretation that this authority does not require delegation through subpart E and, instead, is automatically granted to States as part of their part 70 operating permits program approval regardless of whether the operating permits program approval is interim or final. Additionally, it is [EPA's] interpretation that the State would not need to have been delegated a particular source category . . . to grant that source a compliance extension.

Motion Exhibit K at 1.

Here, even assuming EPA had successfully withdrawn LDEQ's delegated authority when the LDEQ Extension was issued (it did not), LDEQ would have maintained its permitting-based extension authority. It is irrelevant that, in 1995, "[n]o section 7412(f) standards applying to Subpart U sources, like Denka's facility, existed." Opposition at 18. EPA's regulations and guidance make clear that no Subpart U delegation is needed to grant an extension of Subpart U standards. As discussed in Part A.1 above, it is the delegation of Subpart A, not Subpart U, that is relevant for LDEQ's delegated authority.

Likewise, in 2002, EPA issued a "Compliance Extension Summary" separately addressing the extension procedures for Sections 112(d) and 112(f) standards. Exhibit S (attached hereto). EPA provides step-by-step extension procedures for Section 112(f) standards and, again, confirms that a "State with an approved permit program" is authorized to act on behalf of EPA. *Id.* at 5-6 (repeatedly indicating that "State with an approved permit program" may implement extension procedures for Section 112(f) standards). EPA's litigation position is refuted by the plain language of its own regulations and guidance.

Importantly, EPA concedes a dispositive point by *not* arguing that its amendment to Section 63.507(c) forecloses LDEQ's automatic permitting-based extension authority. *See, e.g.,* Motion at 15.

Instead, EPA offers a half-hearted, three-sentence rebuttal. Opposition at 18-19. First, contrary to EPA's assertion, nowhere does DPE state that LDEQ has "automatic authority to grant Denka's request by virtue of a 1995 *delegation*." *Id.*[2] Rather, LDEQ's automatic permitting-based authority *does not depend on an express delegation*. EPA's only counter is that "the 2015 delegation of authority with respect to Subpart U is subject to the express limitations under Table 1." Opposition at 18-19. But it is irrelevant to LDEQ's *permitting-based authority*

---

[2] The only event in 1995 discussed by DPE was EPA's approval of LDEQ's permitting program. *See* Motion at 4, 15. That approval meant LDEQ did *not* need express delegation to grant extensions.

whether EPA's "2015 delegation" is subject to purported limitations. LDEQ's permitting-based authority "does not require delegation." Motion Exhibit K at 1. For the reasons discussed in Part A.3 below, even if permitting-based authority could be affected by delegation limitations, "Table 1" would have no such impact.

### 3. "Table 1" in Subpart U does not impact either source of LDEQ's extension authority.

EPA's entire rebuttal against both LDEQ's delegated authority and its automatic permitting-based authority rests on a baseless interpretation of "Table 1" in Subpart U (the subpart containing emission standards applicable to the Facility). Prior to the standards promulgated in the Rule ("2024 Regulations"), "Table 1" labeled one of the extension provisions—Section 63.6(i)(4)(ii)—as not "applicable" to operators. When EPA first promulgated the extension provisions and other "General Provisions" in Part 63, Subpart A, EPA recognized that operators would face the "confusing task" of determining when "General Provisions" were "superseded because they conflict with a requirement in an individual standard." Exhibit T at 12,415 (attached hereto). Accordingly, applicability tables, like Table 1, identify when requirements in a specific subpart supersede an operator's "general" obligations in Subpart A.

EPA cannot transform a table designed to clarify *DPE's* regulatory obligations into a vehicle to divest *LDEQ* of extension authority. Section 63.481(f) unequivocally states that Table 1 governs *owners and operators*—not states.

40 C.F.R. § 63.481(f) ("Table 1 of this subpart specifies the provisions of subpart A that apply and those that do not apply to *owners and operators of affected sources*.") (emphasis added). Contrary to EPA's lynchpin assertion, Table 1 cannot bypass the process for granting or withdrawing a state's extension authority pursuant to delegated authority in Section 112(l) or a state's permitting-based authority.

At most, Table 1 renders extension request procedures inapplicable to *DPE*, but that is irrelevant to *LDEQ's* authority. Motion at 20. EPA points to no "superseding" extension provisions in Subpart U. Accordingly, even if the extension request procedures were "inapplicable" to DPE, that would only mean DPE was relieved from following such procedures. It would not somehow foreclose DPE from requesting an extension. Congress authorized such extensions by statute. 42 U.S.C. § 7412(f)(4).[3]

Finally, EPA focuses entirely on an outdated version of Table 1 that applies to regulations promulgated in April 2011. 76 Fed. Reg. 22,566 (Apr. 21, 2011). However, the LDEQ Extension grants an extension of the *2024 Regulations*, which clearly *do* provide for extensions. *See* Exhibit U at 43,264 (stating that 63.6(i)(4)(ii) applies for Neoprene sources). Before the Rule's effective date, LDEQ's authority under Section 63.6(i)(4)(ii) was unaffected by Table 1 because it did not address the

[3] Because Table 1 does not distinguish between EPA and States, EPA's interpretation would absurdly result in Table 1 prohibiting *EPA* from issuing extensions.

2024 Regulations.[4] After the effective date, Table 1 expressly states that Section 63.6(i)(4)(ii) *does* apply to the 2024 Regulations.

**B. DPE Will Suffer Irreparable Harm Absent A Stay.**

EPA's argument on irreparable harm (Opposition at 20-21) is easily dispatched. Contrary to EPA's suggestion (*id.* at 20), DPE's irreparable harm *does* arise from the October 15 deadline: unless DPE obtains relief from this Court and can rely on the LDEQ Extension, the Facility *will have to shut down by October 15*. The notion that compliance with the Rule would be difficult even with a two-year compliance period (Opposition at 21) plainly does not negate the *certainty* that compliance by October 15 is impossible and will cause the Facility to shut down.

Next, EPA asserts that DPE cannot show irreparable harm because DPE has failed to seek an extension from EPA and can still do so, a point the D.C. Circuit cited (after this action was filed) in denying DPE's petition for rehearing. Opposition at 20. But any question of a purely hypothetical EPA extension is irrelevant here because DPE seeks a ruling on the validity of an extension that LDEQ has *already granted* under its lawful authority.

Further, EPA's assertions about a hypothetical extension from EPA disregard the facts. EPA has already made clear to DPE that an extension request to EPA

[4] Contrary to EPA's "withdrawal" theory, LDEQ's operative extension-approval provision, Section 63.6(i)(9) (Motion at 19-20) has *always* been labeled as "applicable"—even before the Rule.

would be dead on arrival. Exhibit R ¶¶ 7-8. On March 15, 2024, DPE submitted to EPA a "Notice of Intent to Submit Extension Request" describing multiple emission reduction measures that DPE has implemented in the past two years, in addition to $35 million DPE invested in major emission reductions since acquiring the Facility in 2015. Exhibit V (attached hereto). On April 30, 2024, EPA advised DPE it could seek an extension by explaining "the specific measures [DPE] intends to pursue to reduce emissions" to justify an extension. Exhibit W at 2 (attached hereto).

Subsequently, DPE and EPA had several meetings about an extension. Exhibit R ¶¶ 3-7. EPA continued to demand that DPE commit to substantial additional actions to obtain an extension and expressly stated that the measures in DPE's Notice of Intent would be "necessary, but not sufficient." *Id.* ¶ 6. Ultimately, EPA demanded that, to obtain an extension, DPE agree to implement extremely costly measures on an expedited basis—a demand effectively as draconian as the Rule itself. *Id.* ¶¶ 7-8.

Thus, EPA's assertion that DPE can redress its irreparable harm by simply asking for an extension is counterfactual. Nonetheless, on July 26, DPE submitted a formal extension request to EPA. *See* Exhibit X (attached hereto). DPE has no illusions as to how EPA will respond to that request, given EPA's prior demands for an extension. In short, EPA's assertions about a hypothetical EPA extension have no bearing on the issues before this Court.

**C. The Balance Of Harms Favors A Stay.**

The balance of harms overwhelmingly favors a stay. Without relief from EPA's determination, DPE will be forced to shut down the Facility and likely never restart. This will *immediately* harm DPE and its 250-plus workers.

Conversely, as explained in the Motion, the potential harm to the public from a stay *even based on EPA's estimate* will be vanishingly small, only increasing an individual's chance of cancer by 0.0017% based on the counterfactual assumption that they would be *continuously* inhaling chloroprene until July 2026. The Opposition does nothing to rebut this dramatic imbalance in harms.

Date: July 29, 2024

Respectfully submitted,

*/s/ David A. Super*

David A. Super
Jason B. Hutt
Jeffrey R. Holmstead
Britt Cass Steckman
Kevin M. Voelkel
BRACEWELL LLP
2001 M Street NW, Ste. 900
Washington, DC 20036
Telephone: (202) 828-5800
david.super@bracewell.com
jason.hutt@bracewell.com
jeff.holmstead@bracewell.com
britt.steckman@bracewell.com
kevin.voelkel@bracewell.com

Jeffrey L. Oldham
BRACEWELL LLP
711 Louisiana Street, Suite 2300
Houston, TX 77002
Telephone: (713) 223-2300
jeffrey.oldham@bracewell.com

James C. Percy
JONES WALKER LLP
445 N. Boulevard, Suite 800
Baton Rouge, LA 70802
Telephone: (225) 248-2130
jpercy@joneswalker.com

Robert E. Holden
Brett S. Venn
JONES WALKER LLP
201 St. Charles Ave
New Orleans, LA 70170
Telephone: (504) 582-8000
bholden@joneswalker.com
bvenn@joneswalker.com

***Counsel for Petitioner Denka Performance Elastomer LLC***

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g), I certify that this motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because this motion contains 2,598 words.

I further certify, pursuant to Fed. R. App. P. 27(d)(1)(E), that this motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this motion has been prepared in Times New Roman 14-point font using Microsoft Word 2013.

Date: July 29, 2024

*/s/ David A. Super*
David A. Super

***Counsel for Petitioner***
***Denka Performance Elastomer LLC***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 29th day of July 2024, pursuant to Federal Rules of Appellate Procedure 15(c) and 25(d), and 40 C.F.R. § 23.12(a), I electronically filed the foregoing *Petitioner's Reply in Support of Emergency Motion for Stay Pending Review* with the Clerk of the Court for the U.S. Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.

Date: July 29, 2024

*/s/ David A. Super*
David A. Super

***Counsel for Petitioner***
***Denka Performance Elastomer LLC***

# EXHIBIT R

**ORAL ARGUMENT NOT YET SCHEDULED**

**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

| | |
|---|---|
| **DENKA PERFORMANCE ELASTOMER LLC,**<br><br>**Petitioner,**<br><br>**v.**<br><br>**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL REGAN, Administrator, United States Environmental Protection Agency,**<br><br>**Respondents.** | **No. 24-60351** |

**DECLARATION OF JASON B. HUTT**

Pursuant to 28 U.S.C § 1746, I, Jason B. Hutt, declare as follows:

1. I am a partner at Bracewell LLP and am representing Denka Performance Elastomers ("DPE") in this action.

2. Concurrently with this Declaration, DPE has filed a Reply in Support of its Emergency Motion for Stay Pending Review ("Reply"), which responds to the Opposition brief filed by the United States Environmental Protection Agency and Administrator Michael Regan ("EPA Opposition"). I am submitting this Declaration solely in support of DPE's arguments regarding irreparable harm.

3. From May 10 to May 24, 2024, counsel for EPA and counsel for DPE, including me, engaged in a series of videoconference meetings regarding multiple topics, including the potential for DPE to submit a request to EPA to extend the compliance period under EPA's final rule released in March 2024 and published on May 16, 2024 ("Rule") from 90 days to two years.

4. During the initial videoconference meeting on May 10, all participants first discussed a rubric for designating settlement confidential discussions and agreed, to the extent any participant intended for particular communications to be subject to Federal Rule of Evidence 408 ("FRE 408"), that participant would specifically state that intention. During the May 10 meeting and subsequent videoconference meetings, participants followed this rubric and occasionally did invoke FRE 408 to cover specific topics, and typically stated when the "covered" topic had ended. Those specific topics designated for FRE 408 coverage typically involved the potential settlement of other litigation and enforcement proceedings between DPE and EPA. Based on my careful attention to this issue, I can specifically attest that the discussions that I describe in this declaration were not designated by either side—either before or after—as covered by FRE 408.

5. During the discussion of a potential extension request on May 10, I noted to the EPA representatives that DPE had submitted to EPA on March 15, 2024, a "Notice of Intent to Submit Extension Request" pursuant to 42 U.S.C.

7412(f)(4)(B) and 40 C.F.R. 63.6(i)(4)(ii). DPE's Notice of Intent described at least seven emission reduction measures that DPE had implemented in the past two years, in addition to roughly $35 million DPE invested in major emission reductions since acquiring the Facility in 2015. DPE's Notice of Intent expressed a willingness to commit to continue implementing these reduction measures during any extension period. Despite the Notice of Intent being submitted to EPA nearly two months earlier, the EPA representatives in the meeting indicated that they did not know about the Notice of Intent.

6. During our next videoconference meeting on May 14, 2024, counsel for EPA informed us that EPA had since reviewed DPE's Notice of Intent. Counsel for EPA described the emission reduction measures set forth in the Notice of Intent as "a necessary, but not sufficient" condition for EPA to grant an extension of the 90-day implementation period. Another EPA representative in the meeting then listed three categories of additional emission control measures that EPA would require in any potentially successful application for an extension. Over the next several days, the parties participated in multiple videoconference sessions to discuss these potential additional emission control measures, with DPE ultimately proposing to EPA a package of potential measures that DPE would agree to perform in return for an extension of the compliance period.

7. During what turned out to be the final videoconference meeting on May 24, 2024, counsel for EPA informed DPE that, to obtain an extension of the compliance period, DPE would be required to agree to implement a series of different emission control measures that very closely approximated the requirements and implementation timelines that EPA had demanded in its motion for preliminary injunction in the litigation EPA filed against DPE in the U.S. District Court for the Eastern District of Louisiana under Section 303 of the Clean Air Act ("Section 303 Litigation"), the "Statement of Final Relief" that EPA had stated it would seek at the trial in the Section 303 Litigation, and the requirements of the Rule itself.

8. Given (i) the impossibility of meeting EPA's demands on the timelines dictated by EPA, (ii) the safety risks associated with attempting to meet EPA's timelines, and (iii) the millions of unrecoverable dollars DPE would be required to spend to acquiesce to EPA's demands, the DPE team, including myself, concluded that EPA's only proposed pathway for granting a facility-specific extension of the 90-day period was draconian and illusory to the point of being non-existent. All of these concerns are well known to EPA based upon the multiple expert declarations submitted and depositions taken in the Section 303 Litigation. To be sure our communications were clear, I told counsel for EPA that EPA's proposal was a nonstarter and invited EPA to revise its position. There were no further discussions at that point or since.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 29, 2024

Jason B. Hutt
______________________________
Jason B. Hutt

# EXHIBIT S

July 30, 2002 Version F

# Compliance Extensions Summary

**What is a compliance extension?**

The Part 63 General Provisions allow a source additional time to come into compliance with a relevant standard, under certain circumstances and with certain requirements.

If the owner/operator of a source requests a compliance extension, and the EPA Administrator (or, in most cases, the State with an approved permit program) approves the request, a compliance extension will be issued to postpone the date by which the source must comply with a relevant standard (or specific part(s) of the relevant standard).

Generally, until the compliance extension has been granted, the owner/operator must comply with all applicable requirements of the relevant standard.

**What is a relevant standard?**

All of the following are "relevant standards" with respect to the Part 63 General Provisions. If a source is subject to any of these requirements, then the source is also subject to the Part 63 General Provisions:

- 112(d) MACT Standard; 112(f) Residual Risk;
- 112(g) Major Source Modification MACT Determination;
- 112(h) NESHAP Work Practice Standard; or
- 112(j) Equivalent Emission Limitation by Permit MACT Determination.

**Where do the General Provisions address compliance extensions?**

The procedures for compliance extensions appear in section 63.6(i).

**Are progress reports required during the extension period?**

When granting an extension of compliance, the Administrator (or the State with an approved permit program) may or may not require that the owner/operator submit progress reports during the period of extension. If progress reports are required, the contents of the progress reports and the dates by which they must be submitted will be specified in the written extension. The purpose of the progress report is to indicate whether steps toward compliance outlined in the compliance schedule have been reached. (The compliance schedule is referred to in §63.6(i)(6)(i)(B) and is submitted as part of the request for compliance extension.) Progress reports are addressed under §63.6(i)(11).

**Through what mechanisms may a compliance extension be granted?**

Compliance extensions may be granted in the following four cases:

Case 1: Early Reductions Program.

If a source achieves reductions in accordance with the voluntary Early Reductions Program (pursuant to section 112(i)(5) of the Clean Air Act), the source may be granted an extension of compliance with specific requirements, as specified in subpart D. [§63.6(i)(2)(i)]

Case 2: BACT/LAER.

If a source has installed BACT or has installed technology required to meet LAER prior to promulgation of the relevant standard, the source may be granted an extension of compliance with the standard for 5 years after the installation date. [§63.6(i)(2)(ii)]

Case 3: Section 112(d) Standard.

Applies to a source subject to a section 112(d) standard [§63.6(i)(4)(i)(A)]:

- If a source needs additional time in order to install controls before it can comply with a section 112(d) standard, then the source may be granted an extension up to 1 year. Conditions of the extension must be incorporated into the source's title V permit.
- If the source is a mining waste operation and it needs additional time in order to install controls before it can comply with a section 112(d) standard, then the source may be first granted an extension up to 1 year. If that 1-year extension is insufficient to dry and cover mining waste, then an additional extension of up to 3 years may be added. Conditions of the extension must be incorporated into source's title V permit.

Case 4: Section 112(f) Standard.

If a source needs additional time in order to install controls before it can comply with a section 112(f) standard, then the source may be granted an extension up to 2 years after the standard's effective date. The source must take steps during the period of extension to assure that the health of persons will be protected from imminent endangerment. [§63.6(i)(4)(ii)]

**When must a request for compliance extension be submitted?**

Generally, the source must submit a request for extension in writing not later than 120 days before the relevant standard's compliance date. [§63.6(i)(4)(i)(B)] There are four exceptions to the 120-day limit:

Exception 1:

> If the standard specifies an alternative date for submittal of requests, the source must submit its request by that alternative date. [§63.6(i)(4)(i)(B)]

Exception 2:

> If the need for the compliance extension arises within 120 days before the compliance date, or if the need for the compliance extension arises between the alternative submittal date specified by the standard and the otherwise applicable compliance date, and the need arose due to circumstances beyond reasonable control of the owner/operator, then the source may submit its request later. [§63.6(i)(4)(i)(C)]

Exception 3:

> If the standard is pursuant to section 112(f), the source must submit request for compliance extension not later than 90 days after the effective date of the standard. [§63.6(i)(4)(ii)]

Exception 4:

> If the compliance extension is requested on the basis of installation of BACT or technology required to meet LAER, the source must submit its request not later than 120 days after the promulgation date of the standard. [§63.6(i)(5)]

If either Exception 1 or 2 above applies, the compliance extension request will stay the effect of the rule until the request is either approved or denied; in other words, the source does not have to comply with a standard while waiting for approval of its request for an extension of compliance with that standard.

**What information must a request for compliance extension include?**

For a source seeking either a 1-year extension of compliance with a standard pursuant to section 112(d) or a 2-year extension of compliance with a standard pursuant to section 112(f), the request for compliance extension must include the following information [§63.6(i)(6)(i)]:

- A description of the controls to be installed
- A compliance schedule, including:
  - Starting date for onsite construction, installation of emission control equipment, or process change.
  - Date by which final compliance is to be achieved.

For a source seeking a 5-year extension of compliance due to installation of BACT or LAER technology (as in Case 2 above), the request for compliance extension must include information needed to demonstrate that the installation controls the same pollutant(s) that would be controlled at that source by the relevant standard. [§63.6(i)(6)(ii)]

**What is the step-by-step procedure for obtaining a compliance extension?**

A request for a compliance extension in connection with Early Reductions (Case 1 above) is handled through subpart D procedures. Other requests (Cases 2, 3, and 4 above) are handled pursuant to paragraphs 63.6(i)(4) through (7).

How the request for extension of compliance will be handled depends on the mechanism through which the owner/operator is requesting an extension. A flow diagram, "Procedure for Compliance Extension Request" depicts how the request for extension of compliance will be handled. This flow diagram shows two possible paths, A and B, which are also described below.

Path A: Section 112(d) Standard or BACT/LAER.

Path A [corresponding to §63.6(i)(12)] depicts how the request is handled if it is for either:

- An owner/operator who is unable to comply with a section 112(d) standard for the reason that additional time is necessary for installation of controls (as in Case 3), or
- An owner/operator who seeks an extension for the reason that the source has installed BACT or LAER technology (as in Case 2).

Within 30 calendar days after receiving the compliance extension request, the Administrator (or the State with an approved permit program) will notify the

owner/operator in writing as to the status of the application (that is, whether it is complete--containing sufficient information with which to make a determination).

If the application is not complete, the notification of status will specify the information needed. The applicant has 30 calendar days after being notified of the incomplete application in which to present additional information or arguments toward further action on the application. After such additional information or arguments have been submitted by the owner/operator, the Administrator (or the State with an approved permit program), just as for the original request, will notify the owner/operator in writing within 30 calendar days as to the status of the application.

When the owner/operator has been notified that the application is complete, the clock starts for the 30-day approval or denial period. This means the Administrator (or the State with an approved permit program) will notify the owner/operator either of approval or of intent to deny approval of the compliance request within 30 calendar days after the owner/operator has been notified that the application is complete.

In the case where the Administrator (or the State with an approved permit program) notifies the owner/operator of intent to deny the compliance extension request, the notification will specify the basis for the intended denial, and it will allow the owner/operator 15 days in which to present in writing any additional information or arguments before a final determination is made.

A final determination to deny the request for a compliance extension will be in writing and will specify the basis for the denial. If additional information or arguments submitted by the owner/operator (following receipt of a notice of intent to deny) do not change the decision to deny, then the final determination of denial will be issued within 30 calendar days after the additional information or arguments were presented. If no additional information or arguments were submitted by the owner/operator, then the final determination of denial will be issued within 30 calendar days after the due date for presentation of additional information or arguments.

Path B: Section 112(f) Standard.

Path B depicts how the request is handled if it is for an owner/operator who is unable to comply with a section 112(f) standard for the reason that additional time is necessary for installation of controls (as in Case 4). [§63.6(i)(13)]

Within 15 calendar days after receiving the compliance extension request, the Administrator (or the State with an approved permit program) will notify the owner/operator in writing as to the status of the application (that is, whether it is complete--containing sufficient information with which to make a determination).

If the application is not complete, the notification of status will specify the information needed. The applicant has 15 calendar days after being notified of the incomplete application in which to present additional information or arguments toward further action on the application. After such additional information or arguments have been submitted by the owner/operator, the Administrator (or the State with an approved permit program), just as for the original request, will notify the owner/operator in writing within 15 calendar days as to the status of the application.

When the owner/operator has been notified that the application is complete, the clock starts for the 30-day approval or denial period. This means the Administrator (or the State with an approved permit program) will notify the owner/operator either of approval or of intent to deny approval of the compliance request within 30 calendar days after the owner/operator has been notified that the application is complete.

In the case where the Administrator (or the State with an approved permit program) notifies the owner/operator of intent to deny the compliance extension request, the notification will specify the basis for the intended denial, and it will allow the owner/operator 15 days in which to present in writing any additional information or arguments before a final determination is made.

A final determination to deny the request for a compliance extension will be in writing and will specify the basis for the denial. If additional information or arguments submitted by the owner/operator (following receipt of a notice of intent to deny) do not change the decision to deny, then the final determination of denial will be issued within 30 calendar days after the additional information or arguments were presented. If no additional information or arguments were submitted by the owner/operator, then the final determination of denial will be issued within 30 calendar days after the due date for presentation of additional information or arguments.

# EXHIBIT T

Case: 24-60351 Document: 49 Page: 36 Date Filed: 07/29/2024

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Parts 60, 61, and 63**

**[FRL-4846-7]**

**RIN 2060-AC98**

## National Emission Standards for Hazardous Air Pollutants for Source Categories: General Provisions

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** On August 11, 1993, the EPA proposed General Provisions for national emission standards for hazardous air pollutants (NESHAP) and other regulatory requirements pursuant to section 112 of the Clean Air Act as amended in 1990 (the Act). This action announces the EPA's final decisions on the General Provisions.

The General Provisions, located in subpart A of part 63, codify general procedures and criteria to implement emission standards for stationary sources that emit (or have the potential to emit) one or more of the 189 substances listed as hazardous air pollutants (HAP) in or pursuant to section 112(b) of the Act. Standards for individual source categories are being developed separately, and they will be codified in other subparts of part 63. When sources become subject to standards established for individual source categories in other subparts of part 63, these sources also must comply with the requirements of the General Provisions, except when specific General Provisions are overridden by the standards.

This action also amends subpart A of parts 60 and 61 to bring them up to date with the amended Act and, where appropriate, to make them consistent with requirements in subpart A of part 63.

**DATES:** *Effective Date.* March 16, 1994.

*Judicial Review.* Under section 307(b)(1) of the Act, judicial review of NESHAP is available only by filing a petition for review in the U. S. Court of Appeals for the District of Columbia Circuit within 60 days of today's publication of this final rule. Under section 307(b)(2) of the Act, the requirements that are the subject of today's notice may not be challenged later in civil or criminal proceedings brought by the EPA to enforce these requirements.

*Incorporation by Reference:* The incorporation by reference of certain publications in these General Provisions is approved by the Director of the Office of the Federal Register as of March 16, 1994.

**ADDRESSES:** *Docket.* Docket No. A-91-09, containing information considered by the EPA in developing the promulgated General Provisions, is available for public inspection and copying between 8 a.m. and 4 p.m., Monday through Friday, including all non-Government holidays, at the EPA's Air and Radiation Docket and Information Center, room M1500, U.S. Environmental Protection Agency, 401 M Street, SW., Washington, DC 20460; telephone (202) 260-7548. A reasonable fee may be charged for copying.

*Background Information Document.* A background information document (BID) for the promulgated General Provisions may be obtained from the National Technical Information Services, 5285 Port Royal Road, Springfield, Virginia 22161; telephone (703) 487-4650. Please refer to "General Provisions for 40 CFR Part 63, Background Information for Promulgated Regulation" (EPA-450/3-91-019b). The BID contains: (1) a summary of the public comments made on the proposed General Provisions and responses to the comments and (2) a summary of the changes made to the General Provisions as a result of the Agency's responses to comments that are not addressed in this **Federal Register** notice.

**FOR FURTHER INFORMATION CONTACT:** Ms. Shirley Tabler, Standards Development Branch, Emission Standards Division (MD-13), U.S. Environmental Protection Agency, Research Triangle Park, North Carolina 27711; telephone (919) 541-5256.

**SUPPLEMENTARY INFORMATION:** The information presented in this preamble is organized as follows:

I. Background
II. Summary of Major Changes Since Proposal
III. Public Participation
IV. Significant Comments and Changes to the Proposed General Provisions
A. Applicability Determinations
B. Potential to Emit
C. Relationship of General Provisions to Other Clean Air Act Requirements
D. Monitoring and Performance Testing Requirements
E. Construction and Reconstruction
F. Operation and Maintenance Requirements: Startup, Shutdown, and Malfunction Plans
G. Recordkeeping and Reporting Requirements
V. Administrative Requirements

### I. Background

Section 301 of title III of the Clean Air Act Amendments of 1990, Public Law 101-549, enacted on November 15, 1990, substantially amended section 112 of the Act regarding promulgation of NESHAP. These NESHAP are to be established for categories of stationary sources that emit one or more of the 189 HAP listed in or pursuant to section 112(b). Each standard established for a source category will be codified in a subpart (or multiple subparts) of part 63. In order to eliminate the repetition of general information and requirements within these subparts, General Provisions that are applicable to all sources regulated by subsequent standards in part 63 have been developed. The General Provisions have the legal force and effect of standards, and they may be enforced independently of relevant standards, if appropriate.

The General Provisions codify procedures and criteria that will be used to implement all NESHAP promulgated under the Act as amended November 15, 1990. The provisions include administrative procedures related to applicability determinations (including new versus existing and area versus major sources), compliance extensions, and requests to use alternative means of compliance. In addition, general requirements related to compliance-related activities outline the responsibilities of owners and operators to comply with relevant emission standards and other requirements. The compliance-related provisions include requirements for compliance dates, operation and maintenance requirements, methods for determining compliance with standards, procedures for performance testing and monitoring, and reporting and recordkeeping requirements. Finally, the EPA is promulgating amendments to the General Provisions for parts 60 and 61 to address new statutory requirements and, where appropriate, to make portions of these existing regulations consistent with the part 63 General Provisions.

Owners or operators who are subject to a subpart promulgated for a specific source category under sections 112(d), 112(f), or 112(h) of the Act are also subject to the requirements of the General Provisions. The General Provisions also will be incorporated, as appropriate, into requirements established under other section 112 authorities (e.g., the early reduction program and case-by-case control technology determinations). Nevertheless, in the development of a part 63 emission standard applicable to a specific source category, the EPA may determine that it is appropriate that the subpart contain provisions that override one or more requirements of the General Provisions. When this occurs, the EPA will describe in the subpart exactly

compliance requirements for major sources.

The Agency believes that these comments are similar in all relevant respects to arguments the Agency already has considered and responded to in a previous rulemaking that dealt with the Federal enforceability of emissions controls and limitations at a source. For a thorough discussion on this topic, see "Requirements for the Preparation, Adoption, and Submittal of Implementation Plans; Air Quality, New Source Review; Final Rules" that appeared in the **Federal Register** on June 28, 1989 (54 FR 27274). (A copy of this notice has been included in the docket for this rulemaking.) After careful consideration during that rulemaking, the EPA decided to retain the requirement for Federal enforceability. At this time, the Agency sees no reason to rescind its decisions described in the June 28, 1989 **Federal Register** notice. On the contrary, the Agency here is affirming the relevance of the Federal enforceability requirements set forth in the June 28, 1989 notice in the context of determinations of major source status under the new Federal air toxics program.

In the context of implementing the air toxics program under amended section 112, the purposes of the Federal enforceability requirements are as follows: (1) To make certain that limits on a source's capacity are, in fact, part of its physical and operational design, and that any claimed limitations will be observed; (2) to ensure that an entity with strong enforcement capability (i.e., the Federal government) has legal and practical means to make sure that such commitments are actually carried out; and (3) to support the goal of the Act that the EPA should be able to enforce all relevant features of the air toxics program as developed pursuant to section 112. The Agency continues to believe that, if sources may avoid the requirements of a Federal air pollution control program by relying on State or local limitations, it is essential to the integrity of the National air toxics program that such limitations be actually and effectively implemented. Thus, Federal enforceability is both necessary and appropriate to ensure that such limitations and reductions are actually incorporated into a source's design and followed in practice. Further, Federal enforceability is needed to back up State and local enforcement efforts and to provide incentive to source operators to ensure adequate compliance. Federal enforceability also enables citizen enforcement under section 304 of the Act.

Thus, in the final General Provisions rulemaking, the Agency is retaining the existing Federal enforceability requirement in the definition of potential to emit for the purposes of implementing section 112 of the Act as amended in 1990.

In the June 28, 1989 **Federal Register** notice, the EPA established that, to be federally enforceable, emission limitations established for a source must be practicably enforceable. To be practicably enforceable, the limitations or conditions must ensure adequate testing, monitoring, recordkeeping, and reporting to demonstrate compliance with the limitations and conditions. Restrictions on operation, production, or emissions must reflect the shortest practicable time period (generally one month). "Blanket" emission limitations such as calendar year limits (e.g., tons per year) are not considered practicably enforceable. In contrast, hourly, daily, weekly, or monthly rolling averages generally are considered acceptable.

Many of the comments requesting that the EPA credit controls that are not federally enforceable in the potential to emit determination were based on a concern over the limited mechanisms available by which emission controls can qualify as federally enforceable. For example, although the EPA will consider terms and conditions in a permit issued under title V of the Act to be federally enforceable, approved State title V permit programs are not yet in place. This effectively limits the mechanisms available to sources subject to early MACT standards. Comments were also received requesting further clarification on how the Agency's potential to emit policy would be implemented, and on how this policy could be implemented with the least burden on both States and affected sources.

As noted earlier in this preamble, the EPA is preparing a separate notice of proposed rulemaking to address potential to emit issues. This notice will propose for public comment a thorough discussion on the Agency's policy with regard to implementing potential to emit in the air toxics program. Among other actions, this rulemaking would amend the General Provisions to provide an interim mechanism for controls to qualify as federally enforceable for HAP until permanent mechanisms are in place. The Agency will consider comments on this proposal and take final action on an expedited schedule.

*C. Relationship of General Provisions to Other Clean Air Act Requirements.*

1. Relationship to Individual NESHAP.

The promulgated General Provisions to part 63 are applicable to all source categories that will be regulated by part 63 NESHAP. Emissions of HAP from all listed source categories eventually will be regulated by NESHAP pursuant to section 112 of the Clean Air Act Amendments of 1990. The General Provisions provide basic, common requirements for all sources subject to applicable standards, and they are intended to avoid unnecessary duplication of information in all subsequent subparts. All parts of the General Provisions apply to an affected source regulated by an applicable standard, unless otherwise specified by the particular standard.

The EPA recognizes that in the development of a standard applicable to a specific source category, the Agency may determine that certain General Provisions of subpart A may not be appropriate. Consequently, as mentioned earlier, subpart A allows individual subparts to supersede some of the requirements of subpart A. Should there be a conflict between the requirements in the General Provisions and specific requirements of another subpart in part 63, whether or not the subpart explicitly overrides the General Provisions, the requirements of the other subpart will prevail.

The Agency received many comments regarding the proposed relationship between the General Provisions and part 63 standards for specific source categories. A substantial number of commenters expressed the opinion that the EPA should reverse the presumptive relationship that the General Provisions apply unless specifically overridden in a source category-specific standard. These commenters argued that the General Provisions should not be applicable until specifically incorporated by an applicable standard. Thus, instead of automatic applicability to any regulated source, the General Provisions would have no regulatory force until specifically incorporated by individual subparts. Specific reasons cited by commenters for advocating this approach focused on minimizing the potential for conflict between the General Provisions and individual subparts and reducing confusion on the part of owners or operators who must establish which provisions are applicable. Some commenters also stated that only generic requirements should be included in the General Provisions, and more specific

Case: 24-60351 Document: 49 Page: 38 Date Filed: 07/29/2024

requirements should be left to individual NESHAP.

The Agency believes that the alternative approach suggested by these commenters is not appropriate. Consequently, the proposed approach has been retained in the final rule. The Agency's concern is that minimum regulatory requirements be established for the control of HAP emissions from source categories. The General Provisions as promulgated ensure an appropriate baseline level of requirements for all sources, and they provide guidance at an early stage to sources regarding the types of requirements that will ensue upon promulgation of an applicable standard. The EPA believes that the provisions of subpart A are the minimum generic requirements necessary for the implementation of NESHAP. The EPA's experience with existing General Provisions under parts 60 and 61 confirms that such provisions eliminate repetition within individual standards. They also improve consistency and understanding of the basic requirements for affected sources among the regulated community and compliance personnel.

Despite the preceding discussion, the EPA does recognize the potentially confusing task faced by owners and operators who must determine which provisions of the General Provisions apply to them, which are explicitly superseded by an applicable subpart, and which are superseded because they conflict with a requirement in an individual standard. Many commenters are concerned about the potential for confusion regarding their compliance responsibilities. By establishing a mechanism whereby all the provisions of subpart A are applicable to an affected source unless otherwise specified, the EPA believes some source responsibilities are directly clarified.

Furthermore, as the Agency continues to develop emission standards for specific source categories, the EPA intends to indicate clearly in these subsequent rulemakings which requirements of subpart A sources in the category are subject to and which requirements are superseded by the individual subpart. The public will have the opportunity to review and comment on Agency decisions on which requirements of the General Provisions are overridden in a source category-specific standard when that standard is proposed in the **Federal Register**.

Other issues were raised by commenters pertaining to general features of the relationship between the General Provisions and individual MACT standards. Several commenters expressed concern with the potential for a situation where there are conflicting provisions between the individual subpart and subpart A, and the individual subpart does not specifically supersede the General Provisions requirement. Proposed § 63.1(a)(13) stated that individual subparts will specify which General Provisions are superseded. Certain commenters believe that provisions in individual subparts should prevail, even if they do not explicitly state that they supersede General Provisions.

The EPA agrees with these commenters. It is the Agency's intent that when there are conflicting requirements in the General Provisions and a source category-specific standard, the requirements of the standard will supersede the General Provisions. If a specific standard does not address a requirement within the General Provisions, then the General Provisions must be followed by the owner or operator. The Agency intends to review thoroughly the appropriateness of applying the General Provisions when developing each source category-specific standard and to indicate clearly in the standard any requirements of the General Provisions that are overridden. However, the Agency appreciates the concerns of the commenters that a conflicting requirement may be overlooked and not explicitly identified in the standard. Therefore, to avoid confusion should a conflicting requirement not be explicitly identified in the standard, the EPA has deleted the statement in § 63.1(a)(13) that individual subparts always will specify which provisions of subpart A are superseded.

2. Relationship to Section 112(g), Section 112(j), and Section 112(i)(5) of the Act

Several comments were received on the relationship of the General Provisions for part 63 to requirements under sections 112(g) and 112(j) of the Act. Regulations to implement section 112(g) and section 112(j) are being developed by the EPA in separate rulemakings. Section 112(g) addresses the modification, construction, and reconstruction of major sources after the effective date of title V permit programs and primarily before source category-specific standards are promulgated. Section 112(j) addresses equivalent emission limitations to be established by the States through title V permits if the EPA fails to promulgate a standard for a category of sources on the schedule established under section 112(e).

Under both of these sections, States may be required to make case-by-case MACT determinations for sources if the EPA has not yet established an applicable emission limitation under section 112. For example, under section 112(g)(2), after the effective date of a title V permit program in any State, no person may modify a major source of HAP in the State, unless the Administrator (or the State) determines that the MACT emission limitation under section 112 for existing sources will be met. This determination must be made on a case-by-case basis where an applicable emission limitation has not been established by the EPA. A similar determination involving new source MACT must be made before a major source is constructed or reconstructed.

Several commenters stated that it was unclear if the General Provisions are intended to be minimum requirements that would apply to sources subject to case-by-case MACT standards established under sections 112 (g) and (j).

The EPA is still considering the most appropriate way to link the General Provisions to the case-by-case MACT standards established under sections 112 (g) and (j). While the EPA believes that some requirements of the General Provisions should apply to any MACT standard established under section 112 (including case-by-case MACT standards), the Agency also recognizes that there may be situations where blanket application of the General Provisions to a particular source or source category may not be appropriate. As discussed elsewhere in this preamble and as stated in the applicability section of the final rule, an emission standard established for a particular source category can override some provisions of the General Provisions, as appropriate. The EPA is reviewing whether it is appropriate to provide similar authority to States with approved title V permit programs to override the General Provisions in case-by-case MACT standards established under sections 112(g) and 112(j) and how such authority should be implemented. In general, the EPA believes that the General Provisions provide an appropriate framework for many aspects of demonstrating compliance with case-by-case MACT determinations. The issue of the relationship of the General Provisions to section 112(g) and section 112(j) will be addressed in the rulemakings implementing these subsections or in future EPA guidance material.

One commenter wanted the EPA to clarify that the General Provisions are superseded by forthcoming subpart B regulations to implement section 112(g).

The EPA disagrees with this commenter. From a general perspective,

# EXHIBIT U

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Parts 60 and 63**

**[EPA–HQ–OAR–2022–0730; FRL–9327–02–OAR]**

**RIN 2060–AV71**

## New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** This action finalizes amendments to the New Source Performance Standards (NSPS) that apply to the Synthetic Organic Chemical Manufacturing Industry (SOCMI) and amendments to the National Emission Standards for Hazardous Air Pollutants (NESHAP) that apply to the SOCMI (more commonly referred to as the Hazardous Organic NESHAP or HON) and Group I and II Polymers and Resins (P&R I and P&R II, respectively) Industries. The EPA is finalizing decisions resulting from the Agency's technology review of the HON and the P&R I and P&R II NESHAP, and its review of the NSPS that apply to the SOCMI. The EPA is also finalizing amendments to the NSPS for equipment leaks of volatile organic compounds (VOC) in SOCMI based on its reconsideration of certain issues raised in an administrative petition for reconsideration. Furthermore, the EPA is finalizing emission standards for ethylene oxide (EtO) emissions and chloroprene emissions after considering the results of a risk assessment for the HON and for Neoprene Production processes subject to the P&R I NESHAP, and is finalizing a fenceline monitoring work practice standard for certain hazardous air pollutants (HAP). Lastly, the EPA is finalizing the removal of exemptions from standards for periods of startup, shutdown, and malfunction (SSM), adding work practice standards for such periods where appropriate, finalizing standards for previously unregulated HAP, and adding provisions for electronic reporting of performance test reports and periodic reports.

**DATES:** This final rule is effective on July 15, 2024. The incorporation by reference (IBR) of certain publications listed in the rule is approved by the Director of the Federal Register as of July 15, 2024. The incorporation by reference of certain other material listed in the rule was approved by the Director of the Federal Register as of October 17, 2000 and November 16, 2007.

**ADDRESSES:** The U.S. Environmental Protection Agency (EPA) has established a docket for this action under Docket ID No. EPA–HQ–OAR–2022–0730. All documents in the docket are listed on the *https://www.regulations.gov/* website. Although listed, some information is not publicly available, *e.g.,* Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available either electronically through *https://www.regulations.gov/*, or in hard copy at the EPA Docket Center, WJC West Building, Room Number 3334, 1301 Constitution Ave. NW, Washington, DC. The Public Reading Room hours of operation are 8:30 a.m. to 4:30 p.m. Eastern Standard Time, Monday through Friday. The telephone number for the Public Reading Room is (202) 566–1744, and the telephone number for the EPA Docket Center is (202) 566–1742.

**FOR FURTHER INFORMATION CONTACT:** For questions about the HON and SOCMI NSPS, contact U.S. EPA, Attn: Mr. Andrew Bouchard, Mail Drop: Sector Policies and Programs Division (E143–01), 109 T.W. Alexander Drive, P.O. Box 12055, RTP, North Carolina 27711; telephone number: (919) 541–4036; and email address: *bouchard.andrew@epa.gov*. For questions about the P&R I and P&R II NESHAP, contact U.S. EPA, Attn: Ms. Njeri Moeller, Mail Drop: Sector Policies and Programs Division (E143–01), 109 T.W. Alexander Drive, P.O. Box 12055, RTP, North Carolina 27711; telephone number: (919) 541–1380; and email address: *moeller.njeri@epa.gov*. For specific information regarding the risk modeling methodology, contact U.S. EPA, Attn: Mr. Matthew Woody, Mail Drop: Health and Environmental Impacts Division (C539–02), 109 T.W. Alexander Drive, P.O. Box 12055, RTP, North Carolina 27711; telephone number: (919) 541–1535; and email address: *woody.matthew@epa.gov*.

**SUPPLEMENTARY INFORMATION:**

*Preamble acronyms and abbreviations.* We use multiple acronyms and terms in this preamble. While this list may not be exhaustive, to ease the reading of this preamble and for reference purposes, the EPA defines the following terms and acronyms here:

ACS American Community Survey
AERMOD American Meteorological Society/EPA Regulatory Model dispersion modeling system
ANSI American National Standards Institute
APCD air pollution control device
API American Petroleum Institute
ASME American Society of Mechanical Engineers
BACT best available control technology
BLR basic liquid epoxy resins
BPT benefit per-ton
BSER best system of emissions reduction
BTEX benzene, toluene, ethylbenzene, and xylenes
CAA Clean Air Act
CBI confidential business information
CDX Central Data Exchange
CEDRI Compliance and Emissions Data Reporting Interface
CFR Code of Federal Regulations
CMPU chemical manufacturing process unit
CO carbon monoxide
$CO_2$ carbon dioxide
CPI consumer price index
CRA Congressional Review Act
EAV equivalent annual value
ECHO Enforcement and Compliance History Online
EFR external floating roof
EIS Emission Information System
EPA Environmental Protection Agency
EPPU elastomer product process unit
ERT Electronic Reporting Tool
EtO ethylene oxide
FTIR fourier transform infrared
HAP hazardous air pollutant(s)
HON Hazardous Organic NESHAP
HQ hazard quotient
$HQ_{REL}$ hazard quotient reference exposure level
IBR incorporation by reference
ICR information collection request
IFR internal floating roof
IRIS Integrated Risk Information System
ISA Integrated Science Assessment
km kilometer
LAER lowest achievable emissions rate
lb/hr pound per hour
lb/yr pound per year
LDAR leak detection and repair
LDEQ Louisiana Department of Environmental Quality
LEL lower explosive limit
MACT maximum achievable control technology
MDL method detection limit
MERP monomer emission reduction project
MIR maximum individual lifetime [cancer] risk
MON Miscellaneous Organic Chemical Manufacturing NESHAP
MTVP maximum true vapor pressure
NAICS North American Industry Classification System
NAAQS National Ambient Air Quality Standards
NATTS National Air Toxic Trends Station
NEI National Emissions Inventory
NESHAP national emission standards for hazardous air pollutants
$NO_X$ nitrogen oxides
$N_2O$ nitrous oxide

63.139(d)(5) (for HON), and 40 CFR 63.484(t), 40 CFR 63.485(x), and 40 CFR 63.489(b)(10) (for the P&R I NESHAP) for owners or operators using adsorbers that cannot be regenerated and regenerative adsorbers that are regenerated offsite to use dual (two or more) adsorbent beds in series and conduct monitoring of HAP or TOC on the outlet of the first adsorber bed in series using a sample port and a portable analyzer or chromatographic analysis. However, we have clarified in the proposed rule text in this final action that the monitoring plan provisions in 40 CFR 63.120(d)(2) and (3) do not apply to HON sources subject to the monitoring provisions in 40 CFR 63.120(d)(1)(iii); and the monitoring plan provisions in 40 CFR 63.120(d)(2) and (3) do not apply to P&R I sources subject to the monitoring provisions in 40 CFR 63.120(d)(1)(iii) (via 40 CFR 63.484(t) and 40 CFR 63.485(x)). The comments and our specific responses to these items can be found in the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking.

We are also finalizing, as proposed, several corrections to the calibration drift assessment requirements in NSPS subpart VVa at 40 CFR 60.485a(b)(2). These amendments include: (1) Correcting a regulatory citation to read "§ 60.486a(e)(8)" instead of "§ 60.486a(e)(7)"; (2) removing the extraneous sentence "Calculate the average algebraic difference between the three meter readings and the most recent readings and the most recent calibration value."; (3) providing clarity in the mathematical step of the assessment by replacing the sentence "Divide this algebraic difference by the initial calibration value and multiply by 100 to express the calibration drift as a percentage." with "Divide the arithmetic difference of the initial and post-test calibration response by the corresponding calibration gas value for each scale and multiply by 100 to express the calibration drift as a percentage."; and (4) providing clarity by making other minor textural changes to the provisions related to the procedures for when a calibration drift assessment shows negative or positive drift of more than 10 percent. We did not receive any comments in opposition of these amendments.

In addition, we are finalizing, as proposed, the requirement in the HON and the P&R I and P&R II NESHAP, and NSPS subparts IIIa, NNNa, and RRRa to conduct subsequent performance testing on non-flare control devices no later than 60 calendar months after the previous performance test. The comments and our specific response to this item can be found in the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking.

Also, we are finalizing, as proposed to: (1) Remove the provisions that allow compliance with certain portions of 40 CFR part 264, subpart AA or CC in lieu of portions of NESHAP subpart G (see 40 CFR 63.110(h)); and (2) remove the provisions that allow compliance with certain portions of 40 CFR part 65 in lieu of portions of NESHAP subparts G and H (see 40 CFR 63.110(i) and 40 CFR 60.160(g)). In addition, based on comments received on the proposed rulemaking, we are: (1) Revising 40 CFR 63.160(b)(1) and (c)(1) in the final rule such that compliance with HON subpart H constitutes compliance with NSPS subpart VVa provided the owner or operator continues to comply with 40 CFR 60.480a(e)(2)(i); and (2) revising 40 CFR 63.160(b)(1) and (c)(1) in the final rule such that compliance with HON subpart H constitutes compliance with NSPS subpart VVb provided the owner or operator continues to comply with 40 CFR 60.480b(e)(2)(i). We have also revised 40 CFR 60.480b(e)(2)(i) in the final rule to require compliance with 40 CFR 60.482–7b (*i.e.,* the standards for gas and light liquid valves in NSPS subpart VVb) in addition to the requirements of 40 CFR 60.485b(d), (e), and (f), and 40 CFR 60.486b(i) and (j). The comments and our specific responses to these items can be found in the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking.

Finally, we are finalizing all of the revisions that we proposed for clarifying text or correcting typographical errors, grammatical errors, and cross-reference errors. These editorial corrections and clarifications are discussed in section III.E.5.f of the proposal preamble (see 88 FR 25080, April 25, 2023). We are also including several additional minor clarifying edits in the final rule based on comments received during the public comment period. The comments and our specific responses to these items can be found in the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking.

### *G. What are the effective and compliance dates of the standards?*

#### 1. HON and the P&R I and P&R II NESHAP

For all of the requirements we are finalizing under CAA sections 112(d)(2), (3), and (6), and 112(h) (except for the removal of affirmative defense provisions in the P&R I NESHAP and fenceline monitoring requirements in HON and the P&R I NESHAP), all existing affected sources and all affected sources that were new sources under the previous HON and P&R I NESHAP (*i.e.,* sources that commenced construction or reconstruction after December 31, 1992 (for HON) or after June 12, 1995 (for the P&R I NESHAP), and on or before April 25, 2023), must comply with all of the amendments no later than July 15, 2027, or upon startup, whichever is later. For existing sources, CAA section 112(i) provides that the compliance date for standards promulgated under section 112(d) shall be as expeditious as practicable, but no later than 3 years after the effective date of the standard. *Association of Battery Recyclers* v. *EPA,* 716 F.3d 667, 672 (D.C. Cir. 2013) ("Section 112(i)(3)'s three-year maximum compliance period applies generally to any emission standard . . . promulgated under [section 112]."). We agree with the commenters (see section 11.1 of the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and*

Case: 24-60351 Document: 49 Page: 42 Date Filed: 07/29/2024

*Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking) that 3 years is needed for owners and operators to implement the requirements we are finalizing under CAA sections 112(d)(2), (3), and (6). For example, for process vents, if an affected source has uncontrolled process vents that emit greater than or equal to 1.0 lb/hr of total organic HAP, then a new control system, such as a thermal oxidizer with piping, ductwork, etc., may need to be installed (due to the removal of the TRE concept in its entirety in the final rule). Also, additional permits (*e.g.,* New Source Review and/or a Title V permit modifications) may be required for new emission control equipment. Moreover, 3 years is needed to understand the final rule changes; revise site guidance and compliance programs; ensure operations can meet the standards during startup and shutdown; update operation, maintenance, and monitoring plans; upgrade emission capture and control systems; install new flare monitoring equipment; and install new process control systems. As provided in CAA section 112(i) and 5 U.S.C. 801(3), all new affected sources that commenced construction or reconstruction after April 25, 2023, are required to comply with all requirements under CAA sections 112(d)(2), (3), (6), and 112(h) (including fenceline monitoring) by July 15, 2024 or upon startup, whichever is later. We are also finalizing, as proposed, that owners or operators of P&R I affected sources must comply with the removal of the affirmative defense provisions 60 days after the publication date of the final rule (or upon startup, whichever is later). We provided additional rationale for these compliance dates in the preamble to the proposed rule (88 FR 25080, April 25, 2023).

In a change from the proposed rule, we have extended the compliance date for fenceline monitoring (with the exception of fenceline monitoring of chloroprene at P&R I affected sources producing neoprene, which is discussed later in this section) from 1 to 2 years. Owners and operators of all existing sources, and all affected sources that were new under the current rules—*i.e.,* sources that commenced construction or reconstruction after December 31, 1992 (for HON) or after June 12, 1995 (for the P&R I NESHAP), and on or before April 25, 2023—must begin fenceline monitoring 2 years after the effective date of the final rule and, starting 3 years after the effective date of the final rule, must perform root cause analysis and apply corrective action requirements upon exceedance of an annual average concentration action level. We extended the timeline for fenceline monitoring from 1 to 2 years based on comments received, which indicated that EPA Method 327 will require laboratories to increase their capacity to meet the requirements for fenceline monitoring. We consider this expanded timeline to be necessary to allow commercial labs to conduct the needed method development, expand capacity, and develop the logistics needed to meet the requirements in the final rule. We also agree with commenters' other assertions that more time is needed to read and assess the new fenceline monitoring requirements; prepare sampling and analysis plans; develop and submit site-specific monitoring plans; identify representative, accessible, and secure monitoring locations for offsite monitors and obtain permission from the property owner to both place and routinely access the monitors; make any necessary physical improvements to fencelines to be able to site monitors, including construction of access roads, physical fencing, and potential drainage improvements; and obtain approval of any necessary capital expenditures. We consider 2 years to be necessary to allow for all of these things. For additional details, see section 11.1 of the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking.

For all of the requirements we are finalizing under CAA sections 112(f) for the HON, we are finalizing as proposed, except we are clarifying that the compliance dates we proposed are from the effective date of the rule rather than the publication date of the proposal. In other words, all existing affected sources and all affected sources that were new sources under the previous HON (*i.e.,* sources that commenced construction or reconstruction after December 31, 1992, and on or before April 25, 2023) must comply with the EtO requirements no later than July 15, 2026, or upon startup, whichever is later. As explained in the April 25, 2023, proposed rule (88 FR 25080, 25176), CAA section 112(f)(4) prescribes the compliance date for emission standards issued under CAA section 112(f). *Ass'n of Battery Recyclers* v. *EPA,* 716 F.3d 667, 672 (D.C. Cir. 2013) ("[S]ection 112(f)(4)'s two-year maximum applies more specifically to standards 'under this subsection,' *i.e.,* section 112(f)."). For existing sources, the earliest compliance date for CAA section 112(f) standards is 90 days. However, the compliance period can be extended up to 2 years if the EPA finds that more time is needed for the installation of controls. 42 U.S.C. 7412(f)(4)(B). The EPA finds that the new EtO provisions under CAA section 112(f) will require additional time to plan, purchase, and install emission control equipment. For example, for process vents, if an affected source cannot demonstrate 99.9-percent control of EtO emissions, or reduce EtO emissions to less than 1 ppmv (from each process vent) or 5 pounds per year (for all combined process vents), then a new control system, such as a scrubber with piping, ductwork, feed tanks, etc., may need to be installed. Similarly, this same scenario (*i.e.,* installation of a new control system, such as a scrubber with piping, ductwork, feed tanks, etc) may be necessary for storage vessels in order to reduce EtO emissions by greater than or equal to 99.9 percent by weight or to a concentration less than 1 ppmv. Likewise, a new steam stripper may be needed control wastewater with a total annual average concentration of EtO greater than or equal to 1 ppmw. Additionally, we agree with commenters (see section 11.1 of the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking) that additional permits may be required for these new emission control equipment (*e.g.,* New Source Review and/or a Title V permit modifications). In other words, sufficient time is needed to properly engineer the project, obtain capital authorization and funding, procure the equipment, obtain permits, and construct and start-up the equipment. Therefore, we are finalizing a compliance date of 2 years after the effective date of the final rule for all existing affected sources to meet the EtO requirements. All new affected sources that commence construction or reconstruction after April 25, 2023, are required to comply with the EtO requirements for the HON by July 15, 2024 or upon startup, whichever is later.

This compliance schedule is consistent with the compliance deadlines outlined in the CAA under section 112(f)(4) and the CRA. We provided additional rationale for these compliance dates in the preamble to the proposed rule (88 FR 25080, April 25, 2023).

In a change from the proposed rule, the EPA is shortening the compliance deadline for affected sources producing neoprene, due to the EPA's finding that chloroprene emissions from the only such source pose an imminent and substantial endangerment under CAA section 303, 42 U.S.C. 7603. *United States* v. *Denka Performance Elastomer, LLC, et al.*, No. 2:23–cv–00735 (E.D. La. filed Feb. 28, 2023). All existing affected sources producing neoprene and all affected sources producing neoprene that were new sources under the previous P&R I NESHAP (*i.e.,* sources that commenced construction or reconstruction after June 12, 1995, and on or before April 25, 2023) must comply with the chloroprene requirements we are finalizing under CAA section 112(f) for the P&R I NESHAP (see sections III.B.1 and IV.A.3.e of this preamble for a details about these chloroprene requirements) no later than October 15, 2024,[32] or upon startup, whichever is later. However, such sources may seek the EPA's approval of a waiver from the 90-day compliance deadline and obtain a compliance date of up to July 15, 2026 if they demonstrate to the Administrator's satisfaction that "such period is necessary for the installation of controls" and that steps will be taken during the waiver period to assure that the public health of persons will be protected from any imminent endangerment. See 42 U.S.C. 112(f)(4)(B); 40 CFR 63.6(i)(4)(ii).[33]

[32] The compliance date is 90 days after the effective date of this final action due to the Congressional Review Act.

[33] We are revising the General Provisions table to the P&R II NESHAP entry for 40 CFR 63.6(e)(1)(i) by changing the "No" to "Yes" for affected sources producing neoprene. EPA is also retaining authority to grant or deny requests for extensions of the compliance date under 40 CFR 63.6(i)(4)(ii) at 40 CFR 63.507(c)(6), and is not delegating that authority to states.

All new affected sources that commence construction or reconstruction after April 25, 2023, are required to comply with the chloroprene requirements for P&R I affected sources producing neoprene no later than by July 15, 2024 or upon startup, whichever is later. This compliance schedule is consistent with the compliance deadlines outlined in the CAA under section 112(f)(4) and the CRA, 5 U.S.C. 801.

2. NSPS Subparts VV, VVa, VVb, III, IIIa, NNN, NNNa, RRR, RRRa

All sources of equipment leaks in the SOCMI (regulated under NSPS subpart VVb) and all SOCMI air oxidation unit processes, distillation operations, and reactor processes (regulated under NSPS subparts IIIa, NNNa, and RRRa, respectively), that commenced construction, reconstruction, or modification on or after April 25, 2023, must meet the requirements of the new NSPS upon startup of the new, reconstructed or modified facility or by July 15, 2024, whichever is later. This compliance schedule is consistent with the requirements in section 111 of the CAA and the CRA.

Also, for NSPS subparts VV, VVa, III, NNN, and RRR, we are finalizing, as proposed, the change in format of the reporting requirements to require electronic reporting (*i.e.,* we are not finalizing any new data elements); and owners and operators must begin submitting performance test reports electronically beginning on July 15, 2024 and semiannual reports on and after July 15, 2025 or once the report template for the subpart has been available on the CEDRI website (*https://www.epa.gov/electronic-reporting-air-emissions/cedri*) for 1 year, whichever date is later. For NSPS subparts IIIa, NNNa, and RRRa, we are finalizing, as proposed, that owners and operators must submit performance test reports electronically within 60 days after the date of completing each performance test, and for NSPS subparts VVb, IIIa, NNNa, and RRRa, semiannual reports on and after July 15, 2024 or once the report template for the subpart has been available on the CEDRI website (*https://www.epa.gov/electronic-reporting-air-emissions/cedri*) for 1 year, whichever date is later.

## IV. What is the rationale for our final decisions and amendments for the SOCMI, P&R I, and P&R II source categories?

For each issue, this section provides a description of what we proposed and what we are finalizing for the issue, the EPA's rationale for the final decisions and amendments, and a summary of key comments and responses. For all comments not discussed in this preamble, comment summaries and the EPA's responses can be found in the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking.

### A. Residual Risk Review for the SOCMI and Neoprene Production Source Categories NESHAP

1. What did we propose pursuant to CAA section 112(f) for the SOCMI and Neoprene Production source categories?

a. SOCMI Source Category

Pursuant to CAA section 112(f), the EPA conducted a residual risk review and presented the results of this review, along with our proposed decisions regarding risk acceptability and ample margin of safety, in the April 25, 2023, proposed rule for the SOCMI source category subject to HON (88 FR 25080). The results of the risk assessment for the proposal are presented briefly in Table 1 of this preamble. More detail is in the residual risk technical support document, *Residual Risk Assessment for the SOCMI Source Category in Support of the 2023 Risk and Technology Review Proposed Rule* (see Docket Item No. EPA–HQ–OAR–2022–0730–0085).

**Table 4. SOCMI Source Category and Facility-wide Inhalation Risk Assessment Results Based on Baseline (Pre-Control) Emissions and Post-Control Emissions**

| Risk Assessment | Maximum Individual Cancer Risk (-in-1 million)[1] | Estimated Population at Increased Risk of Cancer > 100-in-1 million | Estimated Population at Increased Risk of Cancer ≥ 1-in-1 million | Estimated Annual Cancer Incidence (cases per year) | Maximum Chronic Noncancer TOSHI | Refined Maximum Screening Acute Noncancer HQ |
|---|---|---|---|---|---|---|
| SOCMI Source Category | | | | | | |
| Pre-Control Baseline | 2,000 | 83,000 (50 km) | 7.17 million (50 km) | 2 | 2 (maleic anhydride)<br>2 (chlorine) | $HQ_{REL}$ = 3 (chlorine)<br>$HQ_{REL}$ = 3 (acrolein) |
| Post-Control | 100 | 0 | 6.27 million (50km) | 0.4 | 2 (maleic anhydride)<br>2 (chlorine) | $HQ_{REL}$ = 3 (chlorine)<br>$HQ_{REL}$ = 3 (acrolein) |
| Facility-wide | | | | | | |
| Pre-Control Baseline | 2,000 | 90,000 (50 km) | 8.92 million (50 km) | 2 | 4 (chlorine, acrylic acid, and acrylonitrile) | -- |
| Post-Control | 2,000 | 2,900 (50 km) | 8.49 million (50 km) | 2 | 4 (chlorine, acrylic acid, and acrylonitrile) | -- |

[1] Maximum individual excess lifetime cancer risk due to HAP emissions.

b. Neoprene Source Category

In response to a comment in section IV.A.3.e.i of this preamble, we revised the performance standard for process vents and storage vessels in chloroprene service for the Neoprene Production source category. This revision did not change the baseline source category or facility-wide risk assessments for the Neoprene Production source category from proposal (see section IV.A.1.b of this preamble and Table 5 of this preamble). The revised assessment indicated that, after implementation of the controls, the MIR for the Neoprene Production source category is 100-in-1 million (down from 500-in-1 million in the pre-control baseline) with no individuals exposed to risk levels greater than 100-in-1 million from HAP emissions from the Neoprene Production source category. This result is the same as in the proposal. The total population exposed to risk levels from the Neoprene Production source category greater than or equal to 1-in-1 million would be reduced from 690,000 people to 58,000 people. The total estimated cancer incidence of 0.05 drops to 0.01 excess cancer cases per year. For the risk results estimated after implementation of controls, the two changes from proposal are the number of people exposed to risk levels greater than or equal to 1-in-1 million (58,000 here compared to 48,000 at proposal) and the cancer incidence (0.01 here compared to 0.008 at proposal) from HAP emissions from the Neoprene Production source category. All other results remained the same. Table 5 of this preamble summarizes the reduction in cancer risks due to emissions from the Neoprene Production source category based on the controls in this action. For further details on the revised risk assessment for the Neoprene Production source category, see the document titled *Residual Risk Assessment for the Polymers & Resins I Neoprene Production Source Category in Support of the 2024 Risk and Technology Review Final Rule,* which is available in the docket for this rulemaking.

Table 5 of this preamble also provides the facility-wide risks for the facility in the Neoprene Production source category, which are of increased importance due to the secondary

fenceline action level for chloroprene, before (pre-control baseline) and after controls (post-control) of neoprene production emission sources in this action. The post-control facility-wide MIR is 200-in-1 million, driven by chloroprene emissions from SOCMI and neoprene production emission sources. The secondary fenceline action level of 0.3 μg/m³ for chloroprene will further reduce chloroprene emissions and therefore risks below these levels, with the MIR expected to be 100-in-1 million or lower, with no individuals exposed to lifetime cancer risk levels greater than 100-in-1 million, and the number of people exposed to cancer risk levels greater than or equal to 1-in-1 million expected to be lower than those in Table 5 of this preamble.

**Table 5. Neoprene Production Source Category and Facility-wide Inhalation Risk Assessment Results Based on Baseline (Pre-Control) Emissions and Post-Control Emissions**

| Risk Assessment | Maximum Individual Cancer Risk (-in-1 million)[1] | Estimated Population at Increased Risk of Cancer | | Estimated Annual Cancer Incidence (cases per year) | Maximum Chronic Noncancer TOSHI | Maximum Screening Acute Noncancer HQ |
|---|---|---|---|---|---|---|
| | | > 100-in-1 million | ≥ 1-in-1 million | | | |
| Neoprene Production Source Category | | | | | | |
| Pre-Control Baseline | 500 | 2,100 (50 km) | 690,000 (50 km) | 0.05 | 0.05 (chloroprene) | $HQ_{REL}$ = 0.3 (chloroform) |
| Post-Control | 100 | 0 | 58,000 (50 km) | 0.01 | 0.01 (chloroprene) | $HQ_{REL}$ = 0.3 (chloroform) |
| Facility-wide | | | | | | |
| Pre-Control Baseline | 600 | 2,300 (50 km) | 890,000 (50 km) | 0.06 | 0.3 (chlorine) | -- |
| Post-Control | 200 | 326 (50 km) | 87,000 (50 km) | 0.02 | 0.3 (chlorine) | --- |

[1] Maximum individual excess lifetime cancer risk due to HAP emissions.

3. What key comments did we receive on the risk review, and what are our responses?

This section provides summaries of and responses to the key comments received regarding our risk assessment for the SOCMI source category, our risk assessment for the Neoprene Production source category, the proposed requirements to reduce EtO emissions from the SOCMI source category, and the proposed requirements to reduce chloroprene emissions from the Neoprene Production source category. We received comments in support of and against the proposed residual risk review, the IRIS URE used in the review, and our determination that additional controls were warranted under CAA section 112(f)(2) for the SOCMI and Neoprene Production source categories. Other comments on these issues, as well as the EtO IRIS URE, chloroprene IRIS URE, and on additional issues regarding the residual risk review and the EPA's proposed changes based on the residual risk review, can be found in the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry*, which is available in the docket for this rulemaking.

a. EtO IRIS URE

We received numerous comments in support of, and in opposition to, the EPA's use of the EtO IRIS value in assessing cancer risk for a source category under CAA section 112(f)(2) for EtO. After careful review of the comments, the Agency has determined that commenters did not identify new scientific information that would alter aspects of the EPA IRIS assessments or call into question the scientific judgments reflected in those assessments. The EPA continues to affirm its determination that the IRIS assessments are scientifically sound and robust and represent the best available inhalation cancer risk values for EtO.[34] These comments are not summarized in this preamble. Instead, all of these comments (related to the EPA's use of the EtO IRIS value for CAA section 112(f)(2) risk assessment) and the EPA's responses are in the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry*, which is available in the docket for this rulemaking.

[34] 87 FR 77985 (Dec. 21, 2022), *Reconsideration of the 2020 National Emission Standards for Hazardous Air Pollutants: Miscellaneous Organic Chemical Manufacturing Residual Risk and Technology Review, Final action;* reconsideration of the final rule.

storage; log entries) for each required record. If the description changes, the owner or operator shall retain both the current and the most recent superseded description. The description, and the most recent superseded description, shall be retained as provided in § 63.103(c) of subpart F of this part, except as provided in paragraph (g)(1)(vi)(D) of this section.

(C) A description, and the date, of any change to the monitoring system that would reasonably be expected to affect its ability to comply with the requirements of paragraph (g)(1) of this section.

(D) Owners and operators subject to paragraph (g)(1)(vi)(B) of this section shall retain the current description of the monitoring system as long as the description is current, but not less than 5 years from the date of its creation. The current description shall, at all times, be retained on-site or be accessible from a central location by computer or other means that provides access within 2 hours after a request. The owner or operator shall retain the most recent superseded description at least until 5 years from the date of its creation. The superseded description shall be retained on-site (or accessible from a central location by computer that provides access within 2 hours after a request) at least 6 months after its creation. Thereafter, the superseded description may be stored off-site.

(2) If an owner or operator has elected to implement the requirements of paragraph (g)(1) of this section, and a period of 6 consecutive months has passed without an excursion as defined in paragraph (g)(2)(iv) of this section, the owner or operator is no longer required to record the daily average value for that parameter for that unit of equipment, for any operating day when the daily average value is less than the maximum, or greater than the minimum established limit. With approval by the Administrator, monitoring data generated prior to the compliance date of this subpart shall be credited toward the period of 6 consecutive months, if the parameter limit and the monitoring was required and/or approved by the Administrator.

(i) If the owner or operator elects not to retain the daily average values, the owner or operator shall notify the Administrator in the next periodic report. The notification shall identify the parameter and unit of equipment.

(ii) If, on any operating day after the owner or operator has ceased recording daily averages as provided in paragraph (g)(2) of this section, there is an excursion as defined in paragraph (g)(2)(iv) of this section, the owner or operator shall immediately resume retaining the daily average value for each day, and shall notify the Administrator in the next periodic report. The owner or operator shall continue to retain each daily average value until another period of 6 consecutive months has passed without an excursion as defined in paragraph (g)(2)(iv) of this section.

(iii) The owner or operator shall retain the records specified in paragraphs (g)(1) (i), (ii), (iii), (iv), (v), and (vi) of this section. For any calendar week, if compliance with paragraphs (g)(1) (i), (ii), (iii), and (iv) of this section does not result in retention of a record of at least one occurrence or measured parameter value, the owner or operator shall record and retain at least one parameter value during a period of operation other than a startup, shutdown, or malfunction. For each source as defined in § 63.101, on and after July 15, 2027, the phrase "other than a startup, shutdown, or malfunction" in this paragraph no longer applies.

(iv) For purposes of paragraph (g) of this section, an excursion means that the daily average value of monitoring data for a parameter is greater than the maximum, or less than the minimum established value, except as provided in paragraphs (g)(2)(iv)(A) and (B) of this section.

(A) The daily average value during any startup, shutdown, or malfunction shall not be considered an excursion for purposes of this paragraph (g)(2), if the owner or operator operates the source during such periods in accordance with § 63.102(a)(4). For each source as defined in § 63.101, on and after July 15, 2027, this paragraph no longer applies.

(B) An excused excursion, as described in § 63.152(c)(2)(ii)(B) and (C), shall not be considered an excursion for purposes of this paragraph (g)(2).

(h) Beginning no later than July 15, 2024, owners and operators must submit performance test reports in accordance with this paragraph. Unless otherwise specified in this subpart, within 60 days after the date of completing each performance test required by this subpart, owners and operators must submit the results of the performance test following the procedures specified in § 63.9(k). Data collected using test methods supported by the EPA's Electronic Reporting Tool (ERT) as listed on the EPA's ERT website (*https://www.epa.gov/electronic-reporting-air-emissions/electronic-reporting-tool-ert*) at the time of the test must be submitted in a file format generated through the use of the EPA's ERT. Alternatively, owners and operators may submit an electronic file consistent with the extensible markup language (XML) schema listed on the EPA's ERT website. Data collected using test methods that are not supported by the EPA's ERT as listed on the EPA's ERT website at the time of the test must be included as an attachment in the ERT or alternate electronic file.

■ 90. Amend § 63.153 by revising paragraph (c) introductory text and adding paragraph (c)(5) as follows:

**§ 63.153 Implementation and enforcement.**

* * * * *

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (5) of this section.

* * * * *

(5) Approval of an alternative to any electronic reporting to the EPA required by this subpart.

■ 91. Revise table 3 to subpart G to read as follows:

TABLE 3 TO SUBPART G OF PART 63—PROCESS VENTS—MONITORING, RECORDKEEPING, AND REPORTING REQUIREMENTS FOR CONTROL DEVICES AND RECAPTURE DEVICES

| Control or recapture device | Parameters to be monitored [a] | Recordkeeping and reporting requirements for monitored parameters |
|---|---|---|
| Thermal incinerator, other than a thermal oxidizer used to comply with § 63.124. | Firebox temperature [b] [63.114(a)(1)(i)] .......... | 1. Continuous records.[c]<br>2. Record and report the firebox temperature averaged over the full period of the performance test—NCS.[d]<br>3. Record the daily average firebox temperature for each operating day.[e]<br>4. Report all daily average temperatures that are outside the range established in the NCS or operating permit and all operating days when insufficient monitoring data are collected [f]—PR.[g] |
| Thermal oxidizer used to comply with § 63.124. | Combustion chamber temperature [63.124(b)(5)(i)]. | 1. Continuous records.[c]<br>2. Record and report the combustion chamber temperature averaged over the full period of the performance test—NCS.[d] |

contamination by the sample handler. High sample results attributed to unknown causes are not outliers if there is no evidence of sample contamination and the sample does not meet the requirements in Section 9.2 of Method 325A of appendix A of this part.

(7) The concentration difference (Δc) for each monitored compound for each sampling period and the annual average Δc for each monitored compound for each sampling period.

(8) Indication of whether the owner or operator was required to develop a corrective action plan under § 63.184(f).

(9) Data flags for each monitor for each analyte that was skipped for the sampling period, if the owner or operator uses an alternative sampling frequency under § 63.184(a)(3)(iii) or § 63.184(b)(2)(iii).

■ 115. Amend § 63.183 by revising paragraph (c) introductory text and adding paragraph (c)(5) to read as follows:

**§ 63.183 Implementation and enforcement.**

* * * * *

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (5) of this section.

* * * * *

(5) Approval of an alternative to any electronic reporting to the EPA required by this subpart.

■ 116. Add § 63.184 to read as follows:

**§ 63.184 Fenceline monitoring provisions.**

For each source as defined in § 63.101, and for each source as defined in § 63.191, beginning no later than the compliance dates specified in § 63.100(k)(12), the owner or operator must conduct sampling along the facility property boundary and analyze the samples in accordance with paragraphs (a) through (i) of this section. Sampling of benzene, 1,3-butadiene, chloroprene, and ethylene dichloride must be conducted in accordance with paragraph (a) of this section. Sampling of ethylene oxide and vinyl chloride must be conducted in accordance with paragraph (b) of this section. Paragraphs (c) through (i) of this section apply for any compound required to be sampled.

(a) The owner or operator must conduct sampling along the facility property boundary and analyze the samples in accordance with Methods 325A and 325B of appendix A to this part and paragraphs (a)(1) through (3) of this section. The monitoring perimeter may be located inside the facility, away from the facility property boundary. However, the monitoring perimeter must encompass all potential sources of the target analyte(s) specified in paragraph (a)(1) of this section that are located within the facility's property boundary.

(1) The owner or operator must monitor the target analyte(s), as specified in paragraphs (a)(1)(i) through (iv) of this section. The owner or operator must follow the procedure in Section 9.6 of Method 325B of appendix A to this part to determine the detection limit of benzene, 1,3-butadiene, chloroprene, and ethylene dichloride for each sampler used to collect samples and blanks.

(i) If an affected source uses, produces, stores, or emits benzene, the owner or operator must include benzene as a target analyte.

(ii) If an affected source uses, produces, stores, or emits 1,3-butadiene, the owner or operator must include 1,3-butadiene as a target analyte.

(iii) If an affected source uses, produces, stores, or emits chloroprene, the owner or operator must include chloroprene as a target analyte.

(iv) If an affected source uses, produces, stores, or emits ethylene dichloride, the owner or operator must include ethylene dichloride as a target analyte.

(2) The owner or operator must determine passive monitor locations in accordance with Section 8.2 of Method 325A of appendix A to this part.

(i) As it pertains to this subpart, known sources of VOCs, as used in Section 8.2.1.3 in Method 325A of appendix A to this part for siting passive monitors, means a wastewater treatment unit, process unit, or any emission source requiring control according to the requirements of this subpart, including marine vessel loading operations. For marine vessel loading operations, one passive monitor should be sited on the shoreline adjacent to the dock. For this subpart, an additional monitor is not required if the only emission sources within 50 meters of the monitoring boundary are equipment leak sources satisfying all of the conditions in paragraphs (a)(2)(i)(A) through (C) of this section. If a leak is found, it must be repaired no later than 15 calendar days after it is detected with no provisions for delay of repair. If a repair is not completed within 15 calendar days, the additional passive monitor specified in Section 8.2.1.3 in Method 325A of appendix A to this part must be used.

(A) The equipment leak sources in organic HAP service within 50 meters of the monitoring boundary are limited to valves, pumps, connectors, sampling connections, and open-ended lines. If compressors, pressure relief devices, or agitators in organic HAP service are present within 50 meters of the monitoring boundary, the additional passive monitoring location specified in Section 8.2.1.3 in Method 325A of appendix A to this part must be used.

(B) All equipment leak sources in gas or light liquid service (and in organic HAP service), including valves, pumps, connectors, sampling connections and open-ended lines, must be monitored using Method 21 of appendix A–7 to 40 CFR part 60 no less frequently than quarterly with no provisions for skip period monitoring, or according to the provisions of § 63.11(c) Alternative Work practice for monitoring equipment for leaks. For the purpose of this provision, a leak is detected if the instrument reading equals or exceeds the applicable limits in paragraphs (a)(2)(i)(B)(*1*) through (*5*) of this section:

(*1*) For valves, pumps or connectors at an existing source, an instrument reading of 10,000 ppmv.

(*2*) For valves or connectors at a new source, an instrument reading of 500 ppmv.

(*3*) For pumps at a new source, an instrument reading of 2,000 ppmv.

(*4*) For sampling connections or open-ended lines, an instrument reading of 500 ppmv above background.

(*5*) For equipment monitored according to the Alternative Work practice for monitoring equipment for leaks, the leak definitions contained in § 63.11(c)(6)(i) through (iii).

(C) All equipment leak sources in organic HAP service, including sources in gas, light liquid and heavy liquid service, must be inspected using visual, audible, olfactory, or any other detection method at least monthly. A leak is detected if the inspection identifies a potential leak to the atmosphere or if there are indications of liquids dripping.

(ii) If there are 19 or fewer monitoring locations, the owner or operator must collect at least one co-located duplicate sample per sampling period and at least one field blank per sampling period. If there are 20 or more monitoring locations, the owner or operator must collect at least two co-located duplicate samples per sampling period and at least one field blank per sampling period. The co-located duplicates may be collected at any of the perimeter sampling.

(iii) Samplers are not required to be placed along internal roads, waterways, or other right of ways that may bisect the facility. If a facility is bounded by a waterway on one or more sides, the shoreline is considered the facility property boundary.

Case: 24-60351 Document: 49 Page: 48 Date Filed: 07/29/2024

**§ 63.480 Applicability and designation of affected sources.**

* * * * *

(j) *Applicability of this subpart.* Paragraphs (j)(1) through (3) of this section must be followed during periods of non-operation of the affected source or any part thereof.

* * * * *

(4) Beginning on July 15, 2024, this paragraph (j)(4) no longer applies. In response to an action to enforce the standards set forth in this subpart, an owner or operator may assert an affirmative defense to a claim for civil penalties for exceedances of such standards that are caused by a malfunction, as defined in § 63.2. Appropriate penalties may be assessed, however, if the owner or operator fails to meet the burden of proving all the requirements in the affirmative defense. The affirmative defense shall not be available for claims for injunctive relief.

* * * * *

■ 121. Amend § 63.481 by revising paragraph (a), (b), (c) introductory text, (d) introductory text, (k), and adding paragraphs (k)(2) and (n) through (p) as follows:

**§ 63.481 Compliance dates and relationship of this subpart to existing applicable rules.**

(a) Affected sources are required to achieve compliance on or before the dates specified in paragraphs (b) through (d) of this section and paragraphs (n) and (o) of this section. Paragraph (e) of this section provides information on requesting compliance extensions. Paragraphs (f) through (l) of this section discuss the relationship of this subpart to subpart A and to other applicable rules. Where an override of another authority of the Act is indicated in this subpart, only compliance with the provisions of this subpart is required. Paragraph (m) of this section specifies the meaning of time periods.

(b) Except as specified in paragraphs (n) and (o) of this section, new affected sources that commence construction or reconstruction after June 12, 1995 shall be in compliance with this subpart upon initial start-up or by June 19, 2000, whichever is later.

(c) With the exceptions provided in paragraphs (c)(1) through (3) of this section and paragraphs (n) and (o) of this section, existing affected sources shall be in compliance with this subpart no later than June 19, 2001, as provided in § 63.6(c), unless an extension has been granted as specified in paragraph (e) of this section.

* * * * *

(d) Except as provided for in paragraphs (d)(1) through (d)(6) of this section, and paragraphs (n) and (o) of this section, existing affected sources shall be in compliance with § 63.502 no later than July 31, 1997, unless an extension has been granted pursuant to paragraph (e) of this section.

* * * * *

(k) *Applicability of other regulations for monitoring, recordkeeping or reporting with respect to combustion devices, recovery devices, or recapture devices.* (1) After the compliance dates specified in this subpart, if any combustion device, recovery device or recapture device subject to this subpart is also subject to monitoring, recordkeeping, and reporting requirements in 40 CFR part 264 subpart AA or CC, or is subject to monitoring and recordkeeping requirements in 40 CFR part 265 subpart AA or CC and the owner or operator complies with the periodic reporting requirements under 40 CFR part 264 subpart AA or CC that would apply to the device if the facility had final-permitted status, the owner or operator may elect to comply either with the monitoring, recordkeeping and reporting requirements of this subpart, or with the monitoring, recordkeeping and reporting requirements in 40 CFR parts 264 and/or 265, as described in this paragraph, which shall constitute compliance with the monitoring, recordkeeping and reporting requirements of this subpart. The owner or operator shall identify which option has been selected in the Notification of Compliance Status required by § 63.506(e)(5).

(2) Owners and operators of flares that are subject to the flare related requirements of this subpart and are also subject to flare related requirements of any other regulation in this part or 40 CFR part 61 or 63, may elect to comply with the requirements in § 63.508 in lieu of all flare related requirements in any other regulation in this part or 40 CFR part 61 or 63.

* * * * *

(n) All affected sources that commenced construction or reconstruction on or before April 25, 2023, must be in compliance with the requirements listed in paragraphs (n)(1) through (9) of this section upon initial startup or on July 15, 2027, whichever is later. All affected sources that commenced construction or reconstruction after April 25, 2023, must be in compliance with the requirements listed in paragraphs (n)(1) through (9) of this section upon initial startup, or on July 15, 2024, whichever is later.

(1) The general requirements specified in § 63.483(e), § 63.504(a), § 63.504(a)(1)(iii), and § 63.506(e)(6)(iii)(C).

(2) For flares, the requirements specified in § 63.508.

(3) For storage vessels, the requirements specified in § 63.484(t) and § 63.506(e)(4)(ii)(F)(*6*).

(4) For continuous front-end process vents, the requirements specified in §§ 63.485(l)(6), (o)(6), (p)(5), (q)(1)(vii), (x), § 63.503(g)(2)(iii)(B)(*4*), and § 63.506(e)(4)(ii)(F)(*6*).

(5) For batch front-end process vents, the requirements specified in §§ 63.487(a)(3), (b)(3), and (e)(1)(iv) and (i), §§ 63.488(d)(2), (e)(4), (f)(2), and (g)(3), §§ 63.489(b)(10) and (d)(3), §§ 63.491(d)(1)(iii), (e)(6), and (h), § 63.492(g), and Table 6 to this subpart, item 3 in column 3 for diversion to the atmosphere and monthly inspections of sealed valves for all control devices.

(6) For back-end processes, the requirements specified in §§ 63.497(a)(8) and (d)(3), and § 63.498(d)(5)(v).

(7) For wastewater, the requirements specified in §§ 63.501(d), (e), and (f).

(8) For equipment leaks, the requirements specified in §§ 63.502(a)(2) and (k)(2).

(9) For heat exchange systems, the requirements specified in §§ 63.502(n)(7) and (n)(8).

(o) All affected sources that commenced construction or reconstruction on or before April 25, 2023, must be in compliance with the chloroprene requirements in §§ 63.484(u), 63.485(y) and (z), 63.487(j), 63.494(a)(7), 63.501(a)(10)(iv), 63.502(a)(3) and (a)(7), 63.509, and 63.510 upon initial startup or on October 15, 2024, whichever is later. All affected sources that commenced construction or reconstruction after April 25, 2023, must be in compliance with the chloroprene requirements in §§ 63.484(u), 63.485(x) and (z), 63.487(j), 63.494(a)(7), § 63.501(a)(10)(iv), 63.502(q), 63.502(a)(3) and (a)(7), 63.509, and 63.510 upon initial startup, or on July 15, 2024, whichever is later.

(p) The compliance schedule for fenceline monitoring is specified in paragraphs (p)(1) and (2) of this section.

(1) Except as specified in paragraph (p)(2) of this section, all affected sources that commenced construction or reconstruction on or before April 25, 2023, must commence fenceline monitoring according to the requirements in § 63.502(a)(4) by no later than July 15, 2026, however requirements for corrective actions are not required until on or after July 15, 2027. All affected sources that commenced construction or

reconstruction after April 25, 2023, must be in compliance with the fenceline monitoring requirements listed in § 63.502(a)(4) upon initial startup, or on July 15, 2024, whichever is later.

(2) For affected sources producing neoprene, the compliance schedule specified in paragraph (p)(1) of this section does not apply for chloroprene. Instead, all affected sources producing neoprene that commenced construction or reconstruction on or before April 25, 2023, must be in compliance with the fenceline monitoring requirements for chloroprene listed in § 63.502(a)(4) and (a)(7) upon initial startup or on October 15, 2024, whichever is later. All affected sources producing neoprene that commenced construction or reconstruction after April 25, 2023, must be in compliance with the fenceline monitoring requirements for chloroprene listed in § 63.502(a)(4) and (a)(7) upon initial startup, or on July 15, 2024, whichever is later.

■ 122. Revise and republish § 63.482 to read as follows:

**§ 63.482 Definitions.**

(a) The following terms used in this subpart shall have the meaning given them in § 63.2, § 63.101, or the Act, as specified after each term:

Act (§ 63.2)
Administrator (§ 63.2)
Automated monitoring and recording system (§ 63.101)
Boiler (§ 63.101)
Bottoms receiver (§ 63.101)
Breakthrough (§ 63.101)
By compound (§ 63.101)
By-product (§ 63.101)
Car-seal (§ 63.101)
Closed-vent system (§ 63.101)
Combustion device (§ 63.101)
Commenced (§ 63.2)
Compliance date (§ 63.2)
Connector (§ 63.101)
Continuous monitoring system (§ 63.2)
Distillation unit (§ 63.101)
Duct work (§ 63.101)
Emission limitation (Section 302(k) of the Act)
Emission standard (§ 63.2)
Emissions averaging (§ 63.2)
EPA (§ 63.2)
Equipment leak (§ 63.101)
External floating roof (§ 63.101)
Fill or filling (§ 63.101)
Fixed capital cost (§ 63.2)
Flame zone (§ 63.101)
Floating roof (§ 63.101)
Flow indicator (§ 63.101)
Fuel gas system (§ 63.101)
Halogens and hydrogen halides (§ 63.101)
Hard-piping (§ 63.101)
Hazardous air pollutant (§ 63.2)
Heat exchange system (§ 63.101)
Impurity (§ 63.101)
Incinerator (§ 63.101)
In organic hazardous air pollutant service or in organic HAP service (§ 63.101)
Instrumentation system (§ 63.101)
Internal floating roof (§ 63.101)
Lesser quantity (§ 63.2)
Major source (§ 63.2)
Malfunction (§ 63.2)
Oil-water separator or organic-water separator (§ 63.101)
Open-ended valve or line (§ 63.101)
Operating permit (§ 63.101)
Organic monitoring device (§ 63.101)
Owner or operator (§ 63.2)
Performance evaluation (§ 63.2)
Performance test (§ 63.2)
Permitting authority (§ 63.2)
Plant site (§ 63.101)
Potential to emit (§ 63.2)
Pressure release (§ 63.101)
Primary fuel (§ 63.101)
Pressure release (§ 63.101)
Pressure relief device (§ 63.101)
Pressure vessel (§ 63.101)
Process heater (§ 63.101)
Process unit shutdown (§ 63.101)
Process wastewater (§ 63.101)
Process wastewater stream (§ 63.101)
Reactor (§ 63.101)
Recapture device (§ 63.101)
Relief valve (§ 63.101)
Repaired (§ 63.101)
Research and development facility (§ 63.101)
Routed to a process or route to a process (§ 63.101)
Run (§ 63.2)
Secondary fuel (§ 63.101)
Sensor (§ 63.101)
Specific gravity monitoring device (§ 63.101)
Start-up, shutdown, and malfunction plan (§ 63.101) On and after July 15, 2027, this definition no longer applies.
State (§ 63.2)
Stationary Source (§ 63.2)
Surge control vessel (§ 63.101)
Temperature monitoring device (§ 63.101)
Test method (§ 63.2)
Treatment process (§ 63.101)
Unit operation (§ 63.101)
Visible emission (§ 63.2)
Secondary fuel (§ 63.101)
Sensor (§ 63.101)
Specific gravity monitoring device (§ 63.101)
Start-up, shutdown, and malfunction plan (§ 63.101) On and after July 15, 2027, this definition no longer applies.
State (§ 63.2)
Stationary Source (§ 63.2)
Surge control vessel (§ 63.101)
Temperature monitoring device (§ 63.101)
Test method (§ 63.2)
Treatment process (§ 63.101)
Unit operation (§ 63.101)
Visible emission (§ 63.2)

(b) All other terms used in this subpart shall have the meaning given them in this section. If a term is defined in a subpart referenced in this section, it shall have the meaning given in this section for purposes of this subpart.

*Affected source* is defined in § 63.480(a).

*Affirmative defense* means, in the context of an enforcement proceeding, a response or a defense put forward by a defendant, regarding which the defendant has the burden of proof, and the merits of which are independently and objectively evaluated in a judicial or administrative proceeding. Beginning on July 15, 2024, this definition of *affirmative defense* no longer applies.

*Aggregate batch vent stream* means a gaseous emission stream containing only the exhausts from two or more batch front-end process vents that are ducted, hard-piped, or otherwise connected together for a continuous flow.

*Annual average batch vent concentration* is determined using Equation 17, as described in § 63.488(h)(2) for halogenated compounds.

*Annual average batch vent flow rate* is determined by the procedures in § 63.488(e)(3).

*Annual average concentration,* as used in the wastewater provisions, means the flow-weighted annual average concentration, as determined according to the procedures specified in § 63.144(b), with the exceptions noted in § 63.501, for the purposes of this subpart.

*Annual average flow rate,* as used in the wastewater provisions, means the annual average flow rate, as determined according to the procedures specified in § 63.144(c), with the exceptions noted in § 63.501, for the purposes of this subpart.

*Average batch vent concentration* is determined by the procedures in § 63.488(b)(5)(iii) for HAP concentrations and is determined by the procedures in § 63.488(h)(1)(iii) for organic compounds containing halogens and hydrogen halides.

*Average batch vent flow rate* is determined by the procedures in § 63.488(e)(1) and (2).

*Back-end* refers to the unit operations in an EPPU following the stripping operations. Back-end process operations include, but are not limited to, filtering,

subpart, owners and operators must submit the results of the performance test following the procedures specified in § 63.9(k). Data collected using test methods supported by the EPA's Electronic Reporting Tool (ERT) as listed on the EPA's ERT website (*https://www.epa.gov/electronic-reporting-air-emissions/electronic-reporting-tool-ert*) at the time of the test must be submitted in a file format generated through the use of the EPA's ERT. Alternatively, owners and operators may submit an electronic file consistent with the extensible markup language (XML) schema listed on the EPA's ERT website. Data collected using test methods that are not supported by the EPA's ERT as listed on the EPA's ERT website at the time of the test must be included as an attachment in the ERT or alternate electronic file.

■ 144. Amend § 63.507 by revising paragraph (c) introductory text and adding paragraphs (c)(5) and (6) to read as follows:

**§ 63.507 Implementation and enforcement.**

* * * * *

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (6) of this section.

* * * * *

(5) Approval of an alternative to any electronic reporting to the EPA required by this subpart.

(6) Approval of an extension request under § 63.6(i)(4)(ii).

■ 145. Add § 63.508 to read as follows:

**§ 63.508 Flare requirements.**

(a) For any flare that is used to reduce organic HAP emissions from an EPPU, the owner or operator may elect to comply with the requirements in this section in lieu of the requirements of § 63.11(b) and the requirements referenced therein. The owner or operator may also elect to comply with the requirements in this section pursuant to the overlap provisions provided in § 63.481(k)(2). However, beginning no later than the compliance dates specified in § 63.481(n), the provisions specified in paragraphs (a)(1) through (32) of this section no longer apply. Instead, if an owner or operator reduces organic HAP emissions from an EPPU by venting emissions through a closed-vent system to a steam-assisted, air-assisted, or non-assisted flare, then the owner or operator must meet the applicable requirements for flares as specified in §§ 63.670 and 63.671, including the provisions in tables 12 and 13 to subpart CC of this part, except as specified in paragraph (b) of this section. This requirement also applies to any flare using fuel gas from a fuel gas system, of which 50 percent or more of the fuel gas is derived from a EPPU, as determined on an annual average basis. For purposes of compliance with this paragraph, the following terms are defined in § 63.641 of subpart CC of this part: Assist air, assist steam, center steam, combustion zone, combustion zone gas, flare, flare purge gas, flare supplemental gas, flare sweep gas, flare vent gas, lower steam, net heating value, perimeter assist air, pilot gas, premix assist air, total steam, and upper steam.

(1) §§ 63.487(a)(1)(i) and (b)(1)(i);

(2) § 63.489(b)(2);

(3) § 63.490(a)(1);

(4) §§ 63.491(b)(3)(i) through (b)(3)(iii);

(5) § 63.494(d);

(6) § 63.496(b)(7)(i)(A);

(7) § 63.497(a)(2);

(8) § 63.498(d)(5)(ii)(E);

(9) § 63.502(k)(1);

(10) §§ 63.504(c)(1) through (c)(3);

(11) § 63.107(h)(9)(i) related to criteria in § 63.11(b);

(12) § 63.113(a)(1);

(13) § 63.114(a)(2);

(14) §§ 63.116(a)(1) through (a)(3);

(15) §§ 63.117(a)(5)(i) through (a)(5)(iii);

(16) § 63.118(f)(5);

(17) The last sentence in § 63.119(e)(1);

(18) §§ 63.120(e)(1) through (e)(6);

(19) §§ 63.122(c)(2) and (g)(3);

(20) § 63.126(b)(2)(i);

(21) § 63.127(a)(2);

(22) §§ 63.128(b)(1) through (b)(3);

(23) §§ 63.129(a)(5)(i) through (a)(5)(iii);

(24) §§ 63.130(a)(2)(i), (c), and (d)(5);

(25) §§ 63.139(c)(3) and (d)(3);

(26) §§ 63.145(j)(1) through (j)(3);

(27) §§ 63.146(b)(7)(i)(A) through (b)(7)(i)(C);

(28) § 63.147(d)(1);

(29) §§ 63.172(d);

(30) §§ 63.180(e)(1) through (e)(3);

(31) § 63.181(g)(1)(iii); and

(32) The phrase "including periods when a flare pilot light system does not have a flame" in § 63.181(g)(2)(i).

(b) The exceptions specified in paragraphs (b) through (o) of § 63.108 apply, except as specified in paragraphs (b)(1) through (5) of this section.

(1) Where the term "chemical manufacturing process unit" is used, the term "EPPU" applies instead for the purposes of this subpart.

(2) Where the reference "§ 63.100(k)(10)" is used, the reference § 63.481(n) applies instead for the purposes of this subpart.

(3) Where the phrase "Hazardous Organic Chemical Manufacturing" is used, the phrase "Polymers and Resins" applies instead for the purposes of this subpart.

(4) Where the reference "§ 63.152(b)(7) of subpart G of this part" is used, the reference "§ 63.506(e)(5)(xiii)" applies instead for the purposes of this subpart.

(5) Section 63.108(i) does not apply.

■ 146. Add § 63.509 to read as follows:

**§ 63.509 Procedures for determining whether process vents, storage vessels, or wastewater are in chloroprene service.**

This section applies beginning no later than the compliance dates specified in § 63.481(o). To determine if process vents, storage vessels, or wastewater in a process at affected sources producing neoprene are in chloroprene service, as defined in § 63.482, owners and operators must comply with the requirements in paragraphs (a) through (c) of this section, as applicable.

(a) For each continuous front-end process vent, each batch front-end process vent, and each back-end process vent in a process at affected sources producing neoprene, owners and operators must measure the flow rate and concentration of chloroprene of each process vent as specified in paragraphs (a)(1) through (5) of this section.

(1) Measurements must be made prior to any dilution of the vent streams.

(2) Measurements may be made on the combined vent streams at an elastomer product process unit or for each separate vent stream.

(3) The sampling site shall be after the last recovery device (if any recovery devices are present) but prior to the inlet of any control device that is present and prior to release to the atmosphere. Method 1 or 1A of appendix A–1 to 40 CFR part 60, as appropriate, must be used for the selection of the sampling sites. For vents smaller than 0.10 meter in diameter, sample at one point at the center of the duct.

(4) The gas volumetric flow rate must be determined using Method 2, 2A, 2C, 2D, 2F, or 2G of appendices A–1 and A–2 to 40 CFR part 60, as appropriate.

(5) Except as specified in paragraph (a)(6) of this section, the concentration of chloroprene must be determined using Method 18 of appendix A–6 to 40 CFR part 60 or Method 320 of appendix A to this part.

(6) You may elect to use ASTM D6348–12 (Reapproved 2020) (incorporated by reference, § 63.14) in lieu of Method 320 of appendix A to this part as specified in paragraph (a)(5) of this section. To comply with this

combustion. Good combustion practices include, but are not limited to, proper burner maintenance, proper burner alignment, proper fuel to air distribution and mixing, routine inspection, and preventative maintenance.

(6) If an owner or operator vents emissions through a closed vent system to a control device other than a thermal oxidizer, then the owner or operator must comply with § 63.148, and the owner or operator must monitor the operating parameters identified in paragraph (a)(2)(viii) of this section and meet the established operating parameter limits to ensure continuous compliance. The frequency of monitoring and averaging time will be determined based upon the information provided to the Administrator.

■ 148. Amend Table 1 to Subpart U by revising entry "§ 63.6(e)(1)(i)", adding entry "§ 63.7(a)(4)", revising entries "§ 63.8(c)(1)(i)", "§ 63.8(c)(1)(iii)", "§ 63.9(k)" and "63.10(d)(5)(i)", removing entry "§ 63.10(d)(5)(ii)", revising entry "§ 63.11", and removing note a to read as follows:

TABLE 1 TO SUBPART U OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART U AFFECTED SOURCES

| Reference | Applies to subpart U | Explanation |
|---|---|---|
| * * * | * * | * * |
| § 63.6(e)(1)(i) | No | See § 63.483(a) for general duty requirement. Any cross reference to § 63.6(e)(1)(i) in any other general provision incorporated by reference shall be treated as a cross reference to § 63.483(a). |
| * * * | * * | * * |
| § 63.6(i)(4)(ii) | No; except yes for affected sources producing neoprene. | |
| * * * | * * | * * |
| § 63.7(a)(4) | Yes. | |
| § 63.8(a)(3) | No | [Reserved.]. |
| § 63.8(a)(4) | Yes, except for flares subject to § 63.508. | |
| § 63.8(b)(1) | Yes. | |
| § 63.8(b)(2) | No | Subpart U specifies locations to conduct monitoring. |
| § 63.8(b)(3) | Yes. | |
| * * * | * * | * * |
| § 63.8(c)(1)(i) | Yes, before July 15, 2027. No, beginning on and after July 15, 2027. | |
| * * * | * * | * * |
| § 63.8(c)(1)(iii) | Yes, before July 15, 2027. No, beginning on and after July 15, 2027. | |
| * * * | * * | * * |
| § 63.9(k) | Yes. | |
| * * * | * * | * * |
| 63.10(d)(5) | No. | |
| * * * | * * | * * |
| § 63.11 | Yes | Except for flares subject to § 63.508, § 63.11(b) specifies requirements for flares used to comply with provisions of this subpart. § 63.504(c) contains the requirements to conduct compliance demonstrations for flares subject to this subpart that are not subject to § 63.508. § 63.11(c), (d), and (e) specifies requirements for an alternative work practice for equipment leaks. |
| * * * | * * | * * |

■ 149. Revise table 6 to subpart U to read as follows:

TABLE 6 TO SUBPART U OF PART 63—GROUP 1 BATCH FRONT-END PROCESS VENTS AND AGGREGATE BATCH VENT STREAMS—MONITORING, RECORDKEEPING, AND REPORTING REQUIREMENTS

| Control/recovery device | Parameter to be monitored | Recordkeeping and reporting requirements for monitored parameters |
|---|---|---|
| Thermal incinerators other than those used for vents in chloroprene service. | Firebox temperature [a] | 1. Continuous records as specified in § 63.491(e)(1).[b] |
| | | 2. Record and report the average firebox temperature measured during the performance test—NCS.[c] |

Case: 24-60351 Document: 49 Page: 52 Date Filed: 07/29/2024

*www.epa.gov/electronic-reporting-air-emissions/cedri*) for this subpart. The date report templates become available will be listed on the CEDRI website. Unless the Administrator or delegated state agency or other authority has approved a different schedule for submission of reports under § 63.9(i) and § 63.10(a), the report must be submitted by the deadline specified in this subpart, regardless of the method in which the report is submitted. If a report is submitted via CEDRI, the certifier's electronic signature during the submission process replaces the requirements in § 63.10(e)(3)(v), § 63.10(e)(3)(vi)(L), and § 63.10(e)(3)(vi)(M) to submit the date of the report and the name, title, and signature of the responsible official who is certifying the accuracy of the report.

(1) Reports of monitoring data, including 15-minute monitoring values as well as daily average values or per-unit operation average values, as applicable, of monitored parameters for all operating days or unit operations when the average values were outside the ranges established in the Notification of Compliance Status or operating permit, including reports specified in paragraph (a)(4) of this section.

(2) Reports of the duration of periods when monitoring data is not collected for each excursion caused by insufficient monitoring data, including reports specified in paragraph (a)(4) of this section. An excursion means any of the three cases listed in paragraph (a)(2)(i) or (a)(2)(ii) of this section. For a control device where multiple parameters are monitored, if one or more of the parameters meets the excursion criteria in paragraph (a)(2)(i) or (a)(2)(ii) of this section, this is considered a single excursion for the control device. In the report, include the identification of the source, start date, start time, duration in hours, and monitored parameter(s) meeting the excursion criteria.

(i) When the period of control device operation is 4 hours or greater in an operating day and monitoring data are insufficient to constitute a valid hour of data, as defined in paragraph (a)(2)(iii) of this section, for at least 75 percent of the operating hours.

(ii) When the period of control device operation is less than 4 hours in an operating day and more than one of the hours during the period of operation does not constitute a valid hour of data due to insufficient monitoring data.

(iii) Monitoring data are insufficient to constitute a valid hour of data, as used in paragraphs (a)(2)(i) and (ii) of this section, if measured values are unavailable for any of the 15-minute periods within the hour.

(3) Whenever a process change, as defined in § 63.115(e), is made that causes the emission rate from a de minimis emission point to become a process vent with an emission rate of one pound per year or greater, the owner or operator shall submit a report within 180 calendar days after the process change. The report may be submitted as part of the next summary report required under § 63.10(e)(3). The report shall include:

(i) A description of the process change; and

(ii) The results of the recalculation of the emission rate.

(4) For each existing, new, or reconstructed affected BLR and WSR source, beginning no later than the compliance dates specified in § 63.521(c), for each excursion that is not an excused excursion, the report must include a list of the affected sources or equipment, the monitored parameter, an estimate of the quantity in pounds of each regulated pollutant emitted over any emission limit, a description of the method used to estimate the emissions, the cause of the excursion (including unknown cause, if applicable), as applicable, and the corrective action taken. Include the start date, start time, and duration in hours of each excursion.

(5) For pressure relief device subject to § 63.527(f), report each pressure release to the atmosphere, including pressure relief device identification name or number, the start date, start time, and duration (in minutes) of the pressure release; and an estimate of the mass quantity in pounds of each organic HAP released.

(6) For heat exchangers subject to § 63.104 of subpart F of this part, the information specified in § 63.104(f)(2) of subpart F of this part.

(b) The owner or operator of any affected BLR source, as well as the owner or operator of any affected WSR source who is subject to the leak detection and repair program specified in subpart H of this part, shall implement the reporting requirements outlined therein. Copies of all reports shall be retained as records for a period of 5 years, in accordance with the requirements of 40 CFR 63.10(b)(1).

(c) The owner or operator of any affected BLR source, as well as the owner or operator of any affected WSR source that is subject to the emission limit for process vents, storage tanks, and wastewater systems shall include records of all monitoring parameters in the Notification of Compliance Status and summary reports required by subpart A of this part.

(d) Beginning no later than July 15, 2024, owners and operators must submit performance test reports in accordance with this paragraph. Unless otherwise specified in this subpart, within 60 days after the date of completing each performance test required by this subpart, owners and operators must submit the results of the performance test following the procedures specified in § 63.9(k). Data collected using test methods supported by the EPA's Electronic Reporting Tool (ERT) as listed on the EPA's ERT website (*https://www.epa.gov/electronic-reporting-air-emissions/electronic-reporting-tool-ert*) at the time of the test must be submitted in a file format generated using the EPA's ERT. Alternatively, owners and operators may submit an electronic file consistent with the extensible markup language (XML) schema listed on the EPA's ERT website. Data collected using test methods that are not supported by the EPA's ERT as listed on the EPA's ERT website at the time of the test must be included as an attachment in the ERT or alternate electronic file.

■ 161. Amend § 63.529 by revising paragraph (c) introductory text, and adding paragraph (c)(5) as follows:

**§ 63.529 Implementation and enforcement.**

* * * * *

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (5) of this section.

* * * * *

(5) Approval of an alternative to any electronic reporting to the EPA required by this subpart.

■ 162. Amend table 1 to subpart W by:

■ a. Revising the header row;

■ b. Revising entry "§ 63.6(e)(1)(i)";

■ c. Adding entries "§ 63.6(e)(1)(ii)", "§ 63.6(e)(1)(iii)", "63.6(e)(2)", and "63.6(e)(3)';

■ d. Revising entry "§ 63.6(g)";

■ e. Adding entry "§ 63.7(a)(4)"; and

■ f. Revising entries "§ 63.7(e)(1)", "§ 63.7(g)(1)", "§ 63.8(c)(1)(i)", "§ 63.8(c)(1)(iii)", "§ 63.9(k)", "§ 63.10(d)(2)", "§ 63.10(d)(5)" and "§ 63.10(e)(3)".

The revisions and additions read as follows:

TABLE 1 TO SUBPART W OF PART 63—GENERAL PROVISIONS APPLICABILITY TO SUBPART W

| Reference | Applies to subpart W | | | Comment |
|---|---|---|---|---|
| | BLR | WSR | WSR equipment leak standard, and BLR equipment leak standard (40 CFR part 63, subpart H) | |
| * | * | * | * | * * * |
| § 63.6(e)(1)(i) | See Comment | | | Yes, before July 15, 2027. No, beginning on and after July 15, 2027. See § 63.525(k) for general duty requirement. |
| § 63.6(e)(1)(ii) | See Comment | | | Yes, before July 15, 2027. No, beginning on and after July 15, 2027. |
| § 63.6(e)(1)(iii) | Yes | Yes | Yes. | |
| 63.6(e)(2) | N/A | N/A | N/A | Reserved. |
| 63.6(e)(3) | See Comment | | | Yes, before July 15, 2027. No, beginning on and after July 15, 2027. |
| * | * | * | * | * * * |
| § 63.6(g) | Yes | Yes | Yes | Affected sources have the opportunity to demonstrate other alternatives to the Administrator. |
| * | * | * | * | * * * |
| § 63.7(a)(4) | Yes | Yes | Yes. | |
| * | * | * | * | * * * |
| § 63.7(e)(1) | Yes, before July 15, 2027. No, beginning on and after July 15, 2027. | | | See § 63.525(l). Subpart W also contains test methods specific to BLR and WSR sources. |
| * | * | * | * | * * * |
| § 63.7(g)(1) | Yes | Yes | No | Subpart H specifies performance test reporting. Additionally, this subpart specifies how and when the performance test results are reported for BLR and WSR. |
| § 63.8(b)(3) | Yes | Yes | Yes. | |
| § 63.8(c)(1)(i) | Yes, before July 15, 2027. No, beginning on and after July 15, 2027. | | | |
| * | * | * | * | * * * |
| § 63.8(c)(1)(iii) | Yes, before July 15, 2027. No, beginning on and after July 15, 2027. | | | |
| * | * | * | * | * * * |
| § 63.9(k) | Yes | Yes | Yes. | |
| * | * | * | * | * * * |
| § 63.10(d)(2) | No | No | No | This subpart and Subpart H specify performance test reporting requirements. |
| * | * | * | * | * * * |
| § 63.10(d)(5) | Yes, before July 15, 2027. No, beginning on and after July 15, 2027. | | | |
| * | * | * | * | * * * |
| § 63.10(e)(3) | Yes | Yes | No | Except that on and after July 15, 2027, the reports shall be submitted according to and in the format required by § 63.528(a). |
| * | * | * | * | * * * |

■ 163. Add table 2 to subpart W to read as follows:

TABLE 2 TO SUBPART W OF PART 63—TOXIC EQUIVALENCY FACTORS

| Dioxin and Furan Congener | Toxic equivalency factor |
|---|---|
| 1,2,3,7,8-pentachlorodibenzo-p-dioxin | 1 |
| 1,2,3,4,7,8-hexachlorodibenzo-p-dioxin | 0.1 |
| 1,2,3,7,8,9-hexachlorodibenzo-p-dioxin | 0.1 |
| 1,2,3,6,7,8-hexachlorodibenzo-p-dioxin | 0.1 |

# EXHIBIT V

BRACEWELL

March 15, 2024

**BY E-MAIL AND FEDEX**

Ms. Cheryl T. Seager
Director, Enforcement and Compliance Assurance Division
Environmental Protection Agency, Region 6
1201 Elm Street, Suite 500
Dallas, Texas 75270

**Re: Denka Performance Elastomer, LLC - Notice of Intent to Submit Extension Request**

Dear Director Seager:

On behalf of Denka Performance Elastomer, LLC ("DPE"), this letter ("Notice of Intent") provides notice that DPE intends to submit a facility-specific request for an extension of compliance periods prescribed in the forthcoming final rule in docket EPA-HQ-OAR-2022-0730 ("Final Rule"). Specifically, DPE intends to request that any compliance periods of less than two years for major new regulatory requirements applicable to DPE's facility in LaPlace, Louisiana (the "Facility") be extended to two years after the Final Rule's effective date pursuant to 42 U.S.C. 7412(f)(4)(B) and 40 C.F.R. 63.6(i)(4)(ii) ("Extension Request").

Based on statements made and actions taken by EPA in the pending litigation under Section 303 of the Clean Air Act ("Section 303 Litigation"),[1] DPE has reason to believe that EPA intends to revoke the two-year compliance period provided in the proposed rule covered by the above-referenced docket. ("Proposed Rule").[2] Accordingly, DPE is proactively submitting this Notice of Intent to facilitate expedited consideration of the forthcoming Extension Request for its Facility. DPE cannot comply with the major requirements of the Proposed Rule in less than two years. Similarly, DPE anticipates that it will not be able to comply with the expected major requirements of the Final Rule in less than two years.

If the Final Rule includes regulatory requirements similar to, or more stringent than, requirements in the Proposed Rule and imposes a compliance period of less than two years for any of the major requirements, DPE intends to submit an Extension Request seeking a two-year compliance period for the Facility. If such relief is denied and the rule requires DPE to comply with requirements in 90 days, DPE will be forced to quickly commence taking steps to shut down the Facility by the end of the 90-day compliance period. Given these operational considerations, the process in 40 CFR 63.6(i) is not sufficient for DPE to obtain

---

[1] *U.S. v. Denka Performance Elastomer LLC et al.*, Case No. 2:23-cv-00735 (E.D. La.).

[2] *New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry*, 88 Fed. Reg. 25080 (Apr. 25, 2023), available at https://www.govinfo.gov/content/pkg/FR-2023-04-25/pdf/2023-07188.pdf (Exhibit 1).

**Jeffrey R. Holmstead**
Partner

T:+1.202.828.5852 F: +1.800.404.3970
2001 M Street NW, Suite 900, Washington,DC 20036-3310
jeff.holmstead@bracewell.com bracewell.com

timely relief from a 90-day compliance period. To ensure EPA has ample time to review the merits of DPE's forthcoming Extension Request, DPE is submitting this Notice of Intent before pre-publication release of the Final Rule and providing the enclosed document to present the legal and factual bases, based on the Proposed Rule, for extending the compliance period to two years for the Facility. DPE intends to file its formal Extension Request shortly after the Final Rule is released and will seek to account for new requirements, risk assessments, or legal justifications set forth by EPA in support of any compliance period of less than two years.

DPE's review of the Proposed Rule has identified a suite of new emission controls that would be necessary for compliance. The enclosure to this Notice of Intent assumes the Final Rule will prescribe standards that require similar (or more stringent) emissions controls as the standards in the Proposed Rule. DPE reserves the right to modify its positions in submitting the Extension Request to account for any differences between the Proposed Rule and the Final Rule.

If the Final Rule does contain a deadline of less than two years for any major new requirement, and DPE's extension request for the Facility is not granted, DPE will need to begin its shut-down planning and procedures shortly after the Final Rule is published. Thus, expediting a decision on DPE's Extension Request will be essential. Given that DPE is the only facility in the Neoprene Production source category, DPE will treat any EPA action in response to DPE's Extension Request, including publication of the Final Rule, as an order adjudicating the request.

For EPA's convenience, exhibits referenced in the enclosure are being made available via a file sharing website at the following URL:

https://bracewell.sharefile.com/d-s2624a7bcde92491f8883f9a6e5c0218b

Please do not hesitate to contact me with any questions.

Sincerely,

Jeffrey R. Holmstead
***Counsel to Denka Performance Elastomer, LLC***

Enclosure:
Enclosure in Support of Notice of Intent (w/ Exhs. 1 – 72)

# Enclosure in Support of Notice of Intent

## *Denka Performance Elastomer, LLC*

**(March 15, 2024)**

**Enclosure in Support of Notice of Intent**

*Denka Performance Elastomer, LLC*

As further discussed in the letter from Mr. Jeffery Holmstead and herein (collectively, the "Notice of Intent"), Denka Performance Elastomer, LLC ("DPE") intends to submit a facility-specific request for an extension of compliance periods prescribed in the forthcoming final rule in docket EPA-HQ-OAR-2022-0730 ("Final Rule").[1] Specifically, DPE intends to request that any compliance periods of less than two years for major new regulatory requirements applicable to DPE's facility in LaPlace, Louisiana (the "Facility") be extended to two years after the Final Rule's effective date pursuant to 42 U.S.C. 7412(f)(4)(B) and 40 C.F.R. 63.6(i)(4)(ii) ("Extension Request"). Based on statements made and actions taken by EPA in the pending litigation under Section 303 of the Clean Air Act ("Section 303 Litigation"),[2] DPE has reason to believe that EPA intends to revoke the two-year compliance period provided in the proposed rule covered by the above-referenced docket. ("Proposed Rule").[3]

DPE's review of the Proposed Rule has identified a suite of new emission controls that would be necessary for compliance ("Section 112(f) Control Projects"). If the Final Rule includes regulatory requirements similar to, or more stringent than, requirements in the Proposed Rule and imposes a compliance period of less than two years for any of the major requirements, DPE intends to submit an Extension Request seeking a two-year compliance period for the Facility.[4]

DPE believes good cause will exist to grant the Extension Request for the Facility because a period of at least two years is necessary for DPE to comply with the Section 112(f) Control Projects and DPE's existing emission controls at the Facility assure that the health of persons will be protected from imminent endangerment. As EPA has historically and repeatedly recognized in rulemakings, including in the Proposed Rule, Section 112(f) Control Projects will take significant time to plan, purchase, and install. Emission controls such as a thermal oxidizer and steam stripper are simply not equipment that can be safely installed in 90 days. Without the additional time for implementation sought in the Extension Request—or, if necessary, through judicial intervention—a compliance period shorter than two years would jeopardize the continuing viability of the Facility and the jobs and livelihood of hundreds of employees and contractors who work there.

During the requested two-year implementation period, DPE would continue to comply with the existing Part 63 requirements at the Facility and continue to implement the emission reduction measures it has

---

[1] *See* Regulations.gov, *New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry*, Docket No. EPA-HQ-OAR-2022-0730 ("Rulemaking Docket"), available at https://www.regulations.gov/docket/EPA-HQ-OAR-2022-073.

[2] *U.S. v. Denka Performance Elastomer LLC et al.*, Case No. 2:23-cv-00735 (E.D. La.).

[3] *New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry*, 88 Fed. Reg. 25080 (Apr. 25, 2023), available at https://www.govinfo.gov/content/pkg/FR-2023-04-25/pdf/2023-07188.pdf (Exhibit 1).

[4] This Notice of Intent sets forth the legal and factual bases, based on the Proposed Rule, for extending the compliance period to at least two years for the Facility. This Notice of Intent assumes the Final Rule will prescribe standards that require similar (or more stringent) emissions controls as the standards in the Proposed Rule. DPE's Extension Request will account for any differences between the Proposed Rule and the Final Rule.

put in place there. These are described in detail in DPE's comments on the Proposed Rule.[5] These steps are sufficient to ensure that individuals near the Facility will be protected from any imminent endangerment. EPA has sparse express guidance on what constitutes an "imminent endangerment" for purposes of setting NESHAP compliance periods, but EPA's actions in prior Section 112 rulemakings make clear that emissions from the Facility do not constitute an "imminent endangerment." DPE is unaware of any credible allegations of endangerment related to acute, short-term, or subchronic exposures from the Facility. In the pending Section 303 Litigation against DPE, EPA has alleged that chronic exposures from the Facility's chloroprene emissions are causing an "imminent and substantial endangerment" due to the maximum plausible risk of cancer over a lifetime. DPE believes that EPA's allegations of "imminent endangerment" are contradicted by decades of EPA actions under Section 112, and predicated on flawed conclusions that fail to consider and incorporate the best available science.

In recent rulemakings, EPA has consistently provided compliance deadlines of at least two years for facilities with estimated MIRs equal to or greater than the DPE Facility, for facilities with higher estimated cancer incidences, and for facilities for which a greater number of people were exposed to an estimated risk above 1-in-10,000. There would be no basis to find that an imminent endangerment exists near DPE's Facility despite consistently allowing such facilities at least two years to come into compliance.

DPE believes that good cause will exist to grant an extension of the compliance period based on the time necessary to install the Section 112(f) Emission Control Projects and the lack of an imminent endangerment at or near the Facility that would result during the compliance period. Neither this Notice of Intent nor the expected forthcoming Extension Request shall constitute a waiver of DPE's rights to challenge the Final Rule, the compliance periods set therein, or the applicability of Section 112(f)(4).

## I. Standards for Obtaining a Compliance Extension

Section 112(f)(4)(a) provides that standards promulgated pursuant to Section 112(f)(2) shall not apply until 90 days after the effective date.[6] However, Section 112(f)(4)(B) provides that EPA may grant a waiver permitting sources up to two years to comply with a standard if EPA finds (1 )"that such period is necessary for the installation of controls" and (2) "that steps will be taken during the period of the waiver to assure that the health of persons will be protected from imminent endangerment."[7]

EPA implemented the procedures for obtaining a Section 112(f)(4)(B) compliance extension in 40 C.F.R. 63.6(I)(4)(ii), which provides that

> The owner or operator of an existing source unable to comply with a relevant standard established under this part pursuant to section 112(f) of the Act may request that the Administrator grant an extension allowing the source up to 2 years after the standard's effective date to comply with the standard. The Administrator may grant such an extension if he/she finds that such additional period is necessary for the installation of controls and that steps will be taken during the period of the extension to assure that the health of persons will be protected from imminent endangerment. Any request for an

---

[5] Denka Performance Elastomer LLC Comments re: EPA's New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry, 88 Fed. Reg. 25080 (April 25, 2023) (Docket No. EPA-HQ-OAR-2022-0730; FRL-9327-01-OAR), Comment ID No. EPA-HQ-OAR-2022-0730-0176 (July 7, 2023) ("DPE Comment"), available at https://www.regulations.gov/comment/EPA-HQ-OAR-2022-0730-0176 (Exhibit 2).

[6] 42 U.S.C. § 7412(4)(A).

[7] 42 U.S.C. § 7412(4)(B).

extension of compliance with a relevant standard under this paragraph must be submitted in writing to the Administrator not later than 90 calendar days after the effective date of the relevant standard.[8]

Additionally, EPA regulations require a compliance extension request to include: (1) a "description of the controls to be installed to comply with the standard" and (2) a "compliance schedule, including the date by which each step toward compliance will be reached."[9]

## II. A Compliance Period Of At Least Two Years Is Necessary At The Facility To Complete The Section 112(f) Control Projects.

### A. Safely Completing The Section 112(f) Control Projects, Including Planning, Approval, Construction, Installation, And Testing, Will Require Substantially More Than 90 Days at the Facility.

If the Final Rule includes regulatory requirements similar to, or more stringent than, requirements in the Proposed Rule, the Facility will require at least a two-year compliance period. Under the Proposed Rule, EPA states that it intends to impose stringent new regulatory requirements for chloroprene emissions based on a discretionary Section 112(f) residual risk review.[10] Specifically, EPA proposes to require "stringent control requirements for process vents, storage vessels, wastewater, maintenance vents, and PRDs that emit or have the potential to emit chloroprene" to reduce risk to what EPA believes is an acceptable level and provides an ample margin of safety to protect public health.[11] EPA identified Section 112(f) Control Projects necessary for compliance, each of which requires at least two years to design, install, construct, and test.[12] Additionally, the Proposed Rule includes standards for flares as well as dioxins and furans emissions that must be accounted for in the planning of the Section 112(f) Control Projects.

DPE personnel and consultants have dedicated significant time and resources to evaluating many emission reduction projects at the Facility, including the projects that would be required under the Proposed Rule. For example, Montrose Environmental Group, Inc. ("Montrose"), a global environmental services provider specializing in emission control planning, measurement, and analysis, has worked closely with DPE over the past two years on nearly all aspects of potential options for chloroprene control at the Facility. Montrose developed several memoranda and Excel calculation workbooks evaluating the feasibility of the Section 112(f) Control Projects, specifically analyzing: the overall cost-benefits; proposed wastewater requirements; and proposed dioxins and furans requirements. DPE also worked with ECT2, a consulting group with significant wastewater expertise, to evaluate the feasibility and alternatives to the Section 112(f) Control Project related to wastewater. Norton Engineering Consultants, Inc. ("Norton

---

[8] 40 C.F.R. § 63.6(I)(4)(ii).

[9] 40 C.F.R. § 63.6(i)(6).

[10] 88 Fed. Reg. at 25090 ("In order to ensure our standards provide an ample margin of safety to protect public health following the new IRIS inhalation UREs for EtO and chloroprene, we are exercising our discretion and conducting risk assessments in this action for HON sources and for affected sources producing neoprene subject to P&R I.") (Exhibit 1).

[11] 88 Fed. Reg. at 25112 (Exhibit 1).

[12] EPA submitted several analysis memorandums to the rulemaking document that describe such projects that were developed by their contractor, ERG. *See* ERG, *Analysis of Control Options for Wastewater Streams to Reduce Residual Risk of Chloroprene From Neoprene Production Processes Subject to P&R I* (July 6, 2023) ("ERG Wastewater Memo") (Exhibit 3); ERG, *Analysis of Control Options for Process Vents and Storage Vessels to Reduce Residual Risk of Chloroprene Emissions at P&R I Affected Sources Producing Neoprene* (Mar. 2023) ("ERG Control Options for Process Vents and Storage Vessels Memo") (Exhibit 4).

Engineering"), a consulting group with specialized expertise in thermal oxidizers, also assisted DPE in evaluating potential thermal oxidizer configurations suitable to be a Section 112(f) Control Project. Norton Engineering provided an analysis memorandum covering thermal oxidizer options and costs, as well as an analysis of the PRD and flare requirements proposed by EPA. DPE submitted comments to EPA's Proposed Rule on July 7, 2023, that incorporated the robust technical work of these outside consultants, including analysis memoranda and Excel workbooks.[13] DPE also continued its evaluation work after submitting its Proposed Rule comments, including continued evaluation of Wash Belt emission capture projects and other projects.

The extensive analyses performed by DPE and these outside consultants are based on reviews of the Proposed Rule and associated technical documents, Facility site visits, third-party vendor quotes for emission control equipment, and extensive emissions control experience. These analyses show that each of the Section 112(f) Control Projects will require significantly more time than a 90-day compliance period at the Facility. Each project involves site- and equipment-specific considerations at the Facility before completing the design, approval, construction, installation, and testing phases.

In addition, DPE has substantial concerns regarding the numerous complex process changes that will be required at the Facility for the installation of the Section 112(f) Control Projects. Chloroprene is a highly volatile, flammable, and highly reactive (polymeric) chemical. Any changes to the production process at the Facility will require properly trained and knowledgeable employees and contractors with process safety experience.[14] Failure to follow process safety procedures can result in disastrous consequences such as fires, explosions, and fatalities, as well as unintended environmental releases. These incidents commonly stem from stressors resulting in significant human error and omissions which are more likely to happen if new complex safety processes are implemented. Avoiding the chloroprene-related consequences associated with process safety failures will demand careful planning and sufficient time to safely develop, assess, and implement procedures required for the Section 112(f) Control Projects.

Complicated emissions reduction projects inherently change the day-to-day operations at the Facility. Such changes significantly increase the risk of human error by encouraging personnel to rush multiple process and procedural changes. A 90-day compliance period would unsafely ignore the potential for human error that can arise in (1) designing processes; (2) engineering projects; (2) specifying process components; (4) predicting safeguards necessary to control risk to an acceptable level and sustain the required safeguards for the life of the process; (5) managing process changes; (6) startup testing; and (7) trouble-shooting (shakedown) physical process changes.[15] EPA's Proposed Rule fails to discuss process safety actions and does not detail designs necessary for DPE to initiate immediate implementation or consider sound change-management principles. Demanding compliance on an unreasonable schedule would pose a serious risk to DPE, its employees, and the surrounding community.[16]

The discussion in the remainder of this Section identifies each Section 112(f) Control Project described in the Proposed Rule, describes why compliance within 90 days would be infeasible, and provides estimated dates by which on-site construction, installation, and compliance could be achieved.

---

[13] Memorandums covered: thermal oxidizer; wastewater; PRDs; flares; dioxins and furans; and cost-benefits review.

[14] Remedy Declaration of Paul S. Casarez ("Casarez Remedy Decl."), ¶¶ 24, 30, Case No. 2:23-cv-00735 (Exhibit 5).

[15] DPE Comment at 108 (Exhibit 2).

[16] *Id.*

i. **Thermal Oxidizer.**

Thermal oxidizers (TOs) are combustion devices used to control volatile organic compounds (VOCs) and other HAP emissions by combusting them to carbon dioxide (CO2) and water. To do so, a TO's combustion chamber is designed to reach temperatures high enough to remove VOCs from an incoming gas stream by initiating reactions required for oxidation of VOCs.[17] The high temperature within the TO must be maintained for sufficient time to ensure that oxidization destroys the VOCs and the gas stream should be thoroughly mixed inside the combustion chamber to ensure the VOC is uniformly burned out.[18] DPE's Facility currently has a regenerative thermal oxidizer (RTO).[19] Following startup and shakedown, stack testing of the existing RTO indicated a destruction removal efficiency (DRE) above 98% and a flow capacity of 58,500 scfm.[20]

EPA proposes to require emissions from process vents and storage vessels in chloroprene service[21] to be routed to a closed vent system to a non-flare control device that reduces chloroprene by greater or equal to 99.9 % DRE.[22] EPA concluded "that the only viable way to meet these proposed standards" is by routing chloroprene emissions from "all of the polymer batch reactors, emulsion storage vessels, strainers, and wash belt dryers" to a thermal oxidizer (TO).[23] However, these sources have air flows that are more than 4.3 times higher than the Facility's existing RTO. The existing RTO is limited to a flow capacity of 58,500 scfm, but the sources identified by EPA would add 210,558 scfm of flow (resulting in a new total flow of 252,869 scfm).[24] Therefore, a new TO must be installed at the Facility to control the excess flow from process vents and storage vessels in chloroprene service as required by the Proposed Rule.

1. **A two-year compliance period is needed to design, obtain approval for, construct, and test a new TO at the Facility.**

As part of its feasibility evaluation, DPE and its outside experts investigated a direct-fired thermal oxidizer (DFTO)[25] configuration that includes an acid-gas scrubber to remove hydrogen chloride (HCl) from the

---

[17] Remedy Declaration of Chris Meyers, P.E. ("Meyers Remedy Decl."), Exhibit A (Slide 8), Case No. 2:23-cv-00735, (Exhibit 6); Norton Engineering Consultants Inc., *Thermal Oxidizer Technology Review* (June 30, 2023) ("Norton Thermal Oxidizer Memo") at 1 (Exhibit 7); DPE Comment at 78 (Exhibit 2).

[18] Norton Thermal Oxidizer Memo at 1 (Exhibit 7).

[19] Regenerative thermal oxidizers are characterized by their regenerative heat recovery capability which allows them to improve overall thermal efficiency.

[20] Norton Thermal Oxidizer Memo at 5-6 (Exhibit 7); *see also* Meyers Remedy Decl., ¶¶ 27, 29 (Exhibit 6).

[21] For process vents, "in chloroprene service" is proposed to mean each continuous front-end process vent and each batch front-end process vent in a process at affected sources producing neoprene that, when uncontrolled, contains a concentration of greater than or equal to 1 ppmv undiluted chloroprene, and when combined, the sum of all these process vents would emit uncontrolled, chloroprene emissions greater than or equal to 5 lb/yr (2.27 kg/yr). For storage vessels, ''in chloroprene service'' is proposed to mean storage vessels of any capacity and vapor pressure in a process at affected sources producing neoprene storing a liquid that is at least 0.1 percent by weight of chloroprene, which would require control of the unstripped resin storage vessels and emissions from opening or degassing of these sources. 88 Fed. Reg. at 25117 (Exhibit 1).

[22] *Id.*

[23] *Id.*; *see* ERG Control Options for Process Vents and Storage Vessels Memo at 7 (Exhibit 4).

[24] Meyers Remedy Decl., ¶ 30 and Exhibit A (Exhibit 6); *see also* Norton Thermal Oxidizer Memo at 5-6 (Exhibit 7).

[25] Direct-fired thermal oxidizers are the simplest configuration for a TO and can achieve DRE above 99.9%. However, DFTOs consume more natural gas and in the case of chloroprene oxidation, will require a wet gas scrubber to remove HCl that is formed in the combustion chamber.

exhaust gas steam.[26] Other TO configurations, like an RTO or a catalytic thermal oxidizer (CTO)[27] configuration would not be sufficient because they cannot achieve the 99.9% DRE.[28] Moreover, the CTO configuration presents significant hazards due to the presence of HCl—a poison to the catalyst used in CTOs. Based on prior experience with thermal oxidizer installation at the Facility and evaluation work already completed by DPE in relation to an additional TO, DPE expects the design, approvals, construction, installation, and testing of a DFTO would take at least two years. This timeframe accounts for testing to determine the applicability of the proposed dioxins and furans standard that must be understood before finalizing the planning of the DFTO. However, as described in the following section, if the dioxins and furans standard is determined to be applicable, additional time will be needed at the Facility to account for such standards in the design and construction of a DFTO.

**2. Two years are needed to design, obtain approval for, construct, and test new permanent total enclosures at the Facility that are expected to be required under the Final Rule.**

DPE must be able to capture chloroprene emissions in order to route them to a TO. EPA concludes that "the only viable way to meet these proposed standards is to enclose all of the polymer batch reactors, emulsion storage vessels, strainers, and wash belt dryers" to capture and route the emissions to the TO.[29] EPA determines that three (3) Permanent Total Enclosures (PTEs) around each of the emissions sources would be necessary:[30]

- One PTE for all five polymerization batch reactors;
- One PTE for the two wash belt dryers; and
- One PTE for the three emulsion storage tanks.

The Proposed Rule does not account for the technical and process safety challenges of enclosing the wash belts and equipment in the poly building at the Facility. First, EPA incorrectly assumed that the wash belts are in the poly building.[31] The wash belts are located in the finishing building, which is separate from the poly building.[32] The Proposed Rule also incorrectly assumes that all sources that are going to be enclosed and routed to a TO are closely clustered at the Facility. In reality, DPE is faced with the technical, process, and safety challenges of enclosing several different and dispersed sections of the Facility, and routing captured emissions to a TO in a manner that complies with EPA Method 204.[33] This includes designing and implementing complicated duct and piping which also impacts blower specifications.[34] EPA recently recognized that achieving compliance with PTE requirements, including the requirements of EPA Method 204, will take well over a year:

---

[26] Meyers Remedy Decl., ¶¶ 32-33 (Exhibit 6).

[27] Catalytic thermal oxidizers require a catalyst to initiate the oxidization reactions at much lower temperatures compared to other TO configurations. However, there is a significant risk of poisoning with a CTO when HCl is involved.

[28] Norton Thermal Oxidizer Memo at 3-4 (Exhibit 7).

[29] 88 Fed. Reg. at 25117 (Exhibit 1).

[30] ERG Control Options for Process Vents and Storage Vessels Memo at 7 (Exhibit 4).

[31] *Id.* at 2, 5.

[32] DPE Comment at 90 (Exhibit 2).

[33] EPA, *Method 204 – Criteria for and Verification of a Permanent or Temporary Total Enclosure* (Jan. 14, 2019) (Exhibit 8).

[34] DPE Comment at 90 (Exhibit 2).

> Most commercial sterilization facilities were not initially designed to be compliant with the PTE requirements of EPA Method 204. We have learned from the comments received that for these facilities, the capture requirements associated with the emission reduction standards for Group 1 and Group 2 room air emissions in the final rule will likely require a redesign of a portion if not all of the facility. Many facilities will also need to purchase additional equipment (e.g., fans, transformers, variable frequency drives, etc.) to meet the capture requirements. Moreover, compliance with the final emission standards will likely require the installation of additional control devices. We have reviewed the time that it has taken for previous projects of this nature to be completed, from submission of the initial state or local permit application to installation of the continuous compliance mechanisms. Based on this analysis, we find that the process of bringing a facility into compliance with the PTE requirements of EPA Method 204, as well as installing and verifying additional emission controls, can take approximately a year from permit submission to project completion. However, this estimate does not account for the time needed to design and plan before the initial permit application is submitted, nor for the time needed to avoid impacts on medical device supply chains, to procure control devices from a limited number of vendors, and to account for the other complexities identified below.[35]

Like the commercial sterilization facilities discussed above, the DPE Facility was not designed to be compliant with the PTE requirements of EPA Method 204. And, like the commercial sterilization facilities, DPE expects that it will need to purchase additional equipment and require the installation of additional control devices at the Facility.

EPA's proposed requirements also pose a serious concern regarding occupational exposure, human health and safety, process maintenance and product quality associated with enclosing the wash belts at the Facility. DPE's wash belt blower motors are equipped with variable frequency drives, which allow a reduction of the total flow rate through the vents. DPE will need an industrial hygienist to evaluate any changes to the airflow through the vent hoods themselves or in other areas of the finishing building to ensure compliance with personnel exposure requirements, or to make recommendations for additional protective equipment.[36] Changes in airflow resulting from enclosing the wash belts can also have a negative impact on product quality and will need to be evaluated before the enclosures are put into permanent use.

Additionally, the wash belts require frequent, manual intervention from area personnel to ensure stable operation. Physical access is required to perform maintenance and repairs. This means that any enclosures will likely need to be transparent and capable of easily and frequently being dissembled and reassembled.[37] In any event, the change in routine maintenance and repairs on the wash belts once enclosed needs to be evaluated to ensure these activities can be carried out safely.

---

[35] EPA, *National Emission Standards for Hazardous Air Pollutants: Ethylene Oxide Emissions Standards for Sterilization Facilities Residual Risk and Technology Review*, Doc. No. 6560-50-P, available at https://www.epa.gov/system/files/documents/2024-03/7055_etosterilizers_final_20240301_admin_disc.pdf (Exhibit 9).

[36] Declaration of Chris Meyers ("Meyers PI Decl."), ¶ 84, Case No. 2:23-cv-00735 (Exhibit 10); DPE Comment at 91 (Exhibit 2).

[37] DPE Comment at 92 (Exhibit 2).

Taken together, enclosing certain equipment like the wash belts will take significant time due to process safety and product quality concerns and contribute to a compliance period of at least two years before the TO can commence operation and control emissions from the enclosures at the Facility.

**3. Proposed dioxins and furans emissions limit further complicates planning and implementation of DFTO at the Facility.**

EPA's proposed dioxins and furans limit further complicates the designing, planning, and implementation of the DFTO as additional condenser equipment or other control devices must be evaluated concurrently with chloroprene ERPs. EPA explained in the Proposed Rule that neoprene production facilities can use, produce, or emit chlorinated chemicals and therefore has proposed dioxins and furans MACT standards under CAA section 112(d)(2) and (3) for P&R I. In doing so, EPA proposes to add an emission standard of 0.054 nanograms per DSCM at 3% $O_2$ for dioxins and furans from chlorinated process vents (including continuous front-end process vents).[38]

EPA further explained that dioxins and furans can be formed when chlorinated compounds are present and combusted in a thermal oxidizer.[39] In turn, EPA has assumed that affected facilities would install a condenser prior to the existing control device that, in the case of DPE, is a thermal oxidizer. The condenser is designed to remove chlorinated compounds from the stream and prevent the formation of dioxins and furans within the thermal oxidizer.[40] EPA's Proposed Rule also assumed that a refrigeration method will be implemented to recover or condense chloroprene out of the vapor streams.[41] DPE is not aware of a commercially available refrigeration system that can achieve the temperatures required to condense chloroprene out of the vapor streams. Therefore, to implement EPA's requirements at the Facility, DPE must install cryogenic technology to achieve the required temperatures, which will pose additional technical, cost, and operational challenges.[42] However, for DPE's Facility, cryogenic technology may not be a feasible option and therefore, installation and/or routing to a control device may be required.[43] How DPE determines to address dioxins and furans may affect how flow streams are routed to the DFTO. This may impact flow capacities and pose serious process safety considerations. Ultimately, ensuring compliance with these dioxins and furans standards contributes to DPE's need for at least two years for the design, approvals, construction, installation, and testing of a DFTO.

**ii. Wastewater Steam Stripper.**

EPA proposes to require owners and operators to manage any existing wastewater streams that are in chloroprene service.[44] This provision would require installation of a steam stripper to achieve 99%

---

[38] 88 Fed. Reg. at 25161 (Exhibit 1).

[39] *Id.* at 25161.

[40] *Id.* at 25162.

[41] ERG, *Dioxins and Furans MACT Floor in the SOCMI Source Category for Processes Subject to HON and Processes Subject to Group I and Group II Polymers and Resins NESHAPs* (Mar. 2023) ("ERG Dioxins and Furans Memo"), Table 11 (costs based on refrigeration condenser technology that has been applied in the PVC industry) (Exhibit 11).

[42] Montrose, *Dioxins and Furans Proposed Rules* (July 6, 2023) ("Montrose Dioxins and Furans Memo") at 2 (Exhibit 12).

[43] Meyers Remedy Decl., ¶ 39 (Exhibit 6).

[44] For wastewater, "in chloroprene service" is proposed to mean a wastewater stream containing total annual average concentration of chloroprene greater than or equal to 10 ppmw at any flow rate. 88 Fed. Reg. at 25118 (Exhibit 1).

reduction[45] of chloroprene emissions from wastewater in chloroprene service.[46] Steam stripping is a method of removing VOCs from a wastewater stream where pressure and temperature is used to separate or strip the contaminants from the water.

Currently, DPE already employs an air stripping system—a process that occurs in the air sparging tank and which routes to the onsite RTO.[47] However, as discussed above, the Facility's RTO does not have the capacity to take on additional waste streams, including chloroprene-containing air from a new steam stripper. Therefore, a new control device will need to be installed in addition to the new steam stripper to properly control the additional steam stripper wastewater streams.[48] Based on prior experience with the design and installation of wastewater control equipment at the Facility and evaluation work already completed, DPE expects that the design, approvals, construction, installation, and testing of a DFTO would take at least two years.

**iii. Equipment to analyze exhaust and monitor releases to atmosphere on 300 pressure relief devices ("PRDs").**

Pressure relief devices (PRDs) are safety equipment that remain closed during normal operation but activate and release in response to an overpressure in the system. Overpressure can occur for a variety of reasons including malfunctions due to power failure or equipment failure, or other unexpected causes that result in immediate venting of gas from process equipment to avoid safety hazards or equipment damage.[49]

EPA has proposed to set work practice standards for PRD releases that require facilities to "monitor these PRDs using a system that is capable of identifying and recording the time and duration of each pressure release and of notifying operators that a pressure release has occurred."[50] The Proposed Rule assumes "that operators would install electronic monitors on PRDs"[51] to achieve these work practice standards. DPE estimates that there are 300 PRDs at the Facility that would be affected by these proposed requirements.[52] DPE does not currently have a complete system in place, or the necessary PRD equipment installed, to be in compliance with the proposed requirements.

---

[45] DPE remains concerned with the lack of evidence provided that steam stripper efficiency can achieve 99% removal. *See* ECT2 and Montrose, *Analysis of Control Options for Wastewater Streams to Reduce Residual Risk of Chloroprene From Neoprene Production Processes Subject to P&R I* (July 6, 2023) ("ECT2 and Montrose Wastewater Memo") at 2-3 (Exhibit 13).

[46] *Id.* at 8.

[47] *Id.* at 2. Also note that the Facility uses an outdoor brine pit to control steam stripper rundown steams which are then routed to the WWTP and subject to biological control that achieves 80% reduction.

[48] *Id.* at 3.

[49] 88 Fed. Reg. at 25155 (Exhibit 1).

[50] *Id.* at 25158. The Proposed Rule also states that "any release event from PRDs in chloroprene service in the Neoprene Production source category facilities is a violation of the standard." *Id.* at 25118.

[51] *Id.*

[52] Meyers Remedy Decl., ¶ 38 (Exhibit 6); Norton Engineering Consultants, Inc., *Summary of the Ruling Applied to Pressure Relief Devices* (June 30, 2023) ("Norton PRD Memo") at 1 (Exhibit 14).

**1. PRD analysis equipment design, approval, procurement, and installation require more than a 90-day compliance period at the Facility.**

EPA has proposed to require the installation of a ppm level analyzer instrument with calibration features and diagnostic feedback at the exhaust of each PRD that is capable of verifying that any discharge is less than 500 ppm.[53] Monitoring equipment associated with the process and piping must also be installed on all 300 PRDs with the capability of indicating when a release to the atmosphere is occurring.[54] This would require installation of a magnetic sensor or motion detector connected to PRD stem travel (or an equivalent indicator of PRD movement).[55] This technological approach has not been implemented in the industry today and is a significant deviation from commercially available PRDs. In turn, DPE will likely not be able to retrofit this equipment onto the 300 PRDs already installed at the Facility, which will further complicate installations. Additionally, it will take longer to plan and test such monitoring systems given the significant risk in terms of reliability due to the lack of reference installations within the industry.[56]

PRDs play a critical role in protecting employee and community safety. DPE must carefully design an installation plan that continues to protect employee and community safety while navigating the Process Safety Management regulations promulgated by the Occupational Safety and Health Administration (OSHA). Modifications of the PRD systems will require a comprehensive process hazard review and will likely require a proposed mechanism for determining which regulatory requirements have primacy in the event that EPA and OSHA requirements conflict.[57]

**2. Extensive process change safety analyses will be necessary at the Facility prior to the installation of the PRD analysis equipment.**

Extensive process change safety analyses are necessary to ensure that installations and operational changes do not pose safety threats to personnel or the community, especially considering that the proposed PRD standards are uncommon in the industry. The required PRD analyzer equipment comes with associated physical and operational changes which increases the likelihood that non-serious trips of the instruments will force unintended shutdowns and subsequent restarts.[58] This activity presents a serious safety concern that must be properly analyzed before rolling out a new 300-PRD program.

Based on these realities, DPE expects it will take at least the full two-year compliance period, possibly longer given the concurrent ERPs being conducted, to design, plan, install, and test the PRD systems required under the Proposed Rule.

**iv. Alternative to safety bypass lines.**

EPA proposes to prohibit the use of bypass lines in closed systems to allow a flow to avoid air pollution control devices at any time. In doing so, EPA also plans to require monitoring systems for flow on bypass lines to detect whether vent stream flow is present every 15 minutes and to estimate and report any releases.[59] The Facility has four closed vent systems to route process emissions from the Neoprene

---

[53] Norton PRD Memo at 1 (Exhibit 14).

[54] *Id.*; DPE Comment at 95-96 (Exhibit 2).

[55] Norton PRD Memo at 1 (Exhibit 14).

[56] *Id.*

[57] *Id.* at 2.

[58] DPE Comment at 96 (Exhibit 2).

[59] 88 Fed. Reg. at 25158-59 (Exhibit 1).

process area to the RTO: (1) a nitrogen-rich header for streams with high chloroprene concentrations; (2) an air rich header for streams with lower chloroprene concentrations; (3) the East Hot Dryer Vent; and (4) the West Hot Dryer Vent. The Facility's Monomer Emissions Reduction Project (MERP)[60] is also a closed vent system which routes emissions from the monomer process area to the halogen acid production furnace. In total, there are 19 bypass lines associated with the RTO and 8 bypass lines associated with the MERP that are required for safety reasons. These bypass lines are rarely used—and only for emergencies[61] (emissions from bypass lines made up less than 1% of Facility emissions in 2022).[62]

EPA's proposed requirement is problematic because bypass lines are used to safeguard against high incoming concentrations of chloroprene into the RTO unit to avoid catastrophic failure. If EPA prohibits bypass lines, there is nowhere else for these dangerous streams to go.[63] DPE needs an ample amount of time to safely design, plan, and implement new configurations to handle these flows. This may require the installation of a new control device or require immense reworking of piping and ducting to safely connect these flows to the Facility's RTO or potential DFTO.[64] DPE continues to consider a safe and technically possible design, but expects that it may need two years or more to determine and implement a safe path forward if the applicable requirements are revised to prohibit bypassing a control device at any time.

**v. Equipment to limit maintenance emissions to 1 tpy.**

The Proposed Rule imposes a 1 tpy cap on maintenance vent emission releases.[65] DPE has made a significant effort to identify and evaluate various options to achieve this proposal, but the complexities of the Facility's processes have complicated the company's evaluation to date.[66] DPE understands that the largest single source of emissions from maintenance activities are from annual steaming of the Facility's 2mmlb Tank (approximately 660 lbs of emissions associated with each annual steam event).

DPE considered the use of a portable condenser and catch tank that would allow vapors from tank steaming maintenance to be routed to an RTO for control but determined that the time requirements render this option infeasible.[67]

DPE also has requested proposals for the use of portable TOs in the maintenance steaming process from several vendors.[68] The proposals, however, failed to consider that scrubbing equipment to remove HCl or heat exchange equipment to combat elevated temperatures, would be required for safe steaming operations and use of the portable TO.[69] DPE cannot limit maintenance vent emissions to 1 tpy without sufficient time to evaluate whether the Facility can develop safe processes. DPE expects evaluation,

---

[60] The MERP controls emissions from the monomer and HCl unit from the following sources: chloroprene synthesis; waste organics tank; HCl feed tanks; aqueous wase system; isomerization and DCM refining vents.

[61] Meyers PI Decl., ¶ 70 (Exhibit 10).

[62] DPE Comment at 98 (Exhibit 2).

[63] Denka Performance Elastomer LLC's Proposed Findings of Fact and Conclusions of Law, *U.S. v. Denka Performance Elastomer LLC*, No. 2:23-cv-00735 (E.D. La. Feb. 2, 2024), ECF No. 156, ¶ 245 (Exhibit 15).

[64] DPE Comment at 98 (Exhibit 2).

[65] 88 Fed. Reg. at 25118 (Exhibit 1).

[66] Meyers PI Decl., ¶¶ 62-68 (Exhibit 10); DPE Comment at Section XV (Exhibit 2).

[67] DPE Comment at 88-89 (Exhibit 2).

[68] *Id.*

[69] *Id.* at 89.

acquiring of equipment, testing, approvals, and implementation of new maintenance activity processes will take two years or more.

**vi. Section 112(d) requirements will increase the complexities and planning time needed to implement the Section 112(f) Control Projects.**

In addition to the Section 112(f) Control Projects, DPE will be required to plan for the implementation of 112(d) requirements. DPE's engineers will need to consider the potential impact of the 112(d) projects when planning, designing, and implementing the Section 112(f) Control Projects. For example, the Proposed Rule proposes to require that flares used in the production of polymers and resins meet the flare requirements in the Refinery Sector Rule (RSR) (40 CFR 63.670 and 63.671).[70] The DPE Facility has two flares—a Butadiene Flare and Liquid Phase Chlorination ("LPC") Flare. To meet EPA's proposed flare standards, instrumentation would have to be installed on both flares to achieve the following requirements[71]:

- A minimum of three pollution prevention measures be installed;
- Flare tip velocity less than 60 ft/sec, or the lesser of 400 ft/sec and $V_{max}$ where:

$$\log_{10}(V^{max}) = \frac{Net\ Heating\ Value_{Vent\ Gas} + 1{,}212}{850}$$

- Maintain a net heating value (NHV) at or above 270 btu/scf, averaged over 15 minutes;
- Continuous monitoring of flares;
- Mandatory reporting requirements for relief events;
- All relief events must be analyzed to determine the cause and be remedied.

DPE personnel must account for the 112(d) requirements in planning the Section 112(f) Control Projects which further underscores the need for at least 2 years for safe implementation.

**B. EPA's Own Timing Estimates Demonstrate That A 90-Day Compliance Period Would Be Infeasible at the Facility.**

EPA's timing estimates for emission controls in the Section 303 Litigation also demonstrate that a 90-day compliance period for the Final Rule is infeasible. In March 2023, EPA filed a motion for preliminary injunction demanding that DPE comply with a series of prescriptive emission controls similar to some of the controls set forth in the Proposed Rule. To be clear, EPA's estimates dramatically underestimate feasible timelines for its requested relief, most glaringly by ignoring fundamental safety requirements that would endanger personnel and the community.[72] EPA based its timetables on the opinions of an expert who ultimately conceded that he did not account for several critical safety requirements.[73]

Despite EPA's flawed and incomplete analysis, the injunctive relief requested by EPA demonstrates that 90 days is an insufficient period of time to comply with the proposed requirements in EPA's Proposed

---

[70] 88 Fed. Reg. at 25148 (Exhibit 1).

[71] *Id.* at 25149-54; *see also* Norton Engineering Consultants, Inc., *Flare System Memorandum* (June 6, 2023) ("Norton Flare Memo") at 1-2 (Exhibit 16).

[72] Deposition Transcript of Jeffrey R. Harrington (July 28, 2023) ("Harrington Dep. Tr.") 90:8-10; 91:16-18; 106:8-16, Case No. 2:23-cv-00735 (Exhibit 17).

[73] *Id.*

Rule. For example, based on analysis from EPA's contractor, DPE would need to capture 90 percent of emissions from the polymer building and reduce such emissions by at least 99.9 percent through a TO to comply with the Final Rule.[74] EPA's expert in the Section 303 Litigation estimated that it would take DPE 90 days just to *prepare a plan* to "evaluate and control" chloroprene emissions in the polymer building.[75] For the reasons described above, the complexities involved with controlling emissions from the polymer building will require more than 90 days to plan. However, it is clear that approving, constructing, installing, and testing a strategy to capture and control such emissions cannot be completed in 90 days if that is how long the planning phase by itself would require. Likewise, EPA's expert in the Section 303 Litigation fails to account for the complexities needed to plan, construct, and install permanent total enclosures for the Facility's "Poly Kettles,"[76] but still estimates installation would require 150 days.[77]

### C. A Compliance Period Of Less Than Two Years Would Likely Require A Shutdown Of The Facility And Increase The Complexity And Dangers Of Implementing The Requirements.

Section 112(f) Control Projects cannot be technically or safely designed, approved, constructed, and tested at the Facility in less than two years. The extensive analysis performed by DPE and its outside experts demonstrate that a timeframe of less than two years is infeasible and potentially unsafe.

As discussed above, based upon prior efforts to implement similar ERPs and DPE's substantial efforts to anticipate and prepare for implementation of the Final Rule requirements, DPE expects that at least two years is required, and possibly longer given the complexities of conducting several ERPs concurrently. A compliance period shorter than two years would require a shutdown of the Facility thereby increasing the complexity of completing the requirements of the Final Rule.

Without a compliance period of at least two years, DPE will need to shift its attention, time, and resources toward completing a safe and effective shutdown of the Facility for an indefinite period of time. Shutdowns and restarts are dangerous[78] and will only complicate the feasibility of implementing the Final Rule. Safety risks increase as personnel are more likely to have to make a "confined space entry" during shutdowns; presence of toxic materials in equipment increases; and the number of maintenance workers (often temporary contractors less familiar with the plant) increases.[79]

The estimated time to shutdown the Facility for an extended outage is between 90-150 days, meaning that, unless an extension is granted, DPE personnel will likely need to immediately begin planning and implementing an indefinite shutdown.[80] The effort, resource-diversion, and time it takes to safely shutdown a plant will displace DPE's ability to efficiently or effectively implement the ERPs required by the Final Rule. Additionally, DPE will be unable to field test the effectiveness of ERPs in a functional, operational setting if the Facility is shutdown.[81] This would prevent DPE from evaluating effective methods to address potential process safety hazards. Simply put, DPE requires its plant to be operational to test

---

[74] ERG Control Options for Process Vents and Storage Vessels Memo at 7-8 (Exhibit 4).

[75] Declaration of Jeffrey R. Harrington In Support of Motion for Preliminary Injunction filed in Case No. 2:23-cv-00735 (E.D. La.) ("Harrington PI Declaration"), ¶ 77, Case No. 2:23-cv-00735 (Exhibit 18).

[76] The Facility's large poly kettles are batch process units and are critical to the manufacture of all types of Neoprene.

[77] Harrington PI Decl., ¶ 51 (estimating PTE installation can occur within 120 days after plan approval) (Exhibit 18).

[78] Remedy Declaration of Jim Moore, P.E. ("Moore Remedy Decl."), ¶¶ 27-30 (noting that 50% of work-related accidents in manufacturing plants occur during plant maintenance shutdowns), Case No. 2:23-cv-00735 (Exhibit 19).

[79] *Id.* ¶ 31.

[80] *Id.* ¶ 39.

[81] Casarez Remedy Decl., ¶ 9 (Exhibit 5).

large-scale ERPs like thermal oxidizers.[82] Even during normal operations, DPE faces process hazard challenges when evaluating ERPs on accelerated timelines—a shutdown would only complicate this further and exacerbate the Facility's shortage in process safety personnel.[83]

Lastly, significant process safety steps will need to precede any restart of the Facility after a prolonged shutdown. Process safety regulations require a pre-startup safety review before a restart. Because DPE has never idled the plant for an indefinite period, personnel would need to draft, review, and finalize safety procedures for any restart that followed a prolonged period of non-use.[84] Installing the Section 112(f) Control Projects from an idled state will impact the amount of time necessary to comply with the Final Rule.

## III. DPE Has Reduced Emissions Since May 2022 Through Practicable and Effective Emission Reduction Strategies And Will Continue to Implement Such Strategies During the Compliance Period.

DPE has and continues to evaluate emission reduction opportunities at the Facility. Between 2016 and 2018, DPE reduced the Facility's emissions by 85%, in large part due to the installation of the Facility's RTO.[85] DPE continued emission reduction efforts and has implemented a series of additional reduction strategies since May 2022—many of which are voluntary and bolster DPE's compliance with existing requirements to assure that the health of personnel and the community will be protected.

### A. Implemented Emission Reduction Strategies Since May 2022.

In July 2022, DPE established a formal chloroprene emission reduction task force ("ERP Task Force") made up of more than 20 engineers, managers, and process experts from all across the Facility. The ERP Task Force met multiple times a week and dedicated well over 5,000 man-hours through July 2023, to ongoing efforts to reduce emissions.[86] These efforts are discussed below:

- DPE has implemented a process to reduce emissions associated with waste from the Facility's poly kettle production units consistent with the requirements of the consent agreement in EPA Docket No. RCRA-06-2023-0906, as well as applying a similar process to waste coagulant generated from the stripper strainers.[87] DPE now steams the coagulant and routes emissions to the RTO. DPE has also improved its washing and nitrogen purging processes to further reduce emissions associated with the poly kettle production units.

- DPE has implemented a voluntary process to reduce the number of concurrently operating unstripped emulsion storage tanks and to strip chloroprene from in-tank coagulant during maintenance of the unstripped emulsion storage tanks.[88] Now only two tanks are used at a time

---

[82] Remedy Declaration of Jorge Lavastida ("Lavastida Remedy Decl."), ¶ 28, Case No. 2:23-cv-00735 (Exhibit 20); Remedy Declaration of Michelle Helfrich ("Helfrich Remedy Decl."), ¶¶ 36-37, Case No. 2:23-cv-00735 (Exhibit 21).

[83] Casarez Remedy Decl., ¶ 22 (Exhibit 5).

[84] Casarez Remedy Decl., ¶ 32 (Exhibit 5); Lavastida Remedy Decl., ¶ 25 (Exhibit 20).

[85] Meyers Remedy Decl., ¶ 4 (Exhibit 10).

[86] DPE Comment at 75 (Exhibit 2).

[87] DPE Responses to US First Set of Interrogatories, at 12-13 (Response to Interrogatory No. 4), Case No. 2:23-cv-00735 (Exhibit 22).

[88] *Id.*

to reduce coagulate formation. The tanks containing coagulate are filled with water and are circulated to strip the remaining chloroprene and route emissions to the RTO.[89]

- The Facility has also employed a voluntary process to strip chloroprene from in-tank coagulant during maintenance of the five poly kettles (emission source 1700-13A).
- DPE has voluntarily decreased the site-wide leak detection and repair threshold from the regulatory standard of 500 ppm organic vapor concentration to 250 ppm.[90] In conjunction with this new 250 ppm threshold hold, an additional voluntary process to screen certain components in the polymerization building located at DPE's Facility and the 1236 waste organics storage tank area multiple times each week and to schedule repairs if leaking components are identified has been rolled out.[91] DPE hired an LDAR technician with over 20 years of experience to lead these voluntary efforts which has included increased weekly screenings, new immediate repair procedures, and the purchase of state-of-the-art detection equipment.[92]
- Furthermore, DPE has supplied operators in the polymers area with photoionization detectors (PIDs) to perform LDAR screenings on any component at any time to detect leaks. Accordingly, prompt repairs are made when leaks are detected.[93]
- DPE voluntarily implemented a process requiring transfers of chloroprene-containing wastes from the chloroprene heels tank to the waste organics tanks in the HCl recovery unit process area be performed only when the 1236 tank system is connected to the MERP control system or other form of emissions control.[94]
- DPE instituted new outdoor brine pit (OBP) management measures which require coagulant from the unstripped emulsion storage tanks and large poly kettles to be placed directly into plastic drums to be sent off-site for incineration. This new process change ensures that solid material is no longer placed in the OBP.[95]

In addition, DPE continues to evaluate additional, voluntary emission reduction projects, such as (i) a potential project to remove chloroprene from the poly kettle strainer waste by circulating water through the strainer and sparging the water and (ii) the potential use of Forward Looking Infrared, or FLIR, cameras to improve leak detection activities.

**B. DPE's Emission Reduction Strategies Have Resulted in Significant, Quantified Reductions of Chloroprene Concentrations Near the Facility.**

The immense efforts to implement these voluntary emission reduction strategies have resulted in quantified reductions of chloroprene concentrations near the Facility. Analysis of Method 325B and Method TO-15 data demonstrate that the Facility has achieved the lowest average chloroprene

---

[89] Meyers Remedy Decl., Exhibit A (Slide 6) (Exhibit 10).

[90] DPE Responses to US First Set of Interrogatories, at 12-13 (Response to Interrogatory No. 4) (Exhibit 22).

[91] *Id.*

[92] DPE Comment at 76 (Exhibit 2).

[93] *Id.*

[94] DPE Responses to US First Set of Interrogatories, at 12-13 (Response to Interrogatory No. 4) (Exhibit 22).

[95] Meyers Remedy Decl., Exhibit A (Slide 6) (Exhibit 10).

concentrations to date following these voluntary changes.[96] The fenceline monitoring results below illustrate the effectiveness of DPE's voluntary emissions reductions:




### C. DPE Plans To Continue To Implement Emission Reduction Projects During The Compliance Period.

Because these voluntary measures help to reduce chloroprene emissions, DPE plans to continue utilizing these voluntary reduction strategies throughout the compliance period. These steps, in conjunction with a compliance timeline of at least two years, will better support DPE's overall efforts to safely design, install, and implement the control equipment and processes necessary under the Final Rule and ensure that emissions from the Facility will not pose an imminent endangerment to anyone.

## IV. A Two-Year Compliance Period Will Not Result in "Imminent Endangerment" Near the Facility

In addition to finding that additional time is necessary for compliance, the Administrator or an authorized representative must find that "steps will be taken during the period of the waiver to assure that the health of persons will be protected from imminent endangerment" to grant an extension.[97] Because no imminent endangerment exists near the Facility, no additional steps need to be taken during the waiver period.

EPA's determination in the Proposed Rule to propose a two-year compliance period appropriately recognized the lack of an imminent endangerment. DPE is aware of no allegations of acute endangerment from DPE's chloroprene emissions and EPA has admitted that the Agency is not aware of any incidents of cancer due to the Facility's emissions.[98]

---

[96] Declaration of Mr. David R. Blye ("Blye PI Decl."), ¶ 33, Case No. 2:23-cv-00735 (Exhibit 23).

[97] 42 U.S.C. § 7412(f)(4)(B).

[98] EPA Responses to DPE First Set of Interrogatories, at 27-28 (Response to Interrogatory No. 12), Case No. 2:23-cv-00735 (Exhibit 24).

EPA has alleged in the Section 303 Litigation that an "imminent and substantial endangerment" exists, but this allegation is based on a conservative and deeply flawed theoretical risk of cancer. Specifically, EPA alleges that the 1-in-10,000 risk level associated with the inhalation unit risk ("IUR") derived in the 2010 *Toxicological Review of Chloroprene* ("2010 IUR") – which translates to a chloroprene concentration of 0.2 μg/m$^3$ — constitutes an imminent and substantial endangerment. Even if EPA's view of the applicable science underlying the 2010 IUR were accepted as true (and DPE strenuously disputes it), the risk levels near the DPE Facility fall far short of an "imminent endangerment" for purposes of Section 112(f)(4)(B). The entire statutory framework of Section 112 refutes any notion that risks above a 1-in-10,000 threshold constitute an "imminent endangerment." If they did, Congress would not have given EPA 18 years to complete residual risk reviews, which specifically use the 1-in-10,000 threshold as a presumptive benchmark for acceptability. Interpreting risks above a 1-in-10,000 threshold to compel a 90-day compliance period is simply incompatible with Congress's decision to tolerate such risks for 18 years.

EPA has *always* recognized that theoretical, pre-compliance risks described in residual risk reviews do not constitute an "imminent endangerment" that prevents EPA from granting extensions.[99] In fact, EPA has issued final rules that expressly allow for a post-compliance risk level greater than 1-in-10,000. In the very first residual risk review imposing requirements under Section 112(f), EPA provided facilities a two-year compliance period despite finding pre-control MIRs as high as 4-in-10,000.[100] Likewise, recent EPA rulemakings propose to provide Section 112(f) compliance extensions to facilities with much higher MIRs than DPE.

Although even EPA's alleged risk estimates for the Facility fail to constitute an "imminent endangerment," the lack of an endangerment becomes even more evident after accounting for data as to real-world risk and the severe distortions of risk inherent in the 2010 IUR. The available epidemiological evidence, which examines health outcomes of workers exposed to chloroprene emissions at dramatically higher rates than the Facility emits today, shows that the Facility's chloroprene emissions have not and do not pose an increased risk of respiratory or liver cancer. In addition, data from the LTR consistently show no increase in cancer incidence rates in the community surrounding the Facility.

Instead, EPA's risk estimates for the Facility are based entirely on the 2010 IUR for chloroprene. The 2010 IUR is a flawed risk estimate that adopts a series of patently unrealistic and unsubstantiated assumptions that overstate the actual risk of chloroprene exposure to humans. Most notably, the 2010 IUR relies on cancer incidence data from female B6C3F1 mice and fails to make scientifically-supported adjustments to account for the dramatic differences between humans and female B6C3F1 mice. Despite the availability of a sophisticated, peer-review computer model capable of accounting for these important inter-species differences, EPA continues to rely on an outdated and distorted risk estimate.

Neither the underlying science nor EPA's deeply flawed 2010 IUR supports a finding of "imminent endangerment" within the meaning of Section 112(f)(4)(B). Accordingly, no additional steps need to be taken by DPE during the compliance period beyond the emission control strategies already being implemented by DPE at the Facility.

---

[99] EPA Responses to DPE Second Set of Interrogatories, at 17 (Response to Interrogatory No. 17), Case No. 2:23-cv-00735 (Exhibit 25).

[100] EPA, *National Perchloroethylene Air Emission Standards for Dry Cleaning Facilities*, 71 Fed. Reg. 42724, 42731 (July 27, 2006) (estimating baseline MIRs between 50- and 400-in-1-million) (Exhibit 26); *id.* at 42729-30 (providing 2-year compliance period).

**A. Even if the Flawed IUR Is Accepted, Chloroprene Concentration Levels Near the Facility Do Not Constitute an Imminent Endangerment.**

Based on EPA's allegations in the Section 303 Litigation, DPE anticipates that EPA will take the position that an "imminent endangerment" exists near the Facility because chloroprene emissions are allegedly causing a lifetime cancer risk of greater than 1-in-10,000.[101] While EPA has alleged risk levels as high as 14-in-10,000 in the Section 303 Litigation, those allegations are based on outdated monitoring data.[102] As of January 15, 2024, the highest alleged concentration measured over the prior 12-months equated to a 6.85-in-10,000 risk level, as determined by EPA's expert in the Section 303 Litigation.[103]

The lifetime risk level associated with chloroprene emissions from DPE's Facility does not constitute an imminent endangerment, including under Section 112(f)(4)(B).

**i. In Section 112 of the CAA, Congress made clear that the risk levels above 1 in 10,000 do not constitute an imminent endangerment by mandating that such risks be addressed through an *18-year* regulatory process.**

In Section 112 of the CAA, Congress created a comprehensive program to address cancer risks due to emissions of hazardous air pollutants ("HAPs") from industrial facilities. In Section 112, Congress imposed deadlines by which EPA was required to take several steps.

- Within one year after the statute was signed into law in 1990, EPA was to identify "source categories"—different types of industrial facilities—that included "major sources" of such pollutants.[104]
- Within ten years (by 2000), EPA was to conduct rulemakings to set technology-based standards to reduce HAP emissions from each source category.[105]
- Within eight years of setting those standards, EPA was to conduct another rulemaking to complete a "residual risk review"—*i.e.*, to evaluate the "risk to public health remaining" after the implementation of the technology-based standards. As part of this rulemaking, EPA was *for the first time* required to consider whether more stringent standards were needed to address lifetime cancer risks higher than 1-in-10,000.[106]

This means that Congress knew that people were then exposed to lifetime cancer risks higher than 1-in-10,000 due to HAPs, yet Congress determined that it was acceptable to allow such exposure *for up to 18 years*. Indeed, as shown in the following table, Congress was specifically briefed prior to passing the 1990 CAA amendments on sources with MIRs higher than 10-in-10,000 ($1 \times 10^{-3}$), including some sources with MIRs as high as 100-in-10,000 ($1 \times 10^{-2}$).[107]

---

[101] *See, e.g.*, Compl., ¶ 58, *U.S. v. Denka Performance Elastomer LLC et al.*, No. 2:23-cv-00735, ECF No. 1 (E.D. La. Feb. 28, 2023) (Exhibit 27).
[102] *Id.* ¶ 48.
[103] *See* Supplement to September 6, 2023 Rebuttal Declaration and December 8, 2023 Declaration of Dr. John J. Vandenberg in Support of United States' Statement of Final Relief ("Vandenberg Supp. Decl."), Updated Table 1, Case No. 2:23-cv-00735 (Exhibit 28).
[104] 42 U.S.C. § 7412c)(1).
[105] *Id.* § 7412(d)(2).
[106] *Id.* § 7412(f)(2).
[107] Report on the Committee on Environment and Public Works United States Senate Report Accompanying S. 1894, at 9907 (S. Rept. 100-231) (Nov. 20, 1987) (Exhibit 29).

**ESTIMATED CANCER RISKS**
**REMAINING UNDER EPA § 112 STANDARDS**

| POLLUTANT | ANNUAL CANCER INCIDENCE FROM BOTH REGULATED AND UNREGULATED SOURCES | SOURCES POSING MIRs OF $10^{-3}$ OR HIGHER |
|---|---|---|
| Inorganic Arsenic | 1.7 | Uncontrolled Primary Copper Smelters ($1x10^{-3}$)<br>Primary Lead Smelters ($2x10^{-3}$)<br>Zinc Oxide Plants ($1x10^{-3}$) |
| Asbestos | 0.7-1.2 | None |
| Benzene | 2.8 | Benzene Handling ($1x10^{-3}$) |
| Coke Oven Emissions | 4.0 | Wet-Coal Charged By-Product Coke Oven Batteries ($1x10^{-2}$) |
| Radionuclides | 2.0-2.8 | Underground Uranium Mines ($>1x10^{-3}$)<br>Open-Pit Uranium Mines ($1x10^{-3}$)<br>Elemental Phosphorous Plants ($1x10^{-3}$) |
| Vinyl Chloride | 0.8 | No estimate |
| TOTALS | 12-13 | 8 sources $\geq 10^{-3}$ |

The MIRs for these sources are 18-times higher than EPA's estimated MIR for DPE's entire Facility. Notably, EPA attributed to each of the source categories an annual cancer incidence at least 10-times higher than the pre-compliance cancer incidence estimated for DPE's Facility in the Proposed Rule. Despite these much higher risk estimates, Congress provided *years* to address these risks. Thus, any conclusion that emissions from DPE's Facility now pose an "imminent endangerment" would directly contradict Congress' mandate under Section 112 that higher risks be addressed over many years.

**ii. The Benzene Rule addressed risk levels up to 10-times higher than the risk level EPA alleged in the Proposed Rule, yet EPA did not allege the facilities responsible for such risks were causing an imminent endangerment.**

It would be inappropriate to use the 1-in-10,000 risk level as an "imminent endangerment" threshold because it flatly contradicts the purpose of the 1-in-10,000 risk benchmark in Section 112. Section 112(f)(2)(B) expressly endorsed EPA's use of the 1-in-10,000 risk level in 1989 rulemaking—known as the "Benzene Rule"—to guide what constitutes an "acceptable risk" under Section 112.[108] In doing so, "Congress rejected the Senate version of the bill—which mandated a bright line standard for carcinogens –in favor of the House version, which gave the Secretary more discretion under the 'ample margin of safety' standard."[109]

---

[108] *Compare* DPE Statement of Material Facts in Support of Motion for Summary Judgment ("DPE MSJ SOF"), *U.S. v. Denka Performance Elastomer LLC*, No. 2:23-cv-00735 (E.D. La. Dec. 29, 2023) ECF No. 131-3, ¶ 9 (Exhibit 30) *with* US Statement of Material Facts in Opposition of Motion for Summary Judgment ("US Contested SOF"), *U.S. v. Denka Performance Elastomer LLC*, No. 2:23-cv-00735 (E.D. La. Jan. 26, 2024) ECF No. 150-1, ¶ 9 (Exhibit 31); EPA, *National Emission Standards for Hazardous Air Pollutants; Stationary Combustion Turbines Residual Risk and Technology Review*, 54 Fed. Reg. 38044, 38045 (Sept. 14, 1989) (Exhibit 32).

[109] *NRDC, et al., v. EPA*, 529 F.3d 1077, 1081 n.4 (D.C. Cir. 2008).

EPA admitted in the Section 303 Litigation that the Benzene Rule is "the primary model for establishing emission standards" under Section 112 and that "[t]he approach developed in [the Benzene] rule was endorsed by Congress in the CAA's 1990 Amendments."[110] The Benzene Rule, which is the Congressionally endorsed "primary model for establishing emission standards," demonstrates that the risk levels attributed to the Facility in the Proposed Rule, which are dwarfed by the risk levels addressed in the Benzene Rule, do not constitute an imminent endangerment.

In the Benzene Rule, EPA stated that it would "generally presume that if the risk to [the maximum exposed] individual is no higher than approximately one in 10 thousand, that risk level is considered acceptable."[111] As made clear in the Benzene Rule, this "presumptive" risk level of 1-in-10,000 is the *beginning* of EPA's framework for rulemaking, which includes significant safeguards to prevent reflexive reliance on a bare number. EPA set out a flexible process, requiring consideration of a range of factors, including scientific uncertainties and weight of evidence.[112] EPA explained that the 1-in-10,000 risk level "does not necessarily reflect the true risk, but displays a conservative risk level which is an upper-bound that is unlikely to be exceeded."[113]

The proposed Benzene Rule was published in July 1988 to establish emission standards for five categories of facilities, known as "source categories."[114] Of those five source categories, EPA determined that the "coke by-product recovery plant" category posed the highest risk, estimating a risk level of 60-in-10,000 (or 6 x 10-3), or 60 times higher than 1-in-10,000 risk level.[115] That risk level is also 10 times higher than the risk EPA attributes to the Facility in the Proposed Rule (6-in-10,000)[116]; more than 8 times higher than the highest risk level EPA attributes to the Facility in the most recent 12-month analyzed in the Section 303 Litigation (6.85-in-10,000)[117]; and more than four times higher even than the highest risk level EPA attributed to the Facility in the Section 303 Litigation based on outdated data (14-in-10,000).[118]

Despite being far higher than any risk level alleged for the DPE Facility, EPA did not assert that coke by-product recovery plants were causing an imminent endangerment in the Benzene Rule, nor did EPA declare such plants were causing an "imminent and substantial endangerment" under Section 303 prior to implementation of the final rule. In the Final Benzene Rule, EPA again did not make an "imminent

---

[110] *Compare* DPE MSJ SOF, ¶ 9 (Exhibit 30), *with* US Contested SOF, ¶ 9 (Exhibit 31); EPA Responses to DPE First Set of Interrogatories, at 12 (Response to Interrogatory No. 6) (Exhibit 24).
[111] 54 Fed. Reg. at 38045 (Exhibit 32).
[112] *Id.*
[113] *Id.*
[114] *See* EPA, *National Emission Standards for Hazardous Air Pollutants; Benzene Emissions from Maleic Anhydride Plants, Ethylbenzene/Styrene Plants, Benzene Storage Vessels, Benzene Equipment Leaks, and Coke By-Product Recovery Plants*, 53 Fed. Reg. 28496 (July 28, 1988) (Exhibit 33).
[115] *Id.* at 28498.
[116] 88 Fed. Reg. at 25107 (Exhibit 1) (Table 2 shows a Facility-wide "maximum individual cancer risk" of 500-in-1 million, or 6-in-10,000 for the Neoprene Source Category).
[117] Vandenberg Supp. Decl., Updated Table 1 (Exhibit 28).
[118] Declaration of Dr. John J. Vandenberg in Support of Motion for Preliminary Injunction ("Vandenberg PI Decl."), ¶ 60 ("The estimated lifetime cancer risks from chloroprene concentrations detected in the air at the Active monitoring sites range from 2 to 14 per 10,000 people. . . ."), Case No. 2:23-cv-00735 (Exhibit 34).

endangerment" finding even though EPA *increased* the risk estimate for coke by-product recovery plants to 70-in-10,000.[119]

In addition to addressing substantially higher risk levels than EPA alleges for the DPE Facility, in the Benzene Rule, EPA also estimated that far more people were exposed to pre-compliance risks greater than 1-in-10,000. In the Proposed Rule for chloroprene, EPA estimates that 2,300 individuals near DPE's Facility could be exposed to greater than a 1-in-10,000 risk from chloroprene based on the *maximum* individual risk estimate.[120] In the Benzene Rule proposal, EPA estimated that 100,000 people were exposed to risks greater than 1-in-10,000 from coke by-product recovery plants.[121] If a 1-in-10,000 risk level constitutes an imminent endangerment, then surely EPA would have made such a finding when such risk levels existed for 100,000 people in the rule that serves as EPA's "primary model" for regulation of HAPs like chloroprene.

**iii. EPA's long-standing, as well as recent, acceptance of risk levels greater than 1-in-10,000 and 6-in-10,000 shows that such levels of risk are not permissible thresholds for alleging an imminent endangerment.**

Finding that the Facility's emissions constitute an imminent endangerment would be unprecedented and contradict more than 30 years of EPA's treatment of risk under Section 112. When EPA has identified a risk level greater than 1-in-10,000 in past rulemakings, EPA has *never* found an imminent endangerment or otherwise limited emissions from the regulated facilities while the rule is being implemented. In fact, EPA has issued final regulations that expressly allow for lifetime cancer risks *greater* than 1-in-10,000.[122] For example, in the final rule implementing the Section 112(f) residual risk review for coke ovens, EPA accepted a post-control MIR of 2.7-in-10,000 and a post-control cancer incidence of 0.06.[123] A 0.06 annual cancer incidence is the same incidence that EPA estimates for DPE's Facility in the Proposed Rule *prior to controls being installed*.[124] In other words, a 90-day compliance period would mean that EPA determines that a 0.06 cancer incidence rate results in an "imminent endangerment" for DPE's Facility during a 21-month period, but is perfectly acceptable for coke oven facilities *indefinitely*.[125]

Likewise, in recent rulemakings, EPA has consistently extended compliance periods for facilities with estimated MIRs equal to or greater than the DPE Facility, for facilities with higher estimated cancer incidences, and for facilities for which a greater number of people were exposed to an estimated risk above 1-in-10,000.

---

[119] *See* 54 Fed. Reg. at 38051 ("There are now 36 coke by-product recovery plants . . . . The revised baseline estimates of health risk indicate an MIR of $7x10^{-3}$ and an annual cancer incidence of 1 case every 6 months (2 cases/year).") (Exhibit 32).

[120] 88 Fed. Reg. at 25107 (Exhibit 1) (Table 2 showing the estimated population at increased risk of cancer greater than 1-in-10,000 to be 2,300).

[121] 53 Fed. Reg. at 28498 (Table I-1 listing estimated population subject to "baseline" risk of $1 \times 10^{-4}$ before compliance with rule) (Exhibit 1).

[122] *See* EPA, *National Emission Standards for Coke Oven Batteries*, 70 Fed. Reg. 19992, 19994 (April 15, 2005) (NESHAP for Coke Oven Batteries setting lifetime cancer risk from exposure to coke oven emissions at 2.7-in-10,000) (Exhibit 35); 72 Fed. Reg. 25138, 25143 (May 3, 2007) (NESHAP for Halogenated Solvent Cleaning settings risk level of 2-in-10,000) (Exhibit 36).

[123] 70 Fed. Reg. at 19993-94 (Exhibit 35)

[124] 88 Fed. Reg. at 25107 (Exhibit 1).

[125] As for chloroprene, EPA determined that children are more sensitive than adults to the carcinogenic effects of coke oven emissions.

EPA also estimates that there are 15 U.S. census tracts where ethylene oxide poses a higher cancer risk than chloroprene poses.[126] DPE anticipates that in the Final Rule EPA will promulgate rules imposing additional emission controls on ethylene oxide facilities, but such facilities will operate for 18-24 months at existing emission levels. As with chloroprene, EPA has also concluded that ethylene oxide operates through a "mutagenic mode of action," meaning that the alleged risks to children are higher in those 15 tracts than in the tract in which the Facility is located. In four of those tracts the risk is more than twice as high as that attributed to the Facility.[127] Thus, any potential impacts to children would arise even faster in census tracts in which these ethylene oxide facilities are located. Yet DPE anticipates that EPA will not impose a 90-day compliance deadline on ethylene oxide facilities in any of the 15 tracts, nor has EPA taken any action under Section 303 to allege an imminent and substantial endangerment in these tracts.

### B. EPA's Allegation Of Imminent Endangerment Is Refuted By The Available Real-World Data Showing No Cancer Risk Of Chloroprene To Humans Near the Facility.

The available real-world evidence shows that chloroprene emissions from the Facility have not and do not pose an increased risk of respiratory or liver cancer (the cancers that, according to EPA, are associated with exposure to chloroprene). The rulemaking record contains no evidence of a single case of cancer attributable to chloroprene emissions from the Facility, let alone any evidence that cancer rates in the vicinity of the Facility have actually increased due to the Facility's chloroprene emissions. Likewise, EPA admitted in the Section 303 Litigation that it has no such evidence.[128] Further, the lack of an association between chloroprene and cancer is corroborated by tumor incidence data collected by the Louisiana Tumor Registry. This complete lack of evidence is meaningful given the decades of operation of the Facility, under prior ownership, when chloroprene emissions were orders of magnitude higher than they are today.[129] If chloroprene posed the risk of respiratory and liver cancer alleged by EPA, then one would expect some signal of such cancers in the neighboring community after many decades of substantially higher chloroprene emission levels.[130] There is no such signal. This is consistent with the strongest epidemiological study of workers historically exposed to chloroprene.

#### i. The epidemiological evidence supports the conclusion that chloroprene exposure at human-relevant levels does not cause respiratory or liver cancers, and thus poses no risk in the vicinity of the Facility.

The "strongest studies" on the human carcinogenicity of chloroprene is the 2007 Marsh *et al.* study published in two parts (Marsh *et al.* 2007a and Marsh *et al.* 2007b, collectively "the 2007 Marsh Study"), which is "the only [study] of adequate quality to validly address epidemiologically the cancer risks

---

[126] *See* EPA, *2019 AirToxScreen: Assessment Results* (last updated Dec. 27, 2023) (providing access to pollutant-specific data in spreadsheet entitled 2019 AirToxScreen National Cancer Risk by Pollutant) (identifying fifteen U.S. census tracts where ethylene oxide poses a higher cancer risk than chloroprene poses at the Facility) (Exhibit 37).

[127] *Id.* (identifying Tracts 72123953100, 13217100300, 48141010337, and 48141010338 as having risk from ethylene oxide emissions more than twice the chloroprene risk in the Facility's tract).

[128] *See* EPA Responses to DPE First Set of Interrogatories, at 28 (Response to Interrogatory No. 12) (EPA "not currently aware of specific incidents of cancer that have been attributed by a medical professional or individual with other relevant scientific expertise to exposure to Denka's chloroprene emissions.") (Exhibit 24); *see also* Deposition Transcript of Dr. Helen Suh ("Suh Dep. Tr.") 230:7-18 (EPA epidemiology expert not aware of any cancer incidence specifically attributable to chloroprene due to Facility emissions), Case No. 2:23-cv-00735 (Exhibit 38).

[129] Declaration of Kenneth A. Mundt, PhD, FACE ("Mundt Decl."), ¶¶ 47-49 (including graph from 10/12/2022 Letter from EPA to LDEQ at 28 showing 500 tons of chloroprene emissions in 1985), Case No. 2:23-cv-00735 (Exhibit 39); Meyers PI Decl., ¶ 21 (Exhibit 10).

[130] Mundt Decl., ¶¶ 44-45, 47-49 (Exhibit 39).

associated with human exposure to chloroprene."[131] Dr. Helen Suh, EPA's epidemiology expert in the Section 303 Litigation, testified that Dr. Marsh's epidemiological study of chloroprene workers "was the most comprehensive study," was "head and shoulders above" the other chloroprene studies, and "had the most detailed and precise measure of chloroprene exposures."[132] The 2007 Marsh Study, which represented 74% of the total person-years studied across all studies, as well as 88% of all lung cancer deaths and 49% of all liver cancer deaths, received scores of "H" (high-quality) or "H-M" (high to medium quality) in all quality review categories.[133]

In Marsh *et al.* (2007), Dr. Marsh studied the impacts of chloroprene on a large cohort of U.S. and European chloroprene workers—individuals who for multiple decades were subjected to chloroprene concentrations estimated to be hundreds of times higher than those of residents living in the vicinity of the Facility today.[134] Overall, the 2007 Marsh Study did not provide evidence of elevated respiratory or liver cancer mortality risks among the cohort of chloroprene-exposed workers.[135] For the chloroprene worker subcohorts defined by the specific plants in the 2007 Marsh Study, all of the standardized mortality rates (the ratio of the number of observed deaths to the number of expected deaths ("SMRs") based on local reference rates were below 1.0, providing no indication of any excess occurrence of cancers among the chloroprene-exposed workers compared with local background rates.[136] In sum, the chloroprene-exposed workers in the 2007 Marsh Study had only about 90% of the expected all-cause mortality rate, relative to the background rates in the local (or state or national) population. This evidence, and especially the results specific to respiratory and liver cancers demonstrating no excesses occurrence of these cancers, does not demonstrate—or even suggest—an association between occupational chloroprene exposure and increased risk of human respiratory or liver cancers.[137]

The Louisville plant chloroprene workers included in the 2007 Marsh Study represent the largest single-site ever studied epidemiologically for chloroprene exposure and had the largest number of reported respiratory cancer deaths—more than all other epidemiological chloroprene studies combined, regardless of study quality.[138] This group also was among the most highly exposed to chloroprene.[139] Nevertheless, no clear evidence of excess occurrence of these cancers or any relationship with exposure category is seen. Regardless of the referent group or exposure metric used, the 2007 Marsh Study of the Louisville workers most highly exposed to chloroprene demonstrated no clear or consistent exposure-response relationship between estimated i) duration of exposure, ii) exposure intensity, and iii) cumulative exposure to chloroprene, and increased risk of respiratory or liver cancers.[140] The lack of exposure-response (*i.e.*, increasing risks with increasing exposures) is real-world evidence that refutes EPA's allegation that chloroprene causes these cancers, as demonstrating increasing risk with increasing exposure is a central tenet in assessing causality.[141]

---

[131] *Id.* ¶ 25 (quoting Sax, Sonja N. *et al.*, "Extended Analysis and Evidence Integration of Chloroprene as a Human Carcinogen," *Risk Analysis* 40(2): 294-318 (2020) ("Sax *et al.* (2020)") (Exhibit 40)).
[132] Suh Dep. Tr. 87:12-15, 83:3-13, 84:15-18 (Exhibit 38).
[133] Mundt Decl., ¶ 26 (Exhibit 39).
[134] *Id.* ¶¶ 39, 42-43.
[135] *Id.* ¶ 28.
[136] *Id.* ¶¶ 28, 36, 41; Sax *et al.* (2020) (Exhibit 40).
[137] *Id.* ¶¶ 28, 36, 41; Sax *et al.* (2020) (Exhibit 40).
[138] *Id.* ¶ 36.
[139] *Id.* ¶ 36.
[140] *Id.* ¶ 35.
[141] *Id.*

The chart below[142] plots the relative risk estimates and their 95% confidence intervals (indicated by vertical lines) based on (i) regional referent rates (shown in orange); (ii) an internal referent group (shown in blue); and (iii) on analyses using mortality rates from a corporate mortality registry (shown in green):




While there are small differences based on the referent rates used, all the results lie close to the null value of 1.0 (*i.e.*, the horizontal line) representing "no association"—meaning there is a clear lack of any exposure-response relationship.[143] Eleven out of twelve estimates indicate no statistically significant increase in the relative risk estimate.[144]

In general, where exposure increases the risk of a specific cancer, SMRs and RRs tend to increase with increasing exposure and an exposure-response will be seen.[145] In contrast, the above chart shows that the subset of workers with the very highest cumulative exposures—shown on the far right of the chart—all fall *below* the null value of 1.0 representing *no association* between chloroprene exposure and cancer.[146] The chart above illustrates what one typically observes where the exposure (especially when ranging over three orders of magnitude) fails to move the risk needle.[147]

---

[142] *Id.* ¶ 36.

[143] *Id.* ¶ 37.

[144] *Id.*

[145] *Id.*

[146] *Id.*

[147] *Id.*; *see also* Mundt, K.A. *et al.*, "Quantitative estimated exposure to vinyl chloride and risk of angiosarcoma of the liver and hepatocellular cancer in the US industry-wide vinyl chloride cohort: mortality update through 2013,"

In 2021, Dr. Marsh updated the 2007 study, examining 17 additional years of data (through 2017) on the same cohort of U.S. chloroprene workers as well from the 2007 study.[148] Again, Dr. Marsh found no increase in cancer mortalities among U.S. chloroprene workers, a population exposed to far higher concentrations of chloroprene than the communities surrounding the Facility today.[149] As depicted in the table below, the updated study of chloroprene workers continued to demonstrate no excess occurrence of either respiratory or liver cancers at the Louisville Plant—the largest plant with the highest chloroprene exposures.[150] The table shows that most SMRs are lower than 1.0 and that, for the two that are greater than 1.0, the lower bound of the 95% confidence interval ("CI") never exceeds 1.0, indicating that, there are no statistically significant excess risks seen.[151] Findings that are not statistically significant, including all reported in the table below, are interpreted as being no different from 1.0, the value representing no association, and therefore providing no scientific support for the hypothesis that chloroprene causes these cancers.[152]

| | Cumulative exposure | Observed deaths | SMR | 95% CI |
|---|---|---|---|---|
| RSC | < 4.747 | 95 | 0.66 | 0.53-0.80 |
| | 4.747-55.918 | 97 | 0.71 | 0.57-0.86 |
| | 55.919-164.052 | 96 | 0.94 | 0.76-1.15 |
| | 164.053+ | 70 | 0.65 | 0.51-0.82 |
| LC | < 4.747 | 9 | 0.76 | 0.35-1.45 |
| | 4.747-55.918 | 8 | 1.34 | 0.58-2.63 |
| | 55.919-164.052 | 5 | 1.09 | 0.35-2.55 |
| | 164.053+ | 9 | 0.90 | 0.41-1.71 |

Dr. Marsh's epidemiological studies strongly support the conclusion that chloroprene does not pose a meaningful risk of respiratory or liver cancer to humans, particularly given the orders of magnitude higher chloroprene exposures experienced by the chloroprene workers compared to the chloroprene concentrations existing near the Facility today.[153]

---

*Occupational and Environmental Medicine*, 74(10): 709-16 (2017) ("Mundt *et al.* (2017)") (study of the North American Vinyl Chloride Workers presents clear demonstration of both excess liver cancer among workers and strong exposure-response relationships) (Exhibit 41).

[148] Mundt Decl., ¶¶ 50-51 (Exhibit 39); Marsh, G. M., Kruchten, A., & Buchanich, J. M., "Mortality Patterns Among Industrial Workers Exposed to Chloroprene and Other Substances: Extended Follow-Up," J. Occup. Environ. Med.: 63(2), 126-138 (2021) ("Marsh *et al.* (2021)" (Exhibit 42)).

[149] Mundt Decl., ¶¶ 50-51 (Exhibit 39); Marsh *et al.* (2021) (Exhibit 42).

[150] Mundt Decl., ¶ 50 (Exhibit 39).

[151] *Id.*

[152] *Id.*

[153] *Id.* ¶¶ 51-52.

**ii. The lack of association between chloroprene and cancer in the vicinity of the Facility is corroborated by data from the Louisiana Tumor Registry.**

For decades, in conjunction with the National Cancer Institute, Louisiana has had a robust program to track cancer cases throughout the state. The data from the Louisiana Tumor Registry ("LTR") consistently show no increase in cancer incidence rates in the community surrounding the Facility.[154] The LTR, maintained by the Louisiana State University School of Public Health, has a mission "[t]o collect and report complete, high-quality, and timely population-based cancer data in Louisiana to support cancer research, control, and prevention."[155] In 2020-2021, Louisiana State University conducted a study confirming that the LTR had not omitted any relevant cancer cases in the 2009-2018 timeframe.[156] Dr. Helen Suh, EPA's epidemiology expert in the Section 303 Litigation, confirmed that the LTR data "seems like it's high-quality,"[157] and she had no questions about the completeness and quality of the LTR data.[158]

Community disease surveillance studies, including those based on the LTR data, can provide a sense of, or clues as to, whether there might be excess occurrences of disease that an agent (like chloroprene) has been postulated to cause.[159] A lack of increased risk of respiratory and liver cancers from chloroprene exposure in the communities surrounding the Facility—where chloroprene exposure likely is orders of magnitude lower than that of the workers studied in the 2007 Marsh Study—would be expected, given the lack of any excess of these cancers in the highly exposed workers in both the Pontchartrain and Louisville plants studied in the 2007 Marsh Study.[160] Analyses using LTR data and comparing cancer rates across Louisiana parishes demonstrate that the overall cancer rate for St. John the Baptist Parish falls into the lowest 25% of cancer rates by parish across the entire state.[161]

Historical emissions from the Facility were orders of magnitude higher during the late 1960s through the mid-1980s than in recent years.[162] In an October 12, 2022 "letter of concern," issued under the authority of Title VI of the Civil Rights Act of 1964, sent by EPA to the Louisiana Department of Environmental Quality ("LDEQ") and the Louisiana Department of Health ("LDH"), EPA included a figure showing the significant emission reductions at the Facility since 1987, particularly the substantial reductions achieved by DPE since commencing operations at the Facility in 2015.[163] This figure not only illustrates the dramatic reduction in chloroprene emissions since 1987, but it also demonstrates the additional, significant chloroprene emission reductions achieved by DPE after DPE's acquisition of the Facility in 2015.

---

[154] *Id.* ¶¶ 52-53.
[155] LSU Health, *About the Registry*, available at https://sph.lsuhsc.edu/louisiana-tumor-registry/about-the-registry/.
[156] LDH Cancer Surveillance Study in St. John Parish (CRISP) Report (Jan. 2022) (Exhibit 43).
[157] Suh Dep. Tr. 99:21-100:12 (Exhibit 38).
[158] *Id.* at 113:6-12; 151:1-9.
[159] Mundt Decl., ¶ 44 (Exhibit 39).
[160] *Id.*
[161] *Id.* ¶ 45; LSU Health, *Louisiana Cancer Data Visualization*, available at https://sph.lsuhsc.edu/louisiana-tumor-registry/data-usestatistics/louisiana-data-interactive-statistics/louisiana-cancer-data-visualization/ (LTR update for 2015-2019 period showing St. John the Baptist Parish within bottom 25% of cancer incidence rates state-wide).
[162] Mundt Decl., ¶ 47 (including graph from 10/12/2022 Letter from EPA to LDEQ at 28) (Exhibit 39).
[163] *See* 10/12/2022 Letter from EPA to LDEQ at 28 (Exhibit 44).




Chloroprene emissions from the Facility dropped precipitously between 1987 and 1993, and declined continuously and roughly monotonically until 2017, whereupon the emissions again rapidly declined.[164] The typical latency periods for respiratory and liver cancers are 20 or more years and can range well above 30 years.[165] Therefore, the exposure time period most likely to give rise to excess cancers (if any) today or in recent years would be those that occurred at least 20 years ago.[166] Thus, if chloroprene emissions from the Facility had increased the risks of respiratory and liver cancers in the community surrounding the Facility from around 2015 to 2020, the most relevant time window for those exposures would have occurred from at least 20 to 40 or more years ago, *i.e.*, conservatively, between 1975 and 2000.[167] The LTR data show no signal of excess occurrence of respiratory or liver cancers, notwithstanding the orders of magnitude higher levels of chloroprene during the period of time most likely to give rise to excess cancers in recent years.[168]

EPA itself relied upon LTR data to assess the health risks due to chloroprene exposure in the communities surrounding the Facility. In 2020, EPA granted roughly $300,000 to the LDEQ and the LDH "to assess the health risks associated with Chloroprene exposure in St. John the Baptist Parish near the Denka Plant." The two stated objectives of the funded research were to determine "if there are higher instances of cancer in the community due to" the Facility's emissions, and "if there has been under-reporting of these

[164] Mundt Decl., ¶ 47 (Exhibit 39).
[165] *Id.* ¶ 48.
[166] *Id.*
[167] *Id.* ¶ 49.
[168] *Id.* ¶ 50.

cases in the [LTR]."[169] The LDH Report resulting from the EPA grant was issued in 2021 and found that "no reportable cancers were identified that were not already contained in the LTR data."[170] The Report further found that census tracts in the vicinity of the Facility "have statistically significantly lower overall cancer incidence rates ... compared to Louisiana overall cancer incidence rates."[171] An LDH official also reported to EPA based on the LTR analysis that "the only elevated rates we found were in census tract 702 for prostate and NHL, which have not been found to be related to chloroprene."[172]

As no excess occurrence of respiratory or liver cancers has been reported in any area or community surrounding Facility, the LTR cancer surveillance exercises fail to support any claim that chloroprene emissions at historically very high levels had any measurable impact on rates of these cancers among residents in areas surrounding the Facility in any recent years.[173] Given the dramatically lower exposure levels today, it is inconceivable that future rates would be any different due to environmental exposure to chloroprene.[174]

### C. To the Extent EPA's Imminent Endangerment Assessment Is Based on EPA's 2010 Inhalation Unit Risk, the IUR Fails To Provide The Best Estimate Of Human Risk From Chloroprene.

EPA's MIR and risk assessment is based on the IUR developed in EPA's Toxicology Review of Chloroprene ("2010 Review").[175] EPA calculated the IUR for human exposure to chloroprene to be $5 \times 10^{-4}$ per μg/m$^3$ for 70-years of continuous exposure ("chloroprene IUR"). In the Section 303 Litigation, EPA calculated cancer risks to humans in relation to a threshold of 0.2 μg/m$^3$.[176] The 0.2 μg/m$^3$ value represents EPA's estimate of a chloroprene concentration that, if inhaled continuously for 70 years, corresponds to a 1-in-10,000 excess chance of cancer.[177] EPA's Integrated Risk Information System ("IRIS") program develops toxicology reviews to characterize the risks to human health posed by specific environmental hazards.

The IRIS Program follows a risk assessment approach based on the four-step process described by the National Research Council.[178] IRIS assessments "serve as starting materials for the overall risk characterization process that completes the risk assessment."[179] The EPA's Guidelines for Carcinogen Risk Assessment state that risk characterization "is an appraisal of the science that informs the risk manager in public health decisions, as do other decision-making analyses of economic, social, or technology

---

169 EPA Cooperative Agreement 01F70601 to LDEQ (Sept. 19, 2020) (Exhibit 45); EPA Responses to DPE Second Set of Interrogatories, at 14-15 (Response to Interrogatory No. 16) (Exhibit 25); EPA_1932780 (Exhibit 46) ("There are two tasks that are to be accomplished: a study to ensure that the types and numbers of cancers in the Louisiana Tumor Registry database are complete for the area to serve as a baseline, and an evaluation and analysis of that database specific to the 1.5-km radius and 2.5-km radius around Denka to determine if there are higher instances of cancer in the community and if the observed cancers are attributable to Denka.").

170 Cancer Reporting in St. John Parish, Cancer Surveillance Project, EPA_2235649 at EPA_2235661 (Exhibit 47).

171 *Id.* at Appendix F ("Cancer Incidence Rates in St. John the Baptist Parish") at EPA_2235686.

172 EPA_2548391 (email correspondence) (Exhibit 48).

173 Mundt Decl., ¶ 50 (Exhibit 39).

174 *Id.* ¶¶ 50, 52.

175 EPA, *Toxicological Review of Chloroprene: In Support of Summary Information on the Integrated Risk Information System (IRIS)* (Sept. 2010) ("2010 Review") (Exhibit 49).

176 *Id.* at 138.

178 *See* EPA, *Basic Information about the Integrated Risk Information System* (last updated Nov. 9, 2023), available at https://www.epa.gov/iris/basic-information-about-integrated-risk-information-system.

179 EPA, *Guidelines for Carcinogen Risk Assessment* at 1-21 (Mar. 2005), *available at* https://www.epa.gov/sites/default/files/2013-09/documents/cancer_guidelines_final_3-25-05.pdf (Exhibit 56).

issues."[180] The risk assessment does not generate independently actionable information, but must be incorporated into EPA's risk management paradigm.[181] Following the completion of a risk assessment, EPA implements "risk management" processes, which include EPA's rulemaking activities.[182]

Simply put, EPA has failed in its obligation to apply risk management principles in assessing the risk of the DPE Facility. Risk management involves developing, analyzing, and comparing options related to potential regulatory control in light of legal, political, social, economic, and technical considerations.[183] The IUR does not reflect any of these essential considerations. Therefore, it is incumbent upon risk managers to consider the uncertainties and weaknesses of the IUR. EPA has provided no evidence that it has considered new risk estimates or qualitative information that accompanied and informed the 2010 IUR. Instead, EPA applied the IUR without adjustment and has opted out of the risk management obligations that it is required to perform.

When new risk estimates and qualitative information are considered, it is clear that the 2010 IUR fails to provide the most probative estimate of human risk from exposure to chloroprene and should not be used to assess "imminent endangerment." First, the physiologically-based pharmacokinetic ("PBPK") computer model developed by scientists at Ramboll US Corporation ("Ramboll"), which can be used to aid in the calculation of an IUR that accounts for species-specific parameters (the "Ramboll PBPK Model"),[184] provides the best method to provide a reasonable scientific estimate of chloroprene's cancer potency in humans and provides a better estimate of risk than the 2010 IUR for chloroprene.[185] Second, even if the Ramboll PBPK Model were not utilized to calculate the IUR, applying real-world adjustments to EPA's chloroprene IUR results in a less uncertain and distorted risk estimate.

**i. The Ramboll PBPK Model provides the best estimate of human risk from chloroprene.**

A PBPK model is a mathematical computer model that simulates the uptake, distribution, metabolism, and elimination of a chemical in a human or animal body using equations that are consistent with the biological structure of the organism being simulated.[186] PBPK models simulate chemical exposures and predict internal doses of the chemical or one or more of its metabolites that appear in specific organ systems of the body.[187] These type of models use well-established, known values for modeling physiological parameters such as heart rate, breathing rate, blood flow rate, body weight, size of organs, and others in the mathematical equations to accurately represent the physiology of a laboratory animal or a human.[188] They also incorporate measured rates of metabolism in the various organs and elimination from the body (such as exhalation or clearance in the urine).[189] Importantly, PBPK models are capable of extrapolating from animal exposures or doses to human exposure, while accounting for physiological and

[180] *Id.* at 5-1 to 5-2.

[181] *Id.*

[182] *Id.*

[183] *Id.*

[184] Declaration of Dr. Robinan Gentry in Support of Opposition to Motion for Preliminary Injunction ("Gentry Decl."), ¶¶ 14-15, Case No. 2:23-cv-00735 (Exhibit 50).

[185] Declaration of Dr. Michael Lumpkin in Support of Opposition to Motion for Preliminary Injunction ("Lumpkin Decl."), ¶ 120, Case No. 2:23-cv-00735 (Exhibit 51).

[186] Gentry Decl., ¶ 14 (Exhibit 50).

[187] Lumpkin Decl., ¶ 42 (Exhibit 51).

[188] *Id.* ¶ 43.

[189] *Id.*

toxicokinetic differences between the species.[190] EPA considers PBPK models to be the optimal approach for extrapolation of chemical dose across species.[191] When preparing IRIS toxicological reviews, EPA considers whether an adequate PBPK model is available for use.[192]

Using the Ramboll PBPK Model and EPA software to calculate an IUR results in the best estimate of chloroprene's cancer potency in humans because it accounts for the significant toxicokinetic differences between humans and female B6C3F1 mice. By failing to calculate its risk estimate for chloroprene using the Ramboll PBPK Model, EPA has failed to offer a risk estimate that is appropriate for assessing whether there is an imminent endangerment to *humans*.

The Ramboll PBPK Model was not available when EPA published the 2010 Review.[193] However, the 2010 Review stated, "[i]deally, a PBPK model for the internal dose(s) of the reactive metabolite(s) would decrease some of the quantitative uncertainty in interspecies extrapolation; however, current PBPK models are inadequate for this purpose." [194] EPA guidance supports the use of PBPK modeling when available. "Toxicokinetic modeling is the preferred approach for estimating dose metrics from exposure."[195] EPA recognizes that "[t]he primary advantage gained by using PBPK models in risk assessment is their ability to relate toxicity responses in a test species to humans and outcomes observed in smaller populations to likely outcomes in the general population."[196]

In April 2018, DPE and Ramboll submitted a work plan to EPA for the development of a PBPK model for chloroprene that would satisfy EPA requirements.[197] From 2018 through 2020, EPA and Ramboll engaged in sustained dialogue to improve the PBPK model, including two separate rounds of quality review by EPA.[198] In response to EPA's review, Ramboll made revisions to the model, developed documentation, and provided EPA with the model's computer code and validation data.[199] At EPA's request, Ramboll also agreed to conduct an additional experiment in support of a specific model parameter.[200]

Based on EPA's feedback, the Ramboll PBPK Model was published in a peer-reviewed article in *Frontiers in Pharmacology* in 2023.[201] Prior to the Ramboll PBPK Model being published in 2023, DPE in 2021 submitted the model (including detailed documentation and the underlying computer code) to EPA as

---

[190] EPA, *Approaches for the Application of Physiologically Based Pharmacokinetic Models and Supporting Data in Risk Assessment* at 4-11 – 4-12 (Aug. 2006) ("EPA PBPK Guidance") (Exhibit 52)

[191] EPA, *Methods for Derivation of Inhalation Reference Concentrations and Application of Inhalation Dosimetry* at 1-12 (Oct. 1994) (Exhibit 53).

[192] *See e.g.,* EPA, *Toxicological Review of Dichloromethane (Methylene Chloride)* at 266 (Nov. 2011) (using "the best available" PBPK models to derive IUR) (Exhibit 54); EPA, *Toxicological Review of Vinyl Chloride* at 44-53 (May 2000) (using Clewell *et al.* PBPK model to derive IUR) (Exhibit 55).

[193] Gentry Decl., ¶ 15 (Exhibit 50).

[194] 2010 Review at 141 (Exhibit 49).

[195] EPA, *Guidelines for Carcinogen Risk Assessment* (March 2005), EPA/630/P-03/001B (Exhibit 56).

[196] EPA PBPK Guidance at 2-9 (2006) (Exhibit 52).

[197] EPA, *Background Description for Chloroprene PBPK Modeling* at 4 (July 2020) (Exhibit 57).

[198] *Id.*; Gentry Decl., ¶¶ 20-28 (Exhibit 50).

[199] Gentry Decl., ¶ 23 (Exhibit 50).

[200] *Id.*

[201] Lumpkin Decl., ¶ 70 (Exhibit 51); Campbell, J.L. et al., "Using available in vitro metabolite identification and time course kinetics for β-chloroprene and its metabolite, (1-chloroethenyl) oxirane, to include reactive oxidative metabolites and glutathione depletion in a PBPK model for β-chloroprene," *Frontiers in Pharmacology* 14:1223808 (2023) ("Campbell et al. (2023)") (Exhibit 58).

part of DPE's administrative challenge to the IUR based on the 2010 Review.[202] EPA did not undertake a technical analysis to evaluate the IUR estimated by the Ramboll PBPK Model. EPA stated: "Ramboll's analyses assert that the risk of human lung cancer is minimal compared to mice, making the current IRIS IUR an overestimate of risk. EPA has not undertaken the technical analysis to reach a conclusion on concurrence with this assertion."[203] EPA subsequently denied DPE's administrative appeal of EPA's decision not to revisit the IUR based on the Ramboll PBPK Model, citing resource limitations and a lack of an appropriate procedural mechanism.[204] Specifically, EPA stated that "the [IRIS administrative appeal] process is not a mechanism to commit EPA to undertake scientific updates of its risk assessment products, such as IRIS Toxicological Reviews."[205] EPA has not evaluated the Ramboll PBPK Model outside of the IRIS program either.

**1. The Ramboll PBPK Model uses the appropriate dose metric to estimate risk.**

PBPK models are designed to estimate an internal "dose metric," which is the amount of a chemical that most closely relates to an adverse (*e.g.,* toxic) response.[206] Internal dose metrics provide a better understanding of the potential for toxicity than an "external" dose (*e.g.,* the amount of chloroprene inhaled), thus reducing uncertainty.[207] This is because internal dose metrics can account for the most biologically relevant form of the chemical, its level, duration of internal exposure, intensity, and the appropriate tissues.[208] The major advantage of using an internal dose metric is that it can provide a stronger biological basis for comparing the effects of a chemical across species (*i.e.,* mice to human) and dose levels (*e.g.,* high levels of chloroprene to low levels of chloroprene).[209]

Because the dose metric is the form of chemical most closely associated with toxicity, a PBPK model is needed to estimate the relevant dose metric across varying exposure scenarios.[210] The appropriate dose metric for a given chemical varies depending on the "mode of action," *i.e.,* the sequence of events and processes resulting in toxicity and tumor formation.[211] Chloroprene's toxicity is thought to result from the formation of "reactive epoxides," compounds that are produced during the metabolism of chloroprene.[212]

The Ramboll PBPK Model estimates the internal dose metric amount of chloroprene metabolized per gram of tissue ("Total Metabolism") for the liver and lung.[213] Using Total Metabolism as the dose metric is appropriate because chloroprene's toxicity is thought to result from the formation of "reactive epoxides," compounds that are produced during the metabolism of chloroprene.[214] There is substantial evidence supporting the use of Total Metabolism as a dose metric. The 2010 Review describes a PBPK model from 2004 (the "Himmelstein PBPK Model") that was a precursor to the models prepared by Ramboll and notes

---

202 DPE, Request for Correction #21005 (July 15, 2021) (Exhibit 59).

203 3/14/2022 Letter from M. Gwinn to P. Walsh at 6 (Exhibit 60).

204 10/19/2022 Letter from Mr. Vaughn Noga to Mr. Robert Holden, et al. at 1-2 (Exhibit 61).

205 *Id.*

206 EPA PBPK Guidance at 2-3 (Exhibit 52).

207 *Id.* at 2-3.

208 *Id.* at 2-3 – 2-4.

209 *Id.* at 2-3.

210 *Id.* at 4-3.

211 *Id.*

212 Lumpkin Decl., ¶ 37 (Exhibit 51).

213 Gentry Decl., ¶ 69 (Exhibit 50).

214 Lumpkin Decl., ¶ 37 (Exhibit 51).

that the Total Metabolism dose metric "fit the [tumor] incidence data much better than the external dose metric."[215] The 2010 Review also explains that many of the available studies investigating the mode of action for chloroprene have focused on identifying reactive metabolites.[216] An expanded version of the Himmelstein model was published in 2012 (the "Yang PBPK Model") that incorporated additional measurements of metabolism and further refined parameter values for chloroprene metabolism.[217] In 2019, Ramboll again expanded the model (the "Clewell PBPK Model") to describe metabolism of a specific reactive metabolite and to confirm the Total Metabolism dose metric.[218] The Clewell PBPK Model was published in a peer-reviewed article in *Inhalation Toxicology* in 2019 (Clewell, 2019).[219] The article explains:

> The dose metric calculated with the PBPK model in this analysis is micromoles of chloroprene metabolized in the lung per gram lung per day (Himmelstein, Carpenter, Evans, *et al.* 2004; Yang *et al.* 2012). This dose metric was chosen because (1) the lung is the tissue with the highest tumor incidence in the chloroprene inhalation bioassays (NTP 1998) and (2) the carcinogenicity of chloroprene in rodents is believed to result from its metabolism to reactive epoxides in the target tissue (Himmelstein, Carpenter, and Hinderliter 2004; Himmelstein, Carpenter, Evans, *et al.* 2004). The dose metric selected for chloroprene is consistent with the dose metrics used in previous PBPK-based risk assessments for both vinyl chloride (USEPA 2000; Clewell *et al.* 2001) and methylene chloride (Andersen *et al.* 1987; USEPA 2011), which were also based on the rate of production of reactive metabolites.[220]

As an outgrowth of Ramboll's dialogue with EPA, Ramboll again extended the PBPK model in 2021 to include more detail on the production of reactive metabolites and a detoxification process involving the compound glutathione.[221] The 2021 extension was subsequently published in a peer-reviewed article in *Frontiers in Pharmacology* in August 2023 and constitutes the Ramboll PBPK Model in this case.[222] The article describing the Ramboll PBPK Model again confirmed that Total Metabolism was the appropriate dose metric.[223]

### 2. The Ramboll PBPK Model has been validated using robust and established methods.

Model "validation" is the process of substantiating that a model, within its domain of applicability, behaves with satisfactory accuracy.[224] To adequately validate a PBPK model, the model should be compared against data that are informative of parameters that influence model predictions (*i.e.*, if metabolism is the most significant influence on model predictions, the validation data should provide

[215] 2010 Review at 20 (Exhibit 49).
[216] *Id.* at 82.
[217] *Id.* at 66.
[218] Clewell, H.J. *et al.*, "Incorporation of in vitro metabolism data and physiologically based pharmacokinetic modeling in a risk assessment for chloroprene," *Inhalation Toxicology* 31(13-14): 468-483 (2019) ("Clewell *et al.* (2019)") (Exhibit 62).
[219] *Id.*
[220] *Id.* at 478.
[221] Lumpkin Decl., ¶ 70 (Exhibit 51).
[222] Campbell *et al.* (2023) (Exhibit 58).
[223] *Id.* at 7-11.
[224] EPA PBPK Guidance at 3-18 (Exhibit 52).

informative data for metabolism parameters).[225] Toxicokinetic tests of cells and tissues removed from the intact body are called *in vitro* tests, while tests conducted on intact animals or humans are called *in vivo* tests.[226]

The Ramboll PBPK Model was validated against *in vivo* data from a 2009 study of female B6C3F1 mice (the same species/gender used by EPA to calculate the IUR in the 2010 Review) in which the mice were exposed chloroprene via nose-only inhalation.[227] The Ramboll PBPK Model was able to accurately predict the data collected in the 2009 study, showing predictions generally within roughly a factor of two, which is consistent with guidance of the World Health Organization and the International Programme on Chemical Safety ("WHO/IPCS").[228]

Ramboll used an approach known as "quantitative *in vitro* to *in vivo* extrapolation" ("IVIE") in developing the Ramboll PBPK Model, which allows modelers to translate *in vitro* test results to *in vivo* outcomes for use in chemical-specific PBPK models.[229] Obtaining *in vivo* data of *humans* requires conducting controlled exposures of human subjects to chemicals.[230] Obtaining *in vivo* data of *animals* requires conducting controlled exposures of animals in a laboratory study.[231]

The notion of requiring human, and even animal, *in vivo* studies is increasingly scrutinized due to ethical concerns.[232] In 2021, EPA led the development of a document on behalf of the Organisation for Economic Co-operation and Development that provides guidance on the use of PBPK models for regulatory purposes ("OECD Guidance").[233] The OECD Guidance explains that there is a trend to reduce animal testing in chemical assessments and that PBPK models have become an important tool because of their ability to leverage *in vitro* to *in vivo* extrapolation.[234]

No human *in vivo* validation data is available for chloroprene and it is effectively impossible to obtain such data, given the obvious inability to conduct an experiment exposing humans to a chemical that EPA has classified as a likely carcinogenic.[235] In the Section 303 Litigation, EPA has insisted upon the use of *in vivo* validation data, but this appears to be post hoc rationale to disregard the Ramboll PBPK Model. The fact is, EPA spent roughly four years examining the Ramboll PBPK Model (or a predecessor iteration of the model) and never once indicated that the lack of *in vivo* human data would serve to preclude use of the model in risk assessment.

---

[225] EPA PBPK Guidance at 3-21 (Exhibit 52).

[226] Lumpkin Decl., ¶ 33 (Exhibit 51).

[227] Gentry Decl., ¶ 51 (describing International Institute of Synthetic Rubber Producers, *Chloroprene: blood concentration toxicokinetics in female mice by single and repeated inhalation exposure,* IISRP-12828-1388 (2009) (Exhibit 50); Clewell *et al.* (2019), at 477-81 (describing same) (Exhibit 62).

[228] Gentry Decl., ¶ 51 (Exhibit 50); Clewell *et al.* (2019) at 477-81 (World Health Organization/International Programme on Chemical Safety, Characterization and application of physiologically based pharmacokinetic models in risk assessment (2010)) (Exhibit 62).

[229] Gentry Decl., ¶ 51 (Exhibit 50); Clewell *et al.* (2019) at 471 (Exhibit 62).

[230] Clewell *et al.* (2019) at 481 (Exhibit 62).

[231] Lumpkin Decl., ¶ 33 (Exhibit 51).

[232] Clewell *et al.* (2019) at 481 (Exhibit 62).

[233] OECD, *Guidance document on the characterization, validation and reporting of Physiologically Based Kinetic (PBK) models for regulatory purposes* (2021) (Exhibit 63).

[234] *Id.* at 17.

[235] Clewell *et al.* (2019) at 481 (Exhibit 62).

Moreover, even if human *in vivo* data for chloroprene were available, it would not materially impact the evaluation of the Ramboll PBPK Model.[236] This is because the key parameters for estimating the relevant dose metric of chloroprene for use in risk assessment are the parameters for lung metabolism and human *in vivo* data would not meaningfully inform those parameters.[237] As such, even if there were a hypothetical set of human *in vivo* data available to DPE, those data would not provide meaningful information to inform or validate the metabolic parameters used in the Ramboll PBPK Model. Indeed, EPA has accepted a PBPK model in prior toxicological reviews under the IRIS program even though for those models (like the Ramboll PBPK Model) human *in vivo* data could not be used to validate or inform the key parameter.

Unlike EPA's IUR based on the 2010 Review, the Ramboll PBPK Model accounts for toxicokinetic differences between female B6C3F1 mice and humans and results in a substantial reduction in uncertainty of extrapolating cancer potency between these two different species.[238] The Ramboll PBPK Model reflects years of review, dialogue, and revision between EPA and Ramboll scientists. By declining to use the Ramboll PBPK Model to calculate an IUR for chloroprene, EPA has failed to offer a risk value that best estimates human risk.

**3. Estimating risk in the lung and liver appropriately accounts for tumors observed in female B6C3F1 mice in the NTP Study.**

In IRIS toxicological reviews, EPA must determine whether to calculate the IUR based on the total number of *tumors* in animal studies or the total number of *tumor-bearing animals*.[239] The key determinant in this decision is whether the tumors observed in a study occurred in a statistically independent manner (*e.g.,* the occurrence of a tumor in the liver was *not* influenced by the occurrence of a tumor in the lung).[240] In the 2010 Review, EPA did not determine whether tumor types associated with chloroprene exposure were statistically independent.[241] In the absence of such a determination, EPA simply assumed that the tumor types were statistically independent.[242] However, EPA conceded that its assumption "could not be verified and if not correct could lead to an overestimate of risk from summing across tumor sites."[243]

In February 2020, an article published in the peer-reviewed journal *Risk Analysis* demonstrated that EPA's independence assumption was incorrect by reporting the results of a correlation analysis.[244] These results demonstrated that tumor incidences in the female B6C3F1 mice in the NTP Toxicology and Carcinogenesis Studies of Chloroprene ("NTP Study") were not statistically independent of lung and liver tumors.[245] The results also showed that EPA's approach of treating tumors as independent was inappropriately overestimating total tumor potency. Indeed, in some cases, EPA ended up counting more tumors than there were animals in a given test group.[246]

---

[236] Clewell *et al.* (2019) at 481 (Exhibit 62).
[237] *Id.*
[238] Lumpkin Decl., ¶ 73 (Exhibit 51).
[239] 2010 Review at 133 (Exhibit 49).
[240] *Id.*
[241] *Id.* at 136.
[242] *Id.*
[243] *Id.*
[244] Sax *et al.* (2020) (Exhibit 40).
[245] *Id.*
[246] *Id.*

Although tumors in B6C3F1 female mice were observed in tissues other than the lung and liver in the NTP Study, at least 85% of all tumors were observed in animals with tumors in the lung or liver.[247] Because the tumors are statistically dependent, calculating an IUR based on multiple tumors in the same animals would inappropriately double count tumors and overestimate risk.[248] Unlike, the IUR derived in the 2010 Review, the IUR derived from the Ramboll PBPK Model considers each animal with tumor(s) only once.

Any assessment of "imminent endangerment" should be based on an IUR derived from the Ramboll PBPK Model. The Ramboll PBPK Model provides the best estimate of chloroprene's cancer potency in humans because it accounts for toxicokinetic differences between humans and female B6C3F1 mice.

**ii. Applying corrective adjustments to EPA's 2010 IUR results in risk estimates that are more representative of actual risk.**

Even if the Ramboll PBPK Model is not used to calculate an IUR for chloroprene, applying corrective adjustments to EPA's IUR would better estimate actual *human* risk. By failing to make these adjustments, EPA has failed to offer a risk estimate that is appropriate to assess imminent endangerment to humans.

**1. Selecting animal tumor incidence data that is more representative of human risk.**

Even if the Ramboll PBPK Model were not used to calculate an IUR for chloroprene, use of the tumor incidence data from F344 rats would better estimate human risk than data from female B6C3F1 mice. The material toxicokinetic differences between humans and female B6C3F1 mice demonstrate that the F344 rat is the "animal model that is most relevant to humans" and a better surrogate for human risk.[249] Because EPA's IUR fails to calculate a risk estimate based on available animal data that is more representative of human risk, EPA's IUR is not appropriate to assess whether an "imminent endangerment" exists for *humans*.

The first step in developing an IUR is to select the data from which the value will be based which, in some cases, will be a human epidemiological study (if an epidemiological study is deemed suitable for use), and in other cases will be an inhalation study using laboratory animals (if an epidemiological study is not deemed suitable for use).[250]

In the 2010 Review, EPA discussed the available toxicokinetic data for chloroprene in humans and animals.[251] A chemical's toxicokinetics are its behavior in how it is absorbed from the environment into the body's tissues (absorption), how it is distributed around various tissues of the body (distribution), how the body makes physical changes to the chemical (metabolism), and how the body removes the chemical from the body (elimination).[252] Toxicokinetic tests of cells, cell components, and tissues removed from the intact body are called *in vitro* tests, while tests conducted on intact and living animals or humans are called *in vivo* tests.[253] A third, and more recent, kind of toxicokinetic test examines toxicokinetic behaviors

---

[247] Gentry Decl., ¶¶ 66-70 (Exhibit 50).

[248] *Id.*

[249] Lumpkin Decl., ¶ 38 (Exhibit 51); 2010 Review at 13-14 (Exhibit 49).

[250] 2010 Review at 128 (Exhibit 49).

[251] Lumpkin Decl., ¶ 32 (Exhibit 51).

[252] *Id.*

[253] *Id.*

through computer simulation of a chemical in cells, tissues, and organ systems of the body, commonly called *in silico* tests (because the data are generated in the silicon chip space of a computer).[254]

EPA concluded that the existing epidemiological studies of chloroprene's potential impacts on humans contained limitations that "precluded developing quantitative risk estimates" from that human epidemiological data. Instead, EPA considered two animal studies for use in calculating the 2010 IUR: (1) the Trochimowicz *et al.* (1998) study, which reported tumor incidences in two types of hamsters following chloroprene inhalation exposures; and (2) a 1998 study by the National Toxicology Program ("NTP"), which reported tumor incidences in groups of male and female F344 rats and male and female B6C3F1 mice ("NTP Study") following chloroprene inhalation exposures.[255] The study involving hamsters found no dose-related increases in cancer development in the animals, Trochimowicz *et al.* (1998), but the NTP Study observed dose-related increases in cancer development in mice, and, to a lesser extent, in rats.[256] In the 2010 Review, EPA estimated the IUR based solely on a 1998 NTP Study of female B6C3F1 mice.[257]

Specifically, the 2010 Review recites the conclusion of the NTP Study that there was evidence of carcinogenicity in F344/N rats and B6C3F1 mice due to lifetime inhalation exposure to chloroprene.[258] Purely as a matter of policy, EPA estimates *human* IURs based on the IUR for the most sensitive *animal* sex and species if (i) EPA does not identify a "clearly most relevant species" and (ii) no adequate human data are available.[259] EPA's guidance document states:

> Although it is preferable to use human studies as the basis for the dose-response derivation, adequate human data are not always available, often forcing reliance on laboratory animal data. Presented with data from several animal studies, *the risk assessor first seeks to identify the animal model that is most relevant to humans*, based on comparability of biological effects using the most defensible biological rationale; for instance, by using comparative metabolic, pharmacokinetic, and pharmacodynamic data. *In the absence of a clearly most relevant species, however, the most sensitive species is used as a matter of science policy at the EPA.*[260]

As the 2010 Review acknowledges, the IUR derived from female B6C3F1 mice studies was *not* based on data that allows for any adjustments to reflect the differences in risks applicable to mice versus humans:

> The calculated composite unit risk is based on the most sensitive endpoint (risk of any tumor type) in the most sensitive species and sex (female mouse). *There is no information on chloroprene to indicate that the observed rodent tumors are not relevant to humans*.

---

[254] *Id.*

[255] 2010 Review at 128 (Exhibit 49).

[256] Lumpkin Decl., ¶ 27 (Exhibit 51).

[257] *Compare* DPE MSJ SOF, ¶ 46 (Exhibit 30), *with* US Contested SOF, ¶ 46 (Exhibit 31); US Responses to DPE First Set of RFAs, at 18 (Response to RFA No. 17), Case No. 2:23-cv-00735 (Exhibit 64).

[258] 2010 Review at 102 (Exhibit 49)

[259] *Compare* DPE MSJ SOF, ¶ 50 (Exhibit 30), *with* US Contested SOF, ¶ 50 (Exhibit 31).

[260] EPA, *Methods for Derivation of Inhalation Reference Concentrations and Application of Inhalation Dosimetry* at 1-5 (Oct. 1994) (emphases added) (Exhibit 53). EPA's expert, Dr. Ila Cote, confirmed that, "in the absence of data to the contrary, the agency will use the most sensitive end point, which generally means the most sensitive [sex and] species." Deposition Transcript of Dr. Ila L. Cote ("Cote Dep. Tr.") 20:1-6 (Exhibit 65).

> Further, *no data exist to guide quantitative adjustment for differences in sensitivity among rodents and humans*.[261]

In the 2010 Review, EPA did not identify animal data that was most relevant to human response to chloroprene.[262] In the absence of such a determination, EPA used data from the most sensitive sex and species in the NTP Study to calculate the IUR for chloroprene, relying entirely on tumor incidence data for female B6C3F1 mice.[263]

In relying on tumor incidence data for the female B6C3F1 mice, EPA made the conservative assumption that humans are equally susceptible to cancer from inhaled chloroprene as female B6C3F1 mice, the most sensitive sex and species in the animal studies that EPA considered.[264] Thus, as an extension of that conservative assumption, the EPA's IUR for chloroprene assumes that humans are more sensitive to chloroprene-induced cancer than male B6C3F1 mice, male and female rats, and male and female hamsters—*i.e.*, the other sexes and species considered by EPA in the chloroprene animal studies, which were all less susceptible to chloroprene-induced cancer than female B6C3F1 mice, the sex and species of animal that EPA chose to exclusively rely upon.[265]

Any "imminent endangerment" finding would need to assess whether there is an imminent endangerment *to humans*. Dr. Kristina Thayer, who leads the IRIS program, admitted that "EPA has . . . no idea of the true correspondence of the [B6C3F1] mouse to human response."[266] Further, EPA admits that, since the 2010 Review, it has performed no *new* analysis to determine that the 2010 IUR provides a risk estimate representative of human risk.[267] Instead, EPA has rested on its unsupported "default" assumption that bases the IUR on the highest possible risk level, stating that its " analysis relating to its use of the B6C3F1 mouse data in calculating the IUR in the 2010 IRIS Assessment, and the analysis EPA performed to determine that the B6C3F1 mouse data was the most representative information available to understand potential human responses to chloroprene *is contained in the 2010 IRIS Assessment*...."[268]

Toxicokinetic data related to chloroprene exposure in humans and animals demonstrates that humans and female B6C3F1 mice are not equally susceptible to chloroprene, as EPA assumed.[269] In the 2010 Review, EPA discussed the available toxicokinetic data for chloroprene in humans and animals.[270] However, EPA makes no reference to this critical information in support of its decision to assess

---

[261] 2010 Review at 141 (Exhibit 49) (emphases added).

[262] *Id.* at 139 ("It was assumed that humans are as sensitive as the most sensitive rodent sex/species tested; true correspondence is unknown."); Deposition Transcript of Kris Thayer, Ph.D. ("Thayer Dep. Tr.") 63:5-21; 154:11-14 (Exhibit 66).

[263] Lumpkin Decl., ¶ 28 (Exhibit 51); 2010 Review at 147-48 (Exhibit 49). "The chloroprene IUR is based on the assumption that humans are as sensitive to chloroprene exposure as the female B6C3F1 mouse." *Compare* DPE MSJ SOF, ¶ 47 (Exhibit 30), *with* US Contested SOF, ¶ 47 (Exhibit 31).

[264] US Responses to DPE First Set of RFAs, at 18 (Response to DPE's RFA No. 17) ("The United States further admits that the inhalation unit risk for chloroprene determined in the 2010 IRIS assessment is based on the assumption that humans are as sensitive to chloroprene exposure as the female B6C3F1 mouse.") (Exhibit 64); Lumpkin Decl., ¶ 31 (Exhibit 51).

[265] Lumpkin Decl., ¶ 31 (Exhibit 51).

[266] Thayer Dep. Tr. 63:5-21; 154:11-14, Case No. 2:23-cv-00735 (Exhibit 66); *see also* 2010 Review at 139 (true correspondence of B6C3F1 mouse to human is "unknown") (Exhibit 49).

[267] EPA Responses to DPE Second Set of Interrogatories, at 20 (Response to Interrogatory No. 18) (Exhibit 25).

[268] *Id.*

[269] Lumpkin Decl., ¶ 38 (Exhibit 51).

[270] *Id.* ¶ 32.

chloroprene risk based on female B6C3F1 mouse data. Instead, EPA blindly relies on the analysis performed in the 2010 Review, ignoring the crucial fact that the 2010 Review failed to determine which set of animal data best reflected human risk.[271]

In Chapter 3 of the 2010 Review (entitled "Toxicokinetics"), EPA summarizes the then-available *in vitro* and *in vivo* studies that informed the toxicokinetic behaviors of chloroprene in animals and humans.[272] Section 3.3 of the 2010 Review discusses the then-available metabolism data for chloroprene based on laboratory rodents and humans, including data on the rate at which chloroprene is metabolized *in vitro* by specific liver and lung cellular components (called microsomes) to a class of one or more compounds called "reactive epoxides."[273] These "reactive epoxides" are believed to react with the cellular structures in the tissues in which they are produced (*e.g.*, the lung or liver), resulting in the loss of proper function and, ultimately, leading to formation and growth of tumors (*i.e.*, the source of toxicity).[274]

The toxicokinetic data presented in the 2010 Review demonstrates significant metabolic differences between female B6C3F1 mice and humans. For example, the data demonstrate that humans and female B6C3F1 mice do *not* metabolize chloroprene the same.[275] Table 3-4 of the 2010 Review, and EPA's accompanying discussion, summarizes the differences between female B6C3F1 mice and humans in metabolizing chloroprene into reactive epoxides, showing, based on *in vitro* studies, that the rate of this metabolism in a female B6C3F1 mouse's liver is more than twice that of human liver microsomes and about 50-times higher in lung microsomes.[276] Because the mouse's metabolic rate of chloroprene is much higher than the human's, the mouse is capable of producing significantly higher amounts of "reactive epoxides," the compounds understood to be responsible for chloroprene's toxicity. The 2010 Review also states that higher metabolism of chloroprene to reactive epoxides was observed in female B6C3F1 mice compared to other tested laboratory rats and hamsters, providing the most likely explanation of the higher tumor incidence reported in B6C3F1 mice relative to the other tested rodents.[277]

In Table 3-5 of the 2010 Review and the accompanying discussion, EPA summarizes study data indicating that enzyme systems that metabolize, and potentially detoxify, one of the key reactive epoxides are much more active in human microsomes than in female B6C3F1 mice.[278] Because the mouse's metabolic rate for the pathway that metabolizes the key reactive epoxide was lower than in the human's, the human is capable of detoxifying (*i.e.,* clearing) higher amounts of this key reactive epoxide from the body.[279]

EPA's risk assessment accepts at face value the IUR's use of the female B6C3F1 mouse to estimate risk, despite ample toxicokinetic data that it is not the data most representative of human risk. The Proposed Rule provides no evidence that EPA has considered this data. Likewise, EPA's expert in the Section 303 Litigation, Dr. Ila Cote, admitted that she did not consider the pharmacokinetic data in Tables 3-4 and 3-5 of the 2010 Review in preparing her initial declaration, explaining she was not familiar with the data.[280]

---

[271] EPA Responses to DPE Second Set of Interrogatories, at 20 (Response to Interrogatory No. 18) (emphasis added) (Exhibit 25).
[272] Lumpkin Decl., ¶ 113 (Exhibit 51).
[273] 2010 Review at 7-19 (Exhibit 49); Lumpkin Decl., ¶ 37 (Exhibit 51).
[274] Lumpkin Decl., ¶ 38 (Exhibit 51).
[275] *Id.*
[276] 2010 Review at 13-44 (Exhibit 49); Lumpkin Decl., ¶ 38 (Exhibit 51).
[277] 2010 Review at 13-14 (Exhibit 49).
[278] *Id.*
[279] Lumpkin Decl., ¶ 116 (Exhibit 51).
[280] Cote Dep. Tr. 186:2-186:18 (Exhibit 65).

In the 2010 Review, EPA's use of the female B6C3F1 mouse to calculate the IUR was based on the NTP Study. But the same NTP Study that included data for female B6C3F1 mice *also included* tumor incidence data for the F344 female rat (the more sensitive sex of F344 rat), which would have resulted, after adjusting for age-dependent adjustment factors ("ADAFs") in an IUR of 6.9 x $10^{-5}$.[281] Indeed, the F344 rat has a rate of metabolism for chloroprene, and metabolic rate for the pathway that metabolizes the key reactive epoxide, that is more similar to humans than the female BC3F1 mouse.[282] EPA's use of female B6C3F1 mouse data, despite the availability of more data more representative to humans, is inappropriate for use in assessing whether an "imminent endangerment" exists for *humans*.

**2. Adjusting for continuous exposure.**

EPA's IUR for chloroprene and corresponding 0.2 µg/$m^3$ concentration level assumes that individuals are continuously exposed to chloroprene 24 hours per day, every day, for 70 years.[283] In the Proposed Rule, EPA provides no suggestion that an assumption of continuous exposure is plausible. Likewise, in the Section 303 Litigation, EPA's expert, offered no evidence that the assumption of continuous exposure is plausible, and he failed to follow EPA's applicable guidance. EPA typically relies on an assumption of continuous exposure when considering a maximum plausible risk and implementing the Benzene Rule framework. However, an "imminent endangerment" finding is based on actual risk and requires EPA to substantiate such an assumption is plausible.[284]

In the residual risk review for coke ovens, EPA explained that the MIR must be "tempered" by the implausible considerations, such as the assumption of continuous exposure for 70 years for every individual near the Facility:

> For the source category associated with the 1993 national emission standards, the revised MIR estimate is 300 in a million. . . . Although we are adjusting risk estimates upward to reflect the new supplemental guidance, these estimated risk increases must also be tempered by consideration of other factors that were discussed at proposal and in the risk assessment document, and the further protective assumption added to the risk assessment that all individuals are born in the assessed area. . . . Our 70-year exposure assumption includes exposures from birth to 70 years. If exposures were from 3 years to 73 years, the adjustment factor would be less than 1.6. If exposures were from 16 years to 86 years, no adjustment would be necessary. In addition, we used a health-protective assumption of a 70-year exposure duration in our risk estimates; however, using the national average residency time of 12 years would reduce the estimate of risk by a factor of six (69 FR 48347).[285]

Notably, EPA failed to include any similar discussion in the Proposed Rule, despite adopting the same assumption. By failing to qualitatively explain the implausibility of the 70-year assumption, the Proposed Rule suggests that an MIR is an appropriate proxy for actual risk. It is not. Without accounting for the 70-year assumption through the use of an exposure assessment, the MIRs are rendered useless for assessing "imminent endangerment."

---

[281] Gentry Decl., ¶ 46 (Exhibit 50).
[282] 2010 Review at 13-14 (Exhibit 49).
[283] 2010 Review at 138 (Exhibit 49); Lumpkin Decl., ¶ 90 (Exhibit 51).
[284] Lumpkin Decl., ¶ 61 (Exhibit 51).
[285] 70 Fed. Reg. at 19994 (Exhibit 35).

EPA's *Guidelines for Human Exposure Assessment* provide guidance on how exposure assessments should be performed and how the risk assessor can better understand the characteristics of a population and its behaviors.[286] The EPA guidance explains that exposure estimates for an individual or population can be developed "[b]y combining information and data describing exposure scenarios, concentrations, activity patterns and other exposure factors."[287] The guidelines also emphasize the importance of data, noting that "[t]he drivers for human activities are complex and, unlike [chemicals], cannot be predicted using first-principle models based on physical/chemical properties. Instead, human activities are treated as stochastic properties (random variables) described by population distributions based on available (*e.g.,* observational or modeled) data."[288]

The preliminary assumption in risk assessment that a person is constantly exposed for a lifetime is a hypothetical construct and only useful for an initial screening-level risk assessment.[289] Moving beyond a mere screening-level risk assessment, however, adjustments for reasonably plausible mobility and residential occupancy durations are needed to sufficiently assess exposure and associated risks on which to justify regulatory action like declaring an imminent and substantial endangerment.[290] While it is true that IURs in the IRIS Program are not developed to account for residential mobility and occupancy (IRIS IURs are chemical-specific, but facility-neutral and, accordingly, assume 70-year continuous exposure), EPA guidance is clear that exposure assessments *do* account for residential mobility and occupancy.[291]

EPA has not performed any such exposure analysis in the rulemaking. Likewise, in the Section 303 Litigation, EPA also failed to make any such adjustments for residential mobility and occupancy duration.[292] For example, EPA has developed an *Exposure Factors Handbook*.[293] This guidance document is specifically designed to reduce uncertainties in estimates of exposure duration and frequency to environmental chemicals.[294] For example, EPA's *Exposure Factors Handbook* provides residential occupancy data, *i.e.,* the "time (years) between a person moving into a residence and the time the person moves out or dies."[295] The *Exposure Factors Handbook* states that the average (mean) residential occupancy period is 12 years and the 95th percentile is 33 years, meaning that, across a population, the true residential occupancy period is expected to be less than 33 years 95% of the time.[296] Notably, the average residential occupancy period of 12 years is the same period of time referenced by EPA in the residual risk review for coke ovens.

For example, in the Section 303 Litigation, DPE's expert, Dr. Lumpkin, prepared such estimates based on plausible residential duration and occupancy (without making other appropriate adjustments described above). Dr. Lumpkin's estimates resulted in an IUR of $2.4 \times 10^{-4}$ per $\mu g/m^3$, or twice the IUR developed by

[286] EPA, *Guidelines for Human Exposure Assessment* (Oct. 2019) (Exhibit 67).
[287] *Id.* at 17.
[288] *Id.* at 6-7.
[289] *Id.*
[290] *Id.*
[291] *Id.*
[292] Rebuttal Declaration of Dr. John J. Vandenberg in Support of United States' Reply to its Motion for Preliminary Injunction ("Vandenberg Rebuttal PI Decl."), ¶ 17, Attachment 11A ("Updated graph of estimated excess lifetime cancer risk associated with ***continuous chloroprene exposure*** at Denka TO-15 monitoring locations" (emphasis added)), Case No. 2:23-cv-00735 (Exhibit 68).
[293] Lumpkin Decl., ¶ 92 (Exhibit 51); EPA, *Exposure Factors Handbook: 2011 Edition* at 6-1 (2011) (Exhibit 69).
[294] EPA, *Exposure Factors Handbook: 2011 Edition* at 6-1 (2011) (Exhibit 69).
[295] *Id.* at Table ES-1; Lumpkin Decl., ¶ 96 (Exhibit 51).
[296] EPA, *Exposure Factors Handbook: 2011 Edition* at Table 16-4 (2011) (Exhibit 69).

EPA in the 2010 Review. Dr. Lumpkin's exposure-adjusted IUR, or any similar adjustments to the IUR, would provide a more representative estimate of actual risk.

Values from EPA's *Exposure Factors Handbook* demonstrate that assuming a person is born near the Facility and remains constantly immobile there for 70 years is not plausible.[297] Even less plausible is the notion that *every* person living near the Facility would remain at a single location for 70 continuous years. Failing to adjust the default 70-year exposure assumption to account for reasonably plausible mobility and residential occupancy durations renders an exposure assessment preliminary, incomplete, and inappropriate for use to assess whether an imminent and substantial endangerment exists.[298]

**3. Adjusting for upper-bound estimate.**

In the 2010 Review, EPA used the "upper bound" risk value when estimating the IUR for chloroprene based exclusively on tumor incidence data from female B6C3F1 mice.[299] The "upper bound" value, or the "upper confidence limit," is a value expected to contain the true value 95% of the time over many different samples.[300] In *estimating risk* in Section 112 rulemakings, EPA often uses an upper bound estimate. However, in assessing whether an *imminent endangerment* exists, it is inappropriate to use a value that by definition, does *not* reflect the most probable risk estimate.[301] An "upper bound" value of the IUR—which results in a concentration of 0.2 $\mu g/m^3$ associated with a 1-in-10,000 excess risk—is just as likely as the "lower bound" value, which results in a concentration of 0.4 $\mu g/m^3$ associated with a 1-in-10,000 excess risk, and is less likely than every value in between.[302] In addition, when the IUR contains other flawed data (i.e., the use of the B6C3F1 female mouse data), using the upper bound value amplifies the risk distortions caused by those data.

When EPA uses an "upper bound" estimate for IURs, it means EPA has confidence that the excess cancer risk will not be *greater* than that estimate.[303] However, the true excess cancer risk is likely below that estimate and could be as low as zero.[304] In the Section 303 Litigation, EPA incorrectly alleges that "a person may breathe no more than an average chloroprene concentration of 0.2 $\mu g/m^3$ over 70 years in order to remain below a 1-in-10,000 lifetime excess cancer risk."[305] Even if every other aspect of EPA's risk allegations were assumed to be correct, which is a false assumption, only a fractional subset of people would face a 1-in-10,000 excess risk of cancer at 0.2 $\mu g/m^3$, and it is possible that *no* people would face such risk. Accordingly, EPA's use of the upper bound IUR does not provide a meaningful estimate of excess cancer risk actually posed by chloroprene. Nor does EPA (i) define what characteristics people within the upper bound exhibit or (ii) identify a single person who exhibits such characteristics. Even if using an upper bound value is appropriate within the framework of the Benzene Rule, it is inappropriate when

---

[297] Lumpkin Decl., ¶ 119 (Exhibit 51).

[298] *Id.* ¶¶ 90-102.

[299] *Id.* ¶ 60; 2010 Review at 136 (Exhibit 49).

[300] 2010 Review at 136 (stating that the 95% upper confidence limit was calculated assuming a normal distribution and using the formula 95% UCL = MLE + 1.645 × SD) (Exhibit 49).

[301] Lumpkin Decl., ¶ 59 (Exhibit 51).

[302] *Id.* ¶¶ 30, 60-62.

[303] *See* EPA, *Air Toxics Risk Assessment Ref. Library, Vol. 2* at 32-33 (Apr. 2004) (Exhibit 70).

[304] EPA, *Guidelines for Carcinogen Risk Assessment* at 13 (Sept. 1986) (approach used in developing IUR "does not necessarily give a realistic prediction of the risk. The *true value of the risk* is *unknown*, and may be as low as zero.") (emphasis added) (Exhibit 71); *see also* Cote Dep. Tr. 31:8-10 ("The true value for human risk [of chloroprene] is really not known. So this is an estimate based on rodent data. . . .") (Exhibit 65).

[305] EPA Memorandum in Support of Motion for Preliminary Injunction, *U.S. v. Denka Performance Elastomer LLC et al.*, Case No. 2:23-cv-00735, ECF No. 9-2, at 2 (E.D. La. Mar. 20, 2023) (Exhibit 72).

assessing actual risk such as in an "imminent endangerment" finding. Adjusting the IUR to reflect the central tendency (2.2 x $10^{-4}$) would provide a more representative estimate of actual risk.

**4. Adjusting for arbitrary rounding.**

In the 2010 Review, EPA calculated an IUR of 5 x $10^{-4}$ (the equivalent of 0.20 μg/$m^3$), in part, by rounding the composite IUR (the risk for all tumor types) for female B6C3F1 mice upwards, from 2.7 x $10^{-4}$ (the equivalent of 0.37 μg/$m^3$) to 3 x $10^{-4}$ (the equivalent of 0.33 μg/$m^3$).[306] EPA then applied the ADAFs to the rounded value to calculate a final IUR of 5 x $10^{-4}$ corresponding to 0.20 μg/$m^3$.[307] If EPA had not rounded the composite risk value before applying the ADAFs, the final IUR would be 4.47 x $10^{-4}$ (the equivalent of 0.22 μg/$m^3$), a decrease in the risk estimate of 10%.

EPA had no biological-based or risk-based reason for rounding the composite risk value from 2.7 x $10^{-4}$ to 3 x $10^{-4}$.[308] Nor has EPA even attempted to offer such a reason, instead admitting that the IUR was rounded as purely a matter of "convention in mathematics."[309] Critically, however, this "convention," by itself, translates into a 10 percent decrease the IUR. Likewise, rounding can distort the MIR values assigned to a facility, particularly given that the MIRs themselves are rounded. EPA's decision to round the values in the IUR overstates the risk of cancer actually posed by chloroprene and it is inappropriate to import this arbitrary error in assessing imminent endangerment. Simply by calculating the IUR without rounding, the 2010 IUR would be more representative of actual risk.

**5. Adjusting for unsupported mutagenic mode of action classification.**

EPA incorrectly determined that the weight of evidence supported classifying chloroprene as acting via a "mutagenetic mode of action."[310] Based on this classification, EPA applied age-dependent adjustment factors ("ADAFs") to the IUR, increasing the IUR by 66 percent from 3 x $10^{-4}$ (the equivalent of 0.33 μg/$m^3$) to 5 x $10^{-4}$ (the equivalent of 0.20 μg/$m^3$).

Contrary to EPA's determination, the scientific evidence demonstrates that a mutagenic mode of action for chloroprene is unlikely.[311] The question of whether chloroprene is a mutagen has been evaluated in *in vitro* mammalian cell studies, *in vitro* bacteria studies, and *in vivo* studies, and the overall evidence indicates that chloroprene does not have a mutagenic mode of action.[312] Most significantly, *in vivo* studies of mice did not report changes in mutations that would support a mutagenic mode of action.[313]

---

[306] 2010 Review at 137 (Exhibit 49); Lumpkin Decl., ¶ 30 (Exhibit 51).
[307] 2010 Review at 137-38 (Exhibit 49).
[308] Cote Dep. Tr. 93-94 (explaining that rounding the composite risk value is "simply a convention in mathematics") (Exhibit 65).
[309] Cote Dep. Tr. 93-94 (Exhibit 65).
[310] 2010 Review at 106-11 (Exhibit 49). EPA defines the carcinogenic "mode of action" of a chemical as "a sequence of key events and processes, starting with interaction of an agency with a cell, proceeding through operational and anatomical changes, and resulting in cancer formation." Lumpkin Decl., ¶ 53 (citing EPA, *Guidelines for Cancer Risk Assessment* (Mar. 2005) at 1-10, n.2 (Exhibit 56)) (Exhibit 51). Although multiple modes of action have been identified for chemical carcinogens, per EPA guidelines, the distinction between a mutagenic or non-mutagenic mode of action has significant implications for deriving an IUR. Lumpkin Decl., ¶ 53 (Exhibit 51).
[311] Lumpkin Decl., ¶ 30 (Opinion 3) (Exhibit 51).
[312] Lumpkin Decl., ¶ 78-86 (Exhibit 51); Sax *et al.* (2020), at 300-303 (Exhibit 40).
[313] Lumpkin Decl., ¶ 83 (Exhibit 51).

Critically, considering the evidence on whether chloroprene acts via a mutagenic mode of action, the NTP Study (the same study EPA relies on for the data on female B6C3F1 mice) concluded that "[c]hloroprene showed *no evidence of mutagenicity* in tests performed in vitro or in vivo."[314]

The Ramboll PBPK Model simulation of the NTP rodent dose-response data indicates that the carcinogenic mode of action may likely be due to cytotoxicity (frank cell damage) rather than direct mutagenicity, and that the prevalence of reactive metabolites is likely to occur only after glutathione (a molecule that can attach to and neutralize the reactivity of chloroprene's reactive metabolites) is depleted at chloroprene exposure levels used in the NTP (1998) studies, but far higher than levels measured in the environment.[315] By accounting for chloroprene's cytotoxic mode of action, and calculating the IUR without applying the ADAFs, the 2010 IUR would be more representative of actual risk.

## V. Conclusion

As set forth above, a two-year compliance period is "necessary for the installation of controls" and the steps that DPE has already taken to reduce emissions will ensure that emissions from the Facility will not cause an "imminent endangerment" during the extension period.

---

[314] *Id.* (citing 1998 NTP Study at 276) (emphasis added).
[315] *Id.* ¶ 71.

# EXHIBIT W

BRACEWELL

July 26, 2024

**BY E-MAIL AND FEDEX**

Ms. Cheryl T. Seager
Director, Enforcement and Compliance Assurance Division
Environmental Protection Agency, Region 6
1201 Elm Street, Suite 500
Dallas, TX 75270

**Re: Denka Performance Elastomer, LLC – Request For Extension**

Dear Director Seager:

I write on behalf of Denka Performance Elastomer, LLC ("DPE") to submit a request for an extension of certain compliance periods prescribed in the final rule published on May 16, 2024, at 89 Fed. Reg. 42,932 ("Final Rule"). Specifically, the enclosed request seeks to extend the compliance periods set forth in 40 C.F.R. §§ 63.481(o) and (p)(2) until two years after the Final Rule's effective date pursuant to 42 U.S.C. § 7412(f)(4)(B) (the "Extension Request"). EPA is authorized to grant the request pursuant to 42 U.S.C. § 7412(f)(4)(B) and 40 C.F.R. § 63.6(i)(9).

The enclosed document provides the basis for granting the Extension Request and satisfies the criteria set forth in 40 C.F.R. Part 63, Subpart A. As the enclosure describes in detail, good cause exists for EPA to grant DPE's request because (as EPA has publicly recognized) a period of at least two years is necessary for DPE to comply with the applicable requirements and chloroprene emissions from DPE's facility (the "Facility") have not presented—and do not present—an imminent endangerment.

As EPA is aware, on March 15, 2024, DPE submitted to EPA a Notice of Intent to Seek an Extension, providing supporting information that was available at that time ("Notice of Intent"). On April 19, 2024, DPE formally requested a two-year extension from the Louisiana Department of Environmental Quality ("LDEQ")—the Louisiana state agency authorized to grant CAA Section 112 compliance extensions. *See* 40 C.F.R. § 63.6(i)(9) (providing that EPA or "the State with an approved permit program[] may grant an extension of compliance with an emission standard"); EPA, *Clean Air Act Final Full Approval of Operating Permits Program; Louisiana Department of Environmental Quality*, 60 Fed. Reg. 47,296 (Sept. 12, 1995) (EPA's approval of LDEQ's permit program).

On June 27, 2024, LDEQ granted DPE's extension request (the "LDEQ Extension"), finding, in part, as follows: "[A]dditional time is needed for Denka to install controls .... LDEQ also finds that steps will be taken during the period of the extension to assure that the health of persons will be protected from imminent endangerment."

**Jeffrey R. Holmstead**
Partner

T:+1.202.828.5852 F: +1.800.404.3970
2001 M Street NW, Suite 900, Washington,DC 20036-3310
jeff.holmstead@bracewell.com bracewell.com

EPA has taken the position in legal proceedings in two different federal courts that the LDEQ Extension is "ineffectual" and "invalid." While DPE emphatically disputes EPA's position, EPA's statements in these legal proceedings have created substantial and mounting legal uncertainty in relation to DPE's compliance obligations. On June 28, 2024, DPE submitted a letter to EPA requesting that EPA explain and confirm its position regarding the LDEQ Extension and stated that EPA's failure to respond by July 8 would be treated as confirmation that EPA would continue to treat the LDEQ Extension as invalid. EPA did not respond. Accordingly, on July 12, 2024, DPE filed in the U.S. Court of Appeals for the Fifth Circuit a petition for declaratory judgment to confirm the validity of the LDEQ Extension and a motion for stay pending review seeking to preserve the status quo, requesting that EPA be precluded from taking action in contravention of the validity of the LDEQ Extension pending resolution of DPE's petition ("Stay Motion").

By submitting this Extension Request, DPE in no way concedes to EPA's position on the validity of the LDEQ Extension, which remains valid and in full force and effect. To the contrary, DPE is confident that the Fifth Circuit will affirm the validity of the LDEQ Extension. DPE recognizes, however, that EPA also has authority to grant compliance date extensions, and the U.S. Court of Appeals for the D.C. Circuit has stated (based on an argument made by the intervenors *but not EPA*) that DPE cannot establish irreparable harm until it has requested an extension from EPA. Accordingly, DPE is submitting the enclosed Extension Request.

DPE has no illusions as to the outcome of its Extension Request. Indeed, EPA's representation to the Fifth Circuit in its July 22 opposition brief (at page 20) that DPE has "fail[ed] to seek" an extension from EPA is false, as is EPA's implied assertion that DPE has a realistic possibility of obtaining such an extension. As EPA well knows, the facts are these: Shortly after the Final Rule was signed, representatives from EPA contacted DPE's counsel to encourage DPE to seek an extension of the 90-day compliance deadline in the Final Rule. In May 2024, at EPA's invitation, representatives of DPE and EPA engaged in a series of videoconference meetings over nearly two weeks to discuss the terms under which EPA would be willing to grant an extension to DPE. In these discussions, representatives of DPE were clearly seeking an extension.

In these discussions, representatives from EPA repeatedly and expressly stated that the measures described in DPE's Notice of Intent to seek an extension would be "necessary, but not sufficient" for EPA to grant an extension. During what turned out to be the final videoconference meeting on May 24, counsel for EPA informed DPE that, to obtain an extension of the 90-day compliance period, DPE would have to agree to implement a series of additional, costly emission control measures that very closely approximated the requirements that EPA had demanded in its motion for preliminary injunction in the litigation EPA filed against DPE in the U.S. District Court for the Eastern District of Louisiana under Section 303 of the Clean Air Act ("Section 303 Litigation") and the requirements in the "Statement of Final Relief" that EPA represented to the district court it would seek at the trial in the Section 303 Litigation. As we have explained to EPA, it is simply not possible (much less economically feasible) for DPE to comply with

those demands, meaning that EPA's only proposed pathway for granting DPE an extension was entirely illusory.

Unfortunately, EPA's demands are unsurprising in light of EPA's prior conduct. In the Section 303 Litigation, EPA's still-unadjudicated allegations are that the Facility's chloroprene emissions are causing an "imminent and substantial endangerment" because they allegedly cause a 0.06 percent increase in the lifetime cancer risk for a hypothetical person breathing those emissions at the fence line of the Facility continuously for 70 years. EPA's requested Final Relief in that case (*i.e.*, what EPA contends is necessary to abate the alleged "imminent and substantial endangerment" finding) is more stringent even than the emission reductions required by the Final Rule. EPA's unadjudicated "finding" in the Section 303 Litigation also serves as the sole basis for its disparate treatment of DPE—requiring DPE to comply with the Final Rule within 90 days when the other 200-plus entities subject to the Rule, including those that, according to EPA's own analysis, pose a higher risk than the DPE Facility, are given two years to come into compliance.

It should not take long for EPA to respond to this Extension Request. The facts and circumstances relating to this Extension Request are well known to EPA, given its lengthy involvement with these issues, including the four months it has already had to review of the Notice of Intent from last March (a document that is not materially different than the enclosed Extension Request) and its multiple discussions with DPE about an extension referenced above. EPA is also acutely aware that the DPE Facility will need to shut down if relief is not obtained in the very near future. In light of the clear irreparable harms facing DPE and its 250 employees, DPE requests that EPA act on this Extension Request by August 9, 2024 (14 calendar days). If EPA refuses to grant the Extension Request within this time period, DPE will continue to seek appropriate judicial action to prevent the unjustified shutdown of its Facility.

Please do not hesitate to contact me with any questions.

Sincerely,

Jeffrey R. Holmstead
***Counsel to Denka Performance Elastomer, LLC***

Enclosure:
Enclosure in Support of Extension Request

# Enclosure in Support of
# <u>Extension Request</u>

## *Denka Performance Elastomer LLC*

**(July 26, 2024)**

**Extension Request**

*Denka Performance Elastomer LLC*

Denka Performance Elastomer LLC ("DPE") submits this timely[1] facility-specific request for an extension of compliance periods prescribed in the final rule in docket EPA-HQ-OAR-2022-0730 ("Final Rule").[2] Specifically, DPE requests that the compliance period for the requirements with a 90-day compliance deadline including those set forth in amended 40 C.F.R. §§ 63.481(o)[3] and 63.481(p)(2) applicable to DPE's facility in LaPlace, Louisiana (the "Facility") be extended to two years after the Final Rule's effective date pursuant to 42 U.S.C. § 7412(f)(4)(B) and 40 C.F.R. § 63.6(i)(4)(ii) ("Extension Request").[4]

As EPA is aware, on April 19, 2024, DPE formally requested a two-year extension from the Louisiana Department of Environmental Quality ("LDEQ")—the Louisiana state agency authorized to grant CAA Section 112 compliance extensions. *See* 40 C.F.R. § 63.6(i)(9) (providing that EPA or "the State with an approved permit program[] may grant an extension of compliance with an emission standard"); EPA, *Clean Air Act Final Full Approval of Operating Permits Program; Louisiana Department of Environmental Quality*, 60 Fed. Reg. 47,296 (Sept. 12, 1995) (EPA's approval of LDEQ's permit program). On June 27, 2024, LDEQ granted DPE's extension request (the "LDEQ Extension"), finding, in part, as follows: "[A]dditional time is needed for Denka to install controls .... LDEQ also finds that steps will be taken during the period of the extension to assure that the health of persons will be protected from imminent endangerment."[5] By submitting this Extension Request to EPA, DPE in no way concedes to EPA's position on the validity of the existing LDEQ Extension, which remains valid and in full force and effect. To the contrary, DPE is confident that the Fifth Circuit will affirm the validity of the LDEQ Extension. However, the U.S. Court of Appeals for the D.C. Circuit has stated (based on an argument made by the intervenors but not EPA) that DPE cannot establish irreparable harm until it has requested an extension from EPA. Accordingly, DPE is submitting this Extension Request.

The Final Rule requires a suite of new emission controls that would be necessary for compliance ("Section 112(f) Control Projects"). Good cause exists for EPA to grant this Extension Request because a period of at least two years is necessary for DPE to comply with the Section 112(f) Control Projects and the Facility does not present an imminent endangerment.

As EPA has historically and repeatedly recognized in rulemakings, including in the proposed rule in the above-referenced docket ("Proposed Rule")[6] as well as the Final Rule, emission reduction projects like the

---

[1] This request has been timely submitted within 90 days after the effective date (July 15, 2024) of the Final Rule. *See* 40 C.F.R. § 63.6(i)(4)(ii).

[2] *See* EPA, *New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry*, 89 Fed. Reg. 42932 (May 16, 2024) (Ex. 1). Due to their volume, the exhibits cited herein have been provided on a ShareFile (via cover email) and a flash drive (via overnight delivery). Certain exhibits contain only the relevant portions of the cited material and have been highlighted for convenience.

[3] This includes chloroprene requirements in amended § 63.484(u), § 63.485(y) and (z), § 63.487(j), § 63.494(a)(7), § 63.501(a)(10)(iv), § 63.502(a)(3) and (a)(7), § 63.509, and §63.510. 40 C.F.R. § 63.481(o).

[4] For ease of reference, this request will refer to the compliance period from the Final Rule's effective date, i.e., 90 days. *See* Final Rule at 43236-37 (amended 40 C.F.R. § 481(o) (not yet effective)) (Ex. 1).

[5] Letter from Amanda Vincent, LDEQ, to Jeffrey R. Holmstead, DPE, re *Extension of Compliance* (June 27, 2024) (Ex. 2).

[6] Denka Performance Elastomer LLC Comments re: EPA's New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the

Section 112(f) Control Projects will take significant time to plan, purchase, and install. Emission controls such as a thermal oxidizer and steam stripper are simply not equipment that can be safely installed in 90 days. Without additional time for implementation, a compliance period shorter than two years would jeopardize the continuing viability of the Facility and the jobs and livelihood of hundreds of employees and contractors who work there.

During the requested two-year implementation period, DPE would continue to comply with the existing Part 63 requirements that are enforceable at the time of this request at the Facility and continue to implement the significant emission reduction measures it has put in place there. These steps are sufficient to ensure that individuals near the Facility will be protected from any potential "imminent endangerment." While EPA has limited express guidance on what constitutes an "imminent endangerment" for purposes of setting NESHAP compliance periods, EPA's actions in prior Section 112 rulemakings make clear that emissions from the Facility do not constitute an "imminent endangerment." There have been no credible allegations of endangerment related to acute, short-term, or subchronic exposures from the Facility. In the pending litigation against DPE under Section 303 of the Clean Air Act ("Section 303 Litigation"),[7] EPA has alleged that chronic exposures from the Facility's chloroprene emissions are causing an "imminent and substantial endangerment" due to the maximum plausible risk of cancer over a lifetime. EPA's allegations of "imminent endangerment" are contradicted by decades of EPA actions under Section 112, and predicated on flawed conclusions that fail to consider and incorporate the best available science. Importantly, EPA's allegations in the Section 303 litigation are just allegations and do not constitute a judicial *finding*, nor does EPA offer any support in the Final Rule for the presence of an "imminent endangerment" associated with the current, historically low level of chloroprene emissions at the DPE Facility.

In recent Section 112 rulemakings, EPA has consistently provided compliance deadlines of at least two years for facilities with estimated maximum individual risks ("MIRs") equal to and in many cases greater than the DPE Facility, for facilities with higher estimated cancer incidences, and for facilities for which a greater number of people were exposed to an estimated risk above 1-in-10,000. As demonstrated in the chart below, there are 16 facilities that EPA has estimated have a higher risk than the DPE Facility, yet EPA has determined that no "imminent endangerment" exists at any of these 16 facilities by providing them unqualified compliance extensions. There is no basis to find that an imminent endangerment exists near DPE's Facility given that EPA has consistently allowed such facilities at least two years to come into compliance.

---

Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry, 88 Fed. Reg. 25080 (April 25, 2023) (Docket No. EPA-HQ-OAR-2022-0730; FRL-9327-01-OAR) (Ex. 3), Comment ID No. EPA-HQ-OAR-2022-0730-0176 (July 7, 2023) ("DPE Comment"), available at https://www.regulations.gov/comment/EPA-HQ-OAR-2022-0730-0176 (Ex. 4).

[7] *U.S. v. Denka Performance Elastomer LLC et al.*, No. 2:23-cv-00735 (E.D. La. Feb. 28, 2023).




Using the "maximum plausible" estimate of risk, the Final Rule estimates that, without the further emissions controls contemplated by the Final Rule, there will be 0.06 cancer incidences per year due to emissions from the Facility, which equates to approximately one cancer case every 17 years.[8] By EPA's estimate in the Final Rule—an estimate DPE disputes—providing the Facility a two-year compliance period would equate to less than 1/8th of a single cancer over the next 70 years. Extending DPE's compliance deadline from 90 days to two years would increase their alleged risk by less than 1/35th of this amount, or 0.0017%. In contrast, the 90-day compliance requirement will virtually ensure the shutdown of the Facility, jeopardize the jobs of hundreds of employees and contractors, and significantly impact the local and state economies.[9]

[8] Final Rule at 42963 (Table 5) (Ex. 1). EPA admits that the value on which the risk estimate is based is a "plausible upper limit to the true value of a quantity" and, in some circumstances, the "the true risk could be as low as zero...." Proposed Rule at 25103 (Ex. 3).

[9] *See* Remedy Declaration of Dr. Loren C. Scott ("Scott Remedy Decl."), Case No. 2:23-cv-00735 (Ex. 5).

Case: 24-60351 Document: 49 Page: 109 Date Filed: 07/29/2024

**I. Good cause exists to grant an extension of the compliance period based on the time necessary to install the Section 112(f) Emission Control Projects and the lack of an imminent endangerment at or near the Facility.**

Section 112(f)(4)(a) provides that standards promulgated pursuant to Section 112(f)(2) shall not apply until 90 days after the effective date.[10] However, Section 112(f)(4)(B) provides that a waiver permitting sources up to two years to comply with a standard may be granted if (1) "such period is necessary for the installation of controls" and (2) "steps will be taken during the period of the waiver to assure that the health of persons will be protected from imminent endangerment."[11]

The procedures for obtaining a Section 112(f)(4)(B) compliance extension are set forth in 40 C.F.R. § 63.6(i)(4)(ii), which provides as follows:

> The owner or operator of an existing source unable to comply with a relevant standard established under this part pursuant to section 112(f) of the Act may request that the Administrator grant an extension allowing the source up to 2 years after the standard's effective date to comply with the standard. The Administrator may grant such an extension if he/she finds that such additional period is necessary for the installation of controls and that steps will be taken during the period of the extension to assure that the health of persons will be protected from imminent endangerment. Any request for an extension of compliance with a relevant standard under this paragraph must be submitted in writing to the Administrator not later than 90 calendar days after the effective date of the relevant standard.[12]

Additionally, the applicable regulations require a compliance extension request to include: (1) a "description of the controls to be installed to comply with the standard" and (2) a "compliance schedule, including the date by which each step toward compliance will be reached."[13]

As discussed herein, good cause exists to grant this Extension Request. However, this Extension Request does not constitute a waiver of DPE's rights to challenge the Final Rule, the compliance periods set therein, or the applicability of Section 112(f)(4).

**II. A Compliance Period Of At Least Two Years Is Necessary For The Facility To Have Any Realistic Chance Of Completing The Section 112(f) Control Projects.**

**A. Safely Completing The Section 112(f) Control Projects, Including Planning, Approval, Construction, Installation, And Testing, Will Require Substantially More Than 90 Days at the Facility.**

The Facility will require at least a two-year compliance period to comply with regulatory requirements in the Final Rule. The Final Rule imposes stringent new regulatory requirements for chloroprene emissions based on a discretionary Section 112(f) residual risk review.[14] Specifically, the Final Rule "require[s]

---

[10] 42 U.S.C. § 7412(f)(4)(A).

[11] 42 U.S.C. § 7412(f)(4)(B); Final Rule at 42955 ("such sources [producing neoprene] may seek the EPA's approval of a waiver from the 90-day compliance deadline and obtain a compliance date…") (Ex. 1).

[12] 40 C.F.R. § 63.6(I)(4)(ii).

[13] 40 C.F.R. § 63.6(i)(6).

[14] Final Rule at 42941 ("In order to ensure our standards provide an ample margin of safety to protect public health following the new IRIS inhalation UREs for EtO and chloroprene, we are exercising our *discretion* and conducting risk assessments in this action for HON sources and for affected sources producing neoprene subject to the P&R I NESHAP.") (emphasis added) (Ex. 1).

control of chloroprene for: (1) Process vents, (2) storage vessels, (3) wastewater 'in chloroprene service'" and "finaliz[es] requirements to reduce chloroprene emissions from maintenance vents" to reduce risk to what EPA believes is an acceptable level and provides an ample margin of safety to protect public health.[15] The Final Rule also requires fenceline monitoring provisions that include an unreasonable threshold for taking corrective action.[16]

The Section 112(f) Control Projects each require at least two years to safely design, install, construct, and test.[17] Additionally, the Final Rule includes standards for pressure relief devices, control equipment bypasses, flares, and dioxins and furans emissions that must be accounted for in the planning of the Section 112(f) Control Projects.

DPE personnel and consultants have dedicated significant time and resources to evaluating many potential emission reduction projects at the Facility, including the types of projects necessary to meet the Final Rule requirements. For example, Montrose Environmental Group, Inc. ("Montrose"), a global environmental services provider specializing in emission control planning, measurement, and analysis, has worked closely with DPE over the past two years on nearly all aspects of potential options for chloroprene control at the Facility. Montrose developed several memoranda and Excel calculation workbooks in support of the Proposed Rule evaluating the feasibility of the Section 112(f) Control Projects. Specifically, Montrose analyzed: the overall cost-benefits of the Proposed Rule; the proposed wastewater requirements; and the proposed dioxins and furans requirements. DPE also worked with ECT2, a consulting group with significant wastewater expertise, to evaluate the feasibility and alternatives to control projects related to wastewater. Norton Engineering Consultants, Inc. ("Norton Engineering"), a consulting group with specialized expertise in thermal oxidizers, also assisted DPE after the Proposed Rule was released in evaluating potential thermal oxidizer configurations. Norton Engineering provided an analysis memorandum covering thermal oxidizer options and costs, as well as an analysis of the PRD and flare requirements proposed by EPA in the Proposed Rule. On July 7, 2023, DPE submitted comments to the Proposed Rule, which incorporated the robust technical work of these outside consultants, including analysis memoranda and Excel workbooks.[18] DPE also continued its evaluation work after submitting its Proposed Rule comments, including continued evaluation of Wash Belt emission capture projects and other projects.

The extensive analyses performed by DPE and these outside consultants are based on reviews of the Proposed Rule and associated technical documents, Facility site visits, third-party vendor quotes for emission control equipment, and extensive emissions control experience. The Final Rule requires virtually the same control projects as the Proposed Rule.[19] Therefore, the work performed to analyze the Proposed Rule remains a reasonable basis to estimate timing and cost. These analyses show that each of the Section

---

[15] *Id.* at 42948.

[16] *Id.* at 43255 (amended 40 C.F.R. § 63.502(a)(7)).

[17] EPA submitted several analysis memorandums in support of the Proposed Rule that describe such projects that were developed by their contractor, ERG. *See* ERG, *Analysis of Control Options for Wastewater Streams to Reduce Residual Risk of Chloroprene From Neoprene Production Processes Subject to P&R I* (July 6, 2023) ("ERG Wastewater Memo") (Ex. 6); ERG, *Analysis of Control Options for Process Vents and Storage Vessels to Reduce Residual Risk of Chloroprene Emissions at P&R I Affected Sources Producing Neoprene* (Mar. 2023) ("ERG Control Options for Process Vents and Storage Vessels Memo") (Ex. 7).

[18] The memoranda covered: thermal oxidizer; wastewater; PRDs; flares; dioxins and furans; and cost-benefits review.

[19] One control project that is no longer needed is a replacement for DPE's existing thermal oxidizer. Under the Proposed Rule, DPE would have been required to operate a thermal oxidizer with a destruction efficiency of 99.9%, an efficiency beyond the capabilities of its current equipment. Nevertheless, the thermal oxidizer analysis performed by DPE and its contractors remains applicable to investigating, designing, constructing, and testing the new thermal oxidizer that is required to meet the Final Rule requirements.

112(f) Control Projects will require significantly more time than a 90-day compliance period at the Facility. Each project involves site- and equipment-specific considerations at the Facility before completing the design, approval, construction, installation, and testing phases.

In addition, DPE has substantial concerns regarding the numerous complex process changes that will be required at the Facility for the installation of the Section 112(f) Control Projects. Chloroprene is a highly volatile, flammable, and highly reactive (polymeric) chemical. Any changes to the production process at the Facility will require properly trained and knowledgeable employees and contractors with process safety experience.[20] Failure to follow process safety procedures can result in disastrous consequences such as fires, explosions, and fatalities, as well as unintended environmental releases. These incidents commonly stem from stressors resulting in significant human error and omissions which are more likely to happen if new complex safety processes are implemented. Avoiding the chloroprene-related consequences associated with process safety failures will demand careful planning and sufficient time to safely develop, assess, and implement procedures required for the Section 112(f) Control Projects.

Further, complicated emissions reduction projects inherently change the day-to-day operations at the Facility. Such changes significantly increase the risk of human error by encouraging personnel to rush multiple process and procedural changes. A 90-day compliance period would unsafely ignore the potential for human error that can arise in (1) designing processes; (2) engineering projects; (2) specifying process components; (4) predicting safeguards necessary to control risk to an acceptable level and sustain the required safeguards for the life of the process; (5) managing process changes; (6) startup testing; and (7) trouble-shooting (shakedown) physical process changes. The shortened compliance period in the Final Rule fails to adequately account for process safety actions and does not detail designs necessary for DPE to initiate immediate implementation or consider sound change-management principles. Demanding compliance on an unreasonable schedule would pose a serious risk to DPE, its employees, and the surrounding community.

The following discussion in sections i. through v. identifies each Section 112(f) Control Project described in the Final Rule and describes why compliance within 90 days would be infeasible. In accordance with 40 C.F.R. § 63.6(i)(6), Table 1 below provides estimated dates for each project by which on-site construction, installation of emission control equipment, or a process change could be initiated and completed, and the estimated date by which final compliance could be achieved. These preliminary estimates are based on DPE's current knowledge of Facility operations and past experience implementing emission control projects; they are subject to change. Although the estimates contained herein are good faith approximations of the time necessary, these projects could take significantly longer to implement. DPE makes no commitment to meet these preliminary minimum estimates.

[20] Remedy Declaration of Paul S. Casarez ("Casarez Remedy Decl."), ¶¶ 24, 30, Case No. 2:23-cv-00735 (Ex. 8).

**Table 1**

| Project | Description of Controls 40 CFR 63.6(i)(6)(i)(A) | The date by which on-site construction, installation of emission control equipment, or a process change is planned to be initiated 40 CFR 63.6(i)(6)(i)(B)(1) | The date by which on-site construction, installation of emission control equipment, or a process change is planned to be completed 40 CFR 63.6(i)(6)(i)(B)(3) | The date by which final compliance is to be achieved. 40 CFR 63.6(i)(6)(i)(B)(4) |
|---|---|---|---|---|
| **Thermal Oxidizer** | *See Section II(A)(i)* | 18-24 months | At least two years | At least two years |
| **Wastewater Steam Stripper** | *See Section II(A)(ii)* | 18-24 months | At least two years | At least two years |
| **Equipment to Limit Maintenance Emissions < 1 tpy** | *See Section II(A)(iii)* | 18-24 months | At least two years | At least two years |

DPE recognizes that some of the preliminary estimates provided in Table 1 extend beyond two years after the effective date, which is the maximum compliance period permitted in 40 CFR 63.6(i)(4)(ii). DPE will endeavor to reduce the implementation period, but Table 1 reflects DPE's best estimates at this time. Given that DPE's preliminary estimates for all three projects will require more than two years to complete, DPE is requesting that EPA grant DPE the maximum extension of two years from the effective date.

**i. Thermal Oxidizer.**

Thermal oxidizers ("TOs") are combustion devices used to control volatile organic compounds ("VOCs") and other HAP emissions by combusting them to carbon dioxide ("$CO_2$") and water. To do so, a TO's combustion chamber is designed to reach temperatures high enough to remove VOCs from an incoming gas stream by initiating reactions required for oxidation of VOCs.[21] The high temperature within the TO must be maintained for sufficient time to ensure that oxidization destroys the VOCs and the gas stream should be thoroughly mixed inside the combustion chamber to ensure the VOC is uniformly burned out.[22] DPE's Facility currently has a regenerative thermal oxidizer ("RTO").[23] Following startup and shakedown, stack testing of the existing RTO indicated a destruction removal efficiency ("DRE") above 98% and a flow capacity of 58,500 scfm.[24]

---

[21] Norton Engineering Consultants Inc., *Thermal Oxidizer Technology Review* (June 30, 2023) ("Norton Thermal Oxidizer Memo") at 1 (Ex. 9); Presentation to EPA (Oct. 18, 2023) ("DPE Presentation") at Slide 8 (Ex. 10); Extension Request Declaration of Chris Meyers (signed July 25, 2024 in support of EPA Request) ("Meyers Extension Request Decl."), ¶¶ 9-10 (Exhibit 11); DPE Comment at 78 (Ex. 4).
[22] Norton Thermal Oxidizer Memo at 1 (Ex. 9).
[23] Regenerative thermal oxidizers are characterized by their regenerative heat recovery capability which allows them to improve overall thermal efficiency.
[24] Norton Thermal Oxidizer Memo at 5-6 (Ex. 9); *see also* Meyers Extension Request Decl., ¶ 10 (Ex. 11).

The Final Rule requires emissions from process vents and storage vessels in chloroprene service[25] to be routed to a closed vent system to a non-flare control device that reduces chloroprene by greater or equal to 98% DRE.[26] EPA concluded in the Proposed Rule "that the only viable way to meet [the] proposed standards is to enclose all of the polymer batch reactors, emulsion storage vessels, strainers, and wash belt dryers and route the vapors to a thermal oxidizer."[27] In the Final Rule, EPA has reiterated that it "continue[s] to stand by [their] analysis" and finalized control requirements for those same sources.[28] However, these sources have air flows that are more than 4.3 times higher than the Facility's existing RTO. The existing RTO is limited to a flow capacity of 58,500 scfm, but the sources identified by EPA would add 210,558 scfm of flow (resulting in a new total flow of 252,869 scfm).[29] Therefore, a new TO must be installed at the Facility to control the excess flow from process vents and storage vessels in chloroprene service as required by the Final Rule. EPA acknowledges that it "anticipate[s] that the facility will still need to install an additional thermal oxidizer in order to comply with the final performance standard for process vents and storage vessels in chloroprene service."[30]

**1. At least two years is needed to design, obtain approval for, construct, and test a new TO at the Facility.**

As part of its feasibility evaluation following the Proposed Rule, DPE and its outside experts investigated various TO configurations.[31] Based on prior experience with thermal oxidizer installation at the Facility and evaluation work already completed by DPE in relation to an additional TO, DPE expects the design, approvals, construction, installation, and testing of a TO would take at least two years.[32] This timeframe does not account for testing to determine the applicability of the dioxins and furans standard that must be understood before finalizing the planning of the TO. However, as described in the following section, if the dioxins and furans standard is determined to be applicable, additional time will be needed at the Facility to account for such standards in the design and construction of a TO.

---

[25] "In chloroprene service" is defined in the Final Rule at § 63.482. For process vents, "in chloroprene service" means each continuous front-end process vent, each batch front-end process vent, and each back-end process vent in a process at affected sources producing neoprene that, when uncontrolled, contains a concentration of greater than or equal to 1 ppmv undiluted chloroprene, and when combined, the sum of all these process vents within the process would emit uncontrolled, chloroprene emissions greater than or equal to 5 lb/yr (2.27 kg/yr). For storage vessels, "in chloroprene service" means storage vessels of any capacity and vapor pressure in a process at affected sources producing neoprene storing a liquid that is at least 0.1 percent by weight of chloroprene. Final Rule at 43240 (Ex. 1).
[26] *Id.* at 42986.
[27] 88 Fed. Reg. at 25117 (Ex. 3); *see* ERG Control Options for Process Vents and Storage Vessels Memo at 7 (Ex. 7).
[28] Final Rule at 42986 (Ex. 1).
[29] Meyers Extension Request Decl., ¶ 10 (Ex. 11); *see also* Norton Thermal Oxidizer Memo at 5-6 (Ex. 9).
[30] Final Rule at 42986 (Ex. 1).
[31] Meyers Extension Request Decl., ¶¶ 10-11 (Ex. 11).
[32] *Id.* ¶¶ 9-26.

**2. Complying with the Final Rule will require significant time to design, obtain approval for, construct, and test new permanent total enclosures at the Facility.**

DPE must be able to capture chloroprene emissions in order to route them to a TO. EPA concludes that "the only viable way to meet these proposed standards is to enclose all of the polymer batch reactors, emulsion storage vessels, strainers, and wash belt dryers" to capture and route the emissions to the TO.[33] In support of the Proposed Rule, EPA determined that three (3) Permanent Total Enclosures ("PTEs") around each of the emissions sources would be necessary to capture and route chloroprene emissions to a TO:[34]

- One PTE for all five polymerization batch reactors;
- One PTE for the two wash belt dryers; and
- One PTE for the three emulsion storage tanks.

In the Final Rule, EPA indicated that there is no explicit requirement to install permanent total enclosures,[35] but provides no alternative compliance option and DPE is aware of no alternative option that achieves the Final Rule requirements. The Final Rule does not alter EPA's analysis regarding PTEs and fails to account for the technical and process safety challenges of enclosing the wash belts and equipment in the poly building at the Facility. DPE is faced with the technical, process, and safety challenges of enclosing several different and dispersed sections of the Facility, and routing captured emissions to a TO. EPA recently recognized that achieving compliance with PTE requirements based on EPA Method 204 will take well over a year:

> Most commercial sterilization facilities were not initially designed to be compliant with the PTE requirements of EPA Method 204. We have learned from the comments received that for these facilities, the capture requirements associated with the emission reduction standards for Group 1 and Group 2 room air emissions in the final rule will likely require a redesign of a portion if not all of the facility. Many facilities will also need to purchase additional equipment (e.g., fans, transformers, variable frequency drives, etc.) to meet the capture requirements. Moreover, compliance with the final emission standards will likely require the installation of additional control devices. We have reviewed the time that it has taken for previous projects of this nature to be completed, from submission of the initial state or local permit application to installation of the continuous compliance mechanisms. Based on this analysis, we find that the process of bringing a facility into compliance with the PTE requirements of EPA Method 204, as well as installing and verifying additional emission controls, can take approximately a year from permit submission to project completion. However, this estimate does not account for the time needed to design and plan before the initial permit application is submitted, nor for the time needed to avoid impacts on medical device supply chains, to procure control devices

---

[33] As stated in the Proposed Rule, 88 Fed. Reg. at 25117 (Ex. 3), and affirmed in the Final Rule. *See* Final Rule at 42986 ("we continue to stand by our analysis") (Ex. 1).
[34] ERG Control Options for Process Vents and Storage Vessels Memo at 7 (Ex. 7).
[35] Final Rule at 42987 ("with regard to a commenter's specific objections to installing a permanent total enclosure…even though we costed out permanent total enclosures for these emission sources in our proposal, there is no explicit requirement in the proposed rule, or final rule, to install permanent total enclosures around these emission sources.") (Ex. 1).

from a limited number of vendors, and to account for the other complexities identified below.[36]

The Final Rule does not require DPE to comply with EPA Method 204, but the time-consuming considerations identified by EPA will also need to be evaluated by DPE.

Capturing emissions from the wash belts at the Facility also poses a serious concern regarding occupational exposure, human health and safety, process maintenance and product quality associated. DPE's wash belt blower motors are equipped with variable frequency drives, which allow a reduction of the total flow rate through the vents. DPE will need an industrial hygienist to evaluate any changes to the airflow through the vent hoods themselves or in other areas of the finishing building to ensure compliance with personnel exposure requirements, or to make recommendations for additional protective equipment.[37] Changes in airflow resulting from enclosing the wash belts can also have a negative impact on product quality and will need to be evaluated before the enclosures are put into permanent use.

Additionally, the wash belts require frequent, manual intervention from area personnel to ensure stable operation. Physical access is required to perform maintenance and repairs. This means that any enclosures will likely need to be transparent and capable of easily and frequently being dissembled and reassembled.[38] In any event, the change in routine maintenance and repairs on the wash belts once enclosed needs to be evaluated to ensure these activities can be carried out safely.

Taken together, enclosing certain equipment like the wash belts will take significant time due to process safety and product quality concerns and contribute to a compliance period of at least two years before the TO can commence operation and control emissions from the enclosures at the Facility.

### 3. Alternative to safety bypass lines must be considered in Thermal Oxidizer design.

The Final Rule prohibits the use of bypass lines in closed systems to allow a flow to avoid air pollution control devices at any time.[39] The Final Rule also requires monitoring systems for flow on bypass lines to detect whether vent stream flow is present every 15 minutes and to estimate and report any releases.[40] These requirements must be considered when planning, designing, and installing a TO at the Facility, and contribute to the complexities of implementing required control equipment within 90 days. Although the Final Rule provides DPE three years to comply with this requirement, it must be accounted for in DPE's planning of a TO.

The Facility has four closed vent systems to route process emissions from the Neoprene process area to the RTO: (1) a nitrogen-rich header for streams with high chloroprene concentrations; (2) an air rich header for streams with lower chloroprene concentrations; (3) the East Hot Dryer Vent; and (4) the West Hot Dryer Vent. The Facility's Monomer Emissions Reduction Project ("MERP")[41] is also a closed vent system which routes emissions from the monomer process area to the halogen acid production furnace. In total, there are 19 bypass lines associated with the RTO and 8 bypass lines associated with the MERP

---

[36] EPA, *National Emission Standards for Hazardous Air Pollutants: Ethylene Oxide Emissions Standards for Sterilization Facilities Residual Risk and Technology Review*, 89 Fed. Reg. 24090, 24102 (Apr. 5, 2024) (Ex. 12).
[37] Meyers Extension Request Decl., ¶ 14 (Ex. 11); DPE Comment at 91 (Ex. 4).
[38] DPE Comment at 92 (Ex. 4); Meyers Extension Request Decl., ¶ 15 (Ex. 11).
[39] Final Rule at 42951, 43023 (Ex. 1).
[40] *Id.* at 42951, 43023, 43102.
[41] The MERP controls emissions from the monomer and HCl unit from the following sources: chloroprene synthesis; waste organics tank; HCl feed tanks; aqueous wase system; isomerization and DCM refining vents.

that are required for safety reasons. These bypass lines are rarely used—and only for emergencies[42] (emissions from bypass lines made up less than 1% of Facility emissions in 2022).[43]

EPA's requirement is problematic because bypass lines are used to safeguard against high incoming concentrations of chloroprene into the RTO unit to avoid catastrophic failure. Without bypass lines, there is nowhere else for these dangerous streams to go.[44] DPE needs an ample amount of time to safely design, plan, and implement new configurations to handle these flows. This may require the installation of a new control device or require immense reworking of piping and ducting to safely connect these flows to the Facility's RTO or new TO.[45] Accordingly, the design of the new TO must consider the potential connection of these bypass lines.

#### 4. Dioxins and furans emissions limit further complicates planning and implementation of TO at the Facility.

The dioxins and furans limit of the Final Rule further complicates the designing, planning, and implementation of the TO as additional condenser equipment or other control devices must be evaluated concurrently with chloroprene ERPs.[46] Although the Final Rule provides DPE three years to comply with this requirement, it must be accounted for in DPE's planning of a TO. The Final Rule provides that neoprene production facilities can use, produce, or emit chlorinated chemicals and therefore has imposed dioxins and furans MACT standards under CAA section 112(d)(2) and (3) for P&R I.[47] In doing so, EPA adds an emission standard of 0.054 nanograms per DSCM at 3% $O_2$ for dioxins and furans from chlorinated process vents (including continuous front-end process vents).[48]

The Final Rule further explains that dioxins and furans can be formed when chlorinated compounds are present and combusted in a thermal oxidizer.[49] In turn, the Final Rule assumes that affected facilities would install a condenser prior to the existing control device that, in the case of DPE, is a thermal oxidizer. The condenser is designed to remove chlorinated compounds from the stream and prevent the formation of dioxins and furans within the thermal oxidizer.[50] In support of the Proposed Rule, EPA assumed that a refrigeration method will be implemented to recover or condense chloroprene out of the vapor streams.[51] Based on the analysis by DPE consultants, DPE will need to identify and evaluate commercially available refrigeration systems that can achieve the temperatures required to recover or condense chloroprene out of the vapor streams. This will take time considering that DPE's consultants are not aware of a commercially available refrigeration system that can achieve the temperatures required to condense chloroprene out of the vapor streams.[52] Therefore, to implement the requirements of the Final Rule at the Facility, the Facility would likely need to install cryogenic technology to achieve the required

---

[42] Meyers Extension Request Decl., ¶ 18 (Ex. 11).
[43] DPE Comment at 98 (Ex. 4); Meyers Extension Request Decl., ¶ 18 (Ex. 11).
[44] Rebuttal Declaration of Junius "J.R." Roussell ("Roussell Rebuttal Decl."), ¶¶ 9-10, Case No. 2:23-cv-00735 (Ex. 13).
[45] DPE Comment at 98 (Ex. 4); Meyers Extension Request Decl., ¶¶ 17-19 (Ex. 11).
[46] Meyers Extension Request Decl., ¶ 20 (Ex. 11).
[47] Final Rule at 42937, 42975 (Ex. 1).
[48] *Id.* at 42937.
[49] *Id.* at 42958.
[50] As explained in the Proposed Rule. 88 Fed. Reg. at 25162 (Ex. 3). The same dioxins and furans requirements were finalized in the Final Rule.
[51] ERG, *Dioxins and Furans MACT Floor in the SOCMI Source Category for Processes Subject to HON and Processes Subject to Group I and Group II Polymers and Resins NESHAPs* (Mar. 2023) ("ERG Dioxins and Furans Memo"), Table 11 (costs based on refrigeration condenser technology that has been applied in the PVC industry) (Ex. 14).
[52] Montrose, *Dioxins and Furans Proposed Rules* (July 6, 2023) ("Montrose Dioxins and Furans Memo") at 2 (Ex. 15).

temperatures, which will pose additional technical, cost, and operational challenges.[53] However, for DPE's Facility, cryogenic technology may not be a feasible option and therefore, installation and/or routing to a control device may be required.[54] How DPE determines to address dioxins and furans may affect how flow streams are routed to the TO. This may impact flow capacities and pose serious process safety considerations. Ultimately, ensuring compliance with these dioxins and furans standards must be accounted for in the design of a TO.

**ii. Wastewater Steam Stripper.**

The Final Rule requires owners and operators to manage any existing wastewater streams that are in chloroprene service.[55] This provision requires installation of a steam stripper to achieve 99% reduction[56] of chloroprene emissions from wastewater in chloroprene service.[57] Steam stripping is a method of removing VOCs from a wastewater stream where pressure and temperature is used to separate or strip the contaminants from the water.

Currently, DPE already employs an air stripping system—a process that occurs in the air sparging tank and which routes to the onsite RTO.[58] However, as discussed above, the Facility's RTO does not have the capacity to take on additional waste streams, including chloroprene-containing air from a new steam stripper. Therefore, a new control device will need to be installed in addition to the new steam stripper to properly control the additional steam stripper wastewater streams.[59] As stated above, based on prior experience with the design and installation of wastewater control equipment at the Facility and evaluation work already completed, DPE expects that the design, approvals, construction, installation, and testing of a TO would take at least two years.[60]

---

[53] Montrose Dioxins and Furans Memo at 2 (Ex. 15).
[54] Meyers Extension Request Decl., ¶ 20 (Ex. 11).
[55] For wastewater, "in chloroprene service" is proposed to mean a wastewater stream containing total annual average concentration of chloroprene greater than or equal to 10 ppmw at any flow rate. Final Rule at 42936, 42959 (Ex. 1).
[56] EPA "believe[s] the use of 99 percent removal of chloroprene from steam stripping is appropriate..." *Id.* at 42988. DPE, however, remains concerned with the lack of evidence provided that steam stripper efficiency can achieve 99% removal. *See* ECT2 and Montrose, *ERG Chloroprene Reduction Memo Analysis* (July 6, 2023) ("ECT2 and Montrose Wastewater Memo") at 2-3 (Ex. 16).
[57] *Id.* at 8; *see also* Final Rule at 42987-88 (Ex. 1) (EPA "maintain[s] it was appropriate to assume no controls during [their] initial analysis such that a steam stripper would be placed before the air sparging tank.").
[58] ECT2 and Montrose Wastewater Memo at 2 (Ex. 16). Also note that the Facility uses an outdoor brine pit to control steam stripper rundown steams which are then routed to the WWTP and subject to biological control that achieves 80% reduction.
[59] *Id.* at 3.
[60] Meyers Extension Request Decl., ¶ 24 (Ex. 11).

**iii. Equipment to limit maintenance emissions to 1 tpy.**

The Final Rule imposes a 1 tpy cap on maintenance vent emission releases.[61] DPE has made a significant effort to identify and evaluate various options to achieve this requirement, but the complexities of the Facility's processes have hindered the company's evaluation to date.[62] DPE understands that the largest single source of emissions from maintenance activities are from annual steaming of the Facility's 2mmlb Tank (approximately 660 lbs of emissions associated with each annual steam event).

DPE considered the use of a portable condenser and catch tank that would allow vapors from tank steaming maintenance to be routed to an RTO for control but determined that the time requirements render this option infeasible.[63]

DPE also has requested proposals for the use of portable TOs in the maintenance steaming process from several vendors.[64] The proposals, however, failed to consider that scrubbing equipment to remove HCl or heat exchange equipment to combat elevated temperatures, would be required for safe steaming operations and use of the portable TO.[65] DPE cannot limit maintenance vent emissions to 1 tpy without sufficient time to evaluate whether the Facility can develop safe processes. DPE expects evaluation, acquiring of equipment, testing, approvals, and implementation of new maintenance activity processes will take two years or more.

**iv. Section 112(d) requirements will increase the complexities and planning time needed to implement the Section 112(f) Control Projects.**

In addition to the Section 112(f) Control Projects, DPE must also plan for the implementation of 112(d) requirements. DPE's engineers will need to consider the potential impact of the 112(d) projects when planning, designing, and implementing the Section 112(f) Control Projects.[66] For example, the Final Rule requires that flares used in the production of polymers and resins meet the flare requirements in the Refinery Sector Rule ("RSR") (40 C.F.R. §§ 63.670 and 63.671).[67] The need to account for this and other 112(d) requirements further underscores the need for at least 2 years for safe implementation.

**v. The fenceline monitoring requirements should conform to the revised compliance dates.**

The Final Rule sets forth a prescriptive set of fenceline monitoring requirements addressing monitoring, root cause analysis, and corrective actions.[68] For every operator except DPE, these requirements provide two years for operators to comply with the monitoring requirements, and three years to comply with the corrective action requirements.[69] However, for DPE, the Final Rule provides only 90 days for compliance with both the monitoring *and* the corrective action requirements.[70] This Extension Request seeks to extend all 90-day compliance periods in the Final Rule to two years from the effective date. It would be premature for DPE to perform root cause analyses and corrective actions before DPE has installed the control equipment required by the Final Rule. Moreover, the trigger for corrective action is based on the

---

[61] Final Rule at 42937, 43245, 43179 (Ex. 1).
[62] Meyers Extension Request Decl., ¶¶ 25-26 (Ex. 11); DPE Comment at 88-90, Section XV (Ex. 4).
[63] DPE Comment at 88-89 (Ex. 4); Meyers Extension Request Decl., ¶ 33 (Ex. 11).
[64] DPE Comment at 88-89 (Ex. 4); Meyers Extension Request Decl., ¶ 26 (Ex. 11).
[65] DPE Comment at 89.
[66] Meyers Extension Request Decl., ¶¶ 30-31 (Ex. 11).
[67] Final Rule at 43169-70 (Ex. 1).
[68] *Id.* at 43254-43255 (amended 40 C.F.R. § 63.502(a)(4), (a)(7))) (modifying amended 63.184).
[69] *Id.* at 43236-43237 (amended 40 C.F.R. § 63.481(p)(1)).
[70] *Id.* at 43237 (amended 40 C.F.R. § 63.481(p)(2)).

annual average "Δc" (the difference between the highest and lowest concentration for each sampling period), which necessarily reflects data from the past 51 weeks. Unless DPE is provided a three-year compliance period to comply with the corrective action requirements, DPE will be evaluating unrepresentative data that do not reflect post-control conditions and are not useful for meaningfully identifying post-control sources of fugitive emissions. Accordingly, a compliance period of 2-3 years is needed for the fenceline monitoring requirements.

**B. EPA's Own Timing Estimates Demonstrate That A 90-Day Compliance Period Would Be Infeasible at the Facility.**

The Final Rule contains two-year compliance deadlines for similar emission controls for affected EtO sources, as well as EPA's rationale for those deadlines. These two-year deadlines starkly demonstrate that the Final Rule's 90-day compliance deadline for chloroprene is fundamentally infeasible. As EPA explains in the Final Rule as to affected EtO sources, "sufficient time is needed to properly engineer the [emissions reduction] project, obtain capital authorization and funding, procure the equipment, obtain permits, and construct and start-up the equipment."[71] Therefore, EPA determined to "finaliz[e] a compliance date of 2 years after the effective date of the final rule for all existing affected sources to meet the EtO requirements," which are substantially similar, and in many cases identical, to those promulgated for chloroprene.[72]

Further, in the Proposed Rule, EPA deemed it appropriate to provide DPE with an unqualified extension to two full years for compliance.[73] Before the Proposed Rule was published, the Office of Management and Budget ("OMB") reviewed the Proposed Rule and questioned if the Facility's emissions would constitute an "imminent endangerment."[74] OMB specifically asked that EPA address "what steps will be taken during the proposed 2-year period to assure that the health of people exposed to [chloroprene] emissions (including children) will receive protection from imminent endangerment[.]" *Id.* In response to OMB, and notwithstanding that EPA had already commenced its Section 303 litigation, EPA declined to change the 2-year waiver and made no changes to describe steps to protect from "imminent endangerment." Instead, EPA responded with the same rationale it uses in the Final Rule to justify a two-year implementation for EtO facilities:

> Significant capital will need to be invested in controls here to further reduce emissions [for] EtO and chloroprene. We are talking about requiring installation of large thermal oxidizers, steam-strippers, etc. at all of the facilities emitting these HAP. This takes significant time [to] engineer, install, and update operating procedures and staff....[75]

EPA's response to OMB simply confirms the reality that the emission reduction projects contemplated by the Final Rule requires at least two years at DPE's Facility.

EPA's position taken in the Section 303 Litigation—and presented to the Court—further confirms EPA's express acknowledgment that a 90-day compliance period for the Final Rule is simply infeasible. In March 2023, EPA filed a motion for preliminary injunction demanding that DPE comply with a series of prescriptive emission controls similar to some of the controls set forth in the Final Rule. To be clear, EPA's estimates dramatically underestimate feasible timelines for its requested relief, most glaringly by ignoring

---

[71] *Id.* at 42954.
[72] *Id.*
[73] 88 Fed. Reg. at 25178 (Ex. 3).
[74] OMB Review of Proposed Rule at 347 (Ex. 17).
[75] *Id.*

fundamental safety requirements that would endanger personnel and the community.[76] EPA based its timetables on the opinions of an expert who ultimately conceded that he did not account for several critical safety requirements.[77] Even with those inherent flaws and incomplete analyses, however, EPA's estimates in the Section 303 Litigation of the timing needed for emission controls demonstrate the infeasibility of a 90-day compliance period.

For example, in support of EPA's request for injunctive relief in the Section 303 Litigation, EPA's expert estimated that it would take DPE 90 days just to *prepare a plan* to "evaluate and control" chloroprene emissions in the polymer building.[78] For the reasons described above, the complexities involved with controlling emissions from the polymer building will require more than 90 days to plan. But the point is, even by EPA's woefully insufficient 90-day estimate for *just planning*, it is patently obvious that the time needed to *also* approve, construct, install, and test a strategy to capture and control such emissions will take far longer than 90 days, by EPA's expert's own analysis. Similarly, EPA's expert in the Section 303 Litigation fails to account for the complexities needed to plan, construct, and install permanent total enclosures for the Facility's "Poly Kettles,"[79] but still estimates installation would require 150 days.[80] There is simply no basis to square these positions on timing—which EPA represented to the Court as accurate—with the Final Rule's demand that the Facility comply with a 90-day implementation period.

### C. A Compliance Period Of 90 Days Would Likely Require A Shutdown Of The Facility And Increase The Complexity And Dangers Of Implementing The Requirements.

The Section 112(f) Control Projects cannot be technically or safely designed, approved, constructed, and tested at the Facility in 90 days. The extensive analyses performed by DPE and its outside experts demonstrate that a timeframe of 90 days is infeasible and potentially unsafe.

As discussed above, based upon prior efforts to implement similar ERPs and DPE's substantial efforts to anticipate and prepare for implementation of the Final Rule requirements, DPE expects that at least two years is required, and possibly longer given the complexities of conducting several ERPs concurrently. A compliance period of 90 days will require a shutdown of the Facility thereby increasing the complexity of completing the requirements of the Final Rule.

Without an extension of the compliance period, DPE will need to immediately shift its attention, time, and resources toward completing a safe and effective shutdown of the Facility for an indefinite period of time. Shutdowns and restarts are dangerous[81] and will only complicate the feasibility of implementing the Final Rule. Safety risks increase as personnel are more likely to have to make a "confined space entry" during shutdowns; presence of toxic materials in equipment increases; and the number of maintenance workers (often temporary contractors less familiar with the plant) increases.[82]

The estimated time required to just shutdown the Facility for an extended outage is between 90-150 days, meaning that, unless an extension is granted, DPE personnel need to begin planning and implementing an

---

[76] Deposition Transcript of Jeffrey R. Harrington (July 28, 2023) ("Harrington Dep. Tr.") 90:8-10; 91:16-18; 106:8-17, Case No. 2:23-cv-00735 (Ex. 18).
[77] *Id.*
[78] Declaration of Jeffrey R. Harrington In Support of Motion for Preliminary Injunction filed in Case No. 2:23-cv-00735 (E.D. La.) ("Harrington PI Decl."), ¶ 77, Case No. 2:23-cv-00735 (Ex. 19).
[79] The Facility's large poly kettles are batch process units and are critical to the manufacture of all types of Neoprene.
[80] Harrington PI Decl., ¶ 51 (estimating PTE installation can occur within 120 days after plan approval) (Ex. 19).
[81] Remedy Declaration of Jim Moore, P.E. ("Moore Remedy Decl."), ¶¶ 27-30 (noting that 50% of work-related accidents in manufacturing plants occur during plant maintenance shutdowns), Case No. 2:23-cv-00735 (Ex. 20).
[82] *Id.* ¶ 31.

indefinite shutdown.[83] The effort, time, and diversion of resources required to safely shutdown a plant will negate DPE's ability to even begin to efficiently or effectively implement the ERPs required by the Final Rule. Additionally, DPE will be unable to field test the effectiveness of ERPs in a functional, operational setting if the Facility is shutdown.[84] This would prevent DPE from evaluating effective methods to address potential process safety hazards. Simply put, DPE requires the Facility to be operational to test large-scale ERPs like thermal oxidizers.[85] Even during normal operations, DPE faces process hazard challenges when evaluating ERPs on accelerated timelines—a shutdown would only complicate this further and exacerbate the Facility's shortage in process safety personnel.[86]

Further, significant process safety steps will need to precede any restart of the Facility after a prolonged shutdown. Process safety regulations require a pre-startup safety review before a restart. Because DPE has never idled the Facility for an indefinite period, personnel would need to draft, review, and finalize safety procedures for any restart that followed a prolonged period of non-use.[87] Installing the Section 112(f) Control Projects from an idled state will impact the amount of time necessary to comply with the Final Rule.

**D. A multi-year or permanent shutdown of the Facility would result in significant negative impacts to both the Parish and State economies and lower tax revenue.**

DPE is a significant economic force in Louisiana and St. John the Baptist Parish. Based on robust modeling performed by an expert economist, Dr. Loren Scott, the total positive economic impacts on the Louisiana economy for the next 10 years directly related to Facility's operations are: $5.086 billion in sales, $1.719 billion in household earnings, and the creation of an annual average of 2,318 jobs.[88] In addition, Tax revenue for the next 10 years are estimated to total $149.3 million.[89] These positive economic impacts will be eliminated if the Facility is forced to permanently shutdown. Indeed, a permanent shutdown may be likely if the Facility is forced to shutdown until the Section 112(f) Control Projects are implemented. A nearly two-year shutdown would eliminate DPE's only source of revenue, drive employees to secure permanent positions elsewhere, drive suppliers to alternative consumers, and drive customers to substitute products. Likewise, the inter-dependence and shared services between DPE's Facility and DuPont's co-located diamines plant could threaten the continuing viability of DuPont's operations and its associated workforce.

---

[83] *Id.* ¶ 39.
[84] Casarez Remedy Decl., ¶ 9 (Ex. 8).
[85] Remedy Declaration of Jorge Lavastida ("Lavastida Remedy Decl."), ¶ 28, Case No. 2:23-cv-00735 (Ex. 21); Remedy Declaration of Michelle Helfrich ("Helfrich Remedy Decl."), ¶¶ 36-37, Case No. 2:23-cv-00735 (Ex. 22).
[86] Casarez Remedy Decl., ¶ 22 (Ex. 8).
[87] *Id.* ¶ 32 (Ex. 9); Lavastida Remedy Decl., ¶ 25 (Ex. 21).
[88] Loren C. Scott & Associates, Inc., *The Economic Impact of Denka Elastic Polymers on St. John the Baptist Parish & the State of Louisiana* (Dec. 2023) ("Scott Report") at 9 (Ex. 23).
[89] *Id.*

**Impacts of Denka Plant Operational Spending on the Louisiana Economy: 2023-2032**

| Year | Sales* | Earnings* | Jobs | Taxes* |
|---|---|---|---|---|
| 2023 | $443.7 | $150.0 | 2,147 | $13.4 |
| 2024 | $457.0 | $154.5 | 2,184 | $13.7 |
| 2025 | $470.7 | $159.1 | 2,221 | $14.0 |
| 2026 | $484.9 | $163.9 | 2,259 | $14.4 |
| 2027 | $499.4 | $168.8 | 2,297 | $14.7 |
| 2028 | $514.4 | $173.8 | 2,335 | $15.1 |
| 2029 | $529.8 | $179.1 | 2,374 | $15.4 |
| 2030 | $545.7 | $184.4 | 2,414 | $15.8 |
| 2031 | $562.1 | $190.0 | 2,454 | $16.2 |
| 2032 | $579.0 | $195.7 | 2,494 | $16.6 |
| **Total** | **$5,086.8** | **$1,719.2** | **2,318**** | **$149.3** |

*Values in millions of dollars. **Jobs total represents an average over the 10-year period.

Source: Scott Report at 9.

Even if the Facility is able to avoid a permanent shutdown, a temporary shutdown would come at enormous cost. Absent an extension of the 90-day compliance period, a shutdown of at least two years is a near certainty. Dr. Scott's modeling also analyzed the economic impact of a two-year shutdown based on modeling of calendar years 2024 and 2025.[90] The results show that the State would lose $927.8 million in business sales, $313.6 million in household earnings, 2,203 jobs, and 13.8 million in state tax revenues.[91] These forecasted economic losses are significant and strongly favor granting a two-year extension of the compliance period.

## III. DPE Has Reduced Emissions Since May 2022 Through Practicable and Effective Emission Reduction Strategies And Will Continue to Implement Such Strategies During the Compliance Period.

DPE has spent considerable time and resources evaluating emission reduction opportunities at the Facility and continues to do so. Between 2016 and 2018, DPE reduced the Facility's emissions by 85%, in large part due to the installation of the Facility's RTO.[92] DPE continued its emission reduction efforts and has implemented a series of additional reduction strategies since May 2022—many of which are voluntary and bolster DPE's compliance with existing requirements to assure that the health of personnel and the community will be protected.

### A. Implemented Emission Reduction Strategies Since May 2022.

In July 2022, DPE established a formal chloroprene emission reduction task force ("ERP Task Force") made up of more than 20 engineers, managers, and process experts from all across the Facility. The ERP Task Force met multiple times a week and dedicated well over 5,000 man-hours through July 2023, to ongoing efforts to reduce emissions.[93] These efforts include the following:

[90] *Id.* at 16.
[91] *Id.*
[92] Meyers Extension Request Decl., ¶ 38 (Ex. 11).
[93] DPE Comment at 75 (Ex. 4).

- DPE has implemented a process to reduce emissions associated with waste from the Facility's poly kettle production units consistent with the requirements of the consent agreement in EPA Docket No. RCRA-06-2023-0906, as well as applying a similar process to waste coagulant generated from the stripper strainers.[94] DPE now steams the coagulant and routes emissions to the RTO. DPE has also improved its washing and nitrogen purging processes to further reduce emissions associated with the poly kettle production units.

- DPE has implemented a voluntary process to reduce the number of concurrently operating unstripped emulsion storage tanks and to strip chloroprene from in-tank coagulant during maintenance of the unstripped emulsion storage tanks.[95] Now only two tanks are used at a time to reduce coagulate formation. The tanks containing coagulate are filled with water and are circulated to strip the remaining chloroprene and route emissions to the RTO.[96]

- The Facility has also employed a voluntary process to strip chloroprene from in-tank coagulant during maintenance of the five poly kettles (emission source 1700-13A).

- DPE has voluntarily decreased the site-wide leak detection and repair threshold from the regulatory standard of 500 ppm organic vapor concentration to 250 ppm.[97] In conjunction with this new 250 ppm threshold hold, an additional voluntary process to screen certain components in the polymerization building located at the Facility and the 1236 waste organics storage tank area multiple times each week and to schedule repairs if leaking components are identified has been rolled out.[98] DPE hired an LDAR technician with over 20 years of experience to lead these voluntary efforts which has included increased weekly screenings, new immediate repair procedures, and the purchase of state-of-the-art detection equipment.[99]

- Further, DPE has supplied operators in the polymers area with photoionization detectors (PIDs) to perform LDAR screenings on any component at any time to detect leaks. Accordingly, prompt repairs are made when leaks are detected.[100]

- DPE voluntarily implemented a process requiring transfers of chloroprene-containing wastes from the chloroprene heels tank to the waste organics tanks in the HCl recovery unit process area be performed only when the 1236 tank system is connected to the MERP control system or other form of emissions control.[101]

- DPE instituted new outdoor brine pit (OBP) management measures which require coagulant from the unstripped emulsion storage tanks and large poly kettles to be placed directly into plastic

[94] DPE Responses to US First Set of Interrogatories, at 12-13 (Response to Interrogatory No. 4), Case No. 2:23-cv-00735 (Ex. 24); Meyers Extension Request Decl., ¶ 39 (Ex. 11).
[95] DPE Responses to US First Set of Interrogatories, at 12-13 (Response to Interrogatory No. 4), Case No. 2:23-cv-00735 (Ex. 24); Meyers Extension Request Decl., ¶ 39 (Ex. 11).
[96] DPE Presentation at Slide 6 (Ex. 10).
[97] DPE Responses to US First Set of Interrogatories, at 12-13 (Response to Interrogatory No. 4) (Ex. 24); Meyers Extension Request Decl., ¶ 39 (Ex. 11).
[98] DPE Responses to US First Set of Interrogatories, at 12-13 (Response to Interrogatory No. 4) (Ex. 24); Meyers Extension Request Decl., ¶ 39 (Ex. 11).
[99] DPE Comment at 76 (Ex. 4).
[100] *Id.*; Meyers Extension Request Decl., ¶ 39 (Ex. 11).
[101] DPE Responses to US First Set of Interrogatories, at 12-13 (Response to Interrogatory No. 4) (Ex. 24); Meyers Extension Request Decl., ¶ 39 (Ex. 11).

drums to be sent off-site for incineration. This new process change ensures that solid material is no longer placed in the OBP.[102]

In addition, DPE continues to evaluate additional, voluntary emission reduction projects, such as (i) a potential project to remove chloroprene from the poly kettle strainer waste by circulating water through the strainer and sparging the water and (ii) the potential use of Forward Looking Infrared, or FLIR, cameras to improve leak detection activities.

**B. DPE's Emission Reduction Strategies Have Resulted in Significant, Quantified Reductions of Chloroprene Concentrations Near the Facility.**

DPE's significant efforts to implement these voluntary emission reduction strategies have resulted in quantified reductions of chloroprene concentrations near the Facility. Analysis of Method 325B and Method TO-15 monitoring data demonstrate that, following these voluntary changes, the Facility has achieved the lowest average chloroprene concentrations to date.[103] The fenceline monitoring results below illustrate the effectiveness of DPE's voluntary emissions reductions:




**C. DPE Plans To Continue To Implement Emission Reduction Projects During The Compliance Period.**

Because these voluntary measures help to reduce chloroprene emissions, DPE plans to continue utilizing these voluntary reduction strategies throughout the compliance period. These steps, in conjunction with

---

[102] DPE Presentation at Slide 6 (Ex. 10).

[103] Declaration of Mr. David R. Blye ("Blye PI Decl."), ¶ 33, Case No. 2:23-cv-00735 (Ex. 25); *see also* Meyers Extension Request Decl., ¶ 41 (Ex. 11).

a compliance timeline of at least two years, will better support DPE's overall efforts to safely design, install, and implement the control equipment and processes necessary under the Final Rule and ensure that emissions from the Facility will not pose a potential imminent endangerment.

## IV. A Two-Year Compliance Period Will Not Result in "Imminent Endangerment" Near the Facility.

In addition to finding that additional time is necessary for compliance, to grant an extension, there must be a finding that "steps will be taken during the period of the waiver to assure that the health of persons will be protected from imminent endangerment."[104] Because no imminent endangerment exists near the Facility, no additional steps need to be taken during the waiver period.

EPA's inclusion of a two-year compliance period in the Proposed Rule appropriately recognized the lack of an imminent endangerment due to the only facility in the source category. DPE is aware of no allegations of acute endangerment from the Facility's chloroprene emissions and EPA has admitted it is not aware of any incidents of cancer due to the Facility's emissions.[105]

EPA has alleged in the Section 303 Litigation that an "imminent and substantial endangerment" exists, but this allegation is based on a conservative and deeply flawed theoretical risk of cancer. Specifically, EPA alleges that the 1-in-10,000 risk level associated with the inhalation unit risk ("IUR") derived in the 2010 *Toxicological Review of Chloroprene* ("2010 IUR") — which translates to a chloroprene concentration of 0.2 $\mu g/m^3$ — constitutes an imminent and substantial endangerment. With no explanation or analysis whatsoever, the Final Rule points to EPA's allegations in the Section 303 Litigation as the sole basis for imposing a 90-day compliance period on DPE for the Section 112(f) Control Projects:

> In a change from the proposed rule, the EPA is shortening the compliance deadline for affected sources producing neoprene, due to the EPA's finding that chloroprene emissions from the only such source pose an imminent and substantial endangerment under CAA section 303, 42 U.S.C. § 7603. *United States v. Denka Performance Elastomer, LLC, et al.*, No. 2:23-cv-00735 (E.D. La. filed Feb. 28, 2023).[106]

Even if EPA's view of the applicable science underlying the 2010 IUR were accepted as true (a point DPE strenuously disputes), the risk levels near the Facility fall far short of an "imminent endangerment" for purposes of Section 112(f)(4)(B). The entire statutory framework of Section 112 refutes any notion that risks above a 1-in-10,000 threshold constitute an "imminent endangerment." If they did, Congress would not have given EPA 18 years to complete residual risk reviews, which specifically use the 1-in-10,000 threshold as a presumptive benchmark for acceptability. Interpreting risks above a 1-in-10,000 threshold to compel a 90-day compliance period is simply incompatible with Congress's decision to tolerate such risks for 18 years.

EPA has *always* recognized that theoretical, pre-compliance risks described in residual risk reviews do not constitute an "imminent endangerment" that prevents EPA from granting extensions.[107] In fact, EPA has consistently issued final rules that expressly allow for a post-compliance risk level greater than 1-in-10,000. In the very first residual risk review imposing requirements under Section 112(f), EPA provided

---

[104] 42 U.S.C. § 7412(f)(4)(B).

[105] EPA Responses to DPE First Set of Interrogatories, at 27-28 (Response to Interrogatory No. 12), Case No. 2:23-cv-00735 (Ex. 26).

[106] Final Rule at 42955 (Ex. 1).

[107] EPA Responses to DPE Second Set of Interrogatories, at 17 (Response to Interrogatory No. 17), Case No. 2:23-cv-00735 (Ex. 27).

facilities a two-year compliance period despite finding pre-control MIRs as high as 4-in-10,000.[108] Likewise, recent Section 112 rulemakings propose to provide compliance extensions to facilities with MIRs equal to or greater than DPE, including to *twelve facilities* in EPA's April 2024 rule for Sterilization Facilities.[109]

Moreover, the lack of an endangerment becomes even more evident after accounting for data as to real-world risk and the severe distortions of risk inherent in the 2010 IUR. The available epidemiological evidence, which examines health outcomes of workers exposed to chloroprene emissions at dramatically higher rates than the Facility emits today, shows that the Facility's chloroprene emissions have not and do not pose an increased risk of respiratory or liver cancer (the types of cancer that, according to EPA, are most associated with exposure to chloroprene). In addition, data from the Louisiana Tumor Registry ("LTR") consistently show no increase in cancer incidence rates in the community surrounding the Facility.

Instead, EPA's risk estimates for the Facility are based entirely on the 2010 IUR for chloroprene. The 2010 IUR is a flawed risk estimate that adopts a series of patently unrealistic and unsubstantiated assumptions that overstate the actual risk of chloroprene exposure to humans. Most notably, the 2010 IUR relies on cancer incidence data from female B6C3F1 mice and fails to make scientifically-supported adjustments to account for the dramatic differences between humans and female B6C3F1 mice. Despite the availability of a sophisticated, peer-review physiologically-based pharmacokinetic ("PBPK") computer model capable of accounting for these important inter-species differences, EPA continues to rely on an outdated and distorted risk estimate.

Neither the underlying science nor EPA's deeply flawed 2010 IUR supports a finding of "imminent endangerment" within the meaning of Section 112(f)(4)(B). Accordingly, no additional steps need to be taken by DPE during the compliance period beyond the emission control strategies already being implemented by DPE at the Facility.

### A. Even if the Flawed IUR Is Accepted, Chloroprene Concentration Levels Near the Facility Do Not Constitute an Imminent Endangerment.

In the Final Rule, based entirely on a bare citation to the existence of the Section 303 Litigation, EPA takes the position that an "imminent endangerment" exists near the Facility because chloroprene emissions are allegedly causing a lifetime cancer risk of greater than 1-in-10,000.[110] While EPA has alleged risk levels as high as 14-in-10,000 in the Section 303 Litigation, those allegations are based on outdated monitoring data.[111] As of January 15, 2024, the highest alleged concentration measured over the prior 12-months equated to a 6.85-in-10,000 risk level, as determined by EPA's expert in the Section 303 Litigation.[112]

The lifetime risk level associated with chloroprene emissions from the Facility does not constitute an imminent endangerment, including under Section 112(f)(4)(B).

---

[108] EPA, *National Perchloroethylene Air Emission Standards for Dry Cleaning Facilities*, 71 Fed. Reg. 42724, 42731 (July 27, 2006) (estimating baseline MIRs between 50- and 400-in-1-million) (Ex. 28); *id.* at 42729-30 (providing 2-year compliance period).

[109] 89 Fed. Reg. 24090 (Apr. 5, 2024) (Ex. 12); EPA, *Residual Risk Assessment for the Commercial Sterilization Facilities Source Category in Support of the 2024 Risk and Technology Review Final Rule* (Jan. 2024) (Table 2a-1) (Ex. 29).

[110] Final Rule at 42955 (Ex. 1); *see also* Compl., ¶ 60-66, *U.S. v. Denka Performance Elastomer LLC*, No. 2:23-cv-00735, ECF No. 1 (E.D. La. Feb. 28, 2023) (Ex. 30).

[111] *Id.* ¶ 48.

[112] *See* Supplement to September 6, 2023 Rebuttal Declaration and December 8, 2023 Declaration of Dr. John J. Vandenberg in Support of United States' Statement of Final Relief ("Vandenberg Supp. Decl."), Updated Table 1, Case No. 2:23-cv-00735 (Ex. 31).

i. **In Section 112 of the CAA, Congress made clear that the risk levels above 1-in-10,000 do not constitute an imminent endangerment by mandating that such risks be addressed through an *18-year* regulatory process.**

In Section 112 of the CAA, Congress created a comprehensive program to address cancer risks due to emissions of hazardous air pollutants ("HAPs") from industrial facilities. In Section 112, Congress imposed deadlines by which EPA was required to take several steps.

- Within one year after the statute was signed into law in 1990, EPA was to identify "source categories"—different types of industrial facilities—that included "major sources" of such pollutants.[113]
- Within ten years (by 2000), EPA was to conduct rulemakings to set technology-based standards to reduce HAP emissions from each source category.[114]
- Within eight years of setting those standards, EPA was to conduct another rulemaking to complete a "residual risk review"—*i.e.*, to evaluate the "risk to public health remaining" after the implementation of the technology-based standards. As part of this rulemaking, EPA was *for the first time* required to consider whether more stringent standards were needed to address lifetime cancer risks higher than 1-in-10,000.[115]

This means that Congress knew that people were then exposed to lifetime cancer risks higher than 1-in-10,000 due to HAPs, yet Congress determined that it was acceptable to allow such exposure *for up to 18 years*. Indeed, as shown in the following table, Congress was specifically briefed prior to passing the 1990 CAA amendments on sources with MIRs higher than 10-in-10,000 ($1 \times 10^{-3}$), including some sources with MIRs as high as 100-in-10,000 ($1 \times 10^{-2}$), or more than *16 times higher* than the alleged MIR associated with the entire Facility in the Final Rule.[116]

[113] 42 U.S.C. § 7412(c)(1).
[114] *Id.* § 7412(d)(2).
[115] *Id.* § 7412(f)(2).
[116] Report on the Committee on Environment and Public Works United States Senate Report Accompanying S. 1894, at 9907 (S. Rept. 100-231) (Nov. 20, 1987) (Ex. 32).

ESTIMATED CANCER RISKS
REMAINING UNDER EPA § 112 STANDARDS

| POLLUTANT | ANNUAL CANCER INCIDENCE FROM BOTH REGULATED AND UNREGULATED SOURCES | SOURCES POSING MIRs OF $10^{-3}$ OR HIGHER |
|---|---|---|
| Inorganic Arsenic | 1.7 | Uncontrolled Primary Copper Smelters ($1x10^{-3}$) |
| | | Primary Lead Smelters ($2x10^{-3}$) |
| | | Zinc Oxide Plants ($1x10^{-3}$) |
| Asbestos | 0.7-1.2 | None |
| Benzene | 2.8 | Benzene Handling ($1x10^{-3}$) |
| Coke Oven Emissions | 4.0 | Wet-Coal Charged By-Product Coke Oven Batteries ($1x10^{-2}$) |
| Radionuclides | 2.0-2.8 | Underground Uranium Mines ($>1x10^{-3}$) |
| | | Open-Pit Uranium Mines ($1x10^{-3}$) |
| | | Elemental Phosphorous Plants ($1x10^{-3}$) |
| Vinyl Chloride | 0.8 | No estimate |
| TOTALS | 12-13 | 8 sources $\geq 10^{-3}$ |

Notably, EPA attributed to each of the source categories an annual cancer incidence at least 10-times higher than the pre-compliance cancer incidence estimated for DPE's Facility in the Final Rule. Despite these much higher risk estimates, Congress provided *years* to address these risks. Thus, the allegation that emissions from DPE's Facility now pose an "imminent endangerment" directly contradicts Congress' mandate under Section 112 that higher risks be addressed over many years.

**ii. The Benzene Rule addressed risk levels up to 10-times higher than the risk level EPA alleges in the Final Rule, yet EPA did not allege the facilities responsible for such risks were causing an imminent endangerment.**

It is inappropriate to use the 1-in-10,000 risk level as the threshold for an "imminent endangerment" because it flatly contradicts the purpose of the 1-in-10,000 risk benchmark in Section 112. Section 112(f)(2)(B) expressly endorsed EPA's use of the 1-in-10,000 risk level in 1989 rulemaking—known as the "Benzene Rule"—to guide what constitutes an "acceptable risk" under Section 112.[117] In doing so, "Congress rejected the Senate version of the bill—which mandated a bright line standard for

[117] *Compare* DPE Statement of Material Facts in Support of Motion for Summary Judgment ("DPE MSJ SOF"), No. 2:23-cv-00735 (E.D. La. Dec. 29, 2023) ECF No. 131-3, ¶ 9 (Ex. 33) *with* US Statement of Material Facts in Opposition of Motion for Summary Judgment ("US Contested SOF"), No. 2:23-cv-00735 (E.D. La. Jan. 26, 2024) ECF No. 150-1, ¶ 9 (Ex. 34); EPA, *National Emission Standards for Hazardous Air Pollutants; Stationary Combustion Turbines Residual Risk and Technology Review*, 54 Fed. Reg. 38044, 38045 (Sept. 14, 1989) (Ex. 35).

carcinogens—in favor of the House version, which gave the Secretary more discretion under the 'ample margin of safety' standard."[118]

EPA admitted in the Section 303 Litigation that the Benzene Rule is "the primary model for establishing emission standards" under Section 112 and that "[t]he approach developed in [the Benzene] rule was endorsed by Congress in the CAA's 1990 Amendments."[119] The Benzene Rule, which is the Congressionally endorsed "primary model for establishing emission standards," demonstrates that the risk levels attributed to the Facility in the Final Rule, which are dwarfed by the risk levels addressed in the Benzene Rule, do not constitute an imminent endangerment.

In the Benzene Rule, EPA stated that it would "generally presume that if the risk to [the maximum exposed] individual is no higher than approximately 1 in 10 thousand, that risk level is considered acceptable."[120] As made clear in the Benzene Rule, this "presumptive" risk level of 1-in-10,000 is the *beginning* of EPA's framework for rulemaking, which includes significant safeguards to prevent reflexive reliance on a bare number. EPA set out a flexible process, requiring consideration of a range of factors, including scientific uncertainties and weight of evidence.[121] EPA explained that the 1-in-10,000 risk level "does not necessarily reflect the true risk, but displays a conservative risk level which is an upper-bound that is unlikely to be exceeded."[122]

The proposed Benzene Rule was published in July 1988 to establish emission standards for five categories of facilities, known as "source categories."[123] Of those five source categories, EPA determined that the "coke by-product recovery plant" category posed the highest risk, estimating a risk level of 60-in-10,000 (or $6 \times 10^{-3}$), or 60 times higher than 1-in-10,000 risk level.[124] That risk level is also 10 times higher than the risk EPA attributes to the Facility in the Final Rule (6-in-10,000)[125]; more than 8 times higher than the highest risk level EPA attributes to the Facility in the most recent 12-month analyzed in the Section 303 Litigation (6.85-in-10,000)[126]; and more than four times higher even than the highest risk level EPA attributed to the Facility in the Section 303 Litigation based on outdated data (14-in-10,000).[127]

Despite being far higher than any risk level alleged for the DPE Facility, EPA did not assert that coke by-product recovery plants were causing an imminent endangerment in the Benzene Rule, nor did EPA declare such plants were causing an "imminent and substantial endangerment" under Section 303 prior to implementation of the final rule. In the Final Benzene Rule, EPA again did not make an "imminent

[118] *NRDC, et al., v. EPA*, 529 F.3d 1077, 1081 n.4 (D.C. Cir. 2008).
[119] *Compare* DPE MSJ SOF, ¶ 9 (Ex. 33), *with* US Contested SOF, ¶ 9 (Ex. 34); EPA Response to DPE Interrogatory No. 6, , Case No. 2:23-cv-00735 (Ex. 36).
[120] 54 Fed. Reg. at 38045 (Ex. 35).
[121] *Id.*
[122] *Id.*
[123] *See* EPA, *National Emission Standards for Hazardous Air Pollutants; Benzene Emissions from Maleic Anhydride Plants, Ethylbenzene/Styrene Plants, Benzene Storage Vessels, Benzene Equipment Leaks, and Coke By-Product Recovery Plants*, 53 Fed. Reg. 28496 (July 28, 1988) (Ex. 37).
[124] *Id.* at 28498.
[125] Final Rule at 42963 (Ex. 1) (Table 5 shows a Facility-wide "maximum individual cancer risk" of 600-in-1 million, or 6-in-10,000 for the Neoprene Source Category).
[126] Vandenberg Supp. Decl., Updated Table 1 (Ex. 31).
[127] Declaration of Dr. John J. Vandenberg in Support of Motion for Preliminary Injunction ("Vandenberg PI Decl."), ¶ 60 ("The estimated lifetime cancer risks from chloroprene concentrations detected in the air at the Active monitoring sites range from 2 to 14 per 10,000 people...."), Case No. 2:23-cv-00735 (Ex. 38).

endangerment" finding even though EPA *increased* the risk estimate for coke by-product recovery plants to 70-in-10,000.[128]

In addition to addressing substantially higher risk levels than EPA alleges for the DPE Facility, in the Benzene Rule, EPA also estimated that far more people were exposed to pre-compliance risks greater than 1-in-10,000. In the Final Rule for chloroprene, EPA estimates that 2,300 individuals near DPE's Facility could be exposed to greater than a 1-in-10,000 risk from chloroprene based on the *maximum* individual risk estimate.[129] In the Benzene Rule proposal, EPA estimated that 100,000 people were exposed to risks greater than 1-in-10,000 from coke by-product recovery plants.[130] If a 1-in-10,000 risk level constitutes an imminent endangerment, then surely EPA would have made such a finding when such risk levels existed for 100,000 people in the rule that serves as EPA's "primary model" for regulation of HAPs like chloroprene.

**iii. Congress expressly deferred any abatement of risk from coke oven facilities for years despite estimating maximum risk levels more than 56-times higher than the risk EPA estimates for the Facility and 340-times higher than the 1-in-10,000 risk level.**

In September 1984, EPA listed coke oven emissions as a HAP under Section 112(b)(1)(A) of the CAA.[131] The EPA Carcinogen Assessment Group established that the unit risk estimate for coke oven emissions was 6.2 x $10^{-4}$ per µg/$m^3$ for 70-years of continuous exposure ("coke oven IUR").[132] Based on the entire set of health studies, the Administrator concluded that coke oven emissions presented a significant risk of cancer to the public.[133] In 1987, EPA proposed standards for coke ovens pursuant to Section 112 of the CAA Amendments of 1970.[134] In that rulemaking, EPA determined that "[f]or 38 of the 43 plants, the [maximum lifetime risk] is more than 1 chance in 1,000 (1 x $10^{-3}$), while the highest [maximum lifetime risk] is 3.4 chances in 100 or *340-in-10,000* (3.4 x $10^{-2}$)."[135] This estimate is 56-times higher than the estimated MIR for DPE's Facility (including risk from non-chloroprene sources) in the Final Rule, which is 6-in-10,000.

Despite EPA's estimate that the levels of coke oven emissions in 1987 caused an average of 6.9 deaths from respiratory cancer per year[136] and that the highest risk to the most exposed individual was 340-in-10,000, EPA permitted the facilities to continue operation. Further, EPA chose not to propose controls that "could potentially shut down much of the domestic coke-making capacity."[137] Instead, EPA proposed controls that would only reduce the maximum lifetime risk from 340-in-10,000 to 120-in-10,000, a number

---

[128] *See* 54 Fed. Reg. at 38051 ("There are now 36 coke by-product recovery plants.... The revised baseline estimates of health risk indicate an MIR of 7x$10^{-3}$ and an annual cancer incidence of 1 case every 6 months (2 cases/year).") (Ex. 35).
[129] Final Rule at 42963 (Ex. 1) (Table 5 showing the estimated population at increased risk of cancer greater than 1-in-10,000 to be 2,300).
[130] 53 Fed. Reg. at 28498 (Table I-1 listing estimated population subject to "baseline" risk of 1 x $10^{-4}$ before compliance with rule) (Ex. 37).
[131] *See* EPA, *National Emission Standards for Hazardous Air Pollutants; Addition of Coke Oven Emissions to List of Hazardous Air Pollutants*, 49 Fed. Reg. 36560 (Sept. 19, 1984) (Ex. 39).
[132] EPA, *Carcinogen Assessment of Coke Oven Emissions* at 5 (Feb. 1984) (Ex. 40).
[133] EPA, *National Emission Standards for Hazardous Air Pollutants; Coke Oven Emissions from Wet-Coal Charged By-Product Coke Oven Batteries*, 52 Fed. Reg. 13586, 13587 (Apr. 23, 1987) (Ex. 41).
[134] *Id.*
[135] *Id.* at 13589.
[136] This figure does not include any carcinogenic effects of occupational exposures.
[137] *Id.* at 13594.

that is still 20-times higher than EPA's MIR for DPE's Facility.[138] EPA never finalized its regulation of coke oven emissions due to the decision in *NRDC v. EPA*, 824 F.2d 1146 (D.C. Cir. 1987) ("*Vinyl Chloride* case"), which ruled that EPA was improperly applying the "ample margin of safety" language in Section 112 at the time.[139]

In the 1990 CAA Amendments, which remain effective today, Congress expressly provided *additional* time for coke ovens to comply with Section 112 requirements despite EPA having previously estimated that coke ovens pose a 340-in-10,000 risk level. A House of Representatives debate on the 1990 Amendments provided the following explanation for a compliance extension:

> Due to the enormous capital investment that will be required over the next decade of the American steel industry in order to clean it up and make it more efficient, the conferees felt it appropriate to extend the deadline for compliance with the residual risk standard for those coke ovens that would comply with a more stringent regulatory regimen in the earlier years.[140]

The result of the 1990 CAA Amendments was that the timetables for compliance with regulations for coke ovens are far longer than those for other industrial sectors. For example, under the normal Section 112 deadlines, the compliance date to comply with MACT standards would have been January 1, 1996, but coke oven facilities were given two additional years (until January 1, 1998) to comply with the MACT standards. In the MACT rule, EPA specifically noted that numerous commenters cited cancer risk estimates ranging from 1-in-55 to 1-in-300 over 70 years, meaning that risks had actually *increased* for some facilities since Congress passed the 1990 Amendments. In response, EPA stated:

> The proposed emission limits were developed under the 1990 Amendments to the Act and are based on available emission control technology and the performance levels that are achievable by the technology. The Act specifically defers immediate implementation of residual risk standards. Estimates of risk to the surrounding community simply do not play a role in the development of MACT standards. (See sections 112(d)(8) (a) and (c).) However, the EPA is required under the Act to develop residual risk standards within the next 8 years. Provisions within the Act will allow certain batteries to defer meeting this risk standard until the year 2020. To defer the risk standard, these batteries must meet the more stringent LAER emission limits.[141]

The importance of this history here could not be clearer: chloroprene emissions from DPE's Facility cannot be causing an imminent endangerment if both Congress and EPA expressly allowed for coke oven facilities to continue operating for years with much higher risk estimates.

---

[138] *Id.*

[139] In the *Vinyl Chloride* case, the U.S. Court of Appeals for the D.C. Circuit ruled en banc that this means that EPA must: (a) determine a safe emissions level, and (b) promulgate an emissions standard at a level which protects the public health with an ample margin of safety—*i.e.*, the promulgated standard may not be less stringent than the safe emissions level determined in (a). Cost and feasibility issues may be considered with regard to the latter, but not the former step. The first NESHAP to be promulgated under the *Vinyl Chloride* ruling would be that for benzene; next was coke oven emissions.

[140] *House Debate on the Clean Air Act Amendments of 1990 Conference Report*, H. Res. 535 (Oct. 26, 1990) (Ex. 42).

[141] EPA, *National Emission Standards for Hazardous Air Pollutants for Source Categories and for Coke Oven Batteries*, 58 Fed. Reg. 57898, 57907 (Oct. 27, 1993) (Ex. 43).

**iv. EPA's long-standing, as well as recent, acceptance of risk levels greater than 1-in-10,000 and 6-in-10,000 shows that such levels of risk are not permissible thresholds for alleging an imminent endangerment.**

Finding that the Facility's emissions constitute an imminent endangerment would be unprecedented and contradict more than 30 years of EPA's treatment of risk under Section 112. When EPA has identified a risk level greater than 1-in-10,000 in past rulemakings, EPA has *never* found an imminent endangerment or otherwise limited emissions from the regulated facilities while the rule is being implemented. In fact, EPA has issued final rules that expressly allow for lifetime cancer risks *greater* than 1-in-10,000.[142] For example, in the final rule implementing the Section 112(f) residual risk review for coke ovens, EPA accepted a post-control MIR of 2.7-in-10,000 and a post-control cancer incidence of 0.06.[143] A 0.06 annual cancer incidence is the same incidence that EPA estimates for DPE's Facility in the Final Rule *prior to controls being installed*.[144] In other words, a 90-day compliance period means that EPA believes a 0.06 cancer incidence rate results in an "imminent endangerment" for DPE's Facility during a 21-month period, but is perfectly acceptable for coke oven facilities *indefinitely*.[145]

Likewise, in recent rulemakings, EPA has consistently extended compliance periods for facilities with estimated MIRs equal to or far greater than DPE's Facility, for facilities with higher estimated cancer incidences, and for facilities for which a greater number of people were exposed to an estimated risk above 1-in-10,000. In the Section 112 rulemaking for commercial sterilization facilities, EPA provides unqualified compliance periods of 2-years to all facilities, including 12 facilities with MIRs equal to or greater than DPE.[146] EPA has not released the final risk assessment in support of the Final Rule, but the Final Rule provides unqualified compliance period of 2-years to all facilities other than DPE, including four facilities for which EPA estimated MIRs that were equal to or greater than DPE at the time of the Proposed Rule.[147] Similarly, EPA provided unqualified extensions for numerous facilities in the Miscellaneous Organic Chemical Manufacturing source category with MIRs equal to or greater than the MIR attributed to DPE in the Final Rule.[148] In total, EPA has provided unqualified extensions to 16 facilities with MIRs higher than DPE in the past four years. *See, supra* at 2 (chart and discussion).

---

[142] *See* EPA, *National Emission Standards for Coke Oven Batteries*, 70 Fed. Reg. 19992, 19994 (Apr. 15, 2005) (NESHAP for Coke Oven Batteries setting lifetime cancer risk from exposure to coke oven emissions at 2.7-in-10,000) (Ex. 44); EPA, *National Air Emission Standards for Hazardous Air Pollutants: Halogenated Solvent Cleaning*, 72 Fed. Reg. 25138, 25143 (May 3, 2007) (NESHAP for Halogenated Solvent Cleaning settings risk level of 2-in-10,000) (Ex. 45).
[143] 70 Fed. Reg. at 19993-94 (Ex. 44).
[144] Final Rule at 42963 (Table 5) (Ex. 1).
[145] As for chloroprene, EPA determined that children are more sensitive than adults to the carcinogenic effects of coke oven emissions.
[146] 89 Fed. Reg. 24090 (Apr. 5, 2024) (Ex. 12); EPA, *Residual Risk Assessment for the Commercial Sterilization Facilities Source Category in Support of the 2024 Risk and Technology Review Final Rule* (Jan. 2024) at Table 2a-1, EPA Docket No. EPA-HQ-OAR-2019-0178-1576 (Ex. 29).
[147] EPA, *Residual Risk Assessment for the Synthetic Organic Chemical Manufacturing Industry (SOCMI) Source Category in Support of the 2024 Risk and Technology Review Final Rule* (March 2024) at Table 2, EPA Docket No. EPA-HQ-OAR-2022-0730-2807 (Ex. 46).
[148] EPA, *National Emission Standards for Hazardous Air Pollutants: Miscellaneous Organic Chemical Manufacturing Residual Risk and Technology Review*, 85 Fed. Reg. 49084 (Aug. 12, 2020) (Ex. 47); EPA, *Residual Risk Assessment for the Miscellaneous Organic Chemical Manufacturing Source Category in Support of the 2020 Risk and Technology Review Final Rule* (April 2020) at Table 21, EPA Docket No. EPA-HQ-OAR-2018-0746-0189 (Ex. 48).

EPA also estimates that there are 15 U.S. census tracts where EtO poses a higher cancer risk than chloroprene poses.[149] The Final Rule imposes additional emission controls on EtO facilities, but such facilities will operate for at least 24 months at existing emission levels. As with chloroprene, EPA has also concluded that EtO operates through a "mutagenic mode of action," meaning that the alleged risks to children are higher in those 15 tracts than in the tract in which the Facility is located. In four of those tracts the risk is more than twice as high as that attributed to the Facility.[150] Thus, any potential impacts to children would arise even faster in census tracts in which these EtO facilities are located. Yet EPA has not imposed a 90-day compliance deadline on EtO facilities in any of the 15 tracts, nor has EPA taken any action under Section 303 to allege an imminent and substantial endangerment in these tracts.[151] This dramatic inconsistency underscores the fundamental flaws in EPA's position on chloroprene.

**B. EPA's Allegation Of Imminent Endangerment Is Refuted By The Available Real-World Data Showing No Cancer Risk Of Chloroprene To Humans Near the Facility.**

The available real-world evidence shows that chloroprene emissions from the Facility have not and do not pose an increased risk of respiratory or liver cancer (the cancers that, according to EPA, are associated with exposure to chloroprene). The rulemaking record contains no evidence of a single case of cancer attributable to chloroprene emissions from the Facility, let alone any evidence that cancer rates in the vicinity of the Facility have actually increased due to the Facility's chloroprene emissions. Likewise, EPA admitted in the Section 303 Litigation that it has no such evidence.[152] Further, the lack of an association between chloroprene and cancer is corroborated by tumor incidence data collected by the Louisiana Tumor Registry. This complete lack of evidence is meaningful given the decades of operation of the Facility, under prior ownership, when chloroprene emissions were orders of magnitude higher than they are today.[153] If chloroprene posed the risk of respiratory and liver cancer alleged by EPA, then one would expect some signal of such cancers in the neighboring community after many decades of substantially higher chloroprene emission levels.[154] There is no such signal. This is consistent with the strongest epidemiological study of workers historically exposed to substantially greater levels of chloroprene, which found no linkage between chloroprene and lung and liver cancer.

**i. The epidemiological evidence supports the conclusion that chloroprene exposure at human-relevant levels does not cause respiratory or liver cancers, and thus poses no risk in the vicinity of the Facility.**

The "strongest studies" on the human carcinogenicity of chloroprene is the 2007 Marsh *et al.* study published in two parts (Marsh *et al.* 2007a and Marsh *et al.* 2007b, collectively "the 2007 Marsh Study"),

---

[149] *See* EPA, *2019 AirToxScreen: Assessment Results* (last updated July 26, 2024) (providing access to pollutant-specific data in spreadsheet entitled 2019 AirToxScreen National Cancer Risk by Pollutant) (identifying fifteen U.S. census tracts where ethylene oxide poses a higher cancer risk than chloroprene poses at the Facility) (Ex. 49).
[150] *Id.* (identifying Tracts 72123953100, 13217100300, 48141010337, and 48141010338 as having risk from ethylene oxide emissions more than twice the chloroprene risk in the Facility's tract).
[151] 89 Fed. Reg. 24090 (Apr. 5, 2024) (Ex. 12).
[152] *See* EPA Responses to DPE First Set of Interrogatories, at 28 (Response to Interrogatory No. 12) (EPA "not currently aware of specific incidents of cancer that have been attributed by a medical professional or individual with other relevant scientific expertise to exposure to Denka's chloroprene emissions.") (Ex. 26); *see also* Deposition Transcript of Dr. Helen Suh ("Suh Dep. Tr.") 230:7-18 (EPA epidemiology expert not aware of any cancer incidence specifically attributable to chloroprene due to Facility emissions), Case No. 2:23-cv-00735 (Ex. 50).
[153] Declaration of Kenneth A. Mundt, PhD, FACE ("Mundt Decl."), ¶¶ 47-49 (including graph from 10/12/2022 Letter from EPA to LDEQ at 28 showing 500 tons of chloroprene emissions in 1985), Case No. 2:23-cv-00735 (Ex. 51); Meyers Extension Request Decl., ¶ 38 (Ex. 11).
[154] Mundt Decl., ¶¶ 44-45, 47-49 (Ex. 51).

which is "the only [study] of adequate quality to validly address epidemiologically the cancer risks associated with human exposure to chloroprene."[155] Dr. Helen Suh, EPA's epidemiology expert in the Section 303 Litigation, testified that the epidemiological study conducted by Dr. Gary Marsh of chloroprene workers "was the most comprehensive study," was "head and shoulders above" the other chloroprene studies, and "had the most detailed and precise measure of chloroprene exposures."[156] The 2007 Marsh Study, which represented 74% of the total person-years studied across all studies, as well as 88% of all lung cancer deaths and 49% of all liver cancer deaths, received scores of "H" (high-quality) or "H-M" (high to medium quality) in all quality review categories.[157]

Marsh *et al.* (2007) studied the impacts of chloroprene on a large cohort of U.S. and European chloroprene workers—individuals who for multiple decades were subjected to chloroprene concentrations estimated to be hundreds of times higher than those of residents living in the vicinity of the Facility today.[158] Overall, the 2007 Marsh Study did not provide evidence of elevated respiratory or liver cancer mortality risks among the cohort of chloroprene-exposed workers.[159] For the chloroprene worker subcohorts defined by the specific plants in the 2007 Marsh Study, all of the standardized mortality rates ("SMRs", the ratio of the number of observed deaths to the number of expected deaths) based on local reference rates were below 1.0, providing no indication of any excess occurrence of cancers among the chloroprene-exposed workers compared with local background rates.[160] In sum, the chloroprene-exposed workers in the 2007 Marsh Study had only about 90% of the expected all-cause mortality rate, relative to the background rates in the local (or state or national) population. This evidence, and especially the results specific to respiratory and liver cancers demonstrating no excesses occurrence of these cancers, does not demonstrate—or even suggest—an association between occupational chloroprene exposure and increased risk of human respiratory or liver cancers.[161]

The Louisville plant chloroprene workers included in the 2007 Marsh Study represent the largest single-site ever studied epidemiologically for chloroprene exposure and had the largest number of reported respiratory cancer deaths—more than all other epidemiological chloroprene studies combined, regardless of study quality.[162] This group also was among the most highly exposed to chloroprene.[163] Nevertheless, no clear evidence of excess occurrence of these cancers or any relationship with exposure category is seen. Regardless of the referent group or exposure metric used, the 2007 Marsh Study of the Louisville workers most highly exposed to chloroprene demonstrated no clear or consistent exposure-response relationship between estimated i) duration of exposure, ii) exposure intensity, and iii) cumulative exposure to chloroprene, and increased risk of respiratory or liver cancers.[164] The lack of exposure-response (*i.e.*, increasing risks with increasing exposures) is real-world evidence that refutes EPA's allegation that chloroprene causes these cancers, as demonstrating increasing risk with increasing exposure is a central tenet in assessing causality.[165]

---

[155] *Id.* ¶ 25 (quoting Sax, Sonja N. *et al.*, "Extended Analysis and Evidence Integration of Chloroprene as a Human Carcinogen," *Risk Analysis* 40(2): 294-318 (2020) ("Sax *et al.* (2020)") (Ex. 52)).
[156] Suh Dep. Tr. 87:12-15, 83:3-13, 84:15-18 (Ex. 50).
[157] Mundt Decl., ¶ 26 (Ex. 51).
[158] *Id.* ¶¶ 39, 42-43.
[159] *Id.* ¶ 28.
[160] *Id.* ¶¶ 28, 36, 41; Sax *et al.* (2020).
[161] *Id.* ¶¶ 28, 36, 41; Sax *et al.* (2020).
[162] *Id.* ¶ 36.
[163] *Id.*
[164] *Id.* ¶ 35.
[165] *Id.*

The chart below[166] plots the relative risk estimates and their 95% confidence intervals (indicated by vertical lines) based on (i) regional referent rates (shown in orange); (ii) an internal referent group (shown in blue); and (iii) on analyses using mortality rates from a corporate mortality registry (shown in green):




While there are small differences based on the referent rates used, all the results lie close to the null value of 1.0 (*i.e.*, the horizontal line) representing "no association"—meaning there is a clear lack of any exposure-response relationship.[167] Eleven out of twelve estimates indicate no statistically significant increase in the relative risk estimate.[168]

In general, where exposure increases the risk of a specific cancer, SMRs and RRs tend to increase with increasing exposure and an exposure-response will be seen.[169] In contrast, the above chart shows that the subset of workers with the very highest cumulative exposures—shown on the far right of the chart—all fall *below* the null value of 1.0 representing *no association* between chloroprene exposure and cancer.[170] The chart above illustrates what one typically observes where the exposure (especially when ranging over three orders of magnitude) fails to move the risk needle.[171]

---

166 *Id.* ¶ 36.
167 *Id.* ¶ 37.
168 *Id.*
169 *Id.*
170 *Id.*
171 *Id.*; *see also* Mundt, K.A. *et al.*, "Quantitative estimated exposure to vinyl chloride and risk of angiosarcoma of the liver and hepatocellular cancer in the US industry-wide vinyl chloride cohort: mortality update through 2013,"

In 2021, Dr. Marsh updated the 2007 study, examining 17 additional years of data (through 2017) on the same cohort of U.S. chloroprene workers as well from the 2007 study.[172] Again, Dr. Marsh found no increase in cancer mortalities among U.S. chloroprene workers, a population exposed to far higher concentrations of chloroprene than the communities surrounding the Facility today.[173] As depicted in the table below, the updated study of chloroprene workers continued to demonstrate no excess occurrence of either respiratory or liver cancers at the Louisville Plant—the largest plant with the highest chloroprene exposures.[174] The table shows that most SMRs are lower than 1.0 and that, for the two that are greater than 1.0, the lower bound of the 95% confidence interval ("CI") never exceeds 1.0, indicating that, there are no statistically significant excess risks seen.[175] Findings that are not statistically significant, including all reported in the table below, are interpreted as being no different from 1.0, the value representing no association, and therefore providing no scientific support for the hypothesis that chloroprene causes these cancers.[176]

| | Cumulative exposure | Observed deaths | SMR | 95% CI |
|---|---|---|---|---|
| **RSC** | < 4.747 | 95 | 0.66 | 0.53-0.80 |
| | 4.747-55.918 | 97 | 0.71 | 0.57-0.86 |
| | 55.919-164.052 | 96 | 0.94 | 0.76-1.15 |
| | 164.053+ | 70 | 0.65 | 0.51-0.82 |
| **LC** | < 4.747 | 9 | 0.76 | 0.35-1.45 |
| | 4.747-55.918 | 8 | 1.34 | 0.58-2.63 |
| | 55.919-164.052 | 5 | 1.09 | 0.35-2.55 |
| | 164.053+ | 9 | 0.90 | 0.41-1.71 |

Dr. Marsh's epidemiological studies strongly support the conclusion that chloroprene does not pose a meaningful risk of respiratory or liver cancer to humans, particularly given the orders of magnitude higher chloroprene exposures experienced by the chloroprene workers compared to the chloroprene concentrations existing near the Facility today.[177]

---

*Occupational and Environmental Medicine*, 74(10): 709-16 (2017) ("Mundt *et al.* (2017)") (study of the North American Vinyl Chloride Workers presents clear demonstration of both excess liver cancer among workers and strong exposure-response relationships) (Ex. 53).

[172] Mundt Decl., ¶¶ 50-51 (Ex. 51); Marsh, G. M., Kruchten, A., & Buchanich, J. M., "Mortality Patterns Among Industrial Workers Exposed to Chloroprene and Other Substances: Extended Follow-Up," *J. Occup. Environ. Med.*: 63(2), 126-138 (2021) ("Marsh *et al.* (2021)" (Ex. 54)).

[173] Mundt Decl., ¶¶ 50-51 (Ex. 51); Marsh *et al.* (2021) (Ex. 54).

[174] Mundt Decl., ¶ 50 (Ex. 51).

[175] *Id.*

[176] *Id.*

[177] *Id.* ¶¶ 51-52.

**ii. The lack of association between chloroprene and cancer in the vicinity of the Facility is corroborated by data from the Louisiana Tumor Registry.**

For decades, in conjunction with the National Cancer Institute, Louisiana has had a robust program to track cancer cases throughout the state. The data from the Louisiana Tumor Registry ("LTR") consistently show no increase in cancer incidence rates in the community surrounding the Facility.[178] The LTR, maintained by the Louisiana State University School of Public Health, has a mission "[t]o collect and report complete, high-quality, and timely population-based cancer data in Louisiana to support cancer research, control, and prevention."[179] In 2020-2021, Louisiana State University conducted a study confirming that the LTR had not omitted any relevant cancer cases in the 2009-2018 timeframe.[180] Dr. Helen Suh, EPA's epidemiology expert in the Section 303 Litigation, confirmed that the LTR data "seems like it's high-quality,"[181] and she had no questions about the completeness and quality of the LTR data.[182]

Community disease surveillance studies, including those based on the LTR data, can provide a sense of, or clues as to, whether there might be excess occurrences of disease that an agent (like chloroprene) has been postulated to cause.[183] A lack of increased risk of respiratory and liver cancers from chloroprene exposure in the communities surrounding the Facility—where chloroprene exposure likely is orders of magnitude lower than that of the workers studied in the 2007 Marsh Study—would be expected, given the lack of any excess of these cancers in the highly exposed workers in both the Pontchartrain and Louisville plants studied in the 2007 Marsh Study.[184] Analyses using LTR data and comparing cancer rates across Louisiana parishes demonstrate that the overall cancer rate for St. John the Baptist Parish falls into the lowest 25% of cancer rates by parish across the entire state.[185]

Historical emissions from the Facility were orders of magnitude higher during the late 1960s through the mid-1980s than in recent years.[186] The figure below not only illustrates the dramatic reduction in chloroprene emissions since 1987, but it also demonstrates the additional, significant chloroprene emission reductions achieved by DPE after DPE's acquisition of the Facility in 2015.

---

[178] *Id.* ¶¶ 52-53.

[179] LSU Health, *About the Registry*, available at https://sph.lsuhsc.edu/louisiana-tumor-registry/about-the-registry/.

[180] LDH Cancer Surveillance Study in St. John Parish (CRISP) Report (Jan. 2022) (Ex. 55).

[181] Suh Dep. Tr. 99:21-100:12 (Ex. 50).

[182] *Id.* at 113:6-12; 151:1-9.

[183] Mundt Decl., ¶ 44 (Ex. 51).

[184] *Id.*

[185] *Id.* ¶ 45; LSU Health, *Louisiana Cancer Data Visualization*, available at https://sph.lsuhsc.edu/louisiana-tumor-registry/data-usestatistics/louisiana-data-interactive-statistics/louisiana-cancer-data-visualization/ (LTR update for 2015-2019 period showing St. John the Baptist Parish within bottom 25% of cancer incidence rates state-wide).

[186] Mundt Decl., ¶ 47 (including graph from 10/12/2022 Letter from EPA to LDEQ at 28) (Ex. 51).




Chloroprene emissions from the Facility dropped precipitously between 1987 and 1993, and declined continuously and roughly monotonically until 2017, whereupon the emissions again rapidly declined.[187] The typical latency periods for respiratory and liver cancers are 20 or more years and can range well above 30 years.[188] Therefore, the exposure time period most likely to give rise to excess cancers (if any) today or in recent years would be those that occurred at least 20 years ago.[189] Thus, if chloroprene emissions from the Facility had increased the risks of respiratory and liver cancers in the community surrounding the Facility from around 2015 to 2020, the most relevant time window for those exposures would have occurred from at least 20 to 40 or more years ago, *i.e.*, conservatively, between 1975 and 2000.[190] The LTR data show no signal of excess occurrence of respiratory or liver cancers, notwithstanding the orders of magnitude higher levels of chloroprene during the period of time most likely to give rise to excess cancers in recent years.[191]

EPA itself relied upon LTR data to assess the health risks due to chloroprene exposure in the communities surrounding the Facility. In 2020, EPA granted roughly $300,000 to the LDEQ and the LDH "to assess the health risks associated with Chloroprene exposure in St. John the Baptist Parish near the Denka Plant." The two stated objectives of the funded research were to determine "if there are higher instances of cancer in the community due to" the Facility's emissions, and "if there has been under-reporting of these

[187] Mundt Decl., ¶ 47 (Ex. 51).
[188] *Id.* ¶ 48.
[189] *Id.*
[190] *Id.* ¶ 49.
[191] *Id.* ¶ 50.

cases in the [LTR]."[192] The LDH Report resulting from the EPA grant was issued in 2021 and found that "no reportable cancers were identified that were not already contained in the LTR data."[193] The Report further found that census tracts in the vicinity of the Facility "have statistically significantly lower overall cancer incidence rates ... compared to Louisiana overall cancer incidence rate."[194] An LDH official also reported to EPA based on the LTR analysis that "the only elevated rates we found were in census tract 702 for prostate and NHL, which have not been found to be related to chloroprene."[195]

As no excess occurrence of respiratory or liver cancers has been reported in any area or community surrounding the Facility, the LTR cancer surveillance exercises fail to support any claim that chloroprene emissions at historically very high levels had any measurable impact on rates of these cancers among residents in areas surrounding the Facility in any recent years.[196] Given the dramatically lower exposure levels today, it is inconceivable that future rates would be any different due to environmental exposure to chloroprene.[197]

### C. To the Extent EPA's Imminent Endangerment Assessment Is Based on EPA's 2010 Inhalation Unit Risk, the IUR Fails To Provide The Best Estimate Of Human Risk From Chloroprene.

EPA's MIR and risk assessment is based on the IUR developed in EPA's Toxicology Review of Chloroprene ("2010 Review").[198] EPA calculated the IUR for human exposure to chloroprene to be $5 \times 10^{-4}$ per $\mu g/m^3$ for 70-years of continuous exposure ("chloroprene IUR"). In the Section 303 Litigation, EPA calculated cancer risks to humans in relation to a threshold of 0.2 $\mu g/m^3$.[199] The 0.2 $\mu g/m^3$ value represents EPA's estimate of a chloroprene concentration that, if inhaled continuously for 70 years, corresponds to a 1-in-10,000 excess chance of cancer. EPA's Integrated Risk Information System ("IRIS") program develops toxicology reviews to characterize the risks to human health posed by specific environmental hazards.

The IRIS Program follows a risk assessment approach based on the four-step process described by the National Research Council.[200] IRIS assessments "serve as starting materials for the overall risk characterization process that completes the risk assessment."[201] The EPA's Guidelines for Carcinogen Risk Assessment state that risk characterization "is an appraisal of the science that informs the risk manager in public health decisions, as do other decision-making analyses of economic, social, or technology issues."[202] The risk assessment does not generate independently actionable information, but must be

---

[192] EPA Cooperative Agreement 01F70601 to LDEQ (Sept. 19, 2020) (Ex. 56); EPA Responses to DPE Second Set of Interrogatories, at 14-15 (Response to Interrogatory No. 16) (Ex. 27); EPA_1932780 at EPA_1932855 (Ex. 57) ("There are two tasks that are to be accomplished: a study to ensure that the types and numbers of cancers in the Louisiana Tumor Registry database are complete for the area to serve as a baseline, and an evaluation and analysis of that database specific to the 1.5-km radius and 2.5-km radius around Denka to determine if there are higher instances of cancer in the community and if the observed cancers are attributable to Denka.").

[193] Cancer Reporting in St. John Parish, Cancer Surveillance Project, EPA_2235649 at EPA_2235661 (Ex. 58).

[194] *Id.* at Appendix F ("Cancer Incidence Rates in St. John the Baptist Parish") at EPA_2235686.

[195] EPA_2548391 (email correspondence) (Ex. 59).

[196] Mundt Decl., ¶ 50 (Ex. 51).

[197] *Id.* ¶¶ 50, 52.

[198] EPA, *Toxicological Review of Chloroprene: In Support of Summary Information on the Integrated Risk Information System (IRIS)* (Sept. 2010) ("2010 Review") (Ex. 60).

[199] *Id.* at 138.

[200] *See* EPA, *Basic Information about the Integrated Risk Information System* (last updated Nov. 9, 2023), available at https://www.epa.gov/iris/basic-information-about-integrated-risk-information-system.

[201] EPA, *Guidelines for Carcinogen Risk Assessment* 1-21 (Mar. 2005), EPA/630/P-03/001B (Ex. 61).

[202] *Id.* at 5-1 to 5-2.

incorporated into EPA's risk management paradigm.[203] Following the completion of a risk assessment, EPA implements "risk management" processes, which include EPA's rulemaking activities.[204]

Simply put, EPA has failed in its obligation to apply risk management principles in assessing the risk of the DPE Facility. Risk management involves developing, analyzing, and comparing options related to potential regulatory control in light of legal, political, social, economic, and technical considerations.[205] The chloroprene IUR does not reflect any of these essential considerations. Therefore, it is incumbent upon risk managers to consider the uncertainties and weaknesses of the chloroprene IUR. EPA has provided no evidence that it has considered new risk estimates or qualitative information that accompanied and informed the chloroprene IUR. Instead, EPA applied the chloroprene IUR without adjustment and has opted out of the risk management obligations that it is required to perform.

When new risk estimates and qualitative information are considered, it is clear that the chloroprene IUR fails to provide the most probative estimate of human risk from exposure to chloroprene and should not be used to assess "imminent endangerment." First, the physiologically-based pharmacokinetic ("PBPK") computer model developed by scientists at Ramboll US Corporation ("Ramboll"), which can be used to aid in the calculation of an IUR that accounts for species-specific parameters (the "Ramboll PBPK Model"),[206] provides the best method to provide a reasonable scientific estimate of chloroprene's cancer potency in humans and provides a better estimate of risk than the chloroprene IUR.[207] Second, even if the Ramboll PBPK Model were not utilized to calculate the chloroprene IUR, applying real-world adjustments to EPA's chloroprene IUR results in a less uncertain and distorted risk estimate.

**i. The Ramboll PBPK Model provides the best estimate of human risk from chloroprene.**

A PBPK model is a mathematical computer model that simulates the uptake, distribution, metabolism, and elimination of a chemical in a human or animal body using equations that are consistent with the biological structure of the organism being simulated.[208] PBPK models simulate chemical exposures and predict internal doses of the chemical or one or more of its metabolites that appear in specific organ systems of the body.[209] These type of models use well-established, known values for modeling physiological parameters such as heart rate, breathing rate, blood flow rate, body weight, size of organs, and others in the mathematical equations to accurately represent the physiology of a laboratory animal or a human.[210] They also incorporate measured rates of metabolism in the various organs and elimination from the body (such as exhalation or clearance in the urine).[211] Importantly, PBPK models are capable of extrapolating from animal exposures or doses to human exposure, while accounting for physiological and toxicokinetic differences between the species.[212] EPA considers PBPK models to be the optimal approach

[203] *Id.*
[204] *Id.*
[205] *Id.*
[206] Declaration of Dr. Robinan Gentry in Support of Opposition to Motion for Preliminary Injunction ("Gentry Decl."), ¶¶ 14-15, Case No. 2:23-cv-00735 (Ex. 62).
[207] Declaration of Dr. Michael Lumpkin in Support of Opposition to Motion for Preliminary Injunction ("Lumpkin Decl."), ¶ 120, Case No. 2:23-cv-00735 (Ex. 63).
[208] Gentry Decl., ¶ 14 (Ex. 62).
[209] Lumpkin Decl., ¶ 42 (Ex. 63).
[210] *Id.* ¶ 43.
[211] *Id.*
[212] EPA, *Approaches for the Application of Physiologically Based Pharmacokinetic Models and Supporting Data in Risk Assessment* at 4-11 – 4-12 (Aug. 2006) ("EPA PBPK Guidance") (Ex. 64).

for extrapolation of chemical dose across species.[213] When preparing IRIS toxicological reviews, EPA considers whether an adequate PBPK model is available for use.[214]

Using the Ramboll PBPK Model and EPA software to calculate an IUR results in the best estimate of chloroprene's cancer potency in humans because it accounts for the significant toxicokinetic differences between humans and female B6C3F1 mice. By failing to calculate its risk estimate for chloroprene using the Ramboll PBPK Model, EPA has failed to offer a risk estimate that is appropriate for assessing whether there is an imminent endangerment to *humans*.

The Ramboll PBPK Model was not available when EPA published the 2010 Review.[215] However, the 2010 Review stated, "[i]deally, a PBPK model for the internal dose(s) of the reactive metabolite(s) would decrease some of the quantitative uncertainty in interspecies extrapolation; however, current PBPK models are inadequate for this purpose."[216] EPA guidance supports the use of PBPK modeling when available, stating that, "[t]oxicokinetic modeling is the preferred approach for estimating dose metrics from exposure."[217] EPA recognizes that "[t]he primary advantage gained by using PBPK models in risk assessment is their ability to relate toxicity responses in a test species to humans and outcomes observed in smaller populations to likely outcomes in the general population."[218]

In April 2018, DPE and Ramboll submitted a work plan to EPA for the development of a PBPK model for chloroprene that would satisfy EPA requirements.[219] From 2018 through 2020, EPA and Ramboll engaged in sustained dialogue to improve the PBPK model, including two separate rounds of quality review by EPA.[220] In response to EPA's review, Ramboll made revisions to the model, developed supporting documentation, and provided EPA with the model's computer code and validation data.[221] At EPA's request, Ramboll also agreed to conduct an additional experiment in support of a specific model parameter.[222]

Based on EPA's feedback, the Ramboll PBPK Model was published in a peer-reviewed article in *Frontiers in Pharmacology* in 2023.[223] Prior to the Ramboll PBPK Model being published in 2023, DPE in 2021 submitted the model (including detailed documentation and the underlying computer code) to EPA as part of DPE's administrative challenge to the chloroprene IUR based on the 2010 Review.[224] EPA did not undertake a technical analysis to evaluate the IUR estimated by the Ramboll PBPK Model. EPA stated: "Ramboll's analyses assert that the risk of human lung cancer is minimal compared to mice, making the current IRIS IUR an overestimate of risk. EPA has not undertaken the technical analysis to reach a

---

[213] EPA, *Methods for Derivation of Inhalation Reference Concentrations and Application of Inhalation Dosimetry* at 1-12 (Oct. 1994) (Ex. 65).

[214] *See e.g.,* EPA, *Toxicological Review of Dichloromethane (Methylene Chloride)* at 226 (Nov. 2011) (using "the best available" PBPK models to derive IUR) (Ex. 66); EPA, *Toxicological Review of Vinyl Chloride* at 44-53 (May 2000) (using Clewell *et al.* PBPK model to derive IUR) (Ex. 67).

[215] Gentry Decl., ¶ 15 (Ex. 62).

[216] 2010 Review at 141 (Ex. 60).

[217] EPA, *Guidelines for Carcinogen Risk Assessment* (Mar. 2005), EPA/630/P-03/001B (Ex. 61).

[218] EPA PBPK Guidance at 2-9 (2006) (Ex. 64).

[219] EPA, *Background Description for Chloroprene PBPK Modeling* at 4 (July 2020) (Ex. 68).

[220] *Id.*; Gentry Decl., ¶¶ 20-28 (Ex. 62).

[221] Gentry Decl., ¶ 23 (Ex. 62).

[222] *Id.*

[223] Lumpkin Decl., ¶ 70 (Ex. 63); Campbell, J.L. et al., "Using available in vitro metabolite identification and time course kinetics for β-chloroprene and its metabolite, (1-chloroethenyl) oxirane, to include reactive oxidative metabolites and glutathione depletion in a PBPK model for β-chloroprene," *Frontiers in Pharmacology* 14:1223808 (2023) ("Campbell et al. (2023)") (Ex. 69).

[224] DPE, Request for Correction #21005 (July 15, 2021) (Ex. 70).

conclusion on concurrence with this assertion."[225] EPA subsequently denied DPE's administrative appeal of EPA's decision not to revisit the chloroprene IUR based on the Ramboll PBPK Model, citing resource limitations and a lack of an appropriate procedural mechanism.[226] Specifically, EPA stated that "the [IRIS administrative appeal] process is not a mechanism to commit EPA to undertake scientific updates of its risk assessment products, such as IRIS Toxicological Reviews."[227] EPA has not evaluated the Ramboll PBPK Model outside of the IRIS program either.

**1. The Ramboll PBPK Model uses the appropriate dose metric to estimate risk.**

PBPK models are designed to estimate an internal "dose metric," which is the amount of a chemical that most closely relates to an adverse (*e.g.,* toxic) response.[228] Internal dose metrics provide a better understanding of the potential for toxicity than an "external" dose (*e.g.,* the amount of chloroprene inhaled), thus reducing uncertainty.[229] This is because internal dose metrics can account for the most biologically relevant form of the chemical, its level, duration of internal exposure, intensity, and the appropriate tissues.[230] The major advantage of using an internal dose metric is that it can provide a stronger biological basis for comparing the effects of a chemical across species (*i.e.,* mice to human) and dose levels (*e.g.,* high levels of chloroprene to low levels of chloroprene).[231]

Because the dose metric is the form of chemical most closely associated with toxicity, a PBPK model is needed to estimate the relevant dose metric across varying exposure scenarios.[232] The appropriate dose metric for a given chemical varies depending on the "mode of action," *i.e.,* the sequence of events and processes resulting in toxicity and tumor formation.[233] Chloroprene's toxicity is thought to result from the formation of "reactive epoxides," compounds that are produced during the metabolism of chloroprene.[234]

The Ramboll PBPK Model estimates the internal dose metric amount of chloroprene metabolized per gram of tissue ("Total Metabolism") for the liver and lung.[235] Using Total Metabolism as the dose metric is appropriate because chloroprene's toxicity is thought to result from the formation of "reactive epoxides," compounds that are produced during the metabolism of chloroprene.[236] There is substantial evidence supporting the use of Total Metabolism as a dose metric. The 2010 Review describes a PBPK model from 2004 (the "Himmelstein PBPK Model") that was a precursor to the models prepared by Ramboll and notes that the Total Metabolism dose metric "fit the [tumor] incidence data much better than the external dose metric."[237] The 2010 Review also explains that many of the available studies investigating the mode of action for chloroprene have focused on identifying reactive metabolites.[238] An expanded version of the Himmelstein PBPK Model was published in 2012 (the "Yang PBPK Model") that incorporated additional

---

[225] 3/14/2022 Letter from M. Gwinn to P. Walsh at 6 (Ex. 71).
[226] 10/19/2022 Letter from Mr. Vaughn Noga to Mr. Robert Holden, *et al.* at 1-2 (Ex. 72).
[227] *Id.*
[228] EPA PBPK Guidance at 2-3 (Ex. 64).
[229] *Id.* at 2-3.
[230] *Id.* at 2-3 – 2-4.
[231] *Id.* at 2-3.
[232] *Id.* at 4-3.
[233] *Id.*
[234] Lumpkin Decl., ¶ 37 (Ex. 63).
[235] Gentry Decl., ¶ 69 (Ex. 62).
[236] Lumpkin Decl., ¶ 37 (Ex. 63).
[237] 2010 Review at 20 (Ex. 60).
[238] *Id.* at 82.

measurements of metabolism and further refined parameter values for chloroprene metabolism.[239] In 2019, Ramboll again expanded the model (the "Clewell PBPK Model") to describe metabolism of a specific reactive metabolite and to confirm the Total Metabolism dose metric.[240] The Clewell PBPK Model was published in a peer-reviewed article in *Inhalation Toxicology* in 2019 (Clewell, 2019).[241] The article explains:

> The dose metric calculated with the PBPK model in this analysis is micromoles of chloroprene metabolized in the lung per gram lung per day (Himmelstein, Carpenter, Evans, *et al.* 2004; Yang *et al.* 2012). This dose metric was chosen because (1) the lung is the tissue with the highest tumor incidence in the chloroprene inhalation bioassays (NTP 1998) and (2) the carcinogenicity of chloroprene in rodents is believed to result from its metabolism to reactive epoxides in the target tissue (Himmelstein, Carpenter, and Hinderliter 2004; Himmelstein, Carpenter, Evans, *et al.* 2004). The dose metric selected for chloroprene is consistent with the dose metrics used in previous PBPK-based risk assessments for both vinyl chloride (USEPA 2000; Clewell *et al.* 2001) and methylene chloride (Andersen *et al.* 1987; USEPA 2011), which were also based on the rate of production of reactive metabolites.[242]

As an outgrowth of Ramboll's dialogue with EPA, Ramboll again extended the PBPK model in 2021 to include more detail on the production of reactive metabolites and a detoxification process involving the compound glutathione.[243] The 2021 extension was subsequently published in a peer-reviewed article in *Frontiers in Pharmacology* in August 2023 and constitutes the Ramboll PBPK Model in this case.[244] The article describing the Ramboll PBPK Model again confirmed that Total Metabolism was the appropriate dose metric.[245]

**2. The Ramboll PBPK Model has been validated using robust and established methods.**

Model "validation" is the process of substantiating that a model, within its domain of applicability, behaves with satisfactory accuracy.[246] To adequately validate a PBPK model, the model should be compared against data that are informative of parameters that influence model predictions (*i.e.*, if metabolism is the most significant influence on model predictions, the validation data should provide informative data for metabolism parameters).[247] Toxicokinetic tests of cells and tissues removed from the intact body are called *in vitro* tests, while tests conducted on intact animals or humans are called *in vivo* tests.[248]

The Ramboll PBPK Model was validated against *in vivo* data from a 2009 study of female B6C3F1 mice (the same species/gender used by EPA to calculate the chloroprene IUR in the 2010 Review) in which the mice

---

239 *Id.* at 66.
240 Clewell, H.J. *et al.*, "Incorporation of in vitro metabolism data and physiologically based pharmacokinetic modeling in a risk assessment for chloroprene," *Inhalation Toxicology* 31(13-14): 468-483 (2019) ("Clewell *et al.* (2019)") (Ex. 73).
241 *Id.*
242 *Id.* at 478.
243 Lumpkin Decl., ¶ 70 (Ex. 63).
244 Campbell *et al.* (2023) (Ex. 69).
245 *Id.* at 7-11.
246 EPA PBPK Guidance at 3-18 (Ex. 64).
247 EPA PBPK Guidance at 3-21 (Ex. 64).
248 Lumpkin Decl., ¶ 33 (Ex. 63).

were exposed chloroprene via nose-only inhalation.[249] The Ramboll PBPK Model was able to accurately predict the data collected in the 2009 study, showing predictions generally within roughly a factor of two, which is consistent with guidance of the World Health Organization and the International Programme on Chemical Safety ("WHO/IPCS").[250]

Ramboll used an approach known as "quantitative *in vitro* to *in vivo* extrapolation" ("IVIE") in developing the Ramboll PBPK Model, which allows modelers to translate *in vitro* test results to *in vivo* outcomes for use in chemical-specific PBPK models.[251] Obtaining *in vivo* data of *humans* requires conducting controlled exposures of human subjects to chemicals.[252] Obtaining *in vivo* data of *animals* requires conducting controlled exposures of animals in a laboratory study.[253]

The notion of requiring human, and even animal, *in vivo* studies is increasingly scrutinized due to ethical concerns.[254] In 2021, EPA led the development of a document on behalf of the Organisation for Economic Co-operation and Development that provides guidance on the use of PBPK models for regulatory purposes ("OECD Guidance").[255] The OECD Guidance explains that there is a trend to reduce animal testing in chemical assessments and that PBPK models have become an important tool because of their ability to leverage *in vitro* to *in vivo* extrapolation.[256]

No human *in vivo* validation data is available for chloroprene, and it is effectively impossible to obtain such data, given the obvious inability to conduct an experiment exposing humans to a chemical that EPA has classified as a likely carcinogenic.[257] In the Section 303 Litigation, EPA has insisted upon the use of *in vivo* validation data, but that argument is an obvious pretext for arbitrarily disregarding the Ramboll PBPK Model. The fact is, until EPA elected to exploit the absence of human *in vivo* data for litigation purposes, EPA spent roughly four years examining the Ramboll PBPK Model (or a predecessor iteration of the model) and never once indicated that the model would be unsuitable for use in the risk assessment due to a lack of *in vivo* human data.

Moreover, even if human *in vivo* data for chloroprene were available, such data would not materially impact the evaluation of the Ramboll PBPK Model.[258] This is because the key parameters for estimating the relevant dose metric of chloroprene for use in risk assessment are the parameters for lung metabolism and human *in vivo* data would not meaningfully inform those parameters.[259] As such, even if there were a hypothetical set of human *in vivo* data available to DPE, those data would not provide meaningful information to inform or validate the metabolic parameters used in the Ramboll PBPK Model. Indeed, EPA has accepted a PBPK model in prior toxicological reviews under the IRIS program despite the fact that,

---

[249] Gentry Decl., ¶ 51 (describing International Institute of Synthetic Rubber Producers, *Chloroprene: blood concentration toxicokinetics in female mice by single and repeated inhalation exposure,* IISRP-12828-1388 (2009) (Ex. 62); Clewell *et al.* (2019), at 477-81 (describing same) (Ex. 73).
[250] Gentry Decl., ¶ 51 (Ex. 62); Clewell *et al.* (2019) at 477-81 (World Health Organization/International Programme on Chemical Safety, Characterization and application of physiologically based pharmacokinetic models in risk assessment (2010)) (Ex. 73).
[251] Gentry Decl., ¶ 51 (Ex. 66); Clewell *et al.* (2019) at 471 (Exhibit 73).
[252] Clewell *et al.* (2019) at 481 (Ex. 73).
[253] Lumpkin Decl., ¶ 33 (Ex. 63).
[254] Clewell *et al.* (2019) at 481 (Ex. 73).
[255] OECD, *Guidance document on the characterization, validation and reporting of Physiologically Based Kinetic (PBK) models for regulatory purposes* 5 (2021) (Ex. 74).
[256] *Id.* at 17.
[257] Clewell *et al.* (2019) at 481 (Ex. 73).
[258] Clewell *et al.* (2019) at 481 (Ex. 73).
[259] *Id.*

like the Ramboll PBPK Model, human *in vivo* data could not be used to validate or inform the key parameter of those models.

Unlike EPA's chloroprene IUR based on the 2010 Review, the Ramboll PBPK Model accounts for the substantial toxicokinetic differences between female B6C3F1 mice and humans and results in a substantial reduction in uncertainty of extrapolating cancer potency between these two dramatically different species.[260] The Ramboll PBPK Model reflects multiple years of review, dialogue, and revision between EPA and Ramboll scientists. By declining to use the Ramboll PBPK Model to calculate an IUR for chloroprene, EPA has failed to offer a risk value that best estimates human risk.

**3. Estimating risk in the lung and liver appropriately accounts for tumors observed in female B6C3F1 mice in the NTP Study.**

In IRIS toxicological reviews, EPA must determine whether to calculate an IUR based on the total number of *tumors* in animal studies or the total number of *tumor-bearing animals*.[261] The key determinant in this decision is whether the tumors observed in a study occurred in a statistically independent manner (*e.g.,* the occurrence of a tumor in the liver was *not* influenced by the occurrence of a tumor in the lung).[262] In the 2010 Review, EPA did not determine whether tumor types associated with chloroprene exposure were statistically independent.[263] In the absence of such a determination, EPA simply *assumed* that the tumor types were statistically independent.[264] At the same time, however, EPA conceded that its assumption "could not be verified and if not correct could lead to an overestimate of risk from summing across tumor sites."[265]

In February 2020, an article published in the peer-reviewed journal *Risk Analysis* demonstrated that EPA's independence assumption was incorrect by reporting the results of a correlation analysis.[266] These results demonstrated that tumor incidences in the female B6C3F1 mice in the NTP Toxicology and Carcinogenesis Studies of Chloroprene ("NTP Study") were not statistically independent of lung and liver tumors.[267] The results also showed that EPA's approach of treating tumors as independent was inappropriately overestimating total tumor potency. Indeed, in some cases, EPA ended up counting more tumors than there were animals in a given test group.[268]

Although tumors in B6C3F1 female mice were observed in tissues other than the lung and liver in the NTP Study, at least 85% of all tumors were observed in animals with tumors in the lung or liver.[269] Because the tumors are statistically dependent, calculating an IUR based on multiple tumors in the same animals inappropriately double count tumors and overestimates risk.[270] Unlike the chloroprene IUR derived in the 2010 Review, the IUR derived from the Ramboll PBPK Model considers each animal with tumor(s) only once, properly reflecting the tumors' statistical dependence.

[260] Lumpkin Decl., ¶ 73 (Ex. 63).
[261] 2010 Review at 133 (Ex. 60).
[262] *Id.*
[263] *Id.* at 136.
[264] *Id.*
[265] *Id.*
[266] Sax *et al.* (2020) (Ex. 52).
[267] *Id.*
[268] *Id.*
[269] Gentry Decl., ¶¶ 66-70 (Ex. 62).
[270] *Id.*

Any assessment of "imminent endangerment" should be based on an IUR derived from the Ramboll PBPK Model. The Ramboll PBPK Model provides the best estimate of chloroprene's cancer potency in humans because it accounts for toxicokinetic differences between humans and female B6C3F1 mice.

**ii. Applying corrective adjustments to EPA's chloroprene IUR results in risk estimates that are more representative of actual risk.**

Even if the Ramboll PBPK Model is not used to calculate an IUR for chloroprene, applying corrective adjustments to EPA's chloroprene IUR would better estimate actual *human* risk. By failing to make these adjustments, EPA has failed to offer a risk estimate that is appropriate to assess imminent endangerment to humans.

**1. Selecting animal tumor incidence data that is more representative of human risk.**

Even if the Ramboll PBPK Model were not used to calculate an IUR for chloroprene, using tumor incidence data from F344 rats would better estimate human risk than using data from female B6C3F1 mice. The material toxicokinetic differences between humans and female B6C3F1 mice demonstrate that the F344 rat is the "animal model that is most relevant to humans" and a better surrogate for human risk.[271] Because EPA's chloroprene UR fails to calculate a risk estimate based on available animal data that is more representative of human risk, EPA's IUR is not appropriate to assess whether an "imminent endangerment" exists for *humans*.

The first step in developing an IUR is to select the data from which the value will be based. In some cases, the data will be a human epidemiological study, if an epidemiological study is deemed suitable for use.[272] In other cases, the data utilized will be from an inhalation study using laboratory animals, if an epidemiological study is not deemed suitable for use.[273]

In the 2010 Review, EPA discussed the available toxicokinetic data for chloroprene in humans and animals.[274] A chemical's toxicokinetics are its behavior in how it is absorbed from the environment into the body's tissues (absorption), how it is distributed around various tissues of the body (distribution), how the body makes physical changes to the chemical (metabolism), and how the body removes the chemical from the body (elimination).[275] Toxicokinetic tests of cells, cell components, and tissues removed from the intact body are called *in vitro* tests, while tests conducted on intact and living animals or humans are called *in vivo* tests.[276] A third, and more recent, kind of toxicokinetic test examines toxicokinetic behaviors through computer simulation of a chemical in cells, tissues, and organ systems of the body, commonly called *in silico* tests (because the data are generated in the silicon chip space of a computer).[277]

EPA concluded that the existing epidemiological studies of chloroprene's potential impacts on humans contained limitations that "precluded developing quantitative risk estimates" from that human epidemiological data. Instead, EPA considered two animal studies for use in calculating the 2010 IUR: (1) the Trochimowicz *et al.* (1998) study, which reported tumor incidences in two types of hamsters following chloroprene inhalation exposures; and (2) a 1998 study by the National Toxicology Program ("NTP"), which reported tumor incidences in groups of male and female F344 rats and male and female B6C3F1

---

[271] Lumpkin Decl., ¶ 38 (Ex. 63); 2010 Review at 13-14 (Ex. 60).
[272] 2010 Review at 128 (Ex. 60).
[273] *Id.*
[274] Lumpkin Decl., ¶ 32 (Ex. 63).
[275] *Id.*
[276] *Id.*
[277] *Id.*

mice ("NTP Study") following chloroprene inhalation exposures.[278] The study involving hamsters found no dose-related increases in cancer development in the animals, Trochimowicz *et al.* (1998), but the NTP Study observed dose-related increases in cancer development in mice, and, to a lesser extent, in rats.[279] In the 2010 Review, EPA estimated the chloroprene IUR based solely on a 1998 NTP Study of female B6C3F1 mice.[280]

Specifically, the 2010 Review recites the conclusion of the NTP Study that there was evidence of carcinogenicity in F344/N rats and B6C3F1 mice due to lifetime inhalation exposure to chloroprene.[281] Purely as a matter of policy, EPA estimates *human* IURs based on the IUR for the most sensitive *animal* sex and species if (i) EPA does not identify a "clearly most relevant species" and (ii) no adequate human data are available.[282] EPA's guidance document states:

> Although it is preferable to use human studies as the basis for the dose-response derivation, adequate human data are not always available, often forcing reliance on laboratory animal data. Presented with data from several animal studies, *the risk assessor first seeks to identify the animal model that is most relevant to humans*, based on comparability of biological effects using the most defensible biological rationale; for instance, by using comparative metabolic, pharmacokinetic, and pharmacodynamic data. *In the absence of a clearly most relevant species, however, the most sensitive species is used as a matter of science policy at the EPA.*[283]

As the 2010 Review acknowledges, the chloroprene IUR derived from female B6C3F1 mice studies was *not* based on data that allows for any adjustments to reflect the substantial differences in risks applicable to female B6C3F1 mice versus humans:

> The calculated composite unit risk is based on the most sensitive endpoint (risk of any tumor type) in the most sensitive species and sex (female mouse). *There is no information on chloroprene to indicate that the observed rodent tumors are not relevant to humans*. Further, *no data exist to guide quantitative adjustment for differences in sensitivity among rodents and humans*.[284]

In the 2010 Review, EPA did not identify animal data that was most relevant to human response to chloroprene.[285] In the absence of such a determination, EPA used data from the most sensitive sex and

---

278 2010 Review at 128 (Ex. 60).
279 Lumpkin Decl., ¶ 27 (Ex. 63).
280 *Compare* DPE MSJ SOF, ¶ 46 (Ex. 33), *with* US Contested SOF, ¶ 46 (Ex. 34); US Responses to DPE First Set of RFAs, at 18 (Response to RFA No. 17), Case No. 2:23-cv-00735 (Ex. 75).
281 2010 Review at 102 (Ex. 60).
282 *Compare* DPE MSJ SOF, ¶ 50 (Ex. 33), *with* US Contested SOF, ¶ 50 (Ex. 34).
283 EPA, *Methods for Derivation of Inhalation Reference Concentrations and Application of Inhalation Dosimetry* at 1-5 (Oct. 1994) (emphases added) (Ex. 65). EPA's expert, Dr. Ila Cote, confirmed that, "in the absence of data to the contrary, the agency will use the most sensitive end point, which generally means the most sensitive [sex and] species." Deposition Transcript of Dr. Ila L. Cote ("Cote Dep. Tr.") 20:1-6, Case No. 2:23-cv-00735 (Ex. 76).
284 2010 Review at 141 (Ex. 60) (emphases added).
285 *Id.* at 139 ("It was assumed that humans are as sensitive as the most sensitive rodent sex/species tested; true correspondence is unknown."); Deposition Transcript of Kris Thayer, Ph.D. ("Thayer Dep. Tr.") 63:5-21; 154:11-14, Case No. 2:23-cv-00735 (Ex. 77).

species in the NTP Study to calculate the IUR for chloroprene, relying entirely on tumor incidence data for female B6C3F1 mice.[286]

In relying on tumor incidence data for the female B6C3F1 mice, EPA made the conservative assumption that humans are equally susceptible to cancer from inhaled chloroprene as female B6C3F1 mice, the most sensitive sex and species in the animal studies that EPA considered.[287] Thus, as an extension of that conservative assumption, the EPA's chloroprene IUR assumes that humans are *more sensitive* to chloroprene-induced cancer than male B6C3F1 mice, male and female rats, and male and female hamsters—*i.e.*, the other sexes and species considered by EPA in the chloroprene animal studies, which were all less susceptible to chloroprene-induced cancer than female B6C3F1 mice, the sex and species of animal that EPA chose to exclusively rely upon.[288]

Any "imminent endangerment" finding would need to assess whether there is an imminent endangerment *to humans*. Dr. Kristina Thayer, who leads the IRIS program, testified in the Section 303 Litigation that "EPA has...no idea of the true correspondence of the [B6C3F1] mouse to human response."[289] Further, EPA admits that, since the 2010 Review, it has performed no *new* analysis to determine that the 2010 IUR provides a risk estimate representative of human risk.[290] Instead, EPA has rested on its unsupported "default" assumption that bases the chloroprene IUR on the highest possible risk level, stating that EPA's "analysis relating to its use of the B6C3F1 mouse data in calculating the IUR in the 2010 IRIS Assessment, and the analysis EPA performed to determine that the B6C3F1 mouse data was the most representative information available to understand potential human responses to chloroprene *is contained in the 2010 IRIS Assessment*...."[291]

Toxicokinetic data related to chloroprene exposure in humans and animals demonstrates that humans and female B6C3F1 mice are not equally susceptible to chloroprene, as EPA assumed.[292] In the 2010 Review, EPA discussed the available toxicokinetic data for chloroprene in humans and animals.[293] However, EPA makes no reference to this critical information in support of its decision to assess chloroprene risk based on female B6C3F1 mouse data. Instead, EPA blindly relies on the analysis performed in the 2010 Review, ignoring the crucial fact that the 2010 Review failed to determine which set of animal data best reflected human risk.[294]

In Chapter 3 of the 2010 Review (entitled "Toxicokinetics"), EPA summarizes the then-available *in vitro* and *in vivo* studies that informed the toxicokinetic behaviors of chloroprene in animals and humans.[295] Section 3.3 of the 2010 Review discusses the then-available metabolism data for chloroprene based on

---

[286] Lumpkin Decl., ¶ 28 (Ex. 63); 2010 Review at 147-48 (Ex. 60). "The chloroprene IUR is based on the assumption that humans are as sensitive to chloroprene exposure as the female B6C3F1 mouse." *Compare* DPE MSJ SOF, ¶ 47 (Ex. 33), *with* US Contested SOF, ¶ 47 (Ex. 34).

[287] US Responses to DPE First Set of RFAs, at 18 (Response to DPE's RFA No. 17) ("The United States further admits that the inhalation unit risk for chloroprene determined in the 2010 IRIS assessment is based on the assumption that humans are as sensitive to chloroprene exposure as the female B6C3F1 mouse.") (Ex. 75); Lumpkin Decl., ¶ 31 (Ex. 63).

[288] Lumpkin Decl., ¶ 31 (Ex. 63).

[289] Thayer Dep. Tr. 63:5-21; 154:11-14, Case No. 2:23-cv-00735 (Ex. 77); *see also* 2010 Review at 139 (true correspondence of B6C3F1 mouse to human is "unknown") (Ex. 60).

[290] EPA Responses to DPE Second Set of Interrogatories, at 20 (Response to Interrogatory No. 18) (Ex. 27).

[291] *Id.*

[292] Lumpkin Decl., ¶ 38 (Ex. 63).

[293] *Id.* ¶ 32.

[294] EPA Responses to DPE Second Set of Interrogatories, at 20 (Response to Interrogatory No. 18) (Ex. 27).

[295] Lumpkin Decl., ¶ 113 (Ex. 63).

laboratory rodents and humans, including data on the rate at which chloroprene is metabolized *in vitro* by specific liver and lung cellular components (called microsomes) to a class of one or more compounds called "reactive epoxides."[296] These "reactive epoxides" are believed to react with the cellular structures in the tissues in which they are produced (*e.g.*, the lung or liver), resulting in the loss of proper function and, ultimately, leading to formation and growth of tumors (*i.e.*, the source of toxicity).[297]

The toxicokinetic data presented in the 2010 Review demonstrates significant metabolic differences between female B6C3F1 mice and humans. For example, the data demonstrate that humans and female B6C3F1 mice do *not* metabolize chloroprene the same.[298] Table 3-4 of the 2010 Review, and EPA's accompanying discussion, summarizes the differences between female B6C3F1 mice and humans in metabolizing chloroprene into reactive epoxides, showing, based on *in vitro* studies, that the rate of this metabolism in a female B6C3F1 mouse's liver is more than twice that of human liver microsomes and about 50-times higher in lung microsomes.[299] Because a mouse's metabolic rate of chloroprene is much higher than a human's, a mouse is capable of producing significantly higher amounts of "reactive epoxides," the compounds understood to be responsible for chloroprene's toxicity. The 2010 Review also states that higher metabolism of chloroprene to reactive epoxides was observed in female B6C3F1 mice compared to other tested laboratory rats and hamsters, providing the most likely explanation of the higher tumor incidence reported in B6C3F1 mice relative to the other tested rodents.[300]

In Table 3-5 of the 2010 Review and the accompanying discussion, EPA summarizes study data indicating that enzyme systems that metabolize, and potentially detoxify, one of the key reactive epoxides are much more active in human microsomes than in female B6C3F1 mice.[301] Because a mouse's metabolic rate for the pathway that metabolizes the key reactive epoxide is lower than in a human's, a human is capable of detoxifying (*i.e.,* clearing) higher amounts of this key reactive epoxide from the body.[302]

EPA's risk assessment accepts, at face value, the chloroprene IUR's use of female B6C3F1 mice to estimate risk, despite ample toxicokinetic data that data from female B6C3F1 mice is not the most representative of human risk. The Final Rule provides no evidence that EPA has considered this data, instead capriciously rejecting DPE's scientific position because EPA determined that DPE failed to provide "new scientific information that would alter aspects of the EPA IRIS assessment or call into question the scientific judgments reflected in those assessment."[303]

Likewise, EPA's expert in the Section 303 Litigation, Dr. Ila Cote, testified that she did not consider the pharmacokinetic data in Tables 3-4 and 3-5 of the 2010 Review in formulating her opinions, explaining she was not familiar with those critical data.[304]

In the 2010 Review, EPA's use of the female B6C3F1 mouse to calculate the chloroprene IUR was based on the NTP Study. But the same NTP Study that included data for female B6C3F1 mice *also included* tumor incidence data for the F344 female rat (the more sensitive sex of F344 rat), which would have resulted in an IUR of $6.9 \times 10^{-5}$, after adjusting for age-dependent adjustment factors ("ADAFs").[305] Indeed, the F344

---

[296] 2010 Review at 7-19 (Ex. 60); Lumpkin Decl., ¶ 37 (Ex. 63).
[297] Lumpkin Decl., ¶ 38 (Ex. 63).
[298] *Id.*
[299] 2010 Review at 13-44 (Ex. 60); Lumpkin Decl., ¶ 38 (Ex. 63).
[300] 2010 Review at 13-14 (Ex. 60).
[301] *Id.*
[302] Lumpkin Decl., ¶ 116 (Ex. 63).
[303] Final Rule at 42964 (Ex. 1).
[304] Cote Dep. Tr. 186:2-186:18 (Ex. 76).
[305] Gentry Decl., ¶ 46 (Ex. 62).

rat has a rate of metabolism for chloroprene, and metabolic rate for the pathway that metabolizes the key reactive epoxide, that is more similar to humans than the female BC3F1 mouse.[306] EPA's use of female B6C3F1 mice data, despite the availability of animal data more representative of humans, is inappropriate for use in assessing whether an "imminent endangerment" exists for *humans*.

**2. Adjusting for continuous exposure.**

EPA's chloroprene IUR and corresponding 0.2 µg/m$^3$ concentration level assumes that individuals are continuously exposed to chloroprene 24 hours per day, every day, for 70 years.[307] In the Final Rule, EPA provides no suggestion that an assumption of continuous exposure is plausible. Likewise, in the Section 303 Litigation, EPA's expert offered no evidence that the assumption of continuous exposure is plausible, and he failed to follow EPA's applicable guidance. EPA typically relies on an assumption of continuous exposure when considering a maximum plausible risk and implementing the Benzene Rule framework. However, an "imminent endangerment" finding is based on actual risk and requires EPA to substantiate such that an assumption is plausible.[308]

In the residual risk review for coke ovens, EPA explained that the MIR must be "tempered" by the implausible considerations, such as the assumption of continuous exposure for 70 years for every individual near the Facility:

> For the source category associated with the 1993 national emission standards, the revised MIR estimate is 300 in a million.... Although we are adjusting risk estimates upward to reflect the new supplemental guidance, these estimated risk increases must also be tempered by consideration of other factors that were discussed at proposal and in the risk assessment document, and the further protective assumption added to the risk assessment that all individuals are born in the assessed area.... Our 70-year exposure assumption includes exposures from birth to 70 years. If exposures were from 3 years to 73 years, the adjustment factor would be less than 1.6. If exposures were from 16 years to 86 years, no adjustment would be necessary. In addition, we used a health-protective assumption of a 70-year exposure duration in our risk estimates; however, using the national average residency time of 12 years would reduce the estimate of risk by a factor of six (69 FR 48347).[309]

Notably, EPA failed to include any similar discussion in the Final Rule, despite adopting the same assumption. By failing to account for the implausibility of the 70-year assumption, the Final Rule suggests that an MIR is an appropriate proxy for actual risk. It is not. Without accounting for the 70-year assumption through the use of an exposure assessment, a MIR is rendered useless for assessing "imminent endangerment."

EPA's *Guidelines for Human Exposure Assessment* provide guidance on how exposure assessments should be performed and how the risk assessor can better understand the characteristics of a population and its behaviors.[310] The EPA guidance explains that exposure estimates for an individual or population can be developed "[b]y combining information and data describing exposure scenarios, concentrations, activity patterns and other exposure factors."[311] The guidelines also emphasize the importance of data, noting

---

[306] 2010 Review at 13-14 (Ex. 60).
[307] 2010 Review at 138 (Ex. 60); Lumpkin Decl., ¶ 90 (Ex. 63).
[308] Lumpkin Decl., ¶ 61 (Ex. 63).
[309] 70 Fed. Reg. at 19994 (Ex. 44).
[310] EPA, *Guidelines for Human Exposure Assessment* xiv (Oct. 2019) (Ex. 78).
[311] *Id.* at 17.

that "[t]he drivers for human activities are complex and, unlike [chemicals], cannot be predicted using first-principle models based on physical/chemical properties. Instead, human activities are treated as stochastic properties (random variables) described by population distributions based on available (*e.g.,* observational or modeled) data."[312]

The preliminary assumption in risk assessment that a person is constantly exposed for a lifetime is a hypothetical construct and only useful for an initial screening-level risk assessment.[313] Moving beyond a mere screening-level risk assessment, however, adjustments for reasonably plausible mobility and residential occupancy durations are needed to sufficiently assess exposure and associated risks on which to justify regulatory action like declaring an imminent and substantial endangerment.[314] While it is true that IURs in the IRIS Program are not developed to account for residential mobility and occupancy (IRIS IURs are chemical-specific, but facility-neutral and, accordingly, assume 70-year continuous exposure), EPA guidance is clear that exposure assessments *do* account for residential mobility and occupancy.[315]

EPA has not performed any such exposure analysis in the Final Rule. Likewise, in the Section 303 Litigation, EPA failed to make any such adjustments for residential mobility and occupancy duration.[316] For example, EPA has developed an *Exposure Factors Handbook*.[317] This guidance document is specifically designed to reduce uncertainties in estimates of exposure duration and frequency to environmental chemicals.[318] For example, EPA's *Exposure Factors Handbook* provides residential occupancy data, *i.e.,* the "time (years) between a person moving into a residence and the time the person moves out or dies."[319] The *Exposure Factors Handbook* states that the average (mean) residential occupancy period is 12 years and the 95th percentile is 33 years, meaning that, across a population, the true residential occupancy period is expected to be less than 33 years 95% of the time.[320] Notably, the average residential occupancy period of 12 years is the same period of time referenced by EPA in the residual risk review for coke ovens.

For example, in the Section 303 Litigation, DPE's expert, Dr. Lumpkin, prepared such estimates based on plausible residential duration and occupancy (without making other appropriate adjustments described above). Dr. Lumpkin's estimates resulted in an IUR of $2.4 \times 10^{-4}$ per $\mu g/m^3$, or twice the IUR developed by EPA in the 2010 Review. Dr. Lumpkin's exposure-adjusted IUR, or any similar adjustments to the IUR, would provide a more representative estimate of actual risk.

Values from EPA's *Exposure Factors Handbook* demonstrate that assuming a person is born near the Facility and remains constantly immobile there for 70 years is not plausible.[321] Even less plausible is the notion that *every* person living near the Facility would remain at a single location for 70 continuous years. Failing to adjust the default 70-year exposure assumption to account for reasonably plausible mobility

---

312 *Id.* at 6-7.
313 *Id.*
314 *Id.*
315 *Id.*
316 Rebuttal Declaration of Dr. John J. Vandenberg in Support of United States' Reply to its Motion for Preliminary Injunction ("Vandenberg Rebuttal PI Decl."), ¶ 70, Attachment 11A ("Updated graph of estimated excess lifetime cancer risk associated with *continuous chloroprene exposure* at Denka TO-15 monitoring locations" (emphasis added)), Case No. 2:23-cv-00735 (Ex. 79).
317 Lumpkin Decl., ¶ 92 (Ex. 63); EPA, *Exposure Factors Handbook: 2011 Edition* at 6-1 (2011) (Ex. 80).
318 EPA, *Exposure Factors Handbook: 2011 Edition* at 6-1 (2011) (Ex. 80).
319 *Id.* at Table ES-1; Lumpkin Decl., ¶ 96 (Ex. 63).
320 EPA, *Exposure Factors Handbook: 2011 Edition* at Table 16-4 (2011) (Ex. 80).
321 Lumpkin Decl., ¶ 119 (Ex. 63).

and residential occupancy durations renders an exposure assessment preliminary, incomplete, and inappropriate for use to assess whether an imminent and substantial endangerment exists.[322]

**3. Adjusting for upper-bound estimate.**

In the 2010 Review, EPA used the "upper bound" risk value when estimating the chloroprene IUR based exclusively on tumor incidence data from female B6C3F1 mice.[323] The "upper bound" value, or the "upper confidence limit," is a value expected to contain the true value 95% of the time over many different samples.[324] In *estimating* risk in Section 112 rulemakings, EPA often uses an upper bound estimate. However, in assessing whether an *imminent endangerment* exists, it is inappropriate to use a value that, by definition, does *not* reflect the most probable risk estimate.[325] An "upper bound" value of the IUR—which results in a concentration of 0.2 μg/m$^3$ associated with a 1-in-10,000 excess risk—is just as likely as the "lower bound" value, which results in a concentration of 0.4 μg/m$^3$ associated with a 1-in-10,000 excess risk, and is less likely than every value in between.[326] In addition, when the IUR contains other flawed data (*i.e.*, the use of female B6C3F1 mice data), using the upper bound value amplifies the risk distortions caused by those data.

When EPA uses an "upper bound" estimate for IURs, it means EPA has confidence that the excess cancer risk will not be *greater* than that estimate.[327] However, the true excess cancer risk is statistically likely to be below that estimate and could be as low as zero.[328] In the Section 303 Litigation, EPA incorrectly alleges that "a person may breathe no more than an average chloroprene concentration of 0.2 μg/m$^3$ over 70 years in order to remain below a 1-in-10,000 lifetime excess cancer risk."[329] Even if every other aspect of EPA's risk allegations were assumed to be correct, which is a false assumption, only a fractional subset of people would face a 1-in-10,000 excess risk of cancer at 0.2 μg/m$^3$, and it is more probable that *no* people would face such risk. Accordingly, EPA's use of the upper bound IUR does not provide a meaningful estimate of excess cancer risk actually posed by chloroprene. Nor does EPA (i) define what characteristics people within the upper bound exhibit or (ii) identify a single person who exhibits such characteristics. Even if using an upper bound value is appropriate within the framework of the Benzene Rule, it is inappropriate when assessing actual risk such as in an "imminent endangerment" finding. Adjusting the IUR to reflect the central tendency ($2.2 \times 10^{-4}$) would provide a more representative estimate of actual risk.

**4. Adjusting for arbitrary rounding.**

In the 2010 Review, EPA calculated an IUR of $5 \times 10^{-4}$ (the equivalent of 0.20 μg/m$^3$), in part, by rounding the composite IUR (the risk for all tumor types) for female B6C3F1 mice upwards, from $2.7 \times 10^{-4}$ (the

---

[322] *Id.* ¶¶ 90-102.

[323] *Id.* ¶ 60; 2010 Review at 136 (Ex. 60).

[324] 2010 Review at 136 (stating that the 95% upper confidence limit was calculated assuming a normal distribution and using the formula 95% UCL = MLE + 1.645 × SD) (Ex. 60).

[325] Lumpkin Decl., ¶ 59 (Ex. 63).

[326] *Id.* ¶¶ 30, 60-62.

[327] *See* EPA, *Air Toxics Risk Assessment Ref. Library, Vol. 2* at 32-33 (Apr. 2004) (Ex. 81).

[328] EPA, *Guidelines for Carcinogen Risk Assessment* at 13 (Sept. 1986) (approach used in developing IUR "does not necessarily give a realistic prediction of the risk. The *true value of the risk* is *unknown*, and may be as low as zero.") (emphasis added) (Ex. 82); *see also* Cote Dep. Tr. 31:8-10 ("The true value for human risk [of chloroprene] is really not known. So this is an estimate based on rodent data....") (Ex. 76).

[329] EPA Memorandum in Support of Motion for Preliminary Injunction, *U.S. v. Denka Performance Elastomer LLC et al.*, Case No. 2:23-cv-00735, ECF No. 9-2, at 2 (E.D. La. Mar. 20, 2023) (Ex. 83).

equivalent of 0.37 μg/m$^3$) to 3 x $10^{-4}$ (the equivalent of 0.33 μg/m$^3$).[330] EPA then applied the ADAFs to the rounded value to calculate a final IUR of 5 x $10^{-4}$ corresponding to 0.20 μg/m$^3$.[331] If EPA had not rounded the composite risk value before applying the ADAFs, the final IUR would be 4.47 x $10^{-4}$ (the equivalent of 0.22 μg/m$^3$), a decrease in the risk estimate of ten percent.

EPA had no biological-based or risk-based reason for rounding the composite risk value from 2.7 x $10^{-4}$ to 3 x $10^{-4}$.[332] Nor has EPA even attempted to offer such a reason, instead admitting that the IUR was rounded as purely a matter of "convention in mathematics."[333] Critically, however, this "convention," by itself, translates into a 10 percent decrease the chloroprene IUR, which is substantial. Likewise, rounding can distort the MIR values assigned to a facility, particularly given that the MIRs themselves are rounded. EPA's decision to round the values in the chloroprene IUR overstates the risk of cancer actually posed by chloroprene and it is inappropriate to adopt this arbitrary (and deliberate) error in assessing imminent endangerment. Simply by calculating the IUR without rounding, the 2010 IUR would be more representative of actual risk.

### 5. Adjusting for unsupported mutagenic mode of action classification.

EPA incorrectly determined that the weight of evidence supported classifying chloroprene as acting via a "mutagenetic mode of action."[334] Based on this classification, EPA applied age-dependent adjustment factors ("ADAFs") to the IUR, increasing the IUR by 66 percent from 3 x $10^{-4}$ (the equivalent of 0.33 μg/m$^3$) to 5 x $10^{-4}$ (the equivalent of 0.20 μg/m$^3$).

Contrary to EPA's determination, the scientific evidence demonstrates that a mutagenic mode of action for chloroprene is unlikely.[335] The question of whether chloroprene is a mutagen has been evaluated in *in vitro* mammalian cell studies, *in vitro* bacteria studies, and *in vivo* studies, and the overall evidence indicates that chloroprene does not have a mutagenic mode of action.[336] Most significantly, *in vivo* studies of mice did not report changes in mutations that would support a mutagenic mode of action.[337]

Critically, considering the evidence on whether chloroprene acts via a mutagenic mode of action, the NTP Study (the same study EPA relies on for the data on female B6C3F1 mice) concluded that "[c]hloroprene showed *no evidence of mutagenicity* in tests performed in vitro or in vivo."[338]

The Ramboll PBPK Model simulation of the NTP rodent dose-response data indicates that the carcinogenic mode of action may likely be due to cytotoxicity (frank cell damage) rather than direct mutagenicity, and that the prevalence of reactive metabolites is likely to occur only after glutathione (a molecule that can attach to and neutralize the reactivity of chloroprene's reactive metabolites) is depleted at chloroprene

---

330 2010 Review at 137 (Ex. 60); Lumpkin Decl., ¶ 30 (Ex. 63).
331 2010 Review at 137-38 (Ex. 60).
332 Cote Dep. Tr. 93-94 (explaining that rounding the composite risk value is "simply a convention in mathematics") (Ex. 76).
333 *Id.*
334 2010 Review at 106-11 (Ex. 60). EPA defines the carcinogenic "mode of action" of a chemical as "a sequence of key events and processes, starting with interaction of an agency with a cell, proceeding through operational and anatomical changes, and resulting in cancer formation." Lumpkin Decl., ¶ 53 (citing EPA, *Guidelines for Cancer Risk Assessment* (Mar. 2005) at 1-10, n.2 (Ex. 61)) (Ex. 63). Although multiple modes of action have been identified for chemical carcinogens, per EPA guidelines, the distinction between a mutagenic or non-mutagenic mode of action has significant implications for deriving an IUR. Lumpkin Decl., ¶ 53 (Ex. 63).
335 Lumpkin Decl., ¶ 30 (Opinion 3) (Ex. 63).
336 *Id.* ¶ 78-86; Sax *et al.* (2020), at 300-303 (Ex. 52).
337 Lumpkin Decl., ¶ 83 (Ex. 63).
338 *Id.* (citing 1998 NTP Study at 276) (emphasis added).

exposure levels used in the NTP (1998) studies, but far higher than levels measured in the environment.[339] By accounting for chloroprene's cytotoxic mode of action, and calculating the IUR without applying the ADAFs, the chloroprene IUR would be more representative of actual risk.

## V. Conclusion

As set forth herein, a two-year compliance period is "necessary for the installation of controls" and the steps that DPE has already taken to reduce emissions will ensure that emissions from the Facility will not cause an "imminent endangerment" during the extension period.

---

[339] *Id.* ¶ 71.

# TABLE OF EXHIBITS

| | |
|---|---|
| Exhibit 1 | EPA, *New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry*, 89 Fed. Reg. 42932 (May 16, 2024) ("Final Rule") |
| Exhibit 2 | Letter from Amanda Vincent, LDEQ, to Jeffrey R. Holmstead, DPE, re *Extension of Compliance* (June 27, 2024) |
| Exhibit 3 | EPA, *New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry*, 88 Fed. Reg. 25080 (April 25, 2023) ("Proposed Rule") |
| Exhibit 4 | Denka Performance Elastomer, LLC Comments re: Proposed Rule, Comment ID No. EPA-HQ-OAR-2022-0730-0176 (July 7, 2023) |
| Exhibit 5 | Remedy Declaration of Dr. Loren C. Scott, Case No. 2:23-cv-00735 |
| Exhibit 6 | ERG, *Analysis of Control Options for Wastewater Streams to Reduce Residual Risk of Chloroprene From Neoprene Production Processes Subject to P&R I* (July 6, 2023) |
| Exhibit 7 | ERG, *Analysis of Control Options for Process Vents and Storage Vessels to Reduce Residual Risk of Chloroprene Emissions at P&R I Affected Sources Producing Neoprene* (Mar. 2023) |
| Exhibit 8 | Remedy Declaration of Paul S. Casarez, Case No. 2:23-cv-00735 |
| Exhibit 9 | Norton Engineering Consultants Inc., *Thermal Oxidizer Technology Review* (June 30, 2023) |
| Exhibit 10 | Presentation to EPA (Oct. 18, 2023) |
| Exhibit 11 | Extension Request Declaration of Chris Meyers (signed July 25, 2024 in support of EPA Request) |
| Exhibit 12 | EPA, *National Emission Standards for Hazardous Air Pollutants: Ethylene Oxide Emissions Standards for Sterilization Facilities Residual Risk and Technology Review*, 89 Fed. Reg. 24090 (Apr. 5, 2024) |
| Exhibit 13 | Rebuttal Declaration of Junius "J.R." Roussell, Case No. 2:23-cv-00735 |
| Exhibit 14 | ERG, *Dioxins and Furans MACT Floor in the SOCMI Source Category for Processes Subject to HON and Processes Subject to Group I and Group II Polymers and Resins NESHAPs* (Mar. 2023) |
| Exhibit 15 | Montrose, *Dioxins and Furans Proposed Rules* (July 6, 2023) |
| Exhibit 16 | ECT2 and Montrose, *ERG Chloroprene Reduction Memo Analysis* (July 6, 2023) |
| Exhibit 17 | Office of Management and Budget Review of Proposed Rule |
| Exhibit 18 | Deposition Transcript of Jeffrey R. Harrington (July 28, 2023), Case No. 2:23-cv-00735 |
| Exhibit 19 | Declaration of Jeffrey R. Harrington In Support of Motion for Preliminary Injunction filed in Case No. 2:23-cv-00735 (E.D. La.), Case No. 2:23-cv-00735 |
| Exhibit 20 | Remedy Declaration of Jim Moore, P.E., Case No. 2:23-cv-00735 |
| Exhibit 21 | Remedy Declaration of Jorge Lavastida, Case No. 2:23-cv-00735 |
| Exhibit 22 | Remedy Declaration of Michelle Helfrich, Case No. 2:23-cv-00735 |
| Exhibit 23 | Loren C. Scott & Associates, Inc., *The Economic Impact of Denka Elastic Polymers on St. John the Baptist Parish & the State of Louisiana* (Dec. 2023) |
| Exhibit 24 | DPE Responses to US First Set of Interrogatories, Case No. 2:23-cv-00735 |

| | |
|---|---|
| Exhibit 25 | Declaration of Mr. David R. Blye, Case No. 2:23-cv-00735 |
| Exhibit 26 | EPA Responses to DPE First Set of Interrogatories, Case No. 2:23-cv-00735 |
| Exhibit 27 | EPA Responses to DPE Second Set of Interrogatories, Case No. 2:23-cv-00735 |
| Exhibit 28 | EPA, *National Perchloroethylene Air Emission Standards for Dry Cleaning Facilities*, 71 Fed. Reg. 42724 (July 27, 2006) |
| Exhibit 29 | EPA, *Residual Risk Assessment for the Commercial Sterilization Facilities Source Category in Support of the 2024 Risk and Technology Review Final Rule* (Jan. 2024) |
| Exhibit 30 | *U.S. v. Denka Performance Elastomer LLC*, No. 2:23-cv-00735, ECF No. 1 (E.D. La. Feb. 28, 2023) |
| Exhibit 31 | Supplement to September 6, 2023 Rebuttal Declaration and December 8, 2023 Declaration of Dr. John J. Vandenberg in Support of United States' Statement of Final Relief, Case No. 2:23-cv-00735 |
| Exhibit 32 | Report on the Committee on Environment and Public Works United States Senate Report Accompanying S. 1894 (S. Rept. 100-231) (Nov. 20, 1987) |
| Exhibit 33 | DPE Statement of Material Facts in Support of Motion for Summary Judgment, No. 2:23-cv-00735 (E.D. La. Dec. 29, 2023) ECF No. 131-3 |
| Exhibit 34 | US Statement of Material Facts in Opposition of Motion for Summary Judgment, No. 2:23-cv-00735 (E.D. La. Jan. 26, 2024) ECF No. 150-1 |
| Exhibit 35 | EPA, *National Emission Standards for Hazardous Air Pollutants; Stationary Combustion Turbines Residual Risk and Technology Review*, 54 Fed. Reg. 38044 (Sept. 14, 1989) |
| Exhibit 36 | EPA Response to DPE Interrogatory No. 6, Case No. 2:23-cv-00735 |
| Exhibit 37 | EPA, *National Emission Standards for Hazardous Air Pollutants; Benzene Emissions from Maleic Anhydride Plants, Ethylbenzene/Styrene Plants, Benzene Storage Vessels, Benzene Equipment Leaks, and Coke By-Product Recovery Plants*, 53 Fed. Reg. 28496 (July 28, 1988) |
| Exhibit 38 | Declaration of Dr. John J. Vandenberg in Support of Motion for Preliminary Injunction, Case No. 2:23-cv-00735 |
| Exhibit 39 | EPA, *National Emission Standards for Hazardous Air Pollutants; Addition of Coke Oven Emissions to List of Hazardous Air Pollutants*, 49 Fed. Reg. 36560 (Sept. 19, 1984) |
| Exhibit 40 | EPA, *Carcinogen Assessment of Coke Oven Emissions* (Feb. 1984) |
| Exhibit 41 | EPA, *National Emission Standards for Hazardous Air Pollutants; Coke Oven Emissions from Wet-Coal Charged By-Product Coke Oven Batteries*, 52 Fed. Reg. 13586 (Apr. 23, 1987) |
| Exhibit 42 | *House Debate on the Clean Air Act Amendments of 1990 Conference Report*, H. Res. 535 (Oct. 26, 1990) |
| Exhibit 43 | EPA, *National Emission Standards for Hazardous Air Pollutants for Source Categories and for Coke Oven Batteries*, 58 Fed. Reg. 57898 (Oct. 27, 1993) |
| Exhibit 44 | EPA, *National Emission Standards for Coke Oven Batteries*, 70 Fed. Reg. 19992 (Apr. 15, 2005) |
| Exhibit 45 | EPA, *National Air Emission Standards for Hazardous Air Pollutants: Halogenated Solvent Cleaning*, 72 Fed. Reg. 25138 (May 3, 2007) |
| Exhibit 46 | EPA, *Residual Risk Assessment for the Synthetic Organic Chemical Manufacturing Industry (SOCMI) Source Category in Support of the 2024 Risk and Technology Review Final Rule* (March 2024), EPA Docket No. EPA-HQ-OAR-2022-0730-2807 |

| | |
|---|---|
| Exhibit 47 | EPA, *National Emission Standards for Hazardous Air Pollutants: Miscellaneous Organic Chemical Manufacturing Residual Risk and Technology Review*, 85 Fed. Reg. 49084 (Aug. 12, 2020) |
| Exhibit 48 | EPA, *Residual Risk Assessment for the Miscellaneous Organic Chemical Manufacturing Source Category in Support of the 2020 Risk and Technology Review Final Rule* (April 2020), EPA Docket No. EPA-HQ-OAR-2018-0746-0189 |
| Exhibit 49 | Select EPA, *2019 AirToxScreen: Assessment Results* (last updated July 26, 2024) |
| Exhibit 50 | Deposition Transcript of Dr. Helen Suh, Case No. 2:23-cv-00735 |
| Exhibit 51 | Declaration of Kenneth A. Mundt, PhD, FACE, Case No. 2:23-cv-00735 |
| Exhibit 52 | Sax, Sonja N. *et al.*, "Extended Analysis and Evidence Integration of Chloroprene as a Human Carcinogen," *Risk Analysis* 40(2): 294-318 (2020) |
| Exhibit 53 | Mundt, K.A. *et al.*, "Quantitative estimated exposure to vinyl chloride and risk of angiosarcoma of the liver and hepatocellular cancer in the US industry-wide vinyl chloride cohort: mortality update through 2013," *Occupational and Environmental Medicine*, 74(10): 709-16 (2017) |
| Exhibit 54 | Marsh, G. M., Kruchten, A., & Buchanich, J. M., "Mortality Patterns Among Industrial Workers Exposed to Chloroprene and Other Substances: Extended Follow-Up," *J. Occup. Environ. Med.*: 63(2), 126-138 (2021) |
| Exhibit 55 | LDH Cancer Surveillance Study in St. John Parish (CRISP) Report (Jan. 2022) |
| Exhibit 56 | EPA Cooperative Agreement 01F70601 to LDEQ (Sept. 19, 2020) |
| Exhibit 57 | EPA_1932780 |
| Exhibit 58 | Cancer Reporting in St. John Parish, Cancer Surveillance Project, EPA_2235649 |
| Exhibit 59 | EPA_2548391 (email correspondence) |
| Exhibit 60 | EPA, *Toxicological Review of Chloroprene: In Support of Summary Information on the Integrated Risk Information System (IRIS)* (Sept. 2010) |
| Exhibit 61 | EPA, *Guidelines for Carcinogen Risk Assessment* (Mar. 2005) |
| Exhibit 62 | Declaration of Dr. Robinan Gentry in Support of Opposition to Motion for Preliminary Injunction, Case No. 2:23-cv-00735 |
| Exhibit 63 | Declaration of Dr. Michael Lumpkin in Support of Opposition to Motion for Preliminary Injunction, Case No. 2:23-cv-00735 |
| Exhibit 64 | EPA, *Approaches for the Application of Physiologically Based Pharmacokinetic Models and Supporting Data in Risk Assessment* (Aug. 2006) |
| Exhibit 65 | EPA, *Methods for Derivation of Inhalation Reference Concentrations and Application of Inhalation Dosimetry* (Oct. 1994) |
| Exhibit 66 | EPA, *Toxicological Review of Dichloromethane (Methylene Chloride)* (Nov. 2011) |
| Exhibit 67 | EPA, *Toxicological Review of Vinyl Chloride* (May 2000) |
| Exhibit 68 | EPA, *Background Description for Chloroprene PBPK Modeling* (July 2020) |
| Exhibit 69 | Campbell, J.L. et al., "Using available in vitro metabolite identification and time course kinetics for β-chloroprene and its metabolite, (1-chloroethenyl) oxirane, to include reactive oxidative metabolites and glutathione depletion in a PBPK model for β-chloroprene," *Frontiers in Pharmacology* 14:1223808 (2023) |
| Exhibit 70 | DPE, Request for Correction #21005 (July 15, 2021) |
| Exhibit 71 | 3/14/2022 Letter from M. Gwinn to P. Walsh |
| Exhibit 72 | 10/19/2022 Letter from Mr. Vaughn Noga to Mr. Robert Holden, *et al.* |
| Exhibit 73 | Clewell, H.J. *et al.*, "Incorporation of in vitro metabolism data and physiologically based pharmacokinetic modeling in a risk assessment for chloroprene," *Inhalation Toxicology* 31(13-14): 468-483 (2019) |

| | |
|---|---|
| Exhibit 74 | OECD, *Guidance document on the characterization, validation and reporting of Physiologically Based Kinetic (PBK) models for regulatory purposes* (2021) |
| Exhibit 75 | US Responses to DPE First Set of RFAs, Case No. 2:23-cv-00735 |
| Exhibit 76 | Deposition Transcript of Dr. Ila L. Cote, Case No. 2:23-cv-00735 |
| Exhibit 77 | Deposition Transcript of Kris Thayer, Ph.D., Case No. 2:23-cv-00735 |
| Exhibit 78 | EPA, *Guidelines for Human Exposure Assessment* (Oct. 2019) |
| Exhibit 79 | Rebuttal Declaration of Dr. John J. Vandenberg in Support of United States' Reply to its Motion for Preliminary Injunction, Case No. 2:23-cv-00735 |
| Exhibit 80 | EPA, *Exposure Factors Handbook: 2011 Edition* (2011) |
| Exhibit 81 | EPA, *Air Toxics Risk Assessment Ref. Library, Vol. 2* (Apr. 2004) |
| Exhibit 82 | EPA, *Guidelines for Carcinogen Risk Assessment* (Sept. 1986) |
| Exhibit 83 | EPA Memorandum in Support of Motion for Preliminary Injunction, *U.S. v. Denka Performance Elastomer LLC et al.*, Case No. 2:23-cv-00735, ECF No. 9-2 (E.D. La. Mar. 20, 2023) |

# EXHIBIT X



ASSISTANT ADMINISTRATOR FOR AIR AND RADIATION
WASHINGTON, D.C. 20460

April 30, 2024

Mr. David A. Super
Bracewell
2001 M Street NW, Suite 900
Washington, D.C. 20036-3310

Dear Mr. Super:

The U.S. Environmental Protection Agency (EPA) has reviewed the April 17, 2024, petition you submitted on behalf of Denka Performance Elastomer, LLC (Denka). This petition asks the EPA to stay the final rule entitled, *New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emissions Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry*, signed on March 28, 2024 ("Final Rule"), pending judicial review. The petition asserts (at page 3) that, "[a]bsent a stay, [Denka] will have no ability to comply with the Final Rule and will be forced to shutdown (indefinitely, and likely permanently) [Denka's] Facility, resulting in irreparable harm," because Denka "cannot safely plan, develop, test, and install the emission controls necessary to comply with the Final Rule in 90 days."

The Final Rule addresses chemical plants' emissions of multiple toxic air pollutants, including chloroprene. Specifically, when fully implemented, the rule will cut more than 6,200 tons of hazardous air pollution per year, reduce volatile organic compound emissions by 23,000 tons per year, and require fenceline monitoring for key pollutants, thereby significantly reducing the number of people in communities surrounding more than 200 covered facilities who face unacceptably high lifetime cancer risks due to toxic pollution exposure.

After careful consideration, the EPA is denying Denka's petition without prejudice. As the preamble to the Final Rule explains, an affected source that produces neoprene "may seek the EPA's approval of a waiver from the 90-day compliance deadline and obtain a compliance date of up to **[INSERT DATE 790 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER]**." Because Denka has not yet requested an extension of its compliance deadline pursuant to 40 C.F.R. 63.6(i)(4)(ii), the petition does not demonstrate that Denka will suffer "irreparable" harm absent a stay of the Final Rule.[1]

---

[1] As explained in *Virginia Petroleum Jobbers Ass'n v. Federal Power Commission*, one of the cases Denka cites in its petition, harm is not "irreparable" if the petitioner has a means to obtain adequate relief other than a stay pending judicial review. 259 F.2d 921, 925 (D.C. Cir. 1958).

The regulations governing the contents of a "request for a compliance extension," which are found at 40 C.F.R. § 63.6(i)(6)(i), explain that such a request focuses narrowly on the specific measures the applicant intends to pursue to reduce emissions from a specific source. In conjunction with an extension request, Denka may also describe any measures the company has taken over recent years to reduce its airborne emissions of chloroprene. If Denka submits such a request, EPA will evaluate it consistent with the regulatory timelines prescribed in 40 C.F.R. § 63.6(i)(13). EPA will also consider at that time any renewed request by Denka for an administrative stay of the Final Rule.

Denka should direct any request for an extension of the 90-day compliance deadline to:

Janet G. McCabe, Deputy Administrator
United States Environmental Protection Agency
1200 Pennsylvania Avenue, NW
MC1102A, Room 3412WJCN
Washington, DC 20460
mccabe.janet@epa.gov

If you have any questions, Penny Lassiter would be pleased to assist you and is available at lassiter.penny@epa.gov or 919-541-5396.

Sincerely,

Joseph Goffman
Assistant Administrator

cc: Jason B. Hutt, Esq.
Jeffrey R. Holmstead, Esq.