## ORAL ARGUMENT NOT YET SCHEDULED

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

| | | |
|---|---|---|
| **DENKA PERFORMANCE ELASTOMER LLC,** | ) ) ) | |
| **Petitioner,** | ) ) | |
| **v.** | ) ) | **No. 24-60351** |
| **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL REGAN, Administrator, United States Environmental Protection Agency,** | ) ) ) ) ) ) | |
| **Respondents.** | ) ) | |

### PETITIONER'S MOTION TO SUPPLEMENT OR COMPLETE ADMINISTRATIVE RECORD AND AMEND BRIEFING SCHEDULE
#### (Ruling Requested By September 12, 2024)

James C. Percy
JONES WALKER LLP
445 N. Boulevard, Suite 800
Baton Rouge, LA 70802
Telephone: (225) 248-2130
jpercy@joneswalker.com

Robert E. Holden
Brett S. Venn
JONES WALKER LLP
201 St. Charles Ave
New Orleans, LA 70170
Telephone: (504) 582-8000
bholden@joneswalker.com
bvenn@joneswalker.com

David A. Super
Jason B. Hutt
Jeffrey R. Holmstead
Britt Cass Steckman
Kevin M. Voelkel
BRACEWELL LLP
2001 M Street NW, Ste. 900
Washington, DC 20036
Telephone: (202) 828-5800
david.super@bracewell.com
jason.hutt@bracewell.com
jeff.holmstead@bracewell.com
britt.steckman@bracewell.com
kevin.voelkel@bracewell.com

*(counsel cont'd)*

Jeffrey L. Oldham
BRACEWELL LLP
711 Louisiana Street, Suite 2300
Houston, TX 77002
Telephone:  (713) 223-2300
jeffrey.oldham@bracewell.com

*Counsel for Petitioner Denka Performance Elastomer LLC*

## I.     INTRODUCTION

Pursuant to Federal Rules of Appellate Procedure 16 and 27, petitioner Denka Performance Elastomer LLC ("DPE") files this motion requesting that the Court order the Environmental Protection Agency ("EPA") to supplement or complete the administrative record filed in this proceeding, so that the Court may engage in meaningful judicial review of the EPA action at issue.[1]  DPE further requests that, if the Court grants this Motion, the due date for DPE's initial brief on the merits be extended until 30 days from the date EPA completes the required supplementation of the administrative record.

By letter dated August 23, 2024, and telephone discussion on August 26, 2024, counsel for DPE conferred with counsel for EPA regarding the relief requested by this Motion.  Counsel for EPA stated that EPA opposes the relief requested herein and will file an opposition.  Intervenor Louisiana Department of Environmental Quality ("LDEQ") consents to the Motion.  DPE's initial brief on the merits is due September 30, 2024.  Doc. 72.  Pursuant to Circuit Rule 27.4, to ensure that the

---

[1] Regarding the need to "supplement" or "complete" the record, terminology is somewhat inconsistent in the case law.  *See Gulf Coast Rod Reel & Gun Club, Inc. v. U.S. Army Corps of Engineers*, No. 3:13-CV-126, 2015 WL 1883522, at *1 (S.D. Tex. Apr. 20, 2015) ("Supplementation is essentially a claim that some information that should have properly been included in the administrative record was not.") (cleaned up); *In re United States*, 875 F.3d 1200, 1206 (9th Cir. 2017), *vacated in part on other grounds*, 138 S. Ct. 443 (2017) (affirming district court order to agency to "complete" administrative record).

administrative record is complete and that DPE has a reasonable opportunity to incorporate into its initial brief the documents missing from the record that are addressed in this Motion, DPE respectfully requests that the Court rule on this Motion by September 12, 2024.

The background of this dispute is discussed fully in DPE's Petition for Review ("Petition") (Doc. 1-2) filed in this case and DPE's Emergency Motion for Stay Pending Review ("Stay Motion") (Doc. 6-1).  Briefly stated, on June 27, 2024, the LDEQ exercised its lawful authority to grant DPE an extension ("LDEQ Extension"), until July 15, 2026, to comply with a rule ("Rule") issued by EPA that, without the LDEQ Extension, would require DPE to comply with the Rule by October 15, 2024, which is impossible.  In furtherance of its well-chronicled crusade against DPE, EPA has unequivocally declared that the LDEQ Extension is "ineffectual" and "invalid."  DPE therefore initiated this proceeding, seeking declarations that the LDEQ Extension is valid and that EPA's determination that the LDEQ Extension is not valid is arbitrary, capricious, and contrary to law.  This Court has denied EPA's motion to dismiss this proceeding and granted DPE's Stay Motion to preclude EPA from taking action in contravention of the validity of the LDEQ Extension pending resolution of DPE's Petition.

On August 20, 2024, EPA submitted a Notice of Filing Certified Copy of Record.  Doc. 70 ("Notice of Certified Record").  EPA's Notice of Certified Record

relates solely to the narrowest, plausible reading as to the scope of the record—referring only to EPA's initial public statement about invalidity in a footnote and not to EPA's decision-making process. According to EPA, the Record in this proceeding should contain only two documents: (i) DPE's Emergency Motion for Stay Pending Review ("D.C. Circuit Stay Motion") filed in May 2024 in DPE's D.C. Circuit action challenging the Rule; and (ii) EPA's June 2024 Opposition to the D.C. Circuit Stay Motion ("D.C. Circuit Stay Opposition"), in which EPA declared that an extension granted to DPE by LDEQ would be "ineffectual." *See* DPE Petition, Exhibit J (Doc. 1-5) at 7-8 n.2. The Record and accompanying certification submitted by EPA are woefully inadequate.

It is fundamental that judicial review of agency action must be "based on the *full* administrative record that was before the Secretary at the time he made his decision." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (emphasis added); *see also* 5 U.S.C. § 706 (in reviewing agency action under the Administrative Procedure Act, "the court shall review the whole record"). As discussed below, DPE requests that seven specific documents (copies of which are attached hereto as Exhibits A-G) be included in the Record. In addition, the Record should include any other documents that were before EPA when it determined that the LDEQ Extension is invalid.

## II.    ARGUMENT

While "an agency is entitled to a presumption that it properly designated the administrative record[,] … in certain circumstances a court may permit supplementation of the record or the introduction of extra-record evidence to enable effective judicial review." *Gulf Coast*, 2015 WL 1883522, at *1.[2] "Supplementation does not pose a difficult legal issue.  It is consistent with the 'record rule' to remedy an inadvertent failure to include part of the agency record in the record submitted with the reviewing court." *Id.*

In this case, DPE seeks declarations that the LDEQ Extension is valid and that EPA's determination to the contrary is arbitrary, capricious, and contrary to law.  *See* DPE Petition (Doc. 1-2) ¶¶ 6, 39-41, 56, 62.  In its Notice of Certified Record, EPA relies on the same overly narrow framing it used in opposing DPE's Stay Motion in this case, characterizing the "agency action" at issue here as "the challenged footnote in [EPA's] June 11, 2024 Response in Opposition" filed in the D.C. Circuit.  Notice of Certified Record (Doc. 70) at 4; *see also* EPA Opp. to Stay & Mot. to Dismiss (Doc. 42) at 11-12 (attempting to downplay agency action at issue as "a footnote in a brief").  But as DPE explained in its Petition and in opposing EPA's motion to

---

[2] "[E]xtra-record evidence is, as its name indicates, 'extra' or additional evidence 'outside of or in addition to the administrative record that was not necessarily considered before the agency.'" *Gulf Coast*, 2015 WL 1883522 at *1 (quoting *Calloway v. Harvey*, 590 F. Supp. 2d 29, 38 (D.D.C. 2008)).

dismiss this proceeding, EPA's "invalidity" determination regarding the LDEQ Extension has been conveyed in multiple forms.    Petition (Doc. 1) ¶¶ 39-41 (describing that determination of invalidity included D.C. Stay Opposition, DPE's June 28, 2024 letter to EPA, and EPA's failure to substantively respond); DPE Opp. to EPA Mot. to Dismiss (Doc. 48-1) at 4, 12-13, & Exhibit 1 (describing representation by EPA counsel during status conference in related action in Eastern District of Louisiana that "EPA does not believe that [the LDEQ Extension] is valid," and that "it is [EPA's] belief that on October 15 that emissions standard … will become effective.").    Each of these statements evidences EPA's determination that the LDEQ Extension is invalid and that DPE cannot rely upon it.    That determination by EPA is the final agency action that DPE is challenging in this case.

EPA's position that the Record should contain only two briefs from the D.C. Circuit litigation is therefore untenable.    Neither of those documents explains the basis for EPA's determination that the LDEQ Extension is invalid.    Notably, EPA's D.C. Circuit Stay Opposition contains none of the analysis that EPA included in its opposition to DPE's Stay Motion filed in this Court explaining why EPA believes that the LDEQ Extension is invalid.    *See* Doc. 42 at 16-20.    Thus, the Record proffered by EPA plainly does not "adequately explain" EPA's determination of invalidity.    *Gulf Coast*, 2015 WL 1883522, at *2.

The Record does not even include the LDEQ Extension itself, which sets forth support for LDEQ's legal authority and factual findings supporting the extension, nor DPE's request for the extension, both of which were posted by LDEQ on its public website. In assessing and issuing multiple statements on the issue of validity, EPA obviously must have considered DPE's request for an extension from LDEQ and the LDEQ Extension itself. Thus, EPA's assertion that the current Record is complete "is not credible." *In re United States*, 875 F.3d at 1206 ("[T]he notion that the head of a United States agency would decide to terminate a program giving legal protections to roughly 800,000 people based solely on 256 pages of publicly available documents is not credible, as the district court concluded."). Accordingly, DPE requests that the following two documents be included in the Record:

- Letter from Mr. Jeffrey R. Holmstead to Secretary Aurelia S. Giacometto and Mr. Bryan Johnston, Denka Performance Elastomer, LLC – Request For Extension of Compliance Periods Set Forth In Final Rule In EPA Docket EPA-HQ-OAR-2022-0730 (April 19, 2024) (attached hereto as Exhibit A).[3]

- Letter from Amanda Vincent, LDEQ, to Jeffrey R. Holmstead, DPE, re Extension of Compliance (June 27, 2024) ("LDEQ Extension") (attached hereto as Exhibit B).[4]

Similarly, the current Record should include the documents that DPE is aware of that show additional instances in which EPA stated its determination that the

---

[3] This document was previously attached as Exhibit I to DPE's Petition. *See* Doc. 1-4.

[4] This document was previously attached as Exhibit K to DPE's Petition. *See* Doc.1-6.

LDEQ Extension is invalid, including by failing to respond to DPE's direct request for confirmation. Accordingly, DPE requests that the following three documents also be included in the Record:

- Letter from Mr. Jeffrey R. Holmstead to Administrator Michael S. Regan (June 28, 2024) (attached hereto as Exhibit C).[5]

- Email from EPA counsel stating that EPA would not respond to DPE's June 28, 2024 Letter (July 8, 2024) (attached hereto as Exhibit D).

- Transcript of Status Conference, *United States v. Denka Performance Elastomer, LLC*, No. 2:23-cv-00735 (E.D. La. July 17, 2024) (attached hereto as Exhibit E).[6]

Further, these documents should be included to assist the Court's understanding of the agency action at issue in this case. *See Gulf Coast*, 2015 WL 1883522, at *6 (allowing consideration of extra-record evidence to aid court's understanding of the issues).

Next, in addition to the above-identified specific documents of which DPE is aware, EPA must provide any other "documents and materials directly or indirectly considered by the agency" in arriving at its position that the LDEQ Extension is invalid. *Exxon Mobil Corp. v. Mnuchin*, No. 3:17-cv-1930-B, 2018 WL 4103724, at *2 (quoting *Exxon Corp. v. Dep't of Energy*, 91 F.R.D. 26, 33 (N.D. Tex. 1981)).

---

[5] This document was previously attached as Exhibit L to DPE's Petition. *See* Doc. 1-7.

[6] This document was previously attached as Exhibit 1 to DPE's Opposition to Motion to Dismiss. *See* Doc. 48, Exhibit 1.

This would include, for example, any government analyses and/or internal or external communications regarding EPA's assessment of validity, such as documents and communications involving EPA Region 6 (the EPA region in which the DPE Facility is located) and/or the LDEQ. For example, EPA has taken the position that the statement in the D.C. Circuit Stay Opposition that an extension would be "ineffectual" was not a final action by EPA, in part, because it was made pursuant to the authority of the Attorney General, not by EPA itself. *See* EPA's Opposition to Stay Motion and Countermotion to Dismiss (Doc. 42) at 11. It is simply not credible to suggest that *EPA*—as opposed to its litigation counsel—did not make the determination that the LDEQ Extension is invalid. But especially in light of EPA's jurisdictional objection, the Record must include a full accounting of the basis for *EPA's* determination of invalidity after DPE's request for an extension was made public by LDEQ and is not limited to EPA's initial public statement about invalidity as set forth in the footnote contained in EPA's D.C. Circuit Stay Opposition. The Record documents must also include "materials relied on by subordinates who directly advised the ultimate decision-maker." *In re United States*, 875 F.3d at 1207.

To the extent EPA claims that any of these documents are privileged, EPA should be required to provide a privilege log substantiating those claims. *See Exxon Mobil*, 2018 WL 4103724, at *2 ("If a privilege applies, the proper strategy isn't

pretending the protected material wasn't considered, but withholding or redacting the protected material and then logging the privilege.") (quoting *Inst. for Fisheries Res. v. Burwell*, No. 16-CV-01574-VC, 2017 WL 89003, at *1 (N.D. Cal. Jan. 10, 2017)); *In re United States*, 875 F.3d at 1210 (denying petition for review of district court order compelling Department of Homeland Security to submit a privilege log for documents allegedly subject to deliberative process privilege).

Finally, the Record should include materials bearing on LDEQ's authority to issue the LDEQ Extension, including the following two documents that DPE submitted with its Stay Motion in this action:

- Letter from John S. Seitz re Delegation of 40 CFR Part 63 General Provisions Authorities to State and Local Air Pollution Control Agencies (July 10, 1998) (attached hereto as Exhibit F) ("Seitz Memorandum").[7]

- EPA, Compliance Extensions Summary (July 30, 2002) (attached hereto as Exhibit G).[8]

As explained in DPE's Petition and stay briefing, these documents confirm that state agencies with approved Clean Air Act permitting programs, like LDEQ, have automatic authority to issue extensions like the LDEQ Extension, without any further delegation required. *See* Petition (Doc. 1) ¶¶ 34-35 (discussing Seitz Memorandum (Exhibit F hereto) confirming that state agencies have "automatic"

---

[7] This document was previously attached as Exhibit K to DPE's Petition. *See* Doc. 1-6.

[8] This document was previously attached as Exhibit S to DPE's Reply in Support of Stay Motion. *See* Doc. 49, at 28.

extension approval authority based on an approved permitting program and do not require a separate express delegation from EPA); DPE Reply in Support of Stay (Doc. 49-1) at 7 (discussing EPA's "Compliance Extension Summary" (Exhibit G hereto) confirming that a "State with an approved permit program" is authorized to act on behalf of EPA to implement extension procedures for Section 112(f) standards). EPA should have considered these authorities in assessing the validity of the LDEQ Extension. If EPA did not consider them, then that itself is material and this Court should consider them as extra-record material showing that "the agency failed to consider factors which are relevant to its final decision," as "the Fifth Circuit allows a court to consider additional documents to get a sense of the universe of potential information in deciding whether the agency conducted a sufficiently thorough assessment." *Gulf Coast*, 2015 WL 1883522, at *2, *4; *accord Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 247 (5th Cir. 2006) ("Extra-record evidence may be admitted if necessary to determine whether an agency has adequately considered" relevant factors).

"Private parties and reviewing courts alike have a strong interest in fully knowing the basis and circumstances of an agency's decision. The process by which the decision has been reached is often mysterious enough without the agency's maintaining unnecessary secrecy." *Nat'l Courier Ass'n v. Bd. of Governors of Fed. Reserve Sys.*, 516 F.2d 1229, 1241 (D.C. Cir. 1975). Accordingly, EPA should be

required to complete or supplement the Record, with an updated certification, to ensure that this Court may conduct a complete review.

## III.    REQUEST FOR RELIEF

For the foregoing reasons, DPE requests that the Court order EPA to include the documents attached hereto as Exhibits A-G as part of the Record in this action. Further, DPE requests that the Court order EPA to include in the Record any other documents and materials directly or indirectly considered by EPA in determining that the LDEQ Extension is invalid (and submit a certification to that effect), including any government analyses and/or internal or external communications regarding EPA's determination, such as documents and communications involving EPA Region 6 and/or the LDEQ.  To the extent EPA claims any such document is privileged, EPA should be ordered to provide a privilege log.

DPE further requests that, if the Court grants this Motion, the due date for DPE's initial brief be extended until 30 days after the date EPA completes the required supplementation of the administrative record.

Date: August 26, 2024

Respectfully submitted,

James C. Percy
JONES WALKER LLP
445 N. Boulevard, Suite 800
Baton Rouge, LA 70802
Telephone: (225) 248-2130
jpercy@joneswalker.com

Robert E. Holden
Brett S. Venn
JONES WALKER LLP
201 St. Charles Ave
New Orleans, LA 70170
Telephone: (504) 582-8000
bholden@joneswalker.com
bvenn@joneswalker.com

*/s/ David A. Super*
David A. Super
Jason B. Hutt
Jeffrey R. Holmstead
Britt Cass Steckman
Kevin M. Voelkel
BRACEWELL LLP
2001 M Street NW, Ste. 900
Washington, DC 20036
Telephone: (202) 828-5800
david.super@bracewell.com
jason.hutt@bracewell.com
jeff.holmstead@bracewell.com
britt.steckman@bracewell.com
kevin.voelkel@bracewell.com

Jeffrey L. Oldham
BRACEWELL LLP
711 Louisiana Street, Suite 2300
Houston, TX 77002
Telephone: (713) 223-2300
jeffrey.oldham@bracewell.com

***Counsel for Petitioner Denka Performance Elastomer LLC***

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify that this motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because this motion contains 2,629 words.

I further certify, pursuant to Fed. R. App. P. 27(d)(1)(E), that this motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this motion has been prepared in Times New Roman 14-point font using Microsoft Word 2013.


Date:  August 26, 2024              /s/ David A. Super
                                   David A. Super

                                   **Counsel for Petitioner**
                                   **Denka Performance Elastomer LLC**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, I have caused a true and correct copy of the foregoing *Petitioner's Motion to Supplement or Complete Administrative Record and Amend Briefing Schedule* to be electronically filed with the Clerk of the Court using the CM/ECF System, which will send a notice of filing to all registered users.


Date:  August 26, 2024                /s/ David A. Super
                                      David A. Super

                                      ***Counsel for Petitioner***
                                      ***Denka Performance Elastomer LLC***

# EXHIBIT A

# BRACEWELL

April 19, 2024

**BY E-MAIL AND FEDEX**

Secretary Aurelia S. Giacometto                    Mr. Bryan Johnston
Louisiana Department of Environmental Quality      Louisiana Department of Environmental Quality
Galvez Building, 602 North Fifth Street            Galvez Building, 602 North Fifth Street
Baton Rouge, LA 70802                              Baton Rouge, LA  70802

Officesec@la.gov                                   Bryan.Johnston@la.gov

Re:    **Denka Performance Elastomer, LLC – Request For Extension of Compliance Periods Set Forth In Final Rule In EPA Docket EPA-HQ-OAR-2022-0730**

       **Agency Interest No. 199310**

Dear Secretary Giacometto and Mr. Johnston:

I write on behalf of Denka Performance Elastomer, LLC ("DPE") to request a facility-specific extension of compliance periods prescribed in the final rule in docket EPA-HQ-OAR-2022-0730 ("Final Rule").[1] Specifically, DPE requests that the compliance periods of 90 days after the effective date, including those set forth in amended 40 C.F.R. 63.481(o)[2] and 63.481(p)(2) applicable to DPE's facility in LaPlace, Louisiana be extended to two years after the Final Rule's effective date pursuant to 42 U.S.C. 7412(f)(4)(B) and 40 C.F.R. 63.6(i)(4)(ii).  The Louisiana Department of Environmental Quality ("LDEQ") is authorized to grant this request pursuant to its Part 70 operating permits program and its delegated authority under 40 C.F.R. Part 63.[3]

The enclosed document provides the basis for granting DPE's request and satisfies the criteria set forth in 40 C.F.R. Part 63, Subpart A. As the enclosure describes in detail, good cause exists for LDEQ to grant DPE's request because a period of at least two years is necessary for DPE to comply with the applicable requirements and DPE's facility does not present an imminent endangerment.

---

[1] *See* EPA, *New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry* (signed Mar. 28, 2024) (pre-publication version).

[2] This includes chloroprene requirements in amended §63.484(u), §§63.485(y) and (z), §63.487(j), §63.494(a)(7), §63.501(a)(10)(iv), §63.502(a)(3) and (a)(7), §63.509, and §63.510.  40 C.F.R. 63.481(o).

[3] 60 Fed. Reg. 47296 (Sept. 12, 1995) (EPA approval of the Louisiana Operating Permits program); 80 Fed. Reg. 9613 (Feb. 24, 2015) (EPA approval of updated NESHAP delegation).

**Jeffrey R. Holmstead**        T:+1.202.828.5852        F: +1.800.404.3970
Partner                         2001 M Street NW, Suite 900, Washington, DC 20036-3310
                                jeff.holmstead@bracewell.com        bracewell.com

AUSTIN   CONNECTICUT   DALLAS   DUBAI   HOUSTON   LONDON   NEW YORK   SAN ANTONIO   SEATTLE   WASHINGTON, DC

# BRACEWELL

Secretary Aurelia S. Giacometto
Mr. Bryan Johnston
April 19, 2024
Page 2


Due to their volume, the exhibits cited in the enclosure are being provided on a flash drive accompanying the overnight delivery of this letter. In addition, exhibits referenced in the enclosure are being made available via a file sharing website at the following URL:[4]

[https://bracewell.sharefile.com/d-s5980150835e645b9805b968e1dd0158e](https://bracewell.sharefile.com/d-s5980150835e645b9805b968e1dd0158e)

Please do not hesitate to contact me with any questions.


Sincerely,

Jeffrey R. Holmstead
*Counsel to Denka Performance Elastomer, LLC*


Enclosure:
        Enclosure in Support of Extension Request

---

[4] Exhibit 26 contains information that is proprietary and confidential to DPE and exempt from public disclosure. Due to the sensitive nature of the information, Exhibit 26 is being provided only via flash drive.

# Enclosure in Support of Extension Request

## *Denka Performance Elastomer, LLC*

**Extension Request**
*Denka Performance Elastomer, LLC*

Denka Performance Elastomer, LLC ("DPE") submits this facility-specific request for an extension of compliance periods prescribed in the final rule in docket EPA-HQ-OAR-2022-0730 ("Final Rule").[1] Specifically, DPE requests that the compliance period for the requirements with a 90-day compliance deadline including those set forth in amended 40 C.F.R. 63.481(o)[2] and 63.481(p)(2) applicable to DPE's facility in LaPlace, Louisiana (the "Facility") be extended to two years after the Final Rule's effective date pursuant to 42 U.S.C. 7412(f)(4)(B) and 40 C.F.R. 63.6(i)(4)(ii) ("Extension Request").[3]

The Final Rule requires a suite of new emission controls that would be necessary for compliance ("Section 112(f) Control Projects"). The Louisiana Department of Environmental Quality ("LDEQ") is authorized to grant this request pursuant to its Part 70 operating permits program and its delegated authority under 40 C.F.R. Part 63.[4] Good cause exists for LDEQ to grant this Extension Request because a period of at least two years is necessary for DPE to comply with the Section 112(f) Control Projects and the Facility does not present an imminent endangerment.

As EPA has historically and repeatedly recognized in rulemakings, including in the proposed rule in the above-referenced docket ("Proposed Rule")[5] as well as the Final Rule, emission reduction projects like the Section 112(f) Control Projects will take significant time to plan, purchase, and install. Emission controls such as a thermal oxidizer and steam stripper are simply not equipment that can be safely installed in 90 days. Without additional time for implementation, a compliance period shorter than two years would jeopardize the continuing viability of the Facility and the jobs and livelihood of hundreds of employees and contractors who work there.

During the requested two-year implementation period, DPE would continue to comply with the existing Part 63 requirements at the Facility and continue to implement the significant emission reduction measures it has put in place there. These steps are sufficient to ensure that individuals near the Facility will be protected from any potential "imminent endangerment." While EPA has limited express guidance on what constitutes an "imminent endangerment" for purposes of setting NESHAP compliance periods, EPA's actions in prior Section 112 rulemakings make clear that emissions from the Facility do not

---

[1] *See* EPA, *New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry* (signed Mar. 28, 2024) (pre-publication version) (Ex. 1). Due to their volume, the exhibits cited herein have been provided on a ShareFile (via cover email) and a flash drive (via overnight delivery). Certain exhibits contain only the relevant portions of the cited material and have been highlighted for convenience.

[2] This includes chloroprene requirements in amended § 63.484(u), §§63.485(y) and (z), §63.487(j), §63.494(a)(7), §63.501(a)(10)(iv), §63.502(a)(3) and (a)(7), §63.509, and §63.510. 40 C.F.R. 63.481(o).

[3] For ease of reference, this request will refer to the compliance period from the Final Rule's effective date, i.e., 90 days. *See* Final Rule at 1131-32 (amended 40 C.F.R. 481(o) (not yet effective)) (Ex. 1)

[4] 60 Fed. Reg. 47296 (Sept. 12, 1995) (EPA approval of the Louisiana Operating Permits program) (Exhibit 2); 80 Fed. Reg. 9613 (Feb. 24, 2015) (EPA approval of updated NESHAP delegation) (Exhibit 3).

[5] Denka Performance Elastomer LLC Comments re: EPA's New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry, 88 Fed. Reg. 25080 (April 25, 2023) (Docket No. EPA-HQ-OAR-2022-0730; FRL-9327-01-OAR) (Ex. 4), Comment ID No. EPA-HQ-OAR-2022-0730-0176 (July 7, 2023) ("DPE Comment"), available at https://www.regulations.gov/comment/EPA-HQ-OAR-2022-0730-0176 (Ex. 5).

constitute an "imminent endangerment."  There have been no credible allegations of endangerment related to acute, short-term, or subchronic exposures from the Facility.  In the pending litigation against DPE under Section 303 of the Clean Air Act ("Section 303 Litigation"),[6] EPA has alleged that chronic exposures from the Facility's chloroprene emissions are causing an "imminent and substantial endangerment" due to the maximum plausible risk of cancer over a lifetime.  EPA's allegations of "imminent endangerment" are contradicted by decades of EPA actions under Section 112, and predicated on flawed conclusions that fail to consider and incorporate the best available science.  Importantly, EPA's allegations in the Section 303 litigation are just allegations and do not constitute a  judicial *finding*, nor does EPA offer any support in the Final Rule for the presence of an "imminent endangerment" associated with the current, historically low level of chloroprene emissions at the DPE Facility.

In recent Section 112 rulemakings, EPA has consistently provided compliance deadlines of at least two years for facilities with estimated maximum individual risks ("MIRs") equal to and in many cases greater than the DPE Facility, for facilities with higher estimated cancer incidences, and for facilities for which a greater number of people were exposed to an estimated risk above 1-in-10,000.   As demonstrated in the chart below, there are 20 facilities that EPA has estimated have a higher risk than the DPE Facility, yet EPA has determined that no "imminent endangerment" exists at any of these 20 facilities by providing them unqualified compliance extensions. There is no basis to find that an imminent endangerment exists near DPE's Facility given that EPA has consistently allowed such facilities at least two years to come into compliance.



---

[6] *U.S. v. Denka Performance Elastomer LLC et al.*, No. 2:23-cv-00735 (E.D. La. Feb. 28, 2023).

Using the "maximum plausible" estimate of risk, the Final Rule estimates that, without the further emissions controls contemplated by the Final Rule, there will be 0.06 cancer incidences per year due to emissions from the Facility, which equates to approximately one cancer case every 17 years.[7] By EPA's estimate in the Final Rule—an estimate DPE disputes—providing the Facility a two-year compliance period would equate to less than 1/8th of a single cancer over the next 70 years.  In contrast, the 90-day compliance requirement will virtually ensure the shutdown of the Facility, jeopardize the jobs of hundreds of employees and contractors, and significantly impact the local and state economies.[8]

I.     **Good cause exists to grant an extension of the compliance period based on the time necessary to install the Section 112(f) Emission Control Projects and the lack of an imminent endangerment at or near the Facility.**

Section 112(f)(4)(a) provides that standards promulgated pursuant to Section 112(f)(2) shall not apply until 90 days after the effective date.[9]  However, Section 112(f)(4)(B) provides that a waiver permitting sources up to two years to comply with a standard may be granted if (1) "such period is necessary for the installation of controls" and (2) "steps will be taken during the period of the waiver to assure that the health of persons will be protected from imminent endangerment."[10]

The procedures for obtaining a Section 112(f)(4)(B) compliance extension are set forth in 40 C.F.R. 63.6(i)(4)(ii), which provides as follows:

> The owner or operator of an existing source unable to comply with a relevant standard established under this part pursuant to section 112(f) of the Act may request that the Administrator grant an extension allowing the source up to 2 years after the standard's effective date to comply with the standard.  The Administrator may grant such an extension if he/she finds that such additional period is necessary for the installation of controls and that steps will be taken during the period of the extension to assure that the health of persons will be protected from imminent endangerment.  Any request for an extension of compliance with a relevant standard under this paragraph must be submitted in writing to the Administrator not later than 90 calendar days after the effective date of the relevant standard.[11]

Additionally, the applicable regulations require a compliance extension request to include: (1) a "description of the controls to be installed to comply with the standard" and (2) a "compliance schedule, including the date by which each step toward compliance will be reached."[12]

As discussed herein, good cause exists to grant this Extension Request.  However, this Extension Request does not constitute a waiver of DPE's rights to challenge the Final Rule, the compliance periods set therein, or the applicability of Section 112(f)(4).

---

[7] Final Rule at 109 (Table 5) (Ex. 1). EPA admits that the value on which the risk estimate is based is a "plausible upper limit to the true value of a quantity" and, in some circumstances, the "the true risk could be as low as zero. . . ." Proposed Rule at 25103 (Ex. 4).

[8] *See* Remedy Declaration of Dr. Loren C. Scott ("Scott Remedy Decl.") (Ex. 6).

[9] 42 U.S.C. § 7412(f)(4)(A).

[10] 42 U.S.C. § 7412(f)(4)(B); Final Rule at 86 ("such sources [producing neoprene] may seek the EPA's approval of a waiver from the 90-day compliance deadline and obtain a compliance date…") (Ex. 1).

[11] 40 C.F.R. § 63.6(I)(4)(ii).

[12] 40 C.F.R. § 63.6(i)(6).

II.     **A Compliance Period Of At Least Two Years Is Necessary For The Facility To Have Any Realistic Chance Of Completing The Section 112(f) Control Projects.**

A.     **Safely Completing The Section 112(f) Control Projects, Including Planning, Approval, Construction, Installation, And Testing, Will Require Substantially More Than 90 Days at the Facility.**

The Facility will require at least a two-year compliance period to comply with regulatory requirements in the Final Rule. The Final Rule imposes stringent new regulatory requirements for chloroprene emissions based on a discretionary Section 112(f) residual risk review.[13] Specifically, the Final Rule "require[s] control of chloroprene for: (1) Process vents, (2) storage vessels, (3) wastewater 'in chloroprene service'" and "finaliz[es] requirements to reduce chloroprene emissions from maintenance vents" to reduce risk to what EPA believes is an acceptable level and provides an ample margin of safety to protect public health.[14] The Final Rule also requires fenceline monitoring provisions that include an unreasonable threshold for taking corrective action.[15]

The Section 112(f) Control Projects each require at least two years to safely design, install, construct, and test.[16] Additionally, the Final Rule includes standards for pressure relief devices, control equipment bypasses, flares, and dioxins and furans emissions that must be accounted for in the planning of the Section 112(f) Control Projects.

DPE personnel and consultants have dedicated significant time and resources to evaluating many potential emission reduction projects at the Facility, including the types of projects necessary to meet the Final Rule requirements. For example, Montrose Environmental Group, Inc. ("Montrose"), a global environmental services provider specializing in emission control planning, measurement, and analysis, has worked closely with DPE over the past two years on nearly all aspects of potential options for chloroprene control at the Facility. Montrose developed several memoranda and Excel calculation workbooks in support of the Proposed Rule evaluating the feasibility of the Section 112(f) Control Projects. Specifically, Montrose analyzed: the overall cost-benefits of the Proposed Rule; the proposed wastewater requirements; and the proposed dioxins and furans requirements. DPE also worked with ECT2, a consulting group with significant wastewater expertise, to evaluate the feasibility and alternatives to control projects related to wastewater. Norton Engineering Consultants, Inc. ("Norton Engineering"), a consulting group with specialized expertise in thermal oxidizers, also assisted DPE after the Proposed Rule was released in evaluating potential thermal oxidizer configurations. Norton Engineering provided an analysis memorandum covering thermal oxidizer options and costs, as well as an analysis of the PRD and flare requirements proposed by EPA in the Proposed Rule. On July 7, 2023, DPE submitted comments to the Proposed Rule, which incorporated the robust technical work of these outside consultants, including

---

[13] Final Rule at 34 ("In order to ensure our standards provide an ample margin of safety to protect public health following the new IRIS inhalation UREs for EtO and chloroprene, we are exercising our *discretion* and conducting risk assessments in this action for HON sources and for affected sources producing neoprene subject to the P&R I NESHAP.") (emphasis added) (Ex. 1).

[14] Final Rule at 59-60 (Ex. 1).

[15] Final Rule at 1209-1210 (amended 40 C.F.R. 63.502(a)(7)) (Ex. 1).

[16] EPA submitted several analysis memorandums in support of the Proposed Rule that describe such projects that were developed by their contractor, ERG. *See* ERG, *Analysis of Control Options for Wastewater Streams to Reduce Residual Risk of Chloroprene From Neoprene Production Processes Subject to P&R I* (July 6, 2023) ("ERG Wastewater Memo") (Ex. 7); ERG, *Analysis of Control Options for Process Vents and Storage Vessels to Reduce Residual Risk of Chloroprene Emissions at P&R I Affected Sources Producing Neoprene* (Mar. 2023) ("ERG Control Options for Process Vents and Storage Vessels Memo") (Ex. 8).

analysis memoranda and Excel workbooks.[17]  DPE also continued its evaluation work after submitting its Proposed Rule comments, including continued evaluation of Wash Belt emission capture projects and other projects.

The extensive analyses performed by DPE and these outside consultants are based on reviews of the Proposed Rule and associated technical documents, Facility site visits, third-party vendor quotes for emission control equipment, and extensive emissions control experience.  The Final Rule requires virtually the same control projects as the Proposed Rule.[18]  Therefore, the work performed to analyze the Proposed Rule remains a reasonable basis to estimate timing and cost. These analyses show that each of the Section 112(f) Control Projects will require significantly more time than a 90-day compliance period at the Facility. Each project involves site- and equipment-specific considerations at the Facility before completing the design, approval, construction, installation, and testing phases.

In addition, DPE has substantial concerns regarding the numerous complex process changes that will be required at the Facility for the installation of the Section 112(f) Control Projects.  Chloroprene is a highly volatile, flammable, and highly reactive (polymeric) chemical.  Any changes to the production process at the Facility will require properly trained and knowledgeable employees and contractors with process safety experience.[19] Failure to follow process safety procedures can result in disastrous consequences such as fires, explosions, and fatalities, as well as unintended environmental releases. These incidents commonly stem from stressors resulting in significant human error and omissions which are more likely to happen if new complex safety processes are implemented.  Avoiding the chloroprene-related consequences associated with process safety failures will demand careful planning and sufficient time to safely develop, assess, and implement procedures required for the Section 112(f) Control Projects.

Further, complicated emissions reduction projects inherently change the day-to-day operations at the Facility.  Such changes significantly increase the risk of human error by encouraging personnel to rush multiple process and procedural changes.  A 90-day compliance period would unsafely ignore the potential for human error that can arise in (1) designing processes; (2) engineering projects; (2) specifying process components; (4) predicting safeguards necessary to control risk to an acceptable level and sustain the required safeguards for the life of the process; (5) managing process changes; (6) startup testing; and (7) trouble-shooting (shakedown) physical process changes.  The shortened compliance period in the Final Rule fails to adequately account for process safety actions and does not detail designs necessary for DPE to initiate immediate implementation or consider sound change-management principles. Demanding compliance on an unreasonable schedule would pose a serious risk to DPE, its employees, and the surrounding community.

The following discussion in sections i. through v. identifies each Section 112(f) Control Project described in the Final Rule and describes why compliance within 90 days would be infeasible.  In accordance with 40 C.F.R. 63.6(i)(6), Table 1 below provides estimated dates for each project by which on-site construction, installation of emission control equipment, or a process change could be initiated and completed, and the estimated date by which final compliance could be achieved.  These preliminary estimates are based on DPE's current knowledge of Facility operations and past experience implementing emission control

---

[17] The memoranda covered: thermal oxidizer; wastewater; PRDs; flares; dioxins and furans; and cost-benefits review.

[18] One control project that is no longer needed is a replacement for DPE's existing thermal oxidizer. Under the Proposed Rule, DPE would have been required to operate a thermal oxidizer with a destruction efficiency of 99.9%, an efficiency beyond the capabilities of its current equipment. Nevertheless, the thermal oxidizer analysis performed by DPE and its contractors remains applicable to investigating, designing, constructing, and testing the new thermal oxidizer that is required to meet the Final Rule requirements.

[19] Remedy Declaration of Paul S. Casarez ("Casarez Remedy Decl."), ¶¶ 24, 30, Case No. 2:23-cv-00735 (Ex. 9).

projects; they are subject to change. Although the estimates contained herein are good faith approximations of the time necessary, these projects could take significantly longer to implement. DPE makes no commitment to meet these preliminary minimum estimates.

**Table 1**

| Project | Description of Controls 40 CFR 63.6(i)(6)(i)(A) | The date by which on-site construction, installation of emission control equipment, or a process change is planned to be initiated 40 CFR 63.6(i)(6)(i)(B)(1) | The date by which on-site construction, installation of emission control equipment, or a process change is planned to be completed 40 CFR 63.6(i)(6)(i)(B)(3) | The date by which final compliance is to be achieved. 40 CFR 63.6(i)(6)(i)(B)(4) |
|---|---|---|---|---|
| Thermal Oxidizer | *See Section II(A)(i)* | [18-24] months from publication | [30-36] months from publication | [30-36] months from publication |
| Wastewater Steam Stripper | *See Section II(A)(ii)* | [18-24] months from publication | [30-36] months from publication | [30-36] months from publication |
| Equipment to Limit Maintenance Emissions < 1 tpy | *See Section II(A)(iii)* | [18-24] months from publication | [30-36] months from publication | [30-36] months from publication |

DPE recognizes that some of the preliminary estimates provided in Table 1 extend beyond two years after the effective date, which is the maximum compliance period permitted in 40 CFR 63.6(i)(4)(ii). DPE will endeavor to reduce the implementation period, but Table 1 reflects DPE's best estimates at this time. Given that DPE's preliminary estimates for all three projects will require more than two years to complete, DPE is requesting that LDEQ grant DPE the maximum extension of two years from the effective date.

### i. Thermal Oxidizer.

Thermal oxidizers ("TOs") are combustion devices used to control volatile organic compounds ("VOCs") and other HAP emissions by combusting them to carbon dioxide ("$CO_2$") and water. To do so, a TO's combustion chamber is designed to reach temperatures high enough to remove VOCs from an incoming gas stream by initiating reactions required for oxidation of VOCs.[20] The high temperature within the TO must be maintained for sufficient time to ensure that oxidization destroys the VOCs and the gas stream should be thoroughly mixed inside the combustion chamber to ensure the VOC is uniformly burned out.[21] DPE's Facility currently has a regenerative thermal oxidizer ("RTO").[22] Following startup and shakedown,

---

[20] Norton Engineering Consultants Inc., *Thermal Oxidizer Technology Review* (June 30, 2023) ("Norton Thermal Oxidizer Memo") at 1 (Ex. 12); Presentation to EPA (Oct. 18, 2023) ("DPE Presentation") at Slide 8 (Ex. 10); Extension Request Declaration of Chris Meyers ("Meyers Extension Request Decl."), ¶ 9-10 (Exhibit 11); DPE Comment at 78 (Ex. 5).

[21] Norton Thermal Oxidizer Memo at 1 (Ex. 12).

[22] Regenerative thermal oxidizers are characterized by their regenerative heat recovery capability which allows them to improve overall thermal efficiency.

stack testing of the existing RTO indicated a destruction removal efficiency ("DRE") above 98% and a flow capacity of 58,500 scfm.[23]

The Final Rule requires emissions from process vents and storage vessels in chloroprene service[24] to be routed to a closed vent system to a non-flare control device that reduces chloroprene by greater or equal to 98% DRE.[25] EPA concluded in the Proposed Rule "that the only viable way to meet [the] proposed standards is to enclose all of the polymer batch reactors, emulsion storage vessels, strainers, and wash belt dryers and route the vapors to a thermal oxidizer."[26] In the Final Rule, EPA has reiterated that it "continue[s] to stand by [their] analysis" and finalized control requirements for those same sources.[27] However, these sources have air flows that are more than 4.3 times higher than the Facility's existing RTO. The existing RTO is limited to a flow capacity of 58,500 scfm, but the sources identified by EPA would add 210,558 scfm of flow (resulting in a new total flow of 252,869 scfm).[28] Therefore, a new TO must be installed at the Facility to control the excess flow from process vents and storage vessels in chloroprene service as required by the Final Rule. EPA acknowledges that it "anticipate[s] that the facility will still need to install an additional thermal oxidizer in order to comply with the final performance standard for process vents and storage vessels in chloroprene service."[29]

> **1. At least two years is needed to design, obtain approval for, construct, and test a new TO at the Facility.**

As part of its feasibility evaluation following the Proposed Rule, DPE and its outside experts investigated various TO configurations.[30] Based on prior experience with thermal oxidizer installation at the Facility and evaluation work already completed by DPE in relation to an additional TO, DPE expects the design, approvals, construction, installation, and testing of a TO would take at least two years.[31] This timeframe does not account for testing to determine the applicability of the dioxins and furans standard that must be understood before finalizing the planning of the TO. However, as described in the following section, if the dioxins and furans standard is determined to be applicable, additional time will be needed at the Facility to account for such standards in the design and construction of a TO.

---

[23] Norton Thermal Oxidizer Memo at 5-6 (Ex. 12); *see also* Meyers Extension Request Decl., ¶ 10 (Ex. 11).

[24] "In chloroprene service" is defined in the Final Rule at §63.482. For process vents, "in chloroprene service" means each continuous front-end process vent, each batch front-end process vent, and each back-end process vent in a process at affected sources producing neoprene that, when uncontrolled, contains a concentration of greater than or equal to 1 ppmv undiluted chloroprene, and when combined, the sum of all these process vents within the process would emit uncontrolled, chloroprene emissions greater than or equal to 5 lb/yr (2.27 kg/yr). For storage vessels, "in chloroprene service" means storage vessels of any capacity and vapor pressure in a process at affected sources producing neoprene storing a liquid that is at least 0.1 percent by weight of chloroprene. Final Rule at 1145-46 (Ex. 1).

[25] Final Rule at 19-20 (Ex. 1).

[26] 88 Fed. Reg. at 25117 (Ex. 4); *see* ERG Control Options for Process Vents and Storage Vessels Memo at 7 (Ex. 8).

[27] Final Rule at 196-97 (Ex. 1).

[28] Meyers Extension Request Decl., ¶ 10 (Ex. 11); *see also* Norton Thermal Oxidizer Memo at 5-6 (Ex. 12).

[29] Final Rule at 198 (Ex. 1).

[30] Meyers Extension Request Decl., ¶ 10-11 (Ex. 11).

[31] *Id.* ¶ 9-26.

2.      **Complying with the Final Rule will require significant time to design, obtain approval for, construct, and test new permanent total enclosures at the Facility.**

DPE must be able to capture chloroprene emissions in order to route them to a TO. EPA concludes that "the only viable way to meet these proposed standards is to enclose all of the polymer batch reactors, emulsion storage vessels, strainers, and wash belt dryers" to capture and route the emissions to the TO.[32] In support of the Proposed Rule, EPA determined that three (3) Permanent Total Enclosures ("PTEs") around each of the emissions sources would be necessary to capture and route chloroprene emissions to a TO:[33]

- One PTE for all five polymerization batch reactors;
- One PTE for the two wash belt dryers; and
- One PTE for the three emulsion storage tanks.

In the Final Rule, EPA indicated that there is no explicit requirement to install permanent total enclosures,[34] but provides no alternative compliance option and DPE is aware of no alternative option that achieves the Final Rule requirements. The Final Rule does not alter EPA's analysis regarding PTEs and fails to account for the technical and process safety challenges of enclosing the wash belts and equipment in the poly building at the Facility. DPE is faced with the technical, process, and safety challenges of enclosing several different and dispersed sections of the Facility, and routing captured emissions to a TO. EPA recently recognized that achieving compliance with PTE requirements based on EPA Method 204 will take well over a year:

> Most commercial sterilization facilities were not initially designed to be compliant with the PTE requirements of EPA Method 204. We have learned from the comments received that for these facilities, the capture requirements associated with the emission reduction standards for Group 1 and Group 2 room air emissions in the final rule will likely require a redesign of a portion if not all of the facility. Many facilities will also need to purchase additional equipment (e.g., fans, transformers, variable frequency drives, etc.) to meet the capture requirements. Moreover, compliance with the final emission standards will likely require the installation of additional control devices. We have reviewed the time that it has taken for previous projects of this nature to be completed, from submission of the initial state or local permit application to installation of the continuous compliance mechanisms. Based on this analysis, we find that the process of bringing a facility into compliance with the PTE requirements of EPA Method 204, as well as installing and verifying additional emission controls, can take approximately a year from permit submission to project completion. However, this estimate does not account for the time needed to design and plan before the initial permit application is submitted, nor for the time needed to avoid impacts on medical device supply chains, to procure control devices

---

[32] As stated in the Proposed Rule, <u>88 Fed. Reg. at 25117</u> (Ex. 4), and affirmed in the Final Rule. *See* Final Rule at 196-97 ("we continue to stand by our analysis").

[33] ERG Control Options for Process Vents and Storage Vessels Memo at 7 (Ex. 8).

[34] Final Rule at 198-199 ("with regard to a commenter's specific objections to installing a permanent total enclosure…even though we costed out permanent total enclosures for these emission sources in our proposal, there is no explicit requirement in the proposed rule, or final rule, to install permanent total enclosures around these emission sources.") (Ex. 1).

from a limited number of vendors, and to account for the other complexities identified below.[35]

The Final Rule does not require DPE to comply with EPA Method 204, but the time-consuming considerations identified by EPA will also need to be evaluated by DPE.

Capturing emissions from the wash belts at the Facility also poses a serious concern regarding occupational exposure, human health and safety, process maintenance and product quality associated. DPE's wash belt blower motors are equipped with variable frequency drives, which allow a reduction of the total flow rate through the vents. DPE will need an industrial hygienist to evaluate any changes to the airflow through the vent hoods themselves or in other areas of the finishing building to ensure compliance with personnel exposure requirements, or to make recommendations for additional protective equipment.[36] Changes in airflow resulting from enclosing the wash belts can also have a negative impact on product quality and will need to be evaluated before the enclosures are put into permanent use.

Additionally, the wash belts require frequent, manual intervention from area personnel to ensure stable operation. Physical access is required to perform maintenance and repairs. This means that any enclosures will likely need to be transparent and capable of easily and frequently being dissembled and reassembled.[37] In any event, the change in routine maintenance and repairs on the wash belts once enclosed needs to be evaluated to ensure these activities can be carried out safely.

Taken together, enclosing certain equipment like the wash belts will take significant time due to process safety and product quality concerns and contribute to a compliance period of at least two years before the TO can commence operation and control emissions from the enclosures at the Facility.

> **3.      Alternative to safety bypass lines must be considered in Thermal Oxidizer design.**

The Final Rule prohibits the use of bypass lines in closed systems to allow a flow to avoid air pollution control devices at any time.[38] The Final Rule also requires monitoring systems for flow on bypass lines to detect whether vent stream flow is present every 15 minutes and to estimate and report any releases.[39] These requirements must be considered when planning, designing, and installing a TO at the Facility, and contribute to the complexities of implementing required control equipment within 90 days. Although the Final Rule provides DPE three years to comply with this requirement, it must be accounted for in DPE's planning of a TO.

The Facility has four closed vent systems to route process emissions from the Neoprene process area to the RTO: (1) a nitrogen-rich header for streams with high chloroprene concentrations; (2) an air rich header for streams with lower chloroprene concentrations; (3) the East Hot Dryer Vent; and (4) the West Hot Dryer Vent. The Facility's Monomer Emissions Reduction Project (MERP)[40] is also a closed vent system which routes emissions from the monomer process area to the halogen acid production furnace. In total,

---

[35] EPA, *National Emission Standards for Hazardous Air Pollutants: Ethylene Oxide Emissions Standards for Sterilization Facilities Residual Risk and Technology Review*, 89 Fed. Reg. 24090, 24102 (Apr. 5, 2024) (Ex. 14).

[36] Meyers Extension Request Decl., ¶ 14 (Ex. 11); DPE Comment at 91 (Ex. 5).

[37] DPE Comment at 92 (Ex. 5); Meyers Extension Request Decl., ¶ 15 (Ex. 11).

[38] Final Rule at 68, 336 (Ex. 1).

[39] Final Rule at 68, 336, 690 (Ex. 1).

[40] The MERP controls emissions from the monomer and HCl unit from the following sources: chloroprene synthesis; waste organics tank; HCl feed tanks; aqueous wase system; isomerization and DCM refining vents.

there are 19 bypass lines associated with the RTO and 8 bypass lines associated with the MERP that are required for safety reasons. These bypass lines are rarely used—and only for emergencies[41] (emissions from bypass lines made up less than 1% of Facility emissions in 2022).[42]

EPA's requirement is problematic because bypass lines are used to safeguard against high incoming concentrations of chloroprene into the RTO unit to avoid catastrophic failure. Without bypass lines, there is nowhere else for these dangerous streams to go.[43] DPE needs an ample amount of time to safely design, plan, and implement new configurations to handle these flows. This may require the installation of a new control device or require immense reworking of piping and ducting to safely connect these flows to the Facility's RTO or new TO.[44] Accordingly, the design of the new TO must consider the potential connection of these bypass lines.

> 4. **Equipment to analyze exhaust and monitor releases to atmosphere on 300 pressure relief devices ("PRDs") which must be routed to control device.**

The Final Rule prohibits "any release event" from a pressure relief device ("PRD") in chloroprene service.[45] PRDs are safety equipment that remain closed during normal operation but activate and release in response to an overpressure in the system. Overpressure can occur for a variety of reasons including malfunctions due to power failure or equipment failure, or other unexpected causes that result in immediate venting of gas from process equipment to avoid safety hazards or equipment damage.[46]

The Final Rule requires work practice standards for PRD releases that require facilities to "monitor these PRDs using a system that is capable of identifying and recording the time and duration of each pressure release and of notifying operators that a pressure release has occurred."[47] The Final Rule expects that operators will install electronic devices or monitors on PRDs[48] to achieve these work practice standards. DPE estimates that there are 300 PRDs at the Facility that would be affected by these requirements.[49] DPE does not currently have a complete system in place, or the necessary PRD equipment installed, to be in compliance with the requirements.[50]

---

[41] Meyers Extension Request Decl., ¶ 24 (Ex. 11).

[42] DPE Comment at 98 (Ex. 5); Meyers Extension Request Decl., ¶ 24 (Ex. 11).

[43] Rebuttal Declaration of Junius "J.R." Roussell ("Roussell Rebuttal Decl."), ¶¶ 9-10, Case No. 2:23-cv-00735 (Ex. 15).

[44] DPE Comment at 98 (Ex. 5); Meyers Extension Request Decl., ¶¶ 23, 25 (Ex. 11).

[45] Final Rule at 1210-1211 (amended 40 C.F.R. 63.502(a)(6)) (modifying amended 63.165(e)(3)(v)(D)).

[46] 88 Fed. Reg. at 25155 (Ex. 4).

[47] *Id.* at 25158. As explained in the Final Rule, EPA proposed "that any release event from a PRD in chloroprene service is a violation of the standard…" Final Rule at 100 (Ex. 1).

[48] Final Rule at 1069 (Ex. 1). "For purposes of estimating the costs of this requirement, [EPA] assumed that operators would install electronic monitors on PRDs that vent to atmosphere to identify and record the time and duration of each pressure release." 88 Fed. Reg. at 25158.

[49] Meyers Extension Request Decl., ¶ 18 (Ex. 11); Norton Engineering Consultants, Inc., *Summary of the Ruling Applied to Pressure Relief Devices* (June 30, 2023) ("Norton PRD Memo") at 1 (Ex. 16).

[50] Meyers Extension Request Decl., ¶ 18 (Ex. 11).

The Final Rule also requires the installation of a ppm level analyzer instrument with calibration features and diagnostic feedback at the exhaust of each PRD that is capable of verifying that any discharge is less than 500 ppm.[51] Monitoring equipment associated with the process and piping must also be installed on all 300 PRDs with the capability of indicating when a release to the atmosphere is occurring.[52] This requires installation of a magnetic sensor or motion detector connected to PRD stem travel (or an equivalent indicator of PRD movement).[53] This technological approach has not been implemented in the industry today and is a significant deviation from commercially available PRDs. In turn, DPE will likely not be able to retrofit this equipment onto the 300 PRDs already installed at the Facility, which will further complicate installations. Additionally, it will take longer to plan and test such monitoring systems given the significant risk in terms of reliability due to the lack of reference installations within the industry.[54]

PRDs also play a critical role in protecting employee and community safety.[55] DPE must carefully design an installation plan that continues to protect employee and community safety while navigating the Process Safety Management regulations promulgated by the Occupational Safety and Health Administration (OSHA). In turn, modifications of the PRD systems will require a comprehensive process hazard review.[56]

Based on these realities, DPE expects that the PRD requirements will take significant time to plan. Because PRDs are prohibited from releasing into the atmosphere, DPE will need to consider routing PRDs to the new TO. As a result, although the Final Rule provides DPE three years to comply with the PRD requirements, they must be accounted for in DPE's planning of a TO.

### 5. Dioxins and furans emissions limit further complicates planning and implementation of TO at the Facility.

The dioxins and furans limit of the Final Rule further complicates the designing, planning, and implementation of the TO as additional condenser equipment or other control devices must be evaluated concurrently with chloroprene ERPs.[57] Although the Final Rule provides DPE three years to comply with this requirement, it must be accounted for in DPE's planning of a TO. The Final Rule provides that neoprene production facilities can use, produce, or emit chlorinated chemicals and therefore has imposed dioxins and furans MACT standards under CAA section 112(d)(2) and (3) for P&R I.[58] In doing so, EPA adds an emission standard of 0.054 nanograms per DSCM at 3% $O_2$ for dioxins and furans from chlorinated process vents (including continuous front-end process vents).[59]

The Final Rule further explains that dioxins and furans can be formed when chlorinated compounds are present and combusted in a thermal oxidizer.[60] In turn, the Final Rule assumes that affected facilities would install a condenser prior to the existing control device that, in the case of DPE, is a thermal oxidizer. The condenser is designed to remove chlorinated compounds from the stream and prevent the formation

---

[51] Final Rule at 1067 (Ex. 1).

[52] Final Rule at 342-43 (Ex. 1).

[53] Norton PRD Memo at 1 (Ex. 16).

[54] *Id.*

[55] Meyers Extension Request Decl., ¶ 20 (Ex. 11).

[56] Norton PRD Memo at 2 (Ex. 16); Meyers Extension Request Decl., ¶ 20 (Ex. 11).

[57] Meyers Extension Request Decl., ¶ 26 (Ex. 11).

[58] Final Rule at 20-21; 152 (Ex. 1).

[59] Final Rule at 20-21(Ex. 1).

[60] *Id.* at 97.

of dioxins and furans within the thermal oxidizer.[61] In support of the Proposed Rule, EPA assumed that a refrigeration method will be implemented to recover or condense chloroprene out of the vapor streams.[62] Based on the analysis by DPE consultants, DPE will need to identify and evaluate commercially available refrigeration systems that can achieve the temperatures required to recover or condense chloroprene out of the vapor streams.  This will take time considering that DPE's consultants are not aware of a commercially available refrigeration system that can achieve the temperatures required to condense chloroprene out of the vapor streams.[63] Therefore, to implement the requirements of the Final Rule at the Facility, the Facility would likely need to install cryogenic technology to achieve the required temperatures, which will pose additional technical, cost, and operational challenges.[64] However, for DPE's Facility, cryogenic technology may not be a feasible option and therefore, installation and/or routing to a control device may be required.[65] How DPE determines to address dioxins and furans may affect how flow streams are routed to the TO. This may impact flow capacities and pose serious process safety considerations.  Ultimately, ensuring compliance with these dioxins and furans standards must be accounted for in the design of a TO.

### ii.    Wastewater Steam Stripper.

The Final Rule requires owners and operators to manage any existing wastewater streams that are in chloroprene service.[66] This provision requires installation of a steam stripper to achieve 99% reduction[67] of chloroprene emissions from wastewater in chloroprene service.[68] Steam stripping is a method of removing VOCs from a wastewater stream where pressure and temperature is used to separate or strip the contaminants from the water.

Currently, DPE already employs an air stripping system—a process that occurs in the air sparging tank and which routes to the onsite RTO.[69] However, as discussed above, the Facility's RTO does not have the capacity to take on additional waste streams, including chloroprene-containing air from a new steam stripper.  Therefore, a new control device will need to be installed in addition to the new steam stripper to properly control the additional steam stripper wastewater streams.[70]  As stated above, based on prior

---

[61] As explained in the Proposed Rule. 88 Fed. Reg. at 25162 (Ex. 4).  The same dioxins and furans requirements were finalized in the Final Rule.

[62] ERG, *Dioxins and Furans MACT Floor in the SOCMI Source Category for Processes Subject to HON and Processes Subject to Group I and Group II Polymers and Resins NESHAPs* (Mar. 2023) ("ERG Dioxins and Furans Memo"), Table 11 (costs based on refrigeration condenser technology that has been applied in the PVC industry) (Ex. 17).

[63] Montrose, *Dioxins and Furans Proposed Rules* (July 6, 2023) ("Montrose Dioxins and Furans Memo") at 2 (Ex. 18).

[64] Montrose Dioxins and Furans Memo at 2 (Ex. 18).

[65] Meyers Extension Request Decl., ¶ 26 (Ex. 11).

[66] For wastewater, "in chloroprene service" is proposed to mean a wastewater stream containing total annual average concentration of chloroprene greater than or equal to 10 ppmw at any flow rate.  Final Rule at 22, 99 (Ex. 1).

[67] EPA "believe[s] the use of 99 percent removal of chloroprene from steam stripping is appropriate…"  Final Rule at 202 (Ex. 1).  DPE, however, remains concerned with the lack of evidence provided that steam stripper efficiency can achieve 99% removal.  *See* ECT2 and Montrose, *ERG Chloroprene Reduction Memo Analysis* (July 6, 2023) ("ECT2 and Montrose Wastewater Memo") at 2-3 (Ex. 19).

[68] *Id.* at 8; *see also* Final Rule at 202 (Ex. 1) (EPA "maintain[s] it was appropriate to assume no controls during [their] initial analysis such that a steam stripper would be placed before the air sparging tank.").

[69] *Id.* at 2.  Also note that the Facility uses an outdoor brine pit to control steam stripper rundown steams which are then routed to the WWTP and subject to biological control that achieves 80% reduction.

[70] *Id.* at 3.

experience with the design and installation of wastewater control equipment at the Facility and evaluation work already completed, DPE expects that the design, approvals, construction, installation, and testing of a TO would take at least two years.[71]

### iii.    Equipment to limit maintenance emissions to 1 tpy.

The Final Rule imposes a 1 tpy cap on maintenance vent emission releases.[72] DPE has made a significant effort to identify and evaluate various options to achieve this requirement, but the complexities of the Facility's processes have hindered the company's evaluation to date.[73] DPE understands that the largest single source of emissions from maintenance activities are from annual steaming of the Facility's 2mmlb Tank (approximately 660 lbs of emissions associated with each annual steam event).

DPE considered the use of a portable condenser and catch tank that would allow vapors from tank steaming maintenance to be routed to an RTO for control but determined that the time requirements render this option infeasible.[74]

DPE also has requested proposals for the use of portable TOs in the maintenance steaming process from several vendors.[75] The proposals, however, failed to consider that scrubbing equipment to remove HCl or heat exchange equipment to combat elevated temperatures, would be required for safe steaming operations and use of the portable TO.[76] DPE cannot limit maintenance vent emissions to 1 tpy without sufficient time to evaluate whether the Facility can develop safe processes. DPE expects evaluation, acquiring of equipment, testing, approvals, and implementation of new maintenance activity processes will take two years or more.

### iv.    Section 112(d) requirements will increase the complexities and planning time needed to implement the Section 112(f) Control Projects.

In addition to the Section 112(f) Control Projects, DPE must also plan for the implementation of 112(d) requirements. DPE's engineers will need to consider the potential impact of the 112(d) projects when planning, designing, and implementing the Section 112(f) Control Projects.[77] For example, the Final Rule requires that flares used in the production of polymers and resins meet the flare requirements in the Refinery Sector Rule ("RSR") (40 CFR 63.670 and 63.671).[78] The need to account for this and other 112(d) requirements further underscores the need for at least 2 years for safe implementation.

### v.    The fenceline monitoring requirements should conform to the revised compliance dates.

The Final Rule sets forth a prescriptive set of fenceline monitoring requirements addressing monitoring, root cause analysis, and corrective actions.[79] For every operator except DPE, these requirements provide two years for operators to comply with the monitoring requirements, and three years to comply with the

---

[71] Meyers Extension Request Decl., ¶ 30 (Ex. 11).

[72] Final Rule at 20-21, 1168-69, 1175-76 (Ex. 1).

[73] Meyers Extension Request Decl., ¶ 31-32 (Ex. 11); DPE Comment at 88-90, Section XV (Ex. 5).

[74] DPE Comment at 88-89 (Ex. 5); Meyers Extension Request Decl., ¶ 33 (Ex. 11).

[75] *Id*; Meyers Extension Request Decl., ¶ 32 (Ex. 11).

[76] *Id.* at 89.

[77] Meyers Extension Request Decl., ¶ 36-37 (Ex. 11).

[78] Final Rule at 868 (Ex. 1).

[79] Final Rule at 1209-1210 (amended 40 C.F.R. 63.502(a)(4), (a)(7))) (modifying amended 63.184) (Ex. 1).

corrective action requirements.[80] However, for DPE, the Final Rule provides only 90 days for compliance with both the monitoring *and* the corrective action requirements.[81]  This Extension Request seeks to extend all 90-day compliance periods in the Final Rule to two years from the effective date.  It would be premature for DPE to perform root cause analyses and corrective actions before DPE has installed the control equipment required by the Final Rule.  Moreover, the trigger for corrective action is based on the annual average "Δc" (the difference between the highest and lowest concentration for each sampling period), which necessarily reflects data from the past 51 weeks.  Unless DPE is provided a three-year compliance period to comply with the corrective action requirements, DPE will be evaluating unrepresentative data that do not reflect post-control conditions and are not useful for meaningfully identifying post-control sources of fugitive emissions.  Accordingly, a compliance period of 2-3 years is needed for the fenceline monitoring requirements.

> **B.     EPA's Own Timing Estimates Demonstrate That A 90-Day Compliance Period Would Be Infeasible at the Facility.**

The Final Rule contains two-year compliance deadlines for similar emission controls for affected EtO sources, as well as EPA's rationale for those deadlines.   These two-year deadlines starkly demonstrate that the Final Rule's 90-day compliance deadline for chloroprene is fundamentally infeasible.  As EPA explains in the Final Rule as to affected EtO sources, "sufficient time is needed to properly engineer the [emissions reduction] project, obtain capital authorization and funding, procure the equipment, obtain permits, and construct and start-up the equipment."[82]   Therefore, EPA determined to "finaliz[e] a compliance date of 2 years after the effective date of the final rule for all existing affected sources to meet the EtO requirements," which are substantially similar, and in many cases identical, to those promulgated for chloroprene.[83]

Further, in the Proposed Rule, EPA deemed it appropriate to provide DPE with an unqualified extension to two full years for compliance.[84]  Before the Proposed Rule was published, the Office of Management and Budget ("OMB") reviewed the Proposed Rule and questioned if the Facility's emissions would constitute an "imminent endangerment."[85]  OMB specifically asked that EPA address "what steps will be taken during the proposed 2-year period to assure that the health of people exposed to [chloroprene] emissions (including children) will receive protection from imminent endangerment[.]"  *Id.*  In response to OMB, and notwithstanding that EPA had already commenced its Section 303 litigation, EPA declined to change the 2-year waiver and made no changes to describe steps to protect from "imminent endangerment."  Instead, EPA responded with the same rationale it uses in the Final Rule to justify a two-year implementation for EtO facilities:

> Significant capital will need to be invested in controls here to further reduce emissions [for] EtO and chloroprene. We are talking about requiring installation of large thermal oxidizers, steam-strippers, etc. at all of the facilities emitting these HAP. This takes significant time [to] engineer, install, and update operating procedures and staff. . . .[86]

---

[80] Final Rule at 1132 (amended 40 C.F.R. 63.481(p)(1)) (Ex. 1).

[81] Final Rule at 1132-33 (amended 40 C.F.R. 63.481(p)(2)) (Ex. 1).

[82] Final Rule at 85 (Ex. 1).

[83] *Id.*

[84] 88 Fed. Reg. at 25178 (Ex. 4).

[85] EPA Passback 1 at 347 (Ex. 20).

[86] *Id.*

EPA's response to OMB simply confirms the reality that the emission reduction projects contemplated by the Final Rule requires at least two years at DPE's Facility.

EPA's position taken in the Section 303 Litigation—and presented to the Court—further confirms EPA's express acknowledgment that a 90-day compliance period for the Final Rule is simply infeasible. In March 2023, EPA filed a motion for preliminary injunction demanding that DPE comply with a series of prescriptive emission controls similar to some of the controls set forth in the Final Rule. To be clear, EPA's estimates dramatically underestimate feasible timelines for its requested relief, most glaringly by ignoring fundamental safety requirements that would endanger personnel and the community.[87] EPA based its timetables on the opinions of an expert who ultimately conceded that he did not account for several critical safety requirements.[88] Even with those inherent flaws and incomplete analyses, however, EPA's estimates in the Section 303 Litigation of the timing needed for emission controls demonstrate the infeasibility of a 90-day compliance period.

For example, in support of EPA's request for injunctive relief in the Section 303 Litigation, EPA's expert estimated that it would take DPE 90 days just to *prepare a plan* to "evaluate and control" chloroprene emissions in the polymer building.[89] For the reasons described above, the complexities involved with controlling emissions from the polymer building will require more than 90 days to plan. But the point is, even by EPA's woefully insufficient 90-day estimate for *just planning*, it is patently obvious that the time needed to *also* approve, construct, install, and test a strategy to capture and control such emissions will take far longer than 90 days, by EPA's expert's own analysis. Similarly, EPA's expert in the Section 303 Litigation fails to account for the complexities needed to plan, construct, and install permanent total enclosures for the Facility's "Poly Kettles,"[90] but still estimates installation would require 150 days.[91] There is simply no basis to square these positions on timing—which EPA represented to the Court as accurate—with the Final Rule's demand that the Facility comply with a 90-day implementation period.

###### C.   A Compliance Period Of 90 Days Would Likely Require A Shutdown Of The Facility And Increase The Complexity And Dangers Of Implementing The Requirements.

The Section 112(f) Control Projects cannot be technically or safely designed, approved, constructed, and tested at the Facility in 90 days. The extensive analyses performed by DPE and its outside experts demonstrate that a timeframe of 90 days is infeasible and potentially unsafe.

As discussed above, based upon prior efforts to implement similar ERPs and DPE's substantial efforts to anticipate and prepare for implementation of the Final Rule requirements, DPE expects that at least two years is required, and possibly longer given the complexities of conducting several ERPs concurrently. A compliance period of 90 days will require a shutdown of the Facility thereby increasing the complexity of completing the requirements of the Final Rule.

Without an extension of the compliance period, DPE will need to immediately shift its attention, time, and resources toward completing a safe and effective shutdown of the Facility for an indefinite period of time.

---

[87] Deposition Transcript of Jeffrey R. Harrington (July 28, 2023) ("Harrington Dep. Tr.") 90:8-10; 91:16-18; 106:8-17, Case No. 2:23-cv-00735 (Ex. 21).

[88] *Id.*

[89] Declaration of Jeffrey R. Harrington In Support of Motion for Preliminary Injunction filed in Case No. 2:23-cv-00735 (E.D. La.) ("Harrington PI Declaration"), ¶ 77, Case No. 2:23-cv-00735 (Ex. 22).

[90] The Facility's large poly kettles are batch process units and are critical to the manufacture of all types of Neoprene.

[91] Harrington PI Decl., ¶ 51 (estimating PTE installation can occur within 120 days after plan approval) (Ex. 22).

Shutdowns and restarts are dangerous[92] and will only complicate the feasibility of implementing the Final Rule. Safety risks increase as personnel are more likely to have to make a "confined space entry" during shutdowns; presence of toxic materials in equipment increases; and the number of maintenance workers (often temporary contractors less familiar with the plant) increases.[93]

The estimated time required to just shutdown the Facility for an extended outage is between 90-150 days, meaning that, unless an extension is granted, DPE personnel need to begin planning and implementing an indefinite shutdown.[94] The effort, time, and diversion of resources required to safely shutdown a plant will negate DPE's ability to even begin to efficiently or effectively implement the ERPs required by the Final Rule. Additionally, DPE will be unable to field test the effectiveness of ERPs in a functional, operational setting if the Facility is shutdown.[95] This would prevent DPE from evaluating effective methods to address potential process safety hazards. Simply put, DPE requires the Facility to be operational to test large-scale ERPs like thermal oxidizers.[96] Even during normal operations, DPE faces process hazard challenges when evaluating ERPs on accelerated timelines—a shutdown would only complicate this further and exacerbate the Facility's shortage in process safety personnel.[97]

Further, significant process safety steps will need to precede any restart of the Facility after a prolonged shutdown. Process safety regulations require a pre-startup safety review before a restart. Because DPE has never idled the Facility for an indefinite period, personnel would need to draft, review, and finalize safety procedures for any restart that followed a prolonged period of non-use.[98] Installing the Section 112(f) Control Projects from an idled state will impact the amount of time necessary to comply with the Final Rule.

> **D.    A multi-year or permanent shutdown of the Facility would result in significant negative impacts to both the Parish and State economies and lower tax revenue.**

DPE is a significant economic force in Louisiana and St. John the Baptist Parish. Based on robust modeling performed by an expert economist, Dr. Loren Scott, the total positive economic impacts on the Louisiana economy for the next 10 years directly related to Facility's operations are: $5.086 billion in sales, $1.719 billion in household earnings, and the creation of an annual average of 2,318 jobs.[99] In addition, Tax revenue for the next 10 years are estimated to total $149.3 million.[100] These positive economic impacts will be eliminated if the Facility is forced to permanently shutdown. Indeed, a permanent shutdown may be likely if the Facility is forced to shutdown until the Section 112(f) Control Projects are implemented. A nearly two-year shutdown would eliminate DPE's only source of revenue, drive employees to secure permanent positions elsewhere, drive suppliers to alternative consumers, and drive customers to substitute products. Likewise, the inter-dependence and shared services between DPE's

---

[92] Remedy Declaration of Jim Moore, P.E. ("Moore Remedy Decl."), ¶¶ 27-30 (noting that 50% of work-related accidents in manufacturing plants occur during plant maintenance shutdowns), Case No. 2:23-cv-00735 (Ex. 23).

[93] *Id.* ¶ 31.

[94] *Id.* ¶ 39.

[95] Casarez Remedy Decl., ¶ 9 (Ex. 9).

[96] Remedy Declaration of Jorge Lavastida ("Lavastida Remedy Decl."), ¶ 28, Case No. 2:23-cv-00735 (Ex. 24); Remedy Declaration of Michelle Helfrich ("Helfrich Remedy Decl."), ¶¶ 36-37, Case No. 2:23-cv-00735 (Ex. 25).

[97] Casarez Remedy Decl., ¶ 22 (Ex.9).

[98] Casarez Remedy Decl., ¶ 32 (Ex. 9); Lavastida Remedy Decl., ¶ 25 (Ex. 24).

[99] Loren C. Scott & Associates, Inc., The Economic Impact of Denka Elastic Polymers on St. John the Baptist Parish & the State of Louisiana (Dec. 2023) ("Scott Report") at 9 (Ex. 26).

[100] *Id.*

Facility and DuPont's co-located diamines plant could threaten the continuing viability of DuPont's operations and its associated workforce.

### Impacts of Denka Plant Operational Spending on the Louisiana Economy: 2023-2032

| Year | Sales* | Earnings* | Jobs | Taxes* |
|------|--------|-----------|------|--------|
| 2023 | $443.7 | $150.0 | 2,147 | $13.4 |
| 2024 | $457.0 | $154.5 | 2,184 | $13.7 |
| 2025 | $470.7 | $159.1 | 2,221 | $14.0 |
| 2026 | $484.9 | $163.9 | 2,259 | $14.4 |
| 2027 | $499.4 | $168.8 | 2,297 | $14.7 |
| 2028 | $514.4 | $173.8 | 2,335 | $15.1 |
| 2029 | $529.8 | $179.1 | 2,374 | $15.4 |
| 2030 | $545.7 | $184.4 | 2,414 | $15.8 |
| 2031 | $562.1 | $190.0 | 2,454 | $16.2 |
| 2032 | $579.0 | $195.7 | 2,494 | $16.6 |
| **Total** | **$5,086.8** | **$1,719.2** | **2,318**\*\* | **$149.3** |

*Values in millions of dollars. \*\*Jobs total represents an average over the 10-year period.

Source: Scott Report at 9.

Even if the Facility is able to avoid a permanent shutdown, a temporary shutdown would come at enormous cost. Absent an extension of the 90-day compliance period, a shutdown of at least two years is a near certainty. Dr. Scott's modeling also analyzed the economic impact of a two-year shutdown based on modeling of calendar years 2024 and 2025.[101] The results show that the State would lose $927.8 million in business sales, $313.6 million in household earnings, 2,203 jobs, and 13.8 million in state tax revenues.[102] These forecasted economic losses are significant and strongly favor granting a two-year extension of the compliance period.

### III.    DPE Has Reduced Emissions Since May 2022 Through Practicable and Effective Emission Reduction Strategies And Will Continue to Implement Such Strategies During the Compliance Period.

DPE has spent considerable time and resources evaluating emission reduction opportunities at the Facility and continues to do so. Between 2016 and 2018, DPE reduced the Facility's emissions by 85%, in large part due to the installation of the Facility's RTO.[103] DPE continued its emission reduction efforts and has implemented a series of additional reduction strategies since May 2022—many of which are voluntary and bolster DPE's compliance with existing requirements to assure that the health of personnel and the community will be protected.

### A.    Implemented Emission Reduction Strategies Since May 2022.

In July 2022, DPE established a formal chloroprene emission reduction task force ("ERP Task Force") made up of more than 20 engineers, managers, and process experts from all across the Facility. The ERP Task

---

[101] *Id.* at 16.

[102] *Id.*

[103] Meyers Extension Request Decl., ¶ 44 (Ex. 11).

Force met multiple times a week and dedicated well over 5,000 man-hours through July 2023, to ongoing efforts to reduce emissions.[104] These efforts include the following:

- DPE has implemented a process to reduce emissions associated with waste from the Facility's poly kettle production units consistent with the requirements of the consent agreement in EPA Docket No. RCRA-06-2023-0906, as well as applying a similar process to waste coagulant generated from the stripper strainers.[105] DPE now steams the coagulant and routes emissions to the RTO. DPE has also improved its washing and nitrogen purging processes to further reduce emissions associated with the poly kettle production units.

- DPE has implemented a voluntary process to reduce the number of concurrently operating unstripped emulsion storage tanks and to strip chloroprene from in-tank coagulant during maintenance of the unstripped emulsion storage tanks.[106] Now only two tanks are used at a time to reduce coagulate formation. The tanks containing coagulate are filled with water and are circulated to strip the remaining chloroprene and route emissions to the RTO.[107]

- The Facility has also employed a voluntary process to strip chloroprene from in-tank coagulant during maintenance of the five poly kettles (emission source 1700-13A).

- DPE has voluntarily decreased the site-wide leak detection and repair threshold from the regulatory standard of 500 ppm organic vapor concentration to 250 ppm.[108] In conjunction with this new 250 ppm threshold hold, an additional voluntary process to screen certain components in the polymerization building located at the Facility and the 1236 waste organics storage tank area multiple times each week and to schedule repairs if leaking components are identified has been rolled out.[109] DPE hired an LDAR technician with over 20 years of experience to lead these voluntary efforts which has included increased weekly screenings, new immediate repair procedures, and the purchase of state-of-the-art detection equipment.[110]

- Further, DPE has supplied operators in the polymers area with photoionization detectors (PIDs) to perform LDAR screenings on any component at any time to detect leaks. Accordingly, prompt repairs are made when leaks are detected.[111]

- DPE voluntarily implemented a process requiring transfers of chloroprene-containing wastes from the chloroprene heels tank to the waste organics tanks in the HCl recovery unit process area be performed only when the 1236 tank system is connected to the MERP control system or other form of emissions control.[112]

---

[104] DPE Comment at 75 (Ex. 5).

[105] DPE Responses to US First Set of Interrogatories, at 12-13 (Response to Interrogatory No. 4), Case No. 2:23-cv-00735 (Ex. 26); Meyers Extension Request Decl., ¶ 45 (Ex. 11).

[106] *Id.*; Meyers Extension Request Decl., ¶ 45 (Ex. 11).

[107] DPE Presentation at Slide 6 (Ex. 10).

[108] DPE Responses to US First Set of Interrogatories, at 12-13 (Response to Interrogatory No. 4) (Ex. 26); Meyers Extension Request Decl., ¶ 45 (Ex. 11).

[109] *Id.*; Meyers Extension Request Decl., ¶ 45 (Ex. 11).

[110] DPE Comment at 76 (Ex. 5).

[111] *Id.*; Meyers Extension Request Decl., ¶ 45 (Ex. 11).

[112] DPE Responses to US First Set of Interrogatories, at 12-13 (Response to Interrogatory No. 4) (Ex. 27); Meyers Extension Request Decl., ¶ 45 (Ex. 11).

- DPE instituted new outdoor brine pit (OBP) management measures which require coagulant from the unstripped emulsion storage tanks and large poly kettles to be placed directly into plastic drums to be sent off-site for incineration. This new process change ensures that solid material is no longer placed in the OBP.[113]

In addition, DPE continues to evaluate additional, voluntary emission reduction projects, such as (i) a potential project to remove chloroprene from the poly kettle strainer waste by circulating water through the strainer and sparging the water and (ii) the potential use of Forward Looking Infrared, or FLIR, cameras to improve leak detection activities.

      **B.**     **DPE's Emission Reduction Strategies Have Resulted in Significant, Quantified Reductions of Chloroprene Concentrations Near the Facility.**

DPE's significant efforts to implement these voluntary emission reduction strategies have resulted in quantified reductions of chloroprene concentrations near the Facility. Analysis of Method 325B and Method TO-15 monitoring data demonstrate that, following these voluntary changes, the Facility has achieved the lowest average chloroprene concentrations to date.[114] The fenceline monitoring results below illustrate the effectiveness of DPE's voluntary emissions reductions:



---

[113] DPE Presentation at Slide 6 (Ex. 10).

[114] Declaration of Mr. David R. Blye ("Blye PI Decl."), ¶ 33, Case No. 2:23-cv-00735 (Ex. 28); *see also* Meyers Extension Request Decl., ¶ 47 (Ex. 11).

### C.    DPE Plans To Continue To Implement Emission Reduction Projects During The Compliance Period.

Because these voluntary measures help to reduce chloroprene emissions, DPE plans to continue utilizing these voluntary reduction strategies throughout the compliance period.  These steps, in conjunction with a compliance timeline of at least two years, will better support DPE's overall efforts to safely design, install, and implement the control equipment and processes necessary under the Final Rule and ensure that emissions from the Facility will not pose a potential imminent endangerment.

### IV.    A Two-Year Compliance Period Will Not Result in "Imminent Endangerment" Near the Facility.

In addition to finding that additional time is necessary for compliance, to grant an extension, there must be a finding that "steps will be taken during the period of the waiver to assure that the health of persons will be protected from imminent endangerment."[115] Because no imminent endangerment exists near the Facility, no additional steps need to be taken during the waiver period.

EPA's inclusion of a two-year compliance period in the Proposed Rule appropriately recognized the lack of an imminent endangerment due to the only facility in the source category.  DPE is aware of no allegations of acute endangerment from the Facility's chloroprene emissions and EPA has admitted it is not aware of <u>any</u> incidents of cancer due to the Facility's emissions.[116]

EPA has alleged in the Section 303 Litigation that an "imminent and substantial endangerment" exists, but this allegation is based on a conservative and deeply flawed theoretical risk of cancer.  Specifically, EPA alleges that the 1-in-10,000 risk level associated with the inhalation unit risk ("IUR") derived in the 2010 *Toxicological Review of Chloroprene* ("2010 IUR") — which translates to a chloroprene concentration of 0.2 $\mu g/m^3$ — constitutes an imminent and substantial endangerment.  With no explanation or analysis whatsoever, the Final Rule points to EPA's allegations in the Section 303 Litigation as the sole basis for imposing a 90-day compliance period on DPE for the Section 112(f) Control Projects:

> In a change from the proposed rule, the EPA is shortening the compliance deadline for affected sources producing neoprene, due to the EPA's finding that chloroprene emissions from the only such source pose an imminent and substantial endangerment under CAA section 303, <u>42 U.S.C. § 7603</u>. *United States v. Denka Performance Elastomer, LLC, et al.*, No. 2:23-cv-00735 (E.D. La. filed Feb. 28, 2023).[117]

Even if EPA's view of the applicable science underlying the 2010 IUR were accepted as true (a point DPE strenuously disputes), the risk levels near the Facility fall far short of an "imminent endangerment" for purposes of Section 112(f)(4)(B). The entire statutory framework of Section 112 refutes any notion that risks above a 1-in-10,000 threshold constitute an "imminent endangerment." If they did, Congress would not have given EPA 18 years to complete residual risk reviews, which specifically use the 1-in-10,000 threshold as a presumptive benchmark for acceptability.  Interpreting risks above a 1-in-10,000 threshold to compel a 90-day compliance period is simply incompatible with Congress's decision to tolerate such risks for 18 years.

---

[115] <u>42 U.S.C. § 7412(f)(4)(B)</u>.

[116] EPA Responses to DPE First Set of Interrogatories, at 27-28 (Response to Interrogatory No. 12), Case No. 2:23-cv-00735 (Ex. 29).

[117] Final Rule at 85 (Ex. 1).

EPA has *always* recognized that theoretical, pre-compliance risks described in residual risk reviews do not constitute an "imminent endangerment" that prevents EPA from granting extensions.[118] In fact, EPA has consistently issued final rules that expressly allow for a post-compliance risk level greater than 1-in-10,000.  In the very first residual risk review imposing requirements under Section 112(f), EPA provided facilities a two-year compliance period despite finding pre-control MIRs as high as 4-in-10,000.[119] Likewise, recent Section 112 rulemakings propose to provide compliance extensions to facilities with MIRs equal to or greater than DPE, including to *twelve facilities* in EPA's April 2024 rule for Sterilization Facilities.[120]

Moreover, the lack of an endangerment becomes even more evident after accounting for data as to real-world risk and the severe distortions of risk inherent in the 2010 IUR.  The available epidemiological evidence, which examines health outcomes of workers exposed to chloroprene emissions at dramatically higher rates than the Facility emits today, shows that the Facility's chloroprene emissions have not and do not pose an increased risk of respiratory or liver cancer (the types of cancer that, according to EPA, are most associated with exposure to chloroprene).  In addition, data from the Louisiana Tumor Registry ("LTR") consistently show no increase in cancer incidence rates in the community surrounding the Facility.

Instead, EPA's risk estimates for the Facility are based entirely on the 2010 IUR for chloroprene.  The 2010 IUR is a flawed risk estimate that adopts a series of patently unrealistic and unsubstantiated assumptions that overstate the actual risk of chloroprene exposure to humans.  Most notably, the 2010 IUR relies on cancer incidence data from female B6C3F1 mice and fails to make scientifically-supported adjustments to account for the dramatic differences between humans and female B6C3F1 mice.  Despite the availability of a sophisticated, peer-review physiologically-based pharmacokinetic ("PBPK") computer model capable of accounting for these important inter-species differences, EPA continues to rely on an outdated and distorted risk estimate.

Neither the underlying science nor EPA's deeply flawed 2010 IUR supports a finding of "imminent endangerment" within the meaning of Section 112(f)(4)(B).  Accordingly, no additional steps need to be taken by DPE during the compliance period beyond the emission control strategies already being implemented by DPE at the Facility.

> **A.     Even if the Flawed IUR Is Accepted, Chloroprene Concentration Levels Near the Facility Do Not Constitute an Imminent Endangerment.**

In the Final Rule, based entirely on a bare citation to the existence of the Section 303 Litigation, EPA takes the position that an "imminent endangerment" exists near the Facility because chloroprene emissions are allegedly causing a lifetime cancer risk of greater than 1-in-10,000.[121]  While EPA has alleged risk levels as high as 14-in-10,000 in the Section 303 Litigation, those allegations are based on outdated monitoring

---

[118] EPA Responses to DPE Second Set of Interrogatories, at 17 (Response to Interrogatory No. 17), Case No. 2:23-cv-00735 (Ex. 30).

[119] EPA, *National Perchloroethylene Air Emission Standards for Dry Cleaning Facilities*, 71 Fed. Reg. 42724, 42731 (July 27, 2006) (estimating baseline MIRs between 50- and 400-in-1-million) (Ex. 31); *id.* at 42729-30 (providing 2-year compliance period).

[120] 89 Fed. Reg. 24090 (Apr. 5, 2024) (Ex. 14); EPA, *Residual Risk Assessment for the Commercial Sterilization Facilities Source Category in Support of the 2024 Risk and Technology Review Final Rule* (Jan. 2024) (Table 2a-1) (Ex. 32).

[121] Final Rule at 85 (Ex. 1); *see also* Compl., ¶ 60-66, *U.S. v. Denka Performance Elastomer LLC et al.*, No. 2:23-cv-00735, ECF No. 1 (E.D. La. Feb. 28, 2023) (Ex. 33).

data.[122]   As of January 15, 2024, the highest alleged concentration measured over the prior 12-months equated to a 6.85-in-10,000 risk level, as determined by EPA's expert in the Section 303 Litigation.[123]

The lifetime risk level associated with chloroprene emissions from the Facility does not constitute an imminent endangerment, including under Section 112(f)(4)(B).

> **i.     In Section 112 of the CAA, Congress made clear that the risk levels above 1-in-10,000 do not constitute an imminent endangerment by mandating that such risks be addressed through an _18-year_ regulatory process.**

In Section 112 of the CAA, Congress created a comprehensive program to address cancer risks due to emissions of hazardous air pollutants ("HAPs") from industrial facilities.  In Section 112, Congress imposed deadlines by which EPA was required to take several steps.

- Within one year after the statute was signed into law in 1990, EPA was to identify "source categories"—different types of industrial facilities—that included "major sources" of such pollutants.[124]

- Within ten years (by 2000), EPA was to conduct rulemakings to set technology-based standards to reduce HAP emissions from each source category.[125]

- Within eight years of setting those standards, EPA was to conduct another rulemaking to complete a "residual risk review"—_i.e._, to evaluate the "risk to public health remaining" after the implementation of the technology-based standards.  As part of this rulemaking, EPA was _for the first time_ required to consider whether more stringent standards were needed to address lifetime cancer risks higher than 1-in-10,000.[126]

This means that Congress knew that people were then exposed to lifetime cancer risks higher than 1-in-10,000 due to HAPs, yet Congress determined that it was acceptable to allow such exposure _for up to 18 years_.  Indeed, as shown in the following table, Congress was specifically briefed prior to passing the 1990 CAA amendments on sources with MIRs higher than 10-in-10,000 ($1 \times 10^{-3}$), including some sources with MIRs as high as 100-in-10,000 ($1 \times 10^{-2}$), or more than _16 times higher_ than the alleged MIR associated with the entire Facility in the Final Rule.[127]

---

[122] _Id._ ¶ 48.

[123] _See_ Supplement to September 6, 2023 Rebuttal Declaration and December 8, 2023 Declaration of Dr. John J. Vandenberg in Support of United States' Statement of Final Relief ("Vandenberg Supp. Decl."), Updated Table 1, Case No. 2:23-cv-00735 (Ex. 34).

[124] 42 U.S.C. § 7412(c)(1).

[125] _Id._ § 7412(d)(2).

[126] _Id._ § 7412(f)(2).

[127] Report on the Committee on Environment and Public Works United States Senate Report Accompanying S. 1894, at 9907 (S. Rept. 100-231) (Nov. 20, 1987) (Ex. 35).

| ESTIMATED CANCER RISKS REMAINING UNDER EPA § 112 STANDARDS | | |
|---|---|---|
| POLLUTANT | ANNUAL CANCER INCIDENCE FROM BOTH REGULATED AND UNREGULATED SOURCES | SOURCES POSING MIRs OF $10^{-3}$ OR HIGHER |
| Inorganic Arsenic | 1.7 | Uncontrolled Primary Copper Smelters ($1\times10^{-3}$) |
| | | Primary Lead Smelters ($2\times10^{-3}$) |
| | | Zinc Oxide Plants ($1\times10^{-3}$) |
| Asbestos | 0.7-1.2 | None |
| Benzene | 2.8 | Benzene Handling ($1\times10^{-3}$) |
| Coke Oven Emissions | 4.0 | Wet-Coal Charged By-Product Coke Oven Batteries ($1\times10^{-2}$) |
| Radionuclides | 2.0-2.8 | Underground Uranium Mines (>$1\times10^{-3}$) |
| | | Open-Pit Uranium Mines ($1\times10^{-3}$) |
| | | Elemental Phosphorous Plants ($1\times10^{-3}$) |
| Vinyl Chloride | 0.8 | No estimate |
| TOTALS | 12-13 | 8 sources ≥ $10^{-3}$ |

Notably, EPA attributed to each of the source categories an annual cancer incidence at least 10-times higher than the pre-compliance cancer incidence estimated for DPE's Facility in the Final Rule. Despite these much higher risk estimates, Congress provided *years* to address these risks. Thus, the allegation that emissions from DPE's Facility now pose an "imminent endangerment" directly contradicts Congress' mandate under Section 112 that higher risks be addressed over many years.

ii.  **The Benzene Rule addressed risk levels up to 10-times higher than the risk level EPA alleges in the Final Rule, yet EPA did not allege the facilities responsible for such risks were causing an imminent endangerment.**

It is inappropriate to use the 1-in-10,000 risk level as the threshold for an "imminent endangerment" because it flatly contradicts the purpose of the 1-in-10,000 risk benchmark in Section 112. Section 112(f)(2)(B) expressly endorsed EPA's use of the 1-in-10,000 risk level in 1989 rulemaking—known as the "Benzene Rule"—to guide what constitutes an "acceptable risk" under Section 112.[128] In doing so, "Congress rejected the Senate version of the bill—which mandated a bright line standard for

---

[128] *Compare* DPE Statement of Material Facts in Support of Motion for Summary Judgment ("DPE MSJ SOF"), *U.S. v. Denka Performance Elastomer LLC*, No. 2:23-cv-00735 (E.D. La. Dec. 29, 2023) ECF No. 131-3, ¶ 9 (Ex. 36) *with* US Statement of Material Facts in Opposition of Motion for Summary Judgment ("US Contested SOF"), *U.S. v. Denka Performance Elastomer LLC*, No. 2:23-cv-00735 (E.D. La. Jan. 26, 2024) ECF No. 150-1, ¶ 9 (Ex. 37); EPA, *National Emission Standards for Hazardous Air Pollutants; Stationary Combustion Turbines Residual Risk and Technology Review*, 54 Fed. Reg. 38044, 38045 (Sept. 14, 1989) (Ex. 38).

carcinogens—in favor of the House version, which gave the Secretary more discretion under the 'ample margin of safety' standard."[129]

EPA admitted in the Section 303 Litigation that the Benzene Rule is "the primary model for establishing emission standards" under Section 112 and that "[t]he approach developed in [the Benzene] rule was endorsed by Congress in the CAA's 1990 Amendments."[130]  The Benzene Rule, which is the Congressionally endorsed "primary model for establishing emission standards," demonstrates that the risk levels attributed to the Facility in the Final Rule, which are dwarfed by the risk levels addressed in the Benzene Rule, do not constitute an imminent endangerment.

In the Benzene Rule, EPA stated that it would "generally presume that if the risk to [the maximum exposed] individual is no higher than approximately 1 in 10 thousand, that risk level is considered acceptable."[131]  As made clear in the Benzene Rule, this "presumptive" risk level of 1-in-10,000 is the *beginning* of EPA's framework for rulemaking, which includes significant safeguards to prevent reflexive reliance on a bare number.  EPA set out a flexible process, requiring consideration of a range of factors, including scientific uncertainties and weight of evidence.[132]  EPA explained that the 1-in-10,000 risk level "does not necessarily reflect the true risk, but displays a conservative risk level which is an upper-bound that is unlikely to be exceeded."[133]

The proposed Benzene Rule was published in July 1988 to establish emission standards for five categories of facilities, known as "source categories."[134]  Of those five source categories, EPA determined that the "coke by-product recovery plant" category posed the highest risk, estimating a risk level of 60-in-10,000 (or $6 \times 10^{-3}$), or 60 times higher than 1-in-10,000 risk level.[135]  That risk level is also 10 times higher than the risk EPA attributes to the Facility in the Final Rule (6-in-10,000)[136]; more than 8 times higher than the highest risk level EPA attributes to the Facility in the most recent 12-month analyzed in the Section 303 Litigation (6.85-in-10,000)[137]; and more than four times higher even than the highest risk level EPA attributed to the Facility in the Section 303 Litigation based on outdated data (14-in-10,000).[138]

Despite being far higher than any risk level alleged for the DPE Facility, EPA did not assert that coke by-product recovery plants were causing an imminent endangerment in the Benzene Rule, nor did EPA declare such plants were causing an "imminent and substantial endangerment" under Section 303 prior to implementation of the final rule.  In the Final Benzene Rule, EPA again did not make an "imminent

---

[129] *NRDC, et al., v. EPA*, 529 F.3d 1077, 1081 n.4 (D.C. Cir. 2008).

[130] *Compare* DPE MSJ SOF, ¶ 9 (Ex. 36), *with* US Contested SOF, ¶ 9 (Ex. 37); EPA Response to DPE Interrogatory No. 6 (Ex. 39).

[131] 54 Fed. Reg. at 38045 (Ex. 38).

[132] *Id.*

[133] *Id.*

[134] *See* EPA, *National Emission Standards for Hazardous Air Pollutants; Benzene Emissions from Maleic Anhydride Plants, Ethylbenzene/Styrene Plants, Benzene Storage Vessels, Benzene Equipment Leaks, and Coke By-Product Recovery Plants*, 53 Fed. Reg. 28496 (July 28, 1988) (Ex. 40).

[135] *Id.* at 28498.

[136] Final Rule at 109 (Ex. 1) (Table 5 shows a Facility-wide "maximum individual cancer risk" of 600-in-1 million, or 6-in-10,000 for the Neoprene Source Category).

[137] Vandenberg Supp. Decl., Updated Table 1 (Ex. 34).

[138] Declaration of Dr. John J. Vandenberg in Support of Motion for Preliminary Injunction ("Vandenberg PI Decl."), ¶ 60 ("The estimated lifetime cancer risks from chloroprene concentrations detected in the air at the Active monitoring sites range from 2 to 14 per 10,000 people. . . ."), Case No. 2:23-cv-00735 (Ex. 41).

endangerment" finding even though EPA *increased* the risk estimate for coke by-product recovery plants to 70-in-10,000.[139]

In addition to addressing substantially higher risk levels than EPA alleges for the DPE Facility, in the Benzene Rule, EPA also estimated that far more people were exposed to pre-compliance risks greater than 1-in-10,000. In the Final Rule for chloroprene, EPA estimates that 2,300 individuals near DPE's Facility could be exposed to greater than a 1-in-10,000 risk from chloroprene based on the *maximum* individual risk estimate.[140] In the Benzene Rule proposal, EPA estimated that 100,000 people were exposed to risks greater than 1-in-10,000 from coke by-product recovery plants.[141] If a 1-in-10,000 risk level constitutes an imminent endangerment, then surely EPA would have made such a finding when such risk levels existed for 100,000 people in the rule that serves as EPA's "primary model" for regulation of HAPs like chloroprene.

> iii.    **Congress expressly deferred any abatement of risk from coke oven facilities for years despite estimating maximum risk levels more than 56-times higher than the risk EPA estimates for the Facility and 340-times higher than the 1-in-10,000 risk level.**

In September 1984, EPA listed coke oven emissions as a HAP under Section 112(b)(1)(A) of the CAA.[142] The EPA Carcinogen Assessment Group established that the unit risk estimate for coke oven emissions was $6.2 \times 10^{-4}$ per $\mu g/m^3$ for 70-years of continuous exposure ("coke oven IUR").[143] Based on the entire set of health studies, the Administrator concluded that coke oven emissions presented a significant risk of cancer to the public.[144] In 1987, EPA proposed standards for coke ovens pursuant to Section 112 of the CAA Amendments of 1970.[145] In that rulemaking, EPA determined that "[f]or 38 of the 43 plants, the [maximum lifetime risk] is more than 1 chance in 1,000 ($1 \times 10^{-3}$), while the highest [maximum lifetime risk] is 3.4 chances in 100 or *340-in-10,000* ($3.4 \times 10^{-2}$)."[146] This estimate is 56-times higher than the estimated MIR for DPE's Facility (including risk from non-chloroprene sources) in the Final Rule, which is 6-in-10,000.

Despite EPA's estimate that the levels of coke oven emissions in 1987 caused an average of 6.9 deaths from respiratory cancer per year[147] and that the highest risk to the most exposed individual was 340-in-10,000, EPA permitted the facilities to continue operation. Further, EPA chose not to propose controls that "could potentially shut down much of the domestic coke-making capacity."[148] Instead, EPA proposed controls that would only reduce the maximum lifetime risk from 340-in-10,000 to 120-in-10,000, a number

---

[139] *See* 54 Fed. Reg. at 38051 ("There are now 36 coke by-product recovery plants . . . . The revised baseline estimates of health risk indicate an MIR of $7 \times 10^{-3}$ and an annual cancer incidence of 1 case every 6 months (2 cases/year).") (Ex. 38).

[140] Final Rule at 109 (Ex. 1) (Table 5 showing the estimated population at increased risk of cancer greater than 1-in-10,000 to be 2,300).

[141] 53 Fed. Reg. at 28498 (Table I-1 listing estimated population subject to "baseline" risk of $1 \times 10^{-4}$ before compliance with rule) (Ex. 40).

[142] *See* 49 Fed. Reg. 36560 (Sept. 19, 1984) (Ex. 42).

[143] EPA, *Carcinogen Assessment of Coke Oven Emissions* at 5 (Feb. 1984) (Ex. 43).

[144] 52 Fed. Reg. 13586, 13587 (Apr. 23, 1987) (Ex. 44).

[145] *Id.*

[146] 52 Fed. Reg. at 13589 (Ex. 44).

[147] This figure does not include any carcinogenic effects of occupational exposures.

[148] 52 Fed. Reg. at 13594 (Ex. 44).

that is still 20-times higher than EPA's MIR for DPE's Facility.[149] EPA never finalized its regulation of coke oven emissions due to the decision in *NRDC v. EPA*, 824 F.2d 1146 (D.C. Cir. 1987) ("*Vinyl Chloride* case"), which ruled that EPA was improperly applying the "ample margin of safety" language in Section 112 at the time.[150]

In the 1990 CAA Amendments, which remain effective today, Congress expressly provided *additional* time for coke ovens to comply with Section 112 requirements despite EPA having previously estimated that coke ovens pose a 340-in-10,000 risk level.  A House of Representatives debate on the 1990 Amendments provided the following explanation for a compliance extension:

> Due to the enormous capital investment that will be required over the next decade of the American steel industry in order to clean it up and make it more efficient, the conferees felt it appropriate to extend the deadline for compliance with the residual risk standard for those coke ovens that would comply with a more stringent regulatory regimen in the earlier years.[151]

The result of the 1990 CAA Amendments was that the timetables for compliance with regulations for coke ovens are far longer than those for other industrial sectors.  For example, under the normal Section 112 deadlines, the compliance date to comply with MACT standards would have been January 1, 1996, but coke oven facilities were given two additional years (until January 1, 1998) to comply with the MACT standards. In the MACT rule, EPA specifically noted that numerous commenters cited cancer risk estimates ranging from 1-in-55 to 1-in-300 over 70 years, meaning that risks had actually *increased* for some facilities since Congress passed the 1990 Amendments.  In response, EPA stated:

> The proposed emission limits were developed under the 1990 Amendments to the Act and are based on available emission control technology and the performance levels that are achievable by the technology. The Act specifically defers immediate implementation of residual risk standards. Estimates of risk to the surrounding community simply do not play a role in the development of MACT standards. (See sections 112(d)(8) (a) and (c).) However, the EPA is required under the Act to develop residual risk standards within the next 8 years. Provisions within the Act will allow certain batteries to defer meeting this risk standard until the year 2020. To defer the risk standard, these batteries must meet the more stringent LAER emission limits.[152]

The importance of this history here could not be clearer: chloroprene emissions from DPE's Facility cannot be causing an imminent endangerment if both Congress and EPA expressly allowed for coke oven facilities to continue operating for years with much higher risk estimates.

---

[149] *Id.*

[150] In the *Vinyl Chloride* case, the U.S. Court of Appeals for the D.C. Circuit ruled en banc that this means that EPA must: (a) determine a safe emissions level, and (b) promulgate an emissions standard at a level which protects the public health with an ample margin of safety—*i.e.*, the promulgated standard may not be less stringent than the safe emissions level determined in (a). Cost and feasibility issues may be considered with regard to the latter, but not the former step.  The first NESHAP to be promulgated under the *Vinyl Chloride* ruling would be that for benzene; next was coke oven emissions.

[151] H. Res. 535 (Oct. 26, 1990) (Ex. 45).

[152] 58 Fed. Reg. 57898, 57907 (Oct. 27, 1993) (Ex. 46).

iv.    **EPA's long-standing, as well as recent, acceptance of risk levels greater than 1-in-10,000 and 6-in-10,000 shows that such levels of risk are not permissible thresholds for alleging an imminent endangerment.**

Finding that the Facility's emissions constitute an imminent endangerment would be unprecedented and contradict more than 30 years of EPA's treatment of risk under Section 112. When EPA has identified a risk level greater than 1-in-10,000 in past rulemakings, EPA has *never* found an imminent endangerment or otherwise limited emissions from the regulated facilities while the rule is being implemented. In fact, EPA has issued final rules that expressly allow for lifetime cancer risks *greater* than 1-in-10,000.[153] For example, in the final rule implementing the Section 112(f) residual risk review for coke ovens, EPA accepted a post-control MIR of 2.7-in-10,000 and a post-control cancer incidence of 0.06.[154] A 0.06 annual cancer incidence is the same incidence that EPA estimates for DPE's Facility in the Final Rule *prior to controls being installed*.[155] In other words, a 90-day compliance period means that EPA believes a 0.06 cancer incidence rate results in an "imminent endangerment" for DPE's Facility during a 21-month period, but is perfectly acceptable for coke oven facilities *indefinitely*.[156]

Likewise, in recent rulemakings, EPA has consistently extended compliance periods for facilities with estimated MIRs equal to or far greater than DPE's Facility, for facilities with higher estimated cancer incidences, and for facilities for which a greater number of people were exposed to an estimated risk above 1-in-10,000. In the Section 112 rulemaking for commercial sterilization facilities, EPA provides unqualified compliance periods of 2-years to all facilities, including 12 facilities with MIRs equal to or greater than DPE.[157] EPA has not released the final risk assessment in support of the Final Rule, but the Final Rule provides unqualified compliance period of 2-years to all facilities other than DPE, including four facilities for which EPA estimated MIRs that were equal to or greater than DPE at the time of the Proposed Rule.[158] Similarly, EPA provided unqualified extensions for numerous facilities in the Miscellaneous Organic Chemical Manufacturing source category with MIRs equal to or greater than the MIR attributed to DPE in the Final Rule.[159] In total, EPA has provided unqualified extensions to 20 facilities with MIRs higher than DPE in the past four years.

---

[153] *See* EPA, *National Emission Standards for Coke Oven Batteries*, 70 Fed. Reg. 19992, 19994 (Apr. 15, 2005) (NESHAP for Coke Oven Batteries setting lifetime cancer risk from exposure to coke oven emissions at 2.7-in-10,000) (Ex. 47); 72 Fed. Reg. 25138, 25143 (May 3, 2007) (NESHAP for Halogenated Solvent Cleaning settings risk level of 2-in-10,000) (Ex. 48).

[154] 70 Fed. Reg. at 19993-94 (Ex. 47).

[155] Final Rule at 109 (Table 5) (Ex. 1).

[156] As for chloroprene, EPA determined that children are more sensitive than adults to the carcinogenic effects of coke oven emissions.

[157] 89 Fed. Reg. 24090 (Apr. 5, 2024) (Ex. 14); EPA, *Residual Risk Assessment for the Commercial Sterilization Facilities Source Category in Support of the 2024 Risk and Technology Review Final Rule* (Jan. 2024) (Table 2a-1) (Ex. 32).

[158] EPA, *Residual Risk Assessment for the SOCMI Source Category in Support of the 2023 Risk and Technology Review Proposed Rule* (Table 2) (Ex. 49).

[159] 85 Fed. Reg. 49084 (Aug. 12, 2020) (Ex. 50); EPA, *Residual Risk Assessment for the Miscellaneous Organic Chemical Manufacturing Source Category in Support of the 2020 Risk and Technology Review Final Rule* (Table 21) (Ex. 51).



EPA also estimates that there are 15 U.S. census tracts where EtO poses a higher cancer risk than chloroprene poses.[160] The Final Rule imposes additional emission controls on EtO facilities, but such facilities will operate for at least 24 months at existing emission levels. As with chloroprene, EPA has also concluded that EtO operates through a "mutagenic mode of action," meaning that the alleged risks to children are higher in those 15 tracts than in the tract in which the Facility is located. In four of those tracts the risk is more than twice as high as that attributed to the Facility.[161] Thus, any potential impacts to children would arise even faster in census tracts in which these EtO facilities are located. Yet EPA has not imposed a 90-day compliance deadline on EtO facilities in any of the 15 tracts, nor has EPA taken any action under Section 303 to allege an imminent and substantial endangerment in these tracts.[162] This dramatic inconsistency underscores the fundamental flaws in EPA's position on chloroprene.

---

[160] *See* EPA, *2019 AirToxScreen: Assessment Results* (last updated Dec. 27, 2023) (providing access to pollutant-specific data in spreadsheet entitled 2019 AirToxScreen National Cancer Risk by Pollutant) (identifying fifteen U.S. census tracts where ethylene oxide poses a higher cancer risk than chloroprene poses at the Facility) (Ex. 52).

[161] *Id.* (identifying Tracts 72123953100, 13217100300, 48141010337, and 48141010338 as having risk from ethylene oxide emissions more than twice the chloroprene risk in the Facility's tract).

[162] 89 Fed. Reg. 24090 (Apr. 5, 2024) (Ex. 14).

**B.      EPA's Allegation Of Imminent Endangerment Is Refuted By The Available Real-World Data Showing No Cancer Risk Of Chloroprene To Humans Near the Facility.**

The available real-world evidence shows that chloroprene emissions from the Facility have not and do not pose an increased risk of respiratory or liver cancer (the cancers that, according to EPA, are associated with exposure to chloroprene).  The rulemaking record contains no evidence of a single case of cancer attributable to chloroprene emissions from the Facility, let alone any evidence that cancer rates in the vicinity of the Facility have actually increased due to the Facility's chloroprene emissions.  Likewise, EPA admitted in the Section 303 Litigation that it has no such evidence.[163]  Further, the lack of an association between chloroprene and cancer is corroborated by tumor incidence data collected by the Louisiana Tumor Registry.  This complete lack of evidence is meaningful given the decades of operation of the Facility, under prior ownership, when chloroprene emissions were orders of magnitude higher than they are today.[164]  If chloroprene posed the risk of respiratory and liver cancer alleged by EPA, then one would expect some signal of such cancers in the neighboring community after many decades of substantially higher chloroprene emission levels.[165]  There is no such signal.  This is consistent with the strongest epidemiological study of workers historically exposed to substantially greater levels of chloroprene, which found no linkage between chloroprene and lung and liver cancer.

**i.      The epidemiological evidence supports the conclusion that chloroprene exposure at human-relevant levels does not cause respiratory or liver cancers, and thus poses no risk in the vicinity of the Facility.**

The "strongest studies" on the human carcinogenicity of chloroprene is the 2007 Marsh *et al.* study published in two parts (Marsh *et al.* 2007a and Marsh *et al.* 2007b, collectively "the 2007 Marsh Study"), which is "the only [study] of adequate quality to validly address epidemiologically the cancer risks associated with human exposure to chloroprene."[166]  Dr. Helen Suh, EPA's epidemiology expert in the Section 303 Litigation, testified that the epidemiological study conducted by Dr. Gary Marsh of chloroprene workers "was the most comprehensive study," was "head and shoulders above" the other chloroprene studies, and "had the most detailed and precise measure of chloroprene exposures."[167]  The 2007 Marsh Study, which represented 74% of the total person-years studied across all studies, as well as 88% of all lung cancer deaths and 49% of all liver cancer deaths, received scores of "H" (high-quality) or "H-M" (high to medium quality) in all quality review categories.[168]

Marsh *et al.* (2007) studied the impacts of chloroprene on a large cohort of U.S. and European chloroprene workers—individuals who for multiple decades were subjected to chloroprene concentrations estimated

---

[163] *See* EPA Responses to DPE First Set of Interrogatories, at 28 (Response to Interrogatory No. 12) (EPA "not currently aware of specific incidents of cancer that have been attributed by a medical professional or individual with other relevant scientific expertise to exposure to Denka's chloroprene emissions.") (Ex. 29); *see also* Deposition Transcript of Dr. Helen Suh ("Suh Dep. Tr.") 230:7-18 (EPA epidemiology expert not aware of any cancer incidence specifically attributable to chloroprene due to Facility emissions), Case No. 2:23-cv-00735 (Ex. 53).

[164] Declaration of Kenneth A. Mundt, PhD, FACE ("Mundt Decl."), ¶¶ 47-49 (including graph from 10/12/2022 Letter from EPA to LDEQ at 28 showing 500 tons of chloroprene emissions in 1985), Case No. 2:23-cv-00735 (Ex. 54); Meyers Extension Request Decl., ¶ 44 (Ex. 11).

[165] Mundt Decl., ¶¶ 44-45, 47-49 (Ex. 54).

[166] *Id.* ¶ 25 (quoting Sax, Sonja N. *et al.*, "Extended Analysis and Evidence Integration of Chloroprene as a Human Carcinogen," *Risk Analysis* 40(2): 294-318 (2020) ("Sax *et al.* (2020)") (Ex. 55)).

[167] Suh Dep. Tr. 87:12-15, 83:3-13, 84:15-18 (Ex. 53).

[168] Mundt Decl., ¶ 26 (Ex. 54).

to be hundreds of times higher than those of residents living in the vicinity of the Facility today.[169]  Overall, the 2007 Marsh Study did not provide evidence of elevated respiratory or liver cancer mortality risks among the cohort of chloroprene-exposed workers.[170]  For the chloroprene worker subcohorts defined by the specific plants in the 2007 Marsh Study, all of the standardized mortality rates ("SMRs", the ratio of the number of observed deaths to the number of expected deaths) based on local reference rates were below 1.0, providing no indication of any excess occurrence of cancers among the chloroprene-exposed workers compared with local background rates.[171]  In sum, the chloroprene-exposed workers in the 2007 Marsh Study had only about 90% of the expected all-cause mortality rate, relative to the background rates in the local (or state or national) population.  This evidence, and especially the results specific to respiratory and liver cancers demonstrating no excesses occurrence of these cancers, does not demonstrate—or even suggest—an association between occupational chloroprene exposure and increased risk of human respiratory or liver cancers.[172]

The Louisville plant chloroprene workers included in the 2007 Marsh Study represent the largest single-site ever studied epidemiologically for chloroprene exposure and had the largest number of reported respiratory cancer deaths—more than all other epidemiological chloroprene studies combined, regardless of study quality.[173]  This group also was among the most highly exposed to chloroprene.[174]  Nevertheless, no clear evidence of excess occurrence of these cancers or any relationship with exposure category is seen.  Regardless of the referent group or exposure metric used, the 2007 Marsh Study of the Louisville workers most highly exposed to chloroprene demonstrated no clear or consistent exposure-response relationship between estimated i) duration of exposure, ii) exposure intensity, and iii) cumulative exposure to chloroprene, and increased risk of respiratory or liver cancers.[175]  The lack of exposure-response (*i.e.*, increasing risks with increasing exposures) is real-world evidence that refutes EPA's allegation that chloroprene causes these cancers, as demonstrating increasing risk with increasing exposure is a central tenet in assessing causality.[176]

The chart below[177] plots the relative risk estimates and their 95% confidence intervals (indicated by vertical lines) based on (i) regional referent rates (shown in orange); (ii) an internal referent group (shown in blue); and (iii) on analyses using mortality rates from a corporate mortality registry (shown in green):

---

[169] *Id.* ¶¶ 39, 42-43.

[170] *Id.* ¶ 28.

[171] *Id.* ¶¶ 28, 36, 41; Sax *et al.* (2020).

[172] *Id.* ¶¶ 28, 36, 41; Sax *et al.* (2020).

[173] *Id.* ¶ 36.

[174] *Id.*

[175] *Id.* ¶ 35.

[176] *Id.*

[177] *Id.* ¶ 36.



While there are small differences based on the referent rates used, all the results lie close to the null value of 1.0 (*i.e.*, the horizontal line) representing "no association"—meaning there is a clear lack of any exposure-response relationship.[178]   Eleven out of twelve estimates indicate no statistically significant increase in the relative risk estimate.[179]

In general, where exposure increases the risk of a specific cancer, SMRs and RRs tend to increase with increasing exposure and an exposure-response will be seen.[180]   In contrast, the above chart shows that the subset of workers with the very highest cumulative exposures—shown on the far right of the chart— all fall *below* the null value of 1.0 representing *no association* between chloroprene exposure and cancer.[181]   The chart above illustrates what one typically observes where the exposure (especially when ranging over three orders of magnitude) fails to move the risk needle.[182]

---

[178] *Id.* ¶ 37.

[179] *Id.*

[180] *Id.*

[181] *Id.*

[182] *Id.*; *see also* Mundt, K.A. *et al.*, "Quantitative estimated exposure to vinyl chloride and risk of angiosarcoma of the liver and hepatocellular cancer in the US industry-wide vinyl chloride cohort: mortality update through 2013," *Occupational and Environmental Medicine*, 74(10): 709-16 (2017) ("Mundt *et al.* (2017)") (study of the North American Vinyl Chloride Workers presents clear demonstration of both excess liver cancer among workers and strong exposure-response relationships) (Ex. 56).

In 2021, Dr. Marsh updated the 2007 study, examining 17 additional years of data (through 2017) on the same cohort of U.S. chloroprene workers as well from the 2007 study.[183]  Again, Dr. Marsh found no increase in cancer mortalities among U.S. chloroprene workers, a population exposed to far higher concentrations of chloroprene than the communities surrounding the Facility today.[184]  As depicted in the table below, the updated study of chloroprene workers continued to demonstrate no excess occurrence of either respiratory or liver cancers at the Louisville Plant—the largest plant with the highest chloroprene exposures.[185]  The table shows that most SMRs are lower than 1.0 and that, for the two that are greater than 1.0, the lower bound of the 95% confidence interval ("CI") never exceeds 1.0, indicating that, there are no statistically significant excess risks seen.[186] Findings that are not statistically significant, including all reported in the table below, are interpreted as being no different from 1.0, the value representing no association, and therefore providing no scientific support for the hypothesis that chloroprene causes these cancers.[187]

|  | Cumulative exposure | Observed deaths | SMR | 95% CI |
|---|---|---|---|---|
| RSC | < 4.747 | 95 | 0.66 | 0.53-0.80 |
|  | 4.747-55.918 | 97 | 0.71 | 0.57-0.86 |
|  | 55.919-164.052 | 96 | 0.94 | 0.76-1.15 |
|  | 164.053+ | 70 | 0.65 | 0.51-0.82 |
| LC | < 4.747 | 9 | 0.76 | 0.35-1.45 |
|  | 4.747-55.918 | 8 | 1.34 | 0.58-2.63 |
|  | 55.919-164.052 | 5 | 1.09 | 0.35-2.55 |
|  | 164.053+ | 9 | 0.90 | 0.41-1.71 |

Dr. Marsh's epidemiological studies strongly support the conclusion that chloroprene does not pose a meaningful risk of respiratory or liver cancer to humans, particularly given the orders of magnitude higher chloroprene exposures experienced by the chloroprene workers compared to the chloroprene concentrations existing near the Facility today.[188]

---

[183] Mundt Decl., ¶¶ 50-51 (Ex. 54); Marsh, G. M., Kruchten, A., & Buchanich, J. M., "Mortality Patterns Among Industrial Workers Exposed to Chloroprene and Other Substances: Extended Follow-Up," *J. Occup. Environ. Med.*: 63(2), 126-138 (2021) ("Marsh *et al.* (2021)" (Ex. 57)).

[184] Mundt Decl., ¶¶ 50-51 (Ex. 54); Marsh *et al.* (2021) (Ex. 57).

[185] Mundt Decl., ¶ 50 (Ex. 54).

[186] *Id.*

[187] *Id.*

[188] *Id.* ¶¶ 51-52.

    **ii.**    **The lack of association between chloroprene and cancer in the vicinity of the Facility is corroborated by data from the Louisiana Tumor Registry.**

For decades, in conjunction with the National Cancer Institute, Louisiana has had a robust program to track cancer cases throughout the state.  The data from the Louisiana Tumor Registry ("LTR") consistently show no increase in cancer incidence rates in the community surrounding the Facility.[189]  The LTR, maintained by the Louisiana State University School of Public Health, has a mission "[t]o collect and report complete, high-quality, and timely population-based cancer data in Louisiana to support cancer research, control, and prevention."[190]  In 2020-2021, Louisiana State University conducted a study confirming that the LTR had not omitted any relevant cancer cases in the 2009-2018 timeframe.[191]  Dr. Helen Suh, EPA's epidemiology expert in the Section 303 Litigation, confirmed that the LTR data "seems like it's high-quality,"[192] and she had no questions about the completeness and quality of the LTR data.[193]

Community disease surveillance studies, including those based on the LTR data, can provide a sense of, or clues as to, whether there might be excess occurrences of disease that an agent (like chloroprene) has been postulated to cause.[194]  A lack of increased risk of respiratory and liver cancers from chloroprene exposure in the communities surrounding the Facility—where chloroprene exposure likely is orders of magnitude lower than that of the workers studied in the 2007 Marsh Study—would be expected, given the lack of any excess of these cancers in the highly exposed workers in both the Pontchartrain and Louisville plants studied in the 2007 Marsh Study.[195]  Analyses using LTR data and comparing cancer rates across Louisiana parishes demonstrate that the overall cancer rate for St. John the Baptist Parish falls into the lowest 25% of cancer rates by parish across the entire state.[196]

Historical emissions from the Facility were orders of magnitude higher during the late 1960s through the mid-1980s than in recent years.[197]  In an October 12, 2022 "letter of concern," issued under the authority of Title VI of the Civil Rights Act of 1964, sent by EPA to the Louisiana Department of Environmental Quality ("LDEQ") and the Louisiana Department of Health ("LDH"), EPA included a figure showing the significant emission reductions at the Facility since 1987, particularly the substantial reductions achieved by DPE since commencing operations at the Facility in 2015.[198] This figure not only illustrates the dramatic reduction in chloroprene emissions since 1987, but it also demonstrates the additional, significant chloroprene emission reductions achieved by DPE after DPE's acquisition of the Facility in 2015.

---

[189] *Id.* ¶¶ 52-53.

[190] LSU Health, *About the Registry*, available at https://sph.lsuhsc.edu/louisiana-tumor-registry/about-the-registry/.

[191] LDH Cancer Surveillance Study in St. John Parish (CRISP) Report (Jan. 2022) (Ex. 58).

[192] Suh Dep. Tr. 99:21-100:12 (Ex. 53).

[193] *Id.* at 113:6-12; 151:1-9.

[194] Mundt Decl., ¶ 44 (Ex. 54).

[195] *Id.*

[196] *Id.* ¶ 45; LSU Health, *Louisiana Cancer Data Visualization*, available at https://sph.lsuhsc.edu/louisiana-tumor-registry/data-usestatistics/louisiana-data-interactive-statistics/louisiana-cancer-data-visualization/ (LTR update for 2015-2019 period showing St. John the Baptist Parish within bottom 25% of cancer incidence rates state-wide).

[197] Mundt Decl., ¶ 47 (including graph from 10/12/2022 Letter from EPA to LDEQ at 28) (Ex. 54).

[198] *See* 10/12/2022 Letter from EPA to LDEQ at 28 (Ex. 59).



Chloroprene emissions from the Facility dropped precipitously between 1987 and 1993, and declined continuously and roughly monotonically until 2017, whereupon the emissions again rapidly declined.[199] The typical latency periods for respiratory and liver cancers are 20 or more years and can range well above 30 years.[200] Therefore, the exposure time period most likely to give rise to excess cancers (if any) today or in recent years would be those that occurred at least 20 years ago.[201] Thus, if chloroprene emissions from the Facility had increased the risks of respiratory and liver cancers in the community surrounding the Facility from around 2015 to 2020, the most relevant time window for those exposures would have occurred from at least 20 to 40 or more years ago, *i.e.*, conservatively, between 1975 and 2000.[202] The LTR data show no signal of excess occurrence of respiratory or liver cancers, notwithstanding the orders of magnitude higher levels of chloroprene during the period of time most likely to give rise to excess cancers in recent years.[203]

EPA itself relied upon LTR data to assess the health risks due to chloroprene exposure in the communities surrounding the Facility. In 2020, EPA granted roughly $300,000 to the LDEQ and the LDH "to assess the health risks associated with Chloroprene exposure in St. John the Baptist Parish near the Denka Plant." The two stated objectives of the funded research were to determine "if there are higher instances of cancer in the community due to" the Facility's emissions, and "if there has been under-reporting of these

---

[199] Mundt Decl., ¶ 47 (Ex. 54).

[200] *Id.* ¶ 48.

[201] *Id.*

[202] *Id.* ¶ 49.

[203] *Id.* ¶ 50.

cases in the [LTR]."[204]   The LDH Report resulting from the EPA grant was issued in 2021 and found that "no reportable cancers were identified that were not already contained in the LTR data."[205]  The Report further found that census tracts in the vicinity of the Facility "have statistically significantly lower overall cancer incidence rates ... compared to Louisiana overall cancer incidence rate."[206]  An LDH official also reported to EPA based on the LTR analysis that "the only elevated rates we found were in census tract 702 for prostate and NHL, which have not been found to be related to chloroprene."[207]

As no excess occurrence of respiratory or liver cancers has been reported in any area or community surrounding the Facility, the LTR cancer surveillance exercises fail to support any claim that chloroprene emissions at historically very high levels had any measurable impact on rates of these cancers among residents in areas surrounding the Facility in any recent years.[208] Given the dramatically lower exposure levels today, it is inconceivable that future rates would be any different due to environmental exposure to chloroprene.[209]

> **C.    To the Extent EPA's Imminent Endangerment Assessment Is Based on EPA's 2010 Inhalation Unit Risk, the IUR Fails To Provide The Best Estimate Of Human Risk From Chloroprene.**

EPA's MIR and risk assessment is based on the IUR developed in EPA's Toxicology Review of Chloroprene ("2010 Review").[210] EPA calculated the IUR for human exposure to chloroprene to be $5 \times 10^{-4}$ per $\mu g/m^3$ for 70-years of continuous exposure ("chloroprene IUR").  In the Section 303 Litigation, EPA calculated cancer risks to humans in relation to a threshold of $0.2 \ \mu g/m^3$.[211]  The $0.2 \ \mu g/m^3$ value represents EPA's estimate of a chloroprene concentration that, if inhaled continuously for 70 years, corresponds to a 1-in-10,000 excess chance of cancer.  EPA's Integrated Risk Information System ("IRIS") program develops toxicology reviews to characterize the risks to human health posed by specific environmental hazards.

The IRIS Program follows a risk assessment approach based on the four-step process described by the National Research Council.[212]   IRIS assessments "serve as starting materials for the overall risk characterization process that completes the risk assessment."[213]  The EPA's Guidelines for Carcinogen Risk Assessment state that risk characterization "is an appraisal of the science that informs the risk manager in public health decisions, as do other decision-making analyses of economic, social, or technology

---

[204] EPA Cooperative Agreement 01F70601 to LDEQ (Sept. 19, 2020) (Ex. 60); EPA Responses to DPE Second Set of Interrogatories, at 14-15 (Response to Interrogatory No. 16) (Ex. 30); EPA_1932780 at EPA_1932855 (Ex. 61) ("There are two tasks that are to be accomplished: a study to ensure that the types and numbers of cancers in the Louisiana Tumor Registry database are complete for the area to serve as a baseline, and an evaluation and analysis of that database specific to the 1.5-km radius and 2.5-km radius around Denka to determine if there are higher instances of cancer in the community and if the observed cancers are attributable to Denka.").

[205] Cancer Reporting in St. John Parish, Cancer Surveillance Project, EPA_2235649 at EPA_2235661 (Ex. 62).

[206] *Id.* at Appendix F ("Cancer Incidence Rates in St. John the Baptist Parish") at EPA_2235686.

[207] EPA_2548391 (email correspondence) (Ex. 63).

[208] Mundt Decl., ¶ 50 (Ex. 54).

[209] *Id.* ¶¶ 50, 52.

[210] EPA, *Toxicological Review of Chloroprene: In Support of Summary Information on the Integrated Risk Information System (IRIS)* (Sept. 2010) ("2010 Review") (Ex. 64).

[211] *Id.* at 138.

[212] *See* EPA, *Basic Information about the Integrated Risk Information System* (last updated Nov. 9, 2023), available at https://www.epa.gov/iris/basic-information-about-integrated-risk-information-system.

[213] EPA, *Guidelines for Carcinogen Risk Assessment* 1-21 (Mar. 2005), EPA/630/P-03/001B (Ex. 65).

issues."[214]  The risk assessment does not generate independently actionable information, but must be incorporated into EPA's risk management paradigm.[215]  Following the completion of a risk assessment, EPA implements "risk management" processes, which include EPA's rulemaking activities.[216]

Simply put, EPA has failed in its obligation to apply risk management principles in assessing the risk of the DPE Facility.  Risk management involves developing, analyzing, and comparing options related to potential regulatory control in light of legal, political, social, economic, and technical considerations.[217]  The chloroprene IUR does not reflect any of these essential considerations.  Therefore, it is incumbent upon risk managers to consider the uncertainties and weaknesses of the chloroprene IUR.  EPA has provided no evidence that it has considered new risk estimates or qualitative information that accompanied and informed the chloroprene IUR.  Instead, EPA applied the chloroprene IUR without adjustment and has opted out of the risk management obligations that it is required to perform.

When new risk estimates and qualitative information are considered, it is clear that the chloroprene IUR fails to provide the most probative estimate of human risk from exposure to chloroprene and should not be used to assess "imminent endangerment."  First, the physiologically-based pharmacokinetic ("PBPK") computer model developed by scientists at Ramboll US Corporation ("Ramboll"), which can be used to aid in the calculation of an IUR that accounts for species-specific parameters (the "Ramboll PBPK Model"),[218] provides the best method to provide a reasonable scientific estimate of chloroprene's cancer potency in humans and provides a better estimate of risk than the chloroprene IUR.[219]  Second, even if the Ramboll PBPK Model were not utilized to calculate the chloroprene IUR, applying real-world adjustments to EPA's chloroprene IUR results in a less uncertain and distorted risk estimate.

  i.   **The Ramboll PBPK Model provides the best estimate of human risk from chloroprene.**

A PBPK model is a mathematical computer model that simulates the uptake, distribution, metabolism, and elimination of a chemical in a human or animal body using equations that are consistent with the biological structure of the organism being simulated.[220]  PBPK models simulate chemical exposures and predict internal doses of the chemical or one or more of its metabolites that appear in specific organ systems of the body.[221]  These type of models use well-established, known values for modeling physiological parameters such as heart rate, breathing rate, blood flow rate, body weight, size of organs, and others in the mathematical equations to accurately represent the physiology of a laboratory animal or a human.[222]  They also incorporate measured rates of metabolism in the various organs and elimination from the body (such as exhalation or clearance in the urine).[223]  Importantly, PBPK models are capable of extrapolating from animal exposures or doses to human exposure, while accounting for physiological and

---

[214] *Id.* at 5-1 to 5-2.

[215] *Id.*

[216] *Id.*

[217] *Id.*

[218] Declaration of Dr. Robinan Gentry in Support of Opposition to Motion for Preliminary Injunction ("Gentry Decl."), ¶¶ 14-15, Case No. 2:23-cv-00735 (Ex. 66).

[219] Declaration of Dr. Michael Lumpkin in Support of Opposition to Motion for Preliminary Injunction ("Lumpkin Decl."), ¶ 120, Case No. 2:23-cv-00735 (Ex. 67).

[220] Gentry Decl., ¶ 14 (Ex. 66).

[221] Lumpkin Decl., ¶ 42 (Ex. 67).

[222] *Id.* ¶ 43.

[223] *Id.*

toxicokinetic differences between the species.[224] EPA considers PBPK models to be the optimal approach for extrapolation of chemical dose across species.[225] When preparing IRIS toxicological reviews, EPA considers whether an adequate PBPK model is available for use.[226]

Using the Ramboll PBPK Model and EPA software to calculate an IUR results in the best estimate of chloroprene's cancer potency in humans because it accounts for the significant toxicokinetic differences between humans and female B6C3F1 mice. By failing to calculate its risk estimate for chloroprene using the Ramboll PBPK Model, EPA has failed to offer a risk estimate that is appropriate for assessing whether there is an imminent endangerment to *humans*.

The Ramboll PBPK Model was not available when EPA published the 2010 Review.[227] However, the 2010 Review stated, "[i]deally, a PBPK model for the internal dose(s) of the reactive metabolite(s) would decrease some of the quantitative uncertainty in interspecies extrapolation; however, current PBPK models are inadequate for this purpose." [228] EPA guidance supports the use of PBPK modeling when available, stating that, "[t]oxicokinetic modeling is the preferred approach for estimating dose metrics from exposure."[229] EPA recognizes that "[t]he primary advantage gained by using PBPK models in risk assessment is their ability to relate toxicity responses in a test species to humans and outcomes observed in smaller populations to likely outcomes in the general population."[230]

In April 2018, DPE and Ramboll submitted a work plan to EPA for the development of a PBPK model for chloroprene that would satisfy EPA requirements.[231] From 2018 through 2020, EPA and Ramboll engaged in sustained dialogue to improve the PBPK model, including two separate rounds of quality review by EPA.[232] In response to EPA's review, Ramboll made revisions to the model, developed supporting documentation, and provided EPA with the model's computer code and validation data.[233] At EPA's request, Ramboll also agreed to conduct an additional experiment in support of a specific model parameter.[234]

Based on EPA's feedback, the Ramboll PBPK Model was published in a peer-reviewed article in *Frontiers in Pharmacology* in 2023.[235] Prior to the Ramboll PBPK Model being published in 2023, DPE in 2021

---

[224] EPA, *Approaches for the Application of Physiologically Based Pharmacokinetic Models and Supporting Data in Risk Assessment* at 4-11 – 4-12 (Aug. 2006) ("EPA PBPK Guidance") (Ex. 68).

[225] EPA, *Methods for Derivation of Inhalation Reference Concentrations and Application of Inhalation Dosimetry* at 1-12 (Oct. 1994) (Ex. 69).

[226] *See e.g.,* EPA, *Toxicological Review of Dichloromethane (Methylene Chloride)* at 226 (Nov. 2011) (using "the best available" PBPK models to derive IUR) (Ex. 70); EPA, *Toxicological Review of Vinyl Chloride* at 44-53 (May 2000) (using Clewell *et al.* PBPK model to derive IUR) (Ex. 71).

[227] Gentry Decl., ¶ 15 (Ex. 66).

[228] 2010 Review at 141 (Ex. 64).

[229] EPA, *Guidelines for Carcinogen Risk Assessment* (Mar. 2005), EPA/630/P-03/001B (Ex. 65).

[230] EPA PBPK Guidance at 2-9 (2006) (Ex. 68).

[231] EPA, *Background Description for Chloroprene PBPK Modeling* at 4 (July 2020) (Ex. 72).

[232] *Id.*; Gentry Decl., ¶¶ 20-28 (Ex. 66).

[233] Gentry Decl., ¶ 23 (Ex. 66).

[234] *Id.*

[235] Lumpkin Decl., ¶ 70 (Ex. 67); Campbell, J.L. et al., "Using available in vitro metabolite identification and time course kinetics for β-chloroprene and its metabolite, (1-chloroethenyl) oxirane, to include reactive oxidative metabolites and glutathione depletion in a PBPK model for β-chloroprene," *Frontiers in Pharmacology* 14:1223808 (2023) ("Campbell et al. (2023)") (Ex. 73).

submitted the model (including detailed documentation and the underlying computer code) to EPA as part of DPE's administrative challenge to the chloroprene IUR based on the 2010 Review.[236] EPA did not undertake a technical analysis to evaluate the IUR estimated by the Ramboll PBPK Model. EPA stated: "Ramboll's analyses assert that the risk of human lung cancer is minimal compared to mice, making the current IRIS IUR an overestimate of risk. EPA has not undertaken the technical analysis to reach a conclusion on concurrence with this assertion."[237] EPA subsequently denied DPE's administrative appeal of EPA's decision not to revisit the chloroprene IUR based on the Ramboll PBPK Model, citing resource limitations and a lack of an appropriate procedural mechanism.[238] Specifically, EPA stated that "the [IRIS administrative appeal] process is not a mechanism to commit EPA to undertake scientific updates of its risk assessment products, such as IRIS Toxicological Reviews."[239] EPA has not evaluated the Ramboll PBPK Model outside of the IRIS program either.

### 1. The Ramboll PBPK Model uses the appropriate dose metric to estimate risk.

PBPK models are designed to estimate an internal "dose metric," which is the amount of a chemical that most closely relates to an adverse (*e.g.,* toxic) response.[240] Internal dose metrics provide a better understanding of the potential for toxicity than an "external" dose (*e.g.,* the amount of chloroprene inhaled), thus reducing uncertainty.[241] This is because internal dose metrics can account for the most biologically relevant form of the chemical, its level, duration of internal exposure, intensity, and the appropriate tissues.[242] The major advantage of using an internal dose metric is that it can provide a stronger biological basis for comparing the effects of a chemical across species (*i.e.,* mice to human) and dose levels (*e.g.,* high levels of chloroprene to low levels of chloroprene).[243]

Because the dose metric is the form of chemical most closely associated with toxicity, a PBPK model is needed to estimate the relevant dose metric across varying exposure scenarios.[244] The appropriate dose metric for a given chemical varies depending on the "mode of action," *i.e.,* the sequence of events and processes resulting in toxicity and tumor formation.[245] Chloroprene's toxicity is thought to result from the formation of "reactive epoxides," compounds that are produced during the metabolism of chloroprene.[246]

The Ramboll PBPK Model estimates the internal dose metric amount of chloroprene metabolized per gram of tissue ("Total Metabolism") for the liver and lung.[247] Using Total Metabolism as the dose metric is appropriate because chloroprene's toxicity is thought to result from the formation of "reactive epoxides," compounds that are produced during the metabolism of chloroprene.[248] There is substantial evidence supporting the use of Total Metabolism as a dose metric. The 2010 Review describes a PBPK model from

---

[236] DPE, Request for Correction #21005 (July 15, 2021) (Ex. 74).

[237] 3/14/2022 Letter from M. Gwinn to P. Walsh at 6 (Ex. 75).

[238] 10/19/2022 Letter from Mr. Vaughn Noga to Mr. Robert Holden, *et al.* at 1-2 (Ex. 76).

[239] *Id.*

[240] EPA PBPK Guidance at 2-3 (Ex. 68).

[241] *Id.* at 2-3.

[242] *Id.* at 2-3 – 2-4.

[243] *Id.* at 2-3.

[244] *Id.* at 4-3.

[245] *Id.*

[246] Lumpkin Decl., ¶ 37 (Ex. 67).

[247] Gentry Decl., ¶ 69 (Ex. 66).

[248] Lumpkin Decl., ¶ 37 (Ex. 67).

2004 (the "Himmelstein PBPK Model") that was a precursor to the models prepared by Ramboll and notes that the Total Metabolism dose metric "fit the [tumor] incidence data much better than the external dose metric."[249]  The 2010 Review also explains that many of the available studies investigating the mode of action for chloroprene have focused on identifying reactive metabolites.[250]  An expanded version of the Himmelstein PBPK Model was published in 2012 (the "Yang PBPK Model") that incorporated additional measurements of metabolism and further refined parameter values for chloroprene metabolism.[251]  In 2019, Ramboll again expanded the model (the "Clewell PBPK Model") to describe metabolism of a specific reactive metabolite and to confirm the Total Metabolism dose metric.[252] The Clewell PBPK Model was published in a peer-reviewed article in *Inhalation Toxicology* in 2019 (Clewell, 2019).[253] The article explains:

> The dose metric calculated with the PBPK model in this analysis is micromoles of chloroprene metabolized in the lung per gram lung per day (Himmelstein, Carpenter, Evans, *et al.* 2004; Yang *et al.* 2012).  This dose metric was chosen because (1) the lung is the tissue with the highest tumor incidence in the chloroprene inhalation bioassays (NTP 1998) and (2) the carcinogenicity of chloroprene in rodents is believed to result from its metabolism to reactive epoxides in the target tissue (Himmelstein, Carpenter, and Hinderliter 2004; Himmelstein, Carpenter, Evans, *et al.* 2004). The dose metric selected for chloroprene is consistent with the dose metrics used in previous PBPK-based risk assessments for both vinyl chloride (USEPA 2000; Clewell *et al.* 2001) and methylene chloride (Andersen *et al.* 1987; USEPA 2011), which were also based on the rate of production of reactive metabolites.[254]

As an outgrowth of Ramboll's dialogue with EPA, Ramboll again extended the PBPK model in 2021 to include more detail on the production of reactive metabolites and a detoxification process involving the compound glutathione.[255] The 2021 extension was subsequently published in a peer-reviewed article in *Frontiers in Pharmacology* in August 2023 and constitutes the Ramboll PBPK Model in this case.[256]  The article describing the Ramboll PBPK Model again confirmed that Total Metabolism was the appropriate dose metric.[257]

**2.      The Ramboll PBPK Model has been validated using robust and established methods.**

Model "validation" is the process of substantiating that a model, within its domain of applicability, behaves with satisfactory accuracy.[258]  To adequately validate a PBPK model, the model should be compared against data that are informative of parameters that influence model predictions (*i.e.*, if metabolism is the most significant influence on model predictions, the validation data should provide

---

[249] 2010 Review at 20 (Ex. 64).

[250] *Id.* at 82.

[251] *Id.* at 66.

[252] Clewell, H.J. *et al.*, "Incorporation of in vitro metabolism data and physiologically based pharmacokinetic modeling in a risk assessment for chloroprene," *Inhalation Toxicology* 31(13-14): 468-483 (2019) ("Clewell *et al.* (2019)") (Ex. 77).

[253] *Id.*

[254] *Id.* at 478.

[255] Lumpkin Decl., ¶ 70 (Ex. 67).

[256] Campbell *et al.* (2023) (Ex. 73).

[257] *Id.* at 7-11.

[258] EPA PBPK Guidance at 3-18 (Ex. 68).

informative data for metabolism parameters).[259]  Toxicokinetic tests of cells and tissues removed from the intact body are called *in vitro* tests, while tests conducted on intact animals or humans are called *in vivo* tests.[260]

The Ramboll PBPK Model was validated against *in vivo* data from a 2009 study of female B6C3F1 mice (the same species/gender used by EPA to calculate the chloroprene IUR in the 2010 Review) in which the mice were exposed chloroprene via nose-only inhalation.[261]  The Ramboll PBPK Model was able to accurately predict the data collected in the 2009 study, showing predictions generally within roughly a factor of two, which is consistent with guidance of the World Health Organization and the International Programme on Chemical Safety ("WHO/IPCS").[262]

Ramboll used an approach known as "quantitative *in vitro* to *in vivo* extrapolation" ("IVIE") in developing the Ramboll PBPK Model, which allows modelers to translate *in vitro* test results to *in vivo* outcomes for use in chemical-specific PBPK models.[263]  Obtaining *in vivo* data of *humans* requires conducting controlled exposures of human subjects to chemicals.[264]  Obtaining *in vivo* data of *animals* requires conducting controlled exposures of animals in a laboratory study.[265]

The notion of requiring human, and even animal, *in vivo* studies is increasingly scrutinized due to ethical concerns.[266]  In 2021, EPA led the development of a document on behalf of the Organisation for Economic Co-operation and Development that provides guidance on the use of PBPK models for regulatory purposes ("OECD Guidance").[267]  The OECD Guidance explains that there is a trend to reduce animal testing in chemical assessments and that PBPK models have become an important tool because of their ability to leverage *in vitro* to *in vivo* extrapolation.[268]

No human *in vivo* validation data is available for chloroprene, and it is effectively impossible to obtain such data, given the obvious inability to conduct an experiment exposing humans to a chemical that EPA has classified as a likely carcinogenic.[269]  In the Section 303 Litigation, EPA has insisted upon the use of *in vivo* validation data, but that argument is an obvious pretext for arbitrarily disregarding the Ramboll PBPK Model.  The fact is, until EPA elected to exploit the absence of human *in vivo* data for litigation purposes, EPA spent roughly four years examining the Ramboll PBPK Model (or a predecessor iteration of the model) and never once indicated that the model would be unsuitable for use in the risk assessment due to a lack of *in vivo* human data.

---

[259] EPA PBPK Guidance at 3-21 (Ex. 68).

[260] Lumpkin Decl., ¶ 33 (Ex. 67).

[261] Gentry Decl., ¶ 51 (describing International Institute of Synthetic Rubber Producers, *Chloroprene: blood concentration toxicokinetics in female mice by single and repeated inhalation exposure,* IISRP-12828-1388 (2009) (Ex. 66); Clewell *et al.* (2019), at 477-81 (describing same) (Ex. 77).

[262] Gentry Decl., ¶ 51 (Ex. 66); Clewell *et al.* (2019) at 477-81 (World Health Organization/International Programme on Chemical Safety, Characterization and application of physiologically based pharmacokinetic models in risk assessment (2010)) (Ex. 77).

[263] Gentry Decl., ¶ 51 (Ex. 66); Clewell *et al.* (2019) at 471 (Exhibit 77).

[264] Clewell *et al.* (2019) at 481 (Ex. 77).

[265] Lumpkin Decl., ¶ 33 (Ex. 67).

[266] Clewell *et al.* (2019) at 481 (Ex. 77).

[267] OECD, *Guidance document on the characterization, validation and reporting of Physiologically Based Kinetic (PBK) models for regulatory purposes* 5 (2021) (Ex. 78).

[268] *Id.* at 17.

[269] Clewell *et al.* (2019) at 481 (Ex. 77).

Moreover, even if human *in vivo* data for chloroprene were available, such data would not materially impact the evaluation of the Ramboll PBPK Model.[270] This is because the key parameters for estimating the relevant dose metric of chloroprene for use in risk assessment are the parameters for lung metabolism and human *in vivo* data would not meaningfully inform those parameters.[271] As such, even if there were a hypothetical set of human *in vivo* data available to DPE, those data would not provide meaningful information to inform or validate the metabolic parameters used in the Ramboll PBPK Model. Indeed, EPA has accepted a PBPK model in prior toxicological reviews under the IRIS program despite the fact that, like the Ramboll PBPK Model, human *in vivo* data could not be used to validate or inform the key parameter of those models.

Unlike EPA's chloroprene IUR based on the 2010 Review, the Ramboll PBPK Model accounts for the substantial toxicokinetic differences between female B6C3F1 mice and humans and results in a substantial reduction in uncertainty of extrapolating cancer potency between these two dramatically different species.[272] The Ramboll PBPK Model reflects multiple years of review, dialogue, and revision between EPA and Ramboll scientists. By declining to use the Ramboll PBPK Model to calculate an IUR for chloroprene, EPA has failed to offer a risk value that best estimates human risk.

> **3.    Estimating risk in the lung and liver appropriately accounts for tumors observed in female B6C3F1 mice in the NTP Study.**

In IRIS toxicological reviews, EPA must determine whether to calculate an IUR based on the total number of *tumors* in animal studies or the total number of *tumor-bearing animals*.[273] The key determinant in this decision is whether the tumors observed in a study occurred in a statistically independent manner (*e.g.,* the occurrence of a tumor in the liver was *not* influenced by the occurrence of a tumor in the lung).[274] In the 2010 Review, EPA did not determine whether tumor types associated with chloroprene exposure were statistically independent.[275] In the absence of such a determination, EPA simply *assumed* that the tumor types were statistically independent.[276] At the same time, however, EPA conceded that its assumption "could not be verified and if not correct could lead to an overestimate of risk from summing across tumor sites."[277]

In February 2020, an article published in the peer-reviewed journal *Risk Analysis* demonstrated that EPA's independence assumption was incorrect by reporting the results of a correlation analysis.[278] These results demonstrated that tumor incidences in the female B6C3F1 mice in the NTP Toxicology and Carcinogenesis Studies of Chloroprene ("NTP Study") were not statistically independent of lung and liver tumors.[279] The results also showed that EPA's approach of treating tumors as independent was inappropriately overestimating total tumor potency. Indeed, in some cases, EPA ended up counting more tumors than there were animals in a given test group.[280]

---

[270] Clewell *et al.* (2019) at 481 (Ex. 77).

[271] *Id.*

[272] Lumpkin Decl., ¶ 73 (Ex. 67).

[273] 2010 Review at 133 (Ex. 64).

[274] *Id.*

[275] *Id.* at 136.

[276] *Id.*

[277] *Id.*

[278] Sax *et al.* (2020) (Ex. 55).

[279] *Id.*

[280] *Id.*

Although tumors in B6C3F1 female mice were observed in tissues other than the lung and liver in the NTP Study, at least 85% of all tumors were observed in animals with tumors in the lung or liver.[281]  Because the tumors are statistically dependent, calculating an IUR based on multiple tumors in the same animals inappropriately double count tumors and overestimates risk.[282]  Unlike the chloroprene IUR derived in the 2010 Review, the IUR derived from the Ramboll PBPK Model considers each animal with tumor(s) only once, properly reflecting the tumors' statistical dependence.

Any assessment of "imminent endangerment" should be based on an IUR derived from the Ramboll PBPK Model.  The Ramboll PBPK Model provides the best estimate of chloroprene's cancer potency in humans because it accounts for toxicokinetic differences between humans and female B6C3F1 mice.

ii.     **Applying corrective adjustments to EPA's chloroprene IUR results in risk estimates that are more representative of actual risk.**

Even if the Ramboll PBPK Model is not used to calculate an IUR for chloroprene, applying corrective adjustments to EPA's chloroprene IUR would better estimate actual *human* risk.  By failing to make these adjustments, EPA has failed to offer a risk estimate that is appropriate to assess imminent endangerment to humans.

1.     **Selecting animal tumor incidence data that is more representative of human risk.**

Even if the Ramboll PBPK Model were not used to calculate an IUR for chloroprene, using tumor incidence data from F344 rats would better estimate human risk than using data from female B6C3F1 mice.  The material toxicokinetic differences between humans and female B6C3F1 mice demonstrate that the F344 rat is the "animal model that is most relevant to humans" and a better surrogate for human risk.[283] Because EPA's chloroprene UR fails to calculate a risk estimate based on available animal data that is more representative of human risk, EPA's IUR is not appropriate to assess whether an "imminent endangerment" exists for *humans*.

The first step in developing an IUR is to select the data from which the value will be based.  In some cases, the data will be a human epidemiological study, if an epidemiological study is deemed suitable for use.[284]  In other cases, the data utilized will be from an inhalation study using laboratory animals, if an epidemiological study is not deemed suitable for use.[285]

In the 2010 Review, EPA discussed the available toxicokinetic data for chloroprene in humans and animals.[286] A chemical's toxicokinetics are its behavior in how it is absorbed from the environment into the body's tissues (absorption), how it is distributed around various tissues of the body (distribution), how the body makes physical changes to the chemical (metabolism), and how the body removes the chemical from the body (elimination).[287]  Toxicokinetic tests of cells, cell components, and tissues removed from the intact body are called *in vitro* tests, while tests conducted on intact and living animals or humans are

---

[281] Gentry Decl., ¶¶ 66-70 (Ex. 66).

[282] *Id.*

[283] Lumpkin Decl., ¶ 38 (Ex. 67); 2010 Review at 13-14 (Ex. 64).

[284] 2010 Review at 128 (Ex. 64).

[285] *Id.*

[286] Lumpkin Decl., ¶ 32 (Ex. 67).

[287] *Id*.

called *in vivo* tests.[288] A third, and more recent, kind of toxicokinetic test examines toxicokinetic behaviors through computer simulation of a chemical in cells, tissues, and organ systems of the body, commonly called *in silico* tests (because the data are generated in the silicon chip space of a computer).[289]

EPA concluded that the existing epidemiological studies of chloroprene's potential impacts on humans contained limitations that "precluded developing quantitative risk estimates" from that human epidemiological data.   Instead, EPA considered two animal studies for use in calculating the 2010 IUR: (1) the Trochimowicz *et al.* (1998) study, which reported tumor incidences in two types of hamsters following chloroprene inhalation exposures; and (2) a 1998 study by the National Toxicology Program ("NTP"), which reported tumor incidences in groups of male and female F344 rats and male and female B6C3F1 mice ("NTP Study") following chloroprene inhalation exposures.[290]  The study involving hamsters found no dose-related increases in cancer development in the animals, Trochimowicz *et al.* (1998), but the NTP Study observed dose-related increases in cancer development in mice, and, to a lesser extent, in rats.[291] In the 2010 Review, EPA estimated the chloroprene IUR based solely on a 1998 NTP Study of female B6C3F1 mice.[292]

Specifically, the 2010 Review recites the conclusion of the NTP Study that there was evidence of carcinogenicity in F344/N rats and B6C3F1 mice due to lifetime inhalation exposure to chloroprene.[293] Purely as a matter of policy, EPA estimates *human* IURs based on the IUR for the most sensitive *animal* sex and species if (i) EPA does not identify a "clearly most relevant species" and (ii) no adequate human data are available.[294]  EPA's guidance document states:

> Although it is preferable to use human studies as the basis for the dose-response derivation, adequate human data are not always available, often forcing reliance on laboratory animal data.  Presented with data from several animal studies, *the risk assessor first seeks to identify the animal model that is most relevant to humans*, based on comparability of biological effects using the most defensible biological rationale; for instance, by using comparative metabolic, pharmacokinetic, and pharmacodynamic data. *In the absence of a clearly most relevant species, however, the most sensitive species is used as a matter of science policy at the EPA*.[295]

As the 2010 Review acknowledges, the chloroprene IUR derived from female B6C3F1 mice studies was *not* based on data that allows for any adjustments to reflect the substantial differences in risks applicable to female B6C3F1 mice versus humans:

> The calculated composite unit risk is based on the most sensitive endpoint (risk of any tumor type) in the most sensitive species and sex (female mouse).  *There is no information*

---

[288] *Id.*

[289] *Id.*

[290] 2010 Review at 128 (Ex. 64).

[291] Lumpkin Decl., ¶ 27 (Ex. 67).

[292] *Compare* DPE MSJ SOF, ¶ 46 (Ex. 36), *with* US Contested SOF, ¶ 46 (Ex. 37); US Responses to DPE First Set of RFAs, at 18 (Response to RFA No. 17), Case No. 2:23-cv-00735 (Ex. 79).

[293] 2010 Review at 102 (Ex. 64).

[294] *Compare* DPE MSJ SOF, ¶ 50 (Ex. 36), *with* US Contested SOF, ¶ 50 (Ex. 37).

[295] EPA, *Methods for Derivation of Inhalation Reference Concentrations and Application of Inhalation Dosimetry* at 1-5 (Oct. 1994) (emphases added) (Ex. 69).  EPA's expert, Dr. Ila Cote, confirmed that, "in the absence of data to the contrary, the agency will use the most sensitive end point, which generally means the most sensitive [sex and] species."  Deposition Transcript of Dr. Ila L. Cote ("Cote Dep. Tr.") 20:1-6 (Ex. 80).

*on chloroprene to indicate that the observed rodent tumors are not relevant to humans. Further, no data exist to guide quantitative adjustment for differences in sensitivity among rodents and humans.*[296]

In the 2010 Review, EPA did not identify animal data that was most relevant to human response to chloroprene.[297]  In the absence of such a determination, EPA used data from the most sensitive sex and species in the NTP Study to calculate the IUR for chloroprene, relying entirely on tumor incidence data for female B6C3F1 mice.[298]

In relying on tumor incidence data for the female B6C3F1 mice, EPA made the conservative assumption that humans are equally susceptible to cancer from inhaled chloroprene as female B6C3F1 mice, the most sensitive sex and species in the animal studies that EPA considered.[299]  Thus, as an extension of that conservative assumption, the EPA's chloroprene IUR assumes that humans are *more sensitive* to chloroprene-induced cancer than male B6C3F1 mice, male and female rats, and male and female hamsters—*i.e.*, the other sexes and species considered by EPA in the chloroprene animal studies, which were all less susceptible to chloroprene-induced cancer than female B6C3F1 mice, the sex and species of animal that EPA chose to exclusively rely upon.[300]

Any "imminent endangerment" finding would need to assess whether there is an imminent endangerment *to humans*.  Dr. Kristina Thayer, who leads the IRIS program, testified in the Section 303 Litigation that "EPA has . . . no idea of the true correspondence of the [B6C3F1] mouse to human response."[301]  Further, EPA admits that, since the 2010 Review, it has performed no *new* analysis to determine that the 2010 IUR provides a risk estimate representative of human risk.[302]  Instead, EPA has rested on its unsupported "default" assumption that bases the chloroprene IUR on the highest possible risk level, stating that EPA's "analysis relating to its use of the B6C3F1 mouse data in calculating the IUR in the 2010 IRIS Assessment, and the analysis EPA performed to determine that the B6C3F1 mouse data was the most representative information available to understand potential human responses to chloroprene *is contained in the 2010 IRIS Assessment*...."[303]

Toxicokinetic data related to chloroprene exposure in humans and animals demonstrates that humans and female B6C3F1 mice are not equally susceptible to chloroprene, as EPA assumed.[304]  In the 2010

---

[296] 2010 Review at 141 (Ex. 64) (emphases added).

[297] *Id.* at 139 ("It was assumed that humans are as sensitive as the most sensitive rodent sex/species tested; true correspondence is unknown."); Deposition Transcript of Kris Thayer, Ph.D. ("Thayer Dep. Tr.") 63:5-21; 154:11-14 (Ex. 81).

[298] Lumpkin Decl., ¶ 28 (Ex. 67); 2010 Review at 147-48 (Ex. 64).  "The chloroprene IUR is based on the assumption that humans are as sensitive to chloroprene exposure as the female B6C3F1 mouse." *Compare* DPE MSJ SOF, ¶ 47 (Ex. 36), *with* US Contested SOF, ¶ 47 (Ex. 37).

[299] US Responses to DPE First Set of RFAs, at 18 (Response to DPE's RFA No. 17) ("The United States further admits that the inhalation unit risk for chloroprene determined in the 2010 IRIS assessment is based on the assumption that humans are as sensitive to chloroprene exposure as the female B6C3F1 mouse.") (Ex. 79); Lumpkin Decl., ¶ 31 (Ex. 67).

[300] Lumpkin Decl., ¶ 31 (Ex. 67).

[301] Thayer Dep. Tr. 63:5-21; 154:11-14, Case No. 2:23-cv-00735 (Ex. 81); *see also* 2010 Review at 139 (true correspondence of B6C3F1 mouse to human is "unknown") (Ex. 64).

[302] EPA Responses to DPE Second Set of Interrogatories, at 20 (Response to Interrogatory No. 18) (Ex. 30).

[303] *Id*.

[304] Lumpkin Decl., ¶ 38 (Ex. 67).

Review, EPA discussed the available toxicokinetic data for chloroprene in humans and animals.[305] However, EPA makes no reference to this critical information in support of its decision to assess chloroprene risk based on female B6C3F1 mouse data. Instead, EPA blindly relies on the analysis performed in the 2010 Review, ignoring the crucial fact that the 2010 Review failed to determine which set of animal data best reflected human risk.[306]

In Chapter 3 of the 2010 Review (entitled "Toxicokinetics"), EPA summarizes the then-available *in vitro* and *in vivo* studies that informed the toxicokinetic behaviors of chloroprene in animals and humans.[307] Section 3.3 of the 2010 Review discusses the then-available metabolism data for chloroprene based on laboratory rodents and humans, including data on the rate at which chloroprene is metabolized *in vitro* by specific liver and lung cellular components (called microsomes) to a class of one or more compounds called "reactive epoxides."[308] These "reactive epoxides" are believed to react with the cellular structures in the tissues in which they are produced (*e.g.*, the lung or liver), resulting in the loss of proper function and, ultimately, leading to formation and growth of tumors (*i.e.*, the source of toxicity).[309]

The toxicokinetic data presented in the 2010 Review demonstrates significant metabolic differences between female B6C3F1 mice and humans. For example, the data demonstrate that humans and female B6C3F1 mice do *not* metabolize chloroprene the same.[310] Table 3-4 of the 2010 Review, and EPA's accompanying discussion, summarizes the differences between female B6C3F1 mice and humans in metabolizing chloroprene into reactive epoxides, showing, based on *in vitro* studies, that the rate of this metabolism in a female B6C3F1 mouse's liver is more than twice that of human liver microsomes and about 50-times higher in lung microsomes.[311] Because a mouse's metabolic rate of chloroprene is much higher than a human's, a mouse is capable of producing significantly higher amounts of "reactive epoxides," the compounds understood to be responsible for chloroprene's toxicity. The 2010 Review also states that higher metabolism of chloroprene to reactive epoxides was observed in female B6C3F1 mice compared to other tested laboratory rats and hamsters, providing the most likely explanation of the higher tumor incidence reported in B6C3F1 mice relative to the other tested rodents.[312]

In Table 3-5 of the 2010 Review and the accompanying discussion, EPA summarizes study data indicating that enzyme systems that metabolize, and potentially detoxify, one of the key reactive epoxides are much more active in human microsomes than in female B6C3F1 mice.[313] Because a mouse's metabolic rate for the pathway that metabolizes the key reactive epoxide is lower than in a human's, a human is capable of detoxifying (*i.e.*, clearing) higher amounts of this key reactive epoxide from the body.[314]

EPA's risk assessment accepts, at face value, the chloroprene IUR's use of female B6C3F1 mice to estimate risk, despite ample toxicokinetic data that data from female B6C3F1 mice is not the most representative of human risk. The Final Rule provides no evidence that EPA has considered this data, instead capriciously rejecting DPE's scientific position because EPA determined that DPE failed to provide "new scientific

---

[305] *Id.* ¶ 32.
[306] EPA Responses to DPE Second Set of Interrogatories, at 20 (Response to Interrogatory No. 18) (Ex. 30).
[307] Lumpkin Decl., ¶ 113 (Ex. 67).
[308] 2010 Review at 7-19 (Ex. 64); Lumpkin Decl., ¶ 37 (Ex. 67).
[309] Lumpkin Decl., ¶ 38 (Ex. 67).
[310] *Id.*
[311] 2010 Review at 13-44 (Ex. 64); Lumpkin Decl., ¶ 38 (Ex. 67).
[312] 2010 Review at 13-14 (Ex. 64).
[313] *Id.*
[314] Lumpkin Decl., ¶ 116 (Ex. 67).

information that would alter aspects of the EPA IRIS assessment or call into question the scientific judgments reflected in those assessment."[315]

Likewise, EPA's expert in the Section 303 Litigation, Dr. Ila Cote, testified that she did not consider the pharmacokinetic data in Tables 3-4 and 3-5 of the 2010 Review in formulating her opinions, explaining she was not familiar with those critical data.[316]

In the 2010 Review, EPA's use of the female B6C3F1 mouse to calculate the chloroprene IUR was based on the NTP Study. But the same NTP Study that included data for female B6C3F1 mice *also included* tumor incidence data for the F344 female rat (the more sensitive sex of F344 rat), which would have resulted in an IUR of 6.9 x $10^{-5}$, after adjusting for age-dependent adjustment factors ("ADAFs").[317] Indeed, the F344 rat has a rate of metabolism for chloroprene, and metabolic rate for the pathway that metabolizes the key reactive epoxide, that is more similar to humans than the female BC3F1 mouse.[318] EPA's use of female B6C3F1 mice data, despite the availability of animal data more representative of humans, is inappropriate for use in assessing whether an "imminent endangerment" exists for *humans*.

### 2.     Adjusting for continuous exposure.

EPA's chloroprene IUR and corresponding 0.2 µg/m³ concentration level assumes that individuals are continuously exposed to chloroprene 24 hours per day, every day, for 70 years.[319] In the Final Rule, EPA provides no suggestion that an assumption of continuous exposure is plausible. Likewise, in the Section 303 Litigation, EPA's expert offered no evidence that the assumption of continuous exposure is plausible, and he failed to follow EPA's applicable guidance. EPA typically relies on an assumption of continuous exposure when considering a maximum plausible risk and implementing the Benzene Rule framework. However, an "imminent endangerment" finding is based on actual risk and requires EPA to substantiate such that an assumption is plausible.[320]

In the residual risk review for coke ovens, EPA explained that the MIR must be "tempered" by the implausible considerations, such as the assumption of continuous exposure for 70 years for every individual near the Facility:

> For the source category associated with the 1993 national emission standards, the revised MIR estimate is 300 in a million. . . . Although we are adjusting risk estimates upward to reflect the new supplemental guidance, these estimated risk increases must also be tempered by consideration of other factors that were discussed at proposal and in the risk assessment document, and the further protective assumption added to the risk assessment that all individuals are born in the assessed area. . . . Our 70-year exposure assumption includes exposures from birth to 70 years. If exposures were from 3 years to 73 years, the adjustment factor would be less than 1.6. If exposures were from 16 years to 86 years, no adjustment would be necessary. In addition, we used a health-protective assumption of a 70-year exposure duration in our risk estimates; however, using the

---

[315] Final Rule at 110 (Ex. 1).

[316] Cote Dep. Tr. 186:2-186:18 (Ex. 80).

[317] Gentry Decl., ¶ 46 (Ex. 66).

[318] 2010 Review at 13-14 (Ex. 64).

[319] 2010 Review at 138 (Ex. 64); Lumpkin Decl., ¶ 90 (Ex. 67).

[320] Lumpkin Decl., ¶ 61 (Ex. 67).

national average residency time of 12 years would reduce the estimate of risk by a factor of six (69 FR 48347).[321]

Notably, EPA failed to include any similar discussion in the Final Rule, despite adopting the same assumption. By failing to account for the implausibility of the 70-year assumption, the Final Rule suggests that an MIR is an appropriate proxy for actual risk. It is not. Without accounting for the 70-year assumption through the use of an exposure assessment, a MIR is rendered useless for assessing "imminent endangerment."

EPA's *Guidelines for Human Exposure Assessment* provide guidance on how exposure assessments should be performed and how the risk assessor can better understand the characteristics of a population and its behaviors.[322] The EPA guidance explains that exposure estimates for an individual or population can be developed "[b]y combining information and data describing exposure scenarios, concentrations, activity patterns and other exposure factors."[323] The guidelines also emphasize the importance of data, noting that "[t]he drivers for human activities are complex and, unlike [chemicals], cannot be predicted using first-principle models based on physical/chemical properties. Instead, human activities are treated as stochastic properties (random variables) described by population distributions based on available (*e.g.,* observational or modeled) data."[324]

The preliminary assumption in risk assessment that a person is constantly exposed for a lifetime is a hypothetical construct and only useful for an initial screening-level risk assessment.[325] Moving beyond a mere screening-level risk assessment, however, adjustments for reasonably plausible mobility and residential occupancy durations are needed to sufficiently assess exposure and associated risks on which to justify regulatory action like declaring an imminent and substantial endangerment.[326] While it is true that IURs in the IRIS Program are not developed to account for residential mobility and occupancy (IRIS IURs are chemical-specific, but facility-neutral and, accordingly, assume 70-year continuous exposure), EPA guidance is clear that exposure assessments *do* account for residential mobility and occupancy.[327]

EPA has not performed any such exposure analysis in the Final Rule. Likewise, in the Section 303 Litigation, EPA failed to make any such adjustments for residential mobility and occupancy duration.[328] For example, EPA has developed an *Exposure Factors Handbook*.[329] This guidance document is specifically designed to reduce uncertainties in estimates of exposure duration and frequency to environmental chemicals.[330] For example, EPA's *Exposure Factors Handbook* provides residential occupancy data, *i.e.,* the "time (years) between a person moving into a residence and the time the person moves out or dies."[331] The *Exposure Factors Handbook* states that the average (mean) residential occupancy period is 12 years and the 95th

---

[321] 70 Fed. Reg. at 19994 (Ex. 47).

[322] EPA, *Guidelines for Human Exposure Assessment* xiv (Oct. 2019) (Ex. 82).

[323] *Id.* at 17.

[324] *Id.* at 6-7.

[325] *Id.*

[326] *Id.*

[327] *Id.*

[328] Rebuttal Declaration of Dr. John J. Vandenberg in Support of United States' Reply to its Motion for Preliminary Injunction ("Vandenberg Rebuttal PI Decl."), ¶ 70, Attachment 11A ("Updated graph of estimated excess lifetime cancer risk associated with *continuous chloroprene exposure* at Denka TO-15 monitoring locations" (emphasis added)), Case No. 2:23-cv-00735 (Ex. 83).

[329] Lumpkin Decl., ¶ 92 (Ex. 67); EPA, *Exposure Factors Handbook: 2011 Edition* at 6-1 (2011) (Ex. 84).

[330] EPA, *Exposure Factors Handbook: 2011 Edition* at 6-1 (2011) (Ex. 84).

[331] *Id.* at Table ES-1; Lumpkin Decl., ¶ 96 (Ex. 67).

percentile is 33 years, meaning that, across a population, the true residential occupancy period is expected to be less than 33 years 95% of the time.[332]  Notably, the average residential occupancy period of 12 years is the same period of time referenced by EPA in the residual risk review for coke ovens.

For example, in the Section 303 Litigation, DPE's expert, Dr. Lumpkin, prepared such estimates based on plausible residential duration and occupancy (without making other appropriate adjustments described above).  Dr. Lumpkin's estimates resulted in an IUR of 2.4 ×10$^{-4}$ per µg/m$^3$, or twice the IUR developed by EPA in the 2010 Review.  Dr. Lumpkin's exposure-adjusted IUR, or any similar adjustments to the IUR, would provide a more representative estimate of actual risk.

Values from EPA's *Exposure Factors Handbook* demonstrate that assuming a person is born near the Facility and remains constantly immobile there for 70 years is not plausible.[333]  Even less plausible is the notion that *every* person living near the Facility would remain at a single location for 70 continuous years. Failing to adjust the default 70-year exposure assumption to account for reasonably plausible mobility and residential occupancy durations renders an exposure assessment preliminary, incomplete, and inappropriate for use to assess whether an imminent and substantial endangerment exists.[334]

### 3.    Adjusting for upper-bound estimate.

In the 2010 Review, EPA used the "upper bound" risk value when estimating the chloroprene IUR based exclusively on tumor incidence data from female B6C3F1 mice.[335]  The "upper bound" value, or the "upper confidence limit," is a value expected to contain the true value 95% of the time over many different samples.[336]  In *estimating* risk in Section 112 rulemakings, EPA often uses an upper bound estimate. However, in assessing whether an *imminent endangerment* exists, it is inappropriate to use a value that, by definition, does *not* reflect the most probable risk estimate.[337]  An "upper bound" value of the IUR— which results in a concentration of 0.2 µg/m$^3$ associated with a 1-in-10,000 excess risk—is just as likely as the "lower bound" value, which results in a concentration of 0.4 µg/m$^3$ associated with a 1-in-10,000 excess risk, and is less likely than every value in between.[338]  In addition, when the IUR contains other flawed data (*i.e.*, the use of female B6C3F1 mice data), using the upper bound value amplifies the risk distortions caused by those data.

When EPA uses an "upper bound" estimate for IURs, it means EPA has confidence that the excess cancer risk will not be *greater* than that estimate.[339]  However, the true excess cancer risk is statistically likely to be below that estimate and could be as low as zero.[340]  In the Section 303 Litigation, EPA incorrectly alleges that "a person may breathe no more than an average chloroprene concentration of 0.2 µg/m$^3$ over 70 years in order to remain below a 1-in-10,000 lifetime excess cancer risk."[341]  Even if every other aspect of

---

[332] EPA, *Exposure Factors Handbook: 2011 Edition* at Table 16-4 (2011) (Ex. 84).

[333] Lumpkin Decl., ¶ 119 (Ex. 67).

[334] *Id.* ¶¶ 90-102.

[335] *Id.* ¶ 60; 2010 Review at 136 (Ex. 64).

[336] 2010 Review at 136 (stating that the 95% upper confidence limit was calculated assuming a normal distribution and using the formula 95% UCL = MLE + 1.645 × SD) (Ex. 64).

[337] Lumpkin Decl., ¶ 59 (Ex. 67).

[338] *Id.* ¶¶ 30, 60-62.

[339] *See* EPA, *Air Toxics Risk Assessment Ref. Library, Vol. 2* at 32-33 (Apr. 2004) (Ex. 85).

[340] EPA, *Guidelines for Carcinogen Risk Assessment* at 13 (Sept. 1986) (approach used in developing IUR "does not necessarily give a realistic prediction of the risk.  The *true value of the risk is unknown*, and may be as low as zero.") (emphasis added) (Ex. 86); *see also* Cote Dep. Tr. 31:8-10 ("The true value for human risk [of chloroprene] is really not known.  So this is an estimate based on rodent data. . . .") (Ex. 80).

[341] EPA Memorandum in Support of Motion for Preliminary Injunction, *U.S. v. Denka Performance Elastomer LLC et al.*, Case No. 2:23-cv-00735, ECF No. 9-2, at 2 (E.D. La. Mar. 20, 2023) (Ex. 87).

EPA's risk allegations were assumed to be correct, which is a false assumption, only a fractional subset of people would face a 1-in-10,000 excess risk of cancer at 0.2 $\mu g/m^3$, and it is more probable that *no* people would face such risk. Accordingly, EPA's use of the upper bound IUR does not provide a meaningful estimate of excess cancer risk actually posed by chloroprene. Nor does EPA (i) define what characteristics people within the upper bound exhibit or (ii) identify a single person who exhibits such characteristics. Even if using an upper bound value is appropriate within the framework of the Benzene Rule, it is inappropriate when assessing actual risk such as in an "imminent endangerment" finding. Adjusting the IUR to reflect the central tendency (2.2 x $10^{-4}$) would provide a more representative estimate of actual risk.

### 4.      Adjusting for arbitrary rounding.

In the 2010 Review, EPA calculated an IUR of 5 x $10^{-4}$ (the equivalent of 0.20 $\mu g/m^3$), in part, by rounding the composite IUR (the risk for all tumor types) for female B6C3F1 mice upwards, from 2.7 x $10^{-4}$ (the equivalent of 0.37 $\mu g/m^3$) to 3 x $10^{-4}$ (the equivalent of 0.33 $\mu g/m^3$).[342] EPA then applied the ADAFs to the rounded value to calculate a final IUR of 5 x $10^{-4}$ corresponding to 0.20 $\mu g/m^3$.[343] If EPA had not rounded the composite risk value before applying the ADAFs, the final IUR would be 4.47 x $10^{-4}$ (the equivalent of 0.22 $\mu g/m^3$), a decrease in the risk estimate of ten percent.

EPA had no biological-based or risk-based reason for rounding the composite risk value from 2.7 x $10^{-4}$ to 3 x $10^{-4}$.[344] Nor has EPA even attempted to offer such a reason, instead admitting that the IUR was rounded as purely a matter of "convention in mathematics."[345] Critically, however, this "convention," by itself, translates into a 10 percent decrease the chloroprene IUR, which is substantial. Likewise, rounding can distort the MIR values assigned to a facility, particularly given that the MIRs themselves are rounded. EPA's decision to round the values in the chloroprene IUR overstates the risk of cancer actually posed by chloroprene and it is inappropriate to adopt this arbitrary (and deliberate) error in assessing imminent endangerment. Simply by calculating the IUR without rounding, the 2010 IUR would be more representative of actual risk.

### 5.      Adjusting for unsupported mutagenic mode of action classification.

EPA incorrectly determined that the weight of evidence supported classifying chloroprene as acting via a "mutagenetic mode of action."[346] Based on this classification, EPA applied age-dependent adjustment factors ("ADAFs") to the IUR, increasing the IUR by 66 percent from 3 x $10^{-4}$ (the equivalent of 0.33 $\mu g/m^3$) to 5 x $10^{-4}$ (the equivalent of 0.20 $\mu g/m^3$).

Contrary to EPA's determination, the scientific evidence demonstrates that a mutagenic mode of action for chloroprene is unlikely.[347] The question of whether chloroprene is a mutagen has been evaluated in *in vitro* mammalian cell studies, *in vitro* bacteria studies, and *in vivo* studies, and the overall evidence

---

[342] 2010 Review at 137 (Ex. 64); Lumpkin Decl., ¶ 30 (Ex. 67).

[343] 2010 Review at 137-38 (Ex. 64).

[344] Cote Dep. Tr. 93-94 (explaining that rounding the composite risk value is "simply a convention in mathematics") (Ex. 80).

[345] *Id.*

[346] 2010 Review at 106-11 (Ex. 64). EPA defines the carcinogenic "mode of action" of a chemical as "a sequence of key events and processes, starting with interaction of an agency with a cell, proceeding through operational and anatomical changes, and resulting in cancer formation." Lumpkin Decl., ¶ 53 (citing EPA, *Guidelines for Cancer Risk Assessment* (Mar. 2005) at 1-10, n.2 (Ex. 65)) (Ex. 67). Although multiple modes of action have been identified for chemical carcinogens, per EPA guidelines, the distinction between a mutagenic or non-mutagenic mode of action has significant implications for deriving an IUR. Lumpkin Decl., ¶ 53 (Ex. 67).

[347] Lumpkin Decl., ¶ 30 (Opinion 3) (Ex. 67).

indicates that chloroprene does not have a mutagenic mode of action.[348] Most significantly, *in vivo* studies of mice did not report changes in mutations that would support a mutagenic mode of action.[349]

Critically, considering the evidence on whether chloroprene acts via a mutagenic mode of action, the NTP Study (the same study EPA relies on for the data on female B6C3F1 mice) concluded that "[c]hloroprene showed *no evidence of mutagenicity* in tests performed in vitro or in vivo."[350]

The Ramboll PBPK Model simulation of the NTP rodent dose-response data indicates that the carcinogenic mode of action may likely be due to cytotoxicity (frank cell damage) rather than direct mutagenicity, and that the prevalence of reactive metabolites is likely to occur only after glutathione (a molecule that can attach to and neutralize the reactivity of chloroprene's reactive metabolites) is depleted at chloroprene exposure levels used in the NTP (1998) studies, but far higher than levels measured in the environment.[351] By accounting for chloroprene's cytotoxic mode of action, and calculating the IUR without applying the ADAFs, the chloroprene IUR would be more representative of actual risk.

**V.     Conclusion**

As set forth herein, a two-year compliance period is "necessary for the installation of controls" and the steps that DPE has already taken to reduce emissions will ensure that emissions from the Facility will not cause an "imminent endangerment" during the extension period.

---

[348] Lumpkin Decl., ¶ 78-86 (Ex. 67); Sax *et al.* (2020), at 300-303 (Ex. 55).

[349] Lumpkin Decl., ¶ 83 (Ex. 67).

[350] *Id.* (citing 1998 NTP Study at 276) (emphasis added).

[351] *Id.* ¶ 71.

# EXHIBIT B



**JEFF LANDRY**
GOVERNOR

**AURELIA S. GIACOMETTO**
SECRETARY

# STATE OF LOUISIANA
### DEPARTMENT OF ENVIRONMENTAL QUALITY
### OFFICE OF ENVIRONMENTAL SERVICES

Certified Mail No.

Agency Interest (AI) No. 199310
Activity No. PER20240003

Mr. Jeffrey R. Holmstead
Counsel to Denka Performance Elastomer, LLC
Bracewell LLP
2001 M Street NW, Suite 900
Washington, DC 20036-3310

RE:   Extension of Compliance
      Denka Performance Elastomer LLC, Pontchartrain Plant
      LaPlace, St. John the Baptist Parish, Louisiana

Dear Mr. Holmstead:

By correspondence dated April 19, 2024,[1] Denka Performance Elastomer LLC (Denka) requested a two-year extension to comply with certain requirements promulgated by the Environmental Protection Agency (EPA) on May 16, 2024.[2] More specifically, Denka requested an extension for the chloroprene requirements of 40 CFR 63.484(u), 63.485(y) and (z), 63.487(j), 63.494(a)(7), 63.501(a)(10)(iv), 63.502(a)(3) and (a)(7), 63.509, and 63.510 of Subpart U, and, with respect to fenceline monitoring provisions, the root cause analysis and corrective action requirements of 40 CFR 63.184(e) and (f) of Subpart H.[3] These provisions have a compliance date of October 15, 2024.

Section 112(f)(4)(B) of the Clean Air Act and 40 CFR 63.6(i)(4)(ii) and (i)(9) provide the Louisiana Department of Environmental Quality (LDEQ) with the authority to grant an extension allowing the owner or operator of an existing source who is unable to comply with an applicable standard established pursuant to 112(f) of the Act up to 2 years to comply with the standard, if such additional period is necessary for the installation of controls and that steps will be taken during the period of the extension to assure that the health of persons will be protected from imminent endangerment.[4] Note that EPA has interpreted "installation of controls" broadly to "include the installation of any equipment needed to comply with the rule, such as adding or modifying emission control equipment and/or equipment necessary to comply with the monitoring, recordkeeping and reporting requirements of the rule."[5]

---

[1]   EDMS Doc ID 14263241
[2]   New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry (89 FR 42932)
[3]   40 CFR 63.502(a) requires Denka to comply with the requirements of 40 CFR 63 Subpart H except as provided in 40 CFR 63.502(a)(1) through (7) and (b) through (m).
[4]   Louisiana has an "approved permit program" as defined in 40 CFR 63.2. See "Clean Air Act Final Full Approval of Operating Permits Program; Louisiana Department of Environmental Quality" (60 FR 47296, September 12, 1995).
[5]   See memorandum dated June 15, 2017, from Peter Tsirigotis, Director of EPA's Sector Policies and Programs Division, titled "MACT Compliance Extension Requests for Petroleum Refineries."

Mr. Jeffrey R. Holmstead
Page 2

LDEQ finds that additional time is needed for Denka to install controls. In justifying the need for a compliance date of two years after the effective date of the final rule, EPA acknowledged that "the new [ethylene oxide] provisions under CAA section 112(f) will require additional time to plan, purchase, and install emission control equipment" and "additional permits may be required for these new emission control equipment (*e.g.*, New Source Review and/or a Title V permit modifications). In other words, sufficient time is needed to properly engineer the project, obtain capital authorization and funding, procure the equipment, obtain permits, and construct and start-up the equipment."[6]

The circumstances facing Denka are no different. According to Denka, a new thermal oxidizer and wastewater steam stripper will be required to comply with the new standards for chloroprene, and additional control equipment may be necessary to limit total chloroprene emissions from all maintenance vents to 1.0 tons per year. In addition, Denka will have to construct as many as three permanent total enclosures to capture emissions from batch reactors, wash belt dryers, and emulsion storage tanks, as well as install additional monitoring equipment on numerous pressure relief devices.

LDEQ also finds that steps will be taken during the period of the extension to assure that the health of persons will be protected from imminent endangerment. Denka must continue to operate the regenerative thermal oxidizer and wet scrubber installed in 2018 and implement the other emission reduction measures mandated by Administrative Order on Consent AE-AOC-17-00011, issued January 6, 2017, which were designed to reduce actual chloroprene emissions by 85 percent.[7] Notably, according to EPA's Air Toxics Screening Assessments, these measures alone reduced local cancer risk due to chloroprene exposure by approximately 84 percent.[8]

Further, during the two-year extension period, Denka shall comply with the following requirements.

*Fenceline Monitoring*

Denka shall comply with fenceline monitoring provisions for chloroprene as required by 40 CFR 63.502(a) of Subpart U and 40 CFR 63.184 of Subpart H according to the schedule set forth in 40 CFR 63.481(p)(2), except that the root cause analysis and corrective action requirements of 40 CFR 63.184(e) and (f) of Subpart H shall not apply until October 15, 2026.

*TO-15 Monitoring*

Denka shall continue the periodic sampling of chloroprene that it voluntarily agreed to in its May 6, 2016, letter to LDEQ.[9] Specifically, Denka must take at least one 24-hour integrated sample at least once every six calendar days using 6L Summa canisters at five different locations near the Pontchartrain Plant and analyze such samples using method TO-15 for 1,3-butadiene, benzene, chloroprene, ethylbenzene, toluene, and total xylenes. Denka shall continue reporting monitoring results to LDEQ on a monthly basis.

---

[6]  89 FR 42954

[7]  EDMS Doc ID 10457076

[8]  Based on the cancer risks attributed to chloroprene per EPA's 2017 AirToxScreen and 2019 AirToxScreen for census tract 22095070800, which encompasses the community immediately west of the Pontchartrain Plant.

[9]  See EDMS Doc IDs 10186646 and 10232609.

Mr. Jeffrey R. Holmstead
Page 3

*Additional Chloroprene Emission Reduction Strategies*

Denka shall continue to implement the emission reduction strategies described in Section III.A (Implemented Emission Reduction Strategies Since May 2022) of Denka's request.[10] If Denka wishes to suspend or cease implementation of any such strategy, Denka shall notify LDEQ at least seven days prior and propose a replacement strategy that is anticipated to achieve a similar level of chloroprene emission reductions.

*Progress Reports*

Consistent with 40 CFR 63.6(i)(11), Denka shall submit semiannual progress reports to the Air Permits Division detailing the actions taken to bring the affected sources at the Pontchartrain Plant into compliance with the standards under 40 CFR 63 Subpart U for which an extension has been requested. These reports shall be due on:

- May 31, 2025, for the period encompassing October 15, 2024, through April 14, 2025;
- November 30, 2025, for the period encompassing April 15, 2025, though October 14, 2025;
- May 31, 2026, for the period encompassing October 15, 2024, through April 14, 2026; and
- November 30, 2026, for the period encompassing April 15, 2026, though October 14, 2026.

Based on the information provided by Denka, LDEQ hereby grants the requested two-year extension to comply with the provisions of 40 CFR 63 Subparts H and U identified above. The new compliance date shall be October 15, 2026.[11]

LDEQ recognizes that EPA has amended 40 CFR 63.507(c) to preclude delegation of its authority to approve extension requests under 40 CFR 63.6(i)(4)(ii) to state, local, and tribal agencies.[12] However, this amendment does not become effective until July 15, 2024,[13] and therefore does not prohibit LDEQ's approval of Denka's extension request.

Should you have any questions regarding this matter, please contact Bryan D. Johnston of the Air Permits Division at (225) 219-3450 or bryan.johnston@la.gov.

Sincerely,

Amanda Vincent, Ph.D., PMP
Assistant Secretary

_June 27, 2024_
Date

AV:BDJ

---

[10] EDMS Doc ID 14263241 (pp. 20-22 of 53)

[11] This extension is effective upon signature. LDEQ is aware that Denka is seeking a stay of the effective date of the May 16, 2024, amendments to Subpart U in the D.C. Circuit. This approval is subject to any modification of the effective date ordered by the court and shall not become effective if Denka obtains a two-year compliance period through its judicial challenge.

[12] 40 CFR 63.507(c)(6)

[13] 89 FR 42932

# EXHIBIT C

# BRACEWELL

June 28, 2024

**BY E-MAIL & FEDEX**

The Honorable Michael S. Regan
Administrator
ENVIRONMENTAL PROTECTION AGENCY
1200 Pennsylvania Avenue, N.W.
MAIL CODE 1101A
Washington, DC 20460

**Re:     Denka Performance Elastomer, LLC – Expedited Request for Position Regarding Validity of Extension of Time in June 27, 2024 Letter from Louisiana Department of Environmental Quality**

Dear Administrator Regan:

Denka Performance Elastomer, LLC ("DPE") hereby requests a statement of position from the Environmental Protection Agency ("EPA") addressing the validity of the extension of time granted by the Louisiana Department of Environmental Quality ("LDEQ") on June 27, 2024, attached as Exhibit A ("LDEQ Extension").

On May 16, 2024, EPA published the final rule entitled *New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emissions Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry* ("Final Rule").[1] The Final Rule imposes a series of stringent emission control requirements upon DPE's facility in LaPlace, Louisiana ("Facility"), which is the Nation's only Neoprene production plant. The Final Rule requires DPE to comply with a significant portion of these requirements within 90 days of the Final Rule's effective date, which – as EPA acknowledges – is an impossible task. *See* 40 C.F.R. 63.481(o) and 63.481(p)(2) (the "90-Day Requirements").

On April 19, 2024, DPE submitted a facility-specific extension request to LDEQ, seeking an extension of the 90-Day Requirements pursuant to 42 U.S.C. § 7412(f)(4)(B) and 40 C.F.R. § 63.6(i)(4)(ii) ("Extension Request") (attached as Exhibit B).  DPE submitted the Extension Request to LDEQ based on LDEQ's authority to grant an extension pursuant to its Part 70 operating permits program and its delegated authority under 40 C.F.R. Part 63.[2] The Extension Request explained that good cause exists for the extension because a period of at least two years is necessary for DPE to comply with the 90-Day Requirements and the Facility does not present an "imminent endangerment."

---

[1]  89 Fed. Reg. 42,932 (May 16, 2024).
[2] 60 Fed. Reg. 47,296 (Sept. 12, 1995) (EPA approval of the Louisiana Operating Permits program); 80 Fed. Reg. 9,613 (Feb. 24, 2015) (EPA approval of updated NESHAP delegation).

**Jeffrey R. Holmstead**
Partner

T:+1.202.828.5852        F: +1.800.404.3970
2001 M Street NW, Suite 900, Washington,DC 20036-3310
jeff.holmstead@bracewell.com        bracewell.com

AUSTIN   CONNECTICUT   DALLAS   DUBAI   HOUSTON   LONDON   NEW YORK   SAN ANTONIO   SEATTLE   WASHINGTON, DC

# BRACEWELL

The Honorable Michael S. Regan (EPA)
June 28, 2024
Page 2

On June 27, 2024, LDEQ granted the Extension Request, stating, in part: "LDEQ finds that additional time is needed for Denka to install controls. . . . LDEQ also finds that steps will be taken during the period of the extension to assure that the health of persons will be protected from imminent endangerment."  The LDEQ Extension provides DPE until two years after the Final Rule's effective date to comply with the 90-Day Requirements, subject to specified conditions.[3]  Such conditions include monitoring of chloroprene in the ambient air near the Facility, the continuation of a suite of emission reduction strategies that DPE has implemented since May 2022, and semiannual progress reports. In reliance on LDEQ's authority to issue the extension, DPE intends to continue operating the Facility beyond October 15, 2024, and until two years after the effective date of the Final Rule, in good faith compliance with currently applicable requirements and the conditions of the LDEQ Extension.

On June 11, 2024, EPA indicated in a court filing that "[a]ny purported compliance extension granted by a state to Denka would be ineffectual."[4]  EPA's court filing provided no explanation as to why any such state-issued extension would be "ineffectual." Nor has EPA provided any explanation since then.

Thus, DPE requests that EPA provide a formal position on the validity of the LDEQ Extension and the legal basis in support of such position.  As EPA acknowledges, DPE cannot comply with the 90-Day Requirements by October 15, 2024.  Without EPA's position on this matter, DPE will be subjected to substantial and mounting legal uncertainty on October 15, 2024, the compliance deadline in place before the LDEQ Extension was granted.  If EPA intends to treat the LDEQ Extension as "ineffectual," and enforce the October 15, 2024 compliance deadline, then DPE intends to avail itself of legal recourse to resolve the consequent uncertainty before allowing "the Agency to drop the hammer" and impose virtually unlimited legal liability on DPE.[5]

Accordingly, DPE requests that EPA take action in response to this letter no later than the close of business on July 8, 2024. DPE will treat EPA's failure to act by July 8, 2024 as confirmation that EPA will treat the LDEQ Extension as "ineffectual" without providing further legal support.  The short timeline associated with DPE's request is driven by two factors.  First, DPE submitted its extension request to LDEQ on April 19, 2024—more than two months ago. EPA has already had ample time to consider the legal status of the extension.  Second, time is of the essence for DPE and its 250 employees, including statutory and contractual obligations that must be addressed in advance of any facility closure.

In further support of this request, DPE is aware that the Final Rule purports to revoke LDEQ's long-standing authority to extend the compliance date of the 90-Day Requirements.[6] However, such action has no bearing on the LDEQ Extension.

---

[3] LDEQ has confirmed to DPE the compliance date based on the extension is July 15, 2026. Due to a clerical error, the LDEQ Extension incorrectly stated the compliance date as October 15, 2026.
[4] EPA, *Respondent's Opposition to Motion to Stay Final Rule* at 7-8, n2 (*Denka Performance Elastomer LLC v. EPA*, Docket No. 24-1135, Doc No. 2059123 (D.C. Cir. Filed June 11, 2024)).
[5] *Sackett v. EPA*, 566 U.S. 120, 127 (2012).
[6] Final Rule at 42,261 (40 C.F.R. § 63.507(c)(6)).

# BRACEWELL

The Honorable Michael S. Regan (EPA)
June 28, 2024
Page 3

First, the Final Rule amends 40 C.F.R. § 63.507(c) to provide that the "[a]pproval of an extension request under § 63.6(i)(4)(ii)" cannot be delegated to state agencies, but the Final Rule does not purport to prohibit the delegation of 40 C.F.R. § 63.6(i)(9), which specifically authorizes that "the Administrator *(or the State with an approved permit program)* may grant an extension of compliance with an emission standard as specified in [§ 63.6(i)(4)]." (Emphasis added). The authority to grant extension requests is clearly authorized by Section 63.6(i)(9) and EPA does not purport to revoke the delegation of such authority. Nor does the plain language of 40 C.F.R. § 63.507(c)(6) purport to prohibit DPE from submitting an extension request to LDEQ. Thus, even if EPA's revocation of authority were proper, it simply does not impact LDEQ's authority under Section 63.6(i)(9).

Second, EPA guidance confirms that granting an extension pursuant to 40 CFR § 63.6(i) "does not require delegation through Subpart E and, instead, is automatically granted to the States as part of their part 70 operating permits program approval. . . ."[7] EPA approved the Louisiana Operating Permits program on September 12, 1995.[8]  Therefore, to issue the LDEQ Extension, LDEQ did not require the delegated Subpart E authority that EPA purports to revoke in the Final Rule.  As such, EPA's purported revocation of authority in the Final Rule does not impact LDEQ's authority under Section 63.6(i)(9) or the validity of the LDEQ Extension.

Third, the Final Rule does not become effective until July 15, 2024. Thus, even assuming that the Final Rule's amendment to 40 C.F.R. § 63.507(c) applied to LDEQ's authority to grant extensions—and, as explained above, it plainly does not—the amended Section 63.507(c) is not yet effective and cannot legally foreclose any action until July 15, 2024. EPA's attempt to revoke Louisiana's authority to grant extensions *after the effective date* unequivocally recognizes that Louisiana does have such authority *before the effective date*, including on June 27, 2024, the date the LDEQ Extension was granted.

Finally, EPA's amendment of Section 63.507(c)(6) in the Final Rule does not adhere to the plain language of Section 63.507(c) or the unambiguous regulatory history of the provision. As the regulatory history makes clear, the authorities listed in Section 63.507(c) were intended to clarify which provisions of Part 63 could not be delegated to states *as a matter of law*.[9] In the preamble supporting the promulgation of Section 63.507, EPA explained:

> Each individual NESHAP, for example, contains requirements that are considered the "standards" and are, therefore, not delegable in terms of your making changes to them. Because the Administrative Procedures Act requires us to approve alternative emission limitations or control requirements through Federal rulemaking, we cannot delegate our rulemaking authority to you. More specifically, any requests by sources for approval of alternative standards must be considered by us and acted upon in a notice and comment rulemaking. Additionally, we cannot delegate authorities that

---

[7] Letter from John S. Seitz re *Delegation of 40 CFR Part 63 General Provisions Authorities to State and Local Air Pollution Control Agencies* (July 10, 1998) (Attached as Exhibit C).

[8] 60 Fed. Reg. 47,296 (Sept. 12, 1995) (Attached as Exhibit D).

[9] *See* 68 Fed. Reg. 37,334 (Aug. 22, 2003) (Attached as Exhibit E).

# BRACEWELL

The Honorable Michael S. Regan (EPA)
June 28, 2024
Page 4

> may alter the stringency of the standard, that require Federal oversight for national consistency, or that may require Federal rulemaking.[10]

Section 63.507 is one of many "implementation and enforcement" provisions in Part 63. Indeed, when EPA promulgated Section 63.507, which is applicable to Subpart U, EPA also promulgated "implementation and enforcement" provisions for 34 other subparts.[11] EPA made clear that the "implementation and enforcement" sections were consistent across subparts and *only pertain to the authority to approve alternatives to emission standards*.

> The new "Implementation and enforcement" sections cite the rule sections or requirements for which you may not approve alternatives (i.e., non-delegable authorities). The authority to make changes to those sections or requirements is retained by us and includes the authority to approve any alternatives to emissions standards; including their applicability requirements. Conversely, any authority, not expressly reserved for us and included in these paragraphs, can be delegated to you.[12]

Contrary to EPA's addition of Section 63.507(c)(6) in the Final Rule, the authority of states to grant extensions pursuant to Section 63.6(i) can be—and has been—delegated as a matter of law.[13] Attempting to revoke a state's delegated authority through a "clarifying" provision (without any prior notice in the Proposed Rule) contradicts entirely the regulatory history of Section 63.507(c) and similar provisions.

Sincerely,

Jeffrey R. Holmstead
**Counsel to Denka Performance Elastomer, LLC**

Enclosures (Exhibits A – E)

---

[10] *Id.* at 37,334.
[11] *Id.* at 37,337.
[12] *Id.* at 37,336.
[13] *See* LDEQ, Letter of Response to Hunt Forest Products, Inc. (Nov. 30, 2015) (granting one-year extension to comply with 40 C.F.R. 63 Subpart DDDDD); LDEQ, Letter of Response to Motiva Enterprises LLC (Dec. 28, 2016) (granting six-month extension to comply with 40 C.F.R. 64 Subpart CC); LDEQ, Letter of Response to Weyerhaeuser Co. (Feb. 6, 2008) (granting fourteen-month extension to comply with 40 C.F.R. 63 Subpart DDDD); LDEQ, Letter of Response to Georgia-Pacific Wood Products LLC (Oct. 16, 2007) (granting fourteen-month extension to comply with 40 C.F.R. 63 Subpart DDDD).

# BRACEWELL

The Honorable Michael S. Regan (EPA)
June 28, 2024
Page 5

cc (w/ encls.):

David A. Super, Counsel to Denka Performance Elastomer, LLC
Jason B. Hutt, Counsel to Denka Performance Elastomer, LLC
Kevin M. Voelkel, Counsel to Denka Performance Elastomer, LLC
Robert E. Holden, Counsel to Denka Performance Elastomer, LLC
Matthew Littleton, Deputy Attorney General, DOJ
Brandon N. Adkins, Environmental Defense Section, DOJ
Steven D. Shermer, Environmental Enforcement Section, DOJ
Amanda Vincent, Ph.D., PMP, Assistant Secretary, LDEQ

# **EXHIBIT D**

| | |
|---|---|
| **From:** | Gange, Heather (ENRD) |
| **To:** | Super, David; Shermer, Steven (ENRD); Voelkel, Kevin; Hutt, Jason; Collins, Kevin; Venn, Brett; Holden, Bob (BHolden@joneswalker.com); Steckman, Britt |
| **Cc:** | Eric Jarrell; Cernich, Scott (ENRD); Smith, Dan (ENRD); Forsythe, Davis (ENRD); Frazier, Hannah (ENRD); Adkins, Brandon (ENRD) |
| **Subject:** | Denka Appellate Question |
| **Date:** | Monday, July 8, 2024 5:51:48 PM |

Good evening everyone,

 I followed up on the potential Fifth Circuit filing question that came up in our call earlier today in the US v Denka call.  After checking into that, I am told that a response to Denka's letter within your time frame will not be possible.

Best regards,

Heather

Heather E. Gange
Senior Attorney, E-DOC

U.S. Department of Justice
Environment & Natural Resources Div.
Environmental Defense Section
P.O. Box 7611
Washington, DC  20044-7611
(202) 514-4206 (office)
(202) 532-3157 (cell)
She/her/hers

# EXHIBIT E

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

UNITED STATES OF AMERICA,

                Plaintiff,

                       Civil Action No. 23-735
VS.                     Section "J"(3)
                       New Orleans, Louisiana
                       July 18, 2024

DENKA PERFORMANCE ELASTOMER, LLC
AND DUPONT SPECIALTY PRODUCTS USA, LLC,

                Defendants.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TRANSCRIPT OF STATUS CONFERENCE
HEARD BEFORE THE HONORABLE CARL J. BARBIER
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:       Steven David Shermer
                       U.S. Department of Justice
                       Environmental
                       601 D Street NW
                       Washington, DC 20004

                       Heather E. Gange
                       U.S. Department of Justice
                       P.O. Box 23926
                       Washington, DC 20026

                       Davis Hoskins Forsythe
                       DOJ-Enrd
                       150 M Street NE
                       Room 2.1130
                       Washington, DC 20002

                       Hannah Lee Frazier
                       DOJ-Enrd
                       Enrd-Ees
                       150 M Street NE
                       Washington, DC 20002

APPEARANCES CONTINUED


FOR THE GOVERNMENT:             Daniel Stephen Smith
                                DOJ-Enrd
                                Environmental Enforcement
                                Section
                                P.O. Box 7611
                                Ben Frankling Station
                                Washington, DC 20044

                                Jonah M Seligman
                                DOJ-Enrd
                                Environment and Natural
                                Resources Division
                                150 M St. NE
                                Rm 5.130
                                Washington, DC 20002




FOR DENKA PERFORMANCE ELASTOMER, LLC:

                                David A. Super
                                Jason B. Hutt
                                Jeffrey Holmstead
                                Kevin Voelkel
                                Bracewell LLP
                                2001 M Street, NW
                                Suite 900
                                Washington D.C., DC 20036

                                Robert E. Holden
                                Jones Walker
                                Place St. Charles
                                201 St. Charles Avenue
                                Suite 5100
                                New Orleans, LA 70170

FOR DUPONT SPECIALTY PRODUCTS USA, LLC:

                             Eric Earl Jarrell
                             King & Jurgens, LLC
                             201 St. Charles Avenue
                             Suite 4500
                             New Orleans, LA 70170

                             Marie Olga Luis
                             King & Jurgens, LLC
                             201 St. Charles Ave
                             45th Floor
                             New Orleans, LA 70170

Official Court Reporter:    Nichelle N. Wheeler, RMR, CRR
                             500 Poydras Street, B-275
                             New Orleans, Louisiana 70130
                             (504) 589-7775

    Proceedings recorded by mechanical stenography,
transcript produced via computer.

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | (Call to order of the court.) |
| 3 | THE DEPUTY CLERK:  The Court calls Civil Action |
| 4 | 23-735, *United States of America v. Denka Performance* |
| 5 | *Elastomer, LLC, et al.* |
| 6 | THE COURT:  All right.  The Court has this -- we |
| 7 | have this as -- scheduled as a status conference to see |
| 8 | where we are in this whole litigation.  I've got to say |
| 9 | this has all been somewhat confusing.  There's so much |
| 10 | going on and I'm not sure exactly where we are or where |
| 11 | we're headed with all of this.  So that's what I hope to |
| 12 | talk about this morning. |
| 13 | Who plans to speak here today, first of all, I |
| 14 | guess on behalf of the United States? |
| 15 | MR. SHERMER:  Good morning, Your Honor, I'm Steve |
| 16 | Shermer.  I'm lead counsel for the United States.  I plan |
| 17 | to speak, as well as Heather Gange, who is counsel for |
| 18 | the United States in its capacity as a counterclaim |
| 19 | defendant. |
| 20 | THE COURT:  Okay.  Very well.  Thank you. |
| 21 | And on behalf of DPE, who plans to speak? |
| 22 | MR. SUPER:  Good morning, Your Honor, Dan Super. |
| 23 | It's nice to meet you in person.  I'll be speaking on |
| 24 | behalf of Denka Performance Elastomer. |
| 25 | THE COURT:  Okay.  Is there someone here from |

1    DuPont?

2          MR. JARRELL:  Eric Jarrell, Your Honor, for DuPont

3    Specialty Products USA, LLC.

4          THE COURT:  Okay.  Other than the persons who just

5    identified themselves, I have a list of everyone who is

6    here, but does anyone plan to need to speak here this

7    morning?

8          Okay.  All right.  I don't know who wants to

9    start.

10         The suit that we have here in this court, of

11   course, was brought by the EPA, by the United States, as

12   an enforcement action against Denka under Section 303 of

13   the Clean Air Act, arguing that Denka's emissions are

14   imminent, constituting imminent and substantial

15   endangerment to the surrounding community, and as I

16   understand, they argued that any emissions above that 0.2

17   microgram level was unsafe and presents an unacceptable

18   high risk of cancer for individuals living near Denka.

19         Denka is located in St. John Parish?

20         MR. SHERMER:  Yes.

21         THE COURT:  So this is in LaPlace, right?

22         MR. SUPER:  LaPlace.

23         THE COURT:  Is that where you're located?

24         Okay.  In the meantime, the EPA has promulgated

25   the so-called final rule, and initially, as I recall, the

1   proposed rule would impose that same standard, 0.2, but

2   with a two-year window to apply -- to comply, right?  The

3   proposed rule?

4        MR. SUPER:  That's not -- may I approach the

5   podium?

6             THE COURT:  Sure.  Go ahead.

7        MR. SUPER:  That's not correct, Your Honor, and

8   that's actually a fundamental point.

9             The proposed rule and now the final rule actually,

10  if all of the control requirements were implemented under

11  the final rule, EPA has said that the concentration that

12  would result is 0.8 micrograms per cubic meter.  And in

13  the rule, the United States says that that would be

14  protective of human health.  So in our view, the rule

15  with a 0.8 result is fundamentally inconsistent with the

16  Section 303 action where they're saying that a level of

17  0.2 constitutes an imminent and substantial endangerment.

18       THE COURT:  Well, you just managed to confuse me

19  even further, Mr. Super.

20       MR. SUPER:  It's confusing.  I'm sorry.

21       THE COURT:  Wait.  You can sit down, ma'am.

22       Wait.  No, stay where you are.  Stay where you

23  are.  I got a couple questions for you.

24       MR. SUPER:  Sure.

25       THE COURT:  So this is the first time I've heard

1   the 0.8.  I thought we were talking about 0.2 that was in

2   the proposed rule, but it provided for a proposed

3   two-year window to comply, but when the final rule came

4   out, they said, no, it's 90 days to comply.

5        MR. SUPER:  That is one of the --

6        THE COURT:  As I understand, the 90 days, I don't

7   want to call it the standard or the statutory

8   requirement, right, the 90 days -- the two-year would be

9   an extension, correct?

10       MR. SUPER:  That is correct.

11       THE COURT:  And that's what was originally

12  proposed.  Now it is 90 days.  So I didn't know there was

13  some argument about 0.2 versus 0.8.  Tell me about that.

14       MR. SUPER:  Yes.

15       THE COURT:  It's the first I heard about that.

16       MR. SUPER:  No, it's a really important point for

17  our motion for summary judgment, but, again -- because,

18  again, the risk assessment in the final rule points out,

19  the estimate is that once all the control requirements

20  are in place, the concentrations then would apply.  The

21  maximum average annual concentration would be 0.8.  And,

22  again, that is four times higher than the level that

23  we're --

24       THE COURT:  Meaning --

25       MR. SUPER:  -- trying to meet --

```
1         THE COURT:  -- meaning all the controls that Denka
2    would be required to implement.
3         MR. SUPER:  Under the rule.  That's exactly --
4    it's a post -- a post-control concentration of 0.8, that
5    under the statute as a matter of law, the agency in
6    promulgating this rule has said that is protective of
7    human health.
8         THE COURT:  What's the current emission from there
9    now?
10        MR. SUPER:  They've gone down considerably over
11   the past several years including during the pendency of
12   this lawsuit.  I can't tell you exactly what they are at
13   the moment, but 0.8 is within the realm of possibility as
14   we've consistently represented to the Court.  0.2 is not.
15   That would require a shutdown.  It's impossible to meet.
16        So, again, the rule, the final rule, will have in
17   our view an enormous impact on this case and it will be
18   part of the summary -- the supplemental summary judgment
19   briefing that --
20        THE COURT:  But --
21        MR. SUPER:  -- both sides proposed.
22        THE COURT:  -- but -- okay.
23        Let me hear from the government --
24        MR. SUPER:  Sure.
25        THE COURT:  -- on their point.  Okay?
```

```
 1         MR. SHERMER:  Good morning --

 2         THE COURT:  Good morning.

 3         MR. SHERMER:  -- Your Honor, Steve Shermer for the

 4   United States.

 5         Your Honor, the reason you're hearing about this

 6   0.8 concentration for the first time is because Mr. Super

 7   is incorrect.  That is not the end-all be-all of this

 8   final rule.  The final rule in addition to the technology

 9   requirements, emission standards that it also requires,

10   it also requires a 0.3 concentration that Denka would

11   have to meet after installing all of its control

12   technologies as a backstop.  That is the end goal of the

13   rule.  So that's why you're not -- you haven't

14   heard about 0.3 --

15         THE COURT:  So now we're talking about 0.8, 0.3

16   and 0.2.

17         MR. SHERMER:  Correct.

18         THE COURT:  So what --

19         MR. SHERMER:  I can try and square that a bit for

20   you.

21         THE COURT:  Yeah, please.

22         MR. SHERMER:  So that 0.3 standard is measured at

23   the fence line, the perimeter of the facility.  The EPA

24   has modeled that that -- achieving that concentration

25   will result in acceptable below or at 0.2 levels in the
```

 1   community, outside the perimeter.  So that's how you

 2   reconcile the different numbers that you're hearing.  0.8

 3   is a technology based standard, 0.3 is an air

 4   concentration based standard at the perimeter of the

 5   fence line, and 0.2 is the ultimate end goal in the

 6   community amongst the people who are being exposed to

 7   Denka's emissions.

 8        THE COURT:  So what is the goal -- what is the

 9   EPA -- what is your final goal here in terms of -- other

10   than shutting down the plant?  What is your goal here in

11   terms of emissions?

12        MR. SHERMER:  So our goal is not to shut down the

13   plant, Your Honor.  Our goal is to have Denka meet -- the

14   relief that we've asked for in this case is that Denka

15   achieve a 0.3 concentration at the perimeter at its fence

16   line using one type of monitoring system, and at the same

17   time, achieve a 0.2 microgram per cubic meter

18   concentration outside the fence line using a different

19   type of monitoring system, hand-in-hand monitoring

20   systems to give --

21        THE COURT:  So you're saying it would be 0.3 at

22   the fence line, so the farther away you got, the

23   concentration would logically be lower, right?

24        MR. SHERMER:  That's correct, in the affected

25   communities who have been exposed --

1      THE COURT:  So from your perspective, what's the

2  significance of the 0.8 that Mr. Super was talking about?

3      MR. SHERMER:  It's part of the rule, Your Honor.

4  It's EPA's calculation of how far they project Denka will

5  be able to get implementing all of the sort of known

6  control technologies that the rule talks about.  0.3 is

7  another target that EPA doesn't dictate how Denka needs

8  to get there, but it needs to get there.

9      THE COURT:  That doesn't make a lot of sense to

10  me, I got to tell you.

11      So you're saying if they install every bit of

12  technology that's available now they would only get to

13  0.8?

14      MR. SHERMER:  Of the categories of emissions.

15      THE COURT:  But they need to get to 0.3, but you

16  don't care how they get there.  Is that what you just

17  said?

18      MR. SHERMER:  The last part is correct, Your

19  Honor.  They have the flexibility to meet that 0.3

20  requirement.

21      THE COURT:  How would they get there if there's no

22  technology other than shutting down?  I'm not -- I'm just

23  having trouble understanding your argument here.

24      MR. SHERMER:  So the 0.8 number is based on a

25  fixed set of different emission sources.  It doesn't

1 represent the whole universe of sources of chloroprene

2 emissions at the facility.

3      So, for example, the rule talks about how to

4 control tanks, how to control different, essentially,

5 smokestacks, process fence (phonetic), how to control

6 emissions from wastewater.  The rule talks about a set of

7 different emission sources that the EPA -- the rule

8 dictates the control requirements for those different

9 sources.  But beyond that, there are other sources of

10 chloroprene emissions that Denka can control.

11      It can control those same sources like tanks below

12 the standards to achieve a 0.3 standard, but the point --

13 the 0.8 standard is based on a fixed set of different

14 manufacturing equipment that the EPA focused on.

15      THE COURT:  Okay.  So tell me -- and I'll let Mr.

16 Super respond, but tell me where things stand

17 procedurally in all of this litigation.  Because you have

18 this case here where you want -- your goal here is to --

19 your goal here would be to shut them down, right, at

20 least temporarily?

21      MR. SHERMER:  The goal would be for them -- would

22 be for them to achieve those two concentrations --

23      THE COURT:  Well, is it even feasible for them to

24 do this -- like, if you say this is an immediate danger,

25 it needs to be shut down or they need to reduce it to

1    that level, it doesn't sound like that's even feasible,

2    would it be?

3          MR. SHERMER:  Within the time that's left between

4    now and October 15th, I don't know.  We don't know if it

5    is feasible.  Denka has had years of time to plan for

6    this, to understand the government's objectives in this

7    case, and with the time that it's been aware of what the

8    government has asked for, it certainly could have

9    achieved those numbers without the need for a shutdown.

10         THE COURT:  And you have the rule up -- the rule

11    in DC.  What's the status of that?

12         MR. SHERMER:  So Ms. Gange's section of the

13    Justice Department is handling that litigation.  If I

14    may, Your Honor, she might be best suited to speak to

15    that.

16         THE COURT:  Okay.  Sure.

17         MS. GANGE:  Good morning, Your Honor.

18         THE COURT:  Hi.

19         MS. GANGE:  The litigation in the DC Circuit of

20    the window for additional petitioners challenging that

21    rule just closed this Monday.  EPA recently designated

22    the administrative record, and so that litigation is in

23    its early stages.  We're estimating that that may take up

24    to a year, give or take a few months, possibly more to

25    resolve and have a decision issued from the DC Circuit,

1    but in the meantime, because Denka's request for a stay

2    of that rule pending review is denied, the rule is valid,

3    and on October 15th will become effective.  And so that

4    will from that date forward be effective and potentially

5    enforceable.

6         All of it is provisions.  There are many, many

7    categories of sources; many, many pollutants regulated by

8    that rule.  So that is very --

9         THE COURT:  This is much -- this is much broader

10    than just the Denka Plant in LaPlace.

11         MS. GANGE:  Much; much, much broader; many more

12    pollutants, many more categories of potential sources all

13    across the country.

14         THE COURT:  But Denka is the only place where

15    chloroprene is manufactured, correct, only place in the

16    United States?

17         MS. GANGE:  I might need to stand corrected, but I

18    believe that there is one other source of chloroprene in

19    this country or one other facility that uses it and

20    therefore might be regulated.  But Denka -- I mean,

21    Denka's focus is chloroprene because that is so central

22    to their manufacturing, but the rule is so much more

23    broader.  There are many more petitioners.  And so

24    Denka's brief may be very focused, but the other issues

25    raised by other petitioners all will be litigated

 1   simultaneously in the DC Circuit.

 2           THE COURT:  But all the other petitioners -- their

 3   argument, one of their arguments for the stay, as I

 4   appreciate it, has been that, for whatever reason, the

 5   EPA decided to -- in the rule to give every other

 6   facility two years to comply as opposed to 90 days for

 7   Denka.  Is that -- is that accurate?

 8           MS. GANGE:  That is an issue that the DC Circuit

 9   will need to grapple with, yes.

10           With respect to -- because that is an issue in the

11   final rule that jurisdiction to entertain that lies

12   exclusively in the DC Circuit.

13           I think Your Honor was accurate earlier today

14   though when you pointed out that under the statute it

15   requires a 90-day compliance with an emissions standard

16   issued under Section 112 unless the EPA grants an

17   extension, and the EPA determined not to do that due to

18   the imminent and substantial endangerment presented by

19   chloroprene.

20           THE COURT:  So in the EPA's view, chloroprene is

21   more imminently dangerous than any of these other

22   chemicals anywhere?

23           MS. GANGE:  My understanding -- and I apologize.

24   I might, again, need to stand corrected, but my

25   understanding of the chemicals regulated in the rule,

1  chloroprene happens to be the only one for which an

2  actual determination of an imminent and substantial

3  endangerment has been made.  For the other chemicals that

4  are regulated, there has not been a formal EPA

5  determination that there is an imminent and substantial

6  endangerment presented.

7        THE COURT:  How was -- who determined that?  How

8  is that determined by the EPA, the imminent danger part

9  of it?

10        MS. GANGE:  Imminent and substantial endangerment?

11        THE COURT:  Yes.

12        MS. GANGE:  In the preparation for this lawsuit

13  and in this lawsuit, there have been positions and

14  statements made.  There is no formal rulemaking, per se,

15  that there is -- there's no document I can point you to

16  from the EPA that has, say, been published in the Federal

17  Register making that determination, but the gravamen of

18  this lawsuit is that EPA scientists in the agency have

19  analyzed the data and information available and

20  determined that there is, in fact, an imminent and

21  substantial endangerment presented that -- that that

22  actually is the issue before Your Honor in this case.

23        THE COURT:  Right.  I understand that, but I was

24  trying to figure out how is that determined.  Do you

25  know?

```
 1        As I recall -- as I recall, there was some --
 2   Denka has filed a request for reconsideration or
 3   rehearing or something up in the DC Circuit on their
 4   request for a stay?
 5        MS. GANGE:  They did.  That was recently filed.
 6   That has not yet been decided.
 7        THE COURT:  Okay.  Now, has -- I know the State of
 8   Louisiana, the Attorney General and so forth, have filed
 9   something in the Fifth Circuit.  Has Louisiana or anyone
10   filed something intervening or somehow in the DC Circuit,
11   too?
12        MS. GANGE:  I am not aware of whether or not
13   Louisiana has intervened in the DC Circuit.  I know that
14   Denka did file a request with the Fifth Circuit for a
15   finding that an extension, a two-year extension that
16   Louisiana tried to grant them, is valid.  They're asking
17   for declaratory judgment that that two-year extension is
18   valid.
19        EPA does not believe that that is valid.  By
20   Friday, I believe an intervention motion from Louisiana
21   will have to be responded to.  Louisiana has tried to
22   intervene in that Fifth Circuit action, and by Monday,
23   the EPA is required to file a response on the merits --
24        THE COURT:  So are you --
25        MS. GANGE:  -- to the request.
```

1    THE COURT:  -- are you involved in that?  Who is

2    involved in that?  Same lawyers who are here in this

3    courtroom this morning?

4    MS. GANGE:  No, Your Honor.  My section of DOJ --

5    I'm in the environmental defense section, and so we are

6    handling the DC Circuit and the Fifth Circuit litigation.

7    I am not personally writing the briefs, but members of my

8    section are and I work with them --

9    THE COURT:  In the Fifth Circuit, too?

10   MS. GANGE:  That's correct.

11   THE COURT:  Okay.  And I'll, of course, ask the

12   other side, but I'm trying to understand the procedural

13   avenue by which Denka and/or Louisiana went from -- went

14   directly to the Fifth Circuit.  Or is that an issue?

15   MS. GANGE:  That is an issue.  It is a bit of a

16   puzzlement.

17   THE COURT:  Yeah.

18   MS. GANGE:  So I -- at this point, the

19   government's position hasn't been articulated formally in

20   a brief and I'm not allowed to present issues until I

21   know that they've been approved by officials at an

22   appropriate level to make them.

23   But I can say and it has been said in other

24   filings that the government does not believe that the

25   two-year extension that was granted by the State of

```
 1  Louisiana is --

 2         THE COURT:  Well, I know -- I know that.  I

 3  understand the government's position on that.  But I was

 4  just thinking about the procedural machinations, if I

 5  want to call it, in this whole case that is going on.

 6         MS. GANGE:  Whether or not all proceedings should

 7  go in the DC Circuit or not, that's certainly a question

 8  and an issue that is being grappled with.  But in the

 9  meantime, for this case, there is no inconsistency

10  between the endangerment that's being litigated here in

11  the 0.2 figure and the figures in the final rule.

12         I think the way perhaps to drop to the bottom line

13  might be that it is our belief that on October 15th that

14  emissions standard or all of these figures you have been

15  hearing about will become effective.  But if --

16         THE COURT:  And what's the -- if that occurs,

17  what's the practical effect or implication?  Does that

18  shut down the plant?  Because they say they can't comply,

19  it's impossible.

20         MS. GANGE:  And I think we -- I would have to

21  reiterate what Mr. Shermer said earlier, which is Denka

22  has been aware of this for years.

23         THE COURT:  Well, that's fine.  But we are where

24  we are now.  We're not -- we're not two years in the

25  past.
```

```
1          So if that happens, do you envision that Denka
2   would be shut down if they can't get a stay from either
3   the Fifth Circuit or the DC Circuit?
4          MS. GANGE:  Whether Denka is shut down or not in
5   light of that emissions standard, I'm afraid that's
6   something only Denka could answer.  I think in the
7   meantime our concern is Denka has been trying every --
8   trying to follow every possible pathway to try to ensure
9   that the standards in the final rule would not become
10  effective against them and our concern is that in the
11  meantime the public is being endangered by these
12  emissions.  And so we would like for this case to go
13  forward so that the public can be protected while these
14  other machinations are playing out.
15         THE COURT:  All right.  Thank you.
16         Mr. Super, you want to --
17         MR. SUPER:  Yes.  Thank you, Your Honor.
18         THE COURT:  Why don't you start by telling me, are
19  you involved in the Fifth Circuit --
20         MR. SUPER:  I'm involved in all of them, Your
21  Honor.
22         THE COURT:  I figured you were.
23         MR. SUPER:  Yeah.  Okay.
24         THE COURT:  So tell me, how is it that you go
25  directly to the circuit on that issue.
```

1    MR. SUPER:  Certainly.

2    THE COURT:  Okay.

3    MR. SUPER:  If I might --

4    THE COURT:  Procedurally.  I'm just trying to

5  understand --

6    MR. SUPER:  Can I just spend a few minutes just

7  telling you what's going on in the DC Circuit and the

8  Fifth Circuit?

9    THE COURT:  Sure.  Yeah.  I'd love --

10   MR. SUPER:  That may help.

11   THE COURT:  -- for you to do that.

12   MR. SUPER:  But the one thing I really do need to

13  just say immediately is, the notion that we're doing

14  everything we can to nullify this unlawful rule is

15  exactly right, because we're trying to protect a plant

16  that they're ordering to be closed.  We're trying to

17  protect the jobs of 250 employees and their families.  So

18  it does matter a lot to us.

19        And so in the DC Circuit, we are challenging the

20  rule in its entirety, but we filed an emergency stay just

21  to stop the 90-day implementation period.  And there

22  really can be no mistake in this court that that

23  implementation period is impossible to comply with.

24        And I'm not sure what Mr. Shermer was referring

25  to, but, I mean, their own experts in this litigation in

1  front of you opined that it would take 90 days just to

2  plan one of the control projects, just one, and now we

3  would have to plan and implement all of the projects in a

4  90-day period and no one believes that's possible,

5  including the EPA.

6      Now -- so we filed a motion for stay of the rule

7  in the DC Circuit and we got sort of the standard

8  one-sentence denial from the court that we had met the

9  stringent standards for a stay.  The next day, the

10 Supreme Court issued the *Ohio v. EPA* case which pretty

11 fundamentally changes how our court should look at

12 granting a stay of an agency rule.  That's why we filed

13 our petition for review just last -- on July 5th actually

14 and we're very hopeful that that may gain some traction

15 with the court.

16     But just to tell you quickly what that argument

17 was, when EPA issued the proposed rule, that was two

18 months after this case had been filed.  And in that

19 proposed result, as Your Honor knows, they had proposed a

20 two-year limitation period for Denka and all the other

21 200 facilities that are impacted by the rule.  And by

22 definition, as a matter of law, to give us that two-year

23 period, they had to have found that there was no imminent

24 endangerment.  Otherwise, they couldn't give it.

25     Now, we argued in summary judgment before this

```
 1    Court that that means they've admitted there is no
 2    imminent and substantial endangerment because they were
 3    giving us a two-year compliance period.  And we frankly
 4    think that the jig was up on summary judgment.  The EPA
 5    realized that and so they went and they changed the rule.
 6    They changed it to a 90-day implementation period.  And
 7    the key thing is, they gave no notice of that in the
 8    proposed rule.  In fact, during the rulemaking process,
 9    they gave a full-throated defense of the two-year period
10    when the Office of Management and Budget asked about
11    that.  So the EPA was all in favor of the two-year period
12    until they changed it.
13          And, you know, in the words of the DC Circuit and
14    the Fifth Circuit and other cases, that's a classic
15    surprise switcheroo.  We think that makes the rule
16    invalid.
17          But worse, in the rule, EPA failed to explain why
18    Denka was being singled out and only given a 90-day
19    period.  Because, Your Honor, there are -- there are two
20    facilities out of the 200 that the EPA estimates that has
21    far higher risk levels than Denka and yet those
22    facilities got the two -- the full two-year period.  Does
23    that mean they're not posing an imminent endangerment?
24    We don't know.
25          I mean, the EPA has not explained how it can
```

```
 1   single out Denka and say that it's causing an

 2   endangerment, when these other facilities are not, who

 3   admittedly pose a higher level of risk.

 4          And I've got to address this finding they're

 5   talking about.  The only, the only explanation they gave

 6   in a 140-page preamble for why Denka was being singled

 7   out was because of a so-called finding that Denka is

 8   posing an imminent and substantial --

 9          THE COURT:  You're talking about what they filed

10   in this court?

11          MR. SUPER:  Well, actually --

12          THE COURT:  Is that -- is that what you're talking

13   --

14          MR. SUPER:  It's even more slippery than that,

15   Your Honor.  They cited this case, but they didn't cite

16   anything in this case.

17          THE COURT:  No.  But you said 140 pages.  Where

18   are you talking about?  In the Circuit, in the DC --

19          MR. SUPER:  That's in the preamble to the rule.

20          THE COURT:  Oh, in the preamble to the rule.

21   Okay.

22          MR. SUPER:  So there's one sentence in the entire

23   preamble to the rule --

24          THE COURT:  Okay.

25          MR. SUPER:  -- purporting to explain why we're
```

```
 1   only given 90 days --

 2          THE COURT:  Okay.

 3          MR. SUPER:  -- and the sentence says there's a

 4   finding of an imminent and substantial endangerment

 5   related to Denka and they cite to this case.

 6          When we argued, okay, fine, there has been no

 7   finding in this case, yet clearly we haven't had a trial

 8   yet, but tell us what evidence you're pointing to, they

 9   said no.  They're not pointing to the evidence in this

10   case.  They're just pointing to the existence of the

11   case.

12          We have no idea who made that finding and, again,

13   it's important to point out allegedly the finding was

14   made two months before they issued the proposed rule

15   giving us the two-year period, which is fundamentally

16   inconsistent with saying there is no imminent

17   endangerment.

18          So we know nothing about this finding.  The EPA

19   has explained nothing about it and we think it's critical

20   because if there is a finding that Denka is causing an

21   imminent endangerment and yet there is at least two

22   facilities under the rule who admittedly pose a higher

23   risk, where's the finding about whether they're causing

24   an imminent endangerment or not?  Apparently, the EPA

25   found that they're not because the EPA gave them the
```

1    two-year period.  And, again, they cannot do that as a

2    matter of law unless they found no imminent endangerment.

3         So we do think that when we spell all of this out

4    to the DC Circuit, as we did in our petition for review,

5    we're very hopeful the Circuit will take another look at

6    this case and enter the stay.

7         We have clear eyes about this though.  It's very

8    difficult to obtain a reversal of a denial of a stay by

9    the DC Circuit.  The DC Circuit has stayed one EPA rule

10   since 2011.  So it's a daunting -- it's a daunting task.

11   So that's where we are in the DC Circuit.

12        Fifth Circuit, on June 27th, the Louisiana

13   Department of Environmental Quality issued an extension

14   to Denka of the 90-day compliance period out to July 15,

15   2026.  Now, it's our position that the LDEQ had full

16   authority to do that for multiple reasons on the merits.

17   I mean, probably the simplest is, in the rule itself, the

18   EPA amended a provision purporting to remove LDEQ's

19   ability to grant extensions.  Well, that rule doesn't

20   come into effect -- it wasn't in effect at the time that

21   LDEQ granted the extension.  So that's one reason.

22        Another is LDEQ has separate authority to issue

23   extensions just because of the fact that it's the

24   permitting authority under the Clean Air Act and there

25   are other reasons as well, but that's for the Fifth

```
 1   Circuit to decide.  EPA has taken the position that the

 2   extension issued by LDEQ is invalid.  And so Denka cannot

 3   rely upon that extension come October 15, and beyond --

 4   without knowing -- without having some certainty that it

 5   is valid.  Otherwise, the EPA is going to bring its full

 6   civil and criminal enforcement liability to bear against

 7   Denka after October 15th.

 8         So what we've done is, we've gone to the Fifth

 9   Circuit.  We filed a petition for review that asks for a

10   declaratory judgment that the LDEQ extension is valid --

11         THE COURT:  But why does that go directly to a

12   circuit?

13         MR. SUPER:  Because it's --

14         THE COURT:  That's what I'm trying to -- that's

15   what I'm trying to understand.

16         MR. SUPER:  Under Section 307(b) of the Clear Air

17   Act, it covers final EPA actions of a local or regional

18   nature.  And so EPA, taking a final position that the

19   LDEQ extension is invalid, is a local matter that goes to

20   the local circuit.  And that's why it's in the Fifth

21   Circuit instead of the DC Circuit.

22         Now, we've also asked the DC Circuit to issue an

23   emergency stay precluding EPA from taking any action in

24   contravention of what we view as a -- as a valid

25   extension granted by the LDEQ.  And mind you --
```

```
 1          THE COURT:  So you raise the Louisiana LDEQ

 2    extension.  If someone is valid -- if -- I mean,

 3    obviously, you think it is valid, they think it's not,

 4    but you've raised that in the DC Circuit also?

 5          MR. SUPER:  We have not.  In the DC Circuit, we're

 6    challenging other aspects of the rule.

 7          THE COURT:  Okay.

 8          MR. SUPER:  This really -- this really isn't the

 9    rule.  This is seeking to get a declaration of the

10    validity of all the other reasons why LDEQ has authority

11    to issue this extension.

12          THE COURT:  I know.  But it creates -- it creates

13    quite an interesting procedural --

14          MR. SUPER:  It does, Your Honor.

15          THE COURT:  -- where you have a DC Circuit -- you

16    have this proceeding in the DC Circuit where the EPA

17    wants to enforce their rule, which is with the 90 days.

18    You've asked to stay that --

19          MR. SUPER:  Right.

20          THE COURT:  The Circuit at this point has denied

21    your request for a stay.  You've applied for a rehearing

22    I guess en banc.

23          MR. SUPER:  That's right, rehearing by the panel

24    and rehearing en banc.

25          THE COURT:  Okay.  And while all that's pending,
```

```
 1   you now go to the Circuit, the Fifth Circuit --

 2          MR. SUPER:  Right.

 3          THE COURT:  -- ask them to give you the two-year

 4   extension that the DC Circuit may or may not -- what if

 5   the DC Circuit says, no, you can't get a stay -- you have

 6   to comply with this rule and the Fifth Circuit says you

 7   have a two-year extension.  We have one circuit against

 8   another circuit.  Meanwhile, I'm sitting down here

 9   between both of them.

10          MR. SUPER:  I'm going to get to your position on

11   this --

12          THE COURT:  Okay.

13          MR. SUPER:  -- in a moment --

14          THE COURT:  Okay.

15          MR. SUPER:  -- if you don't mind.

16          What I would say to you there, Your Honor -- this

17   was on page 1 of our motion for stay in the Fifth

18   Circuit.  The arguments we are making to the Fifth

19   Circuit can assume that the rule is valid because, again,

20   we're saying that LDEQ acted under other authority.  It

21   doesn't matter that that rule is out there, that LDEQ had

22   separate and independent and lawful authority to issue

23   this extension.  So that's what we've got before the

24   Fifth Circuit right now.

25          Now, what we've asked the Court to do --
```

1     THE COURT:  Could you have -- could you have gone

2  to the DC Circuit with the argument about the extension

3  granted by the LDEQ?

4     MR. SUPER:  I believe we -- I believe we could.

5  My colleagues may correct me on this, but I think when

6  you're talking about a final agency action of local or

7  regional application, you can either go to the local

8  circuit or you can go to the DC Circuit.  We elected to

9  go to the Fifth Circuit.

10     And, again, in our view and we spelled this out to

11  the Fifth Circuit, there was no overlap between the two

12  cases, because in the DC Circuit, we're talking about a

13  rule; in the Fifth Circuit, we're talking about other

14  authority that the State maintains to issue extensions.

15     THE COURT:  Well, I see a lot of potential overlap

16  from where I sit here, but anyway.  Go ahead.

17     MR. SUPER:  We will undoubtedly be faced with

18  those arguments and we'll wade through them, but to kind

19  of -- just one other point about the Fifth Circuit.

20     We've asked for the Court to rule on our stay

21  motion by the 12th of August.  Very significant date.

22     October 14th, again, that is when the 90-day

23  implementation period kicks it.  Denka cannot comply with

24  it.  It's gonna have to shut down.  But it can't shut

25  down on October 14th.  It has to start that process

```
 1    earlier and many of the things that need to be done will
 2    be starting in mid-August and that is why we need --
 3         THE COURT:  Give me an example of why -- why it
 4    takes two months to shut down a plant.
 5         MR. SUPER:  Yeah.  One major one is there's
 6    the W-A-R-N, the WARN Act, obligations with respect to
 7    employees.  We have to tell them --
 8         THE COURT:  I'm very familiar with that.
 9         MR. SUPER:  -- we have to tell them well in
10    advance.  But it's not an -- it's not an easy task to
11    shut down a facility, particularly if it's shut down
12    potentially permanently.  There's just a lot of
13    engineering steps that go into it to ensure safety, to
14    ensure the removal of all of the ingredients that go into
15    the products.  So it's something that does need to start
16    in August, again, which is why we with some temerity
17    asked the Fifth Circuit to rule pretty quickly.
18         THE COURT:  Well, what would be -- what would be
19    the practical consequences if nothing changes, the 90-day
20    requirement stays in effect and Denka chooses not to shut
21    down or says we can't shut down by that time?  Are they
22    continuing to challenge on the merits, but they're not --
23         MR. SUPER:  Denka, Your Honor, is not -- is
24    sensibly not willing to operate beyond October 15th
25    without an assurance that it has a valid extension
```

 1  permitting it to do so due to the substantial criminal

 2  and civil liabilities that could be brought to merit --

 3       THE COURT:  So you can ensure the Court there's no

 4  question, no doubt that if Denka does not get a stay from

 5  either the DC Circuit or the Fifth Circuit, it's going to

 6  shut down by October 15th.

 7       MR. SUPER:  Yes, Your Honor.  Yes, Your Honor.

 8  There's no other -- there's no other options.

 9       And that kind of leads to where I believe the

10  matter sits before this Court, and as you saw in our

11  portion of the status report, we were suggesting that the

12  case should be held in abeyance to find out what's going

13  to happen in the Fifth Circuit and the DC Circuit, which

14  would certainly happen before October 14th and may happen

15  much sooner in the next, I don't know, six to

16  eight weeks.  But if we don't obtain relief from the

17  90-day implementation period, just as I said, the plant

18  will shut down and the litigation alleging an imminent

19  and substantial endangerment will render moot.

20       And so in our view, it doesn't make much sense and

21  it's not very prudent for the parties to be preparing for

22  a trial, I think -- actually I know that the United

23  States proposed the second half of October, that the

24  parties should be preparing for a trial that could be

25  rendered moot, like days before the trial begins, nor

 1   frankly should the Court be wrestling with fairly complex

 2   motion for judgment, a motion to dismiss, DuPont's motion

 3   for judgment on the pleadings, I think there's a couple

 4   of motions in limine out there, I think there are a lot

 5   of party and judicial resources that would be wasted

 6   unless -- and believe you me, I'm very hopeful that we

 7   get relief from the DC Circuit or the Fifth Circuit.  But

 8   we recognize that we have some daunting challenges in

 9   front of us before those courts.

10        If we don't get that relief, again, it doesn't

11   make much sense to have been preparing for a trial that

12   has been rendered moot and that was the basis for our

13   abeyance suggestion.

14        THE COURT:  In light of -- in light of speaking of

15   the pending motions, there's a pending motion for --

16   there's still a renewed, I guess, motion on the -- on

17   your counterclaims, right?

18        MR. SUPER:  That is correct.

19        THE COURT:  And then your motion for summary

20   judgment, of course.

21        MR. SUPER:  And our motion for summary judgment.

22   As I alluded to before, we think that motion has -- the

23   strength of that motion has doubled since the rule came

24   out.

25        THE COURT:  So here's my question and does it --

1    do you envision that it would -- the court should or

2    would be -- would be asked to file additional -- allow

3    additional briefing on those motions?

4           MR. SUPER:  I do --

5           THE COURT:  In light of everything that's going on

6    that we've talked about and the couple of recent U.S.

7    Supreme Court cases.

8           MR. SUPER:  No, I do, Your Honor, and I apologize

9    for sort of the separate status reports, but this was one

10   point that we sort of agreed on, that the United States,

11   for example, in the motion for summary judgment, would

12   file a sur-reply updating the court on the issues and we

13   would file an opposition.  I think where we disagreed is

14   we felt like we needed about 15 pages to make all of

15   these points clear and I think they had mentioned eight,

16   but, you know, going forward with the summary judgment

17   actually makes a lot of sense because we think that can

18   make this case go away.

19          By the same token, we would be -- we would be

20   happy to submit a supplemental brief relating to the

21   motion to dismiss our counterclaim as well because there

22   have been some developments there that --

23          THE COURT:  Would it be cleaner to allow or to

24   start anew with the briefing?  In other words, instead of

25   filing a supplemental brief for each side, just dismiss

1   the -- let's just file a renewed brief --

2        MR. SUPER:  I will say an emphatic yes.  We were

3   thinking this might be easier for the Court, but if the

4   Court would rather have an omnibus motion for summary

5   judgment with all the points, we're happy to do that.

6        THE COURT:  I mean, that's kind of what I have

7   been thinking, but I'll let the other side respond, too.

8        Okay.  All right.  Let me hear from the government

9   again, please.

10        Thank you.

11        Who wants to speak?

12        Mr. Shermer?

13        MS. GANGE:  Your Honor, I apologize for the

14   shuffle.  Just one quick point.

15        Is Your Honor more concerned at this point about

16   hearing about the schedule and potentially renewed

17   briefing for summary judgment?

18        THE COURT:  Well, that and whether we should hold

19   things in abeyance until at least October 15th to see

20   where we are, because I'm really concerned about spending

21   not only my time, but time of the parties and counsel on

22   something that could become essentially moot.

23        If -- if Denka loses on their request for stays in

24   either the circuit -- either circuit, they've represented

25   to the Court that there's no question that they will have

```
 1   to shut down.  So that would seem to me moot the

 2   immediate endangerment issue in this court, right?

 3           MS. GANGE:  If I could have --

 4           THE COURT:  If they're not operating, they can't

 5   have a -- that's what you're effectively asking me to do

 6   anyway.

 7           Mr. Shermer.

 8           MR. SHERMER:  So, Your Honor, if, in fact, Denka

 9   permanently shuts down, then, yes, this case is moot, but

10   Denka --

11           THE COURT:  Well, even if they temporarily shut

12   down, it's moot.  The immediacy of this whole case is

13   not -- not present it seems to me.

14           MR. SHERMER:  Until they restart, which --

15           THE COURT:  Well, yeah.  But, I mean, there would

16   be no -- I wouldn't see any need to go forward on an

17   injunction hearing as opposed to a trial on the merits if

18   that's necessary at some point down the line.

19           MR. SHERMER:  So, Your Honor, we do think it makes

20   sense to restart the litigation schedule.  Denka's

21   arguments about not wanting to spend time and resources

22   on this litigation seem to fall away pretty quickly when

23   it comes to submitting additional briefing, which they

24   seem more than willing to do.  They obviously have filed

25   multiple pieces of other litigation.  So they have the
```

 1   resources and the determination to file litigation when

 2   they want to --

 3        THE COURT:  Well, how about if we just held

 4   everything in abeyance until October 15th and then we

 5   hold another status conference around that time and see

 6   where we are?

 7        MR. SHERMER:  So, Your Honor, the -- until that

 8   time, Denka has made it clear that they will continue to

 9   emit their chloroprene emissions at their current levels,

10   and if they get their extension from the Fifth Circuit or

11   they get their extension from the DC Circuit, they will

12   continue to emit for as long as whatever relief they get

13   in either of those circuits.  During that time, their

14   emissions are causing cancer risks to the people --

15        THE COURT:  We're not going to be able to hold

16   this trial and have that decided earlier than that

17   anyway, right?

18        MR. SHERMER:  So, Your Honor, we can provide the

19   Court with status updates, the status of the circuit

20   court litigation, which is on fast-track to keep you

21   apprised of the decisions in that case or how that may or

22   may not affect the schedule, but the harm associated with

23   Denka's emissions will continue until they're ordered to

24   stop and reduce them.

25        THE COURT:  Well, if -- but if they get stays from

 1   one or both of those circuits, I don't know how -- I

 2   don't know how that does not impact our schedule here,

 3   our litigation here.

 4        MR. SHERMER:  If they get a stay, Your Honor, then

 5   it's all the more reason for this case to continue.  This

 6   case is based on a separate statute under the Clean Air

 7   Act, Section 303, which makes -- the text makes clear

 8   that authority stands and gives this Court authority to

 9   order relief to abate endangerments to public health,

10   notwithstanding any other provision of the Clean Air Act,

11   notwithstanding Section 112 rulemaking like is going on

12   in DC Circuit.  This action stands alone based on

13   independent legal authority, which is a lot of what our

14   summary judgment briefing is about.

15        Denka disagrees with that position.  We think

16   that's contrary to the text of the statute, but if they

17   get a stay for a year, eighteen months, two years from

18   either one of these courts, then they will continue their

19   current level of emissions, which depending on the

20   monitor we're looking at, it can be as much as seven

21   times in the past year, that 0.2 number.

22        So seven times the --

23        THE COURT:  How long --

24        MR. SHERMER:  -- acceptable --

25        THE COURT:  -- has the Denka Plant been in

1    operation?  Do you know?

2          MR. SHERMER:  Roughly 1968, but DuPont's counsel

3    might know that better.

4          THE COURT:  So has the emissions since 1968 been

5    more or less the same?  Has it increased?  Has it gone

6    down?  What's the general sense of that?

7          MR. SHERMER:  Since Denka has bought the plant, it

8    is undeniable that they have reduced their emissions

9    substantially, Your Honor, in no small part due to the

10   government's efforts to do that.

11         In 2017 they talk about this.  They entered into

12   an agreement with the State that required them to take on

13   multiple projects to install air pollution control

14   equipment that reduced their emissions by about

15   85 percent from when they bought the plant from DuPont.

16   So the emissions are dramatically lower, but they are

17   still too high and Denka has explained that it will not

18   reduce them further without being ordered to do so.  It's

19   filed litigation, multiple pieces of litigation in the

20   circuit courts of appeal so that it can avoid ever having

21   to comply with the final rule, because that's its end

22   game, is to invalidate the final rule, in which case,

23   this case is abundantly necessary.  It will be the last

24   legal action that's available to address the public

25   health endangerment caused by Denka's chloroprene

1    emissions.

2           THE COURT:  Okay.  Thank you.

3           I got a couple more questions for Mr. Super,

4    please.

5           Maybe you can answer.  Do you know -- is Denka the

6    only plant in the entire United States that produces

7    chloroprene?

8           MR. SUPER:  Yes.

9           THE COURT:  Okay.  I understand there was a plant

10   in Kentucky that was shut down.

11          MR. SUPER:  Yes.  And that actually sort of

12   relates to the merits of this action because there was a

13   study conducted at that plant of chloroprene workers by

14   Dr. Gary Marsh back in 20 -- 2007 and then updated in

15   2021 and those workers inhaled orders of magnitude higher

16   levels of chloroprene than anyone in connection with the

17   vicinity of the Denka facility.  And Dr. --

18          THE COURT:  And why was that?

19          MR. SUPER:  They worked there.  And so just by

20   working in a chloroprene plant, they were exposed to much

21   higher levels.

22          And Dr. Marsh's study found there was no linkage

23   between the types of cancers that the EPA attributes to

24   chloroprene and these massive exposures of chloroprene.

25   But we think that's pretty --

```
 1          THE COURT:  So why was that plant shut down in
 2   Kentucky?
 3          MR. SUPER:  That I don't know.
 4          THE COURT:  Who shut it down?
 5          MR. SUPER:  I don't know the answer to that.
 6          THE COURT:  You don't know -- you don't know if
 7   the EPA or the State of Kentucky shut it down?
 8          MR. SUPER:  I don't know.  Maybe one of my
 9   colleagues --
10          MR. JARRELL:  If Your Honor is really interested
11   --
12          THE COURT:  Give us your name, please.
13          MR. JARRELL:  Eric Jarrell, Your Honor, for DuPont
14   --
15          THE COURT:  Oh, yeah, DuPont.  Why don't you come
16   up?
17          MR. JARRELL:  That facility, Your Honor, was shut
18   down for marketing reasons.  It wasn't -- it wasn't
19   environmental health and safety reasons.
20          THE COURT:  Marketing reasons.
21          That was a DuPont plant also?
22          MR. JARRELL:  Right.  It was -- it produced a
23   product that wasn't needed in the place it wasn't needed
24   and so that's why it was shut down.  No one --
25          THE COURT:  It wasn't --
```

1          MR. JARRELL:  -- shut it down.

2          THE COURT:  Didn't it produce the same product as

3    Denka?

4          MR. JARRELL:  It did.

5          THE COURT:  So why is Denka's product needed, but

6    not that plant?

7          MR. JARRELL:  Oh, it's just the -- as I appreciate

8    it -- now I'm going off of memory here.  But as I

9    appreciate it, it was simply because of what was needed

10   in the market worldwide and whether multiple facilities

11   were needed for that, but the remaining operations in

12   LaPlace were needed and continued.  That facility has

13   been operating since the early 1960s.  I have been

14   representing it since the early 1980s and going out there

15   regularly.  It's a relatively modest facility, but serves

16   a very important purpose.

17         THE COURT:  So since Denka took it over -- I read

18   something on Denka's website.  I know this is not

19   evidence, but I assume this is accurate information.

20         Denka took -- bought it from DuPont November 1,

21   2015, correct?

22         MR. JARRELL:  Correct, Your Honor.

23         THE COURT:  And then it says that Denka -- Denka

24   Company, Limited -- whose polychloroprene business is

25   based in Japan, has long business experience with this

```
 1   product.
 2          So Denka had been in a business -- Denka had been
 3   in a business of manufacturing chloroprene long before it
 4   bought the Denka Plant?  I mean, the LaPlace plant,
 5   right?
 6          MR. JARRELL:  Correct, Your Honor.  They were a
 7   market competitor.
 8          THE COURT:  Of DuPont?
 9          MR. JARRELL:  Of DuPont.
10          THE COURT:  Okay.
11          MR. JARRELL:  And that was the only facility that
12   E.I. du Pont de Nemours and Company had at the time doing
13   that.  Denka had other facilities.
14          THE COURT:  So if you can't compete, buy out your
15   competition, huh?
16          MR. JARRELL:  That's certainly one thing that
17   someone can argue.
18          THE COURT:  You don't have to answer that.
19          MR. JARRELL:  I think we were just happy someone
20   was willing to buy it for a price we were willing to
21   accept.  That's how the world works, right?
22          THE COURT:  Okay.  I have another question for Mr.
23   Super.  It looks like he wants to say something anyway.
24          MR. SUPER:  My colleague --
25          THE COURT:  Come up, Mr. Super --
```

```
1              MR. SUPER:  -- may have historical knowledge --
2              THE COURT:  Wait.
3              MR. SUPER:  -- of Denka.
4              THE COURT:  Well, here's my question and I don't
5     know which one of you wants to answer this.  But Denka,
6     based on the statement that they have a long business
7     experience with this product that they manufactured in
8     Japan?
9              MR. SUPER:  I'm going to let my colleague, Jason
10    Hutt, address these points.
11             THE COURT:  Okay.
12             MR. HUTT:  Good morning, Your Honor, Jason Hutt,
13    for Denka Performance Elastomer.
14             THE COURT:  Okay.
15             MR. HUTT:  So Denka, one of the joint venture
16    partners of DPE, the Defendant in this case, owns a
17    neoprene manufacturing facility in Japan, but the way in
18    which they make neoprene is not the same as the way
19    neoprene is made here in LaPlace, Louisiana, or in the
20    way in which it was made at the Kentucky facility by the
21    prior owner and operator of DuPont.
22             The Kentucky facility and the LaPlace plant make
23    the neoprene in the same way in that chloroprene is one
24    of the key ingredients that is used to make the neoprene.
25    The neoprene that is made in Japan is not made with
```

 1    chloroprene as the input ingredient.  They use a settling

 2    process, so it's a different process, has a different

 3    emission profile, different public health considerations

 4    associated with that.

 5         THE COURT:  So in Japan, Denka is not emitting

 6    chloroprene.  Is that what you're saying?

 7         MR. HUTT:  Not in the same way that this -- this

 8    facility uses two fundamental ingredients -- butadiene,

 9    1,3-butadiene and chloroprene -- that they combine to

10    make neoprene at the plant.

11         THE COURT:  So apparently -- are you a chemist,

12    too?

13         MR. HUTT:  No, sir.  An aspiring chemist.

14         THE COURT:  Okay.  So it seems like based on what

15    you said you can make neoprene without using chloroprene.

16         MR. HUTT:  That's correct.  If your plant is

17    configured in that fashion.

18         No?

19         MR. HOLDEN:  Can I weigh in?

20         MR. HUTT:  Yeah.  Sure.

21         MR. HOLDEN:  Your Honor, this is Bob Holden with

22    Jones Walker on behalf of Denka Performance Elastomer and

23    I have had the privilege of representing DPE since 2016.

24         Neoprene is polychloroprene.  It is a polymerized

25    version of chloroprene.  So in Japan and the United

1    States, you have to use chloroprene in order to make

2    neoprene. How you make the chloroprene is the difference

3    between the Japanese plant and the United States plant.

4         And in the United States at the LaPlace plant,

5    butadiene is the raw material along with chlorine that's

6    purchased separately in order to make the chloroprene,

7    and from the chloroprene, you go through a polymerized

8    process, but it is correct that DPE is the only

9    significant emitter of chloroprene in the United States.

10   So everything else that my colleagues have said is

11   correct, but I don't think we were really prepared to get

12   into an elaborate discussion of the chemical processes

13   that make the chloroprene.

14        THE COURT: Well, I'm only -- I'm trying to

15   understand downstream, so to speak, downstream from this

16   litigation what the practical consequences of any of this

17   would be, if -- I know neoprene, you know -- yeah,

18   neoprene is apparently an important product that's

19   produced in the country for -- that can make everything

20   from gloves to diving suits and so forth, right?

21        MR. HOLDEN: That is correct, Your Honor.

22        THE COURT: And a lot of other things I'm sure.

23        MR. HOLDEN: Used in all sort of industrial,

24   automotive --

25        THE COURT: But I guess what I'm -- I'm just

1  wondering out loud here, if this same product can be

2  produced in a different way, perhaps a safer way in

3  Japan, why can't that be done in the United States?

4      MR. HOLDEN:  There are also chloroprene emissions

5  in Japan, but Japan is not subject to the same sorts of

6  EPA risk analyses that resulted in ultimately the 0.2,

7  0.3, 0.8 types of argument and analyses.

8      THE COURT:  And do you know -- does someone know

9  what the emission levels are in Japan from that plant?

10      MR. HOLDEN:  We would have to take that under

11  advisement and respond to Your Honor separately.  I don't

12  think we're prepared to address that.

13      THE COURT:  Okay.  All right.  Thank you.

14      You want to say something?

15      MR. SUPER:  May I just address one point that Mr.

16  Shermer made about the alleged harms that might accrue

17  during an abeyance period?

18      I think it's important to keep in mind that

19  they're the ones who asked the Court to cancel the March

20  trial and that led to -- if they get a trial in October,

21  which they want, that would have led to a seven-month

22  delay.  So the harm during that seven-month delay would

23  be longer or more than any potential harm during a

24  four-month abeyance period.

25      So I think it's -- you know, pointing out there

```
 1   will be substantial harms during this abeyance period
 2   isn't really accurate.  I mean, they assess their whole
 3   risk profile based on a 70-year lifetime, so a four-month
 4   abeyance period is something like 0.005 percent of that
 5   70-year lifetime.  So it's an infinitesimal increase in
 6   risk if the Court were to grant an abeyance.  And, again,
 7   it's less than the delay that was caused by the United
 8   States canceling the trial last March.
 9            THE COURT:  While you're up, tell me about this:
10   One of the issues that was raised in the status report to
11   the court, it says that Denka suggests or argues that it
12   would like to conduct additional discovery.
13            I'm not clear on what additional -- assuming if or
14   when this litigation goes forward, what would be the need
15   for that and the scope of that discovery?
16            MR. SUPER:  I'm glad you asked that because it is
17   very targeted and limited discovery that goes directly to
18   the rule and it relates to issues we've already discussed
19   today, you know.  One is, again, the fact that once all
20   of the projects that are required by the rule are
21   implemented, the EPA admits that you're left with a 0.8
22   micrograms per cubic meter concentration which is
23   entirely consistent with the emergency they're alleging
24   in this case, that 0.2.
25            And there are -- there's modeling.  It's called
```

1   Human Exposure Modeling or HEMs that EPA performed in

2   connection with the rule that would lay all of that --

3   lay all of that out and we really need that modeling.

4   Interestingly enough, they actually made it available

5   with respect to the proposed rule, but they have not made

6   it available with respect to the final rule.  And that is

7   something that they should be able to produce to us and

8   we should be able to receive.

9        But it doesn't end there because, you know, as

10  we've talked earlier today, this notion that Denka was

11  singled out and given the 90-day period when other

12  facilities with higher risk profiles were given two

13  years, we think we're entitled to know why, what analysis

14  was done by the EPA to say -- as they had to as a matter

15  of law, to say this facility that has a four times higher

16  risk profile than Denka gets two years, thus no imminent

17  endangerment, but Denka doesn't.  Why?  How?  Who made

18  that decision?  What is it based on?

19       We have nothing on that other than one sentence in

20  the 140-page preamble, which is this finding associated

21  with this case.  And I know Your Honor has made no

22  findings in this case.  We have no idea what they're

23  talking about with respect to these findings.  So we

24  think we should be able to get some basic simple

25  discovery on who made the finding, where does it exist,

```
 1   is it on a piece of paper, what is it supported by,
 2   because they can't stand up here and tell you that it has
 3   anything to do with what's happened in this case because
 4   we made that point.
 5            We said, all right, if you're making a finding
 6   based on the case before Judge Barbier, then let's put
 7   that whole district court record into the administrative
 8   record as support for the finding.  They said no.  It's
 9   not that.  It's something else.  It's this mysterious
10   finding that someone made sometime presumably in February
11   of 2023 and we need to know what that finding is all
12   about.  And it's critical because if the finding was made
13   by the EPA that Denka is causing an imminent
14   endangerment, then who made the finding that these higher
15   profile facilities are not causing an imminent
16   endangerment and why?  What's the difference?
17            That is a fundamental point of administrative law.
18   If you're going to single out a party and then treat it
19   in a disparate fashion, you've got to explain why and we
20   see no explanation why other than this one sentence
21   referring to the case before you where there have been no
22   findings.  So that in a nutshell is the discovery.
23            What I would propose is that we write it up in a
24   very short motion, explain to you exactly what we want
25   and why we want it and why it's important both as to the
```

1  summary judgment and to the trial and we can get that

2  prepared pretty quickly or after the abeyance period if

3  the Court thinks that's appropriate.

4        THE COURT:  So we talked about what happened --

5  what the effect would be if Denka does not get its relief

6  in either circuit.  You represent to the Court it would

7  require a shutdown.

8        What if you do get the relief from either circuit?

9  Where does that leave this case in your view?

10        MR. SUPER:  I think if we do get the relief, that

11  means we are alive until July 15, 2026, to try to comply

12  with the rule.  Under those circumstances, if the United

13  States thinks it's important to renew this imminent and

14  substantial litigation, then they can take that position

15  and maybe we'll try to find a trial date.

16        What I will say though is, if we do get relief,

17  that means one of the circuit courts has basically

18  undercut this notion that Denka is causing an imminent

19  endangerment because that would be the basis upon which

20  we receive the extension.  If, you know, that happens, we

21  think in addition to the various points about the rules

22  that I've been talking about, our summary judgment motion

23  would be very strong at that point.

24        So if the United States wants to bring the case

25  back, that's the first thing we want to do, is make sure

```
 1   we get the summary judgment motion in front of you.

 2          THE COURT:  And just to be clear, finally, Denka

 3   really doesn't want to ever comply with this rule, right?

 4          MR. SUPER:  Denka cannot comply with the rule.

 5          THE COURT:  So it's not just a matter of 90 days

 6   or two years.

 7          MR. SUPER:  I know -- I can represent to the Court

 8   that 90 days is impossible.  It's not going to work.  I

 9   can't really say that with respect to July 2026.  It

10   gives the company hope that it can continue.  I'm not

11   sure how that will play out.

12          THE COURT:  And why couldn't it comply in two

13   years?

14          MR. SUPER:  Why couldn't it comply --

15          THE COURT:  Why could it not comply if given the

16   two years?

17          MR. SUPER:  Well, I think that's an analysis

18   that's beyond my ability to discuss at this point.  It

19   involves a lot of engineering issues.  But I think it's

20   on the table.

21          I'm not standing here saying to you the plant

22   would shut down after two years.  I just don't know the

23   ends and outs of how the rule would be complied with.

24   What I do know right now is they cannot possibly do it by

25   October 15th.
```

```
 1          THE COURT:  Okay.  Thank you, Mr. Super.

 2          Anybody want to respond briefly before we

 3   conclude?

 4          MS. GANGE:  I would like to make a couple of quick

 5   points about the discovery --

 6          THE COURT:  Okay.  Sure.

 7          MS. GANGE:  -- that we had spoken about earlier.

 8          With respect to information and data and analyses

 9   that were used to develop the terms of the final rule,

10   that all is available to Denka today.

11          The United States --

12          THE COURT:  When you say it's available, you mean

13   it has been provided or it's publicly available or what?

14          MS. GANGE:  It is publicly available.

15          Under Section 42, U.S. Code, Section 7607(d), the

16   statute specifies that the EPA is required to put all of

17   the information that it based its final rules on into the

18   administrative record and all of those materials have to

19   be posted to that record by the time the rule is

20   finalized and that is available online at

21   regulations.gov.  And every rule in the Federal Register

22   Notice it specifies the internet address and the rule

23   number that you simply type in to access all of that

24   information.

25          So Denka's counsel -- everyone can Google today,
```

1  right -- they should -- they should be able to download

2  that.  If they have electronic issues, we're happy to

3  talk to the EPA about it.

4       THE COURT:  Well, if they -- if they for some

5  reason need information that is not available as you

6  just -- as easily as you just said, you have no problem

7  -- the EPA would have no problem providing that, correct?

8       MS. GANGE:  All they need to do is contact us and

9  ask for it and we'll either point to the regulations.gov

10  page or discuss whether it's legitimate.

11       THE COURT:  Okay.

12       MS. GANGE:  With respect to a finding, I just

13  wanted to clarify, when people talk about an agency

14  finding, let's say of an imminent and substantial

15  endangerment, most people are thinking of some final and

16  reviewable agency action.  There is not a final and

17  reviewable agency action as that's codified under the

18  Clean Air Act.  There is no magic document that was, say,

19  published in the Federal Register.

20       But this lawsuit is an imminent and substantial

21  endangerment lawsuit.  The claim that the EPA brought has

22  to by definition and by statute be based on a scientific

23  conclusion that an imminent and substantial endangerment

24  is being created and that had to be substantiated in the

25  EPA.  The EPA had to refer the case to DOJ and DOJ had to

```
 1   make its determinations about filing and all of the

 2   information about that and how it was determined and

 3   calculated, all the information supporting it, is the

 4   evidence in this case.

 5         THE COURT:  What's the -- what's the case law

 6   under Section 303?  That's what this case is based on,

 7   right?

 8         MS. GANGE:  Yes, it is, Your Honor.

 9         THE COURT:  Is there any case law supporting using

10   that section in the way the EPA seeks to use it in this

11   case?

12         MS. GANGE:  I'm sorry, Your Honor.  I don't quite

13   understand.

14         THE COURT:  Well, I mean, I can envision things

15   happening, you know, something blows up and creates an

16   immediate endangerment to the surrounding community,

17   whatever, but the -- I believe the other side suggests

18   that this is an unprecedented use of Section 303 in the

19   context of this kind of case is -- what's your response

20   to that?

21         And I know we're not arguing a motion for summary

22   judgment right now, but I believe I've stated that

23   correctly.

24         MS. GANGE:  Could I hand this to Mr. Shermer?

25         THE COURT:  Okay.  Sure.  Sure.
```

```
 1          MS. GANGE:  Thank you.

 2          THE COURT:  Okay.

 3          MR. SHERMER:  Thank you, Your Honor.

 4          So, Your Honor, in our preliminary injunction

 5     briefing, we discussed the state of the law under

 6     Section 303 and how those elements have been interpreted

 7     by different courts and the statute provides very broad

 8     authority for the court to stop an endangerment to public

 9     health and welfare caused by air pollution.  There is

10     really no limit in terms of what basis the EPA can use,

11     what evidence it can rely upon, to bring this type of

12     claim.

13          Here, a while ago, Your Honor, you asked how is

14     this endangerment determined.  And the EPA determined

15     that based on a very site specific investigation using

16     air monitoring data, multiple sets of air monitors,

17     that have been collecting data for years --

18          THE COURT:  I guess what I'm -- that's the issue

19     here, because you've got a plant that's been in existence

20     since 1968 --

21          MR. SHERMER:  I believe so.

22          THE COURT:  -- with emitting certain chemicals, a

23     certain chemical that I don't think there's any question

24     that can cause, you know, a danger to people over a

25     period of time, but it's been emitting this for decades
```

```
 1   and you even admitted that they've made substantial

 2   progress in reducing those emissions since Denka bought

 3   the plant in 2015.  So I'm trying to -- I'm just trying

 4   to envision how this fits into the idea of an immediate

 5   endangerment, where this has been going on for so long.

 6   What's the immediacy of it?

 7          MR. SHERMER:  So cases that we -- I can point you

 8   to --

 9          THE COURT:  Again, this is not like something

10   explodes and causes catastrophe in an immediate area or

11   whatever.

12          MR. SHERMER:  So the legislative history in a

13   companion statute, the Safe Drinking Water Act, talks

14   about the long-term cancer risks as being an example of

15   an endangerment that these types of environmental

16   endangerment statutes are supposed to cover.  It cites --

17   and it is sort of particularly for the reasons that we've

18   been talking about, that cancer -- you don't step on

19   something and get cancer.  It takes years, if not

20   decades, to develop.

21          THE COURT:  Right.

22          MR. SHERMER:  And so because of that very

23   secretive, very slow moving harm, it's important to still

24   make progress, even if emission levels have gone down.

25          The cases have cited that legislative history as
```

1  acknowledging that is an actionable type of endangerment

2  under similar environmental endangerment statutes.  I

3  mean, it's probably a poor analogy, but, Your Honor, if

4  you're driving your car at 150 miles an hour and you drop

5  it down to 100, you're still speeding and you're still

6  being --

7          THE COURT:  Yeah --

8          MR. SHERMER:  -- dangerous.

9          THE COURT:  -- but that's a little different than

10  this.  But okay.

11          I guess when we get around to maybe the motion for

12  summary judgment -- I'm just trying to -- I'm inclined to

13  just grant the suggestion of -- agree with the suggestion

14  that we should hold this in abeyance until October 15th

15  and then hold a status conference at that time.

16          I mean, the only other thing we could do is have

17  the parties file additional or new briefing in the

18  interim.  Perhaps that makes sense.  I don't know.

19          What are your thoughts on that?

20          MR. SHERMER:  Your Honor, we would be amenable to

21  filing additional briefing in the interim.

22          MS. GANGE:  I think Your Honor would respect -- I

23  think with respect to the amended counterclaim, the

24  fundamental issue hasn't changed and that's that this

25  court does not have subject matter jurisdiction for legal

```
 1   reasons.  It's not a factual or fact based issue --

 2          THE COURT:  So you think there's no need for

 3   additional briefing on that issue?

 4          MS. GANGE:  That is correct, Your Honor.  And the

 5   United States would be more than happy to provide

 6   argument or stand on its briefs.

 7          THE COURT:  What about the DuPont issue?  Because

 8   we haven't talked about that very much.

 9          MR. SHERMER:  Your Honor, I don't think we need

10   additional briefing on that as well.  It's ready to be

11   decided.  I think you observed back in February that

12   DuPont's motion didn't raise any new issues from the

13   motion to dismiss that it filed in the middle of last

14   year and that you denied.  It's re-casted as a motion for

15   judgment on the pleadings, but it really doesn't change

16   much and I think you recognized that.  So we

17   don't believe there would be additional briefing

18   necessary --

19          THE COURT:  Let me ask Mr. Jarrell to respond to

20   that, if he would like.

21          MR. JARRELL:  Your Honor --

22          THE COURT:  What's changed from when I denied your

23   motion to -- originally, it was a -- it's a motion to

24   dismiss.  Is that what it is?  Okay.

25          MR. JARRELL:  What's changed -- and it's
```

1    everything that matters, Your Honor.  While we didn't

2    necessarily completely agree with what was in the Court's

3    ruling --

4          THE COURT:  Well, I suspected that.

5          MR. JARRELL:  But having said that, it doesn't

6    matter because the Court's ruling then perfectly fits

7    what happens when they change the relief they were

8    requesting.  They got out from under the 12(b)(6) by

9    convincing the Court that they were going to be coming in

10   here and directing that Denka would make specific changes

11   at the facility and they were going to have to do this to

12   this air emission point and they were going to have to

13   change this facility this way.  They had specific

14   projects that they said they were going to have the Court

15   force Denka to do.  And so, therefore, they had to

16   involve us because we could stand in the way of the

17   specific relief that the Court was going to grant.  And

18   that's how they tried to hook into the All Writs Act.

19         THE COURT:  Well, are they still going to try to

20   require that?

21         MR. JARRELL:  Absolutely not, Your Honor.

22         When Your Honor required that they give a

23   statement of final relief requested, they shifted from

24   saying they were going to require Denka to do specific

25   projects, possibly because Denka was saying those

```
 1   projects won't work and so they were going to have a big

 2   fight about that.  And so they shifted to not that Denka

 3   would do specific projects, but that they would shut down

 4   unless and until they could meet certain standards, and

 5   how they got there, if they ever got there, was up to

 6   Denka --

 7        THE COURT:  Well, I mean, obviously, to get to

 8   this much lower standard that the EPA is requesting or

 9   requiring, would a necessity require Denka to do some

10   substantial changes at that plant?  Would it not?  I

11   mean, it just strikes me as common sense.

12        MR. JARRELL:  Well, there's two aspects to that.

13   First, Your Honor, that assumes they would ever do the

14   projects, because you've heard folks come up here and

15   tell you already today they can't get there.  The

16   standard that the government is asking them to meet,

17   there is no way to get there.

18        THE COURT:  But I asked Mr. Super and he said they

19   are not prepared to say absolutely that they can't

20   eventually lower their emissions.

21        MR. JARRELL:  I don't wish to speak for them, but

22   it was always my understanding the point, too, is just an

23   absolutely no-go.

24        But aside from that, the truth of the matter is,

25   there's a massive distinction between an order that this
```

```
 1    Court would issue that says you have to stop operating
 2    unless and until you can do these things and an order
 3    that this Court was going to issue, which what they --
 4    what they said they were going to have the Court do
 5    before, to get out from under our 12(b)(6), was the Court
 6    was going to order specific changes at the facility.  So
 7    the actual order from this Court would direct specific
 8    projects to be done and that's how they tried to hook
 9    into the All Writs Act to say that if we stood in the way
10    of the specific project that was ordered, then we could
11    potentially interfere with the jurisdiction of the court
12    because we could get in the way of that specific project.
13    The notion that some project might be done on down the
14    road at some point in some way is completely different.
15         The All Writs Act requires that you present an
16    extraordinary circumstance of undermining the court's
17    jurisdiction.  We're just not there now.  There's no way
18    to get there.  What we're at right now is very simply
19    they're requesting an order that says you shut down until
20    you can meet this, you figure out how to do it.  All
21    Writs Act doesn't come into play.
22         THE COURT:  All right.
23         MR. JARRELL:  We got no involvement with that
24    order.
25         THE COURT:  Okay.  I'll look at that again, but
```

```
 1    I'm kind of -- I think I'm at the same view that I was

 2    the last time when we argued your motion, you know.

 3         Thank you.  Thank you, Mr. Jarrell.

 4         MR. JARRELL:  If Your Honor would like, I am happy

 5    to provide additional briefing.

 6         THE COURT:  No, no, no, I don't need any

 7    additional briefing on this.

 8         Okay.  Thank you.

 9         Okay.  So anybody need to say anything else?

10         MR. SUPER:  Your Honor, I just wanted to address

11    the notion of a briefing on the summary judgment.

12         THE COURT:  Okay.  Okay.

13         MR. SUPER:  I agree with Mr. Shermer that we

14    should go ahead and do that and I think Your Honor

15    preferred the full brief --

16         THE COURT:  Yeah --

17         MR. SUPER:  -- instead of just a --

18         THE COURT:  -- it would be cleaner, I think, to do

19    it that way.

20         MR. SUPER:  We'll do that.

21         And with the Court's indulgence, we would like to

22    submit --

23         THE COURT:  So we're talking about your motion for

24    summary judgment?

25         MR. SUPER:  That's correct.
```

```
 1            THE COURT:  So how much time would you need to do
 2    that?
 3            MR. SUPER:  Three weeks.
 4            THE COURT:  Okay.  I'll tell you what, I'll give
 5    you 30 days.  How about that?  30 days.
 6            MR. SUPER:  30 days.
 7            THE COURT:  And how much time will the government
 8    need to file an opposition after that?
 9            MR. SHERMER:  Your Honor, that's tough to say
10    since we don't know how that summary judgment motion
11    would change, but we would ask for a similar amount of
12    time to respond.
13            THE COURT:  I'm sorry.  What?
14            MR. SHERMER:  We would ask for -- it's tough for
15    us to budget for a response if we don't know how the
16    arguments are going to change, but we would ask for a
17    similar amount of time --
18            THE COURT:  Okay.  So what we'll do -- here's what
19    we'll do.  I'm going to order the parties to file, I
20    guess, their new briefs in support of your motion for
21    summary judgment and new brief and opposition by the
22    government, 30 days for Denka, 30 days for the
23    government, 10 days after that for any reply by Denka.
24    Okay?
25            MR. SUPER:  That's good.
```

```
1          THE COURT:  At which time I'll look at it and

2     decide where we are in terms of whether I schedule oral

3     argument on that or we may be -- otherwise, I'm not --

4     I'm holding everything else in abeyance in this case

5     until at least October 15th.  Okay?

6          MR. SUPER:  And, Your Honor, with your indulgence,

7     we would like to submit a very short motion to compel,

8     the rule-related discovery that I had mentioned.  We can

9     get that in almost immediately.  Some of it is relevant

10    to the summary judgment and we think it supports the

11    summary judgment, particularly that Human Exposure

12    Modeling information I was talking about.

13          And, of course, we will meet and confer with the

14    government before we submit that.  And if there is

15    something that we're just not looking at the right spot

16    on the website to find it, then, of course, we won't

17    include that in the motion.  But I can promise you, Your

18    Honor, that it will be a short motion, very targeted,

19    explaining exactly what we need and when we would like to

20    get it.  So we can submit that within a week.

21          THE COURT:  All right.  Submit that in a week and

22    we'll see what the response is.  But hopefully you-all

23    can work that out.  Okay?

24          MR. SUPER:  And I have one last point --

25          THE COURT:  Okay.
```

```
 1        MR. SUPER:  -- because it relates to the amended

 2   counterclaim.

 3        I agree with Ms. Gange that the -- otherwise the

 4   amended counterclaim and the motion to dismiss are ripe,

 5   but there is one issue that's arisen based on a recent

 6   Supreme Court ruling.

 7        Your Honor, in the August 30th ruling dismissing

 8   five of the counterclaims, dismissed counterclaim number

 9   one and counterclaim number one, was a challenge to the

10   2010 toxicological review which ended up in the 0.2

11   concentration that we've been fighting about.  And Your

12   Honor dismissed that claim based on a Fifth Circuit case

13   called Dunn-McCampbell Royalty Interest v. National Park

14   Service from 1997 on the grounds that the claim was in

15   violation of the six-year statute of limitations.

16        Well, last month, in the Corner Post case, the

17   Supreme Court expressly overruled Dunn-McCampbell and how

18   that six-year statue of limitations --

19        THE COURT:  When it starts to run.

20        MR. SUPER:  Yeah.  It doesn't start -- it's once

21   -- it's once the agency action is being applied to a

22   plaintiff.  That's when the statute of limitations

23   starts.  So we think we've got a very strong argument

24   that the results of the 2010 toxicological review, the

25   0.2 level, were not applied to us until many years later,
```

1    so the statute of limitations wouldn't be a problem.

2         The Court, I believe, is free to reconsider its

3    decision based on intervening Supreme Court authority and

4    we would propose submitting a very short motion to

5    reconsider just that aspect of the August 30th order

6    because it does impact the amended counterclaim in a

7    pretty important way.

8         THE COURT:  What's the goal of your amended

9    counterclaim?  Because I said when I denied your motion

10   that you can raise the same -- attack the standard

11   regardless as a defense to this case, right?

12        MR. SUPER:  Yeah.  That is --

13        THE COURT:  So I've always had a hard time

14   understanding the purpose of your counterclaim.

15        MR. SUPER:  If I -- the way to address that, I

16   think, is -- if they decided to dismiss the imminent and

17   substantial endangerment claim for whatever reason, they

18   still have -- we describe it as an *ultra vires* standard

19   of 0.2 that they're trying to get Denka to comply with

20   and it's completely separate from the rule.  This is a

21   standard they've tried to impose upon us in this case,

22   through rigger enforcement actions, through pressuring

23   LDEQ to impact our permits.

24        THE COURT:  Wasn't that issue -- was it raised,

25   litigated, somehow in 2010?  Wasn't Denka involved in

```
 1   that?
 2          MR. SUPER:  I'm not sure what you're referring to,
 3   Your Honor.
 4          THE COURT:  I thought there was some -- what
 5   happened in 2010 when that -- what you're talking about
 6   occurred?
 7          MR. SUPER:  Well, when the toxicological review of
 8   chloroprene came out and established the inhalation unit
 9   risk that led to the 0.2 concentration, Denka did
10   ultimately file administrative challenges before the
11   agency.  But those were denied by the agency.
12          THE COURT:  So how does -- I'm trying to
13   understand how this Corner Post case would make a
14   difference.
15          MR. SUPER:  Well, the Corner Post case --
16          THE COURT:  I know what the Corner Post case says
17   --
18          MR. SUPER:  Yeah.
19          THE COURT:  -- but it seems that to me that Denka
20   was aware in 2010 that there were -- that the EPA was
21   going to enforce the 0.2 standard, right?
22          MR. SUPER:  No, because Denka didn't enter the
23   picture until 2015.  So that may have been DuPont, but it
24   wasn't Denka.
25          So Denka -- our argument would be that when the
```

 1   EPA tries to start enforcing this 0.2 standard against

 2   us, it was in May of 2022, when they -- when one of the

 3   EPA officials said we're going to bring all the tools the

 4   agency can bring to bear to make sure that you get down

 5   to 0.2.  That was applying what we describe as an *ultra*

 6   *vires* ambient air standard against Denka and that was

 7   what was applied to us and a six-year statute of

 8   limitations wouldn't apply to preclude that action

 9   because we didn't learn about it until 2022.  So that's

10   why we think that --

11        THE COURT:  Well, I don't -- I can't believe you

12   didn't know about it.  Denka buys this plant in 2015.

13   They have no clue that this is hanging out there, that

14   the EPA -- I mean, I'm assuming these are smart people

15   that bought Denka and they would know what they're buying

16   here, right?

17        MR. SUPER:  We do have an argument that Denka --

18   that the 0.2 level was brought to bear against Denka

19   within the six-year statute of limitations.

20        THE COURT:  All right.  Well, I'm not

21   reconsidering that right now and I'm going to -- the more

22   we talk, the more I might say don't do anything until

23   October 15th.  I'll tell you, you-all keep adding stuff

24   here.

25        MR. SHERMER:  Can I say one thing to that point,

```
 1   Your Honor?

 2          THE COURT:  Yeah.

 3          MR. SHERMER:  I think I would agree with you, Your

 4   Honor.  We object to --

 5          THE COURT:  You know, we talked about briefing.

 6   Then we talked about now more discovery before the

 7   briefing.  And now we're talking about the counterclaim

 8   and all of that.

 9          MR. SHERMER:  Your Honor, the United States

10   certainly objects to the discovery and we would ask

11   for --

12          THE COURT:  Well, I'll tell you what I'm going to

13   do.  I'm going to hold everything in abeyance.  We're not

14   going to have anymore briefing or anything until at least

15   October 15th.  You-all have managed to change my mind

16   here.  And so we will hold everything in abeyance.  By

17   October 15th, I think, you -- the parties shall file

18   another status report, tell me where things stand, we'll

19   set a status conference and we'll go from there.  Okay?

20          All right.  Everyone have a good day.

21          THE DEPUTY CLERK:  All rise.

22                          *  *  *  *

23          (WHEREUPON, the proceedings were adjourned.)

24                          *  *  *  *

25
```

1          REPORTER'S CERTIFICATE

2          I, Nichelle N. Wheeler, RMR, CRR, Official
   Court Reporter, United States District Court, Eastern
3  District of Louisiana, do hereby certify that the
   foregoing is a true and correct transcript, to the best
4  of my ability and understanding, from the record of the
   proceedings in the above-entitled and numbered matter.

5

6              /s/ Nichelle N. Wheeler
              Official Court Reporter
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT F

July 10, 1998


MEMORANDUM

SUBJECT:  Delegation of 40 CFR Part 63 General Provisions Authorities to State and Local
          Air Pollution Control Agencies

FROM:     John S. Seitz, Director /s/ John Seitz
          Office of Air Quality Planning and Standards (MD-10)

TO:       See Addressees


    This memorandum is to provide guidance to the EPA Regional Offices on delegation of discretionary authorities relating to air toxics in 40 CFR part 63, subpart A (the General Provisions) to State and Local Air Pollution Control (S/L) agencies through 40 CFR part 63, subpart E (Approval of State Programs). Under the General Provisions, the EPA Administrator has the authority to approve certain changes to, or make decisions under, specific General Provisions requirements. Questions have been raised by the Regions about whether S/L agencies may make the same discretionary decisions when they are delegated the General Provisions.

    In explaining the straight delegation process for delegating air toxics provisions to S/L agencies under 40 CFR part 63, subpart E, we did not clarify what discretionary authorities are delegated to S/L agencies when they seek straight delegation of the General Provisions. Although this is briefly discussed in the proposed General Provisions' preamble (Federal Register, August 11, 1993, page 42775-42777), the forthcoming proposed subpart E revisions will fill that gap by clarifying which discretionary authorities may be delegated to S/L agencies through straight delegation of the General Provisions. At your discretion, the Regional Offices must then specify in delegation agreements or documents which of the subpart A authorities are being delegated to each State. We recommend that you begin implementing these changes as soon as possible. Therefore, this memorandum is intended to explain the changes and provide guidance for you to begin implementing the changes now. Neither this memorandum nor the subpart E rulemaking changes any source-specific decisions that have already been made under the General Provisions, but the guidance in this memorandum should be used as guidance for all future decisions regarding the General Provisions' authorities.

    To implement these changes, you will need to clarify with your S/L agencies which General Provisions' authorities have and have not been delegated. In cases where you may have delegated authorities in the past that should no longer be delegated, you will need to inform your
S/L agencies that delegation of these authorities will be revoked.

    At this time, we are also providing clarification of section 63.6(i)(1), "Extension of Compliance with Emission Standards," General Provisions authority. This section states "(u)ntil an extension of compliance has been granted by the Administrator (or a State with an approved permit program) under this paragraph, the owner or operator of an affected source subject to the requirements of this section shall comply with all applicable requirements of this part." It is our
interpretation that this authority does not require delegation through subpart E and, instead, is automatically granted to States as part of their part 70 operating permits program approval regardless of whether the operating permits program approval is interim or final. Additionally, it
is our interpretation that the State would not need to have been delegated a particular source category or have issued a part 70 operating permit for a particular source to grant that source a compliance extension.

    We are also providing clarification of section 63.5(e) and (f), "Approval and Disapproval of Construction and Reconstruction," General Provisions authority. The Clean Air Act as

amended (1990 Amendments), sections 112(i)(1) and (3) state that the "Administrator (or a State with a permit program approved under title V)" can determine whether a source will comply with the standard if constructed properly.  It is our interpretation that this authority does not require
delegation through subpart E and, instead, is automatically granted to States as part of their part 70 operating permits program approval.

    Link to section 112(l):  This guidance only addresses the case where the General Provisions are delegated to an S/L agency through straight delegation under section 112(l) provisions which were promulgated in 40 CFR part 63, subpart E.  Therefore, the guidance addresses S/L agencies' authority to make source-specific decisions only, not source-category wide decisions.  Any S/L agency wishing to make discretionary decisions on a source-category wide basis under the General Provisions or any other part 63 requirement would need to use the section 112(l) delegation process under 40 CFR part 63, subsections 63.92, 63.93, or 63.94 to substitute its own rule or program.  When subpart E revisions are promulgated, section 63.97 will be added to the above list as a delegation option.

    Consistency with Previous Policies:  This guidance is intended to be consistent with previous policies developed for new source performance standards (NSPS) under 40 CFR part 60, national emission standards for hazardous air pollutants (NESHAP) under 40 CFR part 61, and for changes to State implementation plans (SIP's).  Past guidance issued for NSPS changes has permitted delegation to S/L agencies of all the Administrator's authorities except those that require Federal rulemaking, or those for which Federal oversight is critical to ensuring
national consistency in the application of standards.  Additionally, such delegations were not intended to give S/L agencies the authority to issue interpretations of Federal law that are subsequently binding on the Federal Government.  Current SIP policy, as reflected in White Paper Number 2 for Improved Implementation of the Part 70 Operating Permits Program, permits S/L agencies to alter SIP requirements so long as the alternative requirements are shown to be equally
stringent and are within a pre-approved protocol (and so long as public review is provided and EPA approval is obtained).  The S/L agencies can show equivalent stringency by providing substantive criteria in SIPs governing the implementation of alternative requirements.

    We recognize that Regions have the prerogative to approve delegation of specific authorities to some S/L agencies and not to others.  Therefore, we encourage Regions to provide as clearly as possible an explanation of the criteria they have used to approve or disapprove delegation of a specific authority, and to apply those criteria consistently across their S/L agencies.  Such criteria could include a determination of whether the S/L agency has sufficient expertise to make such decisions, or a determination that the working relationship between the Region and the S/L agencies is such that individual decisions could or could not be determined through consultation on an "as needed" basis.  For example, you may want to work more closely with your S/L agencies on their first decision-making for some authorities, thus gaining assurance
that the S/L agencies can and will make appropriate decisions.  We also recommend that Regions obtain copies of all S/L agencies' alternative determinations for their records; especially where new issues are addressed.

Delegation of Specific Authorities

    The part 63 General Provisions lists 15 specific types of authorities for which the Administrator may make discretionary decisions on a source-specific basis.  When the General Provisions are delegated to an S/L agency, such discretion may be appropriately delegated, provided the stringency of the underlying standard would not be compromised.

    We recognize that, in order for Regional Offices to have the authority to delegate some of the authorities outlined in this memorandum (such as intermediate changes to test methods), delegation 7-121 must first be revised to delegate these authorities to the Regions.  We intend to
make this revision, i.e., to delegation 7-121, as soon as possible.  Additionally, the Emission Measurement Center of the Emissions Monitoring and Analysis Division must receive copies o any approved intermediate changes to test methods or monitoring.  Please note that intermediate

changes to test methods must be demonstrated as equivalent through the procedures set out in EPA method 301 (see Attachment 1).  This information will be used to compile a database of decisions that will be accessible to the S/L agencies and Regions for reference in making future decisions.  Regions are asked to ensure that initial intermediate changes to testing and monitoring
made in each Region are evaluated.  All intermediate test changes and State-issued intermediate changes to monitoring should be provided via mail or facsimile to:

            Chief, Source Characterization Group A
            U.S. EPA (MD-19)
            Research Triangle Park, NC  27711
            Facsimile Telephone Number:  (919) 541-1039

Changes in monitoring issued by Regional Offices should continue to be posted on the Applicability Determination Index (ADI).  For electronic file transfer procedures for ADI updates,
please contact Belinda Breidenbach in the Office of Compliance at 202-564-7022.

    We have divided the General Provisions discretionary authorities into two categories, based upon the relative significance of each discretionary type of decision: they are those authorities which can be delegated and those authorities which cannot be delegated.  These categories are delineated below:

Category I.  General Provisions That May Be Delegated

    In general, we believe that, where possible, authority to make decisions which are not likely to be nationally significant or to alter the stringency of the underlying standard should be
delegated to S/L agencies.  While we understand the need for Federal oversight of S/L agency decision-making which will ensure that the delegated authorities are being adequately implemented and enforced, we do not want to impede S/L agencies in running the part 70 operating permit and Federal air toxics programs with oversight that is cumbersome.  We recommend that Regions rely on their existing mechanisms and resources for oversight.  During oversight, if the Region determines that the S/L agency had made decisions that decreased the stringency of the standard, then corrective actions should be taken and the source(s) should be notified.  Withdrawal of the program should be initiated if the corrective actions taken are insufficient.

    The authorities listed in Table 1 may be delegated to S/L agencies, so long as the S/L agencies have the capability to carry out the Administrator's responsibilities and any decisions made do not decrease the stringency of the standards.  Since you are ultimately responsible for all  General Provisions authorities' decision-making made in your Region, I am comfortable with trusting your judgement about which of the Administrator's discretionary authorities listed here should be delegated to the S/L agencies in your Region.  When the Region delegates any category I authority to the S/L agency, it could be accomplished either when the General Provisions are delegated or at the time that each relevant maximum achievable control technology (MACT) standard is delegated, with the exception of approval of construction and reconstruction (40 CFR part 63, section 63.5), which should be delegated when the General Provisions are delegated.

    There are some category I authorities, such as approval of intermediate alternatives to test methods, for which you should be notified when decisions are made by your S/L agencies.  Also, you may want to monitor the progress of S/L agencies' decision-making, in addition to updating your files for compliance and enforcement matters.  We have indicated these authorities in Table 1 with an asterisk.  We encourage you to document, in delegation agreements or delegation rulemaking, the request for notification when decisions are made regarding the indicated category I authorities.

Category II.  General Provisions That May Not Be Delegated

    Authorities listed in this section are those decisions which could result in a change to the stringency of the underlying standard, which are likely to be nationally significant, or which may

require a rulemaking and subsequent Federal Register notice.  Therefore, these authorities must
be retained by the EPA Regional Office or EPA Headquarters.  As a result, the following
authorities in Table 2 may not be delegated to S/L agencies (all references are to sections of 40
CFR part 63, subpart A):

     If you have any questions, or would like to discuss this matter further, please contact me
at (919) 541-5608, or Tom Driscoll of my staff at (919) 541-5135.
 Table 1.  General Provisions' Authorities that may be Delegate


Section
Authorities

Section 63.1
Applicability Determinations

Section 63.6(e)
Operation and Maintenance Requirements -
Responsibility for Determining Compliance

Section 63.6(f)
Compliance with Non-Opacity Standards -
Responsibility for Determining Compliance

Section 63.6(h)
Compliance with Opacity and Visible
Emissions Standards - Responsibility for
Determining Compliance

Sections 63.7(c)(2)(i) and (d)
Approval of Site-Specific Test Plans

Section 63.7(e)(2)(i)*
Approval of Minor Alternatives to Test
Methods (see Attachment 1)

Sections 63.7(e)(2)(ii) and (f)*
Approval of Intermediate Alternatives to Test
Methods (see Attachment 1)

Section 63.7(e)(2)(iii)
Approval of Shorter Sampling Times and
Volumes When Necessitated by Process
Variables or Other Factors

Sections 63.7(e)(2)(iv) and (h)(2), (3)
 Waiver of Performance Testing

Sections 63.8(c)(1) and (e)(1)
Approval of Site-Specific Performance
Evaluation (monitoring) Test Plans

Section 63.8(f)*
Approval of Minor Alternatives to Monitoring
(see Attachment 1)

Section 63.8(f)*
Approval of Intermediate Alternatives to
Monitoring (see Attachment 1)

Sections 63.9 and 63.10
Approval of Adjustments to Time Periods for
Submitting Reports

Table 2.  Authorities That May Not Be Delegated

Section
Authority

Section 63.6(g)
Approval of Alternative Non-Opacity
Emission Standards

Section 63.6(h)(9)
Approval of Alternative Opacity Standard

Sections 63.7(e)(2)(ii) and (f)
Approval of Major Alternatives to Test
Methods (see Attachment 1)

Section 63.8(f)
Approval of Major Alternatives to Monitoring
(see Attachment 1)

Section 63.10(f)
Waiver of Recordkeeping -- all

 Addressees
Director, Office of Ecosystem Protection, Region I
Director, Division of Environmental Planning and Protection, Region II
Director, Air Protection Division, Region III
Director, Air, Pesticides and Toxics Management Division, Region IV
Director, Air and Radiation Division, Region V
Director, Multimedia Planning and Permitting Division, Region VI
Director, Air, RCRA and Toxics Division, Region VII
Assistant Regional Administrator, Office of Pollution Prevention,
     State and Tribal Programs, Region VIII
Director, Air and Toxics Division, Region IX
Director, Office of Air Quality, Region X

Attachments

cc:  B.  Buckheit, 2242A
     C.  Garlow, 2111A
     B.  Hunt, MD-14B

```
    B.  Jordan, MD-13
    S.  Mitoff, 2223A
    J.  Seitz, MD-10
    L.  Wegman, MD-10

bcc:    K.  Blanchard, MD-12
    F.  Dimmick, MD-12
    K.  Kaufman, MD-12
    J.  Szykman, MD-13
    Regional Air Toxics Coordinators
```

This letter has been concurred with William Lamason, SCGA, Emission Measurement Center, Charles Garlow, OECA, and verbally from Patrick Chang, OGC.

OAQPS:ITPID:IIG:TDriscoll:cjbaines:x1-5319:MD-12:June 17, 1998:
File: Driscoll/delauth9.mem

ATTACHMENT

   Intermediate change to monitoring is a modification to federally required monitoring involving "proven technology" (generally accepted by the scientific community as equivalent or better) that is applied on a site-specific basis and that may have the potential to decrease the stringency of the compliance and enforcement measures for the relevant standard.  Though site-specific, an intermediate decrease may set a national precedent for a source category and may ultimately result in a revision to the federally required monitoring.  Examples of intermediate changes to monitoring include, but are not limited to: (1) use of a continuous emission monitoring
system (CEMS) in lieu of a parameter monitoring approach;  (2) changes to quality control requirements for parameter monitoring; and (3) use of an electronic data reduction system in lieu of manual data reduction.

   Intermediate change to a test method is a within-method modification to a federally enforceable test method involving "proven technology" (generally accepted by the scientific community as equivalent or better) that is applied on a site-specific basis and that may have the potential to decrease the stringency of the associated emission limitation or standard.  Intermediate changes are not approvable if they decrease the stringency of the standard.  Though site-specific, an intermediate change may set a national precedent for a source category and may ultimately result in a revision to the federally enforceable test method.  In order to be approved,
an intermediate change must be validated according to EPA method 301 (part 63, appendix A) to demonstrate that it provides equal or improved accuracy and precision.  Examples of intermediate changes to a test method include, but are not limited to:  (1) modifications to a test method's sampling procedure including substitution of sampling equipment that has been demonstrated for a particular sample matrix and the use of a different impinger absorbing solution; (2) changes in sample recovery procedures and analytical techniques, such as changes to sample holding times and use of a different analytical finish with proven capability for the analyte of interest; and (3)
"combining" a federally-required method with another proven method for application to processes emitting multiple pollutants.  As an example, Region IX and the CARB have developed a testing protocol to determine whether California chromium electroplaters needed to "retest" for the Chromium Electroplating NESHAP.  This testing protocol has been attached (Attachment 2) for your information should you choose to use it.  Again, these examples should only be approved if they do not decrease the stringency of the monitoring requirement.

   Major change to monitoring is a modification to federally required monitoring that uses unproven technology or procedures or is an entirely new method (sometimes necessary when the required monitoring is unsuitable).  A major change to a test method may be site-specific or may apply to one or more source categories and will usually set a national precedent.  Examples of major changes to a test method include, but are not limited to:  (1) use of a new monitoring approach developed to apply to a control technology not contemplated in the applicable regulation; (2) use of a predictive emission monitoring system (PEMS) in place of a required
 continuous emission monitoring system (CEMS); (3) use of alternative calibration procedures tha

do not involve calibration gases or test cells; (4) use of an analytical technology that differs from
that specified by a performance specification;  and (5) use of alternative averaging times for
reporting purposes.

   Major change to a test method is a modification to a federally enforceable test method
that uses unproven technology or procedures or is an entirely new method (sometimes necessary
when the required test method is unsuitable).  A major change to a test method may be site-
specific or may apply to one or more source categories and will usually set a national precedent.

In order to be approved, a major change must be validated according to EPA method 301
(part 63, appendix A).  Examples of major changes to a test method include, but are not limited
to:  (1) use of an unproven analytical finish; (2) use of a method developed to fill a test method
gap; (3) use of a new test method developed to apply to a control technology not contemplated in
the applicable regulation; and (4) "combining" two or more sampling/analytical methods (at least
one unproven) into one for application to processes

   Minor change to monitoring is a modification to federally required monitoring that
(a) does not decrease the stringency of the compliance and enforcement measures for the relevant
standard; (b) has no national significance (e.g., does not affect implementation of the applicable
regulation for other affected sources, does not set a national precedent, and individually does not
result in a revision to the monitoring requirements);  and (c) is site-specific, made to reflect or
accommodate the operational characteristics, physical constraints, or safety concerns of an
affected source.  Examples of minor changes to monitoring include, but are not limited to:
(1) modifications to a sampling procedure, such as use of an improved sample conditioning
system to reduce maintenance requirements; (2) increased monitoring frequency; and
(3) modification of the environmental shelter to moderate temperature fluctuation and thus
protect the analytical instrumentation.

   Minor change to a test method is a modification to a federally enforceable test method
that (a) does not decrease the stringency of the emission limitation or standard; (b) has no
national
significance (e.g., does not affect implementation of the applicable regulation for other affected
sources, does not set a national precedent, and individually does not result in a revision to the test
method); and  (c) is site-specific, made to reflect or accommodate the operational characteristics,
physical constraints, or safety concerns of an affected source.  Examples of minor changes to a
test procedure, such as a modified sampling traverse or location to avoid interference from an
obstruction in the stack, increasing the sampling time or volume, use of additional impingers for a
high moisture situation, accepting particulate emission results for a test run that was conducted
with a lower than specified temperature, substitution of a material in the sampling train that has
been demonstrated to be more inert for the sample matrix, and changes in recovery and analytical
techniques such as a change in quality control/quality assurance requirements needed to adjust for
analysis of a certain sample matrix.   NOTE: The authority to approve decreases in sampling times
and volumes when
necessitated by process variables has typically been delegated in conjunction with the
minor changes to test methods, but these types of changes are not included within the scope
of minor changes.

                    ATTACHMENT

           DESCRIPTION OF THE TECHNICAL REVIEW
            PROTOCOL FOR PERFORMANCE TESTS OF

CALIFORNIA CHROME PLATING SOURCES

Introduction

In 1988, the CARB adopted a statewide airborne toxics control measure (ATCM) for the control of hexavalent chrome emissions from chrome platers (both decorative and hard) and chromic acid anodizers.  In general, the California ATCM required facilities to install equipment or modify their operation to minimize emissions of hexavalent chrome.  In addition to installing equipment and making the necessary process changes, hard chrome platers were required to demonstrate compliance by performing a District -approved source test.

Since the State ATCM was adopted, the majority of hard chrome platers in California have complied with the requirements by installing and source testing their control equipment to demonstrate compliance with the California standards.

On January 25, 1995, the EPA promulgated a national regulation to control emissions of chromium from chrome platers and anodizers.  This regulation is known as the NESHAP for hard and decorative chromium electroplating and chromium anodizing tanks.  This regulation also requires facilities to demonstrate compliance by performing an approved emission source test.

Further, on January 30, 1997, the EPA promulgated certain revisions to the chrome NESHAP dealing with the monitoring, recordkeeping and reporting (MRR) requirements for hard chromium electroplaters and chromic acid anodizers in California.  Specifically, EPA extended the MRR compliance deadline from January 25, 1997 to July 24, 1997.  This action was taken to allow time for CARB to establish and get approved MRR requirements for these sources that would be at least as stringent as the Federal NESHAP requirements; however, that work remains unfinished.  The Federal NESHAP requires these sources to monitor applicable parameters on and after the date on which the initial performance test is required to be completed, which is July 24, 1997.  It is consistent with the revised NESHAP MRR requirements that all California source tests of hard chrome platers and chromic acid anodizers conducted prior to July 24, 1997 be reviewed according to the performance test review criteria contained herein to determine compliance with the applicable NESHAP emission standard.  This recommendation is made notwithstanding the restrictions identified in 40 CFR 63 section 63.344(b)(2).

This criteria was developed by a team of chrome plating/regulatory professionals representing EPA, CARB, Bay Area Air Quality Management District, South Coast Air Quality Management District (SCAQMD), and Pacific Environmental Services (industry).  The criteria are necessary in reviewing the existing chrome plating emissions source tests in California.  It is estimated that in California there are approximately 100 hard chrome platers, 150 decorative chrome platers and 50 chromic acid anodizers, over half of which have performed source tests (where applicable).  Many of these source tests have sufficient information and quality control to demonstrate compliance with the Federal NESHAP for chrome plating and anodizing.  This document is to present and discuss the criteria developed for this purpose.

NESHAP Source Testing for Compliance

The NESHAP standard for chrome plating and anodizing indicates that source testing to demonstrate compliance with the standard is required unless the facility is a decorative chrome plater or chromic acid anodizer choosing the alternate emission limitation of 45 dyne/cm bath surface tension.  In accordance with this, 40 CFR part 63 specifies acceptable source test procedures, methods, materials, etc.  Although the requirements outlined in the NESHAP are specific, there are allowances for the "owner or operator of an affected source conduct[ing] performance testing at startup to obtain an operating permit in the State in which the affected source is located, the results of such testing may be used to demonstrate compliance with this subpart . . . " (40 CFR 63.344).  The following discussion presents a step-by-step approach for determining whether an existing source test in California can be used to demonstrate compliance with the chrome plating and anodizing NESHAP.

Determining if Existing Source Tests Can Be Used to Demonstrate Compliance

The Chrome Plating Source Test Review Criteria Section (see below) provides a step-by-step process for the review of existing source tests in light of the NESHAP standards.  The following is a discussion of each of the criteria steps from the Chrome Plating Source Test Review Criteria Section with an explanation of the rationale for the chosen process.

Criteria Step 1.  Compliance with the NESHAP Standards Demonstrated?  The NESHAP standards are in terms of milligram of total chrome per dry standard cubic meter (mg/dscm) of ventilation gas flow.  The NESHAP standards are listed in 40 CFR part 63, section 63.342.  Emission standards vary depending on whether the facility performs hard chrome plating, decorative chrome plating, chromic acid anodizing, or whether the facility is new or existing, and
how large the facility is (how much chrome plating is performed on an annual basis).

Most of the existing chrome emission source test reports provide a variety of information including test date and time, plating bath rectifier amp-hours, sample volume, ventilation gas velocity, sample flowrate percent isokinetic, duct temperature, flowrate, ventilation gas water content, total and hexavalent chrome catch, as well as chrome emissions on a process rate (amp-hrs) and concentration basis.

    - If the resulting average source test emission value is less than or equal to th applicable
NESHAP standard, the source test acceptability determination can continue.

    - If the existing source test does not demonstrate compliance with the NESHAP, then the facility operator must decide what course of action to take for a remediation.  For example, the facility operator may need to make some operational or design changes to lower the emission rate to achieve compliance with the NESHAP standards.  A retest will be required.  All future source tests should be conducted according to the requirements and specifications of 40 CFR part 63.344 Performance test requirements and test methods.

Criteria Step 2.  Was the Source Test Conducted Under Close Approximation of Normal Operating Conditions?  Normal operating conditions are defined as normal bath temperatures (+ 10 deg F), normal bath composition range (within 5 percent), normal rectifier amperage range, normal agitation rates, and normal voltage loadings.  For the purpose of demonstrating compliance, normal operating conditions can also include conditions needed to meet specific source test requirements such as the use of dummy parts to be plated.

Although there can be a significant variation in the operating conditions from one plating shop to another, most chrome platers are well aware of their individual normal operating conditions and operate on a consistent basis with these constraints.  Significant variation from the
normal operating mode is undesirable for quality assurance and controllability purposes.

Facilities may have increased the source test sampling period in order to capture the requisite sample mass for analytical detection.  Extending the source test period may require the use of dummy parts rather than the real parts that would normally be plated.  An example of this is a Bay Area plater which plates automobile body part dies.  Plating such a part for a longer than
normal period would result in a plated part with tolerances outside of specification limits.  To avoid ruining an expensive automobile die, a dummy part (a large sheet of steel, sized similar to the die) is plated for the time period required to meet capture requirements.

    - If the source test was conducted under close approximation of normal operating conditions, then the evaluator can proceed to the next step in the evaluation process, step 3.

    - If the source test was conducted under conditions deemed abnormal, the facility must conduct a new source test.  All retests should be conducted according to the requirements and specifications of 40 CFR part 63.344 Performance test requirements and test methods.

Criteria Step 3.  Correct Use of Approved Test Method?  Source tests to demonstrate compliance with the requirements of the NESHAP must use the EPA approved source test

method.  According to 40 CFR part 63.344 the following source test methods have been deemed acceptable to demonstrate compliance with the NESHAP standards:  EPA method 306 or 306A (conducted after December 1991) and CARB method 425.  The EPA has granted a verbal approval for the use of the SCAQMD method 205.1 for total chrome analysis only and will issue an official letter soon.

Any use of an approved source test method must be done in strict accordance with the requirements and specifications of the method itself and performance testing requirements of section 63.344 of the NESHAP.  Such requirements include sample point locations, use of EPA method 5 source test train, impinger solution compositions, isokinetic ratios, sample handling, sampling times, sample volume, catch mass requirements, etc.  Implicit in the use of an approved source test method is the correct use of the method itself.  Any variation in the source test procedure will trigger a retest unless the change has been approved beforehand by the EPA and the local permitting authority.

Criteria Step 4.  Number of Runs:  Paragraph 63.7(e)(3) of the part 63 General Provisions specifies at least three sampling runs to make up one source test.  If three sampling runs were performed, the reviewer is directed to proceed on to review criteria step 5 (catch mass requirement).

<3 sampling runs:  Previous source tests attempted to meet the requirement for at least three sampling runs.  For some previous California source tests, the expected ultra-low concentrations of chrome in the exhaust required the use of longer than normal source test runs (normal sampling run length is 120 minutes and normal sampling volume is 1.7 dscm).

Some operators chose (with local agency approval) to perform longer sample runs to capture enough sample to produce a chrome emission number and to reduce the potential for error with minimal chrome capture.  In California the longer times ranged from 3 to 8 hours per sampling run.  Due to the added expense, potential problems of multiple long sampling runs, and the potential operational conflicts due to reduced production from multiple sampling runs, these facilities proposed performing one or two long duration source tests instead of three or more shorter runs.

For tests where less than three sampling runs were conducted, the reviewer is directed to go to criteria step 6 to determine if the source testing results are far enough below the NESHAP emission limit to warrant acceptance.

Regarding future source testing/Retesting:  Unless prior approval is obtained from EP and the local air quality agency, future source tests will require at least three sampling runs to be acceptable.

Criteria Step 5.  Catch Mass Requirements:  Consistent with the discussion in section 2.2.2 of method 306 in 40 CFR part 63, appendix A, it is recommended that the catch mass requirement be at least five times the limit of detection for the analytical method chosen.  Such catch mass requirements produce analytical results well within the range of confidence.  If the catch mass requirements are not met, the reviewer is directed to criteria step 6.

Criteria Step 6.  Source Test Emission Results Compared With NESHAP Limit:  If the catch mass requirement is not met, the reviewer evaluates the resulting emission rate according to criteria step 6.  Criteria step 6 requires that the source test results be ó1/5 of the respective NESHAP standard; if this specification is met, then the existing source test can be accepted for demonstrating compliance with the NESHAP.  A factor of one fifth (20 percent) is consistent with the catch mass requirements.

Criteria step 6 directs that if the source test results were greater than 1/5 of the NESHAP standard, the facility must retest.  All retests should be conducted according to the requirements and specifications of 40 CFR part 63.344 Performance test requirements and test methods.

Regarding future source testing/Retesting:  Unless prior approval is given from EPA and

the local air quality agency, all future source tests will require at least three sampling runs to be
acceptable.  The catch mass requirements identified in 40 CFR part 63, section 63.344 also must
be met unless the source test emission result is <1/5 of the respective NESHAP emission limit or
is below detection levels.

Other Issues:  Establishing Monitoring Parameter Ranges to Ensure Ongoing Compliance

    Continued compliance with the chrome plating and anodizing NESHAP is assured by
monitoring of specific operating parameters associated with the control equipment.  Normally
operating parameter values or ranges are established in conducting the performance test.  Since
many California source tests were performed before the final adoption and understanding of the
NESHAP monitoring requirements, some alternate procedures may be necessary to establish
appropriate ranges/values for the monitoring parameters.

        The Establishing Monitoring Pararmeters to Ensure Ongoing Compliance Section (see
below) provides an approach to establishing the monitoring parameter compliance ranges after the
performance test is completed.  Where applicable, the basic requirements include the following:

(1)  Source test conducted during normal operating conditions.

(2)  Flowrate was monitored/recorded at outlet of emission control device.

    Control Device Pressure Drop and Velocity Pressure:  Assuming the above criteria items
(1) and (2) were met and that the current ventilation gas flowrate is within 10 percent of the
flowrate determined during the source test, the current control device pressure drop and/or
velocity pressure can be used to establish the appropriate ranges/value for the monitoring
parameters.  Guidance for the development of the operating parameter range is found in
40 CFR 63 section 63.344.

    Surface Tension Parameter Development:  If the surface tension was monitored during the
performance test, the facility operator should use the higher of either (1) the surface tension
parameter measured during the source test; or (2) 45 dyne/cm as specified in the NESHAP.  If the
surface tension was not monitored during the source test, the facility should use 45 dyne/cm as
the maximum allowable surface tension parameter for monitoring ongoing compliance.

    Foam Thickness Parameter Development:  If the foam additive thickness was monitored
during the performance test, the facility operator should use the lessor of either (1) the foam
thickness parameter measured during the source test; or (2) the 1 inch foam thickness as specified
in the NESHAP.  If the foam thickness was not monitored during the source test, then the facility
should use 1 inch foam thickness as the minimum allowable thickness parameter for monitoring
ongoing compliance.
            Chrome Plating Source Test Review Criteria

    The following criteria are to be used for those chrome plater and anodizer performance tests
conducted in the State of California prior to July 24, 1997.  If the source test cannot be evaluated
using these criteria, then the facility owner/operator should contact Kingsley Adeduro, EPA
Region IX at (415) 744-1177 for guidance.

(1)  Compliance with the NESHAP Standards Demonstrated?
   Y:  Go to (2)
   N:  Evaluate operation/make necessary changes then perform retest according to
40 CFR 63.344.

(2)  Was source test conducted under close approximation of normal operating
     conditions?
   Y:  Go to (3)

N:  Retest according to 40 CFR part 63.344.

(3)      Correct Use of Approved Test Method [CARB 425, EPA 306, EPA 306A (conducted
      after 12/91), SCAQMD 205.1 ( total chrome only)]
   Y:  Go to (4)
   N: Retest according to 40 CFR part 63.344.

(4)      Number of Sampling Runs
   (a)  3 or more runs:  Go to (5)
   (b)  1 or 2 runs:  Go to (6)

      (5)      Catch Mass Requirements (at least 5 times the limit of detection for the analytical
method)
      Hex Chrome Analysis Methods      Diphenylcarbazide Colorimetric Test
                        Ion Chromatography with Post-Column Reactor (ICPCR)
      Total Chrome Analysis Methods:  Atomic Absorption Graphite Furnace (AAGF)
                        Inductively Coupled Argon Plasmography (ICAP)

   Y:  S/T is acceptable
   N:  Go to (6)

(6)          Source Test Emission Results <20 prcent (1/5) of the NESHAP Emission Limit?
   Y:  S/T is acceptable
          N: Retest according to 40 CFR part 63.344. Establishing Monitoring Parameters to Ensure
Ongoing Compliance

(A)  Were normal operating conditions employed during source test performance?
   Y:  Go to (B)
   N: Retest according to source testing and operating parameter development guidelines of
          40 CFR part 63.344.

(B)      Were appropriate operating parameters monitored/recorded during the source test?
   Y:  Use measured parameter values to establish ranges for ongoing compliance
      monitoring.
   N:    (a)  If bath emissions controlled by bath controls (surfactant additive or  foam) only
                go to (E).
         (b)  If bath emissions controlled by bath controls and downstream control device go
                to (C) and (E).
         (c)  If bath emission controlled by downstream control device(s) go to (C).

(C)  Was control device outlet flow rate recorded during the source test?
   Y:  Go to (D).
   N: Retest according to source testing and operating parameter range development
      guidelines of 40 CFR part 63.344.

(D)  Determine inlet velocity pressure compliant range as follows:  (for PBS only)

   Collect concurrent data on facility's inlet velocity pressure, and scrubber outlet flow rate.
      If the current scrubber outlet flow rate is within 10 percent of the outlet flow rate
      measured during the source testing, then the current inlet velocity pressure value can be
      used to establish the compliant range for continuous monitoring.

   Determine control device pressure drop complaint range as follows:  (for CMP, FB Mist
      Eliminator,  PBS, HEPA Filter)
          Collect concurrent data on pressure drop across the control device, and outlet flow
rate.
      If the outlet flow rate is within 10 percent of the outlet flow rate recorded during the
      source testing, then the current pressure drop value can be used to establish the compliant
      range for continuous monitoring if the controls are visually inspected and the work
      practice standards are conducted immediately prior to collecting current pressure drop
      data.

(E)     Surfactant Additive Surface Tension:  If surface tension was monitored during the source test, use the higher of either (1) the surface tension developed during the source test or (2) 45 dyne/cm surface tension for demonstration of ongoing compliance.  If no surface tension monitoring during source test, use 45 dyne/cm as surface tension parameter for demonstration of ongoing compliance.

Foam Thickness:  If foam thickness was monitored during the source test, use the minimum thickness parameter for demonstration of ongoing compliance.  If no foam thickness monitoring during source test, use 1 inch foam blanket as parameter for demonstration of ongoing compliance.

# EXHIBIT G

July 30, 2002  Version F

# Compliance Extensions Summary

**What is a compliance extension?**

The Part 63 General Provisions allow a source additional time to come into compliance with a relevant standard, under certain circumstances and with certain requirements.

If the owner/operator of a source requests a compliance extension, and the EPA Administrator (or, in most cases, the State with an approved permit program) approves the request, a compliance extension will be issued to postpone the date by which the source must comply with a relevant standard (or specific part(s) of the relevant standard).

Generally, until the compliance extension has been granted, the owner/operator must comply with all applicable requirements of the relevant standard.

**What is a relevant standard?**

All of the following are "relevant standards" with respect to the Part 63 General Provisions. If a source is subject to any of these requirements, then the source is also subject to the Part 63 General Provisions:

- 112(d) MACT Standard; 112(f) Residual Risk;
- 112(g) Major Source Modification MACT Determination;
- 112(h) NESHAP Work Practice Standard; or
- 112(j) Equivalent Emission Limitation by Permit MACT Determination.

**Where do the General Provisions address compliance extensions?**

The procedures for compliance extensions appear in section 63.6(i).

**Are progress reports required during the extension period?**

When granting an extension of compliance, the Administrator (or the State with an approved permit program) may or may not require that the owner/operator submit progress reports during the period of extension. If progress reports are required, the contents of the progress reports and the dates by which they must be submitted will be specified in the written extension. The purpose of the progress report is to indicate whether steps toward compliance outlined in the compliance schedule have been reached. (The compliance schedule is referred to in §63.6(i)(6)(i)(B) and is submitted as part of the request for compliance extension.) Progress reports are addressed under §63.6(i)(11).

1

July 30, 2002  Version F

**Through what mechanisms may a compliance extension be granted?**

Compliance extensions may be granted in the following four cases:

Case 1:  Early Reductions Program.

> If a source achieves reductions in accordance with the voluntary Early Reductions Program (pursuant to section 112(i)(5) of the Clean Air Act), the source may be granted an extension of compliance with specific requirements, as specified in subpart D.  [§63.6(i)(2)(i)]

Case 2:  BACT/LAER.

> If a source has installed BACT or has installed technology required to meet LAER prior to promulgation of the relevant standard, the source may be granted an extension of compliance with the standard for 5 years after the installation date.  [§63.6(i)(2)(ii)]

Case 3:  Section 112(d) Standard.

Applies to a source subject to a section 112(d) standard [§63.6(i)(4)(i)(A)]:

- If a source needs additional time in order to install controls before it can comply with a section 112(d) standard, then the source may be granted an extension up to 1 year.  Conditions of the extension must be incorporated into the source's title V permit.

- If the source is a mining waste operation and it needs additional time in order to install controls before it can comply with a section 112(d) standard, then the source may be first granted an extension up to 1 year.  If that 1-year extension is insufficient to dry and cover mining waste, then an additional extension of up to 3 years may be added.  Conditions of the extension must be incorporated into source's title V permit.

Case 4:  Section 112(f) Standard.

> If a source needs additional time in order to install controls before it can comply with a section 112(f) standard, then the source may be granted an extension up to 2 years after the standard's effective date.  The source must take steps during the period of extension to assure that the health of persons will be protected from imminent endangerment.  [§63.6(i)(4)(ii)]

2

July 30, 2002  Version F

**When must a request for compliance extension be submitted?**

Generally, the source must submit a request for extension in writing not later than 120 days before the relevant standard's compliance date.  [§63.6(i)(4)(i)(B)]  There are four exceptions to the 120-day limit:

Exception 1:

If the standard specifies an alternative date for submittal of requests, the source must submit its request by that alternative date.  [§63.6(i)(4)(i)(B)]

Exception 2:

If the need for the compliance extension arises within 120 days before the compliance date, or if the need for the compliance extension arises between the alternative submittal date specified by the standard and the otherwise applicable compliance date, and the need arose due to circumstances beyond reasonable control of the owner/operator, then the source may submit its request later.  [§63.6(i)(4)(i)(C)]

Exception 3:

If the standard is pursuant to section 112(f), the source must submit request for compliance extension not later than 90 days after the effective date of the standard.  [§63.6(i)(4)(ii)]

Exception 4:

If the compliance extension is requested on the basis of installation of BACT or technology required to meet LAER, the source must submit its request not later than 120 days after the promulgation date of the standard.  [§63.6(i)(5)]

If either Exception 1 or 2 above applies, the compliance extension request will stay the effect of the rule until the request is either approved or denied; in other words, the source does not have to comply with a standard while waiting for approval of its request for an extension of compliance with that standard.

July 30, 2002  Version F

**What information must a request for compliance extension include?**

For a source seeking either a 1-year extension of compliance with a standard pursuant to section 112(d) or a 2-year extension of compliance with a standard pursuant to section 112(f), the request for compliance extension must include the following information [§63.6(i)(6)(i)]:

- • A description of the controls to be installed
- • A compliance schedule, including:
    - - Starting date for onsite construction, installation of emission control equipment, or process change.
    - - Date by which final compliance is to be achieved.

For a source seeking a 5-year extension of compliance due to installation of BACT or LAER technology (as in Case 2 above), the request for compliance extension must include information needed to demonstrate that the installation controls the same pollutant(s) that would be controlled at that source by the relevant standard.  [§63.6(i)(6)(ii)]

**What is the step-by-step procedure for obtaining a compliance extension?**

A request for a compliance extension in connection with Early Reductions (Case 1 above) is handled through subpart D procedures.  Other requests (Cases 2, 3, and 4 above) are handled pursuant to paragraphs 63.6(i)(4) through (7).

How the request for extension of compliance will be handled depends on the mechanism through which the owner/operator is requesting an extension.  A flow diagram, "Procedure for Compliance Extension Request" depicts how the request for extension of compliance will be handled.  This flow diagram shows two possible paths, A and B, which are also described below.

Path A:  Section 112(d) Standard or BACT/LAER.

Path A [corresponding to §63.6(i)(12)] depicts how the request is handled if it is for either:

- • An owner/operator who is unable to comply with a section 112(d) standard for the reason that additional time is necessary for installation of controls (as in Case 3), or
- • An owner/operator who seeks an extension for the reason that the source has installed BACT or LAER technology (as in Case 2).

Within 30 calendar days after receiving the compliance extension request, the Administrator (or the State with an approved permit program) will notify the

4

owner/operator in writing as to the status of the application (that is, whether it is complete--containing sufficient information with which to make a determination).

If the application is <u>not</u> complete, the notification of status will specify the information needed.  The applicant has 30 calendar days after being notified of the incomplete application in which to present additional information or arguments toward further action on the application.  After such additional information or arguments have been submitted by the owner/operator, the Administrator (or the State with an approved permit program), just as for the original request, will notify the owner/operator in writing within 30 calendar days as to the status of the application.

When the owner/operator has been notified that the application <u>is</u> complete, the clock starts for the 30-day approval or denial period.  This means the Administrator (or the State with an approved permit program) will notify the owner/operator either of approval or of intent to deny approval of the compliance request within 30 calendar days after the owner/operator has been notified that the application is complete.

In the case where the Administrator (or the State with an approved permit program) notifies the owner/operator of intent to deny the compliance extension request, the notification will specify the basis for the intended denial, and it will allow the owner/operator 15 days in which to present in writing any additional information or arguments before a final determination is made.

A final determination to deny the request for a compliance extension will be in writing and will specify the basis for the denial.  If additional information or arguments submitted by the owner/operator (following receipt of a notice of intent to deny) do not change the decision to deny, then the final determination of denial will be issued within 30 calendar days after the additional information or arguments were presented.  If no additional information or arguments were submitted by the owner/operator, then the final determination of denial will be issued within 30 calendar days after the due date for presentation of additional information or arguments.

<u>Path B:  Section 112(f) Standard.</u>

Path B depicts how the request is handled if it is for an owner/operator who is unable to comply with a section 112(f) standard for the reason that additional time is necessary for installation of controls (as in Case 4).  [§63.6(i)(13)]

July 30, 2002  Version F

Within 15 calendar days after receiving the compliance extension request, the Administrator (or the State with an approved permit program) will notify the owner/operator in writing as to the status of the application (that is, whether it is complete--containing sufficient information with which to make a determination).

If the application is not complete, the notification of status will specify the information needed.  The applicant has 15 calendar days after being notified of the incomplete application in which to present additional information or arguments toward further action on the application.  After such additional information or arguments have been submitted by the owner/operator, the Administrator (or the State with an approved permit program), just as for the original request, will notify the owner/operator in writing within 15 calendar days as to the status of the application.

When the owner/operator has been notified that the application is complete, the clock starts for the 30-day approval or denial period.  This means the Administrator (or the State with an approved permit program) will notify the owner/operator either of approval or of intent to deny approval of the compliance request within 30 calendar days after the owner/operator has been notified that the application is complete.

In the case where the Administrator (or the State with an approved permit program) notifies the owner/operator of intent to deny the compliance extension request, the notification will specify the basis for the intended denial, and it will allow the owner/operator 15 days in which to present in writing any additional information or arguments before a final determination is made.

A final determination to deny the request for a compliance extension will be in writing and will specify the basis for the denial.  If additional information or arguments submitted by the owner/operator (following receipt of a notice of intent to deny) do not change the decision to deny, then the final determination of denial will be issued within 30 calendar days after the additional information or arguments were presented.  If no additional information or arguments were submitted by the owner/operator, then the final determination of denial will be issued within 30 calendar days after the due date for presentation of additional information or arguments.