## ORAL ARGUMENT NOT SCHEDULED

No. 24-60351

# In the United States Court of Appeals
# For the Fifth Circuit

DENKA PERFORMANCE ELASTOMER LLC,
*Petitioner,*

STATE OF LOUISIANA AND LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY,
*Intervenors,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL REGAN,
ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
*Respondents,*

On Appeal from Environmental Protection Agency
40 CFR Parts 60 and 63

## OPENING BRIEF OF
## PETITIONER DENKA PERFORMANCE ELASTOMER, LLC

James C. Percy
JONES WALKER LLP
445 N. Boulevard, Suite 800
Baton Rouge, LA 70802
Telephone: (225) 248-2130
jpercy@joneswalker.com

Robert E. Holden
Brett S. Venn
JONES WALKER LLP
201 St. Charles Ave
New Orleans, LA 70170
Telephone: (504) 582-8000
bholden@joneswalker.com
bvenn@joneswalker.com

David A. Super
Jason B. Hutt
Jeffrey R. Holmstead
Britt Cass Steckman
Kevin M. Voelkel
BRACEWELL LLP
2001 M Street NW, Ste. 900
Washington, DC 20036
Telephone: (202) 828-5800
david.super@bracewell.com
jason.hutt@bracewell.com
jeff.holmstead@bracewell.com
britt.steckman@bracewell.com
kevin.voelkel@bracewell.com

*(cont'd)*

Jeffrey L. Oldham
BRACEWELL LLP
711 Louisiana Street, Suite 2300
Houston, TX 77002
Telephone:  (713) 223-2300
jeffrey.oldham@bracewell.com

***Counsel for Petitioner Denka Performance Elastomer LLC***

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

- Petitioner Denka Performance Elastomer LLC ("DPE"). DPE is a privately owned limited liability company formed under the laws of the State of Delaware, headquartered in LaPlace, Louisiana, and authorized to do business in the State of Louisiana. DPE owns and operates a manufacturing facility in LaPlace, Louisiana that produces Neoprene by utilizing chloroprene, a chemical regulated under a Clean Air Act rule promulgated by EPA that is relevant to this action. DPE's membership interests are held by Denka USA LLC (whose ultimate parent is Denka Company Limited) and Diana Elastomers, Inc. (whose ultimate parent is Mitsui & Co., Ltd). Denka Company Limited and Mitsui & Co. Ltd. are each Japanese companies listed on the Tokyo Stock Exchange.

- BRACEWELL LLP (Counsel for Petitioner)

- David A. Super (Counsel for Petitioner)

- Jason B. Hutt (Counsel for Petitioner)

- Jeffrey R. Holmstead (Counsel for Petitioner)

- Britt Cass Steckman (Counsel for Petitioner)

- Kevin M. Voelkel (Counsel for Petitioner)

- Jeffrey L. Oldham (Counsel for Petitioner)

- JONES WALKER LLP (Counsel for Petitioner)

- James C. Percy (Counsel for Petitioner)

- Robert E. Holden (Counsel for Petitioner)

- Brett S. Venn (Counsel for Petitioner)

- Respondent United States Environmental Protection Agency

- Respondent Michael S. Regan, Administrator, United States Environmental Protection Agency

- United States Department of Justice, Environment and Natural Resources Division, Environmental Enforcement Section (Counsel for Respondents)

- Alexander M. Purpuro (Counsel for Respondents)

- Brandon N. Adkins (Counsel for Respondents)

- Michael Thrift (Counsel for Respondents)

- Hali Kerr (Counsel for Respondents)

- Steven D. Shermer (Counsel for Respondents)

- Davis H. Forsythe (Counsel for Respondents)

- Daniel S. Smith (Counsel for Respondents)

- Hannah L. Frazier (Counsel for Respondents)

- Scott Cernich (Counsel for Respondents)

- Heather Gange (Counsel for Respondents)

- Intervenor Louisiana Department of Environmental Quality

- Intervenor State of Louisiana

- Jorge Aguinaga of Louisiana Department of Justice Baton Rouge, LA (Counsel for Intervenors)

- Kelsey Smith of Louisiana Department of Justice Baton Rouge, LA (Counsel for Intervenors)


Date:  October 30, 2024            */s/ David A. Super*

David A. Super

**Counsel for Petitioner**
**Denka Performance Elastomer LLC**

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Pursuant to Federal Rule of Appellate Procedure 34(a) and (f) and Fifth Circuit Rule 28.2.3, Petitioner Denka Performance Elastomer LLC ("DPE") respectfully requests oral argument. This case involves important, and nuanced, issues of interpretation under the Clean Air Act and associated regulations. This case also raises important issues of cooperative federalism and will have substantial impacts on DPE and the State of Louisiana and its citizens. DPE respectfully submits that oral argument would substantially aid the Court's resolution of the case.

# **TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTERESTED PERSONS .........................................i

STATEMENT REGARDING ORAL ARGUMENT ...............................iv

TABLE OF AUTHORITIES ................................................... vii

STATEMENT OF JURISDICTION....................................................1

STATEMENT OF THE ISSUES...........................................................3

INTRODUCTION ...............................................................................3

STATEMENT OF THE CASE...........................................................7

    A.    EPA's Rule And Litigation Against DPE. ............................7

    B.    LDEQ's Authority To Grant Compliance Extensions. .......................11

    C.    The LDEQ Extension And EPA's Final Action Declaring It "Ineffectual."...............................................................13

SUMMARY OF ARGUMENT ............................................................17

ARGUMENT ....................................................................................19

    A.    DPE Has Met The Declaratory-Judgment Elements For Relief Regarding EPA's Invalidity Determination. .........................19

        1.    There is an actual controversy between EPA and DPE. ...........19

        2.    This Court has the authority to grant declaratory relief because EPA's determination of invalidity is reviewable final agency action. ...............................................20

            a.    EPA's decisionmaking process is final. ........................24

            b.    EPA has determined DPE's rights and obligations........25

                i.    EPA's focus on the form of its invalidity determination fails to account for the law and the facts.........................................27

                ii.    In assessing the finality of EPA's action here, context is critical. ........................28

        3.    The Court should exercise its discretion to address DPE's Petition. ...............................................30

B.     EPA's Determination That The LDEQ Extension Is Invalid Is Arbitrary, Capricious, And Contrary To Law. .................................... 31

     1.     EPA expressly delegated to LDEQ the specific authority to grant extensions in 2004 and has not withdrawn that delegation. ................................................................................ 32

     2.     LDEQ also has an automatic delegation of authority through its EPA-approved permit program. ............................ 37

     3.     EPA's objections to LDEQ's two sources of extension authority lack merit. .................................................................. 40

CONCLUSION ................................................................................................. 50

CERTIFICATE OF SERVICE ......................................................................... 52

CERTIFICATE OF COMPLIANCE ................................................................ 53

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Elec. Power Co. v. Conn.*,
   564 U.S. 410 (2011)........................................................................7

*Barrick Goldstrike Mines v. Browner*,
   215 F.3d 45 (D.C. Cir. 2000)....................................................24, 27

*Bennett v. Spear*,
   520 U.S. 154 (1997)......................................................................23

*Carreon v. Garland*,
   71 F.4th 247 (5th Cir. 2023) ...........................................10, 13, 15, 22

*Ciba-Geigy Corp. v. EPA*,
   801 F.2d 430 (D.C. Cir. 1986)..........................................24, 26, 28, 31

*Clarke v. CFTC*,
   74 F.4th 627 (5th Cir. 2023) ...............................................24, 25, 26

*Data Mktg. P'ship v. Dep't of Labor*,
   45 F.4th 846 (5th Cir. 2022) ..........................................................26

*Fort Bend Cty. v. U.S. Army Corps of Eng'rs*,
   59 F.4th 180 (5th Cir. 2023) ...........................................................23

*Friedman v. FAA*,
   841 F.3d 537 (D.C. Cir. 2016)........................................................24

*Frye v. Anadarko Petroleum Corp.*,
   953 F.3d 285 (5th Cir. 2019) ...............................................19, 20, 31

*Her Majesty the Queen in Right of Ontario v. EPA*,
   912 F.2d 1525 (D.C. Cir. 1990)......................................................28

*Louisiana v. EPA*,
   712 F. Supp. 3d 820 (W.D. La. 2024) .............................................29

*Louisiana v. EPA*,
   No. 23-cv-692, 2024 WL 3904868 (W.D. La. Aug. 22, 2024) ...........29

*MedImmune, Inc. v. Genentech, Inc.*,
   549 U.S. 118 (2007)....................................................................19, 20

*Ohio v. EPA*,
   144 S.Ct. 2040 (2024).........................................................................7

*Sackett v. EPA*,
   566 U.S. 120 (2012).................................................6, 16, 23, 25, 30

*San Francisco Herring Ass'n v. Dep't of Interior*,
   946 F.3d 564 (9th Cir. 2019) ..............................................26, 27, 29

*Sherwin-Williams Co. v. Holmes County*,
   343 F.3d 383 (5th Cir. 2003) ........................................................20, 21

*Sierra Club v. EPA*,
   292 F.3d 895 (D.C. Cir. 2002)......................................................22

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014)........................................................................20

*Tex. Employers' Ins. Assn. v. Jackson*,
   862 F.2d 491 (5th Cir. 1988) ........................................................18, 30

*Texas v. Becerra*,
   89 F.4th 529 (5th Cir. 2024) ...........................................26, 27, 28

*Texas v. Biden*,
   No. 21-cv-067, 2021 WL 4552547 (N.D. Tex. July 19, 2021) .........22

*Texas v. EPA*,
   829 F.3d 405 (5th Cir. 2016) .........................................................1

*Texas v. Equal Emp. Opportunity Comm'n*,
   933 F.3d 433 (5th Cir. 2019) ..........................................................27

*Texas v. United States*,
   40 F.4th 205 (5th Cir. 2022) ..........................................................28

*United States v. DPE, et al.*,
   No. 2:23-cv-00735 (E.D. La.)................................9, 10, 17, 22, 25, 42

*United States v. Yildiz,*
   355 F.3d 80 (2d Cir. 2004) ...................................................26

*Vantage Trailers, Inc. v. Beall Corp.,*
   567 F.3d 745 (5th Cir. 2009) ...............................................20

*Wages and White Lion Invs. v. FDA,*
   16 F.4th 1130 (5th Cir. 2021) ..............................................31

*Whitman v. Am. Trucking Ass'ns,*
   531 U.S. 457 (2001) ............................................................21

