**ORAL ARGUMENT NOT SCHEDULED**

No. 24-60351

# In the United States Court of Appeals
# For the Fifth Circuit

_____

DENKA PERFORMANCE ELASTOMER LLC,
*Petitioner,*

STATE OF LOUISIANA AND LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY,
*Intervenors,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL REGAN,
ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
*Respondents,*

_____

On Appeal from Environmental Protection Agency
40 CFR Parts 60 and 63

---

## ADDENDUM TO PETITIONER'S OPENING BRIEF

---

James C. Percy
JONES WALKER LLP
445 N. Boulevard, Suite 800
Baton Rouge, LA 70802
Telephone: (225) 248-2130
jpercy@joneswalker.com

Robert E. Holden
Brett S. Venn
JONES WALKER LLP
201 St. Charles Ave
New Orleans, LA 70170
Telephone: (504) 582-8000
bholden@joneswalker.com
bvenn@joneswalker.com

David A. Super
Jason B. Hutt
Jeffrey R. Holmstead
Britt Cass Steckman
Kevin M. Voelkel
BRACEWELL LLP
2001 M Street NW, Ste. 900
Washington, DC 20036
Telephone: (202) 828-5800
david.super@bracewell.com
jason.hutt@bracewell.com
jeff.holmstead@bracewell.com
britt.steckman@bracewell.com
kevin.voelkel@bracewell.com

*(cont'd)*

Jeffrey L. Oldham
BRACEWELL LLP
711 Louisiana Street, Suite 2300
Houston, TX 77002
Telephone:  (713) 223-2300
jeffrey.oldham@bracewell.com

*Counsel for Petitioner Denka Performance Elastomer LLC*

# ADDENDUM
# <u>TABLE OF CONTENTS</u>

| **FEDERAL STATUTES** | Page |
|---|---|
| 5 U.S.C. § 706 | Add.1 |
| 28 U.S.C. § 2201 | Add.3 |
| 28 U.S.C. § 2283 | Add.5 |
| 42 U.S.C. § 7401 | Add.6 |
| 42 U.S.C. § 7412 | Add.9 |
| 42 U.S.C. § 7607 | Add.65 |
| **FEDERAL REGULATIONS** | |
| 40 C.F.R. § 63.6 | Add.72 |
| 40 C.F.R. § 63.12 | Add.88 |
| 40 C.F.R. § 63.90 | Add.90 |
| 40 C.F.R. § 63.96 | Add.97 |
| 40 C.F.R. § 63.99 | Add.101 |
| 40 C.F.R. § 63.481 | Add.209 |
| 40 C.F.R. § 63.507 | Add.216 |
| 89 Fed. Reg. 42,932 (May 16, 2024) (excerpted) | Add.218 |
| 88 Fed. Reg. 25,080 (Apr. 25, 2023) (excerpted) | Add.231 |
| 69 Fed. Reg. 15,687 (Mar. 26, 2004) | Add.233 |
| 68 Fed. Reg. 37,334 (Aug. 22, 2003) (excerpted) | Add.242 |
| 60 Fed. Reg. 47,296 (Sept. 12, 1995) | Add.263 |
| 59 Fed. Reg. 12,408 (Mar. 16, 1994) (excerpted) | Add.265 |
| EPA, *Compliance Extensions Summary* (July 30, 2002) | Add.268 |
| Memorandum from John S. Seitz re *Delegation of 40 CFR Part 63 General provisions Authorities to State and Local Air Pollution Control Agencies* (July 10, 1998) | Add.274 |

United States Code Annotated
Title 5. Government Organization and Employees (Refs & Annos)
Part I. The Agencies Generally
Chapter 7. Judicial Review (Refs & Annos)

5 U.S.C.A. § 706

§ 706. Scope of review

Currentness

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

**(1)** compel agency action unlawfully withheld or unreasonably delayed; and

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be--

**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

**(B)** contrary to constitutional right, power, privilege, or immunity;

**(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

**(D)** without observance of procedure required by law;

**(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

**(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**CREDIT(S)**

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 393.)

Notes of Decisions (5716)

Add.1

5 U.S.C.A. § 706, 5 USCA § 706
Current through P.L. 118-106. Some statute sections may be more current, see credits for details.

**End of Document**                                        © 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part VI. Particular Proceedings
      Chapter 151. Declaratory Judgments (Refs & Annos)

28 U.S.C.A. § 2201

§ 2201. Creation of remedy

Effective: July 1, 2020
Currentness

**(a)** In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986, a proceeding under section 505 or 1146 of title 11, or in any civil action involving an antidumping or countervailing duty proceeding regarding a class or kind of merchandise of a free trade area country (as defined in section 516A(f)(9) of the Tariff Act of 1930), as determined by the administering authority, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

**(b)** For limitations on actions brought with respect to drug patents see section 505 or 512 of the Federal Food, Drug, and Cosmetic Act, or section 351 of the Public Health Service Act.

**CREDIT(S)**

(June 25, 1948, c. 646, 62 Stat. 964; May 24, 1949, c. 139, § 111, 63 Stat. 105; Aug. 28, 1954, c. 1033, 68 Stat. 890; Pub.L. 85-508, § 12(p), July 7, 1958, 72 Stat. 349; Pub.L. 94-455, Title XIII, § 1306(b)(8), Oct. 4, 1976, 90 Stat. 1719; Pub.L. 95-598, Title II, § 249, Nov. 6, 1978, 92 Stat. 2672; Pub.L. 98-417, Title I, § 106, Sept. 24, 1984, 98 Stat. 1597; Pub.L. 100-449, Title IV, § 402(c), Sept. 28, 1988, 102 Stat. 1884; Pub.L. 100-670, Title I, § 107(b), Nov. 16, 1988, 102 Stat. 3984; Pub.L. 103-182, Title IV, § 414(b), Dec. 8, 1993, 107 Stat. 2147; Pub.L. 111-148, Title VII, § 7002(c)(2), Mar. 23, 2010, 124 Stat. 816; Pub.L. 116-113, Title IV, § 423(b), Jan. 29, 2020, 134 Stat. 66.)

**TERMINATION OF AMENDMENT**

<For termination of amendment by section 501(c) of Pub.L. 100-449, see Sunset Provisions note set out under this section.>

**TERMINATION OF USMCA (AGREEMENT BETWEEN THE UNITED
STATES OF AMERICA, THE UNITED MEXICAN STATES, AND CANADA)**

<During any period in which a country ceases to be a USMCA country, this Act and the amendments made by this Act (United States-Mexico-Canada Agreement Implementation Act, Pub.L. 116-113) shall cease to have effect with respect to that country, and on the date on which the USMCA ceases to be in force with respect to the United States, this Act and the amendments made by this Act shall cease to have effect, see Pub.L. 116-113, Title VI, § 621, set out as 19 U.S.C.A. § 4621.>

**§ 2201. Creation of remedy, 28 USCA § 2201**

Notes of Decisions (3937)

28 U.S.C.A. § 2201, 28 USCA § 2201
Current through P.L. 118-106. Some statute sections may be more current, see credits for details.

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

**Add.4**

United States Code Annotated
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part VI. Particular Proceedings
      Chapter 155. Injunctions; Three-Judge Courts

28 U.S.C.A. § 2283

§ 2283. Stay of State court proceedings

Currentness

A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

**CREDIT(S)**

(June 25, 1948, c. 646, 62 Stat. 968.)

Notes of Decisions (979)

28 U.S.C.A. § 2283, 28 USCA § 2283
Current through P.L. 118-106. Some statute sections may be more current, see credits for details.

                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
      Subchapter I. Programs and Activities
        Part A. Air Quality and Emissions Limitations (Refs & Annos)

42 U.S.C.A. § 7401

§ 7401. Congressional findings and declaration of purpose

Currentness

**(a) Findings**

The Congress finds--

(1) that the predominant part of the Nation's population is located in its rapidly expanding metropolitan and other urban areas, which generally cross the boundary lines of local jurisdictions and often extend into two or more States;

(2) that the growth in the amount and complexity of air pollution brought about by urbanization, industrial development, and the increasing use of motor vehicles, has resulted in mounting dangers to the public health and welfare, including injury to agricultural crops and livestock, damage to and the deterioration of property, and hazards to air and ground transportation;

(3) that air pollution prevention (that is, the reduction or elimination, through any measures, of the amount of pollutants produced or created at the source) and air pollution control at its source is the primary responsibility of States and local governments; and

(4) that Federal financial assistance and leadership is essential for the development of cooperative Federal, State, regional, and local programs to prevent and control air pollution.

**(b) Declaration**

The purposes of this subchapter are--

(1) to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population;

(2) to initiate and accelerate a national research and development program to achieve the prevention and control of air pollution;

**(3)** to provide technical and financial assistance to State and local governments in connection with the development and execution of their air pollution prevention and control programs; and

**(4)** to encourage and assist the development and operation of regional air pollution prevention and control programs.

**(c) Pollution prevention**

A primary goal of this chapter is to encourage or otherwise promote reasonable Federal, State, and local governmental actions, consistent with the provisions of this chapter, for pollution prevention.

## CREDIT(S)

(July 14, 1955, c. 360, Title I, § 101, formerly § 1, as added Pub.L. 88-206, § 1, Dec. 17, 1963, 77 Stat. 392, and renumbered § 101 and amended Pub.L. 89-272, Title I, § 101(2), (3), Oct. 20, 1965, 79 Stat. 992; Pub.L. 90-148, § 2, Nov. 21, 1967, 81 Stat. 485; Pub.L. 101-549, Title I, § 108(k), Nov. 15, 1990, 104 Stat. 2468.)

## EXECUTIVE ORDERS

### EXECUTIVE ORDER NO. 10779

Ex. Ord. No. 10779, Aug. 21, 1958, 23 F.R. 6487, which related to cooperation of Federal agencies with State and local authorities, was superseded by Ex. Ord. No. 11282, May 26, 1966, 31 F.R. 7663, formerly set out under section 7418 of this title.

### EXECUTIVE ORDER NO. 11507

Ex. Ord. No. 11507, Feb. 4, 1970, 35 F.R. 2573, which provided for the prevention, control, and abatement of air pollution at Federal facilities was superseded by Ex. Ord. No. 11752, Dec. 17, 1973, 38 F.R. 34793, formerly set out as a note under section 4331 of this title.

### EXECUTIVE ORDER NO. 11752

Ex. Ord. No. 11752, Dec. 17, 1973, 38 F.R. 34793, formerly set out as a note under section 4331 of this title, provided for the prevention, control, and abatement of environmental pollution at Federal facilities.

## MEMORANDA OF PRESIDENT

## PRESIDENTIAL MEMORANDUM

Memorandum of President of the United States, Apr. 12, 2018, 83 F.R. 16761, which related to State Implementation Plans for the Regional Haze Program, was revoked by Ex. Ord. No. 13990, § 7(d), Jan. 20, 2021, 86 F.R. 7042.

Notes of Decisions (57)

42 U.S.C.A. § 7401, 42 USCA § 7401

Add.7

§ 7401. Congressional findings and declaration of purpose, 42 USCA § 7401

Current through P.L. 118-106. Some statute sections may be more current, see credits for details.

**End of Document**                                                      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**Add.8**

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
      Subchapter I. Programs and Activities
        Part A. Air Quality and Emissions Limitations (Refs & Annos)

42 U.S.C.A. § 7412

§ 7412. Hazardous air pollutants

Effective: August 5, 1999
Currentness

**(a) Definitions**

For purposes of this section, except subsection (r)--

**(1) Major source**

The term "major source" means any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants. The Administrator may establish a lesser quantity, or in the case of radionuclides different criteria, for a major source than that specified in the previous sentence, on the basis of the potency of the air pollutant, persistence, potential for bioaccumulation, other characteristics of the air pollutant, or other relevant factors.

**(2) Area source**

The term "area source" means any stationary source of hazardous air pollutants that is not a major source. For purposes of this section, the term "area source" shall not include motor vehicles or nonroad vehicles subject to regulation under subchapter II.

**(3) Stationary source**

The term "stationary source" shall have the same meaning as such term has under section 7411(a) of this title.

**(4) New source**

The term "new source" means a stationary source the construction or reconstruction of which is commenced after the Administrator first proposes regulations under this section establishing an emission standard applicable to such source.

**(5) Modification**

Add.9

The term "modification" means any physical change in, or change in the method of operation of, a major source which increases the actual emissions of any hazardous air pollutant emitted by such source by more than a de minimis amount or which results in the emission of any hazardous air pollutant not previously emitted by more than a de minimis amount.

**(6) Hazardous air pollutant**

The term "hazardous air pollutant" means any air pollutant listed pursuant to subsection (b).

**(7) Adverse environmental effect**

The term "adverse environmental effect" means any significant and widespread adverse effect, which may reasonably be anticipated, to wildlife, aquatic life, or other natural resources, including adverse impacts on populations of endangered or threatened species or significant degradation of environmental quality over broad areas.

**(8) Electric utility steam generating unit**

The term "electric utility steam generating unit" means any fossil fuel fired combustion unit of more than 25 megawatts that serves a generator that produces electricity for sale. A unit that cogenerates steam and electricity and supplies more than one-third of its potential electric output capacity and more than 25 megawatts electrical output to any utility power distribution system for sale shall be considered an electric utility steam generating unit.

**(9) Owner or operator**

The term "owner or operator" means any person who owns, leases, operates, controls, or supervises a stationary source.

**(10) Existing source**

The term "existing source" means any stationary source other than a new source.

**(11) Carcinogenic effect**

Unless revised, the term "carcinogenic effect" shall have the meaning provided by the Administrator under Guidelines for Carcinogenic Risk Assessment as of the date of enactment. Any revisions in the existing Guidelines shall be subject to notice and opportunity for comment.

**(b) List of pollutants**

**(1) Initial list**

The Congress establishes for purposes of this section a list of hazardous air pollutants as follows:

| CAS number | Chemical name |
| --- | --- |

§ 7412. Hazardous air pollutants, 42 USCA § 7412

| | |
|---|---|
| 75070 | Acetaldehyde |
| 60355 | Acetamide |
| 75058 | Acetonitrile |
| 98862 | Acetophenone |
| 53963 | 2-Acetylaminofluorene |
| 107028 | Acrolein |
| 79061 | Acrylamide |
| 79107 | Acrylic acid |
| 107131 | Acrylonitrile |
| 107051 | Allyl chloride |
| 92671 | 4-Aminobiphenyl |
| 62533 | Aniline |
| 90040 | o-Anisidine |
| 1332214 | Asbestos |
| 71432 | Benzene (including benzene from gasoline) |
| 92875 | Benzidine |
| 98077 | Benzotrichloride |
| 100447 | Benzyl chloride |
| 92524 | Biphenyl |
| 117817 | Bis(2-ethylhexyl)phthalate (DEHP) |
| 542881 | Bis(chloromethyl)ether |
| 75252 | Bromoform |
| 106990 | 1,3-Butadiene |
| 156627 | Calcium cyanamide |
| 105602 | Caprolactam |
| 133062 | Captan |
| 63252 | Carbaryl |
| 75150 | Carbon disulfide |
| 56235 | Carbon tetrachloride |

Add.11

§ 7412. Hazardous air pollutants, 42 USCA § 7412

463581    Carbonyl sulfide

120809    Catechol

133904    Chloramben

57749    Chlordane

7782505    Chlorine

79118    Chloroacetic acid

532274    2-Chloroacetophenone

108907    Chlorobenzene

510156    Chlorobenzilate

67663    Chloroform

107302    Chloromethyl methyl ether

126998    Chloroprene

1319773    Cresols/Cresylic acid (isomers and mixture)

95487    o-Cresol

108394    m-Cresol

106445    p-Cresol

98828    Cumene

94757    2,4-D, salts and esters

3547044    DDE

334883    Diazomethane

132649    Dibenzofurans

96128    1,2-Dibromo-3-chloropropane

84742    Dibutylphthalate

106467    1,4-Dichlorobenzene(p)

91941    3,3-Dichlorobenzidene

111444    Dichloroethyl ether (Bis(2-chloroethyl)ether)

542756    1,3-Dichloropropene

62737    Dichlorvos

111422    Diethanolamine

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.    4

| | |
|---|---|
| 121697 | N,N-Diethyl aniline (N,N-Dimethylaniline) |
| 64675 | Diethyl sulfate |
| 119904 | 3,3-Dimethoxybenzidine |
| 60117 | Dimethyl aminoazobenzene |
| 119937 | 3,3′-Dimethyl benzidine |
| 79447 | Dimethyl carbamoyl chloride |
| 68122 | Dimethyl formamide |
| 57147 | 1,1-Dimethyl hydrazine |
| 131113 | Dimethyl phthalate |
| 77781 | Dimethyl sulfate |
| 534521 | 4,6-Dinitro-o-cresol, and salts |
| 51285 | 2,4-Dinitrophenol |
| 121142 | 2,4-Dinitrotoluene |
| 123911 | 1,4-Dioxane (1,4-Diethyleneoxide) |
| 122667 | 1,2-Diphenylhydrazine |
| 106898 | Epichlorohydrin (1-Chloro-2,3-epoxypropane) |
| 106887 | 1,2-Epoxybutane |
| 140885 | Ethyl acrylate |
| 100414 | Ethyl benzene |
| 51796 | Ethyl carbamate (Urethane) |
| 75003 | Ethyl chloride (Chloroethane) |
| 106934 | Ethylene dibromide (Dibromoethane) |
| 107062 | Ethylene dichloride (1,2-Dichloroethane) |
| 107211 | Ethylene glycol |
| 151564 | Ethylene imine (Aziridine) |
| 75218 | Ethylene oxide |
| 96457 | Ethylene thiourea |
| 75343 | Ethylidene dichloride (1,1-Dichloroethane) |
| 50000 | Formaldehyde |

**Add.13**

§ 7412. Hazardous air pollutants, 42 USCA § 7412

| | |
|---|---|
| 76448 | Heptachlor |
| 118741 | Hexachlorobenzene |
| 87683 | Hexachlorobutadiene |
| 77474 | Hexachlorocyclopentadiene |
| 67721 | Hexachloroethane |
| 822060 | Hexamethylene-1,6-diisocyanate |
| 680319 | Hexamethylphosphoramide |
| 110543 | Hexane |
| 302012 | Hydrazine |
| 7647010 | Hydrochloric acid |
| 7664393 | Hydrogen fluoride (Hydrofluoric acid) |
| 123319 | Hydroquinone |
| 78591 | Isophorone |
| 58899 | Lindane (all isomers) |
| 108316 | Maleic anhydride |
| 67561 | Methanol |
| 72435 | Methoxychlor |
| 74839 | Methyl bromide (Bromomethane) |
| 74873 | Methyl chloride (Chloromethane) |
| 71556 | Methyl chloroform (1,1,1-Trichloroethane) |
| 78933 | Methyl ethyl ketone (2-Butanone) |
| 60344 | Methyl hydrazine |
| 74884 | Methyl iodide (Iodomethane) |
| 108101 | Methyl isobutyl ketone (Hexone) |
| 624839 | Methyl isocyanate |
| 80626 | Methyl methacrylate |
| 1634044 | Methyl tert butyl ether |
| 101144 | 4,4-Methylene bis(2-chloroaniline) |
| 75092 | Methylene chloride (Dichloromethane) |

| | |
|---|---|
| 101688 | Methylene diphenyl diisocyanate (MDI) |
| 101779 | 4,4′-Methylenedianiline |
| 91203 | Naphthalene |
| 98953 | Nitrobenzene |
| 92933 | 4-Nitrobiphenyl |
| 100027 | 4-Nitrophenol |
| 79469 | 2-Nitropropane |
| 684935 | N-Nitroso-N-methylurea |
| 62759 | N-Nitrosodimethylamine |
| 59892 | N-Nitrosomorpholine |
| 56382 | Parathion |
| 82688 | Pentachloronitrobenzene (Quintobenzene) |
| 87865 | Pentachlorophenol |
| 108952 | Phenol |
| 106503 | p-Phenylenediamine |
| 75445 | Phosgene |
| 7803512 | Phosphine |
| 7723140 | Phosphorus |
| 85449 | Phthalic anhydride |
| 1336363 | Polychlorinated biphenyls (Aroclors) |
| 1120714 | 1,3-Propane sultone |
| 57578 | beta-Propiolactone |
| 123386 | Propionaldehyde |
| 114261 | Propoxur (Baygon) |
| 78875 | Propylene dichloride (1,2-Dichloropropane) |
| 75569 | Propylene oxide |
| 75558 | 1,2-Propylenimine (2-Methyl aziridine) |
| 91225 | Quinoline |
| 106514 | Quinone |

§ 7412. Hazardous air pollutants, 42 USCA § 7412

| | |
|---|---|
| 100425 | Styrene |
| 96093 | Styrene oxide |
| 1746016 | 2,3,7,8-Tetrachlorodibenzo-p-dioxin |
| 79345 | 1,1,2,2-Tetrachloroethane |
| 127184 | Tetrachloroethylene (Perchloroethylene) |
| 7550450 | Titanium tetrachloride |
| 108883 | Toluene |
| 95807 | 2,4-Toluene diamine |
| 584849 | 2,4-Toluene diisocyanate |
| 95534 | o-Toluidine |
| 8001352 | Toxaphene (chlorinated camphene) |
| 120821 | 1,2,4-Trichlorobenzene |
| 79005 | 1,1,2-Trichloroethane |
| 79016 | Trichloroethylene |
| 95954 | 2,4,5-Trichlorophenol |
| 88062 | 2,4,6-Trichlorophenol |
| 121448 | Triethylamine |
| 1582098 | Trifluralin |
| 540841 | 2,2,4-Trimethylpentane |
| 108054 | Vinyl acetate |
| 593602 | Vinyl bromide |
| 75014 | Vinyl chloride |
| 75354 | Vinylidene chloride (1,1-Dichloroethylene) |
| 1330207 | Xylenes (isomers and mixture) |
| 95476 | o-Xylenes |
| 108383 | m-Xylenes |
| 106423 | p-Xylenes |
| 0 | Antimony Compounds |
| 0 | Arsenic Compounds (inorganic including arsine) |

**Add.16**

§ 7412. Hazardous air pollutants, 42 USCA § 7412

0    Beryllium Compounds

0    Cadmium Compounds

0    Chromium Compounds

0    Cobalt Compounds

0    Coke Oven Emissions

0    Cyanide Compounds [1]

0    Glycol ethers [2]

0    Lead Compounds

0    Manganese Compounds

0    Mercury Compounds

0    Fine mineral fibers [3]

0    Nickel Compounds

0    Polycyclic Organic Matter [4]

0    Radionuclides (including radon) [5]

0    Selenium Compounds

NOTE: For all listings above which contain the word "compounds" and for glycol ethers, the following applies: Unless otherwise specified, these listings are defined as including any unique chemical substance that contains the named chemical (i.e., antimony, arsenic, etc.) as part of that chemical's infrastructure.

[1] X′CN where X = H′ or any other group where a formal dissociation may occur. For example KCN or Ca(CN)$_2$

[2] Includes mono- and di- ethers of ethylene glycol, diethylene glycol, and triethylene glycol R-(OCH$_2$CH$_2$)$_n$-OR′ where

n = 1, 2, or 3

R = alkyl or aryl groups

R′ = R, H, or groups which, when removed, yield glycol ethers with the structure: R-(OCH$_2$CH)$_n$-OH. Polymers are excluded from the glycol category.

[3] Includes mineral fiber emissions from facilities manufacturing or processing glass, rock, or slag fibers (or other mineral derived fibers) of average diameter 1 micrometer or less.

[4] Includes organic compounds with more than one benzene ring, and which have a boiling point greater than or equal to 100°C.

[5] A type of atom which spontaneously undergoes radioactive decay.

**Add.17**

**(2) Revision of the list**

The Administrator shall periodically review the list established by this subsection and publish the results thereof and, where appropriate, revise such list by rule, adding pollutants which present, or may present, through inhalation or other routes of exposure, a threat of adverse human health effects (including, but not limited to, substances which are known to be, or may reasonably be anticipated to be, carcinogenic, mutagenic, teratogenic, neurotoxic, which cause reproductive dysfunction, or which are acutely or chronically toxic) or adverse environmental effects whether through ambient concentrations, bioaccumulation, deposition, or otherwise, but not including releases subject to regulation under subsection (r) as a result of emissions to the air. No air pollutant which is listed under section 7408(a) of this title may be added to the list under this section, except that the prohibition of this sentence shall not apply to any pollutant which independently meets the listing criteria of this paragraph and is a precursor to a pollutant which is listed under section 7408(a) of this title or to any pollutant which is in a class of pollutants listed under such section. No substance, practice, process or activity regulated under subchapter VI of this chapter shall be subject to regulation under this section solely due to its adverse effects on the environment.

**(3) Petitions to modify the list**

**(A)** Beginning at any time after 6 months after November 15, 1990, any person may petition the Administrator to modify the list of hazardous air pollutants under this subsection by adding or deleting a substance or, in case of listed pollutants without CAS numbers (other than coke oven emissions, mineral fibers, or polycyclic organic matter) removing certain unique substances. Within 18 months after receipt of a petition, the Administrator shall either grant or deny the petition by publishing a written explanation of the reasons for the Administrator's decision. Any such petition shall include a showing by the petitioner that there is adequate data on the health or environmental defects [1] of the pollutant or other evidence adequate to support the petition. The Administrator may not deny a petition solely on the basis of inadequate resources or time for review.

**(B)** The Administrator shall add a substance to the list upon a showing by the petitioner or on the Administrator's own determination that the substance is an air pollutant and that emissions, ambient concentrations, bioaccumulation or deposition of the substance are known to cause or may reasonably be anticipated to cause adverse effects to human health or adverse environmental effects.

**(C)** The Administrator shall delete a substance from the list upon a showing by the petitioner or on the Administrator's own determination that there is adequate data on the health and environmental effects of the substance to determine that emissions, ambient concentrations, bioaccumulation or deposition of the substance may not reasonably be anticipated to cause any adverse effects to the human health or adverse environmental effects.

**(D)** The Administrator shall delete one or more unique chemical substances that contain a listed hazardous air pollutant not having a CAS number (other than coke oven emissions, mineral fibers, or polycyclic organic matter) upon a showing by the petitioner or on the Administrator's own determination that such unique chemical substances that contain the named chemical of such listed hazardous air pollutant meet the deletion requirements of subparagraph (C). The Administrator must grant or deny a deletion petition prior to promulgating any emission standards pursuant to subsection (d) applicable to any source category or subcategory of a listed hazardous air pollutant without a CAS number listed under subsection (b) for which a deletion petition has been filed within 12 months of November 15, 1990.

**(4) Further information**

If the Administrator determines that information on the health or environmental effects of a substance is not sufficient to make a determination required by this subsection, the Administrator may use any authority available to the Administrator to acquire such information.

**(5) Test methods**

The Administrator may establish, by rule, test measures and other analytic procedures for monitoring and measuring emissions, ambient concentrations, deposition, and bioaccumulation of hazardous air pollutants.

**(6) Prevention of significant deterioration**

The provisions of part C (prevention of significant deterioration) shall not apply to pollutants listed under this section.

**(7) Lead**

The Administrator may not list elemental lead as a hazardous air pollutant under this subsection.

**(c) List of source categories**

**(1) In general**

Not later than 12 months after November 15, 1990, the Administrator shall publish, and shall from time to time, but no less often than every 8 years, revise, if appropriate, in response to public comment or new information, a list of all categories and subcategories of major sources and area sources (listed under paragraph (3)) of the air pollutants listed pursuant to subsection (b). To the extent practicable, the categories and subcategories listed under this subsection shall be consistent with the list of source categories established pursuant to section 7411 of this title and part C. Nothing in the preceding sentence limits the Administrator's authority to establish subcategories under this section, as appropriate.

**(2) Requirement for emissions standards**

For the categories and subcategories the Administrator lists, the Administrator shall establish emissions standards under subsection (d), according to the schedule in this subsection and subsection (e).

**(3) Area sources**

The Administrator shall list under this subsection each category or subcategory of area sources which the Administrator finds presents a threat of adverse effects to human health or the environment (by such sources individually or in the aggregate) warranting regulation under this section. The Administrator shall, not later than 5 years after November 15, 1990, and pursuant to subsection (k)(3)(B), list, based on actual or estimated aggregate emissions of a listed pollutant or pollutants, sufficient categories or subcategories of area sources to ensure that area sources representing 90 percent of the area source emissions of the 30 hazardous air pollutants that present the greatest threat to public health in the largest number of urban areas are subject to regulation under this section. Such regulations shall be promulgated not later than 10 years after November 15, 1990.

**(4) Previously regulated categories**

The Administrator may, in the Administrator's discretion, list any category or subcategory of sources previously regulated under this section as in effect before November 15, 1990.

**(5) Additional categories**

In addition to those categories and subcategories of sources listed for regulation pursuant to paragraphs (1) and (3), the Administrator may at any time list additional categories and subcategories of sources of hazardous air pollutants according to the same criteria for listing applicable under such paragraphs. In the case of source categories and subcategories listed after publication of the initial list required under paragraph (1) or (3), emission standards under subsection (d) for the category or subcategory shall be promulgated within 10 years after November 15, 1990, or within 2 years after the date on which such category or subcategory is listed, whichever is later.

**(6) Specific pollutants**

With respect to alkylated lead compounds, polycyclic organic matter, hexachlorobenzene, mercury, polychlorinated biphenyls, 2,3,7,8-tetrachlorodibenzofurans and 2,3,7,8-tetrachlorodibenzo-p-dioxin, the Administrator shall, not later than 5 years after November 15, 1990, list categories and subcategories of sources assuring that sources accounting for not less than 90 per centum of the aggregate emissions of each such pollutant are subject to standards under subsection (d)(2) or (d)(4). Such standards shall be promulgated not later than 10 years after November 15, 1990. This paragraph shall not be construed to require the Administrator to promulgate standards for such pollutants emitted by electric utility steam generating units.

**(7) Research facilities**

The Administrator shall establish a separate category covering research or laboratory facilities, as necessary to assure the equitable treatment of such facilities. For purposes of this section, "research or laboratory facility" means any stationary source whose primary purpose is to conduct research and development into new processes and products, where such source is operated under the close supervision of technically trained personnel and is not engaged in the manufacture of products for commercial sale in commerce, except in a de minimis manner.

**(8) Boat manufacturing**

When establishing emissions standards for styrene, the Administrator shall list boat manufacturing as a separate subcategory unless the Administrator finds that such listing would be inconsistent with the goals and requirements of this chapter.

**(9) Deletions from the list**

**(A)** Where the sole reason for the inclusion of a source category on the list required under this subsection is the emission of a unique chemical substance, the Administrator shall delete the source category from the list if it is appropriate because of action taken under either subparagraphs (C) or (D) of subsection (b)(3).

**(B)** The Administrator may delete any source category from the list under this subsection, on petition of any person or on the Administrator's own motion, whenever the Administrator makes the following determination or determinations, as applicable:

**(i)** In the case of hazardous air pollutants emitted by sources in the category that may result in cancer in humans, a determination that no source in the category (or group of sources in the case of area sources) emits such hazardous air pollutants in quantities which may cause a lifetime risk of cancer greater than one in one million to the individual in the population who is most exposed to emissions of such pollutants from the source (or group of sources in the case of area sources).

**(ii)** In the case of hazardous air pollutants that may result in adverse health effects in humans other than cancer or adverse environmental effects, a determination that emissions from no source in the category or subcategory concerned (or group of sources in the case of area sources) exceed a level which is adequate to protect public health with an ample margin of safety and no adverse environmental effect will result from emissions from any source (or from a group of sources in the case of area sources).

The Administrator shall grant or deny a petition under this paragraph within 1 year after the petition is filed.

**(d) Emission standards**

**(1) In general**

The Administrator shall promulgate regulations establishing emission standards for each category or subcategory of major sources and area sources of hazardous air pollutants listed for regulation pursuant to subsection (c) in accordance with the schedules provided in subsections (c) and (e). The Administrator may distinguish among classes, types, and sizes of sources within a category or subcategory in establishing such standards except that, there shall be no delay in the compliance date for any standard applicable to any source under subsection (i) as the result of the authority provided by this sentence.

**(2) Standards and methods**

Emissions standards promulgated under this subsection and applicable to new or existing sources of hazardous air pollutants shall require the maximum degree of reduction in emissions of the hazardous air pollutants subject to this section (including a prohibition on such emissions, where achievable) that the Administrator, taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements, determines is achievable for new or existing sources in the category or subcategory to which such emission standard applies, through application of measures, processes, methods, systems or techniques including, but not limited to, measures which--

**(A)** reduce the volume of, or eliminate emissions of, such pollutants through process changes, substitution of materials or other modifications,

**(B)** enclose systems or processes to eliminate emissions,

**(C)** collect, capture or treat such pollutants when released from a process, stack, storage or fugitive emissions point,

Add.21

**(D)** are design, equipment, work practice, or operational standards (including requirements for operator training or certification) as provided in subsection (h), or

**(E)** are a combination of the above.

None of the measures described in subparagraphs (A) through (D) shall, consistent with the provisions of section 7414(c) of this title, in any way compromise any United States patent or United States trademark right, or any confidential business information, or any trade secret or any other intellectual property right.

### (3) New and existing sources

The maximum degree of reduction in emissions that is deemed achievable for new sources in a category or subcategory shall not be less stringent than the emission control that is achieved in practice by the best controlled similar source, as determined by the Administrator. Emission standards promulgated under this subsection for existing sources in a category or subcategory may be less stringent than standards for new sources in the same category or subcategory but shall not be less stringent, and may be more stringent than--

**(A)** the average emission limitation achieved by the best performing 12 percent of the existing sources (for which the Administrator has emissions information), excluding those sources that have, within 18 months before the emission standard is proposed or within 30 months before such standard is promulgated, whichever is later, first achieved a level of emission rate or emission reduction which complies, or would comply if the source is not subject to such standard, with the lowest achievable emission rate (as defined by section 7501 of this title) applicable to the source category and prevailing at the time, in the category or subcategory for categories and subcategories with 30 or more sources, or

**(B)** the average emission limitation achieved by the best performing 5 sources (for which the Administrator has or could reasonably obtain emissions information) in the category or subcategory for categories or subcategories with fewer than 30 sources.

### (4) Health threshold

With respect to pollutants for which a health threshold has been established, the Administrator may consider such threshold level, with an ample margin of safety, when establishing emission standards under this subsection.

### (5) Alternative standard for area sources

With respect only to categories and subcategories of area sources listed pursuant to subsection (c), the Administrator may, in lieu of the authorities provided in paragraph (2) and subsection (f), elect to promulgate standards or requirements applicable to sources in such categories or subcategories which provide for the use of generally available control technologies or management practices by such sources to reduce emissions of hazardous air pollutants.

### (6) Review and revision

§ 7412. Hazardous air pollutants, 42 USCA § 7412

The Administrator shall review, and revise as necessary (taking into account developments in practices, processes, and control technologies), emission standards promulgated under this section no less often than every 8 years.

**(7) Other requirements preserved**

No emission standard or other requirement promulgated under this section shall be interpreted, construed or applied to diminish or replace the requirements of a more stringent emission limitation or other applicable requirement established pursuant to section 7411 of this title, part C or D, or other authority of this chapter or a standard issued under State authority.

**(8) Coke ovens**

**(A)** Not later than December 31, 1992, the Administrator shall promulgate regulations establishing emission standards under paragraphs (2) and (3) of this subsection for coke oven batteries. In establishing such standards, the Administrator shall evaluate--

**(i)** the use of sodium silicate (or equivalent) luting compounds to prevent door leaks, and other operating practices and technologies for their effectiveness in reducing coke oven emissions, and their suitability for use on new and existing coke oven batteries, taking into account costs and reasonable commercial door warranties; and

**(ii)** as a basis for emission standards under this subsection for new coke oven batteries that begin construction after the date of proposal of such standards, the Jewell design Thompson non-recovery coke oven batteries and other non-recovery coke oven technologies, and other appropriate emission control and coke production technologies, as to their effectiveness in reducing coke oven emissions and their capability for production of steel quality coke.

Such regulations shall require at a minimum that coke oven batteries will not exceed 8 per centum leaking doors, 1 per centum leaking lids, 5 per centum leaking offtakes, and 16 seconds visible emissions per charge, with no exclusion for emissions during the period after the closing of self-sealing oven doors. Notwithstanding subsection (i), the compliance date for such emission standards for existing coke oven batteries shall be December 31, 1995.

**(B)** The Administrator shall promulgate work practice regulations under this subsection for coke oven batteries requiring, as appropriate--

**(i)** the use of sodium silicate (or equivalent) luting compounds, if the Administrator determines that use of sodium silicate is an effective means of emissions control and is achievable, taking into account costs and reasonable commercial warranties for doors and related equipment; and

**(ii)** door and jam cleaning practices.

Notwithstanding subsection (i), the compliance date for such work practice regulations for coke oven batteries shall be not later than the date 3 years after November 15, 1990.

**(C)** For coke oven batteries electing to qualify for an extension of the compliance date for standards promulgated under subsection (f) in accordance with subsection (i)(8), the emission standards under this subsection for coke oven batteries shall

Add.23

require that coke oven batteries not exceed 8 per centum leaking doors, 1 per centum leaking lids, 5 per centum leaking offtakes, and 16 seconds visible emissions per charge, with no exclusion for emissions during the period after the closing of self-sealing doors. Notwithstanding subsection (i), the compliance date for such emission standards for existing coke oven batteries seeking an extension shall be not later than the date 3 years after November 15, 1990.

**(9) Sources licensed by the Nuclear Regulatory Commission**

No standard for radionuclide emissions from any category or subcategory of facilities licensed by the Nuclear Regulatory Commission (or an Agreement State) is required to be promulgated under this section if the Administrator determines, by rule, and after consultation with the Nuclear Regulatory Commission, that the regulatory program established by the Nuclear Regulatory Commission pursuant to the Atomic Energy Act for such category or subcategory provides an ample margin of safety to protect the public health. Nothing in this subsection shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce any standard or limitation respecting emissions of radionuclides which is more stringent than the standard or limitation in effect under section 7411 of this title or this section.

**(10) Effective date**

Emission standards or other regulations promulgated under this subsection shall be effective upon promulgation.

**(e) Schedule for standards and review**

**(1) In general**

The Administrator shall promulgate regulations establishing emission standards for categories and subcategories of sources initially listed for regulation pursuant to subsection (c)(1) as expeditiously as practicable, assuring that--

**(A)** emission standards for not less than 40 categories and subcategories (not counting coke oven batteries) shall be promulgated not later than 2 years after November 15, 1990;

**(B)** emission standards for coke oven batteries shall be promulgated not later than December 31, 1992;

**(C)** emission standards for 25 per centum of the listed categories and subcategories shall be promulgated not later than 4 years after November 15, 1990;

**(D)** emission standards for an additional 25 per centum of the listed categories and subcategories shall be promulgated not later than 7 years after November 15, 1990; and

**(E)** emission standards for all categories and subcategories shall be promulgated not later than 10 years after November 15, 1990.

**(2) Priorities**

§ 7412. Hazardous air pollutants, 42 USCA § 7412

In determining priorities for promulgating standards under subsection (d), the Administrator shall consider--

**(A)** the known or anticipated adverse effects of such pollutants on public health and the environment;

**(B)** the quantity and location of emissions or reasonably anticipated emissions of hazardous air pollutants that each category or subcategory will emit; and

**(C)** the efficiency of grouping categories or subcategories according to the pollutants emitted, or the processes or technologies used.

### (3) Published schedule

Not later than 24 months after November 15, 1990, and after opportunity for comment, the Administrator shall publish a schedule establishing a date for the promulgation of emission standards for each category and subcategory of sources listed pursuant to subsection (c)(1) and (3) which shall be consistent with the requirements of paragraphs (1) and (2). The determination of priorities for the promulgation of standards pursuant to this paragraph is not a rulemaking and shall not be subject to judicial review, except that, failure to promulgate any standard pursuant to the schedule established by this paragraph shall be subject to review under section 7604 of this title.

### (4) Judicial review

Notwithstanding section 7607 of this title, no action of the Administrator adding a pollutant to the list under subsection (b) or listing a source category or subcategory under subsection (c) shall be a final agency action subject to judicial review, except that any such action may be reviewed under such section 7607 of this title when the Administrator issues emission standards for such pollutant or category.

### (5) Publicly owned treatment works

The Administrator shall promulgate standards pursuant to subsection (d) applicable to publicly owned treatment works (as defined in title II of the Federal Water Pollution Control Act) not later than 5 years after November 15, 1990.

## (f) Standard to protect health and environment

### (1) Report

Not later than 6 years after November 15, 1990, the Administrator shall investigate and report, after consultation with the Surgeon General and after opportunity for public comment, to Congress on--

**(A)** methods of calculating the risk to public health remaining, or likely to remain, from sources subject to regulation under this section after the application of standards under subsection (d);

**Add.25**

**(B)** the public health significance of such estimated remaining risk and the technologically and commercially available methods and costs of reducing such risks;

**(C)** the actual health effects with respect to persons living in the vicinity of sources, any available epidemiological or other health studies, risks presented by background concentrations of hazardous air pollutants, any uncertainties in risk assessment methodology or other health assessment technique, and any negative health or environmental consequences to the community of efforts to reduce such risks; and

**(D)** recommendations as to legislation regarding such remaining risk.

**(2) Emission standards**

**(A)** If Congress does not act on any recommendation submitted under paragraph (1), the Administrator shall, within 8 years after promulgation of standards for each category or subcategory of sources pursuant to subsection (d), promulgate standards for such category or subcategory if promulgation of such standards is required in order to provide an ample margin of safety to protect public health in accordance with this section (as in effect before November 15, 1990) or to prevent, taking into consideration costs, energy, safety, and other relevant factors, an adverse environmental effect. Emission standards promulgated under this subsection shall provide an ample margin of safety to protect public health in accordance with this section (as in effect before November 15, 1990), unless the Administrator determines that a more stringent standard is necessary to prevent, taking into consideration costs, energy, safety, and other relevant factors, an adverse environmental effect. If standards promulgated pursuant to subsection (d) and applicable to a category or subcategory of sources emitting a pollutant (or pollutants) classified as a known, probable or possible human carcinogen do not reduce lifetime excess cancer risks to the individual most exposed to emissions from a source in the category or subcategory to less than one in one million, the Administrator shall promulgate standards under this subsection for such source category.

**(B)** Nothing in subparagraph (A) or in any other provision of this section shall be construed as affecting, or applying to the Administrator's interpretation of this section, as in effect before November 15, 1990, and set forth in the Federal Register of September 14, 1989 (54 Federal Register 38044).

**(C)** The Administrator shall determine whether or not to promulgate such standards and, if the Administrator decides to promulgate such standards, shall promulgate the standards 8 years after promulgation of the standards under subsection (d) for each source category or subcategory concerned. In the case of categories or subcategories for which standards under subsection (d) are required to be promulgated within 2 years after November 15, 1990, the Administrator shall have 9 years after promulgation of the standards under subsection (d) to make the determination under the preceding sentence and, if required, to promulgate the standards under this paragraph.

**(3) Effective date**

Any emission standard established pursuant to this subsection shall become effective upon promulgation.

**(4) Prohibition**

No air pollutant to which a standard under this subsection applies may be emitted from any stationary source in violation of such standard, except that in the case of an existing source--

**(A)** such standard shall not apply until 90 days after its effective date, and

**(B)** the Administrator may grant a waiver permitting such source a period of up to 2 years after the effective date of a standard to comply with the standard if the Administrator finds that such period is necessary for the installation of controls and that steps will be taken during the period of the waiver to assure that the health of persons will be protected from imminent endangerment.

**(5) Area sources**

The Administrator shall not be required to conduct any review under this subsection or promulgate emission limitations under this subsection for any category or subcategory of area sources that is listed pursuant to subsection (c)(3) and for which an emission standard is promulgated pursuant to subsection (d)(5).

**(6) Unique chemical substances**

In establishing standards for the control of unique chemical substances of listed pollutants without CAS numbers under this subsection, the Administrator shall establish such standards with respect to the health and environmental effects of the substances actually emitted by sources and direct transformation byproducts of such emissions in the categories and subcategories.

**(g) Modifications**

**(1) Offsets**

**(A)** A physical change in, or change in the method of operation of, a major source which results in a greater than de minimis increase in actual emissions of a hazardous air pollutant shall not be considered a modification, if such increase in the quantity of actual emissions of any hazardous air pollutant from such source will be offset by an equal or greater decrease in the quantity of emissions of another hazardous air pollutant (or pollutants) from such source which is deemed more hazardous, pursuant to guidance issued by the Administrator under subparagraph (B). The owner or operator of such source shall submit a showing to the Administrator (or the State) that such increase has been offset under the preceding sentence.

**(B)** The Administrator shall, after notice and opportunity for comment and not later than 18 months after November 15, 1990, publish guidance with respect to implementation of this subsection. Such guidance shall include an identification, to the extent practicable, of the relative hazard to human health resulting from emissions to the ambient air of each of the pollutants listed under subsection (b) sufficient to facilitate the offset showing authorized by subparagraph (A). Such guidance shall not authorize offsets between pollutants where the increased pollutant (or more than one pollutant in a stream of pollutants) causes adverse effects to human health for which no safety threshold for exposure can be determined unless there are corresponding decreases in such types of pollutant(s).

**(2) Construction, reconstruction and modifications**

**(A)** After the effective date of a permit program under subchapter V in any State, no person may modify a major source of hazardous air pollutants in such State, unless the Administrator (or the State) determines that the maximum achievable control technology emission limitation under this section for existing sources will be met. Such determination shall be made on a case-by-case basis where no applicable emissions limitations have been established by the Administrator.

**(B)** After the effective date of a permit program under subchapter V in any State, no person may construct or reconstruct any major source of hazardous air pollutants, unless the Administrator (or the State) determines that the maximum achievable control technology emission limitation under this section for new sources will be met. Such determination shall be made on a case-by-case basis where no applicable emission limitations have been established by the Administrator.

**(3) Procedures for modifications**

The Administrator (or the State) shall establish reasonable procedures for assuring that the requirements applying to modifications under this section are reflected in the permit.

**(h) Work practice standards and other requirements**

**(1) In general**

For purposes of this section, if it is not feasible in the judgment of the Administrator to prescribe or enforce an emission standard for control of a hazardous air pollutant or pollutants, the Administrator may, in lieu thereof, promulgate a design, equipment, work practice, or operational standard, or combination thereof, which in the Administrator's judgment is consistent with the provisions of subsection (d) or (f). In the event the Administrator promulgates a design or equipment standard under this subsection, the Administrator shall include as part of such standard such requirements as will assure the proper operation and maintenance of any such element of design or equipment.

**(2) Definition**

For the purpose of this subsection, the phrase "not feasible to prescribe or enforce an emission standard" means any situation in which the Administrator determines that--

**(A)** a hazardous air pollutant or pollutants cannot be emitted through a conveyance designed and constructed to emit or capture such pollutant, or that any requirement for, or use of, such a conveyance would be inconsistent with any Federal, State or local law, or

**(B)** the application of measurement methodology to a particular class of sources is not practicable due to technological and economic limitations.

**(3) Alternative standard**

If after notice and opportunity for comment, the owner or operator of any source establishes to the satisfaction of the Administrator that an alternative means of emission limitation will achieve a reduction in emissions of any air pollutant

at least equivalent to the reduction in emissions of such pollutant achieved under the requirements of paragraph (1), the Administrator shall permit the use of such alternative by the source for purposes of compliance with this section with respect to such pollutant.

**(4) Numerical standard required**

Any standard promulgated under paragraph (1) shall be promulgated in terms of an emission standard whenever it is feasible to promulgate and enforce a standard in such terms.

**(i) Schedule for compliance**

**(1) Preconstruction and operating requirements**

After the effective date of any emission standard, limitation, or regulation under subsection (d), (f) or (h), no person may construct any new major source or reconstruct any existing major source subject to such emission standard, regulation or limitation unless the Administrator (or a State with a permit program approved under subchapter V) determines that such source, if properly constructed, reconstructed and operated, will comply with the standard, regulation or limitation.

**(2) Special rule**

Notwithstanding the requirements of paragraph (1), a new source which commences construction or reconstruction after a standard, limitation or regulation applicable to such source is proposed and before such standard, limitation or regulation is promulgated shall not be required to comply with such promulgated standard until the date 3 years after the date of promulgation if--

**(A)** the promulgated standard, limitation or regulation is more stringent than the standard, limitation or regulation proposed; and

**(B)** the source complies with the standard, limitation, or regulation as proposed during the 3-year period immediately after promulgation.

**(3) Compliance schedule for existing sources**

**(A)** After the effective date of any emissions standard, limitation or regulation promulgated under this section and applicable to a source, no person may operate such source in violation of such standard, limitation or regulation except, in the case of an existing source, the Administrator shall establish a compliance date or dates for each category or subcategory of existing sources, which shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the effective date of such standard, except as provided in subparagraph (B) and paragraphs (4) through (8).

**(B)** The Administrator (or a State with a program approved under subchapter V) may issue a permit that grants an extension permitting an existing source up to 1 additional year to comply with standards under subsection (d) if such additional period is necessary for the installation of controls. An additional extension of up to 3 years may be added for mining waste operations,

if the 4-year compliance time is insufficient to dry and cover mining waste in order to reduce emissions of any pollutant listed under subsection (b).

**(4) Presidential exemption**

The President may exempt any stationary source from compliance with any standard or limitation under this section for a period of not more than 2 years if the President determines that the technology to implement such standard is not available and that it is in the national security interests of the United States to do so. An exemption under this paragraph may be extended for 1 or more additional periods, each period not to exceed 2 years. The President shall report to Congress with respect to each exemption (or extension thereof) made under this paragraph.

**(5) Early reduction**

**(A)** The Administrator (or a State acting pursuant to a permit program approved under subchapter V) shall issue a permit allowing an existing source, for which the owner or operator demonstrates that the source has achieved a reduction of 90 per centum or more in emissions of hazardous air pollutants (95 per centum in the case of hazardous air pollutants which are particulates) from the source, to meet an alternative emission limitation reflecting such reduction in lieu of an emission limitation promulgated under subsection (d) for a period of 6 years from the compliance date for the otherwise applicable standard, provided that such reduction is achieved before the otherwise applicable standard under subsection (d) is first proposed. Nothing in this paragraph shall preclude a State from requiring reductions in excess of those specified in this subparagraph as a condition of granting the extension authorized by the previous sentence.

**(B)** An existing source which achieves the reduction referred to in subparagraph (A) after the proposal of an applicable standard but before January 1, 1994, may qualify under subparagraph (A), if the source makes an enforceable commitment to achieve such reduction before the proposal of the standard. Such commitment shall be enforceable to the same extent as a regulation under this section.

**(C)** The reduction shall be determined with respect to verifiable and actual emissions in a base year not earlier than calendar year 1987, provided that, there is no evidence that emissions in the base year are artificially or substantially greater than emissions in other years prior to implementation of emissions reduction measures. The Administrator may allow a source to use a baseline year of 1985 or 1986 provided that the source can demonstrate to the satisfaction of the Administrator that emissions data for the source reflects verifiable data based on information for such source, received by the Administrator prior to November 15, 1990, pursuant to an information request issued under section 7414 of this title.

**(D)** For each source granted an alternative emission limitation under this paragraph there shall be established by a permit issued pursuant to subchapter V an enforceable emission limitation for hazardous air pollutants reflecting the reduction which qualifies the source for an alternative emission limitation under this paragraph. An alternative emission limitation under this paragraph shall not be available with respect to standards or requirements promulgated pursuant to subsection (f) and the Administrator shall, for the purpose of determining whether a standard under subsection (f) is necessary, review emissions from sources granted an alternative emission limitation under this paragraph at the same time that other sources in the category or subcategory are reviewed.

**(E)** With respect to pollutants for which high risks of adverse public health effects may be associated with exposure to small quantities including, but not limited to, chlorinated dioxins and furans, the Administrator shall by regulation limit the use of

Add.30

offsetting reductions in emissions of other hazardous air pollutants from the source as counting toward the 90 per centum reduction in such high-risk pollutants qualifying for an alternative emissions limitation under this paragraph.

**(6) Other reductions**

Notwithstanding the requirements of this section, no existing source that has installed--

**(A)** best available control technology (as defined in section 7479(3) of this title), or

**(B)** technology required to meet a lowest achievable emission rate (as defined in section 7501 of this title),

prior to the promulgation of a standard under this section applicable to such source and the same pollutant (or stream of pollutants) controlled pursuant to an action described in subparagraph (A) or (B) shall be required to comply with such standard under this section until the date 5 years after the date on which such installation or reduction has been achieved, as determined by the Administrator. The Administrator may issue such rules and guidance as are necessary to implement this paragraph.

**(7) Extension for new sources**

A source for which construction or reconstruction is commenced after the date an emission standard applicable to such source is proposed pursuant to subsection (d) but before the date an emission standard applicable to such source is proposed pursuant to subsection (f) shall not be required to comply with the emission standard under subsection (f) until the date 10 years after the date construction or reconstruction is commenced.

**(8) Coke ovens**

**(A)** Any coke oven battery that complies with the emission limitations established under subsection (d)(8)(C), subparagraph (B), and subparagraph (C), and complies with the provisions of subparagraph (E), shall not be required to achieve emission limitations promulgated under subsection (f) until January 1, 2020.

**(B)(i)** Not later than December 31, 1992, the Administrator shall promulgate emission limitations for coke oven emissions from coke oven batteries. Notwithstanding paragraph (3) of this subsection, the compliance date for such emission limitations for existing coke oven batteries shall be January 1, 1998. Such emission limitations shall reflect the lowest achievable emission rate as defined in section 7501 of this title for a coke oven battery that is rebuilt or a replacement at a coke oven plant for an existing battery. Such emission limitations shall be no less stringent than--

**(I)** 3 per centum leaking doors (5 per centum leaking doors for six meter batteries);

**(II)** 1 per centum leaking lids;

**(III)** 4 per centum leaking offtakes; and

**Add.31**

**(IV)** 16 seconds visible emissions per charge,

with an exclusion for emissions during the period after the closing of self-sealing oven doors (or the total mass emissions equivalent). The rulemaking in which such emission limitations are promulgated shall also establish an appropriate measurement methodology for determining compliance with such emission limitations, and shall establish such emission limitations in terms of an equivalent level of mass emissions reduction from a coke oven battery, unless the Administrator finds that such a mass emissions standard would not be practicable or enforceable. Such measurement methodology, to the extent it measures leaking doors, shall take into consideration alternative test methods that reflect the best technology and practices actually applied in the affected industries, and shall assure that the final test methods are consistent with the performance of such best technology and practices.

**(ii)** If the Administrator fails to promulgate such emission limitations under this subparagraph prior to the effective date of such emission limitations, the emission limitations applicable to coke oven batteries under this subparagraph shall be--

**(I)** 3 per centum leaking doors (5 per centum leaking doors for six meter batteries);

**(II)** 1 per centum leaking lids;

**(III)** 4 per centum leaking offtakes; and

**(IV)** 16 seconds visible emissions per charge,

or the total mass emissions equivalent (if the total mass emissions equivalent is determined to be practicable and enforceable), with no exclusion for emissions during the period after the closing of self-sealing oven doors.

**(C)** Not later than January 1, 2007, the Administrator shall review the emission limitations promulgated under subparagraph (B) and revise, as necessary, such emission limitations to reflect the lowest achievable emission rate as defined in section 7501 of this title at the time for a coke oven battery that is rebuilt or a replacement at a coke oven plant for an existing battery. Such emission limitations shall be no less stringent than the emission limitation promulgated under subparagraph (B). Notwithstanding paragraph (2) of this subsection, the compliance date for such emission limitations for existing coke oven batteries shall be January 1, 2010.

**(D)** At any time prior to January 1, 1998, the owner or operator of any coke oven battery may elect to comply with emission limitations promulgated under subsection (f) by the date such emission limitations would otherwise apply to such coke oven battery, in lieu of the emission limitations and the compliance dates provided under subparagraphs (B) and (C) of this paragraph. Any such owner or operator shall be legally bound to comply with such emission limitations promulgated under subsection (f) with respect to such coke oven battery as of January 1, 2003. If no such emission limitations have been promulgated for such coke oven battery, the Administrator shall promulgate such emission limitations in accordance with subsection (f) for such coke oven battery.

**(E)** Coke oven batteries qualifying for an extension under subparagraph (A) shall make available not later than January 1, 2000, to the surrounding communities the results of any risk assessment performed by the Administrator to determine the appropriate level of any emission standard established by the Administrator pursuant to subsection (f).

Add.32

**(F)** Notwithstanding the provisions of this section, reconstruction of any source of coke oven emissions qualifying for an extension under this paragraph shall not subject such source to emission limitations under subsection (f) more stringent than those established under subparagraphs (B) and (C) until January 1, 2020. For the purposes of this subparagraph, the term "reconstruction" includes the replacement of existing coke oven battery capacity with new coke oven batteries of comparable or lower capacity and lower potential emissions.

**(j) Equivalent emission limitation by permit**

**(1) Effective date**

The requirements of this subsection shall apply in each State beginning on the effective date of a permit program established pursuant to subchapter V in such State, but not prior to the date 42 months after November 15, 1990.

**(2) Failure to promulgate a standard**

In the event that the Administrator fails to promulgate a standard for a category or subcategory of major sources by the date established pursuant to subsection (e)(1) and (3), and beginning 18 months after such date (but not prior to the effective date of a permit program under subchapter V), the owner or operator of any major source in such category or subcategory shall submit a permit application under paragraph (3) and such owner or operator shall also comply with paragraphs (5) and (6).

**(3) Applications**

By the date established by paragraph (2), the owner or operator of a major source subject to this subsection shall file an application for a permit. If the owner or operator of a source has submitted a timely and complete application for a permit required by this subsection, any failure to have a permit shall not be a violation of paragraph (2), unless the delay in final action is due to the failure of the applicant to timely submit information required or requested to process the application. The Administrator shall not later than 18 months after November 15, 1990, and after notice and opportunity for comment, establish requirements for applications under this subsection including a standard application form and criteria for determining in a timely manner the completeness of applications.

**(4) Review and approval**

Permit applications submitted under this subsection shall be reviewed and approved or disapproved according to the provisions of section 7661d of this title. In the event that the Administrator (or the State) disapproves a permit application submitted under this subsection or determines that the application is incomplete, the applicant shall have up to 6 months to revise the application to meet the objections of the Administrator (or the State).

**(5) Emission limitation**

The permit shall be issued pursuant to subchapter V and shall contain emission limitations for the hazardous air pollutants subject to regulation under this section and emitted by the source that the Administrator (or the State) determines, on a case-by-case basis, to be equivalent to the limitation that would apply to such source if an emission standard had been promulgated in a timely manner under subsection (d). In the alternative, if the applicable criteria are met, the permit may contain an

**Add.33**

emissions limitation established according to the provisions of subsection (i)(5). For purposes of the preceding sentence, the reduction required by subsection (i)(5)(A) shall be achieved by the date on which the relevant standard should have been promulgated under subsection (d). No such pollutant may be emitted in amounts exceeding an emission limitation contained in a permit immediately for new sources and, as expeditiously as practicable, but not later than the date 3 years after the permit is issued for existing sources or such other compliance date as would apply under subsection (i).

**(6) Applicability of subsequent standards**

If the Administrator promulgates an emission standard that is applicable to the major source prior to the date on which a permit application is approved, the emission limitation in the permit shall reflect the promulgated standard rather than the emission limitation determined pursuant to paragraph (5), provided that the source shall have the compliance period provided under subsection (i). If the Administrator promulgates a standard under subsection (d) that would be applicable to the source in lieu of the emission limitation established by permit under this subsection after the date on which the permit has been issued, the Administrator (or the State) shall revise such permit upon the next renewal to reflect the standard promulgated by the Administrator providing such source a reasonable time to comply, but no longer than 8 years after such standard is promulgated or 8 years after the date on which the source is first required to comply with the emissions limitation established by paragraph (5), whichever is earlier.

**(k) Area source program**

**(1) Findings and purpose**

The Congress finds that emissions of hazardous air pollutants from area sources may individually, or in the aggregate, present significant risks to public health in urban areas. Considering the large number of persons exposed and the risks of carcinogenic and other adverse health effects from hazardous air pollutants, ambient concentrations characteristic of large urban areas should be reduced to levels substantially below those currently experienced. It is the purpose of this subsection to achieve a substantial reduction in emissions of hazardous air pollutants from area sources and an equivalent reduction in the public health risks associated with such sources including a reduction of not less than 75 per centum in the incidence of cancer attributable to emissions from such sources.

**(2) Research program**

The Administrator shall, after consultation with State and local air pollution control officials, conduct a program of research with respect to sources of hazardous air pollutants in urban areas and shall include within such program--

**(A)** ambient monitoring for a broad range of hazardous air pollutants (including, but not limited to, volatile organic compounds, metals, pesticides and products of incomplete combustion) in a representative number of urban locations;

**(B)** analysis to characterize the sources of such pollution with a focus on area sources and the contribution that such sources make to public health risks from hazardous air pollutants; and

**(C)** consideration of atmospheric transformation and other factors which can elevate public health risks from such pollutants.

Health effects considered under this program shall include, but not be limited to, carcinogenicity, mutagenicity, teratogenicity, neurotoxicity, reproductive dysfunction and other acute and chronic effects including the role of such pollutants as precursors of ozone or acid aerosol formation. The Administrator shall report the preliminary results of such research not later than 3 years after November 15, 1990.

**(3) National strategy**

**(A)** Considering information collected pursuant to the monitoring program authorized by paragraph (2), the Administrator shall, not later than 5 years after November 15, 1990, and after notice and opportunity for public comment, prepare and transmit to the Congress a comprehensive strategy to control emissions of hazardous air pollutants from area sources in urban areas.

**(B)** The strategy shall--

**(i)** identify not less than 30 hazardous air pollutants which, as the result of emissions from area sources, present the greatest threat to public health in the largest number of urban areas and that are or will be listed pursuant to subsection (b), and

**(ii)** identify the source categories or subcategories emitting such pollutants that are or will be listed pursuant to subsection (c). When identifying categories and subcategories of sources under this subparagraph, the Administrator shall assure that sources accounting for 90 per centum or more of the aggregate emissions of each of the 30 identified hazardous air pollutants are subject to standards pursuant to subsection (d).

**(C)** The strategy shall include a schedule of specific actions to substantially reduce the public health risks posed by the release of hazardous air pollutants from area sources that will be implemented by the Administrator under the authority of this or other laws (including, but not limited to, the Toxic Substances Control Act, the Federal Insecticide, Fungicide and Rodenticide Act and the Resource Conservation and Recovery Act) or by the States. The strategy shall achieve a reduction in the incidence of cancer attributable to exposure to hazardous air pollutants emitted by stationary sources of not less than 75 per centum, considering control of emissions of hazardous air pollutants from all stationary sources and resulting from measures implemented by the Administrator or by the States under this or other laws.

**(D)** The strategy may also identify research needs in monitoring, analytical methodology, modeling or pollution control techniques and recommendations for changes in law that would further the goals and objectives of this subsection.

**(E)** Nothing in this subsection shall be interpreted to preclude or delay implementation of actions with respect to area sources of hazardous air pollutants under consideration pursuant to this or any other law and that may be promulgated before the strategy is prepared.

**(F)** The Administrator shall implement the strategy as expeditiously as practicable assuring that all sources are in compliance with all requirements not later than 9 years after November 15, 1990.

**(G)** As part of such strategy the Administrator shall provide for ambient monitoring and emissions modeling in urban areas as appropriate to demonstrate that the goals and objectives of the strategy are being met.

Add.35

**(4) Areawide activities**

In addition to the national urban air toxics strategy authorized by paragraph (3), the Administrator shall also encourage and support areawide strategies developed by State or local air pollution control agencies that are intended to reduce risks from emissions by area sources within a particular urban area. From the funds available for grants under this section, the Administrator shall set aside not less than 10 per centum to support areawide strategies addressing hazardous air pollutants emitted by area sources and shall award such funds on a demonstration basis to those States with innovative and effective strategies. At the request of State or local air pollution control officials, the Administrator shall prepare guidelines for control technologies or management practices which may be applicable to various categories or subcategories of area sources.

**(5) Report**

The Administrator shall report to the Congress at intervals not later than 8 and 12 years after November 15, 1990, on actions taken under this subsection and other parts of this chapter to reduce the risk to public health posed by the release of hazardous air pollutants from area sources. The reports shall also identify specific metropolitan areas that continue to experience high risks to public health as the result of emissions from area sources.

**(l) State programs**

**(1) In general**

Each State may develop and submit to the Administrator for approval a program for the implementation and enforcement (including a review of enforcement delegations previously granted) of emission standards and other requirements for air pollutants subject to this section or requirements for the prevention and mitigation of accidental releases pursuant to subsection (r). A program submitted by a State under this subsection may provide for partial or complete delegation of the Administrator's authorities and responsibilities to implement and enforce emissions standards and prevention requirements but shall not include authority to set standards less stringent than those promulgated by the Administrator under this chapter.

**(2) Guidance**

Not later than 12 months after November 15, 1990, the Administrator shall publish guidance that would be useful to the States in developing programs for submittal under this subsection. The guidance shall also provide for the registration of all facilities producing, processing, handling or storing any substance listed pursuant to subsection (r) in amounts greater than the threshold quantity. The Administrator shall include as an element in such guidance an optional program begun in 1986 for the review of high-risk point sources of air pollutants including, but not limited to, hazardous air pollutants listed pursuant to subsection (b).

**(3) Technical assistance**

The Administrator shall establish and maintain an air toxics clearinghouse and center to provide technical information and assistance to State and local agencies and, on a cost recovery basis, to others on control technology, health and ecological risk assessment, risk analysis, ambient monitoring and modeling, and emissions measurement and monitoring. The Administrator shall use the authority of section 7403 of this title to examine methods for preventing, measuring, and controlling emissions and evaluating associated health and ecological risks. Where appropriate, such activity shall be conducted with not-for-profit

organizations. The Administrator may conduct research on methods for preventing, measuring and controlling emissions and evaluating associated health and environment risks. All information collected under this paragraph shall be available to the public.

**(4) Grants**

Upon application of a State, the Administrator may make grants, subject to such terms and conditions as the Administrator deems appropriate, to such State for the purpose of assisting the State in developing and implementing a program for submittal and approval under this subsection. Programs assisted under this paragraph may include program elements addressing air pollutants or extremely hazardous substances other than those specifically subject to this section. Grants under this paragraph may include support for high-risk point source review as provided in paragraph (2) and support for the development and implementation of areawide area source programs pursuant to subsection (k).

**(5) Approval or disapproval**

Not later than 180 days after receiving a program submitted by a State, and after notice and opportunity for public comment, the Administrator shall either approve or disapprove such program. The Administrator shall disapprove any program submitted by a State, if the Administrator determines that--

**(A)** the authorities contained in the program are not adequate to assure compliance by all sources within the State with each applicable standard, regulation or requirement established by the Administrator under this section;

**(B)** adequate authority does not exist, or adequate resources are not available, to implement the program;

**(C)** the schedule for implementing the program and assuring compliance by affected sources is not sufficiently expeditious; or

**(D)** the program is otherwise not in compliance with the guidance issued by the Administrator under paragraph (2) or is not likely to satisfy, in whole or in part, the objectives of this chapter.

If the Administrator disapproves a State program, the Administrator shall notify the State of any revisions or modifications necessary to obtain approval. The State may revise and resubmit the proposed program for review and approval pursuant to the provisions of this subsection.

**(6) Withdrawal**

Whenever the Administrator determines, after public hearing, that a State is not administering and enforcing a program approved pursuant to this subsection in accordance with the guidance published pursuant to paragraph (2) or the requirements of paragraph (5), the Administrator shall so notify the State and, if action which will assure prompt compliance is not taken within 90 days, the Administrator shall withdraw approval of the program. The Administrator shall not withdraw approval of any program unless the State shall have been notified and the reasons for withdrawal shall have been stated in writing and made public.

**Add.37**

**(7) Authority to enforce**

Nothing in this subsection shall prohibit the Administrator from enforcing any applicable emission standard or requirement under this section.

**(8) Local program**

The Administrator may, after notice and opportunity for public comment, approve a program developed and submitted by a local air pollution control agency (after consultation with the State) pursuant to this subsection and any such agency implementing an approved program may take any action authorized to be taken by a State under this section.

**(9) Permit authority**

Nothing in this subsection shall affect the authorities and obligations of the Administrator or the State under subchapter V.

**(m) Atmospheric deposition to Great Lakes and coastal waters**

**(1) Deposition assessment**

The Administrator, in cooperation with the Under Secretary of Commerce for Oceans and Atmosphere, shall conduct a program to identify and assess the extent of atmospheric deposition of hazardous air pollutants (and in the discretion of the Administrator, other air pollutants) to the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters. As part of such program, the Administrator shall--

**(A)** monitor the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters, including monitoring of the Great Lakes through the monitoring network established pursuant to paragraph (2) of this subsection and designing and deploying an atmospheric monitoring network for coastal waters pursuant to paragraph (4);

**(B)** investigate the sources and deposition rates of atmospheric deposition of air pollutants (and their atmospheric transformation precursors);

**(C)** conduct research to develop and improve monitoring methods and to determine the relative contribution of atmospheric pollutants to total pollution loadings to the Great Lakes, the Chesapeake Bay, Lake Champlain, and coastal waters;

**(D)** evaluate any adverse effects to public health or the environment caused by such deposition (including effects resulting from indirect exposure pathways) and assess the contribution of such deposition to violations of water quality standards established pursuant to the Federal Water Pollution Control Act and drinking water standards established pursuant to the Safe Drinking Water Act; and

**(E)** sample for such pollutants in biota, fish, and wildlife of the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters and characterize the sources of such pollutants.

**(2) Great Lakes monitoring network**

The Administrator shall oversee, in accordance with Annex 15 of the Great Lakes Water Quality Agreement, the establishment and operation of a Great Lakes atmospheric deposition network to monitor atmospheric deposition of hazardous air pollutants (and in the Administrator's discretion, other air pollutants) to the Great Lakes.

**(A)** As part of the network provided for in this paragraph, and not later than December 31, 1991, the Administrator shall establish in each of the 5 Great Lakes at least 1 facility capable of monitoring the atmospheric deposition of hazardous air pollutants in both dry and wet conditions.

**(B)** The Administrator shall use the data provided by the network to identify and track the movement of hazardous air pollutants through the Great Lakes, to determine the portion of water pollution loadings attributable to atmospheric deposition of such pollutants, and to support development of remedial action plans and other management plans as required by the Great Lakes Water Quality Agreement.

**(C)** The Administrator shall assure that the data collected by the Great Lakes atmospheric deposition monitoring network is in a format compatible with databases sponsored by the International Joint Commission, Canada, and the several States of the Great Lakes region.

**(3) Monitoring for the Chesapeake Bay and Lake Champlain**

The Administrator shall establish at the Chesapeake Bay and Lake Champlain atmospheric deposition stations to monitor deposition of hazardous air pollutants (and in the Administrator's discretion, other air pollutants) within the Chesapeake Bay and Lake Champlain watersheds. The Administrator shall determine the role of air deposition in the pollutant loadings of the Chesapeake Bay and Lake Champlain, investigate the sources of air pollutants deposited in the watersheds, evaluate the health and environmental effects of such pollutant loadings, and shall sample such pollutants in biota, fish and wildlife within the watersheds, as necessary to characterize such effects.

**(4) Monitoring for coastal waters**

The Administrator shall design and deploy atmospheric deposition monitoring networks for coastal waters and their watersheds and shall make any information collected through such networks available to the public. As part of this effort, the Administrator shall conduct research to develop and improve deposition monitoring methods, and to determine the relative contribution of atmospheric pollutants to pollutant loadings. For purposes of this subsection, "coastal waters" shall mean estuaries selected pursuant to section 320(a)(2)(A) of the Federal Water Pollution Control Act or listed pursuant to section 320(a)(2)(B) of such Act or estuarine research reserves designated pursuant to section 1461 of Title 16.

**(5) Report**

Within 3 years of November 15, 1990, and biennially thereafter, the Administrator, in cooperation with the Under Secretary of Commerce for Oceans and Atmosphere, shall submit to the Congress a report on the results of any monitoring, studies, and investigations conducted pursuant to this subsection. Such report shall include, at a minimum, an assessment of--

**(A)** the contribution of atmospheric deposition to pollution loadings in the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters;

**(B)** the environmental and public health effects of any pollution which is attributable to atmospheric deposition to the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters;

**(C)** the source or sources of any pollution to the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters which is attributable to atmospheric deposition;

**(D)** whether pollution loadings in the Great Lakes, the Chesapeake Bay, Lake Champlain or coastal waters cause or contribute to exceedances of drinking water standards pursuant to the Safe Drinking Water Act or water quality standards pursuant to the Federal Water Pollution Control Act or, with respect to the Great Lakes, exceedances of the specific objectives of the Great Lakes Water Quality Agreement; and

**(E)** a description of any revisions of the requirements, standards, and limitations pursuant to this chapter and other applicable Federal laws as are necessary to assure protection of human health and the environment.

**(6) Additional regulation**

As part of the report to Congress, the Administrator shall determine whether the other provisions of this section are adequate to prevent serious adverse effects to public health and serious or widespread environmental effects, including such effects resulting from indirect exposure pathways, associated with atmospheric deposition to the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters of hazardous air pollutants (and their atmospheric transformation products). The Administrator shall take into consideration the tendency of such pollutants to bioaccumulate. Within 5 years after November 15, 1990, the Administrator shall, based on such report and determination, promulgate, in accordance with this section, such further emission standards or control measures as may be necessary and appropriate to prevent such effects, including effects due to bioaccumulation and indirect exposure pathways. Any requirements promulgated pursuant to this paragraph with respect to coastal waters shall only apply to the coastal waters of the States which are subject to section 7627(a) of this title.

**(n) Other provisions**

**(1) Electric utility steam generating units**

**(A)** The Administrator shall perform a study of the hazards to public health reasonably anticipated to occur as a result of emissions by electric utility steam generating units of pollutants listed under subsection (b) after imposition of the requirements of this chapter. The Administrator shall report the results of this study to the Congress within 3 years after November 15, 1990. The Administrator shall develop and describe in the Administrator's report to Congress alternative control strategies for emissions which may warrant regulation under this section. The Administrator shall regulate electric utility steam generating units under this section, if the Administrator finds such regulation is appropriate and necessary after considering the results of the study required by this subparagraph.

**(B)** The Administrator shall conduct, and transmit to the Congress not later than 4 years after November 15, 1990, a study of mercury emissions from electric utility steam generating units, municipal waste combustion units, and other sources, including area sources. Such study shall consider the rate and mass of such emissions, the health and environmental effects of such emissions, technologies which are available to control such emissions, and the costs of such technologies.

**(C)** The National Institute of Environmental Health Sciences shall conduct, and transmit to the Congress not later than 3 years after November 15, 1990, a study to determine the threshold level of mercury exposure below which adverse human health effects are not expected to occur. Such study shall include a threshold for mercury concentrations in the tissue of fish which may be consumed (including consumption by sensitive populations) without adverse effects to public health.

**(2) Coke oven production technology study**

**(A)** The Secretary of the Department of Energy and the Administrator shall jointly undertake a 6-year study to assess coke oven production emission control technologies and to assist in the development and commercialization of technically practicable and economically viable control technologies which have the potential to significantly reduce emissions of hazardous air pollutants from coke oven production facilities. In identifying control technologies, the Secretary and the Administrator shall consider the range of existing coke oven operations and battery design and the availability of sources of materials for such coke ovens as well as alternatives to existing coke oven production design.

**(B)** The Secretary and the Administrator are authorized to enter into agreements with persons who propose to develop, install and operate coke production emission control technologies which have the potential for significant emissions reductions of hazardous air pollutants provided that Federal funds shall not exceed 50 per centum of the cost of any project assisted pursuant to this paragraph.

**(C)** On completion of the study, the Secretary shall submit to Congress a report on the results of the study and shall make recommendations to the Administrator identifying practicable and economically viable control technologies for coke oven production facilities to reduce residual risks remaining after implementation of the standard under subsection (d).

**(D)** There are authorized to be appropriated $5,000,000 for each of the fiscal years 1992 through 1997 to carry out the program authorized by this paragraph.

**(3) Publicly owned treatment works**

The Administrator may conduct, in cooperation with the owners and operators of publicly owned treatment works, studies to characterize emissions of hazardous air pollutants emitted by such facilities, to identify industrial, commercial and residential discharges that contribute to such emissions and to demonstrate control measures for such emissions. When promulgating any standard under this section applicable to publicly owned treatment works, the Administrator may provide for control measures that include pretreatment of discharges causing emissions of hazardous air pollutants and process or product substitutions or limitations that may be effective in reducing such emissions. The Administrator may prescribe uniform sampling, modeling and risk assessment methods for use in implementing this subsection.

**(4) Oil and gas wells; pipeline facilities**

(A) Notwithstanding the provisions of subsection (a), emissions from any oil or gas exploration or production well (with its associated equipment) and emissions from any pipeline compressor or pump station shall not be aggregated with emissions from other similar units, whether or not such units are in a contiguous area or under common control, to determine whether such units or stations are major sources, and in the case of any oil or gas exploration or production well (with its associated equipment), such emissions shall not be aggregated for any purpose under this section.

(B) The Administrator shall not list oil and gas production wells (with its associated equipment) as an area source category under subsection (c), except that the Administrator may establish an area source category for oil and gas production wells located in any metropolitan statistical area or consolidated metropolitan statistical area with a population in excess of 1 million, if the Administrator determines that emissions of hazardous air pollutants from such wells present more than a negligible risk of adverse effects to public health.

### (5) Hydrogen sulfide

The Administrator is directed to assess the hazards to public health and the environment resulting from the emission of hydrogen sulfide associated with the extraction of oil and natural gas resources. To the extent practicable, the assessment shall build upon and not duplicate work conducted for an assessment pursuant to section 8002(m) of the Solid Waste Disposal Act and shall reflect consultation with the States. The assessment shall include a review of existing State and industry control standards, techniques and enforcement. The Administrator shall report to the Congress within 24 months after November 15, 1990, with the findings of such assessment, together with any recommendations, and shall, as appropriate, develop and implement a control strategy for emissions of hydrogen sulfide to protect human health and the environment, based on the findings of such assessment, using authorities under this chapter including sections [3] 7411 of this title and this section.

### (6) Hydrofluoric acid

Not later than 2 years after November 15, 1990, the Administrator shall, for those regions of the country which do not have comprehensive health and safety regulations with respect to hydrofluoric acid, complete a study of the potential hazards of hydrofluoric acid and the uses of hydrofluoric acid in industrial and commercial applications to public health and the environment considering a range of events including worst-case accidental releases and shall make recommendations to the Congress for the reduction of such hazards, if appropriate.

### (7) RCRA facilities

In the case of any category or subcategory of sources the air emissions of which are regulated under subtitle C of the Solid Waste Disposal Act, the Administrator shall take into account any regulations of such emissions which are promulgated under such subtitle and shall, to the maximum extent practicable and consistent with the provisions of this section, ensure that the requirements of such subtitle and this section are consistent.

## (o) National Academy of Sciences study

### (1) Request of the Academy

Within 3 months of November 15, 1990, the Administrator shall enter into appropriate arrangements with the National Academy of Sciences to conduct a review of--

**(A)** risk assessment methodology used by the Environmental Protection Agency to determine the carcinogenic risk associated with exposure to hazardous air pollutants from source categories and subcategories subject to the requirements of this section; and

**(B)** improvements in such methodology.

**(2) Elements to be studied**

In conducting such review, the National Academy of Sciences should consider, but not be limited to, the following--

**(A)** the techniques used for estimating and describing the carcinogenic potency to humans of hazardous air pollutants; and

**(B)** the techniques used for estimating exposure to hazardous air pollutants (for hypothetical and actual maximally exposed individuals as well as other exposed individuals).

**(3) Other health effects of concern**

To the extent practicable, the Academy shall evaluate and report on the methodology for assessing the risk of adverse human health effects other than cancer for which safe thresholds of exposure may not exist, including, but not limited to, inheritable genetic mutations, birth defects, and reproductive dysfunctions.

**(4) Report**

A report on the results of such review shall be submitted to the Senate Committee on Environment and Public Works, the House Committee on Energy and Commerce, the Risk Assessment and Management Commission established by section 303 of the Clean Air Act Amendments of 1990 and the Administrator not later than 30 months after November 15, 1990.

**(5) Assistance**

The Administrator shall assist the Academy in gathering any information the Academy deems necessary to carry out this subsection. The Administrator may use any authority under this chapter to obtain information from any person, and to require any person to conduct tests, keep and produce records, and make reports respecting research or other activities conducted by such person as necessary to carry out this subsection.

**(6) Authorization**

Of the funds authorized to be appropriated to the Administrator by this chapter, such amounts as are required shall be available to carry out this subsection.

**(7) Guidelines for carcinogenic risk assessment**

Add.43

The Administrator shall consider, but need not adopt, the recommendations contained in the report of the National Academy of Sciences prepared pursuant to this subsection and the views of the Science Advisory Board, with respect to such report. Prior to the promulgation of any standard under subsection (f), and after notice and opportunity for comment, the Administrator shall publish revised Guidelines for Carcinogenic Risk Assessment or a detailed explanation of the reasons that any recommendations contained in the report of the National Academy of Sciences will not be implemented. The publication of such revised Guidelines shall be a final Agency action for purposes of section 7607 of this title.

**(p) Mickey Leland National Urban Air Toxics Research Center**

**(1) Establishment**

The Administrator shall oversee the establishment of a National Urban Air Toxics Research Center, to be located at a university, a hospital, or other facility capable of undertaking and maintaining similar research capabilities in the areas of epidemiology, oncology, toxicology, pulmonary medicine, pathology, and biostatistics. The center shall be known as the Mickey Leland National Urban Air Toxics Research Center. The geographic site of the National Urban Air Toxics Research Center should be further directed to Harris County, Texas, in order to take full advantage of the well developed scientific community presence on-site at the Texas Medical Center as well as the extensive data previously compiled for the comprehensive monitoring system currently in place.

**(2) Board of Directors**

The National Urban Air Toxics Research Center shall be governed by a Board of Directors to be comprised of 9 members, the appointment of which shall be allocated pro rata among the Speaker of the House, the Majority Leader of the Senate and the President. The members of the Board of Directors shall be selected based on their respective academic and professional backgrounds and expertise in matters relating to public health, environmental pollution and industrial hygiene. The duties of the Board of Directors shall be to determine policy and research guidelines, submit views from center sponsors and the public and issue periodic reports of center findings and activities.

**(3) Scientific Advisory Panel**

The Board of Directors shall be advised by a Scientific Advisory Panel, the 13 members of which shall be appointed by the Board, and to include eminent members of the scientific and medical communities. The Panel membership may include scientists with relevant experience from the National Institute of Environmental Health Sciences, the Center for Disease Control, the Environmental Protection Agency, the National Cancer Institute, and others, and the Panel shall conduct peer review and evaluate research results. The Panel shall assist the Board in developing the research agenda, reviewing proposals and applications, and advise on the awarding of research grants.

**(4) Funding**

The center shall be established and funded with both Federal and private source funds.

**(q) Savings provision**

**(1) Standards previously promulgated**

Any standard under this section in effect before the date of enactment of the Clean Air Act Amendments of 1990 shall remain in force and effect after such date unless modified as provided in this section before the date of enactment of such Amendments or under such Amendments. Except as provided in paragraph (4), any standard under this section which has been promulgated, but has not taken effect, before such date shall not be affected by such Amendments unless modified as provided in this section before such date or under such Amendments. Each such standard shall be reviewed and, if appropriate, revised, to comply with the requirements of subsection (d) within 10 years after the date of enactment of the Clean Air Act Amendments of 1990. If a timely petition for review of any such standard under section 7607 of this title is pending on such date of enactment, the standard shall be upheld if it complies with this section as in effect before that date. If any such standard is remanded to the Administrator, the Administrator may in the Administrator's discretion apply either the requirements of this section, or those of this section as in effect before the date of enactment of the Clean Air Act Amendments of 1990.

**(2) Special rule**

Notwithstanding paragraph (1), no standard shall be established under this section, as amended by the Clean Air Act Amendments of 1990, for radionuclide emissions from (A) elemental phosphorous plants, (B) grate calcination elemental phosphorous plants, (C) phosphogypsum stacks, or (D) any subcategory of the foregoing. This section, as in effect prior to the date of enactment of the Clean Air Act Amendments of 1990, shall remain in effect for radionuclide emissions from such plants and stacks.

**(3) Other categories**

Notwithstanding paragraph (1), this section, as in effect prior to the date of enactment of the Clean Air Act Amendments of 1990, shall remain in effect for radionuclide emissions from non-Department of Energy Federal facilities that are not licensed by the Nuclear Regulatory Commission, coal-fired utility and industrial boilers, underground uranium mines, surface uranium mines, and disposal of uranium mill tailings piles, unless the Administrator, in the Administrator's discretion, applies the requirements of this section as modified by the Clean Air Act Amendments of 1990 to such sources of radionuclides.

**(4) Medical facilities**

Notwithstanding paragraph (1), no standard promulgated under this section prior to November 15, 1990, with respect to medical research or treatment facilities shall take effect for two years following November 15, 1990, unless the Administrator makes a determination pursuant to a rulemaking under subsection (d)(9). If the Administrator determines that the regulatory program established by the Nuclear Regulatory Commission for such facilities does not provide an ample margin of safety to protect public health, the requirements of this section shall fully apply to such facilities. If the Administrator determines that such regulatory program does provide an ample margin of safety to protect the public health, the Administrator is not required to promulgate a standard under this section for such facilities, as provided in subsection (d)(9).

**(r) Prevention of accidental releases**

**(1) Purpose and general duty**

It shall be the objective of the regulations and programs authorized under this subsection to prevent the accidental release and to minimize the consequences of any such release of any substance listed pursuant to paragraph (3) or any other extremely hazardous substance. The owners and operators of stationary sources producing, processing, handling or storing such substances have a general duty in the same manner and to the same extent as section 654 of Title 29 to identify hazards

which may result from such releases using appropriate hazard assessment techniques, to design and maintain a safe facility taking such steps as are necessary to prevent releases, and to minimize the consequences of accidental releases which do occur. For purposes of this paragraph, the provisions of section 7604 of this title shall not be available to any person or otherwise be construed to be applicable to this paragraph. Nothing in this section shall be interpreted, construed, implied or applied to create any liability or basis for suit for compensation for bodily injury or any other injury or property damages to any person which may result from accidental releases of such substances.

**(2) Definitions**

**(A)** The term "accidental release" means an unanticipated emission of a regulated substance or other extremely hazardous substance into the ambient air from a stationary source.

**(B)** The term "regulated substance" means a substance listed under paragraph (3).

**(C)** The term "stationary source" means any buildings, structures, equipment, installations or substance emitting stationary activities (i) which belong to the same industrial group, (ii) which are located on one or more contiguous properties, (iii) which are under the control of the same person (or persons under common control), and (iv) from which an accidental release may occur.

**(D)** The term "retail facility" means a stationary source at which more than one-half of the income is obtained from direct sales to end users or at which more than one-half of the fuel sold, by volume, is sold through a cylinder exchange program.

**(3) List of substances**

The Administrator shall promulgate not later than 24 months after November 15, 1990, an initial list of 100 substances which, in the case of an accidental release, are known to cause or may reasonably be anticipated to cause death, injury, or serious adverse effects to human health or the environment. For purposes of promulgating such list, the Administrator shall use, but is not limited to, the list of extremely hazardous substances published under the Emergency Planning and Community Right-to-Know [6] Act of 1986, with such modifications as the Administrator deems appropriate. The initial list shall include chlorine, anhydrous ammonia, methyl chloride, ethylene oxide, vinyl chloride, methyl isocyanate, hydrogen cyanide, ammonia, hydrogen sulfide, toluene diisocyanate, phosgene, bromine, anhydrous hydrogen chloride, hydrogen fluoride, anhydrous sulfur dioxide, and sulfur trioxide. The initial list shall include at least 100 substances which pose the greatest risk of causing death, injury, or serious adverse effects to human health or the environment from accidental releases. Regulations establishing the list shall include an explanation of the basis for establishing the list. The list may be revised from time to time by the Administrator on the Administrator's own motion or by petition and shall be reviewed at least every 5 years. No air pollutant for which a national primary ambient air quality standard has been established shall be included on any such list. No substance, practice, process, or activity regulated under subchapter VI shall be subject to regulations under this subsection. The Administrator shall establish procedures for the addition and deletion of substances from the list established under this paragraph consistent with those applicable to the list in subsection (b).

**(4) Factors to be considered**

In listing substances under paragraph (3), the Administrator--

**(A)** shall consider--

**(i)** the severity of any acute adverse health effects associated with accidental releases of the substance;

**(ii)** the likelihood of accidental releases of the substance; and

**(iii)** the potential magnitude of human exposure to accidental releases of the substance; and

**(B)** shall not list a flammable substance when used as a fuel or held for sale as a fuel at a retail facility under this subsection solely because of the explosive or flammable properties of the substance, unless a fire or explosion caused by the substance will result in acute adverse health effects from human exposure to the substance, including the unburned fuel or its combustion byproducts, other than those caused by the heat of the fire or impact of the explosion.

**(5) Threshold quantity**

At the time any substance is listed pursuant to paragraph (3), the Administrator shall establish by rule, a threshold quantity for the substance, taking into account the toxicity, reactivity, volatility, dispersibility, combustibility, or flammability of the substance and the amount of the substance which, as a result of an accidental release, is known to cause or may reasonably be anticipated to cause death, injury or serious adverse effects to human health for which the substance was listed. The Administrator is authorized to establish a greater threshold quantity for, or to exempt entirely, any substance that is a nutrient used in agriculture when held by a farmer.

**(6) Chemical Safety Board**

**(A)** There is hereby established an independent safety board to be known as the Chemical Safety and Hazard Investigation Board.

**(B)** The Board shall consist of 5 members, including a Chairperson, who shall be appointed by the President, by and with the advice and consent of the Senate. Members of the Board shall be appointed on the basis of technical qualification, professional standing, and demonstrated knowledge in the fields of accident reconstruction, safety engineering, human factors, toxicology, or air pollution regulation. The terms of office of members of the Board shall be 5 years. Any member of the Board, including the Chairperson, may be removed for inefficiency, neglect of duty, or malfeasance in office. The Chairperson shall be the Chief Executive Officer of the Board and shall exercise the executive and administrative functions of the Board.

**(C)** The Board shall--

**(i)** investigate (or cause to be investigated), determine and report to the public in writing the facts, conditions, and circumstances and the cause or probable cause of any accidental release resulting in a fatality, serious injury or substantial property damages;

**(ii)** issue periodic reports to the Congress, Federal, State and local agencies, including the Environmental Protection Agency and the Occupational Safety and Health Administration, concerned with the safety of chemical production, processing, handling and storage, and other interested persons recommending measures to reduce the likelihood or the consequences of accidental releases and proposing corrective steps to make chemical production, processing, handling and storage as safe and free from risk of injury as is possible and may include in such reports proposed rules or orders which should be issued by the Administrator under the authority of this section or the Secretary of Labor under the Occupational Safety and Health Act to prevent or minimize the consequences of any release of substances that may cause death, injury or other serious adverse effects on human health or substantial property damage as the result of an accidental release; and

**(iii)** establish by regulation requirements binding on persons for reporting accidental releases into the ambient air subject to the Board's investigatory jurisdiction. Reporting releases to the National Response Center, in lieu of the Board directly, shall satisfy such regulations. The National Response Center shall promptly notify the Board of any releases which are within the Board's jurisdiction.

**(D)** The Board may utilize the expertise and experience of other agencies.

**(E)** The Board shall coordinate its activities with investigations and studies conducted by other agencies of the United States having a responsibility to protect public health and safety. The Board shall enter into a memorandum of understanding with the National Transportation Safety Board to assure coordination of functions and to limit duplication of activities which shall designate the National Transportation Safety Board as the lead agency for the investigation of releases which are transportation related. The Board shall not be authorized to investigate marine oil spills, which the National Transportation Safety Board is authorized to investigate. The Board shall enter into a memorandum of understanding with the Occupational Safety and Health Administration so as to limit duplication of activities. In no event shall the Board forego an investigation where an accidental release causes a fatality or serious injury among the general public, or had the potential to cause substantial property damage or a number of deaths or injuries among the general public.

**(F)** The Board is authorized to conduct research and studies with respect to the potential for accidental releases, whether or not an accidental release has occurred, where there is evidence which indicates the presence of a potential hazard or hazards. To the extent practicable, the Board shall conduct such studies in cooperation with other Federal agencies having emergency response authorities, State and local governmental agencies and associations and organizations from the industrial, commercial, and nonprofit sectors.

**(G)** No part of the conclusions, findings, or recommendations of the Board relating to any accidental release or the investigation thereof shall be admitted as evidence or used in any action or suit for damages arising out of any matter mentioned in such report.

**(H)** Not later than 18 months after November 15, 1990, the Board shall publish a report accompanied by recommendations to the Administrator on the use of hazard assessments in preventing the occurrence and minimizing the consequences of accidental releases of extremely hazardous substances. The recommendations shall include a list of extremely hazardous substances which are not regulated substances (including threshold quantities for such substances) and categories of stationary sources for which hazard assessments would be an appropriate measure to aid in the prevention of accidental releases and to minimize the consequences of those releases that do occur. The recommendations shall also include a description of the information and analysis which would be appropriate to include in any hazard assessment. The Board shall also make

recommendations with respect to the role of risk management plans as required by paragraph (8)(B) [4] in preventing accidental releases. The Board may from time to time review and revise its recommendations under this subparagraph.

**(I)** Whenever the Board submits a recommendation with respect to accidental releases to the Administrator, the Administrator shall respond to such recommendation formally and in writing not later than 180 days after receipt thereof. The response to the Board's recommendation by the Administrator shall indicate whether the Administrator will--

**(i)** initiate a rulemaking or issue such orders as are necessary to implement the recommendation in full or in part, pursuant to any timetable contained in the recommendation; [7]

**(ii)** decline to initiate a rulemaking or issue orders as recommended.

Any determination by the Administrator not to implement a recommendation of the Board or to implement a recommendation only in part, including any variation from the schedule contained in the recommendation, shall be accompanied by a statement from the Administrator setting forth the reasons for such determination.

**(J)** The Board may make recommendations with respect to accidental releases to the Secretary of Labor. Whenever the Board submits such recommendation, the Secretary shall respond to such recommendation formally and in writing not later than 180 days after receipt thereof. The response to the Board's recommendation by the Administrator [8] shall indicate whether the Secretary will--

**(i)** initiate a rulemaking or issue such orders as are necessary to implement the recommendation in full or in part, pursuant to any timetable contained in the recommendation; [7]

**(ii)** decline to initiate a rulemaking or issue orders as recommended.

Any determination by the Secretary not to implement a recommendation or to implement a recommendation only in part, including any variation from the schedule contained in the recommendation, shall be accompanied by a statement from the Secretary setting forth the reasons for such determination.

**(K)** Within 2 years after November 15, 1990, the Board shall issue a report to the Administrator of the Environmental Protection Agency and to the Administrator of the Occupational Safety and Health Administration recommending the adoption of regulations for the preparation of risk management plans and general requirements for the prevention of accidental releases of regulated substances into the ambient air (including recommendations for listing substances under paragraph (3)) and for the mitigation of the potential adverse effect on human health or the environment as a result of accidental releases which should be applicable to any stationary source handling any regulated substance in more than threshold amounts. The Board may include proposed rules or orders which should be issued by the Administrator under authority of this subsection or by the Secretary of Labor under the Occupational Safety and Health Act. Any such recommendations shall be specific and shall identify the regulated substance or class of regulated substances (or other substances) to which the recommendations apply. The Administrator shall consider such recommendations before promulgating regulations required by paragraph (7) (B).

**(L)** The Board, or upon authority of the Board, any member thereof, any administrative law judge employed by or assigned to the Board, or any officer or employee duly designated by the Board, may for the purpose of carrying out duties authorized by subparagraph (C)--

**(i)** hold such hearings, sit and act at such times and places, administer such oaths, and require by subpoena or otherwise attendance and testimony of such witnesses and the production of evidence and may require by order that any person engaged in the production, processing, handling, or storage of extremely hazardous substances submit written reports and responses to requests and questions within such time and in such form as the Board may require; and

**(ii)** upon presenting appropriate credentials and a written notice of inspection authority, enter any property where an accidental release causing a fatality, serious injury or substantial property damage has occurred and do all things therein necessary for a proper investigation pursuant to subparagraph (C) and inspect at reasonable times records, files, papers, processes, controls, and facilities and take such samples as are relevant to such investigation.

Whenever the Administrator or the Board conducts an inspection of a facility pursuant to this subsection, employees and their representatives shall have the same rights to participate in such inspections as provided in the Occupational Safety and Health Act.

**(M)** In addition to that described in subparagraph (L), the Board may use any information gathering authority of the Administrator under this chapter, including the subpoena power provided in section 7607(a)(1) of this title.

**(N)** The Board is authorized to establish such procedural and administrative rules as are necessary to the exercise of its functions and duties. The Board is authorized without regard to section 6101 of Title 41 to enter into contracts, leases, cooperative agreements or other transactions as may be necessary in the conduct of the duties and functions of the Board with any other agency, institution, or person.

**(O)** After the effective date of any reporting requirement promulgated pursuant to subparagraph (C)(iii) it shall be unlawful for any person to fail to report any release of any extremely hazardous substance as required by such subparagraph. The Administrator is authorized to enforce any regulation or requirements established by the Board pursuant to subparagraph (C) (iii) using the authorities of sections 7413 and 7414 of this title. Any request for information from the owner or operator of a stationary source made by the Board or by the Administrator under this section shall be treated, for purposes of sections 7413, 7414, 7416, 7420, 7603, 7604 and 7607 of this title and any other enforcement provisions of this chapter, as a request made by the Administrator under section 7414 of this title and may be enforced by the Chairperson of the Board or by the Administrator as provided in such section.

**(P)** The Administrator shall provide to the Board such support and facilities as may be necessary for operation of the Board.

**(Q)** Consistent with subsection (G) [5] and section 7414(c) of this title any records, reports or information obtained by the Board shall be available to the Administrator, the Secretary of Labor, the Congress and the public, except that upon a showing satisfactory to the Board by any person that records, reports, or information, or particular part thereof (other than release or emissions data) to which the Board has access, if made public, is likely to cause substantial harm to the person's competitive position, the Board shall consider such record, report, or information or particular portion thereof confidential in accordance with section 1905 of Title 18, except that such record, report, or information may be disclosed to other officers, employees,

Add.50

and authorized representatives of the United States concerned with carrying out this chapter or when relevant under any proceeding under this chapter. This subparagraph does not constitute authority to withhold records, reports, or information from the Congress.

**(R)** Whenever the Board submits or transmits any budget estimate, budget request, supplemental budget request, or other budget information, legislative recommendation, prepared testimony for congressional hearings, recommendation or study to the President, the Secretary of Labor, the Administrator, or the Director of the Office of Management and Budget, it shall concurrently transmit a copy thereof to the Congress. No report of the Board shall be subject to review by the Administrator or any Federal agency or to judicial review in any court. No officer or agency of the United States shall have authority to require the Board to submit its budget requests or estimates, legislative recommendations, prepared testimony, comments, recommendations or reports to any officer or agency of the United States for approval or review prior to the submission of such recommendations, testimony, comments or reports to the Congress. In the performance of their functions as established by this chapter, the members, officers and employees of the Board shall not be responsible to or subject to supervision or direction, in carrying out any duties under this subsection, of any officer or employee or agent of the Environmental Protection Agency, the Department of Labor or any other agency of the United States except that the President may remove any member, officer or employee of the Board for inefficiency, neglect of duty or malfeasance in office. Nothing in this section shall affect the application of Title 5 to officers or employees of the Board.

**(S)** The Board shall submit an annual report to the President and to the Congress which shall include, but not be limited to, information on accidental releases which have been investigated by or reported to the Board during the previous year, recommendations for legislative or administrative action which the Board has made, the actions which have been taken by the Administrator or the Secretary of Labor or the heads of other agencies to implement such recommendations, an identification of priorities for study and investigation in the succeeding year, progress in the development of risk-reduction technologies and the response to and implementation of significant research findings on chemical safety in the public and private sector.

**(7) Accident prevention**

**(A)** In order to prevent accidental releases of regulated substances, the Administrator is authorized to promulgate release prevention, detection, and correction requirements which may include monitoring, record-keeping, reporting, training, vapor recovery, secondary containment, and other design, equipment, work practice, and operational requirements. Regulations promulgated under this paragraph may make distinctions between various types, classes, and kinds of facilities, devices and systems taking into consideration factors including, but not limited to, the size, location, process, process controls, quantity of substances handled, potency of substances, and response capabilities present at any stationary source. Regulations promulgated pursuant to this subparagraph shall have an effective date, as determined by the Administrator, assuring compliance as expeditiously as practicable.

**(B)(i)** Within 3 years after November 15, 1990, the Administrator shall promulgate reasonable regulations and appropriate guidance to provide, to the greatest extent practicable, for the prevention and detection of accidental releases of regulated substances and for response to such releases by the owners or operators of the sources of such releases. The Administrator shall utilize the expertise of the Secretaries of Transportation and Labor in promulgating such regulations. As appropriate, such regulations shall cover the use, operation, repair, replacement, and maintenance of equipment to monitor, detect, inspect, and control such releases, including training of persons in the use and maintenance of such equipment and in the conduct of periodic inspections. The regulations shall include procedures and measures for emergency response after an accidental release of a regulated substance in order to protect human health and the environment. The regulations shall cover storage, as well as operations. The regulations shall, as appropriate, recognize differences in size, operations, processes, class and categories of sources and the voluntary actions of such sources to prevent such releases and respond to such releases. The

Add.51

regulations shall be applicable to a stationary source 3 years after the date of promulgation, or 3 years after the date on which a regulated substance present at the source in more than threshold amounts is first listed under paragraph (3), whichever is later.

**(ii)** The regulations under this subparagraph shall require the owner or operator of stationary sources at which a regulated substance is present in more than a threshold quantity to prepare and implement a risk management plan to detect and prevent or minimize accidental releases of such substances from the stationary source, and to provide a prompt emergency response to any such releases in order to protect human health and the environment. Such plan shall provide for compliance with the requirements of this subsection and shall also include each of the following:

**(I)** a hazard assessment to assess the potential effects of an accidental release of any regulated substance. This assessment shall include an estimate of potential release quantities and a determination of downwind effects, including potential exposures to affected populations. Such assessment shall include a previous release history of the past 5 years, including the size, concentration, and duration of releases, and shall include an evaluation of worst case accidental releases;

**(II)** a program for preventing accidental releases of regulated substances, including safety precautions and maintenance, monitoring and employee training measures to be used at the source; and

**(III)** a response program providing for specific actions to be taken in response to an accidental release of a regulated substance so as to protect human health and the environment, including procedures for informing the public and local agencies responsible for responding to accidental releases, emergency health care, and employee training measures.

At the time regulations are promulgated under this subparagraph, the Administrator shall promulgate guidelines to assist stationary sources in the preparation of risk management plans. The guidelines shall, to the extent practicable, include model risk management plans.

**(iii)** The owner or operator of each stationary source covered by clause (ii) shall register a risk management plan prepared under this subparagraph with the Administrator before the effective date of regulations under clause (i) in such form and manner as the Administrator shall, by rule, require. Plans prepared pursuant to this subparagraph shall also be submitted to the Chemical Safety and Hazard Investigation Board, to the State in which the stationary source is located, and to any local agency or entity having responsibility for planning for or responding to accidental releases which may occur at such source, and shall be available to the public under section 7414(c) of this title. The Administrator shall establish, by rule, an auditing system to regularly review and, if necessary, require revision in risk management plans to assure that the plans comply with this subparagraph. Each such plan shall be updated periodically as required by the Administrator, by rule.

**(C)** Any regulations promulgated pursuant to this subsection shall to the maximum extent practicable, consistent with this subsection, be consistent with the recommendations and standards established by the American Society of Mechanical Engineers (ASME), the American National Standards Institute (ANSI) or the American Society of Testing Materials (ASTM). The Administrator shall take into consideration the concerns of small business in promulgating regulations under this subsection.

**(D)** In carrying out the authority of this paragraph, the Administrator shall consult with the Secretary of Labor and the Secretary of Transportation and shall coordinate any requirements under this paragraph with any requirements established for comparable purposes by the Occupational Safety and Health Administration or the Department of Transportation. Nothing in this subsection shall be interpreted, construed or applied to impose requirements affecting, or to grant the Administrator, the

Chemical Safety and Hazard Investigation Board, or any other agency any authority to regulate (including requirements for hazard assessment), the accidental release of radionuclides arising from the construction and operation of facilities licensed by the Nuclear Regulatory Commission.

**(E)** After the effective date of any regulation or requirement imposed under this subsection, it shall be unlawful for any person to operate any stationary source subject to such regulation or requirement in violation of such regulation or requirement. Each regulation or requirement under this subsection shall for purposes of sections 7413, 7414, 7416, 7420, 7604, and 7607 of this title and other enforcement provisions of this chapter, be treated as a standard in effect under subsection (d).

**(F)** Notwithstanding the provisions of subchapter V or this section, no stationary source shall be required to apply for, or operate pursuant to, a permit issued under such subchapter solely because such source is subject to regulations or requirements under this subsection.

**(G)** In exercising any authority under this subsection, the Administrator shall not, for purposes of section 653(b)(1) of Title 29, be deemed to be exercising statutory authority to prescribe or enforce standards or regulations affecting occupational safety and health.

**(H) Public access to off-site consequence analysis information**

**(i) Definitions**

In this subparagraph:

**(I) Covered person**

The term "covered person" means--

**(aa)** an officer or employee of the United States;

**(bb)** an officer or employee of an agent or contractor of the Federal Government;

**(cc)** an officer or employee of a State or local government;

**(dd)** an officer or employee of an agent or contractor of a State or local government;

**(ee)** an individual affiliated with an entity that has been given, by a State or local government, responsibility for preventing, planning for, or responding to accidental releases;

**(ff)** an officer or employee or an agent or contractor of an entity described in item (ee); and

**(gg)** a qualified researcher under clause (vii).

**(II) Official use**

The term "official use" means an action of a Federal, State, or local government agency or an entity referred to in subclause (I)(ee) intended to carry out a function relevant to preventing, planning for, or responding to accidental releases.

**(III) Off-site consequence analysis information**

The term "off-site consequence analysis information" means those portions of a risk management plan, excluding the executive summary of the plan, consisting of an evaluation of 1 or more worst-case release scenarios or alternative release scenarios, and any electronic data base created by the Administrator from those portions.

**(IV) Risk management plan**

The term "risk management plan" means a risk management plan submitted to the Administrator by an owner or operator of a stationary source under subparagraph (B)(iii).

**(ii) Regulations**

Not later than 1 year after August 5, 1999, the President shall--

**(I)** assess--

**(aa)** the increased risk of terrorist and other criminal activity associated with the posting of off-site consequence analysis information on the Internet; and

**(bb)** the incentives created by public disclosure of off-site consequence analysis information for reduction in the risk of accidental releases; and

**(II)** based on the assessment under subclause (I), promulgate regulations governing the distribution of off-site consequence analysis information in a manner that, in the opinion of the President, minimizes the likelihood of accidental releases and the risk described in subclause (I)(aa) and the likelihood of harm to public health and welfare, and--

**(aa)** allows access by any member of the public to paper copies of off-site consequence analysis information for a limited number of stationary sources located anywhere in the United States, without any geographical restriction;

**(bb)** allows other public access to off-site consequence analysis information as appropriate;

Add.54

**(cc)** allows access for official use by a covered person described in any of items (cc) through (ff) of clause (i)(I) (referred to in this subclause as a "State or local covered person") to off-site consequence analysis information relating to stationary sources located in the person's State;

**(dd)** allows a State or local covered person to provide, for official use, off-site consequence analysis information relating to stationary sources located in the person's State to a State or local covered person in a contiguous State; and

**(ee)** allows a State or local covered person to obtain for official use, by request to the Administrator, off-site consequence analysis information that is not available to the person under item (cc).

**(iii) Availability under freedom of information act**

**(I) First year**

Off-site consequence analysis information, and any ranking of stationary sources derived from the information, shall not be made available under section 552 of Title 5 during the 1-year period beginning on August 5, 1999.

**(II) After first year**

If the regulations under clause (ii) are promulgated on or before the end of the period described in subclause (I), off-site consequence analysis information covered by the regulations, and any ranking of stationary sources derived from the information, shall not be made available under section 552 of Title 5 after the end of that period.

**(III) Applicability**

Subclauses (I) and (II) apply to off-site consequence analysis information submitted to the Administrator before, on, or after August 5, 1999.

**(iv) Availability of information during transition period**

The Administrator shall make off-site consequence analysis information available to covered persons for official use in a manner that meets the requirements of items (cc)through (ee) of clause (ii)(II), and to the public in a form that does not make available any information concerning the identity or location of stationary sources, during the period--

**(I)** beginning on August 5, 1999; and

**(II)** ending on the earlier of the date of promulgation of the regulations under clause (ii) or the date that is 1 year after August 5, 1999.

**(v) Prohibition on unauthorized disclosure of information by covered persons**

Add.55

**(I) In general**

Beginning on August 5, 1999, a covered person shall not disclose to the public off-site consequence analysis information in any form, or any statewide or national ranking of identified stationary sources derived from such information, except as authorized by this subparagraph (including the regulations promulgated under clause (ii)). After the end of the 1-year period beginning on August 5, 1999, if regulations have not been promulgated under clause (ii), the preceding sentence shall not apply.

**(II) Criminal penalties**

Notwithstanding section 7413 of this title, a covered person that willfully violates a restriction or prohibition established by this subparagraph (including the regulations promulgated under clause (ii)) shall, upon conviction, be fined for an infraction under section 3571 of Title 18 (but shall not be subject to imprisonment) for each unauthorized disclosure of off-site consequence analysis information, except that subsection (d) of such section 3571 shall not apply to a case in which the offense results in pecuniary loss unless the defendant knew that such loss would occur. The disclosure of off-site consequence analysis information for each specific stationary source shall be considered a separate offense. The total of all penalties that may be imposed on a single person or organization under this item shall not exceed $1,000,000 for violations committed during any 1 calendar year.

**(III) Applicability**

If the owner or operator of a stationary source makes off-site consequence analysis information relating to that stationary source available to the public without restriction--

**(aa)** subclauses (I) and (II) shall not apply with respect to the information; and

**(bb)** the owner or operator shall notify the Administrator of the public availability of the information.

**(IV) List**

The Administrator shall maintain and make publicly available a list of all stationary sources that have provided notification under subclause (III)(bb).

**(vi) Notice**

The Administrator shall provide notice of the definition of official use as provided in clause (i)(III) [9] and examples of actions that would and would not meet that definition, and notice of the restrictions on further dissemination and the penalties established by this chapter to each covered person who receives off-site consequence analysis information under clause (iv) and each covered person who receives off-site consequence analysis information for an official use under the regulations promulgated under clause (ii).

**(vii) Qualified researchers**

**(I) In general**

Not later than 180 days after August 5, 1999, the Administrator, in consultation with the Attorney General, shall develop and implement a system for providing off-site consequence analysis information, including facility identification, to any qualified researcher, including a qualified researcher from industry or any public interest group.

**(II) Limitation on dissemination**

The system shall not allow the researcher to disseminate, or make available on the Internet, the off-site consequence analysis information, or any portion of the off-site consequence analysis information, received under this clause.

**(viii) Read-only information technology system**

In consultation with the Attorney General and the heads of other appropriate Federal agencies, the Administrator shall establish an information technology system that provides for the availability to the public of off-site consequence analysis information by means of a central data base under the control of the Federal Government that contains information that users may read, but that provides no means by which an electronic or mechanical copy of the information may be made.

**(ix) Voluntary industry accident prevention standards**

The Environmental Protection Agency, the Department of Justice, and other appropriate agencies may provide technical assistance to owners and operators of stationary sources and participate in the development of voluntary industry standards that will help achieve the objectives set forth in paragraph (1).

**(x) Effect on State or local law**

**(I) In general**

Subject to subclause (II), this subparagraph (including the regulations promulgated under this subparagraph) shall supersede any provision of State or local law that is inconsistent with this subparagraph (including the regulations).

**(II) Availability of information under State law**

Nothing in this subparagraph precludes a State from making available data on the off-site consequences of chemical releases collected in accordance with State law.

**(xi) Report**

**(I) In general**

Not later than 3 years after August 5, 1999, the Attorney General, in consultation with appropriate State, local, and Federal Government agencies, affected industry, and the public, shall submit to Congress a report that describes the extent to which regulations promulgated under this paragraph have resulted in actions, including the design and

Add.57

maintenance of safe facilities, that are effective in detecting, preventing, and minimizing the consequences of releases of regulated substances that may be caused by criminal activity. As part of this report, the Attorney General, using available data to the extent possible, and a sampling of covered stationary sources selected at the discretion of the Attorney General, and in consultation with appropriate State, local, and Federal governmental agencies, affected industry, and the public, shall review the vulnerability of covered stationary sources to criminal and terrorist activity, current industry practices regarding site security, and security of transportation of regulated substances. The Attorney General shall submit this report, containing the results of the review, together with recommendations, if any, for reducing vulnerability of covered stationary sources to criminal and terrorist activity, to the Committee on Commerce of the United States House of Representatives and the Committee on Environment and Public Works of the United States Senate and other relevant committees of Congress.

**(II) Interim report**

Not later than 12 months after August 5, 1999, the Attorney General shall submit to the Committee on Commerce of the United States House of Representatives and the Committee on Environment and Public Works of the United States Senate, and other relevant committees of Congress, an interim report that includes, at a minimum--

**(aa)** the preliminary findings under subclause (I);

**(bb)** the methods used to develop the findings; and

**(cc)** an explanation of the activities expected to occur that could cause the findings of the report under subclause (I) to be different than the preliminary findings.

**(III) Availability of information**

Information that is developed by the Attorney General or requested by the Attorney General and received from a covered stationary source for the purpose of conducting the review under subclauses(I) and (II) shall be exempt from disclosure under section 552 of Title 5 if such information would pose a threat to national security.

**(xii) Scope**

This subparagraph--

**(I)** applies only to covered persons; and

**(II)** does not restrict the dissemination of off-site consequence analysis information by any covered person in any manner or form except in the form of a risk management plan or an electronic data base created by the Administrator from off-site consequence analysis information.

**(xiii) Authorization of appropriations**

There are authorized to be appropriated to the Administrator and the Attorney General such sums as are necessary to carry out this subparagraph (including the regulations promulgated under clause (ii)), to remain available until expended.

### (8) Research on hazard assessments

The Administrator may collect and publish information on accident scenarios and consequences covering a range of possible events for substances listed under paragraph (3). The Administrator shall establish a program of long-term research to develop and disseminate information on methods and techniques for hazard assessment which may be useful in improving and validating the procedures employed in the preparation of hazard assessments under this subsection.

### (9) Order authority

**(A)** In addition to any other action taken, when the Administrator determines that there may be an imminent and substantial endangerment to the human health or welfare or the environment because of an actual or threatened accidental release of a regulated substance, the Administrator may secure such relief as may be necessary to abate such danger or threat, and the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require. The Administrator may also, after notice to the State in which the stationary source is located, take other action under this paragraph including, but not limited to, issuing such orders as may be necessary to protect human health. The Administrator shall take action under section 7603 of this title rather than this paragraph whenever the authority of such section is adequate to protect human health and the environment.

**(B)** Orders issued pursuant to this paragraph may be enforced in an action brought in the appropriate United States district court as if the order were issued under section 7603 of this title.

**(C)** Within 180 days after November 15, 1990, the Administrator shall publish guidance for using the order authorities established by this paragraph. Such guidance shall provide for the coordinated use of the authorities of this paragraph with other emergency powers authorized by section 9606 of this title, sections 311(c), 308, 309 and 504(a) of the Federal Water Pollution Control Act, sections 3007, 3008, 3013, and 7003 of the Solid Waste Disposal Act, sections 1445 and 1431 of the Safe Drinking Water Act, sections 5 and 7 of the Toxic Substances Control Act, and sections 7413, 7414, and 7603 of this title.

### (10) Presidential review

The President shall conduct a review of release prevention, mitigation and response authorities of the various Federal agencies and shall clarify and coordinate agency responsibilities to assure the most effective and efficient implementation of such authorities and to identify any deficiencies in authority or resources which may exist. The President may utilize the resources and solicit the recommendations of the Chemical Safety and Hazard Investigation Board in conducting such review. At the conclusion of such review, but not later than 24 months after November 15, 1990, the President shall transmit a message to the Congress on the release prevention, mitigation and response activities of the Federal Government making such recommendations for change in law as the President may deem appropriate. Nothing in this paragraph shall be interpreted, construed or applied to authorize the President to modify or reassign release prevention, mitigation or response authorities otherwise established by law.

### (11) State authority

Nothing in this subsection shall preclude, deny or limit any right of a State or political subdivision thereof to adopt or enforce any regulation, requirement, limitation or standard (including any procedural requirement) that is more stringent than a regulation, requirement, limitation or standard in effect under this subsection or that applies to a substance not subject to this subsection.

**(s) Periodic report**

Not later than January 15, 1993 and every 3 years thereafter, the Administrator shall prepare and transmit to the Congress a comprehensive report on the measures taken by the Agency and by the States to implement the provisions of this section. The Administrator shall maintain a database on pollutants and sources subject to the provisions of this section and shall include aggregate information from the database in each annual report. The report shall include, but not be limited to--

**(1)** a status report on standard-setting under subsections (d) and (f);

**(2)** information with respect to compliance with such standards including the costs of compliance experienced by sources in various categories and subcategories;

**(3)** development and implementation of the national urban air toxics program; and

**(4)** recommendations of the Chemical Safety and Hazard Investigation Board with respect to the prevention and mitigation of accidental releases.

<div align="center">

**CREDIT(S)**

</div>

(July 14, 1955, c. 360, Title I, § 112, as added Pub.L. 91-604, § 4(a), Dec. 31, 1970, 84 Stat. 1685; amended Pub.L. 95-95, Title I, §§ 109(d)(2), 110, Title IV, § 401(c), Aug. 7, 1977, 91 Stat. 701, 703, 791; Pub.L. 95-623, § 13(b), Nov. 9, 1978, 92 Stat. 3458; Pub.L. 101-549, Title III, § 301, Nov. 15, 1990, 104 Stat. 2531; Pub.L. 102-187, Dec. 4, 1991, 105 Stat. 1285; Pub.L. 105-362, Title IV, § 402(b), Nov. 10, 1998, 112 Stat. 3283; Pub.L. 106-40, §§ 2, 3(a), Aug. 5, 1999, 113 Stat. 207.)

<div align="center">

**MEMORANDA OF PRESIDENT**

**DELEGATION OF AUTHORITY TO REVIEW EMERGENCY RELEASE AUTHORITIES AND PREPARE AND TRANSMIT TO THE CONGRESS A MESSAGE CONCERNING SUCH AUTHORITIES**

&lt;Aug. 19, 1993, 58 F.R. 52397&gt;

</div>

Memorandum for the Administrator of the Environmental Protection Agency

WHEREAS, the Environmental Protection Agency, the agencies and departments that are members of the National Response Team (authorized under Executive Order No. 12580, 52 Fed.Reg. 2923 (1987)) [set out as a note under section 9615 of this title], and other Federal agencies and departments undertake emergency release prevention, mitigation, and response activities pursuant to various authorities;

By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 112(r)(10) of the Clean Air Act (the "Act") (section 7412(r)(10) of title 42 of the United States Code) [subsec. (r)(10) of this

<div align="center">

**Add.60**

</div>

section] and section 301 of title 3 of the United States Code [section 301 of Title 3, The President], and in order to provide for the delegation of certain functions under the Act [42 U.S.C.A. § 7401 et seq.], I hereby:

**(1)** Authorize you, in coordination with agencies and departments that are members of the National Response Team and other appropriate agencies and departments, to conduct a review of release prevention, mitigation, and response authorities of Federal agencies in order to assure the most effective and efficient implementation of such authorities and to identify any deficiencies in authority or resources that may exist, to the extent such review is required by section 112(r)(10) of the Act; and

**(2)** Authorize you, in coordination with agencies and departments that are members of the National Response Team and other appropriate agencies and departments, to prepare and transmit a message to the Congress concerning the release prevention, mitigation, and response activities of the Federal Government with such recommendations for change in law as you deem appropriate, to the extent such message is required by section 112(r)(10) of the Act.

The authority delegated by this memorandum may be further redelegated within the Environmental Protection Agency.

You are hereby authorized and directed to publish this memorandum in the **Federal Register.**

WILLIAM J. CLINTON

### DELEGATION OF AUTHORITY TO CONDUCT ASSESSMENTS AND PROMULGATE REGULATIONS ON PUBLIC ACCESS TO OFF-SITE CONSEQUENCE ANALYSIS INFORMATION

<Jan. 27, 2000, 65 F.R. 8631>

Memorandum for the Attorney General[,] the Administrator of the Environmental Protection Agency[,] and the Director of the Office of Management and Budget

By the authority vested in me as President by the Constitution and laws of the United States of America, including section 112(r)(7)(H) of the Clean Air Act ("Act") (42 U.S.C. 7412(r)(7)(H)) [subsec. (r)(7)(H) of this section], as added by section 3 of the Chemical Safety Information, Site Security and Fuels Regulatory Relief Act (Public Law 106-40), and section 301 of title 3, United States Code, I hereby delegate to:

**(1)** the Attorney General the authority vested in the President under section 112(r)(7)(H)(i)(II)(aa) of the Act [subsec. (r)(7)(H)(i)(II)(aa) of this section] to assess the increased risk of terrorist and other criminal activity associated with the posting of off-site consequence analysis information on the Internet;

**(2)** the Administrator of the Environmental Protection Agency (EPA) the authority vested in the President under section 112(r)(7)(H)(ii)(I)(bb) of the Act [subsec. (r)(7)(H)(ii)(I)(bb) of this section] to assess the incentives created by public disclosure of off-site consequence analysis information for reduction in the risk of accidental releases; and

**(3)** the Attorney General and the Administrator of EPA, jointly, the authority vested in the President under section 112(r)(7)(H)(ii)(II) of the Act [subsec. (r)(7)(H)(ii)(II) of this section] to promulgate regulations, based on these assessments, governing the distribution of off-site consequence analysis information. These regulations, in proposed and final form, shall be subject to review and approval by the Director of the Office of Management and Budget.

The Administrator of EPA is authorized and directed to publish this memorandum in the Federal Register.

WILLIAM J. CLINTON

Add.61

**FLEXIBLE IMPLEMENTATION OF THE MERCURY AND AIR TOXICS STANDARDS RULE**

<Dec. 21, 2011, 76 F.R. 80727>

Memorandum for the Administrator of the Environmental Protection Agency

Today's issuance, by the Environmental Protection Agency (EPA), of the final Mercury and Air Toxics Standards rule for power plants (the "MATS Rule") represents a major step forward in my Administration's efforts to protect public health and the environment.

This rule, issued after careful consideration of public comments, prescribes standards under section 112 of the Clean Air Act to control emissions of mercury and other toxic air pollutants from power plants, which collectively are among the largest sources of such pollution in the United States. The EPA estimates that by substantially reducing emissions of pollutants that contribute to neurological damage, cancer, respiratory illnesses, and other health risks, the MATS Rule will produce major health benefits for millions of Americans_including children, older Americans, and other vulnerable populations. Consistent with Executive Order 13563 (Improving Regulation and Regulatory Review), the estimated benefits of the MATS Rule far exceed the estimated costs.

The MATS Rule can be implemented through the use of demonstrated, existing pollution control technologies. The United States is a global market leader in the design and manufacture of these technologies, and it is anticipated that U.S. firms and workers will provide much of the equipment and labor needed to meet the substantial investments in pollution control that the standards are expected to spur.

These new standards will promote the transition to a cleaner and more efficient U.S. electric power system. This system as a whole is critical infrastructure that plays a key role in the functioning of all facets of the U.S. economy, and maintaining its stability and reliability is of critical importance. It is therefore crucial that implementation of the MATS Rule proceed in a cost-effective manner that ensures electric reliability.

Analyses conducted by the EPA and the Department of Energy (DOE) indicate that the MATS Rule is not anticipated to compromise electric generating resource adequacy in any region of the country. The Clean Air Act offers a number of implementation flexibilities, and the EPA has a long and successful history of using those flexibilities to ensure a smooth transition to cleaner technologies.

The Clean Air Act provides 3 years from the effective date of the MATS Rule for sources to comply with its requirements. In addition, section 112(i)(3)(B) of the Act allows the issuance of a permit granting a source up to one additional year where necessary for the installation of controls. As you stated in the preamble to the MATS Rule, this additional fourth year should be broadly available to sources, consistent with the requirements of the law.

The EPA has concluded that 4 years should generally be sufficient to install the necessary emission control equipment, and DOE has issued analysis consistent with that conclusion. While more time is generally not expected to be needed, the Clean Air Act offers other important flexibilities as well. For example, section 113(a) of the Act provides the EPA with flexibility to bring sources into compliance over the course of an additional year, should unusual circumstances arise that warrant such flexibility.

To address any concerns with respect to electric reliability while assuring MATS' public health benefits, I direct you to take the following actions:

**1.** Building on the information and guidance that you have provided to the public, relevant stakeholders, and permitting authorities in the preamble of the MATS Rule, work with State and local permitting authorities to make the additional year for compliance with the MATS Rule provided under section 112(i)(3)(B) of the Clean Air Act broadly available to sources, consistent with law, and to invoke this flexibility expeditiously where justified.

Add.62

**2.** Promote early, coordinated, and orderly planning and execution of the measures needed to implement the MATS Rule while maintaining the reliability of the electric power system. Consistent with Executive Order 13563, this process should be designed to "promote predictability and reduce uncertainty," and should include engagement and coordination with DOE, the Federal Energy Regulatory Commission, State utility regulators, Regional Transmission Organizations, the North American Electric Reliability Corporation and regional electric reliability organizations, other grid planning authorities, electric utilities, and other stakeholders, as appropriate.

**3.** Make available to the public, including relevant stakeholders, information concerning any anticipated use of authorities: (a) under section 112(i)(3)(B) of the Clean Air Act in the event that additional time to comply with the MATS Rule is necessary for the installation of technology; and (b) under section 113(a) of the Clean Air Act in the event that additional time to comply with the MATS Rule is necessary to address a specific and documented electric reliability issue. This information should describe the process for working with entities with relevant expertise to identify circumstances where electric reliability concerns might justify allowing additional time to comply.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

You are hereby authorized and directed to publish this memorandum in the Federal Register.

BARACK OBAMA

Notes of Decisions (159)

---

### Footnotes

1     So in original. Probably should be "effects".

2     So in original.

3     So in original. Probably should be "section".

4     So in original. Probably should be paragraph "(7)(B)".

5     So in original. Probably should be "subparagraph".

6     So in original. Probably should be "Right-To-Know".

7     So in original. The word "or" probably should appear.

8     So in original. The word "Administrator" probably should be "Secretary".

9     So in original. Probably should be "(i)(II)".

42 U.S.C.A. § 7412, 42 USCA § 7412
Current through P.L. 118-106. Some statute sections may be more current, see credits for details.

Add.63

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

**Add.64**

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
      Subchapter III. General Provisions

42 U.S.C.A. § 7607

§ 7607. Administrative proceedings and judicial review

Currentness

**(a) Administrative subpenas; confidentiality; witnesses**

In connection with any determination under section 7410(f) of this title, or for purposes of obtaining information under section 7521(b)(4) [1] or 7545(c)(3) of this title, any investigation, monitoring, reporting requirement, entry, compliance inspection, or administrative enforcement proceeding under the [2] chapter (including but not limited to section 7413, section 7414, section 7420, section 7429, section 7477, section 7524, section 7525, section 7542, section 7603, or section 7606 of this title),, [3] the Administrator may issue subpenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents, and he may administer oaths. Except for emission data, upon a showing satisfactory to the Administrator by such owner or operator that such papers, books, documents, or information or particular part thereof, if made public, would divulge trade secrets or secret processes of such owner or operator, the Administrator shall consider such record, report, or information or particular portion thereof confidential in accordance with the purposes of section 1905 of Title 18, except that such paper, book, document, or information may be disclosed to other officers, employees, or authorized representatives of the United States concerned with carrying out this chapter, to persons carrying out the National Academy of Sciences' study and investigation provided for in section 7521(c) of this title, or when relevant in any proceeding under this chapter. Witnesses summoned shall be paid the same fees and mileage that are paid witnesses in the courts of the United States. In case of contumacy or refusal to obey a subpena served upon any person under this subparagraph [4], the district court of the United States for any district in which such person is found or resides or transacts business, upon application by the United States and after notice to such person, shall have jurisdiction to issue an order requiring such person to appear and give testimony before the Administrator to appear and produce papers, books, and documents before the Administrator, or both, and any failure to obey such order of the court may be punished by such court as a contempt thereof.

**(b) Judicial review**

**(1)** A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission standard or requirement under section 7412 of this title, any standard of performance or requirement under section 7411 of this title,, [3] any standard under section 7521 of this title (other than a standard required to be prescribed under section 7521(b)(1) of this title), any determination under section 7521(b)(5) [1] of this title, any control or prohibition under section 7545 of this title, any standard under section 7571 of this title, any rule issued under section 7413, 7419, or under section 7420 of this title, or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 7410 of this title or section 7411(d) of this title, any order under section 7411(j) of this title, under section 7412 of this title, under section 7419 of this title, or under section 7420 of this title, or his action under section 1857c-10(c)(2)(A), (B), or (C) of this title (as in effect before

Add.65

August 7, 1977) or under regulations thereunder, or revising regulations for enhanced monitoring and compliance certification programs under section 7414(a)(3) of this title, or any other final action of the Administrator under this chapter (including any denial or disapproval by the Administrator under subchapter I) which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit. Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination. Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise. The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review nor extend the time within which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action.

**(2)** Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement. Where a final decision by the Administrator defers performance of any nondiscretionary statutory action to a later time, any person may challenge the deferral pursuant to paragraph (1).

**(c) Additional evidence**

In any judicial proceeding in which review is sought of a determination under this chapter required to be made on the record after notice and opportunity for hearing, if any party applies to the court for leave to adduce additional evidence, and shows to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Administrator, the court may order such additional evidence (and evidence in rebuttal thereof) to be taken before the Administrator, in such manner and upon such terms and conditions as to [5] the court may deem proper. The Administrator may modify his findings as to the facts, or make new findings, by reason of the additional evidence so taken and he shall file such modified or new findings, and his recommendation, if any, for the modification or setting aside of his original determination, with the return of such additional evidence.

**(d) Rulemaking**

**(1)** This subsection applies to--

    **(A)** the promulgation or revision of any national ambient air quality standard under section 7409 of this title,

    **(B)** the promulgation or revision of an implementation plan by the Administrator under section 7410(c) of this title,

    **(C)** the promulgation or revision of any standard of performance under section 7411 of this title, or emission standard or limitation under section 7412(d) of this title, any standard under section 7412(f) of this title, or any regulation under section 7412(g)(1)(D) and (F) of this title, or any regulation under section 7412(m) or (n) of this title,

    **(D)** the promulgation of any requirement for solid waste combustion under section 7429 of this title,

**(E)** the promulgation or revision of any regulation pertaining to any fuel or fuel additive under section 7545 of this title,

**(F)** the promulgation or revision of any aircraft emission standard under section 7571 of this title,

**(G)** the promulgation or revision of any regulation under subchapter IV-A (relating to control of acid deposition),

**(H)** promulgation or revision of regulations pertaining to primary nonferrous smelter orders under section 7419 of this title (but not including the granting or denying of any such order),

**(I)** promulgation or revision of regulations under subchapter VI of (relating to stratosphere and ozone protection),

**(J)** promulgation or revision of regulations under part C of subchapter I (relating to prevention of significant deterioration of air quality and protection of visibility),

**(K)** promulgation or revision of regulations under section 7521 of this title and test procedures for new motor vehicles or engines under section 7525 of this title, and the revision of a standard under section 7521(a)(3) of this title,

**(L)** promulgation or revision of regulations for noncompliance penalties under section 7420 of this title,

**(M)** promulgation or revision of any regulations promulgated under section 7541 of this title (relating to warranties and compliance by vehicles in actual use),

**(N)** action of the Administrator under section 7426 of this title (relating to interstate pollution abatement),

**(O)** the promulgation or revision of any regulation pertaining to consumer and commercial products under section 7511b(e) of this title,

**(P)** the promulgation or revision of any regulation pertaining to field citations under section 7413(d)(3) of this title,

**(Q)** the promulgation or revision of any regulation pertaining to urban buses or the clean-fuel vehicle, clean-fuel fleet, and clean fuel programs under part C of subchapter II,

**(R)** the promulgation or revision of any regulation pertaining to nonroad engines or nonroad vehicles under section 7547 of this title,

**(S)** the promulgation or revision of any regulation relating to motor vehicle compliance program fees under section 7552 of this title,

**(T)** the promulgation or revision of any regulation under subchapter IV–A (relating to acid deposition),

**(U)** the promulgation or revision of any regulation under section 7511b(f) of this title pertaining to marine vessels, and

**(V)** such other actions as the Administrator may determine.

The provisions of section 553 through 557 and section 706 of Title 5 shall not, except as expressly provided in this subsection, apply to actions to which this subsection applies. This subsection shall not apply in the case of any rule or circumstance referred to in subparagraphs (A) or (B) of subsection 553(b) of Title 5.

**(2)** Not later than the date of proposal of any action to which this subsection applies, the Administrator shall establish a rulemaking docket for such action (hereinafter in this subsection referred to as a "rule"). Whenever a rule applies only within a particular State, a second (identical) docket shall be simultaneously established in the appropriate regional office of the Environmental Protection Agency.

**(3)** In the case of any rule to which this subsection applies, notice of proposed rulemaking shall be published in the Federal Register, as provided under section 553(b) of Title 5, shall be accompanied by a statement of its basis and purpose and shall specify the period available for public comment (hereinafter referred to as the "comment period"). The notice of proposed rulemaking shall also state the docket number, the location or locations of the docket, and the times it will be open to public inspection. The statement of basis and purpose shall include a summary of--

**(A)** the factual data on which the proposed rule is based;

**(B)** the methodology used in obtaining the data and in analyzing the data; and

**(C)** the major legal interpretations and policy considerations underlying the proposed rule.

The statement shall also set forth or summarize and provide a reference to any pertinent findings, recommendations, and comments by the Scientific Review Committee established under section 7409(d) of this title and the National Academy of Sciences, and, if the proposal differs in any important respect from any of these recommendations, an explanation of the reasons for such differences. All data, information, and documents referred to in this paragraph on which the proposed rule relies shall be included in the docket on the date of publication of the proposed rule.

**(4)(A)** The rulemaking docket required under paragraph (2) shall be open for inspection by the public at reasonable times specified in the notice of proposed rulemaking. Any person may copy documents contained in the docket. The Administrator shall provide copying facilities which may be used at the expense of the person seeking copies, but the Administrator may waive or reduce such expenses in such instances as the public interest requires. Any person may request copies by mail if the person pays the expenses, including personnel costs to do the copying.

**(B)(i)** Promptly upon receipt by the agency, all written comments and documentary information on the proposed rule received from any person for inclusion in the docket during the comment period shall be placed in the docket. The transcript of public hearings, if any, on the proposed rule shall also be included in the docket promptly upon receipt from the person who transcribed

such hearings. All documents which become available after the proposed rule has been published and which the Administrator determines are of central relevance to the rulemaking shall be placed in the docket as soon as possible after their availability.

**(ii)** The drafts of proposed rules submitted by the Administrator to the Office of Management and Budget for any interagency review process prior to proposal of any such rule, all documents accompanying such drafts, and all written comments thereon by other agencies and all written responses to such written comments by the Administrator shall be placed in the docket no later than the date of proposal of the rule. The drafts of the final rule submitted for such review process prior to promulgation and all such written comments thereon, all documents accompanying such drafts, and written responses thereto shall be placed in the docket no later than the date of promulgation.

**(5)** In promulgating a rule to which this subsection applies (i) the Administrator shall allow any person to submit written comments, data, or documentary information; (ii) the Administrator shall give interested persons an opportunity for the oral presentation of data, views, or arguments, in addition to an opportunity to make written submissions; (iii) a transcript shall be kept of any oral presentation; and (iv) the Administrator shall keep the record of such proceeding open for thirty days after completion of the proceeding to provide an opportunity for submission of rebuttal and supplementary information.

**(6)(A)** The promulgated rule shall be accompanied by (i) a statement of basis and purpose like that referred to in paragraph (3) with respect to a proposed rule and (ii) an explanation of the reasons for any major changes in the promulgated rule from the proposed rule.

**(B)** The promulgated rule shall also be accompanied by a response to each of the significant comments, criticisms, and new data submitted in written or oral presentations during the comment period.

**(C)** The promulgated rule may not be based (in part or whole) on any information or data which has not been placed in the docket as of the date of such promulgation.

**(7)(A)** The record for judicial review shall consist exclusively of the material referred to in paragraph (3), clause (i) of paragraph (4)(B), and subparagraphs (A) and (B) of paragraph (6).

**(B)** Only an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial review. If the person raising an objection can demonstrate to the Administrator that it was impracticable to raise such objection within such time or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule, the Administrator shall convene a proceeding for reconsideration of the rule and provide the same procedural rights as would have been afforded had the information been available at the time the rule was proposed. If the Administrator refuses to convene such a proceeding, such person may seek review of such refusal in the United States court of appeals for the appropriate circuit (as provided in subsection (b)). Such reconsideration shall not postpone the effectiveness of the rule. The effectiveness of the rule may be stayed during such reconsideration, however, by the Administrator or the court for a period not to exceed three months.

**(8)** The sole forum for challenging procedural determinations made by the Administrator under this subsection shall be in the United States court of appeals for the appropriate circuit (as provided in subsection (b)) at the time of the substantive review of the rule. No interlocutory appeals shall be permitted with respect to such procedural determinations. In reviewing alleged

Add.69

procedural errors, the court may invalidate the rule only if the errors were so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made.

**(9)** In the case of review of any action of the Administrator to which this subsection applies, the court may reverse any such action found to be--

    **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

    **(B)** contrary to constitutional right, power, privilege, or immunity;

    **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or

    **(D)** without observance of procedure required by law, if (i) such failure to observe such procedure is arbitrary or capricious, (ii) the requirement of paragraph (7)(B) has been met, and (iii) the condition of the last sentence of paragraph (8) is met.

**(10)** Each statutory deadline for promulgation of rules to which this subsection applies which requires promulgation less than six months after date of proposal may be extended to not more than six months after date of proposal by the Administrator upon a determination that such extension is necessary to afford the public, and the agency, adequate opportunity to carry out the purposes of this subsection.

**(11)** The requirements of this subsection shall take effect with respect to any rule the proposal of which occurs after ninety days after August 7, 1977.

**(e) Other methods of judicial review not authorized**

Nothing in this chapter shall be construed to authorize judicial review of regulations or orders of the Administrator under this chapter, except as provided in this section.

**(f) Costs**

In any judicial proceeding under this section, the court may award costs of litigation (including reasonable attorney and expert witness fees) whenever it determines that such award is appropriate.

**(g) Stay, injunction, or similar relief in proceedings relating to noncompliance penalties**

In any action respecting the promulgation of regulations under section 7420 of this title or the administration or enforcement of section 7420 of this title no court shall grant any stay, injunctive, or similar relief before final judgment by such court in such action.

**(h) Public participation**

It is the intent of Congress that, consistent with the policy of subchapter II of chapter 5 of Title 5, the Administrator in promulgating any regulation under this chapter, including a regulation subject to a deadline, shall ensure a reasonable period for public participation of at least 30 days, except as otherwise expressly provided in section [6] 7407(d), 7502(a), 7511(a) and (b), and 7512(a) and (b) of this title.

### CREDIT(S)

(July 14, 1955, c. 360, Title III, § 307, as added Pub.L. 91-604, § 12(a), Dec. 31, 1970, 84 Stat. 1707; amended Pub.L. 92-157, Title III, § 302(a), Nov. 18, 1971, 85 Stat. 464; Pub.L. 93-319, § 6(c), June 22, 1974, 88 Stat. 259; Pub.L. 95-95, Title III, §§ 303(d), 305(a), (c), (f) to (h), Aug. 7, 1977, 91 Stat. 772, 776, 777; Pub.L. 95-190, § 14(a)(79), (80), Nov. 16, 1977, 91 Stat. 1404; Pub.L. 101-549, Title I, §§ 108(p), 110(5), Title III, § 302(g), (h), Title VII, §§ 702(c), 703, 706, 707(h), 710(b), Nov. 15, 1990, 104 Stat. 2469, 2470, 2574, 2681-2684.)

Notes of Decisions (412)

---

### Footnotes

1    Repealed. See References in Text notes set out under this section.

2    So in original. Probably should be "this".

3    So in original.

4    So in original. Probably should be "subsection,".

5    So in original. The word "to" probably should not appear.

6    So in original. Probably should be "sections".

42 U.S.C.A. § 7607, 42 USCA § 7607
Current through P.L. 118-106. Some statute sections may be more current, see credits for details.

---

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Add.71

Code of Federal Regulations
   Title 40. Protection of Environment
      Chapter I. Environmental Protection Agency (Refs & Annos)
         Subchapter C. Air Programs
            Part 63. National Emission Standards for Hazardous Air Pollutants for Source Categories (Refs & Annos)
            Subpart A. General Provisions (Refs & Annos)

40 C.F.R. § 63.6

§ 63.6 Compliance with standards and maintenance requirements.

Effective: March 11, 2021

Currentness

(a) Applicability.

(1) The requirements in this section apply to the owner or operator of affected sources for which any relevant standard has been established pursuant to section 112 of the Act and the applicability of such requirements is set out in accordance with § 63.1(a)(4) unless—

(i) The Administrator (or a State with an approved permit program) has granted an extension of compliance consistent with paragraph (i) of this section; or

(ii) The President has granted an exemption from compliance with any relevant standard in accordance with section 112(i)(4) of the Act.

(2) If an area source that otherwise would be subject to an emission standard or other requirement established under this part if it were a major source subsequently increases its emissions of hazardous air pollutants (or its potential to emit hazardous air pollutants) such that the source is a major source, such source shall be subject to the relevant emission standard or other requirement.

(b) Compliance dates for new and reconstructed sources.

(1) Except as specified in paragraphs (b)(3) and (4) of this section, the owner or operator of a new or reconstructed affected source for which construction or reconstruction commences after proposal of a relevant standard that has an initial startup before the effective date of a relevant standard established under this part pursuant to section 112(d), (f), or (h) of the Act must comply with such standard not later than the standard's effective date.

(2) Except as specified in paragraphs (b)(3) and (4) of this section, the owner or operator of a new or reconstructed affected source that has an initial startup after the effective date of a relevant standard established under this part pursuant to section 112(d), (f), or (h) of the Act must comply with such standard upon startup of the source.

(3) The owner or operator of an affected source for which construction or reconstruction is commenced after the proposal date of a relevant standard established under this part pursuant to section 112(d), 112(f), or 112(h) of the Act but before the effective date (that is, promulgation) of such standard shall comply with the relevant emission standard not later than the date 3 years after the effective date if:

(i) The promulgated standard (that is, the relevant standard) is more stringent than the proposed standard; for purposes of this paragraph, a finding that controls or compliance methods are "more stringent" must include control technologies or performance criteria and compliance or compliance assurance methods that are different but are substantially equivalent to those required by the promulgated rule, as determined by the Administrator (or his or her authorized representative); and

(ii) The owner or operator complies with the standard as proposed during the 3–year period immediately after the effective date.

(4) The owner or operator of an affected source for which construction or reconstruction is commenced after the proposal date of a relevant standard established pursuant to section 112(d) of the Act but before the proposal date of a relevant standard established pursuant to section 112(f) shall not be required to comply with the section 112(f) emission standard until the date 10 years after the date construction or reconstruction is commenced, except that, if the section 112(f) standard is promulgated more than 10 years after construction or reconstruction is commenced, the owner or operator must comply with the standard as provided in paragraphs (b)(1) and (2) of this section.

(5) The owner or operator of a new source that is subject to the compliance requirements of paragraph (b)(3) or (4) of this section must notify the Administrator in accordance with § 63.9(d).

(6) [Reserved]

(7) When an area source increases its emissions of (or its potential to emit) hazardous air pollutants such that the source becomes a major source, the portion of the facility that meets the definition of a new affected source must comply with all requirements of that standard applicable to new sources. The source owner or operator must comply with the relevant standard upon startup.

(c) Compliance dates for existing sources.

(1) After the effective date of a relevant standard established under this part pursuant to section 112(d) or 112(h) of the Act, the owner or operator of an existing source shall comply with such standard by the compliance date established by the Administrator in the applicable subpart(s) of this part, except as provided in § 63.1(c)(6)(i). Except as otherwise provided for in section 112 of the Act, in no case will the compliance date established for an existing source in an applicable subpart of this part exceed 3 years after the effective date of such standard.

(2) If an existing source is subject to a standard established under this part pursuant to section 112(f) of the Act, the owner or operator must comply with the standard by the date 90 days after the standard's effective date, or by the date specified in an extension granted to the source by the Administrator under paragraph (i)(4)(ii) of this section, whichever is later.

**Add.73**

(3), (4) [Reserved]

(5) Except as provided in paragraph (b)(7) of this section, the owner or operator of an area source that increases its emissions of (or its potential to emit) hazardous air pollutants such that the source becomes a major source and meets the definition of an existing source in the applicable major source standard shall be subject to relevant standards for existing sources. Except as provided in paragraph § 63.1(c)(6)(i)(B), such sources must comply by the date specified in the standards for existing area sources that become major sources. If no such compliance date is specified in the standards, the source shall have a period of time to comply with the relevant emission standard that is equivalent to the compliance period specified in the relevant standard for existing sources in existence at the time the standard becomes effective.

(d) [Reserved]

(e) Operation and maintenance requirements.

(1)(i) At all times, including periods of startup, shutdown, and malfunction, the owner or operator must operate and maintain any affected source, including associated air pollution control equipment and monitoring equipment, in a manner consistent with safety and good air pollution control practices for minimizing emissions. During a period of startup, shutdown, or malfunction, this general duty to minimize emissions requires that the owner or operator reduce emissions from the affected source to the greatest extent which is consistent with safety and good air pollution control practices. The general duty to minimize emissions during a period of startup, shutdown, or malfunction does not require the owner or operator to achieve emission levels that would be required by the applicable standard at other times if this is not consistent with safety and good air pollution control practices, nor does it require the owner or operator to make any further efforts to reduce emissions if levels required by the applicable standard have been achieved. Determination of whether such operation and maintenance procedures are being used will be based on information available to the Administrator which may include, but is not limited to, monitoring results, review of operation and maintenance procedures (including the startup, shutdown, and malfunction plan required in paragraph (e)(3) of this section), review of operation and maintenance records, and inspection of the source.

(ii) Malfunctions must be corrected as soon as practicable after their occurrence. To the extent that an unexpected event arises during a startup, shutdown, or malfunction, an owner or operator must comply by minimizing emissions during such a startup, shutdown, and malfunction event consistent with safety and good air pollution control practices.

(iii) Operation and maintenance requirements established pursuant to section 112 of the Act are enforceable independent of emissions limitations or other requirements in relevant standards.

(2) [Reserved]

(3) Startup, shutdown, and malfunction plan.

(i) The owner or operator of an affected source must develop a written startup, shutdown, and malfunction plan that describes, in detail, procedures for operating and maintaining the source during periods of startup, shutdown, and malfunction; and a program of corrective action for malfunctioning process, air pollution control, and monitoring equipment used to comply with the relevant standard. The startup, shutdown, and malfunction plan does not need to address

any scenario that would not cause the source to exceed an applicable emission limitation in the relevant standard. This plan must be developed by the owner or operator by the source's compliance date for that relevant standard. The purpose of the startup, shutdown, and malfunction plan is to—

(A) Ensure that, at all times, the owner or operator operates and maintains each affected source, including associated air pollution control and monitoring equipment, in a manner which satisfies the general duty to minimize emissions established by paragraph (e)(1)(i) of this section;

(B) Ensure that owners or operators are prepared to correct malfunctions as soon as practicable after their occurrence in order to minimize excess emissions of hazardous air pollutants; and

(C) Reduce the reporting burden associated with periods of startup, shutdown, and malfunction (including corrective action taken to restore malfunctioning process and air pollution control equipment to its normal or usual manner of operation).

(ii) [Reserved]

(iii) When actions taken by the owner or operator during a startup or shutdown (and the startup or shutdown causes the source to exceed any applicable emission limitation in the relevant emission standards), or malfunction (including actions taken to correct a malfunction) are consistent with the procedures specified in the affected source's startup, shutdown, and malfunction plan, the owner or operator must keep records for that event which demonstrate that the procedures specified in the plan were followed. These records may take the form of a "checklist," or other effective form of recordkeeping that confirms conformance with the startup, shutdown, and malfunction plan and describes the actions taken for that event. In addition, the owner or operator must keep records of these events as specified in paragraph 63.10(b), including records of the occurrence and duration of each startup or shutdown (if the startup or shutdown causes the source to exceed any applicable emission limitation in the relevant emission standards), or malfunction of operation and each malfunction of the air pollution control and monitoring equipment. Furthermore, the owner or operator shall confirm that actions taken during the relevant reporting period during periods of startup, shutdown, and malfunction were consistent with the affected source's startup, shutdown and malfunction plan in the semiannual (or more frequent) startup, shutdown, and malfunction report required in § 63.10(d)(5).

(iv) If an action taken by the owner or operator during a startup, shutdown, or malfunction (including an action taken to correct a malfunction) is not consistent with the procedures specified in the affected source's startup, shutdown, and malfunction plan, and the source exceeds any applicable emission limitation in the relevant emission standard, then the owner or operator must record the actions taken for that event and must report such actions within 2 working days after commencing actions inconsistent with the plan, followed by a letter within 7 working days after the end of the event, in accordance with § 63.10(d)(5) (unless the owner or operator makes alternative reporting arrangements, in advance, with the Administrator).

(v) The owner or operator must maintain at the affected source a current startup, shutdown, and malfunction plan and must make the plan available upon request for inspection and copying by the Administrator. In addition, if the startup, shutdown, and malfunction plan is subsequently revised as provided in paragraph (e)(3)(viii) of this section, the owner or operator must maintain at the affected source each previous (i.e., superseded) version of the startup, shutdown, and malfunction plan, and must make each such previous version available for inspection and copying by the Administrator for a period of

5 years after revision of the plan. If at any time after adoption of a startup, shutdown, and malfunction plan the affected source ceases operation or is otherwise no longer subject to the provisions of this part, the owner or operator must retain a copy of the most recent plan for 5 years from the date the source ceases operation or is no longer subject to this part and must make the plan available upon request for inspection and copying by the Administrator. The Administrator may at any time request in writing that the owner or operator submit a copy of any startup, shutdown, and malfunction plan (or a portion thereof) which is maintained at the affected source or in the possession of the owner or operator. Upon receipt of such a request, the owner or operator must promptly submit a copy of the requested plan (or a portion thereof) to the Administrator. The owner or operator may elect to submit the required copy of any startup, shutdown, and malfunction plan to the Administrator in an electronic format. If the owner or operator claims that any portion of such a startup, shutdown, and malfunction plan is confidential business information entitled to protection from disclosure under section 114(c) of the Act or 40 CFR 2.301, the material which is claimed as confidential must be clearly designated in the submission.

(vi) To satisfy the requirements of this section to develop a startup, shutdown, and malfunction plan, the owner or operator may use the affected source's standard operating procedures (SOP) manual, or an Occupational Safety and Health Administration (OSHA) or other plan, provided the alternative plans meet all the requirements of this section and are made available for inspection or submitted when requested by the Administrator.

(vii) Based on the results of a determination made under paragraph (e)(1)(i) of this section, the Administrator may require that an owner or operator of an affected source make changes to the startup, shutdown, and malfunction plan for that source. The Administrator must require appropriate revisions to a startup, shutdown, and malfunction plan, if the Administrator finds that the plan:

(A) Does not address a startup, shutdown, or malfunction event that has occurred;

(B) Fails to provide for the operation of the source (including associated air pollution control and monitoring equipment) during a startup, shutdown, or malfunction event in a manner consistent with the general duty to minimize emissions established by paragraph (e)(1)(i) of this section;

(C) Does not provide adequate procedures for correcting malfunctioning process and/or air pollution control and monitoring equipment as quickly as practicable; or

(D) Includes an event that does not meet the definition of startup, shutdown, or malfunction listed in § 63.2.

(viii) The owner or operator may periodically revise the startup, shutdown, and malfunction plan for the affected source as necessary to satisfy the requirements of this part or to reflect changes in equipment or procedures at the affected source. Unless the permitting authority provides otherwise, the owner or operator may make such revisions to the startup, shutdown, and malfunction plan without prior approval by the Administrator or the permitting authority. However, each such revision to a startup, shutdown, and malfunction plan must be reported in the semiannual report required by § 63.10(d)(5). If the startup, shutdown, and malfunction plan fails to address or inadequately addresses an event that meets the characteristics of a malfunction but was not included in the startup, shutdown, and malfunction plan at the time the owner or operator developed the plan, the owner or operator must revise the startup, shutdown, and malfunction plan within 45 days after the event to include detailed procedures for operating and maintaining the source during similar malfunction events and a program of corrective action for similar malfunctions of process or air pollution control and monitoring equipment. In the event that the owner or operator makes any revision to the startup, shutdown, and malfunction plan which alters the

scope of the activities at the source which are deemed to be a startup, shutdown, or malfunction, or otherwise modifies the applicability of any emission limit, work practice requirement, or other requirement in a standard established under this part, the revised plan shall not take effect until after the owner or operator has provided a written notice describing the revision to the permitting authority.

(ix) The title V permit for an affected source must require that the owner or operator develop a startup, shutdown, and malfunction plan which conforms to the provisions of this part, but may do so by citing to the relevant subpart or subparagraphs of paragraph (e) of this section. However, any revisions made to the startup, shutdown, and malfunction plan in accordance with the procedures established by this part shall not be deemed to constitute permit revisions under part 70 or part 71 of this chapter and the elements of the startup, shutdown, and malfunction plan shall not be considered an applicable requirement as defined in § 70.2 and § 71.2 of this chapter. Moreover, none of the procedures specified by the startup, shutdown, and malfunction plan for an affected source shall be deemed to fall within the permit shield provision in section 504(f) of the Act.

(f) Compliance with nonopacity emission standards—

(1) Applicability. The non-opacity emission standards set forth in this part shall apply at all times except as otherwise specified in an applicable subpart. If a startup, shutdown, or malfunction of one portion of an affected source does not affect the ability of particular emission points within other portions of the affected source to comply with the non-opacity emission standards set forth in this part, then that emission point must still be required to comply with the non-opacity emission standards and other applicable requirements.

(2) Methods for determining compliance.

(i) The Administrator will determine compliance with nonopacity emission standards in this part based on the results of performance tests conducted according to the procedures in § 63.7, unless otherwise specified in an applicable subpart of this part.

(ii) The Administrator will determine compliance with nonopacity emission standards in this part by evaluation of an owner or operator's conformance with operation and maintenance requirements, including the evaluation of monitoring data, as specified in § 63.6(e) and applicable subparts of this part.

(iii) If an affected source conducts performance testing at startup to obtain an operating permit in the State in which the source is located, the results of such testing may be used to demonstrate compliance with a relevant standard if—

(A) The performance test was conducted within a reasonable amount of time before an initial performance test is required to be conducted under the relevant standard;

(B) The performance test was conducted under representative operating conditions for the source;

(C) The performance test was conducted and the resulting data were reduced using EPA-approved test methods and procedures, as specified in § 63.7(e) of this subpart; and

(D) The performance test was appropriately quality-assured, as specified in § 63.7(c).

(iv) The Administrator will determine compliance with design, equipment, work practice, or operational emission standards in this part by review of records, inspection of the source, and other procedures specified in applicable subparts of this part.

(v) The Administrator will determine compliance with design, equipment, work practice, or operational emission standards in this part by evaluation of an owner or operator's conformance with operation and maintenance requirements, as specified in paragraph (e) of this section and applicable subparts of this part.

(3) Finding of compliance. The Administrator will make a finding concerning an affected source's compliance with a non-opacity emission standard, as specified in paragraphs (f)(1) and (2) of this section, upon obtaining all the compliance information required by the relevant standard (including the written reports of performance test results, monitoring results, and other information, if applicable), and information available to the Administrator pursuant to paragraph (e)(1)(i) of this section.

(g) Use of an alternative nonopacity emission standard.

(1) If, in the Administrator's judgment, an owner or operator of an affected source has established that an alternative means of emission limitation will achieve a reduction in emissions of a hazardous air pollutant from an affected source at least equivalent to the reduction in emissions of that pollutant from that source achieved under any design, equipment, work practice, or operational emission standard, or combination thereof, established under this part pursuant to section 112(h) of the Act, the Administrator will publish in the Federal Register a notice permitting the use of the alternative emission standard for purposes of compliance with the promulgated standard. Any Federal Register notice under this paragraph shall be published only after the public is notified and given the opportunity to comment. Such notice will restrict the permission to the stationary source(s) or category(ies) of sources from which the alternative emission standard will achieve equivalent emission reductions. The Administrator will condition permission in such notice on requirements to assure the proper operation and maintenance of equipment and practices required for compliance with the alternative emission standard and other requirements, including appropriate quality assurance and quality control requirements, that are deemed necessary.

(2) An owner or operator requesting permission under this paragraph shall, unless otherwise specified in an applicable subpart, submit a proposed test plan or the results of testing and monitoring in accordance with § 63.7 and § 63.8, a description of the procedures followed in testing or monitoring, and a description of pertinent conditions during testing or monitoring. Any testing or monitoring conducted to request permission to use an alternative nonopacity emission standard shall be appropriately quality assured and quality controlled, as specified in § 63.7 and § 63.8.

(3) The Administrator may establish general procedures in an applicable subpart that accomplish the requirements of paragraphs (g)(1) and (g)(2) of this section.

(h) Compliance with opacity and visible emission standards—

Add.78

(1) *Applicability.* The opacity and visible emission standards set forth in this part must apply at all times except as otherwise specified in an applicable subpart. If a startup, shutdown, or malfunction of one portion of an affected source does not affect the ability of particular emission points within other portions of the affected source to comply with the opacity and visible emission standards set forth in this part, then that emission point shall still be required to comply with the opacity and visible emission standards and other applicable requirements.

(2) *Methods for determining compliance.*

(i) The Administrator will determine compliance with opacity and visible emission standards in this part based on the results of the test method specified in an applicable subpart. Whenever a continuous opacity monitoring system (COMS) is required to be installed to determine compliance with numerical opacity emission standards in this part, compliance with opacity emission standards in this part shall be determined by using the results from the COMS. Whenever an opacity emission test method is not specified, compliance with opacity emission standards in this part shall be determined by conducting observations in accordance with Test Method 9 in appendix A of part 60 of this chapter or the method specified in paragraph (h)(7)(ii) of this section. Whenever a visible emission test method is not specified, compliance with visible emission standards in this part shall be determined by conducting observations in accordance with Test Method 22 in appendix A of part 60 of this chapter.

(ii) [Reserved]

(iii) If an affected source undergoes opacity or visible emission testing at startup to obtain an operating permit in the State in which the source is located, the results of such testing may be used to demonstrate compliance with a relevant standard if—

(A) The opacity or visible emission test was conducted within a reasonable amount of time before a performance test is required to be conducted under the relevant standard;

(B) The opacity or visible emission test was conducted under representative operating conditions for the source;

(C) The opacity or visible emission test was conducted and the resulting data were reduced using EPA-approved test methods and procedures, as specified in § 63.7(e); and

(D) The opacity or visible emission test was appropriately quality-assured, as specified in § 63.7(c) of this section.

(3) [Reserved]

(4) *Notification of opacity or visible emission observations.* The owner or operator of an affected source shall notify the Administrator in writing of the anticipated date for conducting opacity or visible emission observations in accordance with § 63.9(f), if such observations are required for the source by a relevant standard.

(5) *Conduct of opacity or visible emission observations.* When a relevant standard under this part includes an opacity or visible emission standard, the owner or operator of an affected source shall comply with the following:

(i) For the purpose of demonstrating initial compliance, opacity or visible emission observations shall be conducted concurrently with the initial performance test required in § 63.7 unless one of the following conditions applies:

(A) If no performance test under § 63.7 is required, opacity or visible emission observations shall be conducted within 60 days after achieving the maximum production rate at which a new or reconstructed source will be operated, but not later than 120 days after initial startup of the source, or within 120 days after the effective date of the relevant standard in the case of new sources that start up before the standard's effective date. If no performance test under § 63.7 is required, opacity or visible emission observations shall be conducted within 120 days after the compliance date for an existing or modified source; or

(B) If visibility or other conditions prevent the opacity or visible emission observations from being conducted concurrently with the initial performance test required under § 63.7, or within the time period specified in paragraph (h)(5)(i)(A) of this section, the source's owner or operator shall reschedule the opacity or visible emission observations as soon after the initial performance test, or time period, as possible, but not later than 30 days thereafter, and shall advise the Administrator of the rescheduled date. The rescheduled opacity or visible emission observations shall be conducted (to the extent possible) under the same operating conditions that existed during the initial performance test conducted under § 63.7. The visible emissions observer shall determine whether visibility or other conditions prevent the opacity or visible emission observations from being made concurrently with the initial performance test in accordance with procedures contained in Test Method 9 or Test Method 22 in appendix A of part 60 of this chapter.

(ii) For the purpose of demonstrating initial compliance, the minimum total time of opacity observations shall be 3 hours (30 6–minute averages) for the performance test or other required set of observations (e.g., for fugitive-type emission sources subject only to an opacity emission standard).

(iii) The owner or operator of an affected source to which an opacity or visible emission standard in this part applies shall conduct opacity or visible emission observations in accordance with the provisions of this section, record the results of the evaluation of emissions, and report to the Administrator the opacity or visible emission results in accordance with the provisions of § 63.10(d).

(iv) [Reserved]

(v) Opacity readings of portions of plumes that contain condensed, uncombined water vapor shall not be used for purposes of determining compliance with opacity emission standards.

(6) Availability of records. The owner or operator of an affected source shall make available, upon request by the Administrator, such records that the Administrator deems necessary to determine the conditions under which the visual observations were made and shall provide evidence indicating proof of current visible observer emission certification.

(7) Use of a continuous opacity monitoring system.

Add.80

(i) The owner or operator of an affected source required to use a continuous opacity monitoring system (COMS) shall record the monitoring data produced during a performance test required under § 63.7 and shall furnish the Administrator a written report of the monitoring results in accordance with the provisions of § 63.10(e)(4).

(ii) Whenever an opacity emission test method has not been specified in an applicable subpart, or an owner or operator of an affected source is required to conduct Test Method 9 observations (see appendix A of part 60 of this chapter), the owner or operator may submit, for compliance purposes, COMS data results produced during any performance test required under § 63.7 in lieu of Method 9 data. If the owner or operator elects to submit COMS data for compliance with the opacity emission standard, he or she shall notify the Administrator of that decision, in writing, simultaneously with the notification under § 63.7(b) of the date the performance test is scheduled to begin. Once the owner or operator of an affected source has notified the Administrator to that effect, the COMS data results will be used to determine opacity compliance during subsequent performance tests required under § 63.7, unless the owner or operator notifies the Administrator in writing to the contrary not later than with the notification under § 63.7(b) of the date the subsequent performance test is scheduled to begin.

(iii) For the purposes of determining compliance with the opacity emission standard during a performance test required under § 63.7 using COMS data, the COMS data shall be reduced to 6–minute averages over the duration of the mass emission performance test.

(iv) The owner or operator of an affected source using a COMS for compliance purposes is responsible for demonstrating that he/she has complied with the performance evaluation requirements of § 63.8(e), that the COMS has been properly maintained, operated, and data quality-assured, as specified in § 63.8(c) and § 63.8(d), and that the resulting data have not been altered in any way.

(v) Except as provided in paragraph (h)(7)(ii) of this section, the results of continuous monitoring by a COMS that indicate that the opacity at the time visual observations were made was not in excess of the emission standard are probative but not conclusive evidence of the actual opacity of an emission, provided that the affected source proves that, at the time of the alleged violation, the instrument used was properly maintained, as specified in § 63.8(c), and met Performance Specification 1 in appendix B of part 60 of this chapter, and that the resulting data have not been altered in any way.

(8) Finding of compliance. The Administrator will make a finding concerning an affected source's compliance with an opacity or visible emission standard upon obtaining all the compliance information required by the relevant standard (including the written reports of the results of the performance tests required by § 63.7, the results of Test Method 9 or another required opacity or visible emission test method, the observer certification required by paragraph (h)(6) of this section, and the continuous opacity monitoring system results, whichever is/are applicable) and any information available to the Administrator needed to determine whether proper operation and maintenance practices are being used.

(9) Adjustment to an opacity emission standard.

(i) If the Administrator finds under paragraph (h)(8) of this section that an affected source is in compliance with all relevant standards for which initial performance tests were conducted under § 63.7, but during the time such performance tests were conducted fails to meet any relevant opacity emission standard, the owner or operator of such source may petition the Administrator to make appropriate adjustment to the opacity emission standard for the affected source. Until the

Administrator notifies the owner or operator of the appropriate adjustment, the relevant opacity emission standard remains applicable.

(ii) The Administrator may grant such a petition upon a demonstration by the owner or operator that—

(A) The affected source and its associated air pollution control equipment were operated and maintained in a manner to minimize the opacity of emissions during the performance tests;

(B) The performance tests were performed under the conditions established by the Administrator; and

(C) The affected source and its associated air pollution control equipment were incapable of being adjusted or operated to meet the relevant opacity emission standard.

(iii) The Administrator will establish an adjusted opacity emission standard for the affected source meeting the above requirements at a level at which the source will be able, as indicated by the performance and opacity tests, to meet the opacity emission standard at all times during which the source is meeting the mass or concentration emission standard. The Administrator will promulgate the new opacity emission standard in the Federal Register.

(iv) After the Administrator promulgates an adjusted opacity emission standard for an affected source, the owner or operator of such source shall be subject to the new opacity emission standard, and the new opacity emission standard shall apply to such source during any subsequent performance tests.

(i) Extension of compliance with emission standards.

(1) Until an extension of compliance has been granted by the Administrator (or a State with an approved permit program) under this paragraph, the owner or operator of an affected source subject to the requirements of this section shall comply with all applicable requirements of this part.

(2) Extension of compliance for early reductions and other reductions—

(i) Early reductions. Pursuant to section 112(i)(5) of the Act, if the owner or operator of an existing source demonstrates that the source has achieved a reduction in emissions of hazardous air pollutants in accordance with the provisions of subpart D of this part, the Administrator (or the State with an approved permit program) will grant the owner or operator an extension of compliance with specific requirements of this part, as specified in subpart D.

(ii) Other reductions. Pursuant to section 112(i)(6) of the Act, if the owner or operator of an existing source has installed best available control technology (BACT) (as defined in section 169(3) of the Act) or technology required to meet a lowest achievable emission rate (LAER) (as defined in section 171 of the Act) prior to the promulgation of an emission standard in this part applicable to such source and the same pollutant (or stream of pollutants) controlled pursuant to the BACT or LAER installation, the Administrator will grant the owner or operator an extension of compliance with such emission

Add.82

standard that will apply until the date 5 years after the date on which such installation was achieved, as determined by the Administrator.

(3) Request for extension of compliance. Paragraphs (i)(4) through (i)(7) of this section concern requests for an extension of compliance with a relevant standard under this part (except requests for an extension of compliance under paragraph (i)(2)(i) of this section will be handled through procedures specified in subpart D of this part).

(4)(i)(A) The owner or operator of an existing source who is unable to comply with a relevant standard established under this part pursuant to section 112(d) of the Act may request that the Administrator (or a State, when the State has an approved part 70 permit program and the source is required to obtain a part 70 permit under that program, or a State, when the State has been delegated the authority to implement and enforce the emission standard for that source) grant an extension allowing the source up to 1 additional year to comply with the standard, if such additional period is necessary for the installation of controls. An additional extension of up to 3 years may be added for mining waste operations, if the 1–year extension of compliance is insufficient to dry and cover mining waste in order to reduce emissions of any hazardous air pollutant. The owner or operator of an affected source who has requested an extension of compliance under this paragraph and who is otherwise required to obtain a title V permit shall apply for such permit or apply to have the source's title V permit revised to incorporate the conditions of the extension of compliance. The conditions of an extension of compliance granted under this paragraph will be incorporated into the affected source's title V permit according to the provisions of part 70 or Federal title V regulations in this chapter (42 U.S.C. 7661), whichever are applicable.

(B) Any request under this paragraph for an extension of compliance with a relevant standard must be submitted in writing to the appropriate authority no later than 120 days prior to the affected source's compliance date (as specified in paragraphs (b) and (c) of this section), except as provided for in paragraph (i)(4)(i)(C) of this section. Nonfrivolous requests submitted under this paragraph will stay the applicability of the rule as to the emission points in question until such time as the request is granted or denied. A denial will be effective as of the date of denial. Emission standards established under this part may specify alternative dates for the submittal of requests for an extension of compliance if alternatives are appropriate for the source categories affected by those standards.

(C) An owner or operator may submit a compliance extension request after the date specified in paragraph (i)(4)(i)(B) of this section provided the need for the compliance extension arose after that date, and before the otherwise applicable compliance date and the need arose due to circumstances beyond reasonable control of the owner or operator. This request must include, in addition to the information required in paragraph (i)(6)(i) of this section, a statement of the reasons additional time is needed and the date when the owner or operator first learned of the problems. Nonfrivolous requests submitted under this paragraph will stay the applicability of the rule as to the emission points in question until such time as the request is granted or denied. A denial will be effective as of the original compliance date.

(ii) The owner or operator of an existing source unable to comply with a relevant standard established under this part pursuant to section 112(f) of the Act may request that the Administrator grant an extension allowing the source up to 2 years after the standard's effective date to comply with the standard. The Administrator may grant such an extension if he/she finds that such additional period is necessary for the installation of controls and that steps will be taken during the period of the extension to assure that the health of persons will be protected from imminent endangerment. Any request for an extension of compliance with a relevant standard under this paragraph must be submitted in writing to the Administrator not later than 90 calendar days after the effective date of the relevant standard.

(5) The owner or operator of an existing source that has installed BACT or technology required to meet LAER [as specified in paragraph (i)(2)(ii) of this section] prior to the promulgation of a relevant emission standard in this part may request that the Administrator grant an extension allowing the source 5 years from the date on which such installation was achieved, as determined by the Administrator, to comply with the standard. Any request for an extension of compliance with a relevant standard under this paragraph shall be submitted in writing to the Administrator not later than 120 days after the promulgation date of the standard. The Administrator may grant such an extension if he or she finds that the installation of BACT or technology to meet LAER controls the same pollutant (or stream of pollutants) that would be controlled at that source by the relevant emission standard.

(6)(i) The request for a compliance extension under paragraph (i)(4) of this section shall include the following information:

(A) A description of the controls to be installed to comply with the standard;

(B) A compliance schedule, including the date by which each step toward compliance will be reached. At a minimum, the list of dates shall include:

(1) The date by which on-site construction, installation of emission control equipment, or a process change is planned to be initiated; and

(2) The date by which final compliance is to be achieved.

(3) The date by which on-site construction, installation of emission control equipment, or a process change is to be completed; and

(4) The date by which final compliance is to be achieved;

(C), (D) [Reserved]

(ii) The request for a compliance extension under paragraph (i)(5) of this section shall include all information needed to demonstrate to the Administrator's satisfaction that the installation of BACT or technology to meet LAER controls the same pollutant (or stream of pollutants) that would be controlled at that source by the relevant emission standard.

(7) Advice on requesting an extension of compliance may be obtained from the Administrator (or the State with an approved permit program).

(8) Approval of request for extension of compliance. Paragraphs (i)(9) through (i)(14) of this section concern approval of an extension of compliance requested under paragraphs (i)(4) through (i)(6) of this section.

Add.84

(9) Based on the information provided in any request made under paragraphs (i)(4) through (i)(6) of this section, or other information, the Administrator (or the State with an approved permit program) may grant an extension of compliance with an emission standard, as specified in paragraphs (i)(4) and (i)(5) of this section.

(10) The extension will be in writing and will—

(i) Identify each affected source covered by the extension;

(ii) Specify the termination date of the extension;

(iii) Specify the dates by which steps toward compliance are to be taken, if appropriate;

(iv) Specify other applicable requirements to which the compliance extension applies (e.g., performance tests); and

(v)(A) Under paragraph (i)(4), specify any additional conditions that the Administrator (or the State) deems necessary to assure installation of the necessary controls and protection of the health of persons during the extension period; or

(B) Under paragraph (i)(5), specify any additional conditions that the Administrator deems necessary to assure the proper operation and maintenance of the installed controls during the extension period.

(11) The owner or operator of an existing source that has been granted an extension of compliance under paragraph (i)(10) of this section may be required to submit to the Administrator (or the State with an approved permit program) progress reports indicating whether the steps toward compliance outlined in the compliance schedule have been reached. The contents of the progress reports and the dates by which they shall be submitted will be specified in the written extension of compliance granted under paragraph (i)(10) of this section.

(12)(i) The Administrator (or the State with an approved permit program) will notify the owner or operator in writing of approval or intention to deny approval of a request for an extension of compliance within 30 calendar days after receipt of sufficient information to evaluate a request submitted under paragraph (i)(4)(i) or (i)(5) of this section. The Administrator (or the State) will notify the owner or operator in writing of the status of his/her application, that is, whether the application contains sufficient information to make a determination, within 30 calendar days after receipt of the original application and within 30 calendar days after receipt of any supplementary information that is submitted. The 30–day approval or denial period will begin after the owner or operator has been notified in writing that his/her application is complete.

(ii) When notifying the owner or operator that his/her application is not complete, the Administrator will specify the information needed to complete the application and provide notice of opportunity for the applicant to present, in writing, within 30 calendar days after he/she is notified of the incomplete application, additional information or arguments to the Administrator to enable further action on the application.

(iii) Before denying any request for an extension of compliance, the Administrator (or the State with an approved permit program) will notify the owner or operator in writing of the Administrator's (or the State's) intention to issue the denial, together with—

(A) Notice of the information and findings on which the intended denial is based; and

(B) Notice of opportunity for the owner or operator to present in writing, within 15 calendar days after he/she is notified of the intended denial, additional information or arguments to the Administrator (or the State) before further action on the request.

(iv) The Administrator's final determination to deny any request for an extension will be in writing and will set forth the specific grounds on which the denial is based. The final determination will be made within 30 calendar days after presentation of additional information or argument (if the application is complete), or within 30 calendar days after the final date specified for the presentation if no presentation is made.

(13)(i) The Administrator will notify the owner or operator in writing of approval or intention to deny approval of a request for an extension of compliance within 30 calendar days after receipt of sufficient information to evaluate a request submitted under paragraph (i)(4)(ii) of this section. The 30–day approval or denial period will begin after the owner or operator has been notified in writing that his/her application is complete. The Administrator (or the State) will notify the owner or operator in writing of the status of his/her application, that is, whether the application contains sufficient information to make a determination, within 15 calendar days after receipt of the original application and within 15 calendar days after receipt of any supplementary information that is submitted.

(ii) When notifying the owner or operator that his/her application is not complete, the Administrator will specify the information needed to complete the application and provide notice of opportunity for the applicant to present, in writing, within 15 calendar days after he/she is notified of the incomplete application, additional information or arguments to the Administrator to enable further action on the application.

(iii) Before denying any request for an extension of compliance, the Administrator will notify the owner or operator in writing of the Administrator's intention to issue the denial, together with—

(A) Notice of the information and findings on which the intended denial is based; and

(B) Notice of opportunity for the owner or operator to present in writing, within 15 calendar days after he/she is notified of the intended denial, additional information or arguments to the Administrator before further action on the request.

(iv) A final determination to deny any request for an extension will be in writing and will set forth the specific grounds on which the denial is based. The final determination will be made within 30 calendar days after presentation of additional information or argument (if the application is complete), or within 30 calendar days after the final date specified for the presentation if no presentation is made.

(14) The Administrator (or the State with an approved permit program) may terminate an extension of compliance at an earlier date than specified if any specification under paragraph (i)(10)(iii) or (iv) of this section is not met. Upon a determination to terminate, the Administrator will notify, in writing, the owner or operator of the Administrator's determination to terminate, together with:

(i) Notice of the reason for termination; and

(ii) Notice of opportunity for the owner or operator to present in writing, within 15 calendar days after he/she is notified of the determination to terminate, additional information or arguments to the Administrator before further action on the termination.

(iii) A final determination to terminate an extension of compliance will be in writing and will set forth the specific grounds on which the termination is based. The final determination will be made within 30 calendar days after presentation of additional information or arguments, or within 30 calendar days after the final date specified for the presentation if no presentation is made.

(15) [Reserved]

(16) The granting of an extension under this section shall not abrogate the Administrator's authority under section 114 of the Act.

(j) Exemption from compliance with emission standards. The President may exempt any stationary source from compliance with any relevant standard established pursuant to section 112 of the Act for a period of not more than 2 years if the President determines that the technology to implement such standard is not available and that it is in the national security interests of the United States to do so. An exemption under this paragraph may be extended for 1 or more additional periods, each period not to exceed 2 years.

**Credits**
[67 FR 16599, April 5, 2002; 68 FR 32600, May 30, 2003; 71 FR 20454, April 20, 2006; 85 FR 73885, Nov. 19, 2020; 86 FR 13821, March 11, 2021]

SOURCE: 57 FR 61992, Dec. 29, 1992; 59 FR 12430, March 16, 1994, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Current through October 25, 2024, 89 FR 85420. Some sections may be more current. See credits for details.

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Add.87

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter C. Air Programs
        Part 63. National Emission Standards for Hazardous Air Pollutants for Source Categories (Refs & Annos)
          Subpart A. General Provisions (Refs & Annos)

40 C.F.R. § 63.12

§ 63.12 State authority and delegations.

Effective: January 19, 2021

Currentness

(a) The provisions of this part shall not be construed in any manner to preclude any State or political subdivision thereof from—

(1) Adopting and enforcing any standard, limitation, prohibition, or other regulation applicable to an affected source subject to the requirements of this part, provided that such standard, limitation, prohibition, or regulation is not less stringent than any requirement applicable to such source established under this part;

(2) Requiring the owner or operator of an affected source to obtain permits, licenses, or approvals prior to initiating construction, reconstruction, modification, or operation of such source; or

(3) Requiring emission reductions in excess of those specified in subpart D of this part as a condition for granting the extension of compliance authorized by section 112(i)(5) of the Act.

(b)(1) Section 112(l) of the Act directs the Administrator to delegate to each State, when appropriate, the authority to implement and enforce standards and other requirements pursuant to section 112 for stationary sources located in that State. Because of the unique nature of radioactive material, delegation of authority to implement and enforce standards that control radionuclides may require separate approval.

(2) Subpart E of this part establishes procedures consistent with section 112(l) for the approval of State rules or programs to implement and enforce applicable Federal rules promulgated under the authority of section 112. Subpart E also establishes procedures for the review and withdrawal of section 112 implementation and enforcement authorities granted through a section 112(l) approval.

(c) All information required to be submitted to the EPA under this part also shall be submitted to the appropriate state agency of any state to which authority has been delegated under section 112(l) of the Act, provided that each specific delegation may exempt sources from a certain federal or state reporting requirement. Any information required to be submitted electronically by this part via the EPA's CEDRI may, at the discretion of the delegated authority, satisfy the requirements of this paragraph. The Administrator may permit all or some of the information to be submitted to the appropriate state agency only, instead of to the EPA and the state agency with the exception of federal electronic reporting requirements under this part. Sources may not be exempted from federal electronic reporting requirements.

Add.88

**Credits**
[85 FR 73887, Nov. 19, 2020]

SOURCE: 57 FR 61992, Dec. 29, 1992; 59 FR 12430, March 16, 1994, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Current through October 25, 2024, 89 FR 85420. Some sections may be more current. See credits for details.

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
 Title 40. Protection of Environment
  Chapter I. Environmental Protection Agency (Refs & Annos)
   Subchapter C. Air Programs
    Part 63. National Emission Standards for Hazardous Air Pollutants for Source Categories (Refs & Annos)
     Subpart E. Approval of State Programs and Delegation of Federal Authorities (Refs & Annos)

40 C.F.R. § 63.90

§ 63.90 Program overview.

Currentness

The regulations in this subpart establish procedures consistent with section 112(l) of the Clean Air Act (Act) (42 U.S.C. 7401–7671q). This subpart establishes procedures for the approval of State rules, programs, or other requirements such as permit terms and conditions to be implemented and enforced in place of certain otherwise applicable section 112 Federal rules, emission standards, or requirements (including section 112 rules promulgated under the authority of the Act prior to the 1990 Amendments to the Act). The authority to implement and enforce section 112 Federal rules as promulgated without changes may be delegated under procedures established in this subpart. In this process, States may seek approval of a State mechanism for receiving delegation of existing and future unchanged Federal section 112 standards. This subpart clarifies which part 63, subpart A General Provisions authorities can be delegated to States. This subpart also establishes procedures for the review and withdrawal of section 112 implementation and enforcement authorities delegated through this subpart. This subpart also establishes procedures for the approval of State rules or programs to establish limitations on the potential to emit pollutants listed in or pursuant to section 112(b) of the Act.

(a) Definitions. The following definitions apply to this subpart.

Alternative requirements means the requirements, rules, permits, provisions, methods, or other enforceable mechanisms that a State submits for approval under this subpart or subpart A and, after approval, replaces the otherwise applicable Federal section 112 requirements, provisions, or methods.

Applicability criteria means the regulatory criteria used to define all affected sources subject to a specific section 112 rule.

Approval means a determination by the Administrator that a State rule, program, or requirement meets the criteria of § 63.91 and the additional criteria of either § 63.92, § 63.93, § 63.94, or § 63.97 as appropriate. For accidental release prevention programs, the criteria of § 63.95 must be met in addition to the criteria of § 63.91. This is considered a "full approval" for the purposes of this subpart. Partial approvals may also be granted as described in this subpart. Any approved requirements become applicable requirements under § 70.2 of this chapter.

Compliance and enforcement measures means requirements relating to compliance and enforcement, including but not necessarily limited to monitoring methods and procedures, recordkeeping, reporting, plans, inspection, maintenance, and operation requirements, pollution prevention requirements, noticing, field inspections, entry, sampling, or accidental release prevention oversight.

Intermediate change to monitoring means a modification to federally required monitoring involving "proven technology" (generally accepted by the scientific community as equivalent or better) that is applied on a site-specific basis and that may have the potential to decrease the stringency of the associated emission limitation or standard. Though site-specific, an

intermediate change may set a national precedent for a source category and may ultimately result in a revision to the federally required monitoring. Examples of intermediate changes to monitoring include, but are not limited to:

(1) Use of a continuous emission monitoring system (CEMS) in lieu of a parameter monitoring approach;

(2) Decreased frequency for non-continuous parameter monitoring or physical inspections;

(3) Changes to quality control requirements for parameter monitoring; and

(4) Use of an electronic data reduction system in lieu of manual data reduction.

Intermediate change to test method means a within-method modification to a federally enforceable test method involving "proven technology" (generally accepted by the scientific community as equivalent or better) that is applied on a site-specific basis and that may have the potential to decrease the stringency of the associated emission limitation or standard. Though site-specific, an intermediate change may set a national precedent for a source category and may ultimately result in a revision to the federally enforceable test method. In order to be approved, an intermediate change must be validated according to EPA Method 301 (Part 63, Appendix A) to demonstrate that it provides equal or improved accuracy and precision. Examples of intermediate changes to a test method include, but are not limited to:

(1) Modifications to a test method's sampling procedure including substitution of sampling equipment that has been demonstrated for a particular sample matrix, and use of a different impinger absorbing solution;

(2) Changes in sample recovery procedures and analytical techniques, such as changes to sample holding times and use of a different analytical finish with proven capability for the analyte of interest; and

(3) "Combining" a federally required method with another proven method for application to processes emitting multiple pollutants.

Level of control means the degree to which a rule, program, or requirement limits emissions or employs design, equipment, work practice, or operational standards, accident prevention, or other requirements or techniques (including a prohibition of emissions) for:

(1)(i) Each hazardous air pollutant, if individual pollutants are subject to emission limitations, and

(ii) The aggregate total of hazardous air pollutants, if the aggregate grouping is subject to emission limitations, provided that the rule, program, or requirement would not lead to an increase in risk to human health or the environment; and

(2) Each substance regulated under part 68 of this chapter.

(3) Test methods and associated procedures and averaging times are integral to the level of control.

Local agency means a local air pollution control agency or, for the purposes of § 63.95, any local agency or entity having responsibility for preventing accidental releases which may occur at a source regulated under part 68 of this chapter.

Major change to monitoring means a modification to federally required monitoring that uses "unproven technology or procedures" (not generally accepted by the scientific community) or is an entirely new method (sometimes necessary when the required monitoring is unsuitable). A major change to monitoring may be site-specific or may apply to one or more source categories and will almost always set a national precedent. Examples of major changes to monitoring include, but are not limited to:

(1) Use of a new monitoring approach developed to apply to a control technology not contemplated in the applicable regulation;

(2) Use of a predictive emission monitoring system (PEMS) in place of a required continuous emission monitoring system (CEMS);

(3) Use of alternative calibration procedures that do not involve calibration gases or test cells;

(4) Use of an analytical technology that differs from that specified by a performance specification;

(5) Decreased monitoring frequency for a continuous emission monitoring system, continuous opacity monitoring system, predictive emission monitoring system, or continuous parameter monitoring system;

(6) Decreased monitoring frequency for a leak detection and repair program; and

(7) Use of alternative averaging times for reporting purposes.

Major change to recordkeeping/reporting means:

(1) A modification to federally required recordkeeping or reporting that:

(i) May decrease the stringency of the required compliance and enforcement measures for the relevant standards;

(ii) May have national significance (e.g., might affect implementation of the applicable regulation for other affected sources, might set a national precedent); or

(iii) Is not site-specific.

(2) Examples of major changes to recordkeeping and reporting include, but are not limited to:

(i) Decreases in the record retention for all records;

(ii) Waiver of all or most recordkeeping or reporting requirements;

(iii) Major changes to the contents of reports; or

(iv) Decreases in the reliability of recordkeeping or reporting (e.g., manual recording of monitoring data instead of required automated or electronic recording, or paper reports where electronic reporting may have been required).

Major change to test method means a modification to a federally enforceable test method that uses "unproven technology or procedures" (not generally accepted by the scientific community) or is an entirely new method (sometimes necessary when the required test method is unsuitable). A major change to a test method may be site-specific, or may apply to one or more sources or source categories, and will almost always set a national precedent. In order to be approved, a major change must be validated according to EPA Method 301 (Part 63, Appendix A). Examples of major changes to a test method include, but are not limited to:

(1) Use of an unproven analytical finish;

(2) Use of a method developed to fill a test method gap;

Add.92

(3) Use of a new test method developed to apply to a control technology not contemplated in the applicable regulation; and

(4) Combining two or more sampling/analytical methods (at least one unproven) into one for application to processes emitting multiple pollutants.

Minor change to monitoring means:

(1) A modification to federally required monitoring that:

(i) Does not decrease the stringency of the compliance and enforcement measures for the relevant standard;

(ii) Has no national significance (e.g., does not affect implementation of the applicable regulation for other affected sources, does not set a national precedent, and individually does not result in a revision to the monitoring requirements); and

(iii) Is site-specific, made to reflect or accommodate the operational characteristics, physical constraints, or safety concerns of an affected source.

(2) Examples of minor changes to monitoring include, but are not limited to:

(i) Modifications to a sampling procedure, such as use of an improved sample conditioning system to reduce maintenance requirements;

(ii) Increased monitoring frequency; and

(iii) Modification of the environmental shelter to moderate temperature fluctuation and thus protect the analytical instrumentation.

Minor change to recordkeeping/reporting means:

(1) A modification to federally required recordkeeping or reporting that:

(i) Does not decrease the stringency of the compliance and enforcement measures for the relevant standards;

(ii) Has no national significance (e.g., does not affect implementation of the applicable regulation for other affected sources, does not set a national precedent, and individually does not result in a revision to the recordkeeping or reporting requirement); and

(iii) Is site-specific.

(2) Examples of minor changes to recordkeeping or reporting include, but are not limited to:

(i) Changes to recordkeeping necessitated by alternatives to monitoring;

(ii) Increased frequency of recordkeeping or reporting, or increased record retention periods;

(iii) Increased reliability in the form of recording monitoring data, e.g., electronic or automatic recording as opposed to manual recording of monitoring data;

(iv) Changes related to compliance extensions granted pursuant to § 63.6(i);

(v) Changes to recordkeeping for good cause shown for a fixed short duration, e.g., facility shutdown;

(vi) Changes to recordkeeping or reporting that is clearly redundant with equivalent recordkeeping/reporting requirements; and

(vii) Decreases in the frequency of reporting for area sources to no less than once a year for good cause shown, or for major sources to no less than twice a year as required by title V, for good cause shown.

Minor change to test method means:

(1) A modification to a federally enforceable test method that:

(i) Does not decrease the stringency of the emission limitation or standard;

(ii) Has no national significance (e.g., does not affect implementation of the applicable regulation for other affected sources, does not set a national precedent, and individually does not result in a revision to the test method); and

(iii) Is site-specific, made to reflect or accommodate the operational characteristics, physical constraints, or safety concerns of an affected source.

(2) Examples of minor changes to a test method include, but are not limited to:

(i) Field adjustments in a test method's sampling procedure, such as a modified sampling traverse or location to avoid interference from an obstruction in the stack, increasing the sampling time or volume, use of additional impingers for a high moisture situation, accepting particulate emission results for a test run that was conducted with a lower than specified temperature, substitution of a material in the sampling train that has been demonstrated to be more inert for the sample matrix; and

(ii) Changes in recovery and analytical techniques such as a change in quality control/quality assurance requirements needed to adjust for analysis of a certain sample matrix.

Partial approval means that the Administrator approves under this subpart:

(1) A State's legal authorities that fully meet the criteria of § 63.91(d)(3)(ii)–(v), and substantially meet the criteria of § 63.91(d)(3)(i) as appropriate; or

(2) A State rule or program that meets the criteria of §§ 63.92, 63.93, 63.94, 63.95, or 63.97 with the exception of a separable portion of that State rule or program which fails to meet those criteria. A separable portion of a State rule or program is defined as a section(s) of a rule or a portion(s) of a program which can be acted upon independently without affecting the overall integrity of the rule or program as a whole.

Program means, for the purposes of an approval under this subpart, a collection of State authorities, resources, and other requirements that satisfy the criteria of this subpart and subpart A.

State agency, for the purposes of this subpart, includes State and local air pollution agencies, Indian tribes as defined in § 71.2 of this chapter, and territories of the United States to the extent they are or will be delegated Federal section 112 rules, emission standards, or requirements.

Stringent or stringency means the degree of rigor, strictness or severity a statute, rule, emission standard, or requirement imposes on an affected source as measured by the quantity of emissions, or as measured by parameters relating to rule applicability and level of control, or as otherwise determined by the Administrator.

Title V operating permit programs means the part 70 permitting program and the delegated Indian tribal programs under part 70 of this chapter.

(b) Local agency coordination with State and territorial agencies. Local agencies submitting a rule or program for approval under this subpart shall consult with the relevant State or Territorial agency prior to making a request for approval to the Administrator. A State or Territorial agency may submit requests for approval on behalf of a local agency after consulting with that local agency.

(c) Tribal authority.

A tribal authority may submit a rule or program under this subpart, provided that the tribal authority has received approval, under the provisions of part 49 of this chapter, for administering Federal rules under section 112 of the Act.

(d) Authorities retained by the Administrator.

(1) The following authorities will be retained by the Administrator and will not be delegated:

(i) The authority to add or delete pollutants from the list of hazardous air pollutants established under section 112(b);

(ii), (iii) [Reserved]

(iv) The authority to add source categories to or delete source categories from the Federal source category list established under section 112(c)(1) or to subcategorize categories on the Federal source category list after proposal of a relevant emission standard;

(v) The authority to revise the source category schedule established under section 112(e) by moving a source category to a later date for promulgation; and

(vi) Any other authorities determined to be nondelegable by the Administrator.

(2) Nothing in this subpart shall prohibit the Administrator from enforcing any applicable rule, emission standard or requirement established under section 112.

(3) Nothing in this subpart shall affect the authorities and obligations of the Administrator or the State under title V of the Act or under regulations promulgated pursuant to that title.

(e) Federally-enforceable requirements. All rules, programs, State or local permits, or other requirements approved under this subpart and all resulting part 70 operating permit conditions are enforceable by the Administrator and by citizens under the Act.

(f) Standards not subject to modification or substitution. With respect to radionuclide emissions from licensees of the Nuclear Regulatory Commission or licensees of Nuclear Regulatory Commission Agreement States which are subject to part 61, subparts I, T, or W of this chapter, a State may request that the EPA approve delegation of implementation and enforcement of the Federal standard pursuant to § 63.91, but no changes or modifications in the form or content of the standard will be approved pursuant to § 63.92, § 63.93, § 63.94, or § 63.97.

(g) Selection of delegation options.

(1) With the exception of paragraphs (g)(2) and (g)(3) of this section, States may only submit requests for approval of alternative requirements for a section 112 Federal rule, emission standard, or other requirement under a single delegation option under this subpart.

(2) In the case of § 63.94 submittals, if the identified sources in any source category comprise a subset of the sources in that category, the State must accept delegation under one other section of this subpart for the remainder of the sources in that category that are required to be permitted by the State under part 70 of this chapter.

(3) If the Administrator partially approves the State request per § 63.91(f), the State may submit a request for the remaining section 112 rules, emission standards, or requirements in that category under another section of this subpart.

**Credits**

[61 FR 36297, July 10, 1996; 65 FR 55835, Sept. 14, 2000]

SOURCE: 57 FR 61992, Dec. 29, 1992; 58 FR 62283, Nov. 26, 1993, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Notes of Decisions (4)

Current through October 25, 2024, 89 FR 85420. Some sections may be more current. See credits for details.

End of Document                                                                © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Add.96

Code of Federal Regulations
    Title 40. Protection of Environment
        Chapter I. Environmental Protection Agency (Refs & Annos)
            Subchapter C. Air Programs
                Part 63. National Emission Standards for Hazardous Air Pollutants for Source Categories (Refs & Annos)
                    Subpart E. Approval of State Programs and Delegation of Federal Authorities (Refs & Annos)

40 C.F.R. § 63.96

§ 63.96 Review and withdrawal of approval.

Currentness

(a) Submission of information for review of approval.

(1) The Administrator may at any time request any of the following information to review the adequacy of implementation and enforcement of an approved rule or program and the State shall provide that information within 45 days of the Administrator's request:

(i) Copies of any State statutes, rules, regulations or other requirements that have amended, repealed or revised the approved State rule or program since approval or since the immediately previous EPA review;

(ii) Information to demonstrate adequate State enforcement and compliance monitoring activities with respect to all approved State rules and with all section 112 rules, emission standards or requirements;

(iii) Information to demonstrate adequate funding, staff, and other resources to implement and enforce the State's approved rule or program;

(iv) A schedule for implementing the State's approved rule or program that assures compliance with all section 112 rules and requirements that the EPA has promulgated since approval or since the immediately previous EPA review,

(v) A list of part 70 or other permits issued, amended, revised, or revoked since approval or since immediately previous EPA review, for sources subject to a State rule or program approved under this subpart.

(vi) A summary of enforcement actions by the State regarding violations of section 112 requirements, including but not limited to administrative orders and judicial and administrative complaints and settlements.

(2) Upon request by the Administrator, the State shall demonstrate that each State rule, emission standard or requirement applied to an individual source is no less stringent as applied than the otherwise applicable Federal rule, emission standard or requirement.

(b) Withdrawal of approval of a state rule or program.

(1) If the Administrator has reason to believe that a State is not adequately implementing or enforcing an approved rule or program according to the criteria of this section or that an approved rule or program is not as stringent as the otherwise applicable Federal rule, emission standard or requirements, the Administrator will so inform the State in writing and will identify the reasons why the Administrator believes that the State's rule or program is not adequate. The State shall then initiate action to correct the deficiencies identified by the Administrator and shall inform the Administrator of the actions it has initiated and completed. If the Administrator determines that the State's actions are not adequate to correct the deficiencies, the Administrator will notify the State that the Administrator intends to withdraw approval and will hold a public hearing and seek public comment on the proposed withdrawal of approval. The Administrator will require that comments be submitted concurrently to the State. Upon notification of the intent to withdraw, the State will notify all sources subject to the relevant approved rule or program that withdrawal proceedings have been initiated.

(2) Based on any public comment received and any response to that comment by the State, the Administrator will notify the State of any changes in identified deficiencies or actions needed to correct identified deficiencies. If the State does not correct the identified deficiencies within 90 days after receiving revised notice of deficiencies, the Administrator shall withdraw approval of the State's rule or program upon a determination that:

(i) The State no longer has adequate authorities to assure compliance or re-sources to implement and enforce the approved rule or program, or

(ii) The State is not adequately implementing or enforcing the approved rule or program, or

(iii) An approved rule or program is not as stringent as the otherwise applicable Federal rule, emission standard or requirement.

(3) The Administrator may withdraw approval for part of a rule, for a rule, for part of a program, or for an entire program.

(4) Any State rule, program or portion of a State rule or program for which approval is withdrawn is no longer Federally enforceable. The Federal rule, emission standard or requirement that would have been applicable in the absence of approval under this will be the federally enforceable rule, emission standard or requirement.

(i) Upon withdrawal of approval, the Administrator will publish an expeditious schedule for sources subject to the previously approved State rule or program to come into compliance with applicable Federal requirements. Such schedule shall include interim emission limits where appropriate. During this transition, sources must be operated in a manner consistent with good air pollution control practices for minimizing emissions.

(ii) Upon withdrawal, the State shall reopen, under the provisions of § 70.7(f) of this chapter, the part 70 permit of each source subject to the previously approved rules or programs in order to assure compliance through the permit with the applicable requirements for each source.

Add.98

(iii) If the Administrator withdraws approval of State rules applicable to sources that are not subject to part 70 permits, the applicable State rules are no longer Federally enforceable.

(iv) If the Administrator withdraws approval of a portion of a State rule or program, other approved portions of the State rule or program that are not withdrawn shall remain in effect.

(v) Any applicable Federal emission standard or requirement shall remain enforceable by the EPA as specified in section 112(l)(7) of the Act.

(5) If a rule approved under § 63.93 is withdrawn under the provisions of § 63.96(b)(2)(i) or (ii), and, at the time of withdrawal, the Administrator finds the rule to be no less stringent than the otherwise applicable Federal requirement, the Administrator will grant equivalency to the previously approved State rule under the appropriate provisions of this part.

(6) A State may submit a new rule, program or portion of a rule or program for approval after the Administrator has withdrawn approval of the State's rule, program or portion of a rule or program. The Administrator will determine whether the new rule or program or portion of a rule or program is approvable according to the criteria and procedures of § 63.91 and either of §§ 63.92, 63.93 or 63.94.

(7) A State may voluntarily withdraw from an approved State rule, program or portion of a rule or program by notifying the EPA and all affected sources subject to the rule or program and providing notice and opportunity for comment to the public within the State.

(i) Upon voluntary withdrawal by a State, the Administrator will publish a timetable for sources subject to the previously approved State rule or program to come into compliance with applicable Federal requirements.

(ii) Upon voluntary withdrawal, the State must reopen and revise the part 70 permits of all sources affected by the withdrawal as provided for in this section and § 70.7(f), and the Federal rule, emission standard, or requirement that would have been applicable in the absence of approval under this subpart will become the applicable requirement for the source.

(iii) Any applicable Federal section 112 rule, emission standard or requirement shall remain enforceable by the EPA as specified in section 112(l)(7) of the Act.

(iv) Voluntary withdrawal shall not be effective sooner than 180 days after the State notifies the EPA of its intent to voluntarily withdraw.

**Credits**

[65 FR 55835, 55843, Sept. 14, 2000]

SOURCE: 57 FR 61992, Dec. 29, 1992; 58 FR 62283, Nov. 26, 1993, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.


Notes of Decisions (4)

Current through October 25, 2024, 89 FR 85420. Some sections may be more current. See credits for details.

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
   Title 40. Protection of Environment
      Chapter I. Environmental Protection Agency (Refs & Annos)
         Subchapter C. Air Programs
            Part 63. National Emission Standards for Hazardous Air Pollutants for Source Categories (Refs & Annos)
               Subpart E. Approval of State Programs and Delegation of Federal Authorities (Refs & Annos)

40 C.F.R. § 63.99

§ 63.99 Delegated Federal authorities.

Effective: June 24, 2024

Currentness

(a) This section lists the specific source categories that have been delegated to the air pollution control agencies in each State under the procedures described in this subpart.

(1) Alabama.

(i) The following table lists the specific part 63 standards that have been delegated unchanged to the Alabama Department of Environmental Management for all sources. The "X" symbol is used to indicate each subpart that has been delegated. The delegations are subject to all of the conditions and limitations set forth in Federal law, regulations, policy, guidance, and determinations. Some authorities cannot be delegated and are retained by EPA. These include certain General Provisions authorities and specific parts of some standards.

**Part 63 Major & Area Source Rule Delegations—Alabama [1]**

| Source category | Subpart | ADEM [2] | JCDH [3] | HDNR [4] |
|---|---|---|---|---|
| 1................HON................ | F, G, H, I................ | X | X | X |
| 2................Polyvinyl Chloride & Co-polymers, VACATED on 5/11/05................ | J | | | |
| 3................Coke Ovens................ | L | X | X | X |
| 4................Dry Cleaners................ | M | X | X | X |
| 5................Chromium Electroplating................ | N | X | X | X |
| 6................EtO Commercial Sterilization................ | O | X | X | X |
| 7................Chromium Cooling Towers................ | Q | X | X | X |
| 8................Gasoline Distribution (stage 1)................ | R | X | X | X |
| 9................Pulp & Paper I................ | S | X | X | X |
| 10................Halogenated Solvent Cleaning................ | T | X | X | X |

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | | | |
|---|---|---|---|---|---|
| 11 | Polymer & Resins 1 | U | X | X | X |
| 12 | Polymer & Resins 2 | W | X | X | X |
| 13 | Secondary Lead Smelters | X | X | X | X |
| 14 | Marine Tank Vessel Loading | Y | X | X | |
| 15 | Phosphoric Acid Mfg. | AA | X | X | X |
| 16 | Phosphate Fertilizers Prod. | BB | X | X | X |
| 17 | Petroleum Refineries | CC | X | X | X |
| 18 | Offsite Waste & Recovery | DD | X | X | X |
| | Tanks; Level 1 | OO | X | X | X |
| | Containers | PP | X | X | X |
| | Surface Impoundments | QQ | X | X | X |
| | Drain Systems | RR | X | X | X |
| | Oil-Water Separators | VV | X | X | X |
| 19 | Magnetic Tape | EE | X | X | X |
| 20 | Aerospace Industry | GG | X | X | X |
| 21 | Oil & Natural Gas Prod. | HH | X | X | X |
| | Area Source Requirements >>. | | | | |
| 22 | Shipbuilding and Repair | II | X | X | X |
| 23 | Wood Furniture Mfg. | JJ | X | X | X |
| 24 | Printing & Publishing | KK | X | X | X |
| 25 | Primary Aluminum | LL | | | |
| 26 | Pulp & Paper II (Combustion sources) | MM | X | X | X |
| 27 | Generic MACT: | | | | |
| | Control Devices | SS | X | X | X |
| | Eq. Leaks—Level 1 | TT | X | X | X |
| | Eq. Leaks—Level 2 | UU | X | X | X |
| | Tanks—Level 2 | WW | X | X | X |
| 28 | Generic MACT: | | | | |
| | Ethylene Mfg. | XX & YY | X | X | X |

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Add.102

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | | | |
|---|---|---|---|---|---|
| ................. | Carbon Black.................................................... | YY | X | X | X |
| ................. | Spandex Prod..................................................... | YY | X | X | X |
| ................. | Cyanide Chemical Mfg....................................... | YY | X | X | X |
| ................. | Acetal Resins.................................................... | YY | X | X | X |
| ................. | Acrylic/Modacrylic Fibers................................ | YY | X | X | X |
| ................. | Hydrogen Fluoride Prod.................................... | YY | X | X | X |
| ................. | Polycarbonates Prod.......................................... | YY | X | X | X |
| 29 | Steel Pickeling.................................................. | CCC | X | X | X |
| 30 | Mineral Wool Prod............................................ | DDD | X | X | X |
| 31 | Hazardous Waste Combustion (Phase I)............. | EEE | X | X | X |
| 32 | Boilers that burn Haz. Waste (Phase II)............ | EEE | X | X | X |
| 33 | HCL Prod. Furnaces burning Haz. Waste (P II)... | EEE | X | X | X |
| 34 | Pharmaceutical Prod.......................................... | GGG | X | X | X |
| 35 | Nat. Gas Transmission & Storage....................... | HHH | X | X | X |
| 36 | Flexible Polyurethane Foam Prod...................... | III | X | X | X |
| 37 | Polymer & Resins 4........................................... | JJJ | X | X | X |
| 38 | Portland Cement............................................... | LLL | X | X | X |
| 39 | Pesticide Active Ingredients.............................. | MMM | X | X | X |
| 40 | Wool Fiberglass................................................ | NNN | X | X | X |
| 41 | Polymer & Resins 3 (Amino & Phenolic)........... | OOO | X | X | X |
| 42 | Polyether Polyols Prod...................................... | PPP | X | X | X |
| 43 | Primary Copper................................................ | QQQ | X | | |
| 44 | Secondary Aluminum Prod................................. | RRR | X | X | X |
| 45 | Primary Lead Smelting..................................... | TTT | | | |
| 46 | Petro Refineries (FCC units)............................ | UUU | X | X | X |
| 47 | POTW.............................................................. | VVV | X | X | X |
| 48 | Ferroalloys...................................................... | XXX | X | X | X |
| 49 | Municipal Landfills.......................................... | AAAA | X | X | X |
| 50 | Nutritional Yeast.............................................. | CCCC | X | X | X |

Add.103

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | | |
|---|---|---|---|---|
| 51............... Plywood and Composite Wood Prod. (Partial Vacatur Oct. 07)............DDDD........................ | X | X | X |
| 52............... Organic Liquids Distribution (non-gas)........................EEEE........................ | X | X | X |
| 53............... Misc. Organic NESHAP........................FFFF........................ | X | X | X |
| 54............... Vegetable Oil........................GGGG........................ | X | X | X |
| 55............... Wet Formed Fiberglass........................HHHH........................ | X | X | X |
| 56............... Auto & Light Duty Truck (coating)........................IIII........................ | X | X | X |
| 57............... Paper & Other Webs........................JJJJ........................ | X | X | X |
| 58............... Metal Can (coating)........................KKKK........................ | X | X | X |
| 59............... Misc. Metal Parts (coating)........................MMMM........................ | X | X | X |
| 60............... Large Appliances (coating)........................NNNN........................ | X | X | X |
| 61............... Printing, Coating, & Dyeing Fabrics........................OOOO........................ | X | X | X |
| 62............... Plastic Parts & Products (coating)........................PPPP........................ | X | X | X |
| 63............... Wood Building Products........................QQQQ........................ | X | X | X |
| 64............... Metal Furniture (coating)........................RRRR........................ | X | X | X |
| 65............... Metal Coil (coating)........................SSSS........................ | X | X | X |
| 66............... Leather Tanning & Finishing........................TTTT........................ | X | | |
| 67............... Cellulose Ethers Prod. Misc. Viscose Processes........................UUUU........................ | X | | |
| 68............... Boat Manufacturing........................VVVV........................ | X | X | X |
| 69............... Reinforced Plastic Composites........................WWWW........................ | X | X | X |
| 70............... Rubber Tire Mfg........................XXXX........................ | X | X | X |
| 71............... Stationary Combustion Turbines........................YYYY........................ | X | X | X |
| 72............... Reciprocating Int. Combustion Engines........................ZZZZ........................ | X | X | X |
| ................... Area Source Requirements >>. | | | |
| 73............... Lime Manufacturing........................AAAAA........................ | X | X | X |
| 74............... Semiconductor Production........................BBBBB........................ | X | X | X |
| 75............... Coke Ovens: (Push/Quench/Battery/Stacks)........................CCCCC........................ | X | X | X |
| 76............... Industrial/Commercial/Institutional Boilers & Process Heaters, VACATED on 7/30/07........................DDDDD........................ | | | |
| 77............... Iron Foundries........................EEEEE........................ | X | X | X |

Add.104

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | | | | |
|---|---|---|---|---|---|---|
| 78 | Integrated Iron & Steel | FFFFF | X | X | X |
| 79 | Site Remediation | GGGGG | X | X | X |
| 80 | Misc. Coating Manufacturing | HHHHH | X | X | X |
| 81 | Mercury Cell Chlor-Alkali | IIIII | X | X | X |
| 82 | Brick & Structural Clay Products, VACATED on 6/18/07 | JJJJJ | | | |
| 83 | Clay Ceramics Manufacturing, VACATED on 6/18/07 | KKKKK | | | |
| 84 | Asphalt Roofing & Processing | LLLLL | X | X | X |
| 85 | Flex. Polyurethane Foam Fabrication | MMMMM | X | | |
| 86 | Hydrochloric Acid Prod/Fumed Silica | NNNNN | X | X | X |
| 87 | Engine & Rocket Test Facilities | PPPPP | X | X | X |
| 88 | Friction Materials Manufacturing | QQQQQ | X | X | X |
| 89 | Taconite Iron Ore | RRRRR | X | X | X |
| 90 | Refactories | SSSSS | X | | |
| 91 | Primary Magnesium | TTTTT | X | X | X |
| | **Area Source Rules** | | | | |
| 92 | Hospital Sterilizers | WWWWW | | | |
| 93 | Stainless and Nonstainless Steel Mfg. Electric Arc Furnaces | YYYYY | | | |
| 94 | Iron & Steel foundries | ZZZZZ | | | |
| 95 | Gasoline Distribution—Bulk | BBBBBB | | | |
| 96 | Gasoline Dispensing Facilities | CCCCCC | | | |
| 97 | PVC & Copolymers Prod. | DDDDDD | X | X | |
| 98 | Primary Copper | EEEEEE | X | X | |
| 99 | Secondary Copper Smelting | FFFFFF | X | X | |
| 100 | Primary Nonferrous Metals | GGGGGG | X | X | |
| 101 | Paint Stripping | HHHHHH | | | |
| | Auto-Body Refinishing | | | | |
| | Plastic Parts & Prod. (coating) | | | | |
| 102 | Acrylic/Modacrylic Fibers Prod. | LLLLLL | | | |
| 103 | Carbon Black Prod. | MMMMMM | | | |

Add.105

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | |
|---|---|---|
| 104............. | Chemical Mfg. Chrom........................................................ | NNNNN........................................ |
| 105............. | Flex. Polyurethane Foam Fab.......................................... | OOOOOO...................................... |
| .................. | Flex. Polyurethane Foam Prod | |
| 106............. | Lead Acid Battery Mfg..................................................... | PPPPP......................................... |
| 107............. | Wood Preserving................................................................ | QQQQQQ...................................... |
| 108............. | Clay Ceramics Mfg............................................................ | RRRRRR....................................... |
| 109............. | Glass Mfg............................................................................ | SSSSSS........................................ |
| 110............. | Secondary Nonferrous Metals.......................................... | TTTTTT........................................ |
| 110............. | Plating and Polishing........................................................ | WWWWWW.................................. |
| 112............. | Industrial Mach. & Eq. Finishing.................................... | XXXXXX |
| .................. | Elect. & Electronics Eq. Finishing | |
| .................. | Fabricated Metal Prod | |
| .................. | Fabricated Plate Work (Boiler Shop) | |
| .................. | Fabricated Structural Metal Mfg | |
| .................. | Heating Eq. Mfg | |
| .................. | Iron and Steel Forging | |
| .................. | Primary Metals Prod. Mfg | |
| .................. | Valves and Pipe Fittings Mfg | |
| 113............. | Ferroalloys Production..................................................... | YYYYYY |
| .................. | Ferro/Silico Manganese | |

(ii) Alabama Department of Environmental Management (ADEM) may implement and enforce alternative requirements in the form of title V permit terms and conditions for International Paper Prattville Mill, Prattville, Alabama, for subpart MM of this part—National Emission Standards for Hazardous Air Pollutants for Chemical Recovery Combustion Sources at Kraft, Soda, Sulfite, and Stand–Alone Semichemical Pulp Mills. This action is contingent upon ADEM including, in title V permits, terms and conditions that are no less stringent than the Federal standard. In addition, the requirement applicable to the source remains the Federal section 112 requirement until EPA has approved the alternative permit terms and conditions and the final title V permit is issued.

(2) Alaska.

(i) The following table lists the specific part 63 standards that have been delegated unchanged to the Alaska Department of Environmental Conservation. The (X) symbol is used to indicate each subpart that has been delegated.

Add.106

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

**Delegation Status for Part 63 Standards—Alaska**

| Subpart | | Alaska Department of Environmental Conservation (1/18/97) |
|---|---|---|
| A..........................General Provisions [1] ..................................... | | X |
| D..........................Early Reductions............................................. | | X |
| F.......................... | HON-SOCMI | |
| G.......................... | HON-Process Vents | |
| H.......................... | HON-Equipment Leaks | |
| I.......................... | HON-Negotiated Leaks | |
| L.......................... | Coke Oven Batteries | |
| M..........................Perc Dry Cleaning............................................ | | X |
| N..........................Chromium Electroplating............................................ | | X [2] |
| O.......................... | Ethylene Oxide Sterilizers | |
| Q..........................Industrial Process Cooling Towers.......................... | | X |
| R..........................Gasoline Distribution.................................... | | X |
| S.......................... | Pulp and Paper | |
| T..........................Halogenated Solvent Cleaning.................................... | | X |
| U.......................... | Polymers and Resins I | |
| W.......................... | Polymers and Resins II-Epoxy | |
| X.......................... | Secondary Lead Smelting | |
| Y..........................Marine Tank Vessel Loading..................................... | | X |
| CC......................Petroleum Refineries........................................ | | X |
| DD......................Off-Site Waste and Recovery..................................... | | X |
| EE.......................... | Magnetic Tape Manufacturing | |
| GG...................... | Aerospace Manufacturing & Rework | |
| II..........................Shipbuilding and Ship Repair.......................... | | X |
| JJ..........................Wood Furniture Manufacturing Operations............... | | X |
| KK......................Printing and Publishing Industry............................. | | X |

**Add.107**

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | |
|---|---|
| LL........................ | Primary Aluminum |
| OO........................ | Tanks—Level 1 |
| PP........................ | Containers |
| QQ........................ | Surface Impoundments |
| RR........................ | Individual Drain Systems |
| VV........................ | Oil-Water Separators and Organic-Water Separators |
| EEE...................... | Hazardous Waste Combustors |
| JJJ........................ | Polymers and Resins IV |

(ii) [Reserved]

Note to paragraph (a)(2): The date in parenthesis indicates the effective date of the federal rules that have been adopted by and delegated to the Alaska Department of Environmental Conservation. Therefore, any amendments made to these delegated rules after this effective date are not delegated to the agency.

(3) Arizona.

(i) The following table lists the specific Part 63 standards that have been delegated unchanged to the air pollution control agencies in the State of Arizona. The (X) symbol is used to indicate each category that has been delegated.

Table 3 to Paragraph (a)(3)(i)—Delegation Status for Part 63 Standards—Arizona

| Subpart | Description | ADEQ [1] | MCAQD [2] | PDEQ [3] | PCAQCD [4] | GRIC [5] |
|---|---|---|---|---|---|---|
| A | General Provisions | X | X | X | X | X |
| F | Synthetic Organic Chemical Manufacturing Industry | X | X | X | X | X |
| G | Synthetic Organic Chemical Manufacturing Industry: Process Vents, Storage Vessels, Transfer Operations, and Wastewater | X | X | X | X | X |
| H | Organic Hazardous Air Pollutants: Equipment Leaks | X | X | X | X | X |
| I | Organic Hazardous Air Pollutants: Certain Processes Subject to the Negotiated Regulation for Equipment Leaks | X | X | X | X | X |
| J | Polyvinyl Chloride and Copolymers Production | X | X | X | .................. | X |
| L | Coke Oven Batteries | X | X | X | X | X |
| M | Perchloroethylene Dry Cleaning | X | X | X | X | X |

Add.108

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | | | |
|---|---|---|---|---|---|
| N.........................Hard and Decorative Chromium Electroplating and Chromium Anodizing Tanks. | X | X | X | X | X |
| O.........................Ethylene Oxide Sterilization Facilities. | X | X | X | X | X |
| Q.........................Industrial Process Cooling Towers. | X | X | X | X | X |
| R.........................Gasoline Distribution Facilities. | X | X | X | X | X |
| S.........................Pulp and Paper. | X | X | X | ....................... | X |
| T.........................Halogenated Solvent Cleaning. | X | X | X | X | X |
| U.........................Group I Polymers and Resins. | X | X | X | X | X |
| W.........................Epoxy Resins Production and Non-Nylon Polyamides Production. | X | X | X | X | X |
| X.........................Secondary Lead Smelting. | X | ....................... | X | X | X |
| Y.........................Marine Tank Vessel Loading Operations. | ....................... | X | ....................... | | X |
| AA.........................Phosphoric Acid Manufacturing Plants. | X | X | X | ....................... | X |
| BB.........................Phosphate Fertilizers Production Plants. | X | X | X | ....................... | X |
| CC.........................Petroleum Refineries. | X | ....................... | X | X | X |
| DD.........................Off-Site Waste and Recovery Operations. | X | X | X | X | X |
| EE.........................Magnetic Tape Manufacturing Operations. | X | X | X | X | X |
| GG.........................Aerospace Manufacturing and Rework Facilities. | X | X | X | X | X |
| HH.........................Oil and Natural Gas Production Facilities. | X | X | X | ....................... | X |
| II.........................Shipbuilding and Ship Repair (Surface Coating). | | | | | X |
| JJ.........................Wood Furniture Manufacturing Operations. | X | X | X | X | X |
| KK.........................Printing and Publishing Industry. | X | X | X | X | X |
| LL.........................Primary Aluminum Reduction Plants. | X | X | X | ....................... | X |
| MM.........................Chemical Recovery Combustion Sources at Kraft, Soda, Sulfite, and Stand-Alone Semichemical Pulp Mills. | X | X | X | ....................... | X |
| NN.........................Wool Fiberglass Manufacturing at Area Sources. | ....................... | X | ....................... | | |
| OO.........................Tanks—Level 1. | X | X | X | X | X |
| PP.........................Containers. | X | X | X | X | X |
| QQ.........................Surface Impoundments. | X | X | X | X | X |
| RR.........................Individual Drain Systems. | X | X | X | X | X |

Add.109

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | | | |
|---|---|---|---|---|---|
| SS | Closed Vent Systems, Control Devices, Recovery Devices and Routing to a Fuel Gas System or a Process | X | X | X | | X |
| TT | Equipment Leaks—Control Level 1 | X | X | X | | X |
| UU | Equipment Leaks—Control Level 2 | X | X | X | | X |
| VV | Oil-Water Separators and Organic-Water Separators | X | X | X | X | X |
| WW | Storage Vessels (Tanks)—Control Level 2 | X | X | X | | X |
| XX | Ethylene Manufacturing Process Units: Heat Exchange Systems and Waste Operations | X | X | X | | X |
| YY | Generic MACT Standards | X | X | X | | X |
| CCC | Steel Pickling | X | X | X | | X |
| DDD | Mineral Wool Production | X | X | X | | X |
| EEE | Hazardous Waste Combustors | X | X | X | | X |
| GGG | Pharmaceuticals Production | X | X | X | | X |
| HHH | Natural Gas Transmission and Storage Facilities | X | X | X | | X |
| III | Flexible Polyurethane Foam Production | X | X | X | | X |
| JJJ | Group IV Polymers and Resins | X | X | X | X | X |
| LLL | Portland Cement Manufacturing Industry | X | | X | | X |
| MMM | Pesticide Active Ingredient Production | X | X | X | | X |
| NNN | Wool Fiberglass Manufacturing | X | X | X | | X |
| OOO | Manufacture of Amino/Phenolic Resins | X | X | X | | X |
| PPP | Polyether Polyols Production | X | X | X | | X |
| QQQ | Primary Copper Smelting | X | | X | | X |
| RRR | Secondary Aluminum Production | X | X | X | | X |
| TTT | Primary Lead Smelting | X | | X | | X |
| UUU | Petroleum Refineries: Catalytic Cracking, Catalytic Reforming, and Sulfur Recovery Units | X | | X | | X |
| VVV | Publicly Owned Treatment Works | X | X | X | | X |
| XXX | Ferroalloys Production | X | X | X | | X |
| AAAA | Municipal Solid Waste Landfills | X | X | X | | X |
| CCCC | Manufacturing of Nutritional Yeast | X | X | X | | X |
| DDDD | Plywood and Composite Wood Products | X | X | X | | X |

Add.110

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | | | |
|---|---|---|---|---|---|
| EEEE..................Organic Liquids Distribution (non-gasoline)................. | X | X | X | .............................. | X |
| FFFF..................Miscellaneous Organic Chemical Manufacturing............... | X | X | X | .............................. | X |
| GGGG................Solvent Extraction for Vegetable Oil Production............... | X | X | X | .............................. | X |
| HHHH................Wet-Formed Fiberglass Mat Production..................... | X | X | X | .............................. | X |
| IIII......................Surface Coating of Automobiles and Light-Duty Trucks...... | X | X | | .............................. | X |
| JJJJ....................Paper and Other Web Coating.............................. | X | X | X | .............................. | X |
| KKKK.................Surface Coating of Metal Cans............................ | X | X | X | .............................. | X |
| MMMM...............Miscellaneous Metal Parts and Products................... | X | X | X | .............................. | X |
| NNNN.................Large Appliances....................................... | X | X | X | .............................. | X |
| OOOO................Printing, Coating, and Dyeing of Fabrics and Other Textiles | X | X | X | .............................. | X |
| PPPP..................Surface Coating of Plastic Parts and Products.................. | X | X | | .............................. | X |
| QQQQ................Wood Building Products.................................. | X | X | X | .............................. | X |
| RRRR.................Surface Coating of Metal Furniture............................. | X | X | X | .............................. | X |
| SSSS...................Surface Coating of Metal Coil.............................. | X | X | X | .............................. | X |
| TTTT....................Leather Finishing Operations................................ | X | X | X | .............................. | X |
| UUUU.................Cellulose Products Manufacturing....................... | X | X | X | .............................. | X |
| VVVV.................Boat Manufacturing........................................ | X | X | X | .............................. | X |
| WWWW.............Reinforced Plastics Composites Production.................. | X | X | X | .............................. | X |
| XXXX................Tire Manufacturing........................................ | X | X | X | .............................. | X |
| YYYY................Stationary Combustion Turbines............................ | X | X | X | .............................. | X |
| ZZZZ..................Stationary Reciprocating Internal Combustion Engines...... | X | X | | .............................. | X |
| AAAAA...............Lime Manufacturing Plants................................ | X | X | X | .............................. | X |
| BBBBB...............Semiconductor Manufacturing............................. | X | X | X | .............................. | X |
| CCCCC...............Coke Oven: Pushing, Quenching and Battery Stacks........... | X | X | X | .............................. | X |
| DDDDD..............Industrial, Commercial, and Institutional Boiler and Process Heaters....................... | X | X | | .............................. | X |
| EEEEE................Iron and Steel Foundries.................................. | X | X | X | .............................. | X |
| FFFFF................Integrated Iron and Steel................................. | X | X | X | .............................. | X |
| GGGGG..............Site Remediation......................................... | X | X | X | .............................. | X |

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.    11

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| Subpart | Description | | | | | |
|---|---|---|---|---|---|---|
| HHHHH | Miscellaneous Coating Manufacturing | X | X | X | | X |
| IIIII | Mercury Emissions from Mercury Cell Chlor-Alkali Plants. | X | X | X | | X |
| JJJJJ | Brick and Structural Clay Products Manufacturing | X | X | X | | X |
| KKKKK | Clay Ceramics Manufacturing | X | X | X | | X |
| LLLLL | Asphalt Roofing and Processing | X | X | X | | X |
| MMMMM | Flexible Polyurethane Foam Fabrication Operation | X | X | X | | X |
| NNNNN | Hydrochloric Acid Production | X | X | X | | X |
| PPPPP | Engine Test Cells/Stands | X | X | X | | X |
| QQQQQ | Friction Products Manufacturing | X | X | X | | X |
| RRRRR | Taconite Iron Ore Processing | X | X | X | | X |
| SSSSS | Refractory Products Manufacturing | X | X | X | | X |
| TTTTT | Primary Magnesium Refining | X | X | X | | X |
| UUUUU | Coal and Oil-Fired Electric Utility Steam Generating Units. | | | X | | |
| WWWWW | Hospital Ethylene Oxide Sterilizers | | X | X | | |
| YYYYY | Area Sources: Electric Arc Furnace Steelmaking Facilities. | | X | X | | |
| ZZZZZ | Iron and Steel Foundries Area Sources | | X | X | | |
| BBBBBB | Gasoline Distribution Bulk Terminals, Bulk Plants, and Pipeline Facilities. | | X | X | | |
| CCCCCC | Gasoline Dispensing Facilities | | X | X | | |
| DDDDDD | Polyvinyl Chloride and Copolymers Production Area Sources. | | X | X | | |
| EEEEEE | Primary Copper Smelting Area Sources | | | X | | |
| FFFFFF | Secondary Copper Smelting Area Sources | | | X | | |
| GGGGGG | Primary Nonferrous Metals Area Sources—Zinc, Cadmium, and Beryllium | | X | X | | |
| HHHHHH | Paint Stripping and Miscellaneous Surface Coating Operations at Area Sources | | X | X | | |
| JJJJJJ | Industrial, Commercial, and Institutional Boilers and Process Heaters—Area Sources. | | X | X | | |
| LLLLLL | Acrylic and Modacrylic Fibers Production Area Sources | | X | X | | |
| MMMMMM | Carbon Black Production Area Sources | | X | X | | |

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Add.112

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | | | |
|---|---|---|---|---|---|
| NNNNNN | Chemical Manufacturing Area Sources: Chromium Compounds | | X | X | |
| OOOOOO | Flexible Polyurethane Foam Production and Fabrication Area Sources | | X | X | |
| PPPPPP | Lead Acid Battery Manufacturing Area Sources | | X | X | |
| QQQQQQ | Wood Preserving Area Sources | | X | X | |
| RRRRRR | Clay Ceramics Manufacturing Area Sources | | X | X | |
| SSSSSS | Glass Manufacturing Area Sources | | X | X | |
| TTTTTT | Secondary Nonferrous Metals Processing Area Sources | | X | X | |
| VVVVVV | Chemical Manufacturing Industry—Area Sources | | X | X | |
| WWWWWW | Area Source Standards for Plating and Polishing Operations | | X | X | |
| XXXXXX | Area Source Standards for Nine Metal Fabrication and Finishing Source Categories | | X | X | |
| YYYYYY | Area Sources: Ferroalloys Production Facilities | | X | X | |
| *ZZZZZZ* | Area Source Standards for Aluminum, Copper, and Other Nonferrous Foundries | | X | X | |
| AAAAAAA | Asphalt Processing and Asphalt Roofing Manufacturing— Area Sources | | X | X | |
| BBBBBBB | Chemical Preparations Industry—Area Sources | | X | X | |
| CCCCCCC | Paint and Allied Products Manufacturing—Area Sources | | X | X | |
| DDDDDDD | Prepared Feeds Manufacturing—Area Sources | | X | X | |
| EEEEEEE | Gold Mine Ore Processing and Production—Area Sources | | X | X | |
| HHHHHHH | Polyvinyl Chloride and Copolymers Production | | X | X | |

(ii) [Reserved]

(4) Arkansas. The following table lists the specific standards under this part that have been delegated unchanged to the Arkansas Department of Energy and Environment, Division of Environmental Quality (DEQ) for all sources subject to the Arkansas Title V operating permit program approved by EPA under section 502 of the Clean Air Act. The "X" symbol is used to indicate each subpart that has been delegated. The delegations are subject to all of the conditions and limitations set forth in Federal law, regulations, policy, guidance, determinations, and the Memorandum of Agreement, dated September 17, 2014, entered into between the DEQ and the U.S. Environmental Protection Agency, Region 6 (hereinafter "EPA") regarding section 112, Clean Air Act Implementation. Some authorities cannot be delegated and are retained by the EPA. These include certain General Provisions authorities and specific parts of some standards. DEQ's authority to implement and enforce a delegated standard under this part is effective when the standard is incorporated into the source's Title V Operating Permit. Any amendments made to these rules after July 21, 2020, are not delegated.

Add.113

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

**Delegation Status for Part 63 Standards—State of Arkansas** [1]

| Subpart | Source category | DEQ [2] |
|---|---|---|
| A | General Provisions | X |
| F | Hazardous Organic NESHAP (HON)—Synthetic Organic Chemical Manufacturing Industry (SOCMI) | X |
| G | HON—SOCMI Process Vents, Storage Vessels, Transfer Operations and Wastewater | X |
| H | HON—Equipment Leaks | X |
| I | HON—Certain Processes Negotiated Equipment Leak Regulation | X |
| J | Polyvinyl Chloride and Copolymers Production | [3] |
| K | [Reserved] | |
| L | Coke Oven Batteries | X |
| M | Perchloroethylene Dry Cleaning | X |
| N | Chromium Electroplating and Chromium Anodizing Tanks | X |
| O | Ethylene Oxide Sterilizers | X |
| P | [Reserved] | |
| Q | Industrial Process Cooling Towers | X |
| R | Gasoline Distribution | X |
| S | Pulp and Paper Industry | X |
| T | Halogenated Solvent Cleaning | X |
| U | Group I Polymers and Resins | X |
| V | [Reserved] | |
| W | Epoxy Resins Production and Non-Nylon Polyamides Production | X |
| X | Secondary Lead Smelting | X |
| Y | Marine Tank Vessel Loading | X |
| Z | [Reserved] | |
| AA | Phosphoric Acid Manufacturing Plants | X |
| BB | Phosphate Fertilizers Production Plants | X |

**Add.114**

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| CC | Petroleum Refineries | X |
|---|---|---|
| DD | Off-Site Waste and Recovery Operations | X |
| EE | Magnetic Tape Manufacturing | X |
| FF | [Reserved] | |
| GG | Aerospace Manufacturing and Rework Facilities | X |
| HH | Oil and Natural Gas Production Facilities | X |
| II | Shipbuilding and Ship Repair Facilities | X |
| JJ | Wood Furniture Manufacturing Operations | X |
| KK | Printing and Publishing Industry | X |
| LL | Primary Aluminum Reduction Plants | X |
| MM | Chemical Recovery Combustion Sources at Kraft, Soda, Sulfide, and Stand-Alone Semichemical Pulp Mills | X |
| NN | Wool Fiberglass Manufacturing at Area Sources | |
| OO | Tanks-Level 1 | X |
| PP | Containers | X |
| QQ | Surface Impoundments | X |
| RR | Individual Drain Systems | X |
| SS | Closed Vent Systems, Control Devices, Recovery Devices and Routing to a Fuel Gas System or a Process | X |
| TT | Equipment Leaks—Control Level 1 | X |
| UU | Equipment Leaks—Control Level 2 Standards | X |
| VV | Oil—Water Separators and Organic—Water Separators | X |
| WW | Storage Vessels (Tanks)—Control Level 2 | X |
| XX | Ethylene Manufacturing Process Units Heat Exchange Systems and Waste Operations | X |
| YY | Generic Maximum Achievable Control Technology Standards | X |
| ZZ-BBB | [Reserved] | |
| CCC | Steel Pickling—HCI Process Facilities and Hydrochloric Acid Regeneration | X |
| DDD | Mineral Wool Production | X |
| EEE | Hazardous Waste Combustors | X |

Add.115

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | |
|---|---|---|
| FFF | [Reserved] | |
| GGG | Pharmaceuticals Production | X |
| HHH | Natural Gas Transmission and Storage Facilities | X |
| III | Flexible Polyurethane Foam Production | X |
| JJJ | Group IV Polymers and Resins | X |
| KKK | [Reserved] | |
| LLL | Portland Cement Manufacturing | X |
| MMM | Pesticide Active Ingredient Production | X |
| NNN | Wool Fiberglass Manufacturing | X |
| OOO | Amino/Phenolic Resins | X |
| PPP | Polyether Polyols Production | X |
| QQQ | Primary Copper Smelting | X |
| RRR | Secondary Aluminum Production | X |
| SSS | [Reserved] | |
| TTT | Primary Lead Smelting | X |
| UUU | Petroleum Refineries—Catalytic Cracking Units, Catalytic Reforming Units and Sulfur Recovery Plants | X |
| VVV | Publicly Owned Treatment Works (POTW) | X |
| WWW | [Reserved] | |
| XXX | Ferroalloys Production: Ferromanganese and Silicomanganese | X |
| AAAA | Municipal Solid Waste Landfills | X |
| CCCC | Nutritional Yeast Manufacturing | X |
| DDDD | Plywood and Composite Wood Products | [4] X |
| EEEE | Organic Liquids Distribution | X |
| FFFF | Misc. Organic Chemical Production and Processes (MON) | X |
| GGGG | Solvent Extraction for Vegetable Oil Production | X |
| HHHH | Wet Formed Fiberglass Mat Production | X |
| IIII | Auto & Light Duty Truck (Surface Coating) | X |
| JJJJ | Paper and other Web (Surface Coating) | X |

Add.116

| | | |
|---|---|---|
| KKKK | Metal Can (Surface Coating) | X |
| MMMM | Misc. Metal Parts and Products (Surface Coating) | X |
| NNNN | Surface Coating of Large Appliances | X |
| OOOO | Fabric Printing, Coating, and Dyeing | X |
| PPPP | Surface Coating of Plastic Parts and Products | X |
| QQQQ | Surface Coating of Wood Building Products | X |
| RRRR | Surface Coating of Metal Furniture | X |
| SSSS | Surface Coating of Metal Coil | X |
| TTTT | Leather Finishing Operations | X |
| UUUU | Cellulose Products Manufacturing | X |
| VVVV | Boat Manufacturing | X |
| WWWW | Reinforced Plastic Composites Production | X |
| XXXX | Rubber Tire Manufacturing | X |
| YYYY | Stationary Combustion Turbines | X |
| ZZZZ | Reciprocating Internal Combustion Engines (RICE) | X |
| AAAAA | Lime Manufacturing Plants | X |
| BBBBB | Semiconductor Manufacturing | X |
| CCCCC | Coke Ovens: Pushing, Quenching and Battery Stacks | X |
| DDDDD | Industrial/Commercial/Institutional Boilers and Process Heaters | [5] X |
| EEEEE | Iron and Steel Foundries | X |
| FFFFF | Integrated Iron and Steel | X |
| GGGGG | Site Remediation | X |
| HHHHH | Miscellaneous Coating Manufacturing | X |
| IIIII | Mercury Cell Chlor-Alkali Plants | X |
| JJJJJ | Brick and Structural Clay Products Manufacturing | [6] X |
| KKKKK | Clay Ceramics Manufacturing | [6] X |
| LLLLL | Asphalt Roofing and Processing | X |

Add.117

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | |
|---|---|---|
| MMMMM | Flexible Polyurethane Foam Fabrication Operation | X |
| NNNNN | Hydrochloric Acid Production, Fumed Silica Production | X |
| OOOOO | [Reserved] | |
| PPPPP | Engine Test Facilities | X |
| QQQQQ | Friction Products Manufacturing | X |
| RRRRR | Taconite Iron Ore Processing | X |
| SSSSS | Refractory Products Manufacture | X |
| TTTTT | Primary Magnesium Refining | X |
| UUUUU | Coal and Oil-Fired Electric Utility Steam Generating Units | 7 |
| | | X |
| VVVVV | [Reserved] | |
| WWWWW | Hospital Ethylene Oxide Sterilizers | |
| XXXXX | [Reserved] | |
| YYYYY | Electric Arc Furnace Steelmaking Area Sources | X |
| ZZZZZ | Iron and Steel Foundries Area Sources | |
| AAAAAA | [Reserved] | |
| BBBBBB | Gasoline Distribution Bulk Terminals, Bulk Plants, and Pipeline Facilities | |
| CCCCCC | Gasoline Dispensing Facilities | |
| DDDDDD | Polyvinyl Chloride and Copolymers Production Area Sources | |
| EEEEEE | Primary Copper Smelting Area Sources | X |
| FFFFFF | Secondary Copper Smelting Area Sources | X |
| GGGGGG | Primary Nonferrous Metals Area Sources: Zinc, Cadmium, and Beryllium | X |
| HHHHHH | Paint Stripping and Miscellaneous Surface Coating Operations at Area Sources | |
| IIIIII | [Reserved] | |
| JJJJJJ | Industrial, Commercial, and Institutional Boilers: Area Sources | |
| KKKKKK | [Reserved] | |
| LLLLLL | Acrylic and Modacrylic Fibers Production Area Sources | |

Add.118

| | | |
|---|---|---|
| MMMMMM | Carbon Black Production Area Sources | X |
| NNNNNN | Chemical Manufacturing Area Sources: Chromium Compounds | X |
| OOOOOO | Flexible Polyurethane Foam Production and Fabrication Area Sources | |
| PPPPPP | Lead Acid Battery Manufacturing Area Sources | |
| QQQQQQ | Wood Preserving Area Sources | |
| RRRRRR | Clay Ceramics Manufacturing Area Sources | |
| SSSSSS | Glass Manufacturing Area Sources | X |
| TTTTTT | Secondary Nonferrous Metals Processing Area Sources | |
| UUUUUU | [Reserved] | |
| VVVVVV | Chemical Manufacturing Area Sources | X |
| WWWWWW | Plating and Polishing Operations Area Sources | |
| XXXXXX | Nine Metal Fabrication and Finishing Categories Area Sources | |
| YYYYYY | Ferroalloys Production Facilities Area Sources | |
| ZZZZZZ | Aluminum, Copper, and Other Nonferrous Foundries Area Sources | |
| AAAAAAA | Asphalt Processing and Asphalt Roofing Manufacturing Area Sources | |
| BBBBBBB | Chemical Preparations Industry Area Sources | |
| CCCCCCC | Paints and Allied Products Manufacturing Area Sources | |
| DDDDDDD | Prepared Feeds Manufacturing Area Sources | |
| EEEEEEE | Gold Mine Ore Processing and Production Area Sources | |
| FFFFFFF | Reserved | |
| GGGGGGG | Reserved | |
| HHHHHHH | Polyvinyl Chloride and Copolymers Production | X |

(5) California.

(i)(A) California major sources. Except as described in paragraph (ii) below, each local air pollution control agency in California has delegation for national emission standards promulgated in this part as they apply to major sources.

Add.119

(B) California area sources. Except as described in paragraph (a)(5)(ii) of this section, the local agencies listed below also have delegation for national emission standards promulgated in this part as they apply to area sources:

(1) Amador County Air Pollution Control District.

(2) Antelope Valley Air Quality Management District.

(3) Butte County Air Quality Management District.

(4) Kern County Air Pollution Control District.

(5) Mendocino County Air Quality Management District.

(6) Mojave Desert Air Quality Management District.

(7) Monterey Bay Unified Air Pollution Control District.

(8) San Diego County Air Pollution Control District.

(9) San Joaquin Valley Unified Air Pollution Control District, only for standards promulgated in this part and incorporated by reference in district Rule 4002, amended on May 20, 2004.

(10) San Luis Obispo County Air Pollution Control District.

(11) Santa Barbara County Air Pollution Control District.

(12) Ventura County Air Pollution Control District.

(13) Yolo–Solano Air Quality Management District.

(ii) California approvals other than straight delegation. Affected sources must comply with the California Regulatory Requirements Applicable to the Air Toxics Program, November 16, 2010, (incorporated by reference as specified in § 63.14) as described as follows:

(A) The material incorporated in Chapter 1 of the California Regulatory Requirements Applicable to the Air Toxics Program (California Code of Regulations Title 17, sections 93109, 93109.1, and 93109.2) pertains to the perchloroethylene dry cleaning source category in the State of California, and has been approved under the procedures

in § 63.93 to be implemented and enforced in place of subpart M—National Perchloroethylene Air Emission Standards for Dry Cleaning Facilities, as it applies to area sources only, as defined in § 63.320(h).

(1) Authorities not delegated.

(i) California is not delegated the Administrator's authority to implement and enforce California Code of Regulations Title 17, section 93109, in lieu of those provisions of subpart M which apply to major sources, as defined in § 63.320(g). Dry cleaning facilities which are major sources remain subject to subpart M.

(ii) California is not delegated the Administrator's authority of § 63.325 to determine equivalency of emissions control technologies. Any source seeking permission to use an alternative means of emission limitation, under sections 93109(d)(27) or (38), or (i)(3)(A)(2), Title 17 of the California Code of Regulations, must also receive approval from the Administrator before using such alternative means of emission limitation for the purpose of complying with section 112 of the Clean Air Act.

(iii) This delegation does not extend to the provisions regarding California's enforcement authorities or its collection of fees as described in Sections 93109.1(c) or 93109.2(c) and (d), Title 17 of the California Code of Regulations. Approval of the California Code of Regulations, Title 17, sections 93109, 93109.1, and 93109.2 does not in any way limit the enforcement authorities, including the penalty authorities, of the Clean Air Act.

(B) [Reserved]

(C) The material incorporated in Chapter 3 of the California Regulatory Requirements Applicable to the Air Toxics Program (South Coast Air Quality Management District Rule 1421) pertains to the perchloroethylene dry cleaning source category in the South Coast Air Quality Management District, and has been approved under the procedures in § 63.93 to be implemented and enforced in place of Subpart M—National Perchloroethylene Air Emission Standards for Dry Cleaning Facilities, as it applies to area sources only, as defined in § 63.320(h).

(1) Authorities not delegated.

(i) South Coast Air Quality Management District is not delegated the Administrator's authority to implement and enforce Rule 1421 in lieu of those provisions of Subpart M which apply to major sources, as defined in § 63.320(g). Dry cleaning facilities which are major sources remain subject to Subpart M.

(ii) South Coast Air Quality Management District is not delegated the Administrator's authority of § 63.325 to determine equivalency of emissions control technologies. Any source seeking permission to use an alternative means of emission limitation, under sections (c)(17), (d)(3)(A)(v), (d)(4)(B)(ii)(III), and (j) of Rule 1421, must also receive approval from the Administrator before using such alternative means of emission limitation for the purpose of complying with section 112.

(D) [Reserved by 76 FR 18066]

(E) The material incorporated in Chapter 5 of the California Regulatory Requirements Applicable to the Air Toxics Program (California Code of Regulations, Title 17, section 93102) pertains to the chromium electroplating and anodizing source category in the State of California, and has been approved under the procedures in § 63.93 to be implemented and enforced in place of subpart N—National Emission Standards for Chromium Emissions from Hard and Decorative Chromium Electroplating and Chromium Anodizing Tanks.

(1) Title V requirements. Subpart N affected sources remain subject to both the Title V permitting requirements of § 63.340(e)(2) and, for major sources, the semi-annual submission of the ongoing compliance status reports as required by § 63.347(g).

(2) Limits on maximum cumulative potential rectifier usage. Section 93102(h)(7)(B) of the California Airborne Toxic Control Measure allows facilities with a maximum cumulative potential rectifier capacity of greater than 60 million ampere-hours per year to be considered small or medium by accepting a limit on the maximum cumulative potential rectifier usage. All such usage limits in non–Title V operating permits are federally-enforceable for the purpose of this rule substitution.

(3) Permitting Agencies' breakdown/malfunction rules. Section 93102(i)(4) of the California Airborne Toxic Control Measure provides that the owner or operator shall report breakdowns as required by the permitting agency's breakdown rule. Under this rule substitution, the permitting agencies' breakdown rules do not override or supplant the requirements of section 93102(g)(4), (h)(5), (h)(6), (i)(3)(B), or Appendix 3; neither expand the scope nor extend the time-frame of a breakdown beyond the definition of section 93102(b)(7); and do not grant the permitting agencies the authority to determine whether a breakdown has occurred, to grant emergency variances, or to decide to take no enforcement action. Owners or operators must submit written breakdown reports even if the permitting agency has not formally requested such reports.

(4) Performance test requirements. Section 93102(d)(3)(A) of the California Airborne Toxic Control Measure allows the use of California Air Resources Board Method 425, dated July 28, 1997, and South Coast Air Quality Management District Method 205.1, dated August 1991, for determining chromium emissions. Any alternatives, modifications, or variations to these test methods must be approved under the procedures in section 93102(k) of the California Airborne Toxic Control Measure.

(6), (7) [Reserved]

(8) Delaware.

(i) Affected sources must comply with the Delaware Department of Natural Resources and Environmental Control, Division of Air and Waste Management, Accidental Release Prevention Regulation, sections 1–5 and sections 7–14, January 11, 1999 (incorporated by reference as specified in § 63.14). The material incorporated in the Delaware Department of Natural Resources and Environmental Control, Division of Air and Waste Management, Accidental Release Prevention Regulation, sections 1–5 and sections 7–14 pertains to owners and operators of stationary sources in the State of Delaware that have more than a threshold quantity of a regulated substance in a process, as described in section 5.10 of Delaware's regulation, and has been approved under the procedures in §§ 63.93 and 63.95 to be implemented and enforced in place of 40 CFR part 68–Chemical Accident Prevention Provisions.

(ii) Affected sources must comply with the State of Delaware Regulations Governing the Control of Air Pollution, Regulation No. 38, subpart A, effective September 11, 1999 (incorporated by reference as specified in § 63.14). The material incorporated in the State of Delaware Regulations Governing the Control of Air Pollution, Regulation No. 38, subpart A pertains to owners and operators of stationary sources in the State of Delaware that are subject to emission standard requirements of the State of Delaware Regulations Governing the Control of Air Pollution, Regulation No. 38, subparts M, N and Q and 40 CFR part 63 and has been approved under the procedures in §§ 63.91 and 63.92 to be implemented and enforced in place of 40 CFR part 63, subpart A. Delaware is delegated the authority to implement and enforce its regulation in place of 40 CFR part 63, subpart A, in accordance with the final rule, published in the Federal Register on October 2, 2001, effective December 3, 2001.

(iii) Affected sources must comply with the State of Delaware Regulations Governing the Control of Air Pollution, Regulation No. 38, subpart M, effective October 11, 2000 (incorporated by reference as specified in § 63.14). The material incorporated in the State of Delaware Regulations Governing the Control of Air Pollution, Regulation No. 38, subpart M pertains to owners and operators of perchloroethylene drycleaning facilities and has been approved under the procedures in § 63.91 and § 63.92 to be implemented and enforced in place of 40 CFR part 63, subpart M. Delaware is delegated the authority to implement and enforce its regulation in place of 40 CFR part 63, subpart M, in accordance with the final rule, published in the Federal Register on October 2, 2001, effective December 3, 2001.

(iv) Affected sources must comply with the State of Delaware Regulations Governing the Control of Air Pollution, Regulation No. 38, subpart N, effective October 11, 2000 (incorporated by reference as specified in § 63.14). The material incorporated in the State of Delaware Regulations Governing the Control of Air Pollution, Regulation No. 38, subpart N pertains to owners and operators of hard and decorative chromium electroplating and chromium anodizing tanks and has been approved under the procedures in § 63.91 and § 63.92 to be implemented and enforced in place of 40 CFR part 63, subpart N. Delaware is delegated the authority to implement and enforce its regulation in place of 40 CFR part 63, subpart N, in accordance with the final rule, published in the Federal Register on October 2, 2001, effective December 3, 2001.

(v) Affected sources must comply with the State of Delaware Regulations Governing the Control of Air Pollution, Regulation No. 38, subpart Q, effective May 11, 1998 (incorporated by reference as specified in § 63.14). The material incorporated in the State of Delaware Regulations Governing the Control of Air Pollution, Regulation No. 38, subpart Q pertains to owners and operators of industrial process cooling towers and has been approved under the procedures in §§ 63.91 and 63.92 to be implemented and enforced in place of 40 CFR part 63, subpart Q. Delaware is delegated the authority to implement and enforce its regulation in place of 40 CFR part 63, subpart Q, in accordance with the final rule, published in the Federal Register on October 2, 2001, effective December 3, 2001.

(9) District of Columbia.

(i) The District of Columbia is delegated the authority to implement and enforce the regulations in 40 CFR part 63, subparts A, M, N, T, VVV and Appendix A and all future unchanged 40 CFR part 63 standards and amendments, if delegation of future standards and amendments is sought by the District of Columbia Department of Health and approved by EPA Region III, at affected sources, as defined by 40 CFR part 63, in accordance with the final rule, dated December 26, 2001, effective February 25, 2002, and any mutually acceptable amendments to the terms described in the direct final rule.

(10) Florida.

Add.123

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

(i) The following table lists the specific part 63 standards that have been delegated unchanged to the Florida Department of Environmental Protection (FDEP) for all sources. The "X" symbol is used to indicate each subpart that has been delegated. The delegations are subject to all of the conditions and limitations set forth in Federal law, regulations, policy, guidance, and determinations. Some authorities cannot be delegated and are retained by EPA. These include certain General Provisions authorities and specific parts of some standards.

Part 63 Major & Area Source Rule Delegations—Florida [1]

| | Source category | Subpart | FDEP |
|---|---|---|---|
| 1. | HON | F, G, H, I | X |
| 2. | Polyvinyl Chloride & Co-polymers VACATED on 5/11/05 | J | X |
| 3. | Coke Ovens | L | X |
| 4. | Dry Cleaners | M | X |
| 5. | Chromium Electroplating | N | X |
| 6. | EtO Commercial Sterilization | O | X |
| 7. | Chromium Cooling Towers | Q | X |
| 8. | Gasoline Distribution (stage 1) | R | X |
| 9. | Pulp & Paper I | S | X |
| 10. | Halogenated Solvent Cleaning | T | X |
| 11. | Polymer & Resins 1 | U | X |
| 12. | Polymer & Resins 2 | W | X |
| 13. | Secondary Lead Smelters | X | X |
| 14. | Marine Tank Vessel Loading | Y | X |
| 15. | Phosphoric Acid Mfg. | AA | X |
| 16. | Phosphate Fertilizers Prod. | BB | X |
| 17. | Petroleum Refineries | CC | X |
| 18. | Offsite Waste & Recovery | DD | X |
| | Tanks; Level 1 | OO | X |
| | Containers | PP | X |
| | Surface Impoundments | QQ | X |
| | Drain Systems | RR | X |

Add.124

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | |
|---|---|---|---|
| ...................... | Oil-Water Separators......................................................... | VV | X |
| 19.................... | Magnetic Tape.................................................................. | EE | X |
| 20.................... | Aerospace Industry........................................................... | GG | X |
| 21.................... | Oil & Natural Gas Prod.................................................... | HH | X |
| ...................... | Area Source Requirements >>. | | |
| 22.................... | Shipbuilding and Repair.................................................. | II | X |
| 23.................... | Wood Furniture Mfg......................................................... | JJ | X |
| 24.................... | Printing & Publishing....................................................... | KK | X |
| 25.................... | Primary Aluminum............................................................ | LL | X |
| 26.................... | Pulp & Paper II (Combustion sources)............................. | MM | X |
| 27.................... | Generic MACT: | | |
| ...................... | Control Devices............................................................... | SS | X |
| ...................... | Eq. Leaks—Level 1.......................................................... | TT | X |
| ...................... | Eq. Leaks—Level 2.......................................................... | UU | X |
| ...................... | Tanks—Level 2................................................................ | WW | X |
| 28.................... | Generic MACT: | | |
| ...................... | Ethylene Mfg.................................................................... | XX & YY | X |
| ...................... | Carbon Black.................................................................... | YY | X |
| ...................... | Spandex Prod.................................................................... | YY | X |
| ...................... | Cyanide Chemical Mfg....................................................... | YY | X |
| ...................... | Acetal Resins.................................................................... | YY | X |
| ...................... | Acrylic/Modacrylic Fibers.................................................. | YY | X |
| ...................... | Hydrogen Fluoride Prod..................................................... | YY | X |
| ...................... | Polycarbonates Prod.......................................................... | YY | X |
| 29.................... | Steel Pickeling.................................................................. | CCC | X |
| 30.................... | Mineral Wool Prod............................................................ | DDD | X |
| 31.................... | Hazardous Waste Combustion (Phase I)........................... | EEE | X |
| 32.................... | Boilers that burn Haz. Waste (Phase II)........................... | EEE | X |
| 33.................... | HCL Prod. Furnaces burning Haz. Waste (P II)................ | EEE | X |

Add.125

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | |
|---|---|---|---|
| 34 | Pharmaceutical Prod. | GGG | X |
| 35 | Nat. Gas Transmission & Storage | HHH | X |
| 36 | Flexible Polyurethane Foam Prod. | III | X |
| 37 | Polymer & Resins 4 | JJJ | X |
| 38 | Portland Cement | LLL | X |
| 39 | Pesticide Active Ingredients | MMM | X |
| 40 | Wool Fiberglass | NNN | X |
| 41 | Polymer & Resins 3 (Amino & Phenolic) | OOO | X |
| 42 | Polyether Polyols Prod. | PPP | X |
| 43 | Primary Copper | QQQ | X |
| 44 | Secondary Aluminum Prod. | RRR | X |
| 45 | Primary Lead Smelting | TTT | X |
| 46 | Petro Refineries (FCC units) | UUU | X |
| 47 | POTW | VVV | X |
| 48 | Ferroalloys | XXX | X |
| 49 | Municipal Landfills | AAAA | X |
| 50 | Nutritional Yeast | CCCC | X |
| 51 | Plywood and Composite Wood Prod. (Partial Vacatur Oct. 07) | DDDD | X |
| 52 | Organic Liquids Distribution (non-gas) | EEEE | X |
| 53 | Misc. Organic NESHAP | FFFF | X |
| 54 | Vegetable Oil | GGGG | X |
| 55 | Wet Formed Fiberglass | HHHH | X |
| 56 | Auto & Light Duty Truck (coating) | IIII | X |
| 57 | Paper & Other Webs | JJJJ | X |
| 58 | Metal Can (coating) | KKKK | X |
| 59 | Misc. Metal Parts (coating) | MMMM | X |
| 60 | Large Appliances (coating) | NNNN | X |
| 61 | Printing, Coating, & Dyeing Fabrics | OOOO | X |
| 62 | Plastic Parts & Products (coating) | PPPP | X |

Add.126

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | | |
|---|---|---|---|---|
| 63 | Wood Building Products | QQQQ | | X |
| 64 | Metal Furniture (coating) | RRRR | | X |
| 65 | Metal Coil (coating) | SSSS | | X |
| 66 | Leather Tanning & Finishing | TTTT | | X |
| 67 | Cellulose Ethers Prod. Misc. Viscose Processes | UUUU | | X |
| 68 | Boat Manufacturing | VVVV | | X |
| 69 | Reinforced Plastic Composites | WWWW | | X |
| 70 | Rubber Tire Mfg | XXXX | | X |
| 71 | Stationary Combustion Turbines | YYYY | | X |
| 72 | Reciprocating Int. Combustion Engines | ZZZZ | | X |
| | Area Source Requirements >>. | | | |
| 73 | Lime Manufacturing | AAAAA | | X |
| 74 | Semiconductor Production | BBBBB | | X |
| 75 | Coke Ovens: (Push/Quench/Battery/Stacks) | CCCCC | | X |
| 76 | Industrial/Commercial/Institutional Boilers & Process Heaters, VACATED on 7/30/07 | DDDDD | | |
| 77 | Iron Foundries | EEEEE | | X |
| 78 | Integrated Iron & Steel | FFFFF | | X |
| 79 | Site Remediation | GGGGG | | X |
| 80 | Misc. Coating Manufacturing | HHHHH | | X |
| 81 | Mercury Cell Chlor-Alkali | IIIII | | X |
| 82 | Brick & Structural Clay Products, VACATED on 6/18/07 | JJJJJ | | X |
| 83 | Clay Ceramics Manufacturing, VACATED on 6/18/07 | KKKKK | | X |
| 84 | Asphalt Roofing & Processing | LLLLL | | X |
| 85 | Flex. Polyurethane Foam Fabrication | MMMMM | | X |
| 86 | Hydrochloric Acid Prod/Fumed Silica | NNNNN | | X |
| 87 | Engine & Rocket Test Facilities | PPPPP | | X |
| 88 | Friction Materials Manufacturing | QQQQQ | | X |
| 89 | Taconite Iron Ore | RRRRR | | X |
| 90 | Refractories | SSSSS | | X |

Add.127

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | |
|---|---|---|---|
| 91 | Primary Magnesium | TTTTT | X |
| | *Area Source Rules* | | |
| 92 | Hospital Sterilizers | WWWWW | |
| 93 | Stainless and Nonstainless Steel Mfg. Electric Arc Furnaces | YYYYY | X |
| 94 | Iron & Steel foundries | *ZZZZZ* | X |
| 95 | Gasoline Distribution—Bulk | BBBBBB | |
| 96 | Gasoline Dispensing Facilities | CCCCCC | |
| 97 | PVC & Copolymers Prod. | DDDDDD | X |
| 98 | Primary Copper | EEEEEE | X |
| 99 | Secondary Copper Smelting | FFFFFF | X |
| 100 | Primary Nonferrous Metals | GGGGGG | X |
| 101 | Paint Stripping | HHHHHH | |
| | Auto-Body Refinishing | | |
| | Plastic Parts & Prod. (coating) | | |
| 102 | Acrylic/Modacrylic Fibers Prod. | LLLLLL | X |
| 103 | Carbon Black Prod. | MMMMMM | X |
| 104 | Chemical Mfg. Chrom. | NNNNNN | X |
| 105 | Flex. Polyurethane Foam Fab. | OOOOOO | X |
| | Flex. Polyurethane Foam Prod | | |
| 106 | Lead Acid Battery Mfg. | PPPPPP | X |
| 107 | Wood Preserving | QQQQQQ | X |
| 108 | Clay Ceramics Mfg. | RRRRRR | X |
| 109 | Glass Mfg. | SSSSSS | X |
| 110 | Secondary Nonferrous Metals. | TTTTTT | X |
| 110 | Plating and Polishing | WWWWWW | |
| 112 | Industrial Mach. & Eq. Finishing | XXXXXX | |
| | Elect. & Electronics Eq. Finishing | | |
| | Fabricated Metal Prod | | |
| | Fabricated Plate Work (Boiler Shop) | | |

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | |
|---|---|
| ...................... | Fabricated Structural Metal Mfg |
| ...................... | Heating Eq. Mfg |
| ...................... | Iron and Steel Forging |
| ...................... | Primary Metals Prod. Mfg |
| ...................... | Valves and Pipe Fittings Mfg |
| 113..................Ferroalloys Production............................................................................................... YYYYYY | |
| ...................... | Ferro/Silico Manganese |

(ii) [Reserved]

(11) Georgia.

(i) The following table lists the specific part 63 standards that have been delegated unchanged to the Georgia Environmental Protection Division (GEPD) for all sources. The "X" symbol is used to indicate each subpart that has been delegated. The delegations are subject to all of the conditions and limitations set force in Federal law, regulations, policy, guidance, and determinations. Some authorities cannot be delegated and are retained by EPA. These include certain General Provisions authorities and specific parts of some standards.

**Part 63 Major & Area Source Rule Delegations—Georgia** [1]

| Source category | Subpart | GEPD |
|---|---|---|
| 1......................HON......................................................................... | F, G, H, I... | X |
| 2....................Polyvinyl Chloride & Co-polymers VACATED on 5/11/05......... | J... | X |
| 3......................Coke Ovens........................................................ | L... | X |
| 4......................Dry Cleaners...................................................... | M... | X |
| 5......................Chromium Electroplating...................................... | N... | X |
| 6......................EtO Commercial Sterilization.............................. | O... | X |
| 7......................Chromium Cooling Towers................................... | Q... | X |
| 8......................Gasoline Distribution (stage 1)........................... | R... | X |
| 9......................Pulp & Paper I.................................................... | S... | X |
| 10....................Halogenated Solvent Cleaning............................. | T... | X |
| 11....................Polymer & Resins 1............................................ | U... | X |
| 12....................Polymer & Resins 2............................................ | W... | X |

**§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99**

| | | | |
|---|---|---|---|
| 13.................... Secondary Lead Smelters | | X | X |
| 14.................... Marine Tank Vessel Loading | | Y | X |
| 15.................... Phosphoric Acid Mfg. | | AA | X |
| 16.................... Phosphate Fertilizers Prod. | | BB | X |
| 17.................... Petroleum Refineries | | CC | X |
| 18.................... Offsite Waste & Recovery | | DD | X |
| .................... | Tanks; Level 1 | OO | X |
| .................... | Containers | PP | X |
| .................... | Surface Impoundments | QQ | X |
| .................... | Drain Systems | RR | X |
| .................... | Oil-Water Separators | VV | X |
| 19.................... Magnetic Tape | | EE | X |
| 20.................... Aerospace Industry | | GG | X |
| 21.................... Oil & Natural Gas Prod. | | HH | X |
| .................... | Area Source Requirements >>. | | |
| 22.................... Shipbuilding and Repair | | II | X |
| 23.................... Wood Furniture Mfg. | | JJ | X |
| 24.................... Printing & Publishing | | KK | X |
| 25.................... Primary Aluminum | | LL | |
| 26.................... Pulp & Paper II (Combustion sources) | | MM | X |
| 27.................... | Generic MACT: | | |
| .................... | Control Devices | SS | X |
| .................... | Eq. Leaks—Level 1 | TT | X |
| .................... | Eq. Leaks—Level 2 | UU | X |
| .................... | Tanks—Level 2 | WW | X |
| 28.................... | Generic MACT: | | |
| .................... | Ethylene Mfg. | XX & YY | X |
| .................... | Carbon Black | YY | X |
| .................... | Spandex Prod. | YY | X |

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | |
|---|---|---|---|
| ...................... | Cyanide Chemical Mfg........................................................................... | YY | X |
| ...................... | Acetal Resins........................................................................................... | YY | X |
| ...................... | Acrylic/Modacrylic Fibers...................................................................... | YY | X |
| ...................... | Hydrogen Fluoride Prod.......................................................................... | YY | X |
| ...................... | Polycarbonates Prod................................................................................ | YY | X |
| 29.................. | Steel Pickeling........................................................................................ | CCC | X |
| 30.................. | Mineral Wool Prod.................................................................................. | DDD | X |
| 31.................. | Hazardous Waste Combustion (Phase I)................................................. | EEE | X |
| 32.................. | Boilers that burn Haz. Waste (Phase II)................................................ | EEE | X |
| 33.................. | HCL Prod. Furnaces burning Haz. Waste (P II)..................................... | EEE | X |
| 34.................. | Pharmaceutical Prod............................................................................... | GGG | X |
| 35.................. | Nat. Gas Transmission & Storage........................................................... | HHH | X |
| 36.................. | Flexible Polyurethane Foam Prod........................................................... | I I I | X |
| 37.................. | Polymer & Resins 4................................................................................. | JJJ | X |
| 38.................. | Portland Cement...................................................................................... | LLL | X |
| 39.................. | Pesticide Active Ingredients................................................................... | MMM | X |
| 40.................. | Wool Fiberglass....................................................................................... | NNN | X |
| 41.................. | Polymer & Resins 3 (Amino & Phenolic).............................................. | OOO | X |
| 42.................. | Polyether Polyols Prod........................................................................... | PPP | X |
| 43.................. | Primary Copper....................................................................................... | QQQ | X |
| 44.................. | Secondary Aluminum Prod...................................................................... | RRR | X |
| 45.................. | Primary Lead Smelting........................................................................... | TTT | X |
| 46.................. | Petro Refineries (FCC units).................................................................. | UUU | X |
| 47.................. | POTW....................................................................................................... | VVV | X |
| 48.................. | Ferroalloys.............................................................................................. | XXX | X |
| 49.................. | Municipal Landfills................................................................................. | AAAA | X |
| 50.................. | Nutritional Yeast..................................................................................... | CCCC | X |
| 51.................. | Plywood and Composite Wood Prod. (Partial Vacatur Oct. 07)............. | DDDD | X |
| 52.................. | Organic Liquids Distribution (non-gas).................................................. | EEEE | X |

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | |
|---|---|---|---|
| 53 | Misc. Organic NESHAP | FFFF | X |
| 54 | Vegetable Oil | GGGG | X |
| 55 | Wet Formed Fiberglass | HHHH | X |
| 56 | Auto & Light Duty Truck (coating) | IIII | X |
| 57 | Paper & Other Webs | JJJJ | X |
| 58 | Metal Can (coating) | KKKK | X |
| 59 | Misc. Metal Parts (coating) | MMMM | X |
| 60 | Large Appliances (coating) | NNNN | X |
| 61 | Printing, Coating, & Dyeing Fabrics | OOOO | X |
| 62 | Plastic Parts & Products (coating) | PPPP | X |
| 63 | Wood Building Products | QQQQ | X |
| 64 | Metal Furniture (coating) | RRRR | X |
| 65 | Metal Coil (coating) | S S S S | X |
| 66 | Leather Tanning & Finishing | TTTT | X |
| 67 | Cellulose Ethers Prod. Misc. Viscose Processes | UUUU | X |
| 68 | Boat Manufacturing | VVVV | X |
| 69 | Reinforced Plastic Composites | WWWW | X |
| 70 | Rubber Tire Mfg. | XXXX | X |
| 71 | Stationary Combustion Turbines | YYYY | X |
| 72 | Reciprocating Int. Combustion Engines | ZZZZ | X |
| | Area Source Requirements >>. | | |
| 73 | Lime Manufacturing | AAAAA | X |
| 74 | Semiconductor Production | BBBBB | X |
| 75 | Coke Ovens: (Push/Quench/Battery/Stacks) | CCCCC | X |
| 76 | Industrial/Commercial/Institutional Boilers & Process Heaters, VACATED on 7/30/07 | DDDDD | |
| 77 | Iron Foundries | EEEEE | X |
| 78 | Integrated Iron & Steel | FFFFF | X |
| 79 | Site Remediation | GGGGG | X |
| 80 | Misc. Coating Manufacturing | HHHHH | X |

Add.132

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | |
|---|---|---|---|
| 81.................... | Mercury Cell Chlor-Alkali.................... | IIIII | X |
| 82.................... | Brick & Structural Clay Products, VACATED on 6/18/07.................... | JJJJJ | |
| 83.................... | Clay Ceramics Manufacturing, VACATED on 6/18/07.................... | KKKKK | |
| 84.................... | Asphalt Roofing & Processing.................... | LLLLL | X |
| 85.................... | Flex. Polyurethane Foam Fabrication.................... | MMMMM | X |
| 86.................... | Hydrochloric Acid Prod/Fumed Silica.................... | NNNNN | X |
| 87.................... | Engine & Rocket Test Facilities.................... | PPPPP | X |
| 88.................... | Friction Materials Manufacturing.................... | QQQQQ | X |
| 89.................... | Taconite Iron Ore.................... | RRRRR | X |
| 90.................... | Refactories.................... | SSSSS | X |
| 91.................... | Primary Magnesium.................... | TTTTT | X |

<div align="center">Area Source Rules</div>

| | | | |
|---|---|---|---|
| 92.................... | Hospital Sterilizers.................... | WWWWW | |
| 93.................... | Stainless and Nonstainless Steel Mfg. Electric Arc Furnaces.................... | YYYYY | |
| 94.................... | Iron & Steel foundries.................... | ZZZZZ | |
| 95.................... | Gasoline Distribution—Bulk.................... | BBBBBB | |
| 96.................... | Gasoline Dispensing Facilities.................... | CCCCCC | |
| 97.................... | PVC & Copolymers Prod.................... | DDDDDD | |
| 98.................... | Primary Copper.................... | EEEEEE | |
| 99.................... | Secondary Copper Smelting.................... | FFFFFF | |
| 100.................... | Primary Nonferrous Metals.................... | GGGGGG | |
| .................... | Paint Stripping | | |
| 101.................... | Auto-Body Refinishing.................... | HHHHHH | |
| .................... | Plastic Parts & Prod. (coating) | | |
| 102.................... | Acrylic/Modacrylic Fibers Prod.................... | LLLLLL | |
| 103.................... | Carbon Black Prod.................... | MMMMMM | |
| 104.................... | Chemical Mfg. Chrom.................... | NNNNNN | |
| .................... | Flex. Polyurethane Foam Fab | | |
| 105.................... | Flex. Polyurethane Foam Prod.................... | OOOOOO | |

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | |
|---|---|---|
| 106.................Lead Acid Battery Mfg.......................................................... | PPPPPP |
| 107.................Wood Preserving................................................................ | QQQQQQ |
| 108.................Clay Ceramics Mfg............................................................. | RRRRRR |
| 109.................Glass Mfg........................................................................ | SSSSSS |
| 110.................Secondary Nonferrous Metals.............................................. | TTTTTT |
| 110.................Plating and Polishing.......................................................... | WWWWWW |
| 112.................Industrial Mach. & Eq. Finishing......................................... | XXXXXX |
| .....................     Elect. & Electronics Eq. Finishing | |
| .....................     Fabricated Metal Prod | |
| .....................     Fabricated Plate Work (Boiler Shop) | |
| .....................     Fabricated Structural Metal Mfg | |
| .....................     Heating Eq. Mfg | |
| .....................     Iron and Steel Forging | |
| .....................     Primary Metals Prod. Mfg | |
| .....................     Valves and Pipe Fittings Mfg | |
| 113.................Ferroalloys Production........................................................ | YYYYYY |
| .....................     Ferro/Silico Manganese | |

(ii) Georgia Environmental Protection Division (GEPD) may implement and enforce alternative requirements in the form of title V permit terms and conditions for International Paper Augusta Mill, Augusta, Georgia, for subpart S of this part —National Emission Standards for Hazardous Air Pollutants from the Pulp and Paper Industry. This action is contingent upon GEPD including, in title V permits, terms and conditions that are no less stringent than the Federal standard. In addition, the requirement applicable to the source remains the Federal section 112 requirement until EPA has approved the alternative permit terms and conditions and the final title V permit is issued.

(12) [Reserved]

(13) Idaho.

(i) The following table lists the specific part 63 subparts that have been delegated unchanged to the Idaho Department of Environmental Quality. The (X) symbol indicates that all or part of the subpart is delegated, subject to the conditions and limits in EPA's action:

**Delegation Status of Part 63 NESHAPS—State of Idaho** [1]

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | Subpart | IDEQ |
|---|---|---|
| A. | General Provisions | X |
| D. | Early Reductions | X |
| F. | HON-SOCMI | X |
| G. | HON-Process Vents | X |
| H. | HON-Equipment Leaks | X |
| I. | HON-Negotiated Leaks | X |
| L. | Coke Oven Batteries | X |
| M. | Perchloroethylene Dry Cleaning | X |
| N. | Chromium Electroplating | X |
| O. | Ethylene Oxide Sterilizers | X |
| Q. | Industrial Process Cooling Towers | X |
| R. | Gasoline Distribution | X |
| S. | Pulp and Paper | X |
| T. | Halogenated Solvent Cleaning | X |
| U. | Polymers and Resins I | X |
| W. | Polymers and Resins II—Epoxy | X |
| X. | Secondary Lead Smelting | X |
| Y. | Marine Tank Vessel Loading | X |
| AA. | Phosphoric Acid Manufacturing Plants | X |
| BB. | Phosphate Fertilizers Production Plants | X |
| CC. | Petroleum Refineries | X |
| DD. | Off-Site Waste and Recovery | X |
| EE. | Magnetic Tape Manufacturing | X |
| GG. | Aerospace Manufacturing & Rework | X |
| HH. | Oil and Natural Gas Production Facilities | X |
| II. | Shipbuilding and Ship Repair | X |
| JJ. | Wood Furniture Manufacturing Operations | X |
| KK. | Printing and Publishing Industry | X |

Add.135

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | |
|---|---|---|
| LL. | Primary Aluminum | X |
| OO. | Tanks—Level 1 | X |
| PP. | Containers | X |
| QQ. | Surface Impoundments | X |
| RR. | Individual Drain Systems | X |
| SS. | Closed Vent Systems, Control Devices, Recovery Devices and Routing to a Fuel Gas System or Process | ......................... |
| TT. | Equipment Leaks—Control Level 1 | X |
| UU. | Equipment Leaks—Control Level 2 | X |
| VV. | Oil-Water Separators and Organic-Water Separators | X |
| WW. | Storage Vessels (Tanks)—Control Level 2 | X |
| YY. | Source Categories: Generic MACT | X |
| CCC. | Steel Pickling—HCl Process Facilities and Hydrochloric Acid Regeneration Plants | X |
| DDD. | Mineral Wool Production | X |
| EEE. | Hazardous Waste Combustors | X |
| GGG. | Pharmaceuticals Production | X |
| HHH. | Natural Gas Transmission and Storage Facilities | X |
| III. | Flexible Polyurethane Foam Production | X |
| JJJ. | Polymers and Resins IV | X |
| LLL. | Portland Cement Manufacturing | X |
| MMM. | Pesticide Active Ingredient Production | X |
| NNN. | Wool Fiberglass Manufacturing | X |
| OOO. | Manufacture of Amino Phenolic Resins | X |
| PPP. | Polyether Polyols Production | X |
| RRR. | Secondary Aluminum Production | X |
| TTT. | Primary Lead Smelting | X |
| VVV. | Publicly Owned Treatment Works | X |
| XXX. | Ferroalloys Production: Ferromanganese & Silicomanganese | X |

(ii) [Reserved]

Add.136

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

(14) to (17) [Reserved]

(18) Kentucky.

(i) The following table lists the specific part 63 standards that have been delegated unchanged to the Kentucky Department of Environmental Protection for all sources. The "X" symbol is used to indicate each subpart that has been delegated. The delegations are subject to all of the conditions and limitations set forth in Federal law, regulations, policy, guidance, and determinations. Some authorities cannot be delegated and are retained by EPA. These include certain General Provisions authorities and specific parts of some standards.

Part 63 Major and Area Source Rule Delegations—Kentucky[1]

| | Source category | Subpart | KDEP[2] | LAPCD[3] |
|---|---|---|---|---|
| 1 | HON | F,G,H,I | X | X |
| 2 | Polyvinyl Chloride & Co-polymers VACATED on 5/11/05 | J | | |
| 3 | Coke Ovens | L | X | X |
| 4 | Dry Cleaners | M | X | X |
| 5 | Chromium Electroplating | N | X | X |
| 6 | EtO Commercial Sterilization | O | X | X |
| 7 | Chromium Cooling Towers | Q | X | X |
| 8 | Gasoline Distribution (stage 1) | R | X | X |
| 9 | Pulp & Paper I | S | X | X |
| 10 | Halogenated Solvent Cleaning | T | X | X |
| 11 | Polymer & Resins 1 | U | X | X |
| 12 | Polymer & Resins 2 | W | X | X |
| 13 | Secondary Lead Smelters | X | X | X |
| 14 | Marine Tank Vessel Loading | Y | X | X |
| 15 | Phosphoric Acid Mfg. | AA | X | X |
| 16 | Phosphate Fertilizers Prod. | BB | X | X |
| 17 | Petroleum Refineries | CC | X | X |
| 18 | Offsite Waste & Recovery | DD | X | X |
| | Tanks; Level 1 | OO | X | X |

Add.137

| | | | | |
|---|---|---|---|---|
| ............................................................ | Containers............................................................ | PP............................ | X | X |
| ............................................................ | Surface Impoundments............................................................ | QQ............................ | X | X |
| ............................................................ | Drain Systems............................................................ | RR............................ | X | X |
| ............................................................ | Oil-Water Separators............................................................ | VV............................ | X | X |
| 19............................................................ | Magnetic Tape............................................................ | EE............................ | X | X |
| 20............................................................ | Aerospace Industry............................................................ | GG............................ | X | X |
| 21............................................................ | Oil & Natural Gas Prod............................................................ | HH............................ | X | X |
| ............................................................ | Area Source Requirements >>............................................................ | X............................ | | |
| 22............................................................ | Shipbuilding and Repair............................................................ | II............................ | X | X |
| 23............................................................ | Wood Furniture Mfg............................................................ | JJ............................ | X | X |
| 24............................................................ | Printing & Publishing............................................................ | KK............................ | X | X |
| 25............................................................ | Primary Aluminum............................................................ | LL............................ | X | |
| 26............................................................ | Pulp & Paper II (Combustion sources)............................................................ | MM............................ | X | X |
| 27............................................................ | Generic MACT: | | | |
| ............................................................ | Control Devices............................................................ | SS............................ | X | X |
| ............................................................ | Eq. Leaks—Level 1............................................................ | TT............................ | X | X |
| ............................................................ | Eq. Leaks—Level 2............................................................ | UU............................ | X | X |
| ............................................................ | Tanks—Level 2............................................................ | WW............................ | X | X |
| 28............................................................ | General MACT | | | |
| ............................................................ | Ethylene Mfg............................................................ | XX & YY............................ | X | X |
| ............................................................ | Carbon Black............................................................ | YY............................ | X | X |
| ............................................................ | Spandex Prod............................................................ | YY............................ | X | X |
| ............................................................ | Cyanide Chemical Mfg............................................................ | YY............................ | X | X |
| ............................................................ | Acetal Resins............................................................ | YY............................ | X | X |
| ............................................................ | Acrylic/Modacrylic Fibers............................................................ | YY............................ | X | X |
| ............................................................ | Hydrogen Fluoride Prod............................................................ | YY............................ | X | X |
| ............................................................ | Polycarbonates Prod............................................................ | YY............................ | X | X |
| 29............................................................ | Steel Pickling............................................................ | CCC............................ | X | X |
| 30............................................................ | Mineral Wool Prod............................................................ | DDD............................ | X | X |

Add.138

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| 31 | Hazardous Waste Combustion (Phase I) | EEE | X | X |
|---|---|---|---|---|
| 32 | Boilers that burn Haz. Waste (Phase II) | EEE | X | X |
| 33 | HCL Prod. Furnaces burning Haz. Waste (P II) | EEE | X | X |
| 34 | Pharmaceutical Prod. | GGG | X | X |
| 35 | Nat. Gas Transmission & Storage | HHH | X | X |
| 36 | Flexible Polyurethane Foam Prod. | III | X | X |
| 37 | Polymer & Resins 4. | JJJ | X | X |
| 38 | Portland Cement. | LLL | X | X |
| 39 | Pesticide Active Ingredients. | MMM | X | X |
| 40 | Wool Fiberglass. | NNN | X | X |
| 41 | Polymer & Resins 3 (Amino & Phenolic) | OOO | X | X |
| 42 | Polyether Polyols Prod. | PPP | X | X |
| 43 | Primary Copper. | QQQ | X | X |
| 44 | Secondary Aluminum Prod. | RRR | X | X |
| 45 | Primary Lead Smelting. | TTT | X | |
| 46 | Petro Refineries (FCC units). | UUU | X | X |
| 47 | POTW. | VVV | X | X |
| 48 | Ferroalloys. | XXX | X | X |
| 49 | Municipal Landfills. | AAAA | X | X |
| 50 | Nutritional Yeast. | CCCC | X | X |
| 51 | Plywood and Composite Wood Prod. (Partial Vacatur Oct. 07) | DDDD | X | X |
| 52 | Organic Liquids Distribution (non-gas). | EEEE | X | X |
| 53 | Misc. Organic NESHAP. | FFFF | X | X |
| 54 | Vegetable Oil. | GGGG | X | X |
| 55 | Wet Formed Fiberglass. | HHHH | X | X |
| 56 | Auto & Light Duty Truck (coating). | IIII | X | X |
| 57 | Paper & Other Webs. | JJJJ | X | X |
| 58 | Metal Can (coating). | KKKK | X | X |

Add.139

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | | |
|---|---|---|---|---|
| 59 | Misc. Metal Parts (coating) | MMMM | X | X |
| 60 | Large Appliances (coating) | NNNN | X | X |
| 61 | Printing, Coating, & Dyeing Fabrics | OOOO | X | X |
| 62 | Plastic Parts & Products (coating) | PPPP | X | X |
| 63 | Wood Building Products | QQQQ | X | X |
| 64 | Metal Furniture (coating) | RRRR | X | X |
| 65 | Metal Coil (coating) | SSSS | X | X |
| 66 | Leather Tanning & Finishing | TTTT | X | X |
| 67 | Cellulose Ethers Prod. Misc. Viscose Processes | UUUU | X | X |
| 68 | Boat Manufacturing | VVVV | X | X |
| 69 | Reinforced Plastic Composites | WWWW | X | X |
| 70 | Rubber Tire Mfg. | XXXX | X | X |
| 71 | Stationary Combustion Turbines | YYYY | X | X |
| 72 | Reciprocating Int. Combustion Engines | ZZZZ | X | X |
| | Area Source Requirements >> | X | | |
| 73 | Lime Manufacturing | AAAAA | X | X |
| 74 | Semiconductor Production | BBBBB | X | X |
| 75 | Coke Ovens: (Push/Quench/Battery/Stacks) | CCCCC | X | X |
| 76 | Industrial/Commercial/Institutional Boilers & Process Heaters, VACATED on 7/30/07 | DDDDD | | |
| 77 | Iron Foundries | EEEEE | X | X |
| 78 | Integrated Iron & Steel | FFFFF | X | X |
| 79 | Site Remediation | GGGGG | X | X |
| 80 | Misc. Coating Manufacturing | HHHHH | X | X |
| 81 | Mercury Cell Chlor-Alkali | IIIII | X | X |
| 82 | Brick & Structural Clay Products, VACATED on 6/18/07 | JJJJJ | | |
| 83 | Clay Ceramics Manufacturing, VACATED on 6/18/07 | KKKKK | | |
| 84 | Asphalt Roofing & Processing | LLLLL | X | X |
| 85 | Flex. Polyurethane Foam Fabrication | MMMMM | X | X |
| 86 | Hydrochloric Acid Prod/Fumed Silica | NNNNN | X | X |

Add.140

**§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99**

| 87 | Engine & Rocket Test Facilities | PPPPP | X | X |
|----|---------------------------------|-------|---|---|
| 88 | Friction Materials Manufacturing | QQQQQ | X | X |
| 89 | Taconite Iron Ore | RRRRR | X | X |
| 90 | Refactories | SSSSS | X | X |
| 91 | Primary Magnesium | TTTTT | X | X |

Ares Source Rules

| 92 | Hospital Sterilizers | WWWWW | X | |
|-----|---------------------|-------|---|---|
| 93 | Electric Arc Furnaces Stainless and Nonstainless Steel Mfg | YYYYY | X | |
| 94 | Iron & Steel foundries | ZZZZZ | X | |
| 95 | Gasoline Distribution—Bulk | BBBBBB | X | |
| 96 | Gasoline Dispensing Facilities | CCCCCC | X | |
| 97 | PVC & Copolymers Prod. | DDDDDD | X | |
| 98 | Primary Copper | EEEEEE | X | |
| 99 | Secondary Copper Smelting | FFFFFF | X | |
| 100 | Primary Nonferrous Metals Paint Stripping | GGGGGG | X | |
| 101 | Auto-Body Refinishing Plastic Parts & Prod. (coating) | HHHHHH | X | |
| 102 | Acrylic/Modacrylic Fibers Prod. | LLLLLL | X | |
| 103 | Carbon Black Prod. | MMMMMM | X | |
| 104 | Chemical Mfg. Chrom Flex. Polyurethane Foam Fab. | NNNNNN | X | |
| 105 | Flex. Polyurethane Foam Prod. | OOOOOO | X | |
| 106 | Lead Acid Battery Mfg. | PPPPPP | X | |
| 107 | Wood Preserving | QQQQQQ | X | |
| 108 | Clay Ceramics Mfg. | RRRRRR | | |
| 109 | Glass Mfg. | SSSSSS | | |
| 110 | Secondary Nonferrous Metals | TTTTTT | | |
| 111 | Plating and Polishing | WWWWWW | | |
| 112 | Hearing Eq. Mfg. | XXXXXX | | |
| | Industrial Mach. & Eq. Finishing | | | |
| | Elect. & Electronics Eq. Finishing | | | |

Add.141

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | |
|---|---|---|
| ...................................................................Fabricated Metal Prod.................................................................... | | |
| ...................................................................Fabricated Plate Work (Boiler Shop).................................................................. | | |
| ...................................................................Fabricated Structural Metal Mfg.................................................................... | | |
| ...................................................................Iron and Steel Forging.................................................................... | | |
| ...................................................................Primary Metals Prod. Mfg.................................................................... | | |
| ...................................................................Valves and Pipe Fittings Mfg.................................................................... | | |
| ...................................................................Ferroalloys Production.................................................................... | | |
| 113...................................................................Ferro/Silico Manganese..........................................................YYYYYY................... | | |

(ii) [Reserved]

(19) Louisiana.

(i) The following table lists the specific part 63 standards that have been delegated unchanged to the Louisiana Department of Environmental Quality for all sources. The "X" symbol is used to indicate each subpart that has been delegated. The delegations are subject to all of the conditions and limitations set forth in Federal law, regulations, policy, guidance, and determinations. Some authorities cannot be delegated and are retained by EPA. These include certain General Provisions authorities and specific parts of some standards. Any amendments made to these rules after July 1, 2013, are not delegated.

**Delegation Status for Part 63 Standards—State of Louisiana**

**[Excluding Indian Country]**

| Subpart | Source category | LDEQ [1] [2] |
|---|---|---|
| A........................................................................ | General Provisions................................................................ | X |
| D........................................................................ | Early Reductions................................................................ | X |
| F........................................................................ | Hazardous Organic NESHAP (HON)—Synthetic Organic Chemical Manufacturing Industry (SOCMI)....................... | X |
| G........................................................................ | HON—SOCMI Process Vents, Storage Vessels, Transfer Operations and Wastewater................................................ | X |
| H........................................................................ | HON—Equipment Leaks................................................ | X |
| I........................................................................ | HON—Certain Processes Negotiated Equipment Leak Regulation................................................................ | X |
| J........................................................................ | Polyvinyl Chloride and Copolymers Production.................. | [3] |
| K........................................................................ | (Reserved)................................................................ | |

Add.142

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| L | Coke Oven Batteries | X |
|---|---|---|
| M | Perchloroethylene Dry Cleaning | X |
| N | Chromium Electroplating and Chromium Anodizing Tanks. | X |
| O | Ethylene Oxide Sterilizers | X |
| P | (Reserved) | |
| Q | Industrial Process Cooling Towers | X |
| R | Gasoline Distribution | X |
| S | Pulp and Paper Industry | X |
| T | Halogenated Solvent Cleaning | X |
| U | Group I Polymers and Resins | X |
| V | (Reserved) | |
| W | Epoxy Resins Production and Non-Nylon Polyamides Production | X |
| X | Secondary Lead Smelting | X |
| Y | Marine Tank Vessel Loading | X |
| Z | (Reserved) | |
| AA | Phosphoric Acid Manufacturing Plants | X |
| BB | Phosphate Fertilizers Production Plants | X |
| CC | Petroleum Refineries | X |
| DD | Off-Site Waste and Recovery Operations | X |
| EE | Magnetic Tape Manufacturing | X |
| FF | (Reserved) | |
| GG | Aerospace Manufacturing and Rework Facilities | X |
| HH | Oil and Natural Gas Production Facilities | X |
| II | Shipbuilding and Ship Repair Facilities | X |
| JJ | Wood Furniture Manufacturing Operations | X |
| KK | Printing and Publishing Industry | X |
| LL | Primary Aluminum Reduction Plants | X |
| MM | Chemical Recovery Combustion Sources at Kraft, Soda, Sulfide, and Stand-Alone Semichemical Pulp Mills | X |

Add.143

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | |
|---|---|---|
| NN | (Reserved) | |
| OO | Tanks—Level 1 | X |
| PP | Containers | X |
| QQ | Surface Impoundments | X |
| RR | Individual Drain Systems | X |
| SS | Closed Vent Systems, Control Devices, Recovery Devices and Routing to a Fuel Gas System or a Process | X |
| TT | Equipment Leaks—Control Level 1 | X |
| UU | Equipment Leaks—Control Level 2 Standards | X |
| VV | Oil—Water Separators and Organic—Water Separators | X |
| WW | Storage Vessels (Tanks)—Control Level 2 | X |
| XX | Ethylene Manufacturing Process Units Heat Exchange Systems and Waste Operations | X |
| YY | Generic Maximum Achievable Control Technology Standards | X |
| ZZ–BBB | (Reserved) | |
| CCC | Steel Pickling—HCl Process Facilities and Hydrochloric Acid Regeneration | X |
| DDD | Mineral Wool Production | X |
| EEE | Hazardous Waste Combustors | X |
| FFF | (Reserved) | |
| GGG | Pharmaceuticals Production | X |
| HHH | Natural Gas Transmission and Storage Facilities | X |
| III | Flexible Polyurethane Foam Production | X |
| JJJ | Group IV Polymers and Resins | X |
| KKK | (Reserved) | |
| LLL | Portland Cement Manufacturing | X |
| MMM | Pesticide Active Ingredient Production | X |
| NNN | Wool Fiberglass Manufacturing | X |
| OOO | Amino/Phenolic Resins | X |
| PPP | Polyether Polyols Production | X |

Add.144

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | |
|---|---|---|
| QQQ..................................................... | Primary Copper Smelting........................................ | X |
| RRR..................................................... | Secondary Aluminum Production............................ | X |
| SSS...................................................... | (Reserved)............................................................. | |
| TTT...................................................... | Primary Lead Smelting.......................................... | X |
| UUU..................................................... | Petroleum Refineries—Catalytic Cracking Units, Catalytic Reforming Units and Sulfur Recovery Plants..................... | X |
| VVV..................................................... | Publicly Owned Treatment Works (POTW)...................... | X |
| WWW.................................................... | (Reserved)............................................................. | |
| XXX..................................................... | Ferroalloys Production: Ferromanganese and Silicomanganese....................................................... | X |
| AAAA.................................................. | Municipal Solid Waste Landfills............................. | X |
| CCCC................................................... | Nutritional Yeast Manufacturing............................ | X |
| DDDD.................................................. | Plywood and Composite Wood Products.................... | 4 |
| | | X |
| EEEE................................................... | °Organic Liquids Distribution................................ | X |
| FFFF.................................................... | Misc. Organic Chemical Production and Processes (MON).. | X |
| GGGG.................................................. | Solvent Extraction for Vegetable Oil Production............. | X |
| HHHH.................................................. | Wet Formed Fiberglass Mat Production..................... | X |
| IIII....................................................... | Auto & Light Duty Truck (Surface Coating)................... | X |
| JJJJ...................................................... | Paper and other Web (Surface Coating).................... | X |
| KKKK.................................................. | Metal Can (Surface Coating)................................. | X |
| MMMM................................................ | Misc. Metal Parts and Products (Surface Coating)............. | X |
| NNNN.................................................. | Surface Coating of Large Appliances...................... | X |
| OOOO.................................................. | Fabric Printing Coating and Dyeing........................ | X |
| PPPP.................................................... | Plastic Parts (Surface Coating)............................. | X |
| QQQQ.................................................. | Surface Coating of Wood Building Products.................. | X |
| RRRR................................................... | Surface Coating of Metal Furniture......................... | X |
| SSSS.................................................... | Surface Coating for Metal Coil............................. | X |
| TTTT.................................................... | Leather Finishing Operations............................... | X |
| UUUU.................................................. | Cellulose Production Manufacture.......................... | X |

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | |
|---|---|---|
| VVVV | Boat Manufacturing | X |
| WWWW | Reinforced Plastic Composites Production | X |
| XXXX | Rubber Tire Manufacturing | X |
| YYYY | Combustion Turbines | X |
| ZZZZ | Reciprocating Internal Combustion Engines (RICE) | X |
| AAAAA | Lime Manufacturing Plants | X |
| BBBBB | Semiconductor Manufacturing | X |
| CCCCC | Coke Ovens: Pushing, Quenching and Battery Stacks | X |
| DDDDD | Industrial/Commercial/Institutional Boilers and Process Heaters | 5 X |
| EEEEE | Iron Foundries | X |
| FFFFF | Integrated Iron and Steel | X |
| GGGGG | Site Remediation | X |
| HHHHH | Miscellaneous Coating Manufacturing | X |
| IIIII | Mercury Cell Chlor-Alkali Plants | X |
| JJJJJ | Brick and Structural Clay Products Manufacturing | 6 |
| KKKKK | Clay Ceramics Manufacturing | 6 |
| LLLLL | Asphalt Roofing and Processing | X |
| MMMMM | Flexible Polyurethane Foam Fabrication Operation | X |
| NNNNN | Hydrochloric Acid Production, Fumed Silica Production | X |
| OOOOO | (Reserved) | |
| PPPPP | Engine Test Facilities | X |
| QQQQQ | Friction Products Manufacturing | X |
| RRRRR | Taconite Iron Ore Processing | X |
| SSSSS | Refractory Products Manufacture | X |
| TTTTT | Primary Magnesium Refining | X |
| UUUUU | Coal and Oil-Fired Electric Utility Steam Generating Units. | 7 X |
| VVVVV | (Reserved) | |
| WWWWW | Hospital Ethylene Oxide Sterilizers | X |

**Add.146**

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | |
|---|---|---|
| XXXXX | (Reserved) | |
| YYYYY | Electric Arc Furnace Steelmaking Area Sources | X |
| ZZZZZ | Iron and Steel Foundries Area Sources | X |
| AAAAAA | (Reserved) | |
| BBBBBB | Gasoline Distribution Bulk Terminals, Bulk Plants, and Pipeline Facilities | X |
| CCCCCC | Gasoline Dispensing Facilities | X |
| DDDDDD | Polyvinyl Chloride and Copolymers Production Area Sources | X |
| EEEEEE | Primary Copper Smelting Area Sources | X |
| FFFFFF | Secondary Copper Smelting Area Sources | X |
| GGGGGG | Primary Nonferrous Metals Area Source: Zinc, Cadmium, and Beryllium | X |
| HHHHHH | Paint Stripping and Miscellaneous Surface Coating Operations at Area Sources | X |
| IIIIII | (Reserved) | |
| JJJJJJ | Industrial, Commercial, and Institutional Boilers Area Sources | X |
| KKKKKK | (Reserved) | |
| LLLLLL | Acrylic and Modacrylic Fibers Production Area Sources | X |
| MMMMMM | Carbon Black Production Area Sources | X |
| NNNNNN | Chemical Manufacturing Area Sources: Chromium Compounds | X |
| OOOOOO | Flexible Polyurethane Foam Production and Fabrication Area Sources | X |
| PPPPPP | Lead Acid Battery Manufacturing Area Sources | X |
| QQQQQQ | Wood Preserving Area Sources | X |
| RRRRRR | Clay Ceramics Manufacturing Area Sources | X |
| SSSSSS | Glass Manufacturing Area Sources | X |
| TTTTTT | Secondary Nonferrous Metals Processing Area Sources | X |
| UUUUUU | (Reserved) | |
| VVVVVV | Chemical Manufacturing Area Sources | X |

Add.147

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | |
|---|---|---|
| WWWWWW | Plating and Polishing Operations Area Sources | X |
| XXXXXX | Metal Fabrication and Finishing Area Sources | X |
| YYYYYY | Ferroalloys Production Facilities Area Sources | X |
| ZZZZZZ | Aluminum, Copper, and Other Nonferrous Foundries Area Sources | X |
| AAAAAAA | Asphalt Processing and Asphalt Roofing Manufacturing Area Sources | X |
| BBBBBBB | Chemical Preparation Industry Area Sources | X |
| CCCCCCC | Paints and Allied Products Manufacturing Area Sources | X |
| DDDDDDD | Prepared Feeds Areas Sources | X |
| EEEEEEE | Gold Mine Ore Processing and Production Area Sources | X |
| FFFFFFF–GGGGGGG | (Reserved) | |
| HHHHHHH | Polyvinyl Chloride and Copolymers Production Major Sources | X |

(20) Maine.

(i) [Reserved]

(ii) Maine Department of Environmental Protection (ME DEP) may implement and enforce alternative requirements in the form of title V permit terms and conditions for Lincoln Pulp and Paper, located in Lincoln, Maine, for subpart S—National Emission Standards for Hazardous Air Pollutants from the Pulp and Paper Industry. This action is contingent upon ME DEP including, in title V permits, terms and conditions that are no less stringent than the federal standard and have been approved by EPA. In addition, the requirement applicable to the source remains the federal section 112 requirement until EPA has approved the alternative permit terms and conditions and the final title V permit is issued.

(iii) Affected area sources within Maine must comply with the Maine Regulations Applicable to Hazardous Air Pollutants (incorporated by reference as specified in § 63.14) as described in paragraph (a)(20)(iii)(A) of this section:

(A) The material incorporated into the Maine Department of Environmental Protection regulations at Chapter 125, Perchloroethylene Dry Cleaner Regulation, effective as of June 2, 1991, last amended on June 24, 2009, pertaining to dry cleaning facilities in the State of Maine jurisdiction, and approved under the procedures in § 63.93 to be implemented and enforced in place of the Federal NESHAP for Perchloroethylene Dry Cleaning Facilities (subpart M of this part), effective as of July 11, 2008, for area sources only, as defined in § 63.320(h).

(1) Authorities not delegated.

(i) Maine is not delegated the Administrator's authority to implement and enforce Maine regulations at Chapter 125, in lieu of those provisions of subpart M of this part which apply to major sources, as defined in § 63.320(g).

(ii) Maine is not delegated the Administrator's authority to implement and enforce Maine regulations at Chapter 125, in lieu of those provisions of subpart M of this part which apply to dry cleaning systems installed in a building with a residence between July 13, 2006 and June 24, 2009, as defined in §§ 63.320(b)(2)(i) and 63.322(o)(4).

(2) [Reserved]

(B) [Reserved]

(21) Maryland.

(i) Maryland is delegated the authority to implement and enforce all existing and future unchanged 40 CFR part 63 standards at major sources, as defined in 40 CFR part 70, in accordance with the delegation agreement between EPA Region III and the Maryland Department of the Environment, dated November 3, 1999, and any mutually acceptable amendments to that agreement.

(ii) Maryland is delegated the authority to implement and enforce all existing 40 CFR part 63 standards and all future unchanged 40 CFR part 63 standards, if delegation is sought by the Maryland Department of the Environment and approved by EPA Region III, at affected sources which are not located at major sources, as defined in 40 CFR part 70, in accordance with the final rule, dated January 30, 2002, effective April 1, 2002, and any mutually acceptable amendments to the terms described in the direct final rule.

(iii) EPA has granted the Maryland Department of the Environment (MDE) "up-front" approval to implement an Equivalency by Permit (EBP) program under which the MDE may establish and enforce alternative State requirements for MeadWestvaco Company's Luke Mill in lieu of those of the National Emissions Standard for Hazardous Air Pollutants (NESHAP) for Chemical Recovery Combustion Sources at Kraft, Soda, Sulfite, and Stand–Alone Semichemical Pulp Mills found at 40 CFR part 63, subpart MM. The MDE may only establish alternative requirements for the Luke Mill which are equivalent to and at least as stringent as the otherwise applicable Federal requirements. The MDE must, in order to establish alternative requirements for the Luke Mill under its EPA approved EBP program: submit to EPA for review pre-draft Clean Air Act (CAA) Title V permit terms specifying alternative requirements which are at least as stringent as the otherwise applicable Federal requirements, obtain EPA's written approval of the alternative pre-draft CAA Title V permit requirements, and issue a CAA Title V permit for the Luke Mill which contains the approved alternative requirements. Until EPA has approved the alternative permit terms and conditions and the MDE has issued a final CAA Title V permit incorporating them, MeadWestvaco Company's Luke Mill will remain subject to the Federal NESHAP requirements found at 40 CFR part 63, subpart MM.

(22) Massachusetts.

(i) [Reserved]

Add.149

(ii) Affected area sources within Massachusetts must comply with the Massachusetts Regulations Applicable to Hazardous Air Pollutants (incorporated by reference as specified in § 63.14) as described in paragraph (a)(22)(ii)(A) of this section:

(A) The material incorporated into the Massachusetts Department of Environmental Protection regulations at 310 CMR 7.26(10)-(16), Air Pollution Control, effective as of September 5, 2008, corrected March 6, 2009, and 310 CMR 70.00, Environmental Results Program Certification, effective as of December 28, 2007, pertaining to dry cleaning facilities in the Commonwealth of Massachusetts jurisdiction, and approved under the procedures in § 63.93 to be implemented and enforced in place of the Federal NESHAP for Perchloroethylene Dry Cleaning Facilities (subpart M of this part), effective as of July 11, 2008, for area sources only, as defined in § 63.320(h).

(1) Authorities not delegated.

(i) Massachusetts is not delegated the Administrator's authority to implement and enforce Massachusetts regulations at 310 CMR 7.26(10)-(16) and 310 CMR 70.00, in lieu of those provisions of subpart M of this part which apply to major sources, as defined in § 63.320(g).

(ii) Massachusetts is not delegated the Administrator's authority to implement and enforce Massachusetts regulations at 310 CMR 7.26(10)-(16) and 310 CMR 70.00, in lieu of those provisions of subpart M of this part which apply to dry cleaning systems installed in a building with a residence between December 21, 2005 and July 13, 2006, as defined in §§ 63.320(b)(2)(ii) and 63.322(o)(5)(i)-(ii).

(B) [Reserved]

(23), (24) [Reserved]

(25) Mississippi.

(i) The following table lists the specific part 63 standards that have been delegated unchanged to the Mississippi Department of Environmental Quality (MDEQ) for all sources. The "X" symbol is used to indicate each subpart that has been delegated. The delegations are subject to all of the conditions and limitations set forth in Federal law, regulations, policy, guidance, and determinations. Some authorities cannot be delegated and are retained by EPA. These include certain General Provisions authorities and specific parts of some standards.

Part 63 Major & Area Source Rule Delegations—Mississippi [1]

| Source category | Subpart | MDEQ |
|---|---|---|
| 1.................. HON.................................................................................... F, G, H, I............................................................ | | X |
| 2.................. Polyvinyl Chloride & Co-polymers VACATED on 5/11/05........................................... | J | |
| 3.................. Coke Ovens..........................................................................L................................................ | | X |

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | |
|---|---|---|---|
| 4 | Dry Cleaners | M | X |
| 5 | Chromium Electroplating | N | X |
| 6 | EtO Commercial Sterilization | O | X |
| 7 | Chromium Cooling Towers | Q | X |
| 8 | Gasoline Distribution (stage 1) | R | X |
| 9 | Pulp & Paper I | S | X |
| 10 | Halogenated Solvent Cleaning | T | X |
| 11 | Polymer & Resins 1 | U | X |
| 12 | Polymer & Resins 2 | W | X |
| 13 | Secondary Lead Smelters | X | X |
| 14 | Marine Tank Vessel Loading | Y | X |
| 15 | Phosphoric Acid Mfg. | AA | X |
| 16 | Phosphate Fertilizers Prod. | BB | X |
| 17 | Petroleum Refineries | CC | X |
| 18 | Offsite Waste & Recovery | DD | X |
| | Tanks; Level 1 | OO | X |
| | Containers | PP | X |
| | Surface Impoundments | QQ | X |
| | Drain Systems | RR | X |
| | Oil-Water Separators | VV | X |
| 19 | Magnetic Tape | EE | X |
| 20 | Aerospace Industry | GG | X |
| 21 | Oil & Natural Gas Prod. | HH | X |
| | Area Source Requirements >>. | | |
| 22 | Shipbuilding and Repair | II | X |
| 23 | Wood Furniture Mfg. | JJ | X |
| 24 | Printing & Publishing | KK | X |
| 25 | Primary Aluminum | LL | X |
| 26 | Pulp & Paper II (Combustion sources) | MM | X |

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | |
|---|---|---|---|
| 27..................... | Generic MACT: | | |
| ..................... | Control Devices.................................................................... | SS | X |
| ..................... | Eq. Leaks—Level 1............................................................... | TT | X |
| ..................... | Eq. Leaks—Level 2............................................................... | UU | X |
| ..................... | Tanks—Level 2..................................................................... | WW | X |
| 28..................... | Generic MACT: | | |
| ..................... | Ethylene Mfg......................................................................... | XX & YY | X |
| ..................... | Carbon Black......................................................................... | YY | X |
| ..................... | Spandex Prod......................................................................... | YY | X |
| ..................... | Cyanide Chemical Mfg.......................................................... | YY | X |
| ..................... | Acetal Resins......................................................................... | YY | X |
| ..................... | Acrylic/Modacrylic Fibers..................................................... | YY | X |
| ..................... | Hydrogen Fluoride Prod........................................................ | YY | X |
| ..................... | Polycarbonates Prod.............................................................. | YY | X |
| 29..................... Steel Pickeling.......................................................................................... | | CCC | X |
| 30..................... Mineral Wool Prod.................................................................................... | | DDD | X |
| 31..................... Hazardous Waste Combustion (Phase I)................................................. | | EEE | X |
| 32..................... Boilers that burn Haz. Waste (Phase II)................................................ | | EEE | X |
| 33..................... HCL Prod. Furnaces burning Haz. Waste (P II)..................................... | | EEE | X |
| 34..................... Pharmaceutical Prod.................................................................................. | | GGG | X |
| 35..................... Nat. Gas Transmission & Storage.......................................................... | | HHH | X |
| 36..................... Flexible Polyurethane Foam Prod........................................................... | | III | X |
| 37..................... Polymer & Resins 4.................................................................................. | | JJJ | X |
| 38..................... Portland Cement....................................................................................... | | LLL | X |
| 39..................... Pesticide Active Ingredients................................................................... | | MMM | X |
| 40..................... Wool Fiberglass........................................................................................ | | NNN | X |
| 41..................... Polymer & Resins 3 (Amino & Phenolic)............................................... | | OOO | X |
| 42..................... Polyether Polyols Prod............................................................................ | | PPP | X |
| 43..................... Primary Copper......................................................................................... | | QQQ | X |

Add.152

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | |
|---|---|---|---|
| 44 | Secondary Aluminum Prod. | RRR | X |
| 45 | Primary Lead Smelting | TTT | X |
| 46 | Petro Refineries (FCC units) | UUU | X |
| 47 | POTW | VVV | X |
| 48 | Ferroalloys | XXX | X |
| 49 | Municipal Landfills | AAAA | X |
| 50 | Nutritional Yeast | CCCC | X |
| 51 | Plywood and Composite Wood Prod. (Partial Vacatur Oct. 07) | DDDD | X |
| 52 | Organic Liquids Distribution (non-gas) | EEEE | X |
| 53 | Misc. Organic NESHAP | FFFF | X |
| 54 | Vegetable Oil | GGGG | X |
| 55 | Wet Formed Fiberglass | HHHH | X |
| 56 | Auto & Light Duty Truck (coating) | IIII | X |
| 57 | Paper & Other Webs | JJJJ | X |
| 58 | Metal Can (coating) | KKKK | X |
| 59 | Misc. Metal Parts (coating) | MMMM | X |
| 60 | Large Appliances (coating) | NNNN | X |
| 61 | Printing, Coating, & Dyeing Fabrics | OOOO | X |
| 62 | Plastic Parts & Products (coating) | PPPP | X |
| 63 | Wood Building Products | QQQQ | X |
| 64 | Metal Furniture (coating) | RRRR | X |
| 65 | Metal Coil (coating) | SSSS | X |
| 66 | Leather Tanning & Finishing | TTTT | X |
| 67 | Cellulose Ethers Prod. Misc. Viscose Processes | UUUU | X |
| 68 | Boat Manufacturing | VVVV | X |
| 69 | Reinforced Plastic Composites | WWWW | X |
| 70 | Rubber Tire Mfg. | XXXX | X |
| 71 | Stationary Combustion Turbines | YYYY | X |
| 72 | Reciprocating Int. Combustion Engines | ZZZZ | X |

Add.153

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| ................... | Area Source Requirements >>. | | |
|---|---|---|---|
| 73................... Lime Manufacturing................... | | AAAAA................... | X |
| 74................... Semiconductor Production................... | | BBBBB................... | X |
| 75................... Coke Ovens: (Push/Quench/Battery/Stacks)................... | | CCCCC................... | X |
| 76................... Industrial/Commercial/Institutional Boilers & Process Heaters, VACATED on 7/30/07..... | | DDDDD | |
| 77................... Iron Foundries................... | | EEEEE................... | X |
| 78................... Integrated Iron & Steel................... | | FFFFF................... | X |
| 79................... Site Remediation................... | | GGGGG................... | X |
| 80................... Misc. Coating Manufacturing................... | | HHHHH................... | X |
| 81................... Mercury Cell Chlor-Alkali................... | | IIIII................... | X |
| 82................... Brick & Structural Clay Products, VACATED on 6/18/07................... | | JJJJJ................... | X |
| 83................... Clay Ceramics Manufacturing, VACATED on 6/18/07................... | | KKKKK | |
| 84................... Asphalt Roofing & Processing................... | | LLLLL................... | X |
| 85................... Flex. Polyurethane Foam Fabrication................... | | MMMMM................... | X |
| 86................... Hydrochloric Acid Prod/Fumed Silica................... | | NNNNN................... | X |
| 87................... Engine & Rocket Test Facilities................... | | PPPPP................... | X |
| 88................... Friction Materials Manufacturing................... | | QQQQQ................... | X |
| 89................... Taconite Iron Ore................... | | RRRRR................... | X |
| 90................... Refractories................... | | SSSSS................... | X |
| 91................... Primary Magnesium................... | | TTTTT................... | X |

| Area Source Rules | | | |
|---|---|---|---|
| 92................... Hospital Sterilizers................... | | WWWWW................... | X |
| 93................... Stainless and Nonstainless Steel Mfg. Electric Arc Furnaces................... | | YYYYY................... | X |
| 94................... Iron & Steel foundries................... | | ZZZZZ................... | X |
| 95................... Gasoline Distribution—Bulk................... | | BBBBBB................... | X |
| 96................... Gasoline Dispensing Facilities................... | | CCCCCC................... | X |
| 97................... PVC & Copolymers Prod................... | | DDDDDD................... | X |
| 98................... Primary Copper................... | | EEEEEE................... | X |
| 99................... Secondary Copper Smelting................... | | FFFFFF................... | X |

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | |
|---|---|---|---|
| 100.................. | Primary Nonferrous Metals................................................................................ | GGGGGG................................................... | X |
| ...................... | Paint Stripping | | |
| 101.................. | Auto-Body Refinishing.................................................. | HHHHHH | |
| ...................... | Plastic Parts & Prod. (coating) | | |
| 102.................. | Acrylic/Modacrylic Fibers Prod...................................................................... | LLLLLL................................................. | X |
| 103.................. | Carbon Black Prod............................................................................................ | MMMMMM.............................................. | X |
| 104.................. | Chemical Mfg. Chrom........................................................................................ | NNNNNN................................................ | X |
| ...................... | Flex. Polyurethane Foam Fab | | |
| 105.................. | Flex. Polyurethane Foam Prod........................................................................ | OOOOOO............................................... | X |
| 106.................. | Lead Acid Battery Mfg...................................................................................... | PPPPPP................................................. | X |
| 107.................. | Wood Preserving............................................................................................... | QQQQQQ............................................... | X |
| 108.................. | Clay Ceramics Mfg............................................................................................ | RRRRRR................................................ | X |
| 109.................. | Glass Mfg.......................................................................................................... | SSSSSS.................................................. | X |
| 110.................. | Secondary Nonferrous Metals.......................................................................... | TTTTTT................................................. | X |
| 110.................. | Plating and Polishing........................................................................................ | WWWWWW............................................. | X |
| 112.................. | Heating Eq. Mfg................................................................................................ | XXXXXX................................................ | X |
| ...................... | Industrial Mach. & Eq. Finishing | | |
| ...................... | Elect. & Electronics Eq. Finishing | | |
| ...................... | Fabricated Metal Prod | | |
| ...................... | Fabricated Plate Work (Boiler Shop) | | |
| ...................... | Fabricated Structural Metal Mfg | | |
| ...................... | Iron and Steel Forging | | |
| ...................... | Primary Metals Prod. Mfg | | |
| ...................... | Valves and Pipe Fittings Mfg | | |
| 113.................. | Ferroalloys Production....................................................................... | YYYYYY | |
| | Ferro/Silico Manganese................................................................................ | | |

(ii) [Reserved]

(26) to (28) [Reserved]

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

(29) Nevada.

(i) The following table lists the specific part 63 standards that have been delegated unchanged to the air pollution control agencies in the State of Nevada. The (X) symbol is used to indicate each category that has been delegated.

Table 11 to Paragraph (a)(29)(i)—Delegation Status for Part 63 Standards—Nevada

| Subpart | Description | NDEP [1] | Washoe [2] | Clark [3] |
|---|---|---|---|---|
| A | General Provisions | X | X | X |
| F | Synthetic Organic Chemical Manufacturing Industry | X | | X |
| G | Synthetic Organic Chemical Manufacturing Industry: Process Vents, Storage Vessels, Transfer Operations, and Wastewater | X | | X |
| H | Organic Hazardous Air Pollutants: Equipment Leaks | X | | X |
| I | Organic Hazardous Air Pollutants: Certain Processes Subject to the Negotiated Regulation for Equipment Leaks | X | | X |
| J | Polyvinyl Chloride and Copolymers Production | X | | X |
| L | Coke Oven Batteries | X | | X |
| M | Perchloroethylene Dry Cleaning | X | X | X |
| N | Hard and Decorative Chromium Electroplating and Chromium Anodizing Tanks | X | X | X |
| O | Ethylene Oxide Sterilization Facilities | X | X | X |
| Q | Industrial Process Cooling Towers | X | | X |
| R | Gasoline Distribution Facilities | X | X | X |
| S | Pulp and Paper | X | | X |
| T | Halogenated Solvent Cleaning | X | X | X |
| U | Group I Polymers and Resins | X | | X |
| W | Epoxy Resins Production and Non-Nylon Polyamides Production | X | | X |
| X | Secondary Lead Smelting | X | | X |
| Y | Marine Tank Vessel Loading Operations | X | | |
| AA | Phosphoric Acid Manufacturing Plants | | | X |
| BB | Phosphate Fertilizers Production Plants | | | X |

Add.156

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| Subpart | Description | | | |
|---|---|---|---|---|
| CC | Petroleum Refineries | X | | X |
| DD | Off-Site Waste and Recovery Operations | | | X |
| EE | Magnetic Tape Manufacturing Operations | X | | X |
| GG | Aerospace Manufacturing and Rework Facilities | | | X |
| HH | Oil and Natural Gas Production Facilities | X | | X |
| II | Shipbuilding and Ship Repair (Surface Coating) | X | | X |
| JJ | Wood Furniture Manufacturing Operations | X | | X |
| KK | Printing and Publishing Industry | X | X | X |
| LL | Primary Aluminum Reduction Plants | | | X |
| MM | Chemical Recovery Combustion Sources at Kraft, Soda, Sulfite, and Stand-Alone Semichemical Pulp Mills | | | X |
| OO | Tanks—Level 1 | X | | X |
| PP | Containers | X | | X |
| QQ | Surface Impoundments | X | | X |
| RR | Individual Drain Systems | X | | X |
| SS | Closed Vent Systems, Control Devices, Recovery Devices and Routing to a Fuel Gas System or a Process | X | | X |
| TT | Equipment Leaks—Control Level 1 | X | | X |
| UU | Equipment Leaks—Control Level 2 | X | | X |
| VV | Oil-Water Separators and Organic-Water Separators | X | | X |
| WW | Storage Vessels (Tanks)—Control Level 2 | X | | X |
| XX | Ethylene Manufacturing Process Units: Heat Exchange Systems and Waste Operations | X | | X |
| YY | Generic MACT Standards | X | | X |
| CCC | Steel Pickling | X | | X |
| DDD | Mineral Wool Production | | | X |
| EEE | Hazardous Waste Combustors | X | | X |
| GGG | Pharmaceuticals Production | X | | X |
| HHH | Natural Gas Transmission and Storage Facilities | X | | X |
| III | Flexible Polyurethane Foam Production | X | | X |
| JJJ | Group IV Polymers and Resins | X | | X |

Add.157

| | | | | |
|---|---|---|---|---|
| LLL | Portland Cement Manufacturing Industry | X | | X |
| MMM | Pesticide Active Ingredient Production | X | | X |
| NNN | Wool Fiberglass Manufacturing | | | X |
| OOO | Manufacture of Amino/Phenolic Resins | X | | X |
| PPP | Polyether Polyols Production | X | | X |
| QQQ | Primary Copper Smelting | X | | X |
| RRR | Secondary Aluminum Production | | | X |
| TTT | Primary Lead Smelting | X | | X |
| UUU | Petroleum Refineries: Catalytic Cracking, Catalytic Reforming, and Sulfur Recovery Units | X | | X |
| VVV | Publicly Owned Treatment Works | X | X | X |
| XXX | Ferroalloys Production | | | X |
| AAAA | Municipal Solid Waste Landfills | X | | X |
| CCCC | Manufacturing of Nutritional Yeast | | | X |
| DDDD | Plywood and Composite Wood Products | X | | X |
| EEEE | Organic Liquids Distribution (non-gasoline) | X | X | X |
| FFFF | Miscellaneous Organic Chemical Manufacturing | X | | X |
| GGGG | Solvent Extraction for Vegetable Oil Production | X | | X |
| HHHH | Wet-Formed Fiberglass Mat Production | X | | X |
| IIII | Surface Coating of Automobiles and Light-Duty Trucks | X | | X |
| JJJJ | Paper and Other Web Coating | X | | X |
| KKKK | Surface Coating of Metal Cans | X | | X |
| MMMM | Miscellaneous Metal Parts and Products | X | | X |
| NNNN | Large Appliances | X | | X |
| OOOO | Printing, Coating, and Dyeing of Fabrics and Other Textiles | X | | X |
| PPPP | Surface Coating of Plastic Parts and Products | X | | X |
| QQQQ | Wood Building Products | X | | X |
| RRRR | Surface Coating of Metal Furniture | X | | X |
| SSSS | Surface Coating of Metal Coil | X | | X |

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | |
|---|---|---|---|
| TTTT..............................Leather Finishing Operations.................................................... | X | .................................. | X |
| UUUU..............................Cellulose Products Manufacturing................................................ | X | .................................. | X |
| VVVV..............................Boat Manufacturing......................................................................... | X | .................................. | X |
| WWWW...........................Reinforced Plastics Composites Production............................... | X | X | X |
| XXXX..............................Tire Manufacturing........................................................................ | X | .................................. | X |
| YYYY..............................Stationary Combustion Turbines.................................................. | X | .................................. | X |
| ZZZZ...............................Stationary Reciprocating Internal Combustion Engines.......... | X | X | X |
| AAAAA...........................Lime Manufacturing Plants.......................................................... | X | .................................. | X |
| BBBBB............................Semiconductor Manufacturing..................................................... | X | .................................. | X |
| CCCCC...........................Coke Oven: Pushing, Quenching and Battery Stacks............... | X | .................................. | X |
| DDDDD...........................Industrial, Commercial, and Institutional Boiler and Process Heaters....... | X | .................................. | X |
| EEEEE............................Iron and Steel Foundries.............................................................. | X | .................................. | X |
| FFFFF.............................Integrated Iron and Steel............................................................. | X | .................................. | X |
| GGGGG..........................Site Remediation............................................................................ | X | .................................. | X |
| HHHHH...........................Miscellaneous Coating Manufacturing...................................... | X | .................................. | X |
| IIIII.................................Mercury Emissions from Mercury Cell Chlor-Alkali Plants...... | | | X |
| JJJJJ..............................Brick and Structural Clay Products Manufacturing.................. | X | .................................. | X |
| KKKKK...........................Clay Ceramics Manufacturing..................................................... | X | .................................. | X |
| LLLLL.............................Asphalt Roofing and Processing.................................................. | X | .................................. | X |
| MMMMM.........................Flexible Polyurethane Foam Fabrication Operation.................. | X | .................................. | X |
| NNNNN...........................Hydrochloric Acid Production...................................................... | X | .................................. | X |
| PPPPP............................Engine Test Cells/Stands............................................................. | X | .................................. | X |
| QQQQQ..........................Friction Products Manufacturing................................................. | X | .................................. | X |
| RRRRR...........................Taconite Iron Ore Processing....................................................... | | | X |
| SSSSS............................Refractory Products Manufacturing............................................. | X | .................................. | X |
| TTTTT.............................Primary Magnesium Refining....................................................... | | | X |
| UUUUU............................Coal and Oil-Fired Electric Utility Steam Generating Units......... | X | | |
| WWWWW.........................Hospital Ethylene Oxide Sterilizers............................................ | X | X | X |
| YYYYY...........................Electric Arc Furnace Steelmaking Facilities (area sources)........ | | | X |

Add.159

**§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99**

| | | | | |
|---|---|---|---|---|
| ZZZZZ | Iron and Steel Foundries Area Sources | X | .......................... | X |
| BBBBBB | Gasoline Distribution Bulk Terminals, Bulk Plants and Pipeline Facilities | X | X | X |
| CCCCCC | Gasoline Dispensing Facilities | X | X | X |
| DDDDDD | Polyvinyl Chloride and Copolymers Production Area Sources | X | | X |
| EEEEEE | Primary Copper Smelting Area Sources | X | | X |
| FFFFFF | Secondary Copper Smelting Area Sources | X | | X |
| GGGGGG | Primary Nonferrous Metals Area Sources—Zinc, Cadmium, and Beryllium | X | | X |
| HHHHHH | Paint Stripping and Miscellaneous Surface Coating Operations at Area Sources | X | X | X |
| JJJJJJ | Industrial, Commercial, and Institutional Boilers and Process Heaters—Area Sources | X | | |
| LLLLLL | Acrylic and Modacrylic Fibers Production Area Sources | X | | X |
| MMMMMM | Carbon Black Production Area Sources | X | | X |
| NNNNNN | Chemical Manufacturing Area Sources: Chromium Compounds | X | | X |
| OOOOOO | Flexible Polyurethane Foam Production and Fabrication Area Sources | X | X | X |
| PPPPPP | Lead Acid Battery Manufacturing Area Sources | X | | X |
| QQQQQQ | Wood Preserving Area Sources | X | | X |
| RRRRRR | Clay Ceramics Manufacturing Area Sources | X | | X |
| SSSSSS | Glass Manufacturing Area Sources | X | | X |
| TTTTTT | Secondary Nonferrous Metals Processing Area Sources | X | | X |
| VVVVVV | Chemical Manufacturing Industry—Area Sources | X | | X |
| WWWWWW | Area Source Standards for Plating and Polishing Operations | X | X | X |
| XXXXXX | Area Source Standards for Nine Metal Fabrication and Finishing Source Categories | X | X | X |
| YYYYYY | Area Sources: Ferroalloys Production Facilities | | | X |
| ZZZZZZ | Area Source Standards for Aluminum, Copper, and Other Nonferrous Foundries | X | | X |
| AAAAAAA | Asphalt Processing and Asphalt Roofing Manufacturing—Area Sources. | X | | X |
| BBBBBBB | Chemical Preparations Industry—Area Sources | X | | X |
| CCCCCCC | Paint and Allied Products Manufacturing—Area Sources | X | | X |

Add.160

| | | |
|---|---|---|
| DDDDDDD........................Prepared Feeds Manufacturing—Area Sources........................................ | | X |
| EEEEEEE............................ Gold Mine Ore Processing and Production—Area Sources.................... | X | X |

(ii) [Reserved]

(30) New Hampshire.

(i) New Hampshire is delegated the authority to implement and enforce all existing and future unchanged 40 CFR part 63 standards in accordance with the delegation procedures in Attachment II of the delegation request letter dated May 9, 2002 submitted by NH DES to EPA and any mutually acceptable amendments to those delegation procedures.

(ii) New Hampshire Department of Environmental Services (NH DES) may implement and enforce alternative requirements in the form of title V permit terms and conditions for Groveton Paper Board Inc. of Groveton, NH and Pulp & Paper of America, LLC of Berlin, NH for subpart S—National Emission Standards for Hazardous Air Pollutants from the Pulp and Paper Industry and subpart MM—National Emissions Standards for Hazardous Air Pollutants for Chemical Recovery Combustion Sources at Kraft, Soda, Sulfite and Stand–Alone Semi-chemical Pulp Mills. This action is contingent upon NH DES including, in title V permits, terms and conditions that are no less stringent than the Federal standard and have been approved by EPA. In addition, the requirement applicable to the source remains the Federal section 112 requirement until EPA has approved the alternative permit terms and conditions and the final title V permit is issued.

(iii) Affected inactive waste disposal sites not operated after July 9, 1981 within New Hampshire must comply with New Hampshire Regulations Chapter Env–Sw 2100: Management and Control of Asbestos Disposal Sites Not Operated after July 9, 1981, effective September 1, 2018 (incorporated by reference, see § 63.14) as described in paragraph (a)(30)(iii) (A) of this section:

(A) The material incorporated by reference from Chapter Env–Sw 2100, Management and Control of Asbestos Disposal Sites Not Operated after July 9, 1981, pertains to inactive waste disposal sites not operated after July 9, 1981 in the State of New Hampshire's jurisdiction, and has been approved under the procedures in § 63.93 to be implemented and enforced in place of the Federal NESHAPs for Inactive Waste Disposal Sites (40 CFR 61.151).

(B) [Reserved]

(iv) Affected asbestos facilities (i.e., facilities found under 40 CFR part 61, subpart M, except those listed under paragraph (a)(30)(iii) of this section) must comply with the New Hampshire Code of Administrative Rules, Chapter Env–A 1800, Asbestos Management and Control, effective as of May 5, 2017 (incorporated by reference as specified in § 63.14) as described in paragraph (a)(30)(iv)(A) of this section:

(A) The material incorporated by reference from Chapter Env–A 1800, Asbestos Management and Control, pertains to those affected sources in the State of New Hampshire's jurisdiction, and has been approved under the procedures in § 63.93 to be implemented and enforced in place of the federal NESHAPs found at 40 CFR part 61, subpart M (except those listed under paragraph (a)(30)(iii) of this section).

(B) [Reserved]

(31) New Jersey.

(i) Affected sources must comply with the Toxic Catastrophe Prevention Act Program (TCPA), (July 20, 1998), (incorporated by reference as specified in § 63.14) as described in paragraph (a)(31)(i)(A) of this section:

(A) Except for authorities identified as not being delegated, the regulations incorporated in New Jersey's "Toxic Catastrophe Prevention Act Program," Title 7, Chapter 31, of the New Jersey Administrative Code: Subchapter 1, "General Provisions" (sections 1.1 to 1.10 except for the definition of "What if Checklist"), Subchapter 2, "Hazard Assessment," Subchapter 3, "Minimum Requirements for a Program 2 TCPA Risk Management Program," Subchapter 4, "Minimum Requirements for a Program 3 TCPA Risk Management Program," Subchapter 5, "Emergency Response," Subchapter 6, "Extraordinarily Hazardous Substances," Subchapter 7, "Risk Management Plan and TCPA Submission," and Subchapter 8, "Other Federal Requirements," (effective July 20, 1998), pertain to the sources affected by 40 CFR part 68 and have been approved under the procedures in §§ 63.91, 63.93 and 63.95 to be implemented and enforced in place of 40 CFR part 68, Subparts A through H, as may be amended.

(1) Authorities not delegated:

(i) The New Jersey Department of Environmental Protection is not delegated the Administrator's authority to implement and enforce New Jersey's Toxic Catastrophe Prevention Act Program, Title 7, Chapter 31, of the New Jersey Administrative Code, in lieu of the provisions of 40 CFR part 68 as they apply to the regulation of processes that are covered only because they contain regulated quantities of liquid petroleum gases (LPG) regulated under the New Jersey Liquified Petroleum Gas Act of 1950 (N.J.S.A. 21:1B),

(ii) Pursuant to § 63.90(c) the New Jersey Department of Environmental Protection is not delegated the Administrator's authority to add or delete substances from the list of substances established under section 112(r) and set forth in 40 CFR 68.130.

(32) New Mexico.

(i) The following table lists the specific part 63 standards that have been delegated unchanged to State and local air pollution agencies in New Mexico. The "X" symbol is used to indicate each subpart that has been delegated. The delegations are subject to all of the conditions and limitations set forth in Federal law and regulations. Some authorities cannot be delegated and are retained by the EPA. These include certain General Provisions authorities and specific parts of some standards. Any amendments made to these rules after January 23, 2017 are not delegated.

**Delegation Status for Part 63 Standards**

| [Excluding Indian country] | | | |
|---|---|---|---|
| Subpart | Source category | NMED [1] [2] | ABCAQCB [1] [3] |

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | |
|---|---|---|---|
| A | General Provisions | X | X |
| D | Early Reductions | X | X |
| F | Hazardous Organic NESHAP (HON)—Synthetic Organic Chemical Manufacturing Industry (SOCMI) | X | X |
| G | HON—SOCMI Process Vents, Storage Vessels, Transfer Operations and Wastewater | X | X |
| H | HON—Equipment Leaks | X | X |
| I | HON—Certain Processes Negotiated Equipment Leak Regulation | X | X |
| J | Polyvinyl Chloride and Copolymers Production | 4 | 4 |
| K | [Reserved] | | |
| L | Coke Oven Batteries | X | X |
| M | Perchloroethylene Dry Cleaning | X | X |
| N | Chromium Electroplating and Chromium Anodizing Tanks | X | X |
| O | Ethylene Oxide Sterilizers | X | X |
| P | [Reserved] | | |
| Q | Industrial Process Cooling Towers | X | X |
| R | Gasoline Distribution | X | X |
| S | Pulp and Paper Industry | X | X |
| T | Halogenated Solvent Cleaning | X | X |
| U | Group I Polymers and Resins | X | X |
| V | [Reserved] | | |
| W | Epoxy Resins Production and Non-Nylon Polyamides Production | X | X |
| X | Secondary Lead Smelting | X | X |
| Y | Marine Tank Vessel Loading | X | X |
| Z | [Reserved] | | |
| AA | Phosphoric Acid Manufacturing Plants | X | X |
| BB | Phosphate Fertilizers Production Plants | X | X |

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | |
|---|---|---|---|
| CC......................................................... | Petroleum Refineries............................................. | X | X |
| DD......................................................... | Off-Site Waste and Recovery Operations............. | X | X |
| EE......................................................... | Magnetic Tape Manufacturing.............................. | X | X |
| FF......................................................... | [Reserved] | | |
| GG......................................................... | Aerospace Manufacturing and Rework Facilities. | X | X |
| HH......................................................... | Oil and Natural Gas Production Facilities............ | X | X |
| II.......................................................... | Shipbuilding and Ship Repair Facilities............... | X | X |
| JJ.......................................................... | Wood Furniture Manufacturing Operations.......... | X | X |
| KK......................................................... | Printing and Publishing Industry......................... | X | X |
| LL......................................................... | Primary Aluminum Reduction Plants................... | X | X |
| MM......................................................... | Chemical Recovery Combustion Sources at Kraft, Soda, Sulfide, and Stand-Alone Semichemical Pulp Mills.................................... | X | X |
| NN......................................................... | Wool Fiberglass Manufacturing Area Sources...... | X | X |
| OO......................................................... | Tanks—Level 1....................................................... | X | X |
| PP......................................................... | Containers.............................................................. | X | X |
| QQ......................................................... | Surface Impoundments.......................................... | X | X |
| RR......................................................... | Individual Drain Systems...................................... | X | X |
| SS......................................................... | Closed Vent Systems, Control Devices, Recovery Devices and Routing to a Fuel Gas System or a Process................................................................... | X | X |
| TT......................................................... | Equipment Leaks—Control Level 1....................... | X | X |
| UU......................................................... | Equipment Leaks—Control Level 2 Standards..... | X | X |
| VV......................................................... | Oil—Water Separators and Organic—Water Separators................................................................ | X | X |
| WW......................................................... | Storage Vessels (Tanks)—Control Level 2........... | X | X |
| XX......................................................... | Ethylene Manufacturing Process Units Heat Exchange Systems and Waste Operations............ | X | X |
| YY......................................................... | Generic Maximum Achievable Control Technology Standards........................................... | X | X |
| ZZ-BBB...................................... | [Reserved] | | |
| CCC......................................................... | Steel Pickling—HCI Process Facilities and Hydrochloric Acid Regeneration......................... | X | X |

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | |
|---|---|---|---|
| DDD | Mineral Wool Production | X | X |
| EEE | Hazardous Waste Combustors | X | X |
| FFF | [Reserved] | | |
| GGG | Pharmaceuticals Production | X | X |
| HHH | Natural Gas Transmission and Storage Facilities. | X | X |
| III | Flexible Polyurethane Foam Production | X | X |
| JJJ | Group IV Polymers and Resins | X | X |
| KKK | [Reserved] | | |
| LLL | Portland Cement Manufacturing | X | X |
| MMM | Pesticide Active Ingredient Production | X | X |
| NNN | Wool Fiberglass Manufacturing | X | X |
| OOO | Amino/Phenolic Resins | X | X |
| PPP | Polyether Polyols Production | X | X |
| QQQ | Primary Copper Smelting | X | X |
| RRR | Secondary Aluminum Production | X | X |
| SSS | [Reserved] | | |
| TTT | Primary Lead Smelting | X | X |
| UUU | Petroleum Refineries—Catalytic Cracking Units, Catalytic Reforming Units and Sulfur Recovery Plants | X | X |
| VVV | Publicly Owned Treatment Works (POTW) | X | X |
| WWW | [Reserved] | | |
| XXX | Ferroalloys Production: Ferromanganese and Silicomanganese | X | X |
| AAAA | Municipal Solid Waste Landfills | X | X |
| CCCC | Nutritional Yeast Manufacturing | X | X |
| DDDD | Plywood and Composite Wood Products | [5] X | [5] X |
| EEEE | Organic Liquids Distribution | X | X |
| FFFF | Misc. Organic Chemical Production and Processes (MON) | X | X |

Add.165

| | | | |
|---|---|---|---|
| GGGG | Solvent Extraction for Vegetable Oil Production.. | X | X |
| HHHH | Wet Formed Fiberglass Mat Production | X | X |
| IIII | Auto and Light Duty Truck (Surface Coating) | X | X |
| JJJJ | Paper and other Web (Surface Coating) | X | X |
| KKKK | Metal Can (Surface Coating) | X | X |
| MMMM | Misc. Metal Parts and Products (Surface Coating) | X | X |
| NNNN | Surface Coating of Large Appliances | X | X |
| OOOO | Fabric Printing Coating and Dyeing | X | X |
| PPPP | Plastic Parts (Surface Coating) | X | X |
| QQQQ | Surface Coating of Wood Building Products | X | X |
| RRRR | Surface Coating of Metal Furniture | X | X |
| SSSS | Surface Coating for Metal Coil | X | X |
| TTTT | Leather Finishing Operations | X | X |
| UUUU | Cellulose Production Manufacture | X | X |
| VVVV | Boat Manufacturing | X | X |
| WWWW | Reinforced Plastic Composites Production | X | X |
| XXXX | Rubber Tire Manufacturing | X | X |
| YYYY | Combustion Turbines | X | X |
| ZZZZ | Reciprocating Internal Combustion Engines (RICE) | X | X |
| AAAAA | Lime Manufacturing Plants | X | X |
| BBBBB | Semiconductor Manufacturing | X | X |
| CCCCC | Coke Ovens: Pushing, Quenching and Battery Stacks | X | X |
| DDDDD | Industrial/Commercial/Institutional Boilers and Process Heaters | [6] X | [6] X |
| EEEEE | Iron Foundries | X | X |
| FFFFF | Integrated Iron and Steel | X | X |
| GGGGG | Site Remediation | X | X |
| HHHHH | Miscellaneous Coating Manufacturing | X | X |

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.    66

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| IIIII | Mercury Cell Chlor-Alkali Plants | X | X |
|---|---|---|---|
| JJJJJ | Brick and Structural Clay Products Manufacturing | [7] X | [7] X |
| KKKKK | Clay Ceramics Manufacturing | [7] X | [7] X |
| LLLLL | Asphalt Roofing and Processing | X | X |
| MMMMM | Flexible Polyurethane Foam Fabrication Operation | X | X |
| NNNNN | Hydrochloric Acid Production, Fumed Silica Production | X | X |
| OOOOO | [Reserved] | | |
| PPPPP | Engine Test Facilities | X | X |
| QQQQQ | Friction Products Manufacturing | X | X |
| RRRRR | Taconite Iron Ore Processing | X | X |
| SSSSS | Refractory Products Manufacture | X | X |
| TTTTT | Primary Magnesium Refining | X | X |
| UUUUU | Coal and Oil-Fired Electric Utility Steam Generating Units | [8] X | [8] X |
| VVVVV | [Reserved] | | |
| WWWWW | Hospital Ethylene Oxide Sterilizers | X | X |
| XXXXX | [Reserved] | | |
| YYYYY | Electric Arc Furnace Steelmaking Area Sources | X | X |
| ZZZZZ | Iron and Steel Foundries Area Sources | X | X |
| AAAAAA | [Reserved] | | |
| BBBBBB | Gasoline Distribution Bulk Terminals, Bulk Plants, and Pipeline Facilities | X | X |
| CCCCCC | Gasoline Dispensing Facilities | X | X |
| DDDDDD | Polyvinyl Chloride and Copolymers Production Area Sources | X | X |
| EEEEEE | Primary Copper Smelting Area Sources | X | X |
| FFFFFF | Secondary Copper Smelting Area Sources | X | X |

Add.167

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | |
|---|---|---|---|
| GGGGGG.......................................... | Primary Nonferrous Metals Area Source: Zinc, Cadmium, and Beryllium........................ | X | X |
| HHHHHH.......................................... | Paint Stripping and Miscellaneous Surface Coating Operations at Area Sources.................... | X | X |
| IIIIII.......................................... | [Reserved] | | |
| JJJJJJ.......................................... | Industrial, Commercial, and Institutional Boilers Area Sources........................ | X | X |
| KKKKKK.......................................... | [Reserved] | | |
| LLLLLL.......................................... | Acrylic and Modacrylic Fibers Production Area Sources........................ | X | X |
| MMMMMM.......................................... | Carbon Black Production Area Sources.............. | X | X |
| NNNNNN.......................................... | Chemical Manufacturing Area Sources: Chromium Compounds........................ | X | X |
| OOOOOO.......................................... | Flexible Polyurethane Foam Production and Fabrication Area Sources........................ | X | X |
| PPPPPP.......................................... | Lead Acid Battery Manufacturing Area Sources.. | X | X |
| QQQQQQ.......................................... | Wood Preserving Area Sources........................ | X | X |
| RRRRRR.......................................... | Clay Ceramics Manufacturing Area Sources........ | X | X |
| SSSSSS.......................................... | Glass Manufacturing Area Sources........................ | X | X |
| TTTTTT.......................................... | Secondary Nonferrous Metals Processing Area Sources........................ | X | X |
| UUUUUU.......................................... | [Reserved] | | |
| VVVVVV.......................................... | Chemical Manufacturing Area Sources............... | X | X |
| WWWWWW.......................................... | Plating and Polishing Operations Area Sources.... | X | X |
| XXXXXX.......................................... | Metal Fabrication and Finishing Area Sources..... | X | X |
| YYYYYY.......................................... | Ferroalloys Production Facilities Area Sources.... | X | X |
| ZZZZZZ.......................................... | Aluminum, Copper, and Other Nonferrous Foundries Area Sources........................ | X | X |
| AAAAAAA.......................................... | Asphalt Processing and Asphalt Roofing Manufacturing Area Sources........................ | X | X |
| BBBBBBB.......................................... | Chemical Preparation Industry Area Sources........ | X | X |
| CCCCCCC.......................................... | Paints and Allied Products Manufacturing Area Sources........................ | X | X |
| DDDDDDD.......................................... | Prepared Feeds Areas Sources........................ | X | X |

Add.168

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | |
|---|---|---|---|
| EEEEEEE.............................................. | Gold Mine Ore Processing and Production Area Sources........................................................... | X | X |
| FFFFFFF-GGGGGGG.......................... | [Reserved] | | |
| HHHHHHHH......................................... | Polyvinyl Chloride and Copolymers Production Major Sources..................................................... | X | X |

(ii) [Reserved]

(33) [Reserved]

(34) North Carolina.

(i) The following table lists the specific part 63 standards that have been delegated unchanged to the North Carolina Department of Environment and Natural Resources (NCDENR) for all sources. The "X" symbol is used to indicate each subpart that has been delegated. The delegations are subject to all of the conditions and limitations set forth in Federal law, regulations, policy, guidance, and determinations. Some authorities cannot be delegated and are retained by EPA. These include certain General Provisions authorities and specific parts of some standards.

Part 63 Major & Area Source Rule Delegations—North Carolina[1]

| Source category | Subpart | NCDENR | FCEAD[2] | MCDEP[3] | WNC[4] |
|---|---|---|---|---|---|
| HON.................................................................F, G, H, I......................................... | | X | X | X | X |
| Polyvinyl Chloride & Co-polymers VACATED on 5/11/05..............J | | | | | |
| Coke Ovens..................................................................L........................................................ | | X | X | X | X |
| Dry Cleaners................................................................M........................................................ | | X | X | X | X |
| Chromium Electroplating.............................................N........................................................ | | X | X | X | X |
| EtO Commercial Sterilization......................................O........................................................ | | X | X | X | X |
| Chromium Cooling Towers..........................................Q........................................................ | | X | X | X | X |
| Gasoline Distribution (stage 1).....................................R........................................................ | | X | X | X | X |
| Pulp & Paper I.............................................................S........................................................ | | X | X | X | X |
| Halogenated Solvent Cleaning.....................................T........................................................ | | X | X | X | X |
| Polymer & Resins 1.....................................................U........................................................ | | X | X | X | X |
| Polymer & Resins 2.....................................................W........................................................ | | X | X | X | X |
| Secondary Lead Smelters..............................................X........................................................ | | X | X | X | X |
| Marine Tank Vessel Loading.........................................Y........................................................ | | X | X | X | X |

Add.169

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | | | |
|---|---|---|---|---|---|
| Phosphoric Acid Mfg. | AA | X | X | X | X |
| Phosphate Fertilizers Prod. | BB | X | X | X | X |
| Petroleum Refineries. | CC | X | X | X | X |
| Offsite Waste & Recovery. | DD | X | X | X | X |
| Tanks; Level 1. | OO | X | X | X | X |
| Containers. | PP | X | X | X | X |
| Surface Impoundments. | QQ | X | X | X | X |
| Drain Systems. | RR | X | X | X | X |
| Oil-Water Separators. | VV | X | X | X | X |
| Magnetic Tape. | EE | X | X | X | X |
| Aerospace Industry. | GG | X | X | X | X |
| Oil & Natural Gas Prod. | HH | X | X | X | X |
| Area Source Requirements >>. | | | | | |
| Shipbuilding and Repair. | II | X | X | X | X |
| Wood Furniture Mfg. | JJ | X | X | X | X |
| Printing & Publishing. | KK | X | X | X | X |
| Primary Aluminum. | LL | X | X | X | X |
| Pulp & Paper II (Combustion sources). | MM | X | X | X | X |
| Generic MACT | | | | | |
| Control Devices. | SS | X | X | X | X |
| Eq. Leaks—Level 1. | TT | X | X | X | X |
| Eq. Leaks—Level 2. | UU | X | X | X | X |
| Tanks—Level 2. | WW | X | X | X | X |
| Generic MACT | | | | | |
| Ethylene Mfg. | XX & YY | X | X | X | X |
| Carbon Black. | YY | X | X | X | X |
| Spandex Prod. | YY | X | X | X | X |
| Cyanide Chemical Mfg. | YY | X | X | X | X |
| Acetal Resins. | YY | X | X | X | X |

Add.170

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | | | |
|---|---|---|---|---|---|
| Acrylic/Modacrylic Fibers | YY | X | X | X | X |
| Hydrogen Fluoride Prod. | YY | X | X | X | X |
| Polycarbonates Prod. | YY | X | X | X | X |
| Steel Pickeling | CCC | X | X | X | X |
| Mineral Wool Prod. | DDD | X | X | X | X |
| Hazardous Waste Combustion (Phase I) | EEE | X | X | X | X |
| Boilers that burn Haz. Waste (Phase II) | EEE | X | X | X | X |
| HCL Prod. Furnaces burning Haz. Waste (P II) | EEE | X | X | X | X |
| Pharmaceutical Prod. | GGG | X | X | X | X |
| Nat. Gas Transmission & Storage | HHH | X | X | X | X |
| Flexible Polyurethane Foam Prod. | III | X | X | X | X |
| Polymer & Resins 4 | JJJ | X | X | X | X |
| Portland Cement | LLL | X | X | X | X |
| Pesticide Active Ingredients | MMM | X | X | X | X |
| Wool Fiberglass | NNN | X | X | X | X |
| Polymer & Resins 3 (Amino & Phenolic) | OOO | X | X | X | X |
| Polyether Polyols Prod. | PPP | X | X | X | X |
| Primary Copper | QQQ | X | X | X | X |
| Secondary Aluminum Prod. | RRR | X | X | X | X |
| Primary Lead Smelting | TTT | X | X | X | X |
| Petro Refineries (FCC units) | UUU | X | X | X | X |
| POTW | VVV | X | X | X | X |
| Ferroalloys | XXX | X | X | X | X |
| Municipal Landfills | AAAA | X | X | X | X |
| Nutritional Yeast | CCCC | X | X | X | X |
| Plywood and Composite Wood Prod. (Partial Vacatur Oct. 07) | DDDD | X | X | X | X |
| Organic Liquids Distribution (non-gas) | EEEE | X | X | X | X |
| Misc. Organic NESHAP | FFFF | X | X | X | X |
| Vegetable Oil | GGGG | X | X | X | X |

Add.171

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | | | |
|---|---|---|---|---|---|
| Wet Formed Fiberglass | HHHH | X | X | X | X |
| Auto & Light Duty Truck (coating) | IIII | X | X | X | X |
| Paper & Other Webs | JJJJ | X | X | X | X |
| Metal Can (coating) | KKKK | X | X | X | X |
| Misc. Metal Parts (coating) | MMMM | X | X | X | X |
| Large Appliances (coating) | NNNN | X | X | X | X |
| Printing, Coating, & Dyeing Fabrics | OOOO | X | X | X | X |
| Plastic Parts & Products (coating) | PPPP | X | X | X | X |
| Wood Building Products | QQQQ | X | X | X | X |
| Metal Furniture (coating) | RRRR | X | X | X | X |
| Metal Coil (coating) | SSSS | X | X | X | X |
| Leather Tanning & Finishing | TTTT | X | X | X | X |
| Cellulose Ethers Prod. Misc. Viscose Processes | UUUU | X | X | X | X |
| Boat Manufacturing | VVVV | X | X | X | X |
| Reinforced Plastic Composites | WWWW | X | X | X | X |
| Rubber Tire Mfg | XXXX | X | X | X | X |
| Stationary Combustion Turbines | YYYY | X | X | X | X |
| Reciprocating Int. Combustion Engines | ZZZZ | X | X | X | X |
| | Area Source Requirements >>. | | | | |
| Lime Manufacturing | AAAAA | X | X | X | X |
| Semiconductor Production | BBBBB | X | X | X | X |
| Coke Ovens: (Push/Quench/Battery/Stacks) | CCCCC | X | X | X | X |
| Industrial/Commercial/Institutional | DDDDD | | | | |
| Boilers & Process Heaters, VACATED on 7/30/07 | | | | | |
| Iron Foundries | EEEEE | X | X | X | X |
| Integrated Iron & Steel | FFFFF | X | X | X | X |
| Site Remediation | GGGGG | X | X | X | X |
| Misc. Coating Manufacturing | HHHHH | X | X | X | X |
| Mercury Cell Chlor-Alkali | IIIII | X | X | X | X |

Add.172

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | | |
|---|---|---|---|---|
| Brick & Structural Clay Products, VACATED on 6/18/07................ JJJJJ | | | | |
| Clay Ceramics Manufacturing, VACATED on 6/18/07.................... KKKKK | | | | |
| Asphalt Roofing & Processing................................................LLLLL................................................. | X | X | X | X |
| Flex. Polyurethane Foam Fabrication........................................MMMMM................................ | X | X | X | X |
| Hydrochloric Acid Prod/Fumed Silica........................................NNNNN.................................. | X | X | X | X |
| Engine & Rocket Test Facilities................................................PPPPP................................... | X | X | X | X |
| Friction Materials Manufacturing.............................................QQQQQ................................... | X | X | X | X |
| Taconite Iron Ore..................................................................RRRRR.................................... | X | X | X | X |
| Refactories...........................................................................SSSSS..................................... | X | X | X | X |
| Primary Magnesium...............................................................TTTTT..................................... | X | X | X | X |
| Area Source Rules | | | | |
| Hospital Sterilizers................................................................WWWWW................................. | X | X | X | X |
| Stainless and Nonstainless Steel Mfg Electric Arc Furnaces...........YYYYY................................. | X | X | X | X |
| Iron & Steel foundries............................................................ZZZZZ.................................... | X | X | X | X |
| Gasoline Distribution—Bulk....................................................BBBBBB.................................. | X | X | X | X |
| Gasoline Dispensing Facilities..................................................CCCCCC................................. | X | X | X | X |
| PVC & Copolymers Prod.........................................................DDDDDD................................ | X | X | X | X |
| Primary Copper.....................................................................EEEEEE................................... | X | X | X | X |
| Secondary Copper Smelting.....................................................FFFFFF.................................. | X | X | X | X |
| Primary Nonferrous Metals......................................................GGGGGG................................ | X | X | X | X |
| Paint Stripping | | | | |
| Auto-Body Refinishing...........................................................HHHHHH................................ | X | X | X | X |
| Plastic Parts & Prod. (coating) | | | | |
| Acrylic/Modacrylic Fibers Prod................................................LLLLLL.................................. | X | X | X | X |
| Carbon Black Prod.................................................................MMMMMM.............................. | X | X | X | X |
| Chemical Mfg. Chrom............................................................NNNNNN............................... | X | X | X | X |
| Flex. Polyurethane Foam Fab..................................................OOOOOO............................... | X | X | X | X |
| Flex. Polyurethane Foam Prod | | | | |
| Lead Acid Battery Mfg...........................................................PPPPPP................................. | X | X | X | X |

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | | | |
|---|---|---|---|---|---|
| Wood Preserving | QQQQQQ | X | X | X | X |
| Clay Ceramics Mfg | RRRRRR | X | X | X | X |
| Glass Mfg | SSSSSS | X | X | X | X |
| Secondary Nonferrous Metals | TTTTTT | X | X | X | X |
| Plating and Polishing | WWWWWW | X | X | X | X |
| Industrial Mach. & Eq. Finishing | XXXXXX | X | X | X | X |
|     Elect. & Electronics Eq. Finishing | | | | | |
|     Fabricated Metal Prod | | | | | |
|     Fabricated Plate Work (Boiler Shop) | | | | | |
|     Fabricated Structural Metal Mfg | | | | | |
|     Heating Eq. Mfg | | | | | |
|     Iron and Steel Forging | | | | | |
|     Primary Metals Prod. Mfg | | | | | |
|     Valves and Pipe Fittings Mfg | | | | | |
| Ferroalloys Production | YYYYYY | X | X | X | X |
|     Ferro/Silico Manganese | | | | | |

(ii) North Carolina Department of Environment and Natural Resources (NC DENR) may implement and enforce alternative requirements in the form of title V permit terms and conditions for International Paper Riegelwood mill, Riegelwood, North Carolina; International Paper Roanoke Rapids mill, Roanoke Rapids, North Carolina; Blue Ridge Paper Products, Canton, North Carolina; Weyerhaeuser New Bern facility, New Bern, North Carolina; and Weyerhaeuser Plymouth facility, Plymouth, North Carolina, for Subpart S of this Part—National Emission Standards for Hazardous Air Pollutants from the Pulp and Paper Industry and Subpart MM of this Part—National Emissions Standards for Hazardous Air Pollutants for Chemical Recovery Combustion Sources at Kraft, Soda, Sulfite and Stand-alone Semi-chemical Pulp Mills. This action is contingent upon NC DENR including, in title V permits, terms and conditions that are no less stringent than the Federal standard. In addition, the requirements applicable to the sources remain the Federal section 112 requirements until EPA has approved the alternative permit terms and conditions and the final title V permit is issued.

(iii) North Carolina Department of Environment and Natural Resources (NC DENR) may implement and enforce alternative requirements in the form of title V permit terms and conditions for New South Lumber Company, Inc. Graham Plant, Alamance County, North Carolina; HDM Furniture Industries, Inc., Henredon Furniture Plant 1 & 2, Burke County, North Carolina; Kohler Co., DBA Baker Furniture, Burke County, North Carolina; Bernhardt Furniture Company Plants 3 & 7, Caldwell County, North Carolina; Thomasville Furniture Industries, Inc., Lenoir Plant, Caldwell County, North Carolina; Kincaid Furniture Company, Inc., Plant No. 1, Caldwell County, North Carolina; Hickory Chair Company, Catawba County, North Carolina; Uniboard USA LLC, Chatham County, North Carolina; Georgia Pacific Whiteville Plant, Columbus County, North Carolina; West Fraser, Inc., Armour Lumber Mill, Columbus County, North Carolina; Weyerhaeuser NR Company, New Bern Lumber Facility, Craven County, North Carolina; Linwood Furniture,

Add.174

Inc., Davidson County, North Carolina; Warvel Products, Inc., Davidson County, North Carolina; Thomasville Furniture Industries, Inc., Plant C/M/W/SB, Davidson County, North Carolina; Lexington Furniture Inc., Plant 5, Davidson County, North Carolina; Stanley Furniture Company, Inc., Graham County, North Carolina; Georgia Pacific, Creedmoor Chip–N–Saw Plant, Granville County, North Carolina; JELD–WEN, Inc., McDowell County, North Carolina; Weyerhaeuser NR Company, Martin County, North Carolina; Jordan Lumber & Supply Co., Montgomery County, North Carolina; Troy Lumber Co., Montgomery County, North Carolina; Unilin Flooring N.V., Montgomery County, North Carolina; West Fraser, Seaboard Lumber Mill, Northampton County, North Carolina; Georgia Pacific Roxboro, Person County, North Carolina; Louisiana Pacific Corp., Roxboro, Person County, North Carolina; Weyerhaeuser Company, Grifton, Pitt County, North Carolina; Vaughan Bassett Furniture Co., Elkin Furniture, Surry County, North Carolina; Weyerhaeuser NR Company, Elkin Facility, Surry County, North Carolina; Georgia Pacific Plywood/OSB/CNS, Dudley, Wayne County, North Carolina; Louisiana Pacific Corp., Roaring River, Wilkes County, North Carolina; and American Drew, Inc., Plant 13, Wilkes County, North Carolina, for subpart DDDD of this Part–National Emissions Standards for Hazardous Air Pollutants: Plywood and Composite Wood Products. This action is contingent upon NC DENR including, in title V permits, terms and conditions that are no less stringent than the Federal standard. In addition, the requirements applicable to the sources remain the Federal section 112 requirements until EPA has approved the alternative permit terms and conditions and the final title V permit is issued.

(35) North Dakota.

(i) The North Dakota Department of Agriculture is delegated the authority to implement and enforce the provisions of 40 CFR part 68 at facilities with an anhydrous ammonia storage capacity of ten thousand pounds or more that is intended to be used as fertilizer or in the manufacturing of a fertilizer within North Dakota and that are subject to the requirements of 40 CFR part 68, in accordance with the final rule, dated December 30, 2013.

(ii) The most current delegation status table for National Emission Standards for Hazardous Air Pollutants for Source Categories in Region VIII can be found online at http://www.epa.gov/region8/air-program.

(36) [Reserved]

(37) Oklahoma.

(i) The following table lists the specific part 63 standards that have been delegated unchanged to the Oklahoma Department of Environmental Quality for all sources. The "X" symbol is used to indicate each subpart that has been delegated. The delegations are subject to all of the conditions and limitations set forth in Federal law, regulations, policy, guidance, and determinations. Some authorities cannot be delegated and are retained by EPA. These include certain General Provisions authorities and specific parts of some standards. Any amendments made to these rules after June 30, 2019, are not delegated.

**Delegation Status for Part 63 Standards—State of Oklahoma**

**[Applies to sources located in certain areas of Indian Country]**

| Subpart | Source category | ODEQ [1] [2] |
|---|---|---|
| A.............................................................. | General Provisions.............................................................. | X |

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | |
|---|---|---|
| F.............................................................. | Hazardous Organic NESHAP (HON)—Synthetic Organic Chemical Manufacturing Industry (SOCMI)...................... | X |
| G.............................................................. | HON—SOCMI Process Vents, Storage Vessels, Transfer Operations and Wastewater............................... | X |
| H.............................................................. | HON—Equipment Leaks................................ | X |
| I.............................................................. | HON—Certain Processes Negotiated Equipment Leak Regulation........................... | X |
| J.............................................................. | Polyvinyl Chloride and Copolymers Production................. | 3 |
| K.............................................................. | [Reserved]............................................ | |
| L.............................................................. | Coke Oven Batteries.................................... | X |
| M.............................................................. | Perchloroethylene Dry Cleaning........................... | X |
| N.............................................................. | Chromium Electroplating and Chromium Anodizing Tanks. | X |
| O.............................................................. | Ethylene Oxide Sterilizers............................... | X |
| P.............................................................. | [Reserved]............................................ | |
| Q.............................................................. | Industrial Process Cooling Towers........................ | X |
| R.............................................................. | Gasoline Distribution................................... | X |
| S.............................................................. | Pulp and Paper Industry................................ | X |
| T.............................................................. | Halogenated Solvent Cleaning............................ | X |
| U.............................................................. | Group I Polymers and Resins............................ | X |
| V.............................................................. | [Reserved]............................................ | |
| W.............................................................. | Epoxy Resins Production and Non-Nylon Polyamides Production............................................ | X |
| X.............................................................. | Secondary Lead Smelting................................ | X |
| Y.............................................................. | Marine Tank Vessel Loading............................. | X |
| Z.............................................................. | [Reserved]............................................ | |
| AA............................................................ | Phosphoric Acid Manufacturing Plants..................... | X |
| BB............................................................ | Phosphate Fertilizers Production Plants.................... | X |
| CC............................................................ | Petroleum Refineries................................... | X |
| DD............................................................ | Off-Site Waste and Recovery Operations................... | X |
| EE............................................................ | Magnetic Tape Manufacturing............................ | X |
| FF............................................................ | [Reserved]............................................ | |

Add.176

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | |
|---|---|---|
| GG | Aerospace Manufacturing and Rework Facilities | X |
| HH | Oil and Natural Gas Production Facilities | X |
| II | Shipbuilding and Ship Repair Facilities | X |
| JJ | Wood Furniture Manufacturing Operations | X |
| KK | Printing and Publishing Industry | X |
| LL | Primary Aluminum Reduction Plants | X |
| MM | Chemical Recovery Combustion Sources at Kraft, Soda, Sulfide, and Stand-Alone Semichemical Pulp Mills | X |
| NN | Wool Fiberglass Manufacturing at Area Sources | X |
| OO | Tanks-Level 1 | X |
| PP | Containers | X |
| QQ | Surface Impoundments | X |
| RR | Individual Drain Systems | X |
| SS | Closed Vent Systems, Control Devices, Recovery Devices and Routing to a Fuel Gas System or a Process | X |
| TT | Equipment Leaks—Control Level 1 | X |
| UU | Equipment Leaks—Control Level 2 Standards | X |
| VV | Oil—Water Separators and Organic—Water Separators | X |
| WW | Storage Vessels (Tanks)—Control Level 2 | X |
| XX | Ethylene Manufacturing Process Units Heat Exchange Systems and Waste Operations | X |
| YY | Generic Maximum Achievable Control Technology Standards | X |
| ZZ-BBB | [Reserved] | |
| CCC | Steel Pickling—HCI Process Facilities and Hydrochloric Acid Regeneration | X |
| DDD | Mineral Wool Production | X |
| EEE | Hazardous Waste Combustors | X |
| FFF | [Reserved] | |
| GGG | Pharmaceuticals Production | X |
| HHH | Natural Gas Transmission and Storage Facilities | X |

Add.177

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | |
|---|---|---|
| III | Flexible Polyurethane Foam Production | X |
| JJJ | Group IV Polymers and Resins | X |
| KKK | [Reserved] | |
| LLL | Portland Cement Manufacturing | X |
| MMM | Pesticide Active Ingredient Production | X |
| NNN | Wool Fiberglass Manufacturing | X |
| OOO | Amino/Phenolic Resins | X |
| PPP | Polyether Polyols Production | X |
| QQQ | Primary Copper Smelting | X |
| RRR | Secondary Aluminum Production | X |
| SSS | [Reserved] | |
| TTT | Primary Lead Smelting | X |
| UUU | Petroleum Refineries—Catalytic Cracking Units, Catalytic Reforming Units and Sulfur Recovery Plants | X |
| VVV | Publicly Owned Treatment Works (POTW) | X |
| WWW | [Reserved] | |
| XXX | Ferroalloys Production: Ferromanganese and Silicomanganese | X |
| AAAA | Municipal Solid Waste Landfills | X |
| CCCC | Nutritional Yeast Manufacturing | X |
| DDDD | Plywood and Composite Wood Products | 4 |
| | | X |
| EEEE | Organic Liquids Distribution | X |
| FFFF | Misc. Organic Chemical Production and Processes (MON) | X |
| GGGG | Solvent Extraction for Vegetable Oil Production | X |
| HHHH | Wet Formed Fiberglass Mat Production | X |
| IIII | Auto & Light Duty Truck (Surface Coating) | X |
| JJJJ | Paper and other Web (Surface Coating) | X |
| KKKK | Metal Can (Surface Coating) | X |
| MMMM | Misc. Metal Parts and Products (Surface Coating) | X |

Add.178

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | |
|---|---|---|---|
| NNNN | Surface Coating of Large Appliances | | X |
| OOOO | Fabric Printing Coating and Dyeing | | X |
| PPPP | Plastic Parts (Surface Coating) | | X |
| QQQQ | Surface Coating of Wood Building Products | | X |
| RRRR | Surface Coating of Metal Furniture | | X |
| SSSS | Surface Coating for Metal Coil | | X |
| TTTT | Leather Finishing Operations | | X |
| UUUU | Cellulose Production Manufacture | | X |
| VVVV | Boat Manufacturing | | X |
| WWWW | Reinforced Plastic Composites Production | | X |
| XXXX | Tire Manufacturing | | X |
| YYYY | Combustion Turbines | | X |
| ZZZZ | Reciprocating Internal Combustion Engines (RICE) | | X |
| AAAAA | Lime Manufacturing Plants | | X |
| BBBBB | Semiconductor Manufacturing | | X |
| CCCCC | Coke Ovens: Pushing, Quenching and Battery Stacks | | X |
| DDDDD | Industrial/Commercial/Institutional Boilers and Process Heaters Major Sources | 5 | X |
| EEEEE | Iron Foundries | | X |
| FFFFF | Integrated Iron and Steel | | X |
| GGGGG | Site Remediation | | X |
| HHHHH | Miscellaneous Coating Manufacturing | | X |
| IIIII | Mercury Cell Chlor-Alkali Plants | | X |
| JJJJJ | Brick and Structural Clay Products Manufacturing | 6 | X |
| KKKKK | Clay Ceramics Manufacturing | 6 | X |
| LLLLL | Asphalt Roofing and Processing | | X |
| MMMMM | Flexible Polyurethane Foam Fabrication Operation | | X |
| NNNNN | Hydrochloric Acid Production, Fumed Silica Production | | X |

Add.179

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | |
|---|---|---|
| OOOOO | [Reserved] | |
| PPPPP | Engine Test Facilities | X |
| QQQQQ | Friction Products Manufacturing | X |
| RRRRR | Taconite Iron Ore Processing | X |
| SSSSS | Refractory Products Manufacture | X |
| TTTTT | Primary Magnesium Refining | X |
| UUUUU | Coal and Oil-Fired Electric Utility Steam Generating Units. | 7 X |
| VVVVV | [Reserved] | |
| WWWWW | Hospital Ethylene Oxide Sterilizers | X |
| XXXXX | [Reserved] | |
| YYYYY | Electric Arc Furnace Steelmaking Area Sources | X |
| ZZZZZ | Iron and Steel Foundries Area Sources | X |
| AAAAAA | [Reserved] | |
| BBBBBB | Gasoline Distribution Bulk Terminals, Bulk Plants, and Pipeline Facilities | X |
| CCCCCC | Gasoline Dispensing Facilities | X |
| DDDDDD | Polyvinyl Chloride and Copolymers Production Area Sources | X |
| EEEEEE | Primary Copper Smelting Area Sources | X |
| FFFFFF | Secondary Copper Smelting Area Sources | X |
| GGGGGG | Primary Nonferrous Metals Area Source: Zinc, Cadmium, and Beryllium | X |
| HHHHHH | Paint Stripping and Miscellaneous Surface Coating Operations at Area Sources | X |
| IIIIII | [Reserved] | |
| JJJJJJ | Industrial, Commercial, and Institutional Boilers Area Sources | X |
| KKKKKK | [Reserved] | |
| LLLLLL | Acrylic and Modacrylic Fibers Production Area Sources | X |
| MMMMMM | Carbon Black Production Area Sources | X |

Add.180

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | |
|---|---|---|
| NNNNNN | Chemical Manufacturing Area Sources: Chromium Compounds | X |
| OOOOOO | Flexible Polyurethane Foam Production and Fabrication Area Sources | X |
| PPPPPP | Lead Acid Battery Manufacturing Area Sources | X |
| QQQQQQ | Wood Preserving Area Sources | X |
| RRRRRR | Clay Ceramics Manufacturing Area Sources | X |
| SSSSSS | Glass Manufacturing Area Sources | X |
| TTTTTT | Secondary Nonferrous Metals Processing Area Sources | X |
| UUUUUU | [Reserved] | |
| VVVVVV | Chemical Manufacturing Area Sources | X |
| WWWWWW | Plating and Polishing Operations Area Sources | X |
| XXXXXX | Metal Fabrication and Finishing Area Sources | X |
| YYYYYY | Ferroalloys Production Facilities Area Sources | X |
| ZZZZZZ | Aluminum, Copper, and Other Nonferrous Foundries Area Sources | X |
| AAAAAAA | Asphalt Processing and Asphalt Roofing Manufacturing Area Sources | X |
| BBBBBBB | Chemical Preparation Industry Area Sources | X |
| CCCCCCC | Paints and Allied Products Manufacturing Area Sources | X |
| DDDDDDD | Prepared Feeds Areas Sources | X |
| EEEEEEE | Gold Mine Ore Processing and Production Area Sources | X |
| FFFFFFF-GGGGGGG | [Reserved] | |
| HHHHHHH | Polyvinyl Chloride and Copolymers Production Major Sources | X |

(38) Oregon.

(i) The following table lists the delegation status of specific part 63 subparts that have been delegated to state and local air pollution control agencies in Oregon. An "X" indicates the subpart has been delegated, subject to all the conditions and limitations set forth in federal law, regulations, policy, guidance, and determinations. Some authorities cannot be delegated and are retained by EPA. These include certain General Provisions authorities and specific parts of some standards. The dates noted at the end of this table indicate the effective dates of federal rules that have been delegated. Any amendments made to these rules after this effective date are not delegated.

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

Delegation Status of Part 63 NESHAPS—State of Oregon[1]

| | Subpart[2] | ODEQ[3] | LRAPA[4] |
|---|---|---|---|
| A | General Provisions[5]........................................................ | X | X |
| D | Early Reductions............................................................ | ............................................................ | |
| F | HON-SOCMI................................................................. | X | X |
| G | HON-Process Vents......................................................... | X | X |
| H | HON-Equipment Leaks..................................................... | X | X |
| I | HON-Negotiated Leaks..................................................... | X | X |
| L | Coke Oven Batteries....................................................... | X | X |
| M | Perchloroethylene Dry Cleaning.......................................... | X | X |
| N | Chromium Electroplating................................................... | X | X |
| O | Ethylene Oxide Sterilizers................................................. | X | X |
| Q | Industrial Process Cooling Towers........................................ | X | X |
| R | Gasoline Distribution....................................................... | X | X |
| S | Pulp and Paper.............................................................. | X | X |
| T | Halogenated Solvent Cleaning............................................ | X | X |
| U | Polymers and Resins I...................................................... | X | X |
| W | Polymers and Resins II-Epoxy............................................ | X | X |
| X | Secondary Lead Smelting.................................................. | X | X |
| Y | Marine Tank Vessel Loading.............................................. | X | X |
| AA | Phosphoric Acid Manufacturing Plants.................................. | X | X |
| BB | Phosphate Fertilizers Production Plants.................................. | X | X |
| CC | Petroleum Refineries....................................................... | X | X |
| DD | Off-Site Waste and Recovery............................................. | X | X |
| EE | Magnetic Tape Manufacturing............................................ | X | X |
| GG | Aerospace Manufacturing & Rework..................................... | X | X |
| HH | Oil and Natural Gas Production Facilities................................ | X | X |
| II | Shipbuilding and Ship Repair............................................. | X | X |

Add.182

| | | | |
|---|---|---|---|
| JJ | Wood Furniture Manufacturing Operations................................................. | X | X |
| KK | Printing and Publishing Industry............................................................... | X | X |
| LL | Primary Aluminum..................................................................................... | X | X |
| MM | Chemical Recovery Combustion Sources at Kraft, Soda, Sulfite, and Stand-Alone Semichemical Pulp Mills.................................................................. | X | X |
| OO | Tanks—Level 1.......................................................................................... | X | X |
| PP | Containers................................................................................................. | X | X |
| QQ | Surface Impoundments............................................................................... | X | X |
| RR | Individual Drain Systems........................................................................... | X | X |
| SS | Closed Vent Systems, Control Devices, Recovery Devices and Routing to a Fuel Gas System or Process........................................................................ | X | X |
| TT | Equipment Leaks—Control Level 1............................................................ | X | X |
| UU | Equipment Leaks—Control Level 2............................................................ | X | X |
| VV | Oil-Water Separators and Organic-Water Separators.................................. | X | X |
| WW | Storage Vessels (Tanks)—Control Level 2................................................. | X | X |
| YY | Source Categories: Generic MACT............................................................ | X | X |
| CCC | Steel Pickling—HCl Process Facilities and Hydrochloric Acid Regeneration Plants........... | X | X |
| DDD | Mineral Wool Production............................................................................ | X | X |
| EEE | Hazardous Waste Combustors..................................................................... | X | X |
| GGG | Pharmaceuticals Production........................................................................ | X | X |
| HHH | Natural Gas Transmission and Storage Facilities....................................... | X | X |
| III | Flexible Polyurethane Foam Production..................................................... | X | X |
| JJJ | Polymers and Resins IV............................................................................. | X | X |
| LLL | Portland Cement Manufacturing................................................................ | X | X |
| MMM | Pesticide Active Ingredient Production...................................................... | X | X |
| NNN | Wool Fiberglass Manufacturing................................................................. | X | X |
| OOO | Manufacture of Amino Phenolic Resins..................................................... | X | X |
| PPP | Polyether Polyols Production..................................................................... | X | X |
| RRR | Secondary Aluminum Production................................................................ | X | X |
| TTT | Primary Lead Smelting............................................................................... | X | X |

Add.183

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | |
|---|---|---|---|
| VVV | Publicly Owned Treatment Works......................................................................... | X | X |
| XXX | Ferroalloys Production: Ferromanganese & Silico manganese............................. | X | X |
| CCCC | Manufacture of Nutritional Yeast.......................................................................... | X | X |
| GGGG | Extraction of Vegetable Oil.................................................................................. | X | X |

(39) Pennsylvania.

(i) Pennsylvania is delegated the authority to implement and enforce all existing and future unchanged 40 CFR part 63 standards at major sources, as defined in 40 CFR part 70, in accordance with the delegation agreement between EPA Region III and the Pennsylvania Department of Environmental Protection, dated January 5, 1998, and any mutually acceptable amendments to that agreement.

(ii) Pennsylvania is delegated the authority to implement and enforce all existing 40 CFR part 63 standards and all future unchanged 40 CFR part 63 standards, if delegation is requested by the Pennsylvania Department of Environmental Protection and approved by EPA Region III, at sources not subject to the permitting requirements of 40 CFR part 70, in accordance with the final rule, dated September 13, 2001, effective November 13, 2001, and any mutually acceptable amendments to the terms described in the direct final rule.

(iii) Philadelphia is delegated the authority to implement and enforce all existing 40 CFR part 63 standards and all future unchanged 40 CFR part 63 standards, if delegation is requested by the City of Philadelphia Department of Public Health Air Management Services and approved by EPA Region III, at sources within the City of Philadelphia, in accordance with the final rule, dated January 29, 2002, effective April 1, 2002, and any mutually acceptable amendments to the terms described in the direct final rule.

(iv) Allegheny County is delegated the authority to implement and enforce all existing 40 CFR part 63 standards and all future unchanged 40 CFR part 63 standards at sources within Allegheny County, in accordance with the final rule, dated January 30, 2002, effective April 1, 2002, and any mutually acceptable amendments to the terms described in the direct final rule.

(v) Allegheny County is not delegated the authority to implement and enforce the provisions of 40 CFR part 68 and all future unchanged amendments to 40 CFR part 68 at sources within Allegheny County, in accordance with the final rule, dated March 5, 2019, effective April 4, 2019.

(40) Rhode Island.

(i) [Reserved]

(ii) Affected organic solvent cleaning sources within Rhode Island must comply with the Rhode Island regulations applicable to hazardous air pollutants, 250–RICR–120–05–0 and 250–RICR–120–05–36 (incorporated by reference as specified in § 63.14), as described in paragraph (a)(40)(ii)(A) of this section:

Add.184

(A) 250–RICR–120–05–0 and 250–RICR–120–05–36 pertain to organic solvent cleaning facilities in the State of Rhode Island's jurisdiction, and have been approved under the procedures in § 63.93 to be implemented and enforced in place of the Federal Halogenated Solvent NESHAP found at 40 CFR part 63, subpart T (except for those provisions listed under paragraphs (a)(40)(ii)(A)(1)(i)).

(1) Authorities not delegated.

(i) Rhode Island is not delegated the Administrator's authority to implement and enforce Rhode Island regulations at 250–RICR–120–05–0 and 250–RICR–120–05–36 in lieu of those provisions of subpart T of this part which apply to continuous web cleaning machines as defined in 40 CFR. § 63.461.

(ii) [Reserved]

(2) [Reserved]

(B) [Reserved]

(41) South Carolina.

(i) The following table lists the specific part 63 standards that have been delegated unchanged to the South Carolina Department of Health and Environmental Control (SCDHEC) for all sources. The "X" symbol is used to indicate each subpart that has been delegated. The delegations are subject to all of the conditions and limitations set forth in Federal law, regulations, policy, guidance, and determinations. Some authorities cannot be delegated and are retained by EPA. These include certain General Provisions authorities and specific parts of some standards.

**Part 63 Major & Area Source Rule Delegations—South Carolina** [1]

| Source category | Subpart | SCDHEC |
|---|---|---|
| 1......................HON...................................................................... | F, G, H, I.................................................................... | X |
| 2......................Polyvinyl Chloride & Co-polymers VACATED on 5/11/05........................................ | J | |
| 3......................Coke Ovens........................................................................ | L........................................................................ | X |
| 4......................Dry Cleaners...................................................................... | M...................................................................... | X |
| 5......................Chromium Electroplating........................................................ | N........................................................................ | X |
| 6......................EtO Commercial Sterilization.................................................... | O........................................................................ | X |
| 7......................Chromium Cooling Towers....................................................... | Q........................................................................ | X |
| 8......................Gasoline Distribution (stage 1)................................................ | R........................................................................ | X |
| 9......................Pulp & Paper I.................................................................... | S........................................................................ | X |

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | |
|---|---|---|---|
| 10 | Halogenated Solvent Cleaning | T | X |
| 11 | Polymer & Resins 1 | U | X |
| 12 | Polymer & Resins 2 | W | X |
| 13 | Secondary Lead Smelters | X | X |
| 14 | Marine Tank Vessel Loading | Y | X |
| 15 | Phosphoric Acid Mfg | AA | X |
| 16 | Phosphate Fertilizers Prod | BB | X |
| 17 | Petroleum Refineries | CC | X |
| 18 | Offsite Waste & Recovery | DD | X |
| | Tanks; Level 1 | OO | X |
| | Containers | PP | X |
| | Surface Impoundments | QQ | X |
| | Drain Systems | RR | X |
| | Oil-Water Separators | VV | X |
| 19 | Magnetic Tape | EE | X |
| 20 | Aerospace Industry | GG | X |
| 21 | Oil & Natural Gas Prod | HH | X |
| | Area Source Requirements >> | | X |
| 22 | Shipbuilding and Repair | II | X |
| 23 | Wood Furniture Mfg | JJ | X |
| 24 | Printing & Publishing | KK | X |
| 25 | Primary Aluminum | LL | X |
| 26 | Pulp & Paper II (Combustion sources) | MM | X |
| 27 | Generic MACT: | | |
| | Control Devices | SS | X |
| | Eq. Leaks—Level 1 | TT | X |
| | Eq. Leaks—Level 2 | UU | X |
| | Tanks—Level 2 | WW | X |
| 28 | Generic MACT: | | |

Add.186

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | |
|---|---|---|---|
| ...................... | Ethylene Mfg........................................... | XX & YY | X |
| ...................... | Carbon Black............................................ | YY | X |
| ...................... | Spandex Prod........................................... | YY | X |
| ...................... | Cyanide Chemical Mfg............................ | YY | X |
| ...................... | Acetal Resins.......................................... | YY | X |
| ...................... | Acrylic/Modacrylic Fibers...................... | YY | X |
| ...................... | Hydrogen Fluoride Prod.......................... | YY | X |
| ...................... | Polycarbonates Prod............................... | YY | X |
| 29.................. | Steel Pickeling....................................... | CCC | X |
| 30.................. | Mineral Wool Prod.................................. | DDD | X |
| 31.................. | Hazardous Waste Combustion (Phase I)... | EEE | X |
| 32.................. | Boilers that burn Haz. Waste (Phase II)... | EEE | X |
| 33.................. | HCL Prod. Furnaces burning Haz. Waste (P II)... | EEE | X |
| 34.................. | Pharmaceutical Prod............................... | GGG | X |
| 35.................. | Nat. Gas Transmission & Storage............ | HHH | X |
| 36.................. | Flexible Polyurethane Foam Prod........... | III | X |
| 37.................. | Polymer & Resins 4................................ | JJJ | X |
| 38.................. | Portland Cement..................................... | LLL | X |
| 39.................. | Pesticide Active Ingredients................... | MMM | X |
| 40.................. | Wool Fiberglass..................................... | NNN | X |
| 41.................. | Polymer & Resins 3 (Amino & Phenolic)... | OOO | X |
| 42.................. | Polyether Polyols Prod........................... | PPP | X |
| 43.................. | Primary Copper...................................... | QQQ | X |
| 44.................. | Secondary Aluminum Prod...................... | RRR | X |
| 45.................. | Primary Lead Smelting........................... | TTT | X |
| 46.................. | Petro Refineries (FCC units).................. | UUU | X |
| 47.................. | POTW.................................................... | VVV | X |
| 48.................. | Ferroalloys............................................ | XXX | X |
| 49.................. | Municipal Landfills................................ | AAAA | X |

Add.187

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | |
|---|---|---|---|
| 50 | Nutritional Yeast | CCCC | X |
| 51 | Plywood and Composite Wood Prod. (Partial Vacatur Oct. 07) | DDDD | X |
| 52 | Organic Liquids Distribution (non-gas) | EEEE | X |
| 53 | Misc. Organic NESHAP | FFFF | X |
| 54 | Vegetable Oil | GGGG | X |
| 55 | Wet Formed Fiberglass | HHHH | X |
| 56 | Auto & Light Duty Truck (coating) | IIII | X |
| 57 | Paper & Other Webs | JJJJ | X |
| 58 | Metal Can (coating) | KKKK | X |
| 59 | Misc. Metal Parts (coating) | MMMM | X |
| 60 | Large Appliances (coating) | NNNN | X |
| 61 | Printing, Coating, & Dyeing Fabrics | OOOO | X |
| 62 | Plastic Parts & Products (coating) | PPPP | X |
| 63 | Wood Building Products | QQQQ | X |
| 64 | Metal Furniture (coating) | RRRR | X |
| 65 | Metal Coil (coating) | SSSS | X |
| 66 | Leather Tanning & Finishing | TTTT | X |
| 67 | Cellulose Ethers Prod. Misc. Viscose Processes | UUUU | X |
| 68 | Boat Manufacturing | VVVV | X |
| 69 | Reinforced Plastic Composites | WWWW | X |
| 70 | Rubber Tire Mfg. | XXXX | X |
| 71 | Stationary Combustion Turbines | YYYY | X |
| 72 | Reciprocating Int. Combustion Engines | ZZZZ | X |
| | Area Source Requirements >> | | X |
| 73 | Lime Manufacturing | AAAAA | X |
| 74 | Semiconductor Production | BBBBB | X |
| 75 | Coke Ovens: (Push/Quench/Battery/Stacks) | CCCCC | X |
| 76 | Industrial/Commercial/Institutional Boilers & Process Heaters, VACATED on 7/30/07 | DDDDD | |

Add.188

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | |
|---|---|---|---|
| 77 | Iron Foundries | EEEEE | X |
| 78 | Integrated Iron & Steel | FFFFF | X |
| 79 | Site Remediation | GGGGG | X |
| 80 | Misc. Coating Manufacturing | HHHHH | X |
| 81 | Mercury Cell Chlor-Alkali | IIIII | X |
| 82 | Brick & Structural Clay Products, VACATED on 6/18/07 | JJJJJ | |
| 83 | Clay Ceramics Manufacturing, VACATED on 6/18/07 | KKKKK | |
| 84 | Asphalt Roofing & Processing | LLLLL | X |
| 85 | Flex. Polyurethane Foam Fabrication | MMMMM | X |
| 86 | Hydrochloric Acid Prod/Fumed Silica | NNNNN | X |
| 87 | Engine & Rocket Test Facilities | PPPPP | X |
| 88 | Friction Materials Manufacturing | QQQQQ | X |
| 89 | Taconite Iron Ore | RRRRR | X |
| 90 | Refactories | SSSSS | X |
| 91 | Primary Magnesium | TTTTT | X |
| | **Area Source Rules** | | |
| 92 | Hospital Sterilizers | WWWWW | X |
| 93 | Stainless and Nonstainless Steel Mfg Electric Arc Furnaces | YYYYY | X |
| 94 | Iron & Steel foundries | ZZZZZ | X |
| 95 | Gasoline Distribution—Bulk | BBBBBB | X |
| 96 | Gasoline Dispensing Facilities | CCCCCC | X |
| 97 | PVC & Copolymers Prod. | DDDDDD | X |
| 98 | Primary Copper | EEEEEE | X |
| 99 | Secondary Copper Smelting | FFFFFF | X |
| 100 | Primary Nonferrous Metals | GGGGGG | X |
| 101 | Paint Stripping | HHHHHH | X |
| | Auto-Body Refinishing | | |
| | Plastic Parts & Prod. (coating) | | |
| 102 | Acrylic/Modacrylic Fibers Prod. | LLLLLL | X |

**Add.189**

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | |
|---|---|---|---|
| 103 | Carbon Black Prod | MMMMMM | X |
| 104 | Chemical Mfg. Chrom | NNNNNN | X |
| 105 | Flex. Polyurethane Foam Fab | OOOOOO | X |
| | Flex. Polyurethane Foam Prod | | |
| 106 | Lead Acid Battery Mfg | PPPPPP | X |
| 107 | Wood Preserving | QQQQQQ | X |
| 108 | Clay Ceramics Mfg | RRRRRR | X |
| 109 | Glass Mfg | SSSSSS | X |
| 110 | Secondary Nonferrous Metals | TTTTTT | X |
| 110 | Plating and Polishing | WWWWWW | X |
| 112 | Heating Eq. Mfg | XXXXXX | X |
| | Industrial Mach. & Eq. Finishing | | |
| | Elect. & Electronics Eq. Finishing | | |
| | Fabricated Metal Prod | | |
| | Fabricated Plate Work (Boiler Shop) | | |
| | Fabricated Structural Metal Mfg | | |
| 113 | Ferro/Silico Manganese | YYYYYY | X |
| | Iron and Steel Forging | | |
| | Primary Metals Prod. Mfg | | |
| | Valves and Pipe Fittings Mfg | | |
| | Ferroalloys Production | | |

(ii) South Carolina Department of Health and Environmental Control (SC DHEC) may implement and enforce alternative requirements in the form of title V permit terms and conditions for International Paper Georgetown Mill, Georgetown, South Carolina, for subpart S of this part–National Emission Standards for Hazardous Air Pollutants from the Pulp and Paper Industry. This action is contingent upon SC DHEC including, in title V permits, terms and conditions that are no less stringent than the Federal standard. In addition, the requirement applicable to the source remains the Federal section 112 requirement until EPA has approved the alternative permit terms and conditions and the final title V permit is issued.

(42) [Reserved]

(43) Tennessee.

Add.190

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

(i) The Tennessee Department of Environment and Conservation (TDEC) has "up-front" approval to implement an Equivalency by Permit (EBP) program under which TDEC may establish and enforce alternative requirements for the Ellison Surface Technologies, Inc. facility located in Morgan County, Tennessee (Ellison) in lieu of those of the National Emissions Standard for Hazardous Air Pollutants (NESHAP) for Plating and Polishing Operations at 40 CFR part 63, subpart WWWWWW, "National Emission Standards for Hazardous Air Pollutants: Area Source Standards for Plating and Polishing Operations." TDEC may only establish alternative requirements for Ellison that are at least as stringent as the otherwise applicable Federal requirements. TDEC must, in order to establish alternative requirements for Ellison under its EPA–approved EBP program: submit to the EPA for review pre-draft title V permit terms specifying alternative requirements that meet the criteria of 40 CFR 63.94(d), including the criterion that the alternative requirements are at least as stringent as the otherwise applicable Federal requirements; obtain the EPA's written approval of the alternative pre-draft title V permit requirements; and issue a title V permit for Ellison that contains the approved alternative requirements. Until the EPA has approved the alternative permit terms and conditions and TDEC has issued a final title V permit incorporating them, Ellison will remain subject to the Federal NESHAP requirements found at 40 CFR part 63, subpart WWWWWW.

(ii) Reserved.

(44) Texas.

(i) The following table lists the specific part 63 standards that have been delegated unchanged to the Texas Commission on Environmental Quality for all sources. The "X" symbol is used to indicate each subpart that has been delegated. The delegations are subject to all of the conditions and limitations set forth in Federal law and regulations. Some authorities cannot be delegated and are retained by the EPA. These include certain General Provisions authorities and specific parts of some standards. Any amendments made to these rules after August 3, 2016 are not delegated.

**Delegation Status for Part 63 Standards—State of Texas** [1]

| [Excluding Indian Country] | | |
|---|---|---|
| **Subpart** | **Source category** | **TCEQ** [2] |
| A | General Provisions | X |
| F | Hazardous Organic NESHAP (HON)—Synthetic Organic Chemical Manufacturing Industry (SOCMI) | X |
| G | HON—SOCMI Process Vents, Storage Vessels, Transfer Operations and Wastewater | X |
| H | HON—Equipment Leaks | X |
| I | HON—Certain Processes Negotiated Equipment Leak Regulation | X |
| J | Polyvinyl Chloride and Copolymers Production | [3] |
| K | [Reserved] | |
| L | Coke Oven Batteries | X |

Add.191

| | | |
|---|---|---|
| M | Perchloroethylene Dry Cleaning | X |
| N | Chromium Electroplating and Chromium Anodizing Tanks... | X |
| O | Ethylene Oxide Sterilizers | X |
| P | [Reserved] | |
| Q | Industrial Process Cooling Towers | X |
| R | Gasoline Distribution | X |
| S | Pulp and Paper Industry | X |
| T | Halogenated Solvent Cleaning | X |
| U | Group I Polymers and Resins | X |
| V | [Reserved] | |
| W | Epoxy Resins Production and Non-Nylon Polyamides Production | X |
| X | Secondary Lead Smelting | X |
| Y | Marine Tank Vessel Loading | X |
| Z | [Reserved] | |
| AA | Phosphoric Acid Manufacturing Plants | X |
| BB | Phosphate Fertilizers Production Plants | X |
| CC | Petroleum Refineries | X |
| DD | Off-Site Waste and Recovery Operations | X |
| EE | Magnetic Tape Manufacturing | X |
| FF | [Reserved] | |
| GG | Aerospace Manufacturing and Rework Facilities | X |
| HH | Oil and Natural Gas Production Facilities | X |
| II | Shipbuilding and Ship Repair Facilities | X |
| JJ | Wood Furniture Manufacturing Operations | X |
| KK | Printing and Publishing Industry | X |
| LL | Primary Aluminum Reduction Plants | X |
| MM | Chemical Recovery Combustion Sources at Kraft, Soda, Sulfide, and Stand-Alone Semichemical Pulp Mills | X |
| NN | Wool Fiberglass Manufacturing Area Sources | X |

Add.192

| | | |
|---|---|---|
| OO | Tanks-Level 1 | X |
| PP | Containers | X |
| QQ | Surface Impoundments | X |
| RR | Individual Drain Systems | X |
| SS | Closed Vent Systems, Control Devices, Recovery Devices and Routing to a Fuel Gas System or a Process | |
| TT | Equipment Leaks—Control Level 1 | X |
| UU | Equipment Leaks—Control Level 2 Standards | X |
| VV | Oil—Water Separators and Organic—Water Separators | X |
| WW | Storage Vessels (Tanks)—Control Level 2 | X |
| XX | Ethylene Manufacturing Process Units Heat Exchange Systems and Waste Operations | X |
| YY | Generic Maximum Achievable Control Technology Standards | X |
| ZZ-BBB | [Reserved] | |
| CCC | Steel Pickling—HCl Process Facilities and Hydrochloric Acid Regeneration | X |
| DDD | Mineral Wool Production | X |
| EEE | Hazardous Waste Combustors | X |
| FFF | [Reserved] | |
| GGG | Pharmaceuticals Production | X |
| HHH | Natural Gas Transmission and Storage Facilities | X |
| III | Flexible Polyurethane Foam Production | X |
| JJJ | Group IV Polymers and Resins | X |
| KKK | [Reserved] | |
| LLL | Portland Cement Manufacturing | X |
| MMM | Pesticide Active Ingredient Production | X |
| NNN | Wool Fiberglass Manufacturing | X |
| OOO | Amino/Phenolic Resins | X |
| PPP | Polyether Polyols Production | X |
| QQQ | Primary Copper Smelting | X |

Add.193

| | | |
|---|---|---|
| RRR | Secondary Aluminum Production | X |
| SSS | [Reserved] | |
| TTT | Primary Lead Smelting | X |
| UUU | Petroleum Refineries—Catalytic Cracking Units, Catalytic Reforming Units and Sulfur Recovery Plants | X |
| VVV | Publicly Owned Treatment Works (POTW) | X |
| WWW | [Reserved] | |
| XXX | Ferroalloys Production: Ferromanganese and Silicomanganese | X |
| AAAA | Municipal Solid Waste Landfills | X |
| CCCC | Nutritional Yeast Manufacturing | X |
| DDDD | Plywood and Composite Wood Products | X [4] |
| EEEE | Organic Liquids Distribution | X |
| FFFF | Misc. Organic Chemical Production and Processes (MON) | X |
| GGGG | Solvent Extraction for Vegetable Oil Production | X |
| HHHH | Wet Formed Fiberglass Mat Production | X |
| IIII | Auto & Light Duty Truck (Surface Coating) | X |
| JJJJ | Paper and other Web (Surface Coating) | X |
| KKKK | Metal Can (Surface Coating) | X |
| MMMM | Misc. Metal Parts and Products (Surface Coating) | X |
| NNNN | Surface Coating of Large Appliances | X |
| OOOO | Fabric Printing Coating and Dyeing | X |
| PPPP | Plastic Parts (Surface Coating) | X |
| QQQQ | Surface Coating of Wood Building Products | X |
| RRRR | Surface Coating of Metal Furniture | X |
| SSSS | Surface Coating for Metal Coil | X |
| TTTT | Leather Finishing Operations | X |
| UUUU | Cellulose Production Manufacture | X |
| VVVV | Boat Manufacturing | X |

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | |
|---|---|---|
| WWWW | Reinforced Plastic Composites Production | X |
| XXXX | Rubber Tire Manufacturing | X |
| YYYY | Combustion Turbines | X |
| ZZZZ | Reciprocating Internal Combustion Engines (RICE) | X |
| AAAAA | Lime Manufacturing Plants | X |
| BBBBB | Semiconductor Manufacturing | X |
| CCCCC | Coke Ovens: Pushing, Quenching and Battery Stacks | X |
| DDDDD | Industrial/Commercial/Institutional Boilers and Process Heaters Major Sources | X [5] |
| EEEEE | Iron Foundries | X |
| FFFFF | Integrated Iron and Steel | X |
| GGGGG | Site Remediation | X |
| HHHHH | Miscellaneous Coating Manufacturing | X |
| IIIII | Mercury Cell Chlor-Alkali Plants | X |
| JJJJJ | Brick and Structural Clay Products Manufacturing | X [6] |
| KKKKK | Clay Ceramics Manufacturing | X [6] |
| LLLLL | Asphalt Roofing and Processing | X |
| MMMMM | Flexible Polyurethane Foam Fabrication Operation | X |
| NNNNN | Hydrochloric Acid Production, Fumed Silica Production | X |
| OOOOO | [Reserved] | |
| PPPPP | Engine Test Facilities | X |
| QQQQQ | Friction Products Manufacturing | X |
| RRRRR | Taconite Iron Ore Processing | X |
| SSSSS | Refractory Products Manufacture | X |
| TTTTT | Primary Magnesium Refining | X |
| UUUUU | Coal and Oil-Fired Electric Utility Steam Generating Units | X [7] |
| VVVVV | [Reserved] | |
| WWWWW | Hospital Ethylene Oxide Sterilizers Area Sources | X |
| XXXXX | [Reserved] | |

**Add.195**

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | |
|---|---|---|
| YYYYY | Electric Arc Furnace Steelmaking Facilities Area Sources | X |
| ZZZZZ | Iron and Steel Foundries Area Sources | X |
| AAAAAA | [Reserved] | |
| BBBBBB | Gasoline Distribution Bulk Terminals, Bulk Plants, and Pipeline Facilities | X |

Area Sources

| | | |
|---|---|---|
| CCCCCC | Gasoline Dispensing Facilities Area Sources | X |
| DDDDDD | Polyvinyl Chloride and Copolymers Production Area Sources | X |
| EEEEE | Primary Copper Smelting Area Sources | X |
| FFFFFF | Secondary Copper Smelting Area Sources | X |
| GGGGGG | Primary Nonferrous Metals Area Sources: Zinc, Cadmium, and Beryllium | X |
| HHHHHH | Paint Stripping and Miscellaneous Surface Coating Operations at Area Sources | X |
| IIIIII | [Reserved] | |
| JJJJJJ | Industrial, Commercial, and Institutional Boilers Area Sources | X |
| KKKKKK | [Reserved] | |
| LLLLLL | Acrylic and Modacrylic Fibers Production Area Sources | X |
| MMMMMM | Carbon Black Production Area Sources | X |
| NNNNNN | Chemical Manufacturing Area Sources: Chromium Compounds | X |
| OOOOOO | Flexible Polyurethane Foam Production and Fabrication Area Sources | X |
| PPPPPP | Lead Acid Battery Manufacturing Area Sources | X |
| QQQQQQ | Wood Preserving Area Sources | X |
| RRRRRR | Clay Ceramics Manufacturing Area Sources | X |
| SSSSSS | Glass Manufacturing Area Sources | X |
| TTTTTT | Secondary Nonferrous Metals Processing Area Sources | X |
| UUUUUU | [Reserved] | |
| VVVVVV | Chemical Manufacturing Area Sources | X |
| WWWWWW | Plating and Polishing Operations Area Sources | X |

Add.196

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | |
|---|---|---|
| XXXXXX | Metal Fabrication and Finishing Area Sources | X |
| YYYYYY | Ferroalloys Production Facilities Area Sources | X |
| *ZZZZZZ* | Aluminum, Copper, and Other Nonferrous Foundries Area Sources | X |
| AAAAAAA | Asphalt Processing and Asphalt Roofing Manufacturing Area Sources | X |
| BBBBBBB | Chemical Preparations Industry Area Sources | X |
| CCCCCCC | Paints and Allied Products Manufacturing Area Sources | X |
| DDDDDDD | Prepared Feeds Manufacturing Area Sources | X |
| EEEEEEE | Gold Mine Ore Processing and Production Area Sources | |
| FFFFFFF—GGGGGGG | [Reserved] | |
| HHHHHHH | Polyvinyl Chloride and Copolymers Production Major Sources | X |

(ii) Affected sources within Texas shall comply with the Federal requirements of 40 CFR part 63—subpart A—General Provisions, adopted by reference by the Texas Commission on Environmental Quality (TCEQ), with the exception of § 63.5(e)(2)(i), § 63.6(i)(12)(i), § 63.6(i)(13)(i) and (ii), § 63.8(e)(5)(ii), § 63.9(i)(3), and § 63.10(e)(2)(ii). The TCEQ has adopted alternative provisions for the cited exceptions above and affected sources in Texas that are subject to the requirements of Subpart A shall comply with the requirements established at Texas Administrative Code, Title 30, Part 1, Chapter 113, Subchapter C, section 113.100.

(45) [Reserved]

(46) Vermont.

(i) Affected area sources within Vermont must comply with Vermont Regulations applicable to Hazardous Air Pollutants (incorporated by reference as specified in § 63.14) as described in paragraph (a)(46)(i)(A) of this section:

(A) The material incorporated into the Vermont Air Pollution Regulations at Chapter 5, Air Pollution Control, section 5–253.11, Perchloroethylene Dry Cleaning (effective as of December 15, 2016) pertaining to area source dry cleaning facilities in the State of Vermont jurisdiction, and approved under the procedures in § 63.93 to be implemented and enforced in place of the requirements for area source dry cleaning facilities in the Federal NESHAP for Perchloroethylene Dry Cleaning Facilities (subpart M of this part), effective as of July 11, 2008. For purposes of this paragraph (a)(46) the term "area source dry cleaning facilities" means any source that qualifies as an area source under § 63.320(h).

(1) Authorities not delegated.

Add.197

(i) Vermont is not delegated the Administrator's authority to implement and enforce Vermont Air Pollution Control Regulations, Chapter 5, Air Pollution Control, section 5–253.11, in lieu of those provisions of subpart M of this part which apply to major sources, as defined in § 63.320(g).

(ii) [Reserved]

(2) [Reserved]

(B) [Reserved]

(ii) [Reserved]

(47) Virginia.

(i) Virginia is delegated the authority to implement and enforce all existing and future unchanged 40 CFR part 63 standards at major sources, as defined in 40 CFR part 70, in accordance with the delegation agreement between EPA Region III and the Virginia Department of Environmental Quality, dated April 20, 1998, and any mutually acceptable amendments to that agreement.

(ii) Virginia is delegated the authority to implement and enforce all existing 40 CFR part 63 standards and all future unchanged 40 CFR part 63 standards, if delegation is sought by the Virginia Department of Environmental Quality and approved by EPA Region III, at affected sources which are not located at major sources, as defined in 40 CFR part 70, in accordance with the final rule, dated January 8, 2002, effective March 11, 2002, and any mutually acceptable amendments to the terms described in the direct final rule.

(iii) EPA has granted the Virginia Department of Environmental Quality (DEQ) "up-front" approval to implement an Equivalency by Permit (EBP) program under which the Virginia DEQ may establish and enforce alternative State requirements for International Paper Company's Franklin Mill in lieu of those of the National Emissions Standard for Hazardous Air Pollutants (NESHAP) for the Pulp and Paper Industry found at 40 CFR part 63, subpart S. The Virginia DEQ may only establish alternative requirements for the Franklin Mill which are equivalent to and at least as stringent as the otherwise applicable Federal requirements. The VA DEQ must, in order to establish alternative requirements for the Franklin Mill under its EPA approved EBP program: (1) Submit to EPA for review pre-draft Clean Air Act (CAA) Title V permit terms specifying alternative requirements which are at least as stringent as the otherwise applicable Federal requirements, (2) obtain EPA's written approval of the alternative pre-draft CAA Title V permit requirements, and (3) issue a CAA Title V permit for the Franklin Mill which contains the approved alternative requirements. Until EPA has approved the alternative permit terms and conditions and the Virginia DEQ has issued a final CAA Title V permit incorporating them, International Paper Company's Franklin Mill will remain subject to the Federal NESHAP requirements found at 40 CFR part 63, subpart S.

(48) Washington.

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

(i) The following table lists the delegation status of specific part 63 Subparts that have been delegated to state and local air pollution control agencies in Washington. An "X" indicates the subpart has been delegated, subject to all the conditions and limitations set forth in Federal law, regulations, policy, guidance, and determinations. Some authorities cannot be delegated and are retained by EPA. These include certain General Provisions authorities and specific parts of some standards. The dates noted at the end of this table indicate the effective dates of Federal rules that have been delegated. Any amendments made to these rules after this effective date are not delegated.

Delegation Status for Part 63 Standards—State of Washington [1]

| 40 CFR Part 63, Subparts [2] | Ecology [3] | BCAA [4] | NWAPA [5] | OAPCA [6] | PSCAA [7] | SCAPCA [8] | SWCAA [9] | YRCAA [10] |
|---|---|---|---|---|---|---|---|---|
| A General Provisions [11] | X | X | X | X | X | X | X | X |
| D Early Reductions | X | X | X | X | X | X | X | X |
| F HON-SOCMI | X | X | X | X | X | X | X | X |
| G HON-Process Vents | X | X | X | X | X | X | X | X |
| H HON-Equipment Leaks | X | X | X | X | X | X | X | X |
| I HON-Negotiated Leaks | X | X | X | X | X | X | X | X |
| L Coke Oven Batteries | X | X | X | X | X | X | X | X |
| M Perchloroethylene Dry Cleaning | X [3] | X [4] | X | | X [7] | X [8] | X | X [10] |
| N Chromium Electroplating | X | X | X | X | X | X | X | X |
| O Ethylene Oxide Sterilizers | X | X | X | X | X | X | X | X |
| Q Industrial Process Cooling Towers | X | X | X | X | X | X | X | X |
| R Gasoline Distribution | X | X | X | X | X | X | X | X |
| S Pulp and Paper [12] | X | | [5] | X [6] | X [7] | X [8] | X [9] | X [10] |
| T Halogenated Solvent Cleaning | X | X | X | X | X | X | X | X |
| U Polymers and Resins I | X | X | X | X | X | X | X | X |
| W Polymers and Resins II-Epoxy | X | X | X | X | X | X | X | X |
| X Secondary Lead Smelting | X | X | X | X | X | X | X | X |
| Y Marine Tank Vessel Loading | X | X | X | | X | X | X | |
| AA Phosphoric Acid Manufacturing Plants | X | X | X | X | X | X | | X |
| BB Phosphate Fertilizers Production Plants | X | X | X | X | X | X | | X |
| CC Petroleum Refineries | X | X | X | X | X | X | X | X |
| DD Off-Site Waste and Recovery | X | X | X | X | X | X | X | X |

Add.199

**§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| EE Magnetic Tape Manufacturing......................... | X | X | X | X | X | X | X | X |
| GG Aerospace Manufacturing & Rework................ | X | X | X | X | X | X | X | X |
| HH Oil and Natural Gas Production Facilities.......... | X | X | X | X | X | X | | X |
| II Shipbuilding and Ship Repair............................. | X | X | X | X | X | X | X | X |
| JJ Wood Furniture Manufacturing Operations........... | X | X | X | X | X | X | X | X |
| KK Printing and Publishing Industry....................... | X | X | X | X | X | X | X | X |
| LL Primary Aluminum [13] ..................................... | X | | | | | | | |
| MM Chemical Recovery Combustion Sources at Kraft, Soda, Sulfite, and Stand-Alone Semichemical Pulp Mills [14] ............................................................. | X | | | | | | | |
| OO Tanks—Level 1............................................. | X | X | X | X | X | X | | X |
| PP Containers................................................... | X | X | X | X | X | X | | X |
| QQ Surface Impoundments................................. | X | X | X | X | X | X | | X |
| RR Individual Drain Systems............................... | X | X | X | X | X | X | | X |
| SS Closed Vent Systems, Control Devices, Recovery Devices and Routing to a Fuel Gas System or Process | X | X | X | X | X | X | | X |
| TT Equipment Leaks—Control Level 1.................. | X | X | X | X | X | X | | X |
| UU Equipment Leaks—Control Level 2.................. | X | X | X | X | X | X | | X |
| VV Oil-Water Separators and Organic-Water Separators................................................................ | X | X | X | X | X | X | | X |
| WW Storage Vessels (Tanks)—Control Level 2........ | X | X | X | | X | X | | |
| YY Source Categories: Generic MACT.................. | X | X | X | | X | X | | |
| CCC Steel Pickling—HCl Process Facilities and Hydrochloric Acid Regeneration Plants.................. | X | X | X | | X | X | | |
| DDD Mineral Wool Production.............................. | X | X | X | | X | X | | |
| EEE Hazardous Waste Combustors........................ | X | X | X | | X | X | | |
| GGG Pharmaceuticals Production.......................... | X | X | X | | X | X | | |
| HHH Natural Gas Transmission and Storage Facilities................................................................ | X | X | X | | X | X | | |
| III Flexible Polyurethane Foam Production.............. | X | X | X | | X | X | | X |
| JJJ Polymers and Resins IV.................................. | X | X | X | | X | X | X | |

Add.200

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

| | | | | | |
|---|---|---|---|---|---|
| LLL Portland Cement Manufacturing..................... | X | X | X | X | X |
| MMM Pesticide Active Ingredient Production.......... | X | X | X | X | X |
| NNN Wool Fiberglass Manufacturing..................... | X | X | X | X | X |
| OOO Manufacture of Amino Phenolic Resins.......... | X | X | X | X | X |
| PPP Polyether Polyols Production........................ | X | X | X | X | X |
| RRR Secondary Aluminum Production.................... | X | X | | X | X |
| TTT Primary Lead Smelting................................ | X | X | X | X | X |
| VVV Publicly Owned Treatment Works................. | X | X | X | X | X |
| XXX Ferroalloys Production: Ferromanganese & Silicomanganese................................................ | X | X | X | X | X |
| CCCC Manufacture of Nutritional Yeast................ | | | | X | |
| GGGG Extraction of Vegetable Oil....................... | | | | X | |
| VVVV Boat Manufacturing | | | | | |

[1] Table last updated on April 15, 2002. See 40 CFR 61.04(b)(WW) for agency addresses.

[2] Any authority within any subpart of this part that is identified as not delegatable, is not delegated.

[3] Washington State Department of Ecology (03/13/2001 for MM, 02/20/2001 for all others). Note: delegation of subpart M applies only to those sources required to obtain an operating permit under Title V of the Clean Air Act.

[4] Benton Clean Air Agency (02/20/2001). Note: delegation of subpart M applies only to those sources required to obtain an operating permit under Title V of the Clean Air Act.

[5] Northwest Air Pollution Control Agency (07/01/2000). Note: delegation of subpart S applies to all applicable facilities and processes except Kraft and Sulfite Pulping Mills (see footnote 12).

[6] Olympic Air Pollution Control Agency (07/01/2000). Note: delegation of subpart M applies only to those sources required to obtain an operating permit under Title V of the Clean Air Act; delegation of subpart S applies to all applicable facilities and processes except Kraft and Sulfite Pulping Mills (see footnote 12).

[7] Puget Sound Clean Air Agency (07/01/2001). Note: delegation of subpart S applies to all applicable facilities and processes except Kraft and Sulfite Pulping Mills (see footnote 12). For information about delegation of subpart M, see paragraph (a)(48)(ii) of this section.

[8] Spokane County Air Pollution Control Agency (02/20/2001). Note: delegation of subpart M applies only to those sources required to obtain an operating permit under Title V of the Clean Air Act; delegation of subpart S applies to all applicable facilities and processes except Kraft and Sulfite Pulping Mills (see footnote 12).

[9] Southwest Clean Air Agency (08/01/1998). Note: delegation of subpart S applies to all applicable facilities and processes except Kraft and Sulfite Pulping Mills (see footnote 12).

[10] Yakima Regional Clean Air Authority (07/01/2000). Note: delegation of subpart M applies only to those sources required to obtain an operating permit under Title V of the Clean Air Act; delegation of subpart S applies to all applicable facilities and processes except Kraft and Sulfite Pulping Mills (see footnote 12).

[11] General Provisions Authorities which are not delegated include approval of major alternatives to test methods, approval of major alternatives to monitoring, and any sections in the subparts pertaining to approval of alternative standards (i.e., alternative means of emission limitations). For definitions of minor, intermediate, and major alternatives to test methods and monitoring, see § 63.90.

[12] Subpart S of this part as it pertains to Kraft and Sulfite Pulping Mills cannot be delegated to any local agencies in Washington. The Washington State Department of Ecology retains sole authority to regulate Kraft and Sulfite Pulping Mills, pursuant to Washington State Administrative Code 173-405-012 and 173-410-012.

[13] Subpart LL of this part cannot be delegated to any local agencies in Washington because the Washington State Department of Ecology retains sole authority to regulate Primary Aluminum Plants, pursuant to Washington Administrative Code 173-415-010.

[14] Subpart MM of this part cannot be delegated to any local agencies in Washington because the Washington State Department of Ecology retains sole authority to regulate Kraft and Sulfite Pulping Mills, pursuant to Washington State Administrative Code 173-405-012 and 173-410-012.

(ii) Affected area sources within Puget Sound Clean Air's jurisdiction must comply with Puget Sound Clean Air's Regulation III, sections 3.03, Perchloroethylene Dry Cleaners, (incorporated by reference as specified in 40 CFR 63.14) as follows:

(A) The material incorporated in Puget Sound Clean Air's Regulation III, section 3.03, Perchloroethylene Dry Cleaners, pertains to the perchloroethylene dry cleaning source category in the Puget Sound Clean Air jurisdiction, and has been approved under the procedures in 40 CFR 63.93 to be implemented and enforced in place of the federal NESHAPs for Perchloroethylene Dry Cleaning Facilities (40 CFR part 63, subpart M), for area sources, as defined in 40 CFR 63.320(h).

(1) Authorities not delegated.

(i) Puget Sound Clean Air is not delegated the authority to implement and enforce Puget Sound Clean Air Regulation III, sections 3.03 in lieu of those provisions of Subpart M which applies to major sources, as defined in 40 CFR 63.320(g). Dry cleaning facilities which are major sources remain subject to subpart M.

(ii) Puget Sound Clean Air is not delegated the authority of 40 CFR 63.325 to determine equivalency of emissions control technologies. Any source seeking permission to use an alternative means of emission limitation under Puget Sound Clean Air Regulation I, section 3.23 must also receive approval from the Administrator before using such alternative means of emission limitation for the purpose of complying with section 112.

(B) [Reserved]

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

Note to paragraph (a)(48): Dates in parenthesis indicate the effective date of the federal rules that have been adopted by and delegated to the state or local air pollution control agency. Therefore, any amendments made to these delegated rules after this effective date are not delegated to the agency.

(49) West Virginia.

(i) West Virginia is delegated the authority to implement and enforce all existing and future unchanged 40 CFR part 63 standards at major sources, as defined in 40 CFR part 70, in accordance with the delegation agreement between EPA Region III and the West Virginia Department of Environmental Protection, dated March 19, 2001, and any mutually acceptable amendments to that agreement.

(ii) West Virginia is delegated the authority to implement and enforce all existing 40 CFR part 63 standards and all future unchanged 40 CFR part 63 standards, if delegation is sought by the West Virginia Department of Environmental Protection and approved by EPA Region III, at affected sources which are not located at major sources, as defined in 40 CFR part 70, in accordance with the final rule, dated April 2, 2002, effective June 3, 2002, and any mutually acceptable amendments to the terms described in the direct final rule.

**Credits**

[61 FR 25399, May 21, 1996; 62 FR 65024, Dec. 10, 1997; 63 FR 26466, May 13, 1998; 63 FR 28909, May 27, 1998; 63 FR 38480, July 17, 1998; 63 FR 63993, Nov. 18, 1998; 63 FR 66061, Dec. 1, 1998; 64 FR 4300, Jan. 28, 1999; 64 FR 12766, March 15, 1999; 64 FR 19721, April 22, 1999; 64 FR 24291, May 6, 1999; 64 FR 34563, June 28, 1999; 64 FR 42764, Aug. 5, 1999; 65 FR 10395, Feb. 28, 2000; 65 FR 11233, March 2, 2000; 66 FR 1591, Jan. 9, 2001; 66 FR 14324, March 12, 2001; 66 FR 27034, May 16, 2001; 66 FR 30822, June 8, 2001; 66 FR 35087, July 3, 2001; 66 FR 47583, Sept. 13, 2001; 66 FR 48218, Sept. 19, 2001; 66 FR 50124, Oct. 2, 2001; 66 FR 57670, Nov. 16, 2001; 66 FR 66324, Dec. 26, 2001; 67 FR 828, Jan. 8, 2002; 67 FR 3112, Jan. 23, 2002; 67 FR 4185, Jan. 29, 2002; 67 FR 4363, 4367, Jan. 30, 2002; 67 FR 11423, March 14, 2002; 67 FR 15489, April 2, 2002; 67 FR 39627, June 10, 2002; 67 FR 46398, July 15, 2002; 67 FR 58342, Sept. 16, 2002; 67 FR 59005, Sept. 19, 2002; 68 FR 31615, May 28, 2003; 68 FR 51194, Aug. 26, 2003; 68 FR 69044, Dec. 11, 2003; 68 FR 70728, Dec. 19, 2003; 69 FR 7375, Feb. 17, 2004; 69 FR 15693, March 26, 2004; 69 FR 19110, April 12, 2004; 69 FR 19946, April 15, 2004; 69 FR 31744, June 7, 2004; 69 FR 41761, July 12, 2004; 69 FR 55762, Sept. 16, 2004; 69 FR 63456, Nov. 2, 2004; 69 FR 74984, Dec. 15, 2004; 70 FR 13114, March 18, 2005; 70 FR 39428, July 8, 2005; 70 FR 73146, Dec. 9, 2005; 70 FR 73602, Dec. 13, 2005; 71 FR 19127, April 13, 2006; 71 FR 19656, April 17, 2006; 71 FR 20900, April 24, 2006; 71 FR 25757, May 2, 2006; 71 FR 36681, June 28, 2006; 71 FR 68750, Nov. 28, 2006; 72 FR 25982, 25984, May 8, 2007; 73 FR 18170, April 3, 2008; 73 FR 47548, Aug. 14, 2008; 74 FR 12593, March 25, 2009; 74 FR 22439, May 13, 2009; 74 FR 61043, Nov. 23, 2009; 74 FR 63616, Dec. 4, 2009; 75 FR 8809, Feb. 26, 2010; 75 FR 19258, April 14, 2010; 75 FR 34653, June 18, 2010; 75 FR 67627, Nov. 3, 2010; 76 FR 14810, March 18, 2011; 76 FR 18066, April 1, 2011; 76 FR 30550, May 26, 2011; 77 FR 11391, Feb. 27, 2012; 77 FR 41078, July 12, 2012; 78 FR 2338, Jan. 11, 2013; 78 FR 20247, April 4, 2013; 78 FR 79319, Dec. 30, 2013; 79 FR 67077, Nov. 12, 2014; 79 FR 70106, Nov. 25, 2014; 80 FR 5480, Feb. 2, 2015; 80 FR 8804, Feb. 19, 2015; 80 FR 9619, Feb. 24, 2015; 80 FR 9626, Feb. 24, 2015; 80 FR 22115, April 21, 2015; 82 FR 21935, May 11, 2017; 82 FR 29435, June 29, 2017; 83 FR 1562, Jan. 12, 2018; 83 FR 9218, March 5, 2018; 83 FR 15969, April 13, 2018; 83 FR 25936, June 5, 2018; 83 FR 46112, Sept. 12, 2018; 83 FR 48256, Sept. 24, 2018; 83 FR 53187, Oct. 22, 2018; 84 FR 3112, Feb. 11, 2019; 84 FR 7827, March 5, 2019; 84 FR 8260, March 7, 2019; 85 FR 8759, Feb. 18, 2020; 85 FR 57744, Sept. 16, 2020; 87 FR 43417, July 21, 2022; 87 FR 52696, Aug. 29, 2022; 88 FR 60346, Sept. 1, 2023; 89 FR 45772, May 24, 2024]

SOURCE: 57 FR 61992, Dec. 29, 1992; 58 FR 62283, Nov. 26, 1993, unless otherwise noted.

Add.203

AUTHORITY: 42 U.S.C. 7401 et seq.

Notes of Decisions (4)

Current through October 25, 2024, 89 FR 85420. Some sections may be more current. See credits for details.

---

### Footnotes

1     State program approved on October 29, 2001. Table last updated on October 5, 2008.

2     Alabama Department of Environmental Management.

3     Jefferson County Department of Health.

4     Huntsville Department of Natural Resources.

1     Authorities which are not delegated include: 40 CFR 63.6(g); 63.6(h)(9); 63.7(e)(2)(ii) and (f) for approval of major alternatives to test methods; 63.8(f) for approval of major alternatives to monitoring; 63.10(f); and all authorities identified in the subparts (i.e., under "Delegation of Authority") that cannot be delegated. For definitions of minor, intermediate, and major alternatives to test methods and monitoring, see memorandum from John Seitz, Office of Air Quality Planning and Standards, dated July, 10, 1998, entitled, "Delegation of 40 CFR Part 63 General Provisions Authorities to State and Local Air Pollution Control Agencies."

2     Alaska received delegation for Subpart N (Chromium Electroplating) as it applies to sources required to obtain an operating permit under Alaska's regulations. EPA retains the authority for implementing and enforcing Subpart N for area source chromium electroplating and anodizing operations which have been exempted from Part 70 permitting in 40 CFR 63.340(e)(1).

1     Arizona Department of Environmental Quality.

2     Maricopa County Air Quality Department.

3     Pima County Department of Environmental Quality.

4     Pinal County Air Quality Control District.

5     Gila River Indian Community Department of Environmental Quality. This table includes the GRIC DEQ only for purposes of identifying all state, local, and tribal agencies responsible for implementing part 63 standards within the geographical boundaries of the State of Arizona and does not establish any state regulatory authority in Indian country.

1     Program delegated to Arkansas Department of Energy and Environment, Division of Environmental Quality (DEQ).

2     Authorities which may not be delegated include: § 63.6(g), Approval of Alternative Non-Opacity Emission Standards; § 63.6(h)(9), Approval of Alternative Opacity Standards; § 63.7(e)(2)(ii) and (f), Approval of Major Alternatives to Test Methods; § 63.8(f), Approval of Major Alternatives to Monitoring; § 63.10(f), Approval of Major Alternatives to Recordkeeping and Reporting; and all authorities identified in the subparts (e.g., under "Delegation of Authority") that cannot be delegated.

3   This subpart was vacated and remanded to EPA by the United States Court of Appeals for the District of Columbia Circuit. See, Mossville Environmental Action Network v. EPA, 370 F. 3d 1232 (D.C. Cir. 2004). Because of the DC Court's holding, this subpart is not delegated to DEQ at this time.

4   This subpart was issued a partial vacatur on October 29, 2007 (72 FR 61060), by the United States Court of Appeals for the District of Columbia Circuit.

5   Final rule. See 76 FR 15608 (March 21, 2011), as amended at 78 FR 7138 (January 31, 2013); 80 FR 72807 (November 20, 2015).

6   Final promulgated rule adopted by the EPA. See 80 FR 65470 (October 26, 2015). Note that subpart KKKKK of this part was amended in response to a petition for reconsideration of the final rule. See 84 FR 58601 (November 1, 2019).

7   Initial final rule. See 77 FR 9304 (February 16, 2012), as amended 81 FR 20172 (April 6, 2016). Final supplemental finding that it is appropriate and necessary to regulate hazardous air pollutant (HAP) emissions from coal- and oil-fired electric utility steam generating units (EUSGU). See 81 FR 24420 (April 25, 2016).

1   State program approved on October 1, 2001. Delegation table last updated on December 19, 2008.

1   State program approved on June 8, 2000. Delegation table last updated on September 15, 2008.

1   Delegation is for major sources only and subject to all federal law, regulations, policy and guidance.

1   State program approved on October 31, 2001. Delegation table last updated on April 1, 2009.

2   Kentucky Department for Environmental Protection.

3   Louisville Air Pollution Control District.

1   Authorities which may not be delegated include: § 63.6(g), Approval of Alternative Non-Opacity Emission Standards; § 63.6(h)(9), Approval of Alternative Opacity Standards; § 63.7(e)(2)(ii) and (f), Approval of Major Alternatives to Test Methods; § 63.8(f), Approval of Major Alternatives to Monitoring; § 63.10(f), Approval of Major Alternatives to Recordkeeping and Reporting; and all authorities identified in the subparts (e.g., under "Delegation of Authority") that cannot be delegated.

2   Program delegated to Louisiana Department of Environmental Quality (LDEQ) for standards promulgated by EPA, as amended in the Federal Register through July 1, 2013.

3   The LDEQ was previously delegated this subpart on March 26, 2004 (69 FR 15687). The LDEQ has adopted the subpart unchanged and applied for delegation of the standard. The subpart was vacated and remanded to EPA by the United States Court of Appeals for the District of Columbia Circuit. See, Mossville Environmental Action Network v. EPA, 370 F. 3d 1232 (D.C. Cir. 2004). Because of the D.C. Court's holding this subpart is not delegated to LDEQ at this time.

4   This subpart was issued a partial vacatur on October 29, 2007 (72 FR 61060) by the United States Court of Appeals for the District of Columbia Circuit.

5   Final rule. See 78 FR 7138 (January 31, 2013).

6   This subpart was vacated and remanded to EPA by the United States Court of Appeals for the District of Columbia Circuit on March 13, 2007. See, Sierra Club v. EPA, 479 F. 3d 875 (D.C. Cir. 2007). Because of the D.C. Court's holding this subpart is not delegated to LDEQ at this time.

7    Initial Final Rule on February 16, 2012 (77 FR 9304). Final on reconsideration of certain new source issues on April 24, 2013 (78 FR 24073). Portions of this subpart are in proposed reconsideration pending final action on June 25, 2013 (78 FR 38001).

1    State program approved on December 28, 1994. Delegation table last updated on November 3, 2008.

1    Nevada Division of Environmental Protection.

2    Washoe County District Health Department, Air Quality Management Division.

3    Clark County, Department of Air Quality.

1    Authorities which may not be delegated include: § 63.6(g), Approval of Alternative Non-Opacity Emission Standards; § 63.6(h)(9), Approval of Alternative Opacity Standards; § 63.7(e)(2)(ii) and (f), Approval of Major Alternatives to Test Methods; § 63.8(f), Approval of Major Alternatives to Monitoring; § 63.10(f), Approval of Major Alternatives to Recordkeeping and Reporting; and all authorities identified in the subparts (e.g., under "Delegation of Authority") that cannot be delegated.

2    Program delegated to New Mexico Environment Department (NMED) for standards promulgated by the EPA, as amended in the Federal Register through January 15, 2017.

3    Program delegated to Albuquerque-Bernalillo County Air Quality Control Board (ABCAQCB) for standards promulgated by the EPA, as amended in the Federal Register through January 23, 2017.

4    The NMED was previously delegated this subpart on February 9, 2004 (68 FR 69036). The ABCAQCB has adopted the subpart unchanged and applied for delegation of the standard. The subpart was vacated and remanded to the EPA by the United States Court of Appeals for the District of Columbia Circuit. See Mossville Environmental Action Network v. EPA, 370 F. 3d 1232 (D.C. Cir. 2004). Because of the D.C. Court's holding this subpart is not delegated to NMED or ABCAQCB at this time.

5    This subpart was issued a partial vacatur by the United States Court of Appeals for the District of Columbia Circuit. See 72 FR 61060 (October 29, 2007).

6    Final Rule. See 76 FR (March 21, 2011), as amended at 78 FR 7138 (January 31, 2013); 80 FR 72807 (November 20, 2015).

7    Final promulgated rule adopted by the EPA. See 80 FR 65470 (October 26, 2015). Note that Part 63 Subpart KKKKK was amended to correct minor typographical errors. See 80 FR 75817 (December 4, 2015).

8    Final Rule. See 77 FR 9304 (February 16, 2012), as amended 81 FR 20172 (April 6, 2016). Final Supplemental Finding that it is appropriate and necessary to regulate HAP emissions from Coal-and Oil-fired EUSGU Units. See 81 FR 24420 (April 25, 2016).

1    State program approved on August 31, 2001. Delegation table last updated on February 23, 2009.

2    Forsyth County Environmental Affairs Department.

3    Mecklenburg County Department of Environmental Protection.

4    Western North Carolina Regional Air Quality Agency.

1    Program delegated to Oklahoma Department of Environmental Quality (ODEQ).

§ 63.99 Delegated Federal authorities., 40 C.F.R. § 63.99

2      Authorities which may not be delegated include: § 63.6(g), Approval of Alternative Non-Opacity Emission Standards; § 63.6(h)(9), Approval of Alternative Opacity Standards; § 63.7(e)(2)(ii) and (f), Approval of Major Alternatives to Test Methods; § 63.8(f), Approval of Major Alternatives to Monitoring; § 63.10(f), Approval of Major Alternatives to Recordkeeping and Reporting; and all authorities identified in the subparts (e.g., under "Delegation of Authority") that cannot be delegated.

3      The ODEQ has adopted this subpart unchanged and applied for delegation of the standard. The subpart was vacated and remanded to the EPA by the United States Court of Appeals for the District of Columbia Circuit. See, Mossville Environmental Action Network v. EPA, 370 F. 3d 1232 (D.C. Cir. 2004). Because of the D.C. Court's holding, this subpart is not delegated to ODEQ at this time.

4      This subpart was issued a partial vacatur by the United States Court of Appeals for the District of Columbia Circuit. See 72 FR 61060 (October 29, 2007).

5      Final rule. See 76 FR 15608 (March 21, 2011), as amended at 78 FR 7138 (January 31, 2013); 80 FR 72807 (November 20, 2015).

6      Final promulgated rule adopted by the EPA. See 80 FR 65470 (October 26, 2015). Part 63 Subpart KKKKK was amended to correct minor typographical errors at 80 FR 75817 (December 4, 2015).

7      Final Rule. See 77 FR 9304 (February 16, 2012), as amended 81 FR 20172 (April 6, 2016). Final Supplemental Finding that it is appropriate and necessary to regulate HAP emissions from Coal- and Oil-fired EUSGU Units. See 81 FR 24420 (April 25, 2016).

1      Table last updated on August 9, 2002; see 40 CFR 61.04(b)(WW) for agency addresses.

2      Any authority within any subpart of this part (i.e. under "Delegation of Authority") that is identified as not delegatable, is not delegated.

3      Oregon Department of Environmental Quality (07/01/2001).

4      Lane Region Air Pollution Authority (07/01/2001).

5      General Provisions Authorities which may not be delegated include: §§ 63.6(g); 63.6(h)(9); 63.7(e)(2)(ii) and (f) for approval of major alternatives to test methods; § 63.9(f) for approval of major alternatives to monitoring. For definitions of minor, intermediate, and major alternatives to test methods and monitoring, see 40 CFR 63.90.

1      State program approved on June 26, 1995. Delegation table last updated on February 23, 2009.

1      Program delegated to the Texas Commission on Environmental Quality (TCEQ).

2      Authorities which may not be delegated include: § 63.6(g), Approval of Alternative Non-Opacity Emission Standards; § 63.6(h)(9), Approval of Alternative Opacity Standards; § 63.7(e)(2)(ii) and (f), Approval of Major Alternatives to Test Methods; § 63.8(f), Approval of Major Alternatives to Monitoring; § 63.10(f), Approval of Major Alternatives to Recordkeeping and Reporting; and all authorities identified in the subparts (e.g., under "Delegation of Authority") that cannot be delegated.

3      TCEQ was previously delegated this subpart on May 17, 2005 (70 FR 13018). The subpart was vacated and remanded to the EPA by the United States Court of Appeals for the District of Columbia Circuit. See, Mossville Environmental Action Network v. EPA, 370 F. 3d 1232 (DC Cir. 2004). Because of the DC Court's holding, this subpart is not delegated to TCEQ at this time.

4    This subpart was issued a partial vacatur by the United States Court of Appeals for the District of Columbia Circuit. See 72 FR 61060 (October 29, 2007).

5    Final rule. See 76 FR 15608 (March 21, 2011), as amended at 78 FR 7138 (January 31, 2013); 80 FR 72807 (November 20, 2015).

6    Final promulgated rule adopted by the EPA. See 80 FR 65470 (October 26, 2015). Note that Part 63 Subpart KKKKK was amended to correct minor typographical errors. See 80 FR 75817 (December 4, 2015).

7    Final Rule. See 77 FR 9304 (February 16, 2012), as amended 81 FR 20172 (April 6, 2016). Final Supplemental Finding that it is appropriate and necessary to regulate HAP emissions from Coal- and Oil-fired EUSGU Units. See 81 FR 24420 (April 25, 2016).

---

**End of Document**                                   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Add.208

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter C. Air Programs
        Part 63. National Emission Standards for Hazardous Air Pollutants for Source Categories (Refs & Annos)
          Subpart U. National Emission Standards for Hazardous Air Pollutant Emissions: Group I Polymers and Resins (Refs & Annos)

40 C.F.R. § 63.481

§ 63.481 Compliance dates and relationship of this subpart to existing applicable rules.

Effective: July 15, 2024
Currentness

(a) Affected sources are required to achieve compliance on or before the dates specified in paragraphs (b) through (d) of this section and paragraphs (n) and (o) of this section. Paragraph (e) of this section provides information on requesting compliance extensions. Paragraphs (f) through (l) of this section discuss the relationship of this subpart to subpart A and to other applicable rules. Where an override of another authority of the Act is indicated in this subpart, only compliance with the provisions of this subpart is required. Paragraph (m) of this section specifies the meaning of time periods.

(b) Except as specified in paragraphs (n) and (o) of this section, new affected sources that commence construction or reconstruction after June 12, 1995 shall be in compliance with this subpart upon initial start-up or by June 19, 2000, whichever is later.

(c) With the exceptions provided in paragraphs (c)(1) through (3) of this section and paragraphs (n) and (o) of this section, existing affected sources shall be in compliance with this subpart no later than June 19, 2001, as provided in § 63.6(c), unless an extension has been granted as specified in paragraph (e) of this section.

    (1) Existing affected sources producing epichlorohydrin elastomer, butyl rubber, neoprene rubber, and nitrile butadiene rubber shall be in compliance with the applicable emission limitation in § 63.494(a)(4) no later than April 23, 2012.

    (2) Existing affected sources producing butyl rubber and ethylene propylene rubber shall be in compliance with § 63.485(q)(1) no later than April 23, 2012.

    (3) Compliance with § 63.502 is covered by paragraph (d) of this section.

(d) Except as provided for in paragraphs (d)(1) through (d)(6) of this section, and paragraphs (n) and (o) of this section, existing affected sources shall be in compliance with § 63.502 no later than July 31, 1997, unless an extension has been granted pursuant to paragraph (e) of this section.

(1) Compliance with the compressor provisions of § 63.164 shall occur no later than September 5, 1997 for any compressor meeting one or more of the criteria in paragraphs (d)(1)(i) through (d)(1)(iv) of this section, if the work can be accomplished without a process unit shutdown, as defined in § 63.161.

(i) The seal system will be replaced;

(ii) A barrier fluid system will be installed;

(iii) A new barrier fluid will be utilized which requires changes to the existing barrier fluid system; or

(iv) The compressor will be modified to permit connecting the compressor to a fuel gas system or closed vent system, or be modified so that emissions from the compressor can be routed to a process.

(2) Compliance with the compressor provisions of § 63.164 shall occur no later than March 5, 1998, for any compressor meeting all the criteria in paragraphs (d)(2)(i) through (d)(2)(iv) of this section.

(i) The compressor meets one or more of the criteria specified in paragraphs (d)(1)(i) through (d)(1)(iv) of this section;

(ii) The work can be accomplished without a process unit shutdown as defined in § 63.161;

(iii) The additional time is actually necessary, due to the unavailability of parts beyond the control of the owner or operator; and

(iv) The owner or operator submits the request for a compliance extension to the appropriate U.S. Environmental Protection Agency (EPA) Regional Office at the address listed in § 63.13 no later than 45 days before the compliance date. The request for a compliance extension shall contain the information specified in § 63.6(i)(6)(i)(A), (B), and (D). Unless the EPA Regional Office objects to the request for a compliance extension within 30 days after receipt of the request, the request shall be deemed approved.

(3) If compliance with the compressor provisions of § 63.164 cannot reasonably be achieved without a process unit shutdown, the owner or operator shall achieve compliance no later than September 5, 1998. The owner or operator who elects to use this provision shall submit a request for an extension of compliance in accordance with the requirements of paragraph (d)(2)(iv) of this section.

(4) Compliance with the compressor provisions of § 63.164 shall occur no later than September 5, 1999 for any compressor meeting one or more of the criteria in paragraphs (d)(4)(i) through (d)(4)(iii) of this section. The owner or operator who elects to use these provisions shall submit a request for an extension of compliance in accordance with the requirements of paragraph (d)(2)(iv) of this section.

(i) Compliance cannot be achieved without replacing the compressor;

Add.210

(ii) Compliance cannot be achieved without recasting the distance piece; or

(iii) Design modifications are required to connect to a closed-vent or recovery system.

(5) Compliance with the surge control vessel and bottoms receiver provisions of § 63.170 shall occur no later than June 19, 2001.

(6) Compliance with the heat exchange system provisions of § 63.104 shall occur no later than June 19, 2001.

(e) Pursuant to section 112(i)(3)(B) of the Act, an owner or operator may request an extension allowing the existing affected source up to 1 additional year to comply with section 112(d) standards. For purposes of this subpart, a request for an extension shall be submitted to the permitting authority as part of the operating permit application, or to the Administrator as a separate submittal or as part of the Precompliance Report. Requests for extensions shall be submitted no later than 120 days prior to the compliance dates specified in paragraphs (b) through (d) of this section, or as specified elsewhere in this subpart, except as provided in paragraph (e)(3) of this section. The dates specified in § 63.6(i) for submittal of requests for extensions shall not apply to this subpart.

(1) A request for an extension of compliance shall include the data described in § 63.6(i)(6)(i)(A), (B), and (D).

(2) The requirements in §§ 63.6(i)(8) through 63.6(i)(14) shall govern the review and approval of requests for extensions of compliance with this subpart.

(3) An owner or operator may submit a compliance extension request after the date specified in paragraph (e) of this section, provided that the need for the compliance extension arose after that date, and the need arose due to circumstances beyond reasonable control of the owner or operator. This request shall include, in addition to the information specified in paragraph (e)(1) of this section, a statement of the reasons additional time is needed and the date when the owner or operator first learned of the circumstances necessitating a request for a compliance extension under this paragraph (e)(3).

(f) Table 1 of this subpart specifies the provisions of subpart A that apply and those that do not apply to owners and operators of affected sources subject to this subpart. For the purposes of this subpart, Table 3 of subpart F is not applicable.

(g) Table 2 of this subpart summarizes the provisions of subparts F, G, and H that apply and those that do not apply to owners and operators of affected sources subject to this subpart.

(h)(1) After the compliance dates specified in this section, an affected source subject to this subpart that is also subject to the provisions of 40 CFR part 63, subpart I, is required to comply only with the provisions of this subpart.

(2) Sources subject to 40 CFR part 63, subpart I that have elected to comply through a quality improvement program, as specified in § 63.175 or § 63.176 or both, may elect to continue these programs without interruption as a means of

Add.211

complying with this subpart. In other words, becoming subject to this subpart does not restart or reset the "compliance clock" as it relates to reduced burden earned through a quality improvement program.

(i) After the compliance dates specified in this section, a storage vessel that is assigned to an affected source subject to this subpart and that is also subject to the provisions of 40 CFR part 60, subpart Kb is required to comply only with the provisions of this subpart. After the compliance dates specified in this section, that storage vessel shall no longer be subject to 40 CFR part 60, subpart Kb.

(j) After the compliance dates specified in this section, an affected source subject to this subpart that is also subject to the provisions of 40 CFR part 60, subpart VV, is required to comply only with the provisions of this subpart. After the compliance dates specified in this section, the source shall no longer be subject to 40 CFR part 60, subpart VV.

(k) Applicability of other regulations for monitoring, recordkeeping or reporting with respect to combustion devices, recovery devices, or recapture devices.

(1) After the compliance dates specified in this subpart, if any combustion device, recovery device or recapture device subject to this subpart is also subject to monitoring, recordkeeping, and reporting requirements in 40 CFR part 264 subpart AA or CC, or is subject to monitoring and recordkeeping requirements in 40 CFR part 265 subpart AA or CC and the owner or operator complies with the periodic reporting requirements under 40 CFR part 264 subpart AA or CC that would apply to the device if the facility had final-permitted status, the owner or operator may elect to comply either with the monitoring, recordkeeping and reporting requirements of this subpart, or with the monitoring, recordkeeping and reporting requirements in 40 CFR parts 264 and/or 265, as described in this paragraph, which shall constitute compliance with the monitoring, recordkeeping and reporting requirements of this subpart. The owner or operator shall identify which option has been selected in the Notification of Compliance Status required by § 63.506(e)(5).

(2) Owners and operators of flares that are subject to the flare related requirements of this subpart and are also subject to flare related requirements of any other regulation in this part or 40 CFR part 61 or 63, may elect to comply with the requirements in § 63.508 in lieu of all flare related requirements in any other regulation in this part or 40 CFR part 61 or 63.

(l) Applicability of other requirements for heat exchange systems or waste management units. Paragraphs (l)(1) and (l)(2) of this section address instances in which certain requirements from other regulations also apply for the same heat exchange system(s) or waste management unit(s) that are subject to this subpart.

(1) After the applicable compliance date specified in this subpart, if a heat exchange system subject to this subpart is also subject to a standard identified in paragraphs (l)(1)(i) or (ii) of this section, compliance with the applicable provisions of the standard identified in paragraphs (l)(1)(i) or (ii) of this section shall constitute compliance with the applicable provisions of this subpart with respect to that heat exchange system.

(i) Subpart F of this part.

(ii) A subpart of this part which requires compliance with § 63.104 (e.g., subpart JJJ of this part).

Add.212

(2) After the applicable compliance date specified in this subpart, if any waste management unit subject to this subpart is also subject to a standard identified in paragraph (l)(2)(i) or (ii) of this section, compliance with the applicable provisions of the standard identified in paragraph (l)(2)(i) or (ii) of this section shall constitute compliance with the applicable provisions of this subpart with respect to that waste management unit.

(i) Subpart G of this part.

(ii) A subpart of this part which requires compliance with §§ 63.132 through 63.147 (e.g., subpart JJJ of this part).

(m) All terms in this subpart that define a period of time for completion of required tasks (e.g., monthly, quarterly, annual), unless specified otherwise in the section or paragraph that imposes the requirement, refer to the standard calendar periods.

(1) Notwithstanding time periods specified in this subpart for completion of required tasks, such time periods may be changed by mutual agreement between the owner or operator and the Administrator, as specified in subpart A of this part (e.g., a period could begin on the compliance date or another date, rather than on the first day of the standard calendar period). For each time period that is changed by agreement, the revised period shall remain in effect until it is changed. A new request is not necessary for each recurring period.

(2) Where the period specified for compliance is a standard calendar period, if the initial compliance date occurs after the beginning of the period, compliance shall be required according to the schedule specified in paragraphs (m)(2)(i) or (m)(2)(ii) of this section, as appropriate.

(i) Compliance shall be required before the end of the standard calendar period within which the compliance deadline occurs, if there remain at least 2 weeks for tasks that shall be performed monthly, at least 1 month for tasks that shall be performed each quarter, or at least 3 months for tasks that shall be performed annually; or

(ii) In all other cases, compliance shall be required before the end of the first full standard calendar period after the period within which the initial compliance deadline occurs.

(3) In all instances where a provision of this subpart requires completion of a task during each of multiple successive periods, an owner or operator may perform the required task at any time during the specified period, provided that the task is conducted at a reasonable interval after completion of the task during the previous period.

(n) All affected sources that commenced construction or reconstruction on or before April 25, 2023, must be in compliance with the requirements listed in paragraphs (n)(1) through (9) of this section upon initial startup or on July 15, 2027, whichever is later. All affected sources that commenced construction or reconstruction after April 25, 2023, must be in compliance with the requirements listed in paragraphs (n)(1) through (9) of this section upon initial startup, or on July 15, 2024, whichever is later.

(1) The general requirements specified in § 63.483(e), § 63.504(a), § 63.504(a)(1)(iii), and § 63.506(e)(6)(iii)(C).

(2) For flares, the requirements specified in § 63.508.

Add.213

(3) For storage vessels, the requirements specified in § 63.484(t) and § 63.506(e)(4)(ii)(F)(6).

(4) For continuous front-end process vents, the requirements specified in §§ 63.485(l)(6), (o)(6), (p)(5), (q)(1)(vii), (x), § 63.503(g)(2)(iii)(B)(4), and § 63.506(e)(4)(ii)(F)(6).

(5) For batch front-end process vents, the requirements specified in §§ 63.487(a)(3), (b)(3), and (e)(1)(iv) and (i), §§ 63.488(d)(2), (e)(4), (f)(2), and (g)(3), §§ 63.489(b)(10) and (d)(3), §§ 63.491(d)(1)(iii), (e)(6), and (h), § 63.492(g), and Table 6 to this subpart, item 3 in column 3 for diversion to the atmosphere and monthly inspections of sealed valves for all control devices.

(6) For back-end processes, the requirements specified in §§ 63.497(a)(8) and (d)(3), and § 63.498(d)(5)(v).

(7) For wastewater, the requirements specified in §§ 63.501(d), (e), and (f).

(8) For equipment leaks, the requirements specified in §§ 63.502(a)(2) and (k)(2).

(9) For heat exchange systems, the requirements specified in §§ 63.502(n)(7) and (n)(8).

(o) All affected sources that commenced construction or reconstruction on or before April 25, 2023, must be in compliance with the chloroprene requirements in §§ 63.484(u), 63.485(y) and (z), 63.487(j), 63.494(a)(7), 63.501(a)(10)(iv), 63.502(a)(3) and (a)(7), 63.509, and 63.510 upon initial startup or on October 15, 2024, whichever is later. All affected sources that commenced construction or reconstruction after April 25, 2023, must be in compliance with the chloroprene requirements in §§ 63.484(u), 63.485(x) and (z), 63.487(j), 63.494(a)(7), § 63.501(a)(10)(iv), 63.502(q), 63.502(a)(3) and (a)(7), 63.509, and 63.510 upon initial startup, or on July 15, 2024, whichever is later.

(p) The compliance schedule for fenceline monitoring is specified in paragraphs (p)(1) and (2) of this section.

(1) Except as specified in paragraph (p)(2) of this section, all affected sources that commenced construction or reconstruction on or before April 25, 2023, must commence fenceline monitoring according to the requirements in § 63.502(a)(4) by no later than July 15, 2026, however requirements for corrective actions are not required until on or after July 15, 2027. All affected sources that commenced construction or reconstruction after April 25, 2023, must be in compliance with the fenceline monitoring requirements listed in § 63.502(a)(4) upon initial startup, or on July 15, 2024, whichever is later.

(2) For affected sources producing neoprene, the compliance schedule specified in paragraph (p)(1) of this section does not apply for chloroprene. Instead, all affected sources producing neoprene that commenced construction or reconstruction on or before April 25, 2023, must be in compliance with the fenceline monitoring requirements for chloroprene listed in § 63.502(a)(4) and (a)(7) upon initial startup or on October 15, 2024, whichever is later. All affected sources producing neoprene that commenced construction or reconstruction after April 25, 2023, must be in compliance with the fenceline

monitoring requirements for chloroprene listed in § 63.502(a)(4) and (a)(7) upon initial startup, or on July 15, 2024, whichever is later.

**Credits**

[62 FR 1837, Jan. 14, 1997; 64 FR 11542, March 9, 1999; 64 FR 35028, June 30, 1999; 65 FR 38042, June 19, 2000; 76 FR 22587, April 21, 2011; 89 FR 43236, May 16, 2024]

SOURCE: 57 FR 61992, Dec. 29, 1992; 61 FR 46924, Sept. 5, 1996, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Current through October 25, 2024, 89 FR 85420. Some sections may be more current. See credits for details.

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter C. Air Programs
        Part 63. National Emission Standards for Hazardous Air Pollutants for Source Categories (Refs & Annos)
          Subpart U. National Emission Standards for Hazardous Air Pollutant Emissions: Group I Polymers and Resins (Refs & Annos)

40 C.F.R. § 63.507

§ 63.507 Implementation and enforcement.

Effective: July 15, 2024
Currentness

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (6) of this section.

(1) Approval of alternatives to the requirements in §§ 63.480 through 63.481, 63.483(a) through (c), 63.484, 63.485(a) through (k), (m) through (s), (u), 63.486 through 63.487, 63.488(a), (b)(1) through (4), (5)(iv) through (v), (6) through (7), (c) through (i), 63.493 through 63.494, 63.500(a)(1) through (3), (b), 63.501, 63.502(a) through (f), (i), (k) through (m), and 63.503. Where these standards reference another subpart, the cited provisions will be delegated according to the delegation provisions of the referenced subpart. Where these standards reference another subpart and modify the requirements, the requirements shall be modified as described in this subpart. Delegation of the modified requirements will also occur according to the delegation provisions of the referenced subpart.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

(5) Approval of an alternative to any electronic reporting to the EPA required by this subpart.

(6) Approval of an extension request under § 63.6(i)(4)(ii).

**Credits**
[68 FR 37349, June 23, 2003; 89 FR 43261, May 16, 2024]

SOURCE: 57 FR 61992, Dec. 29, 1992; 61 FR 46924, Sept. 5, 1996, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Current through October 25, 2024, 89 FR 85420. Some sections may be more current. See credits for details.

End of Document    © 2024 Thomson Reuters. No claim to original U.S. Government Works.



## ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Parts 60 and 63**

**[EPA–HQ–OAR–2022–0730; FRL–9327–02–OAR]**

**RIN 2060–AV71**

**New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** This action finalizes amendments to the New Source Performance Standards (NSPS) that apply to the Synthetic Organic Chemical Manufacturing Industry (SOCMI) and amendments to the National Emission Standards for Hazardous Air Pollutants (NESHAP) that apply to the SOCMI (more commonly referred to as the Hazardous Organic NESHAP or HON) and Group I and II Polymers and Resins (P&R I and P&R II, respectively) Industries. The EPA is finalizing decisions resulting from the Agency's technology review of the HON and the P&R I and P&R II NESHAP, and its review of the NSPS that apply to the SOCMI. The EPA is also finalizing amendments to the NSPS for equipment leaks of volatile organic compounds (VOC) in SOCMI based on its reconsideration of certain issues raised in an administrative petition for reconsideration. Furthermore, the EPA is finalizing emission standards for ethylene oxide (EtO) emissions and chloroprene emissions after considering the results of a risk assessment for the HON and for Neoprene Production processes subject to the P&R I NESHAP, and is finalizing a fenceline monitoring work practice standard for certain hazardous air pollutants (HAP). Lastly, the EPA is finalizing the removal of exemptions from standards for periods of startup, shutdown, and malfunction (SSM), adding work practice standards for such periods where appropriate, finalizing standards for previously unregulated HAP, and adding provisions for electronic reporting of performance test reports and periodic reports.

**DATES:** This final rule is effective on July 15, 2024. The incorporation by reference (IBR) of certain publications listed in the rule is approved by the Director of the Federal Register as of July 15, 2024. The incorporation by reference of certain other material listed in the rule was approved by the Director of the Federal Register as of October 17, 2000 and November 16, 2007.

**ADDRESSES:** The U.S. Environmental Protection Agency (EPA) has established a docket for this action under Docket ID No. EPA–HQ–OAR–2022–0730. All documents in the docket are listed on the *https://www.regulations.gov/* website. Although listed, some information is not publicly available, *e.g.,* Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available either electronically through *https://www.regulations.gov/,* or in hard copy at the EPA Docket Center, WJC West Building, Room Number 3334, 1301 Constitution Ave. NW, Washington, DC. The Public Reading Room hours of operation are 8:30 a.m. to 4:30 p.m. Eastern Standard Time, Monday through Friday. The telephone number for the Public Reading Room is (202) 566–1744, and the telephone number for the EPA Docket Center is (202) 566–1742.

**FOR FURTHER INFORMATION CONTACT:** For questions about the HON and SOCMI NSPS, contact U.S. EPA, Attn: Mr. Andrew Bouchard, Mail Drop: Sector Policies and Programs Division (E143–01), 109 T.W. Alexander Drive, P.O. Box 12055, RTP, North Carolina 27711; telephone number: (919) 541–4036; and email address: *bouchard.andrew@epa.gov.* For questions about the P&R I and P&R II NESHAP, contact U.S. EPA, Attn: Ms. Njeri Moeller, Mail Drop: Sector Policies and Programs Division (E143–01), 109 T.W. Alexander Drive, P.O. Box 12055, RTP, North Carolina 27711; telephone number: (919) 541–1380; and email address: *moeller.njeri@epa.gov.* For specific information regarding the risk modeling methodology, contact U.S. EPA, Attn: Mr. Matthew Woody, Mail Drop: Health and Environmental Impacts Division (C539–02), 109 T.W. Alexander Drive, P.O. Box 12055, RTP, North Carolina 27711; telephone number: (919) 541–1535; and email address: *woody.matthew@epa.gov.*

**SUPPLEMENTARY INFORMATION:**
*Preamble acronyms and abbreviations.* We use multiple acronyms and terms in this preamble. While this list may not be exhaustive, to ease the reading of this preamble and for reference purposes, the EPA defines the following terms and acronyms here:

ACS  American Community Survey
AERMOD  American Meteorological Society/EPA Regulatory Model dispersion modeling system
ANSI  American National Standards Institute
APCD  air pollution control device
API  American Petroleum Institute
ASME  American Society of Mechanical Engineers
BACT  best available control technology
BLR  basic liquid epoxy resins
BPT  benefit per-ton
BSER  best system of emissions reduction
BTEX  benzene, toluene, ethylbenzene, and xylenes
CAA  Clean Air Act
CBI  confidential business information
CDX  Central Data Exchange
CEDRI  Compliance and Emissions Data Reporting Interface
CFR  Code of Federal Regulations
CMPU  chemical manufacturing process unit
CO  carbon monoxide
$CO_2$  carbon dioxide
CPI  consumer price index
CRA  Congressional Review Act
EAV  equivalent annual value
ECHO  Enforcement and Compliance History Online
EFR  external floating roof
EIS  Emission Information System
EPA  Environmental Protection Agency
EPPU  elastomer product process unit
ERT  Electronic Reporting Tool
EtO  ethylene oxide
FTIR  fourier transform infrared
HAP  hazardous air pollutant(s)
HON  Hazardous Organic NESHAP
HQ  hazard quotient
$HQ_{REL}$  hazard quotient reference exposure level
IBR  incorporation by reference
ICR  information collection request
IFR  internal floating roof
IRIS  Integrated Risk Information System
ISA  Integrated Science Assessment
km  kilometer
LAER  lowest achievable emissions rate
lb/hr  pound per hour
lb/yr  pound per year
LDAR  leak detection and repair
LDEQ  Louisiana Department of Environmental Quality
LEL  lower explosive limit
MACT  maximum achievable control technology
MDL  method detection limit
MERP  monomer emission reduction project
MIR  maximum individual lifetime [cancer] risk
MON  Miscellaneous Organic Chemical Manufacturing NESHAP
MTVP  maximum true vapor pressure
NAICS  North American Industry Classification System
NAAQS  National Ambient Air Quality Standards
NATTS  National Air Toxic Trends Station
NEI  National Emissions Inventory
NESHAP  national emission standards for hazardous air pollutants
$NO_X$  nitrogen oxides
$N_2O$  nitrous oxide

63.139(d)(5) (for HON), and 40 CFR 63.484(t), 40 CFR 63.485(x), and 40 CFR 63.489(b)(10) (for the P&R I NESHAP) for owners or operators using adsorbers that cannot be regenerated and regenerative adsorbers that are regenerated offsite to use dual (two or more) adsorbent beds in series and conduct monitoring of HAP or TOC on the outlet of the first adsorber bed in series using a sample port and a portable analyzer or chromatographic analysis. However, we have clarified in the proposed rule text in this final action that the monitoring plan provisions in 40 CFR 63.120(d)(2) and (3) do not apply to HON sources subject to the monitoring provisions in 40 CFR 63.120(d)(1)(iii); and the monitoring plan provisions in 40 CFR 63.120(d)(2) and (3) do not apply to P&R I sources subject to the monitoring provisions in 40 CFR 63.120(d)(1)(iii) (via 40 CFR 63.484(t) and 40 CFR 63.485(x)). The comments and our specific responses to these items can be found in the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking.

We are also finalizing, as proposed, several corrections to the calibration drift assessment requirements in NSPS subpart VVa at 40 CFR 60.485a(b)(2). These amendments include: (1) Correcting a regulatory citation to read ''§ 60.486a(e)(8)'' instead of ''§ 60.486a(e)(7)''; (2) removing the extraneous sentence ''Calculate the average algebraic difference between the three meter readings and the most recent readings and the most recent calibration value.''; (3) providing clarity in the mathematical step of the assessment by replacing the sentence ''Divide this algebraic difference by the initial calibration value and multiply by 100 to express the calibration drift as a percentage.'' with ''Divide the arithmetic difference of the initial and post-test calibration response by the corresponding calibration gas value for each scale and multiply by 100 to express the calibration drift as a percentage.''; and (4) providing clarity by making other minor textural changes to the provisions related to the procedures for when a calibration drift assessment shows negative or positive drift of more than 10 percent. We did

not receive any comments in opposition of these amendments.

In addition, we are finalizing, as proposed, the requirement in the HON and the P&R I and P&R II NESHAP, and NSPS subparts IIIa, NNNa, and RRRa to conduct subsequent performance testing on non-flare control devices no later than 60 calendar months after the previous performance test. The comments and our specific response to this item can be found in the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking.

Also, we are finalizing, as proposed to: (1) Remove the provisions that allow compliance with certain portions of 40 CFR part 264, subpart AA or CC in lieu of portions of NESHAP subpart G (see 40 CFR 63.110(h)); and (2) remove the provisions that allow compliance with certain portions of 40 CFR part 65 in lieu of portions of NESHAP subparts G and H (see 40 CFR 63.110(i) and 40 CFR 60.160(g)). In addition, based on comments received on the proposed rulemaking, we are: (1) Revising 40 CFR 63.160(b)(1) and (c)(1) in the final rule such that compliance with HON subpart H constitutes compliance with NSPS subpart VVa provided the owner or operator continues to comply with 40 CFR 60.480a(e)(2)(i); and (2) revising 40 CFR 63.160(b)(1) and (c)(1) in the final rule such that compliance with HON subpart H constitutes compliance with NSPS subpart VVb provided the owner or operator continues to comply with 40 CFR 60.480b(e)(2)(i). We have also revised 40 CFR 60.480b(e)(2)(i) in the final rule to require compliance with 40 CFR 60.482–7b (*i.e.,* the standards for gas and light liquid valves in NSPS subpart VVb) in addition to the requirements of 40 CFR 60.485b(d), (e), and (f), and 40 CFR 60.486b(i) and (j). The comments and our specific responses to these items can be found in the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking.

Finally, we are finalizing all of the revisions that we proposed for clarifying text or correcting typographical errors, grammatical errors, and cross-reference errors. These editorial corrections and clarifications are discussed in section III.E.5.f of the proposal preamble (see 88 FR 25080, April 25, 2023). We are also including several additional minor clarifying edits in the final rule based on comments received during the public comment period. The comments and our specific responses to these items can be found in the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking.

*G. What are the effective and compliance dates of the standards?*

1. HON and the P&R I and P&R II NESHAP

For all of the requirements we are finalizing under CAA sections 112(d)(2), (3), and (6), and 112(h) (except for the removal of affirmative defense provisions in the P&R I NESHAP and fenceline monitoring requirements in HON and the P&R I NESHAP), all existing affected sources and all affected sources that were new sources under the previous HON and P&R I NESHAP (*i.e.,* sources that commenced construction or reconstruction after December 31, 1992 (for HON) or after June 12, 1995 (for the P&R I NESHAP), and on or before April 25, 2023), must comply with all of the amendments no later than July 15, 2027, or upon startup, whichever is later. For existing sources, CAA section 112(i) provides that the compliance date for standards promulgated under section 112(d) shall be as expeditious as practicable, but no later than 3 years after the effective date of the standard. *Association of Battery Recyclers* v. *EPA,* 716 F.3d 667, 672 (D.C. Cir. 2013) (''Section 112(i)(3)'s three-year maximum compliance period applies generally to any emission standard . . . promulgated under [section 112].''). We agree with the commenters (see section 11.1 of the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and*

*Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking) that 3 years is needed for owners and operators to implement the requirements we are finalizing under CAA sections 112(d)(2), (3), and (6). For example, for process vents, if an affected source has uncontrolled process vents that emit greater than or equal to 1.0 lb/hr of total organic HAP, then a new control system, such as a thermal oxidizer with piping, ductwork, etc., may need to be installed (due to the removal of the TRE concept in its entirety in the final rule). Also, additional permits (*e.g.,* New Source Review and/or a Title V permit modifications) may be required for new emission control equipment. Moreover, 3 years is needed to understand the final rule changes; revise site guidance and compliance programs; ensure operations can meet the standards during startup and shutdown; update operation, maintenance, and monitoring plans; upgrade emission capture and control systems; install new flare monitoring equipment; and install new process control systems. As provided in CAA section 112(i) and 5 U.S.C. 801(3), all new affected sources that commenced construction or reconstruction after April 25, 2023, are required to comply with all requirements under CAA sections 112(d)(2), (3), (6), and 112(h) (including fenceline monitoring) by July 15, 2024 or upon startup, whichever is later. We are also finalizing, as proposed, that owners or operators of P&R I affected sources must comply with the removal of the affirmative defense provisions 60 days after the publication date of the final rule (or upon startup, whichever is later). We provided additional rationale for these compliance dates in the preamble to the proposed rule (88 FR 25080, April 25, 2023).

In a change from the proposed rule, we have extended the compliance date for fenceline monitoring (with the exception of fenceline monitoring of chloroprene at P&R I affected sources producing neoprene, which is discussed later in this section) from 1 to 2 years. Owners and operators of all existing sources, and all affected sources that were new under the current rules—*i.e.,* sources that commenced construction or reconstruction after December 31, 1992 (for HON) or after June 12, 1995 (for the P&R I NESHAP), and on or before April 25, 2023—must begin fenceline monitoring 2 years after the effective date of the final rule and, starting 3 years after the effective date of the final rule, must perform root cause analysis and apply corrective action

requirements upon exceedance of an annual average concentration action level. We extended the timeline for fenceline monitoring from 1 to 2 years based on comments received, which indicated that EPA Method 327 will require laboratories to increase their capacity to meet the requirements for fenceline monitoring. We consider this expanded timeline to be necessary to allow commercial labs to conduct the needed method development, expand capacity, and develop the logistics needed to meet the requirements in the final rule. We also agree with commenters' other assertions that more time is needed to read and assess the new fenceline monitoring requirements; prepare sampling and analysis plans; develop and submit site-specific monitoring plans; identify representative, accessible, and secure monitoring locations for offsite monitors and obtain permission from the property owner to both place and routinely access the monitors; make any necessary physical improvements to fencelines to be able to site monitors, including construction of access roads, physical fencing, and potential drainage improvements; and obtain approval of any necessary capital expenditures. We consider 2 years to be necessary to allow for all of these things. For additional details, see section 11.1 of the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking.

For all of the requirements we are finalizing under CAA sections 112(f) for the HON, we are finalizing as proposed, except we are clarifying that the compliance dates we proposed are from the effective date of the rule rather than the publication date of the proposal. In other words, all existing affected sources and all affected sources that were new sources under the previous HON (*i.e.,* sources that commenced construction or reconstruction after December 31, 1992, and on or before April 25, 2023) must comply with the EtO requirements no later than July 15, 2026, or upon startup, whichever is later. As explained in the April 25, 2023, proposed rule (88 FR 25080, 25176), CAA section 112(f)(4) prescribes the compliance date for emission standards issued under CAA section 112(f). *Ass'n of Battery Recyclers* v.

*EPA, 716 F.3d 667, 672 (D.C. Cir. 2013)* ("[S]ection 112(f)(4)'s two-year maximum applies more specifically to standards 'under this subsection,' *i.e.,* section 112(f)."). For existing sources, the earliest compliance date for CAA section 112(f) standards is 90 days. However, the compliance period can be extended up to 2 years if the EPA finds that more time is needed for the installation of controls. 42 U.S.C. 7412(f)(4)(B). The EPA finds that the new EtO provisions under CAA section 112(f) will require additional time to plan, purchase, and install emission control equipment. For example, for process vents, if an affected source cannot demonstrate 99.9-percent control of EtO emissions, or reduce EtO emissions to less than 1 ppmv (from each process vent) or 5 pounds per year (for all combined process vents), then a new control system, such as a scrubber with piping, ductwork, feed tanks, etc., may need to be installed. Similarly, this same scenario (*i.e.,* installation of a new control system, such as a scrubber with piping, ductwork, feed tanks, etc) may be necessary for storage vessels in order to reduce EtO emissions by greater than or equal to 99.9 percent by weight or to a concentration less than 1 ppmv. Likewise, a new steam stripper may be needed control wastewater with a total annual average concentration of EtO greater than or equal to 1 ppmv. Additionally, we agree with commenters (see section 11.1 of the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking) that additional permits may be required for these new emission control equipment (*e.g.,* New Source Review and/or a Title V permit modifications). In other words, sufficient time is needed to properly engineer the project, obtain capital authorization and funding, procure the equipment, obtain permits, and construct and start-up the equipment. Therefore, we are finalizing a compliance date of 2 years after the effective date of the final rule for all existing affected sources to meet the EtO requirements. All new affected sources that commence construction or reconstruction after April 25, 2023, are required to comply with the EtO requirements for the HON by July 15, 2024 or upon startup, whichever is later.

This compliance schedule is consistent with the compliance deadlines outlined in the CAA under section 112(f)(4) and the CRA. We provided additional rationale for these compliance dates in the preamble to the proposed rule (88 FR 25080, April 25, 2023).

In a change from the proposed rule, the EPA is shortening the compliance deadline for affected sources producing neoprene, due to the EPA's finding that chloroprene emissions from the only such source pose an imminent and substantial endangerment under CAA section 303, 42 U.S.C. 7603. *United States* v. *Denka Performance Elastomer, LLC, et al.,* No. 2:23–cv–00735 (E.D. La. filed Feb. 28, 2023). All existing affected sources producing neoprene and all affected sources producing neoprene that were new sources under the previous P&R I NESHAP (*i.e.,* sources that commenced construction or reconstruction after June 12, 1995, and on or before April 25, 2023) must comply with the chloroprene requirements we are finalizing under CAA section 112(f) for the P&R I NESHAP (see sections III.B.1 and IV.A.3.e of this preamble for a details about these chloroprene requirements) no later than October 15, 2024,[32] or upon startup, whichever is later. However, such sources may seek the EPA's approval of a waiver from the 90-day compliance deadline and obtain a compliance date of up to July 15, 2026 if they demonstrate to the Administrator's satisfaction that "such period is necessary for the installation of controls" and that steps will be taken during the waiver period to assure that the public health of persons will be protected from any imminent endangerment. See 42 U.S.C. 112(f)(4)(B); 40 CFR 63.6(i)(4)(ii).[33]

[32] The compliance date is 90 days after the effective date of this final action due to the Congressional Review Act.

[33] We are revising the General Provisions table to the P&R II NESHAP entry for 40 CFR 63.6(e)(1)(i) by changing the "No" to "Yes" for affected sources producing neoprene. EPA is also retaining authority to grant or deny requests for extensions of the compliance date under 40 CFR 63.6(i)(4)(ii) at 40 CFR 63.507(c)(6), and is not delegating that authority to states.

All new affected sources that commence construction or reconstruction after April 25, 2023, are required to comply with the chloroprene requirements for P&R I affected sources producing neoprene no later than by July 15, 2024 or upon startup, whichever is later. This compliance schedule is consistent with the compliance deadlines outlined in the CAA under section 112(f)(4) and the CRA, 5 U.S.C. 801.

### 2. NSPS Subparts VV, VVa, VVb, III, IIIa, NNN, NNNa, RRR, RRRa

All sources of equipment leaks in the SOCMI (regulated under NSPS subpart VVb) and all SOCMI air oxidation unit processes, distillation operations, and reactor processes (regulated under NSPS subparts IIIa, NNNa, and RRRa, respectively), that commenced construction, reconstruction, or modification on or after April 25, 2023, must meet the requirements of the new NSPS upon startup of the new, reconstructed or modified facility or by July 15, 2024, whichever is later. This compliance schedule is consistent with the requirements in section 111 of the CAA and the CRA.

Also, for NSPS subparts VV, VVa, III, NNN, and RRR, we are finalizing, as proposed, the change in format of the reporting requirements to require electronic reporting (*i.e.,* we are not finalizing any new data elements); and owners and operators must begin submitting performance test reports electronically beginning on July 15, 2024 and semiannual reports on and after July 15, 2025 or once the report template for the subpart has been available on the CEDRI website (*https://www.epa.gov/electronic-reporting-air-emissions/cedri*) for 1 year, whichever date is later. For NSPS subparts IIIa, NNNa, and RRRa, we are finalizing, as proposed, that owners and operators must submit performance test reports electronically within 60 days after the date of completing each performance test, and for NSPS subparts VVb, IIIa, NNNa, and RRRa, semiannual reports on and after July 15, 2024 or once the report template for the subpart has been

available on the CEDRI website (*https://www.epa.gov/electronic-reporting-air-emissions/cedri*) for 1 year, whichever date is later.

### IV. What is the rationale for our final decisions and amendments for the SOCMI, P&R I, and P&R II source categories?

For each issue, this section provides a description of what we proposed and what we are finalizing for the issue, the EPA's rationale for the final decisions and amendments, and a summary of key comments and responses. For all comments not discussed in this preamble, comment summaries and the EPA's responses can be found in the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry,* which is available in the docket for this rulemaking.

### A. Residual Risk Review for the SOCMI and Neoprene Production Source Categories NESHAP

1. What did we propose pursuant to CAA section 112(f) for the SOCMI and Neoprene Production source categories?

### a. SOCMI Source Category

Pursuant to CAA section 112(f), the EPA conducted a residual risk review and presented the results of this review, along with our proposed decisions regarding risk acceptability and ample margin of safety, in the April 25, 2023, proposed rule for the SOCMI source category subject to HON (88 FR 25080). The results of the risk assessment for the proposal are presented briefly in Table 1 of this preamble. More detail is in the residual risk technical support document, *Residual Risk Assessment for the SOCMI Source Category in Support of the 2023 Risk and Technology Review Proposed Rule* (see Docket Item No. EPA–HQ–OAR–2022–0730–0085).

**Table 4. SOCMI Source Category and Facility-wide Inhalation Risk Assessment Results Based on Baseline (Pre-Control) Emissions and Post-Control Emissions**

| Risk Assessment | Maximum Individual Cancer Risk (-in-1 million)[1] | Estimated Population at Increased Risk of Cancer | | Estimated Annual Cancer Incidence (cases per year) | Maximum Chronic Noncancer TOSHI | Refined Maximum Screening Acute Noncancer HQ |
|---|---|---|---|---|---|---|
| | | > 100-in-1 million | ≥ 1-in-1 million | | | |
| SOCMI Source Category | | | | | | |
| Pre-Control Baseline | 2,000 | 83,000 (50 km) | 7.17 million (50 km) | 2 | 2 (maleic anhydride) 2 (chlorine) | $HQ_{REL} = 3$ (chlorine) $HQ_{REL} = 3$ (acrolein) |
| Post-Control | 100 | 0 | 6.27 million (50km) | 0.4 | 2 (maleic anhydride) 2 (chlorine) | $HQ_{REL} = 3$ (chlorine) $HQ_{REL} = 3$ (acrolein) |
| Facility-wide | | | | | | |
| Pre-Control Baseline | 2,000 | 90,000 (50 km) | 8.92 million (50 km) | 2 | 4 (chlorine, acrylic acid, and acrylonitrile) | -- |
| Post-Control | 2,000 | 2,900 (50 km) | 8.49 million (50 km) | 2 | 4 (chlorine, acrylic acid, and acrylonitrile) | -- |

[1] Maximum individual excess lifetime cancer risk due to HAP emissions.

**b. Neoprene Source Category**

In response to a comment in section IV.A.3.e.i of this preamble, we revised the performance standard for process vents and storage vessels in chloroprene service for the Neoprene Production source category. This revision did not change the baseline source category or facility-wide risk assessments for the Neoprene Production source category from proposal (see section IV.A.1.b of this preamble and Table 5 of this preamble). The revised assessment indicated that, after implementation of the controls, the MIR for the Neoprene Production source category is 100-in-1 million (down from 500-in-1 million in the pre-control baseline) with no individuals exposed to risk levels greater than 100-in-1 million from HAP

emissions from the Neoprene Production source category. This result is the same as in the proposal. The total population exposed to risk levels from the Neoprene Production source category greater than or equal to 1-in-1 million would be reduced from 690,000 people to 58,000 people. The total estimated cancer incidence of 0.05 drops to 0.01 excess cancer cases per year. For the risk results estimated after implementation of controls, the two changes from proposal are the number of people exposed to risk levels greater than or equal to 1-in-1 million (58,000 here compared to 48,000 at proposal) and the cancer incidence (0.01 here compared to 0.008 at proposal) from HAP emissions from the Neoprene Production source category. All other

results remained the same. Table 5 of this preamble summarizes the reduction in cancer risks due to emissions from the Neoprene Production source category based on the controls in this action. For further details on the revised risk assessment for the Neoprene Production source category, see the document titled *Residual Risk Assessment for the Polymers & Resins I Neoprene Production Source Category in Support of the 2024 Risk and Technology Review Final Rule,* which is available in the docket for this rulemaking.

Table 5 of this preamble also provides the facility-wide risks for the facility in the Neoprene Production source category, which are of increased importance due to the secondary

**Add.222**

fenceline action level for chloroprene, before (pre-control baseline) and after controls (post-control) of neoprene production emission sources in this action. The post-control facility-wide MIR is 200-in-1 million, driven by chloroprene emissions from SOCMI and

neoprene production emission sources. The secondary fenceline action level of 0.3 µg/m³ for chloroprene will further reduce chloroprene emissions and therefore risks below these levels, with the MIR expected to be 100-in-1 million or lower, with no individuals exposed

to lifetime cancer risk levels greater than 100-in-1 million, and the number of people exposed to cancer risk levels greater than or equal to 1-in-1 million expected to be lower than those in Table 5 of this preamble.

**Table 5. Neoprene Production Source Category and Facility-wide Inhalation Risk Assessment Results Based on Baseline (Pre-Control) Emissions and Post-Control Emissions**

| Risk Assessment | Maximum Individual Cancer Risk (-in-1 million)[1] | Estimated Population at Increased Risk of Cancer | | Estimated Annual Cancer Incidence (cases per year) | Maximum Chronic Noncancer TOSHI | Maximum Screening Acute Noncancer HQ |
|---|---|---|---|---|---|---|
| | | > 100-in-1 million | ≥ 1-in-1 million | | | |
| Neoprene Production Source Category | | | | | | |
| Pre-Control Baseline | 500 | 2,100 (50 km) | 690,000 (50 km) | 0.05 | 0.05 (chloroprene) | HQ$_{REL}$ = 0.3 (chloroform) |
| Post-Control | 100 | 0 | 58,000 (50 km) | 0.01 | 0.01 (chloroprene) | HQ$_{REL}$ = 0.3 (chloroform) |
| Facility-wide | | | | | | |
| Pre-Control Baseline | 600 | 2,300 (50 km) | 890,000 (50 km) | 0.06 | 0.3 (chlorine) | -- |
| Post-Control | 200 | 326 (50 km) | 87,000 (50 km) | 0.02 | 0.3 (chlorine) | --- |

[1] Maximum individual excess lifetime cancer risk due to HAP emissions.

**3. What key comments did we receive on the risk review, and what are our responses?**

This section provides summaries of and responses to the key comments received regarding our risk assessment for the SOCMI source category, our risk assessment for the Neoprene Production source category, the proposed requirements to reduce EtO emissions from the SOCMI source category, and the proposed requirements to reduce chloroprene emissions from the Neoprene Production source category. We received comments in support of and against the proposed residual risk review, the IRIS URE used in the review, and our determination that additional controls were warranted under CAA section 112(f)(2) for the SOCMI and Neoprene Production source categories. Other comments on these issues, as well as the EtO IRIS URE, chloroprene IRIS URE, and on additional issues regarding the residual risk review and the EPA's proposed changes based on the residual risk

review, can be found in the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry*, which is available in the docket for this rulemaking.

a. EtO IRIS URE

We received numerous comments in support of, and in opposition to, the EPA's use of the EtO IRIS value in assessing cancer risk for a source category under CAA section 112(f)(2) for EtO. After careful review of the comments, the Agency has determined that commenters did not identify new scientific information that would alter aspects of the EPA IRIS assessments or call into question the scientific judgments reflected in those assessments. The EPA continues to

affirm its determination that the IRIS assessments are scientifically sound and robust and represent the best available inhalation cancer risk values for EtO.[34] These comments are not summarized in this preamble. Instead, all of these comments (related to the EPA's use of the EtO IRIS value for CAA section 112(f)(2) risk assessment) and the EPA's responses are in the document titled *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry*, which is available in the docket for this rulemaking.

---

[34] 87 FR 77985 (Dec. 21, 2022), *Reconsideration of the 2020 National Emission Standards for Hazardous Air Pollutants: Miscellaneous Organic Chemical Manufacturing Residual Risk and Technology Review, Final action; reconsideration of the final rule.*

storage; log entries) for each required record. If the description changes, the owner or operator shall retain both the current and the most recent superseded description. The description, and the most recent superseded description, shall be retained as provided in § 63.103(c) of subpart F of this part, except as provided in paragraph (g)(1)(vi)(D) of this section.

(C) A description, and the date, of any change to the monitoring system that would reasonably be expected to affect its ability to comply with the requirements of paragraph (g)(1) of this section.

(D) Owners and operators subject to paragraph (g)(1)(vi)(B) of this section shall retain the current description of the monitoring system as long as the description is current, but not less than 5 years from the date of its creation. The current description shall, at all times, be retained on-site or be accessible from a central location by computer or other means that provides access within 2 hours after a request. The owner or operator shall retain the most recent superseded description at least until 5 years from the date of its creation. The superseded description shall be retained on-site (or accessible from a central location by computer that provides access within 2 hours after a request) at least 6 months after its creation. Thereafter, the superseded description may be stored off-site.

(2) If an owner or operator has elected to implement the requirements of paragraph (g)(1) of this section, and a period of 6 consecutive months has passed without an excursion as defined in paragraph (g)(2)(iv) of this section, the owner or operator is no longer required to record the daily average value for that parameter for that unit of equipment, for any operating day when the daily average value is less than the maximum, or greater than the minimum established limit. With approval by the Administrator, monitoring data generated prior to the compliance date of this subpart shall be credited toward the period of 6 consecutive months, if

the parameter limit and the monitoring was required and/or approved by the Administrator.

(i) If the owner or operator elects not to retain the daily average values, the owner or operator shall notify the Administrator in the next periodic report. The notification shall identify the parameter and unit of equipment.

(ii) If, on any operating day after the owner or operator has ceased recording daily averages as provided in paragraph (g)(2) of this section, there is an excursion as defined in paragraph (g)(2)(iv) of this section, the owner or operator shall immediately resume retaining the daily average value for each day, and shall notify the Administrator in the next periodic report. The owner or operator shall continue to retain each daily average value until another period of 6 consecutive months has passed without an excursion as defined in paragraph (g)(2)(iv) of this section.

(iii) The owner or operator shall retain the records specified in paragraphs (g)(1) (i), (ii), (iii), (iv), (v), and (vi) of this section. For any calendar week, if compliance with paragraphs (g)(1) (i), (ii), (iii), and (iv) of this section does not result in retention of a record of at least one occurrence or measured parameter value, the owner or operator shall record and retain at least one parameter value during a period of operation other than a startup, shutdown, or malfunction. For each source as defined in § 63.101, on and after July 15, 2027, the phrase ''other than a startup, shutdown, or malfunction'' in this paragraph no longer applies.

(iv) For purposes of paragraph (g) of this section, an excursion means that the daily average value of monitoring data for a parameter is greater than the maximum, or less than the minimum established value, except as provided in paragraphs (g)(2)(iv)(A) and (B) of this section.

(A) The daily average value during any startup, shutdown or malfunction shall not be considered an excursion for purposes of this paragraph (g)(2), if the owner or operator operates the source

during such periods in accordance with § 63.102(a)(4). For each source as defined in § 63.101, on and after July 15, 2027, this paragraph no longer applies.

(B) An excused excursion, as described in § 63.152(c)(2)(ii)(B) and (C), shall not be considered an excursion for purposes of this paragraph (g)(2).

(h) Beginning no later than July 15, 2024, owners and operators must submit performance test reports in accordance with this paragraph. Unless otherwise specified in this subpart, within 60 days after the date of completing each performance test required by this subpart, owners and operators must submit the results of the performance test following the procedures specified in § 63.9(k). Data collected using test methods supported by the EPA's Electronic Reporting Tool (ERT) as listed on the EPA's ERT website (https://www.epa.gov/electronic-reporting-air-emissions/electronic-reporting-tool-ert) at the time of the test must be submitted in a file format generated through the use of the EPA's ERT. Alternatively, owners and operators may submit an electronic file consistent with the extensible markup language (XML) schema listed on the EPA's ERT website. Data collected using test methods that are not supported by the EPA's ERT as listed on the EPA's ERT website at the time of the test must be included as an attachment in the ERT or alternate electronic file.

■ 90. Amend § 63.153 by revising paragraph (c) introductory text and adding paragraph (c)(5) as follows:

**§ 63.153  Implementation and enforcement.**

\*    \*    \*    \*    \*

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (5) of this section.

\*    \*    \*    \*    \*

(5) Approval of an alternative to any electronic reporting to the EPA required by this subpart.

■ 91. Revise table 3 to subpart G to read as follows:

TABLE 3 TO SUBPART G OF PART 63—PROCESS VENTS—MONITORING, RECORDKEEPING, AND REPORTING REQUIREMENTS FOR CONTROL DEVICES AND RECAPTURE DEVICES

| Control or recapture device | Parameters to be monitored [a] | Recordkeeping and reporting requirements for monitored parameters |
|---|---|---|
| Thermal incinerator, other than a thermal oxidizer used to comply with § 63.124. | Firebox temperature [b] [63.114(a)(1)(i)] .......... | 1. Continuous records.[c]<br>2. Record and report the firebox temperature averaged over the full period of the performance test—NCS.[d]<br>3. Record the daily average firebox temperature for each operating day.[e]<br>4. Report all daily average temperatures that are outside the range established in the NCS or operating permit and all operating days when insufficient monitoring data are collected [f]—PR.[g] |
| Thermal oxidizer used to comply with § 63.124. | Combustion chamber temperature [63.124(b)(5)(i)]. | 1. Continuous records.[c]<br>2. Record and report the combustion chamber temperature averaged over the full period of the performance test—NCS.[d] |

contamination by the sample handler. High sample results attributed to unknown causes are not outliers if there is no evidence of sample contamination and the sample does not meet the requirements in Section 9.2 of Method 325A of appendix A of this part.

(7) The concentration difference ($\Delta c$) for each monitored compound for each sampling period and the annual average $\Delta c$ for each monitored compound for each sampling period.

(8) Indication of whether the owner or operator was required to develop a corrective action plan under § 63.184(f).

(9) Data flags for each monitor for each analyte that was skipped for the sampling period, if the owner or operator uses an alternative sampling frequency under § 63.184(a)(3)(iii) or § 63.184(b)(2)(iii).

■ 115. Amend § 63.183 by revising paragraph (c) introductory text and adding paragraph (c)(5) to read as follows:

### § 63.183   Implementation and enforcement.

\*   \*   \*   \*   \*

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (5) of this section.

\*   \*   \*   \*   \*

(5) Approval of an alternative to any electronic reporting to the EPA required by this subpart.

■ 116. Add § 63.184 to read as follows:

### § 63.184   Fenceline monitoring provisions.

For each source as defined in § 63.101, and for each source as defined in § 63.191, beginning no later than the compliance dates specified in § 63.100(k)(12), the owner or operator must conduct sampling along the facility property boundary and analyze the samples in accordance with paragraphs (a) through (i) of this section. Sampling of benzene, 1,3-butadiene, chloroprene, and ethylene dichloride must be conducted in accordance with paragraph (a) of this section. Sampling of ethylene oxide and vinyl chloride must be conducted in accordance with paragraph (b) of this section. Paragraphs (c) through (i) of this section apply for any compound required to be sampled.

(a) The owner or operator must conduct sampling along the facility property boundary and analyze the samples in accordance with Methods 325A and 325B of appendix A to this part and paragraphs (a)(1) through (3) of this section. The monitoring perimeter may be located inside the facility, away from the facility property boundary. However, the monitoring perimeter must encompass all potential sources of

the target analyte(s) specified in paragraph (a)(1) of this section that are located within the facility's property boundary.

(1) The owner or operator must monitor the target analyte(s), as specified in paragraphs (a)(1)(i) through (iv) of this section. The owner or operator must follow the procedure in Section 9.6 of Method 325B of appendix A to this part to determine the detection limit of benzene, 1,3-butadiene, chloroprene, and ethylene dichloride for each sampler used to collect samples and blanks.

(i) If an affected source uses, produces, stores, or emits benzene, the owner or operator must include benzene as a target analyte.

(ii) If an affected source uses, produces, stores, or emits 1,3-butadiene, the owner or operator must include 1,3-butadiene as a target analyte.

(iii) If an affected source uses, produces, stores, or emits chloroprene, the owner or operator must include chloroprene as a target analyte.

(iv) If an affected source uses, produces, stores, or emits ethylene dichloride, the owner or operator must include ethylene dichloride as a target analyte.

(2) The owner or operator must determine passive monitor locations in accordance with Section 8.2 of Method 325A of appendix A to this part.

(i) As it pertains to this subpart, known sources of VOCs, as used in Section 8.2.1.3 in Method 325A of appendix A to this part for siting passive monitors, means a wastewater treatment unit, process unit, or any emission source requiring control according to the requirements of this subpart, including marine vessel loading operations. For marine vessel loading operations, one passive monitor should be sited on the shoreline adjacent to the dock. For this subpart, an additional monitor is not required if the only emission sources within 50 meters of the monitoring boundary are equipment leak sources satisfying all of the conditions in paragraphs (a)(2)(i)(A) through (C) of this section. If a leak is found, it must be repaired no later than 15 calendar days after it is detected with no provisions for delay of repair. If a repair is not completed within 15 calendar days, the additional passive monitor specified in Section 8.2.1.3 in Method 325A of appendix A to this part must be used.

(A) The equipment leak sources in organic HAP service within 50 meters of the monitoring boundary are limited to valves, pumps, connectors, sampling connections, and open-ended lines. If compressors, pressure relief devices, or

agitators in organic HAP service are present within 50 meters of the monitoring boundary, the additional passive monitoring location specified in Section 8.2.1.3 in Method 325A of appendix A to this part must be used.

(B) All equipment leak sources in gas or light liquid service (and in organic HAP service), including valves, pumps, connectors, sampling connections and open-ended lines, must be monitored using Method 21 of appendix A–7 to 40 CFR part 60 no less frequently than quarterly with no provisions for skip period monitoring, or according to the provisions of § 63.11(c) Alternative Work practice for monitoring equipment for leaks. For the purpose of this provision, a leak is detected if the instrument reading equals or exceeds the applicable limits in paragraphs (a)(2)(i)(B)(1) through (5) of this section:

(1) For valves, pumps or connectors at an existing source, an instrument reading of 10,000 ppmv.

(2) For valves or connectors at a new source, an instrument reading of 500 ppmv.

(3) For pumps at a new source, an instrument reading of 2,000 ppmv.

(4) For sampling connections or open-ended lines, an instrument reading of 500 ppmv above background.

(5) For equipment monitored according to the Alternative Work practice for monitoring equipment for leaks, the leak definitions contained in § 63.11(c)(6)(i) through (iii).

(C) All equipment leak sources in organic HAP service, including sources in gas, light liquid and heavy liquid service, must be inspected using visual, audible, olfactory, or any other detection method at least monthly. A leak is detected if the inspection identifies a potential leak to the atmosphere or if there are indications of liquids dripping.

(ii) If there are 19 or fewer monitoring locations, the owner or operator must collect at least one co-located duplicate sample per sampling period and at least one field blank per sampling period. If there are 20 or more monitoring locations, the owner or operator must collect at least two co-located duplicate samples per sampling period and at least one field blank per sampling period. The co-located duplicates may be collected at any of the perimeter sampling.

(iii) Samplers are not required to be placed along internal roads, waterways, or other right of ways that may bisect the facility. If a facility is bounded by a waterway on one or more sides, the shoreline is considered the facility property boundary.

## § 63.480 Applicability and designation of affected sources.

\*    \*    \*    \*    \*

(j) *Applicability of this subpart.* Paragraphs (j)(1) through (3) of this section must be followed during periods of non-operation of the affected source or any part thereof.

\*    \*    \*    \*    \*

(4) Beginning on July 15, 2024, this paragraph (j)(4) no longer applies. In response to an action to enforce the standards set forth in this subpart, an owner or operator may assert an affirmative defense to a claim for civil penalties for exceedances of such standards that are caused by a malfunction, as defined in § 63.2. Appropriate penalties may be assessed, however, if the owner or operator fails to meet the burden of proving all the requirements in the affirmative defense. The affirmative defense shall not be available for claims for injunctive relief.

\*    \*    \*    \*    \*

■ 121. Amend § 63.481 by revising paragraph (a), (b), (c) introductory text, (d) introductory text, (k), and adding paragraphs (k)(2) and (n) through (p) as follows:

## § 63.481 Compliance dates and relationship of this subpart to existing applicable rules.

(a) Affected sources are required to achieve compliance on or before the dates specified in paragraphs (b) through (d) of this section and paragraphs (n) and (o) of this section. Paragraph (e) of this section provides information on requesting compliance extensions. Paragraphs (f) through (l) of this section discuss the relationship of this subpart to subpart A and to other applicable rules. Where an override of another authority of the Act is indicated in this subpart, only compliance with the provisions of this subpart is required. Paragraph (m) of this section specifies the meaning of time periods.

(b) Except as specified in paragraphs (n) and (o) of this section, new affected sources that commence construction or reconstruction after June 12, 1995 shall be in compliance with this subpart upon initial start-up by June 19, 2000, whichever is later.

(c) With the exceptions provided in paragraphs (c)(1) through (3) of this section and paragraphs (n) and (o) of this section, existing affected sources shall be in compliance with this subpart no later than June 19, 2001, as provided in § 63.6(c), unless an extension has been granted as specified in paragraph (e) of this section.

\*    \*    \*    \*    \*

(d) Except as provided for in paragraphs (d)(1) through (d)(6) of this section, and paragraphs (n) and (o) of this section, existing affected sources shall be in compliance with § 63.502 no later than July 31, 1997, unless an extension has been granted pursuant to paragraph (e) of this section.

\*    \*    \*    \*    \*

(k) *Applicability of other regulations for monitoring, recordkeeping or reporting with respect to combustion devices, recovery devices, or recapture devices.* (1) After the compliance dates specified in this subpart, if any combustion device, recovery device or recapture device subject to this subpart is also subject to monitoring, recordkeeping, and reporting requirements in 40 CFR part 264 subpart AA or CC, or is subject to monitoring and recordkeeping requirements in 40 CFR part 265 subpart AA or CC and the owner or operator complies with the periodic reporting requirements under 40 CFR part 264 subpart AA or CC that would apply to the device if the facility had final-permitted status, the owner or operator may elect to comply either with the monitoring, recordkeeping and reporting requirements of this subpart, or with the monitoring, recordkeeping and reporting requirements in 40 CFR parts 264 and/or 265, as described in this paragraph, which shall constitute compliance with the monitoring, recordkeeping and reporting requirements of this subpart. The owner or operator shall identify which option has been selected in the Notification of Compliance Status required by § 63.506(e)(5).

(2) Owners and operators of flares that are subject to the flare related requirements of this subpart and are also subject to flare related requirements of any other regulation in this part or 40 CFR part 61 or 63, may elect to comply with the requirements in § 63.508 in lieu of all flare related requirements in any other regulation in this part or 40 CFR part 61 or 63.

\*    \*    \*    \*    \*

(n) All affected sources that commenced construction or reconstruction on or before April 25, 2023, must be in compliance with the requirements listed in paragraphs (n)(1) through (9) of this section upon initial startup or on July 15, 2027, whichever is later. All affected sources that commenced construction or reconstruction after April 25, 2023, must be in compliance with the requirements listed in paragraphs (n)(1) through (9) of this section upon initial startup, or on July 15, 2024, whichever is later.

(1) The general requirements specified in § 63.483(e), § 63.504(a),

§ 63.504(a)(1)(iii), and § 63.506(e)(6)(iii)(C).

(2) For flares, the requirements specified in § 63.508.

(3) For storage vessels, the requirements specified in § 63.484(t) and § 63.506(e)(4)(ii)(F)(6).

(4) For continuous front-end process vents, the requirements specified in §§ 63.485(l)(6), (o)(6), (p)(5), (q)(1)(vii), (x), § 63.503(g)(2)(iii)(B)(4), and § 63.506(e)(4)(ii)(F)(6).

(5) For batch front-end process vents, the requirements specified in §§ 63.487(a)(3), (b)(3), and (e)(1)(iv) and (i), §§ 63.488(d)(2), (e)(4), (f)(2), and (g)(3), §§ 63.489(b)(10) and (d)(3), §§ 63.491(d)(1)(iii), (e)(6), and (h), § 63.492(g), and Table 6 to this subpart, item 3 in column 3 for diversion to the atmosphere and monthly inspections of sealed valves for all control devices.

(6) For back-end processes, the requirements specified in §§ 63.497(a)(8) and (d)(3), and § 63.498(d)(5)(v).

(7) For wastewater, the requirements specified in §§ 63.501(d), (e), and (f).

(8) For equipment leaks, the requirements specified in §§ 63.502(a)(2) and (k)(2).

(9) For heat exchange systems, the requirements specified in §§ 63.502(n)(7) and (n)(8).

(o) All affected sources that commenced construction or reconstruction on or before April 25, 2023, must be in compliance with the chloroprene requirements in §§ 63.484(u), 63.485(y) and (z), 63.487(j), 63.494(a)(7), 63.501(a)(10)(iv), 63.502(a)(3) and (a)(7), 63.509, and 63.510 upon initial startup or on October 15, 2024, whichever is later. All affected sources that commenced construction or reconstruction after April 25, 2023, must be in compliance with the chloroprene requirements in §§ 63.484(u), 63.485(x) and (z), 63.487(j), 63.494(a)(7), § 63.501(a)(10)(iv), 63.502(q), 63.502(a)(3) and (a)(7), 63.509, and 63.510 upon initial startup, or on July 15, 2024, whichever is later.

(p) The compliance schedule for fenceline monitoring is specified in paragraphs (p)(1) and (2) of this section.

(1) Except as specified in paragraph (p)(2) of this section, all affected sources that commenced construction or reconstruction on or before April 25, 2023, must commence fenceline monitoring according to the requirements in § 63.502(a)(4) by no later than July 15, 2026, however requirements for corrective actions are not required until on or after July 15, 2027. All affected sources that commenced construction or

reconstruction after April 25, 2023, must be in compliance with the fenceline monitoring requirements listed in § 63.502(a)(4) upon initial startup, or on July 15, 2024, whichever is later.

(2) For affected sources producing neoprene, the compliance schedule specified in paragraph (p)(1) of this section does not apply for chloroprene. Instead, all affected sources producing neoprene that commenced construction or reconstruction on or before April 25, 2023, must be in compliance with the fenceline monitoring requirements for chloroprene listed in § 63.502(a)(4) and (a)(7) upon initial startup or on October 15, 2024, whichever is later. All affected sources producing neoprene that commenced construction or reconstruction after April 25, 2023, must be in compliance with the fenceline monitoring requirements for chloroprene listed in § 63.502(a)(4) and (a)(7) upon initial startup, or on July 15, 2024, whichever is later.

■ 122. Revise and republish § 63.482 to read as follows:

**§ 63.482  Definitions.**

(a) The following terms used in this subpart shall have the meaning given them in § 63.2, § 63.101, or the Act, as specified after each term:

Act (§ 63.2)
Administrator (§ 63.2)
Automated monitoring and recording system (§ 63.101)
Boiler (§ 63.101)
Bottoms receiver (§ 63.101)
Breakthrough (§ 63.101)
By compound (§ 63.101)
By-product (§ 63.101)
Car-seal (§ 63.101)
Closed-vent system (§ 63.101)
Combustion device (§ 63.101)
Commenced (§ 63.2)
Compliance date (§ 63.2)
Connector (§ 63.101)
Continuous monitoring system (§ 63.2)
Distillation unit (§ 63.101)
Duct work (§ 63.101)
Emission limitation (Section 302(k) of the Act)
Emission standard (§ 63.2)
Emissions averaging (§ 63.2)
EPA (§ 63.2)
Equipment leak (§ 63.101)
External floating roof (§ 63.101)
Fill or filling (§ 63.101)
Fixed capital cost (§ 63.2)
Flame zone (§ 63.101)
Floating roof (§ 63.101)
Flow indicator (§ 63.101)
Fuel gas system (§ 63.101)
Halogens and hydrogen halides (§ 63.101)
Hard-piping (§ 63.101)

Hazardous air pollutant (§ 63.2)
Heat exchange system (§ 63.101)
Impurity (§ 63.101)
Incinerator (§ 63.101)
In organic hazardous air pollutant service or in organic HAP service (§ 63.101)
Instrumentation system (§ 63.101)
Internal floating roof (§ 63.101)
Lesser quantity (§ 63.2)
Major source (§ 63.2)
Malfunction (§ 63.2)
Oil-water separator or organic-water separator (§ 63.101)
Open-ended valve or line (§ 63.101)
Operating permit (§ 63.101)
Organic monitoring device (§ 63.101)
Owner or operator (§ 63.2)
Performance evaluation (§ 63.2)
Performance test (§ 63.2)
Permitting authority (§ 63.2)
Plant site (§ 63.101)
Potential to emit (§ 63.101)
Pressure release (§ 63.101)
Primary fuel (§ 63.101)
Pressure release (§ 63.101)
Pressure relief device (§ 63.101)
Pressure vessel (§ 63.101)
Process heater (§ 63.101)
Process unit shutdown (§ 63.101)
Process wastewater (§ 63.101)
Process wastewater stream (§ 63.101)
Reactor (§ 63.101)
Recapture device (§ 63.101)
Relief valve (§ 63.101)
Repaired (§ 63.101)
Research and development facility (§ 63.101)
Routed to a process or route to a process (§ 63.101)
Run (§ 63.101)
Secondary fuel (§ 63.101)
Sensor (§ 63.101)
Specific gravity monitoring device (§ 63.101)
Start-up, shutdown, and malfunction plan (§ 63.101) On and after July 15, 2027, this definition no longer applies.
State (§ 63.2)
Stationary Source (§ 63.2)
Surge control vessel (§ 63.101)
Temperature monitoring device (§ 63.101)
Test method (§ 63.2)
Treatment process (§ 63.101)
Unit operation (§ 63.101)
Visible emission (§ 63.2)
Secondary fuel (§ 63.101)
Sensor (§ 63.101)
Specific gravity monitoring device (§ 63.101)
Start-up, shutdown, and malfunction plan (§ 63.101) On and after July 15, 2027, this definition no longer applies.
State (§ 63.2)
Stationary Source (§ 63.2)
Surge control vessel (§ 63.101)

Temperature monitoring device (§ 63.101)
Test method (§ 63.2)
Treatment process (§ 63.101)
Unit operation (§ 63.101)
Visible emission (§ 63.2)

(b) All other terms used in this subpart shall have the meaning given them in this section. If a term is defined in a subpart referenced in this section, it shall have the meaning given in this section for purposes of this subpart.

*Affected source* is defined in § 63.480(a).

*Affirmative defense* means, in the context of an enforcement proceeding, a response or a defense put forward by a defendant, regarding which the defendant has the burden of proof, and the merits of which are independently and objectively evaluated in a judicial or administrative proceeding. Beginning on July 15, 2024, this definition of *affirmative defense* no longer applies.

*Aggregate batch vent stream* means a gaseous emission stream containing only the exhausts from two or more batch front-end process vents that are ducted, hard-piped, or otherwise connected together for a continuous flow.

*Annual average batch vent concentration* is determined using Equation 17, as described in § 63.488(h)(2) for halogenated compounds.

*Annual average batch vent flow rate* is determined by the procedures in § 63.488(e)(3).

*Annual average concentration,* as used in the wastewater provisions, means the flow-weighted annual average concentration, as determined according to the procedures specified in § 63.144(b), with the exceptions noted in § 63.501, for the purposes of this subpart.

*Annual average flow rate,* as used in the wastewater provisions, means the annual average flow rate, as determined according to the procedures specified in § 63.144(c), with the exceptions noted in § 63.501, for the purposes of this subpart.

*Average batch vent concentration* is determined by the procedures in § 63.488(b)(5)(iii) for HAP concentrations and is determined by the procedures in § 63.488(h)(1)(iii) for organic compounds containing halogens and hydrogen halides.

*Average batch vent flow rate* is determined by the procedures in § 63.488(e)(1) and (2).

*Back-end* refers to the unit operations in an EPPU following the stripping operations. Back-end process operations include, but are not limited to, filtering,

subpart, owners and operators must submit the results of the performance test following the procedures specified in § 63.9(k). Data collected using test methods supported by the EPA's Electronic Reporting Tool (ERT) as listed on the EPA's ERT website (*https://www.epa.gov/electronic-reporting-air-emissions/electronic-reporting-tool-ert*) at the time of the test must be submitted in a file format generated through the use of the EPA's ERT. Alternatively, owners and operators may submit an electronic file consistent with the extensible markup language (XML) schema listed on the EPA's ERT website. Data collected using test methods that are not supported by the EPA's ERT as listed on the EPA's ERT website at the time of the test must be included as an attachment in the ERT or alternate electronic file.

■ 144. Amend § 63.507 by revising paragraph (c) introductory text and adding paragraphs (c)(5) and (6) to read as follows:

**§ 63.507    Implementation and enforcement.**

\*    \*    \*    \*    \*

==(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (6) of this section.==

\*    \*    \*    \*    \*

(5) Approval of an alternative to any electronic reporting to the EPA required by this subpart.

==(6) Approval of an extension request under § 63.6(i)(4)(ii).==

■ 145. Add § 63.508 to read as follows:

**§ 63.508    Flare requirements.**

(a) For any flare that is used to reduce organic HAP emissions from an EPPU, the owner or operator may elect to comply with the requirements in this section in lieu of the requirements of § 63.11(b) and the requirements referenced therein. The owner or operator may also elect to comply with the requirements in this section pursuant to the overlap provisions provided in § 63.481(k)(2). However, beginning no later than the compliance dates specified in § 63.481(n), the provisions specified in paragraphs (a)(1) through (32) of this section no longer apply. Instead, if an owner or operator reduces organic HAP emissions from an EPPU by venting emissions through a closed-vent system to a steam-assisted, air-assisted, or non-assisted flare, then the owner or operator must meet the applicable requirements for flares as specified in §§ 63.670 and 63.671, including the provisions in tables 12 and 13 to subpart CC of this part, except as specified in paragraph (b) of this

section. This requirement also applies to any flare using fuel gas from a fuel gas system, of which 50 percent or more of the fuel gas is derived from a EPPU, as determined on an annual average basis. For purposes of compliance with this paragraph, the following terms are defined in § 63.641 of subpart CC of this part: Assist air, assist steam, center steam, combustion zone, combustion zone gas, flare, flare purge gas, flare supplemental gas, flare sweep gas, flare vent gas, lower steam, net heating value, perimeter assist air, pilot gas, premix assist air, total steam, and upper steam.

(1) §§ 63.487(a)(1)(i) and (b)(1)(i);
(2) § 63.489(b)(2);
(3) § 63.490(a)(1);
(4) §§ 63.491(b)(3)(i) through (b)(3)(iii);
(5) § 63.494(d);
(6) § 63.496(b)(7)(i)(A);
(7) § 63.497(a)(2);
(8) § 63.498(d)(5)(ii)(E);
(9) § 63.502(k)(1);
(10) §§ 63.504(c)(1) through (c)(3);
(11) § 63.107(h)(9)(i) related to criteria in § 63.11(b);
(12) § 63.113(a)(1);
(13) § 63.114(a)(2);
(14) §§ 63.116(a)(1) through (a)(3);
(15) §§ 63.117(a)(5)(i) through (a)(5)(iii);
(16) § 63.118(f)(5);
(17) The last sentence in § 63.119(e)(1);
(18) §§ 63.120(e)(1) through (e)(6);
(19) §§ 63.122(c)(2) and (g)(3);
(20) § 63.126(b)(2)(i);
(21) § 63.127(a)(2);
(22) §§ 63.128(b)(1) through (b)(3);
(23) §§ 63.129(a)(5)(i) through (a)(5)(iii);
(24) §§ 63.130(a)(2)(i), (c), and (d)(5);
(25) §§ 63.139(c)(3) and (d)(3);
(26) §§ 63.145(j)(1) through (j)(3);
(27) §§ 63.146(b)(7)(i)(A) through (b)(7)(i)(C);
(28) § 63.147(d)(1);
(29) § 63.172(d);
(30) §§ 63.180(e)(1) through (e)(3);
(31) § 63.181(g)(1)(iii); and
(32) The phrase ''including periods when a flare pilot light system does not have a flame'' in § 63.181(g)(2)(i).

(b) The exceptions specified in paragraphs (b) through (o) of § 63.108 apply, except as specified in paragraphs (b)(1) through (5) of this section.

(1) Where the term ''chemical manufacturing process unit'' is used, the term ''EPPU'' applies instead for the purposes of this subpart.

(2) Where the reference ''§ 63.100(k)(10)'' is used, the reference § 63.481(n) applies instead for the purposes of this subpart.

(3) Where the phrase ''Hazardous Organic Chemical Manufacturing'' is

used, the phrase ''Polymers and Resins'' applies instead for the purposes of this subpart.

(4) Where the reference ''§ 63.152(b)(7) of subpart G of this part'' is used, the reference ''§ 63.506(e)(5)(xiii)'' applies instead for the purposes of this subpart.

(5) Section 63.108(i) does not apply.

■ 146. Add § 63.509 to read as follows:

**§ 63.509    Procedures for determining whether process vents, storage vessels, or wastewater are in chloroprene service.**

This section applies beginning no later than the compliance dates specified in § 63.481(o). To determine if process vents, storage vessels, or wastewater in a process at affected sources producing neoprene are in chloroprene service, as defined in § 63.482, owners and operators must comply with the requirements in paragraphs (a) through (c) of this section, as applicable.

(a) For each continuous front-end process vent, each batch front-end process vent, and each back-end process vent in a process at affected sources producing neoprene, owners and operators must measure the flow rate and concentration of chloroprene of each process vent as specified in paragraphs (a)(1) through (5) of this section.

(1) Measurements must be made prior to any dilution of the vent streams.

(2) Measurements may be made on the combined vent streams at an elastomer product process unit or for each separate vent stream.

(3) The sampling site shall be after the last recovery device (if any recovery devices are present) but prior to the inlet of any control device that is present and prior to release to the atmosphere. Method 1 or 1A of appendix A–1 to 40 CFR part 60, as appropriate, must be used for the selection of the sampling sites. For vents smaller than 0.10 meter in diameter, sample at one point at the center of the duct.

(4) The gas volumetric flow rate must be determined using Method 2, 2A, 2C, 2D, 2F, or 2G of appendices A–1 and A–2 to 40 CFR part 60, as appropriate.

(5) Except as specified in paragraph (a)(6) of this section, the concentration of chloroprene must be determined using Method 18 of appendix A–6 to 40 CFR part 60 or Method 320 of appendix A to this part.

(6) You may elect to use ASTM D6348–12 (Reapproved 2020) (incorporated by reference, § 63.14) in lieu of Method 320 of appendix A to this part as specified in paragraph (a)(5) of this section. To comply with this

*www.epa.gov/electronic-reporting-air-emissions/cedri*) for this subpart. The date report templates become available will be listed on the CEDRI website. Unless the Administrator or delegated state agency or other authority has approved a different schedule for submission of reports under § 63.9(i) and § 63.10(a), the report must be submitted by the deadline specified in this subpart, regardless of the method in which the report is submitted. If a report is submitted via CEDRI, the certifier's electronic signature during the submission process replaces the requirements in § 63.10(e)(3)(v), § 63.10(e)(3)(vi)(L), and § 63.10(e)(3)(vi)(M) to submit the date of the report and the name, title, and signature of the responsible official who is certifying the accuracy of the report.

(1) Reports of monitoring data, including 15-minute monitoring values as well as daily average values or per-unit operation average values, as applicable, of monitored parameters for all operating days or unit operations when the average values were outside the ranges established in the Notification of Compliance Status or operating permit, including reports specified in paragraph (a)(4) of this section.

(2) Reports of the duration of periods when monitoring data is not collected for each excursion caused by insufficient monitoring data, including reports specified in paragraph (a)(4) of this section. An excursion means any of the three cases listed in paragraph (a)(2)(i) or (a)(2)(ii) of this section. For a control device where multiple parameters are monitored, if one or more of the parameters meets the excursion criteria in paragraph (a)(2)(i) or (a)(2)(ii) of this section, this is considered a single excursion for the control device. In the report, include the identification of the source, start date, start time, duration in hours, and monitored parameter(s) meeting the excursion criteria.

(i) When the period of control device operation is 4 hours or greater in an operating day and monitoring data are insufficient to constitute a valid hour of data, as defined in paragraph (a)(2)(iii) of this section, for at least 75 percent of the operating hours.

(ii) When the period of control device operation is less than 4 hours in an operating day and more than one of the hours during the period of operation does not constitute a valid hour of data due to insufficient monitoring data.

(iii) Monitoring data are insufficient to constitute a valid hour of data, as used in paragraphs (a)(2)(i) and (ii) of this section, if measured values are unavailable for any of the 15-minute periods within the hour.

(3) Whenever a process change, as defined in § 63.115(e), is made that causes the emission rate from a de minimis emission point to become a process vent with an emission rate of one pound per year or greater, the owner or operator shall submit a report within 180 calendar days after the process change. The report may be submitted as part of the next summary report required under § 63.10(e)(3). The report shall include:

(i) A description of the process change; and

(ii) The results of the recalculation of the emission rate.

(4) For each existing, new, or reconstructed affected BLR and WSR source, beginning no later than the compliance dates specified in § 63.521(c), for each excursion that is not an excused excursion, the report must include a list of the affected sources or equipment, the monitored parameter, an estimate of the quantity in pounds of each regulated pollutant emitted over any emission limit, a description of the method used to estimate the emissions, the cause of the excursion (including unknown cause, if applicable), as applicable, and the corrective action taken. Include the start date, start time, and duration in hours of each excursion.

(5) For pressure relief device subject to § 63.527(f), report each pressure release to the atmosphere, including pressure relief device identification name or number, the start date, start time, and duration (in minutes) of the pressure release; and an estimate of the mass quantity in pounds of each organic HAP released.

(6) For heat exchangers subject to § 63.104 of subpart F of this part, the information specified in § 63.104(f)(2) of subpart F of this part.

(b) The owner or operator of any affected BLR source, as well as the owner or operator of any affected WSR source who is subject to the leak detection and repair program specified in subpart H of this part, shall implement the reporting requirements outlined therein. Copies of all reports shall be retained as records for a period of 5 years, in accordance with the requirements of 40 CFR 63.10(b)(1).

(c) The owner or operator of any affected BLR source, as well as the owner or operator of any affected WSR source that is subject to the emission limit for process vents, storage tanks, and wastewater systems shall include records of all monitoring parameters in the Notification of Compliance Status and summary reports required by subpart A of this part.

(d) Beginning no later than July 15, 2024, owners and operators must submit performance test reports in accordance with this paragraph. Unless otherwise specified in this subpart, within 60 days after the date of completing each performance test required by this subpart, owners and operators must submit the results of the performance test following the procedures specified in § 63.9(k). Data collected using test methods supported by the EPA's Electronic Reporting Tool (ERT) as listed on the EPA's ERT website (*https://www.epa.gov/electronic-reporting-air-emissions/electronic-reporting-tool-ert*) at the time of the test must be submitted in a file format generated using the EPA's ERT. Alternatively, owners and operators may submit an electronic file consistent with the extensible markup language (XML) schema listed on the EPA's ERT website. Data collected using test methods that are not supported by the EPA's ERT as listed on the EPA's ERT website at the time of the test must be included as an attachment in the ERT or alternate electronic file.

■ 161. Amend § 63.529 by revising paragraph (c) introductory text, and adding paragraph (c)(5) as follows:

**§ 63.529   Implementation and enforcement.**

\*     \*     \*     \*     \*

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (5) of this section.

\*     \*     \*     \*     \*

(5) Approval of an alternative to any electronic reporting to the EPA required by this subpart.

■ 162. Amend table 1 to subpart W by:

■ a. Revising the header row;

■ b. Revising entry "§ 63.6(e)(1)(i)";

■ c. Adding entries "§ 63.6(e)(1)(ii)", "§ 63.6(e)(1)(iii)", "63.6(e)(2)", and "63.6(e)(3)";

■ d. Revising entry "§ 63.6(g)";

■ e. Adding entry "§ 63.7(a)(4)"; and

■ f. Revising entries "§ 63.7(e)(1)", "§ 63.7(g)(1)", "§ 63.8(c)(1)(i)", "§ 63.8(c)(1)(iii)", "§ 63.9(k)", "§ 63.10(d)(2)", "§ 63.10(d)(5)" and "§ 63.10(e)(3)".

The revisions and additions read as follows:

TABLE 1 TO SUBPART W OF PART 63—GENERAL PROVISIONS APPLICABILITY TO SUBPART W

| Reference | Applies to subpart W | | | Comment |
|---|---|---|---|---|
| | BLR | WSR | WSR equipment leak standard, and BLR equipment leak standard (40 CFR part 63, subpart H) | |
| * | * | * | * | * |
| § 63.6(e)(1)(i) | | See Comment | | Yes, before July 15, 2027. No, beginning on and after July 15, 2027. See § 63.525(k) for general duty requirement. |
| § 63.6(e)(1)(ii) | | See Comment | | Yes, before July 15, 2027. No, beginning on and after July 15, 2027. |
| § 63.6(e)(1)(iii) | Yes | Yes | Yes. | |
| 63.6(e)(2) | N/A | N/A | N/A | Reserved. |
| 63.6(e)(3) | | See Comment | | Yes, before July 15, 2027. No, beginning on and after July 15, 2027. |
| * | * | * | * | * |
| § 63.6(g) | Yes | Yes | Yes | Affected sources have the opportunity to demonstrate other alternatives to the Administrator. |
| * | * | * | * | * |
| § 63.7(a)(4) | Yes | Yes | Yes. | |
| * | * | * | * | * |
| § 63.7(e)(1) | Yes, before July 15, 2027. No, beginning on and after July 15, 2027. | | | See § 63.525(l). Subpart W also contains test methods specific to BLR and WSR sources. |
| * | * | * | * | * |
| § 63.7(g)(1) | Yes | Yes | No | Subpart H specifies performance test reporting. Additionally, this subpart specifies how and when the performance test results are reported for BLR and WSR. |
| § 63.8(b)(3) | Yes | Yes | Yes. | |
| § 63.8(c)(1)(i) | Yes, before July 15, 2027. No, beginning on and after July 15, 2027. | | | |
| * | * | * | * | * |
| § 63.8(c)(1)(iii) | Yes, before July 15, 2027. No, beginning on and after July 15, 2027. | | | |
| * | * | * | * | * |
| § 63.9(k) | Yes | Yes | Yes. | |
| * | * | * | * | * |
| § 63.10(d)(2) | No | No | No | This subpart and Subpart H specify performance test reporting requirements. |
| * | * | * | * | * |
| § 63.10(d)(5) | Yes, before July 15, 2027. No, beginning on and after July 15, 2027. | | | |
| * | * | * | * | * |
| § 63.10(e)(3) | Yes | Yes | No | Except that on and after July 15, 2027, the reports shall be submitted according to and in the format required by § 63.528(a). |
| * | * | * | * | * |

■ 163. Add table 2 to subpart W to read
as follows:

TABLE 2 TO SUBPART W OF part 63—TOXIC EQUIVALENCY FACTORS

| Dioxin and Furan Congener | Toxic equivalency factor |
|---|---|
| 1,2,3,7,8-pentachlorodibenzo-p-dioxin | 1 |
| 1,2,3,4,7,8-hexachlorodibenzo-p-dioxin | 0.1 |
| 1,2,3,7,8,9-hexachlorodibenzo-p-dioxin | 0.1 |
| 1,2,3,6,7,8-hexachlorodibenzo-p-dioxin | 0.1 |



## ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Parts 60 and 63**

**[EPA–HQ–OAR–2022–0730; FRL–9327–01–OAR]**

**RIN 2060–AV71**

**New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** The U.S. Environmental Protection Agency (EPA) is proposing amendments to the New Source Performance Standards (NSPS) that apply to the Synthetic Organic Chemical Manufacturing Industry (SOCMI) and to the National Emission Standards for Hazardous Air Pollutants (NESHAP) that apply to the SOCMI (more commonly referred to as the Hazardous Organic NESHAP or HON) and Group I and II Polymers and Resins Industries (P&R I and P&R II). The EPA is proposing decisions resulting from the Agency's technology review of the HON, P&R I, and P&R II, and its eight-year review of the NSPS that apply to the SOCMI. The EPA is also proposing amendments to the NSPS for equipment leaks of volatile organic compounds (VOC) in SOCMI based on its reconsideration of certain issues raised in an administrative petition for reconsideration. Furthermore, the EPA is proposing to strengthen the emission standards for ethylene oxide (EtO) emissions and chloroprene emissions after considering the results of a risk assessment for the HON and Neoprene Production processes subject to P&R I. Lastly, the EPA is proposing to remove exemptions from standards for periods of startup, shutdown, and malfunction (SSM), to add work practice standards for such periods where appropriate, and to add provisions for electronic reporting. We estimate that the proposed amendments to the NESHAP would reduce hazardous air pollutants (HAP) emissions (excluding EtO and chloroprene) from the SOCMI, P&R I, and P&R II sources by approximately 1,123 tons per year (tpy), reduce EtO emissions from HON processes by approximately 58 tpy, and reduce chloroprene emissions from Neoprene Production processes in P&R I by

approximately 14 tpy. We also estimate that these proposed amendments to the NESHAP will reduce excess emissions of HAP from flares in the SOCMI and P&R I source categories by an additional 4,858 tpy. Lastly, we estimate that the proposed amendments to the NSPS would reduce VOC emissions from the SOCMI source category by approximately 1,609 tpy.

**DATES:**

*Comments.* Comments must be received on or before June 26, 2023. Under the Paperwork Reduction Act (PRA), comments on the information collection provisions are best assured of consideration if the Office of Management and Budget (OMB) receives a copy of your comments on or before May 25, 2023.

*Public hearing:* The EPA will hold a virtual public hearing on May 16, 2023. See **SUPPLEMENTARY INFORMATION** for information on the public hearing.

**ADDRESSES:** You may send comments, identified by Docket ID No. EPA–HQ–OAR–2022–0730, by any of the following methods:

• *Federal eRulemaking Portal: https://www.regulations.gov/* (our preferred method). Follow the online instructions for submitting comments.

• *Email: a-and-r-docket@epa.gov.* Include Docket ID No. EPA–HQ–OAR–2022–0730 in the subject line of the message.

• *Fax:* (202) 566–9744. Attention Docket ID No. EPA–HQ–OAR–2022–0730.

• *Mail:* U.S. Environmental Protection Agency, EPA Docket Center, Docket ID No. EPA–HQ–OAR–2022–0730, Mail Code 28221T, 1200 Pennsylvania Avenue NW, Washington, DC 20460.

• *Hand/Courier Delivery:* EPA Docket Center, WJC West Building, Room 3334, 1301 Constitution Avenue NW, Washington, DC 20004. The Docket Center's hours of operation are 8:30 a.m.–4:30 p.m., Monday–Friday (except Federal Holidays).

*Instructions:* All submissions received must include the Docket ID No. for this rulemaking. Comments received may be posted without change to *https://www.regulations.gov/,* including any personal information provided. For detailed instructions on sending comments and additional information on the rulemaking process, see the **SUPPLEMENTARY INFORMATION** section of this document.

**FOR FURTHER INFORMATION CONTACT:** Mr. Andrew Bouchard, Sector Policies and Programs Division (E143–01), Office of Air Quality Planning and Standards, U.S. Environmental Protection Agency,

Research Triangle Park, North Carolina 27711; telephone number: (919) 541–4036; and email address: *bouchard.andrew@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

*Participation in virtual public hearing.* The public hearing will be held via virtual platform on May 16, 2023. The hearing will convene at 11:00 a.m. Eastern Time (ET) and will conclude at 7:00 p.m. ET. The EPA may close a session 15 minutes after the last pre-registered speaker has testified if there are not additional speakers. The EPA will announce further details on the virtual public hearing website at *https://www.epa.gov/stationary-sources-air-pollution/synthetic-organic-chemical-manufacturing-industry-organic-national, https://www.epa.gov/stationary-sources-air-pollution/group-i-polymers-and-resins-national-emission-standards-hazardous, and https://www.epa.gov/stationary-sources-air-pollution/epoxy-resins-production-and-non-nylon-polyamides-national-emission.* If the EPA receives a high volume of registrations for the public hearing, we may continue the public hearing on May 17, 2023.

The EPA will begin pre-registering speakers for the hearing no later than 1 business day following the publication of this document in the **Federal Register**. The EPA will accept registrations on an individual basis. To register to speak at the virtual hearing, please use the online registration form available at any of the following websites: *https://www.epa.gov/stationary-sources-air-pollution/synthetic-organic-chemical-manufacturing-industry-organic-national, https://www.epa.gov/stationary-sources-air-pollution/group-i-polymers-and-resins-national-emission-standards-hazardous, or https://www.epa.gov/stationary-sources-air-pollution/epoxy-resins-production-and-non-nylon-polyamides-national-emission;* or contact the public hearing team at (888) 372–8699 or by email at *SPPDpublichearing@epa.gov.* The last day to pre-register to speak at the hearing will be May 10, 2023. Prior to the hearing, the EPA will post a general agenda that will list pre-registered speakers in approximate order at: *https://www.epa.gov/stationary-sources-air-pollution/synthetic-organic-chemical-manufacturing-industry-organic-national, https://www.epa.gov/stationary-sources-air-pollution/group-i-polymers-and-resins-national-emission-standards-hazardous, and https://www.epa.gov/stationary-sources-air-pollution/epoxy-resins-production-and-*

operator training. Therefore, we are proposing that all existing affected sources, and all new affected sources under the current rules that commenced construction or reconstruction after December 31, 1992 (for HON) or after June 12, 1995 (for P&R I), and on or before April 25, 2023, must comply with the new process vent requirements no later than 3 years from the publication date of the final rule (or upon startup, whichever is later). For all new affected sources that commence construction or reconstruction after April 25, 2023, we are proposing owners or operators comply with the new process vent requirements within 60 days after the publication date of the final rule (or upon startup, whichever is later).

Compliance dates for the fenceline monitoring provisions proposed under CAA section 112 (d)(6) consider the amount of time that it will take owners and operators to develop their siting plans and secure the capabilities to conduct the monitoring and analyze the results. For fenceline monitoring, the compliance timeline also must consider the timeline for controls to be installed and operational before root cause analysis and application of corrective measures can take place. However, the actual monitoring can and must begin at least a year before to develop the annual average concentration baseline. Therefore, we are proposing that owners and operators of all existing sources and all new affected sources under the current rules that commenced construction or reconstruction after December 31, 1992 (for HON) or after June 12, 1995 (for P&R I), and on or before April 25, 2023 must begin fenceline monitoring one year after the publication date of the final rule and must perform root cause analysis and apply corrective action requirements upon exceedance of an annual average concentration action level starting 3 years after the publication date of the final rule (*i.e.,* such that by after two years after the publication date of this rule, facilities will have installed controls to reduce EtO and chlorprene (as discussed in section III.F.1.c of this preamble) and be able to compare 1 year of data to the annual average concentration action level by year 3). For all new affected sources that commence construction or reconstruction after April 25, 2023, we are proposing owners or operators begin fenceline monitoring within 60 days after the publication date of the final rule (or upon startup, whichever is later). We are also proposing to require quarterly reporting of fenceline results

beginning 1 year after monitoring begins.

c. Rationale for Proposed Compliance Dates of Proposed CAA Section 112(f) Amendments

As previously mentioned in this preamble, we are proposing under CAA section 112(f), new provisions considering results of the risk assessments to address emissions of EtO from equipment leaks, flares, heat exchange systems, maintenance vents, process vents, storage vessels, and wastewater at HON processes; and emissions of chloroprene from continuous front-end process vents, batch front-end process vents, maintenance vents, storage vessels, and wastewater associated with neoprene production processes subject to P&R I. The proposed provisions will require additional time to plan, purchase, and install equipment for EtO or chloroprene control. For example, for HON process vents in EtO service, if the affected source cannot demonstrate 99.9 percent control of EtO emissions, or reduce EtO emissions to less than 1 ppmv (from each process vent) or 5 pounds per year (for all combined process vents), then a new control system will need to be installed. Therefore, we are proposing a compliance date of 2 years after the publication date of the final rule, or upon startup, whichever is later for all existing affected sources, and all new affected sources under the current rules that commenced construction or reconstruction after December 31, 1992 (for HON) or after June 12, 1995 (for P&R I), and on or before April 25, 2023 to comply with the proposed EtO and chloroprene requirements. For all new affected sources that commence construction or reconstruction after April 25, 2023, we are proposing owners or operators comply with the EtO and chloroprene requirements within 60 days after the publication date of the final rule (or upon startup, whichever is later).

d. Rationale for Proposed Compliance Dates of Other Proposed Amendments

We are proposing to change the HON, P&R I, and P&R II requirements for SSM by removing the exemption from the requirements to meet the standard during SSM periods, proposing alternative standards where needed, and by removing the requirement to develop and implement an SSM plan. In addition, we are proposing to remove all of the regulatory affirmative defense provisions from P&R I. We are also proposing electronic reporting requirements for the HON, P&R I, and

P&R II. For details on these proposed amendments, see section III.E of this preamble. Except for the removal of the affirmative defense provisions in P&R I, we are positing that facilities would need some time to successfully accomplish these revisions, including time to read and understand the amended rule requirements, to evaluate their operations to ensure that they can meet the standards during periods of startup and shutdown, as defined in the rule, and make any necessary adjustments, including making adjustments to standard operating procedures, and to convert reporting mechanisms to install necessary hardware and software. As previously mentioned, the EPA recognizes the confusion that multiple different compliance dates for individual requirements would create and the additional burden such an assortment of dates would impose. From our assessment of the timeframe needed for compliance with the entirety of the proposed revisions to SSM requirements as well as the new proposed electronic reporting requirements for flare management plans, compliance reports, and performance evaluation reports, the EPA considers a period of 3 years after the publication date of the final rule to be the most expeditious compliance period practicable and, thus, is proposing that all affected sources be in compliance with these revised requirements upon initial startup or within 3 years of the publication date of the final rule, whichever is later. However, we are proposing to provide 60 days after the publication date of the final rule (or upon startup, whichever is later) for owners or operators of all affected sources to comply with the requirement to report electronically. We are also proposing to provide 60 days after the publication date of the final rule (or upon startup, whichever is later) for owners or operators of P&R I affected sources to comply with the removal of the affirmative defense provisions.

2. NSPS Subparts VVb, IIIa, NNNa, RRRa

We are proposing that all sources of equipment leaks in the SOCMI (regulated under 40 CFR part 60, subpart VVb) and all SOCMI air oxidation unit processes, distillation operations, and reactor processes (regulated under 40 CFR part 60, subparts IIIa, NNNa, and RRRa, respectively), that commenced construction, reconstruction, or modification on or after April 25, 2023, would need to meet the requirements of the new NSPS upon startup of the new, reconstructed or modified facility or 60

[FR Doc. 04–6309 Filed 3–25–04; 8:45 am]
**BILLING CODE 6560–50–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Parts 60, 61, and 63

**[LA–69–2–7617a; FRL–7638–7]**

### New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants; Delegation of Authority to Louisiana

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Direct final rule; delegation of authority.

**SUMMARY:** The Louisiana Department of Environmental Quality (LDEQ) has submitted updated regulations for receiving delegation of EPA authority for implementation and enforcement of New Source Performance Standards (NSPS) and National Emission Standards for Hazardous Air Pollutants (NESHAPs) for all sources (both part 70 and non-part 70 sources). These regulations apply to certain NSPS promulgated by EPA at 40 CFR part 60, as amended through July 1, 2002; and certain NESHAPs promulgated by EPA, as amended through July 1, 2002, for both 40 CFR part 61 and 63 standards. The delegation of authority under this notice does not apply to sources located in Indian Country. EPA is providing notice that it has approved delegation of certain NSPS to LDEQ, and taking direct final action to approve the delegation of certain NESHAPs to LDEQ.

**DATES:** This rule is effective on May 25, 2004, without further notice, unless EPA receives adverse comment by April 26, 2004. If EPA receives such comment, EPA will publish a timely withdrawal in the **Federal Register** informing the public that this rule will not take effect.

**ADDRESSES:** Comments may be submitted electronically, by mail, or through hand delivery/courier. Follow the detailed instructions as provided in the **SUPPLEMENTARY INFORMATION** section below.

**FOR FURTHER INFORMATION CONTACT:** Mr. Jeffery Robinson, U.S. EPA, Region 6, Multimedia Planning and Permitting Division (6PD), 1445 Ross Avenue, Dallas, TX 75202–2733, (214) 665–6435; or electronic mail at *robinson.jeffrey@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

#### Table of Contents

I. General Information
II. What Does This Action Do?
III. What Is The Authority For Delegation?
IV. What Criteria Must Louisiana's Program Meet To Be Approved?
V. How Did LDEQ Meet The Subpart E Approval Criteria?
VI. What Is Being Delegated?
VII. What Is Not Being Delegated?
VIII. How Will Applicability Determinations Under Section 112 Be Made?
IX. What Authority Does EPA Have?
X. What Information Must LDEQ Provide To EPA?
XI. What Is EPA's Oversight Of This Delegation To LDEQ?
XII. Should Sources Submit Notices To EPA Or LDEQ?
XIII. How Will Unchanged Authorities Be Delegated To LDEQ In The Future?
XIV. What Is The Relationship Between RCRA And The Hazardous Waste Combustor MACT?
XV. Final Action
XVI. Statutory and Executive Order Reviews

### I. General Information

#### A. What Is the Public Rulemaking File?

EPA is committed to ensuring public access to the information that is used to inform the public of the Agency's decisions regarding the environment and human health and to ensuring that the public has an opportunity to participate in the Agency's decision process. The official public rulemaking file consists of the documents specifically referenced in this action, any public comments received, and other information related to this action. The public rulemaking file does not include Confidential Business Information (CBI) or other information for which disclosure is restricted by statute, although such information is a part of the administrative record for this action. The public rulemaking file is the collection of materials that is available for public viewing at the Regional Office. The administrative record is the collection of material used to inform the public of the Agency's decision on this rulemaking action.

#### B. How Can I Get Copies of This Document and Other Related Information?

1. *An official public rulemaking file is available for inspection at the Regional Office.* The Regional Office has established an official public rulemaking file for this action under LA–69–2–7617a. The public rulemaking file is available for viewing at the Air Permits Section, U.S. Environmental Protection Agency, 1445 Ross Avenue, Suite 700, Dallas, Texas 75202–2733. EPA requests that, if at all possible, you contact the person listed in the **FOR FURTHER INFORMATION CONTACT** section two working days in advance to schedule your inspection. The Regional Office's official hours of business are Monday through Friday, 8:30 a.m. to 4 p.m. excluding Federal holidays.

2. *Copies of the State submittal.* Copies of the State submittal are also available for public inspection during official business hours, by appointment at the Louisiana Department of Environmental Quality, 602 N. Fifth Street, Baton Rouge, LA 70802.

3. *Electronic Access.* You may access this **Federal Register** document electronically through the Regulation.gov Web site located at *http://www.regulations.gov* where you can find, review, and submit comments on federal rules that are open for comment and have been published in the **Federal Register.**

The E Government Act of 2002 states that to "to the extent practicable" agencies shall accept electronic comments and establish electronic dockets. Also, President Bush's management plan for government includes a government-wide electronic rulemaking system. The first phase of the e-Rulemaking initiative was the development of a Federal portal that displays all **Federal Register** notices and proposed rules open for comment. The URL for this site is *http://www.regulations.gov.* The site also provides the public with the ability to submit electronic comments that can then be transferred to the Agency responsible for the rule.

EPA's policy is to make all comments it receives, whether submitted electronically or on paper, available for public viewing at the Regional Office as EPA receives them and without change. However, those portions of a comment that contain properly identified and claimed CBI or other information for which disclosure is restricted by statute will be excluded from the public rulemaking file. The entire comment, including publicly restricted information, will be included in the administrative record for this action.

#### C. How and To Whom Do I Submit Comments?

You may submit comments electronically, by mail, or through hand delivery/courier. To ensure proper receipt by EPA, identify the appropriate docket identification number in the subject line on the first page of your comment. Please ensure that your comments are submitted within the specified comment period. Comments received after the close of the comment period will be marked "late." EPA is not required to consider these late comments. If you wish to submit CBI or information that is otherwise protected by statute, please follow the instructions in Section I.D, below. Do not use e-mail

to submit CBI or information protected by statute.

1. *Electronically.* If you submit an electronic comment as prescribed below, EPA recommends that you include your name, mailing address, and an e-mail address or other contact information in the body of your comment. Also include this contact information on the outside of any disk or CD ROM you submit, and in any cover letter accompanying the disk or CD ROM. This ensures that you can be identified as the submitter of the comment, and allows EPA to contact you in case EPA cannot read your comment due to technical difficulties or needs further information on the substance of your comment. EPA's policy is that EPA will not edit your comment, and any identifying or contact information provided in the body of a comment will be included as part of the comment that is placed in the public rulemaking file, and may be made available in EPA's electronic public docket. If EPA cannot read your comment due to technical difficulties and cannot contact you for clarification, EPA may not be able to consider your comment.

i. *E-mail.* Comments may be sent by electronic mail (e-mail) to *robinson.jeffrey@epa.gov,* Attention "Public comment on proposed rulemaking LA–69–2–7617a." In contrast to EPA's electronic public docket, EPA's e-mail system is not an "anonymous access" system. If you send an e-mail comment directly to the Docket without going through EPA's electronic public docket, EPA's e-mail system automatically captures your e-mail address. E-mail addresses that are automatically captured by EPA's e-mail system are included as part of the comment that is placed in the official public docket, and made available in EPA's electronic public docket.

ii. *Regulations.gov.* As an alternative to e-mail, you may submit comments electronically to EPA by using the Federal web-based portal that displays all **Federal Register** notices and proposed rules open for comment. To use this method, access the Regulations.gov Web site at *http:// www.regulations.gov,* then select "Environmental Protection Agency" at the top of the page and click on the "Go" button. The list of current EPA actions available for comment will be displayed. Select the appropriate action and please follow the online instructions for submitting comments. Unlike EPA's e-mail system, the Regulations.gov Web site is an "anonymous" system, which means EPA will not know your identity, e-mail

address, or other contact information, unless you provide it in the text of your comments.

iii. *Disc or CD ROM.* You may submit comments on a disk or CD ROM that you mail to the mailing address identified in Section I.C.2, directly below. These electronic submissions will be accepted in WordPerfect, Word, or ASCII file format. You should avoid the use of special characters and any form of encryption.

2. *By Mail.* Send your comments to: Jeff Robinson, Air Permits Section (6PD–R), Multimedia Planning and Permitting Division, U.S. Environmental Protection Agency, 1445 Ross Avenue, Suite 700, Dallas, Texas 75202–2733. Please include the text "Public comment on proposed rulemaking LA–69–2–7617a" in the subject line of the first page of your comments.

3. *By Hand Delivery or Courier.* Deliver your written comments or comments on a disk or CD ROM to: Jeff Robinson, Air Permits Section (6PD–R), Multimedia Planning and Permitting Division, U.S. Environmental Protection Agency, 1445 Ross Avenue, Suite 700, Dallas, Texas 75202–2733, Attention "Public comment on proposed rulemaking LA–69–2–7617a." Such deliveries are only accepted during official hours of business, which are Monday through Friday, 8:30 a.m. to 4:00 p.m., excluding Federal holidays.

*D. How Should I Submit CBI to the Agency?*

For comments submitted to the Agency by mail or hand delivery, in either paper or electronic format, you may assert a business confidentiality claim covering confidential business information (CBI) included in your comment by clearly marking any part or all of the information as CBI at the time the comment is submitted to EPA. CBI should be submitted separately, if possible, to facilitate handling by EPA. Submit one complete version of the comment that includes the properly labeled CBI for EPA's official docket and one copy that does not contain the CBI to be included in the public docket. If you submit CBI on a disk or CD ROM, mark on the outside of the disk or the CD ROM that it contains CBI and then identify the CBI within the disk or CD ROM. Also submit a non-CBI version if possible. Information which is properly labeled as CBI and submitted by mail or hand delivery will be disclosed only in accordance with procedures set forth in 40 CFR part 2. For comments submitted by EPA's e-mail system or through Regulations.gov, no CBI claim may be asserted. Do not submit CBI to Regulations.gov or via EPA's e-mail

system. Any claim of CBI will be waived for comments received through Regulations.gov or EPA's e-mail system. For further advice on submitting CBI to the Agency, contact the person listed in the **FOR FURTHER INFORMATION CONTACT** section of this notice.

*E. Privacy Notice*

It is important to note that the comments you provide to EPA will be publicly disclosed in a rulemaking docket or on the Internet. The comments are made available for public viewing as EPA receives them and without change. Any personal information you choose to include in your comment will be included in the docket. However, EPA will exclude from the public docket any information labeled confidential business information (CBI), copyrighted material or other information restricted from disclosure by statute.

Comments submitted via Regulations.gov will not collect any personal information, e-mail addresses, or contact information unless they are included in the body of the comment. Comments submitted via Regulations.gov will be submitted anonymously unless you include personal information in the body of the comment. Please be advised that EPA cannot contact you for any necessary clarification if technical difficulties arise unless your contact information is included in the body of comments submitted through Regulations.gov. However, EPA's e-mail system is not an anonymous system. E-mail addresses are automatically captured by EPA's e-mail system and included as part of your comment that is placed in the public rulemaking docket.

*F. What Should I Consider as I Prepare My Comments for EPA?*

You may find the following suggestions helpful for preparing your comments:

1. Explain your views as clearly as possible.

2. Describe any assumptions that you used.

3. Provide any technical information and/or data you used that support your views.

4. If you estimate potential burden or costs, explain how you arrived at your estimate.

5. Provide specific examples to illustrate your concerns.

6. Offer alternatives.

7. Make sure to submit your comments by the comment period deadline identified.

8. To ensure proper receipt by EPA, identify the appropriate docket identification number in the subject line

**Federal Register** / Vol. 69, No. 59 / Friday, March 26, 2004 / Rules and Regulations    **15689**

on the first page of your response. It would also be helpful if you provided the name, date, and **Federal Register** citation related to your comments.

## II. What Does This Action Do?

EPA is providing notice that it is delegating authority for implementation and enforcement of certain NSPS to LDEQ. EPA is also taking direct final action to approve the delegation of certain NESHAPs to LDEQ. With this delegation, LDEQ has the primary responsibility to implement and enforce the delegated standards.

## III. What Is the Authority for Delegation?

Section 111(c)(1) of the Clean Air Act (CAA) authorizes EPA to delegate authority to any state agency which submits adequate regulatory procedures for implementation and enforcement of the NSPS program. The NSPS standards are codified at 40 CFR part 60.

Section 112(l) of the CAA and 40 CFR part 63, subpart E, authorizes EPA to delegate authority to any state or local agency which submits adequate regulatory procedures for implementation and enforcement of emission standards for hazardous air pollutants. The hazardous air pollutant standards are codified at 40 CFR parts 61 and 63, respectively.

## IV. What Criteria Must Louisiana's Program Meet To Be Approved?

EPA previously approved LDEQ's program for the delegation of NSPS. 47 FR 07665 (February 22, 1982). This action notifies the public that EPA is updating LDEQ's delegation to implement and enforce certain NSPS. As to the NESHAP standards in 40 CFR parts 61 and 63, section 112(l) of the CAA enables EPA to approve State air toxics programs or rules to operate in place of the Federal air toxics program or rules. 40 CFR part 63, subpart E (subpart E) governs EPA's approval of State rules or programs under section 112(l).

EPA will approve an air toxics program if we find that:
(1) the State program is "no less stringent" than the corresponding Federal program or rule;
(2) the State has adequate authority and resources to implement the program;
(3) the schedule for implementation and compliance is sufficiently expeditious; and
(4) the program otherwise complies with Federal guidance.

In order to obtain approval of its program to implement and enforce Federal section 112 rules as

promulgated without changes (straight delegation), only the criteria of 40 CFR 63.91(d) must be met. 40 CFR 63.91(d)(3) provides that interim or final Title **V** program approval will satisfy the criteria of 40 CFR 63.91(d) for part 70 sources.

## V. How Did LDEQ Meet the Subpart E Approval Criteria?

As part of its Title **V** submission, LDEQ stated that it intended to use the mechanism of incorporation by reference to adopt unchanged Federal section 112 into its regulations. This applied to both existing and future standards as they applied to part 70 sources. 59 FR 43797 (August 25, 1994) and 60 FR 17750 (April 7, 1995). On September 12, 1995, EPA promulgated final full approval of the State's operating permits program effective October 12, 1995. 60 FR 42296. Under 40 CFR 63.91(d)(2), once a state has satisfied up-front approval criteria, it needs only to reference the previous demonstration and reaffirm that it still meets the criteria for any subsequent submittals. LDEQ has affirmed that it still meets the up-front approval criteria.

In addition, Louisiana has requested delegation of a State requirement to adjust a section 112 rule. The approval of this adjustment is regulated at 40 CFR 63.92. The LDEQ has adopted an earlier compliance date and is more stringent than the Federal requirement at 40 CFR 63.440(d)(1). The LDEQ has met the criteria of 40 CFR 63.91, and the State compliance date adjustment is not ambiguous with respect to stringency of applicability, level of control, compliance and enforcement measures, or the compliance date of any affected source or emission point, and satisfies the requirements at 40 CFR 63.92(b).

## VI. What Is Being Delegated?

EPA received requests to update the NSPS and NESHAP delegations on November 21, 1997, and June 17, 2003. LDEQ requested the EPA to update the delegation of authority for the following:
A. NSPS (40 CFR part 60 standards) through July 1, 2002;
B. NESHAPs (40 CFR part 61 standards) through July 1, 2002; and
C. NESHAPs (40 CFR part 63 standards) through July 1, 2002.
LDEQ's request was for delegation of certain NSPS and NESHAP for all sources (both part 70 and non-part 70 sources). The request includes revisions of the NESHAP standards adopted unchanged into Louisiana Administrative Code (LAC) Title 33:III, Chapter 30, Subchapter A, section 3003—Incorporation by Reference 40 CFR part 60; Chapter 51, Subchapter B,

section 5116—Incorporation by Reference of 40 CFR part 61; Chapter 51, Subchapter C, section 5122—Incorporation by Reference of 40 CFR part 63 as it Applies to Major Sources, except for the compliance date established in Subpart S—Pulp and Paper Industry at 40 CFR 63.440(d)(1); and Chapter 53, Subchapter B, section 5311—Incorporation by Reference of 40 CFR part 63 as it Applies to Area Sources. For NSPS, this revision incorporated all NSPS promulgated by EPA (except Subpart AAA—Standards of Performance for New Residential Wood Heaters) as amended in the **Federal Register** through July 1, 2002. For the part 61 NESHAPs, this revision included all NESHAPs promulgated by EPA as amended in the **Federal Register** through July 1, 2002, excluding subparts B, H, I, K, Q, R, T, and W. For the part 63 NESHAPs, this includes the NESHAPs set forth in Table 1 below. The effective date of the Federal delegation for parts 61 and 63 standards is the effective date of this rule.

TABLE 1

40 CFR Part 63 NESHAP for Source Categories

| Subpart | Emission standard |
|---|---|
| A | General Provisions |
| D | Early Reductions |
| F | Hazardous Organic NESHAP (HON)—Synthetic Organic Chemical Manufacturing Industry (SOCMI) |
| G | HON—SOCMI Process Vents, Storage Vessels, Transfer Operations and Wastewater |
| H | HON—Equipment Leaks |
| I | HON—Certain Processes Negotiated Equipment Leak Regulation |
| J | Polyvinyl Chloride and Co-polymers Production |
| L | Coke Oven Batteries |
| M | Perchloroethylene Dry Cleaning |
| N | Chromium Electroplating |
| O | Ethylene Oxide Sterilizers |
| Q | Industrial Process Cooling Towers |
| R | Gasoline Distribution |
| S | Pulp and Paper Industry |
| T | Halogenated Solvent Cleaning |
| U | Polymers and Resins I |
| W | Polymers and Resins II—Epoxy Resins and Non-Nylon Polyamides |
| X | Secondary Lead Smelting |
| Y | Marine Tank Vessel Loading |
| AA | Phosphoric Acid |
| BB | Phosphate Fertilizers |
| CC | Petroleum Refineries |
| DD | Off-Site Waste and Recovery |
| EE | Magnetic Tape Manufacturing |

HeinOnline -- 69 Fed. Reg. 15689 2004

TABLE 1—Continued

40 CFR Part 63 NESHAP for Source Categories

| Subpart | Emission standard |
|---------|-------------------|
| GG ................ | Aerospace Manufacturing and Rework |
| HH ................ | Oil and Natural Gas Production |
| II .................... | Shipbuilding and Ship Repair |
| JJ .................... | Wood Furniture Manufacturing |
| KK .................. | Printing and Publishing Industry |
| LL .................. | Primary Aluminum Reduction Plants |
| OO ................. | Tanks—Level 1 |
| PP .................. | Containers |
| QQ ................. | Surface Impoundments |
| RR .................. | Individual Drain Systems |
| SS .................. | Closed Vent Systems, Control Devices, Recovery Devices and Routing to a Fuel Gas System or a Process |
| TT .................. | Equipment Leaks—Level 1 |
| UU .................. | Equipment Leaks—Level 2 Standards |
| VV .................. | Oil-Water Separators and Organic-Water Separators |
| WW ................ | Storage Vessels (Tanks)—Control Level 2 |
| YY .................. | Generic Maximum Achievable Control Technology Standards |
| CCC ............... | Steel Pickling—HCl Process Facilities and Hydrochloric Acid Regeneration |
| DDD ............... | Mineral Wool Production |
| EEE ............... | Hazardous Waste Combustors |
| GGG .............. | Pharmaceuticals Production |
| HHH .............. | Natural Gas Transmission and Storage |
| III ................... | Flexible Polyurethane Foam Production |
| JJJ ................. | Polymers and Resins, Group IV |
| LLL ................ | Portland Cement Manufacturing |
| MMM ............. | Pesticide Active Ingredient Production |
| NNN ............... | Wool Fiberglass Manufacturing |
| OOO .............. | Polymer and Resins III— Amino Resins and Phenolic Resins |
| PPP ............... | Polyether Polyols Production |
| QQQ .............. | Primary Copper Smelting |
| RRR ............... | Secondary Aluminum |
| TTT ................ | Primary Lead Smelting |
| UUU ............... | Petroleum Refineries—Catalytic Cracking, Catalytic Reforming and Sulfer Plants |
| VVV ................ | Publicly Owned Treatment Works (POTW) |
| XXX ................ | Ferroalloys Production |
| CCCC ............ | Nutritional Yeast Mfg. |
| GGGG ............ | Vegetable Oil Production—Solvent Extraction |
| HHHH ............ | Wet Formed Fiberglass Mat Production |
| SSSS ............ | Surface Coating for Metal Coil |

TABLE 1—Continued

40 CFR Part 63 NESHAP for Source Categories

| Subpart | Emission standard |
|---------|-------------------|
| TTTT ............. | Leather Finishing Operations |
| UUUU ........... | Cellulose Production Manufacture |
| VVVV ............ | Boat Manufacturing |
| CCCCC .......... | Coke Ovens: Pushing, Quenching and Battery Stacks |

## VII. What Is Not Being Delegated?

As mentioned above, LDEQ has not been delegated the authority for the following standards:

40 CFR Part 60, Subpart AAA (Standards of Performance for New Residential Wood Heaters);

40 CFR Part 61, Subpart B (National Emission Standards for Radon Emissions from Underground Uranium Mines);

40 CFR Part 61, Subpart H (National Emission Standards for Emissions of Radionuclides Other Than Radon From Department of Energy Facilities);

40 CFR Part 61, Subpart I (National Emission Standards for Radionuclide Emissions from Federal Facilities Other Than Nuclear Regulatory Commission Licensees and Not Covered by Subpart H);

40 CFR Part 61, Subpart K—(National Emission Standards for Radionuclide Emissions from Elemental Phosphorus Plants);

40 CFR Part 61, Subpart Q (National Emission Standards for Radon Emissions from Department of Energy facilities);

40 CFR Part 61, Subpart R (National Emission Standards for Radon Emissions from Phosphogypsum Stacks);

40 CFR Part 61, Subpart T (National Emission Standards for Radon Emissions from the Disposal of Uranium Mill Tailings); and

40 CFR Part 61, Subpart W (National Emission Standards for Radon Emissions from Operating Mill Tailings).

In addition, EPA cannot delegate to a State any of the Category II Subpart A authorities set forth in 40 CFR 63.91(g)(2). These include the following provisions: § 63.6(g), Approval of Alternative Non-Opacity Standards; § 63.6(h)(9), Approval of Alternative Opacity Standards; § 63.7(e)(2)(ii) and (f), Approval of Major Alternatives to Test Methods; § 63.8(f), Approval of Major Alternatives to Monitoring; and § 63.10(f), Approval of Major Alternatives to Recordkeeping and Reporting. In addition, some MACT

standards have certain provisions that cannot be delegated to the States [e.g. 40 CFR 63.106(b)].[1] Therefore, any MACT standard that EPA is delegating to LDEQ that provides that certain authorities cannot be delegated are retained by EPA and not delegated. Furthermore, no authorities are delegated that require rulemaking in the **Federal Register** to implement, or where Federal overview is the only way to ensure national consistency in the application of the standards or requirements of CAA section 112. Finally, section 112(r), the accidental release program authority, is not being delegated by this approval.

All of the inquiries and requests concerning implementation and enforcement of the excluded standards in the State of Louisiana should be directed to the EPA Region 6 Office.

In addition, this delegation to LDEQ to implement and enforce certain NSPS and NESHAPs does not extend to sources or activities located in Indian country, as defined in 18 U.S.C. 1151. Under this definition, EPA treats as reservations, trust lands validly set aside for the use of a Tribe even if the trust lands have not been formally designated as a reservation. Consistent with previous federal program approvals or delegations, EPA will continue to implement the NSPS and NESHAPs in Indian country because LDEQ has not adequately demonstrated its authority over sources and activities located within the exterior boundaries of Indian reservations and other areas in Indian country.

## VIII. How Will Applicability Determinations Under Section 112 Be Made?

In approving this delegation, LDEQ will obtain concurrence from EPA on any matter involving the interpretation of section 112 of the CAA or 40 CFR part 63 to the extent that implementation, administration, or enforcement of these sections have not been covered by EPA determinations or guidance.

## IX. What Authority Does EPA Have?

We retain the right, as provided by CAA section 112(l)(7), to enforce any applicable emission standard or requirement under section 112. EPA also has the authority to make certain decisions under the General Provisions

[1] On June 23, 2003, EPA modified certain NESHAPs to clarify which authorities can be delegated to State, local, and tribal agencies. 68 FR 37334. However, this delegation is not directly affected by these changes, since LDEQ is receiving delegation of the part 63 standards that were promulgated by EPA, as amended thorough July 1, 2002.

(subpart A) of part 63. We are granting LDEQ some of these authorities, and retaining others, as explained in sections VI and VII above. In addition, EPA may review and disapprove of State determinations and subsequently require corrections. (*See* 40 CFR 63.91(g) and 65 FR 55810, 55823, September 14, 2000.)

Furthermore, we retain any authority in an individual emission standard that may not be delegated according to provisions of the standard.[2] Also, listed in the footnotes of the part 63 delegation table at the end of this rule are the authorities that cannot be delegated to any State or local agency which we therefore retain.

## X. What Information Must LDEQ Provide to EPA?

In delegating the authority to implement and enforce these rules and in granting a waiver of EPA notification requirements, we require LDEQ to input all source information into the Aerometric Information Retrieval System (AIRS) for both point and area sources. LDEQ must enter this information into the AIRS system and update the information by September 30 of every year. LDEQ must provide any additional compliance related information to EPA, Region 6, Office of Enforcement and Compliance Assurance within 45 days of a request under 40 CFR 63.96(a).

In receiving delegation for specific General Provisions authorities, LDEQ must submit to EPA Region 6 on a semi-annual basis, copies of determinations issued under these authorities. For part 63 standards, these determinations include: Applicability determinations (§ 63.1); approval/disapprovals of construction and reconstruction (§ 63.5(e) and (f)); notifications regarding the use of a continuous opacity monitoring system (§ 63.6(h)(7)(ii)); finding of compliance (§ 63.6(h)(8)); approval/disapprovals of compliance extensions (§ 63.6(i)); approvals/disapprovals of minor (§ 63.7(e)(2)(i)) or intermediate (§ 63.7(e)(2)(ii) and (f)) alternative test methods; approval of shorter sampling times and volumes (§ 63.7(e)(2)(iii));

waiver of performance testing (§ 63.7(e)(2)(iv) and (h)(2), (3)); approvals/disapprovals of minor or intermediate alternative monitoring methods (§ 63.8(f)); approval of adjustments to time periods for submitting reports (§ 63.9 and 63.10); and approvals/disapprovals of minor alternatives to recordkeeping and reporting (§ 63.10(f)).

Additionally, EPA's Emission Measurement Center of the Emissions Monitoring and Analysis Division must receive copies of any approved intermediate changes to test methods or monitoring. (Please note that intermediate changes to test methods must be demonstrated as equivalent through the procedures set out in EPA method 301.) This information on approved intermediate changes to test methods and monitoring will be used to compile a database of decisions that will be accessible to State and local agencies and EPA Regions for reference in making future decisions. (For definitions of *major, intermediate* and *minor* alternative test methods or monitoring methods, *see* 40 CFR 63.90). The LDEQ should forward these intermediate test methods or monitoring changes via mail or facsimile to: Chief, Source Categorization Group A, EPA (MD–19), Research Triangle Park, NC 27711, Facsimile telephone number: (919) 541–1039.

## XI. What Is EPA's Oversight of This Delegation to LDEQ?

EPA must oversee LDEQ's decisions to ensure the delegated authorities are being adequately implemented and enforced. We will integrate oversight of the delegated authorities into the existing mechanisms and resources for oversight currently in place. If, during oversight, we determine that LDEQ made decisions that decreased the stringency of the delegated standards, then LDEQ shall be required to take corrective actions and the source(s) affected by the decisions will be notified, as required by 40 CFR 63.91(g)(1)(ii). We will initiate withdrawal of the program or rule if the corrective actions taken are insufficient.

## XII. Should Sources Submit Notices to EPA or LDEQ?

All of the information required pursuant to the Federal NSPS and NESHAP (40 CFR parts 60, 61, and 63) should be submitted by sources located outside of Indian country, directly to the LDEQ at the following address: Office of Environmental Services, P. O. Box 4313, Baton Rouge, LA 70821–4313. The LDEQ is the primary point of contact with respect to delegated NSPS and

NESHAPs. Sources do not need to send a copy to EPA. EPA Region 6 waives the requirement that notifications and reports for delegated standards be submitted to EPA in addition to LDEQ in accordance with 40 CFR 63.9(a)(4)(ii) and 63.10(a)(4)(ii).

## XIII. How Will Unchanged Authorities Be Delegated to LDEQ in the Future?

In the future, LDEQ will only need to send a letter of request to EPA, Region 6, for those NSPS and NESHAP regulations that LDEQ has adopted by reference. The letter must reference the previous up-front approval demonstration and reaffirm that it still meets the up-front approval criteria. We will respond in writing to the request stating that the request for delegation is either granted or denied. If a request is approved, the effective date of the delegation will be the date of our response letter. A **Federal Register** will be published to inform the public and affected sources of the delegation, indicate where source notifications and reports should be sent, and to amend the relevant portions of the Code of Federal Regulations showing which NSPS and NESHAP standards have been delegated to LDEQ.

## XIV. What Is the Relationship Between RCRA and the Hazardous Waste Combustor MACT?

As part of today's rule, we are delegating, under the CAA, implementation and enforcement authority for the Hazardous Waste Combustor (HWC) MACT (subpart EEE) to LDEQ. Many of the sources subject to the HWC MACT are also subject to the RCRA permitting requirements. We expect air emissions and related operating requirements found in the HWC MACT will be included in part 70 permits issued by LDEQ. However, RCRA permits will still be required for all other aspects of the combustion unit and the facility that are governed by RCRA (*e.g.,* corrective action, general facility standards, other combustor-specific concerns such as materials handling, risk-based emissions limits and operating requirements, as appropriate and other hazardous waste management units).[3] See the HWC

---

[2] EPA amended several NESHPs to clarify the implementation and enforcement authorities within the standards that we may delegate to each State, local or tribal agency such as LDEQ. 68 FR 37334 (June 23, 2003). A complete list of the standards is contained in a copy of the proposal available for review at the Dallas Regional Office. An electronic copy of the proposal may be obtained from EPA's Internet site, *http://www.epa.gov/ttn/oarpg/t3pfpr.html.* EPA believes these changes make all of the standards consistent in defining what may not be delegated in actions such as the one we are taking today.

[3] EPA promulgated the HWC MACT (40 CFR part 63, subpart EEE) under the joint authority of the CAA and RCRA. Before this rule went into effect, the air emissions from these sources were primarily regulated under the authority of RCRA. *See* 40 CFR parts 264, 265, 266, and 270. With the release of HWC MACT, the air emissions are now regulated under both CAA and RCRA. Even though both statutes give EPA the authority to regulate air emissions, we determined that having the emissions standards and permitting requirements in both sets
Continued

MACT rule preamble discussion (64 FR 52828, 52839–52843 (September 30, 1999)), and the RCRA Site-Specific Risk Assessment Policy for HWC Facilities dated June 2000 for more information on the interrelationship of the MACT rule with the RCRA Omnibus provision and site specific risk assessments.

## XV. Final Action

The public was provided the opportunity to comment on the proposed approval of the program and mechanism for delegation of section 112 standards, as they apply to part 70 sources, on August 24, 1994, for the proposed interim approval of LDEQ's Title V operating permits program; and on April 7, 1995, for the proposed final approval of LDEQ's Title V operating permits program. In EPA's final full approval of Louisiana's Operating Permits Program (60 FR 47296), the EPA discussed the public comments on the proposed delegation of the Title V operating permits program. In this action, the public is given the opportunity to comment on the approval of LDEQ request for delegation of authority to implement and enforce certain section 112 standards for all sources (both part 70 and non-part 70 sources) which have been adopted by reference into Louisiana's state regulations. However, the Agency views the approval of these requests as a noncontroversial action and anticipates no adverse comments. Therefore, EPA is publishing this rule without prior proposal. However, in the "Proposed Rules" section of today's **Federal Register** publication, EPA is publishing a separate document that will serve as the proposal to approve the program and delegation of authority described in this action if adverse comments are received. This action will be effective May 25, 2004, without further notice unless the Agency receives relevant adverse comments by April 26, 2004.

If EPA receives adverse comments, we will publish a timely withdrawal in the **Federal Register** informing the public

of implementing regulations would be duplicative. For this reason, using the authority provided by section 1006(b) of RCRA, EPA deferred the RCRA requirements for the HWC emission controls to the CAA requirements of 40 CFR part 63, subpart EEE. After a facility has demonstrated compliance with the HWC MACT, the RCRA standards for air emissions from these units will no longer apply, with the exception of section 3005(c)(3) of RCRA, which requires that each RCRA permit contain the terms and conditions necessary to protect human health and the environment. Under this provision of RCRA, if a regulatory authority determines that more stringent conditions that the HWC MACT are necessary to protect human health and the environment for a particular facility, then that regulatory authority may impose those conditions in the facility's RCRA permit.

the rule will not take effect. We will address all public comments in a subsequent final rule based on the proposed rule. The EPA will not institute a second comment period on this action. Any parties interested in commenting must do so at this time. Please note that if we receive adverse comment on an amendment, paragraph, or section of this rule and if that provision may be severed from the remainder of the rule, we may adopt as final those provisions of the rule that are not the subject of an adverse comment.

## XVI. Statutory and Executive Order Reviews

Under Executive Order 12866 (58 FR 51735, October 4, 1993), this action is not a "significant regulatory action" and therefore is not subject to review by the Office of Management and Budget. For this reason, this action is also not subject to Executive Order 13211, "Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use" (66 FR 28355, May 22, 2001). This action merely approves state law as meeting Federal requirements and imposes no additional requirements beyond those imposed by state law. Accordingly, the Administrator certifies that this rule will not have a significant economic impact on a substantial number of small entities under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*). Because this rule approves pre-existing requirements under state law and does not impose any additional enforceable duty beyond that required by state law, it does not contain any unfunded mandate or significantly or uniquely affect small governments, as described in the Unfunded Mandates Reform Act of 1995 (Public Law 104–4).

This rule also does not have tribal implications because it will not have a substantial direct effect on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes, as specified by Executive Order 13175 (65 FR 67249, November 9, 2000). This action also does not have Federalism implications because it does not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government, as specified in Executive Order 13132 (64 FR 43255, August 10, 1999). This action merely approves a state request to receive delegation of certain Federal standards, and does not alter the relationship or

the distribution of power and responsibilities established in the Clean Air Act. This rule also is not subject to Executive Order 13045 "Protection of Children from Environmental Health Risks and Safety Risks" (62 FR 19885, April 23, 1997), because it is not economically significant.

In reviewing delegation submissions, EPA's role is to approve submissions provided that they meet the criteria of the Clean Air Act. In this context, in the absence of a prior existing requirement for the State to use voluntary consensus standards (VCS), EPA has no authority to disapprove a delegation submission for failure to use VCS. It would thus be inconsistent with applicable law for EPA to use VCS in place of a delegation submission that otherwise satisfies the provisions of the Clean Air Act. Thus, the requirements of section 12(d) of the National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) do not apply. This rule does not impose an information collection burden under the provisions of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*).

The Congressional Review Act, 5 U.S.C. 801 *et seq.*, as added by the Small Business Regulatory Enforcement Fairness Act of 1996, generally provides that before a rule may take effect, the agency promulgating the rule must submit a rule report, which includes a copy of the rule, to each House of the Congress and to the Comptroller General of the United States. EPA will submit a report containing this rule and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States prior to publication of the rule in the **Federal Register**. A major rule cannot take effect until 60 days after it is published in the **Federal Register**. This action is not a "major rule" as defined by 5 U.S.C. 804(2).

Under section 307(b)(1) of the Clean Air Act, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by May 25, 2004. Filing a petition for reconsideration by the Administrator of this final rule does not affect the finality of this rule for the purposes of judicial review nor does it extend the time within which a petition for judicial review may be filed, and shall not postpone the effectiveness of such rule or action. This action may not be challenged later in proceedings to enforce its requirements. (*See* section 307(b)(2).)

**Add.238**

**List of Subjects**

*40 CFR Part 60*

Environmental protection, Administrative practice and procedure, Air pollution control, Hazardous substances, Intergovernmental relations, Reporting and recordkeeping requirements.

*40 CFR Part 61*

Environmental protection, Air pollution control, Arsenic, Benzene, Beryllium, Hazardous substances, Mercury, Radon, Reporting and recordkeeping requirements, Uranium, Vinyl chloride.

*40 CFR Part 63*

Environmental protection, Air pollution control, Hazardous substances, Intergovernmental relations, Reporting and recordkeeping requirements.

**Authority:** This action is issued under the authority of sections 111 and 112 of the Clean Air Act, as amended, 42 U.S.C. 7411 and 7412.

Dated: March 9, 2004.

**Richard E. Greene,**

*Regional Administrator, Region 6.*

40 CFR parts 60, 61, and 63 are amended as follows:

**PART 60—[AMENDED]**

■ 1. The authority citation for part 60 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

■ 2. Section 60.4 is amended by revising paragraph (b)(T), and adding paragraph (e)(2) to read as follows:

**§ 60.4  Address.**

\*    \*    \*    \*    \*

(b) \*    \*    \*

(T) State of Louisiana: Louisiana Department of Environmental Quality, Office of Environmental Assessment, P.O. Box 4314, Baton Rouge, LA 70821–4314. For a list of delegated standards for Louisiana (excluding Indian country), see paragraph (e)(1) of this section.

\*    \*    \*    \*    \*

(e) \*    \*    \*

(2) Louisiana. The Louisiana Department of Environmental Quality has been delegated all part 60 standards promulgated by EPA, except subpart AAA—Standards of Performance for New Residential Wood Heaters, as amended in the **Federal Register** through July 1, 2002.

**PART 61—[AMENDED]**

■ 1. The authority citation for part 61 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

■ 2. Section 61.04 is amended by revising paragraph (b)(T), and adding paragraph (c)(6)(ii) to read as follows:

**§ 61.04  Addresses.**

\*    \*    \*    \*    \*

(b) \*    \*    \*

(T) State of Louisiana: Louisiana Department of Environmental Quality, Office of Environmental Assessment, P.O. Box 4314, Baton Rouge, LA 70821–4314.

\*    \*    \*    \*    \*

(c) \*    \*    \*

(6) \*    \*    \*

(ii) Louisiana. The Louisiana Department of Environmental Quality (LDEQ) has been delegated the following part 61 standards promulgated by EPA, as amended in the **Federal Register** through July 1, 2002. The (X) symbol is used to indicate each subpart that has been delegated.

### DELEGATION STATUS FOR PART 61 STANDARDS—STATE OF LOUISIANA[1]

| Subpart | | LDEQ[2,3] |
|---|---|---|
| A ............ | General Provisions ............................................................................................................................. | X |
| C ............ | Beryllium ............................................................................................................................................ | X |
| D ............ | Beryllium Rocket Motor Firing ........................................................................................................... | X |
| E ............ | Mercury .............................................................................................................................................. | X |
| F ............ | Vinyl Chloride .................................................................................................................................... | X |
| J ............. | Equipment Leaks of Benzene ........................................................................................................... | X |
| L ............ | Benzene Emissions from Coke By-Product Recovery Plants ............................................................ | X |
| N ............ | Inorganic Arsenic Emissions from Glass Manufacturing Plants ....................................................... | X |
| O ............ | Inorganic Arsenic Emissions from Primary Copper Smelters ........................................................... | X |
| P ............ | Inorganic Arsenic Emissions from Arsenic Trioxide and Metallic Arsenic Production Facilities ...... | X |
| V ............ | Equipment Leaks ............................................................................................................................... | X |
| Y ............ | Benzene Emissions from Benzene Storage Vessels ........................................................................ | X |
| BB .......... | Benzene Emissions from Benzene Transfer Operations ................................................................... | X |
| FF .......... | Benzene Emissions from Benzene Waste Operations ...................................................................... | X |

[1] Program delegated to Louisiana Department of Environmental Quality (LDEQ).
[2] Authorities which may not be delegated include: § 61.04(b), Addresses of State and Local Implementing Agencies; § 61.12(d)(1), Compliance with Standards and Maintenance Requirements, Alternate Means of Emission Limitation; § 61.13(h), Major Change to an Emissions Test; § 61.14(g), Major Modifications to Monitoring Requirements; § 61.16, Availability of Information Procedures; § 61.53(c)(4), List of Approved Design, Maintenance, and Housekeeping Practices for Mercury Chlor-Alkali Plants; and all authorities identified within specific subparts (*e.g.*, under "Delegation of Authority") that cannot be delegated.
[3] Federal rules adopted unchanged as of July 1, 2002.

\*    \*    \*    \*    \*

**PART 63—[AMENDED]**

■ 1. The authority citation for part 63 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

■ 2. Section 63.99 is amended by adding paragraph (a)(18) to read as follows:

**§ 63.99  Delegated Federal authorities.**

(a) \*    \*    \*

(18) Louisiana.

(i) The following table lists the specific part 63 standards that have been delegated unchanged to the Louisiana Department of Environmental Quality for all sources. The "X" symbol is used to indicate each subpart that has been delegated. The delegations are

subject to all of the conditions and limitations set forth in Federal law, regulations, policy, guidance, and determinations. Some authorities cannot be delegated and are retained by EPA. These include certain General Provisions authorities and specific parts of some standards. Any amendments made to these rules after this effective date are not delegated.

HeinOnline -- 69 Fed. Reg. 15693 2004

DELEGATION STATUS FOR PART 63 STANDARDS—STATE OF LOUISIANA [1]

| Subpart | Source category | LDEQ [2,3] |
|---|---|---|
| A ................. | General Provisions [2] ............................................................................................................................................ | X |
| D ................. | Early Reductions ................................................................................................................................................... | X |
| F .................. | Hazardous Organic NESHAP (HON)—Synthetic Organic Chemical Manufacturing Industry (SOCMI) .................. | X |
| G ................. | HON—SOCMI Process Vents, Storage Vessels, Transfer Operations and Wastewater ....................................... | X |
| H ................. | HON—Equipment Leaks ......................................................................................................................................... | X |
| I ................... | HON—Certain Processes Negotiated Equipment Leak Regulation ....................................................................... | X |
| J .................. | Polyvinyl Chloride and Copolymers Production ..................................................................................................... | X |
| K ................. | (Reserved). | |
| L .................. | Coke Oven Batteries ............................................................................................................................................. | X |
| M ................ | Perchloroethylene Dry Cleaning ........................................................................................................................... | X |
| N ................. | Chromium Electroplating and Chromium Anodizing Tanks .................................................................................. | X |
| O ................. | Ethylene Oxide Sterilizers .................................................................................................................................... | X |
| P ................. | (Reserved). | |
| Q ................. | Industrial Process Cooling Towers ....................................................................................................................... | X |
| R ................. | Gasoline Distribution ............................................................................................................................................. | X |
| T ................. | Halogenated Solvent Cleaning .............................................................................................................................. | X |
| U ................. | Group I Polymers and Resins ............................................................................................................................... | X |
| V ................. | (Reserved). | |
| W ................ | Epoxy Resins Production and Non-Nylon Polyamides Production ........................................................................ | X |
| X ................. | Secondary Lead Smelting ...................................................................................................................................... | X |
| Y ................. | Marine Tank Vessel Loading .................................................................................................................................. | X |
| Z ................. | (Reserved). | |
| AA ............... | Phosphoric Acid Manufacturing Plants ................................................................................................................. | X |
| BB ............... | Phosphate Fertilizers Production Plants ................................................................................................................ | X |
| CC ............... | Petroleum Refineries ............................................................................................................................................. | X |
| DD ............... | Off-Site Waste and Recovery Operations ............................................................................................................. | X |
| EE ............... | Magnetic Tape Manufacturing ............................................................................................................................... | X |
| FF ................ | (Reserved). | |
| GG ............... | Aerospace Manufacturing and Rework Facilities .................................................................................................. | X |
| HH ............... | Oil and Natural Gas Production Facilities ............................................................................................................. | X |
| II .................. | Shipbuilding and Ship Repair Facilities ................................................................................................................ | X |
| JJ ................ | Wood Furniture Manufacturing Operations ........................................................................................................... | X |
| KK ............... | Printing and Publishing Industry ........................................................................................................................... | X |
| LL ................ | Primary Aluminum Reduction Plants ..................................................................................................................... | X |
| MM .............. | Chemical Recovery Combustion Sources at Kraft, Soda, Sulfide, and Stand-Alone Semichemical Pulp Mills ............. | X |
| NN ............... | (Reserved). | |
| OO ............... | Tanks—Level 1 ...................................................................................................................................................... | X |
| PP ............... | Containers ............................................................................................................................................................. | X |
| QQ ............... | Surface Impoundments .......................................................................................................................................... | X |
| RR ............... | Individual Drain Systems ....................................................................................................................................... | X |
| SS ............... | Closed Vent Systems, Control Devices, Recovery Devices and Routing to a Fuel Gas System or a Process ............. | X |
| TT ............... | Equipment Leaks—Control Level 1 ....................................................................................................................... | X |
| UU ............... | Equipment Leaks—Control Level 2 Standards ...................................................................................................... | X |
| VV ............... | Oil-Water Separators and Organic-Water Separators .......................................................................................... | X |
| WW ............. | Storage Vessels (Tanks)—Control Level 2 ........................................................................................................... | X |
| XX ............... | (Reserved). | |
| YY ............... | Generic Maximum Achievable Control Technology Standards .............................................................................. | X |
| ZZ–BBB ....... | (Reserved). | |
| CCC ............ | Steel Pickling—HCl Process Facilities and Hydrochloric Acid Regeneration ...................................................... | X |
| DDD ............ | Mineral Wool Production ........................................................................................................................................ | X |
| EEE ............ | Hazardous Waste Combustors .............................................................................................................................. | X |
| FFF ............. | (Reserved). | |
| GGG ............ | Pharmaceuticals Production .................................................................................................................................. | X |
| HHH ............ | Natural Gas Transmission and Storage Facilities ................................................................................................ | X |
| III ................ | Flexible Polyurethane Foam Production ................................................................................................................ | X |
| JJJ .............. | Group IV Polymers and Resins ............................................................................................................................. | X |
| KKK ............. | (Reserved). | |
| LLL .............. | Portland Cement Manufacturing ........................................................................................................................... | X |
| MMM ........... | Pesticide Active Ingredient Production ................................................................................................................. | X |
| NNN ............ | Wool Fiberglass Manufacturing ............................................................................................................................ | X |
| OOO ............ | Amino/Phenolic Resins ......................................................................................................................................... | X |
| PPP ............ | Polyether Polyols Production ................................................................................................................................. | X |
| QQQ ............ | Primary Copper Smelting ...................................................................................................................................... | X |
| RRR ............ | Secondary Aluminum Production ........................................................................................................................... | X |
| SSS ............ | (Reserved). | |
| TTT ............. | Primary Lead Smelting .......................................................................................................................................... | X |
| UUU ............ | Petroleum Refineries—Catalytic Cracking Units, Catalytic Reforming Units and Sulfur Recovery Plants ........... | X |
| VVV ............. | Publicly Owned Treatment Works (POTW) ............................................................................................................ | X |
| WWW .......... | (Reserved). | |
| XXX ............. | Ferroalloys Production: Ferromanganese and Silicomanganese ......................................................................... | X |
| AAAA .......... | Municipal Solid Waste Landfills. | |
| CCCC .......... | Nutritional Yeast Manufacturing ........................................................................................................................... | X |

DELEGATION STATUS FOR PART 63 STANDARDS—STATE OF LOUISIANA [1]—Continued

| Subpart | Source category | LDEQ [2,3] |
|---|---|---|
| GGGG ......... | Solvent Extraction for Vegetable Oil Production ............................................................................................................ | X |
| HHHH ......... | Wet Formed Fiberglass Mat Production ......................................................................................................................... | X |
| JJJJ .............. | Paper and other Web (Surface Coating). | |
| NNNN ........... | Surface Coating of Large Appliances. | |
| OOOO ......... | Fabric Printing Coating and Dyeing. | |
| QQQQ ......... | Surface Coating of Wood Building Products. | |
| RRRR ........... | Surface Coating of Metal Furniture. | |
| SSSS ........... | Surface Coating for Metal Coil .................................................................................................................................... | X |
| TTTT ............ | Leather Finishing Operations ...................................................................................................................................... | X |
| UUUU ........... | Cellulose Production Manufacture ................................................................................................................................ | X |
| VVVV ........... | Boat Manufacturing ...................................................................................................................................................... | X |
| WWWW ........ | Reinforced Plastic Composites Production. | |
| XXXX ........... | Tire Manufacturing. | |
| BBBBB ......... | Semiconductor Manufacturing. | |
| CCCCC ......... | Coke Ovens: Pushing, Quenching and Battery Stacks .................................................................................................. | X |
| FFFFF ........... | Integrated Iron and Steel. | |
| JJJJJ ............ | Brick and Structural Clay Products Manufacturing. | |
| KKKKK ......... | Clay Ceramics Manufacturing. | |
| LLLLL ........... | Asphalt Roofing and Processing. | |
| MMMMM ...... | Flexible Polyurethane Foam Fabrication Operation. | |
| NNNNN ......... | Hydrochloric Acid Production, Fumed Silica Production. | |
| PPPPP ......... | Engine Test Facilities. | |
| QQQQQ ........ | Friction Products Manufacturing. | |
| SSSSS ......... | Refractory Products Manufacture. | |

[1] Program delegated to Louisiana Department of Environmental Quality (LDEQ).
[2] Authorities which may not be delegated include: § 63.6(g), Approval of Alternative Non-Opacity Emission Standards; § 63.6(h)(9), Approval of Alternative Opacity Standards; § 63.7(e)(2)(ii) and (f), Approval of Major Alternatives to Test Methods; § 63.8(f), Approval of Major Alternatives to Monitoring; § 63.10(f), Approval of Major Alternatives to Recordkeeping and Reporting; and all authorities identified in the subparts (e.g., under "Delegation of Authority") that cannot be delegated.
[3] Federal rules adopted unchanged as of July 1, 2002.

(ii) Affected sources within Louisiana shall comply with the Federal requirements of 40 CFR part 63—subpart S—Pulp and Paper Industry, adopted by reference by the Louisiana Department of Environmental Quality's (LDEQ), with the exception of the compliance date listed in § 63.440(d)(1). The LDEQ has adopted an earlier compliance date than the Federal requirement. The earlier compliance date is approved by EPA pursuant to § 63.92. Affected sources in Louisiana that are subject to the requirements of Subpart S shall meet the compliance date established at Louisiana Administrative Code, Title 33, part III, chapter 51, subchapter C., section 5122, C.2.

\* \* \* \* \*

[FR Doc. 04–6299 Filed 3–25–04; 8:45 am]

**BILLING CODE 6560–50–P**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

**Office of the Secretary**

**45 CFR Part 148**

**[CMS–2179–F]**

**RIN 0938–AM42**

**Grants to States for Operation of Qualified High Risk Pools**

**AGENCY:** Office of the Secretary, HHS.

**ACTION:** Final rule.

**SUMMARY:** This final rule implements a provision of the Trade Adjustment Assistance Reform Act of 2002 by providing $40 million in Federal fiscal year 2003 and $40 million in Federal fiscal year 2004 to States that have incurred losses in connection with the operation of qualified high risk pools that meet certain criteria. This final rule also addresses comments received in response to the interim final rule that was published on May 2, 2003. This grant program implements section 2745 of the Public Health Service Act, as added by the Trade Adjustment Assistance Reform Act of 2002.

**DATES:** Effective date. These regulations are effective on April 26, 2004
*Deadline for States to submit an application for losses incurred in their*

*fiscal year 2002:* States had to submit an application to us by no later than September 30, 2003. *Deadline for States to submit an application for losses incurred in their fiscal year 2003:* States must submit an application to us by no later than June 30, 2004. *Deadline for States to submit an application for losses incurred in their fiscal year 2004:* States must submit an application to us by no later than June 30, 2005.

**ADDRESSES:** *Where To Submit an Application.* All initial applications and supplemental applications must be submitted to: Centers for Medicare & Medicaid Services, Acquisition and Grants Group, Mail Stop C2–21–15, 7500 Security Boulevard, Baltimore, MD 21244–1850, Attn: Nicole Nicholson.

**FOR FURTHER INFORMATION CONTACT:** James Mayhew, (410) 786–9244.

**SUPPLEMENTARY INFORMATION:**

## I. Background

### A. General

Section 2745(b) of the Public Health Service Act (PHS Act), as added by section 201(b) of the Trade Adjustment Assistance Reform Act of 2002, authorizes the Secretary to make grants to States for up to 50 percent of the losses they incur in the operation of qualified high risk pools, and appropriates the necessary funds. In order to qualify for a grant, a State's risk



# ENVIRONMENTAL PROTECTION AGENCY

## 40 CFR Part 63

[FRL–7508–8]

RIN 2060–AJ26

## Clarifications to Existing National Emissions Standards for Hazardous Air Pollutants Delegations' Provisions

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** As part of the section 112(l), ''Approval of State Programs and Delegation of Federal Authorities'' rulemaking process, EPA (we) agreed to clarify which portions of the existing national emission standards for hazardous air pollutants (NESHAP) contain authorities that can be delegated to State, local, and tribal agencies (S/L/Ts) (65 FR 55810, September 14, 2000). Today's rulemaking clarifies which parts of the existing NESHAP can be delegated to S/L/Ts by adding or modifying a section in each NESHAP to describe the authorities that can be delegated to S/L/Ts and those that must be retained by us. In addition, to further clarify which portions of the NESHAP are delegable, some NESHAP standards sections were slightly reorganized or rephrased to separate delegable from non-delegable authorities. These clarifications do not change any substantive NESHAP requirements for industrial sources.

**EFFECTIVE DATE:** This final rule will be effective on August 22, 2003.

**ADDRESSES:** Docket No. A–2000–57, containing supporting information used to develop the proposed rule and the final rule, is available for public inspection and copying between 8 a.m. and 4:30 p.m., Monday through Friday (except government holidays) at the Air and Radiation Docket and Information Center (6102T), Room B–108, EPA West Building, 1301 Constitution Avenue, NW., Washington, DC 20460; telephone (202) 566–1742, fax (202) 566–1741. A reasonable fee may be charged for copying docket materials.

*Worldwide Web (WWW).* In addition to being available in the docket, an electronic copy of this final rule will also be available on the WWW through the Technology Transfer Network (TTN). Following signature, a copy of the rule will be posted on the TTN's policy and guidance page for newly proposed or promulgated rules: *http://www.epa.gov/ttn/oarpg.*

**FOR FURTHER INFORMATION CONTACT:** Mr. Tom Driscoll or Ms. Robin Segall,

Emissions, Moitoring Measurement and Analysis Division, Office of Air Quality Planning and Standards, U.S. Environmental Protection Agency, 109 T. W. Alexander Drive, Research Triangle Park, North Carolina 27709, telephone (919) 541–5135 or (919) 541–0893, or electronic mail at *driscoll.tom@epa.gov* or *segall.robin@epa.gov.*

**SUPPLEMENTARY INFORMATION:** *Regulated Entities.* Entities potentially affected by this rule are S/L/Ts that voluntarily request delegation of section 112 rules, emissions standards, or requirements. The procedures and criteria for requesting and receiving delegation are described in § 63.90 through § 63.97, excluding § 63.96, of 40 CFR part 63, subpart E. Facilities that are subject to the individual subparts to be changed should not be affected by the final amendments, which clarify the delegation requirements between EPA and the S/L/Ts.

*Outline.* The information presented in this preamble is organized as follows:

I. Background
  A. How Do We Delegate Section 112 Standards to You?
  B. When a Standard is Delegated, Can You Approve Changes to Any of the Requirements?
  C. What Is the Purpose of This Rulemaking?
  D. What are the Types of Changes We Are Making?
  E. Once NESHAP Are Delegated, Does the S/L/Ts' Enforcement Authority Replace EPA's Authority?
  F. Does Today's Rulemaking Impact Prior Delegations of These Part 63 NESHAP (Maximum Achievable Control Technology (MACT) Standards)?
  G. What Public Comments Were Received on the Proposal?
II. Overview of Changes
  A. What Categories of Changes Are We Making?
  B. What Clarifications Have We Made to Individual Subparts?
III. Statutory and Executive Order Reviews
  A. Executive Order 12866: Regulatory Planning and Review
  B. Paperwork Reduction Act
  C. Regulatory Flexibility Act
  D. Unfunded Mandates Reform Act
  E. Executive Order 13132: Federalism
  F. Executive Order 13175: Consultation and Coordination with Indian Tribal Governments
  G. Executive Order 13045: Protection of Children from Environmental Health Risks and Safety Risks
  H. Executive Order 13211: Actions that Significantly Affect Energy Supply, Distribution, or Use
  I. National Technology Transfer Advancement Act
  J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations
  K. Congressional Review Act
IV. Statutory Authority
V. Judicial Review

## I. Background

*A. How Do We Delegate Section 112 Standards to You?*

The requirements in 40 CFR part 63, subpart E provide a framework for you, the S/L/Ts, to request and receive delegation of the NESHAP. Once you accept delegation, you are responsible for implementing and enforcing the NESHAP for sources in your jurisdiction.

*B. When a Standard Is Delegated, Can You Approve Changes to Any of the Requirements?*

In addition to the overall implementation and enforcement authority conferred by the delegation, there are separate parts of each section 112 requirement that we cannot delegate to you. Each individual NESHAP, for example, contains requirements that are considered the ''standards'' and are, therefore, not delegable in terms of your making changes to them. Because the Administrative Procedures Act requires us to approve alternative emission limitations or control requirements through Federal rulemaking, we cannot delegate our rulemaking authority to you. More specifically, any requests by sources for approval of alternative standards must be considered by us and acted upon in a notice and comment rulemaking. Additionally, we cannot delegate authorities that may alter the stringency of the standard, that require Federal oversight for national consistency, or that may require Federal rulemaking. Generally, requests by you to revise standards for a source category (or portions thereof) must be addressed through subpart E or the subpart E rulemaking process for alternative standards. Please note that nothing in the section or this rulemaking usurps your authority to have more a stringent State program or regulatory requirements, such as more stringent emission limitations, that apply to sources subject to NESHAP.

However, the authorities in other sections of the NESHAP, such as testing, monitoring, reporting, and recordkeeping, may be delegable and, if delegated, the authority to approve alternatives to these requirements may be exercised by you on a case-by-case basis once you have been delegated the NESHAP through subpart E (straight delegation, § 63.91). These delegable authorities are similar to those in 40 CFR part 63, subpart A General Provisions, which are incorporated into the majority of the NESHAP. Because

only some of the testing, monitoring, reporting, and recordkeeping requirements are delegable in subpart A, EPA has identified what authorities can be delegated in the subpart E revisions (65 FR 55810, September 14, 2000). Section 63.91(g)(1)(i) clarifies what ''Category I'' changes, including minor and intermediate changes to testing, monitoring, recordkeeping, and reporting requirements, may be considered and approved by S/L/Ts if you receive delegation for these authorities from your EPA Regional Office. For more discussion of delegable authorities, *see* 65 FR 55811 through 55814, September 14, 2000.

There are similar discretionary authorities, as mentioned above, in each NESHAP that may also be delegated to you. Please note, each NESHAP being revised in today's rulemaking will describe those authorities that will be retained by EPA. All other authorities in those NESHAP are delegable to S/L/Ts.

*C. What Is the Purpose of This Rulemaking?*

As a part of a larger regulatory and policy effort to clarify and streamline delegation of part 63 requirements, we agreed to clarify which portions of the existing 40 CFR part 63 NESHAP contain authorities that can be delegated to you. In order to achieve this objective, we are making slight changes to many of the existing NESHAP. These changes are clarifications that will allow you to approve alternatives to the delegable authorities, including category I authorities listed in § 63.91(g)(i), instead of requiring a rulemaking by the EPA to approve the site-specific alternatives. Many NESHAP lack a clear delegation section that this final rule remedies. We are also taking this opportunity to make the format of the existing NESHAP more consistent.

*D. What Are the Types of Changes We Are Making?*

Many of the existing NESHAP were promulgated before we developed a consistent rule format, so each one has slightly different content and order. In addition, the way that the delegable authorities were identified and delegated varies. Due to these variations, each NESHAP in this rulemaking needs one or more clarifications, listed below, to ease delegation:

• Addition or modification of a section (implementation and enforcement) in each NESHAP describing the authorities that can be delegated to you and those that must be retained by us;

• Reorganization of the standards sections in NESHAP to separate compliance assurance measures, such as monitoring, recordkeeping, or reporting provisions, from actual standards; or

• Minor rephrasing of work practices and other standards developed under the authority of section 112(h) of the Act to allow approval of delegable testing, monitoring, reporting, and recordkeeping authorities by S/L/Ts and without rulemaking by us.

*E. Once NESHAP Are Delegated, Does the S/L/Ts' Enforcement Authority Replace EPA's Authority?*

Throughout this preamble, we state that once NESHAP are delegated to you, then you will have the authority to implement and enforce those rules for sources in your jurisdiction. However, nothing in this preamble is intended to suggest that our enforcement agencies have replaced our Federal authority to enforce and implement those rules. We remain partners with you in enforcing the NESHAP.

*F. Does Today's Rulemaking Affect Prior Delegations of These Part 63 NESHAP (MACT Standards)?*

In many cases, you already accepted delegation of these NESHAP and, consequently, you are currently implementing and enforcing them. We do not believe that today's rulemaking adversely affects existing delegations of these NESHAP to you. For the most part, today's rulemaking clarifies which of the authorities in each existing NESHAP can, and cannot, be delegated to you.

In all prior delegations, specific authorities in each NESHAP were generally not identified as being delegated. Instead, the NESHAP have been generally delegated in their entirety. For example, when our Regional Offices delegate a NESHAP or MACT standard through straight delegation (*see* 65 FR 55810, September 14, 2000) to a S/L/T, they reference the whole NESHAP, such as subpart M, National Perchloroethylene Air Emission Standards for Dry Cleaning Facilities, in any rulemaking or documents. They usually do not reference a particular authority within the NESHAP, such as § 63.324(d), ''[E]ach owner or operator of a dry cleaning facility shall keep receipts of perchloroethylene purchases ...'' in any delegation. Therefore, we believe that today's rulemaking will not affect your existing part 63 NESHAP delegation.

However, potential issues may have occurred where you have already acted on the authorities you believed you had been delegated. For example, in subpart HH, the delegation of authority paragraph in § 63.776 does not withhold the delegation of any of the standards' sections. Therefore, you may have exercised the authority to approve alternative emissions controls or limitations in this example. As mentioned above, you cannot approve alternatives to NESHAP's emissions controls or limitations because they must be established through national rulemaking. Only we can approve alternatives to emissions controls or limitations through national rulemaking.

If you have inadvertently approved alternatives to NESHAP's emissions controls or limitations for a specific source, then the appropriate EPA Regional Office must be notified of this approval. Our Regional Office will then work with you and our Office of Air Quality Planning and Standards, Office of Enforcement and Compliance Assurance, and Office of General Counsel to reevaluate the alternative through the process in § 63.6 or the provisions in 40 CFR part 63, subpart E. If you have any questions regarding inadvertent approvals, please contact your appropriate EPA Regional Office.

*G. What Public Comments Were Received on the Proposal?*

On January 16, 2002 (67 FR 2286), the proposed rule was published in the **Federal Register** and we requested written comments on the proposal. We received 4 sets of written comments on the package from the State and Territorial Air Pollution Program and Association of Local Air Pollution Control (STAPPA/ALAPCO), State of Missouri Department of Natural Resources Air Pollution Control Program (APCP), South Coast Air Quality Management District, and Safety-Kleen Corporation. Although the comments were mostly general in nature, some were specific to certain NESHAP. The Missouri APCP's comments included support for EPA's approach to clarify which authorities can be delegated and noted that the ''APCP had taken a similar approach to rulemaking.'' Copies of the comments are available in the public docket for the regulation (docket A–2000–57).

**II. Overview of Changes**

The EPA has made a number of changes to the proposed rule in response to the comments we received. The comments on the proposal were limited to a relatively small subset of authorities in a few NESHAP. Accordingly, EPA believes that it is not necessary to repeat the comprehensive discussion contained in the preamble to

**37336**    **Federal Register** / Vol. 68, No. 120 / Monday, June 23, 2003 / Rules and Regulations

the proposal. *See* 67 FR 2288–2298, January 16, 2002, for a more detailed discussion of today's changes to each NESHAP. Instead, EPA has limited the discussion in this preamble to issues raised by commenters, and to discuss changes made to the final rule based on those issues.

*A. What Categories of Changes Are We Making?*

1. Adding an "Implementation and Enforcement" Section

The first category of changes involves adding a section that describes non-delegable authorities or changing current delegation sections to conform to a consistent format. The new "Implementation and enforcement" sections cite the rule sections or requirements for which you may not approve alternatives (*i.e.*, non-delegable authorities). The authority to make changes to those sections or requirements is retained by us and includes the authority to approve any alternatives to emissions standards; including their applicability requirements. Conversely, any authority, not expressly reserved for us and included in these paragraphs, can be delegated to you.

As part of the subpart E rulemaking (65 FR 55810, September 14, 2000), we clarified which of the specific General Provisions authorities (regarding alternative requirements) could not be delegated to you. We divided the General Provisions discretionary authorities into two groups, based upon the relative significance of each type of decision. Category I contains those authorities which can be delegated. We believe that the EPA Regional Office retains the ability to request review of these decisions, although we expect that this authority will be exercised infrequently. Category II contains those authorities which cannot be delegated. For more discussion on the general provisions' delegable authorities, *see* 67 FR 2288, January 16, 2002. The changes in the individual subparts in today's rule reference the subpart E classifications to ensure that they conform with this similar framework.

2. Reorganizing Sections To Separate Compliance Assurance Measures From Actual Standards

The NESHAP contain two major types of requirements: standards and compliance assurance requirements. The standards are the essential requirements that implement EPA's authority under the Act to establish hazardous air pollutant (HAP) emission standards. These standards may be

emission limitations (emission limits, operating limits, opacity limits, and visible emission limits) and/or work practice standards (design, equipment, work practices, and operational standards). The authority to approve alternatives to any of the promulgated standards must be retained by us. Requirements that are essential to ensuring that the standards are achieved as EPA intended, such as applicability requirements and compliance dates, are also retained.

The compliance assurance requirements are also essential, but they offer some flexibility in their implementation. For example, you can approve (or disapprove) minor and intermediate changes to testing, monitoring, reporting, and recordkeeping provisions, as long as they are at least as stringent (or disapprove, if they are not as stringent) as EPA requirements.

In other cases, the S/L/T is given authority to make changes in the implementation of a requirement, but not to change the actual requirement itself. For example, some NESHAP require operation and maintenance plans. Here the S/L/T agency is given the authority to approve some changes in the content of the plan, but does not have the authority to waive the requirement that the plan must be created and followed. Additionally, some newly-named operation and maintenance sections contain provisions which are similar to work practices, in that they can potentially affect emissions, such as the requirement to operate and maintain the source's equipment in keeping with good air pollution control practices, or the requirement to correct malfunctions as soon as practicable. You may not approve alternatives that are less stringent than the criteria outlined in the subpart. However, you may require more stringent provisions, such as not permitting excess emissions at all during malfunctions. Where an operations and maintenance plan is required, it usually allows the source considerable latitude in designing the plan, so long as the plan meets certain criteria. You may approve alternatives to the plan that are more stringent than the criteria listed, but you may not approve elimination of major criteria, such as specifying the process and control system monitoring equipment.

As a second example, most NESHAP include requirements to monitor certain specified control equipment operating parameters and to set enforceable operating limits for these same parameters based on data from the performance test. In this case, the S/L/

T may be delegated the authority to approve changes to the ranges for the operating limits based on new performance test data and/or other relevant information submitted by the source. However, we must retain the authority to approve modifications to requirements affecting which parameters are monitored (*e.g.*, EPA would approve appropriate parameters to monitor for a control device not addressed in a NESHAP).

A more detailed discussion and additional examples of changes that may be made to the delegable requirements are presented in the preambles to the proposed and final subpart E rule (64 FR 1880, January 12, 1999) and (65 FR 55822, September 14, 2000).

In most NESHAP, the non-delegable authorities and the delegable authorities are separated into different sections of the rule. However, in a few NESHAP, these authorities are mixed within a single section or are in the standard section in some NESHAP. In this case, we identified and separated out (where possible) the paragraphs that contain requirements for which you may not approve alternatives in the "Implementation and enforcement" section.

In other NESHAP, the delegable and non-delegable authorities are not clearly separated into different sections or into different paragraphs within a standards section. In these cases, we restructured the standards sections to separate the delegable and non-delegable authorities. This restructuring was accomplished by moving the delegable authorities to more appropriate sections of the rule, such as "Monitoring requirements" or "Recordkeeping requirements" sections. As a result, the "Implementation and enforcement" section more clearly shows which authorities you may not be delegated by simply listing the sections containing those authorities.

3. Minor Work Practices' Amendments To Allow Approval of Alternatives Without EPA Rulemaking

In some MACTs, provisions for which you could or should have the authority to approve alternatives are written in a way that precludes you from approving alternatives to these practices. Authority to approve alternatives to work practice standards or any other emission limitation established under section 112(d) or (h) of the Act cannot be delegated to you. However, some work practice requirements could be written more broadly to allow alternative practices to be implemented or these work practice requirements could be

written to expressly state that you may approve alternative practices.

We have rewritten these work practice standards, where possible, to specifically state that you have the authority to approve equivalent or more stringent alternative compliance assurance measures. The sections containing these requirements are not listed as authorities retained by us in the implementation and enforcement section. These kinds of changes are necessary only for a small number of subparts.

### B. What Clarifications Have We Made to Individual Subparts?

We did not receive any public comments concerning proposed changes to 37 of the subparts we included in the September 2000 proposal notice. However, upon closer review of the proposed changes, we determined that we had inadvertently and inconsistently delegated some of the standards we should have reserved to the Administrator's authority. For those subparts for which we received no public comments and which were correctly proposed, we have promulgated the final NESHAP amendments as proposed. Following is a list of the unchanged subparts:

• Subpart F, Synthetic Organic Chemical Manufacturing Industry
• Subpart I, HON for Certain Processes Subject to the Negotiated Regulation for Equipment Leaks
• Subpart M, National Perchloroethylene Air Emission Standards for Dry Cleaning Facilities
• Subpart O, Ethylene Oxide Emissions Standards for Sterilization Facilities
• Subpart Q, National Emission Standards for Hazardous Air Pollutants for Industrial Process Cooling Towers
• Subpart U, National Emission Standards for Hazardous Air Pollutant Emissions: Group I Polymers and Resins
• Subpart Y, National Emission Standards for Marine Tank Vessel Loading Operations
• Subpart AA, National Emission Standards for Hazardous Air Pollutants from Phosphoric Acid Manufacturing Plants
• Subpart BB, National Emission Standards for Hazardous Air Pollutants from Phosphate Fertilizers Production Plants
• Subpart CC, National Emission Standards for Hazardous Air Pollutants from Petroleum Refineries
• Subpart EE, National Emission Standards for Magnetic Tape Manufacturing Operations
• Subpart II, National Emission Standards for Shipbuilding and Ship Repair (Surface Coating)
• Subpart OO, National Emission Standards for Tanks—Level 1
• Subpart PP, National Emission Standards for Containers
• Subpart QQ, National Emission Standards for Surface Impoundments
• Subpart RR, National Emission Standards for Individual Drain Systems
• Subpart GGG, National Emission Standards for Pharmaceuticals Production
• Subpart JJJ, National Emission Standards for Hazardous Air Pollutant Emissions: Group IV Polymers and Resins
• Subpart OOO, National Emission Standards for Hazardous Air Pollutants for Amino/Phenolic Resins Production
• Subpart PPP, National Emission Standards for Hazardous Air Pollutant Emissions for Polyether Polyols Production
• Subpart XXX, National Emission Standards for Hazardous Air Pollutants for Ferroalloys Production: Ferromanganese and Silicomanganese

The first correction we must make to the proposal package is to ensure that we consistently reserve the requirements in each of the NESHAP that establish the compliance dates for all new, reconstructed, and existing sources that are subject to the applicable subparts. Upon review of the proposal package, we determined that we did not consistently reserve these requirements, which was an error because they are integral to the overall standards and cannot be delegated. Following is a list of the subparts we need to modify to ensure that the compliance date of the applicable requirements are reserved. Also included is the notation for the compliance date requirements paragraphs and/or sections that are affected by this correction to the proposed amendments.

• Subpart N, chromium electroplating (§ 63.343(a))
• Subpart W, epoxy resins and non-nylon polyamides (§ 63.521)
• Subpart X, secondary lead smelting (§ 63.546)
• Subpart LL, primary aluminum production plants (§ 63.847(a))
• Subpart CCC, steel pickling (§ 63.1160(a))
• Subpart DDD, mineral wool production (§ 63.1180)
• Subpart EEE, hazardous waste combustors (§ 63.1206(a))
• Subpart III, flexible polyurethane foam production (§ 63.1291)
• Subpart LLL, portland cement (§ 63.1351)
• Subpart MMM, pesticide active ingredient production (§ 63.1364)

• Subpart NNN, wool fiberglass manufacturing (§ 63.1387)
• Subpart RRR, secondary aluminum production (§ 63.1501)
• Subpart TTT, primary lead smelting (§ 63.1545)
• Subpart VVV, publically owned treatment works (§§ 63.1584 and 63.1587).

The second correction we must make to the proposal package is to ensure that we reserve all of the relevant standards in each of the applicable subparts. Upon closer review of the proposal package, we determined that we did not reserve all of the so-called "general requirements" sections that we should have. In some cases it was appropriate to delegate these sections, because even though the title indicated they were "standards" the content of the sections was clearly related to delegable provisions such as various reporting and recordkeeping requirements. For example, in subpart CC (petroleum refineries), § 63.642, general standards, we correctly retained §§ 63.642(g) through (l). These paragraphs require the following:

• Requires existing sources to control HAP emissions to a level represented by a specified equation;
• Requires new sources to control HAP emissions to a level represented by a specified equation;
• Directs source to use specified compliance provisions;
• Describes compliance approach;
• Describes emissions averaging approach. Note, however, that we correctly delegated §§ 63.642(a) through (f) that describe the following requirements:
• Source must obtain a part 70/71 permit;
• Cross references General Provisions applicability table;
• Initial performance tests and compliance demonstrations required only as specified in this subpart;
• Recordkeeping requirements;
• Reports sent to Administrator.

However, in other subparts, we inadvertently delegated some "general standards" requirements. We have corrected this error in today's final rule. The affected subparts and the now-retained general standards requirements are listed below:

• Subpart DD, offsite waste (§ 63.683);
• Subpart HH, oil and natural gas production facilities (§ 63.764);
• Subpart KK, printing and publishing (§ 63.823);
• Subpart HHH, natural gas transmission and storage facilities (§ 63.1274);
• Subpart LLL, portland cement manufacturing (§ 63.1342).

Executive Order 12866, and because the Agency does not have reason to believe the environmental health or safety risks addressed by this action present a disproportionate risk to children because we believe that this package as a whole will result in equal or better environmental protection than currently provided by the existing regulations, and do so in a more streamlined and effective manner.

### H. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution, or Use

This rule is not subject to Executive Order 13211, "Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use" (66 FR 28355 (May 22, 2001)) because it is not a significant regulatory action under Executive Order 12866.

### I. National Technology Transfer Advancement Act

Section 12(d) of the National Technology Transfer and Advancement Act (NTTAA) of 1995 (Public Law No. 104–113) (15 U.S.C. 272 note) directs EPA to use voluntary consensus standards in their regulatory and procurement activities unless to do so would be inconsistent with applicable law or otherwise impractical. Voluntary consensus standards are technical standards (e.g., materials specifications, test methods, sampling procedures, business practices) developed or adopted by one or more voluntary consensus bodies. The NTTAA directs EPA to provide Congress, through annual reports to the Office of Management and Budget (OMB), with explanations when an agency does not use available and applicable voluntary consensus standards.

The changes in today's rulemaking do not affect selection of technical standards that are contained in the existing subparts. Therefore, we are not considering the use of any voluntary consensus standards.

### J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations

Executive Order 12898 requires that each Federal agency make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minorities and low-income populations.

The EPA believes that today's rule should not raise any environmental justice issues. The intent of the rule is to clarify the delegation provisions in existing NESHAP and will not impact the emissions reductions provisions in these NESHAP. As a result, it appears unlikely that this program would permit any adverse effects on local populations. The EPA did not receive any public comments regarding this executive order.

### K. Congressional Review Act

The Congressional Review Act, 5 U.S.C. 801 et seq., as added by the Small Business Regulatory Enforcement Fairness Act of 1996, generally provides that before a rule may take effect, the agency promulgating the rule must submit a rule report, which includes a copy of the rule, to each House of the Congress and to the Comptroller General of the U.S. The EPA will submit a report containing this rule and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the U.S. prior to publication of the rule in the **Federal Register**. A "major rule" cannot take effect until 60 days after it is published in the **Federal Register**. This action is a "major rule" as defined by 5 U.S.C. section 804(2). This rule will be effective on August 22, 2003.

### IV. Statutory Authority

The statutory authority for this action is provided by sections 101, 112, 114, 116, and 301 of the Act as amended (42 U.S.C. 7401, 7412, 7414, 7416, and 7601). This rulemaking is also subject to section 307(d) of the Act (42 U.S.C. 7407(d)).

### V. Judicial Review

Under section 307(b)(1) of the Act, judicial review of these final rules are available only by the filing of a petition for review in the U.S. Court of Appeals for the District of Columbia Circuit by August 22, 2003. Any such judicial review is limited to only those objections that are raised with reasonable specificity in timely comments. Under section 307(b)(2) of the Act, the requirements that are the subject of this final rule may not be challenged later in civil or criminal proceedings brought by us to enforce these requirements.

### List of Subjects in 40 CFR Part 63

Environmental protection, Administrative practices and procedures, Air pollution control, Hazardous substances, Intergovernmental relations, Reporting and recordkeeping requirements.

Dated: May 29, 2003.

**Christine Todd Whitman,**
*Administrator.*

■ For the reasons set out in the preamble, title 40, chapter 1 of the Code of Federal Regulations is amended as follows:

### PART 63—[AMENDED]

■ 1. The authority citation for part 63 continues to read as follows:

**Authority:** 42 U.S.C. 7401, et seq.

### Subpart F—[Amended]

■ 2. Section 63.106 is revised to read as follows:

### §63.106   Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if implementation and enforcement of this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to requirements in §§63.100, 63.102, and 63.104. Where these standards reference another subpart, the cited provisions will be delegated according to the delegation provisions of the referenced subpart.

(2) Approval of major alternatives to test methods under §63.7(e)(2)(ii) and (f), as defined in §63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under §63.8(f), as defined in §63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under §63.10(f), as defined in §63.90, and as required in this subpart.

### Subpart G—[Amended]

■ 3. Section 63.153 is added to Subpart G to read as follows:

### § 63.153   Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if implementation and enforcement of this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.110, 63.112 through 63.113, 63.119, 63.126, 63.132 through 63.140, 63.148 through 63.149, and 63.150(i)(1) through (4). Follow the requirements in § 63.121 to request permission to use an alternative means of emission limitation for storage vessels. Where these standards reference another subpart, the cited provisions will be delegated according to the delegation provisions of the referenced subpart. Where these standards reference another subpart and modify the requirements, the requirements shall be modified as described in this subpart. Delegation of the modified requirements will also occur according to the delegation provisions of the referenced subpart.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

### Subpart H—[Amended]

■ 4. Section 63.162 is amended by revising paragraph (f)(1) to read as follows:

### § 63.162   Standards: General.

\*      \*      \*      \*      \*

(f) \*      \*      \*

(1) Clearly identify the leaking equipment.

\*      \*      \*      \*      \*

■ 5. Section 63.181 is amended by adding paragraph (b)(10) to read as follows:

### § 63.181   Recordkeeping requirements.

\*      \*      \*      \*      \*

(b) \*      \*      \*

(10) For any leaks detected as specified in §§ 63.163 and 63.164; §§ 63.168 and 63.169; and §§ 63.172 through 63.174 of this subpart, a weatherproof and readily visible identification, marked with the equipment identification number, shall be attached to the leaking equipment.

\*      \*      \*      \*      \*

■ 6. Section 63.183 is added to Subpart H to read as follows:

### § 63.183   Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if implementation and enforcement of this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.160, 63.162 through 63.176, 63.178 through 63.179. Follow the applicable procedures of § 63.177 to request an alternative means of emission limitation for batch processes and enclosed-vented process units. Where these standards reference another subpart, the cited provisions will be delegated according to the delegation provisions of the referenced subpart. Where these standards reference another subpart and modify the requirements, the requirements shall be modified as described in this subpart. Delegation of the modified requirements will also occur according to the delegation provisions of the referenced subpart.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

### Subpart I—[Amended]

■ 7. Section 63.193 is revised to read as follows:

### § 63.193   Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if implementation and enforcement of this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.190 and 63.192(a) through (b), (e), and (h) through (j). Where these standards reference another subpart, the cited provisions will be delegated according to the delegation provisions of the referenced subpart.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

### Subpart L—[Amended]

■ 8. Section 63.306 is amended by revising paragraphs (a) introductory text, (a)(1), (a)(2), and (d) to read as follows.

**37346**    **Federal Register** / Vol. 68, No. 120 / Monday, June 23, 2003 / Rules and Regulations

## § 63.306  Work practice standards.

(a) *Work practice plan.* On or before November 15, 1993, each owner or operator shall prepare and submit a written emission control work practice plan for each coke oven battery. The plan shall be designed to achieve compliance with visible emission limitations for coke oven doors, topside port lids, offtake systems, and charging operations under this subpart, or, for a coke oven battery not subject to visible emission limitations under this subpart, other federally enforceable visible emission limitations for these emission points.

(1) The work practice plan must address each of the topics specified in paragraph (b) of this section in sufficient detail and with sufficient specificity to allow the reviewing authority to evaluate the plan for completeness and enforceability.

(2) The initial plan and any revisions shall be submitted to the Administrator or the delegated State, local, or Tribal authority. The Administrator (or delegated State, local, or Tribal authority) may require revisions to the initial plan only where the Administrator (or delegated State, local, or Tribal authority) finds either that the plan does not address each subject area listed in paragraph (b) of this section for each emission point subject to a visible emission standard under this subpart, or that the plan in unenforceable because it contains requirements that are unclear.

\*    \*    \*    \*    \*

(d) *Revisions to plan.* Revisions to the work practice emission control plan will be governed by the provisions in this paragraph (d) and in paragraph (a)(2) of this section. The reviewing authority is the Administrator or the delegated State, local, or Tribal authority.

(1) The reviewing authority may request the owner or operator to review and revise as needed the work practice emission control plan for a particular emission point if there are 2 exceedances of the applicable visible emission limitation in the 6-month period that starts 30 days after the owner or operator is required to implement work practices under paragraph (c) of this section. In the case of a coke oven battery subject to visual emission limitations under this subpart, the second exceedance must be independent of the criteria in paragraph (c)(1)(i) of this section.

(2) The reviewing authority may not request the owner or operator to review and revise the plan more than twice in any 12 consecutive month period for any particular emission point unless the

reviewing authority disapproves the plan according to the provisions in paragraph (d)(6) of this section.

(3) If the certified observer calculates that a second exceedance (or, if applicable, a second independent exceedance) has occurred, the certified observer shall notify the owner or operator. No later than 10 days after receipt of such a notification, the owner or operator shall notify the reviewing authority of any finding of whether work practices are related to the cause or the solution of the problem. The notification is subject to review by the reviewing authority according to the provisions in paragraph (d)(6) of this section.

(4) The owner or operator shall submit a revised work practice plan within 60 days of notification from the reviewing authority under paragraph (d)(1) of this section, unless the reviewing authority grants an extension of time to submit the revised plan.

(5) If the reviewing authority requires a plan revision, the reviewing authority may require the plan to address a subject area or areas in addition to those in paragraph (b) of this section, if the reviewing authority determines that without plan coverage of such an additional subject area, there is a reasonable probability of further exceedances of the visible emission limitation for the emission point for which a plan revision is required.

(6) The reviewing authority may disapprove a plan revision required under paragraph (d) of this section if the reviewing authority determines that the revised plan is inadequate to prevent exceedances of the visible emission limitation under this subpart for the emission point for which a plan revision is required or, in the case of a battery not subject to visual emission limitations under this subpart, other federally enforceable emission limitations for such emission point. The reviewing authority may also disapprove the finding that may be submitted pursuant to paragraph (d)(3) of this section if the reviewing authority determines that a revised plan is needed to prevent exceedances of the applicable visible emission limitations.

■ 9. Section 63.309 is amended by revising paragraph (a)(5)(i) to read as follows:

## § 63.309  Performance tests and procedures.

(a) \*    \*    \*

(5)(i) The EPA shall be the enforcement agency during any period of time that a delegation of enforcement authority is not in effect or a withdrawal of enforcement authority under § 63.313

is in effect, and the Administrator is responsible for performing the inspections required by this section, pursuant to § 63.313(c).

\*    \*    \*    \*    \*

■ 10. Section 63.313 is revised to read as follows:

## § 63.313  Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if implementation and enforcement of this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (d) of this section are retained by the Administrator and cannot be transferred to the State, local, or Tribal agency.

(c) *Withdrawal of authority:*

(1) Whenever the Administrator learns that a delegated agency has not fully carried out the inspections and performance tests required under § 63.309 for each applicable emission point of each battery each day, the Administrator shall immediately notify the agency. Unless the delegated agency demonstrates to the Administrator's satisfaction within 15 days of notification that the agency is consistently carrying out the inspections and performance tests required under § 63.309 in the manner specified in the preceding sentence, the Administrator shall notify the coke oven battery owner or operator that inspections and performance tests shall be carried out according to § 63.309(a)(5). When the Administrator determines that the delegated agency is prepared to consistently perform all the required inspections and performance tests each day, the Administrator shall give the coke oven battery owner or operator at least 15 days notice that implementation will revert to the previously delegated agency.

(2) In addition to the provisions in paragraph (c)(1) of this section, the Administrator may also withdraw delegation of authority pursuant to the provisions of § 63.96 of subpart E of this part.

(d) The authorities that cannot be delegated to State, local, or Tribal

agencies are as specified in paragraphs (d)(1) through (5) of this section.

(1) Approval of alternatives to the requirements in §§ 63.300 and 63.302 through 63.308 (except the authorities in 63.306(a)(2) and (d)).

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of any changes to section 2 of Method 303 in appendix A of this part.

(4) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(5) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

**Subpart M—[Amended]**

■ 11. Section 63.326 is added to Subpart M to read as follows:

**§ 63.326    Implementation and enforcement.**

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if implementation and enforcement of this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.320 and 63.322(a) through (j). Follow the requirements in § 63.325 to demonstrate that alternative equipment or procedures are equivalent to the requirements of § 63.322.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

**Subpart N—[Amended]**

■ 12. Section 63.342 is amended:
■ a. By revising paragraph (f) introductory text.
■ b. Revising paragraph (f)(3)(i) introductory text.
■ c. Revising paragraphs (f)(3)(i)(B) and (C).
■ d. Revising the headings for Table 1 and its columns.
■ The revisions read as follows:

**§ 63.342    Standards.**

\*    \*    \*    \*    \*

(f) *Operation and maintenance practices.* All owners or operators subject to the standards in paragraphs (c) and (d) of this section are subject to these operation and maintenance practices.

\*    \*    \*    \*    \*

(3) *Operation and maintenance plan.*

(i) The owner or operator of an affected source subject to paragraph (f) of this section shall prepare an operation and maintenance plan to be implemented no later than the compliance date, except for hard chromium electroplaters and the chromium anodizing operations in California which have until January 25, 1998. The plan shall be incorporated by reference into the source's title V permit, if and when a title V permit is required. The plan shall include the following elements:

\*    \*    \*    \*    \*

(B) For sources using an add-on control device or monitoring equipment to comply with this subpart, the plan shall incorporate the operation and maintenance practices for that device or monitoring equipment, as identified in Table 1 of this section, if the specific equipment used is identified in Table 1 of this section;

(C) If the specific equipment used is not identified in Table 1 of this section, the plan shall incorporate proposed operation and maintenance practices. These proposed operation and maintenance practices shall be submitted for approval as part of the submittal required under § 63.343(d);

\*    \*    \*    \*    \*

TABLE 1 TO § 63.342.—SUMMARY OF OPERATION AND MAINTENANCE PRACTICES

| Control technique | Operation and maintenance practices | Frequency |
|---|---|---|
| \* | \* | \* | \* | \* | \* | \* |

■ 13. Section 63.343 is amended by revising paragraph (d) to read as follows:

**§ 63.343    Compliance provisions.**

\*    \*    \*    \*    \*

(d) An owner or operator who uses an air pollution control device not listed in this section shall submit a description of the device, test results collected in accordance with § 63.344(c) verifying the performance of the device for reducing chromium emissions to the atmosphere to the level required by this subpart, a copy of the operation and maintenance plan referenced in § 63.342(f) including operation and maintenance practices, and appropriate operating parameters that will be monitored to establish continuous compliance with the standards. The monitoring plan submitted identifying the continuous compliance monitoring is subject to the Administrator's approval.

■ 14. Section 63.348 is added to Subpart N to read as follows:

**§ 63.348    Implementation and enforcement.**

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if implementation and enforcement of this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.340, 63.342(a) through (e) and (g), and 63.343(a).

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

## Subpart O—[Amended]

■ 15. Section 63.368 is added to Subpart O to read as follows:

### § 63.368  Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if implementation and enforcement of this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.360 and 63.362.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

## Subpart Q—[Amended]

■ 16. Section 63.407 is added to Subpart Q to read as follows:

### § 63.407  Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if implementation and enforcement of this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.400 and 63.402 through 63.403.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

## Subpart R—[Amended]

■ 17. Section 63.429 is revised to read as follows:

### § 63.429  Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if implementation and enforcement of this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the

Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.420, 63.422 through 63.423, and 63.424. Any owner or operator requesting to use an alternative means of emission limitation for storage vessels covered by § 63.423 must follow the procedures in § 63.426.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart, and any alternatives to § 63.427(a)(1) through (4) per § 63.427(a)(5).

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

## Subpart S—[Amended]

■ 18. Section 63.450 is amended by revising paragraph (d)(1) to read as follows:

### § 63.450  Standards for enclosures and closed-vent systems.

\*    \*    \*    \*    \*

(d) \* \* \*

(1) On each bypass line, the owner or operator shall install, calibrate, maintain, and operate according to the manufacturer's specifications a flow indicator that is capable of taking periodic readings as frequently as specified in § 63.454(e). The flow indicator shall be installed in the bypass line in such a way as to indicate flow in the bypass line; or

\*    \*    \*    \*    \*

■ 19. Section 63.454 is amended by revising paragraph (e) to read as follows:

### § 63.454  Recordkeeping requirements.

\*    \*    \*    \*    \*

(e) The owner or operator shall set the flow indicator on each bypass line specified in § 63.450(d)(1) to provide a record of the presence of gas stream flow in the bypass line at least once every 15 minutes.

\*    \*    \*    \*    \*

■ 20. Section 63.458 is revised to read as follows:

### § 63.458  Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency.

If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.440, 63.443 through 63.447 and 63.450. Where these standards reference another subpart, the cited provisions will be delegated according to the delegation provisions of the referenced subpart.

(2) Approval of alternatives to using §§ 63.457(b)(5)(iii), 63.457(c)(3)(ii) through (iii), and 63.257(c)(5)(ii), and any major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of alternatives using § 64.453(m) and any major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

**Subpart T—[Amended]**

■ 21. Section 63.460 is amended by removing and reserving paragraph (f).
■ 22. Section 63.462 is amended by adding paragraph (e) to read as follows:

### § 63.462  Batch cold cleaning machine standards.

\*    \*    \*    \*    \*

(e) Each owner or operator subject to the requirements of paragraph (c)(1) through (8) of this section may request to use measures other than those described in these paragraphs. The owner or operator must demonstrate to the Administrator (or delegated State, local, or Tribal authority) that the alternative measures will result in equivalent or better emissions control compared to the measures described in paragraphs (c)(1) through (8) of this section. For example, storing solvent

and solvent-laden materials in an enclosed area that is ventilated to a solvent recovery or destruction device may be considered an acceptable alternative.

■ 23. Section 63.463 is amended by revising paragraph (e)(2)(ix)(B) to read as follows:

### § 63.463  Batch vapor and in-line cleaning machine standards.

\*    \*    \*    \*    \*

(e) \*    \*    \*
(2) \*    \*    \*
(ix) \*    \*    \*
(B) Conduct the weekly monitoring required by § 63.466(a)(3). Record the results required by § 63.467(a)(6).

\*    \*    \*    \*    \*

■ 24. Section 63.467 is amended by revising paragraph (a)(6) to read as follows:

### § 63.467  Recordkeeping requirements.

(a) \*    \*    \*
(6) If a squeegee system is used to comply with these standards, records of the test required by § 63.466(f) to determine the maximum product throughput for the squeegees and records of both the weekly monitoring required by § 63.466(a)(3) for visual inspection and the length of continuous web product cleaned during the previous week.

\*    \*    \*    \*    \*

■ 25. Section 63.470 is added to Subpart T to read as follows:

### § 63.470  Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if implementation and enforcement of this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.460, 63.462(a)

through (d), and 63.463 through 63.464 (except for the authorities in § 63.463(d)(9)). Use the procedures in § 63.469 to request the use of alternative equipment or procedures.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

**Subpart U—[Amended]**

■ 26. Section 63.507 is added to Subpart U to read as follows:

### § 63.507  Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.480 through 63.481, 63.483(a) through (c), 63.484, 63.485(a) through (k), (m) through (s), (u), 63.486 through 63.487, 63.488(a), (b)(1) through (4), (5)(iv) through (v), (6) through (7), (c) through (i), 63.493 through 63.494, 63.500(a)(1) through (3), (b), 63.501, 63.502(a) through (f), (i), (k) through (m), and 63.503. Where these standards reference another subpart, the cited provisions will be delegated according to the delegation provisions of the referenced subpart. Where these standards reference another subpart and modify the requirements, the requirements shall be modified as described in this subpart. Delegation of the modified requirements will also occur according to the delegation provisions of the referenced subpart.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

## Subpart W—[Amended]

■ 27. Section 63.529 is added to Subpart W to read as follows:

### § 63.529   Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if implementation and enforcement of this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.520, 63.521, 63.523, and 63.524. Where these standards reference another rule, the cited provisions in that rule will be delegated according to the delegation provisions of that rule.

(2) Approval of major alternatives to test methods for under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

## Subpart X—[Amended]

■ 28. Section 63.545 is amended by revising paragraph (c) introductory text and adding paragraph (f) to read as follows:

### § 63.545   Standards for fugitive dust sources.

\* \* \* \* \*

(c) The controls specified in the standard operating procedures manual shall at a minimum include the requirements of paragraphs (c)(1) through (c)(5) of this section, unless the owner or operator satisfies the requirements in paragraph (f) of this section.

\* \* \* \* \*

(f) Demonstrate to the Administrator (or delegated State, local, or Tribal authority) that an alternative measure(s) is equivalent or better than a practice(s) described in paragraphs (c)(1) through (c)(5) of this section.

■ 29. Section 63.551 is added to Subpart X to read as follows:

### § 63.551   Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.541, 63.543 through 63.544, 63.545(a) and (c) through (e), and 63.546.

(2) Approval of major alternatives to test methods for under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

## Subpart Y—[Amended]

■ 30. Section 63.562 is amended by removing paragraph (d)(3).

■ 31. Section 63.567 is amended by adding paragraph (l) to read as follows:

### § 63.567   Recordkeeping and reporting requirements.

\* \* \* \* \*

(l) The owner or operator of the VMT source required by § 63.562(d)(2)(iv) to develop a program, shall submit annual reports on or before January 31 of each year to the Administrator certifying the annual average daily loading rate for the previous calendar year. Beginning on January 31, 1996, for the reported year 1995, the annual report shall specify the annual average daily loading rate over all loading berths. Beginning on January 31, 1999, for the reported year 1998, the annual report shall specify the annual average daily loading rate over all loading berths, over each loading berth equipped with a vapor collection system and control device, and over each loading berth not equipped with a vapor collection system and control device. The annual average daily loading rate under this section is calculated as the total amount of crude oil loaded during the calendar year divided by 365 days or 366 days, as appropriate.

■ 32.–33. Section 63.568 is added to Subpart Y to read as follows:

### § 63.568   Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if implementation and enforcement of this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.560 and 63.562(a) through (d).

(2) Approval of major alternatives to test methods for under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, as required in this subpart.

## Subpart AA—[Amended]

■ 34. Section 63.611 is added to Subpart AA to read as follows:

### § 63.611   Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if implementation and enforcement of this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.600, 63.602 through 63.604, and 63.609 through 63.610.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

## Subpart BB—[Amended]

■ 35. Section 63.632 is added to Subpart BB to read as follows:

### § 63.632   Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in

addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if implementation and enforcement of this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.620, 63.622 through 63.624, and 63.629 through 63.631.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

## Subpart CC—[Amended]

■ 36. Section 63.655 is added to Subpart CC to read as follows:

### § 63.655   Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if implementation and enforcement of this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.640, 63.642(g) through (l), 63.643, and 63.646 through 63.652. Where these standards reference another subpart, the cited provisions will be delegated according to the delegation provisions of the referenced subpart. Where these standards reference another subpart and modify the requirements, the requirements shall be modified as described in this subpart. Delegation of the modified requirements will also occur according to the delegation provisions of the referenced subpart.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

## Subpart DD—[Amended]

■ 37. Section 63.684 is amended by revising paragraph (e)(1) to read as follows:

### § 63.684   Standards: Off-Site material treatment.

\*    \*    \*    \*    \*

(e) \* \* \*

(1) A continuous monitoring system shall be installed and operated for each treatment that measures operating parameters appropriate for the treatment process technology. This system shall include a continuous recorder that records the measured values of the selected operating parameters. The monitoring equipment shall be installed, calibrated, and maintained in accordance with the equipment manufacturer's specifications. The continuous recorder shall be a data recording device that is capable of recording either an instantaneous data value at least once every 15 minutes or an average value for intervals of 15 minutes or less.

\*    \*    \*    \*    \*

■ 38. Section 63.693 is amended by revising paragraph (c)(2)(ii) to read as follows:

### § 63.693   Standards: closed-vent systems and control devices.

\*    \*    \*    \*    \*

(c) \* \* \*

(2) \* \* \*

(ii) If a seal or locking device is used to comply with paragraph (c)(2) of this section, the device shall be placed on the mechanism by which the bypass

**37352** **Federal Register** / Vol. 68, No. 120 / Monday, June 23, 2003 / Rules and Regulations

device position is controlled (*e.g.*, valve handle, damper lever) when the bypass device is in the closed position such that the bypass device cannot be opened without breaking the seal or removing the lock. Examples of such devices include, but are not limited to, a car-seal or a lock-and-key configuration valve.

\*    \*    \*    \*    \*

■ 39. Section 63.695 is amended by revising paragraph (a)(4) and adding paragraphs (c)(1)(ii)(C) and (D) to read as follows:

### §63.695  Inspection and monitoring requirements.

\*    \*    \*    \*    \*

(a) \* \* \*

(4) To monitor and record off-site material treatment processes for compliance with the standards specified in 63.684(e), the monitoring procedures are specified in paragraph (e) of this section.

\*    \*    \*    \*    \*

(c) \* \* \*

(1) \* \* \*

(ii) \* \* \*

(C) The continuous monitoring system required by § 63.693(b)(4)(i) shall monitor and record either an instantaneous data value at least once every 15 minutes or an average value for intervals of 15 minutes or less.

(D) The owner or operator shall visually inspect the seal or closure mechanism required by § 63.693(c)(2)(ii) at least once every month to verify that the bypass mechanism is maintained in the closed position.

\*    \*    \*    \*    \*

■ 40. Section 63.698 is revised to read as follows:

### §63.698  Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal

agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.680, 63.683 through 63.691, and 63.693. Where these standards reference another subpart, the cited provisions will be delegated according to the delegation provisions of the referenced subpart.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

### Subpart EE—[Amended]

■ 41. Section 63.708 is revised to read as follows:

### §63.708  Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if implementation and enforcement of this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.701 and 63.703.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

### Subpart GG—[Amended]

■ 42. Section 63.744 is amended:

■ a. By revising the first sentence of paragraph (a)(1).

■ b. By revising paragraph (a)(2).

■ c. Adding paragraph (a)(4).

The revisions and addition read as follows:

### §63.744  Standards: Cleaning operations.

(a) \* \* \*

(1) Unless the owner or operator satisfies the requirements in paragraph (a)(4) of this section, place used solvent-laden cloth, paper, or any other absorbent applicators used for cleaning in bags or other closed containers. \* \* \*

(2) Unless the owner or operator satisfies the requirements in paragraph (a)(4) of this section, store fresh and spent cleaning solvents, except semi-aqueous solvent cleaners, used in aerospace cleaning operations in closed containers.

\*    \*    \*    \*    \*

(4) Demonstrate to the Administrator (or delegated State, local, or Tribal authority) that equivalent or better alternative measures are in place compared to the use of closed containers for the solvent-laden materials described in paragraph (a)(1) of this section, or the storage of solvents described in paragraph (a)(2) of this section.

\*    \*    \*    \*    \*

■ 43. Section 63.759 is added to Subpart GG to read as follows:

### §63.759  Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if implementation and enforcement of this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.741, 63.743, 63.744(a)(3), (b) through (e), 63.745 through 63.748, and 63.649(a).

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

## Subpart HH—[Amended]

■ 44. Section 63.771 is amended by revising paragraphs (c)(3)(i)(A) and (B) to read as follows:

### § 63.771   Control equipment requirements.

\*        \*        \*        \*        \*

(c) \* \* \*

(3) \* \* \*

(i) \* \* \*

(A) At the inlet to the bypass device that could divert the stream away from the control device to the atmosphere, properly install, calibrate, maintain, and operate a flow indicator that is capable of taking periodic readings and sounding an alarm when the bypass device is open such that the stream is being, or could be, diverted away from the control device to the atmosphere; or

(B) Secure the bypass device valve installed at the inlet to the bypass device in the non-diverting position using a car-seal or a lock-and-key type configuration.

\*        \*        \*        \*        \*

■ 45. Section 63.773 is amended by revising paragraph (c)(2) introductory text and adding paragraph (c)(2)(iv) to read as follows:

### § 63.773   Inspection and monitoring requirements.

\*        \*        \*        \*        \*

(c) \* \* \*

(2) Except as provided in paragraphs (c)(5) and (6) of this section, each closed-vent system shall be inspected according to the procedures and schedule specified in paragraphs (c)(2)(i) and (ii) of this section, each cover shall be inspected according to the procedures and schedule specified in paragraph (c)(2)(iii) of this section, and each bypass device shall be inspected according to the procedures of paragraph (c)(2)(iv) of this section.

\*        \*        \*        \*        \*

(iv) For each bypass device, except as provided for in § 63.771(c)(3)(ii), the owner or operator shall either:

(A) At the inlet to the bypass device that could divert the steam away from

the control device to the atmosphere, set the flow indicator to take a reading at least once every 15 minutes; or

(B) If the bypass device valve installed at the inlet to the bypass device is secured in the non-diverting position using a car-seal or a lock-and-key type configuration, visually inspect the seal or closure mechanism at least once every month to verify that the valve is maintained in the non-diverting position and the vent stream is not diverted through the bypass device.

\*        \*        \*        \*        \*

■ 46. Section 63.776 is revised to read as follows:

### § 63.776   Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.760, 63.764 through 63.766, 63.769, 63.771, and 63.777.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

## Subpart II—[Amended]

■ 47. Section 63.789 is added to Subpart II to read as follows:

### § 63.789   Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the

applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if implementation and enforcement of this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.780 through 63.781, and 63.783 through 63.784.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

## Subpart JJ—[Amended]

■ 48. Section 63.803 is amended by revising paragraph (a) to read as follows:

### § 63.803   Work practice standards.

\*        \*        \*        \*        \*

(a) *Work practice implementation plan.*

(1) Each owner or operator of an affected source subject to this subpart shall prepare and maintain a written work practice implementation plan that defines environmentally desirable work practices for each wood furniture operation manufacturing operation and addresses each of the work practice standards presented in paragraphs (b) through (l) of this section. The plan shall be developed no more than 60 days after the compliance date.

(2) The written work practice implementation plan shall be available for inspection by the Administrator (or delegated State, local, or Tribal authority) upon request. If the Administrator (or delegated State, local, or Tribal authority) determines that the work practice implementation plan does not include sufficient mechanisms for

ensuring that the work practice standards are being implemented, the Administrator (or delegated State, local, or Tribal authority) may require the affected source to modify the plan. Revisions or modifications to the plan do not require a revision of the source's Title V permit.

(3) The inspection and maintenance plan required by paragraph (c) of this section and the formulation assessment plan for finishing operations required by paragraph (l) of this section are also reviewable by the Administrator (or delegated State, local, or Tribal authority).

\* \* \* \* \*

■ 49. Section 63.808 is revised to read as follows:

### § 63.808  Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if implementation and enforcement of this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (5) of this section.

(1) Approval of alternatives to the requirements in §§ 63.800, 63.802, and 63.803(a)(1), (b), (c) introductory text, and (d) through (l).

(2) Approval of alternatives to the monitoring and compliance requirements in §§ 63.804(f)(4)(iv)(D) and (E), 63.804(g)(4)(iii)(C), 63.804(g)(4)(vi), and 63.804(g)(6)(vi).

(3) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart, as well as approval of any alternatives to the specific test methods under §§ 63.805(a), 63.805(d)(2)(v), and 63.805(e)(1).

(4) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(5) Approval of major alternatives to recordkeeping and reporting under

§ 63.10(f), as defined in § 63.90, and as required in this subpart.

## Subpart KK—[Amended]

■ 50. Section 63.831 is revised to read as follows:

### § 63.831  Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.820 through 63.821 and 63.823 through 63.826.

(2) Approval of alternatives to the test method for organic HAP content determination in § 63.827(b) and alternatives to the test method for volatile matter in § 63.827(c), and major alternatives to other test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

## Subpart LL—[Amended]

■ 51. Section 63.853 is revised to read as follows:

### § 63.853  Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this regulation. Contact the applicable U.S.

EPA Regional Office to find out if this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.840, 63.843 (with the exception of 63.843(b)(3)), 63.844, 63.845(a) introductory text, (a)(1), (b) through (e), (h), 63.846(a) through (c), and 63.847(a)(1) and (4).

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

## Subpart OO—[Amended]

■ 52. Section 63.908 is added to Subpart OO to read as follows:

### § 63.908  Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.900 and 63.902.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and

(f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

## Subpart PP—[Amended]

■ 53. Section 63.929 is added to Subpart PP to read as follows:

### § 63.929   Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.920 and 63.922 through 63.924. Where these standards reference another subpart, the cited provisions will be delegated according to the delegation provisions of the referenced subpart.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

## Subpart QQ—[Amended]

■ 54. Section 63.949 is added to Subpart QQ to read as follows:

### § 63.949   Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the

applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.940, 63.942, and 63.943. Where these standards reference subpart DD, the cited provisions will be delegated according to the delegation provisions of subpart DD.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

## Subpart RR—[Amended]

■ 55. Section 63.967 is added to Subpart RR to read as follows:

### § 63.967   Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.960 and 63.962. Where these standards reference subpart DD, the cited provisions will be delegated according to the delegation provisions subpart DD of this part.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

## Subpart VV—[Amended]

■ 56. Section 63.1050 is added to Subpart VV to read as follows:

### § 63.1050   Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.1040 and 63.1042 through 63.1045. Where these standards reference subpart DD, the cited provisions will be delegated according to the delegation provisions of subpart DD of this part.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

## Subpart CCC—[Amended]

■ 57. Section 63.1166 is revised to read as follows:

### § 63.1166  Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if implementation and enforcement of this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (8) of this section.

(1) Approval of alternatives to the requirements in §§ 63.1155, 63.1157 through 63.1159, and 63.1160(a).

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of any alternative measurement methods for HCl and CL$_2$ to those specified in § 63.1161(d)(1).

(4) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(5) Approval of any alternative monitoring requirements to those specified in §§ 63.1162(a)(2) through (5) and 63.1162(b)(1) through (3).

(6) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

(7) Waiver of recordkeeping requirements specified in § 63.1165.

(8) Approval of an alternative schedule for conducting performance tests to the requirement specified in § 63.1162(a)(1).

## Subpart DDD—[Amended]

■ 58. Section 63.1195 is revised to read as follows:

### § 63.1195  Who implements and enforces this subpart?

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if implementation and enforcement of this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.1177 through 63.1180.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

## Subpart EEE—[Amended]

■ 59. Section 63.1214 is added to Subpart EEE to read as follows:

### § 63.1214  Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to requirements in §§ 63.1200, 63.1203 through 63.1205, and 63.1206(a).

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

## Subpart GGG—[Amended]

■ 60. Section 63.1261 is revised to read as follows:

### § 63.1261  Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if implementation and enforcement of this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.1250 and 63.1252 through 63.1256. Where these standards reference another subpart, the cited provisions will be delegated according to the delegation provisions of the referenced subpart.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, as required in this subpart.

## Subpart HHH—[Amended]

■ 61. Section 63.1281 is amended by revising paragraphs (c)(3)(i)(A) and (B) to read as follows:

### § 63.1281   Control equipment requirements.

\*    \*    \*    \*    \*

(c) \* \* \*

(3) \* \* \*

(i) \* \* \*

(A) At the inlet to the bypass device that could divert the stream away from the control device to the atmosphere, properly install, calibrate, maintain, and operate a flow indicator that is capable of taking periodic readings and sounding an alarm when the bypass device is open such that the stream is being, or could be, diverted away from the control device to the atmosphere; or

(B) Secure the bypass device valve installed at the inlet to the bypass device in the non-diverting position using a car-seal or a lock-and-key type configuration.

\*    \*    \*    \*    \*

■ 62. Section 13.1283 is amended by revising paragraph (c)(2) introductory text and adding paragraph (c)(2)(iii) to read as follows:

### § 63.1283   Inspection and monitoring requirements.

\*    \*    \*    \*    \*

(c) \* \* \*

(2) Except as provided in paragraphs (c)(5) and (6) of this section, each closed-vent system shall be inspected according to the procedures and schedule specified in paragraphs (c)(2)(i) and (ii) of this section and each bypass device shall be inspected according to the procedures of (c)(2)(iii) of this section.

\*    \*    \*    \*    \*

(iii) For each bypass device, except as provided for in § 63.1281(c)(3)(ii), the owner or operator shall either:

(A) At the inlet to the bypass device that could divert the steam away from the control device to the atmosphere, set the flow indicator to take a reading at least once every 15 minutes; or

(B) If the bypass device valve installed at the inlet to the bypass device is

secured in the non-diverting position using a car-seal or a lock-and-key type configuration, visually inspect the seal or closure mechanism at least once every month to verify that the valve is maintained in the non-diverting position and the vent stream is not diverted through the bypass device.

\*    \*    \*    \*    \*

■ 63. Section 63.1286 is revised to read as follows:

### § 63.1286   Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.1270, 63.1274 through 63.1275, 63.1281, and 63.1287.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

## Subpart III—[Amended]

■ 64. Section 63.1309 is revised to read as follows:

### § 63.1309   Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in

addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if implementation and enforcement of this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (5) of this section.

(1) Approval of alternatives to the requirements in §§ 63.1290, 63.1291, 63.1293 through 63.1301, and 63.1305.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of alternatives to the specific monitoring requirements of § 63.1303(b)(5).

(5) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

## Subpart JJJ—[Amended]

■ 65. Section 63.1336 is added to Subpart JJJ to read as follows:

### § 63.1336   Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal

agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.1310 through 63.1311, 63.1313 through 63.1315(a)(1) through (9), (11) through (18), (b) through (e), 63.1316, 63.1321 through 63.1322, 63.1323(a), (b)(1) through (4), (b)(5)(iv) through (v), (b)(6) through (7), (c) through (j), and 63.1328 through 63.1332. Where these standards reference another subpart, the cited provisions will be delegated according to the delegation provisions of the referenced subpart. Where these standards reference another subpart and modify the requirements, the requirements shall be modified as described in this subpart. Delegation of the modified requirements will also occur according to the delegation provisions of the referenced subpart.

(2) Approval of major alternatives to test methods for under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

## Subpart LLL—[Amended]

■ 66. Section 63.1358 is revised to read as follows:

### § 63.1358    Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.1340, 63.1342 through 63.1348, and 63.1351.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

## Subpart MMM—[Amended]

■ 67. Section 63.1362 is amended by revising paragraphs (j)(1) and (j)(2) to read as follows:

### § 63.1362    Standards.

*    *    *    *    *

(j) * * *

(1) Install, calibrate, maintain, and operate a flow indicator that is capable of determining whether vent stream flow is present and taking frequent, periodic readings. Records shall be maintained as specified in § 63.1367(f)(1). The flow indicator shall be installed at the entrance to any bypass line that could divert the vent stream away from the control device to the atmosphere; or

(2) Secure the bypass line valve in the closed position with a car-seal or lock-and-key type configuration. Records shall be maintained as specified in § 63.1367(f)(2).

*    *    *    *    *

■ 68. Section 63.1366 is amended by revising paragraph (b)(1)(xiii) to read as follows:

### § 63.1366    Monitoring and inspection requirements.

*    *    *    *    *

(b) * * *

(1) * * *

(xiii) *Closed-vent system visual inspections.* The owner or operator shall comply with the requirements in either paragraph (b)(1)(xiii)(A) or (B) of this section:

(A) Set the flow indicator at the entrance to any bypass line that could divert the stream away from the control device to the atmosphere to take a reading at least once every 15 minutes; or

(B) If the bypass device valve installed at the inlet to the bypass device is secured in the closed position with a car-seal or lock-and-key type configuration, visually inspect the seal or closure mechanism at least once every month to verify that the valve is maintained in the closed position and the vent stream is not diverted through the bypass line.

*    *    *    *    *

■ 69. Section 63.1369 is revised to read as follows:

### § 63.1369    Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if implementation and enforcement of this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.1360 and 63.1362 through 63.1364. Where these standards reference another subpart, the cited provisions will be delegated according to the delegation provisions of the referenced subpart. Where these standards reference another subpart and modify the requirements, the requirements shall be modified as described in this subpart. Delegation of the modified requirements will also occur according to the delegation provisions of the referenced subpart.

(2) Approval of major alternatives to test methods for under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

## Subpart NNN—[Amended]

■ 70. Section 63.1388 is added to Subpart NNN to read as follows:

### § 63.1388    Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has

delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if implementation and enforcement of this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.1380, 63., and 63.1387.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

### Subpart OOO—[Amended]

■ 71. Section 63.1419 is revised to read as follows:

### § 63.1419   Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if implementation and enforcement of this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal

agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.1400 through 63.1401 and 63.1404 through 63.1410. Where these standards reference another subpart, the cited provisions will be delegated according to the delegation provisions of the referenced subpart. Where these standards reference another subpart and modify the requirements, the requirements shall be modified as described in this subpart. Delegation of the modified requirements will also occur according to the delegation provisions of the referenced subpart.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

### Subpart PPP—[Amended]

■ 72. Section 63.1421 is revised to read as follows:

### § 63.1421   Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.1420, 63.1422, 63.1424 through 63.1428, and 63.1432 through 63.1436. Where these standards reference another subpart, the cited provisions will be delegated according to the delegation provisions of the referenced subpart. Where these

standards reference another subpart and modify the requirements, the requirements shall be modified as described in this subpart. Delegation of the modified requirements will also occur according to the delegation provisions of the referenced subpart.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

### Subpart RRR—[Amended]

■ 73. Section 63.1519 is revised to read as follows:

### § 63.1519   Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this regulation. Contact the applicable U.S. EPA Regional Office to find out if this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this regulation to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.1500 through 63.1501 and 63.1505 through 63.1506.

(2) Approval of major alternatives to test methods for under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

## Subpart TTT—[Amended]

■ 74. Section 63.1550 is revised to read as follows:

### § 63.1550  Implementation and enforcement.

(a) This subpart will be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.1541, 63.1543(a) through (c), (f) through (g), and 63.1544 through 63.1545.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

## Subpart VVV—[Amended]

■ 75. Section 63.1594 is revised to read as follows:

### § 63.1594  Who enforces this subpart?

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if implementation and enforcement of this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.1580, 63.1583 through 63.1584, and 63.1586 through 63.1587.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

## Subpart XXX—[Amended]

■ 76. Section 63.1661 is revised to read as follows:

### § 63.1661  Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to requirements in §§ 63.1650 and 63.1652 through 63.1654.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

[FR Doc. 03–14190 Filed 6–20–03; 8:45 am]
**BILLING CODE 6560–50–P**



Rule 154   Stage 1 Episode Actions (Adopted 9/17/91)
Rule 155   Stage 2 Episode Actions (Adopted 9/17/91)
Rule 156   Stage 3 Episode Actions (Adopted 9/17/91)
Rule 158   Source Abatement Plans (Adopted 9/17/91)
Rule 159   Traffic Abatement Procedures (Adopted 9/17/91)

\*     \*     \*     \*     \*

[FR Doc. 95–22519 Filed 9–11–95; 8:45 am]
**BILLING CODE 6050–50–P**

## 40 CFR Part 70

**[LA–001; FRL–5293–3]**

## Clean Air Act Final Full Approval of Operating Permits Program; Louisiana Department of Environmental Quality

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final full approval.

**SUMMARY:** The EPA is promulgating full approval of the Louisiana Operating Permits program submitted by the Governor of Louisiana for the Louisiana Department of Environmental Quality (LDEQ) for the purpose of complying with Federal requirements which mandate that States develop and submit to EPA, programs for issuing operating permits to all major stationary sources, and to certain other sources.

**EFFECTIVE DATE:** This program will be effective October 12, 1995.

**ADDRESSES:** Copies of the State's submittal and other supporting information used in developing the final full approval are available for inspection during normal business hours at the following location:

Environmental Protection Agency, Region 6, Air Permits Section (6PD–R), 1445 Ross Avenue, Suite 700, Dallas, Texas 75202–2733.

Louisiana Department of Environmental Quality, Office of Air Quality, 7290 Bluebonnet Boulevard, P.O. Box 82135, Baton Rouge, Louisiana 70884–2135.

**FOR FURTHER INFORMATION CONTACT:**
Joyce P. Stanton, Multimedia Planning and Permitting Division, Environmental Protection Agency, Region 6, 1445 Ross Avenue, Suite 700, Dallas, Texas 75202–2733, telephone 214–665–7547.

**SUPPLEMENTARY INFORMATION:**

## I. Background and Purpose

### A. Introduction

Title V of the Clean Air Act ("the Act"), and implementing regulations at 40 Code of Federal Regulations (CFR) part 70 require that States develop and submit operating permits programs to the EPA by November 15, 1993, and that the EPA act to approve or disapprove each program within one year after receiving the submittal. The EPA's program review occurs pursuant to section 502 of the Act and the part 70 regulations, which together outline criteria for approval or disapproval. Where a program substantially, but not fully, meets the requirements of part 70, the EPA may grant the program interim approval for a period of up to two years. If the EPA has not fully approved a program by two years after the date of November 15, 1993, or by the end of an interim program, it must establish and implement a Federal program.

On August 25, 1994, the EPA proposed interim approval of the Operating Permits program submitted by the LDEQ on November 15, 1993, to meet the requirements of part 70 and title V of the Act. (See 59 FR 43797, August 25, 1994) (hereafter Interim Approval Notice). Many comments were received on the Interim Approval Notice. The LDEQ provided comments and revised their Operating Permits program to address the issues discussed in the Interim Approval Notice. These revisions were sent to the EPA on November 10, 1994. On April 7, 1995, the EPA rescinded the proposed interim approval, addressed all comments received on the Interim Approval Notice, and proposed full approval of the Operating Permits program for the LDEQ based on the revised Operating Permits program. (See 60 FR 17750, April 7, 1995) (hereafter Full Approval Notice). The EPA received public comment on the Full Approval Notice and compiled a technical support document which describes the Operating Permits program in greater detail.

A single commentor, the National Environmental Development Association-Clean Air Regulatory Project (NEDA-CARP), provided comments on the Full Approval Notice. NEDA-CARP was concerned that the EPA was requiring the LDEQ to revise its regulatory provision on research and development (R&D) facilities to prevent R&D facilities from being considered separately from sources with which they are co-located, in order to receive full approval. NEDA-CARP stated its belief that the EPA was not correct in its interpretation of 40 CFR part 70 and that it is likely that the part 70 rules will be revised in the near future to allow States the flexibility to consider co-located R&D facilities separately from the source. The EPA appreciates NEDA-CARP's concerns; however, the Louisiana Operating Permits program

must be evaluated based on the part 70 rules and interpretations in place at the time of approval. In any case, the premise of NEDA-CARP's comment is incorrect. Apparently basing its comment on drafts of a proposed revision to part 70, NEDA-CARP claims that the proposal would allow an R&D facility to be treated separately for applicability purposes regardless of its Standard Industrial Classification (SIC) code or whether it functions as a support facility. While it is true that the proposed rule would create a separate industrial classification for R&D, the preamble to the proposed rule clarifies that this is a codification of the EPA's previous understanding of the SIC code test embodied in the current part 70, which would allow an R&D facility to be treated separately only if it belongs to a separate two digit SIC code. Moreover, the proposal expressly retains from the SIC code approach the duty to aggregate an R&D facility with other on-site sources for which it functions as a support facility. Therefore, the EPA continues to believe that these changes to Louisiana's Operating Permits program were necessary for full approval.

NEDA-CARP's other comments were supportive of the positions taken by the EPA in the Full Approval Notice such as the definitions of "title I modification" and "case-by-case" determinations, and the approval of the insignificant activities and criteria.

In this notice, the EPA is taking final action to promulgate full approval of the Operating Permits program for the LDEQ.

## II. Final Action and Implications

### A. Analysis of State Submission

On April 7, 1995, the EPA proposed full approval of the State of Louisiana's Title V Operating Permits program. (See 60 FR 17750). The program elements discussed in the proposed notice are unchanged from the analysis in the Full Approval Notice and continue to fully meet the requirements of 40 CFR part 70.

In the Interim Approval Notice, the following items were delineated as deficiencies in the Louisiana Operating permit program: State confidentiality provisions could be interpreted to protect the contents of the permit itself from disclosure; Louisiana Administrative Code (LAC) 33:III.501.B.7 allowed the permitting authority to consider a certain complex within a facility as a source separate from the facility with which it is co-located, provided that the complex is used solely for R & D of new processes

and/or products, and is not engaged in the manufacture of products for commercial sale; deadlines for submittal of Acid Rain permits were inconsistent; LAC 33.III.521.A.6 appeared to allow administrative amendments to permits to incorporate certain ''off-permit'' changes; it was unclear whether the State could lawfully require records to be retained for five years; LAC 33.III.527.A.3 allowed certain changes that rendered existing compliance terms irrelevant to be incorporated through minor modification procedures, yet was unclear whether the criteria in the State rule conformed to 40 CFR 70.4(b)(14); State provisions did not include a requirement that the permit specify the origin of and reference the authority for each term or condition, nor did they identify differences in form from the applicable requirements upon which the terms were based or contain various other elements required by 40 CFR 70.6; inadequate definition of ''title I modification;'' provisions to determine insignificant activities were not included with the State's original submittal. As discussed in the notice proposing full approval, Louisiana has addressed all of these items. For further discussion of these items, please see the proposed full approval and the Technical Support Document.

*B. Options for Approval/Disapproval*

The EPA is promulgating full approval of the Operating Permits program submitted to the EPA for the LDEQ on November 15, 1993, and revised on November 10, 1994. Among other things, the LDEQ has demonstrated that the program will be adequate to meet the minimum elements of a State operating permits program as specified in 40 CFR part 70.

Requirements for approval, specified in 40 CFR 70.4(b), encompass section 112(l)(5) requirements for approval of a program for delegation of section 112 standards as promulgated by the EPA as they apply to part 70 sources. Section 112(l)(5) requires that the State's program contain adequate authorities, adequate resources for implementation, and an expeditious compliance schedule, which are also requirements under part 70.

Therefore, the EPA is also promulgating full approval under section 112(l)(5) and 40 CFR 63.91 of the State's program for receiving delegation of section 112 standards that are unchanged from Federal standards as promulgated. This program for delegations only applies to sources covered by the part 70 program.

## III. Administrative Requirements

*A. Docket*

Copies of the State's submittal and other information relied upon for the final full approval, including the public comments received and reviewed by the EPA on the proposal, are contained in the docket maintained at the EPA Regional Office. The docket is an organized and complete file of all the information submitted to, or otherwise considered by, the EPA in the development of this final full approval. The docket is available for public inspection at the location listed under **ADDRESSES** section of this document.

*B. Executive Order 12866*

The Office of Management and Budget has exempted this action from Executive Order 12866 review.

*C. Regulatory Flexibility Act*

The EPA's actions under section 502 of the Act do not create any new requirements, but simply address operating permits programs submitted to satisfy the requirements of 40 CFR part 70. Because this action does not impose any new requirements, it does not have a significant impact on a substantial number of small entities.

*D. Unfunded Mandates*

Under Section 202 of the Unfunded Mandates Reform Act of 1995 (''Unfunded Mandates Act''), signed into law on March 22, 1995, the EPA must prepare a budgetary impact statement to accompany any proposed or final rule that includes a Federal mandate that may result in estimated costs to State, local, or tribal governments in the aggregate; or to the private sector, of $100 million or more. Under Section 205, the EPA must select the most cost-effective and least burdensome alternative that achieves the objectives of the rule and is consistent with statutory requirements. Section 203 of the Unfunded Mandates Act requires the EPA to establish a plan for informing and advising any small governments that may be significantly or uniquely impacted by the rule.

The EPA has determined that the approval action promulgated today does not include a Federal mandate that may result in estimated costs of $100 million or more to either State, local, or tribal governments in the aggregate, or to the private sector. This Federal action approves pre-existing requirements under State or local law, and imposes no new Federal requirements. Accordingly, no additional costs to State, local, or tribal governments, or to

the private sector, result from this action.

List of Subjects in 40 CFR Part 70

Administrative practice and procedure, Air pollution control, Environmental protection, Intergovernmental relations, Operating permits, Reporting and recordkeeping requirements.

Dated: August 25, 1995.

**A. Stanley Meiburg,**

*Acting Regional Administrator (6RA).*

40 CFR Part 70 is amended as follows:

## PART 70—[AMENDED]

1. The authority citation for part 70 continues to read as follows:

**Authority:** 42 U.S.C. 7401, *et seq.*

2. Appendix A is amended by adding an entry for ''Louisiana'' in alphabetical order to read as follows:

## Appendix A to Part 70—Approval Status of State and Local Operating Permits Programs

\*     \*     \*     \*     \*

*Louisiana*

(a) The Louisiana Department of Environmental Quality, Air Quality Division submitted an Operating Permits program on November 15, 1993, which was revised November 10, 1994, and became effective on October 12, 1995.

(b) [Reserved]

\*     \*     \*     \*     \*

[FR Doc. 95–22330 Filed 9–11–95; 8:45 am]

**BILLING CODE 6560–50–P**

## 40 CFR Part 81

[FRL–5279–6]

## Designation of Areas for Air Quality Planning Purposes; Wyoming; Redesignation of Particulate Matter Attainment Areas

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Direct final rule.

**SUMMARY:** In this document, EPA is approving a December 19, 1994 request from the Governor of Wyoming to redesignate the Powder River Basin particulate matter attainment area in portions of Campbell and Converse Counties to exclude an area designated as the Kennecott/Puron Prevention of Significant Deterioration (PSD) Baseline area, pursuant to section 107 of the Clean Air Act (Act). EPA is designating the Kennecott/Puron PSD Baseline area as a separate particulate matter attainment area under section 107 of the Act. EPA is approving the State's

## ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Parts 60, 61, and 63**

**[FRL–4846–7]**

**RIN 2060–AC98**

### National Emission Standards for Hazardous Air Pollutants for Source Categories: General Provisions

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** On August 11, 1993, the EPA proposed General Provisions for national emission standards for hazardous air pollutants (NESHAP) and other regulatory requirements pursuant to section 112 of the Clean Air Act as amended in 1990 (the Act). This action announces the EPA's final decisions on the General Provisions.

The General Provisions, located in subpart A of part 63, codify general procedures and criteria to implement emission standards for stationary sources that emit (or have the potential to emit) one or more of the 189 substances listed as hazardous air pollutants (HAP) in or pursuant to section 112(b) of the Act. Standards for individual source categories are being developed separately, and they will be codified in other subparts of part 63. When sources become subject to standards established for individual source categories in other subparts of part 63, these sources also must comply with the requirements of the General Provisions, except when specific General Provisions are overridden by the standards.

This action also amends subpart A of parts 60 and 61 to bring them up to date with the amended Act and, where appropriate, to make them consistent with requirements in subpart A of part 63.

**DATES:** *Effective Date.* March 16, 1994.

*Judicial Review.* Under section 307(b)(1) of the Act, judicial review of NESHAP is available only by filing a petition for review in the U. S. Court of Appeals for the District of Columbia Circuit within 60 days of today's publication of this final rule. Under section 307(b)(2) of the Act, the requirements that are the subject of today's notice may not be challenged later in civil or criminal proceedings brought by the EPA to enforce these requirements.

*Incorporation by Reference:* The incorporation by reference of certain publications in these General Provisions is approved by the Director of the Office

of the Federal Register as of March 16, 1994.

**ADDRESSES:** *Docket.* Docket No. A–91–09, containing information considered by the EPA in developing the promulgated General Provisions, is available for public inspection and copying between 8 a.m. and 4 p.m., Monday through Friday, including all non-Government holidays, at the EPA's Air and Radiation Docket and Information Center, room M1500, U.S. Environmental Protection Agency, 401 M Street, SW., Washington, DC 20460; telephone (202) 260–7548. A reasonable fee may be charged for copying.

*Background Information Document.* A background information document (BID) for the promulgated General Provisions may be obtained from the National Technical Information Services, 5285 Port Royal Road, Springfield, Virginia 22161; telephone (703) 487–4650. Please refer to "General Provisions for 40 CFR Part 63, Background Information for Promulgated Regulation" (EPA–450/3–91–019b). The BID contains: (1) a summary of the public comments made on the proposed General Provisions and responses to the comments and (2) a summary of the changes made to the General Provisions as a result of the Agency's responses to comments that are not addressed in this **Federal Register** notice.

**FOR FURTHER INFORMATION CONTACT:** Ms. Shirley Tabler, Standards Development Branch, Emission Standards Division (MD–13), U.S. Environmental Protection Agency, Research Triangle Park, North Carolina 27711; telephone (919) 541–5256.

**SUPPLEMENTARY INFORMATION:** The information presented in this preamble is organized as follows:

I. Background
II. Summary of Major Changes Since Proposal
III. Public Participation
IV. Significant Comments and Changes to the Proposed General Provisions
  A. Applicability Determinations
  B. Potential to Emit
  C. Relationship of General Provisions to Other Clean Air Act Requirements
  D. Monitoring and Performance Testing Requirements
  E. Construction and Reconstruction
  F. Operation and Maintenance Requirements: Startup, Shutdown, and Malfunction Plans
  G. Recordkeeping and Reporting Requirements
V. Administrative Requirements

## I. Background

Section 301 of title III of the Clean Air Act Amendments of 1990, Public Law 101–549, enacted on November 15, 1990, substantially amended section 112 of the Act regarding promulgation of

NESHAP. These NESHAP are to be established for categories of stationary sources that emit one or more of the 189 HAP listed in or pursuant to section 112(b). Each standard established for a source category will be codified in a subpart (or multiple subparts) of part 63. In order to eliminate the repetition of general information and requirements within these subparts, General Provisions that are applicable to all sources regulated by subsequent standards in part 63 have been developed. The General Provisions have the legal force and effect of standards, and they may be enforced independently of relevant standards, if appropriate.

The General Provisions codify procedures and criteria that will be used to implement all NESHAP promulgated under the Act as amended November 15, 1990. The provisions include administrative procedures related to applicability determinations (including new versus existing and area versus major sources), compliance extensions, and requests to use alternative means of compliance. In addition, general requirements related to compliance-related activities outline the responsibilities of owners and operators to comply with relevant emission standards and other requirements. The compliance-related provisions include requirements for compliance dates, operation and maintenance requirements, methods for determining compliance with standards, procedures for performance testing and monitoring, and reporting and recordkeeping requirements. Finally, the EPA is promulgating amendments to the General Provisions for parts 60 and 61 to address new statutory requirements and, where appropriate, to make portions of these existing regulations consistent with the part 63 General Provisions.

Owners or operators who are subject to a subpart promulgated for a specific source category under sections 112(d), 112(f), or 112(h) of the Act are also subject to the requirements of the General Provisions. The General Provisions also will be incorporated, as appropriate, into requirements established under other section 112 authorities (e.g., the early reduction program and case-by-case control technology determinations). Nevertheless, in the development of a part 63 emission standard applicable to a specific source category, the EPA may determine that it is appropriate that the subpart contain provisions that override one or more requirements of the General Provisions. When this occurs, the EPA will describe in the subpart exactly

compliance requirements for major sources.

The Agency believes that these comments are similar in all relevant respects to arguments the Agency already has considered and responded to in a previous rulemaking that dealt with the Federal enforceability of emissions controls and limitations at a source. For a thorough discussion on this topic, see "Requirements for the Preparation, Adoption, and Submittal of Implementation Plans; Air Quality, New Source Review; Final Rules" that appeared in the **Federal Register** on June 28, 1989 (54 FR 27274). (A copy of this notice has been included in the docket for this rulemaking.) After careful consideration during that rulemaking, the EPA decided to retain the requirement for Federal enforceability. At this time, the Agency sees no reason to rescind its decisions described in the June 28, 1989 **Federal Register** notice. On the contrary, the Agency here is affirming the relevance of the Federal enforceability requirements set forth in the June 28, 1989 notice in the context of determinations of major source status under the new Federal air toxics program.

In the context of implementing the air toxics program under amended section 112, the purposes of the Federal enforceability requirements are as follows: (1) To make certain that limits on a source's capacity are, in fact, part of its physical and operational design, and that any claimed limitations will be observed; (2) to ensure that an entity with strong enforcement capability (i.e., the Federal government) has legal and practical means to make sure that such commitments are actually carried out; and (3) to support the goal of the Act that the EPA should be able to enforce all relevant features of the air toxics program as developed pursuant to section 112. The Agency continues to believe that, if sources may avoid the requirements of a Federal air pollution control program by relying on State or local limitations, it is essential to the integrity of the National air toxics program that such limitations be actually and effectively implemented. Thus, Federal enforceability is both necessary and appropriate to ensure that such limitations and reductions are actually incorporated into a source's design and followed in practice. Further, Federal enforceability is needed to back up State and local enforcement efforts and to provide incentive to source operators to ensure adequate compliance. Federal enforceability also enables citizen

enforcement under section 304 of the Act.

Thus, in the final General Provisions rulemaking, the Agency is retaining the existing Federal enforceability requirement in the definition of potential to emit for the purposes of implementing section 112 of the Act as amended in 1990.

In the June 28, 1989 **Federal Register** notice, the EPA established that, to be federally enforceable, emission limitations established for a source must be practicably enforceable. To be practicably enforceable, the limitations or conditions must ensure adequate testing, monitoring, recordkeeping, and reporting to demonstrate compliance with the limitations and conditions. Restrictions on operation, production, or emissions must reflect the shortest practicable time period (generally one month). "Blanket" emission limitations such as calendar year limits (e.g., tons per year) are not considered practicably enforceable. In contrast, hourly, daily, weekly, or monthly rolling averages generally are considered acceptable.

Many of the comments requesting that the EPA credit controls that are not federally enforceable in the potential to emit determination were based on a concern over the limited mechanisms available by which emission controls can qualify as federally enforceable. For example, although the EPA will consider terms and conditions in a permit issued under title V of the Act to be federally enforceable, approved State title V permit programs are not yet in place. This effectively limits the mechanisms available to sources subject to early MACT standards. Comments were also received requesting further clarification on how the Agency's potential to emit policy would be implemented, and on how this policy could be implemented with the least burden on both States and affected sources.

As noted earlier in this preamble, the EPA is preparing a separate notice of proposed rulemaking to address potential to emit issues. This notice will propose for public comment a thorough discussion on the Agency's policy with regard to implementing potential to emit in the air toxics program. Among other actions, this rulemaking would amend the General Provisions to provide an interim mechanism for controls to qualify as federally enforceable for HAP until permanent mechanisms are in place. The Agency will consider comments on this proposal and take final action on an expedited schedule.

*C. Relationship of General Provisions to Other Clean Air Act Requirements.*

1. Relationship to Individual NESHAP.

The promulgated General Provisions to part 63 are applicable to all source categories that will be regulated by part 63 NESHAP. Emissions of HAP from all listed source categories eventually will be regulated by NESHAP pursuant to section 112 of the Clean Air Act Amendments of 1990. The General Provisions provide basic, common requirements for all sources subject to applicable standards, and they are intended to avoid unnecessary duplication of information in all subsequent subparts. All parts of the General Provisions apply to an affected source regulated by an applicable standard, unless otherwise specified by the particular standard.

The EPA recognizes that in the development of a standard applicable to a specific source category, the Agency may determine that certain General Provisions of subpart A may not be appropriate. Consequently, as mentioned earlier, subpart A allows individual subparts to supersede some of the requirements of subpart A. Should there be a conflict between the requirements in the General Provisions and specific requirements of another subpart in part 63, whether or not the subpart explicitly overrides the General Provisions, the requirements of the other subpart will prevail.

The Agency received many comments regarding the proposed relationship between the General Provisions and part 63 standards for specific source categories. A substantial number of commenters expressed the opinion that the EPA should reverse the presumptive relationship that the General Provisions apply unless specifically overridden in a source category-specific standard. These commenters argued that the General Provisions should not be applicable until specifically incorporated by an applicable standard. Thus, instead of automatic applicability to any regulated source, the General Provisions would have no regulatory force until specifically incorporated by individual subparts. Specific reasons cited by commenters for advocating this approach focused on minimizing the potential for conflict between the General Provisions and individual subparts and reducing confusion on the part of owners or operators who must establish which provisions are applicable. Some commenters also stated that only generic requirements should be included in the General Provisions, and more specific

requirements should be left to individual NESHAP.

The Agency believes that the alternative approach suggested by these commenters is not appropriate. Consequently, the proposed approach has been retained in the final rule. The Agency's concern is that minimum regulatory requirements be established for the control of HAP emissions from source categories. The General Provisions as promulgated ensure an appropriate baseline level of requirements for all sources, and they provide guidance at an early stage to sources regarding the types of requirements that will ensue upon promulgation of an applicable standard. The EPA believes that the provisions of subpart A are the minimum generic requirements necessary for the implementation of NESHAP. The EPA's experience with existing General Provisions under parts 60 and 61 confirms that such provisions eliminate repetition within individual standards. They also improve consistency and understanding of the basic requirements for affected sources among the regulated community and compliance personnel.

Despite the preceding discussion, the EPA does recognize the potentially confusing task faced by owners and operators who must determine which provisions of the General Provisions apply to them, which are explicitly superseded by an applicable subpart, and which are superseded because they conflict with a requirement in an individual standard. Many commenters are concerned about the potential for confusion regarding their compliance responsibilities. By establishing a mechanism whereby all the provisions of subpart A are applicable to an affected source unless otherwise specified, the EPA believes some source responsibilities are directly clarified.

Furthermore, as the Agency continues to develop emission standards for specific source categories, the EPA intends to indicate clearly in these subsequent rulemakings which requirements of subpart A sources in the category are subject to and which requirements are superseded by the individual subpart. The public will have the opportunity to review and comment on Agency decisions on which requirements of the General Provisions are overridden in a source category-specific standard when that standard is proposed in the **Federal Register**.

Other issues were raised by commenters pertaining to general features of the relationship between the General Provisions and individual MACT standards. Several commenters expressed concern with the potential for a situation where there are conflicting provisions between the individual subpart and subpart A, and the individual subpart does not specifically supersede the General Provisions requirement. Proposed § 63.1(a)(13) stated that individual subparts will specify which General Provisions are superseded. Certain commenters believe that provisions in individual subparts should prevail, even if they do not explicitly state that they supersede General Provisions.

The EPA agrees with these commenters. It is the Agency's intent that when there are conflicting requirements in the General Provisions and a source category-specific standard, the requirements of the standard will supersede the General Provisions. If a specific standard does not address a requirement within the General Provisions, then the General Provisions must be followed by the owner or operator. The Agency intends to review thoroughly the appropriateness of applying the General Provisions when developing each source category-specific standard and to indicate clearly in the standard any requirements of the General Provisions that are overridden. However, the Agency appreciates the concerns of the commenters that a conflicting requirement may be overlooked and not explicitly identified in the standard. Therefore, to avoid confusion should a conflicting requirement not be explicitly identified in the standard, the EPA has deleted the statement in § 63.1(a)(13) that individual subparts always will specify which provisions of subpart A are superseded.

2. Relationship to Section 112(g), Section 112(j), and Section 112(i)(5) of the Act

Several comments were received on the relationship of the General Provisions for part 63 to requirements under sections 112(g) and 112(j) of the Act. Regulations to implement section 112(g) and section 112(j) are being developed by the EPA in separate rulemakings. Section 112(g) addresses the modification, construction, and reconstruction of major sources after the effective date of title V permit programs and primarily before source category-specific standards are promulgated. Section 112(j) addresses equivalent emission limitations to be established by the States through title V permits if the EPA fails to promulgate a standard for a category of sources on the schedule established under section 112(e).

Under both of these sections, States may be required to make case-by-case MACT determinations for sources if the EPA has not yet established an applicable emission limitation under section 112. For example, under section 112(g)(2), after the effective date of a title V permit program in any State, no person may modify a major source of HAP in the State, unless the Administrator (or the State) determines that the MACT emission limitation under section 112 for existing sources will be met. This determination must be made on a case-by-case basis where an applicable emission limitation has not been established by the EPA. A similar determination involving new source MACT must be made before a major source is constructed or reconstructed.

Several commenters stated that it was unclear if the General Provisions are intended to be minimum requirements that would apply to sources subject to case-by-case MACT standards established under sections 112 (g) and (j).

The EPA is still considering the most appropriate way to link the General Provisions to the case-by-case MACT standards established under sections 112 (g) and (j). While the EPA believes that some requirements of the General Provisions should apply to any MACT standard established under section 112 (including case-by-case MACT standards), the Agency also recognizes that there may be situations where blanket application of the General Provisions to a particular source or source category may not be appropriate. As discussed elsewhere in this preamble and as stated in the applicability section of the final rule, an emission standard established for a particular source category can override some provisions of the General Provisions, as appropriate. The EPA is reviewing whether it is appropriate to provide similar authority to States with approved title V permit programs to override the General Provisions in case-by-case MACT standards established under sections 112(g) and 112(j) and how such authority should be implemented. In general, the EPA believes that the General Provisions provide an appropriate framework for many aspects of demonstrating compliance with case-by-case MACT determinations. The issue of the relationship of the General Provisions to section 112(g) and section 112(j) will be addressed in the rulemakings implementing these subsections or in future EPA guidance material.

One commenter wanted the EPA to clarify that the General Provisions are superseded by forthcoming subpart B regulations to implement section 112(g).

The EPA disagrees with this commenter. From a general perspective,

July 30, 2002  Version F

# Compliance Extensions Summary

## What is a compliance extension?

The Part 63 General Provisions allow a source additional time to come into compliance with a relevant standard, under certain circumstances and with certain requirements.

If the owner/operator of a source requests a compliance extension, and the EPA Administrator (or, in most cases, the State with an approved permit program) approves the request, a compliance extension will be issued to postpone the date by which the source must comply with a relevant standard (or specific part(s) of the relevant standard).

Generally, until the compliance extension has been granted, the owner/operator must comply with all applicable requirements of the relevant standard.

## What is a relevant standard?

All of the following are "relevant standards" with respect to the Part 63 General Provisions.  If a source is subject to any of these requirements, then the source is also subject to the Part 63 General Provisions:

- 112(d) MACT Standard; 112(f) Residual Risk;
- 112(g) Major Source Modification MACT Determination;
- 112(h) NESHAP Work Practice Standard; or
- 112(j) Equivalent Emission Limitation by Permit MACT Determination.

## Where do the General Provisions address compliance extensions?

The procedures for compliance extensions appear in section 63.6(i).

## Are progress reports required during the extension period?

When granting an extension of compliance, the Administrator (or the State with an approved permit program) may or may not require that the owner/operator submit progress reports during the period of extension.  If progress reports are required, the contents of the progress reports and the dates by which they must be submitted will be specified in the written extension.  The purpose of the progress report is to indicate whether steps toward compliance outlined in the compliance schedule have been reached.  (The compliance schedule is referred to in §63.6(i)(6)(i)(B) and is submitted as part of the request for compliance extension.)  Progress reports are addressed under §63.6(i)(11).

1

July 30, 2002  Version F

**Through what mechanisms may a compliance extension be granted?**

Compliance extensions may be granted in the following four cases:

Case 1:  Early Reductions Program.

> If a source achieves reductions in accordance with the voluntary Early Reductions Program (pursuant to section 112(i)(5) of the Clean Air Act), the source may be granted an extension of compliance with specific requirements, as specified in subpart D.  [§63.6(i)(2)(i)]

Case 2:  BACT/LAER.

> If a source has installed BACT or has installed technology required to meet LAER prior to promulgation of the relevant standard, the source may be granted an extension of compliance with the standard for 5 years after the installation date.  [§63.6(i)(2)(ii)]

Case 3:  Section 112(d) Standard.

> Applies to a source subject to a section 112(d) standard [§63.6(i)(4)(i)(A)]:

> • If a source needs additional time in order to install controls before it can comply with a section 112(d) standard, then the source may be granted an extension up to 1 year.  Conditions of the extension must be incorporated into the source's title V permit.

> • If the source is a mining waste operation and it needs additional time in order to install controls before it can comply with a section 112(d) standard, then the source may be first granted an extension up to 1 year.  If that 1-year extension is insufficient to dry and cover mining waste, then an additional extension of up to 3 years may be added.  Conditions of the extension must be incorporated into source's title V permit.

Case 4:  Section 112(f) Standard.

> If a source needs additional time in order to install controls before it can comply with a section 112(f) standard, then the source may be granted an extension up to 2 years after the standard's effective date.  The source must take steps during the period of extension to assure that the health of persons will be protected from imminent endangerment.  [§63.6(i)(4)(ii)]

2

July 30, 2002  Version F

**When must a request for compliance extension be submitted?**

Generally, the source must submit a request for extension in writing not later than 120 days before the relevant standard's compliance date.  [§63.6(i)(4)(i)(B)]  There are four exceptions to the 120-day limit:

Exception 1:

If the standard specifies an alternative date for submittal of requests, the source must submit its request by that alternative date.  [§63.6(i)(4)(i)(B)]

Exception 2:

If the need for the compliance extension arises within 120 days before the compliance date, or if the need for the compliance extension arises between the alternative submittal date specified by the standard and the otherwise applicable compliance date, and the need arose due to circumstances beyond reasonable control of the owner/operator, then the source may submit its request later. [§63.6(i)(4)(i)(C)]

Exception 3:

If the standard is pursuant to section 112(f), the source must submit request for compliance extension not later than 90 days after the effective date of the standard. [§63.6(i)(4)(ii)]

Exception 4:

If the compliance extension is requested on the basis of installation of BACT or technology required to meet LAER, the source must submit its request not later than 120 days after the promulgation date of the standard.  [§63.6(i)(5)]

If either Exception 1 or 2 above applies, the compliance extension request will stay the effect of the rule until the request is either approved or denied; in other words, the source does not have to comply with a standard while waiting for approval of its request for an extension of compliance with that standard.

3

**Add.270**

July 30, 2002  Version F

**What information must a request for compliance extension include?**

For a source seeking either a 1-year extension of compliance with a standard pursuant to section 112(d) or a 2-year extension of compliance with a standard pursuant to section 112(f), the request for compliance extension must include the following information [§63.6(i)(6)(i)]:

- • A description of the controls to be installed
- • A compliance schedule, including:
  - Starting date for onsite construction, installation of emission control equipment, or process change.
  - Date by which final compliance is to be achieved.

For a source seeking a 5-year extension of compliance due to installation of BACT or LAER technology (as in Case 2 above), the request for compliance extension must include information needed to demonstrate that the installation controls the same pollutant(s) that would be controlled at that source by the relevant standard.  [§63.6(i)(6)(ii)]

**What is the step-by-step procedure for obtaining a compliance extension?**

A request for a compliance extension in connection with Early Reductions (Case 1 above) is handled through subpart D procedures.  Other requests (Cases 2, 3, and 4 above) are handled pursuant to paragraphs 63.6(i)(4) through (7).

How the request for extension of compliance will be handled depends on the mechanism through which the owner/operator is requesting an extension.  A flow diagram, "Procedure for Compliance Extension Request" depicts how the request for extension of compliance will be handled.  This flow diagram shows two possible paths, A and B, which are also described below.

Path A:  Section 112(d) Standard or BACT/LAER.

Path A [corresponding to §63.6(i)(12)] depicts how the request is handled if it is for either:

- • An owner/operator who is unable to comply with a section 112(d) standard for the reason that additional time is necessary for installation of controls (as in Case 3), or
- • An owner/operator who seeks an extension for the reason that the source has installed BACT or LAER technology (as in Case 2).

Within 30 calendar days after receiving the compliance extension request, the Administrator (or the State with an approved permit program) will notify the

4

**Add.271**

owner/operator in writing as to the status of the application (that is, whether it is complete--containing sufficient information with which to make a determination).

If the application is <u>not</u> complete, the notification of status will specify the information needed.  The applicant has 30 calendar days after being notified of the incomplete application in which to present additional information or arguments toward further action on the application.  After such additional information or arguments have been submitted by the owner/operator, the Administrator (or the State with an approved permit program), just as for the original request, will notify the owner/operator in writing within 30 calendar days as to the status of the application.

When the owner/operator has been notified that the application <u>is</u> complete, the clock starts for the 30-day approval or denial period.  This means the Administrator (or the State with an approved permit program) will notify the owner/operator either of approval or of intent to deny approval of the compliance request within 30 calendar days after the owner/operator has been notified that the application is complete.

In the case where the Administrator (or the State with an approved permit program) notifies the owner/operator of intent to deny the compliance extension request, the notification will specify the basis for the intended denial, and it will allow the owner/operator 15 days in which to present in writing any additional information or arguments before a final determination is made.

A final determination to deny the request for a compliance extension will be in writing and will specify the basis for the denial.  If additional information or arguments submitted by the owner/operator (following receipt of a notice of intent to deny) do not change the decision to deny, then the final determination of denial will be issued within 30 calendar days after the additional information or arguments were presented.  If no additional information or arguments were submitted by the owner/operator, then the final determination of denial will be issued within 30 calendar days after the due date for presentation of additional information or arguments.

<u>Path B:  Section 112(f) Standard.</u>

Path B depicts how the request is handled if it is for an owner/operator who is unable to comply with a section 112(f) standard for the reason that additional time is necessary for installation of controls (as in Case 4).  [§63.6(i)(13)]

5

July 30, 2002  Version F

Within 15 calendar days after receiving the compliance extension request, the Administrator (or the State with an approved permit program) will notify the owner/operator in writing as to the status of the application (that is, whether it is complete--containing sufficient information with which to make a determination).

If the application is not complete, the notification of status will specify the information needed.  The applicant has 15 calendar days after being notified of the incomplete application in which to present additional information or arguments toward further action on the application.  After such additional information or arguments have been submitted by the owner/operator, the Administrator (or the State with an approved permit program), just as for the original request, will notify the owner/operator in writing within 15 calendar days as to the status of the application.

When the owner/operator has been notified that the application is complete, the clock starts for the 30-day approval or denial period.  This means the Administrator (or the State with an approved permit program) will notify the owner/operator either of approval or of intent to deny approval of the compliance request within 30 calendar days after the owner/operator has been notified that the application is complete.

In the case where the Administrator (or the State with an approved permit program) notifies the owner/operator of intent to deny the compliance extension request, the notification will specify the basis for the intended denial, and it will allow the owner/operator 15 days in which to present in writing any additional information or arguments before a final determination is made.

A final determination to deny the request for a compliance extension will be in writing and will specify the basis for the denial.  If additional information or arguments submitted by the owner/operator (following receipt of a notice of intent to deny) do not change the decision to deny, then the final determination of denial will be issued within 30 calendar days after the additional information or arguments were presented.  If no additional information or arguments were submitted by the owner/operator, then the final determination of denial will be issued within 30 calendar days after the due date for presentation of additional information or arguments.

6

July 10, 1998


MEMORANDUM

SUBJECT:   Delegation of 40 CFR Part 63 General Provisions Authorities to State and Local
           Air Pollution Control Agencies

FROM:      John S. Seitz, Director /s/ John Seitz
           Office of Air Quality Planning and Standards (MD-10)

TO:        See Addressees


     This memorandum is to provide guidance to the EPA Regional Offices on delegation of
discretionary authorities relating to air toxics in 40 CFR part 63, subpart A (the General
Provisions) to State and Local Air Pollution Control (S/L) agencies through 40 CFR part 63,
subpart E (Approval of State Programs).  Under the General Provisions, the EPA Administrator
has the authority to approve certain changes to, or make decisions under, specific General
Provisions requirements.  Questions have been raised by the Regions about whether S/L agencies
may make the same discretionary decisions when they are delegated the General Provisions.

     In explaining the straight delegation process for delegating air toxics provisions to S/L
agencies under 40 CFR part 63, subpart E, we did not clarify what discretionary authorities are
delegated to S/L agencies when they seek straight delegation of the General Provisions.  Although
this is briefly discussed in the proposed General Provisions' preamble (Federal Register, August
11, 1993, page 42775-42777), the forthcoming proposed subpart E revisions will fill that gap by
clarifying which discretionary authorities may be delegated to S/L agencies through straight
delegation of the General Provisions.  At your discretion, the Regional Offices must then specify
in delegation agreements or documents which of the subpart A authorities are being delegated to
each State.  We recommend that you begin implementing these changes as soon as possible.
Therefore, this memorandum is intended to explain the changes and provide guidance for you to
begin implementing the changes now.  Neither this memorandum nor the subpart E rulemaking
changes any source-specific decisions that have already been made under the General Provisions,
but the guidance in this memorandum should be used as guidance for all future decisions
regarding the General Provisions' authorities.

     To implement these changes, you will need to clarify with your S/L agencies which
General Provisions' authorities have and have not been delegated.  In cases where you may have
delegated authorities in the past that should no longer be delegated,  you will need to inform
your
S/L agencies that delegation of these authorities will be revoked.

     At this time, we are also providing clarification of section 63.6(i)(1), "Extension of
Compliance with Emission Standards," General Provisions authority.  This section states "(u)ntil
an extension of compliance has been granted by the Administrator (or a State with an approved
permit program) under this paragraph, the owner or operator of an affected source subject to the
requirements of this section shall comply with all applicable requirements of this part."  It is
our
interpretation that this authority does not require delegation through subpart E and, instead, is
automatically granted to States as part of their part 70 operating permits program approval
regardless of whether the operating permits program approval is interim or final.  Additionally,
it
is our interpretation that the State would not need to have been delegated a particular source
category or have issued a part 70 operating permit for a particular source to grant that source a
compliance extension.

     We are also providing clarification of section 63.5(e) and (f), "Approval and Disapproval
of Construction and Reconstruction," General Provisions authority.  The Clean Air Act as

**Add.274**

amended (1990 Amendments), sections 112(i)(1) and (3) state that the "Administrator (or a State with a permit program approved under title V)" can determine whether a source will comply with the standard if constructed properly.  It is our interpretation that this authority does not require
delegation through subpart E and, instead, is automatically granted to States as part of their part 70 operating permits program approval.

Link to section 112(l):  This guidance only addresses the case where the General Provisions are delegated to an S/L agency through straight delegation under section 112(l) provisions which were promulgated in 40 CFR part 63, subpart E.  Therefore, the guidance addresses S/L agencies' authority to make source-specific decisions only, not source-category wide decisions.  Any S/L agency wishing to make discretionary decisions on a source-category wide basis under the General Provisions or any other part 63 requirement would need to use the section 112(l) delegation process under 40 CFR part 63, subsections 63.92, 63.93, or 63.94 to substitute its own rule or program.  When subpart E revisions are promulgated, section 63.97 will be added to the above list as a delegation option.

Consistency with Previous Policies:  This guidance is intended to be consistent with previous policies developed for new source performance standards (NSPS) under 40 CFR part 60, national emission standards for hazardous air pollutants (NESHAP) under 40 CFR part 61, and for changes to State implementation plans (SIP's).  Past guidance issued for NSPS changes has permitted delegation to S/L agencies of all the Administrator's authorities except those that require Federal rulemaking, or those for which Federal oversight is critical to ensuring
national consistency in the application of standards.  Additionally, such delegations were not intended to give S/L agencies the authority to issue interpretations of Federal law that are subsequently binding on the Federal Government.  Current SIP policy, as reflected in White Paper Number 2 for Improved Implementation of the Part 70 Operating Permits Program, permits S/L agencies to alter SIP requirements so long as the alternative requirements are shown to be equally
stringent and are within a pre-approved protocol (and so long as public review is provided and EPA approval is obtained).  The S/L agencies can show equivalent stringency by providing substantive criteria in SIPs governing the implementation of alternative requirements.

We recognize that Regions have the prerogative to approve delegation of specific authorities to some S/L agencies and not to others.  Therefore, we encourage Regions to provide as clearly as possible an explanation of the criteria they have used to approve or disapprove delegation of a specific authority, and to apply those criteria consistently across their S/L agencies.  Such criteria could include a determination of whether the S/L agency has sufficient expertise to make such decisions, or a determination that the working relationship between the Region and the S/L agencies is such that individual decisions could or could not be determined through consultation on an "as needed" basis.  For example, you may want to work more closely with your S/L agencies on their first decision-making for some authorities, thus gaining assurance
that the S/L agencies can and will make appropriate decisions.  We also recommend that Regions obtain copies of all S/L agencies' alternative determinations for their records; especially where new issues are addressed.

Delegation of Specific Authorities

The part 63 General Provisions lists 15 specific types of authorities for which the Administrator may make discretionary decisions on a source-specific basis.  When the General Provisions are delegated to an S/L agency, such discretion may be appropriately delegated, provided the stringency of the underlying standard would not be compromised.

We recognize that, in order for Regional Offices to have the authority to delegate some of the authorities outlined in this memorandum (such as intermediate changes to test methods), delegation 7-121 must first be revised to delegate these authorities to the Regions.  We intend to
make this revision, i.e., to delegation 7-121, as soon as possible.  Additionally, the Emission Measurement Center of the Emissions Monitoring and Analysis Division must receive copies o any approved intermediate changes to test methods or monitoring.  Please note that intermediate

changes to test methods must be demonstrated as equivalent through the procedures set out in EPA method 301 (see Attachment 1).  This information will be used to compile a database of decisions that will be accessible to the S/L agencies and Regions for reference in making future decisions.  Regions are asked to ensure that initial intermediate changes to testing and monitoring
made in each Region are evaluated.  All intermediate test changes and State-issued intermediate changes to monitoring should be provided via mail or facsimile to:

> Chief, Source Characterization Group A
> U.S. EPA (MD-19)
> Research Triangle Park, NC  27711
> Facsimile Telephone Number:  (919) 541-1039

Changes in monitoring issued by Regional Offices should continue to be posted on the Applicability Determination Index (ADI).  For electronic file transfer procedures for ADI updates,
please contact Belinda Breidenbach in the Office of Compliance at 202-564-7022.

We have divided the General Provisions discretionary authorities into two categories, based upon the relative significance of each discretionary type of decision: they are those authorities which can be delegated and those authorities which cannot be delegated.  These categories are delineated below:

Category I.  General Provisions That May Be Delegated

In general, we believe that, where possible, authority to make decisions which are not likely to be nationally significant or to alter the stringency of the underlying standard should be
delegated to S/L agencies.  While we understand the need for Federal oversight of S/L agency decision-making which will ensure that the delegated authorities are being adequately implemented and enforced, we do not want to impede S/L agencies in running the part 70 operating permit and Federal air toxics programs with oversight that is cumbersome.  We recommend that Regions rely on their existing mechanisms and resources for oversight.  During oversight, if the Region determines that the S/L agency had made decisions that decreased the stringency of the standard, then corrective actions should be taken and the source(s) should be notified.  Withdrawal of the program should be initiated if the corrective actions taken are insufficient.

The authorities listed in Table 1 may be delegated to S/L agencies, so long as the S/L agencies have the capability to carry out the Administrator's responsibilities and any decisions made do not decrease the stringency of the standards.  Since you are ultimately responsible for all  General Provisions authorities' decision-making made in your Region, I am comfortable with trusting your judgement about which of the Administrator's discretionary authorities listed here should be delegated to the S/L agencies in your Region.  When the Region delegates any category I authority to the S/L agency, it could be accomplished either when the General Provisions are delegated or at the time that each relevant maximum achievable control technology (MACT) standard is delegated, with the exception of approval of construction and reconstruction (40 CFR part 63, section 63.5), which should be delegated when the General Provisions are delegated.

There are some category I authorities, such as approval of intermediate alternatives to test methods, for which you should be notified when decisions are made by your S/L agencies.  Also, you may want to monitor the progress of S/L agencies' decision-making, in addition to updating your files for compliance and enforcement matters.  We have indicated these authorities in Table 1 with an asterisk.  We encourage you to document, in delegation agreements or delegation rulemaking, the request for notification when decisions are made regarding the indicated category I authorities.

Category II.  General Provisions That May Not Be Delegated

Authorities listed in this section are those decisions which could result in a change to the stringency of the underlying standard, which are likely to be nationally significant, or which may

require a rulemaking and subsequent Federal Register notice. Therefore, these authorities must be retained by the EPA Regional Office or EPA Headquarters. As a result, the following authorities in Table 2 may not be delegated to S/L agencies (all references are to sections of 40 CFR part 63, subpart A):

If you have any questions, or would like to discuss this matter further, please contact me at (919) 541-5608, or Tom Driscoll of my staff at (919) 541-5135.

Table 1. General Provisions' Authorities that may be Delegate

Section
Authorities

Section 63.1
Applicability Determinations

Section 63.6(e)
Operation and Maintenance Requirements -
Responsibility for Determining Compliance

Section 63.6(f)
Compliance with Non-Opacity Standards -
Responsibility for Determining Compliance

Section 63.6(h)
Compliance with Opacity and Visible
Emissions Standards - Responsibility for
Determining Compliance

Sections 63.7(c)(2)(i) and (d)
Approval of Site-Specific Test Plans

Section 63.7(e)(2)(i)*
Approval of Minor Alternatives to Test
Methods (see Attachment 1)

Sections 63.7(e)(2)(ii) and (f)*
Approval of Intermediate Alternatives to Test
Methods (see Attachment 1)

Section 63.7(e)(2)(iii)
Approval of Shorter Sampling Times and
Volumes When Necessitated by Process
Variables or Other Factors

Sections 63.7(e)(2)(iv) and (h)(2), (3)
 Waiver of Performance Testing

Sections 63.8(c)(1) and (e)(1)
Approval of Site-Specific Performance
Evaluation (monitoring) Test Plans

Section 63.8(f)*
Approval of Minor Alternatives to Monitoring
(see Attachment 1)


Section 63.8(f)*
Approval of Intermediate Alternatives to
Monitoring (see Attachment 1)


Sections 63.9 and 63.10
Approval of Adjustments to Time Periods for
Submitting Reports

                                    Table 2.  Authorities That May Not Be Delegated


Section
Authority


Section 63.6(g)
Approval of Alternative Non-Opacity
Emission Standards


Section 63.6(h)(9)
Approval of Alternative Opacity Standard


Sections 63.7(e)(2)(ii) and (f)
Approval of Major Alternatives to Test
Methods (see Attachment 1)


Section 63.8(f)
Approval of Major Alternatives to Monitoring
(see Attachment 1)


Section 63.10(f)
Waiver of Recordkeeping -- all

 Addressees
Director, Office of Ecosystem Protection, Region I
Director, Division of Environmental Planning and Protection, Region II
Director, Air Protection Division, Region III
Director, Air, Pesticides and Toxics Management Division, Region IV
Director, Air and Radiation Division, Region V
Director, Multimedia Planning and Permitting Division, Region VI
Director, Air, RCRA and Toxics Division, Region VII
Assistant Regional Administrator, Office of Pollution Prevention,
    State and Tribal Programs, Region VIII
Director, Air and Toxics Division, Region IX
Director, Office of Air Quality, Region X

Attachments

cc:  B.  Buckheit, 2242A
     C.  Garlow, 2111A
     B.  Hunt, MD-14B

```
     B.  Jordan, MD-13
     S.  Mitoff, 2223A
     J.  Seitz, MD-10
     L.  Wegman, MD-10

bcc:    K.  Blanchard, MD-12
     F.  Dimmick, MD-12
     K.  Kaufman, MD-12
     J.  Szykman, MD-13
     Regional Air Toxics Coordinators
```

This letter has been concurred with William Lamason, SCGA, Emission Measurement Center, Charles Garlow, OECA, and verbally from Patrick Chang, OGC.

OAQPS:ITPID:IIG:TDriscoll:cjbaines:x1-5319:MD-12:June 17, 1998:
File: Driscoll/delauth9.mem

ATTACHMENT

Intermediate change to monitoring is a modification to federally required monitoring involving "proven technology" (generally accepted by the scientific community as equivalent or better) that is applied on a site-specific basis and that may have the potential to decrease the stringency of the compliance and enforcement measures for the relevant standard. Though site-specific, an intermediate decrease may set a national precedent for a source category and may ultimately result in a revision to the federally required monitoring. Examples of intermediate changes to monitoring include, but are not limited to: (1) use of a continuous emission monitoring system (CEMS) in lieu of a parameter monitoring approach; (2) changes to quality control requirements for parameter monitoring; and (3) use of an electronic data reduction system in lieu of manual data reduction.

Intermediate change to a test method is a within-method modification to a federally enforceable test method involving "proven technology" (generally accepted by the scientific community as equivalent or better) that is applied on a site-specific basis and that may have the potential to decrease the stringency of the associated emission limitation or standard. Intermediate changes are not approvable if they decrease the stringency of the standard. Though site-specific, an intermediate change may set a national precedent for a source category and may ultimately result in a revision to the federally enforceable test method. In order to be approved, an intermediate change must be validated according to EPA method 301 (part 63, appendix A) to demonstrate that it provides equal or improved accuracy and precision. Examples of intermediate changes to a test method include, but are not limited to: (1) modifications to a test method's sampling procedure including substitution of sampling equipment that has been demonstrated for a particular sample matrix and the use of a different impinger absorbing solution; (2) changes in sample recovery procedures and analytical techniques, such as changes to sample holding times and use of a different analytical finish with proven capability for the analyte of interest; and (3) "combining" a federally-required method with another proven method for application to processes emitting multiple pollutants. As an example, Region IX and the CARB have developed a testing protocol to determine whether California chromium electroplaters needed to "retest" for the Chromium Electroplating NESHAP. This testing protocol has been attached (Attachment 2) for your information should you choose to use it. Again, these examples should only be approved if they do not decrease the stringency of the monitoring requirement.

Major change to monitoring is a modification to the monitoring to federally required monitoring that uses unproven technology or procedures or is an entirely new method (sometimes necessary when the required monitoring is unsuitable). A major change to a test method may be site-specific or may apply to one or more source categories and will usually set a national precedent. Examples of major changes to a test method include, but are not limited to: (1) use of a new monitoring approach developed to apply to a control technology not contemplated in the applicable regulation; (2) use of a predictive emission monitoring system (PEMS) in place of a required continuous emission monitoring system (CEMS); (3) use of alternative calibration procedures tha

do not involve calibration gases or test cells; (4) use of an analytical technology that differs from
that specified by a performance specification; and (5) use of alternative averaging times for
reporting purposes.

Major change to a test method is a modification to a federally enforceable test method
that uses unproven technology or procedures or is an entirely new method (sometimes necessary
when the required test method is unsuitable. A major change to a test method may be site-
specific or may apply to one or more source categories and will usually set a national precedent.

In order to be approved, a major change must be validated according to EPA method 301
(part 63, appendix A). Examples of major changes to a test method include, but are not limited
to: (1) use of an unproven analytical finish; (2) use of a method developed to fill a test method
gap; (3) use of a new test method developed to apply to a control technology not contemplated in
the applicable regulation; and (4) "combining" two or more sampling/analytical methods (at least
one unproven) into one for application to processes

Minor change to monitoring is a modification to federally required monitoring that
(a) does not decrease the stringency of the compliance and enforcement measures for the relevant
standard; (b) has no national significance (e.g., does not affect implementation of the applicable
regulation for other affected sources, does not set a national precedent, and individually does not
result in a revision to the monitoring requirements); and (c) is site-specific, made to reflect or
accommodate the operational characteristics, physical constraints, or safety concerns of an
affected source. Examples of minor changes to monitoring include, but are not limited to:
(1) modifications to a sampling procedure, such as use of an improved sample conditioning
system to reduce maintenance requirements; (2) increased monitoring frequency; and
(3) modification of the environmental shelter to moderate temperature fluctuation and thus
protect the analytical instrumentation.

Minor change to a test method is a modification to a federally enforceable test method
that (a) does not decrease the stringency of the emission limitation or standard; (b) has no national
significance (e.g., does not affect implementation of the applicable regulation for other affected
sources, does not set a national precedent, and individually does not result in a revision to the test
method); and (c) is site-specific, made to reflect or accommodate the operational characteristics,
physical constraints, or safety concerns of an affected source. Examples of minor changes to a
test procedure, such as a modified sampling traverse or location to avoid interference from an
obstruction in the stack, increasing the sampling time or volume, use of additional impingers for a
high moisture situation, accepting particulate emission results for a test run that was conducted
with a lower than specified temperature, substitution of a material in the sampling train that has
been demonstrated to be more inert for the sample matrix, and changes in recovery and analytical
techniques such as a change in quality control/quality assurance requirements needed to adjust for
analysis of a certain sample matrix. NOTE: The authority to approve decreases in sampling times
and volumes when
necessitated by process variables has typically been delegated in conjunction with the
minor changes to test methods, but these types of changes are not included within the scope
of minor changes.

ATTACHMENT


DESCRIPTION OF THE TECHNICAL REVIEW
PROTOCOL FOR PERFORMANCE TESTS OF

CALIFORNIA CHROME PLATING SOURCES

Introduction

In 1988, the CARB adopted a statewide airborne toxics control measure (ATCM) for the control of hexavalent chrome emissions from chrome platers (both decorative and hard) and chromic acid anodizers.  In general, the California ATCM required facilities to install equipment or modify their operation to minimize emissions of hexavalent chrome.  In addition to installing equipment and making the necessary process changes, hard chrome platers were required to demonstrate compliance by performing a District -approved source test.

Since the State ATCM was adopted, the majority of hard chrome platers in California have complied with the requirements by installing and source testing their control equipment to demonstrate compliance with the California standards.

On January 25, 1995, the EPA promulgated a national regulation to control emissions of chromium from chrome platers and anodizers.  This regulation is known as the NESHAP for hard and decorative chromium electroplating and chromium anodizing tanks.  This regulation also requires facilities to demonstrate compliance by performing an approved emission source test.

Further, on January 30, 1997, the EPA promulgated certain revisions to the chrome NESHAP dealing with the monitoring, recordkeeping and reporting (MRR) requirements for hard chromium electroplaters and chromic acid anodizers in California.  Specifically, EPA extended the MRR compliance deadline from January 25, 1997 to July 24, 1997.  This action was taken to allow time for CARB to establish and get approved MRR requirements for these sources that would be at least as stringent as the Federal NESHAP requirements; however, that work remains unfinished.  The Federal NESHAP requires these sources to monitor applicable parameters on and after the date on which the initial performance test is required to be completed, which is July 24, 1997.  It is consistent with the revised NESHAP MRR requirements that all California source tests of hard chrome platers and chromic acid anodizers conducted prior to July 24, 1997 be reviewed according to the performance test review criteria contained herein to determine compliance with the applicable NESHAP emission standard.  This recommendation is made notwithstanding the restrictions identified in 40 CFR 63 section 63.344(b)(2).

This criteria was developed by a team of chrome plating/regulatory professionals representing EPA, CARB, Bay Area Air Quality Management District, South Coast Air Quality Management District (SCAQMD), and Pacific Environmental Services (industry).  The criteria are necessary in reviewing the existing chrome plating emissions source tests in California.  It is estimated that in California there are approximately 100 hard chrome platers, 150 decorative chrome platers and 50 chromic acid anodizers, over half of which have performed source tests (where applicable).  Many of these source tests have sufficient information and quality control to demonstrate compliance with the Federal NESHAP for chrome plating and anodizing.  This document is to present and discuss the criteria developed for this purpose.

NESHAP Source Testing for Compliance

The NESHAP standard for chrome plating and anodizing indicates that source testing to demonstrate compliance with the standard is required unless the facility is a decorative chrome plater or chromic acid anodizer choosing the alternate emission limitation of 45 dyne/cm bath surface tension.  In accordance with this, 40 CFR part 63 specifies acceptable source test procedures, methods, materials, etc.  Although the requirements outlined in the NESHAP are specific, there are allowances for the "owner or operator of an affected source conduct[ing] performance testing at startup to obtain an operating permit in the State in which the affected source is located, the results of such testing may be used to demonstrate compliance with this subpart . . . " (40 CFR 63.344).  The following discussion presents a step-by-step approach for determining whether an existing source test in California can be used to demonstrate compliance with the chrome plating and anodizing NESHAP.

Determining if Existing Source Tests Can Be Used to Demonstrate Compliance

The Chrome Plating Source Test Review Criteria Section (see below) provides a step-by-step process for the review of existing source tests in light of the NESHAP standards. The following is a discussion of each of the criteria steps from the Chrome Plating Source Test Review Criteria Section with an explanation of the rationale for the chosen process.

Criteria Step 1. Compliance with the NESHAP Standards Demonstrated? The NESHAP standards are in terms of milligram of total chrome per dry standard cubic meter (mg/dscm) of ventilation gas flow. The NESHAP standards are listed in 40 CFR part 63, section 63.342. Emission standards vary depending on whether the facility performs hard chrome plating, decorative chrome plating, chromic acid anodizing, or whether the facility is new or existing, and
how large the facility is (how much chrome plating is performed on an annual basis).

Most of the existing chrome emission source test reports provide a variety of information including test date and time, plating bath rectifier amp-hours, sample volume, ventilation gas velocity, sample flowrate percent isokinetic, duct temperature, flowrate, ventilation gas water content, total and hexavalent chrome catch, as well as chrome emissions on a process rate (amp-hrs) and concentration basis.

- If the resulting average source test emission value is less than or equal to th applicable
NESHAP standard, the source test acceptability determination can continue.

- If the existing source test does not demonstrate compliance with the NESHAP, then the facility operator must decide what course of action to take for a remediation. For example, the facility operator may need to make some operational or design changes to lower the emission rate to achieve compliance with the NESHAP standards. A retest will be required. All future source tests should be conducted according to the requirements and specifications of 40 CFR part 63.344 Performance test requirements and test methods.

Criteria Step 2. Was the Source Test Conducted Under Close Approximation of Normal Operating Conditions? Normal operating conditions are defined as normal bath temperatures (+ 10 deg F), normal bath composition range (within 5 percent), normal rectifier amperage range, normal agitation rates, and normal voltage loadings. For the purpose of demonstrating compliance, normal operating conditions can also include conditions needed to meet specific source test requirements such as the use of dummy parts to be plated.

Although there can be a significant variation in the operating conditions from one plating shop to another, most chrome platers are well aware of their individual normal operating conditions and operate on a consistent basis with these constraints. Significant variation from the
normal operating mode is undesirable for quality assurance and controllability purposes.

Facilities may have increased the source test sampling period in order to capture the requisite sample mass for analytical detection. Extending the source test period may require the use of dummy parts rather than the real parts that would normally be plated. An example of this is a Bay Area plater which plates automobile body part dies. Plating such a part for a longer than
normal period would result in a plated part with tolerances outside of specification limits. To avoid ruining an expensive automobile die, a dummy part (a large sheet of steel, sized similar to the die) is plated for the time period required to meet capture requirements.

- If the source test was conducted under close approximation of normal operating conditions, then the evaluator can proceed to the next step in the evaluation process, step 3.

- If the source test was conducted under conditions deemed abnormal, the facility must conduct a new source test. All retests should be conducted according to the requirements and specifications of 40 CFR part 63.344 Performance test requirements and test methods.

Criteria Step 3. Correct Use of Approved Test Method? Source tests to demonstrate compliance with the requirements of the NESHAP must use the EPA approved source test

method.  According to 40 CFR part 63.344 the following source test methods have been deemed acceptable to demonstrate compliance with the NESHAP standards:  EPA method 306 or 306A (conducted after December 1991) and CARB method 425.  The EPA has granted a verbal approval for the use of the SCAQMD method 205.1 for total chrome analysis only and will issue an official letter soon.

Any use of an approved source test method must be done in strict accordance with the requirements and specifications of the method itself and performance testing requirements of section 63.344 of the NESHAP.  Such requirements include sample point locations, use of EPA method 5 source test train, impinger solution compositions, isokinetic ratios, sample handling, sampling times, sample volume, catch mass requirements, etc.  Implicit in the use of an approved source test method is the correct use of the method itself.  Any variation in the source test procedure will trigger a retest unless the change has been approved beforehand by the EPA and the local permitting authority.

Criteria Step 4.  Number of Runs:  Paragraph 63.7(e)(3) of the part 63 General Provisions specifies at least three sampling runs to make up one source test.  If three sampling runs were performed, the reviewer is directed to proceed on to review criteria step 5 (catch mass requirement).

<3 sampling runs:  Previous source tests attempted to meet the requirement for at least three sampling runs.  For some previous California source tests, the expected ultra-low concentrations of chrome in the exhaust required the use of longer than normal source test runs (normal sampling run length is 120 minutes and normal sampling volume is 1.7 dscm).

Some operators chose (with local agency approval) to perform longer sample runs to capture enough sample to produce a chrome emission number and to reduce the potential for error with minimal chrome capture.  In California the longer times ranged from 3 to 8 hours per sampling run.  Due to the added expense, potential problems of multiple long sampling runs, and the potential operational conflicts due to reduced production from multiple sampling runs, these facilities proposed performing one or two long duration source tests instead of three or more shorter runs.

For tests where less than three sampling runs were conducted, the reviewer is directed to go to criteria step 6 to determine if the source testing results are far enough below the NESHAP emission limit to warrant acceptance.

Regarding future source testing/Retesting:  Unless prior approval is obtained from EP and the local air quality agency, future source tests will require at least three sampling runs to be acceptable.

Criteria Step 5.  Catch Mass Requirements:  Consistent with the discussion in section 2.2.2 of method 306 in 40 CFR part 63, appendix A, it is recommended that the catch mass requirement be at least five times the limit of detection for the analytical method chosen.  Such catch mass requirements produce analytical results well within the range of confidence.  If the catch mass requirements are not met, the reviewer is directed to criteria step 6.

Criteria Step 6.  Source Test Emission Results Compared With NESHAP Limit:  If the catch mass requirement is not met, the reviewer evaluates the resulting emission rate according to criteria step 6.  Criteria step 6 requires that the source test results be 61/5 of the respective NESHAP standard; if this specification is met, then the existing source test can be accepted for demonstrating compliance with the NESHAP.  A factor of one fifth (20 percent) is consistent with the catch mass requirements.

Criteria step 6 directs that if the source test results were greater than 1/5 of the NESHAP standard, the facility must retest.  All retests should be conducted according to the requirements and specifications of 40 CFR part 63.344 Performance test requirements and test methods.

Regarding future source testing/Retesting:  Unless prior approval is given from EPA and

the local air quality agency, all future source tests will require at least three sampling runs to be
acceptable.  The catch mass requirements identified in 40 CFR part 63, section 63.344 also must
be met unless the source test emission result is <1/5 of the respective NESHAP emission limit or
is below detection levels.

Other Issues:  Establishing Monitoring Parameter Ranges to Ensure Ongoing Compliance

Continued compliance with the chrome plating and anodizing NESHAP is assured by
monitoring of specific operating parameters associated with the control equipment.  Normally
operating parameter values or ranges are established in conducting the performance test.  Since
many California source tests were performed before the final adoption and understanding of the
NESHAP monitoring requirements, some alternate procedures may be necessary to establish
appropriate ranges/values for the monitoring parameters.

The Establishing Monitoring Pararmeters to Ensure Ongoing Compliance Section (see
below) provides an approach to establishing the monitoring parameter compliance ranges after the
performance test is completed.  Where applicable, the basic requirements include the following:

(1)  Source test conducted during normal operating conditions.

(2)  Flowrate was monitored/recorded at outlet of emission control device.

Control Device Pressure Drop and Velocity Pressure:  Assuming the above criteria items
(1) and (2) were met and that the current ventilation gas flowrate is within 10 percent of the
flowrate determined during the source test, the current control device pressure drop and/or
velocity pressure can be used to establish the appropriate ranges/value for the monitoring
parameters.  Guidance for the development of the operating parameter range is found in
40 CFR 63 section 63.344.

Surface Tension Parameter Development:  If the surface tension was monitored during the
performance test, the facility operator should use the higher of either (1) the surface tension
parameter measured during the source test; or (2) 45 dyne/cm as specified in the NESHAP.  If the
surface tension was not monitored during the source test, the facility should use 45 dyne/cm as
the maximum allowable surface tension parameter for monitoring ongoing compliance.

Foam Thickness Parameter Development:  If the foam additive thickness was monitored
during the performance test, the facility operator should use the lessor of either (1) the foam
thickness parameter measured during the source test; or (2) the 1 inch foam thickness as specified
in the NESHAP.  If the foam thickness was not monitored during the source test, then the facility
should use 1 inch foam thickness as the minimum allowable thickness parameter for monitoring
ongoing compliance.

Chrome Plating Source Test Review Criteria

The following criteria are to be used for those chrome plater and anodizer performance tests
conducted in the State of California prior to July 24, 1997.  If the source test cannot be evaluated
using these criteria, then the facility owner/operator should contact Kingsley Adeduro, EPA
Region IX at (415) 744-1177 for guidance.

(1)  Compliance with the NESHAP Standards Demonstrated?
   Y:  Go to (2)
   N:  Evaluate operation/make necessary changes then perform retest according to
   40 CFR 63.344.

(2)  Was source test conducted under close approximation of normal operating
    conditions?
   Y:  Go to (3)

N:  Retest according to 40 CFR part 63.344.

(3)      Correct Use of Approved Test Method [CARB 425, EPA 306, EPA 306A (conducted
    after 12/91), SCAQMD 205.1 ( total chrome only)]
    Y:  Go to (4)
    N:  Retest according to 40 CFR part 63.344.

(4)      Number of Sampling Runs
    (a)  3 or more runs:  Go to (5)
    (b)  1 or 2 runs:  Go to (6)

    (5)      Catch Mass Requirements (at least 5 times the limit of detection for the analytical
method)
    Hex Chrome Analysis Methods    Diphenylcarbazide Colorimetric Test
                        Ion Chromatography with Post-Column Reactor (ICPCR)
    Total Chrome Analysis Methods:  Atomic Absorption Graphite Furnace (AAGF)
                        Inductively Coupled Argon Plasmography (ICAP)

    Y:  S/T is acceptable
    N:  Go to (6)

(6)      Source Test Emission Results <20 prcent (1/5) of the NESHAP Emission Limit?
    Y:  S/T is acceptable
    N:  Retest according to 40 CFR part 63.344. Establishing Monitoring Parameters to Ensure
Ongoing Compliance

(A)  Were normal operating conditions employed during source test performance?
    Y:  Go to (B)
    N:  Retest according to source testing and operating parameter development guidelines of
        40 CFR part 63.344.

(B)      Were appropriate operating parameters monitored/recorded during the source test?
    Y:  Use measured parameter values to establish ranges for ongoing compliance
        monitoring.
    N:    (a)  If bath emissions controlled by bath controls (surfactant additive or  foam) only
             go to (E).
          (b)  If bath emissions controlled by bath controls and downstream control device go
             to (C) and (E).
          (c)  If bath emission controlled by downstream control device(s) go to (C).

(C)  Was control device outlet flow rate recorded during the source test?
    Y:  Go to (D).
    N:  Retest according to source testing and operating parameter range development
        guidelines of 40 CFR part 63.344.

(D)  Determine inlet velocity pressure compliant range as follows:  (for PBS only)

    Collect concurrent data on facility's inlet velocity pressure, and scrubber outlet flow rate.
      If the current scrubber outlet flow rate is within 10 percent of the outlet flow rate
      measured during the source testing, then the current inlet velocity pressure value can be
      used to establish the compliant range for continuous monitoring.

    Determine control device pressure drop complaint range as follows:  (for CMP, FB Mist
      Eliminator, PBS, HEPA Filter)
          Collect concurrent data on pressure drop across the control device, and outlet flow
rate.
      If the outlet flow rate is within 10 percent of the outlet flow rate recorded during the
      source testing, then the current pressure drop value can be used to establish the compliant
      range for continuous monitoring if the controls are visually inspected and the work
      practice standards are conducted immediately prior to collecting current pressure drop
      data.

(E)    Surfactant Additive Surface Tension:  If surface tension was monitored during the source test, use the higher of either (1) the surface tension developed during the source test or (2) 45 dyne/cm surface tension for demonstration of ongoing compliance.  If no surface tension monitoring during source test, use 45 dyne/cm as surface tension parameter for demonstration of ongoing compliance.

Foam Thickness:  If foam thickness was monitored during the source test, use the minimum thickness parameter for demonstration of ongoing compliance.  If no foam thickness monitoring during source test, use 1 inch foam blanket as parameter for demonstration of ongoing compliance.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 5th day of November 2024, I electronically filed the foregoing ADDENDUM TO PETITIONER'S OPENING BRIEF with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.

I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

I further certify that: (1) any required privacy redactions have been made (5th Cir. R. 25.2.13); (2) the electronic submission is an exact copy of the paper document in compliance with (5th Cir. R. 25.2.1); and (3) the document has been scanned with the most recent version of CrowdStrike Windows Sensor Version 7.17.18721.0, last updated on October 23, 2024, and is free of viruses.

*/s/ David A. Super*
David A. Super

***Counsel for Petitioner***
***Denka Performance Elastomer LLC***