No. 24-60351

# In the United States Court of Appeals for the Fifth Circuit

DENKA PERFORMANCE ELASTOMER LLC,
*Petitioner,*

STATE OF LOUISIANA AND LOUISIANA DEPARTMENT OF ENVIRONMENTAL
QUALITY,
*Intervenors,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL REGAN,
ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
*Respondents,*

_____

On Appeal from Environmental Protection Agency
40 CFR Parts 60 and 63
_____

## OPENING BRIEF OF INTERVENORS
## STATE OF LOUISIANA AND LOUISIANA DEPARTMENT OF
## ENVIRONMENTAL QUALITY
_____

NOAH HOGGATT
Executive Counsel

LOUISIANA DEPARTMENT OF
ENVIRONMENTAL QUALITY
602 North Fifth Street
Baton Rouge, LA 70802
(225) 219-3985
Noah.Hoggatt@la.gov

ELIZABETH B. MURRILL
Attorney General of Louisiana

KELSEY L. SMITH
Deputy Solicitor General

OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 428-7432
SmithKel@ag.louisiana.gov

*Counsel for Intervenors the
State of Louisiana and the
Louisiana Department of
Environmental Quality*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required here because, under the fourth sentence of Fifth Circuit Rule 28.2.1, the State—as a "governmental" party—need not furnish a certificate of interested persons.

## STATEMENT REGARDING ORAL ARGUMENT

Petitioners have requested oral argument. Pet. Br. iv. Intervenors, the State of Louisiana and the Louisiana Department of Environmental Quality, do not oppose this request.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..........................................ii

STATEMENT REGARDING ORAL ARGUMENT ................................ iii

TABLE OF AUTHORITIES ...................................................................v

INTRODUCTION ..................................................................................1

STATEMENT OF THE ISSUES..............................................................3

STATEMENT OF THE CASE ................................................................4

    A.    The Clean Air Act, Cooperative Federalism, and Louisiana ........4

    B.    EPA's Ongoing Attack on DPE and Louisiana............................10

    C.    EPA Promulgates the Final Rule .................................................14

    D.    Louisiana Grants a Compliance Extension to DPE ....................18

ARGUMENT .......................................................................................23

    I.   THE EXTENSION WAS LAWFULLY GRANTED AND EFFECTUAL............23

        A.    Louisiana Has the Delegated Authority to Grant
                Extensions. ...........................................................................23

        B.    EPA Has Not Taken Action to Modify or Withdraw
                LDEQ's Delegated Authority. ...............................................29

        C.    EPA's Action Flouts the CAA's Cooperative Federalism
                Framework. ...........................................................................33

CONCLUSION ....................................................................................34

CERTIFICATE OF SERVICE................................................................36

CERTIFICATE OF COMPLIANCE.......................................................37

# TABLE OF AUTHORITIES

## Cases

*Am. Elec. Power Co. v. Conn.*,
   564 U.S. 410 (2011) ................................................................6

*BCCA Appeal Group v. EPA*,
   355 F.3d 817 (5th Cir. 2003), *as amended on denial of reh'g and reh'g
   en banc* (Jan. 8, 2004)................................................ 4, 5, 33

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ..............................................................22

*Fla. Power & Light Co. v. Costle*,
   650 F.2d 579 (5th Cir. 1981) ................................................34

*Health & Hosp. Corp. of Marion Cnty. v. Talevski*,
   599 U.S. 166 (2023) ................................................................4

*Louisiana v. EPA*,
   712 F. Supp. 3d 820 (W.D. La. 2024) ...................................11

*Louisiana v. EPA*,
   No. 2:23-CV-00692, 2024 WL 3904868 (W.D. La. Aug. 22, 2024) .......12

*Luminant Generation Co. v. E.P.A.*,
   675 F.3d 917 (5th Cir. 2012) ..........................................4, 34

*Ohio v. EPA*,
   144 S. Ct. 2040 (2024) ............................................................5

*Texas v. EPA*,
   690 F.3d 670 (5th Cir. 2012) ................................................33

*Texas v. EPA*,
   829 F.3d 405 (5th Cir. 2016) ................................................34

*Union Elec. Co. v. EPA*,
  427 U.S. 246 (1976) ..................................................................... 5

*United States v. DPE, et al.*,
  No. 2:23-cv-00735 (E.D. La.) ............................................... 12

*United States v. Ron Pair Enterprises, Inc.*,
  489 U.S. 235 (1989) .................................................................. 28

*Wis. Dep't of Health & Family Servs. v. Blumer*,
  534 U.S. 473 (2002) ..................................................................... 6

**Statutes**

5 U.S.C. § 706(2)(A) ................................................................. 22, 32

42 U.S.C. § 7401 ................................................................. 4, 5, 6, 33

42 U.S.C. § 7407 ......................................................................... 5, 33

42 U.S.C. §§ 7408 ........................................................................ 5, 33

42. U.S.C. § 7409 ........................................................................ 5, 33

42 U.S.C. § 7412 ............................................................ 7, 8, 23, 31

42 U.S.C. § 7603 ...................................................................... 12, 15

**Federal Register**

*Clean Air Act Final Full Approval of Operating Permits Program;
  Louisiana Department of Environmental Quality*,
  60 Fed. Reg. 47296 (Sept. 12, 1995) ............................ 7, 25, 28

*New Source Performance Standards and National Emission Standards
  for Hazardous Air Pollutants; Delegation of Authority to Louisiana*,
  69 Fed. Reg. 15687 (Mar. 26, 2004) ................................. 7, 24

*New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emissions Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry*,
88 Fed. Reg. 25080, 25178 (Apr. 25, 2023) ...................................13, 14

*New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emissions Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry*,
89 Fed. Reg. 42932 (May 16, 2024) ............................................. passim

