No. 24-60351

# United States Court of Appeals
# for the Fifth Circuit

DENKA PERFORMANCE ELASTOMER, L.L.C.,

*Petitioner,*

STATE OF LOUISIANA;
LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY,

*Intervenors,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;
MICHAEL REGAN, ADMINISTRATOR,
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondents.*

On Petition for Review and Complaint
for Declaratory and Injunctive Relief

**BRIEF FOR *AMICUS CURIAE***
**U.S. REPRESENTATIVE CLAY HIGGINS OF LOUISIANA**
**IN SUPPORT OF PETITIONER**

Erik S. Jaffe
  *Counsel of Record*
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
ejaffe@schaerr-jaffe.com

*Counsel for* Amicus Curiae

NOVEMBER 6, 2024

# SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS

No. 24-60351
*Denka Performance Elastomer LLC v.*
*United States Environmental Protection Agency, et al.*

Pursuant to 5th Cir. R. 29.2, the undersigned counsel of record hereby certifies that, in addition to the persons and entities listed in the Certificate of Interested Persons in Petitioner's Petition for Review and Complaint for Declaratory and Injunctive Relief, the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Intervenors:
The State of Louisiana
The Louisiana Department of Environmental Quality

Counsel for Intervenors:
Elizabeth B. Murrill, Attorney General of Louisiana
J. Benjamin Aguinaga, Solicitor General of Louisiana
Kelsey L. Smith, Deputy Solicitor General of Louisiana

*Amicus Curiae*:
Clay Higgins, U.S. Representative, Louisiana 3rd Dist.

Counsel for *Amicus Curiae*:
Erik S. Jaffe
SCHAERR | JAFFE LLP

# TABLE OF CONTENTS

SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS............i

TABLE OF AUTHORITIES.................................................................. iii

IDENTITY AND INTEREST OF *AMICUS CURIAE* AND
    SOURCE OF AUTHORITY TO FILE BRIEF......................................1

RULE 29(a)(4)(e) STATEMENT ..............................................................2

SUMMARY OF ARGUMENT .................................................................2

ARGUMENT ...........................................................................................4

    I.    Congress Designed the Clean Air Act to Favor Local
        Authority in Cases Like This. .......................................................5

    II.   The Public Interest Favors Confirming the Validity of
        the LDEQ Extension.................................................................. 11

CONCLUSION ..................................................................................... 15

CERTIFICATE OF SERVICE................................................................ 16

CERTIFICATE OF COMPLIANCE....................................................... 17

# TABLE OF AUTHORITIES

**Cases**

*Alden v. Maine,*
  527 U.S. 706 (1999) ...............................................................5

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
  591 U.S. 1 (2020) ................................................................10

*Luminant Generation Co. v. EPA,*
  675 F.3d 917 (5th Cir. 2012) .................................................6

*Printz v. United States,*
  521 U.S. 898 (1997) ...............................................................5

*Sierra Club v. La. Dep't of Env't Quality,*
  100 F.4th 555 (5th Cir. 2024)................................................6

*Texas v. EPA,*
  983 F.3d 826 (5th Cir. 2020) .................................................5

*United States v. Lopez,*
  514 U.S. 549 (1995) ...............................................................6

*West Virginia v. EPA,*
  597 U.S. 697 (2022) .............................................................11

**Other Authorities**

Josh Bivens, Econ. Pol'y Inst., Updated employment multipliers
  for the U.S. economy (Jan. 23, 2019) ..................................13

The Federalist No. 39...............................................................5

Nat'l Inst. Occupational Safety & Health,
  *NIOSH Study Examines Relationship between
  Employment Status, Healthcare Access, and Health
  Outcomes* (Nov. 18, 2021)....................................................14

Statement of Scott H. Segal, Dir., Elec.
  Reliability Coordinating Council, *Hr'g on the Energy
  Consumers Relief Act of 2013  Before the Subcomm. on
  Energy & Power of the H. Comm. on Energy & Com.,*
  113th Cong. (Apr. 12, 2013) ................................................14

U.S. Env't Prot. Agency,
  *Where in the U.S. Can I Work for EPA?* (Feb. 8, 2024) .........8

## IDENTITY AND INTEREST OF *AMICUS CURIAE* AND SOURCE OF AUTHORITY TO FILE BRIEF

*Amicus curiae* Clay Higgins is a Member of Congress representing Louisiana's 3rd District, which is just over 65 miles from the facility at issue in this case (and will be even closer under the 2025 district maps). Indeed, Representative Higgins and his family themselves live in nearby Lafayette, Louisiana, and many of the people who work at Petitioner's facility and who benefit from the jobs it directly and indirectly provides, are likely his constituents.

