**NOT YET SCHEDULED FOR ORAL ARGUMENT**

Case No. 24-60351

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

DENKA PERFORMANCE ELASTOMER, LLC,

*Petitioner,*

STATE OF LOUISIANA, ET AL.,

*Intervenors,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, ET AL.,

*Respondents.*

ON PETITION FOR REVIEW FROM THE UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY

**RESPONDENTS' STATUTORY AND REGULATORY ADDENDUM**

                                         TODD KIM
                                         *Assistant Attorney General*

*Of Counsel:*
MICHAEL THRIFT                           ALEXANDER M. PURPURO
HALI KERR                                BRANDON N. ADKINS
  Office of the General Counsel        *Attorneys, Environmental Defense*
  U.S. Environmental Protection        *Section*
  Agency                               Environment and Natural Resources
  Washington, DC                       Division
                                           U.S. Department of Justice
                                           P.O. Box 7611
                                           Washington, D.C. 20044
                                           Alexander.Purpuro@usdoj.gov
                                           Brandon.Adkins@usdoj.gov

# TABLE OF CONTENTS[1]

**STATUTES**

28 U.S.C. § 2401 ...................................................................... ADD1

42 U.S.C. § 7602 ...................................................................... ADD2

42 U.S.C. § 7605 ...................................................................... ADD4

**REGULATIONS**

40 C.F.R. § 63.1 ...................................................................... ADD5

40 C.F.R. § 63.91 .................................................................... ADD9

40 C.F.R. § 63.92 .................................................................. ADD14

40 C.F.R. § 63.93 .................................................................. ADD16

40 C.F.R. Part 63, Subpart U, Table 1 (2001) ................................. ADD19

40 C.F.R. Part 63, Subpart U, Table 1 (2008) ................................. ADD23

**FEDERAL REGISTER PUBLICATIONS**

60 Fed. Reg. 17750 (Apr. 7, 1995) ............................................... ADD26

66 Fed. Reg. 16318 (Mar. 23, 2001) (excerpts) ............................... ADD33

67 Fed. Reg. 16582 (Apr. 5, 2002) (excerpts) ................................. ADD37

80 Fed. Reg. 9613 (Feb. 24, 2015) ............................................... ADD43

---

[1] Authorities already contained in the Addendum to Petitioner's Opening Brief (ECF No. 95) have not been duplicated herein.

## § 2401. Time for commencing action against United States

(a) Except as provided by chapter 71 of title 41, every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues. The action of any person under legal disability or beyond the seas at the time the claim accrues may be commenced within three years after the disability ceases.

(b) A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

(June 25, 1948, ch. 646, 62 Stat. 971; Apr. 25, 1949, ch. 92, § 1, 63 Stat. 62; Pub. L. 86–238, § 1(3), Sept. 8, 1959, 73 Stat. 472; Pub. L. 89–506, § 7, July 18, 1966, 80 Stat. 307; Pub. L. 95–563, § 14(b), Nov. 1, 1978, 92 Stat. 2389; Pub. L. 111–350, § 5(g)(8), Jan. 4, 2011, 124 Stat. 3848.)

### HISTORICAL AND REVISION NOTES

Based on title 28, U.S.C., 1940 ed., §§ 41(20), 942 (Mar. 3, 1911, ch. 231, § 24, part 20, 36 Stat. 1093; Nov. 23, 1921, ch. 136, § 1310(c), 42 Stat. 311; June 2, 1924, 4:01 p.m., ch. 234, § 1025(c), 43 Stat. 348; Feb. 24, 1925, ch. 309, 43 Stat. 972; Feb. 26, 1926, ch. 27, §§ 1122(c), 1200, 44 Stat. 121, 125; Aug. 2, 1946, ch. 753, § 420, 60 Stat. 845).

Section consolidates provision in section 41(20) of title 28, U.S.C., 1940 ed., as to time limitation for bringing actions against the United States under section 1346(a) of this title, with section 942 of said title 28.

Words "or within one year after the date of enactment of this Act whichever is later", in section 942 of title 28, U.S.C., 1940 ed., were omitted as executed.

Provisions of section 41(20) of title 28, U.S.C., 1940 ed., relating to jurisdiction of district courts and trial by the court of actions against the United States are the basis of sections 1346(a) and 2402 of this title.

Words in subsec. (a) of this revised section, "person under legal disability or beyond the seas at the time the claim accrues" were substituted for "claims of married women, first accrued during marriage, of persons under the age of twenty-one years, first accrued during minority, and of idiots, lunatics, insane persons, and persons beyond the seas at the time the claim accrued, entitled to the claim." (See reviser's note under section 2501 of this title.)

Words in section 41(20) of title 28, U.S.C., 1940 ed., "nor shall any of the said disabilities operate cumulatively" were omitted. (See reviser's note under section 2501 of this title.)

A provision in section 41(20) of title 28, U.S.C., 1940 ed., that disabilities other than those specifically mentioned should not prevent any action from being barred was omitted as superfluous.

Subsection (b) of the revised section simplifies and restates said section 942 of title 28, U.S.C., 1940 ed., without change of substance.

Changes were made in phraseology.

### SENATE REVISION AMENDMENT

Subsection (b) amended in the Senate to insert the 1 year limitation on the bringing of tort actions and to include the limitation upon the time in which tort claims not exceeding $1000 must be presented to the appropriate Federal agencies for administrative disposition. 80th Congress Senate Report No. 1559, Amendment No. 48.

### AMENDMENTS

2011—Subsec. (a). Pub. L. 111–350 substituted "chapter 71 of title 41" for "the Contract Disputes Act of 1978".

1978—Subsec. (a). Pub. L. 95–563 inserted Contract Disputes Act of 1978 exception.

1966—Subsec. (b). Pub. L. 89–506 struck out provisions dealing with a tort claim of $2,500 or under as a special category of tort claim requiring preliminary administrative action and substituted provisions requiring presentation of all tort claims to the appropriate Federal agency in writing within two years after the claim accrues and commencement of an action within six months of the date of mailing of notice of final denial of the claim by the agency to which it was presented for provisions requiring commencement of an action within two years after the claim accrues.

1959—Subsec. (b). Pub. L. 86–238 substituted "$2,500" for "$1,000" in two places.

1949—Subsec. (b). Act Apr. 25, 1949, the time limitation on bringing tort actions from 1 year to 2 years.

### EFFECTIVE DATE OF 1978 AMENDMENT

Amendment by Pub. L. 95–563 effective with respect to contracts entered into 120 days after Nov. 1, 1978, and, at the election of the contractor, with respect to any claim pending at such time before the contracting officer or initiated thereafter, see section 16 of Pub. L. 95–563, Nov. 1, 1978, 92 Stat. 2391, formerly set out as an Effective Date note under section 601 of former Title 41, Public Contracts.

### EFFECTIVE DATE OF 1966 AMENDMENT

Amendment by Pub. L. 89–506 applicable to claims accruing six months or more after July 18, 1966, see section 10 of Pub. L. 89–506, set out as a note under section 2672 of this title.

## § 2402. Jury trial in actions against United States

Subject to chapter 179 of this title, any action against the United States under section 1346 shall be tried by the court without a jury, except that any action against the United States under section 1346(a)(1) shall, at the request of either party to such action, be tried by the court with a jury.

(June 25, 1948, ch. 646, 62 Stat. 971; July 30, 1954, ch. 648, § 2(a), 68 Stat. 589; Pub. L. 104–331, § 3(b)(3), Oct. 26, 1996, 110 Stat. 4069.)

### HISTORICAL AND REVISION NOTES

Based on title 28, U.S.C., 1940 ed., §§ 41(20), 931(a) (Mar. 3, 1911, ch. 231, § 24, par. 20, 36 Stat. 1093; Nov. 23, 1921, ch. 136, § 1310(c), 42 Stat. 311; June 2, 1924, 4:01 p.m., ch. 234, § 1025(c), 43 Stat. 348; Feb. 24, 1925, ch. 309, 43 Stat. 972; Feb. 26, 1926, ch. 27, §§ 1122(c), 1200, 44 Stat. 121, 125; Aug. 2, 1946, ch. 753, § 410(a), 60 Stat. 843).

Section consolidates non-jury provisions of sections 41(20) and 931(a) of title 28, U.S.C., 1940 ed. For other provisions of said section 931(a) relating to tort claims, see Distribution Table.

Word "actions" was substituted for "suits", in view of Rule 2 of the Federal Rules of Civil Procedure.

Provisions of title 28, U.S.C., 1940 ed., relating to jurisdiction of district courts and time for bringing actions against the United States are the basis of sections 1346 and 2401 of this title.

### AMENDMENTS

1996—Pub. L. 104–331 substituted "Subject to chapter 179 of this title, any action" for "Any action".

1954—Act July 30, 1954, permitted a jury trial at the request of either party in actions under section 1346(a)(1) of this title.

### EFFECTIVE DATE OF 1996 AMENDMENT

Amendment by Pub. L. 104–331 effective Oct. 1, 1997, see section 3(d) of Pub. L. 104–331, set out as an Effective Date note under section 1296 of this title.

"(E) Nothing in this paragraph shall prohibit any member of a racial or ethnic group that is not listed in subparagraph (B)(i) from establishing that they have been impeded in establishing or developing a business concern as a result of racial or ethnic discrimination.

"SEC. 1002. USE OF QUOTAS PROHIBITED.—Nothing in this title shall permit or require the use of quotas or a requirement that has the effect of a quota in determining eligibility under section 1001."

## § 7602. Definitions

When used in this chapter—

(a) The term "Administrator" means the Administrator of the Environmental Protection Agency.

(b) The term "air pollution control agency" means any of the following:

(1) A single State agency designated by the Governor of that State as the official State air pollution control agency for purposes of this chapter.

(2) An agency established by two or more States and having substantial powers or duties pertaining to the prevention and control of air pollution.

(3) A city, county, or other local government health authority, or, in the case of any city, county, or other local government in which there is an agency other than the health authority charged with responsibility for enforcing ordinances or laws relating to the prevention and control of air pollution, such other agency.

(4) An agency of two or more municipalities located in the same State or in different States and having substantial powers or duties pertaining to the prevention and control of air pollution.

(5) An agency of an Indian tribe.

(c) The term "interstate air pollution control agency" means—

(1) an air pollution control agency established by two or more States, or

(2) an air pollution control agency of two or more municipalities located in different States.

(d) The term "State" means a State, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, and American Samoa and includes the Commonwealth of the Northern Mariana Islands.

(e) The term "person" includes an individual, corporation, partnership, association, State, municipality, political subdivision of a State, and any agency, department, or instrumentality of the United States and any officer, agent, or employee thereof.

(f) The term "municipality" means a city, town, borough, county, parish, district, or other public body created by or pursuant to State law.

(g) The term "air pollutant" means any air pollution agent or combination of such agents, including any physical, chemical, biological, radioactive (including source material, special nuclear material, and byproduct material) substance or matter which is emitted into or otherwise enters the ambient air. Such term includes any precursors to the formation of any air pollutant, to the extent the Administrator has identified such precursor or precursors for the particular purpose for which the term "air pollutant" is used.

(h) All language referring to effects on welfare includes, but is not limited to, effects on soils, water, crops, vegetation, manmade materials, animals, wildlife, weather, visibility, and climate, damage to and deterioration of property, and hazards to transportation, as well as effects on economic values and on personal comfort and well-being, whether caused by transformation, conversion, or combination with other air pollutants.

(i) The term "Federal land manager" means, with respect to any lands in the United States, the Secretary of the department with authority over such lands.

(j) Except as otherwise expressly provided, the terms "major stationary source" and "major emitting facility" mean any stationary facility or source of air pollutants which directly emits, or has the potential to emit, one hundred tons per year or more of any air pollutant (including any major emitting facility or source of fugitive emissions of any such pollutant, as determined by rule by the Administrator).

(k) The terms "emission limitation" and "emission standard" mean a requirement established by the State or the Administrator which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction, and any design, equipment, work practice or operational standard promulgated under this chapter..[1]

(l) The term "standard of performance" means a requirement of continuous emission reduction, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction.

(m) The term "means of emission limitation" means a system of continuous emission reduction (including the use of specific technology or fuels with specified pollution characteristics).

(n) The term "primary standard attainment date" means the date specified in the applicable implementation plan for the attainment of a national primary ambient air quality standard for any air pollutant.

(o) The term "delayed compliance order" means an order issued by the State or by the Administrator to an existing stationary source, postponing the date required under an applicable implementation plan for compliance by such source with any requirement of such plan.

(p) The term "schedule and timetable of compliance" means a schedule of required measures including an enforceable sequence of actions or operations leading to compliance with an emission limitation, other limitation, prohibition, or standard.

(q) For purposes of this chapter, the term "applicable implementation plan" means the portion (or portions) of the implementation plan, or most recent revision thereof, which has been approved under section 7410 of this title, or promulgated under section 7410(c) of this title, or promulgated or approved pursuant to regulations promulgated under section 7601(d) of this title and which implements the relevant requirements of this chapter.

(r) INDIAN TRIBE.—The term "Indian tribe" means any Indian tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

---

[1] So in original.

(s) VOC.—The term "VOC" means volatile organic compound, as defined by the Administrator.

(t) PM–10.—The term "PM–10" means particulate matter with an aerodynamic diameter less than or equal to a nominal ten micrometers, as measured by such method as the Administrator may determine.

(u) NAAQS AND CTG.—The term "NAAQS" means national ambient air quality standard. The term "CTG" means a Control Technique Guideline published by the Administrator under section 7408 of this title.

(v) $NO_x$.—The term "$NO_x$" means oxides of nitrogen.

(w) CO.—The term "CO" means carbon monoxide.

(x) SMALL SOURCE.—The term "small source" means a source that emits less than 100 tons of regulated pollutants per year, or any class of persons that the Administrator determines, through regulation, generally lack technical ability or knowledge regarding control of air pollution.

(y) FEDERAL IMPLEMENTATION PLAN.—The term "Federal implementation plan" means a plan (or portion thereof) promulgated by the Administrator to fill all or a portion of a gap or otherwise correct all or a portion of an inadequacy in a State implementation plan, and which includes enforceable emission limitations or other control measures, means or techniques (including economic incentives, such as marketable permits or auctions of emissions allowances), and provides for attainment of the relevant national ambient air quality standard.

(z) STATIONARY SOURCE.—The term "stationary source" means generally any source of an air pollutant except those emissions resulting directly from an internal combustion engine for transportation purposes or from a nonroad engine or nonroad vehicle as defined in section 7550 of this title.

(July 14, 1955, ch. 360, title III, § 302, formerly § 9, as added Pub. L. 88–206, § 1, Dec. 17, 1963, 77 Stat. 400, renumbered Pub. L. 89–272, title I, § 101(4), Oct. 20, 1965, 79 Stat. 992; amended Pub. L. 90–148, § 2, Nov. 21, 1967, 81 Stat. 504; Pub. L. 91–604, § 15(a)(1), (c)(1), Dec. 31, 1970, 84 Stat. 1710, 1713; Pub. L. 95–95, title II, § 218(c), title III, § 301, Aug. 7, 1977, 91 Stat. 761, 769; Pub. L. 95–190, § 14(a)(76), Nov. 16, 1977, 91 Stat. 1404; Pub. L. 101–549, title I, §§ 101(d)(4), 107(a), (b), 108(j), 109(b), title III, § 302(e), title VII, § 709, Nov. 15, 1990, 104 Stat. 2409, 2464, 2468, 2470, 2574, 2684.)

CODIFICATION

Section was formerly classified to section 1857h of this title.

PRIOR PROVISIONS

Provisions similar to those in subsecs. (b) and (d) of this section were contained in a section 1857e of this title, act July 14, 1955, ch. 360, § 6, 69 Stat. 323, prior to the general amendment of this chapter by Pub. L. 88–206.

AMENDMENTS

1990—Subsec. (b)(1) to (3). Pub. L. 101–549, § 107(a)(1), (2), struck out "or" at end of par. (3) and substituted periods for semicolons at end of pars. (1) to (3).

Subsec. (b)(5). Pub. L. 101–549, § 107(a)(3), added par. (5).

Subsec. (g). Pub. L. 101–549, § 108(j)(2), inserted at end "Such term includes any precursors to the formation of any air pollutant, to the extent the Administrator has identified such precursor or precursors for the particular purpose for which the term 'air pollutant' is used."

Subsec. (h). Pub. L. 101–549, § 109(b), inserted before period at end ", whether caused by transformation, conversion, or combination with other air pollutants".

Subsec. (k). Pub. L. 101–549, § 303(e), inserted before period at end ", and any design, equipment, work practice or operational standard promulgated under this chapter."

Subsec. (q). Pub. L. 101–549, § 101(d)(4), added subsec. (q).

Subsec. (r). Pub. L. 101–549, § 107(b), added subsec. (r).

Subsecs. (s) to (y). Pub. L. 101–549, § 108(j)(1), added subsecs. (s) to (y).

Subsec. (z). Pub. L. 101–549, § 709, added subsec. (z).

1977—Subsec. (d). Pub. L. 95–95, § 218(c), inserted "and includes the Commonwealth of the Northern Mariana Islands" after "American Samoa".

Subsec. (e). Pub. L. 95–190 substituted "individual, corporation" for "individual corporation".

Pub. L. 95–95, § 301(b), expanded definition of "person" to include agencies, departments, and instrumentalities of the United States and officers, agents, and employees thereof.

Subsec. (g). Pub. L. 95–95, § 301(c), expanded definition of "air pollutant" so as, expressly, to include physical, chemical, biological, and radioactive substances or matter emitted into or otherwise entering the ambient air.

Subsecs. (i) to (p). Pub. L. 95–95, § 301(a), added subsecs. (i) to (p).

1970—Subsec. (a). Pub. L. 91–604, § 15(c)(1), substituted definition of "Administrator" as meaning Administrator of the Environmental Protection Agency for definition of "Secretary" as meaning Secretary of Health, Education, and Welfare.

Subsecs. (g), (h). Pub. L. 91–604, § 15(a)(1), added subsec. (g) defining "air pollutant", redesignated former subsec. (g) as (h) and substituted references to effects on soil, water, crops, vegetation, manmade materials, animals, wildlife, weather, visibility, and climate for references to injury to agricultural crops and livestock, and inserted references to effects on economic values and on personal comfort and well being.

1967—Pub. L. 90–148 reenacted section without change.

EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

§ 7603. Emergency powers

Notwithstanding any other provision of this chapter, the Administrator, upon receipt of evidence that a pollution source or combination of sources (including moving sources) is presenting an imminent and substantial endangerment to public health or welfare, or the environment, may bring suit on behalf of the United States in the appropriate United States district court to immediately restrain any person causing or contributing to the alleged pollution to stop the emission of air pollutants causing or contributing to such pollution or to take such other action as may be necessary. If it is not practicable to assure prompt protection of public health or welfare or the environment by commencement of such a civil action, the Administrator may issue such orders as may be necessary to protect public health or welfare or the environment. Prior to taking any action under this section, the Administrator shall consult with appropriate State and local authorities and attempt to confirm the accuracy of the information on which the action proposed to be taken is based. Any order issued by the Administrator under this section shall be effective upon issuance and shall remain in effect for a period of not more than 60 days, unless the Administrator brings

Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

## § 7605. Representation in litigation

### (a) Attorney General; attorneys appointed by Administrator

The Administrator shall request the Attorney General to appear and represent him in any civil action instituted under this chapter to which the Administrator is a party. Unless the Attorney General notifies the Administrator that he will appear in such action, within a reasonable time, attorneys appointed by the Administrator shall appear and represent him.

### (b) Memorandum of understanding regarding legal representation

In the event the Attorney General agrees to appear and represent the Administrator in any such action, such representation shall be conducted in accordance with, and shall include participation by, attorneys appointed by the Administrator to the extent authorized by, the memorandum of understanding between the Department of Justice and the Environmental Protection Agency, dated June 13, 1977, respecting representation of the agency by the department in civil litigation.

(July 14, 1955, ch. 360, title III, § 305, as added Pub. L. 91–604, § 12(a), Dec. 31, 1970, 84 Stat. 1707; amended Pub. L. 95–95, title III, § 304(a), Aug. 7, 1977, 91 Stat. 772.)

CODIFICATION

Section was formerly classified to section 1857h–3 of this title.

PRIOR PROVISIONS

A prior section 305 of act July 14, 1955, as added Nov. 21, 1967, Pub. L. 90–148, § 2, 81 Stat. 505, was renumbered section 312 by Pub. L. 91–604 and is classified to section 7612 of this title.

Another prior section 305 of act July 14, 1955, ch. 360, title III, formerly § 12, as added Dec. 17, 1963, Pub. L. 88–206, § 1, 77 Stat. 401, was renumbered section 305 by Pub. L. 89–272, renumbered section 308 by Pub. L. 90–148, and renumbered section 315 by Pub. L. 91–604, and is classified to section 7615 of this title.

AMENDMENTS

1977—Pub. L. 95–95 designated existing provisions as subsec. (a) and added subsec. (b).

EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

PENDING ACTIONS AND PROCEEDINGS

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other ac-

tions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

## § 7606. Federal procurement

### (a) Contracts with violators prohibited

No Federal agency may enter into any contract with any person who is convicted of any offense under section 7413(c) of this title for the procurement of goods, materials, and services to perform such contract at any facility at which the violation which gave rise to such conviction occurred if such facility is owned, leased, or supervised by such person. The prohibition in the preceding sentence shall continue until the Administrator certifies that the condition giving rise to such a conviction has been corrected. For convictions arising under section 7413(c)(2) of this title, the condition giving rise to the conviction also shall be considered to include any substantive violation of this chapter associated with the violation of 7413(c)(2) of this title. The Administrator may extend this prohibition to other facilities owned or operated by the convicted person.

### (b) Notification procedures

The Administrator shall establish procedures to provide all Federal agencies with the notification necessary for the purposes of subsection (a).

### (c) Federal agency contracts

In order to implement the purposes and policy of this chapter to protect and enhance the quality of the Nation's air, the President shall, not more than 180 days after December 31, 1970, cause to be issued an order (1) requiring each Federal agency authorized to enter into contracts and each Federal agency which is empowered to extend Federal assistance by way of grant, loan, or contract to effectuate the purpose and policy of this chapter in such contracting or assistance activities, and (2) setting forth procedures, sanctions, penalties, and such other provisions, as the President determines necessary to carry out such requirement.

### (d) Exemptions; notification to Congress

The President may exempt any contract, loan, or grant from all or part of the provisions of this section where he determines such exemption is necessary in the paramount interest of the United States and he shall notify the Congress of such exemption.

(July 14, 1955, ch. 360, title III, § 306, as added Pub. L. 91–604, § 12(a), Dec. 31, 1970, 84 Stat. 1707; amended Pub. L. 101–549, title VII, § 705, Nov. 15, 1990, 104 Stat. 2682.)

CODIFICATION

Subsec. (e) of this section, which required the President to annually report to Congress on measures taken toward implementing the purpose and intent of this section, terminated, effective May 15, 2000, pursuant to section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance. See, also, the 14th item on page 20 of House Document No. 103–7.

**Environmental Protection Agency**  §63.1

Table 1 to Subpart W of Part 63—General Provisions Applicability to Subpart W

**Subpart X—National Emission Standards for Hazardous Air Pollutants From Secondary Lead Smelting**

63.541   Applicability.
63.542   Definitions.
63.543   What are my standards for process vents?
63.544   What are my total enclosure standards?
63.545   What are my standards for fugitive dust sources?
63.546   Compliance dates.
63.547   Test methods.
63.548   Monitoring requirements.
63.549   Notification requirements.
63.550   Recordkeeping and reporting requirements.
63.551   Implementation and enforcement.
63.552   Affirmative defense to civil penalties for exceedance of emissions limit during malfunction.

Table 1 to Subpart X of Part 63—General Provisions Applicability to Subpart X
Table 2 to Subpart X of Part 63—Emissions Limits for Secondary Lead Smelting Furnaces
Table 3 to Subpart X of Part 63—Toxic Equivalency Factor

**Subpart Y—National Emission Standards for Marine Tank Vessel Loading Operations**

63.560   Applicability and designation of affected source.
63.561   Definitions.
63.562   Standards.
63.563   Compliance and performance testing.
63.564   Monitoring requirements.
63.565   Test methods and procedures.
63.566   Construction and reconstruction.
63.567   Recordkeeping and reporting requirements.
63.568   Implementation and enforcement.

**Subpart Z [Reserved]**

63.569–63.599   [Reserved]

Authority: 42 U.S.C. 7401 et seq.

Source: 57 FR 61992, Dec. 29, 1992, unless otherwise noted.

## Subpart A—General Provisions

Source: 59 FR 12430, Mar. 16, 1994, unless otherwise noted.

**§63.1   Applicability.**

(a) *General.* (1) Terms used throughout this part are defined in §63.2 or in the Clean Air Act (Act) as amended in 1990, except that individual subparts of this part may include specific definitions in addition to or that supersede definitions in §63.2.

(2) This part contains national emission standards for hazardous air pollutants (NESHAP) established pursuant to section 112 of the Act as amended November 15, 1990. These standards regulate specific categories of stationary sources that emit (or have the potential to emit) one or more hazardous air pollutants listed in this part pursuant to section 112(b) of the Act. This section explains the applicability of such standards to sources affected by them. The standards in this part are independent of NESHAP contained in 40 CFR part 61. The NESHAP in part 61 promulgated by signature of the Administrator before November 15, 1990 (i.e., the date of enactment of the Clean Air Act Amendments of 1990) remain in effect until they are amended, if appropriate, and added to this part.

(3) No emission standard or other requirement established under this part shall be interpreted, construed, or applied to diminish or replace the requirements of a more stringent emission limitation or other applicable requirement established by the Administrator pursuant to other authority of the Act (section 111, part C or D or any other authority of this Act), or a standard issued under State authority. The Administrator may specify in a specific standard under this part that facilities subject to other provisions under the Act need only comply with the provisions of that standard.

(4)(i) Each relevant standard in this part 63 must identify explicitly whether each provision in this subpart A is or is not included in such relevant standard.

(ii) If a relevant part 63 standard incorporates the requirements of 40 CFR part 60, part 61 or other part 63 standards, the relevant part 63 standard must identify explicitly the applicability of each corresponding part 60, part 61, or other part 63 subpart A (General) provision.

(iii) The General Provisions in this subpart A do not apply to regulations developed pursuant to section 112(r) of the amended Act, unless otherwise specified in those regulations.

11

(5) [Reserved]

(6) To obtain the most current list of categories of sources to be regulated under section 112 of the Act, or to obtain the most recent regulation promulgation schedule established pursuant to section 112(e) of the Act, contact the Office of the Director, Emission Standards Division, Office of Air Quality Planning and Standards, U.S. EPA (MD–13), Research Triangle Park, North Carolina 27711.

(7)–(9) [Reserved]

(10) For the purposes of this part, time periods specified in days shall be measured in calendar days, even if the word "calendar" is absent, unless otherwise specified in an applicable requirement.

(11) For the purposes of this part, if an explicit postmark deadline is not specified in an applicable requirement for the submittal of a notification, application, test plan, report, or other written communication to the Administrator, the owner or operator shall postmark the submittal on or before the number of days specified in the applicable requirement. For example, if a notification must be submitted 15 days before a particular event is scheduled to take place, the notification shall be postmarked on or before 15 days preceding the event; likewise, if a notification must be submitted 15 days after a particular event takes place, the notification shall be postmarked on or before 15 days following the end of the event. The use of reliable non-Government mail carriers that provide indications of verifiable delivery of information required to be submitted to the Administrator, similar to the postmark provided by the U.S. Postal Service, or alternative means of delivery agreed to by the permitting authority, is acceptable.

(12) Notwithstanding time periods or postmark deadlines specified in this part for the submittal of information to the Administrator by an owner or operator, or the review of such information by the Administrator, such time periods or deadlines may be changed by mutual agreement between the owner or operator and the Administrator. Procedures governing the implementation of this provision are specified in § 63.9(i).

(b) *Initial applicability determination for this part.* (1) The provisions of this part apply to the owner or operator of any stationary source that—

(i) Emits or has the potential to emit any hazardous air pollutant listed in or pursuant to section 112(b) of the Act; and

(ii) Is subject to any standard, limitation, prohibition, or other federally enforceable requirement established pursuant to this part.

(2) [Reserved]

(3) An owner or operator of a stationary source who is in the relevant source category and who determines that the source is not subject to a relevant standard or other requirement established under this part must keep a record as specified in § 63.10(b)(3).

(c) *Applicability of this part after a relevant standard has been set under this part.* (1) If a relevant standard has been established under this part, the owner or operator of an affected source must comply with the provisions of that standard and of this subpart as provided in paragraph (a)(4) of this section.

(2) Except as provided in § 63.10(b)(3), if a relevant standard has been established under this part, the owner or operator of an affected source may be required to obtain a title V permit from a permitting authority in the State in which the source is located. Emission standards promulgated in this part for area sources pursuant to section 112(c)(3) of the Act will specify whether—

(i) States will have the option to exclude area sources affected by that standard from the requirement to obtain a title V permit (i.e., the standard will exempt the category of area sources altogether from the permitting requirement);

(ii) States will have the option to defer permitting of area sources in that category until the Administrator takes rulemaking action to determine applicability of the permitting requirements; or

(iii) If a standard fails to specify what the permitting requirements will be for area sources affected by such a standard, then area sources that are subject to the standard will be subject

12

**Environmental Protection Agency** §63.1

to the requirement to obtain a title V permit without any deferral.

(3)–(4) [Reserved]

(5) If an area source that otherwise would be subject to an emission standard or other requirement established under this part if it were a major source subsequently increases its emissions of hazardous air pollutants (or its potential to emit hazardous air pollutants) such that the source is a major source that is subject to the emission standard or other requirement, such source also shall be subject to the notification requirements of this subpart.

(6) A major source may become an area source at any time upon reducing its emissions of and potential to emit hazardous air pollutants, as defined in this subpart, to below the major source thresholds established in §63.2, subject to the provisions in paragraphs (c)(6)(i) and (ii) of this section.

(i) A major source reclassifying to area source status is subject to the applicability of standards, compliance dates and notification requirements specified in (c)(6)(i)(A) of this section. An area source that previously was a major source and becomes a major source again is subject to the applicability of standards, compliance dates, and notification requirements specified in (c)(6)(i)(B) of this section:

(A) A major source reclassifying to area source status under this part remains subject to any applicable major source requirements established under this part until the reclassification becomes effective. After the reclassification becomes effective, the source is subject to any applicable area source requirements established under this part immediately, provided the compliance date for the area source requirements has passed. The owner or operator of a major source that becomes an area source subject to newly applicable area source requirements under this part must comply with the initial notification requirements pursuant to §63.9(b). The owner or operator of a major source that becomes an area source must also provide to the Administrator any change in the information already provided under §63.9(b) per §63.9(j).

(B) An area source that previously was a major source under this part and that becomes a major source again is subject to the applicable major source requirements established under this part immediately upon becoming a major source again, provided the compliance date for the major source requirements has passed, notwithstanding any provision within the applicable subparts. The owner or operator of an area source that becomes a major source again must comply with the initial notification pursuant to §63.9(b). The owner or operator must also provide to the Administrator any change in the information already provided under §63.9(b) per §63.9(j).

(ii) Becoming an area source does not absolve a source subject to an enforcement action or investigation for major source violations or infractions from the consequences of any actions occurring when the source was major. Becoming a major source does not absolve a source subject to an enforcement action or investigation for area source violations or infractions from the consequences of any actions occurring when the source was an area source.