**Statutes**

5 U.S.C. § 706(2) ...................................................................31

28 U.S.C. § 2201(a) ................................................6, 18, 19, 30

28 U.S.C. § 2283 ...................................................................21

42 U.S.C. Chapter 85 ..............................................................1

42 U.S.C. § 7401(a)(3) .............................................................7

42 U.S.C. § 7412 .................................. 12, 32, 33, 37, 39, 41, 43, 44, 47

42 U.S.C. § 7412(1)(6) ...........................................................34

42 U.S.C. §§ 7412(c)-(d) ........................................................41

42 U.S.C. § 7412(d) ...............................................................38

42 U.S.C. § 7412(f) ......................................................7, 38, 39, 47

42 U.S.C. § 7412(f)(2) .............................................................7

42 U.S.C. § 7412(f)(2)(A) .........................................................7

42 U.S.C. § 7412(f)(4) ............................................................11

42 U.S.C. § 7412(f)(4)(B) ................................................7, 9, 11

42 U.S.C. § 7412(l) ................................ 12, 13, 32, 33, 36, 43, 46, 48

42 U.S.C. § 7412(l)(1) ............................................................32

42 U.S.C. § 7412(l)(1)-(5) ...................................................................32

42 U.S.C. § 7412(l)(5) .......................................................................32

42 U.S.C. § 7412(l)(6) ........................................ 34, 36, 37, 40, 42, 43, 47

42 U.S.C. § 7603 ........................... 4, 9, 10, 16, 22, 23, 24, 26, 29, 49

42 U.S.C. § 7607(b) .............................................................................1

42 U.S.C. § 7607(b)(1)....................................................................1, 2, 21

42 U.S.C. § 7607(d)(9).......................................................................31

42 U.S.C. § 7607(f) ............................................................................50

## Rules

Fifth Circuit Rule 28.2.1 .........................................................................i

Fifth Circuit Rule 28.2.3 .......................................................................iv

Fifth Circuit Rule 30.1.5 ....................................................................1, 13

Fifth Circuit Rule 30.2(b) ..................................................................1, 13

Fed. R. App. P. 28(f)..............................................................................1

Fed. R. App. P. 34(a) ...........................................................................iv

Fed. R. App. P. 34(f) ............................................................................iv

## Regulations

40 C.F.R. Part 63...............................................................................44

40 C.F.R. Part 63, subpt. A ...............................................................33, 41

40 C.F.R. Part 63, subpt. E ............................................................12, 32, 43

40 C.F.R. Part 63, subpt. U ..............................................................40, 41

40 C.F.R. § 63.6(i) ......................................................................11, 33, 34, 45, 47

40 C.F.R. § 63.6(i)(1)........................................................................37, 38

40 C.F.R. § 63.6(i)(3)................................................................11, 47

40 C.F.R. § 63.6(i)(4)(ii)................................ 12, 33, 41, 42, 43, 47

40 C.F.R. §§ 63.6(i)(4) through (i)(7)......................................47

40 C.F.R. § 63.6(i)(8)................................................................11, 47

40 C.F.R. § 63.6(i)(9).................................... 11, 12, 33, 37, 43, 47, 48

40 C.F.R. §§ 63.6(i)(9) through (i)(14).................................47

40 C.F.R. § 63.6(i). § 63.6(i)(4)(ii).........................................11

40 C.F.R. § 63.12(b)(2)................................................................43

40 C.F.R. § 63.90..........................................................................32

40 C.F.R. § 63.96....................................................................32, 33

40 C.F.R. § 63.96(b)............................................................34, 35, 36

40 C.F.R. § 63.99(a)(19)..............................................................11

40 C.F.R. § 63.99(a)(19)(i).........................................................33

40 C.F.R. § 63.481(f)....................................................................42

40 C.F.R. § 63.481(o)-(p) ..........................................................10

40 C.F.R. § 63.507....................................................................39, 45, 48

40 C.F.R. § 63.507(c)................................... 12, 40, 43, 45, 46, 48

40 C.F.R. §§ 63.507(c)(1)-(4)..............................................44, 45

40 C.F.R. § 63.507(c)(6)...........................................36, 43, 46

43 C.F.R. § 63.6(i)(4)(ii)............................................................11

40 CFR § 63.6(i)(4)(ii)................................................................49

59 Fed. Reg. 12,408 (Mar. 16, 1994)......................................41

60 Fed. Reg. 47,296 (Sept. 12, 1995) ..............................12, 39

68 Fed. Reg. 37,334, 37,334 (Aug. 22, 2003) ..............................................43, 44, 45

69 Fed. Reg. 15,687 (Mar. 26, 2004)..........................................................12, 33, 45

88 Fed. Reg. 25,080 (Apr. 25, 2023) ...................................................8, 9, 10, 13, 49

89 Fed. Reg. 42,932 (May 16, 2024) ........... i, 3, 4, 5, 6, 7, 8, 10, 12, 13, 14, 20, 23, ............................................... 25, 29, 31, 34, 35, 36, 40, 41, 43, 44, 45, 46, 47, 49

**Other Authorities**

https://www.justice.gov/d9/2023-10/comprehensive-environmental-
    justice-enforcement-strategy-annual-report.pdf ...................................................4

## STATEMENT OF JURISDICTION

This Court has original jurisdiction over this lawsuit pursuant to Section 307(b)(1) of the Clean Air Act ("CAA"), 42 U.S.C. § 7607(b)(1), because it challenges a final action of the Administrator of the Environmental Protection Agency ("EPA") under Chapter 85 of the CAA, 42 U.S.C. Chapter 85. Venue is appropriate only in this Court because the EPA determination at issue applies solely to Petitioner Denka Performance Elastomer LLC's ("DPE") chemical manufacturing facility in LaPlace, Louisiana, and is therefore locally applicable. *See* 42 U.S.C. § 7607(b) (Addendum.65-66 ("Add"))[1] (final action of EPA Administrator under CAA "which is locally or regionally applicable may be filed *only* in the United States Court of Appeals for the appropriate circuit") (emphasis added); *Texas v. EPA*, 829 F.3d 405, 419 (5th Cir. 2016) (explaining that CAA "separates petitions for review of nationally applicable actions from petitions for review of locally or regionally applicable actions. The question of applicability turns on the legal impact of the action as a whole.").

---

[1] Pursuant to Federal Rule of Appellate Procedure 28(f), DPE has included relevant statutes, and regulations and materials issued by EPA, in the Addendum filed with this brief. Materials in the Addendum are paginated with numbers beginning with "Add." In addition, for the Court's convenience and pursuant to Fifth Circuit Rules 30.1.5 and 30.2(b), DPE has filed an Appendix concurrently with this brief containing copies of documents that are the subject of DPE's pending Motion to Supplement or Complete the Administrative Record, Doc. 73-1, as well as relevant briefing excerpts related litigation. Materials in the Appendix are paginated with numbers beginning with "App."

The final agency action at issue in this case was first announced on June 11,

2024. DPE's petition for review was timely filed on July 10, 2024, less than 60 days

later. 42 U.S.C. § 7607(b)(1) (Add.65-66).

## STATEMENT OF THE ISSUES

1.      Whether EPA's determination at issue—deeming invalid the two-year extension of time granted by the Louisiana Department of Environmental Quality ("LDEQ") for DPE to comply with an EPA rule governing chloroprene ("LDEQ Extension")—constitutes a final agency action that is subject to review in this Court?

2.      Whether EPA acted arbitrarily, capriciously, and contrary to law in determining that the LDEQ Extension is invalid?

## INTRODUCTION

For over two years, EPA and Administrator Regan have embarked on a politically-motivated, unscientific crusade to shut down DPE's Neoprene manufacturing facility in LaPlace, Louisiana (the "Facility").  The Facility is the Nation's only manufacturer of Neoprene, a synthetic rubber with applications in the automotive, construction, adhesives, and medical industries as well as military applications.  With nearly 250 employees and 100 contractors, the Facility manufactures Neoprene using a chemical called chloroprene, which is regulated by EPA under the CAA.  Despite the undisputed fact that the Facility's chloroprene emissions have decreased dramatically in the past five years, EPA has since 2022 thrown the full weight of the federal government into shutting down the Facility

unless it can achieve extreme emissions reductions within an indisputably impossible-to-meet timeframe, all in the name of purported environmental justice.[2]

In February 2023, relying on its emergency powers under Section 303 of the CAA, EPA filed an "emergency" lawsuit in the U.S. District Court for the Eastern District of Louisiana, alleging that the Facility's chloroprene emissions are causing an "imminent and substantial endangerment" and seeking a preliminary injunction that would shut down the Facility if DPE could not meet EPA's demands ("Section 303 Litigation"). In response to DPE's motion for summary judgment in that action, EPA abruptly requested in February 2024—mere weeks before trial— that EPA's "emergency" lawsuit be continued indefinitely. EPA's so-called emergency lawsuit has been stayed ever since, although EPA recently asked the district court to reopen that litigation following this Court's stay order in this case.[3]

Having utterly failed to achieve its goals through "emergency" litigation, on May 16, 2024, EPA promulgated a final rule ("Rule") under the CAA regulating chloroprene emissions from the Facility and emissions of certain other chemicals

---

[2] The Department of Justice Environment and Natural Resources Division, which represents EPA in court, issued a Comprehensive Environmental Justice Enforcement Strategy Annual Report that highlighted the government's emergency action against DPE's Facility in Louisiana as a "highlight" of the government's environmental justice campaign. *See* https://www.justice.gov/d9/2023-10/comprehensive-environmental-justice-enforcement-strategy-annual-report.pdf.

[3] In response to EPA's recent request, the district court set a status hearing in the Section 303 Litigation for November 21, 2024.

from 200-plus other facilities.  Specific to the Facility, the Rule required DPE to design, purchase, and install equipment and implement a series of stringent emission control requirements in a mere 90 days (by October 15, 2024)—an indisputably impossible-to-meet deadline.  Notably, EPA's *proposed* version of that Rule would have given DPE two full years to comply, but EPA's final Rule cut DPE's implementation period to only 90 days, without providing DPE any notice or ability to comment on that material change.   In sharp contrast to EPA's treatment of DPE, the 200-plus other facilities subject to the Rule—including facilities that EPA itself estimates pose higher estimated risk levels than the Facility—are permitted two years to comply, as was originally proposed for DPE.[4]

EPA's quest to shut down DPE's Facility forced DPE to pursue all available avenues for relief.  Because DPE cannot possibly comply with the Rule within the prescribed 90-day timeframe, it publicly sought and received an extension of time to comply with the Rule from LDEQ, the Facility's regulator in Louisiana.  The LDEQ Extension, which was issued lawfully pursuant to LDEQ's authority under the CAA, is a lifeline that permits DPE the same two-year compliance period that EPA originally proposed for DPE and that the other regulated sources received.

---

[4] EPA's "surprise switcheroo" rulemaking, and the Rule in general, are subject to a separate, on-going challenge in the D.C. Circuit by DPE and other entities impacted by the Rule.  *See* Case No. 24-1135 (D.C. Cir. filed May 16, 2024).