## Other Authorities

Letter from Assistant Secretary Amanda Vincent, LDEQ, to Jeffrey R. Holmstead, DPE, *Re Extension of Compliance* (June 27, 2024)..........19

Letter from Assistant Secretary Cheryl Sonnier Nolan, LDEQ, to Wade L. Alleman, Occidential Chemical Corporation, *re Letter of Response* (Oct. 13, 2008)........................................................................................9

Letter from Assistant Secretary Chuck Carr Brown, LDEQ, to Claudine Gorman, Chalmette Refining LLC, *re Request for Extension of Compliance* (Feb. 6, 2006) ...................................................................10

Letter from Assistant Secretary Elliott B. Vega, LDEQ, to Brett Woltjen of Equilon Enterprises LLC, *Re Extension of Compliance* (Oct. 24, 2017) .........................................................................................................9

Letter from Assistant Secretary Elliott B. Vega, LDEQ, to Jerry Forstell, Chalmette Refining, LLC, *re Extension of Compliance* (July 14, 2017) .........................................................................................................9

Letter from Assistant Secretary Elliott B. Vega, LDEQ, to Phyllis Holifield, CITGO Petroleum Corporation, *re Extension of Compliance with EPA's Refinery Sector Rule* (May 9, 2016).....................................9

Lisa Friedman, *To Cut Cancer Risks, E.P.A. Limits Pollution From Chemical Plants*, The New York Times, April 9, 2024, available at http://tiny.cc/wt4tzz ................................................................................10

**Rules**
Fifth Circuit Rule 28.2.1 ................................................................................ii

**Regulations**

40 C.F.R. § 63.507(c) ........................................................................ 17, 29

40 C.F.R. § 63.6 .................................................................... passim

40 C.F.R. § 63.90 ........................................................................ 23

40 C.F.R. § 63.96(b) ........................................................................ 31

40 C.F.R. § 63.99 ........................................................................ 24

40 C.F.R. Part 63, Subpart E ........................................................ 7, 30

40 C.F.R. Pt. 63, Subpt. U, Tbl. 1 ............................................ 16, 26

## INTRODUCTION

The Environmental Protection Agency (EPA) has repeatedly attempted to shut down Petitioner Denka Performance Elastomer LLC's (DPE) neoprene producing facility and circumvent Louisiana's primary authority to implement and enforce Clean Air Act (CAA) requirements within the State. This targeted series of unjustified actions is not based on scientific findings but rather upon an arbitrary political agenda.

EPA's Final Rule targets DPE's facility by requiring implementation of new requirements within 90 days, an impossible feat intended to seal DPE's fate. Faced with the serious consequences of an impossible to meet compliance deadline, DPE requested an Extension of Compliance from the Louisiana Department of Environmental Quality (LDEQ, referred collectively with the State as the State or Louisiana). Louisiana lawfully granted DPE a two-year compliance extension pursuant to its delegated authority under the CAA, thus preventing the facility's shut down—and the devastating economic impact of hundreds of lost jobs—and avoiding potential risks of rushed compliance.

In an unprecedented usurpation of Louisiana's delegated authority to implement CAA regulations within the State, EPA proclaimed that

Louisiana's lawful granting of the extension request was "ineffectual." EPA's stance is arbitrary, capricious, and contrary to the law. EPA ignores the plain text of the extension clauses and the statutory requirements for revoking delegated authority. That alone is sufficient for DPE to prevail.

In addition to flouting the relevant statutes, EPA also upends the cooperative federalism scheme underlying the CAA and impermissibly interferes with Louisiana's primary responsibility to manage air pollution within the State. Accordingly, Louisiana intervened in this lawsuit to protect its lawfully delegated authority under the CAA and to maintain the proper federal-state partnership embodied in the CAA. The State supports DPE's request for a declaratory judgment to preserve the compliance extension.

## STATEMENT OF THE ISSUES

1. Whether EPA incorrectly determined the two-year extension of compliance granted by the State of Louisiana was invalid?

## STATEMENT OF THE CASE

Intervenors the State of Louisiana and LDEQ largely concur with the Statement of the Case set forth in Petitioner Denka Performance Elastomer Opening Brief. Pet. Br. at 7–17.[1]

### A. The Clean Air Act, Cooperative Federalism, and Louisiana

The Clean Air Act "establishes a comprehensive program for controlling and improving the nation's air quality through state and federal regulation." *BCCA Appeal Group v. EPA*, 355 F.3d 817, 821–22 (5th Cir. 2003), *as amended on denial of reh'g and reh'g en banc* (Jan. 8, 2004); 42 U.S.C. § 7401 et seq. The Act is "an experiment in cooperative federalism." *Luminant Generation Co. v. E.P.A.*, 675 F.3d 917, 921 (5th Cir. 2012). The concept itself is exceedingly simple: "Cooperative federalism" is "federal and state actors working together." *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 182 (2023). In other words, Congress designed a system in which the states would work as partners with EPA to regulate air pollution emissions from stationary

---

[1] The State takes no position on DPE's statement of jurisdiction. Pet. Br. at 1–2. As Louisiana's extension is at issue in this case, the State intervened to protect its authority under the CAA to implement and enforce CAA standards within the state.

sources. *See Ohio v. EPA*, 144 S. Ct. 2040, 2048 (2024) ("The Clean Air Act envisions States and the federal government working together to improve air quality.").

The line between federal and state powers is clear: The CAA assigns responsibility to the EPA for identifying air pollutants and establishing standards, 42 U.S.C. §§ 7408–7409, but the states bear "the primary responsibility" for implementing those standards, *BCCA Appeal Group*, 355 F.3d at 822. *See also* 42 U.S.C. § 7407(a) ("Each State shall have the primary responsibility for assuring air quality within [its] entire geographic area."); § 7401(a)(3) ("[A]ir pollution prevention ... is the primary responsibility of States and local governments."). The states "have broad authority to determine the methods and particular control strategies they will use to achieve the statutory requirements." *BCCA Appeal Group*, 355 F.3d at 822 (citing *Union Elec. Co. v. EPA*, 427 U.S. 246, 266 (1976) ("So long as the national standards are met, the State may select whatever mix of control devices it desires.")).