Representative Higgins is thus interested in this case because the rule EPA seeks to rush into operation will have a severe economic impact on his constituents, on Louisiana, and on the nation's neoprene manufacturing ability. He is further interested in this case because as a Representative of the people of Louisiana in the national Congress, it is his privilege and duty to defend state prerogatives and maintain the appropriate degree of cooperation, checks, and balances between federal bureaucrats and state actors that our system of federalism and the Clean Air Act expect and require.

*Amicus* is authorized to file this brief by Fed. R. App. P. 29(a)(2) because all parties have consented to its filing.

## RULE 29(a)(4)(e) STATEMENT

*Amicus* hereby states that no party's counsel authored this brief in whole or in part; that no party or party's counsel contributed money that was intended to fund the preparation or submission of the brief; and that no person other than *amicus* or his counsel contributed money that was intended to fund the preparation or submission of the brief.

## SUMMARY OF ARGUMENT

This case involves critical issues about the proper balance of state and federal involvement in local environmental decisions. The Clean Air Act was designed to ensure that such balance does not drift too far toward a centralized and distant administrative body, divorced from local circumstances and needs, and to provide a local reality check (and authority check) on bureaucratic tunnel vision from Washington. While the Act envisions a more modern "cooperative" federalism, it also implements important checks and balances that reflect the traditional concerns of federalism. In this case, the Environmental Protection Agency (EPA) abandoned cooperation, and rode roughshod over the checks and balances built into the statutory and administrative structure. It adopted a restrictive rule concerning exclusively local chloroprene emissions that imposed an impossible deadline applicable to

a single neoprene plant in Louisiana—the only one in the country—and then refused to recognize the lawful and eminently sensible extension of time granted by the Louisiana Department of Environmental Quality (LDEQ). In doing so, EPA took it upon itself to disregard local expertise and authority built into the structure of the Act and regulations. And it made an absurd demand with severe adverse local and national implications but virtually no demonstrable material benefit to human health in Louisiana, much less *any* purported benefit to health beyond the State's borders. Such adverse local consequences, non-existent cross-border interest, and high-handed bureaucratic disregard for state government demonstrates the strong public interest in confirming the proper role of state government under the Act and the validity of the enforcement-mitigating extension of time granted by the LDEQ.

Refusing to accept the validity of the properly adopted LDEQ extension would impose substantial and unnecessary harm. Louisianans will lose their livelihoods, and the nation will lose its only neoprene producer. And it would frustrate the compromise brokered by the Clean Air Act, which allows EPA to set new standards, but interposes state governments between those distant federal bureaucrats and the ultimate

and locally tailored enforcement of those standards.  Here, Louisiana could, and did, better respond to local needs and recognized the harms to local jobs and the economy of a hasty deadline that would have accomplished nothing but destruction.  Indeed, the public health consequences of such economic injury are likely as or more significant than the questionable health effects of the two-year delay.

## ARGUMENT

With distant Washington experts in charge, EPA gave a Louisiana company ninety days to comply with new regulations.  Compliance with that short deadline was and remains impossible.  Aware that the timetable spells doom for its facility, Petitioner asked for and received an extension from the LDEQ, which EPA had previously empowered to extend these deadlines.  EPA rejected this extension, with little analysis or reasoning, ignoring the applicable procedures required for overriding local exercises of such authority.  This Court has already stayed EPA from acting contrary to the LDEQ extension, and it should ultimately rule on the merits that the LDEQ's extension of the applicable deadline was lawful and that EPA's disregard of that extension violated the Act,

the Agency's own regulations, and the important principles of federalism built into both.