(d) [Reserved]

(e) If the Administrator promulgates an emission standard under section 112(d) or (h) of the Act that is applicable to a source subject to an emission limitation by permit established under section 112(j) of the Act, and the requirements under the section 112(j) emission limitation are substantially as effective as the promulgated emission standard, the owner or operator may request the permitting authority to revise the source's title V permit to reflect that the emission limitation in the permit satisfies the requirements of the promulgated emission standard. The process by which the permitting authority determines whether the section 112(j) emission limitation is substantially as effective as the promulgated emission standard must include, consistent with part 70 or 71 of this chapter, the opportunity for full public, EPA, and affected State review (including the opportunity for EPA's objection) prior to the permit revision

13

VerDate Sep<11>2014    14:48 Aug 17, 2023    Jkt 259162    PO 00000    Frm 00023    Fmt 8010    Sfmt 8010    Q:\40\40V11.TXT    PC31

being finalized. A negative determination by the permitting authority constitutes final action for purposes of review and appeal under the applicable title V operating permit program.

[59 FR 12430, Mar. 16, 1994, as amended at 67 FR 16595, Apr. 5, 2002; 85 FR 73885, Nov. 19, 2020]

## § 63.2  Definitions.

The terms used in this part are defined in the Act or in this section as follows:

*Act* means the Clean Air Act (42 U.S.C. 7401 *et seq.*, as amended by Pub. L. 101–549, 104 Stat. 2399).

*Actual emissions* is defined in subpart D of this part for the purpose of granting a compliance extension for an early reduction of hazardous air pollutants.

*Administrator* means the Administrator of the United States Environmental Protection Agency or his or her authorized representative (e.g., a State that has been delegated the authority to implement the provisions of this part).

*Affected source*, for the purposes of this part, means the collection of equipment, activities, or both within a single contiguous area and under common control that is included in a section 112(c) source category or subcategory for which a section 112(d) standard or other relevant standard is established pursuant to section 112 of the Act. Each relevant standard will define the "affected source," as defined in this paragraph unless a different definition is warranted based on a published justification as to why this definition would result in significant administrative, practical, or implementation problems and why the different definition would resolve those problems. The term "affected source," as used in this part, is separate and distinct from any other use of that term in EPA regulations such as those implementing title IV of the Act. Affected source may be defined differently for part 63 than affected facility and stationary source in parts 60 and 61, respectively. This definition of "affected source," and the procedures for adopting an alternative definition of "affected source," shall apply to each section 112(d) standard for which the initial proposed rule is signed by the Administrator after June 30, 2002.

*Alternative emission limitation* means conditions established pursuant to sections 112(i)(5) or 112(i)(6) of the Act by the Administrator or by a State with an approved permit program.

*Alternative emission standard* means an alternative means of emission limitation that, after notice and opportunity for public comment, has been demonstrated by an owner or operator to the Administrator's satisfaction to achieve a reduction in emissions of any air pollutant at least equivalent to the reduction in emissions of such pollutant achieved under a relevant design, equipment, work practice, or operational emission standard, or combination thereof, established under this part pursuant to section 112(h) of the Act.

*Alternative test method* means any method of sampling and analyzing for an air pollutant that has been demonstrated to the Administrator's satisfaction, using Method 301 in appendix A of this part, to produce results adequate for the Administrator's determination that it may be used in place of a test method specified in this part.

*Approved permit program* means a State permit program approved by the Administrator as meeting the requirements of part 70 of this chapter or a Federal permit program established in this chapter pursuant to title V of the Act (42 U.S.C. 7661).

*Area source* means any stationary source of hazardous air pollutants that is not a major source as defined in this part.

*Commenced* means, with respect to construction or reconstruction of an affected source, that an owner or operator has undertaken a continuous program of construction or reconstruction or that an owner or operator has entered into a contractual obligation to undertake and complete, within a reasonable time, a continuous program of construction or reconstruction.

*Compliance date* means the date by which an affected source is required to be in compliance with a relevant standard, limitation, prohibition, or any federally enforceable requirement established by the Administrator (or a State

14

consult with the relevant State or Territorial agency prior to making a request for approval to the Administrator. A State or Territorial agency may submit requests for approval on behalf of a local agency after consulting with that local agency.

(c) *Tribal authority.* A tribal authority may submit a rule or program under this subpart, provided that the tribal authority has received approval, under the provisions of part 49 of this chapter, for administering Federal rules under section 112 of the Act.

(d) *Authorities retained by the Administrator.* (1) The following authorities will be retained by the Administrator and will not be delegated:

(i) The authority to add or delete pollutants from the list of hazardous air pollutants established under section 112(b);

(ii)–(iii) [Reserved]

(iv) The authority to add source categories to or delete source categories from the Federal source category list established under section 112(c)(1) or to subcategorize categories on the Federal source category list after proposal of a relevant emission standard;

(v) The authority to revise the source category schedule established under section 112(e) by moving a source category to a later date for promulgation; and

(vi) Any other authorities determined to be nondelegable by the Administrator.

(2) Nothing in this subpart shall prohibit the Administrator from enforcing any applicable rule, emission standard or requirement established under section 112.

(3) Nothing in this subpart shall affect the authorities and obligations of the Administrator or the State under title V of the Act or under regulations promulgated pursuant to that title.

(e) *Federally-enforceable requirements.* All rules, programs, State or local permits, or other requirements approved under this subpart and all resulting part 70 operating permit conditions are enforceable by the Administrator and by citizens under the Act.

(f) *Standards not subject to modification or substitution.* With respect to radionuclide emissions from licensees of the Nuclear Regulatory Commission

or licensees of Nuclear Regulatory Commission Agreement States which are subject to part 61, subparts I, T, or W of this chapter, a State may request that the EPA approve delegation of implementation and enforcement of the Federal standard pursuant to § 63.91, but no changes or modifications in the form or content of the standard will be approved pursuant to § 63.92, § 63.93, § 63.94, or § 63.97.

(g) *Selection of delegation options.* (1) With the exception of paragraphs (g)(2) and (g)(3) of this section, States may only submit requests for approval of alternative requirements for a section 112 Federal rule, emission standard, or other requirement under a single delegation option under this subpart.

(2) In the case of § 63.94 submittals, if the identified sources in any source category comprise a subset of the sources in that category, the State must accept delegation under one other section of this subpart for the remainder of the sources in that category that are required to be permitted by the State under part 70 of this chapter.

(3) If the Administrator partially approves the State request per § 63.91(f), the State may submit a request for the remaining section 112 rules, emission standards, or requirements in that category under another section of this subpart.

[65 FR 55835, Sept. 14, 2000]

**§ 63.91  Criteria for straight delegation and criteria common to all approval options.**

(a) *Applicable approval criteria.* A State must satisfy the criteria in paragraph (d) of this section for up-front approval to obtain delegation of the Federal section 112 rules, emission standards, or requirements. Once a State has demonstrated it meets the criteria in paragraph (d) of this section, it only needs to reference that demonstration and reaffirm that it still meets the criteria in future submittals. In addition, a State must satisfy the applicable approval criteria in § 63.92, § 63.93, § 63.94, § 63.95, or § 63.97, as specified in the following paragraphs.

(1) *Unchanged Federal section 112 rules ("straight delegation").* To obtain approval of State programs to implement and enforce Federal section 112 rules as

**Environmental Protection Agency**                    **§ 63.91**

promulgated without changes (except for accidental release programs, described in paragraph (a)(4) of this section), only the criteria of paragraph (d) of this section must be met. This includes State requests for one-time approval of their mechanism for taking delegation of future unchanged Federal section 112 rules, emission standards, and requirements as well as approval to implement and enforce unchanged Federal section 112 rules, emission standards, and requirements on a rule-by-rule basis.

(2) *State rules, programs, or requirements that are different from the Federal rule.* To obtain approval under this subpart of a rule, program, or requirement that is different from the Federal section 112 rule, emission standard, or requirement, the criteria of paragraph (d) of this section and the criteria of either § 63.92, § 63.93, § 63.94, or § 63.97 must be met.

(3) *Separable portions of State rules, programs, or requirements (''partial approval'').* To obtain partial approval under this subpart, a State request

must meet the criteria in paragraphs (d) and (f) of this section.

(4) *Programs under part 68 of this chapter, prevention of accidental releases.* For approval of State rules or programs to implement and enforce the Federal accidental release prevention program in part 68 of this chapter, as promulgated without changes, the provisions of paragraph (d) of this section, and § 63.95 must be met. For approval of alternative requirements, the provisions of either § 63.92 or § 63.93 must also be met.

(5) *Limits on the potential to emit section 112 pollutants.* The Administrator may, under the authority of section 112(l) and this subpart, also approve a State program designed to establish limits on the potential to emit hazardous air pollutants listed pursuant to section 112 of the Act.

(b) *Approval process.* When a State submits an initial request for approval, and except as otherwise specified under § 63.92, § 63.93, § 63.94, § 63.95, or § 63.97, for a State's subsequent requests for approval, the approval process will be as shown in the following table:

| If . . . | Then . . . | And then . . . |
|---|---|---|
| (1) A request for approval is received ...... | the Administrator will review the request for approval and determine whether the request is complete according to the criteria in this subpart. | if a request is incomplete, the Administrator will notify the State of the specific deficient elements of the request. |
| (2) A complete request for approval is received. | the Administrator will seek public comment for a minimum of 30 days through a FEDERAL REGISTER notice on the State's request for approval. | the Administrator will require that comments be submitted concurrently to the State. |
| (3) A complete request for approval is received and there has been a period of public comment. | the Administrator will either approve, partially approve, or disapprove the State rule, program, or requirement within 180 days of receipt of a complete request. | |
| (4) The Administrator finds that all of the criteria of this section are met and all of the criteria of § 63.92, § 63.93, § 63.94, § 63.95, or § 63.97 are met. | the Administrator will approve or partially approve the State rule, program, or requirement. | the Administrator will publish it in the FEDERAL REGISTER, and incorporate it directly or by reference, in the appropriate subpart of part 63. Requirements approved under § 63.95 will be incorporated pursuant to requirements under part 68 of this chapter. |
| (5) The Administrator finds that any of the criteria of this section are not met, or any of the criteria of § 63.92, § 63.93, § 63.94, § 63.95, or § 63.97 under which the request for approval was made are not met. | the Administrator will notify the State of any revisions or additions necessary to obtain approval. | any resubmittal by a State of a request for approval will be considered a new request under this subpart. |
| (6) A State rule, program, or requirement is disapproved. | unless the State can revise the submittal to meet the criteria, the Administrator will disapprove the State rule, program, or requirement. | the Administrator will publish the disapproval in the FEDERAL REGISTER. |

(c) *Enforcement.* (1) Approval of the alternative rule, program, or requirement delegates to the State the au-

thority to implement and enforce the approved rule, program, or requirement

125

VerDate Sep<11>2014    14:48 Aug 17, 2023    Jkt 259162    PO 00000    Frm 00135    Fmt 8010    Sfmt 8002    Q:\40\40V11.TXT    PC31

awolrey on LAPBH6H6L3 with DISTILLER

in lieu of the otherwise applicable Federal section 112 rule, emission standard, or requirement.

(i) The approved State rule, program, or requirement shall be federally enforceable from the date the Administrator signs the approval, with two exceptions. For States that implement unchanged Federal requirements (§ 63.91, straight delegation) via their title V permit program, and for States using the equivalency by permit option (63.94), the approved requirements shall be federally enforceable on the date of issuance or revision of the title V permit.

(ii) In the case of a partial approval under paragraph (f)(1) of this section, only those authorities of the State request found to meet the requirements of this section will be approved; the remaining Federal authorities will be implemented and enforced by EPA.

(iii) For partial approvals under paragraph (f)(3) of this section, only the portion of the State rule that is approved will be federally enforceable; the remainder continues to be State enforceable only.

(2) When a State rule, program, or requirement is approved by the Administrator under this subpart, applicable title V permits shall be revised according to the provisions of § 70.7(f) of this chapter.

(i) Each permit shall specify the origin of the alternative conditions per § 70.6 (a)(i) of this chapter and specifically reference the FEDERAL REGISTER notice or other EPA approval mechanism in the permit.

(ii) When approved alternative requirements are incorporated in a permit, those requirements must be clearly identified and carried forward in any subsequent permit revisions or renewals. If the permit is not renewed, or if a revision or renewal does not carry the alternate requirements forward, then the Federal section 112 requirements become the applicable requirements.

(3) If approval is withdrawn under § 63.96, all otherwise applicable Federal rules and requirements shall be enforceable in accordance with the compliance schedule established in the withdrawal notice and relevant title V permits shall be revised according to

the provisions of § 70.7(f) of this chapter.

(d) *Criteria for approval.* (1) Any request for approval under this subpart shall meet all section 112(l) approval criteria specified by the otherwise applicable Federal section 112 rule, emission standard, or requirement, all of the approval criteria of this section, and any additional approval criteria in § 63.92, § 63.93, § 63.94, § 63.95, or § 63.97.

(2) Once a State has satisfied the § 63.91(d) up-front approval requirements, it only needs to reference the previous demonstration and reaffirm that is still meets the criteria for any subsequent equivalency submittals.

(3) Interim or final title V program approval will satisfy the criteria set forth in § 63.91(d), up-front approval criteria. Alternatively, the State must provide the following items in paragraphs (d)(3)(i) through (v) of this section to the Administrator:

(i) A written finding by the State Attorney General (or for a local agency or tribal authority, the General Counsel with full authority to represent the local agency or tribal authority) that the State has the necessary legal authority to implement and to enforce the State rule, program, or requirement upon approval and to assure compliance by all sources within the State with each applicable section 112 rule, emission standard, or requirement. For full approval, the State must have the following legal authorities concerning enforcement and compliance assurance:

(A) The State shall have enforcement authorities that meet the requirements of § 70.11 of this chapter, except that tribal authorities shall have enforcement authorities that meet the requirements of part 49 of this chapter, the Tribal Air Rule.

(B) The State shall have authority to request information from regulated sources regarding their compliance status.

(C) The State shall have authority to inspect sources and any records required to determine a source's compliance status.

(D) If a State delegates authorities to a local agency, the State must retain enforcement authority unless the local

126

agency has authorities that meet the requirements of §70.11 of this chapter.

(ii) A copy of State statutes, regulations, and requirements that contain the appropriate provisions granting authority to implement and enforce the State rule, program, or requirement upon approval.

(iii) A demonstration that the State has adequate resources to implement and enforce all aspects of the rule, program, or requirement upon approval (except for authorities explicitly retained by the Administrator, such as those pursuant to paragraph (f) of this section or pursuant to part 49 of this chapter), which includes:

(A) A description in narrative form of the scope, structure, coverage, and processes of the State program.

(B) A description of the organization and structure of the agency or agencies that will have responsibility for administering the program.

(C) A description of the agency's capacity to carry out the State program, including the number, occupation, and general duties of the employees.

(iv) A schedule demonstrating expeditious State implementation of the rule, program, or requirement upon approval.

(v) A plan that assures expeditious compliance by all sources subject to the State rule, program, or requirement upon approval. The plan should include, at a minimum, a complete description of the State's compliance tracking and enforcement program, including but not limited to inspection strategies.

(4) If any of the State documents that are required to support an approval under this subpart are readily available to the EPA and to the public, the State may cite the relevant portions of the documents or indicate where they are available (e.g., by providing an Internet address) rather than provide copies.

(5) *Electronic documents.* Submission of electronic documents shall comply with the requirements of 40 CFR part 3—(Electronic reporting).

(e) *Revisions.* Within 90 days of any State amendment, repeal, or revision of any State rule, program, permit, or other requirement approved as an alternative to a Federal requirement or part of the authority necessary for the up-front approval, the State must provide the Administrator with a copy of the revised authorities and meet the requirements of either paragraph (e)(1) or (e)(2) of this section.

(1)(i) The State shall provide the Administrator with a written finding by the State Attorney General (or for a local agency or tribal authority, the General Counsel with full authority to represent the local agency or tribal authority) that the State's revised legal authorities are adequate to continue to implement and to enforce all previously approved State rules and the approved State program (as applicable) and adequate to continue to assure compliance by all sources within the State with approved rules, the approved program, the approved permit, or other requirements (as applicable) and each applicable section 112 rule, emission standard, or requirement.

(ii) If the Administrator determines that the written finding is not adequate, the State shall request approval of the revised rule, program, permit, or other requirement according to the provisions of paragraph (e)(2) of this section.

(2) The State shall request approval under this subpart for any revised rule, program, permit, or other requirement.

(i) If the Administrator approves the revised rule, program, permit, or other requirement, the revision will replace the previously approved rule, program, permit, or other requirement.

(ii) If the Administrator disapproves the revised rule, program, permit, or other requirement, the Administrator will initiate procedures under §63.96 to withdraw approval of any previously approved rule, program, permit, or other requirement that may be affected by the revised requirements.

(iii) Until such time as the Administrator approves or withdraws approval of a revised rule, program, permit, or other requirement, the previously approved rule, program, permit, or requirement remains federally enforceable and the revision is not federally enforceable.

(3) If the EPA amends, or otherwise revises a promulgated section 112 rule or requirement in a way that increases its stringency, the EPA will notify any

127

State which has received delegation under this subpart of the need to revise their equivalency demonstration.

(i) The EPA Regional Office will consult with the affected State(s) to set a time frame for the State(s) to submit a revised equivalency demonstration.

(ii) The revised equivalency demonstration will be reviewed and approved or disapproved according to the procedures set forth in this section and §63.91, §63.92, §63.93, §63.94, §63.95, or §63.97, whichever are applicable.

(f) *Partial approval.* The partial approval process under this subpart is described in the following table:

| If . . . | Then . . . | And . . . |
|---|---|---|
| (1) A State's legal authorities submitted under this subpart substantially meet the requirements of paragraph (d)(3)(i) of this section, but are not fully approvable. | the Administrator may grant a partial approval with the State's consent. | The EPA will continue to implement and enforce those authorities under paragraph (d)(3)(i) of this section that are not approved. |
| (2) Any of the other requirements in paragraphs (d)(3)(ii)–(v) of this section are not approvable. | the Administrator will disapprove the submittal. | |
| (3) A rule, requirement, or program submitted under this subpart meets the requirements of §63.92, §63.93, §63.94, §63.95, or §63.97 as appropriate, with the exception of a separable portion of that rule, requirement, or program. | the Administrator may remove that separable portion with the State's consent. | the Administrator may then grant a partial approval of the portion of the rule, requirement, or program that meets the requirements of this subpart. |
| (4) the Administrator determines that there are too many areas of deficiency or that separating the responsibilities between Federal and State government would be too cumbersome and complex. | the Administrator may disapprove the submittal in its entirety. | |

(g) *Subpart A, Delegable authorities.* A State may exercise certain authorities granted to the Administrator under subpart A, but may not exercise others, according to the following criteria:

(1) A State may ask the appropriate EPA Regional Office to delegate any of the authorities listed as "Category I", in paragraph (g)(1)(i) of this section. The EPA Regional Office will delegate any such authorities at their discretion.

(i) "Category I" shall consist of the following authorities:

Category I Authorities

(A) Section 63.1, Applicability Determinations

(B) Section 63.6(e), Operation and Maintenance Requirements—Responsibility for Determining Compliance

(C) Section 63.6(f), Compliance with Non-Opacity Standards—Responsibility for Determining Compliance

(D) Section 63.6(h), Compliance with Opacity and Visible Emissions Standards—Responsibility for Determining Compliance

(E) Sections 63.7(c)(2)(i) and (d), Approval of Site-Specific Test Plans

(F) Section 63.7(e)(2)(i), Approval of Minor Alternatives to Test Methods

(G) Section 63.7(e)(2)(ii) and (f), Approval of Intermediate Alternatives to Test Methods

(H) Section 63.7(e)(iii), Approval of Shorter Sampling Times and Volumes When Necessitated by Process Variables or Other Factors

(I) Sections 63.7(e)(2)(iv), (h)(2), and (h)(3), Waiver of Performance Testing

(J) Sections 63.8(c)(1) and (e)(1), Approval of Site-Specific Performance Evaluation (Monitoring) Test Plans

(K) Section 63.8(f), Approval of Minor Alternatives to Monitoring

(L) Section 63.8(f), Approval of Intermediate Alternatives to Monitoring

(M) Section 63.9 and 63.10, Approval of Adjustments to Time Periods for Submitting Reports

(N) Section 63.10(f), Approval of Minor Alternatives to Recordkeeping and Reporting

(O) Section 63.7(a)(4), Extension of Performance Test Deadline

(ii) The State must maintain a record of all approved alternatives to all monitoring, testing, recordkeeping, and reporting requirements and provide this

lrworley on LAPBH6H6L3 with DISTILLER

**Environmental Protection Agency**                                    **§ 63.92**

list of alternatives to its EPA Regional Office at least semi-annually, or on a more frequent basis if requested by the Regional Office. The Regional Office may audit the State-approved alternatives and disapprove any that it determines are inappropriate, after discussion with the State. If changes are disapproved, the State must notify the source that it must revert to the original applicable monitoring, testing, recordkeeping, and/or reporting requirements (either those requirements of the original section 112 requirement, the alternative requirements approved under this subpart, or the previously approved site-specific alternative requirements). Also, in cases where the source does not maintain the conditions which prompted the approval of the alternatives to the monitoring, testing, recordkeeping, and/or reporting requirements, the State (or EPA Regional Office) must require the source to revert to the original monitoring, testing, recordkeeping, and reporting requirements, or more stringent requirements, if justified.

(2)(i) A State may not ask the appropriate EPA Regional Office to delegate any of the authorities listed as "Category II" in paragraph (g)(2)(ii) of this section.

(ii) "Category II" shall consist of the following authorities:

#### Category II Authorities

(A) Section 63.6(g), Approval of Alternative Non-Opacity Emission Standards

(B) Section 63.6(h)(9), Approval of Alternative Opacity Standards

(C) Sections 63.7(e)(2)(ii) and (f), Approval of Major Alternatives to Test Methods

(D) Section 63.8(f), Approval of Major Alternatives to Monitoring

(E) Section 63.10(f), Approval of Major Alternatives to Recordkeeping and Reporting

[65 FR 55837, Sept. 14, 2000, as amended at 70 FR 59887, Oct. 13, 2005; 72 FR 27443, May 16, 2007]

**§ 63.92  Approval of State requirements that adjust a section 112 rule.**

Under this section a State may seek approval of State requirements that make pre-approved adjustments to a

Federal section 112 rule, emission standard, or requirement that are unambiguously no less stringent than the Federal rule, emission standard, or requirement.

(a) *Approval process.* (1) If the Administrator finds that the criteria of this section and the criteria of § 63.91 are met, the Administrator will approve the State requirements, publish them in the FEDERAL REGISTER, and incorporate them, directly or by reference, in the appropriate subpart of part 63, without additional notice and opportunity for comment. Requirements approved under § 63.95 will be incorporated pursuant to requirements under part 68 of this chapter.

(2) If the Administrator finds that any one of the State adjustments to the Federal rule is in any way ambiguous with respect to the stringency of applicability, level of control, compliance and enforcement measures, or the compliance date for any affected source or emission point, the Administrator will either disapprove the State request or consider the request under § 63.93.

(3) Within 60 days of receiving a complete request for approval under this section, the Administrator will either approve or disapprove the State request. If approved, the change will be effective upon signature of the FEDERAL REGISTER notice.

(4) Requirements submitted for approval under this section shall include either title V permits, title V general permits, Federal new source review permits, or State rules. Permits must already be issued to be used under this section.

(5) If the State uses a permit as the basis of alternative requirements under this section, the relevant permit terms and conditions must remain applicable to the source, even if the source takes steps that would otherwise release it from an obligation to have a permit.

(b) *Criteria for approval.* Any request for approval under this section shall meet all of the criteria of this section and § 63.91 before approval. The State shall provide the Administrator with:

(1) A demonstration that the public within the State has had adequate notice and opportunity to submit written

129

list of alternatives to its EPA Regional Office at least semi-annually, or on a more frequent basis if requested by the Regional Office. The Regional Office may audit the State-approved alternatives and disapprove any that it determines are inappropriate, after discussion with the State. If changes are disapproved, the State must notify the source that it must revert to the original applicable monitoring, testing, recordkeeping, and/or reporting requirements (either those requirements of the original section 112 requirement, the alternative requirements approved under this subpart, or the previously approved site-specific alternative requirements). Also, in cases where the source does not maintain the conditions which prompted the approval of the alternatives to the monitoring, testing, recordkeeping, and/or reporting requirements, the State (or EPA Regional Office) must require the source to revert to the original monitoring, testing, recordkeeping, and reporting requirements, or more stringent requirements, if justified.

(2)(i) A State may not ask the appropriate EPA Regional Office to delegate any of the authorities listed as "Category II" in paragraph (g)(2)(ii) of this section.

(ii) "Category II" shall consist of the following authorities:

### Category II Authorities

(A) Section 63.6(g), Approval of Alternative Non-Opacity Emission Standards

(B) Section 63.6(h)(9), Approval of Alternative Opacity Standards

(C) Sections 63.7(e)(2)(ii) and (f), Approval of Major Alternatives to Test Methods

(D) Section 63.8(f), Approval of Major Alternatives to Monitoring

(E) Section 63.10(f), Approval of Major Alternatives to Recordkeeping and Reporting

[65 FR 55837, Sept. 14, 2000, as amended at 70 FR 59887, Oct. 13, 2005; 72 FR 27443, May 16, 2007]

### § 63.92 Approval of State requirements that adjust a section 112 rule.

Under this section a State may seek approval of State requirements that make pre-approved adjustments to a Federal section 112 rule, emission standard, or requirement that are unambiguously no less stringent than the Federal rule, emission standard, or requirement.

(a) *Approval process.* (1) If the Administrator finds that the criteria of this section and the criteria of § 63.91 are met, the Administrator will approve the State requirements, publish them in the FEDERAL REGISTER, and incorporate them, directly or by reference, in the appropriate subpart of part 63, without additional notice and opportunity for comment. Requirements approved under § 63.95 will be incorporated pursuant to requirements under part 68 of this chapter.

(2) If the Administrator finds that any one of the State adjustments to the Federal rule is in any way ambiguous with respect to the stringency of applicability, level of control, compliance and enforcement measures, or the compliance date for any affected source or emission point, the Administrator will either disapprove the State request or consider the request under § 63.93.

(3) Within 60 days of receiving a complete request for approval under this section, the Administrator will either approve or disapprove the State request. If approved, the change will be effective upon signature of the FEDERAL REGISTER notice.

(4) Requirements submitted for approval under this section shall include either title V permits, title V general permits, Federal new source review permits, or State rules. Permits must already be issued to be used under this section.

(5) If the State uses a permit as the basis of alternative requirements under this section, the relevant permit terms and conditions must remain applicable to the source, even if the source takes steps that would otherwise release it from an obligation to have a permit.

(b) *Criteria for approval.* Any request for approval under this section shall meet all of the criteria of this section and § 63.91 before approval. The State shall provide the Administrator with:

(1) A demonstration that the public within the State has had adequate notice and opportunity to submit written

129

comment on the State requirements, and

(2) A demonstration that each State adjustment to the Federal rule individually results in requirements that:

(i) Are unequivocally no less stringent than the otherwise applicable Federal rule with respect to applicability;

(ii) Are unequivocally no less stringent than the otherwise applicable Federal rule with respect to level of control for each affected source and emission point;

(iii) Are unequivocally no less stringent than the otherwise applicable Federal rule with respect to compliance and enforcement measures for each affected source and emission point; and

(iv) Assure compliance by every affected source no later than would be required by the otherwise applicable Federal rule.

(3) State adjustments to Federal section 112 rules which may be part of an approved rule under this section are:

(i) Lowering a required emission rate or *de minimis* level;

(ii) Adding a design, work practice, operational standard, emission rate or other such requirement;

(iii) Increasing a required control efficiency;

(iv) Increasing the frequency of required reporting, testing, sampling or monitoring;

(v) Adding to the amount of information required for records or reports;

(vi) Decreasing the amount of time to come into compliance;

(vii) Subjecting additional emission points or sources within a source category to control requirements;

(viii) Any adjustments allowed in a specific section 112 rule;

(ix) Minor editorial, formatting, and other nonsubstantive changes; or

(x) Identical alternative requirements previously approved by the Administrator in another local agency within the same State, if previously noticed that the alternative requirements would be applicable in the jurisdiction seeking approval under this section.

[65 FR 55840, Sept. 14, 2000]

§ 63.93  Approval of State requirements that substitute for a section 112 rule.

Under this section a State may seek approval of State requirements which differ from a Federal section 112 rule for which they would substitute, such that the State requirements do not qualify for approval under § 63.92.

(a) *Approval process.* (1) After receiving a complete request for approval under this section and making a preliminary determination on its equivalence, the Administrator will seek public comment on the State's request for a minimum of 30 days through a FEDERAL REGISTER notice. The Administrator will require that comments be submitted concurrently to the State.

(2) If, after review of public comments and any State responses to comments submitted to the Administrator, the Administrator finds that the criteria of this section and the criteria of § 63.91 are met, the Administrator will approve the State requirements under this section, publish the approved requirements in the FEDERAL REGISTER, and incorporate them directly or by reference, in the appropriate subpart of part 63. Requirements approved under § 63.95 will be incorporated pursuant to requirements under part 68 of this chapter.

(3) If the Administrator finds that any of the requirements of this section or § 63.91 have not been met, the Administrator may partially approve or disapprove the State requirements. For any partial approvals or disapprovals, the Administrator will provide the State with the basis for the partial approval or disapproval and what actions that State can take to make the requirements approvable.

(4) Requirements submitted for approval under this section shall include either: State rules, title V permits, title V general permits, Federal new source review permits, board and administrative orders, permits issued pursuant to permit templates, or State operating permits. Permits must already be issued to be used under this section.

(5) If the State uses a permit as the basis of alternative requirements under this section, the relevant permit terms and conditions must remain applicable

comment on the State requirements, and

(2) A demonstration that each State adjustment to the Federal rule individually results in requirements that:

(i) Are unequivocally no less stringent than the otherwise applicable Federal rule with respect to applicability;

(ii) Are unequivocally no less stringent than the otherwise applicable Federal rule with respect to level of control for each affected source and emission point;

(iii) Are unequivocally no less stringent than the otherwise applicable Federal rule with respect to compliance and enforcement measures for each affected source and emission point; and

(iv) Assure compliance by every affected source no later than would be required by the otherwise applicable Federal rule.

(3) State adjustments to Federal section 112 rules which may be part of an approved rule under this section are:

(i) Lowering a required emission rate or *de minimis* level;

(ii) Adding a design, work practice, operational standard, emission rate or other such requirement;

(iii) Increasing a required control efficiency;

(iv) Increasing the frequency of required reporting, testing, sampling or monitoring;

(v) Adding to the amount of information required for records or reports;

(vi) Decreasing the amount of time to come into compliance;

(vii) Subjecting additional emission points or sources within a source category to control requirements;

(viii) Any adjustments allowed in a specific section 112 rule;

(ix) Minor editorial, formatting, and other nonsubstantive changes; or

(x) Identical alternative requirements previously approved by the Administrator in another local agency within the same State, if previously noticed that the alternative requirements would be applicable in the jurisdiction seeking approval under this section.

[65 FR 55840, Sept. 14, 2000]

§ 63.93  Approval of State requirements that substitute for a section 112 rule.

Under this section a State may seek approval of State requirements which differ from a Federal section 112 rule for which they would substitute, such that the State requirements do not qualify for approval under § 63.92.