Aware of DPE's extension request to LDEQ, and realizing the hole in its plan to shutdown DPE's Facility through rulemaking, EPA conjured the position that the LDEQ's extension is invalid and that DPE cannot rely on it. EPA has unambiguously conveyed its determination that the LDEQ Extension is invalid to DPE and the public in multiple communications, which can only be construed as threats to "drop the hammer" and impose substantial criminal and civil penalties against DPE for non-compliance with the Rule. *Sackett v. EPA*, 566 U.S. 120, 127 (2012). In response to those threats, DPE filed this action seeking relief from the EPA's determination and seeking an emergency stay. On July 31, 2024, this Court issued a stay that precluded EPA from taking action in contravention of the validity of the LDEQ Extension pending the Court's resolution of this lawsuit. *See* Doc. 57. Notably, nowhere in EPA's opposition to the stay or other motions briefing does it deny its position that the LDEQ Extension is invalid.

DPE seeks relief from this Court pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a) (Add.3). A declaratory judgment will preserve DPE's ability to rely on the LDEQ Extension. The LDEQ Extension is the lifeline that keeps DPE's Facility in business, protecting the jobs of its roughly 250 employees while DPE pursues its separate judicial challenge to the Rule in the D.C. Circuit, including forcing EPA to confront the scientific evidence that EPA has thus far disregarded concerning the true risk of chloroprene to humans.

## STATEMENT OF THE CASE

**A.    EPA's Rule And Litigation Against DPE.**

"The Clean Air Act regulates air quality through a federal-state collaboration." *Ohio v. EPA*, 144 S.Ct. 2040, 2048 (2024) (quotation omitted). The CAA assigns states the primary role in air pollution prevention and control as to existing sources. *Am. Elec. Power Co. v. Conn.*, 564 U.S. 410, 424-28 (2011); 42 U.S.C. § 7401(a)(3) (Add.6).

Section 112(f) of the CAA requires EPA to prescribe emission standards if EPA determines that existing standards do not provide an "ample margin of safety to protect public health." 42 U.S.C. § 7412(f)(2)(A) (Add.26). Standards promulgated pursuant to Section 112(f)(2) cannot apply until 90 days after the effective date, *id*, and the EPA Administrator may grant an extension (or "waiver") permitting sources up to two years to comply. 42 U.S.C. § 7412(f)(4)(B) (Add.26-27).

On May 16, 2024, EPA promulgated the Rule, 89 Fed. Reg. 42,932, requiring DPE to implement stringent emission control requirements by October 15, 2024, which was 90 days after the Rule's effective date (the "90-Day Requirements"). *See New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emissions Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I*

& *II Polymers and Resins Industry*, 89 Fed. Reg. 42,932, 43,236 (May 16, 2024) ("Rule") (Add.226).  It is undisputed that this deadline is impossible to meet.  *See generally* Doc. 6-1, DPE Mot. for Stay at 1, 20 (stating that 90-day deadline is impossible to meet); Doc. 6-15, Declaration of Christopher Meyers in Support of Stay (explaining why 90-day deadline is impossible to meet); Doc. 42, EPA Opp. to Mot. for Stay (EPA opposing stay but not disputing that DPE cannot comply within 90 days).  DPE has challenged the Rule, including the 90-Day Requirements, in the D.C. Circuit.  That action remains pending, and DPE does not challenge the Rule itself in this case.

The final Rule's background is key to understanding fully the Rule's 90-day compliance deadline.  In April 2023, EPA published the proposal for the Rule ("Proposed Rule"), which proposed providing all sources, including DPE, with the maximum *two years* to comply with the applicable requirements.  In so doing, EPA expressly recognized that the DPE Facility "will require additional time to plan, purchase, and install equipment for … chloroprene control."  *New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emissions Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry*, 88 Fed. Reg. 25,080, 25,178 (Apr. 25, 2023) ("Proposed Rule") (Add.232).  A two-year compliance deadline, proposed by EPA for the Facility, is available only

if EPA finds that steps will be taken to protect people from "imminent endangerment." 42 U.S.C. § 7412(f)(4)(B) (Add.26-27).

Notably, before publishing the Proposed Rule, EPA filed the Section 303 Litigation in February 2023 in the U.S. District Court for the Eastern District of Louisiana, which was an unprecedented action taken pursuant to EPA's emergency authority under the CAA. *United States v. DPE, et al.*, No. 2:23-cv-00735 (E.D. La. filed Feb. 28, 2023). EPA alleged that the Facility is causing an "imminent and substantial endangerment" because its emissions—which did not violate any air standard or permit—result in off-site, ambient air concentrations of chloroprene greater than the level EPA alleges is needed to ensure that the lifetime cancer risk for a person located continuously at the Facility's fenceline *all day, every day for 70 years* is no higher than 1-in-10,000. Notwithstanding that allegation, EPA's subsequent Proposed Rule proposed a two-year deadline for DPE's compliance, without alleging any "imminent endangerment" or requiring any steps to protect from any such endangerment during the compliance period.

As the Section 303 Litigation progressed, DPE moved for summary judgment in December 2023 and argued that, because the Facility's emissions do not present an "imminent endangerment"—as EPA had subsequently conceded in the Proposed Rule by providing the two-year compliance period—there was no "imminent *and substantial* endangerment." DPE's Memorandum in Support of Motion for

Summary Judgment, *United States v. DPE, et al.*, No. 2:23-cv-00735 (E.D. La.),

Doc. 131-2, at 5-8 (relevant portions attached at Appendix-1-5 ("App")).[5]  EPA's

only response was that the Proposed Rule was not final.   United States'

Memorandum in Opposition of Motion for Summary Judgment, *United States v.

DPE, et al.*, No. 2:23-cv-00735 (E.D. La.), Doc. 150, at 5-6 & n.6 (relevant portion

attached at App.6-9).   EPA then asked the district court to stay the Section 303

Litigation.

      The EPA Administrator ultimately signed the final Rule, allowing DPE only

90 days to comply but retaining the Proposed Rule's two-year compliance period for

every other source, including those posing higher risks as estimated by EPA.  89 Fed.

Reg. at 43,236-37 (40 C.F.R. § 63.481(o)-(p)) (Add.226-27); *id.* at 42,955

(Add.221).  The Rule provided no explanation for cutting DPE's compliance period

from two years to 90 days, other than to cite the still-unadjudicated Section 303

Litigation against DPE.  *Id.* at 42,955 (Add.221)

---

[5] The Court may take judicial notice of these matters of public record.  *See Carreon v. Garland*, 71 F.4th 247, 253 n.4 (5th Cir. 2023) ("Though our review is ordinarily limited to the administrative record … , we may take judicial notice of matters of public record directly relevant to the issue at hand.") (cleaned up).  For the Court's convenience, DPE has included relevant briefing excerpts from the Section 303 Litigation in the Appendix filed concurrently with this brief.

**B.    LDEQ's Authority To Grant Compliance Extensions.**

Section 112(f)(4)(B) of the CAA provides that the EPA Administrator may grant an extension (or "waiver") permitting sources up to two years to comply with a standard if the Administrator finds (1) "that such period is necessary for the installation of controls" and (2) "that steps will be taken during the period of the waiver to assure that the health of persons will be protected from imminent endangerment."    42 U.S.C. § 7412(f)(4)(B) (Add.26-27).    EPA's regulations implementing Section 112(f)(4) are set forth in 40 C.F.R. § 63.6(i). Section 63.6(i)(4)(ii) governs the procedures for requesting compliance extensions. *See* 40 C.F.R. §§ 63.6(i)(3); 63.6(i)(4)(ii) (Add.83).   Section 63.6(i)(9) governs the approvals of compliance extensions.    *See* 40 C.F.R. §§ 63.6(i)(8), 63.6(i)(9) (Add.84-85).

Section 63.6(i) also provides *LDEQ* with authority to grant compliance extensions.  LDEQ can grant extensions under Section 63.6(i) through two sources*:* (i) its express delegation of Section 63.6(i) authority pursuant to Part 63, Subpart E, *see* 40 C.F.R. § 63.99(a)(19) (Add.142-48); *and* (ii) its automatic authority pursuant to its approved CAA permit program, *see* 40 C.F.R. § 63.6(i)(9) (Add.85) (authorizing EPA "or the State with an approved permit program" to grant extension).

Regarding the first source of LDEQ authority, on March 26, 2004, pursuant to Section 112(l) of the CAA and 40 C.F.R. Part 63, Subpart E, EPA Region 6 expressly delegated to LDEQ the authority to implement and enforce Section 112 standards, including the authority to grant compliance extensions under 40 C.F.R. § 63.6(i)(9) and 40 C.F.R. § 63.6(i)(4)(ii). *See* EPA, *New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants; Delegation of Authority to Louisiana*, 69 Fed. Reg. 15,687 (Mar. 26, 2004) (Add.233-241). Regarding the second source of LDEQ authority, in September 1995, EPA approved Louisiana to implement and enforce the CAA's operating permits program. *See* EPA, *Clean Air Act Final Full Approval of Operating Permits Program; Louisiana Department of Environmental Quality*, 60 Fed. Reg. 47,296 (Sept. 12, 1995) (Add.263). The approval of LDEQ's permit program also authorizes LDEQ to issue extensions. For more than 20 years, Louisiana has exercised its delegated authority.

However, in the final Rule in 2024—as part of its efforts to shut down DPE's Facility—EPA included an amendment to 40 C.F.R. § 63.507(c) providing that the "[a]pproval of an extension request under § 63.6(i)(4)(ii)" cannot be delegated to state agencies. 89 Fed. Reg. at 43,261 (Add.228). Because EPA granted waivers for all other regulated sources by providing a two-year compliance period in the Rule, this purported revocation applies (if it applies at all) solely to LDEQ's ability

to grant a compliance waiver to DPE.  This is the first time that EPA has purported to revoke any part of Louisiana's delegated authority, or that of any state.  Notably, as with the reduction of the compliance deadline from two years to 90 days, EPA's Proposed Rule did not contain a single word about possibly revoking LDEQ's authority—it first appeared, without prior notice, in the final Rule.

## C.    The LDEQ Extension And EPA's Final Action Declaring It "Ineffectual."

On April 19, 2024, faced with the Rule's impossible-to-meet 90-day implementation period, DPE submitted to LDEQ an extension request for the DPE Facility, seeking a two-year extension of the implementation period ("Extension Request").  *See* Letter from Jeffrey R. Holmstead, DPE, to Aurelia S. Giacometto and Bryan Johnston, LDEQ, re *Request for Extension of Compliance Period Set Forth in Final Rule in EPA Docket EPA-HQ-OAR-2022-0730* (Apr. 19, 2024) (App.10-62).[6]  DPE sought an extension pursuant to both LDEQ's express delegated authority under Section 112(l) of the CAA and LDEQ's automatic authority based

---

[6] DPE's Extension Request to LDEQ was not included in EPA's Certified Copy of the Record, Doc. 70.  EPA did include this document in its Corrected Certified Copy of the Record, Doc. 78, after DPE moved to complete the administrative record. Regardless, the Court may take judicial notice of this document, which was an official request filed with LDEQ and made available on LDEQ's website.  *See Carreon*, 71 F.4th at 253 n.4.  For the Court's convenience, DPE has included a copy of this document, together with other relevant documents that are the subject of DPE's pending Motion to Supplement or Complete the Administrative Record, Doc. 73-1, in its Appendix filed concurrently with this brief.  *See* 5th Cir. Rules 30.1.5, 30.2(b).

on its EPA-approved air permit program.  In the Extension Request, DPE explained that good cause exists for the extension because a period of at least two years is necessary for DPE to comply with the 90-Day Requirements and the Facility does not present an "imminent endangerment."