As such, most states have detailed and EPA-approved regulatory schemes that seek to improve the air quality within their respective states. These states shouldered their sovereign responsibilities to

regulate within their borders, and they have harnessed their unique knowledge of their citizens' needs to advance the best policy for their respective states. States with approved programs, including Louisiana, have primary enforcement responsibility of CAA requirements and wide discretion over their implementation, including those for air pollution prevention and control. *Am. Elec. Power Co. v. Conn.*, 564 U.S. 410, 424–28 (2011); 42 U.S.C. § 7401(a)(3); s*ee also Wis. Dep't of Health & Family Servs. v. Blumer*, 534 U.S. 473, 495 (2002) ("When interpreting [statutes embodying cooperative federalism], [courts] have not been reluctant to leave a range of permissible choices to the States, at least where the superintending federal agency has concluded that such latitude is consistent with the statute's aims.").

EPA's federal role is primarily to establish emission standards for states to implement and to provide financial and technical assistance for the development of cooperative federal, state, and local programs to prevent and control air pollution. 42 U.S.C. § 7401(a)(4). EPA's authority to manage air emissions is delegated to the states through approved state programs, including the authority to grant permits under an approved program, extend permit compliance schedules, and waive deadlines. 42

6

U.S.C. § 7412(l)(1). Once delegation occurs, states are trusted to implement the CAA's requirements within their borders and are given great discretion in their operation. The CAA sets forth standards and processes for withdrawal of a state's delegated authority, which can occur only if EPA determines that a state is not administering and enforcing a program consistent with the CAA. *Id.* at § 7412(l)(6).

Louisiana has an approved program for "the implementation and enforcement … of emission standards and other requirements for air pollutants subject to" the CAA. *Id.* at § 7412(l)(1). Pursuant to this section, Louisiana was expressly delegated the authority to implement and enforce the CAA's Section 112 standards in 2004. *See id.*; 40 C.F.R. Part 63, Subpart E; *see also* EPA, *New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants; Delegation of Authority to Louisiana*, 69 Fed. Reg. 15687 (Mar. 26, 2004) (Pet. Br. Add.233).[2]

---

[2] As DPE explains, Pet. Br. at 37–39, Louisiana also has an approved Operating Permits Program that includes extension authority. EPA, *Clean Air Act Final Full Approval of Operating Permits Program; Louisiana Department of Environmental Quality*, 60 Fed. Reg. 47296 (Sept. 12, 1995) (Pet. Br. Add.263).

One Section 112 standard is particularly relevant here: Section 112(f) requires EPA to set new emission standards if it determines that existing standards do not provide an "ample margin of safety to protect public health." 42 U.S.C. § 7412(f)(2)(A). New 112(f) standards apply 90 days after their effective date. *Id.* § 7412(f)(4)(A). However, the Administrator may grant an extension (or "waiver") allowing sources up to two years to comply with a standard if the Administrator finds (1) "that such period is necessary for the installation of controls" and (2) "that steps will be taken during the period of the waiver to assure that the health of persons will be protected from imminent endangerment." *Id.* § 7412(f)(4)(B). Regulations implementing Section 112(f)(4) are set forth in 40 C.F.R. § 63.6(i), with provisions that govern the procedures for requesting compliance extensions, §§ 63.6(i)(3), 63.6(i)(4)(ii), and approving compliance extensions, *id.* §§ 63.6(i)(8), 63.6(i)(9). Through its delegated powers, Louisiana has the authority to grant or deny such compliance extensions.

The State has exercised this delegated authority for years. Take, for example, LDEQ's issuance of a compliance extension to CITGO Petroleum Corporation in 2016. *See* Letter from Assistant Secretary

Elliott B. Vega, LDEQ, to Phyllis Holifield, CITGO Petroleum Corporation, *re Extension of Compliance with EPA's Refinery Sector Rule* (May 9, 2016), available at https://tinyurl.com/2abu43am. Relying on its ability to grant extensions under 40 C.F.R. 63.6(i)(9), Louisiana determined compliance with EPA's new requirements could not "reasonably be achieved" by the rule's compliance date. *Id.* "Based on the information provided," Louisiana granted a 2-year extension of compliance pursuant to 112(f) of the CAA. *Id.*

Just as the CAA envisions, Louisiana exercises its extension authority using best professional judgement. Often, that means granting compliance extensions to industry actors under Section 63.6(i)(9).[3] Other

---

[3] *See, e.g.*, Letter from Assistant Secretary Elliott B. Vega, LDEQ, to Brett Woltjen of Equilon Enterprises LLC, *Re Extension of Compliance* (Oct. 24, 2017), available at https://tinyurl.com/by685xr (granting a Section 112(d) extension under 40 C.F.R. 63.6(i)(9) based "on the information provided"); Letter from Assistant Secretary Elliott B. Vega, LDEQ, to Jerry Forstell, Chalmette Refining, LLC, *re Extension of Compliance* (July 14, 2017), available at https://tinyurl.com/3n46hbp5 (same); Letter from Assistant Secretary Cheryl Sonnier Nolan, LDEQ, to Wade L. Alleman, Occidental Chemical Corporation, *re Letter of Response* (Oct. 13, 2008), available at https://tinyurl.com/3s22p686 (granting one-month extension under 40 C.F.R. 36.6(i) "based on information provided" regarding impact of hurricane).

times, that means denying a compliance extension.[4] Either way, Louisiana has a long, uncontested history of exercising its extension authority under the CAA.