## I.    Congress Designed the Clean Air Act to Favor Local Authority in Cases Like This.

Recognizing both the national and local interests in air quality and economic regulation, the Clean Air Act instructs state and federal actors to coordinate their efforts to regulate air pollution.  *See, e.g.*, *Texas v. EPA*, 983 F.3d 826, 831 (5th Cir. 2020).  This arrangement is consistent with the original constitutional design, "even as to matters within the competence of the National Government," which design rejected "'the concept of a central government that would act upon and through the States' in favor of 'a system in which the State and Federal Governments would exercise concurrent authority over the people.'"  *Alden v. Maine*, 527 U.S. 706, 714 (1999) (quoting *Printz v. United States*, 521 U.S. 898, 919–20 (1997)).   "States thus retain 'a residuary and inviolable sovereignty'" and "are not relegated to the role of mere provinces or political corporations."  *Alden*, 527 U.S. at 715 (quoting The Federalist No. 39, at 245).

The approach under the Clean Air Act has often been described as an "experiment in cooperative federalism" under which EPA sets air

quality standards and each State has "primary responsibility" for implementing those standards within the State's geography. *Sierra Club v. La. Dep't of Env't Quality*, 100 F.4th 555, 560 (5th Cir. 2024) (quoting *Luminant Generation Co. v. EPA*, 675 F.3d 917, 921 (5th Cir. 2012), and 42 U.S.C. § 7407(a)); *see also* Pet. Br. at 7 (Doc. 92) (discussing CAA's plan of state and federal collaboration and primary role of States regarding existing sources of pollution). Indeed, LDEQ was exercising just such primary, and lawful, authority when it granted the extension in this case. Pet. Br. 11–12.

The benefit of this approach is not merely to increase effectiveness by ensuring local input into decisions made by distant Washington bureaucrats, but also to promote accountability. Through "two distinct and discernible lines of political accountability," federal and state governments "hold each other in check." *United States v. Lopez*, 514 U.S. 549, 576 (1995) (Kennedy, J., concurring). Both sides have a role to play; sometimes helping each other, sometimes checking each other. Here, the Clean Air Act and its implementing regulations empower Louisiana to balance overly centralized federal authority by tailoring the enforcement of centrally developed standards to local circumstances and needs. *See*

Pet. Br. 11–12, 14–15. They put a thumb on the scale in favor of Louisiana regarding local issues and mitigate some of the flaws of central planning by EPA.

Here, local issues dominate, and national concerns are virtually non-existent (other than to the extent EPA *undermines* national interests). This case concerns a Louisiana facility whose emissions could, at best, only affect Louisiana's communities. EPA does not disagree. *See generally* Opp'n to Emergency Mot. for Stay Pending Rev. at 4 ("Stay Opp'n") (Doc. 42) (noting that "Denka is the only affected neoprene producer currently operating in the United States" and failing to claim any serious interstate impact). And even the local effects are speculative and absurd. To justify its draconian regulation and deadline, EPA simulated the effects of standing at the facility's fence line, around the clock, for seventy years. *See* Pet. Emergency Mot. for Stay Pending Rev. at 21 ("Stay Pet.") (Doc. 6). From this simulation, EPA extrapolates a supposed harm to "neighboring communities." Stay Opp'n at 6. To call the alleged harms speculative and near trivial, particularly over the brief time frame of the extension at issue here, would be an understatement.

Based on this speculative localized harm, EPA decided to *de facto* close the facility by imposing an impossible-to-meet deadline. For EPA, this is an easy-to-administer, though high-handed, option: no production, no pollution. But this option would cause severe economic dislocation, not just for the workers employed by the facility, but for surrounding areas and the State as well. *See infra*, at 13–14. Assessing such a tradeoff between minor to non-existent local health impact and substantial local economic disruption and injury is precisely the kind of local decision making that the Act contemplates, and that Louisiana would best handle.

EPA does not have any institutional interest or expertise in the local concerns of Louisiana. It does not answer to the people of Louisiana or even have many staff that live and work there. *See* U.S. Env't Prot. Agency, *Where in the U.S. Can I Work for EPA?* (Feb. 8, 2024), https://www.epa.gov/careers/where-us-can-i-work-epa. Its institutional interests are narrow and distant from the local concerns of the people and the State and it simply presumed to know better and disregarded the local concerns and input that the Act and regulations intended and

expected.  The very point of federalism, both cooperative and competitive, is to mitigate such distant national focus with local input and control.