(a) *Approval process.* (1) After receiving a complete request for approval under this section and making a preliminary determination on its equivalence, the Administrator will seek public comment on the State's request for a minimum of 30 days through a FEDERAL REGISTER notice. The Administrator will require that comments be submitted concurrently to the State.

(2) If, after review of public comments and any State responses to comments submitted to the Administrator, the Administrator finds that the criteria of this section and the criteria of § 63.91 are met, the Administrator will approve the State requirements under this section, publish the approved requirements in the FEDERAL REGISTER, and incorporate them directly or by reference, in the appropriate subpart of part 63. Requirements approved under § 63.95 will be incorporated pursuant to requirements under part 68 of this chapter.

(3) If the Administrator finds that any of the requirements of this section or § 63.91 have not been met, the Administrator may partially approve or disapprove the State requirements. For any partial approvals or disapprovals, the Administrator will provide the State with the basis for the partial approval or disapproval and what actions that State can take to make the requirements approvable.

(4) Requirements submitted for approval under this section shall include either: State rules, title V permits, title V general permits, Federal new source review permits, board and administrative orders, permits issued pursuant to permit templates, or State operating permits. Permits must already be issued to be used under this section.

(5) If the State uses a permit as the basis of alternative requirements under this section, the relevant permit terms and conditions must remain applicable

130

to the source even if it takes steps that would otherwise release it from an obligation to have a permit.

(6) Within 180 days of receiving a complete request for approval under this section, the Administrator will either approve, partially approve, or disapprove the State request.

(b) *Criteria for approval.* Any request for approval under this section shall meet all of the criteria of this section and § 63.91 before approval. The State shall provide the Administrator with detailed documentation that the State requirements contain or demonstrate:

(1) Applicability criteria that are no less stringent than those in the respective Federal rule;

(2) Levels of control (including associated performance test methods) and compliance and enforcement measures that result in emission reductions from each affected source or accidental release prevention program requirements for each affected source that are no less stringent than would result from the otherwise applicable Federal rule;

(3) A compliance schedule that requires each affected source to be in compliance within a time frame consistent with the deadlines established in the otherwise applicable Federal rule; and

(4) At a minimum, the approved State requirements must include the following compliance and enforcement measures. (For requirements addressing the accidental release prevention program, minimum compliance and enforcement provisions are described in § 63.95.)

(i) The approved requirements must include monitoring or another method for determining compliance.

(ii) If a standard in the approved rule is not instantaneous, a maximum averaging time must be established.

(iii) The requirements must establish an obligation to periodically monitor for compliance using the monitoring or another method established in paragraph (b)(4)(i) of this section sufficient to yield reliable data that are representative of the source's compliance status.

[65 FR 55841, Sept. 14, 2000]

## § 63.94  Approval of State permit terms and conditions that substitute for a section 112 rule.

Under this section a State may seek approval of State permit terms and conditions to be implemented and enforced in lieu of specified existing and future Federal section 112 rules, emission standards, or requirements promulgated under section 112, for those affected sources permitted by the State under part 70 of this chapter. The State may not seek approval under this section for permit terms and conditions that implement and enforce part 68 requirements.

(a) *Up-front approval process.* (1) A State must submit a request that meets the requirements of paragraph (b) of this section. After receiving a complete request for approval of a State program under this section and making a preliminary determination of equivalence, the Administrator will seek public comment for 21 days through a FEDERAL REGISTER notice. The Administrator will require that comments be submitted concurrently to the State.

(2) If, after review of all public comments, and State responses to comments submitted to the Administrator, the Administrator finds that the criteria of paragraph (b) of this section and the criteria of § 63.91 are met, the Administrator will approve the State program. The approved program will be published in the FEDERAL REGISTER and incorporated directly or by reference in the appropriate subpart of part 63.

(3) If the Administrator finds that any of the criteria of paragraph (b) of this section or § 63.91 have not been met, the Administrator will partially approve or disapprove the State program. For any partial approvals or disapprovals, the Administrator will provide the State with the basis for the partial approval or disapproval and what action the State can take to make the programs approvable.

(4) Within 90 days of receiving a complete request for approval under this section, the Administrator will either approve, partially approve, or disapprove the State request.

(b) *Criteria for up-front approval.* Any request for program approval under

131

shutdown, and malfunction plan required by § 63.6(e)(3).

(B) An excused excursion, as described in § 63.505(i), shall not be considered an excursion for the purposes of paragraph (h)(2) of this section.

[62 FR 46925, Sept. 5, 1996, as amended at 64 FR 11547, Mar. 9, 1999; 65 FR 38076, June 19, 2000; 66 FR 36928, July 16, 2001]

### § 63.507 Implementation and enforcement.

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (4) of this section.

(1) Approval of alternatives to the requirements in §§ 63.480 through 63.481, 63.483(a) through (c), 63.484, 63.485(a) through (k), (m) through (s), (u), 63.486 through 63.487, 63.488(a), (b)(1) through (4), (5)(iv) through (v), (6) through (7), (c) through (i), 63.493 through 63.494, 63.500(a)(1) through (3), (b), 63.501, 63.502(a) through (f), (i), (k) through (m), and 63.503. Where these standards reference another subpart, the cited provisions will be delegated according to the delegation provisions of the referenced subpart. Where these standards reference another subpart and modify the requirements, the requirements shall be modified as described in this subpart. Delegation of the modified requirements will also occur according to the delegation provisions of the referenced subpart.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

[68 FR 37349, June 23, 2003]

TABLE 1 TO SUBPART U OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART U AFFECTED SOURCES

| Reference | Applies to subpart U | Explanation |
|---|---|---|
| § 63.1(a)(1) ................ | Yes ................ | § 63.482 specifies definitions in addition to or that supersede definitions in § 63.2. |
| § 63.1(a)(2) ................ | Yes. | |
| § 63.1(a)(3) ................ | Yes ................ | § 63.481(f) through (k) and § 63.160(b) identify those standards which may apply in addition to the requirements of subparts U and H of this part, and specify how compliance shall be achieved. |
| § 63.1(a)(4) ................ | Yes ................ | Subpart U (this table) specifies the applicability of each paragraph in subpart A to subpart U. |
| § 63.1(a)(5) ................ | No ................ | [Reserved.]. |
| § 63.1(a)(6)–(8) ......... | Yes. | |
| § 63.1(a)(9) ................ | No ................ | [Reserved.]. |
| § 63.1(a)(10) .............. | Yes. | |
| § 63.1(a)(11) .............. | Yes. | |
| § 63.1(a)(12)–(14) ...... | Yes. | |
| § 63.1(b)(1) ................ | No ................ | § 63.480(a) contains specific applicability criteria. |
| § 63.1(b)(2) ................ | Yes. | |
| § 63.1(b)(3) ................ | No ................ | § 63.480(b) provides documentation requirements for EPPUs not considered affected sources. |
| § 63.1(c)(1) ................ | Yes ................ | Subpart U (this table) specifies the applicability of each paragraph in subpart A to subpart U. |
| § 63.1(c)(2) ................ | No ................ | Area sources are not subject to subpart U. |
| § 63.1(c)(3) ................ | No ................ | [Reserved.]. |

648

**Environmental Protection Agency**                    **Pt. 63, Subpt. U, Table 1**

| Reference | Applies to sub-part U | Explanation |
|---|---|---|
| § 63.1(c)(4) | Yes. | |
| § 63.1(c)(5) | Yes | Except that affected sources are not required to submit notifications that are not required by subpart U. |
| § 63.1(d) | No | [Reserved.]. |
| § 63.1(e) | Yes. | |
| § 63.2 | Yes | § 63.482 specifies those subpart A definitions that apply to subpart U. |
| § 63.3 | Yes. | |
| § 63.4(a)(1)–(3) | Yes. | |
| § 63.4(a)(4) | No | [Reserved.]. |
| § 63.4(a)(5) | Yes. | |
| § 63.4(b) | Yes. | |
| § 63.4(c) | Yes. | |
| § 63.5(a)(1) | Yes | Except the terms "source" and "stationary source" should be interpreted as having the same meaning as "affected source". |
| § 63.5(a)(2) | Yes. | |
| § 63.5(b)(1) | Yes | Except § 63.480(i) defines when construction or reconstruction is subject to new source standards. |
| § 63.5(b)(2) | No | [Reserved.]. |
| § 63.5(b)(3) | Yes. | |
| § 63.5(b)(4) | Yes | Except that the Initial Notification and § 63.9(b) requirements do not apply. |
| § 63.5(b)(5) | Yes. | |
| § 63.5(b)(6) | Yes | Except that § 63.480(i) defines when construction or reconstruction is subject to the new source standards. |
| § 63.5(c) | No | [Reserved.]. |
| § 63.5(d)(1)(i) | Yes | Except that the references to the Initial Notification and § 63.9(b)(5) do not apply. |
| § 63.5(d)(1)(ii) | Yes | Except that § 63.5(d)(1)(ii)(H) does not apply. |
| § 63.5(d)(1)(iii) | No | § 63.506(e)(5) and § 63.502(f) specify Notification of Compliance Status requirements. |
| § 63.5(d)(2) | No. | |
| § 63.5(d)(3) | Yes | Except § 63.5(d)(3)(ii) does not apply, and equipment leaks subject to § 63.502 are exempt. |
| § 63.5(d)(4) | Yes. | |
| § 63.5(e) | Yes. | |
| § 63.5(f)(1) | Yes. | |
| § 63.5(f)(2) | Yes | Except that where § 63.9(b)(2) is referred to, the owner or operator need not comply. |
| § 63.6(a) | Yes. | |
| § 63.6(b)(1) | No | The dates specified in § 63.481(b) apply, instead. |
| § 63.6(b)(2) | No. | |
| § 63.6(b)(3) | No. | |
| § 63.6(b)(4) | No. | |
| § 63.6(b)(5) | No. | |
| § 63.6(b)(6) | No | [Reserved.]. |
| § 63.6(b)(7) | No. | |
| § 63.6(c)(1) | Yes | § 63.481 specifies the compliance date. |
| § 63.6(c)(2) | No. | |
| § 63.6(c)(3) | No | [Reserved.]. |
| § 63.6(c)(4) | No | [Reserved.]. |
| § 63.6(c)(5) | Yes. | |
| § 63.6(d) | No | [Reserved.]. |
| § 63.6(e) | Yes | Except as otherwise specified for individualparagraphs. Does not apply to Group 2 emission points, unless they are included in an emissions average.ª |
| § 63.6(e)(1)(i) | No | This is addressed by § 63.480(j)(4). |
| § 63.6(e)(1)(ii) | Yes. | |
| § 63.6(e)(1)(iii) | Yes. | |
| § 63.6(e)(2) | Yes. | |
| § 63.6(e)(3)(i) | Yes | For equipment leaks (subject to § 63.502), the start-up, shutdown, and malfunction planrequirement of § 63.6(e)(3)(i) is limited to control devices and is optional for other equipment. The start-up, shutdown, and malfunction plan may include written procedures that identify conditions that justify a delay of repair. |
| § 63.6(e)(3)(i)(A) | No | This is addressed by § 63.480(j)(4). |
| § 63.6(e)(3)(i)(B) | Yes. | |
| § 63.6(e)(3)(i)(C) | Yes. | |
| § 63.6(e)(3)(ii) | Yes. | |
| § 63.6(e)(3)(iii) | No | Recordkeeping and reporting are specified in § 63.506(b)(1). |
| § 63.6(e)(3)(iv) | No | Recordkeeping and reporting are specified in § 63.506(b)(1). |
| § 63.6(e)(3)(v) | Yes. | |
| § 63.6(e)(3)(vi) | Yes. | |
| § 63.6(e)(3)(vii) | Yes. | |
| § 63.6(e)(3)(vii) (A) | Yes. | |
| § 63.6(e)(3)(vii) (B) | Yes | Except the plan shall provide for operation in compliance with § 63.480(j)(4). |
| § 63.6(e)(3)(vii) (C) | Yes. | |
| § 63.6(e)(3)(viii) | Yes. | |
| § 63.6(f)(1) | Yes. | |
| § 63.6(f)(2) | Yes | Except 63.7(c), as referred to in § 63.6(f)(2)(iii)(D) does not apply, and except that § 63.6(f)(2)(ii) does not apply to equipment leaks subject to § 63.502. |

649

| Reference | Applies to sub-part U | Explanation |
|---|---|---|
| §63.6(f)(3) .................. | Yes. | |
| §63.6(g) .................. | Yes. | |
| §63.6(h) .................. | No | Subpart U does not require opacity and visibleemission standards. |
| §63.6(i)(1) .................. | Yes. | |
| §63.6(i)(2) .................. | Yes. | |
| §63.6(i)(3) .................. | Yes. | |
| §63.6(i)(4)(i)(A) ......... | Yes. | |
| §63.6(i)(4)(i)(B) .......... | No .................. | Dates are specified in §63.481(e) and §63.506(e)(3)(i). |
| §63.6(i)(4)(ii) .......... | No. | |
| §63.6(i)(5)–(14) .......... | Yes. | |
| §63.6(i)(15) .................. | No .................. | [Reserved]. |
| §63.6(i)(16) .................. | Yes. | |
| §63.6(j) .................. | Yes. | |
| §63.7(a)(1) .................. | Yes. | |
| §63.7(a)(2) .................. | No. | §63.506(e)(5) specifies the submittal dates of performance test results for all emission pointsexcept equipment leaks; for equipment leaks, compliance demonstration results are reported in the Periodic Reports. |
| §63.7(a)(3) .................. | Yes. | |
| §63.7(b) .................. | No .................. | §63.504(a)(4) specifies notification requirements. |
| §63.7(c) .................. | No .................. | Except if the owner or operator chooses to submit an alternative nonopacity emission standard for approval under §63.6(g). |
| §63.7(d) .................. | Yes. | |
| §63.7(e)(1) .................. | Yes .................. | Except that all performance tests shall beconducted at maximum representative operating conditions achievable at the time without disruption of operations or damage to equipment. |
| §63.7(e)(2) .................. | Yes. | |
| §63.7(e)(3) .................. | No .................. | Subpart U specifies requirements. |
| §63.7(e)(4) .................. | Yes. | |
| §63.7(f) .................. | Yes .................. | Except that §63.144(b)(5)(iii)(A) & (B) shall apply for process wastewater. Also, since a site specific test plan is not required, the notification deadline in §63.7(f)(2)(i) shall be 60 days prior to the performance test, and in §63.7(f)(3) approval or disapproval of the alternative test method shall not be tied to the site specific test plan. |
| §63.7(g) .................. | Yes .................. | Except that the requirements in §63.506(e)(5) shall apply instead of references to the Notification of Compliance Status report in 63.9(h). In addition, equipment leaks subject to §63.502 are not required to conduct performance tests. |
| §63.7(h) .................. | Yes .................. | Except §63.7(h)(4)(ii) is not applicable, since the site-specific test plans in §63.7(c)(2) arenot required. |
| §63.8(a)(1) .................. | Yes. | |
| §63.8(a)(2) .................. | No. | |
| §63.8(a)(3) .................. | No .................. | [Reserved]. |
| §63.8(a)(4) .................. | Yes. | |
| §63.8(b)(1) .................. | Yes. | |
| §63.8(b)(2) .................. | No .................. | Subpart U specifies locations to conductmonitoring. |
| §63.8(b)(3) .................. | Yes. | |
| §63.8(c)(1) .................. | Yes. | |
| §63.8(c)(1)(i) .................. | Yes. | |
| §63.8(c)(1)(ii) .................. | No .................. | For all emission points except equipment leaks, comply with §63.506(b)(1)(i)(B); for equipmentleaks, comply with §63.181(g)(2)(iii). |
| §63.8(c)(1)(iii) .......... | Yes. | |
| §63.8(c)(2) .................. | Yes. | |
| §63.8(c)(3) .................. | Yes. | |
| §63.8(c)(4) .................. | No .................. | §63.505 specifies monitoring frequency; not applicable to equipment leaks, because §63.502does not require continuous monitoring systems. |
| §63.8(c)(5)–(8) .......... | No. | |
| §63.8(d) .................. | No. | |
| §63.8(e) .................. | No. | |
| §63.8(f)(1)–(3) .......... | Yes. | |
| §63.8(f)(4)(i) .................. | No .................. | Timeframe for submitting request is specified in §63.506(f) or (g); not applicable to equipmentleaks, because §63.502 (through reference to subpart H) specifies acceptable alternative methods. |
| §63.8(f)(4)(ii) .......... | No .................. | Contents of request are specified in §63.506(f) or (g). |
| §63.8(f)(4)(iii) .......... | No. | |
| §63.8(f)(5)(i) .......... | No. | |
| §63.8(f)(5)(ii) .......... | No. | |
| §63.8(f)(5)(iii) .......... | Yes. | |
| §63.8(f)(6) .................. | No .................. | Subpart U does not require CEM's. |
| §63.8(g) .................. | No .................. | Data reduction procedures specified in§63.506(d) and (h); not applicable to equipment leaks. |
| §63.9(a) .................. | Yes. | |
| §63.9(b) .................. | No .................. | Subpart U does not require an initial notification. |
| §63.9(c) .................. | Yes. | |
| §63.9(d) .................. | Yes. | |
| §63.9(e) .................. | No .................. | §63.504(a)(4) specifies notification deadline. |

**Environmental Protection Agency**                    **Pt. 63, Subpt. U, Table 2**

| Reference | Applies to sub-part U | Explanation |
|---|---|---|
| §63.9(f) .................... | No .................... | Subpart U does not require opacity and visible emission standards. |
| §63.9(g) .................... | No .................... | |
| §63.9(h) .................... | Yes .................... | §63.506(e)(5) specifies Notification of Compliance Status requirements. |
| §63.9(i) .................... | Yes. | |
| §63.9(j) .................... | No. | |
| §63.10(a) .................... | Yes. | |
| §63.10(b)(1) .................... | Yes .................... | §63.506(a) specifies record retention requirements. |
| §63.10(b)(2) .................... | No .................... | Subpart U specifies recordkeeping requirements. |
| §63.10(b)(3) .................... | No .................... | §63.480(b) requires documentation of sources that are not affected sources. |
| §63.10(c) .................... | No .................... | §63.506 specifies recordkeeping requirements. |
| §63.10(d)(1) .................... | Yes. | |
| §63.10(d)(2) .................... | No .................... | §63.506(e)(5) specifies performance test reporting requirements; not applicable to equipment leaks. |
| §63.10(d)(3) .................... | No .................... | Subpart U does not require opacity and visible emission standards. |
| §63.10(d)(4) .................... | Yes. | |
| §63.10(d)(5)(i) .................... | Yes .................... | Except that reports required by §63.10(d)(5)(i) shall be submitted at the same time as Periodic Reports specified in §63.506(e)(6). The start-up, shutdown, and malfunction plan, and any records or reports of start-up, shutdown, and malfunction do not apply to Group 2 emission points unless they are included in an emissions average. |
| §63.10(d)(5)(ii) .......... | No. | |
| §63.10(e) .................... | No .................... | §63.506 specifies reporting requirements. |
| §63.10(f) .................... | Yes. | |
| §63.11 .................... | Yes .................... | §63.11(b) specifies requirements for flares used to comply with provisions of this sub-part. §63.504(c) contains the requirements to conduct compliance demonstrations for flares subject to this subpart. |
| §63.12 .................... | Yes .................... | Except that the authority of §63.503(i) and the authority of §63.177 (for equipment leaks) will not be delegated to States. |
| §§63.13–63.15 .......... | Yes. | |

ᵃ The plan and any records or reports of start-up, shutdown, and malfunction do not apply to Group 2 emission points unless they are included in an emissions average.

[66 FR 36928, July 16, 2001]

TABLE 2 TO SUBPART U OF PART 63—APPLICABILITY OF SUBPARTS F, G, & H OF THIS PART TO SUBPART U AFFECTED SOURCES

| Reference | Applies to Sub-part U | Comment | Applicable section of Subpart U |
|---|---|---|---|
| Subpart F: | | | |
| §63.100 .................... | No. | | |
| §63.101 .................... | Yes .................... | Several definitions from §63.101 are referenced in §63.482. | §63.482. |
| §§63.102–63.103 .......... | No. | | |
| §§63.104–63.105 .......... | Yes .................... | | §§63.501 and 63.502. |
| §§63.106–63.109 .......... | No. | | |
| Subpart G: | | | |
| §63.110 .................... | No. | | |
| §63.111 .................... | Yes .................... | Several definitions from §63.111 reference in §63.482 .. | §63.482. |
| §63.112 .................... | No. | | |
| §§63.113–63.118 .......... | Yes .................... | With the differences noted in §63.485 (b) through §63.485(k). | |
| §§63.119–63.123 .......... | Yes .................... | With the differences noted in §63.484(c) through 63.484(s). | 63.484. |
| §§63.124–63.125 .......... | No .................... | [Reserved.]. | |
| §§63.126–63.130 .......... | No. | | |
| §63.131 .................... | .................... | [Reserved.]. | |
| §§63.133–63.147 .......... | Yes .................... | With the differences noted in §63.501(a)(1) through (19) | §63.501. |
| §§63.148–63.149 .......... | Yes .................... | With the differences noted in §§63.484(c) through (s) and 63.501(a)(1) through (23). | §§63.484 and 63.501. |
| §63.150(a) through (f) ..... | No. | | |
| §63.150(g)(1) and (2) ...... | No. | | |
| §63.150(g)(3) .................... | Yes .................... | .................... | §63.503(g)(3). |
| §63.150(g)(4) .................... | No. | | |
| §63.150(g)(5) .................... | Yes .................... | .................... | §63.503(g)(5). |
| §63.150(h)(1) and (2) ...... | No. | | |
| §63.150(h)(3) .................... | Yes .................... | .................... | §63.503(h)(3). |
| §63.150(h)(4) .................... | No. | | |
| §63.150(h)(5) .................... | Yes .................... | .................... | §63.503(h)(5). |
| §63.150(i) through (o) ...... | No. | | |
| §§63.151–63.152 .......... | No. | | |

651

TABLE 1 TO SUBPART U OF PART 63—APPLICABILITY OF GENERAL PROVISIONS TO SUBPART U AFFECTED SOURCES

| Reference | Applies to subpart U | Explanation |
|---|---|---|
| §63.1(a)(1) | Yes | §63.482 specifies definitions in addition to or that supersede definitions in §63.2. |
| §63.1(a)(2) | Yes | |
| §63.1(a)(3) | Yes | §63.481 through (k) and §63.160(b) identify those standards which may apply in addition to the requirements of subparts U and H of this part, and specify how compliance shall be achieved. |
| §63.1(a)(4) | Yes | Subpart U (this table) specifies the applicability of each paragraph in subpart A to subpart U. |
| §63.1(a)(5) | No | [Reserved.] |
| §63.1(a)(6)–(8) | Yes | |
| §63.1(a)(9) | No | [Reserved.]. |
| §63.1(a)(10) | Yes | |
| §63.1(a)(11) | Yes | |
| §63.1(a)(12)–(14) | Yes | |
| §63.1(b)(1) | No | §63.480(a) contains specific applicability criteria. |
| §63.1(b)(2) | Yes | |
| §63.1(b)(3) | No | §63.480(b) provides documentation requirements for EPPUs not considered affected sources. |
| §63.1(c)(1) | Yes | Subpart U (this table) specifies the applicability of each paragraph in subpart A to subpart U. |
| §63.1(c)(2) | No | Area sources are not subject to subpart U. |
| §63.1(c)(3) | Yes | |
| §63.1(c)(4) | No | [Reserved.] |
| §63.1(c)(5) | Yes | Except that affected sources are not required to submit notifications that are not required by subpart U. |
| §63.1(d) | No | [Reserved.] |
| §63.1(e) | Yes | |
| §63.2 | Yes | §63.482 specifies those subpart A definitions that apply to subpart U. |
| §63.3 | Yes | |
| §63.4(a)(1)–(3) | Yes | |
| §63.4(a)(4) | No | [Reserved.] |
| §63.4(a)(5) | Yes | |
| §63.4(b) | Yes | |
| §63.4(c) | Yes | |
| §63.5(a)(1) | Yes | Except the terms "source" and "stationary source" should be interpreted as having the same meaning as "affected source". |
| §63.5(a)(2) | Yes | |
| §63.5(b)(1) | Yes | Except §63.480(i) defines when construction or reconstruction is subject to new source standards. |
| §63.5(b)(2) | No | [Reserved.] |
| §63.5(b)(3) | Yes | |
| §63.5(b)(4) | Yes | Except that the Initial Notification and §63.9(b) requirements do not apply. |
| §63.5(b)(5) | Yes | |
| §63.5(b)(6) | Yes | Except that §63.480(i) defines when construction or reconstruction is subject to the new source standards. |
| §63.5(c) | No | [Reserved.] |
| §63.5(d)(1)(i) | Yes | Except that the references to the Initial Notification and §63.9(b)(5) do not apply. |
| §63.5(d)(1)(ii) | Yes | Except that §63.5(d)(1)(ii)(H) does not apply. |
| §63.5(d)(1)(iii) | Yes | §63.506(e)(5) and §63.502(f) specify Notification of Compliance Status requirements. |
| §63.5(d)(2) | No | |
| §63.5(d)(3) | Yes | Except §63.5(d)(3)(ii) does not apply, and equipment leaks subject to §63.502 are exempt. |
| §63.5(d)(4) | Yes | |
| §63.5(e) | Yes | |
| §63.5(f)(1) | Yes | |
| §63.5(f)(2) | Yes | Except that where §63.9(b)(2) is referred to, the owner or operator need not comply. |
| §63.6(a) | Yes | |
| §63.6(b)(1) | No | The dates specified in §63.481(b) apply, instead. |
| §63.6(b)(2) | No | |
| §63.6(b)(3) | No | |
| §63.6(b)(4) | No | |
| §63.6(b)(5) | No | |
| §63.6(b)(6) | No | [Reserved.] |
| §63.6(b)(7) | No | |
| §63.6(c)(1) | Yes | §63.481 specifies the compliance date. |

714

**Environmental Protection Agency**                    **Pt. 63, Subpt. U, Table 1**

| Reference | Applies to subpart U | Explanation |
|---|---|---|
| § 63.6(c)(2) | No. | |
| § 63.6(c)(3) | No | [Reserved.]. |
| § 63.6(c)(4) | No | [Reserved.]. |
| § 63.6(c)(5) | Yes. | |
| § 63.6(d) | No | [Reserved.]. |
| § 63.6(e)(1)(i) | No | See § 63.483(a)(1) for general duty requirement. Any cross reference to § 63.6(e)(1)(i) in any other general provision incorporated by reference shall be treated as a cross reference to § 63.483(a)(1). |
| § 63.6(e)(1)(ii) | No. | |
| § 63.6(e)(1)(iii) | Yes. | |
| § 63.6(e)(2) | No | [Reserved] |
| § 63.6(e)(3) | No. | |
| § 63.6(f)(1) | No. | |
| § 63.6(f)(2) | Yes | Except 63.7(c), as referred to in § 63.6(f)(2)(iii)(D) does not apply, and except that § 63.6(f)(2)(ii) does not apply to equipment leaks subject to § 63.502. |
| § 63.6(f)(3) | Yes. | |
| § 63.6(g) | Yes. | |
| § 63.6(h) | No | Subpart U does not require opacity and visible emission standards. |
| § 63.6(i)(1) | Yes. | |
| § 63.6(i)(2) | Yes. | |
| § 63.6(i)(3) | Yes. | |
| § 63.6(i)(4)(i)(A) | Yes. | |
| § 63.6(i)(4)(i)(B) | No | Dates are specified in § 63.481(e) and § 63.506(e)(3)(i). |
| § 63.6(i)(4)(ii) | No. | |
| § 63.6(i)(5)–(14) | Yes. | |
| § 63.6(i)(15) | No | [Reserved.]. |
| § 63.6(i)(16) | Yes. | |
| § 63.6(j) | Yes. | |
| § 63.7(a)(1) | Yes. | |
| § 63.7(a)(2) | No. | § 63.506(e)(5) specifies the submittal dates of performance test results for all emission points except equipment leaks; for equipment leaks, compliance demonstration results are reported in the Periodic Reports. |
| § 63.7(a)(3) | Yes. | |
| § 63.7(b) | No | § 63.504(a)(4) specifies notification requirements. |
| § 63.7(c) | No | Except if the owner or operator chooses to submit an alternative nonopacity emission standard for approval under § 63.6(g). |
| § 63.7(d) | Yes. | |
| § 63.7(e)(1) | No | See § 63.504(a)(1). Any cross-reference to § 63.7(e)(1) in any other general provision incorporated by reference shall be treated as a cross-reference to § 63.504(a)(1). |
| § 63.7(e)(2) | Yes. | |
| § 63.7(e)(3) | No | Subpart U specifies requirements. |
| § 63.7(e)(4) | Yes. | |
| § 63.7(f) | Yes | Except that § 63.144(b)(5)(iii)(A) & (B) shall apply for process wastewater. Also, since a site specific test plan is not required, the notification deadline in § 63.7(f)(2)(i) shall be 60 days prior to the performance test, and in § 63.7(f)(3) approval or disapproval of the alternative test method shall not be tied to the site specific test plan. |
| § 63.7(g) | Yes | Except that the requirements in § 63.506(e)(5) shall apply instead of references to the Notification of Compliance Status report in 63.9(h). In addition, equipment leaks subject to § 63.502 are not required to conduct performance tests. |
| § 63.7(h) | Yes | Except § 63.7(h)(4)(ii) is not applicable, since the site-specific test plans in § 63.7(c)(2) are not required. |
| § 63.8(a)(1) | Yes. | |
| § 63.8(a)(2) | No. | |
| § 63.8(a)(3) | No | [Reserved.]. |
| § 63.8(a)(4) | Yes. | |
| § 63.8(b)(1) | Yes. | |
| § 63.8(b)(2) | No | Subpart U specifies locations to conduct monitoring. |
| § 63.8(b)(3) | Yes. | |
| § 63.8(c)(1) | Yes. | |
| § 63.8(c)(1)(i) | Yes. | |
| § 63.8(c)(1)(ii) | No | For all emission points except equipment leaks, comply with § 63.506(b)(1)(i)(B); for equipment leaks, comply with § 63.181(g)(2)(iii). |
| § 63.8(c)(1)(iii) | Yes. | |
| § 63.8(c)(2) | Yes. | |
| § 63.8(c)(3) | Yes. | |

715

**Pt. 63, Subpt. U, Table 2**           **40 CFR Ch. I (7–1–13 Edition)**

| Reference | Applies to subpart U | Explanation |
|---|---|---|
| §63.8(c)(4) | No | §63.505 specifies monitoring frequency; not applicable to equipment leaks, because §63.502 does not require continuous monitoring systems. |
| §63.8(c)(5)–(8) | No. | |
| §63.8(d) | No. | |
| §63.8(e) | No. | |
| §63.8(f)(1)–(3) | Yes. | |
| §63.8(f)(4)(i) | No | Timeframe for submitting request is specified in §63.506(f) or (g); not applicable to equipment leaks, because §63.502 (through reference to subpart H) specifies acceptable alternative methods. |
| §63.8(f)(4)(ii) | No | Contents of request are specified in §63.506(f) or (g). |
| §63.8(f)(4)(iii) | No. | |
| §63.8(f)(5)(i) | Yes. | |
| §63.8(f)(5)(ii) | No. | |
| §63.8(f)(5)(iii) | Yes. | |
| §63.8(f)(6) | No | Subpart U does not require CEM's. |
| §63.8(g) | No | Data reduction procedures specified in §63.506(d) and (h); not applicable to equipment leaks. |
| §63.9(a) | Yes. | |
| §63.9(b) | No | Subpart U does not require an initial notification. |
| §63.9(c) | Yes. | |
| §63.9(d) | Yes. | |
| §63.9(e) | No | §63.504(a)(4) specifies notification deadline. |
| §63.9(f) | No | Subpart U does not require opacity and visible emission standards. |
| §63.9(g) | No. | |
| §63.9(h) | No | §63.506(e)(5) specifies Notification of Compliance Status requirements. |
| §63.9(i) | Yes. | |
| §63.9(j) | No. | |
| §63.10(a) | Yes. | |
| §63.10(b)(1) | No | §63.506(a) specifies record retention requirements. |
| §63.10(b)(2) | No | Subpart U specifies recordkeeping requirements. |
| §63.10(b)(3) | No | §63.480(b) requires documentation of sources that are not affected sources. |
| §63.10(c) | No | §63.506 specifies recordkeeping requirements. |
| §63.10(d)(1) | Yes. | |
| §63.10(d)(2) | No | §63.506(e)(5) specifies performance test reporting requirements; not applicable to equipment leaks. |
| §63.10(d)(3) | No | Subpart U does not require opacity and visible emission standards. |
| §63.10(d)(4) | Yes. | |
| 63.10(d)(5)(i) | No. | |
| §63.10(d)(5)(ii) | No. | |
| §63.10(e) | No | §63.506 specifies reporting requirements. |
| §63.10(f) | Yes. | |
| §63.11 | Yes | §63.11(b) specifies requirements for flares used to comply with provisions of this subpart. §63.504(c) contains the requirements to conduct compliance demonstrations for flares subject to this subpart. §63.11(c), (d), and (e) specifies requirements for an alternative work practice for equipment leaks. |
| §63.12 | Yes | Except that the authority of §63.503(i) and the authority of §63.177 (for equipment leaks) will not be delegated to States. |
| §§63.13–63.15 | Yes. | |

ª The plan and any records or reports of start-up, shutdown, and malfunction do not apply to Group 2 emission points unless they are included in an emissions average.