On May 28, 2024, DPE filed a motion for stay of the Rule's 90-day compliance deadline in the D.C. Circuit, where DPE's challenge to the Rule was already (and remains) pending.  In its motion for stay, DPE stated that it had submitted the Extension Request to LDEQ.  ROA.24-60351.26.

On June 11, 2024, EPA filed its opposition to DPE's motion for stay in the D.C. Circuit.  In its opposition brief, EPA declared that any extension granted by LDEQ to DPE "would be ineffectual."  ROA.24-60351.56.  In taking that final position, which was signed by the Department of Justice and EPA's Office of General Counsel on behalf of EPA and Administrator Regan, EPA provided no explanation as to why any such state-issued extension "would be ineffectual."[7]

On June 27, 2024, LDEQ granted DPE's Extension Request, finding, in part: "LDEQ finds that additional time is needed for Denka to install controls.... LDEQ also finds that steps will be taken during the period of the extension to assure that the health of persons will be protected from imminent endangerment."  Letter from

---

[7] The D.C. Circuit denied DPE's stay motion.

Amanda Vincent, LDEQ, to Jeffrey R. Holmstead, DPE, re *Extension of Compliance* (June 27, 2024) at 2 (App.63-65).[8]   The LDEQ Extension provides DPE until July 15, 2026, to comply with the 90-Day Requirements, subject to DPE satisfying specified conditions regarding additional emissions controls, monitoring of ambient air, and periodic reporting to LDEQ.  *Id.*

On June 28, 2024, DPE submitted a request to EPA seeking confirmation of EPA's position taken in its D.C. Circuit brief on the alleged invalidity of the LDEQ Extension and requesting the legal basis for EPA's position.  *See* Letter from Jeffrey R. Holmstead, DPE, to Michael S. Regan, EPA, re *Expedited Request for Final Action Addressing Validity of Extension of Time Granted in June 27, 2024 Letter from Louisiana Department of Environmental Quality; Contingent Application for Extension of Time* (June 28, 2024) (App.66-70).  DPE specifically explained that "DPE will be subjected to substantial and mounting legal uncertainty on October 15, 2024, the compliance deadline in place before the LDEQ Extension was granted." *Id.* at 2.  The letter also stated that "[i]f EPA intends to treat the LDEQ Extension as 'ineffectual,' and enforce the October 15, 2024, compliance deadline, then DPE intends to avail itself of legal recourse to resolve the consequent uncertainty before

---

[8] EPA disputes that the LDEQ Extension should be included in the administrative record.  Regardless, the Court may take judicial notice of this document, which is a public record of LDEQ.  *Carreon*, 71 F.4th at 253 n.4.

allowing 'the Agency to drop the hammer' and impose virtually unlimited legal liability on DPE." *Id.* (citing *Sackett*, 566 U.S. at 127). DPE's letter also expressly informed EPA that DPE would treat EPA's failure to respond by July 8, 2024, as confirmation that EPA would continue to treat the LDEQ Extension as "ineffectual." *Id.* On July 8, 2024, EPA's litigation counsel informed DPE by email that a timely response to DPE's June 28 letter was not possible. App.71.[9] In fact, EPA has never responded to DPE's June 28 letter.

On July 11, 2024, DPE filed its Petition for Review and Complaint for Declaratory and Injunctive Relief in this action. Doc. 1-2. That same day, DPE also filed an emergency motion for stay pending review, requesting that EPA be precluded from taking action in contravention of the validity of the LDEQ Extension pending resolution of the Petition. Doc. 6-1.

On July 17, 2024, at a status conference in the Section 303 Litigation, counsel for EPA stated on the record in open court that "EPA does not believe that [the

---

[9] EPA has taken the position that DPE's June 28 letter and EPA's July 8 email in response are not part of the administrative record because they post-date the D.C. Circuit brief in which EPA first stated its position on non-validity. Doc. 79 at 10. DPE believes these documents should be included in the administrative record. *See* Doc. 73-1 (Motion to Supplement or Complete the Administrative Record). However, regardless of whether these documents are considered part of the administrative record, the Court may consider them in assessing whether EPA has taken reviewable "final agency action" that is subject to this Court's jurisdiction. *See infra* at 22 n.13 (citing cases holding that Court may consider non-record evidence to determine jurisdictional issues).

LDEQ Extension] is valid," and "it is [EPA's] belief that on October 15th that emissions standard … will become effective" as to DPE. Transcript of Status Conference, *United States v. DPE*, No. 2:23-cv-00735 (E.D. La. July 17, 2024) (relevant portions attached as App.88, App.90).

On July 22, 2024, in this Court, EPA filed its opposition to the stay motion and a motion to dismiss. EPA's opposition to DPE's stay motion argued that the LDEQ Extension not valid and did not deny that EPA had made its final decision on that point. Doc. 42 at 17-20. At the same time, for purposes of its motion to dismiss, EPA argued that there was no reviewable final agency action. *Id.* at 9-15. On July 30, 2024, this Court granted DPE's motion for stay pending review and denied EPA's motion to dismiss. Doc. 57.

## SUMMARY OF ARGUMENT

DPE is entitled to a declaratory judgment that the LDEQ Extension is valid and enforceable. DPE has met all the requirements for declaratory-judgment relief, including because—contrary to EPA's objection—EPA's determination that the LDEQ Extension is invalid is a final agency action that is reviewable by this Court. EPA has made a definitive and final determination that the LDEQ Extension is not valid and has communicated that determination to DPE and the public in multiple ways. And EPA's invalidity determination is a reviewable final agency action because it marks the consummation of EPA's decision on validity and determines

DPE's rights or obligations as to whether it may continue to rely upon the lifeline that is the LDEQ Extension. As it did in granting DPE's motion for emergency stay, this Court should reject any argument by EPA that jurisdiction is lacking here.

On the merits, EPA's determination that the LDEQ Extension is invalid is arbitrary and capricious and in violation of the law. LDEQ lawfully granted DPE's Extension Request under two independent sources of authority. First, LDEQ had authority to issue the LDEQ Extension because such authority was expressly delegated by EPA to LDEQ in 2004 and has not been revoked. Second, and as an entirely separate basis for LDEQ's authority, LDEQ had the power to issue the LDEQ Extension because such authority was automatically granted to LDEQ when EPA approved of Louisiana's CAA air permits program in 1995. Prior to LDEQ granting the LDEQ Extension, EPA failed to take any action capable of divesting LDEQ of either source of its authority to grant extensions.

Therefore, to avoid putting DPE to the "Hobson's choice"[10] of having to close its Facility or rely on the lawfully issued LDEQ Extension while risking potential enforcement by EPA, DPE respectfully requests that this Court declare EPA's

---

[10] *See Tex. Employers' Ins. Assn. v. Jackson*, 862 F.2d 491, 505 (5th Cir. 1988) (through action under Declaratory Judgment Act, "[l]itigants would no longer be put to the Hobson's choice of foregoing their rights or acting at their peril").

invalidity determination to be arbitrary, capricious, and contrary to law, and to declare the LDEQ Extension to be valid.

## ARGUMENT

### A.     DPE Has Met The Declaratory-Judgment Elements For Relief Regarding EPA's Invalidity Determination.

To obtain a declaratory judgment, DPE must show that: (1) "an actual controversy exists between the parties;" (2) the Court "has authority to grant declaratory relief;" and (3) the Court should "exercise its discretion to decide … a declaratory judgment action." *Frye v. Anadarko Petroleum Corp.*, 953 F.3d 285, 294 (5th Cir. 2019). Each element is met here, where EPA threatens DPE with prosecution for violations of the CAA based on EPA's determination that the LDEQ Extension is invalid. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) ("[W]here threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat.… The dilemma posed by that coercion—putting the challenger to the choice between abandoning his rights or risking prosecution—is a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate.") (emphasis in original) (cleaned up).

### 1.     There is an actual controversy between EPA and DPE.

An actual and justiciable controversy exists where "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy

and reality to warrant the issuance of a declaratory judgment." *Frye*, 953 F.3d at 294 (quoting *MedImmune*, 549 U.S. at 127). The controversy must be "definite and concrete." *Id.* Here, EPA intends to prevent DPE from continuing to reply upon the lifeline of the LDEQ Extension based on EPA's determination that it is invalid. This is a real, concrete, and immediate dispute: if the LDEQ Extension is invalid, EPA will continue its campaign against DPE by using the threat of enforcement to force the closure of the Facility.[11]  There is plainly a justiciable dispute as to EPA's determination that the LDEQ Extension is invalid. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161 (2014) (finding that a pre-enforcement suit for declaratory judgment is justiciable where petitioner has "alleged a credible threat of enforcement").

> **2.    This Court has the authority to grant declaratory relief because EPA's determination of invalidity is reviewable final agency action.**

The second factor goes to subject-matter jurisdiction. *See Sherwin-Williams Co. v. Holmes County*, 343 F.3d 383, 387-88 (5th Cir. 2003) (court has authority to

---

[11] "[T]hreats of litigation can constitute evidence of a justiciable controversy even if they are 'indirect or implicit or covert.'" *Frye*, 953 F.3d at 295 (quoting *Vantage Trailers, Inc. v. Beall Corp.*, 567 F.3d 745, 750 (5th Cir. 2009)). Here, where EPA is already pursuing separate litigation against DPE pursuant to its emergency authority and singled out DPE as the only entity to receive a 90-day compliance period under the Rule, there can be no reasonable doubt that DPE would be under a threat of EPA enforcement action if DPE continues to operate in reliance upon the LDEQ Extension.

issue declaratory judgment where "[d]iversity jurisdiction was present...."). [12]  This

Court, and only this Court, has original jurisdiction over this action pursuant to

42 U.S.C. § 7607(b)(1) because this action challenges a final action of the EPA

Administrator under the CAA that is locally applicable in Louisiana. "Final action"

under the CAA "bears the same meaning … that it does under the Administrative

Procedure Act." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001). "[T]he

word 'action' … is meant to cover comprehensively every manner in which an

agency may exercise its power." *Id.*  Therefore, the "bite" in this test is "in the word

'final.'" *Id.*

The only jurisdictional challenge asserted by EPA has been to whether there

is final agency action.  *See* Doc. 42 at 9-14.  But in this case, DPE seeks judicial

review of EPA's final determination that the LDEQ Extension is invalid.  That EPA

determination has been unequivocally conveyed to DPE and the public several times,

both before and after LDEQ issued the LDEQ Extension on June 27, 2024,

including:

---

[12] As part of the second factor, courts also consider application of the Anti-Injunction
Act, 28 U.S.C. § 2283 (Add.5), which restricts a court's ability to enjoin ongoing
state proceedings.  *See Sherwin-Williams*, 343 F.3d at 387-88.  Because there is no
pending state court action, the Court need not consider application of the Anti-
Injunction Act.  *Id.*

- EPA's statement, in opposing DPE's stay motion in the D.C. Circuit, that "[a]ny purported compliance extension granted by a state agency to Denka would be ineffectual." ROA.24-60351.56.