However, in this unprecedented situation, EPA attempts to overhaul Louisiana's primary authority to grant extensions, thus destroying the cooperative federalism framework underlying the CAA. As described below, EPA has targeted Louisiana and DPE for years, attempting to shut down the facility and unceremoniously strip the State of its primary enforcement responsibility of CAA requirements.

## B. EPA's Ongoing Attack on DPE and Louisiana

EPA's attempt to shut down the facility via the Final Rule is the latest play by EPA in an ongoing and targeted campaign against DPE, fueled by EPA Administrator Michael Regan's pledge to crack down on chemical plants in the State "us[ing] every single tool in [the] toolbox."[5]

---

[4] *See* Letter from Assistant Secretary Chuck Carr Brown, LDEQ, to Claudine Gorman, Chalmette Refining LLC, *re Request for Extension of Compliance* (Feb. 6, 2006), available at https://tinyurl.com/5e7mccwd (denying extension request because company "has ample time to initiate and complete the events necessary to achieve compliance").

[5] *See* Lisa Friedman, *To Cut Cancer Risks, E.P.A. Limits Pollution From Chemical Plants*, The New York Times, April 9, 2024, available at http://tiny.cc/wt4tzz.

*First*, EPA attempted to leverage Title VI of the Civil Rights Act to require Louisiana, and other states, to impose emissions limitations—beyond those required by the CAA—on chemical plants that were operating consistent with lawfully issued CAA permits. Louisiana challenged EPA's supposed authority to impose conditions on CAA permits based solely on allegations of discriminatory effect pursuant to Title VI of the Civil Rights Act. *See generally Louisiana v. EPA*, 712 F. Supp. 3d 820 (W.D. La. 2024). EPA relied on regulations barring actions that would have a discriminatory effect to leverage permit conditions to address impacts from a civil rights perspective, going beyond environmental statutory authorities. *Id.* While not focused on DPE specifically, this would open avenues for EPA to challenge DPE's existing permits, which are required to operate lawfully.

In a flat rejection of EPA's expansion of its own authority, the court held that EPA could not enforce any cumulative or disparate impact requirements under Title VI of the Civil Rights Act. *Id.* at 859–63, 866 (entering preliminary injunction against EPA and DOJ to enjoin them from imposing or enforcing disparate impact based requirements against

11

the State); *see also Louisiana v. EPA*, No. 2:23-CV-00692, 2024 WL 3904868 (W.D. La. Aug. 22, 2024) (entering permanent injunction).

*Second*, after failing to shut down DPE's facility through the Title VI litigation, EPA next challenged DPE's CAA permit, which was lawfully issued by LDEQ, under Section 303 of the CAA through an emergency lawsuit.[6] On February 28, 2023, EPA sued DPE in the Eastern District of Louisiana alleging that chloroprene emissions from DPE's neoprene manufacturing operations present an "imminent and substantial endangerment" to public health and welfare. *See generally United States v. DPE, et al.*, No. 2:23-cv-00735 (E.D. La.).

A month later, EPA filed a motion for preliminary injunction that would require DPE to shut down immediately if its chloroprene emissions were not reduced or eliminated. To date, the court has not granted the motion for preliminary injunction.

Around the same time, EPA published the proposal for the Final Rule, which proposed providing all sources, including DPE, with two

---

[6] Section 303 of the CAA provides that EPA can sue "upon receipt of evidence that a pollution source … is presenting an imminent and substantial endangerment to public health or welfare … to immediately restrain any person causing or contributing to the alleged pollution to stop the emission of air pollutants." 42 U.S.C. § 7603.

years to comply with the applicable requirements. In so doing, EPA expressly recognized that the DPE Facility "will require additional time to plan, purchase, and install equipment for … chloroprene control." *New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emissions Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry*, 88 Fed. Reg. 25080, 25178 (Apr. 25, 2023) ("Proposed Rule") (Pet. Br. Add.231).

*Third,* in February of 2024, a year after filing the section 303 case, EPA requested that the Court continue the "emergency" litigation—thus avoiding having to (a) prove the existence of "imminent and substantial endangerment" as required by Section 303, and (b) go to the trial scheduled to begin on March 11, 2024. EPA's strategy is obvious: it requested a deferral to delay the trial until *after* the Final Rule's official publication in May—which, as explained *infra pp.* 13–18, (a) changed the compliance deadline for DPE to 90 days with no notice, thus ensuring DPE's facility would be shut down, and (b) declared the facility an imminent and substantial endangerment to public health, thus providing

the necessary precondition for EPA's section 303 litigation. EPA's goal? Either mooting the trial or guaranteeing a favorable outcome. Either way, EPA would achieve its overarching goal—forced closure of DPE's facility. The court granted EPA's request for continuance, and EPA soon published the Final Rule.

## C. EPA Promulgates the Final Rule

On May 16, 2024, EPA published the Final Rule regarding organic chemical manufacturers under the CAA. *New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emissions Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry*, 89 Fed. Reg. 42932 (May 16, 2024) (Pet. Br. Add.218) ("Final Rule"). The Final Rule required DPE to complete an impossible task: implement a series of stringent emissions control requirements by October 15, 2024, just 90 days after the Final Rule's effective date.

As previously explained, the Proposed Rule gave all existing sources two years to comply with the new emission control requirements. 88 Fed. Reg. at 25178. EPA knew, and explicitly acknowledged in the

Final Rule, that complying with the newly promulgated requirements would take time:

> [S]ufficient time is needed to properly engineer the project, obtain capital authorization and funding, procure the equipment, obtain permits, and construct and start-up the equipment. Therefore, we are finalizing a compliance date of *2 years after the effective date of the final rule for all existing affected sources to meet the EtO requirements* … This compliance schedule is consistent with the compliance deadlines outlined in the CAA under section 112(f)(4) and the CRA.