Unlike EPA, the LDEQ answers to the people of Louisiana.  Its employees could drive from headquarters to the facility in less than an hour.  They talk to the State's people daily.  With this expertise, they decided that the facility needed to and could spend two more years adapting to the new EPA mandates without undue adverse effects on public health.  Maybe some might disagree with that decision or think it imperfect.  But such a properly delegated local decision is a better way of handling a local issue than having it decided exclusively by out-of-touch bureaucrats in Washington.  The LDEQ's decision was well within its authority, consistent with the structure of the Act and regulations, and in keeping with the fundamental principles of federalism built into both.

If EPA wanted to bypass the default allocation of state authority built into the Act and regulations it could do so, but only after surmounting numerous hurdles designed to check such an ill-considered central power grab.  For example, EPA first must rescind its previous decisions, including withdrawing its delegation of authority to the LDEQ.  Pet. Br. 31–39 (discussing LDEQ authority to grant extensions and

restrictive means of withdrawing such authority).  It thus was wrong to disregard the LDEQ's extension prior to jumping through the required regulatory hoops.  *See, e.g., Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 29 (2020) (separate policy of forbearance regarding DACA recipients "could not be rescinded 'without any consideration whatsoever'" of that separate policy).

That EPA might jump through all the necessary hoops after the fact, revoke local authority, and reissue the regulations in a manner that cannot be extended, is irrelevant to its earlier and premature disregard of local authority.  Those administrative procedural requirements provide checks and balances, including eventual judicial review.  And such procedural hurdles ensure multiple touchpoints for education, cooperation, compromise, and any other interventions that could easily lead to a better approach respectful of local needs and concerns.  That is the entire point of both cooperative and traditional federalism reflected in the Act and regulations.  This Court should ensure that such interests are not lightly disregarded by unelected bureaucrats in Washington.  Indeed, such a diminution of state authority granted and exercised for years consistent with the Act and regulations should be viewed as

something akin to a "major question" or "major" change triggering caution and a heightened attention to procedural requirements and proper authority. *Cf. West Virginia v. EPA*, 597 U.S. 697, 723–24 (2022) (where assertion of authority is "extraordinary" there "may be reason to hesitate" and greet the assertion of power with "skepticism") (cleaned up)). While perhaps not as sweeping as the carbon emissions policy in *West Virginia*, EPA's effort to re-write the state-federal balance under the Clean Air Act and its long-standing regulations is a major change deserving of skepticism and strict enforcement of the statutory prerequisites for such a change. This Court thus should recognize the federalism safeguards built into the Act and regulations, strictly enforce those safeguards, and confirm the validity of the LDEQ extension.

## II. The Public Interest Favors Confirming the Validity of the LDEQ Extension.

The public interest in this case also strongly favors confirming the validity of the extension granted by LDEQ.

Regarding any health concerns, start with EPA's math. Without a hint of mirth, EPA predicts a risk of cancer greater than the "presumptively acceptable" level of "100-in-1 million" excess cancer deaths. Stay Opp'n at 16; *see also* Compl. ¶ 52, ECF No. 1 (predicting

excess lifetime cancer risks from "approximately two years" of exposure). How much more than that acceptable level, however, remains largely speculation. EPA cannot predict that allowing a two-year period to implement the rule will cause a single case of cancer. Indeed, it has not done so. *See generally* Stay Opp'n at 21–22 (claiming only an "excess lifetime cancer risk[]" from continuous 70-year exposure of only 500-in-1 million, or .05%, and making no claim that the effect is linear as to a brief 2-year exposure at a tremendously diluted concentration; denying any need to discuss any "specific incidences of harm" as opposed to the broader "residual risk to public health").