[66 FR 36928, July 16, 2001, as amended at 71 FR 20457, Apr. 20, 2006; 73 FR 78213, Dec. 22, 2008]

TABLE 2 TO SUBPART U OF PART 63—APPLICABILITY OF SUBPARTS F, G, & H OF THIS PART TO SUBPART U AFFECTED SOURCES

| Reference | Applies to Subpart U | Comment | Applicable section of Subpart U |
|---|---|---|---|
| Subpart F: | | | |
| §63.100 | No. | | |
| §63.101 | Yes | Several definitions from §63.101 are referenced in §63.482. | §63.482. |
| §§63.102–63.103 | No. | | |
| §§63.104–63.105 | Yes | .......... | §§63.501 and 63.502. |
| §§63.106–63.109 | No. | | |

**17750**    **Federal Register** / Vol. 60, No. 67 / Friday, April 7, 1995 / Proposed Rules

Rule 74   Specific Source Standards (Adopted 7/6/76)

Rule 74.1   Abrasive Blasting (Adopted 11/12/91)

Rule 74.2   Architectural Coatings (Adopted 08/11/92)

Rule 74.6   Surface Cleaning and Degreasing (Adopted 5/8/90)

Rule 74.6.1   Cold Cleaning Operations (Adopted 9/12/89)

Rule 74.6.2   Batch Loaded Vapor Degreasing Operations (Adopted 9/12/89)

Rule 74.7   Fugitive Emissions of Reactive Organic Compounds at Petroleum Refineries and Chemical Plants (Adopted 1/10/89)

Rule 74.8   Refinery Vacuum Producing Systems, Waste-water Separators and Process Turnarounds (Adopted 7/5/83)

Rule 74.9   Stationary Internal Combustion Engines (Adopted 12/21/93)

Rule 74.10   Components at Crude Oil Production Facilities and Natural Gas Production and Processing Facilities (Adopted 6/16/92)

Rule 74.11   Natural Gas-Fired Residential Water Heaters-Control of $NO_x$ (Adopted 4/9/85)

Rule 74.12   Surface Coating of Metal Parts and Products (Adopted 11/17/92)

Rule 74.15   Boilers, Steam Generators and Process Heaters (5MM BTUs and greater) (Adopted 12/3/91)

Rule 74.15.1   Boilers, Steam Generators and Process Heaters (1–5MM BTUs) (Adopted 5/11/93)

Rule 74.16   Oil Field Drilling Operations (Adopted 1/8/91)

Rule 74.20   Adhesives and Sealants (Adopted 6/8/93)

Rule 74.24   Marine Coating Operations (Adopted 3/8/94)

Rule 75   Circumvention (Adopted 11/27/78)

Appendix IV-A   Soap Bubble Tests (Adopted 12/86)

Rule 100   Analytical Methods (Adopted 7/18/72)

Rule 101   Sampling and Testing Facilities (Adopted 5/23/72)

Rule 102   Source Tests (Adopted 11/21/78)

Rule 103   Stack Monitoring (Adopted 6/4/91)

Rule 154   Stage 1 Episode Actions (Adopted 9/17/91)

Rule 155   Stage 2 Episode Actions (Adopted 9/17/91)

Rule 156   Stage 3 Episode Actions (Adopted 9/17/91)

Rule 158   Source Abatement Plans (Adopted 9/17/91)

Rule 159   Traffic Abatement Procedures (Adopted 9/17/91)

[FR Doc. 95–8604 Filed 4–6–95; 8:45 am]

BILLING CODE 6050–50–P

## 40 CFR Part 70

[LA–001; FRL–5185–4]

**Clean Air Act Proposed Full Approval of Operating Permits Program; Louisiana Department of Environmental Quality**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed full approval.

---

**SUMMARY:** The EPA proposes to rescind the proposed interim approval of the Louisiana Operating Permits Program published in the **Federal Register** (see 59 FR 43797, August 25, 1994) (hereafter Interim Approval Notice) and propose full approval of the Operating Permits Program as revised by the State's November 16, 1994, submittal. The proposed interim approval in the Interim Approval Notice was based upon the Operating Permits Program submitted by the Governor of Louisiana for the Louisiana Department of Environmental Quality (LDEQ) and received by the EPA on November 15, 1993. On November 16, 1994, the State submitted material revisions adequately addressing the issues raised by the EPA in the Interim Approval Notice and adding insignificant activities criteria to the Louisiana Operating Permits Program. This revised Operating Permits Program will provide for the issuance of operating permits to all major stationary sources and to certain other sources with the exception of sources on Indian Lands, in compliance with the Federal requirements.

**DATES:** Comments on this proposed action must be received in writing by May 8, 1995.

**ADDRESSES:** Written comments on this action should be addressed to Ms. Jole C. Luehrs, Chief, New Source Review Section, at the EPA Region 6 Office listed below. Copies of the State's submittal and other supporting information used in developing the proposed full approval are available for inspection during normal business hours at the following locations. Interested persons wanting to examine these documents should make an appointment with the appropriate office at least 24 hours before visiting day.

Environmental Protection Agency, Region 6, Air Programs Branch (6T–AN), 1445 Ross Avenue, Suite 700, Dallas, Texas 75202–2733. Louisiana Department of Environmental Quality, Office of Air Quality, 7290 Bluebonnet Boulevard, P.O. Box 82135, Baton Rouge, Louisiana 70884–2135.

**FOR FURTHER INFORMATION CONTACT:** Joyce P. Stanton, New Source Review

Section, Environmental Protection Agency, Region 6, 1445 Ross Avenue, Suite 700, Dallas, Texas 75202–2733, telephone 214–665–7218.

**SUPPLEMENTARY INFORMATION:**

**I. Background and Purpose**

*A. Introduction*

As required under title V of the Clean Air Act as amended on November 15, 1990 (''the Act''), the EPA has promulgated rules which define the minimum elements of an approvable State Operating Permits Program and the corresponding standards and procedures by which the EPA will approve, oversee, and withdraw approval of a State Operating Permits Program (see 57 **Federal Register** 32250, July 21, 1992). These rules are codified at 40 Code of Federal Regulations (CFR) part 70. Title V requires States to develop, and submit to the EPA, programs for issuing these operating permits to all major stationary sources and to certain other sources.

The Act requires that States develop and submit these Operating Permits Programs to the EPA by November 15, 1993, and that the EPA act to approve or disapprove each Operating Permits Program within one year after receiving the submittal. The EPA's Operating Permits Program review occurs pursuant to section 502 of the Act and the part 70 regulations, which together outline criteria for approval and disapproval. The EPA proposed interim approval in the Interim Approval Notice on August 25, 1994, for the Operating Permits Program submitted by the LDEQ on November 15, 1993. However, 40 CFR 70.4(e)(2) allows the Administrator to extend the review period of a State's submittal if the State's submission is materially altered during the one-year review period. This additional review period may not extend beyond one year following receipt of the revised submission. On November 16, 1994, the EPA received material changes to Louisiana's Operating Permits Program from the Governor of Louisiana on behalf of the LDEQ. These changes included regulations adopted to add insignificant activities criteria, and to address issues raised in the Interim Approval Notice. The EPA will act expeditiously to promulgate a final notice on the State's revised Operating Permits Program within one year of the November 16, 1994, revised submittal. The publication of this proposal allows the public the opportunity to review and comment on the changes contained in the revised submittal.

At this time, the EPA proposes to rescind the interim approval proposed

in the Interim Approval Notice and instead proposes full approval of the Operating Permits Program as revised by the November 16, 1994, submittal. The Interim Approval Notice had a 30-day comment period which was extended an additional 30 days to October 26, 1994 (see 59 FR 50537, October 4, 1994). The comments received on issues discussed in the Interim Approval Notice during that comment period are discussed in this notice together with a discussion of the revisions to the State's Operating Permits Program received on November 16, 1994.

## II. Proposed Action and Implications

### A. Analysis of State Submission

1. Confidentiality Provisions. In the Interim Approval Notice, the EPA stated that, while the State statute provided that certain environmental information such as air emissions data may not be held confidential, it was not clear whether these confidentiality provisions could be interpreted to protect the contents of the permit itself from disclosure. The Interim Approval Notice stated that the LDEQ must either submit an Attorney General's Opinion demonstrating that the State's statute is interpreted not to allow any portion of a permit to be held confidential, consistent with section 503(e) of the Act, or revise Louisiana Administrative Code (LAC) 33:III.Chapter 5, section 517.F (permit regulations) to clarify that no portion of the permit may be held confidential. In response to this statement in the Interim Approval Notice, the LDEQ commented that it did not currently protect from disclosure as confidential any permit issued under LAC 33.III.Chapter 5, and that the LDEQ has adopted a conservative policy in interpreting the reference to "emissions data" in a manner which limits the grant of confidentiality under the Louisiana statute. The LDEQ stated, however, that in the interest of cooperation, it would revise its regulations. The November 16, 1994, submittal contained a revision to LAC 33:III.517.F which requires that no permit or portion of a permit issued to a source in accordance with Louisiana's Operating Permits Program shall be held confidential. This regulatory revision has adequately addressed the EPA's concern regarding confidentiality and is no longer an interim approval issue.

2. Requirement that No Major Source be Exempt from Part 70 Requirements Because a Research and Development (R&D) Facility is Co-located with the Source. In the Interim Approval Notice, the EPA explained that LAC 33:III.501.B.7 allows the permitting

authority to consider a certain complex within a facility as a source separate from the facility with which it is co-located, provided that the complex is used solely for R&D of new processes and/or products, and is not engaged in the manufacture of products for commercial sale. The EPA noted that this regulation was inconsistent with 40 CFR 70.3 which requires that a State's Operating Permits Program provide for the permitting of all major sources, and 40 CFR 70.4(b)(3)(i) which requires that the State demonstrate adequate legal authority to issue permits and assure compliance with each applicable requirement by all part 70 sources.

The Interim Approval Notice explained that 40 CFR 70.2 requires all sources located on contiguous or adjacent properties, under common control, and belonging to a single major industrial grouping, to be considered as the same source. The EPA concluded that the Louisiana permit regulations could cause certain part 70 major sources, as defined in 40 CFR 70.2, or portions of such sources with the same Standard Industrial Classification (SIC) code, to be treated as separate sources. This could cause some part 70 sources to be exempted from coverage by part 70 permits which must ensure that all part 70 requirements for those sources are met.

The Interim Approval Notice went on to state that for full part 70 approval, the LDEQ would be required to revise its permit regulations and demonstrate that no source, or portion of a source, which would be defined as major under 40 CFR 70.2 would be exempted from part 70 requirements because an R&D facility is co-located with the source.

One commenter objected to the EPA's proposed action related to the R&D issue and stated that by limiting the scope of the exemption to R&D facilities with different SIC codes, the EPA has virtually eliminated any relief for R&D facilities. The commenter stated that, since R&D activities are so limited in time, scale, and actual production, subjecting these activities to the Operating Permits Program requirements unnecessarily burdened research by companies as well as the State's Operating Permits Programs. This commenter also requested that any guidance concerning R&D facilities be published for public comment as part of future part 70 rulemakings. The EPA's position continues to be that 40 CFR part 70 allows R&D facilities to be treated separately in cases where the R&D facility has a different two-digit SIC code and is not a support facility.

The LDEQ commented that its regulatory provision cited as deficient

on this point had been incorporated into the State's Operating Permits Program based on the State's understanding of guidance provided by the EPA in the preamble to the part 70 regulations. In the Interim Approval Notice, the EPA explained that the preamble language was intended to clarify the flexibility in 40 CFR part 70 for allowing R&D facilities to be treated separately from the manufacturing facilities with which they are co-located where the R&D facility has a different two-digit SIC code and is not a support facility. This approach is consistent with the treatment of R&D facilities in the New Source Review program. In response to the Interim Approval Notice and in an effort to receive full approval of Louisiana's Operating Permits Program, the LDEQ has revised LAC 33:III.501.B.7 to include a provision that an R&D facility may be considered separately provided the facility has a different two-digit SIC code then, and is not a support facility of, the source with which it is co-located. This revision was included in the November 16, 1994, submittal. This change adequately addresses the EPA's concern and the State's treatment of R&D facilities is no longer an interim approval issue.

3. Acid Rain Application Deadlines. In the Interim Approval Notice, the EPA discussed LAC 33.III.507.C.1.b which contained the deadlines for submittal of acid rain permit applications. Although this section purported to cover all relevant dates for submittal of acid rain permit applications, this section did not contain the deadlines required by 40 CFR 72.30(b)(2)(iii) for new units and for units that did not serve a generator with a name plate capacity greater than 25 Megawatts electrical on November 15, 1990, but which served such a generator after November 15, 1990. In the Interim Approval Notice, the EPA noted that LAC 33:III.505.D.2 contains the deadlines for submittal of acid rain permit applications consistent with those required by title IV of the Act, but that it contradicted LAC 33.III.507.C.1.b. The Interim Approval Notice explained that, even though LAC 33.III.505.A.4 provides that Federal acid rain requirements applicable to an affected source shall supersede LAC 33:III.Chapter 5 of the Louisiana Regulations where the two are inconsistent, the inconsistency between LAC 33.III.505.D.2, 507.C.1.b and the Federal acid rain regulations created a lack of clarity and should be eliminated. The Interim Approval Notice required that, for full part 70 approval, LAC 33.III.507.C.1.b be revised to require the

affected sources to conform with the deadlines in LAC 33.III.505.D.2.

The LDEQ commented that the provisions of LAC 33.III.507.C.1.b cited by the EPA in the Interim Approval Notice as creating an interim approval issue were incorporated by the LDEQ in response to an earlier EPA comment on the LDEQ's proposed Air Quality regulations. The State responded by stating that, despite the error in LAC 33.III.507.C.1.b, LAC 33.III.505.A.4 and 505.D.2 would still require sources to comply with all Federal acid rain deadlines. However, the November 16, 1994, Operating Permits Program submittal included a revision to LAC 33.III.507.C.1.b to clarify the acid rain permit application submittal deadlines as requested by the EPA. This revision adequately addresses the EPA's concern and, therefore, this is no longer an interim approval issue.

4. Provision for Administrative Amendments. In the Interim Approval Notice, the EPA stated its concern that LAC 33.III.521.A.6 could be interpreted to allow administrative amendments to permits to incorporate changes authorized by 40 CFR 70.4(b)(14). These "off-permit" changes, which are not addressed or prohibited by the permit, may be made under part 70 without permit revisions. However, the Interim Approval Notice explained that the part 70 rule contains no authority for such changes to be incorporated into operating permits except through the appropriate part 70 permit procedures for minor or significant modifications. In the Interim Approval Notice, the EPA stated that, for full part 70 approval, section 521.A.6 of the permit regulations must be revised to eliminate administrative amendments for this type of change.

LAC 33.III.521.A.6 also allows changes to be made to operating permits by administrative amendment where the State's permitting authority has determined they are similar to the changes listed in LAC 33.III.521.A. The Interim Approval Notice explained that part 70 allows changes submitted as part of a State's part 70 program, in addition to those specified in 40 CFR 70.7(d)(1), to be made as administrative amendments where the EPA Administrator determines those changes to be similar to the changes listed in 40 CFR 70.7(d)(1)(i)–(iv). However, no such proposed changes were submitted by the State as part of its Operating Permits Program, and part 70 does not allow for the substitution of the State permitting authority's approval for the Administrator's approval, which is required by 40 CFR 70.7(d)(1)(vi). The Interim Approval Notice required that,

for full part 70 approval, this defect in LAC 33.III.521.A.6 of the permit regulations must be corrected.

The LDEQ commented that the cited provision was intended by the State to allow the LDEQ discretion in revising permits for terms and conditions altogether outside the scope of 40 CFR part 70 and would not circumscribe 40 CFR part 70. However, to receive full approval, LAC 33.III.521.A.6 has been revised to clarify that this provision can be used solely for State-only changes involving terms and conditions which are not federally enforceable. These revisions were included in the November 16, 1994, submittal and adequately address the EPA's concerns. Therefore, this is no longer an interim approval issue.

5. Requirement to Keep Records for Five Years. In the Interim Approval Notice, the EPA cited the 40 CFR 70.8(a)(3) requirement that each State permitting authority keep for five years such records as the Administrator may reasonably require to ascertain whether the State program complies with the requirements of the Act and 40 CFR part 70. While 44 Louisiana Revised Statutes (L.R.S.) section 1 contains a very broad definition of "public records," 44 L.R.S. section 36 requires the records to be kept for only three years unless a longer formal retention schedule has been developed. The Interim Approval Notice required as a condition of full part 70 approval, a statutory change or a supplemental Attorney General's Opinion demonstrating how the current statute ensures that the required records will be kept for at least five years.

The LDEQ commented that it intended to keep records for five years, and that it believed that 40 CFR part 70 did not require a permit rule ensuring that records be retained for five years. It remains the EPA's position that because the language in the Louisiana Statute does not appear to ensure that records be retained for five years, 40 CFR 70.8(a)(3) requires either an Attorney General's Opinion demonstrating how this statute ensures a five-year retention of these records or a statutory or regulatory change. In the interest of obtaining full approval, the LDEQ revised LAC 33.III.533.B.5. As revised, LAC 33.III.533.B.5 provides that the permitting authority shall keep for five years such records and submit to the EPA such information as the Administrator may reasonably require to ascertain whether the State Operating Permits Program complies with the requirements of part 70 and the Act. This revision, which was included in the November 16, 1994, submittal, adequately addresses the EPA's concern,

and records retention is no longer an interim approval issue.

6. Significant Modification Procedures. In the Interim Approval Notice the EPA stated its concern about the lack of clarity of LAC 33.III.527.A.3. This provision allowed certain changes that rendered existing compliance terms irrelevant to be incorporated through minor modification procedures. The changes cited appeared to be of the type described in 40 CFR 70.4(b)(14), "off-permit" changes. However, the State's provision was unclear, and the Interim Approval Notice explained that, to remedy this ambiguity, the State should add language clarifying that the modification is one which would qualify as a change under 40 CFR 70.4(b)(14), because it is not addressed or prohibited by the permit and would otherwise qualify for treatment as a minor modification under 40 CFR 70.7(e)(2)(i)(A).

The LDEQ commented that the cited State provision was meant only to clarify that obsolete compliance measures could be removed from the permit without requiring a significant permit modification. In the interest of obtaining full approval, however, the LDEQ deleted LAC 33.III.527.A.3 in its entirety. This revision, which was included in the November 16, 1994, submittal, has adequately addressed the EPA's concern, and the previously noted ambiguity is no longer an interim approval issue.

7. Permit Conditions. In the Interim Approval Notice, the EPA explained that even though the permit content requirements of 40 CFR 70.6(a) are met by the model permit submitted in Volume III of the State's original part 70 submittal, 40 CFR 70.4(b)(16) also requires regulatory provisions in the State's program to implement the requirements of 40 CFR 70.6 and 70.7. The EPA noted that LAC 33.III.501.C.5 and 6 speak generally to permit terms and conditions, but do not set out all requirements for each operating permit as required.

Specifically, the EPA noted that these State provisions did not include a requirement that the permit specify the origin of and reference the authority for each term or condition, nor did they identify differences in form from the applicable requirements upon which the terms were based or contain various other elements required by 40 CFR 70.6. The Interim Approval Notice explained that 40 CFR 70.6(a) includes requirements for emission limitations, monitoring, and recordkeeping, and specifies that the regulation must state that no permit revision shall be required under any approved economic

incentive, marketable permits, or similar program. The Interim Approval Notice stated that a severability clause is also required to ensure the continued validity of the various permit requirements in the event of a challenge to any portion of the permit. The EPA stated that these elements must be addressed in the permit regulations in order to afford citizens the opportunity to legally challenge permits. The Interim Approval Notice stated that, although some of these elements are contained in the State's model operating permit, one condition of full part 70 approval would be that the permit regulations be revised to require that all permit elements of 40 CFR 70.6(a) be included in each permit.

In its comments, the LDEQ stated its belief that the model permit forms and applications submitted with the original Operating Permits Program submittal adequately addressed this issue. However, in an effort to obtain full approval, the LDEQ has revised LAC 33.III.507.B.2 to incorporate by reference the provisions of 40 CFR 70.6 as in effect on July 21, 1992. This revision was submitted with the November 16, 1994, submittal and adequately addresses the EPA's concern. Therefore, this is no longer an interim approval issue.

8. Title I Modifications and Case-by-case Determinations. In the Interim Approval Notice, the EPA discussed the State's definition of the phrase "title I modification." At the time of the Interim Approval Notice, the EPA believed that for a State's program to be fully approvable, it would be necessary for the State's definition of "title I modification" to be interpreted to include literally any change at a source that would trigger permitting authority review under regulations approved or promulgated under title I of the Act. This would include State preconstruction review programs approved into the State Implementation Plan under section 110(a)(2)(C) of the Act and regulations addressing source changes that trigger National Emission Standards for Hazardous Air Pollutants established pursuant to section 112 of the Act prior to the 1990 amendments. LAC 33.III.502 defines "title I modification" as a change at a site that qualifies as a modification under section 111 of the Act or section 112(g) of the Act, or that results in a significant net emissions increase under part C or part D of the Act. In the Interim Approval Notice, the EPA required that the LDEQ revise the definition of "title I modification" in order to receive full approval.

The LDEQ commented that it believed the part 70 regulations clearly allowed

"minor" preconstruction changes to be processed as minor permit modifications under part 70. The LDEQ further stated its belief that States which allowed minor preconstruction changes to be processed as minor operating permit modifications should be approved, and to do otherwise, would cause the States to suffer significant negative impact.

The American Forest and Paper Association (AF & PA) stated that the EPA's interpretation set out in the Interim Approval Notice was without legal basis, and that such an interpretation failed to take into account the numbers of additional source modifications which would be required to be processed under the significant modification procedures of title V of the Act. The AF & PA stated its belief that such an interpretation would further have potentially devastating consequences on the AF & PA's members doing business in Louisiana.

The Louisiana Chemical Association disagreed with the EPA's position that Louisiana's definition of "title I modification" must be revised for full approval, and provided legislative history excerpts in support of its interpretation of the term "title I modification."

On August 29, 1994, the EPA proposed revisions to the interim approval criteria in 40 CFR 70.4(d) to allow State Operating Permits Programs with a narrower definition of "title I modification" to receive interim approval (See 59 FR 44572, August 29, 1994). Following is a discussion of points noted in that publication.

The EPA intended to finalize its revisions to the interim approval criteria under 40 CFR 70.4(d) before taking action on part 70 Operating Permits Programs submitted by the States. However, publication of the proposed revision was delayed until August 29, 1994, and several requests to the EPA to extend the public comment period further delayed final action on the revisions. Given the importance of the issues in that rulemaking to States, sources, and the public, but mindful of the need to take action quickly, the EPA agreed to extend the comment period until October 28, 1994 (see 59 FR 52122, October 14, 1994). Consequently, final action to revise the interim approval criteria will not occur before the deadline for EPA action on State programs that were submitted on or before November 15, 1993. The EPA believes it would be inappropriate to delay action on these States' Operating Permits Programs until final action is taken on the interim approval revisions. The EPA also believes it would be

inappropriate to grant interim approval to Louisiana's Operating Permits Program on this issue before final action is taken to revise the current interim approval criteria of 40 CFR 70.4(d) in a manner which would provide a legal basis for such an interim approval. Prior to the EPA's final promulgation of interim approval criteria, Louisiana may maintain and implement the narrower definition of "title I modification." Upon the EPA's final decision of what constitutes a "title I modification," if the EPA's definition differs from Louisiana's current definition, the State will be required to revise its definition in accordance with the EPA's final definition.

The EPA is allowing this approach to "title I modification" for a number of reasons. First, the EPA has not yet conclusively determined that a narrower definition of "title I modification" is incorrect and thus a basis for disapproval (or even interim approval). The EPA has received numerous comments on this issue as a result of the August 29, 1994, FR notice, and the EPA cannot and will not make a final decision on this issue until it has evaluated all of the comments. Second, the EPA believes that the Louisiana Operating Permits Program should not be disapproved because the EPA itself has not yet been able to resolve this issue through rulemaking. Moreover, disapproving Operating Permits Programs from States such as Louisiana that submitted their Operating Permits Program to the EPA on or before the November 15, 1993, statutory deadline could lead to the unfair result that States which were late in submitting Operating Permits Programs could take advantage of revised interim approval criteria if and when these criteria become final. In effect, States would be severely penalized for having made timely program submissions to the EPA. Finally, disapproval for a State's Operating Permits Program for a potential problem that primarily affects permit revision procedures would delay the issuance of part 70 permits, hampering State/Federal efforts to improve environmental protection through the operating permits system.

For the reasons mentioned above, the EPA is approving the Louisiana Operating Permits Program's use of a narrower definition of "title I modification" at this time. However, should the EPA in the interim approval criteria rulemaking make the final determination that such a narrow definition of "title I modification" is incorrect and that a revision of the interim approval criteria is warranted, the EPA will propose further action on

Louisiana's Operating Permits Program so that the State's definition of "title I modification" could become grounds for interim approval. A State Operating Permits Program like the one in Louisiana, which receives full approval of its narrower definition pending completion of the EPA's rulemaking, must ultimately be placed on an equal footing with States which receive interim approval in later months under revised interim approval criteria based on the same issue. Converting the full approval on this issue to an interim approval after the EPA completes its rulemaking will avoid this inequity. The EPA anticipates that an action to convert the full approval on the "title I modification" issue to an interim approval would be effected through an additional rulemaking, so as to ensure that there is adequate notice of the change in approval status.

Questions have been raised on a national level concerning whether the 40 CFR 70.7(e)(2)(i)(A)(3) provisions prohibiting minor modifications for changes in "case-by-case" determinations would apply in the instance of a preconstruction permit in which the permitting authority, through a minor modification procedure, changes a source-specific control technology requirement not required under part C or D or section 111 or 112 of the Act, or an emission limitation determination established on a source-specific basis. At the time of the Interim Approval Notice, the EPA believed the better interpretation of 40 CFR 70.7(e)(2)(i)(A)(3) required that any requirement imposed on a source-specific basis, such as one in which the permitting authority has discretion in setting the requirement for the particular source, must be considered to be a "case-by-case" determination. Therefore, the EPA believed that a change involving a source-specific requirement in a preconstruction permit would be considered a "case-by-case determination of an emission limitation" under 40 CFR 70.7(e)(2)(i)(A)(3), ineligible for processing as a minor permit modification.

LAC 33.III.525.A.2.d allows the use of minor modification procedures for some changes which would be considered "case-by-case" emission limits under the EPA's narrower interpretation. The EPA is taking comment on whether a less narrow interpretation of "case-by-case" is acceptable.

Therefore, the EPA will not at this time construe 40 CFR 70.7(e)(2)(i)(A)(3) to prohibit Louisiana from allowing minor preconstruction changes to be processed as minor permit

modifications. Should the EPA's final interpretation be inconsistent with Louisiana's current regulations, the definition of "case-by-case" will also be an interim approval issue. The EPA anticipates that an action to convert the full approval on the "case-by-case" issue to an interim approval would be effected through an additional rulemaking, so as to ensure that there is adequate notice of the change in approval status.

9. Insignificant Activities. As the Interim Approval Notice indicated, provisions to determine insignificant activities were not included with the State's original submittal. The State's later, November 16, 1994, submittal contained a list of insignificant activities and criteria for determining which activities were sufficiently insignificant to be exempt from the requirement to obtain a permit, or from inclusion in a permit (for a part 70 source engaged in other activities which must appear in permits), unless the LDEQ determines on a site-specific basis that such exemption is not appropriate. These insignificant activities were divided into four categories. The first category consisted of activities based on size or production rate that were required to be included in the application but not the permit. This is consistent with 40 CFR 70.5(c) which provides that, if approved by the EPA, a list of insignificant activities based on size or production rate may be exempted from inclusion in a part 70 permit, although they must still be included in the application. LAC 33.III.501.B.5 provides that any activity to which a State or Federal applicable requirement applies is not insignificant even if the activity meets the criteria of the "Insignificant Activities List." Therefore such an activity must be included in the permit. The LDEQ has clarified in a letter that insignificant activities may not be exempted from major source applicability determinations. This is consistent with 40 CFR 70.3(c) and 70.5(c) which requires that the permitting authority include in the permit all applicable requirements for all relevant emissions units.

As allowed by 40 CFR 70.5(c), LAC 33.III.501.B.5 contains a second category based on activities that do not need to be included in a permit application. This list includes activities such as maintenance of grounds, general repairs, lawn care, steam cleaning, certain painting activities, use of adhesives, office activities, vehicle emissions, etc. The third category of insignificant activities is based on type of pollutant. LAC 33.III.501.B.5 allows water vapor,

oxygen, carbon dioxide, nitrogen, and hydrogen to be exempt from the permit application.

The last category of insignificant activities is based on emissions levels. In order to use this category, the source must receive prior approval from the LDEQ, and all of the criteria must be met. These criteria include: (a) The emissions unit emits and has the potential to emit no more than five tons per year of any regulated air pollutant; (b) the emissions unit emits and has the potential to emit less than the minimum emission rate listed in Table 51.1, LAC 33.III.Chapter 51, for each Louisiana toxic air pollutant; (c) the emissions unit emits and has the potential to emit less than the de minimis rate established pursuant to section 112(g) of the Federal Act for each hazardous air pollutant; and (d) no enforceable permit conditions are necessary to ensure compliance with any applicable requirement.

The EPA believes that these insignificant criteria are sufficient to ensure that every application contains the information needed to determine the applicability of, and to impose, any applicable requirement, or to evaluate the fee amount as required by 40 CFR 70.5(c). The list and its criteria meet the requirements of 40 CFR part 70 and therefore are approvable. The EPA will accept comments on the insignificant activities discussed herein, as well as other provisions of the State's revised submittal.