- EPA's refusal to substantively respond to DPE's June 28, 2024, letter seeking confirmation of EPA's position regarding the alleged invalidity of the LDEQ Extension. (App.71).

- EPA's on-the-record statement, through counsel on July 17, 2024, in the Section 303 Litigation, that "EPA does not believe that [the LDEQ Extension] is valid," and "it is [EPA's] belief that on October 15 that emissions standard … will become effective" as to DPE.  Transcript of Status Conference, *United States v. DPE*, No. 2:23-cv-00735 (E.D. La. July 17, 2024) (relevant portions attached at App.88, App.90).[13]

---

[13] EPA has taken the position that DPE's June 28 letter and EPA counsel's July 17 statements in court should not be considered part of the administrative record. Again, DPE disputes that position and the parties' dispute over the scope of the administrative record remains pending.  *See* Doc. 79, EPA Opp. to Mot. to Supp. Admin. Record, at 10; Doc. 88, Order Carrying With the Case Denka's Mot. to Supp. Admin. Record.  Regardless, the Court may consider these materials for purposes of determining subject-matter jurisdiction.  *See, e.g.*, *Carreon*, 71 F.4th at 253 n.4 ("Though our review is ordinarily limited to the administrative record, … we may take judicial notice of matters of public record directly relevant to the issue at hand, where the issue is the BIA's authority itself, not its consideration of the record.") (cleaned up); *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002) ("The petitions are not confined to the administrative record" in establishing standing) (cleaned up); *Texas v. Biden*, No. 21-cv-067, 2021 WL 4552547, at *3-4 (N.D. Tex. July 19, 2021) (collecting cases and finding that non-record evidence is permitted to determine jurisdictional issues).  The question of "final agency action" presented here is a

- EPA's definitive statements *in this Court* when opposing DPE's stay motion that the LDEQ Extension is not valid. Doc. 42 at 17-20.

Thus, EPA has conveyed a series of consistent statements aimed at coercing DPE to fall in line with EPA's invalidity determination and, as a consequence, EPA's impossible-to-meet compliance deadline. Notably, there was no reason for EPA to affirmatively state its position regarding the validity of the LDEQ Extension *other* than to convey that DPE could not rely on the LDEQ Extension to operate past the 90-day compliance deadline.[14] These EPA statements plainly were meant to put DPE and the public on notice of EPA's determination.

An agency action is final if it (1) marks the consummation of the agency's decision, and (2) determines a party's rights or obligations, or legal consequences flow from it. *Sackett*, 566 U.S. at 126 (citing *Bennett v. Spear*, 520 U.S. 154, 178

---

question of the Court's subject matter jurisdiction. *See Fort Bend Cty. v. U.S. Army Corps of Eng'rs*, 59 F.4th 180, 189 (5th Cir. 2023).

[14] Indeed, placed in context, each of EPA's statements of position was entirely gratuitous. In the D.C. Circuit, EPA's statement that "[a]ny purported compliance extension granted by a state agency to Denka would be ineffectual" was in a footnote to EPA's "Background" section, ROA.24-60351.56, and actually cut *against* EPA's argument that DPE would not be irreparably harmed absent a D.C. Circuit stay of EPA's Rule as to DPE—because an extension from LDEQ would remediate the harms to DPE. In the Section 303 Litigation, the district court asked EPA counsel about the status of the litigation in this Court, and counsel's response included the statement that "EPA does not believe that [the LDEQ Extension] is valid." (App.90) (July 17, 2024 Transcript). This statement can only have been intended to send a message to DPE and the press in the courtroom.

(1997)); *Clarke v. CFTC*, 74 F.4th 627, 637 (5th Cir. 2023). As explained below, this test is the same regardless of the form the action takes. EPA's invalidity determination plainly meets both finality elements.

### a.    EPA's decisionmaking process is final.

Although EPA disputes that its determination that the LDEQ Extension is invalid is reviewable by this Court, EPA has never disputed that its determination is not subject to further deliberation *by the agency* and thus is final *within EPA*. *See generally* Doc. 42, EPA Mot. to Dismiss. Since EPA learned that DPE had applied for the LDEQ Extension, EPA's "unwavering position," *Friedman v. FAA*, 841 F.3d 537, 539 (D.C. Cir. 2016), has been that LDEQ does not have the authority to issue an extension and that DPE will be in violation of the Rule if it operates in reliance on the LDEQ Extension. This warning was expressed unequivocally by multiple attorneys representing EPA in different venues. *See Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436-37 (D.C. Cir. 1986) (finding final agency action where EPA's statements of position "admit of no ambiguity" and EPA representative did not appear to "lack[] authority to speak for EPA on this issue"). In assessing finality, courts may rely on statements by agency counsel. *See id.* at 437; *Barrick Goldstrike Mines v. Browner*, 215 F.3d 45, 47 (D.C. Cir. 2000). And EPA's counsel at the status conference in the Section 303 Litigation expressly confirmed that she was "allowed to present" EPA's position that the LDEQ Extension is invalid, and that

EPA's position had "been approved by officials at an appropriate level."  Transcript of Status Conference, *United States v. DPE*, No. 2:23-cv-00735 (E.D. La. July 17, 2024) at 18:18-19:1 (relevant portions attached at App.89).  There is no right of appeal to any higher authority within the agency.  *See Clarke*, 74 F.4th at 638.  Because EPA's determination is not "subject to further agency review," this prong of the finality test is satisfied.  *See id.*

### b.    EPA has determined DPE's rights and obligations.

As in *Sackett*, EPA has "determine[d]" DPE's "rights" and "obligations." 566 U.S. at 126.  EPA's position that the LDEQ Extension is invalid indisputably creates new legal consequences for DPE.  Prior to EPA's announcement of that determination, DPE had two years to comply with EPA's Rule; after the determination, DPE had only 90 days.  EPA's invalidation of the LDEQ Extension, if allowed to stand, has the effect of undoing the air emissions permits granted to DPE by LDEQ.  "Courts have previously found that … grants of permission to avoid compliance with administrative requirements constitute agency action," and that "withdrawal" of such grants "constitute[] agency action."  *Clarke*, 74 F.4th at 637 (recognizing that a CFTC no-action letter is a "license" under the APA and that withdrawal of that letter is a separate, reviewable agency action).  Like the withdrawal of the CFTC no-action letter in *Clarke*, which found that the prior no-

action letter was "void," EPA's action here unquestionably results in legal consequences to DPE. *Id.* at 638-39.[15]

"[A]n action is final once the agency makes clear that it 'expects regulated entities to alter their primary conduct to conform to the agency's position.'" *Texas v. Becerra*, 89 F.4th 529, 538 (5th Cir. 2024) (quoting *Ciba-Geigy*, 801 F.2d at 436). Actions that are expressed in "mandatory language" are viewed as "binding." *Id.* at 538-39. Here, all of EPA's statements regarding the invalidity of the LDEQ Extension have been phrased as final and binding: (i) "*any* purported compliance extension granted by a state agency to Denka *would be ineffectual*" (EPA's June 11 brief in the D.C. Circuit) (App.8-9); (ii) "EPA does not believe that [the LDEQ Extension] *is valid*," and "it is [EPA's] belief that on October 15 that emissions standard … *will become effective*" (EPA counsel's July 17 statement in Section 303 Litigation) (App.88, App.90); and (iii) EPA's refusal to disclaim or soften its position when DPE asked for clarification (App.71). *See San Francisco Herring Ass'n v. Dep't of Interior*, 946 F.3d 564, 575 (9th Cir. 2019) (considering agency's "refus[al] to change its position when pressed").

---

[15] Further, EPA's multiple statements in court that the LDEQ Extension is invalid bind the agency. *Id.* at 638 (citing *Data Mktg. P'ship v. Dep't of Labor*, 45 F.4th 846, 854 (5th Cir. 2022)); *see United States v. Yildiz*, 355 F.3d 80, 82 (2d Cir. 2004) ("[T]he government's attorneys can bind the government with their in-court statements … and filings.").

### i.  EPA's focus on the form of its invalidity determination fails to account for the law and the facts.

In its prior motion to dismiss in this case, EPA argued that its invalidity determination is not "final," and therefore not reviewable, because of the form in which that determination was conveyed.  Specifically, EPA has focused on the fact that its determination was first conveyed in a statement in an appellate brief and wrongly suggested that that cannot be final agency action.  *See* Doc. 42, EPA Mot. to Dismiss at 10-12 (arguing that statement in appellate brief cannot be agency action); Doc. 79, EPA Opp. to Mot. to Supp. Admin. Record at 1, 3 (same).  But this Court has rejected agency attempts to evade judicial review that focus on the form of the agency declaration, instead requiring a "'pragmatic approach'" that views the "finality requirement as 'flexible.'"  *Becerra*, 89 F.4th at 538 (quoting *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 441 (5th Cir. 2019)).

Further, EPA conveyed its invalidity determination in multiple statements, not just the appellate brief.  Courts may review multiple statements—rather than a single agency publication—in considering whether an agency has arrived at a final, reviewable determination.  "[F]inal agency action may result from a series of agency pronouncements rather than a single edict. … Hence, a preamble plus a guidance plus an enforcement letter from EPA could crystallize an agency position into final agency action…"  *Barrick Goldstrike Mines*, 215 F.3d at 48-49; *accord San Francisco Herring Ass'n*, 946 F.3d at 576-77, 579 (series of Park Service notices

and oral enforcement orders constituted final agency action); *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1531 (D.C. Cir. 1990) (series of letters from EPA Acting Administrator for Air and Radiation constituted final agency action even in "the absence of a formal statement of the agency's position"); *Ciba-Geigy*, 801 F.2d at 435-39 (series of letters from EPA to a pesticide manufacturer determined that the agency's position regarding labeling requirements applicable to the manufacturer was sufficiently final to permit judicial review).[16]  EPA's determination has likewise been expressed in multiple forums, by officials representing the agency and acting within the scope of their authority, in an obvious effort to direct DPE's conduct.[17]

> ### ii.     In assessing the finality of EPA's action here, context is critical.

In assessing the finality of its action here, the context of EPA's pronouncements is critical.  *See Texas v. United States*, 40 F.4th 205, 220-21

---

[16] The Fifth Circuit favorably cited *Ciba-Geigy* as recently as January 2024. *See Becerra*, 89 F.4th at 538.

[17] EPA has also suggested that the Court may not consider EPA's statements that post-date DPE's Petition in this action as part of EPA's final agency action at issue. *See* Doc. 79, EPA Opp. to Mot. to Supp. Admin. Record at 1, 3.  The case law shows that EPA is wrong.  *See Ciba-Geigy*, 801 F.2d at 433, 436 (considering series of correspondence from EPA, including letter sent two days after lawsuit was filed, in determining "whether the agency's position is definitive" and appropriate for judicial review).  Further, EPA's formalistic argument conflicts with the "pragmatic" approach taken with respect to questions of finality.  *Becerra*, 89 F.4th at 538.