89 Fed. Reg. at 42954–55 (emphasis added).

To LDEQ's surprise—and despite the Proposed Rule and EPA's statement that the two-year compliance period applied to all existing sources—EPA contradicted its own position in the very next paragraph, and set an unrealistic 90-day compliance period for an existing source producing one chemical: neoprene.

> In a change from the proposed rule, the EPA is shortening the compliance deadline *for affected sources producing neoprene*, due to the EPA's finding that *chloroprene emissions from the only such source pose an imminent and substantial endangerment under CAA Section 303*, 42 U.S.C. § 7603 … All existing affected sources producing neoprene … must comply with the chloroprene requirements we are finalizing under CAA section 112(f) … no later than October 15, 2024.

89 Fed. Reg. at 42955 (emphasis added).

15

The obvious catch? DPE is the *only* facility in the United States that produces neoprene. The expedited compliance schedule was shocking but predictable. There was no notice to either DPE or Louisiana that the timeframe would change from the Proposed Rule, but the "surprise switcheroo," Pet. Br. at 5 n.4, was yet another attempt by EPA to shut down DPE, this time by unlawfully targeting the facility in a rulemaking proceeding.[7] The targeted, shortened deadline for compliance virtually ensures permanent closure of DPE's facility, jeopardizing the jobs of hundreds of employees and contractors within the State, and significantly affecting local and State economies.

Anticipating DPE and Louisiana's frustration with the impossible compliance schedule, EPA also attempted (but failed) to strip Louisiana of its delegated authority to grant compliance extensions to facilities operating within the State. First, EPA altered Subpart U, Table 1, an applicability table that shows what provisions of the CAA are delegable to the states. *See* 40 C.F.R. Pt. 63, Subpt. U, Tbl. 1. Requests for

---

[7] As DPE notes, the change in compliance deadline, as well as the Final Rule in general, is subject to a separate, on-going challenge in the D.C. Circuit by Louisiana, DPE, and other entities impacted by the Rule. *See* Case No. 24-1135 (D.C. Cir. filed May 16, 2024).

16

extensions under 40 C.F.R. 63.6(i)(4)(ii) for Subpart U chemicals were previously listed as not available to owners or operators. The Final Rule changed that, once again singling out DPE. With the Final Rule, owners and operators of affected sources producing neoprene can request a Section 63.6(i)(4)(ii) extension, but theoretically only from EPA itself (as explained below).

EPA, however, missed a curtail distinction—Subpart U does not affect Louisiana's delegated authority to *grant* extensions. While Subpart U may impact DPE's ability to *request* an extension as an owner or operator under Section 63.6(i)(4)(ii) specifically, any impact to DPE's ability to request does not necessarily affect Louisiana's ability to grant. As explained *infra* Section IA, Section 63.6(i)(9) states that Louisiana can grant a compliance extension based on either an (i)(4) request *or other information*. 40 C.F.R. 63.6(i)(9). The source of the request is therefore irrelevant to Louisiana's ability to grant an extension, so long as there is information to support the grant. The change to Subpart U does nothing to affect Louisiana's ability to grant extensions, but it does demonstrates EPA's complex plan to shutter DPE.

Next, in another sneaky change from the Proposed Rule, EPA slipped in an amendment to 40 C.F.R. § 63.507(c) providing that the "[a]pproval of an extension request under § 63.6(i)(4)(ii)" cannot be delegated to states. 89 Fed. Reg. at 43261 (Add.228). This would force owners and operators to request such extensions from EPA, thus circumventing state authority and autonomy.

EPA knew Louisiana would step in to protect its sovereign interest in regulating the state's air pollution by granting DPE a compliance extension. Rather than participating in the CAA's cooperative federalism scheme, EPA attempted to gut Louisiana's delegated authority to grant extensions without following statutory procedures for withdrawing delegated authority.

### D. Louisiana Grants a Compliance Extension to DPE

Faced with an impossible compliance deadline, on April 19, 2024, DPE requested an extension from the new section 112(f) requirements from LDEQ—the entity primarily responsible with implementing and enforcing the CAA's requirements within Louisiana. DPE's request established that there was good cause to grant an extension, that continued operation of the Facility did not pose an imminent

endangerment, and that a compliance period of at least two years was necessary to complete the required control projects. LDEQ responded on June 27, 2024, exercising its authority to grant an extension of two years for DPE to comply with EPA's newly revised emissions standards. Doc 6-9, Letter from Assistant Secretary Amanda Vincent, LDEQ, to Jeffrey R. Holmstead, DPE, *Re Extension of Compliance* (June 27, 2024) (Pet. Br. App.63–65) (hereinafter Extension Letter).

LDEQ explained that additional time was necessary for DPE to install controls, thus justifying the need for a compliance date of two years after the effective date of the final rule, June 27, 2024. *Id.* The extension recognized the impracticability of, and serious risks associated with, securing and installing the equipment and infrastructure required by EPA's Final Rule within the 90-day timeframe imposed for compliance, in addition to the impact on jobs and the economy. *Id.*; *see also* Doc. 6-15, Declaration of Christopher Meyers in Support of Stay. LDEQ's extension, however, was not without additional protections. During the extension period, DPE is required to "take steps to ensure that the health of persons is protected from imminent endangerment." *Id.* at 2.

LDEQ also considered its primary responsibility to determine whether to extend compliance with 112(f) standards. LDEQ took steps consistent with the procedures outlined in existing regulations governing the granting of extensions at 40 C.F.R. 63.6(i)(9). LDEQ considered information in DPE's request, along with other information associated with the impacts and risks to the State and local communities posed by the rush to meet a 90 day compliance period, in granting the extension request. *Id.*

But EPA was never going to recognize Louisiana's compliance extension as valid: it attempted to use "every tool in the toolbox" in crafting the Final Rule to strip the State of its delegated authority. EPA left DPE with no choice but to seek a declaratory judgment regarding the compliance extension's validity.