To prevent this unlikely, perhaps nonexistent, localized harm, EPA will shut down the nation's only neoprene facility. To the extent that this facility has a national impact, it is positive. Because neoprene costs little, works in heat and in cold, and handles physical stress, many products use it. Products used by the U.S. military, wetsuits, mousepads, weather proofing, O-rings, laptop sleeves, and automotive gaskets all use neoprene. These products benefit American consumers and benefit multiple industries that incorporate neoprene into their own products. If EPA shuts down this facility, as its draconian deadline would do, there

will be no domestic neoprene production and American consumers and companies would have to rely on imports. At a national level, creating such foreign dependance, especially on products used by the U.S. military, surely weighs in favor of the limited extension granted by LDEQ to allow Petitioner time to become compliant without having to shutter its facility.

A shutdown likewise would harm Louisiana's communities more directly. The facility itself employs around 250 people and another 100 contractors. Pet. Br. at 3. Those people would lose their jobs if the emissions deadline were enforced as written. They and their families would suffer from such sudden economic dislocation, as would their surrounding communities and other Louisiana businesses who exist in the same interrelated economy with those employees. *See*, *e.g.*, Josh Bivens, Econ. Pol'y Inst., Updated employment multipliers for the U.S. economy tbl. 1 (Jan. 23, 2019) (Table 1: for durable manufacturing jobs, each 100 direct jobs generates 744.1 indirect jobs), https://tinyurl.com/bd5tmmaj. Even the health and welfare consequences of such economic disruption are likely greater than the speculative health consequences of the emissions EPA have targeted.

Nat'l Inst. Occupational Safety & Health, *NIOSH Study Examines Relationship between Employment Status, Healthcare Access, and Health Outcomes* (Nov. 18, 2021), https://tinyurl.com/mpwfcdp7 (the "unemployed were more likely to report adverse health outcomes" including "poor physical and mental health, obesity, and 10 chronic health conditions"; "Short-term unemployed respondents were most likely to face challenges accessing healthcare."); Statement of Scott H. Segal, Dir., Elec. Reliability Coordinating Council at 8, *Hr'g on the Energy Consumers Relief Act of 2013 Before the Subcomm. on Energy & Power of the H. Comm. on Energy & Com.,* 113th Cong. (Apr. 12, 2013) ("additional unemployment may significantly harm public health," causing an "increase in premature deaths" among the unemployed), available at https://tinyurl.com/ykvhbkem.

If the LDEQ extension is not upheld, irreparable injury will follow. The facility might never recover. The communities might never regain the lost jobs and economic opportunities lost through a rash imposition of an impossible deadline. Even the health and welfare costs of temporary economic dislocation could easily outweigh the supposed risks from marginally higher pollution during the limited extension period.

Whatever the speculative local risk to health from a brief extension of the regulatory deadline, local authorities with local expertise and local accountability have weighed such risk against the certain consequences absent an extension and have made a decision based on those competing local concerns.  To have distant national bureaucrats paternalistically override that local assessment for the supposed benefit of local residents, is nonsensical.  It is also contrary to the statute, contrary to the regulations, and contrary to deep-seated principles of federalism.

## CONCLUSION

This Court should confirm the validity of the extension granted by the LDEQ, confirm the proper role of state entities in a cooperative and competitive system of federalism, and allow the facility the full two-year period deemed appropriate by the LDEQ to comply with EPA's rule.

November 6, 2024                          Respectfully submitted,

/s/ Erik S. Jaffe
Erik S. Jaffe
  Counsel of Record
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
Facsimile: (202) 776-0136

Counsel for Amicus Curiae

15

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(d) and 5th Cir. R. 25.2.5, I hereby certify that on November 6, 2024, I filed the foregoing Brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the Court's CM/ECF system; service on counsel for all parties was accomplished by electronic mail or by service through the Court's electronic filing system.

*/s/ Erik S. Jaffe*
Erik S. Jaffe

## CERTIFICATE OF COMPLIANCE

The foregoing brief contains 2,857 words excluding the parts of the brief exempted by Fed. R. App. P. 32(f), and complies with the type-volume limitation of Fed. R. App. P. 29(a)(5).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Office 2016 in 14-point Century Schoolbook font.

Additionally, I certify that (1) any required redactions have been made in compliance with 5th Cir. R. 25.2.13; and (2) the document has been scanned with the most recent version of Microsoft Defender virus detector and is free of viruses.

November 6, 2024                    */s/Erik S. Jaffe*
                                    Erik S. Jaffe