*B. Discussion of Other Comments*

1. Section 112(g) Comments. Louisiana Mid-Continent Oil and Gas Association (LAMOGA) was concerned that the Louisiana Operating Permits Program was being approved prior to the finalization of Federal requirements regarding section 112(g) of the Act on modification of sources of hazardous air pollutants. The AF & PA commented that it believes the EPA's delegation to Louisiana of section 112(g) authority is unlawful and confusing to the regulated community, because the EPA has not issued any regulation to implement this statutory language and does not expect for many months. The AF & PA opposes the approval of the Louisiana preconstruction permit rules for the implementation of section 112(g), because it believes that these rules were never intended to define or otherwise address issues such as "de minimis" and offsets. The AF & PA is concerned that sources would have no way to determine whether and when they are subject to the program until a final

Federal section 112(g) rule is promulgated.

In the Interim Approval Notice, the EPA also proposed to approve Louisiana's preconstruction program for the purpose of implementing section 112(g) during the transition period before a Federal rule had been promulgated implementing section 112(g). This proposal was based in part on an interpretation of the Act that would require sources to comply with section 112(g) beginning on the date of approval of the Operating Permits Program, regardless whether the EPA had completed its section 112(g) rulemaking. The EPA has since revised this interpretation of the Act in the **Federal Register** (see 60 FR 8333, February 14, 1995) (hereafter Interpretive Notice). The Interpretive Notice postpones the effective date of section 112(g) until after the EPA has promulgated a final rule addressing that provision. The rationale for the revised interpretation was explained in detail in the Interpretive Notice. The EPA's new position of not requiring the implementation of section 112(g) until the Federal 112(g) rule is promulgated renders moot the AF & PA comment regarding section 112(g).

The Interpretive Notice explains that the EPA is still considering whether the effective date of section 112(g) should be delayed beyond the date of promulgation of the Federal rule to allow States time to adopt rules implementing the Federal rule. If a decision is made to allow such additional delay in the implementation of section 112(g), the EPA will announce that decision in the final section 112(g) rulemaking.

2. Natural Resources Defense Council (NRDC) Comments. The NRDC objected to the approval of the Louisiana Operating Permits Program for the same reasons the NRDC objected to the EPA's part 70 regulation upon which the approval was based. The NRDC's earlier comments on the national proposed part 70 rulemaking were attached to its comments on the proposed approval of the Louisiana Operating Permits Program. The EPA believes the appropriate forum for pursuing objections to the legal validity of the part 70 rule is through a petition for review of the rule in the D.C. Circuit Court of Appeals; therefore, those part 70 comments will not be addressed in this notice. Unless and until the part 70 rule is revised, the EPA must evaluate proposed part 70 programs according to the rule currently in effect.

3. Enhanced Monitoring. The LAMOGA expressed concern that the Louisiana Operating Permits Program was being approved prior to the finalization of Federal enhanced monitoring requirements. The LDEQ will implement the enhanced monitoring requirements of the Act and provide appropriate permit conditions after the Federal enhanced monitoring rules are finalized. The EPA will not delay approval of Louisiana's Operating Permits Program based on the fact that the Federal enhanced monitoring rule is not yet finalized.

4. General Comments. The EPA received comments from Citizens for a Clean Environment and some comments from LAMOGA favorable to the Louisiana Operating Permits Program and requesting full approval for the program.

## C. Provisions Implementing the Requirements of Other Titles of the Act

By submitting the State's Operating Permits Program for approval, Louisiana commits to appropriately implementing and enforcing the existing and future requirements of sections 111, 112, and 129 of the Act, and all maximum achievable control technology (MACT) standards promulgated in the future, in a timely manner.

Requirements for title V approval, specified in 40 CFR 70.4(b), encompass section 112(l)(5) requirements for approval of a program for delegation of Federal section 112 standards as they apply to part 70 sources. The State of Louisiana acknowledges that its request for approval of a part 70 program is also a request for approval of a program for delegation of unchanged section 112 standards under the authority of section 112(l) as they apply to part 70 sources.

Section 112(l)(5) requires that the State's program contain adequate authorities, adequate resources for implementation, and an expeditious compliance schedule, which are also requirements under 40 CFR part 70. Therefore, as part of this proposal for full approval, the EPA is also proposing to grant approval under section 112(l)(5) and 40 CFR 63.91 of the State's program for receiving delegation of section 112 standards that are unchanged from Federal standards as promulgated. At this time, the State plans to use the mechanism of incorporation by reference to adopt unchanged Federal section 112 requirements into its regulations. After this approval is made final, in cases where the State utilizes the mechanism of incorporation by reference, no additional Federal public comment period will occur prior to the transfer of authority for unchanged section 112 standards to the State. This approval for delegation of unchanged Federal section 112 standards applies to existing and future standards as they apply to sources covered by the part 70 program. The State retains the option at any time to promulgate the full text of the Federal standard unchanged or to request delegation of section 112 standards in the form of State regulations which the State demonstrates are equivalent to the corresponding section 112 provisions promulgated by the EPA instead of using the mechanism of incorporation by reference. If the State chooses either of these options, an approval under 40 CFR part 63 subpart E will be required.

## D. Summary

The State of Louisiana submitted to the EPA, under cover letters from the Governor dated November 4, 1993, and November 10, 1994, the State's Operating Permits Program and the State's revised Operating Permits Program, respectively. The original and revised submittals have been reviewed for adequacy under the requirements of title V of the Act and the 40 CFR part 70 regulations which together outline criteria for approval and disapproval. The results of this review are included in the technical support document. The EPA believes that the LDEQ, in its revised submittal, has adequately addressed all issues discussed in the Interim Approval Notice which proposed interim approval. The EPA believes the insignificant activities list and criteria are fully approvable. Therefore, at this time the EPA is proposing to grant full approval to the Louisiana Operating Permits Program. The EPA is soliciting comments on all aspects of this proposed full approval.

## E. Options for Approval/Disapproval

The EPA proposes to withdraw the proposed interim approval announced in the Interim Approval Notice and to fully approve the Operating Permits Program submitted to the EPA from the State of Louisiana on November 15, 1993, and revised on November 16, 1994. Louisiana has demonstrated that the program meets the minimum elements of a State Operating Permits Program as specified in 40 CFR part 70.

## III. Administrative Requirements

### A. Request for Public Comments

The EPA is requesting comments on Louisiana's revised submittal as discussed in this proposed full approval. Copies of the State's submittal and other information relied upon for the proposed full approval are contained in a docket maintained at the EPA Regional Office. The docket is an organized and complete file of all the

information submitted to, or otherwise considered by, the EPA in the development of this proposed interim approval. The principal purposes of the docket are:

(1) To allow interested parties a means to identify and locate documents so that they can effectively participate in the approval process, and

(2) To serve as the record in case of judicial review. The EPA will consider any comments received by May 8, 1995.

*B. Executive Order 12866*

The Office of Management and Budget has exempted this regulatory action from Executive Order 12866 review.

*C. Regulatory Flexibility Act*

The EPA's actions under section 502 of the Act do not create any new requirements, but simply address Operating Permits Programs submitted to satisfy the requirements of 40 CFR part 70. Because this action does not impose any new requirements, it does not have a significant impact on a substantial number of small entities.

**List of Subjects in 40 CFR Part 70**

Environmental protection, Air pollution control, Intergovernmental relations, Operating permits, Administrative practice and procedure, Reporting and recordkeeping requirements.

**V. Miscellaneous**

*A. Proposed Full Approval*

Proposed full approval of the part 70 Operating Permits Program for the State of Louisiana.

Authority: 42 U.S.C. 7401–7671q.

Dated: March 30, 1995.

Jane N. Saginaw,

*Regional Administrator (6A).*

[FR Doc. 95–8608 Filed 4–6–95; 8:45 am]

BILLING CODE 6560–50–P

---

**40 CFR Part 81**

[NM–25–1–6908; FRL–5185–5]

**Designation of Area for Air Quality Planning Purposes; New Mexico; Designation of Sunland Park Ozone Nonattainment Area**

AGENCY: Environmental Protection Agency (EPA).

ACTION: Proposed rule.

SUMMARY: Pursuant to the Clean Air Act (CAA), as amended in 1990, the EPA is authorized to promulgate new designations of areas (or portions thereof) as nonattainment for the ozone National Ambient Air Quality Standards

(NAAQS). In this action, the EPA is proposing to revise the ozone designation for a portion of Dona Ana County, New Mexico (i.e. the Sunland Park area). Previously, consistent with the CAA, the EPA notified the Governor of New Mexico that the Sunland Park area should be redesignated from unclassifiable/attainment to nonattainment for ozone. The redesignation is based upon violations of the ozone NAAQS which were monitored from 1992–1994.

DATES: All written comments must be received by May 8, 1995.

ADDRESSES: Written comments on this action should be addressed to Mr. Thomas H. Diggs, Chief, Planning Section, at the EPA Regional Office listed below. Copies of the documents relevant to this action are available for public inspection during normal business hours at the addresses listed below. The interested persons wanting to examine these documents should make an appointment at least twenty-four hours before the visiting day.

U.S. Environmental Protection Agency, Region 6, Air Programs Branch (6T–A), 1445 Ross Avenue, suite 700, Dallas, Texas 75202–2733.

New Mexico Environment Department, Air Monitoring & Control Strategy Bureau, 1190 St. Francis Drive, room So. 2100, Santa Fe, New Mexico 87503.

FOR FURTHER INFORMATION CONTACT: Mr. Mark Sather, Planning Section (6T–AP), Air Programs Branch (6T–A), USEPA Region 6, 1445 Ross Avenue, Dallas, Texas 75202–2733, telephone (214) 665–7258.

SUPPLEMENTARY INFORMATION:

**Background**

By operation of law upon enactment of the 1990 amendments to the CAA (Public Law 101–549, 104 Statute 2399), all areas of the country were designated either nonattainment or unclassifiable/attainment for the ozone NAAQS [see section 107(d)(4)(A) of the CAA; 56 FR 56694–56858 (November 6, 1991), 57 FR 56762–56778 (November 30, 1992), and 59 FR 18967–18971 (April 21, 1994)]. The amended CAA also authorizes the EPA to revise the designation of current ozone areas from unclassifiable/attainment to nonattainment on the basis of air quality data, planning and control considerations, or any other air quality-related considerations the EPA deems appropriate [see section 107(d)(3) of the CAA].

Following the process outlined in section 107(d)(3), on December 16, 1994, the Regional Administrator of the EPA Region 6 notified the Governor of

New Mexico that the EPA believed the Sunland Park area should be redesignated as nonattainment for ozone. Under section 107(d)(3)(B) of the CAA, the Governor of New Mexico was required to submit to the EPA the designation considered appropriate for the Sunland Park area within 120 days after the EPA's notification. The EPA received the State's response for the Sunland Park area on February 6, 1995 (letter dated January 30, 1995). Now, the EPA must promulgate the redesignation that it deems necessary and appropriate, consistent with section 107(d)(3)(C) of the CAA.

Based upon the EPA's review of the State's January 30, 1995, letter for the Sunland Park area, the EPA is proposing a redesignation to nonattainment which is consistent with the request submitted by the Governor of New Mexico. The EPA is requesting comments on this action and will consider any relevant comments before taking final action.

Section 107(d)(1)(A) of the CAA sets out definitions of nonattainment, attainment, and unclassifiable. The EPA has proposed that the Sunland Park area in Dona Ana County, New Mexico, addressed in this action, be redesignated nonattainment for the ozone NAAQS. A nonattainment area is defined as any area that does not meet (or that significantly contributes to ambient air quality in a nearby area that does not meet) the national primary or secondary ambient air quality standard for ozone [see section 107(d)(1)(A)(i) of the CAA].[1] Thus, in determining the appropriate boundaries for the nonattainment area proposed in this action, the EPA has considered not only the area where the violations of the ozone NAAQS are occurring, but nearby areas which significantly contribute to such violations.

**Proposed Action**

As noted above, pursuant to section 107(d)(3) of the CAA, the EPA is authorized to initiate the redesignation of areas as nonattainment for ozone. Based on the ozone air quality monitoring data for the Sunland Park monitoring station, the EPA notified the Governor of New Mexico on December 16, 1994, that the Sunland Park area should be redesignated from unclassifiable/attainment to nonattainment for the ozone NAAQS. Ozone monitoring began in Sunland Park on June 15, 1992. Seven measured

---

[1] The EPA has construed the definition of nonattainment area to require some material or significant contribution to a violation in a nearby area. The Agency believes it is reasonable to conclude that something greater than a molecular impact is required.

## ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Part 63**

**[FRL–6949–7]**

**RIN 2060–AF31**

**National Emission Standards for Hazardous Air Pollutants for Source Categories: General Provisions; and Requirements for Control Technology Determinations for Major Sources in Accordance With Clean Air Act Sections, Sections 112(g) and 112(j)**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed amendments.

**SUMMARY:** *General Provisions (Subpart A).* On March 16, 1994, the EPA promulgated General Provisions for national emission standards for hazardous air pollutants (NESHAP) and other regulatory requirements that are established under section 112 of the Clean Air Act as amended in 1990 (CAA or Act) (59 FR 12408). In today's action, we are proposing amendments to the General Provisions that would revise and clarify several of the current provisions.

We are proposing these amendments, in part, as a result of decisions reached in settlement negotiations conducted between petitioners, who filed for review of the General Provisions, and the EPA. The proposed amendments also reflect internal EPA discussions on issues regarding implementation of the General Provisions.

*Section 112(j) Provisions (Subpart B).* In addition, in today's action, we are proposing amendments to rules that establish equivalent emission limitations by permit under section 112(j) of the Act. The "section 112(j)" rule establishes requirements and procedures for owners or operators of major sources of hazardous air pollutants (HAP), and permitting authorities, to comply with section 112(j). The section 112(j) rule was promulgated on May 20, 1994 (59 FR 26429).

These proposed amendments have been developed in response to settlement negotiations conducted between petitioners, who filed for review of the section 112(j) rule, and the EPA. The proposed amendments also reflect internal EPA discussions regarding implementation of the section 112(j) rule.

**DATES:** *Comments.* Submit comments on or before May 22, 2001.

*Public Hearing.* If anyone contacts us requesting to speak at a public hearing by April 2, 2001, a public hearing will be held on April 23, 2001.

**ADDRESSES:** *Comments.* Written comments should be submitted (in duplicate if possible) to: Air and Radiation Docket and Information Center (6102), Attention Docket Number A–2001–02, Part 63 General Provisions (Subpart A) and Section 112(j) Regulations (Subpart B) Litigation Settlement Amendments, U.S. Environmental Protection Agency, 1200 Pennsylvania Ave., NW, Washington, DC 20460. We request a separate copy also be sent to the appropriate contact person listed below in the **FOR FURTHER INFORMATION CONTACT** section.

*Public Hearing.* If a public hearing is held, it will be held at 10:00 a.m. on April 23, 2001 in our Office of Administration Auditorium, Research Triangle Park, North Carolina, or at an alternate site nearby.

*Docket.* Docket No. A–2001–02, Part 63 General Provisions (Subpart A) and Section 112(j) Regulations (Subpart B) Litigation Settlement Amendments, contains information relevant to today's proposed rulemaking. This docket is located at the U.S. Environmental Protection Agency, 401 M Street, SW, Washington, DC 20460 in room M–1500, Waterside Mall (ground floor) and is available for public inspection and copying from 8:30 a.m. and 5:30 p.m., Monday through Friday, excluding legal holidays. A reasonable fee may be charged for copying.

**FOR FURTHER INFORMATION CONTACT:** For further information about the proposed rule amendments, contact Mr. James Szykman, Emission Standards Division (MD–13), U.S. Environmental Protection Agency, Research Triangle Park, North Carolina 27711, telephone (919) 541–5469, E-mail szykman.jim@epa.gov; or Mr. Rick Colyer, Emission Standards Division (MD–13), U.S. Environmental Protection Agency, Research Triangle Park, North Carolina 27711, telephone (919) 541–5262, E-mail colyer.rick@epa.gov.

For questions about the public hearing, contact Ms. Dorothy Apple, Policy, Planning and Standards Group, Emission Standards Division (MD–13), U.S. Environmental Protection Agency, Research Triangle Park, North Carolina 27711, telephone (919) 541–4487, E-mail apple.dorothy@epa.gov.

**SUPPLEMENTARY INFORMATION:** *Comments.* Comments and data may be submitted by electronic mail (e-mail) to: a-and-r-docket@epa.gov. Electronic comments must be submitted as an ASCII file to avoid the use of special characters and encryption problems and will also be accepted on disks in WordPerfect® version 5.1, 6.1 or Corel 8 file format. All comments and data submitted in electronic form must note the docket number A–2001–02, Part 63 General Provisions (Subpart A) and section 112(j) Regulations (Subpart B) Litigation Settlement Amendments. No confidential business information (CBI) should be submitted by e-mail. Electronic comments may be filed online at many Federal Depository Libraries.

Commenters wishing to submit proprietary information for consideration must clearly distinguish such information from other comments and clearly label it as CBI. Send submissions containing such proprietary information directly to the following address, and not to the public docket, to ensure that proprietary information is not inadvertently placed in the docket: Attention: Mr. Rick Colyer, c/o OAQPS Document Control Officer (Room 740B), U.S. Environmental Protection Agency, 411 W. Chapel Hill Street, Durham, NC 27701. We will disclose information identified as CBI only to the extent allowed by the procedures set forth in 40 CFR part 2. If no claim of confidentiality accompanies a submission when we receive it, the information may be made available to the public without further notice to the commenter.

*Public Hearing.* Persons interested in presenting oral testimony or inquiring as to whether a hearing is to be held should contact Ms. Dorothy Apple at least 2 days in advance of the public hearing. Persons interested in attending such a public hearing must also contact Ms. Apple to verify the time, date, and location of the hearing. The address, telephone number, and e-mail address for Ms. Apple are listed in the preceding **FOR FURTHER INFORMATION CONTACT SECTION.** If a public hearing is held, it will provide interested parties the opportunity to present data, views, or arguments concerning these proposed amendments.

*Docket.* The docket is an organized and complete file of all the information considered by us in the development of this rulemaking. The docket is a dynamic file because material is added throughout the rulemaking process. The docketing system is intended to allow members of the public and industries involved to readily identify and locate documents so that they can effectively participate in the rulemaking process. Along with the proposed and promulgated standards and their preambles, the contents of the docket will serve as the record in the case of judicial review. (See section

307(d)(7)(A) of the CAA.) The regulatory text and other materials related to this rulemaking are available for review in the docket or copies may be mailed on request from the Air Docket by calling (202) 260–7548. A reasonable fee may be charged for copying docket materials.

*Worldwide Web (WWW)*. In addition to being available in the docket, an electronic copy of today's proposed rule amendments will also be available on the WWW through the Technology Transfer Network (TTN). Following the Administrator's signature, a copy of the rule will be posted on the TTN's policy and guidance page for newly proposed or promulgated rules http://www.epa.gov/ttn/oarpg. The TTN provides information and technology exchange in various areas of air pollution control. If more information regarding the TTN is needed, call the TTN HELP line at (919) 541–5384.

*Regulated Entities*. Categories and entities potentially regulated by this action include all section 112 source categories listed under section 112(c) of the CAA.

*Industry Group: Source Category*

Fuel Combustion:
  Combustion Turbines
  Engine Test Facilities
  Industrial Boilers
  Institutional/Commercial Boilers
  Process Heaters
  Reciprocating Internal Combustion Engines
  Rocket Testing Facilities
Non-Ferrous Metals Processing:
  Primary Aluminum Production
  Primary Copper Smelting
  Primary Lead Smelting
  Primary Magnesium Refining
  Secondary Aluminum Production
  Secondary Lead Smelting
Ferrous Metals Processing:
  Coke By-Product Plants
  Coke Ovens: Charging, Top Side, and Door Leaks
  Coke Ovens: Pushing, Quenching, Battery Stacks
  Ferroalloys Production: Silicomanganese and Ferromanganese
  Integrated Iron and Steel Manufacturing
  Iron Foundries Electric Arc Furnace (EAF) Operation
  Steel Foundries
  Steel Pickling—HCl Process Facilities and Hydrochloric Acid Regeneration
Mineral Products Processing:
  Alumina Processing
  Asphalt Concrete Manufacturing
  Asphalt Processing
  Asphalt Roofing Manufacturing
  Asphalt/Coal Tar Application—Metal Pipes
  Clay Products Manufacturing
  Lime Manufacturing
  Mineral Wool Production
  Portland Cement Manufacturing
  Refractories Manufacturing
  Taconite Iron Ore Processing
  Wool Fiberglass Manufacturing

Petroleum and Natural Gas Production and Refining:
  Oil and Natural Gas Production
  Natural Gas Transmission and Storage
  Petroleum Refineries—Catalytic Cracking (Fluid and other) Units, Catalytic Reforming Units, and Sulfur Plant Units
  Petroleum Refineries—Other Sources Not Distinctly Listed
Liquids Distribution:
  Gasoline Distribution (Stage 1)
  Marine Vessel Loading Operations
  Organic Liquids Distribution (Non-Gasoline)
Surface Coating Processes:
  Aerospace Industries
  Auto and Light Duty Truck
  Large Appliance
  Magnetic Tapes
  Manufacture of Paints, Coatings, and Adhesives
  Metal Can
  Metal Coil
  Metal Furniture
  Miscellaneous Metal Parts and Products
  Paper and Other Webs
  Plastic Parts and Products
  Printing, Coating, and Dyeing of Fabrics
  Printing/Publishing
  Shipbuilding and Ship
  Wood Building Products
  Wood Furniture
Waste Treatment and Disposal:
  Hazardous Waste Incineration
  Municipal Landfills
  Off-Site Waste and Recovery Operations
  Publicly Owned Treatment Works (POTW) Emissions
  Sewage Sludge Incineration
  Site Remediation
  Solid Waste Treatment, Storage and Disposal Facilities (TSDF)
Agricultural Chemicals Production:
  Pesticide Active Ingredient Production
Fibers Production Processes:
  Acrylic Fibers/Modacrylic Fibers Production
  Rayon Production
  Spandex Production
Food and Agriculture Processes:
  Manufacturing of Nutritional Yeast
  Cellulose Food Casing Manufacturing
  Vegetable Oil Production
Pharmaceutical Production Processes:
  Pharmaceuticals Production
Polymers and Resins Production:
  Acetal Resins Production
  Acrylonitrile-Butadiene-Styrene Production
  Alkyd Resins Production
  Amino Resins Production
  Boat Manufacturing
  Butyl Rubber Production
  Carboxymethylcellulose Production
  Cellophane Production
  Cellulose Ethers Production
  Epichlorohydrin Elastomers Production
  Epoxy Resins Production
  Ethylene-Propylene Rubber Production
  Flexible Polyurethane Foam Production
  Hypalon (tm) Production
  Maleic Anhydride Copolymers Production
  Methylcellulose Production
  Methyl Methacrylate-Acrylonitrile-Butadiene-Styrene Production
  Methyl Methacrylate-Butadiene-Styrene Terpolymers Production

Neoprene Production
Nitrile Butadiene Rubber Production
Nitrile Resins Production
Non-Nylon Polyamides Production
Phenolic Resins Production
Polybutadiene Rubber Production
Polycarbonates Production
Polyester Resins Production
Polyether Polyols Production
Polyethylene Terephthalate Production
Polymerized Vinylidene Chloride Production
Polymethyl Methacrylate Resins Production
Polystyrene Production
Polysulfide Rubber Production
Polyvinyl Acetate Emulsions Production
Polyvinyl Alcohol Production
Polyvinyl Butyral Production
Polyvinyl Chloride and Copolymers Production
Reinforced Plastic Composites Production
Styrene-Acrylonitrile Production
Styrene-Butadiene Rubber and Latex Production
Production of Inorganic Chemicals:
  Ammonium Sulfate Production—Caprolactam By-Product Plants
  Carbon Black Production
  Chlorine Production
  Cyanide Chemicals Manufacturing
  Fumed Silica Production
  Hydrochloric Acid Production
  Hydrogen Fluoride Production
  Phosphate Fertilizers Production
  Phosphoric Acid Manufacturing
  Uranium Hexafluoride Production
Production of Organic Chemicals:
  Ethylene Processes
  Quaternary Ammonium Compounds Production
  Synthetic Organic Chemical
Miscellaneous Processes:
  Benzyltrimethylammonium Chloride Production
  Butadiene Dimers Production
  Carbonyl Sulfide Production
  Cellulosic Sponge Manufacturing
  Chelating Agents Production
  Chlorinated Paraffins
  Chromic Acid Anodizing
  Commercial Dry Cleaning (Perchloroethylene)—Transfer Machines
  Commercial Sterilization Facilities
  Decorative Chromium Electroplating
  Dry Cleaning (Petroleum Solvent)
  Ethylidene Norbornene Production
  Explosives Production
  Flexible Polyurethane Foam Fabrication Operations
  Friction Products Manufacturing
  Halogenated Solvent Cleaners
  Hard Chromium Electroplating
  Hydrazine Production
  Industrial Cleaning (Perchloroethylene)—Dry-to-dry Machines
  Industrial Dry Cleaning (Perchloroethylene)—Transfer Machines
  Industrial Process Cooling Towers
  Leather Tanning and Finishing Operations
  OBPA/1,3-Diisocyanate Production
  Paint Stripping Operations
  Photographic Chemicals Production
  Phthalate Plasticizers Production
  Plywood and Composite Wood Products
  Polyether Polyols Production

Pulp and Paper Production
Rubber Chemicals Manufacturing
Rubber Tire Manufacturing
Semiconductor Manufacturing
Symmetrical Tetrachloropyridine
  Production
Categories of Area Sources:
  Chromic Acid Anodizing
  Commercial Dry Cleaning
    (Perchloroethylene)—Dry-to-Dry
    Machines
  Commercial Dry Cleaning
    (Perchloroethylene)—Transfer Machines
  Commercial Sterilization Facilities
  Decorative Chromium Electroplating
  Halogenated Solvent Cleaners
  Hard Chromium Electroplating
  Secondary Lead Smelting

This list is not intended to be
exhaustive, but rather provides a guide
for readers regarding entities likely to be
regulated by this action. To determine
whether you are regulated by this
action, you should examine your source
category specific section 112 regulation.
If you have any questions regarding the
applicability of this action to a
particular entity, consult the person
listed in the preceding **FOR FURTHER
INFORMATION CONTACT SECTION.**

  *Outline.* The information presented in
this preamble is organized as follows:

I. Background
  A. General Provisions
  B. Section 112(j) Provisions
II. Proposed Amendments to the General
  Provisions
  A. Presumptive Applicability of the
    General Provisions
  B. Definition of Affected Source
  C. Other Definitions
  D. Prohibited Activities and Circumvention
  E. Preconstruction Review
  F. Startup, Shutdown and Malfunction
    Plans
  G. Compliance Provisions
  H. Test Methods
  I. Monitoring Requirements
  J. Notification Requirements
  K. Recordkeeping and Reporting
    Requirements
  L. Lesser Quantity
  M. Clarification and Consistency
III. Proposed Amendments to the Section
  112(j) Provisions
  A. Applicability
  B. Definitions
  C. Approval Process
  D. Application Content
  E. Preconstruction Review
  F. Enforcement Liability
  G. MACT Determinations
  H. Case-by-Case MACT Requirements after
    Promulgation of a Subsequent MACT
    Standard
  I. Section 112(j) Guidelines Document
IV. Additional Issues
  A. Discussion of the Relationship Among
    Requirements Under Section 112(d), (g),
    and (j)
  B. Potential to Emit
V. Administrative Requirements
  A. Executive Order 12866, Regulatory
    Planning and Review
  B. Executive Order 13132, Federalism
  C. Executive Order 13084, Consultation
    and Coordination with Indian Tribal
    Governments
  D. Executive Order 13045, Protection of
    Children from Environmental Health
    Risks and Safety Acts
  E. Unfunded Mandates Reform Act of 1995
  F. Regulatory Flexibility Act (RFA) as
    Amended by Small Business Regulatory
    Enforcement Fairness Act of 1996
    (SBREFA), 5 U.S.C. 601 *et seq.*
  G. Paperwork Reduction Act
  H. National Technology Transfer and
    Advancement Act of 1995

## I. Background

### A. General Provisions

  Section 112 of the CAA requires us to
list categories and subcategories of
major sources and area sources of HAP
and to establish NESHAP for the listed
source categories and subcategories.
Major sources of HAP are those that
have the potential to emit greater than
10 tons/yr of any one HAP or 25 tons/
yr of any combination of HAP. Area
sources of HAP are those sources that do
not have potential to emit greater than
10 tons/yr of any one HAP and 25 tons/
yr of any combination of HAP. The
General Provisions to 40 CFR part 63
establish the framework for emission
standards and other requirements
developed pursuant to section 112 of
the Act. The General Provisions
eliminate the repetition of general
information and requirements in
individual NESHAP by consolidating all
generally applicable information in one
location. They include sections on
applicability, definitions, compliance
dates and requirements, monitoring,
recordkeeping and reporting, among
others. In addition, they include
administrative sections concerning
actions that the EPA (or delegated
authorities) must take, such as making
determinations of applicability,
reviewing applications for approval of
new construction, responding to
requests for extensions or waivers of
applicable requirements, and generally
enforcing national air toxics standards.
The General Provisions become
applicable to a section 112(d) source
category rule when the source category
rule is promulgated and becomes
effective.

  The General Provisions to part 63
were developed in a collaborative
process that included input from
industry and other interested parties.
On August 11, 1993, we proposed the
General Provisions in the **Federal
Register** (58 FR 42760). We received
numerous comments on that proposal
from industry groups, environmental
groups, and State and local agencies,
and those comments addressed a wide
range of issues and requirements in the
proposed rulemaking. We published our
final decisions regarding the General
Provisions in the **Federal Register** on
March 16, 1994 (59 FR 12408). In the
preamble to the promulgated rule, we
discussed major comments on the
proposal and our responses to those
comments. We addressed other
comments in the Background
Information Document (BID) for the
promulgated rulemaking (EPA–450/3–
91–019b). In responding to comments,
we made some changes and some
clarifications to the final package and
retained other provisions where the
Agency believed it was appropriate to
do so. On May 16, 1994, six petitioners
filed for review of the General
Provisions. They cited a variety of
issues raised in comments on the
proposed rule whose resolution they
believed to be inappropriate. In
addition, we have identified other
changes that would clarify the EPA's
original intent. The amendments to the
General Provisions being proposed
today constitute the outcome of
settlement negotiations between the
EPA and the petitioners and internal
Agency discussions.

  The amendments proposed in today's
action would have the effect of
clarifying certain sections of the General
Provisions and of altering other
sections.

### B. Section 112(j) Provisions

  The 1990 Amendments to section 112
of the CAA include a new section 112(j),
which is entitled "Equivalent Emission
Limitation by Permit." Section 112(j)(2)
provides that the provisions of section
112(j) apply if the EPA misses a
deadline for promulgation of a standard
under section 112(d) established in the
source category schedule for standards.
After the effective date of a title V
permit program in a State, section
112(j)(3) requires the owner or operator
of a major source in a source category,
for which the EPA failed to promulgate
a section 112(d) standard, to submit a
permit application 18 months after the
missed promulgation deadline. Section
112(j)(5) also specifies that if the
applicable criteria for voluntary early
reductions established under section
112(i)(5) are met, then this alternative
emission limit satisfies the requirements
of section 112(j), provided that the
emission reductions are achieved by the
missed promulgation date.