(5th Cir. 2022) (examining contemporaneous agency conduct beyond the face of the agency-issued document in question and concluding that agency memorandum "alters the legal regime" and "binds" the agency); *San Francisco Herring Ass'n*, 946 F.3d at 578-79 (similar).   EPA has devoted over two years and significant resources to shutting down the Facility unless DPE implements tens of millions of dollars' worth of emissions reduction measures.   This has included, among other things, filing an unprecedented enforcement action using EPA's emergency authority, imposing via the Rule (without notice and comment) a 90-day compliance period for emissions controls that EPA knows would take at least two years to implement, and attempting through that same Rule to revoke LDEQ's authority to grant compliance extensions (without notice and comment).[18]   EPA's decision pronounced in its D.C. Circuit brief and in the hearing in the Section 303 Litigation were not inadvertent references; they were part of a calculated attempt to sew up the only remaining hole in EPA's strategy to shut down DPE's Facility.   EPA's

---

[18] *See also* Letter from Lilian S. Dorka, EPA, to Roger Gingles, LDEQ (June 27, 2023) (EPA Office of Environmental Justice and External Civil Rights closing investigation of a complaint based on allegations of disparate impact by LDEQ, including at DPE's Facility); *Louisiana v. EPA*, 712 F. Supp. 3d 820, 866 (W.D. La. 2024) (enjoining EPA and DOJ "from imposing or enforcing any disparate impact based requirements against the State or any State agency under Title VI, and imposing or enforcing any Title VI based requirements upon the State or any State agency"); *Louisiana v. EPA*, No. 23-cv-692, 2024 WL 3904868, at *3 (W.D. La. Aug. 22, 2024) (entering permanent injunction).

invalidity determination and its multiple statements that the LDEQ Extension is invalid must be viewed with this context in mind—particularly in light of the fact that there was no other reason for EPA to make those statements. *See supra* at 23 & n.14.

Thus, it is plain that EPA seeks to wield the threat of enforcement against DPE to force DPE to abandon the LDEQ Extension, all while attempting to evade judicial review by pronouncing its invalidity determination through legal briefs and attorney statements in court. This Court may review this agency conduct for what it is: the attempted "strong-arming of [a] regulated part[y] into 'voluntary compliance.'" *Sackett*, 566 U.S. at 131. Faced with EPA's multiple, firm warnings, DPE need not "wait for the Agency to drop the hammer" and file an enforcement action before obtaining judicial review of EPA's invalidity determination. *See id.* at 127.

### 3.     The Court should exercise its discretion to address DPE's Petition.

This matter presents the paradigmatic case for declaratory judgment.

> One of the main purposes of the Federal Declaratory Judgment Act … was to provide a means to grant litigants judicial relief from legal uncertainty in situations that had not developed sufficiently to authorize traditional coercive relief. Litigants would no longer be put to the Hobson's choice of foregoing their rights or acting at their peril.

*Texas Employers' Ins. Ass'n*, 862 F.2d at 505. That is precisely the situation in which DPE finds itself: it is faced with the choice of foregoing its right to rely on the LDEQ Extension or exposing itself to potential enforcement action by EPA. The

issue before the Court—the validity of the LDEQ Extension—is purely legal; there is no benefit to waiting for further facts to develop. *See Frye*, 953 F.3d at 294; *Ciba-Geigy*, 637 F.3d at 435. This Court should exercise its discretion in favor of providing certainty to the parties regarding EPA's invalidity determination.

## B.     EPA's Determination That The LDEQ Extension Is Invalid Is Arbitrary, Capricious, And Contrary To Law.

This Court may vacate EPA's determination that the LDEQ Extension is invalid if the Court finds that EPA's action is arbitrary, capricious, an abuse of discretion, or not in accordance with law. *See* 5 U.S.C. § 706(2)(A) (Add.1); *see also Wages and White Lion Invs. v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021) (citing 5 U.S.C. § 706(2)) (other citations omitted); *see also* 42 U.S.C. § 7607(d)(9) (Add.70).

LDEQ lawfully granted the LDEQ Extension, providing DPE a two-year extension of time to comply with the Rule. When LDEQ issued the LDEQ Extension, it had (and continues to have) two independent sources of authority: (i) authority expressly delegated by EPA in 2004 and (ii) authority automatically granted to LDEQ when EPA approved Louisiana's CAA air permits program in 1995. Prior to the LDEQ Extension, EPA did not take any action capable of divesting LDEQ of either authority. This case can be decided on these simple points.

Prior to this lawsuit, EPA did not explain the basis on which it determined that the LDEQ Extension is invalid. In this litigation, EPA has argued that two clarifying

provisions in its regulations deprived LDEQ of authority to grant extensions. EPA is wrong. Neither provision on which EPA relies withdrew LDEQ's existing, expressly delegated authority to grant extensions pursuant to Section 112(l) of the CAA or negated LDEQ's authority to grant extensions through its EPA-approved CAA permitting program. EPA's determination that the LDEQ Extension is ineffectual is arbitrary, capricious, and contrary to law.

> **1.    EPA expressly delegated to LDEQ the specific authority to grant extensions in 2004 and has not withdrawn that delegation.**

One basis for LDEQ's authority to grant the LDEQ Extension is that EPA expressly delegated such authority to LDEQ in 2004 under 42 U.S.C. § 7412(l). This basis alone defeats EPA's invalidity determination and warrants declaratory relief for DPE here.

Sections 112(l)(1)-(5) of the CAA authorize EPA to delegate authorities under Section 112 to the states. 42 U.S.C. §§ 7412(l)(1)-(5) (Add.36-37). Specifically, Section 112(l)(1) provides that states may submit to EPA for approval "a program for the implementation and enforcement ... of emission standards and other requirements for air pollutants" subject to Section 112. 42 U.S.C. § 7412(l)(1) (Add.36). Section 112(l)(5) then requires that EPA "either approve or disapprove such program" and sets forth conditions for disapproval. 42 U.S.C. § 7412(l)(5) (Add.37). Further, 40 C.F.R. Part 63, Subpart E establishes "procedures consistent with section 112(l)...." 40 C.F.R. § 63.90 (Add.90). Section 63.96 implements the

requirements for approval and withdrawal of delegated authority. 40 C.F.R. § 63.96 (Add.97-99).

Here, on March 26, 2004, pursuant to Section 112(l) of the CAA, EPA delegated to LDEQ the authority to implement 40 C.F.R. Part 63, Subpart A, including the authority to grant Section 112 compliance extensions under 40 C.F.R. § 63.6(i). 69 Fed. Reg. 15,687 (Add.233-241). EPA clearly intended to delegate this specific extension authority, as part of the overall delegation, because it expressly required LDEQ to submit copies of these compliance extensions to EPA:

> In receiving delegation for specific General Provisions authorities, LDEQ must submit to EPA Region 6 on a semiannual basis, copies of determinations issued under these authorities. For part 63 standards, these determinations include: Applicability determinations (§ 63.1); ... finding of compliance (§ 63.6(h)(8)); *approval/disapprovals of compliance extensions (§ 63.6(i))*; ... or intermediate (§ 63.7(e)(2)(ii) and (f)) alternative test methods; ...."

*Id.* at 15,691 (emphasis added) (Add.237).

Subpart E of Part 63 lists the specific Section 112 provisions that have been delegated to each state, including Louisiana. 40 C.F.R. § 63.99(a)(19)(i) (Add.142-48) (delegation status for Section 112 standards for Louisiana). The table found in 40 C.F.R. § 63.99(a)(19)(i) clearly states that Subpart A—which includes the extension approval provisions in Sections 63.6(i)(9) and 63.6(i)(4)(ii)—has been delegated to LDEQ. *Id.* That table also contains a Footnote 1 that identifies provisions that *cannot* be delegated to LDEQ. *See id.* n.1. But critically, the

extension-approval provisions in Section 63.6(i) are *not* listed in Footnote 1,

confirming that such provisions *can* be delegated to LDEQ.

Nor has EPA ever withdrawn this authority that was validly delegated to

LDEQ. CAA Section 112(l)(6) mandates strict statutory requirements for how such

authorities, once delegated, are withdrawn:

> **(6) Withdrawal**
>
> Whenever the Administrator determines, after public hearing, that a
> State is not administering and enforcing a program approved pursuant
> to this subsection in accordance with the guidance published pursuant
> to paragraph (2) or the [delegation approval or disapproval]
> requirements of paragraph (5), the Administrator shall so notify the
> State and, if action which will assure prompt compliance is not taken
> within 90 days, the Administrator shall withdraw approval of the
> program. The Administrator shall not withdraw approval of any
> program unless the State shall have been notified and the reasons for
> withdrawal shall have been stated in writing and made public.

42 U.S.C. § 7412(l)(6) (Add.37).

In EPA's regulations, 40 C.F.R. § 63.96(b) implements the withdrawal

requirements set forth in Section 112(1)(6) of the CAA, including notice of EPA's

intent to withdraw delegation, an opportunity for the operator to correct deficiencies

identified by EPA, holding a public hearing, and reaching a final determination

meeting specific criteria:

> (b) *Withdrawal of approval of a state rule or program.*
>
> (1) If the Administrator has reason to believe that a State is not
> adequately implementing or enforcing an approved rule or program
> according to the criteria of this section or that an approved rule or

program is not as stringent as the otherwise applicable Federal rule, emission standard or requirements, the Administrator will so inform the State in writing and will identify the reasons why the Administrator believes that the State's rule or program is not adequate. The State shall then initiate action to correct the deficiencies identified by the Administrator and shall inform the Administrator of the actions it has initiated and completed. If the Administrator determines that the State's actions are not adequate to correct the deficiencies, the Administrator will notify the State that the Administrator intends to withdraw approval and will hold a public hearing and seek public comment on the proposed withdrawal of approval. The Administrator will require that comments be submitted concurrently to the State. Upon notification of the intent to withdraw, the State will notify all sources subject to the relevant approved rule or program that withdrawal proceedings have been initiated.

(2) Based on any public comment received and any response to that comment by the State, the Administrator will notify the State of any changes in identified deficiencies or actions needed to correct identified deficiencies. If the State does not correct the identified deficiencies within 90 days after receiving revised notice of deficiencies, the Administrator shall withdraw approval of the State's rule or program upon a determination that:

> (i) The State no longer has adequate authorities to assure compliance or re-sources to implement and enforce the approved rule or program, or

> (ii) The State is not adequately implementing or enforcing the approved rule or program, or

> (iii) An approved rule or program is not as stringent as the otherwise applicable Federal rule, emission standard or requirement.