Following LDEQ's extension grant, on July 31, 2024, this Court issued a stay that precluded EPA from taking action in contravention of the validity of the LDEQ extension pending this Court's resolution of this lawsuit, at the request of DPE. Doc. 57.[8]

---

[8] Notably, only after issuance of the extension by LDEQ and this Court's stay, did EPA seek to restart the District Court Section 303

In this litigation, EPA has challenged the State's authority to grant DPE's extension request. EPA's declaration that the compliance extension is "ineffectual" undermines Louisiana's delegated authority to implement and enforce the CAA in the State and upsets the delicate balance between federal and state regulatory authority for cooperative federalism. LDEQ has relied on its authority to extend compliance deadlines for over years without EPA objection. Owners and operators of facilities, such as DPE, have likewise relied on the legal certainty provided by the extensions granted by the State. EPA's action have turned decades of regulatory certainty upside down. As such, the State supports DPE's request for a declaration from this Court as to the validity of Louisiana's extension action.

## SUMMARY OF THE ARGUMENT

Louisiana's compliance extension is valid and enforceable, and EPA's determination to the contrary is arbitrary, capricious, and contrary to the law. Louisiana has had the expressly delegated authority to grant compliance extensions since 2004. Despite the State's clear

---

litigation that it had tried to end run with its Final Rule. On September 17, 2024, EPA finally filed a motion to reopen the Section 303 case.

statutory authority for granting the extension, EPA continues its campaign against DPE by claiming Louisiana never had the authority to issue the extension, or alternatively, the Final Rule revoked that authority. Neither of these arguments support EPA's declaration that the extension is invalid. Louisiana's granting of the extension is supported by the timeline of events, the text of relevant provisions, the statutory requirements for withdrawing delegated authority, and the delicate balance of powers between state and federal authorities implementing the CAA.

## STANDARD OF REVIEW

Under the Administrative Procedure Act, the Court must "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). Review under this standard requires that an agency's action be "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Reviewing courts are asked to "ensure[] that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.*

# ARGUMENT

## I.    THE EXTENSION WAS LAWFULLY GRANTED AND EFFECTUAL

EPA has offered two theories for why Louisiana's granting of the compliance extension was ineffectual. First, Louisiana supposedly lacks the delegated authority to grant compliance extensions. Second, even if Louisiana previously had the delegated authority to grant compliance extensions, that authority was revoked by the Final Rule. Neither theory passes muster under the text of the CAA. Louisiana's extension is therefore valid and enforceable.

### A. Louisiana Has the Delegated Authority to Grant Extensions.

LDEQ has primary responsibility to implement and enforce emissions standards in the State through authority properly delegated under Section 112(l) of the CAA. Specifically, the section provides that states may submit to EPA for approval "a program for the implementation and enforcement … of emission standards and other requirements for air pollutants" subject to Section 112. 42 U.S.C. § 7412(l)(1). Section 112(l)(5) requires that EPA "either approve or disapprove such program" and sets forth conditions for disapproval. *Id.* § 7412(l)(5). Subpart E of 40 C.F.R. Part 63 ("Approval of State Programs

and Delegation of Federal Authorities") establishes procedures for implementing delegated authority, 40 C.F.R. § 63.90, including the requirements for approval and withdrawal of delegated authority, *id.* § 63.96.

On March 26, 2004, EPA Region 6 expressly delegated to Louisiana the authority to implement and enforce Section 112 standards. *See generally* 69 Fed. Reg. 15687 (Pet. Br. Add.233–41). This delegation specifically included 40 C.F.R. Part 63, Subpart A ("General Provisions"). *Id.* at 15689 (Pet. Br. Add.235); *see also* 40 C.F.R. § 63.99(19) ("Delegated Federal Authorities," listing Subpart A as being delegated to Louisiana).

Subpart A requires owners or operators to comply with any relevant standards established under Section 112 of the Act, unless the Administrator (or a State with an approved permit program) has granted an extension of compliance. 40 C.F.R. § 63.6(a)(1); *id.* § 63.6 ("Compliance with standards and maintenance requirements"); *id.* § 63.6(i) ("Extension and compliance with emission standards"). The process for requesting extensions of compliance are covered in subsections 63.6(i)(4) through (i)(7). Here, our focus is on (i)(4)(ii), which establishes the process for an owner or operator to request an extension from Section 112(f) standards:

> The owner or operator of an existing source unable to comply with a relevant standard established under this part pursuant to section 112(f) of the Act may request that the Administrator grant an extension allowing the source up to 2 years after the standard's effective date to comply with the standard.

*Id.* § 63.6(i)(4)(ii). The Administrator, which is defined to include states with delegated authority, i*d.* § 63.2 (Administrator means the Administrator of EPA "or his or her authorized representative (e.g., a State that has been delegated the authority to implement the provisions of this part)"), may grant the extension "if he/she finds that such additional period is necessary for the installation of controls and that steps will be taken during the period of the extension to assure that the health of persons will be protected from imminent endangerment," *id.* § 63.6(i)(4)(ii). If an extension is necessary, then:

> Based on the information provided in any request made under paragraphs (i)(4) through (i)(6) of this section, or other information, the Administrator (or the State with an approved permit program) may grant an extension of compliance with an emission standard, as specified in paragraphs (i)(4) and (i)(5) of this section.

*Id.* 63.6(i)(9).[9]

---

[9] The request provision, Section 63.6(i)(4)(ii), does not include the same "or the State with an approved permit program" language that is

As a state with delegated authority to implement Subpart A provisions, *id.* §63.2, Louisiana granted an extension to DPE under Section 63.6(i)(9). *See* Extension Letter at 2.