  The proposed rule implementing
section 112(j) of the CAA was published
on July 13, 1993 (58 FR 37778). The
public comments were considered, and
changes we deemed appropriate were
made in developing a final rule.

**Federal Register** / Vol. 66, No. 57 / Friday, March 23, 2001 / Proposed Rules **16321**

On May 20, 1994 (59 FR 26429), we issued a final rule for implementing section 112(j). That rule requires major source owners or operators to submit a permit application by the date 18 months after a missed date on the regulatory schedule. As required under section 112(j) of the Act, the section 112(j) rule establishes requirements for the content of permit applications, contains provisions governing the establishment of the maximum achievable control technology (MACT)-equivalent emission limitations by the permitting authority, includes the criteria for the reviewing authority to determine completeness, and allows the applicant up to 6 months to revise and resubmit the application. As required in subsection 112(j)(5) of the Act, the rule also establishes compliance dates:

No such pollutant may be emitted in amounts exceeding an emission limitation contained in a permit immediately for new sources and, as expeditiously as practicable, but not later than the date 3 years after the permit is issued for existing sources or such other compliance date as would apply under subsection (i).

Several petitioners filed for review of several provisions of the section 112(j) rule that they believed needed to be clarified or streamlined. The amendments to the section 112(j) rule being proposed today constitute the outcome of settlement negotiations between the EPA and the litigants. In addition, we have made other clarifying changes we consider to be appropriate.

## II. Proposed Amendments to the General Provisions

### A. Presumptive Applicability of the General Provisions

We are proposing to amend the presumptive applicability of 40 CFR part 63, subpart A (General Provisions). The promulgated rule applies, in its entirety (§§ 63.1 through 63.15), to owners or operators of an affected source subject to a relevant subpart established under 40 CFR part 63, unless otherwise indicated in the subpart. This presumption was intended to eliminate the repetition of requirements that would be applicable to all owners or operators affected by the General Provisions. To date, relevant subparts typically include a General Provisions applicability table that delineates the provisions that apply and do not apply.

We recognized concern that potential confusion could result by applying the General Provisions presumptively when they are not tailored to the circumstances of each relevant subpart. For example, a relevant subpart could indicate that all of the monitoring requirements of § 63.8 of the General Provisions apply. Some of the requirements in § 63.8 are inappropriate for some sources and may confuse an owner or operator (e.g., requirements for continuous opacity monitoring systems (COMS) in § 63.8 are not appropriate for all sources).

The objective of the General Provisions, i.e., to avoid repetitive redrafting of common provisions in each subpart of the part, is valid and should be preserved. Therefore, today we are proposing a revised applicability of the General Provisions that would retain the benefits and reduce or eliminate the potential for confusion. This proposed action would not reduce or narrow the scope of applicable requirements. Instead, it would reduce the confusion as to the actual requirements of each applicable subpart.

We have determined that the dual objectives of efficiency and clarity can best be met by including in each part 63 subpart a table that specifies precisely which subpart A General Provisions are and are not included in such subpart. Many existing part 63 subparts already include such a table, and this has been very helpful for both the regulatory authorities and the regulated community. These tables specify applicability down to the subparagraph level of detail so that there is no doubt as to the total universe of applicable General Provisions. In some instances, we have determined that a general provision should apply but that a very minor change to that provision is appropriate for a specific standard. In such cases, we may indicate in the table that the general provision does apply but with that minor change, or we may indicate in the table that the general provision does not apply. In the latter case, the appropriate requirement would be set out in its entirety in the subpart. Either approach is acceptable provided there is no compromise to clarity.

To streamline part 63 subparts and to avoid imposing conflicting requirements on sources subject to more than one part 63 subpart or to subparts under other parts, we have often allowed compliance with one subpart (sometimes with some changes) to constitute compliance with the other(s). We recognize that each subpart incorporates some or all of the General Provisions of the part under which it is promulgated. Therefore, if a part 63 subpart incorporates portions of other subparts, we will clarify the precise extent to which the General Provisions that are incorporated in other subparts become incorporated in the part 63 subpart in a table of General Provision applicability for each part, and we will explicitly state the resolution of any conflicts between applicable General Provisions of the various parts. It is important to note that, in addition to the changes to the presumptive applicability of the General Provisions, today's proposal includes changes to a number of other sections of the General Provisions (e.g., definitions). The effect of the proposed changes on relevant subparts that have already been promulgated depends on the manner in which the General Provisions were incorporated into the relevant subparts. If a relevant subpart specifically set out General Provisions that are subject to today's proposal (i.e., wrote the relevant General Provision in the relevant subpart itself), then that subpart is not affected since today's proposal pertains only to the General Provisions and does not include a proposal to change the specific provisions of promulgated subparts.

However, if a relevant subpart incorporates by reference General Provisions that are subject to today's proposal or if the General Provisions presumptively applied to a relevant subpart, then the changes to the General Provisions being proposed today would apply to the extent that the changed provisions are incorporated by reference into, or presumptively apply to, the existing relevant subpart. Based on an analysis of the potential impact of these proposed changes on promulgated subparts, we do not believe they have disrupted the integrity of the promulgated subparts. We have not identified any conflicts that would result in contradictory or incompatible effects from the promulgation of today's proposed amendments. Also, we identified no cross-reference conflicts due to adding or deleting paragraphs or subparagraphs that were cross-referenced by previously promulgated part 63 subparts. However, we are requesting comment on any conflicts identified by others that result solely from applying these proposed amendments to the General Provisions to promulgated part 63 subparts.

### B. Definition of Affected Source

#### 1. Background on the Term "Affected Source"

The General Provisions define the term "affected source" to be "* * * the stationary source, the group of stationary sources, or the portion of a stationary source that is regulated by a relevant standard or other requirement established pursuant to section 112 of the Act." (40 CFR 63.2). We have defined and used this term primarily as

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 63**

**[FRL–7155–8]**

**RIN 2060–AF31**

**National Emission Standards for Hazardous Air Pollutants for Source Categories: General Provisions; and Requirements for Control Technology Determinations for Major Sources in Accordance with Clean Air Act Sections, Sections 112(g) and 112(j)**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule; amendments.

**SUMMARY:** On March 16, 1994, the EPA promulgated General Provisions for national emission standards for hazardous air pollutants (NESHAP) and other regulatory requirements that are established under section 112 of the Clean Air Act (CAA). In today's action, we are promulgating amendments to the General Provisions that revise and clarify several of the current provisions.

We are promulgating these amendments, in part, as a result of decisions reached in settlement negotiations conducted between petitioners who filed for review of the General Provisions and the EPA, as well as internal EPA discussions on issues regarding implementation of the General Provisions. The promulgated amendments also reflect our response to public comments.

In a separate action in today's **Federal Register**, we are also amending regulations on National Emission Standards for Hazardous Air Pollutants: Solvent Extraction for Vegetable Oil Production, in a direct final rule in order to resolve inconsistencies between that rule and these amendments to the General Provisions.

In addition, in today's action, we are promulgating amendments to the rule that establishes equivalent emission limitations by permit under section 112(j) of the CAA. The "section 112(j)" rule establishes requirements and procedures for owners or operators of major sources of hazardous air pollutants (HAP) and permitting authorities to comply with section 112(j). The section 112(j) rule was promulgated on May 20, 1994.

These amendments have been developed in response to settlement negotiations conducted between petitioners who filed for review of the section 112(j) rule and the EPA, as well as internal EPA discussions regarding implementation of the section 112(j)

rule. The promulgated amendments to the section 112(j) rule also reflect our response to public comments.

**EFFECTIVE DATE:** April 5, 2002.

**ADDRESSES:** Docket No. A–2001–02, Part 63 General Provisions (Subpart A) and Section 112(j) Regulations (Subpart B) Litigation Settlement Amendments, contains supporting information used in developing these amendments. This docket is located at the U.S. EPA, 401 M Street, SW, Washington, DC 20460 in room M–1500, Waterside Mall (ground floor), and is available for public inspection and copying from 8:30 a.m. through 5:30 p.m., Monday through Friday, excluding legal holidays. A reasonable fee may be charged for copying.

**FOR FURTHER INFORMATION CONTACT:** For information concerning applicability and rule determinations, contact your State or local permitting agency representative or the appropriate EPA Regional Office representative. For further information concerning the development of these rule amendments, contact Mr. Rick Colyer, U.S. EPA, Office of Air Quality Planning and Standards, Minerals and Inorganic Chemicals Group, C504–05, Research Triangle Park, North Carolina, 27711, telephone (919) 541–5262, *e-mail colyer.rick@epa.gov*.

**SUPPLEMENTARY INFORMATION:** *Docket.* The docket is an organized and complete file of the record compiled by EPA in the development of this rulemaking. The docket is a dynamic file because material is added throughout the rulemaking process. The docketing system is intended to allow members of the public and industries involved to readily identify and locate documents so that they can effectively participate in the rulemaking process. Along with the background information document and the proposal and promulgation preamble and standards for this rulemaking, the contents of the docket will serve as the record in the case of judicial review. (See section 307(d)(7)(A) of the CAA.) All these materials are available for review in the docket or copies may be mailed on request from the Air Docket by calling (202) 260–7548. A reasonable fee may be charged for copying docket materials.

*Worldwide Web (WWW).* In addition to being available in the docket, an electronic copy of today's promulgated rule amendments will also be available on the WWW through the Technology Transfer Network (TTN). Following the Administrator's signature, a copy of the rule will be posted on the TTN's policy and guidance page for newly proposed

or promulgated rules: *http://www.epa.gov/ttn/oarpg.* The TTN provides information and technology exchange in various areas of air pollution control. If more information regarding the TTN is needed, call the TTN HELP line at (919) 541–5384.

*Regulated Entities.* Categories and entities potentially regulated by this action include all section 112 source categories listed under section 112(c) of the CAA.

**Industry Group: Source Category**

*Fuel Combustion*

Combustion Turbines
Engine Test Facilities
Industrial Boilers
Institutional/Commercial Boilers
Process Heaters
Reciprocating Internal Combustion Engines
Rocket Testing Facilities

*Non-Ferrous Metals Processing*

Primary Aluminum Production
Primary Copper Smelting
Primary Lead Smelting
Primary Magnesium Refining
Secondary Aluminum Production
Secondary Lead Smelting

*Ferrous Metals Processing*

Coke By-Product Plants
Coke Ovens: Charging, Top Side, and Door Leaks
Coke Ovens: Pushing, Quenching, Battery Stacks
Ferroalloys Production: Silicomanganese and Ferromanganese
Integrated Iron and Steel Manufacturing
Iron Foundries Electric Arc Furnace (EAF) Operation
Steel Foundries
Steel Pickling—HCl Process Facilities and Hydrochloric Acid Regeneration

*Mineral Products Processing*

Alumina Processing
Asphalt Concrete Manufacturing
Asphalt Processing
Asphalt Roofing Manufacturing
Asphalt/Coal Tar Application—Metal Pipes
Clay Products Manufacturing
Lime Manufacturing
Mineral Wool Production
Portland Cement Manufacturing
Refractories Manufacturing
Taconite Iron Ore Processing
Wool Fiberglass Manufacturing

*Petroleum and Natural Gas Production and Refining*

Oil and Natural Gas Production
Natural Gas Transmission and Storage
Petroleum Refineries—Catalytic Cracking (Fluid and other) Units, Catalytic Reforming Units, and Sulfur Plant Units
Petroleum Refineries—Other Sources Not Distinctly Listed

*Liquids Distribution*

Gasoline Distribution (Stage 1)
Marine Vessel Loading Operations
Organic Liquids Distribution (Non-Gasoline)

*Surface Coating Processes*

Aerospace Industries
Auto and Light Duty Truck
Large Appliance
Magnetic Tapes
Manufacture of Paints, Coatings, and
    Adhesives
Metal Can
Metal Coil
Metal Furniture
Miscellaneous Metal Parts and Products
Paper and Other Webs
Plastic Parts and Products
Printing, Coating, and Dyeing of Fabrics
Printing/Publishing
Shipbuilding and Ship Repair
Wood Building Products
Wood Furniture

*Waste Treatment and Disposal*

Hazardous Waste Incineration
Municipal Landfills
Off-Site Waste and Recovery Operations
Publicly Owned Treatment Works (POTW)
    Emissions
Sewage Sludge Incineration
Site Remediation
Solid Waste Treatment, Storage and Disposal
    Facilities (TSDF)

*Agricultural Chemicals Production*

Pesticide Active Ingredient Production

*Fibers Production Processes*

Acrylic Fibers/Modacrylic Fibers Production
Rayon Production
Spandex Production

*Food and Agriculture Processes*

Manufacturing of Nutritional Yeast
Cellulose Food Casing Manufacturing
Vegetable Oil Production

*Pharmaceutical Production Processes*

Pharmaceuticals Production

*Polymers and Resins Production*

Acetal Resins Production
Acrylonitrile-Butadiene-Styrene Production
Alkyd Resins Production
Amino Resins Production
Boat Manufacturing
Butyl Rubber Production
Carboxymethylcellulose Production
Cellophane Production
Cellulose Ethers Production
Epichlorohydrin Elastomers Production
Epoxy Resins Production
Ethylene-Propylene Rubber Production
Flexible Polyurethane Foam Production
Hypalon (tm) Production
Maleic Anhydride Copolymers Production
Methylcellulose Production
Methyl Methacrylate-Acrylonitrile-
    Butadiene-Styrene Production
Methyl Methacrylate-Butadiene-Styrene
    Terpolymers Production
Neoprene Production
Nitrile Butadiene Rubber Production
Nitrile Resins Production
Non-Nylon Polyamides Production
Phenolic Resins Production
Polybutadiene Rubber Production
Polycarbonates Production
Polyester Resins Production
Polyether Polyols Production
Polyethylene Terephthalate Production

Polymerized Vinylidene Chloride Production
Polymethyl Methacrylate Resins Production
Polystyrene Production
Polysulfide Rubber Production
Polyvinyl Acetate Emulsions Production
Polyvinyl Alcohol Production
Polyvinyl Butyral Production
Polyvinyl Chloride and Copolymers
    Production
Reinforced Plastic Composites Production
Styrene-Acrylonitrile Production
Styrene-Butadiene Rubber and Latex
    Production

*Production of Inorganic Chemicals*

Ammonium Sulfate Production—
    Caprolactam By-Product Plants
Carbon Black Production
Chlorine Production
Cyanide Chemicals Manufacturing
Fumed Silica Production
Hydrochloric Acid Production
Hydrogen Fluoride Production
Phosphate Fertilizers Production
Phosphoric Acid Manufacturing
Uranium Hexafluoride Production

*Production of Organic Chemicals*

Ethylene Processes
Quaternary Ammonium Compounds
    Production
Synthetic Organic Chemical

*Miscellaneous Processes*

Benzyltrimethylammonium Chloride
    Production
Butadiene Dimers Production
Carbonyl Sulfide Production
Cellulosic Sponge Manufacturing
Chelating Agents Production
Chlorinated Paraffins
Chromic Acid Anodizing
Commercial Dry Cleaning
    (Perchloroethylene)—Transfer Machines
Commercial Sterilization Facilities
Decorative Chromium Electroplating
Dry Cleaning (Petroleum Solvent)
Ethylidene Norbornene Production
Explosives Production
Flexible Polyurethane Foam Fabrication
    Operations
Friction Products Manufacturing
Halogenated Solvent Cleaners
Hard Chromium Electroplating
Hydrazine Production
Industrial Dry Cleaning
    (Perchloroethylene)—Dry-to-Dry Machines
Industrial Dry Cleaning
    (Perchloroethylene)—Transfer Machines
Industrial Process Cooling Towers
Leather Tanning and Finishing Operations
OBPA/1,3-Diisocyanate Production
Paint Stripping Operations
Photographic Chemicals Production
Phthalate Plasticizers Production
Plywood and Composite Wood Products
Polyether Polyols Production
Pulp and Paper Production
Rubber Chemicals Manufacturing
Rubber Tire Manufacturing
Semiconductor Manufacturing
Symmetrical Tetrachloropyridine Production

*Categories of Area Sources*

Chromic Acid Anodizing
Commercial Dry Cleaning
    (Perchloroethylene)—Dry-to-Dry Machines

Commercial Dry Cleaning
    (Perchloroethylene)—Transfer Machines
Commercial Sterilization Facilities
Decorative Chromium Electroplating
Halogenated Solvent Cleaners
Hard Chromium Electroplating
Secondary Lead Smelting

This list is not intended to be
exhaustive, but rather provides a guide
for readers regarding entities likely to
be regulated by this action. To
determine whether you are regulated by
this action, you should examine the
section 112(d) regulation for your source
category. If you have any questions
regarding the applicability of this action
to a particular entity, consult the person
listed in the preceding **FOR FURTHER
INFORMATION CONTACT** section. Only
source categories for which standards
have not been promulgated by May 15,
2002, are affected by the section 112(j)
regulation.

*Judicial Review.* The amendments to
the General Provisions and the section
112(j) provisions were proposed on
March 23, 2001 (66 FR 16318). Today's
action announces EPA's final decision
on the amendments. Under section
307(b)(1) of the CAA, judicial review of
these amendments is available only by
filing a petition for review in the U.S.
Court of Appeals for the District of
Columbia Circuit by June 4, 2002. Under
section 307(d)(7)(B) of the CAA, only
those objections to this rule that were
raised with reasonable specificity
during the period for public comment
may be raised during judicial review.
Moreover, under section 307(b)(2) of the
CAA, the requirements that are the
subject of today's final rule may not be
challenged separately in civil or
criminal proceedings brought by the
EPA to enforce these requirements.

*Outline.* The information presented in
this preamble is organized as follows:

I. Background
    A. General Provisions
    B. Section 112(j) Provisions
II. What significant comments did we
    consider and what are the major changes
    to the proposed amendments to the
    General Provisions?
    A. Comments and Changes in Response to
    Our Requests for Comments
    B. Other Comments and Changes
III. What significant comments did we
    consider and what are the major changes
    to the proposed amendments to the
    section 112(j) provisions?
    A. Impact of Missing the Section 112(j)
    Deadline
    B. Comments and Changes in Response to
    our Requests for Comments
    C. Other Comments and Changes
IV. What is the section 112(j) process?
    A. If I am an owner or operator of a source,
    what must I do?

B. If I am the permitting authority for a source subject to section 112(j), what must I do?

C. What happens when a rule comes out after the hammer date for a given source category?

V. What are the environmental, energy, cost, and economic impacts of this rule?

VI. What are the administrative requirements for this rule?

A. Executive Order 12866, Regulatory Planning and Review

B. Paperwork Reduction Act

C. Executive Order 13132, Federalism

D. Executive Order 13175, Consultation and Coordination with Indian Tribal Governments

E. Unfunded Mandates Reform Act of 1995

F. Regulatory Flexibility Act (RFA) as Amended by Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), 5 U.S.C. 601 *et seq.*

G. National Technology Transfer and Advancement Act of 1995

H. Executive Order 13045, Protection of Children from Environmental Health Risks and Safety Risks

I. Congressional Review Act

J. Executive Order 13211, Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use

**I. Background**

*A. General Provisions*

Section 112 of the CAA requires us to list categories and subcategories of major sources and area sources of HAP and to establish NESHAP for the listed source categories and subcategories. Major sources of HAP are those that have the potential to emit greater than 10 tons per year of any one HAP or 25 tons per year of any combination of HAP. Area sources of HAP are those sources that do not have potential to emit greater than 10 tons per year of any one HAP and 25 tons per year of any combination of HAP. The General Provisions to 40 CFR part 63 establish the framework for emission standards and other requirements developed pursuant to section 112(d) of the CAA. The General Provisions eliminate the repetition of general information and requirements in individual NESHAP by consolidating all generally applicable information in one location. They include sections on applicability, definitions, compliance dates and requirements, monitoring, recordkeeping and reporting, among others. In addition, they include administrative sections concerning actions that the EPA (or delegated authorities) must take, such as making determinations of applicability, reviewing applications for approval of new construction, responding to requests for extensions or waivers of applicable requirements, and generally enforcing national standards for controlling toxic air pollutants. The General Provisions become applicable to a section 112(d) source category rule when the source category rule is promulgated and becomes effective.

The General Provisions to part 63 were developed in a collaborative process that included input from industry and other interested parties. On August 11, 1993, we proposed the General Provisions in the **Federal Register** (58 FR 42760). We received numerous comments on that proposal from industry groups, environmental groups, and State and local agencies. Those comments addressed a wide range of issues and requirements in the proposed rulemaking. We published our final decisions regarding the General Provisions in the **Federal Register** on March 16, 1994 (59 FR 12408). In the preamble to the promulgated rule, we discussed major comments on the proposal and our responses to those comments. We addressed other comments in the Background Information Document (BID) for the promulgated rulemaking (EPA–450/3–91–019b). In responding to comments, we made some changes and some clarifications to the final package and retained other provisions where the Agency believed it was appropriate to do so.

On May 16, 1994, six petitioners filed for review of the General Provisions. They cited a variety of issues raised in comments on the proposed rule whose resolution they believed to be inappropriate. In addition, we identified other changes that would clarify the EPA's original intent. On March 23, 2001 (66 FR 16318), we proposed changes to the General Provisions based on the outcome of settlement negotiations between the EPA and the petitioners, as well as on other internal EPA deliberations. We received 27 public comment letters in response to our proposal. In section II of this preamble, we discuss our responses to these public comments and the specific changes that were made to the proposed amendments to reflect our responses. The amendments to the General Provisions being promulgated today reflect decisions which we made in connection with settlement negotiations between the EPA and the petitioners, and our responses to the public comments on the proposed amendments.

In a separate action, we are promulgating changes to the Vegetable Oil NESHAP in response to public comments on the proposed amendments to the General Provisions. These changes are discussed briefly in section II of this preamble and more extensively in the preamble to the direct final action on the Vegetable Oil NESHAP.

The amendments finalized with today's action clarify and alter certain sections of the General Provisions.

*B. Section 112(j) Provisions*

The 1990 Amendments to section 112 of the CAA included a new section 112(j) which is entitled "Equivalent Emission Limitation by Permit." Section 112(j)(2) provides that the provisions of section 112(j) apply if the EPA misses a deadline for promulgation of a standard under section 112(d) established in the source category schedule for standards. After the effective date of a title V permit program in a State, section 112(j)(3) requires the owner or operator of a major source in a source category for which the EPA failed to promulgate a section 112(d) standard to submit a permit application 18 months after the missed promulgation deadline. Section 112(j)(5) also specifies that if the applicable criteria for voluntary early reductions established under section 112(i)(5) are met, then this alternative emission limit satisfies the requirements of section 112(j), provided that the emissions reductions are achieved by the missed promulgation date.

The rule proposing to implement section 112(j) of the CAA was published on July 13, 1993 (58 FR 37778). Public comments received on the proposed rule were considered, and changes we deemed appropriate were made in developing a final rule.

On May 20, 1994 (59 FR 26429), we issued a final rule for implementing section 112(j). That rule requires major source owners or operators to submit a permit application by the date 18 months after a missed date on the regulatory schedule. As required under section 112(j) of the CAA, the section 112(j) rule establishes requirements for the content of permit applications, contains provisions governing the establishment of the maximum achievable control technology (MACT)-equivalent emission limitations by the permitting authority, includes the criteria for the reviewing authority to determine completeness, and allows the applicant up to 6 months to revise and resubmit the application. As required in section 112(j)(5) of the CAA, the rule also establishes compliance dates:

No such pollutant may be emitted in amounts exceeding an emission limitation contained in a permit immediately for new sources and, as expeditiously as practicable, but not later than the date 3 years after the permit is issued for existing sources or such other compliance date as would apply under subsection (i).

Several petitioners filed for review of several provisions of the section 112(j) rule that they believed needed to be clarified or streamlined. On March 23, 2001 (66 FR 16318), we proposed changes to the section 112(j) rule based on the outcome of settlement negotiations between the EPA and the petitioners, as well as on other internal EPA deliberations. We received 27 public comment letters in response to our proposal. In section III of this preamble, we discuss our responses to these public comments and the specific changes that were made to the proposed section 112(j) amendments to reflect those public comments. The amendments to the section 112(j) rule being promulgated today reflect decisions which we made in connection with settlement negotiations between the EPA and the litigants, as well as our response to the public comments on the proposed amendments.

## II. What Significant Comments Did We Consider and What Are the Major Changes to the Proposed Amendments to the General Provisions?

While we received many comments on the proposed amendments to the General Provisions, most commenters expressed general support for the proposed changes. For this reason, the majority of amendments were promulgated as proposed. A comprehensive summary of public comments and responses can be found in "National Emission Standards for Hazardous Air Pollutants for Source Categories: General Provisions and Requirements for Control Technology Determinations for Major Sources in Accordance with Clean Air Act Sections, Sections 112(g) and 112(j)—Background Information for Standards," (EPA 453/R–02–002). This preamble discusses the significant comments received and major changes made. Additional minor changes and clarifications are discussed in the Background Information Document (BID) cited above. In the proposed amendments to the General Provisions, we specifically discussed and solicited comments on certain issues. In addition, we received comments on other proposed amendments to the General Provisions.

### A. Comments and Changes in Response to Our Requests for Comments

In the proposal preamble, we discussed the presumptive applicability of the General Provisions, which has been an issue of concern for industry petitioners. We believe that the presumptive applicability of the General Provisions serves an important and valid purpose by eliminating the repetition of common provisions in individual NESHAP. While we reiterated that the General Provisions do apply unless specifically overridden, we acknowledged the potential for confusion regarding the actual requirements for sources when General Provisions requirements are not tailored to specific source categories. For several years, we have included a table for most part 63 subparts that indicates the applicability of each provision of the General Provisions to a particular subpart. To codify this practice, we proposed to amend the General Provisions to require individual subparts to explicitly state which General Provisions requirements are included in the relevant standard and which are not.

In addition, we requested comment on "any conflicts * * * that result solely from applying these proposed amendments to the General Provisions to promulgated part 63 subparts." One commenter identified such a conflict between the startup, shutdown, malfunction (SSM) provisions of the Vegetable Oil Production NESHAP and those provisions in the General Provisions. Specifically, the commenter noted that proposed 40 CFR 63.6(e)(3)(iv), which requires reporting of actions inconsistent with the Startup, Shutdown, and Malfunction Plan (SSMP) if the emissions exceed the relevant standard, does not comport with subpart GGGG. The Vegetable Oil NESHAP require reporting of such actions regardless of whether the standard was exceeded. The commenter also specifically noted that proposed 40 CFR 63.6(e)(3)(viii), the requirement to report modifications to the SSMP in the semiannual report, should not apply to sources subject to subpart GGGG, as subpart GGGG does not require a semiannual report.

We agree that the proposed amendments would have had a substantive impact on the Vegetable Oil NESHAP. However, the commenter has misinterpreted the intent of the changes, which was to reduce burden.

We agree with the commenter's assessment that certain SSM provisions in the proposed amendments are inconsistent with the promulgated Vegetable Oil NESHAP. We had previously reviewed the existing rules and did not identify any substantive problems. However, the Vegetable Oil NESHAP were promulgated after our review and subsequent proposal of the amendments. We have discussed the implications with the commenter and as a result, we are amending, in a separate **Federal Register** notice, several provisions in the Vegetable Oil NESHAP related to SSM requirements to eliminate unintended inconsistencies. The Vegetable Oil NESHAP include specifically tailored SSM provisions and, thus, sources covered by the Vegetable Oil NESHAP should look to that rule for their applicable SSM provisions.

Specifically, we are correcting the explanation column of Table 1 of 40 CFR 63.2870 as it applies to 40 CFR 63.6(e) to state, "implement your plan as specified in § 63.2852." Table 1 also now indicates specifically that 40 CFR 63.6(e)(3)(iii), (iv), and (viii) do not apply to Vegetable Oil NESHAP affected sources; this clarifies that not all of 40 CFR 63.6(e) applies, as the rule was originally promulgated.

We are also amending the first sentence of 40 CFR 63.2861(d) to clarify that owners or operators must submit an immediate SSM report if an SSM is handled differently from the procedures in the SSM plan and the emission standards are exceeded. We are also amending the third sentence of 40 CFR 63.2852 to clarify that the SSMP does not have to be incorporated into the title V permit, consistent with the General Provisions amendments.

These changes will ensure the minimization of emissions at all times, clarify the SSM requirements, and specify the relationship of the General Provisions to Vegetable Oil NESHAP affected sources.

### B. Other Comments and Changes

#### 1. Substantially Equivalent State Preconstruction Review

We proposed substantive amendments to the preconstruction review program, which were designed to clarify and streamline existing requirements. Included in these amendments was a provision that allows States or local agencies to use preconstruction review procedures used for other purposes for purposes of 40 CFR 63.5, provided their procedures are "substantially equivalent."

While one commenter generally supported this concept, a few commenters disagreed with the specific provisions in proposed 40 CFR 63.5(f)(1)(i) and (ii), which they interpreted as requiring each owner or operator to demonstrate that the State or local agency review is substantially equivalent to the relevant requirements in 40 CFR 63.5. The commenters instead believed that EPA should determine which State or local air permit programs have substantially equivalent preconstruction review requirements. One commenter noted that if EPA has

EPA nonetheless has tried to reduce the impact of the rule amendments on small entities. We have extended the time between application deadlines for the Part 1 and Part 2 submittals so that all 10-year MACT standards would be promulgated before any Part 2 applications are due. We have also minimized the required information in the Part 1 permit application. Although we expect some small businesses to be affected by the section 112(j) permit application requirement, we cannot determine how many. In any event, the impact would be insignificant. Furthermore, the net effect of these rule amendments to the existing rule will be to reduce potential regulatory burdens.

*G. National Technology Transfer and Advancement Act of 1995*

Section 12(d) of the National Technology Transfer and Advancement Act (NTTAA) of 1995, (Public Law No. 104–113) (15 U.S.C. 272 note), directs the EPA to use voluntary consensus standards in their regulatory and procurement activities unless to do so would be inconsistent with applicable law or otherwise impractical. Voluntary consensus standards are technical standards (e.g., materials specifications, test methods, sampling procedures, business practices) developed or adopted by one or more voluntary consensus bodies. The NTTAA directs the EPA to provide Congress, through annual reports to OMB, with explanations when an agency does not use available and applicable voluntary consensus standards.

The final amendments to the General Provisions do not include any technical standards; they consist primarily of revisions to the generally applicable procedural and administrative requirements that the General Provisions overlay on NESHAP. The final amendments to the section 112(j) rule, which establishes requirements and procedures for owners or operators of major sources of HAP and permitting authorities to follow if the EPA misses the deadline for promulgation of section 112(d) standards, clarify and amend current procedural and administrative provisions to establish equivalent emissions limitations by permit. Therefore, section 112(j) is also not a vehicle for the application of voluntary consensus standards.

*H. Executive Order 13045, Protection of Children from Environmental Health Risks and Safety Risks*

Executive Order 13045 (62 FR 19885, April 23, 1997) applies to any rule that (1) is determined to be ''economically significant'' as defined under Executive Order 12866, and (2) concerns an environmental health or safety risk that EPA has reason to believe may have a disproportionate effect on children. If the regulatory action meets both criteria, the Agency must evaluate the environmental health or safety effects of the planned rule on children and explain why the planned regulation is preferable to other potentially effective and reasonable alternatives considered by the Agency.