40 C.F.R. § 63.96(b) (Add.98).

Here, EPA has not withdrawn the extension authority it granted to Louisiana in 2004.  Indeed, EPA has taken *none* of the steps for withdrawal that are required by Section 112(l) of the CAA or its implementing regulations.  EPA did not (i) hold a public hearing; (ii) determine that Louisiana is not appropriately administering its CAA program; or (iii) notify Louisiana of EPA's intention to withdraw the delegation of authority that the State has possessed for 20 years.  See 42 U.S.C. § 7412(l)(6) (Add.37); 40 C.F.R. § 63.96(b) (Add.98).

In short, EPA delegated this extension authority to Louisiana more than 20 years ago in accordance with applicable statutory and regulatory requirements, and EPA has not withdrawn that authority.  EPA has previously argued, in response to DPE's stay motion in this Court, that a table in a different subpart of Part 63 (Subpart U) prevented LDEQ from exercising this delegated extension authority. Doc. 42 at 17.  However, as discussed below (*see infra* Part B.3), that table, which was never intended to withdraw delegated authority, was not promulgated in accordance with the relevant statutory and regulatory requirements and therefore cannot withdraw the extension authority granted to LDEQ in 2004.  Likewise, EPA's effort in the final Rule (without notice and comment) to amend yet another distinct regulatory provision (40 C.F.R. § 63.507(c)(6)) (Add.216-17) to prohibit EPA from delegating extension authority to LDEQ cannot withdraw authority that is already delegated in accordance with Section 112(l)(6) of the CAA.  *See infra* Part B.3.

Because EPA did not—and has not—withdrawn its delegation of extension authority to LDEQ, the LDEQ Extension was lawfully issued and remains valid today.

**2.    LDEQ also has an automatic delegation of authority through its EPA-approved permit program.**

Separate from the extension authority expressly delegated to LDEQ by EPA in accordance with Section 112(l)(6) of the CAA, LDEQ also had automatic authority to grant the LDEQ Extension based on LDEQ's EPA-approved permit program under the CAA. EPA did not modify that source of LDEQ authority prior to the LDEQ Extension and has not modified it since. This independently defeats EPA's invalidity determination and warrants declaratory relief for DPE here.

State agencies have automatic authority to grant Section 112 compliance extensions if they have an approved CAA permitting program. 40 C.F.R. § 63.6(i)(1) ("Until an extension of compliance has been granted by the Administrator *(or a State with an approved permit program)* under this paragraph, the owner or operator of an affected source subject to the requirements of this section shall comply with all applicable requirements of this part.") (emphasis added); 40 C.F.R. § 63.6(i)(9) ("the Administrator (*or the State with an approved permit program*) may grant an extension of compliance. 40 C.F.R. § 63.6(i)(9)") (emphasis added)) (Add.82-85).

EPA has confirmed in formal guidance that state agencies have this "automatic" extension-approval authority based on an approved permitting program,

and that they do not require a separate express delegation from EPA.  Specifically,

on July 10, 1998, EPA published a memorandum confirming that the authority to

grant compliance extensions is independent of expressly delegated authority and

granted "automatically" to states with approved operating permit programs.

> At this time, we are also providing clarification of section 63.6(i)(1), "Extension of Compliance with Emission Standards," General Provisions authority. This section states "(u)ntil an extension of compliance has been granted by the Administrator (or a State with an approved permit program) under this paragraph, the owner or operator of an affected source subject to the requirements of this section shall comply with all applicable requirements of this part" *It is our interpretation that this authority does not require delegation through subpart E and, instead, is automatically granted to States as part of their part 70 operating permits program approval regardless of whether the operating permits program approval is interim or final.* Additionally, it is our interpretation that the State would not need to have been delegated a particular source category or have issued a part 70 operating permit for a particular source to grant that source a compliance extension.

Memorandum from John S. Seitz re *Delegation of 40 CFR Part 63 General*

*provisions Authorities to State and Local Air Pollution Control Agencies* (July 10,

1998) (emphasis added) ("Seitz Memorandum") (Add.274).[19]

Likewise, in 2002, EPA issued a "Compliance Extension Summary"

separately addressing the extension procedures for Sections 112(d) and 112(f)

standards.  *See* EPA, *Compliance Extensions Summary* (July 30, 2002) (Add.268-

---

[19] While EPA has disputed that the Seitz Memorandum should be included in the Administrative Record, EPA agrees that DPE can refer to it in merits briefing, "just as Denka can cite other legal authorities."  Doc. 79 at 12.

73).[20]    This publication provides step-by-step extension procedures for Section 112(f) standards and, again, confirms that a "State with an approved permit program" is authorized to act on behalf of EPA. *Id.* at 5-6 (repeatedly indicating that a "State with an approved permit program" may implement extension procedures for Section 112(f) standards).

Here, EPA approved the Louisiana Operating Permits program in 1995. *See* 60 Fed. Reg. 47,296 (Sept. 12, 1995) (Add.263-64). Therefore, Louisiana has held for decades—and continues to hold—automatic permit-program authority to issue Section 112 compliance extensions, pursuant to controlling regulatory text and clear EPA guidance. And this extension authority is not affected by EPA's recent amendment to a provision purporting to govern delegation (40 C.F.R. § 63.507 (Add.216-17)) or a table intended to clarify an operator's regulatory obligations (Table 1 in Subpart U of the regulations) (Add.230). *See infra* Part B.3. Indeed, EPA has never modified this source of LDEQ authority. This automatic extension authority, arising from Louisiana's EPA-approved permit program, independently and fully supports the LDEQ Extension here.

---

[20] *See* n.19 *supra.*

### 3.    EPA's objections to LDEQ's two sources of extension authority lack merit.

In opposing DPE's stay motion in this Court, EPA explained for the first time the basis for its determination that LDEQ lacks authority to grant DPE an extension. Doc. 42 at 17-18.  EPA argued that LDEQ "never had authority" to grant DPE's Extension Request because (i) a provision in Subpart U, "Table 1," prohibited LDEQ from issuing the LDEQ Extension, and (ii) an amendment to 40 C.F.R. § 63.507(c) included in the Rule prevents delegations of authority to LDEQ after the Rule's effective date of July 15, 2024.  Yet neither provision complies with the requirements of Section 112(l)(6) of the CAA to withdraw expressly delegated authority—the first source of LDEQ authority supporting the LDEQ Extension—and neither provision affects the second source of LDEQ's extension authority that automatically arises through its EPA-approved CAA permit program.  Each of EPA's arguments fails.

***"Table 1" in Subpart U.***  Contrary to EPA's assertion, "Table 1" in 40 C.F.R. Part 63, Subpart U has never limited LDEQ's authority to issue extensions.  It does not comply with the requirements for withdrawing the first source of LDEQ authority—LDEQ's expressly delegated authority, which can be withdrawn only by complying with the statutory procedures in Section 112(l)(6) of the CAA.  And it does not apply to LDEQ at all: Table 1 was never intended to define rights and obligations of operators and certainly does not apply to *non-operators* like the State of Louisiana.

As background, EPA promulgates emission standards for different types of facilities, or "source categories," in implementing Section 112. *See generally* 42 U.S.C. §§ 7412(c)-(d) (Add.19-24). DPE is subject to requirements for multiple source categories, including the requirements for the "Group I Polymers and Resins" category found in Part 63, Subpart U. In addition, in Part 63, Subpart A, EPA promulgated "General Provisions" establishing overarching requirements and definitions that, by default, apply to all source categories. In some instances, however, EPA recognized that the general provisions in Subpart A may need to yield to more specific provisions in other subparts.

When EPA first promulgated the extension provisions and other "General Provisions" in Part 63, Subpart A, EPA recognized that operators would face the "confusing task" of determining when "General Provisions" were "superseded because they conflict with a requirement in an individual standard." EPA, *National Emission Standards for Hazardous Air Pollutants for Source Categories; General Provisions*, 59 Fed. Reg. 12,408, 12,415 (Mar. 16, 1994) (Add.267). Accordingly, certain "applicability tables," like Subpart U's "Table 1," clarify when requirements in a specific subpart supersede an operator's "general" obligations in Subpart A.

Prior to the Rule becoming effective, "Table 1" labeled one of the extension provisions—40 C.F.R. § 63.6(i)(4)(ii)—as not "applicable" to operators. However,

this label was clearly designed to clarify *DPE's* regulatory obligations, and cannot divest *LDEQ* of its delegated extension authority.

First, none of this affects LDEQ's expressly delegated extension authority. EPA has not (i) held a public hearing; (ii) determined that Louisiana is not appropriately administering a CAA program; and (iii) notified Louisiana of EPA's intention to withdraw the delegation of Section 63.6(i)(4)(ii). *See* 42 U.S.C. § 7412(l)(6) (Add.37). Without taking these required statutory steps, EPA cannot withdraw extension authority that was expressly delegated to Louisiana in 2004. At minimum, EPA's reliance on "Table 1" cannot affect this LDEQ extension authority.

Second, EPA's argument is more fundamentally misguided because interpreting a provision in "Table 1" to impact the legal rights of the State of Louisiana would contradict clear regulatory text and be inconsistent with the regulatory history of EPA's applicability tables. Section 63.481(f) unequivocally states that Table 1 governs *owners and operators*—not states. 40 C.F.R. § 63.481(f) (Add.211) ("Table 1 of this subpart specifies the provisions of subpart A that apply and those that do not apply to *owners and operators of affected sources*.") (emphasis added). At most, Table 1 renders extension request procedures inapplicable to *DPE*, meaning DPE would be relieved from following such procedures. The table is irrelevant to defining *LDEQ's* authority to grant extension requests and cannot withdraw Louisiana's delegated authority.

In sum, EPA's arguments based on Table 1 of Subpart U lack merit.

***40 C.F.R. § 63.507(c) amendment.***   In the Rule, EPA amended 40 C.F.R. § 63.507(c)(6) to provide that the authority to approve extension requests under 40 C.F.R. § 63.6(i)(4)(ii) "cannot be delegated" to state agencies.  89 Fed. Reg. at 43,261 (Add.228).  That amendment did not affect the extension authority expressly delegated to LDEQ in 2004 because (i) it became effective *after* LDEQ issued the LDEQ Extension; (ii) Louisiana was already delegated extension authority in 2004 and EPA failed to comply with the delegation withdrawal procedures in Section 112(l)(6); and (iii) no regulatory provisions preclude LDEQ from granting extension requests under Section 63.6(i)(9).  Separately, the amendment did not affect the automatic extension authority that was conferred to LDEQ when EPA approved Louisiana's CAA air permits program in 1995.