CAA Part 63 Subpart U includes an applicability table intended to clarify for facility owners and operators what provisions are applicable to their source category. 40 C.F.R. Pt. 63, Subpt. U, Tbl. 1 (DPE is subject to the requirements for the "Group I Polymers and Resins" category found in Part 63, Subpart U). Table 1 runs through all of Subpart A's provisions and states whether they are applicable to Subpart U affected sources. Before the Final Rule was effective, Section 63.6(i)(4)(ii) was listed as not being applicable. EPA wrongly thinks this is determinative of the outcome.

The regulations are clear that Table 1 merely specifies the provisions of Subpart A "that apply and those that do not apply to owners

---

in the granting section, which is why the definition of Administrator is important.

As explained, *supra* n.2, Louisiana also has an approved permit program. *See* 60 Fed. Reg. 47296. Louisiana could therefore grant an extension either as the "Administrator" or as "a State with an approved permit program." *See infra pp.* 28–29; Pet. Br. at 37–39 (discussing Louisiana's "automatic authority").

and operators of affected sources subject to [Subpart U]." *Id.* § 63.481 ("Compliance dates and relationship of this subpart to existing applicable rules"). That means § 63.6(i)(4)(ii) was inapplicable to DPE, as the owner and operator of its facility. It says nothing about Louisiana's delegated authority—especially since the approval provision, Section 63.6(i)(9), was listed as applicable. Simply put: Table 1 does not divest Louisiana from its delegated authority to *grant* extensions.[10]

And that holds true regardless of the Final Rule's alteration to Subpart U, Table 1, which now lists Section 63.6(i)(4)(ii) as applicable to owners and operators of affected sources producing neoprene. True, that means DPE can request an extension under Section 63.6(i)(4)(ii). But again, it does nothing to alter Louisiana's ability to grant an extension under Section 63.6(i)(9).

The granting provision is thus the crux of this case. The plain text of the regulation makes clear that a proper request under Section 63.6(i)(4) is unnecessary to trigger Louisiana's ability to grant an

---

[10] DPE interprets Table 1 as relieving it from the obligation of following Section 63.6(i)(4)(ii)'s procedures. Pet. Br. at 40–42. Louisiana takes no stance on this assertion, as it is unnecessary to the argument and does not affect the State's authority to grant an extension.

extension: "Based on the information provided in any request made under paragraphs (i)(4) through (i)(6) of this section, *or other information,* the Administrator … may grant an extension of compliance with an emission standard, as specified in paragraphs (i)(4) and (i)(5) of this section." 40 C.F.R. § 63.6(i)(9) (emphasis added); *see also United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242 (1989) (discussing commas, language, and punctuation as offsetting two "distinct" requirements). Put differently: Louisiana may grant an extension based on (a) a request made under Section 63.6(i)(4), or (b) other information. With its delegated authority to grant extensions intact, Louisiana relied upon information provided by DPE and other information to grant the extension lawfully. *See* Extension Letter at 3 (discussing EPA's own determination that compliance would take two years and other information submitted by DPE).

The support for Louisiana's granting of the extension does not end there. Recall the wording difference between the request provision (Section 63.6(i)(4)(ii)) and the granting provision (Section 63.6(i)(9)). *See supra* n.7. The granting provision allows "the Administrator *(or the State with an approved permit program)*" to grant an extension—a phrase that

28

is notably absent from the requesting provision. *See id.* § 63.6(i)(9) (emphasis added); *see also id.* § 63.6(i)(1) ("Until an extension of compliance has been granted by the Administrator *(or a State with an approved permit program)* under this paragraph . . ." (emphasis added)). Louisiana has had an approved permit program since 1995. 60 Fed. Reg. 47296. The State is therefore independently able to grant an extension based on "other information" as a state "with an approved permit program." *See id.* § 63.6(i)(9).

Subpart U, Table 1 has no bearing on the State's delegated authority to grant extensions under Section 63.6(i)(9). Louisiana's granting of the compliance extension was a valid exercise of its delegated authority. EPA's proclamation that the extension is "ineffectual" is therefore arbitrary, capricious, and contrary to law.

### B. EPA Has Not Taken Action to Modify or Withdraw LDEQ's Delegated Authority.

Louisiana lawfully granted DPE's extension under existing authority. *See supra* Section IA. Prior to the extension, EPA had not questioned or disapproved of the State's authority to grant extensions. EPA now points to provisions in the Final Rule—intended to revoke the

State's extension authority and prevent the State from aiding DPE—as evidence that the extension was ineffective.

EPA's deeply flawed reasoning is rooted in the Final Rule's sneaky amendment to 40 C.F.R. § 63.507(c), a provision intended only to clarify what authorities pursuant to Subpart E can and cannot be delegated as a matter of law for any subcategory. *See* 89 Fed. Reg. at 43261 (Pet. Add.228). The Final Rule added approval of an extension request under § 63.6(i)(4)(ii) to the list of non-delegable authorities. According to EPA, that amendment revoked any authority the State had to issue an (i)(4)(ii) extension. The problem? EPA ignores the timeline of events and the statutory requirements for withdrawing delegated authority.

**1.** The Final Rule was not in effect at the time LDEQ granted the extension (June 27, 2024). Rather, the Final Rule became effective on July 15, 2024—eighteen days *after* Louisiana granted the extension. EPA's argument belies this simple timeline.