The EPA interprets Executive Order 13045 as applying only to those regulatory actions that are based on health or safety risks, such that the analysis required under section 5–501 of the Executive Order has the potential to influence the regulation. The final amendments to the General Provisions are not subject to Executive Order 13045 because the provisions provide general technology performance and compliance guidelines for section 112(d) standards, which are not based on health or safety risks. Likewise, the final amendments to the section 112(j) rule are not subject to Executive Order 13045 because they establish the process for developing case-by-case MACT, and thus are based on technology performance and not on safety or health risks.

*I. Congressional Review Act*

The Congressional Review Act, 5 U.S.C. 801 *et seq.*, as added by the SBREFA, generally provides that before a rule may take effect, the agency promulgating the rule must submit a rule report, which includes a copy of the rule, to each House of the Congress and to the Comptroller General of the United States. Therefore, we will submit a report containing the final amendments and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States prior to publication of the rule in the **Federal Register**. A major rule cannot take effect until 60 days after it is published in the **Federal Register**. These final amendments are not a ''major rule'' as defined by 5 U.S.C. 804(2), and therefore will be effective April 5, 2002.

*J. Executive Order 13211, Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution or Use*

The final amendments are not subject to Executive Order 13211, ''Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use'' (66 FR 28355, May 22, 2001) because it is not a significant regulatory action under Executive Order 12866.

List of Subjects in 40 CFR Part 63

Environmental protection, Administrative practice and procedure, Air pollution control, Hazardous substances, Intergovernmental relations, Reporting and recordkeeping requirements.

Dated: March 5, 2002.

**Christine Todd Whitman,**
*Administrator.*

For the reasons cited in the preamble, part 63, title 40, chapter I of the Code of Federal Regulations is amended as follows:

PART 63—[AMENDED]

1. The authority citation for part 63 continues to read as follows:

**Authority:** 42 U.S.C. 7401, *et seq.*

Subpart A—[Amended]

2. Section 63.1 is amended by:
a. Revising paragraphs (a)(3) and (4);
b. Removing and reserving paragraphs (a)(7) and (a)(8);
c. Removing paragraphs (a)(13) and (14);
d. Removing and reserving paragraph (b)(2);
e. Revising paragraph (b)(3);
f. Revising paragraphs (c)(1), (c)(2) introductory text and (c)(2)(iii);
g. Removing and reserving paragraph (c)(4); and
h. Revising paragraph (e).
The revisions read as follows:

**§ 63.1    Applicability.**

(a) * * *
(3) No emission standard or other requirement established under this part shall be interpreted, construed, or applied to diminish or replace the requirements of a more stringent emission limitation or other applicable requirement established by the Administrator pursuant to other authority of the Act (section 111, part C or D or any other authority of this Act), or a standard issued under State authority. The Administrator may specify in a specific standard under this part that facilities subject to other provisions under the Act need only comply with the provisions of that standard.

(4)(i) Each relevant standard in this part 63 must identify explicitly whether each provision in this subpart A is or is not included in such relevant standard.

(ii) If a relevant part 63 standard incorporates the requirements of 40 CFR part 60, part 61 or other part 63 standards, the relevant part 63 standard

must identify explicitly the applicability of each corresponding part 60, part 61, or other part 63 subpart A (General) provision.

(iii) The General Provisions in this subpart A do not apply to regulations developed pursuant to section 112(r) of the amended Act, unless otherwise specified in those regulations.

\*   \*   \*   \*   \*

(7) [Reserved]
(8) [Reserved]

\*   \*   \*   \*   \*

(b) \* \* \*
(2) [Reserved]
(3) An owner or operator of a stationary source who is in the relevant source category and who determines that the source is not subject to a relevant standard or other requirement established under this part must keep a record as specified in § 63.10(b)(3).

(c) \* \* \*
(1) If a relevant standard has been established under this part, the owner or operator of an affected source must comply with the provisions of that standard and of this subpart as provided in paragraph (a)(4) of this section.

(2) Except as provided in § 63.10(b)(3), if a relevant standard has been established under this part, the owner or operator of an affected source may be required to obtain a title V permit from a permitting authority in the State in which the source is located. Emission standards promulgated in this part for area sources pursuant to section 112(c)(3) of the Act will specify whether—

\*   \*   \*   \*   \*

(iii) If a standard fails to specify what the permitting requirements will be for area sources affected by such a standard, then area sources that are subject to the standard will be subject to the requirement to obtain a title V permit without any deferral.

\*   \*   \*   \*   \*

(4) [Reserved]

\*   \*   \*   \*   \*

(e) If the Administrator promulgates an emission standard under section 112(d) or (h) of the Act that is applicable to a source subject to an emission limitation by permit established under section 112(j) of the Act, and the requirements under the section 112(j) emission limitation are substantially as effective as the promulgated emission standard, the owner or operator may request the permitting authority to revise the source's title V permit to reflect that the emission limitation in the permit satisfies the requirements of the promulgated emission standard. The process by which the permitting authority determines whether the

section 112(j) emission limitation is substantially as effective as the promulgated emission standard must include, consistent with part 70 or 71 of this chapter, the opportunity for full public, EPA, and affected State review (including the opportunity for EPA's objection) prior to the permit revision being finalized. A negative determination by the permitting authority constitutes final action for purposes of review and appeal under the applicable title V operating permit program.

3. Section 63.2 is amended by:
a. Revising the definition of *Affected source*;
b. Revising the definition of *Commenced*;
c. Revising the definition of *Construction*;
d. Revising paragraph (2) in the definition of *Effective date*;
e. Revising the definition of *Equivalent emission limitation*;
f. Revising paragraph (6) in the definition of *Federally enforceable*;
g. Revising the first sentence in the definition of *Malfunction*;
h. Revising the definition of *New source*;
i. Revising the introductory text in the definition of *Reconstruction*;
j. Amending the definition of *Relevant standard* by revising the first sentence of paragraph (4); running the undesignated paragraph at the end of paragraph (4) into pargraph (4), and revising the last sentence of newly designated text in paragraph (4);
k. Revising the definition of *Shutdown*;
l. Revising the definition of *Startup*;
m. By adding in alphabetical order definitions for *Monitoring, New affected source*, and *Working day*; and
n. By removing definitions for *Compliance plan, Lesser quantity*, and *Part 70 permit.*

The revisions and additions read as follows:

§ 63.2  **Definitions.**

\*   \*   \*   \*   \*

*Affected source*, for the purposes of this part, means the collection of equipment, activities, or both within a single contiguous area and under common control that is included in a section 112(c) source category or subcategory for which a section 112(d) standard or other relevant standard is established pursuant to section 112 of the Act. Each relevant standard will define the "affected source," as defined in this paragraph unless a different definition is warranted based on a published justification as to why this definition would result in significant

administrative, practical, or implementation problems and why the different definition would resolve those problems. The term "affected source," as used in this part, is separate and distinct from any other use of that term in EPA regulations such as those implementing title IV of the Act. Affected source may be defined differently for part 63 than affected facility and stationary source in parts 60 and 61, respectively. This definition of "affected source," and the procedures for adopting an alternative definition of "affected source," shall apply to each section 112(d) standard for which the initial proposed rule is signed by the Administrator after June 30, 2002.

\*   \*   \*   \*   \*

*Commenced* means, with respect to construction or reconstruction of an affected source, that an owner or operator has undertaken a continuous program of construction or reconstruction or that an owner or operator has entered into a contractual obligation to undertake and complete, within a reasonable time, a continuous program of construction or reconstruction.

\*   \*   \*   \*   \*

*Construction* means the on-site fabrication, erection, or installation of an affected source. Construction does not include the removal of all equipment comprising an affected source from an existing location and reinstallation of such equipment at a new location. The owner or operator of an existing affected source that is relocated may elect not to reinstall minor ancillary equipment including, but not limited to, piping, ductwork, and valves. However, removal and reinstallation of an affected source will be construed as reconstruction if it satisfies the criteria for reconstruction as defined in this section. The costs of replacing minor ancillary equipment must be considered in determining whether the existing affected source is reconstructed.

\*   \*   \*   \*   \*

*Effective date* means: \* \* \*
(2) With regard to an alternative emission limitation or equivalent emission limitation determined by the Administrator (or a State with an approved permit program), the date that the alternative emission limitation or equivalent emission limitation becomes effective according to the provisions of this part.

\*   \*   \*   \*   \*

*Equivalent emission limitation* means any maximum achievable control technology emission limitation or requirements which are applicable to a

(2) *Alternative inspection method.* An inspection of a property will be valid for purposes of this paragraph if:

(i) The inspection was conducted pursuant to the requirements of a Federal, State, or local housing program (including, but not limited to, the Home investment partnership program under title II of the Cranston-Gonzalez National Affordable Housing Act or the low-income housing tax credit program under section 42 of the Internal Revenue Code of 1986);

(ii) If the inspection was not conducted pursuant to the requirements of a Federal housing program, the public housing agency has certified to the Secretary that such standard or requirement provides the same (or greater) protection to occupants of inspected dwelling units;

(iii) Pursuant to the inspection, the property was determined to meet the requirements regarding housing quality or safety applicable to properties assisted under such program; and

(iv) The inspection was conducted within the past 2 years.

(g) *Continuum of Care coordinated assessment.* Grantees must participate in the development, implementation, and ongoing operations of their local Continuum of Care's coordinated assessment system, or equivalent, as described in the McKinney-Vento Act, as amended by the HEARTH Act (42 U.S.C. 11302).

* * * * *

(The Office of Management and Budget has approved the information collection provisions in this section under control number 2900–0757.)

■ 11. Add § 62.38 to read as follows:

**§ 62.38   Ineligible activities.**

Notwithstanding any other section in this part, grantees are not authorized to use supportive services grant funds to pay for the following:

(a) Mortgage costs or costs needed by homeowners to assist with any fees, taxes, or other costs of refinancing.

(b) Construction or rehabilitation of buildings.

(c) Home care and home health aides typically used to provide care in support of daily living activities. This includes care that is focused on treatment for an injury or illness, rehabilitation, or other assistance generally required to assist with handicaps or other physical limitations.

(d) Credit card bills or other consumer debt.

(e) Medical or dental care and medicines.

(f) Direct cash assistance to participants.

(g) Court-ordered judgments or fines, except for those supported under § 62.34(a)(1).

(h) Pet care.

(i) Entertainment activities.

(Authority: 38 U.S.C. 501, 2044)

■ 12. Amend § 62.60 by adding a parenthetical at the end of the section to read as follows:

**§ 62.60   Program or budget changes and corrective action plans.**

* * * * *

(The Office of Management and Budget has approved the information collection provisions in this section under control number 2900–0757.)

[FR Doc. 2015–03753 Filed 2–23–15; 8:45 am]

**BILLING CODE 8320–01–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Parts 60, 61, and 63**

**[EPA–R06–OAR–2010–1054; FRL–9923–11– Region 6]**

**New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants; Delegation of Authority to Louisiana**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Direct final rule; delegation of authority.

**SUMMARY:** The Louisiana Department of Environmental Quality (LDEQ) has submitted updated regulations for receiving delegation of Environmental Protection Agency (EPA) authority for implementation and enforcement of New Source Performance Standards (NSPS) and National Emission Standards for Hazardous Air Pollutants (NESHAPs) for all sources (both part 70 and non-part 70 sources). The delegation of authority under this action does not apply to sources located in Indian Country. EPA is providing notice that it is updating the delegation of certain NSPS to LDEQ, and taking direct final action to approve the delegation of certain NESHAPs to LDEQ.

**DATES:** This rule is effective on April 27, 2015 without further notice, unless EPA receives relevant adverse comment by March 26, 2015. If EPA receives such comment, EPA will publish a timely withdrawal in the **Federal Register** informing the public that the updated NESHAPs delegation will not take effect; however, the NSPS delegation will not be affected by such action.

**ADDRESSES:** Submit your comments, identified by Docket ID No. EPA–R06–

OAR–2007–0488, by one of the following methods:

• *www.regulations.gov.* Follow the on-line instructions.

• *Email:* Mr. Rick Barrett at *barrett.richard@epa.gov.* Please also send a copy by email to the person listed in the **FOR FURTHER INFORMATION CONTACT** section below.

• *Mail or delivery:* Mr. Rick Barrett, Air Permits Section (6PD–R), Environmental Protection Agency, 1445 Ross Avenue, Suite 1200, Dallas, Texas 75202–2733.

*Instructions:* Direct your comments to Docket No. EPA–R06–OAR–2007–0488. EPA's policy is that all comments received will be included in the public docket without change and may be made available online at *http:// www.regulations.gov,* including any personal information provided, unless the comment includes information claimed to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Do not submit information through *http://www.regulations.gov* or email, if you believe that it is CBI or otherwise protected from disclosure. The *http:// www.regulations.gov* Web site is an ''anonymous access'' system, which means EPA will not know your identity or contact information unless you provide it in the body of your comment. If you send an email comment directly to EPA without going through *http:// www.regulations.gov,* your email address will be automatically captured and included as part of the comment that is placed in the public docket and made available on the Internet. If you submit an electronic comment, EPA recommends that you include your name and other contact information in the body of your comment along with any disk or CD–ROM submitted. If EPA cannot read your comment due to technical difficulties and cannot contact you for clarification, EPA may not be able to consider your comment. Electronic files should avoid the use of special characters and any form of encryption and be free of any defects or viruses. For additional information about EPA's public docket, visit the EPA Docket Center homepage at *http:// www.epa.gov/epahome/dockets.htm.*

*Docket:* The index to the docket for this action is available electronically at *www.regulations.gov* and in hard copy at EPA Region 6, 1445 Ross Avenue, Suite 700, Dallas, Texas. While all documents in the docket are listed in the index, some information may be publicly available only at the hard copy location (*e.g.,* copyrighted material), and some may not be publicly available at either location (*e.g.,* CBI).

**FOR FURTHER INFORMATION CONTACT:** Mr. Rick Barrett, (214) 665–7227, *barrett.richard@epa.gov*. To inspect the hard copy materials, please schedule an appointment with Mr. Barrett or Mr. Bill Deese at (214) 665–7253.

**SUPPLEMENTARY INFORMATION:** Throughout this document "we," "us," or "our" refers to EPA.

## Table of Contents

I. What does this action do?
II. What is the authority for delegation?
III. What criteria must Louisiana's programs meet to be approved?
IV. How did LDEQ meet the approval criteria?
V. What is being delegated?
VI. What is not being delegated?
VII. How will applicability determinations be made?
VIII. What authority does EPA have?
IX. What information must LDEQ provide to EPA?
X. What is EPA's oversight role?
XI. Should sources submit notices to EPA or LDEQ?
XII. How will unchanged authorities be delegated to LDEQ in the future?
XIII. Final Action
XIV. Statutory and Executive Order Reviews

## I. What does this action do?

EPA is providing notice that it is delegating authority for implementation and enforcement of certain NSPS to LDEQ. EPA is also taking direct final action to approve the delegation of certain NESHAPs to LDEQ. With this delegation, LDEQ has the primary responsibility to implement and enforce the delegated standards.

## II. What is the authority for delegation?

Section 111(c)(1) of the Clean Air Act (CAA) authorizes EPA to delegate authority to any state agency which submits adequate regulatory procedures for implementation and enforcement of the NSPS program. The NSPS standards are codified at 40 CFR part 60.

Section 112(l) of the CAA and 40 CFR part 63, subpart E, authorizes EPA to delegate authority to any state or local agency which submits an adequate regulatory program for implementation and enforcement of emission standards for hazardous air pollutants. The hazardous air pollutant standards are codified at 40 CFR parts 61 and 63.

## III. What criteria must Louisiana's programs meet to be approved?

In order to receive delegation of NSPS, a state must develop and submit to the EPA a procedure for implementing and enforcing the NSPS in the state, and their regulations and resources must be adequate for the implementation and enforcement of the NSPS. EPA initially approved

Louisiana's program for the delegation of NSPS on February 22, 1982 (47 FR 07665). EPA reviewed the laws of the State and the rules and regulations of the Louisiana Department of Natural Resources (now the LDEQ) and determined the State's procedures, regulations and resources adequate for the implementation and enforcement of the NSPS program. This action notifies the public that EPA is updating LDEQ's delegation to implement and enforce certain additional NSPS.

As to the NESHAP standards in 40 CFR parts 61 and 63, section 112(l)(5) of the CAA enables EPA to approve state air toxics programs or rules to operate in place of the Federal air toxics program or rules. 40 CFR part 63, subpart E governs EPA's approval of State programs or rules under section 112(l).

EPA will approve the State's submittal of a program for implementation and enforcement of the NESHAPs if we find that:

(1) The State program is "no less stringent" than the corresponding Federal program or rule;

(2) The State has adequate authority and resources to implement the program;

(3) The schedule for implementation and compliance is sufficiently expeditious; and

(4) The program otherwise complies with Federal guidance.

In order to obtain approval of its program to implement and enforce Federal section 112 rules as promulgated without changes (straight delegation), a State must demonstrate that it meets the approval criteria of 40 CFR 63.91(d). 40 CFR 63.91(d)(3) provides that interim or final Title V program approval will satisfy the criteria of 40 CFR 63.91(d) for part 70 sources (sources required to obtain operating permits pursuant to Title V of the Clean Air Act).

## IV. How did LDEQ meet the approval criteria?

As to the NSPS standards in 40 CFR part 60, LDEQ adopted the Federal standards via incorporation by reference. The LDEQ regulations are, therefore, at least as stringent as EPA's rules. See 40 CFR 60.10(a). Also, in the EPA initial approval of NSPS delegation, we determined that the State developed procedures for implementing and enforcing the NSPS in the State, and that the State's regulations and resources are adequate for the implementation and enforcement of the NSPS program. See 47 FR 07665 (February 22, 1982).

As to the NESHAP standards in 40 CFR parts 61 and 63, as part of its Title V submission LDEQ stated that it intended to use the mechanism of incorporation by reference to adopt unchanged Federal section 112 standards into its regulations. This commitment applied to both existing and future standards as they applied to part 70 sources. EPA's final interim approval of Louisiana's Title V operating permits program delegated the authority to implement certain NESHAPs to the State. See 60 FR 17750 (April 7, 1995). EPA promulgated final full approval of the State's operating permits program on September 12, 1995. See 60 FR 42296. These interim and final title V program approvals satisfy the upfront approval criteria of 40 CFR 63.91(d). Under 40 CFR 63.91(d)(2), once a state has satisfied the up-front approval criteria, it needs only to reference the previous demonstration and reaffirm that it still meets the criteria for any subsequent submittals for delegation of the section 112 standards. LDEQ has affirmed that it still meets the up-front approval criteria.

## V. What is being delegated?

By letter dated November 30, 2010, EPA received a request from Louisiana to update LDEQ's NSPS delegation and NESHAPs delegation. With certain exceptions noted in section VI below, LDEQ's request included NSPS in 40 CFR part 60, and NESHAPs in 40 CFR part 61 and 63, as amended between July 2, 2008 and July 1, 2009.

By letter dated May 28, 2013, EPA received a second request from Louisiana to update LDEQ's NSPS delegation. Louisiana's request only included NSPS in 40 CFR part 60, subpart OOOO, Standards of Performance for Crude Oil and Natural Gas Production, Transmission and Distribution, as promulgated by EPA on August 16, 2012 (77 FR 49490).

By letter dated June 21, 2013, EPA received a third request from Louisiana to update LDEQ's NSPS delegation and NESHAPs delegation. With certain exceptions noted in section VI below, Louisiana's request included NSPS in 40 CFR part 60, and NESHAPs in 40 CFR parts 61 and 63, as amended between July 2, 2009 and July 1, 2012.

By letter dated August 28, 2014, EPA received a fourth request from Louisiana to update LDEQ's NSPS delegation and NESHAPs delegation. With certain exceptions noted in section VI below, Louisiana's request included NSPS in 40 CFR part 60, and NESHAPs in 40 CFR part 61 and 63, as amended between July 2, 2012 and July 1, 2013.

## VI. What is not being delegated?

The following part 60, 61 and 63 authorities listed below are not delegated. All of the inquiries and requests concerning implementation and enforcement of the excluded standards in the State of Louisiana should be directed to the EPA Region 6 Office.

• 40 CFR part 60, subpart AAA (Standards of Performance for New Residential Wood Heaters);

• 40 CFR part 61, subpart B (National Emission Standards for Radon Emissions from Underground Uranium Mines);

• 40 CFR part 61, subpart H (National Emission Standards for Emissions of Radionuclides Other Than Radon From Department of Energy Facilities);

• 40 CFR part 61, subpart I (National Emission Standards for Radionuclide Emissions from Federal Facilities Other Than Nuclear Regulatory Commission Licensees and Not Covered by Subpart H);

• 40 CFR part 61, subpart K (National Emission Standards for Radionuclide Emissions from Elemental Phosphorus Plants);

• 40 CFR part 61, subpart Q (National Emission Standards for Radon Emissions from Department of Energy facilities);

• 40 CFR part 61, subpart R (National Emission Standards for Radon Emissions from Phosphogypsum Stacks);

• 40 CFR part 61, subpart T (National Emission Standards for Radon Emissions from the Disposal of Uranium Mill Tailings); and

• 40 CFR part 61, subpart W (National Emission Standards for Radon Emissions from Operating Mill Tailings).

In addition, EPA cannot delegate to a State any of the Category II Subpart A authorities set forth in 40 CFR 63.91(g)(2). These include the following provisions: § 63.6(g), Approval of Alternative Non-Opacity Standards; § 63.6(h)(9), Approval of Alternative Opacity Standards; § 63.7(e)(2)(ii) and (f), Approval of Major Alternatives to Test Methods; § 63.8(f), Approval of Major Alternatives to Monitoring; and § 63.10(f), Approval of Major Alternatives to Recordkeeping and Reporting. Also, some Part 63 standards have certain provisions that cannot be delegated to the States. Therefore, any Part 63 standard that EPA is delegating to LDEQ that provides that certain authorities cannot be delegated are retained by EPA and not delegated. Furthermore, no authorities are delegated that require rulemaking in the

Federal Register to implement, or where Federal overview is the only way to ensure national consistency in the application of the standards or requirements of CAA section 112. Finally, section 112(r), the accidental release program authority, is not being delegated by this approval.

In addition, this delegation to LDEQ to implement and enforce certain NSPS and NESHAPs does not extend to sources or activities located in Indian country, as defined in 18 U.S.C. 1151. Under this definition, EPA treats as reservations, trust lands validly set aside for the use of a Tribe even if the trust lands have not been formally designated as a reservation. Consistent with previous federal program approvals or delegations, EPA will continue to implement the NSPS and NESHAPs in Indian country because LDEQ has not submitted information to demonstrate authority over sources and activities located within the exterior boundaries of Indian reservations and other areas in Indian country.

## VII. How will applicability determinations be made?

In approving the NSPS delegation, LDEQ will obtain concurrence from EPA on any matter involving the interpretation of section 111 of the CAA or 40 CFR part 60 to the extent that application, implementation, administration, or enforcement of these provisions have not been covered by prior EPA determinations or guidance. See 47 FR 07665 (February 22, 1982).

In approving the NESHAPs delegation, LDEQ will obtain concurrence from EPA on any matter involving the interpretation of section 112 of the CAA or 40 CFR parts 61 and 63 to the extent that application, implementation, administration, or enforcement of these provisions have not been covered by prior EPA determinations or guidance.

## VIII. What authority does EPA have?

We retain the right, as provided by CAA section 111(c)(2), to enforce any applicable emission standard or requirement under section 111.

We retain the right, as provided by CAA section 112(l)(7), to enforce any applicable emission standard or requirement under section 112. EPA also has the authority to make certain decisions under the General Provisions (subpart A) of part 63. We are granting LDEQ some of these authorities, and retaining others, as explained in sections V and VI above. In addition, EPA may review and disapprove State determinations and subsequently require corrections. (See 40 CFR

63.91(g) and 65 FR 55810, 55823, September 14, 2000, as amended at 70 FR 59887, October 13, 2005; 72 FR 27443, May 16, 2007.)

Furthermore, we retain any authority in an individual emission standard that may not be delegated according to provisions of the standard. Also, listed in the footnotes of the part 63 delegation table at the end of this rule are the authorities that cannot be delegated to any State or local agency which we therefore retain.

Finally, we retain the authorities stated in the original delegation agreement. See 47 FR 07665 (February 22, 1982).

## IX. What information must LDEQ provide to EPA?

Under 40 CFR 60.4(b), all notifications under NSPS must be sent to both EPA and to LDEQ. Please send notifications and reports to Chief, Air/ Toxics Inspection and Coordination Branch at the EPA Region 6 office.

LDEQ must provide any additional compliance related information to EPA, Region 6, Office of Enforcement and Compliance Assurance, within 45 days of a request under 40 CFR 63.96(a). In receiving delegation for specific General Provisions authorities, LDEQ must submit to EPA Region 6, on a semi-annual basis, copies of determinations issued under these authorities. For 40 CFR parts 61 and 63 standards, these determinations include: Section 63.1, Applicability Determinations; Section 63.6(e), Operation and Maintenance Requirements—Responsibility for Determining Compliance; Section 63.6(f), Compliance with Non-Opacity Standards—Responsibility for Determining Compliance; Section 63.6(h), Compliance with Opacity and Visible Emissions Standards— Responsibility for Determining Compliance; Sections 63.7(c)(2)(i) and (d), Approval of Site-Specific Test Plans; Section 63.7(e)(2)(i), Approval of Minor Alternatives to Test Methods; Section 63.7(e)(2)(ii) and (f), Approval of Intermediate Alternatives to Test Methods; Section 63.7(e)(iii), Approval of Shorter Sampling Times and Volumes When Necessitated by Process Variables or Other Factors; Sections 63.7(e)(2)(iv), (h)(2), and (h)(3), Waiver of Performance Testing; Sections 63.8(c)(1) and (e)(1), Approval of Site-Specific Performance Evaluation (Monitoring) Test Plans; Section 63.8(f), Approval of Minor Alternatives to Monitoring; Section 63.8(f), Approval of Intermediate Alternatives to Monitoring; Section 63.9 and 63.10, Approval of Adjustments to Time Periods for Submitting Reports; Section 63.10(f), Approval of Minor

Alternatives to Recordkeeping and Reporting; Section 63.7(a)(4), Extension of Performance Test Deadline?

## X. What is EPA's oversight role?

EPA must oversee LDEQ's decisions to ensure the delegated authorities are being adequately implemented and enforced. We will integrate oversight of the delegated authorities into the existing mechanisms and resources for oversight currently in place. If, during oversight, we determine that LDEQ made decisions that decreased the stringency of the delegated standards, then LDEQ shall be required to take corrective actions and the source(s) affected by the decisions will be notified, as required by 40 CFR 63.91(g)(1)(ii). We will initiate withdrawal of the program or rule if the corrective actions taken are insufficient. Also see 47 FR 07665 (February 22, 1982).

## XI. Should sources submit notices to EPA or LDEQ?

All of the information required pursuant to the Federal NSPS and NESHAPs (40 CFR parts 60, 61 and 63) should be submitted by sources located outside of Indian country directly to the LDEQ at the following address: Louisiana Department of Environmental Quality, PO Box 4301, Baton Rouge, Louisiana 70821–4301. The LDEQ is the primary point of contact with respect to delegated NSPS and NESHAPs. Sources do not need to send a copy to EPA. EPA Region 6 waives the requirement that notifications and reports for delegated standards be submitted to EPA in addition to LDEQ, in accordance with 40 CFR 63.9(a)(4)(ii) and 63.10(a)(4)(ii). Also, see 51 FR 20648 (June 6, 1986). For those standards that are not delegated, sources must continue to submit all appropriate information to EPA.

## XII. How will unchanged authorities be delegated to LDEQ in the future?

In the future, LDEQ will only need to send a letter of request to update their delegation to EPA, Region 6, for those NSPS which they have adopted by reference. EPA will amend the relevant portions of the Code of Federal Regulations showing which NSPS standards have been delegated to LDEQ. Also, in the future, LDEQ will only need to send a letter of request for approval to EPA, Region 6, for those NESHAPs regulations that LDEQ has adopted by reference. The letter must reference the previous up-front approval demonstration and reaffirm that it still meets the up-front approval criteria. We will respond in writing to the request

stating that the request for delegation is either granted or denied. A **Federal Register** action will be published to inform the public and affected sources of the delegation, indicate where source notifications and reports should be sent, and to amend the relevant portions of the Code of Federal Regulations showing which NESHAP standards have been delegated to LDEQ.

## XIII. Final Action

The public was provided the opportunity to comment on the proposed approval of the program and mechanism for delegation of section 112 standards, as they apply to part 70 sources, on August 24, 1994, for the proposed interim approval of LDEQ's Title V operating permits program; and on April 7, 1995, for the proposed final approval of LDEQ's Title V operating permits program. In EPA's final full approval of Louisiana's Operating Permits Program (60 FR 47296), the EPA discussed the public comments on the proposed final delegation of the Title V operating permits program. In today's action, the public is given the opportunity to comment on the approval of LDEQ's request for delegation of authority to implement and enforce certain section 112 standards for all sources (both part 70 and non-part 70 sources) which have been adopted by reference into Louisiana's state regulations. However, the Agency views the approval of these requests as a noncontroversial action and anticipates no adverse comments. Therefore, EPA is publishing this rule without prior proposal. However, in the "Proposed Rules" section of today's **Federal Register** publication, EPA is publishing a separate document that will serve as the proposal to approve the program and NESHAPs delegation of authority described in this action if adverse comments are received. This action will be effective April 27, 2015 without further notice unless the Agency receives relevant adverse comments by March 26, 2015.

If EPA receives relevant adverse comments, we will publish a timely withdrawal in the **Federal Register** informing the public the rule will not take effect with respect to the updated NESHAPs delegation. We will address all public comments in a subsequent final rule based on the proposed rule. The EPA will not institute a second comment period on this action. Any parties interested in commenting must do so at this time. Please note that if we receive relevant adverse comment on an amendment, paragraph, or section of this rule and if that provision may be severed from the remainder of the rule,

we may adopt as final those provisions of the rule that are not the subject of a relevant adverse comment.

## XIV. Statutory and Executive Order Reviews

Under Executive Order 12866 (58 FR 51735, October 4, 1993), this action is not a "significant regulatory action" and therefore is not subject to review by the Office of Management and Budget. For this reason, this action is also not subject to Executive Order 13211, "Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use" (66 FR 28355, May 22, 2001). This action merely approves state law as meeting Federal requirements and imposes no additional requirements beyond those imposed by state law. Accordingly, the Administrator certifies that this rule will not have a significant economic impact on a substantial number of small entities under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*). Because this rule approves pre-existing requirements under state law and does not impose any additional enforceable duty beyond that required by state law, it does not contain any unfunded mandate or significantly or uniquely affect small governments, as described in the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4).

In addition, this rule does not have tribal implications as specified by Executive Order 13175 (65 FR 67249, November 9, 2000), because the delegation is not approved to apply in Indian country located in the State, and the EPA notes that it will not impose substantial direct costs on tribal governments or preempt tribal law. This action also does not have Federalism implications because it does not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government, as specified in Executive Order 13132 (64 FR 43255, August 10, 1999). This action merely approves a state request to receive delegation of certain Federal standards, and does not alter the relationship or the distribution of power and responsibilities established in the Clean Air Act. This rule also is not subject to Executive Order 13045 "Protection of Children from Environmental Health Risks and Safety Risks" (62 FR 19885, April 23, 1997), because it is not economically significant.

In reviewing delegation submissions, EPA's role is to approve submissions, provided that they meet the criteria of the Clean Air Act. In this context, in the

absence of a prior existing requirement for the State to use voluntary consensus standards (VCS), EPA has no authority to disapprove a delegation submission for failure to use VCS. It would thus be inconsistent with applicable law for EPA to use VCS in place of a delegation submission that otherwise satisfies the provisions of the Clean Air Act. Thus, the requirements of section 12(d) of the National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) do not apply. This rule does not impose an information collection burden under the provisions of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 et seq.).