As background, EPA's regulations, 40 C.F.R. Subpart E, "establish[] procedures for the review and withdrawal of section 112 implementation and enforcement authorities granted through a section 112(l) approval." 40 C.F.R. § 63.12(b)(2) (Add.88).   In 2003—prior to EPA's delegation of authority to LDEQ—EPA issued a final rule "to clarify which portions of the existing [Section 112 emission standards] contain authorities that can be delegated to State, local, and tribal agencies.  68 Fed. Reg. 37,334, 37,334 (Aug. 22, 2003) (Add.242). EPA made clear that "there are separate parts of each section 112 requirement that

we cannot delegate to you." *Id.* The non-delegable authorities were not withheld as a matter of discretion, but because of a conflict with law. As an example, EPA explained that "[b]ecause the Administrative Procedures Act requires us to approve alternative emission limitations or control requirements through Federal rulemaking, we cannot delegate our rulemaking authority to you." *Id.* As part of the 2003 rule, EPA added a new section, titled the "Implementation and enforcement" section, to 48 different subparts within 40 C.F.R. Part 63, including a subpart applicable to DPE (Subpart U). *Id.* at 37,336 (Add.244). Each of these "implementation and enforcement" sections included consistent provisions that could not be delegated to a state, local, or tribal agency. *Id.* EPA explicitly stated that "any authority, not expressly reserved for us and included in these paragraphs, can be delegated to you." *Id.*

The "Implementation and enforcement" section that applied to the requirements at issue in this case (Subpart U) were promulgated at 40 C.F.R. §§ 63.507(c)(1)-(4). *Id.* at 37,349-50 (Add.251-52) (providing final regulatory text). In that provision EPA's 2003 rule clarified that four categories of provisions could not be delegated to states for Subpart U. *Id.* These included (i) approval of alternatives to specific Subpart U requirements; (ii) approval of major alternatives to test methods; (iii) approval of major alternatives to monitoring; and (iv) approval of major alternatives to recordkeeping and reporting. *Id.* (regulatory text

promulgated at 40 C.F.R. §§ 63.507(c)(1)-(4) (Add.216)).  These four categories were also adopted for every other "Implementation and enforcement" sections across the other 47 subparts.  68 Fed. Reg. at 37,344-60 (Add.246-62).

In the 2003 final rule promulgating 40 C.F.R. § 507, EPA did not identify EPA's extension authority (40 C.F.R. § 63.6(i) in Subpart A) as an authority that could not be delegated.  68 Fed. Reg. at 37,349-50.  (Add.251-52).  Indeed, as discussed above (*see supra* Part B(1)), EPA *did* delegate its extension authority to LDEQ in 2004.  *See* 69 Fed. Reg. 15,687 (Mar. 26, 2004) (Add.233-41).  EPA did withhold delegation of certain provisions in 2004 that "EPA cannot delegate," but they precisely mirrored the four categories of provisions included in Section 63.507 in 2003.  *Id.* at 15,690 (Add.236) (withholding delegation of (i) approval of alternatives; (ii) approval of major alternatives to test methods; (iii) approval of major alternatives to monitoring; and (iv) approval of major alternatives to recordkeeping and reporting). Until EPA's amendment to the Rule, EPA was clear that its extension authority could be—and was—delegated to states.

Now, more than 20 years later, EPA (without notice and comment) amended Section 63.507(c) to say that EPA's extension provisions *cannot* be delegated, despite no relevant changes in the statutory requirements for delegation.  Nor has EPA revised the corresponding "Implementation and enforcement" provisions in any of the other dozens of subparts to claim that extension authority "cannot" be

delegated. EPA may have wanted to transform a clarifying provision into a selective, discretionary revocation of existing delegation, but it is irrelevant to the validity of the LDEQ Extension because neither source of LDEQ's authority—*i.e.*, LDEQ's expressly-delegated authority under Section 112(l) or its automatic authority through its permit program approval—is impacted by EPA's amendment.

First, the express delegation of EPA's extension authority in 2004 is unaffected by EPA's amendment to 40 C.F.R. § 63.507(c)(6) (Add.216-17). On its face, the Rule and its amendment to 40 C.F.R. § 63.507(c)(6) did not become effective until *July 15*, 2024. Thus, the amendment had no impact on the LDEQ Extension, which issued on *June 27*, 2024. Even if the amendment could otherwise impact LDEQ's authority to grant extensions—and it plainly does not—the amended Section 63.507(c) did not become effective until July 15, 2024, and therefore could not legally foreclose any actions before that date. EPA's attempt to revoke Louisiana's extension authority *after the fact* is baseless, though it admits that Louisiana *did* have such expressly delegated authority *before the effective date*, including on June 27, 2024, when the LDEQ Extension was granted.

Even if the amendment to 40 C.F.R. § 63.507(c)(6) had been effective prior to the extension, LDEQ's expressly delegated extension authority would not be impacted by the amendment because it did not comply with the statutory requirements for withdrawing delegated authority. EPA has not (i) held a public

hearing; (ii) determined that Louisiana is not appropriately administering a CAA program; or (iii) notified Louisiana of EPA's intention to withdraw the delegation of Section 63.6(i)(4)(ii). *See* 42 U.S.C. § 7412(l)(6) (Add.37). Without taking these required statutory steps, EPA cannot withdraw the extension authority that was expressly delegated to Louisiana in 2004. For this reason alone, the Rule's amendment cannot possibly render the LDEQ Extension invalid, and EPA's reliance on it is therefore misguided.

LDEQ's expressly delegated extension authority would also not be impacted by the amendment in the Rule because it fails to address the operative provision for granting extensions of Section 112 emission standards: Section 63.6(i)(9). Section 63.6(i) sets forth clear and distinct authorities for *requesting* and *approving* compliance extensions. 40 C.F.R. § 63.6(i) (Add.82-87). Sections 63.6(i)(4) through (i)(7) "concern *requests for an extension* of compliance...." 40 C.F.R. § 63.6(i)(3) (Add.83) (emphasis added). Included in these *request* provisions is Section 63.6(i)(4)(ii), which addresses compliance extensions under Section 112(f) of the CAA. Separately, Sections 63.6(i)(9) through (i)(14) "concern *approval of an extension* of compliance requested under paragraphs (i)(4) through (i)(6) of this section...." 40 C.F.R. § 63.6(i)(8) (Add.84) (emphasis added). Included in these *approval* provisions is Section 63.6(i)(9), which states:

> Based on the information provided in any request made under paragraphs (i)(4) through (i)(6) of this section, or other information, the Administrator (or

> *the State with an approved permit program) may grant an extension of compliance with an emission standard*, as specified in paragraphs (i)(4) and (i)(5) of this section.

40 C.F.R. § 63.6.(i)(9) (Add.85) (emphasis added). EPA's amendment to Section 63.507, even on its own terms, does not reference 40 C.F.R. § 63.6.(i)(9), which is a legal basis authorizing LDEQ to grant extension requests. Thus, even if EPA's revocation of authority were otherwise proper, it does not impact LDEQ's authority under Section 63.6(i)(9). In sum, EPA's amendment of Section 63.507 does not impact DPE's expressly delegated authority because the amendment was not yet effective, did not comply with statutory requirements for withdrawing delegations, and did not address the operative extension provision.

Second—and independent from LDEQ's expressly-delegated authority—the amended Section 63.507(c) could not affect the LDEQ Extension because it does not impact LDEQ's other basis for granting the extension: LDEQ's authority to grant extensions through its EPA-approved CAA permit program. Even if LDEQ lacked expressly delegated authority through Section 112(l) (it did not), EPA's regulations and guidance make clear that no such express delegation is needed for states with CAA permit programs approved by EPA. *See* Seitz Memorandum ("[I]t is our interpretation that the State would not need to have been delegated a particular source category or have issued a part 70 operating permit for a particular source to

grant that source a compliance extension.") (Add.274).  EPA's argument therefore does not impact this independent basis for adjudging the LDEQ Extension valid.

*    *    *

EPA's elaborate scheme to shut down DPE's Facility was unsuccessful in the Section 303 Litigation.  Undeterred, EPA was forced it to reconcile its Section 303 Litigation position (a finding of "imminent and substantial endangerment") and its position in the Proposed Rule (a finding of no "imminent" endangerment).  The reconciliation forced EPA to shorten the compliance period in the Final Rule as to DPE only.  This left EPA's new strategy vulnerable to LDEQ's extension authority.  Still undeterred, EPA stated in a footnote in the Rule preamble (without notice or comment) that "EPA is also retaining authority to grant or deny requests for extensions of the compliance date under 40 CFR § 63.6(i)(4)(ii) ... and is not delegating that authority to the states."  89 Fed. Reg. at 42,955 (Add.221).  But that does not make it so.  EPA already delegated such authority to Louisiana more than 20 years ago.  To revoke such authority, EPA must comply with the necessary statutory withdrawal procedures and foreclose all sources of LDEQ's extension authority.  It did not do so prior to the LDEQ Extension and still has not done so today.

## **CONCLUSION**

For the foregoing reasons, DPE respectfully requests that this Court grant DPE's petition for relief, and

(i)    declare that the LDEQ Extension is valid and enforceable;

(ii)    declare that EPA's determination of invalidity as to the LDEQ Extension is arbitrary, capricious, and contrary to law, and therefore unenforceable; and

(iii)    enjoin EPA from denying the validity of the LDEQ Extension and taking action in contravention of the validity of the LDEQ Extension.

In addition, DPE requests its litigation costs, including reasonable attorney fees, pursuant to 42 U.S.C. § 7607(f).

Date:  October 30, 2024

Respectfully submitted,

James C. Percy
JONES WALKER LLP
445 N. Boulevard, Suite 800
Baton Rouge, LA 70802
Telephone: (225) 248-2130
jpercy@joneswalker.com

Robert E. Holden
Brett S. Venn
JONES WALKER LLP
201 St. Charles Ave
New Orleans, LA 70170
Telephone: (504) 582-8000
bholden@joneswalker.com
bvenn@joneswalker.com

*/s/ David A. Super*
David A. Super
Jason B. Hutt
Jeffrey R. Holmstead
Britt Cass Steckman
Kevin M. Voelkel
BRACEWELL LLP
2001 M Street NW, Ste. 900
Washington, DC 20036
Telephone: (202) 828-5800
david.super@bracewell.com
jason.hutt@bracewell.com
jeff.holmstead@bracewell.com
britt.steckman@bracewell.com
kevin.voelkel@bracewell.com

Jeffrey L. Oldham
BRACEWELL LLP
711 Louisiana Street, Suite 2300
Houston, TX 77002
Telephone:  (713) 223-2300
jeffrey.oldham@bracewell.com

**Counsel for Petitioner Denka Performance Elastomer LLC**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 30th day of October 2024, I electronically filed the foregoing OPENING BRIEF OF PETITIONER DENKA PERFORMANCE ELASTOMER, LLC and ADDENDUM thereto with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.

I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

I further certify that: (1) any required privacy redactions have been made (5th Cir. R. 25.2.13); (2) the electronic submission is an exact copy of the paper document in compliance with (5 Cir. R. 25.2.1); and (3) the document has been scanned with the most recent version of CrowdStrike Windows Sensor Version 7.17.18721.0, last updated on October 23, 2024, and is free of viruses.


*/s/ David A. Super*
David A. Super

***Counsel for Petitioner***
***Denka Performance Elastomer LLC***

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 5th CIR. R. 32.1:  this document contains **11,856 words**.

This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

Date:  October 30, 2024          */s/ David A. Super*          
                                David A. Super

                                ***Counsel for Petitioner***
                                ***Denka Performance Elastomer LLC***