**2.** Even setting aside the timing issue, EPA's attempted modification via rulemaking runs afoul of the regulations governing delegation approval and withdrawal. As discussed, *supra pp.* 7–10, EPA delegated the Administrator's authority to implement and enforce the

CAA in Louisiana to the State. Regulations at 40 C.F.R. Part 63, Subpart E contain the regulatory framework for such express delegations. A state's Subpart E authority is modified only by amending Subpart E, which EPA last did on February 24, 2015. EPA has done nothing to revise Louisiana's CAA authority since that time. EPA's Final Rule does not accomplish revocation of LDEQ's lawfully delegated extension authority because it failed to modify the Subpart E delegated authorities conveyed more than 20 years ago.

Further, EPA's attempt to revoke Louisiana's delegated extension authority through rulemaking ignores the statutory requirements for withdrawing a state's approved program. A state's delegated authority can be withdrawn only after the state has been notified, the state has been given time to correct the deficiencies (if possible), the reasons for withdrawal have been stated in writing and made public, and there has been a public hearing. 42 U.S.C. § 7412(l)(6); *see also* 40 C.F.R. 63.96(b) (implementing the withdrawal requirements from Section 112(l)(6)). Withdrawal also requires a public comment period and a determination that (1) "[t]he State no longer has authority to assure compliance or resources to implement and enforce the approved rule or program," (2)

"[t]he State is not adequately implementing or enforcing the approved rule or program, or" (3) "[a]n approved rule or program is not as stringent as the otherwise applicable Federal rule, emission standard or requirement." 40 C.F.R. § 63.96(b).

EPA did not comply with any of these statutory requirements. Instead, EPA devised an end-run around these obligations, attempting to revoke Louisiana's delegated authority in a rulemaking purportedly addressing industry-wide practices. This is a complete violation of Section 112(l)(6) and the regulations governing withdrawal of CAA delegated authority.

Louisiana's expressly delegated authority to issue extensions was intact when it granted the compliance extension to DPE. EPA's refusal to acknowledge the timeline is unreasonable. And EPA's failure to comply with the statutory requirements for withdrawing delegated authority is certainly "not in accordance with the law." *See* 5 U.S.C. § 706(2)(A). This Court should hold that EPA's determination of invalidity as to Louisiana's extension is arbitrary, capricious, and contrary to law.

### C. EPA's Action Flouts the CAA's Cooperative Federalism Framework.

Even beyond the timeline and the text of the relevant provisions, EPA's refusal to acknowledge Louisiana's compliance extension as a valid exercise of its delegated authority egregiously violates the CAA's cooperative federalism framework. The "CAA's regulatory design, which requires cooperation between the federal government and the state in administering the CAA," should informs this Court's review. *Texas v. EPA*, 690 F.3d 670, 677 (5th Cir. 2012).

The CAA "establishes a comprehensive program for controlling and improving the nation's air quality through state and federal regulation." *BCCA Appeal Group*, 355 F.3d at 821–22. The CAA assigns responsibility to the EPA for identifying air pollutants and establishing standards. 42 U.S.C. §§ 7408–7409. But the states bear "the primary responsibility" for implementing those standards. *BCCA Appeal Group*, 355 F.3d at 822; *see also* § 7407(a) ("Each State shall have the primary responsibility for assuring air quality within [its] entire geographic area."); § 7401(a)(3) ("[A]ir pollution prevention ... is the primary responsibility of States and local governments."). The states are afforded "great flexibility," which is

"illustrated by the sharply contrasting, narrow role to be played by EPA." *Fla. Power & Light Co. v. Costle*, 650 F.2d 579, 587 (5th Cir. 1981).

"The structure of the Clean Air Act indicates a congressional preference that states, not EPA, drive the regulatory process." *Texas v. EPA*, 829 F.3d 405, 411 (5th Cir. 2016). This "division of responsibility between the states and the federal government 'reflects the balance of state and federal rights and responsibilities characteristic of our federal system of government.'" *Luminant Generation*, 675 F.3d at 921 (quoting *Fla. Power & Light Co.,* 650 F.2d at 581).

EPA's proclamation that Louisiana's extension was "ineffectual" is directly at odds with the CAA's cooperative federalism scheme. EPA has exceeded its "narrow role" and attempted to usurp Louisiana's control over the regulatory processes within the State. EPA's position is therefore arbitrary, capricious, and contrary to the structure of the CAA.

## CONCLUSION

For the foregoing reasons, Louisiana respectfully requests that this Court grant DPE's petition for relief, and

(i)    declare that Louisiana's compliance extension is valid and enforceable;

(ii)   declare that EPA's determination of invalidity as to Louisiana's extension is arbitrary, capricious, and contrary to law, and therefore unenforceable; and

(iii)   enjoin EPA from denying the validity of Louisiana's extension and taking action in contravention of the validity of Louisiana's extension.

Respectfully submitted,

NOAH HOGGATT
EXECUTIVE COUNSEL

LOUISIANA DEPARTMENT OF
ENVIRONMENTAL QUALITY
602 North Fifth Street
Baton Rouge, LA 70802
(225) 219-3985
Noah.Hoggatt@la.gov

ELIZABETH B. MURRILL
ATTORNEY GENERAL OF LOUISIANA

*/s/ Kelsey L. Smith*
KELSEY L. SMITH
DEPUTY SOLICITOR GENERAL

OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 428-7432
SmithKel@ag.louisiana.gov

*Counsel for Intervenors the State of Louisiana and the Louisiana Department of Environmental Quality*

## CERTIFICATE OF SERVICE

I certify that on November 6, 2024, I filed the foregoing brief with the Court's CM/ECF system, which will automatically send an electronic notice of filing to all counsel of record.

*/s/ Kelsey L. Smith*
KELSEY L. SMITH

# CERTIFICATE OF COMPLIANCE

Pursuant to Fifth Circuit Rule 32.3, the undersigned certifies that this brief complies with:

(1) the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7) because it contains 6,390 words; and

(2) the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016 (the same program used to calculate the word count).

*/s/ Kelsey L. Smith*
KELSEY L. SMITH

Dated:   November 6, 2024