The Congressional Review Act, 5 U.S.C. 801 et seq., as added by the Small Business Regulatory Enforcement Fairness Act of 1996, generally provides that before a rule may take effect, the agency promulgating the rule must submit a rule report, which includes a copy of the rule, to each House of the Congress and to the Comptroller General of the United States. EPA will submit a report containing this rule and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States prior to publication of the rule in the **Federal Register**. A major rule cannot take effect until 60 days after it is published in the **Federal Register**. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2).

Under section 307(b)(1) of the Clean Air Act, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by *April 27, 2015*.

Filing a petition for reconsideration by the Administrator of this final rule does not affect the finality of this rule for the purposes of judicial review nor does it extend the time within which a petition for judicial review may be filed, and shall not postpone the effectiveness of such rule or action. This action may not be challenged later in proceedings to enforce its requirements. (See section 307(b)(2)).

## List of Subjects

### 40 CFR Part 60

Environmental protection, Administrative practice and procedure, Air pollution control, Intergovernmental relations, Reporting and recordkeeping requirements.

### 40 CFR Part 61

Environmental protection, Administrative practice and procedure, Air pollution control, Arsenic, Benzene, Beryllium, Hazardous substances, Mercury, Intergovernmental relations, Reporting and recordkeeping requirements, Vinyl chloride.

### 40 CFR Part 63

Environmental protection, Administrative practice and procedure, Air pollution control, Hazardous substances, Intergovernmental relations, Reporting and recordkeeping requirements.

Dated: January 28, 2015.

**Samuel Coleman,**

*Acting Regional Administrator, Region 6.*

For the reasons stated in the preamble, 40 CFR parts 60, 61, and 63 are amended as follows:

## PART 60—STANDARDS OF PERFORMANCE FOR NEW STATIONARY SOURCES

■ 1. The authority citation for part 60 continues to read as follows:

**Authority:** 42 U.S.C. 7401 et seq.

### Subpart A—General Provisions

■ 2. Section 60.4 is amended by revising paragraphs (b)(T) and (e)(2) to read as follows:

### § 60.4   Address.

\*     \*     \*     \*     \*

(b) \* \* \*

(T) State of Louisiana: Louisiana Department of Environmental Quality, P.O. Box 4301, Baton Rouge, Louisiana 70821–4301.

**Note:** For a list of delegated standards for Louisiana (excluding Indian country), see paragraph (e)(2) of this section.

\*     \*     \*     \*     \*

(e) \* \* \*

(2) *Louisiana*. The Louisiana Department of Environmental Quality has been delegated all part 60 standards promulgated by EPA, except subpart AAA—Standards of Performance for New Residential Wood Heaters, as amended in the **Federal Register** through July 1, 2013.

DELEGATION STATUS FOR PART 60 STANDARDS—STATE OF LOUISIANA

[Excluding Indian Country]

| Subpart | Source category | LDEQ [1] |
|---|---|---|
| A | General Provisions | Yes |
| Ce | Emission Guidelines and Compliance Times for Hospital/Medical/Infectious Waste Incinerators | Yes |
| D | Fossil Fueled Steam Generators (>250 MM BTU/hr) | Yes |
| Da | Electric Utility Steam Generating Units (>250 MM BTU/hr) | Yes |
| Db | Industrial-Commercial-Institutional Steam Generating Units (100 to 250 MM BTU/hr) | Yes |
| Dc | Industrial-Commercial-Institutional Small Steam Generating Units (10 to 100 MM BTU/hr) | Yes |
| E | Incinerators (>50 tons per day) | Yes |
| Ea | Municipal Waste Combustors | Yes |
| Eb | Large Municipal Waste Combustors | Yes |
| Ec | Hospital/Medical/Infectious Waste Incinerators | Yes |
| F | Portland Cement Plants | Yes |
| G | Nitric Acid Plants | Yes |
| Ga | Nitric Acid Plants (after October 14, 2011) | Yes |
| H | Sulfuric Acid Plants | Yes |
| I | Hot Mix Asphalt Facilities | Yes |
| J | Petroleum Refineries | Yes |
| Ja | Petroleum Refineries (After May 14, 2007) | Yes |
| K | Storage Vessels for Petroleum Liquids (After 6/11/73 & Before 5/19/78) | Yes |
| Ka | Storage Vessels for Petroleum Liquids (After 6/11/73 & Before 5/19/78) | Yes |
| Kb | Volatile Organic Liquid Storage Vessels (Including Petroleum Liquid Stg/Vessels) After 7/23/84 | Yes |
| L | Secondary Lead Smelters Yes | Yes |
| M | Secondary Brass and Bronze Production Plants | Yes |
| N | Primary Emissions from Basic Oxygen Process Furnaces (Construction Commenced After June 11, 1973) | Yes |

DELEGATION STATUS FOR PART 60 STANDARDS—STATE OF LOUISIANA—Continued

[Excluding Indian Country]

| Subpart | Source category | LDEQ [1] |
|---|---|---|
| Na | Secondary Emissions from Basic Oxygen Process Steelmaking Facilities Construction is Commenced After January 20, 1983. | Yes |
| O | Sewage Treatment Plants | Yes |
| P | Primary Copper Smelters | Yes |
| Q | Primary Zinc Smelters | Yes |
| R | Primary Lead Smelters | Yes |
| S | Primary Aluminum Reduction Plants | Yes |
| T | Phosphate Fertilizer Industry: Wet Process Phosphoric Plants | Yes |
| U | Phosphate Fertilizer Industry: Superphosphoric Acid Plants | Yes |
| V | Phosphate Fertilizer Industry: Diammonium Phosphate Plants | Yes |
| W | Phosphate Fertilizer Industry: Triple Superphosphate Plants | Yes |
| X | Phosphate Fertilizer Industry: Granular Triple Superphosphate Storage Facilities | Yes |
| Y | Coal Preparation Plants | Yes |
| Z | Ferroalloy Production Facilities | Yes |
| AA | Steel Plants: Electric Arc Furnaces After 10/21/74 & On or Before 8/17/83 | Yes |
| AAa | Steel Plants: Electric Arc Furnaces & Argon-Oxygen Decarburization Vessels After 8/07/83 | Yes |
| BB | Kraft Pulp Mills | Yes |
| CC | Glass Manufacturing Plants | Yes |
| DD | Grain Elevators | Yes |
| EE | Surface Coating of Metal Furniture | Yes |
| GG | Stationary Gas Turbines | Yes |
| HH | Lime Manufacturing Plants | Yes |
| KK | Lead-Acid Battery Manufacturing Plants | Yes |
| LL | Metallic Mineral Processing Plants | Yes |
| MM | Automobile & Light Duty Truck Surface Coating Operations | Yes |
| NN | Phosphate Manufacturing Plants | Yes |
| PP | Ammonium Sulfate Manufacture | Yes |
| QQ | Graphic Arts Industry: Publication Rotogravure Printing | Yes |
| RR | Pressure Sensitive Tape and Label Surface Coating Operations | Yes |
| SS | Industrial Surface Coating: Large Appliances | Yes |
| TT | Metal Coil Surface Coating | Yes |
| UU | Asphalt Processing and Asphalt Roofing Manufacture | Yes |
| VV | VOC Equipment Leaks in the SOCMI Industry | Yes |
| VVa | VOC Equipment Leaks in the SOCMI Industry (After November 7, 2006) | Yes |
| XX | Bulk Gasoline Terminals | Yes |
| AAA | New Residential Wood Heaters | No |
| BBB | Rubber Tire Manufacturing Industry | Yes |
| DDD | Volatile Organic Compound (VOC) Emissions from the Polymer Manufacturing Industry | Yes |
| FFF | Flexible Vinyl and Urethane Coating and Printing | Yes |
| GGG | VOC Equipment Leaks in Petroleum Refineries | Yes |
| HHH | Synthetic Fiber Production | Yes |
| III | VOC Emissions from the SOCMI Air Oxidation Unit Processes | Yes |
| JJJ | Petroleum Dry Cleaners | Yes |
| KKK | VOC Equipment Leaks From Onshore Natural Gas Processing Plants | Yes |
| LLL | Onshore Natural Gas Processing: $SO_2$ Emissions | Yes |
| NNN | VOC Emissions from SOCMI Distillation Operations | Yes |
| OOO | Nonmetallic Mineral Processing Plants | Yes |
| PPP | Wool Fiberglass Insulation Manufacturing Plants | Yes |
| QQQ | VOC Emissions From Petroleum Refinery Wastewater Systems | Yes |
| RRR | VOC Emissions from SOCMI Reactor Processes | Yes |
| SSS | Magnetic Tape Coating Operations | Yes |
| TTT | Industrial Surface Coating: Plastic Parts for Business Machines | Yes |
| UUU | Calciners and Dryers in Mineral Industries | Yes |
| VVV | Polymeric Coating of Supporting Substrates Facilities | Yes |
| WWW | Municipal Solid Waste Landfills | Yes |
| AAAA | Small Municipal Waste Combustion Units (Construction is Commenced After 8/30/99 or Modification/Re-construction is Commenced After 6/06/2001). | Yes |
| CCCC | Commercial & Industrial Solid Waste Incineration Units (Construction is Commenced After 11/30/1999 or Modification/Reconstruction is Commenced on or After 6/01/2001). | Yes |
| DDDD | Emission Guidelines & Compliance Times for Commercial & Industrial Solid Waste Incineration Units (Commenced Construction On or Before 11/30/1999). | Yes |
| EEEE | Other Solid Waste Incineration Units (Constructed after 12/09/2004 or Modification/Reconstruction is com-menced on or after 06/16/2004). | Yes |
| IIII | Stationary Compression Ignition Internal Combustion Engines | Yes |
| JJJJ | Stationary Spark Ignition Internal Combustion Engines | Yes |
| KKKK | Stationary Combustion Turbines (Construction Commenced After 02/18/2005) | Yes |
| LLLL | New Sewage Sludge Incineration Units | Yes |
| MMMM | Emission Guidelines and Compliance Times for Existing Sewage Sludge Incineration Units | Yes |
| OOOO | Crude Oil and Natural Gas Production, Transmission and Distribution | Yes |

[1] The Louisiana Department of Environmental Quality (LDEQ) has been delegated all Part 60 standards promulgated by EPA, except subpart AAA—Standards of Performance for New Residential Wood Heaters—as amended in the **Federal Register** through July 1, 2013.

*   *   *   *   *

## PART 61—NATIONAL EMISSION STANDARDS FOR HAZARDOUS AIR POLLUTANTS

■ 3. The authority citation for part 61 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

## Subpart A—General Provisions

■ 4. Section 61.04 is amended by revising paragraph (c)(6)(ii) to read as follows:

**§61.04  Address.**

*   *   *   *   *

(c) * * *

(6) * * *

(ii) *Louisiana.* The Louisiana Department of Environmental Quality (LDEQ) has been delegated the following part 61 standards promulgated by EPA, as amended in the **Federal Register** through July 1, 2013. The (X) symbol is used to indicate each subpart that has been delegated.

DELEGATION STATUS FOR PART 61 STANDARDS—STATE OF LOUISIANA

[Excluding Indian Country]

| Subpart | Source category | LDEQ [1] |
|---|---|---|
| A | General Provisions | X |
| B | Radon Emissions From Underground Uranium Mines | |
| C | Beryllium | X |
| D | Beryllium Rocket Motor Firing | X |
| E | Mercury | X |
| F | Vinyl Chloride | X |
| G | (Reserved) | |
| H | Emissions of Radionuclides Other Than Radon From Department of Energy Facilities | |
| I | Radionuclide Emissions From Federal Facilities Other Than Nuclear Regulatory Commission Licensees and Not Covered by Subpart H. | |
| J | Equipment Leaks (Fugitive Emission Sources) of Benzene | X |
| K | Radionuclide Emissions From Elemental Phosphorus Plants | |
| L | Benzene Emissions From Coke By-Product Recovery Plants | X |
| M | Asbestos | X |
| N | Inorganic Arsenic Emissions From Glass Manufacturing Plants | X |
| O | Inorganic Arsenic Emissions From Primary Copper Smelters | X |
| P | Inorganic Arsenic Emissions From Arsenic Trioxide and Metallic Arsenic Production Facilities | X |
| Q | Radon Emissions From Department of Energy Facilities | |
| R | Radon Emissions From Phosphogypsum Stacks | |
| S | (Reserved) | |
| T | Radon Emissions From the Disposal of Uranium Mill Tailings | |
| U | (Reserved) | |
| V | Equipment Leaks (Fugitives Emission Sources) | X |
| W | Radon Emissions From Operating Mill Tailings | |
| X | (Reserved) | |
| Y | Benzene Emissions From Benzene Storage Vessels | X |
| Z–AA | (Reserved) | |
| BB | Benzene Emissions From Benzene Transfer Operations | X |
| CC–EE | (Reserved) | |
| FF | Benzene Waste Operations | X |

[1] Program delegated to Louisiana Department of Environmental Quality (LDEQ).

*   *   *   *   *

## PART 63—NATIONAL EMISSION STANDARDS FOR HAZARDOUS AIR POLLUTANTS FOR SOURCE CATEGORIES

■ 5. The authority citation for part 63 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

## Subpart E—Approval of State Programs and Delegation of Federal Authorities

■ 6. Section 63.99 is amended by revising paragraph (a)(19)(i) to read as follows:

**§63.99  Delegated Federal authorities.**

(a) * * *

(19) * * *

(i) The following table lists the specific part 63 standards that have been delegated unchanged to the Louisiana Department of Environmental Quality for all sources. The "X" symbol is used to indicate each subpart that has been delegated. The delegations are subject to all of the conditions and limitations set forth in Federal law, regulations, policy, guidance, and determinations. Some authorities cannot be delegated and are retained by EPA. These include certain General Provisions authorities and specific parts of some standards. Any amendments made to these rules after July 1, 2013, are not delegated.

DELEGATION STATUS FOR PART 63 STANDARDS—STATE OF LOUISIANA

[Excluding Indian Country]

| Subpart | Source category | LDEQ [1] [2] |
|---|---|---|
| A | General Provisions | X |
| D | Early Reductions | X |
| F | Hazardous Organic NESHAP (HON)—Synthetic Organic Chemical Manufacturing Industry (SOCMI) | X |
| G | HON—SOCMI Process Vents, Storage Vessels, Transfer Operations and Wastewater | X |

DELEGATION STATUS FOR PART 63 STANDARDS—STATE OF LOUISIANA—Continued

[Excluding Indian Country]

| Subpart | Source category | LDEQ [1] [2] |
|---|---|---|
| H | HON—Equipment Leaks | X |
| I | HON—Certain Processes Negotiated Equipment Leak Regulation | X |
| J | Polyvinyl Chloride and Copolymers Production | (3) |
| K | (Reserved) | |
| L | Coke Oven Batteries | X |
| M | Perchloroethylene Dry Cleaning | X |
| N | Chromium Electroplating and Chromium Anodizing Tanks | X |
| O | Ethylene Oxide Sterilizers | X |
| P | (Reserved) | |
| Q | Industrial Process Cooling Towers | X |
| R | Gasoline Distribution | X |
| S | Pulp and Paper Industry | X |
| T | Halogenated Solvent Cleaning | X |
| U | Group I Polymers and Resins | X |
| V | (Reserved) | |
| W | Epoxy Resins Production and Non-Nylon Polyamides Production | X |
| X | Secondary Lead Smelting | X |
| Y | Marine Tank Vessel Loading | X |
| Z | (Reserved) | |
| AA | Phosphoric Acid Manufacturing Plants | X |
| BB | Phosphate Fertilizers Production Plants | X |
| CC | Petroleum Refineries | X |
| DD | Off-Site Waste and Recovery Operations | X |
| EE | Magnetic Tape Manufacturing | X |
| FF | (Reserved) | |
| GG | Aerospace Manufacturing and Rework Facilities | X |
| HH | Oil and Natural Gas Production Facilities | X |
| II | Shipbuilding and Ship Repair Facilities | X |
| JJ | Wood Furniture Manufacturing Operations | X |
| KK | Printing and Publishing Industry | X |
| LL | Primary Aluminum Reduction Plants | X |
| MM | Chemical Recovery Combustion Sources at Kraft, Soda, Sulfide, and Stand-Alone Semichemical Pulp Mills. | X |
| NN | (Reserved) | |
| OO | Tanks-Level 1 | X |
| PP | Containers | X |
| QQ | Surface Impoundments | X |
| RR | Individual Drain Systems | X |
| SS | Closed Vent Systems, Control Devices, Recovery Devices and Routing to a Fuel Gas System or a Process. | X |
| TT | Equipment Leaks—Control Level 1 | X |
| UU | Equipment Leaks—Control Level 2 Standards | X |
| VV | Oil—Water Separators and Organic—Water Separators | X |
| WW | Storage Vessels (Tanks)—Control Level 2 | X |
| XX | Ethylene Manufacturing Process Units Heat Exchange Systems and Waste Operations | X |
| YY | Generic Maximum Achievable Control Technology Standards | X |
| ZZ–BBB | (Reserved) | |
| CCC | Steel Pickling—HCl Process Facilities and Hydrochloric Acid Regeneration | X |
| DDD | Mineral Wool Production | X |
| EEE | Hazardous Waste Combustors | X |
| FFF | (Reserved) | |
| GGG | Pharmaceuticals Production | X |
| HHH | Natural Gas Transmission and Storage Facilities | X |
| III | Flexible Polyurethane Foam Production | X |
| JJJ | Group IV Polymers and Resins | X |
| KKK | (Reserved) | |
| LLL | Portland Cement Manufacturing | X |
| MMM | Pesticide Active Ingredient Production | X |
| NNN | Wool Fiberglass Manufacturing | X |
| OOO | Amino/Phenolic Resins | X |
| PPP | Polyether Polyols Production | X |
| QQQ | Primary Copper Smelting | X |
| RRR | Secondary Aluminum Production | X |
| SSS | (Reserved) | |
| TTT | Primary Lead Smelting | X |
| UUU | Petroleum Refineries—Catalytic Cracking Units, Catalytic Reforming Units and Sulfur Recovery Plants | X |
| VVV | Publicly Owned Treatment Works (POTW) | X |
| WWW | (Reserved) | |
| XXX | Ferroalloys Production: Ferromanganese and Silicomanganese | X |
| AAAA | Municipal Solid Waste Landfills | X |
| CCCC | Nutritional Yeast Manufacturing | X |

### Delegation Status for Part 63 Standards—State of Louisiana—Continued
[Excluding Indian Country]

| Subpart | Source category | LDEQ [1][2] |
|---|---|---|
| DDDD ...................... | Plywood and Composite Wood Products .............................................................................. | [4] X |
| EEEE ...................... | °Organic Liquids Distribution ............................................................................................... | X |
| FFFF ...................... | Misc. Organic Chemical Production and Processes (MON) .................................................. | X |
| GGGG ...................... | Solvent Extraction for Vegetable Oil Production .................................................................. | X |
| HHHH ...................... | Wet Formed Fiberglass Mat Production ............................................................................... | X |
| IIII ...................... | Auto & Light Duty Truck (Surface Coating) ......................................................................... | X |
| JJJJ ...................... | Paper and other Web (Surface Coating) .............................................................................. | X |
| KKKK ...................... | Metal Can (Surface Coating) ............................................................................................... | X |
| MMMM ...................... | Misc. Metal Parts and Products (Surface Coating) .............................................................. | X |
| NNNN ...................... | Surface Coating of Large Appliances ................................................................................... | X |
| OOOO ...................... | Fabric Printing Coating and Dyeing ..................................................................................... | X |
| PPPP ...................... | Plastic Parts (Surface Coating) ........................................................................................... | X |
| QQQQ ...................... | Surface Coating of Wood Building Products ......................................................................... | X |
| RRRR ...................... | Surface Coating of Metal Furniture ...................................................................................... | X |
| SSSS ...................... | Surface Coating for Metal Coil ............................................................................................. | X |
| TTTT ...................... | Leather Finishing Operations ............................................................................................... | X |
| UUUU ...................... | Cellulose Production Manufacture ........................................................................................ | X |
| VVVV ...................... | Boat Manufacturing .............................................................................................................. | X |
| WWWW ...................... | Reinforced Plastic Composites Production ........................................................................... | X |
| XXXX ...................... | Rubber Tire Manufacturing ................................................................................................... | X |
| YYYY ...................... | Combustion Turbines ............................................................................................................ | X |
| ZZZZ ...................... | Reciprocating Internal Combustion Engines (RICE) ............................................................ | X |
| AAAAA ...................... | Lime Manufacturing Plants ................................................................................................... | X |
| BBBBB ...................... | Semiconductor Manufacturing .............................................................................................. | X |
| CCCCC ...................... | Coke Ovens: Pushing, Quenching and Battery Stacks ........................................................ | X |
| DDDDD ...................... | Industrial/Commercial/Institutional Boilers and Process Heaters ........................................ | [5] X |
| EEEEE ...................... | Iron Foundries ...................................................................................................................... | X |
| FFFFF ...................... | Integrated Iron and Steel ..................................................................................................... | X |
| GGGGG ...................... | Site Remediation .................................................................................................................. | X |
| HHHHH ...................... | Miscellaneous Coating Manufacturing ................................................................................. | X |
| IIIII ...................... | Mercury Cell Chlor-Alkali Plants .......................................................................................... | X |
| JJJJJ ...................... | Brick and Structural Clay Products Manufacturing .............................................................. | ([6]) |
| KKKKK ...................... | Clay Ceramics Manufacturing .............................................................................................. | ([6]) |
| LLLLL ...................... | Asphalt Roofing and Processing .......................................................................................... | X |
| MMMMM ...................... | Flexible Polyurethane Foam Fabrication Operation .............................................................. | X |
| NNNNN ...................... | Hydrochloric Acid Production, Fumed Silica Production ....................................................... | X |
| OOOOO ...................... | (Reserved) ............................................................................................................................ | .................. |
| PPPPP ...................... | Engine Test Facilities ........................................................................................................... | X |
| QQQQQ ...................... | Friction Products Manufacturing .......................................................................................... | X |
| RRRRR ...................... | Taconite Iron Ore Processing ............................................................................................... | X |
| SSSSS ...................... | Refractory Products Manufacture ......................................................................................... | X |
| TTTTT ...................... | Primary Magnesium Refining ............................................................................................... | X |
| UUUUU ...................... | Coal and Oil-Fired Electric Utility Steam Generating Units .................................................. | [7] X |
| VVVVV ...................... | (Reserved) ............................................................................................................................ | .................. |
| WWWWW ...................... | Hospital Ethylene Oxide Sterilizers ...................................................................................... | X |
| XXXXX ...................... | (Reserved) ............................................................................................................................ | .................. |
| YYYYY ...................... | Electric Arc Furnace Steelmaking Area Sources ................................................................. | X |
| ZZZZZ ...................... | Iron and Steel Foundries Area Sources ............................................................................... | X |
| AAAAAA ...................... | (Reserved) ............................................................................................................................ | .................. |
| BBBBBB ...................... | Gasoline Distribution Bulk Terminals, Bulk Plants, and Pipeline Facilities ......................... | X |
| CCCCCC ...................... | Gasoline Dispensing Facilities ............................................................................................. | X |
| DDDDDD ...................... | Polyvinyl Chloride and Copolymers Production Area Sources .............................................. | X |
| EEEEEE ...................... | Primary Copper Smelting Area Sources ............................................................................... | X |
| FFFFFF ...................... | Secondary Copper Smelting Area Sources .......................................................................... | X |
| GGGGGG ...................... | Primary Nonferrous Metals Area Source: Zinc, Cadmium, and Beryllium ........................... | X |
| HHHHHH ...................... | Paint Stripping and Miscellaneous Surface Coating Operations at Area Sources ............... | X |
| IIIIII ...................... | (Reserved) ............................................................................................................................ | .................. |
| JJJJJJ ...................... | Industrial, Commercial, and Institutional Boilers Area Sources ........................................... | X |
| KKKKKK ...................... | (Reserved) ............................................................................................................................ | .................. |
| LLLLLL ...................... | Acrylic and Modacrylic Fibers Production Area Sources ...................................................... | X |
| MMMMMM ...................... | Carbon Black Production Area Sources ................................................................................ | X |
| NNNNNN ...................... | Chemical Manufacturing Area Sources: Chromium Compounds .......................................... | X |
| OOOOOO ...................... | Flexible Polyurethane Foam Production and Fabrication Area Sources ............................... | X |
| PPPPPP ...................... | Lead Acid Battery Manufacturing Area Sources ................................................................... | X |
| QQQQQQ ...................... | Wood Preserving Area Sources ........................................................................................... | X |
| RRRRRR ...................... | Clay Ceramics Manufacturing Area Sources ....................................................................... | X |
| SSSSSS ...................... | Glass Manufacturing Area Sources ...................................................................................... | X |
| TTTTTT ...................... | Secondary Nonferrous Metals Processing Area Sources ..................................................... | X |
| UUUUUU ...................... | (Reserved) ............................................................................................................................ | .................. |
| VVVVVV ...................... | Chemical Manufacturing Area Sources ................................................................................ | X |
| WWWWWW ...................... | Plating and Polishing Operations Area Sources .................................................................. | X |

DELEGATION STATUS FOR PART 63 STANDARDS—STATE OF LOUISIANA—Continued

[Excluding Indian Country]

| Subpart | Source category | LDEQ [1] [2] |
|---|---|---|
| XXXXXX .................. | Metal Fabrication and Finishing Area Sources ........................................................................... | X |
| YYYYYY .................. | Ferroalloys Production Facilities Area Sources ........................................................................... | X |
| ZZZZZZ .................. | Aluminum, Copper, and Other Nonferrous Foundries Area Sources ........................................... | X |
| AAAAAAA ............... | Asphalt Processing and Asphalt Roofing Manufacturing Area Sources ...................................... | X |
| BBBBBBB ............... | Chemical Preparation Industry Area Sources ............................................................................. | X |
| CCCCCCC ............... | Paints and Allied Products Manufacturing Area Sources ........................................................... | X |
| DDDDDDD ............... | Prepared Feeds Areas Sources .................................................................................................. | X |
| EEEEEEE ................ | Gold Mine Ore Processing and Production Area Sources ........................................................... | X |
| FFFFFFF– GGGGGGG. | (Reserved) .................................................................................................................................. | .............. |
| HHHHHHH .............. | Polyvinyl Chloride and Copolymers Production Major Sources .................................................. | X |

[1] Authorities which may not be delegated include: § 63.6(g), Approval of Alternative Non-Opacity Emission Standards; § 63.6(h)(9), Approval of Alternative Opacity Standards; § 63.7(e)(2)(ii) and (f), Approval of Major Alternatives to Test Methods; § 63.8(f), Approval of Major Alternatives to Monitoring; § 63.10(f), Approval of Major Alternatives to Recordkeeping and Reporting; and all authorities identified in the subparts (*e.g.,* under "Delegation of Authority") that cannot be delegated.

[2] Program delegated to Louisiana Department of Environmental Quality (LDEQ) for standards promulgated by EPA, as amended in the **Federal Register** through July 1, 2013.

[3] The LDEQ was previously delegated this subpart on March 26, 2004 (69 FR 15687). The LDEQ has adopted the subpart unchanged and applied for delegation of the standard. The subpart was vacated and remanded to EPA by the United States Court of Appeals for the District of Columbia Circuit. See, *Mossville Environmental Action Network* v. *EPA,* 370 F. 3d 1232 (D.C. Cir. 2004). Because of the D.C. Court's holding this subpart is not delegated to LDEQ at this time.

[4] This subpart was issued a partial vacatur on October 29, 2007 (72 FR 61060) by the United States Court of Appeals for the District of Columbia Circuit.

[5] Final rule. See 78 FR 7138 (January 31, 2013).

[6] This subpart was vacated and remanded to EPA by the United States Court of Appeals for the District of Columbia Circuit on March 13, 2007. See, *Sierra Club* v. *EPA,* 479 F. 3d 875 (D.C. Cir. 2007). Because of the D.C. Court's holding this subpart is not delegated to LDEQ at this time.

[7] Initial Final Rule on February 16, 2012 (77 FR 9304). Final on reconsideration of certain new source issues on April 24, 2013 (78 FR 24073). Portions of this subpart are in proposed reconsideration pending final action on June 25, 2013 (78 FR 38001).

\*    \*    \*    \*    \*

[FR Doc. 2015–03730 Filed 2–23–15; 8:45 am]

**BILLING CODE 6560–50–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Parts 61 and 63**

**[EPA–R06–OAR–2008–0063; FRL–9923–22– Region 6]**

**National Emission Standards for Hazardous Air Pollutants; Delegation of Authority to Oklahoma**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Direct final rule; delegation of authority.

**SUMMARY:** The Oklahoma Department of Environmental Quality (ODEQ) has submitted updated regulations for receiving delegation of Environmental Protection Agency (EPA) authority for implementation and enforcement of National Emission Standards for Hazardous Air Pollutants (NESHAPs) for all sources (both part 70 and non-part 70 sources). The delegation of authority under this action does not apply to sources located in Indian Country. EPA is taking direct final action to approve the delegation of certain NESHAPs to ODEQ.

**DATES:** This rule is effective on April 27, 2015 without further notice, unless EPA receives relevant adverse comment by March 26, 2015. If EPA receives such comment, EPA will publish a timely withdrawal in the **Federal Register** informing the public that the updated NESHAPs delegation will not take effect.

**ADDRESSES:** Submit your comments, identified by Docket ID No. EPA–R06– OAR–2008–0063, by one of the following methods:

• *www.regulations.gov.* Follow the on-line instructions.

• Email: Mr. Rick Barrett at *barrett.richard@epa.gov.* Please also send a copy by email to the person listed in the **FOR FURTHER INFORMATION CONTACT** section below.

• Mail or delivery: Mr. Rick Barrett, Air Permits Section (6PD–R), Environmental Protection Agency, 1445 Ross Avenue, Suite 1200, Dallas, Texas 75202–2733.

*Instructions:* Direct your comments to Docket No. EPA–R06–OAR–2008–0063. EPA's policy is that all comments received will be included in the public docket without change and may be made available online at *http:// www.regulations.gov,* including any personal information provided, unless the comment includes information claimed to be Confidential Business Information (CBI) or other information

whose disclosure is restricted by statute. Do not submit information through *http://www.regulations.gov* or email, if you believe that it is CBI or otherwise protected from disclosure. The *http:// www.regulations.gov* Web site is an "anonymous access" system, which means EPA will not know your identity or contact information unless you provide it in the body of your comment. If you send an email comment directly to EPA without going through *http:// www.regulations.gov,* your email address will be automatically captured and included as part of the comment that is placed in the public docket and made available on the Internet. If you submit an electronic comment, EPA recommends that you include your name and other contact information in the body of your comment along with any disk or CD–ROM submitted. If EPA cannot read your comment due to technical difficulties and cannot contact you for clarification, EPA may not be able to consider your comment. Electronic files should avoid the use of special characters and any form of encryption and be free of any defects or viruses. For additional information about EPA's public docket, visit the EPA Docket Center homepage at *http:// www.epa.gov/epahome/dockets.htm.*

*Docket:* The index to the docket for this action is available electronically at *www.regulations.gov* and in hard copy

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing Statutory and Regulatory Addendum on all registered counsel through the Court's electronic filing system (CM/ECF).


Dated: December 20, 2024

*/s/ Alexander M. Purpuro*
ALEXANDER M. PURPURO